# Exhibit H:

# Letter from Members of Congress to Commissioner Werfel

DARRELL E. ISSA, CALIFORNIA
CHAIRMAN

JOHN L. MICA, FLORIDA
MICHAEL R. TURNER, OHIO
JOHN J. DUNCAN, JR., TENNESSEE
PATRICK T. McHENRY, NORTH CAROLINA
JIM JORDAN, OHIO
JASON CHAFFETZ, UTAH
TIM WALBERG, MICHIGAN
JAMES LANKFORD, OKLAHOMA
JUSTIN AMASH, MICHIGAN
PAUL A. GOSAR, ARIZONA
PATRICK MEEHAN, PENNSYLVANIA
SCOTT DesJARLAIS, TENNESSEE
TREY GOWDY, SOUTH CAROLINA
BLAKE FARENTHOLD, TEXAS
DOC HASTINGS, WASHINGTON
CYNTHIA M. LUMMIS, WYOMING
ROB WOODALL, GEORGIA
THOMAS MASSIE, KENTUCKY
DOUG COLLINS, GEORGIA
MARK MEADOWS, NORTH CAROLINA
KERRY L. BENTIVOLIO, MICHIGAN
RON DeSANTIS, FLORIDA

LAWRENCE J. BRADY
STAFF DIRECTOR

ONE HUNDRED THIRTEENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5074
FACSIMILE  (202) 225–3974
MINORITY  (202) 225–5051

http://oversight.house.gov

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

CAROLYN B. MALONEY, NEW YORK
ELEANOR HOLMES NORTON,
    DISTRICT OF COLUMBIA
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
STEPHEN F. LYNCH, MASSACHUSETTS
JIM COOPER, TENNESSEE
GERALD E. CONNOLLY, VIRGINIA
JACKIE SPEIER, CALIFORNIA
MATTHEW A. CARTWRIGHT, PENNSYLVANIA
MARK POCAN, WISCONSIN
L. TAMMY DUCKWORTH, ILLINOIS
ROBIN L. KELLY, ILLINOIS
DANNY K. DAVIS, ILLINOIS
PETER WELCH, VERMONT
TONY CARDENAS, CALIFORNIA
STEVEN A. HORSFORD, NEVADA
MICHELLE LUJAN GRISHAM, NEW MEXICO

July 17, 2013

The Honorable Daniel Werfel
Principal Deputy Commissioner
Internal Revenue Service
1111 Constitution Avenue NW
Washington, DC 20224

Dear Mr. Werfel:

    The Committee on Oversight and Government Reform and Committee on Ways and Means are continuing to investigate the Internal Revenue Service's (IRS) inappropriate treatment of certain applicants for tax-exempt status. As a part of this ongoing investigation, the Committees have learned that the IRS Chief Counsel's office in Washington, D.C. has been closely involved in some of the applications. Its involvement and demands for information about political activity during the 2010 election cycle appears to have caused systematic delays in the processing of Tea Party applications. To better understand the IRS Chief Counsel's office role in this matter, we write to prioritize our outstanding document request as well as to request additional documents.

    During recent interviews of IRS employees, including Carter Hull, a tax law specialist and self-described 501(c)(4) expert with 48 years of experience at the IRS, the Committees were informed that Tea Party applications under his review were, in an unusual turn of events, referred to the Chief Counsel's office for further review at the direction of Lois Lerner, the head of the Exempt Organizations division. The IRS Chief Counsel is one of two politically appointed officials in the agency.[1]

    In April 2010, Mr. Hull was instructed to scrutinize certain Tea Party applications by one of his supervisors in Washington.[2] According to Mr. Hull, these applications were used as "test" cases and assigned to him because of his expertise and because IRS leadership in Washington was "trying to find out how [the IRS] should approach these organizations, and how [the IRS] should handle them."[3] In the course of working on these applications, Mr. Hull requested additional information from the taxpayers through what is termed a development letter. Once he

---

[1] 26 U.S.C. § 7803.
[2] Transcribed Interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. at 23 (June 14, 2013). [hereinafter Hull]
[3] *Id.* at 24-29.

The Honorable Daniel Werfel
July 17, 2013
Page 2

received responses, based on his decades of experience, he determined he had enough facts to make recommendations whether to approve or deny the applications:[4]

> Q: [B]ased on those responses, were you able to have enough facts to make a determination as to whether they had engaged in a permissible amount of political activity?
>
> A: It was my opinion that, yes, I did have enough facts.
>
> Q: So based on your 48 years of experience and your expertise in 501(c)(3)s and 501(c)(4)s you felt that those responses they sent to you had a sufficient amount of facts for you to evaluate whether they engaged in a permissible amount of political activity?
>
> A: Correct.[5]

However, Mr. Hull's recommendations were not carried out. Instead, according to Michael Seto, the head of Mr. Hull's unit in Washington, Ms. Lerner, gave an atypical instruction that the Tea Party applications undergo special scrutiny that included an uncommon multi-layer review that involved a top advisor to Lerner as well as the Chief Counsel's office. During an interview, Mr. Seto told the Committees' staff:

> [Ms. Lerner] sent me email saying that when these cases need to go through multi-tier review and they will eventually have to go [through her staff] and the chief counsel's office.[6]

Indeed, according to Mr. Hull, sometime in the winter of 2010-2011, the senior advisor to Lois Lerner told him the IRS Chief Counsel's office would need to review these applications. Mr. Hull also indicated this was the first time he sent an application to Ms. Lerner's senior advisor. Hull testified about how this was unusual and a break from ordinary procedure:

> Q: Have you ever sent a case to [the senior advisor to Ms. Lerner] before?
>
> A; Not to my knowledge.
>
> Q: This is the only case you remember?
>
> A: Uh-huh.
>
> Q: Correct?
>
> A: This is the only case I remember sending directly to [the senior advisor

---

[4] *Id.* at 33-38.
[5] *Id.* at 97-98.
[6] Transcribed Interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. at 34 (July 11, 2013).

The Honorable Daniel Werfel
July 17, 2013
Page 3

                to Ms. Lerner].[7]

***

     Q:     Did [the senior advisor to Ms. Lerner] indicate to you whether she agreed with your recommendations?

     A:     She did not say whether she agreed or not. She said it should go to Chief Counsel.

     Q:     The IRS Chief Counsel?

     A:     The IRS Chief Counsel.[8]

After substantial delay, finally, in August 2011, the Chief Counsel's office held a meeting with Mr. Hull, Ms. Lerner's senior advisor, and other Washington officials to discuss these test applications.[9] During the intervening months, these applications lingered. Moreover, months after Mr. Hull presented his recommendations to his superiors, the Chief Counsel's office instructed Mr. Hull that they needed updated information to evaluate the applications. Since the applications were up-to-date months earlier, when Mr. Hull made his recommendations, Mr. Hull found this request from the Chief Counsel's office surprising. The Chief Counsel's office also discussed the possibility of a template letter to develop all the Tea Party applications, including those being held in Cincinnati. Mr. Hull explained that all the applications were different and that a template was impractical.

     Q:     Did [the IRS Chief Counsel's office] give you any feedback on these [test] cases?

     A:     Yes, they did.

     Q:     What did they say?

     A:     I needed more information. I needed more current information.

     Q:     What do you mean, more current information?

     A:     They had it for a while and the information wasn't as current as it should be. They wanted more current information.[10]

***

     Q:     And what does that mean practically for you?

---

[7] Hull at 44.
[8] Id. at 45.
[9] Id. at 47-49; IRS1341.
[10] Id. at 50-51.

The Honorable Daniel Werfel
July 17, 2013
Page 4

> A: That means that probably I should send out another development letter.
>
> Q: A second development letter?
>
> A: A second development letter. I think also at that time there was a discussion of having a template made up so that all the cases could be worked in the same manner. And my reviewer and I both said a template makes absolutely no difference because these organizations, all of them are different. A template would not work.
>
> Q: You and [your reviewer, an IRS tax law specialist] agreed that a template wouldn't help?
>
> A: But [an IRS tax law specialist] said he would prepare it, along with [an IRS Chief Counsel employee] and whoever else was from Chief Counsel. I never saw it.[11]
>
> \*\*\*
>
> Q: When you say all of these cases, are you referring to Tea Party cases?
>
> A: How the Tea Party cases should be worked. And I assume that would be the ones in Cincinnati too, since we would provide guidance when we were able to come up with how we were going to act.[12]
>
> \*\*\*
>
> Q: Just one follow-up question to that. Did you have any reaction to when they told you they needed current information?
>
> A: I sort of -- I was taken aback.
>
> Q: Why were you taken aback?
>
> A: Because I hadn't had the case for a while. I couldn't ask if I didn't have the case.[13]

It appears the IRS never resolved the test applications. Indeed, Mr. Hull told Committee staff:

> Q: Sir, as you sit here today, do you know the status of those [test] cases?
>
> A: Only from hearsay, sir.

---

[11] *Id.* at 50-51.
[12] *Id.* at 51-52.
[13] *Id.* at 55-56.

The Honorable Daniel Werfel
July 17, 2013
Page 5

Q:  What do you know?

A:  

Q:  Still open as far as today?

A:  As far as I know. I do not know for certain.

Q:  So for 3 years since they filed application?

A:  Yes, sir.

Q:  

A:  [14]

Mr. Hull's supervisor, Ronald Shoemaker, provided insight on the type of additional information sought by the Chief Counsel's office—namely, information about the applicants' political activities leading up to the 2010 election. While Mr. Shoemaker indicated he did not think the request for election information was unreasonable, the fact that applications had still not been resolved raises important questions about the Chief Counsel's office interest in the applicants' 2010 election activity. In an interview with the Committees' staff, Mr. Shoemaker testified:

A:  

Q:  

A:  Counsel was not very forthcoming on what their opinion was. But we discussed it to some extent and they indicated that they wanted more development of possible political activity or political intervention right before the election period; that that had not occurred and that's what was missing.

Q:  So they wanted more information about the activities ▬ –

A:  Of ▬ right before the election period. In other words, immediately before.[15]

\*\*\*

---

[14] *Id.* at 58.
[15] Transcribed Interview of Ronald Shoemaker, Internal Revenue Serv., in Wash., D.C. at 105 (June 21, 2013).

The Honorable Daniel Werfel
July 17, 2013
Page 6

Q: Sir, as you sit here today, do you know the status of the test cases that were sent up since April 2010?

A: The [test] cases we're talking about?

Q: Correct.

A: Yes. 

Q: Okay.

A: [redacted]

Q: Still pending as of today. As far as you know.

A: As far is [sic] I know.

Q: Over 3 years since the application was filed.

A: Absolutely.

Q: Is that an atypical time period?

A: That's a very long time period.[16]

The lengthy and unusual review of the test applications in Washington created a bottleneck and caused the delay of other Tea Party applications in Cincinnati. Indeed, multiple IRS employees in Cincinnati have told the Committee they were waiting on guidance from Washington on how to move the applications forward. In an interview with the Committees' staff, Elizabeth Hofacre, the coordinator of the Tea Party applications in Cincinnati, testified:

Q: When you sent these letters out, the letters that Carter Hull approved, and you would get responses from the taxpayers, all of those responses you would then forward on to Carter Hull?

A: That is correct.

Q: Is that unusual?

---

[16] *Id.* at 108-109.

The Honorable Daniel Werfel
July 17, 2013
Page 7

> A:  Very unusual. I have never known of an agent to do that in the past or to this time.
>
> Q:  Even for other Emerging Issues?
>
> A:  I am not aware of any.
>
> Q:  Do you why he wanted those responses?
>
> A:  No. I would have to speculate.
>
> Q:  So these cases are still assigned to you though, right?
>
> A:  They were sitting on my number and I was essentially a front person, because I had no autonomy or no authority to act on them without Carter Hull's influence or input.[17]

Mr. Hull testified that he could not provide advice to Ms. Hofacre because his hands were tied by his superiors in Washington. Therefore, none of these applications were approved or denied during the time he worked with Ms. Hofacre on the cases.[18] Hull testified:

> Q:  Was it your role with the additional material to evaluate the case and determine whether it could be exempt or not?
>
> A:  That was what I was supposed to do but I couldn't do that because I had no idea which way we were going. I had to get my own cases done to be able to tell [Cincinnati] which direction the Service was taking and to be able to give guidance that was correct and proper as opposed to guessing.
>
> Q:  And you say you have no idea which direction we were going. Who is the "we" in that sentence?
>
> A:  The way the Service was going.
>
> Q:  The Internal Revenue Service?
>
> A:  Whether they were going to deny or exempt these organizations.[19]

Moreover, in an interview with the Committees' staff, the head of the Cincinnati office, Cindy Thomas, testified that she continuously asked senior Washington officials when guidance was coming, but it was to no avail. Ms. Thomas told the Committee:

---

[17] Transcribed Interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. at 37 (May 31, 2013).
[18] Hull at 108.
[19] Hull at 104-105.

The Honorable Daniel Werfel
July 17, 2013
Page 8

> Q: So the cases that [Cincinnati employee] was working from October 2010 through September 2011 were still in kind of a holding pattern awaiting guidance from Washington? Is that right?
>
> A: That's correct.
>
> Q: And were there additional applications that were coming in at this time?
>
> A: To my knowledge, yes.
>
> Q: And those were also still in a holding pattern?
>
> A: That's correct.
>
> Q: Pending guidance from Washington?
>
> A: That's correct.[20]

To better understand the IRS Chief Counsel's office involvement with the Tea Party applications, we request the following documents that the Committees have already requested be given priority.

1. All documents and communications between or among employees of the Internal Revenue Service Chief Counsel's office, employees of the Department of the Treasury General Counsel's office, or employees of the Executive Office of the President between February 1, 2010, and the present referring or relating to tax-exempt applications.

In addition, we request the following documents by noon on July 29, 2013.

1. All documents and communications between or among employees of the Internal Revenue Service, employees of the Department of the Treasury, or employees of the Executive Office of the President between February 1, 2010, and the present referring or relating to the 2010 election.

2. All documents and communications between or among employees of the Internal Revenue Service, employees of the Department of the Treasury, or employees of the Executive Office of the President between February 1, 2010, and the present referring or relating to the 2010 Supreme Court decision, *Citizens United v. Federal Election Commission*.

3. All documents and communications between or among employees of the Internal Revenue Service, employees of the Department of the Treasury, or outside parties

---

[20] Transcribed Interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. at 136-138 (June 28, 2013).

The Honorable Daniel Werfel
July 17, 2013
Page 9

between February 1, 2010, and the present referring or relating to the tax-exempt status of Tea Party groups.

When producing documents to the Committee on Oversight and Government Reform, please deliver production sets to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in room 2471 of the Rayburn House Office Building. The Committee prefers, if possible, to receive all documents in electronic format. To the extent that the production contains tax returns or return information pursuant to IRC §6103(f)(1), please provide the Committee on Ways and Means both redacted and unredacted responses. For purposes of delivery to the Committee on Ways and Means, please deliver two sets of redacted responses, one for the Majority and the other for the Minority, and one set of unredacted responses to Matt Hittle in 1136 Longworth. As you know, Mr. Hittle has been authorized to handle IRC §6103(f)(1) material for purposes of this investigation.

If you have any questions about this request, please contact David Brewer or Kristin Nelson of the Committee on Oversight and Government Reform staff at (202) 225-5074 and Mark Epley or Chris Armstrong with the Committee on Ways and Means staff at (202) 225-5522. Thank you for your attention to this matter.

Sincerely,

Darrell Issa
Chairman
Committee on Oversight and Government Reform

Dave Camp
Chairman
Committee on Ways and Means

Jim Jordan
Chairman
Subcommittee on Economic Growth,
Job Creation and Regulatory Affairs

Charles W. Boustany, Jr., M.D.
Chairman
Committee on Ways and Means
Subcommittee on Oversight

cc:   The Honorable Elijah E. Cummings, Ranking Minority Member

The Honorable Sander M. Levin, Ranking Minority Member

The Honorable Matthew A. Cartwright, Ranking Minority Member
Subcommittee on Economic Growth, Job Creation and Regulatory Affairs

The Honorable John Lewis, Ranking Minority Member
Subcommittee on Oversight