# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TRUE THE VOTE, INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | Civ. No. 13-cv-00734-RBW |
| | ) | |
| v. | ) | Judge Reggie B. Walton |
| | ) | |
| INTERNAL REVENUE SERVICE, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MOTION TO DISMISS OF CINCINNATI DEFENDANTS
## SUSAN MALONEY, RONALD BELL, JANINE L. ESTES, AND FAYE NG

Pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6), Defendants Susan Maloney, Ronald Bell, Janine L. Estes, and Faye Ng (the "Cincinnati Defendants") move to dismiss Count 3 of Plaintiff's Amended Complaint with prejudice.  Count 3—the sole count against the defendants in their individual capacities—asserts damages claims under the cause of action created by *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971).  For the reasons set forth more fully in the accompanying memorandum, the Complaint fails to establish personal jurisdiction over the Cincinnati Defendants, fails to state a claim under *Bivens*, and does not overcome the defense of qualified immunity.  Accordingly, Count 3 against the Cincinnati Defendants should be dismissed.

October 18, 2013                    Respectfully submitted,

                                   /s/ Jeffrey A. Lamken
                                   Jeffrey A. Lamken (D.C. Bar No. 440547)
                                   Justin V. Shur (D.C. Bar No. 973855)
                                   MOLOLAMKEN LLP
                                   600 New Hampshire Avenue, N.W.
                                   Washington, D.C.  20037
                                   (202) 556-2000 (phone)
                                   (202) 556-2001 (fax)
                                   jlamken@mololamken.com
                                   jshur@mololamken.com

                                   *Counsel for Susan Maloney, Ronald Bell,*
                                   *Janine L. Estes, and Faye Ng*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TRUE THE VOTE, INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | Civ. No. 13-cv-00734-RBW |
| | ) | |
| v. | ) | Judge Reggie B. Walton |
| | ) | |
| INTERNAL REVENUE SERVICE, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THE CINCINNATI DEFENDANTS' MOTION TO DISMISS**</u>

Jeffrey A. Lamken (D.C. Bar No. 440547)
Justin V. Shur (D.C. Bar No. 973855)
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000 (phone)
(202) 556-2001(fax)
jlamken@mololamken.com
jshur@mololamken.com

*Counsel for Susan Maloney, Ronald Bell,
Janine L. Estes, and Faye Ng*

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND ......................................................................................................... 2

   I.   Statutory Background ....................................................................................... 3

      A.   Tax-Exempt Status Under § 501(c)(3) of the Internal Revenue Code ............... 3

      B.   Review of IRS Decisions ................................................................. 5

   II.   The Complaint's Allegations ........................................................................... 6

      A.   IRS Identification Scheme ............................................................... 6

      B.   True the Vote's Application for § 501(c)(3) Tax-Exempt Status ..................... 7

ARGUMENT .......................................................................................................... 10

   I.   Count 3 Must Be Dismissed Because This Court Lacks Personal Jurisdiction
      over the Cincinnati Defendants ..................................................................... 11

      A.   D.C. Code § 13-423(a)(4) Does Not Provide Jurisdiction ................................ 12

      B.   D.C. Code § 13-423(a)(1) Does Not Provide Jurisdiction ................................ 13

   II.   Count 3 Must Be Dismissed Because *Bivens* Should Not Be Extended to
      This New Context ........................................................................................ 15

      A.   *Bivens* Should Rarely, If Ever, Be Extended to New Contexts ...................... 16

      B.   Special Factors Counsel Hesitation Before—Indeed, Preclude—
            Extending *Bivens* to This New Context ............................................ 18

           1.   Congress's Provision of a Comprehensive Remedial Regime
               Counsels Hesitation ....................................................... 19

           2.   Extending *Bivens* Would Be Incompatible with the Existing
               Remedial Scheme ........................................................ 24

           3.   The Administrative Procedure Act Underscores the Existence of
               Special Factors ........................................................... 27

           4.   The Content and Context of the Asserted Violation Counsel
               Against Expanding *Bivens* ................................................ 29

C.     True the Vote Had Adequate Alternative Remedies ........................................... 32

III.   Count 3 Must Be Dismissed Because the Cincinnati Defendants Are Entitled to Qualified Immunity ...................................................................... 33

    A.     The Complaint Does Not Allege That the Cincinnati Defendants Violated True the Vote's First Amendment Rights ............................................. 34

         1.     The Alleged Retaliation Would Not Deter a Person of Ordinary Firmness from Speaking Again ............................................. 34

         2.     True the Vote Has Not Alleged the Required Discriminatory Intent by Each Defendant ......................................................... 36

         3.     The Complaint Fails Under *Hartman v. Moore* .................................... 38

         4.     The Claims Against Mr. Bell Fail for Failure To Plead Personal Participation of Any Sort in Discriminatory Conduct ............. 41

    B.     At the Very Least, the Complaint Fails To Allege a Violation of "Clearly Established Law" ........................................................ 41

CONCLUSION ................................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004) .......................................................21

*Airlie Found. v. I.R.S.*, 283 F. Supp. 2d 58 (D.D.C. 2003)..........................................4, 5

*Ali v. District of Columbia*, 278 F.3d 1 (D.C. Cir. 2002) ............................................14

*Am. Ass'n of Commodity Traders v. Dep't of Treasury*, 598 F.2d 1233 (1st Cir. 1979).........21, 32

*AMAF Int'l Corp. v. Ralston Purina Co.,* 428 A.2d 849 (D.C. 1981)...........................13

*Anderson v. City of Naples*, 501 F. App'x 910 (11th Cir. 2012) ......................................39, 41, 42

*Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009)..............................................................18, 37

*Aref v. Holder*, No. 10-539(BJR), 2013 WL 3488487 (D.D.C. July 12, 2013)............................34

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011) .................................................................33

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009)......................2, 10, 33, 35, 36, 37, 38, 41

*Baddour, Inc. v. United States*, 802 F.2d 801 (5th Cir. 1986) ..........................................21, 24, 30

*Ballard v. Holinka*, 601 F. Supp. 2d 110 (D.D.C. 2009) ...............................................15

*Bame v. Clark*, 466 F. Supp. 2d 105 (D.D.C. 2006).......................................................26

*Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416 (D.C. Cir. 1986)..............................25

*Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006) ...........................................................39

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 127 S. Ct. 1955 (2007)......................2, 10, 35, 37

*Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008)........................................................30

*Better Bus. Bureau of Wash., D.C. v. United States*, 326 U.S. 279,
66 S. Ct. 112 (1945)..............................................................................................4

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
403 U.S. 388, 91 S. Ct. 1999 (1971)...............................1, 2, 11, 15, 16, 17, 18, 19, 20, 21, 23,
24, 25, 26, 27, 28, 29, 30, 32, 33, 41

*Bubbling Well Church of Universal Love, Inc. v. Commissioner*,
74 T.C. 531 (1981)..............................................................................................5, 38, 40

*Budik v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-329, 2013 WL 1386211
(D.D.C. Apr. 5, 2013) ................................................................................................11

*Bush v. Lucas*, 462 U.S. 367, 103 S. Ct. 2404 (1983) .........................16, 17, 19, 23, 24, 30, 31, 32

*Samantar v. Yousuf*, 560 U.S. 305, 130 S. Ct. 2278 (2010) ...........................................12

*Cammarano v. United States*, 358 U.S. 498, 79 S. Ct. 524 (1959) ...................................31

*Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468 (1980) ..............................................16

*Chappell v. Wallace*, 462 U.S. 296, 103 S. Ct. 2362 (1983) .....................................16, 18

*Church by Mail, Inc. v. United States*, No. 87-0754, 1988 WL 8271
(D.D.C. Jan. 22, 1988) ..........................................................................................21, 32

*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 125 S. Ct. 1453 (2005) ...................26, 27

*Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) ................................................6

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 122 S. Ct. 515 (2001).............................16, 17, 24

*Crawford-El v. Britton*, 93 F.3d 813 (D.C. Cir. 1996) ...........................................34, 42

*Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001).............................................39

*Dahl v. Holley*, 312 F.3d 1228 (11th Cir. 2002) .........................................................39

*Davis v. Billington*, 681 F.3d 377 (D.C. Cir. 2012)....................................................20

*Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264 (1979) ..........................................16, 18

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977).....................................................17

*Educ. Assistance Found. v. United States*, 904 F. Supp. 2d 95 (D.D.C. 2012) ......................25

*El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996).................................12, 14

*F.D.I.C. v. Meyer*, 510 U.S. 471, 114 S. Ct. 996 (1994) .........................................17, 18

*Family Trust of Mass., Inc. v. United States*, 722 F.3d 355 (D.C. Cir. 2013) .....................3, 4

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008) ...........................11, 12

*FCC v. ITT World Commc'ns Inc.*, 466 U.S. 463, 104 S. Ct. 1936 (1984) ............................28

*First Chi. Int'l v. United Exch. Co.*, 836 F.3d 1375 (D.C. Cir. 1988) ...........................11, 14

*Fishburn v. Brown*, 125 F.3d 979 (6th Cir. 1997) .......................................................21

*GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000)........................12

*Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982) ........................................33

*Hartman v. Moore*, 547 U.S. 250, 126 S. Ct. 1695 (2006)..........................................38, 39, 40, 43

*Hatfill v. Ashcroft*, 404 F. Supp. 2d 104 (D.D.C. 2005) ................................................36

*Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987)..............................................17

*Heckler v. Chaney*, 470 U.S. 821, 105 S. Ct. 1649 (1985) ..........................................28

*Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012)...........................................2, 10

*Holly v. Scott*, 434 F.3d 287 (4th Cir. 2006)....................................................17

*Hudson Valley Black Press v. IRS*, 409 F.3d 106 (2d Cir. 2005) .................................21, 22

*ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 107 S. Ct. 2360 (1987) ......................29

*Johnson v. Gov't of D.C.*, 780 F. Supp. 2d 62 (D.D.C. 2011) ...................................36, 41

*Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401 (4th Cir. 2003)..............................21, 22, 24

*Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119 (D.D.C. 2004)..........................12

*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002)................................................39

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S. Ct. 1473 (1984)......................15

*Kennedy v. City of Villa Hills*, 635 F.3d 210 (6th Cir. 2011) ..................................39

*Kim v. United States*, 632 F.3d 713 (D.C. Cir. 2011) .........................................21

*Klay v. Panetta*, 924 F. Supp. 2d 8 (D.D.C. 2013) ...........................................38

*Kraham v. Lippman*, 478 F.3d 502 (2d Cir. 2007) ...........................................31

*Krieger v. U.S. Dep't of Justice*, 529 F. Supp. 2d 29 (D.D.C. 2008)..........................35

*Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002)....................................17

*Lyng v. Int'l Union, United Auto. Workers of Am.*, 485 U.S. 360, 108 S. Ct. 1184 (1988)..........31

*Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092 (1986) ................................33, 42, 43

*McCabe v. Parker*, 608 F.3d 1068 (8th Cir. 2010) ..........................................39

*McCarthy v. Madigan*, 503 U.S. 140, 112 S. Ct. 1081 (1992) .................................25

*McMillen v. U.S. Dep't of Treasury*, 960 F.2d 187 (1st Cir. 1991)...............................21

*Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012) ...................................................43

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1,
101 S. Ct. 2615 (1981).................................................................................27

*Minneci v. Pollard*, 132 S. Ct. 617 (2012).....................................................................17

*Moore v. Hartman*, 704 F.3d 1003 (D.C. Cir. 2013) ...................................................43

*Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994) ...............24

*Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240 (10th Cir. 1989)...............24

*Neb. Beef, Ltd. v. Greening*, 398 F.3d 1080 (8th Cir. 2005)........................................28

*Oberwetter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011) ...............................................17

*Pathfinder Fund v. Agency for Int'l Dev.*, 746 F. Supp. 192 (D.D.C. 1990)...............31

*Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009)..................................33, 34

*Polm Family Found., Inc. v. United States*, 644 F.3d 406 (D.C. Cir. 2011) ..................3

*Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983 (2002).................................................25

*Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) ................................42

*Rameses Sch. of San Antonio, Tex. v. Commissioner*, No. 23228-04X,
2007 WL 1061871 (Tax Ct. Apr. 10, 2007) ............................................................4

*Regan v. Taxation with Representation of Wash.*, 461 U.S. 540,
103 S. Ct. 1997 (1983)......................................................................4, 30, 31

*Reichle v. Howards*, 132 S. Ct. 2088 (2012) ......................17, 33, 34, 39, 41, 42, 43, 44

*Rice v. Holder*, 898 F. Supp. 2d 291 (D.D.C. 2012)....................................................37

*Rushing v. Parker*, 599 F.3d 1263 (11th Cir. 2010) ....................................................43

*Robbins v. Wilkie*, 300 F.3d 1208 (10th Cir. 2002) .....................................................28

*Schweiker v. Chilicky*, 487 U.S. 412, 108 S. Ct. 2460 (1988) ........................17, 19, 32

*Scinto v. Fed. Bureau of Prisons*, 608 F. Supp. 2d 4 (D.D.C. 2009)...........................15

*Shreiber v. Mastrogiovanni*, 214 F.3d 148 (3d Cir. 2000) ..........................................21

*Simpkins v. District of Columbia*, 108 F.3d 366 (D.C. Cir. 1997)...................................16

*Skoog v. County of Clackamas*, 469 F.3d 1221 (9th Cir. 2006) ..........................................39

*Smith v. Robinson*, 468 U.S. 992, 104 S. Ct. 3457 (1984)..........................................26, 27

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739 (2004)....................................17

*Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) ..........................................19, 23, 24

*Speiser v. Randall*, 357 U.S. 513, 78 S. Ct. 1332 (1958)...................................................31

*Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169 (D.C. Cir. 2006)..........................................10

*Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ................................29

*Thayer v. Chiczewski*, 705 F.3d 237 (7th Cir. 2012) ......................................................43

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002) ...........................................34

*United States v. Stanley*, 483 U.S. 669, 107 S. Ct. 3054 (1987)..........................................16

*Varrone v. Bilotti*, 123 F.3d 75 (2d Cir. 1997) ..............................................................40

*Vennes v. Unknown Number of Unidentified Agents of the U.S.*, 26 F.3d 1448
(8th Cir. 1994).........................................................................................................21

*W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116 (9th Cir. 2009) ..............................28, 29

*Walton v. Fed. Bureau of Prisons*, 533 F. Supp. 2d 107 (D.D.C. 2008) ................................11, 12

*Webster v. Doe*, 486 U.S. 592, 108 S. Ct. 2047 (1988) ......................................................28

*Weise v. Jenkins*, 796 F. Supp. 2d 188 (D.D.C. 2011)......................................................17

*Wilkie v. Robbins*, 551 U.S. 537, 127 S. Ct. 2588 (2007)..............................16, 17, 18, 20, 31, 32

*Wilson v. Libby*, 498 F. Supp. 2d 74 (D.D.C. 2007)..........................................18, 19, 23

*Wood v. Kesler*, 323 F.3d 872 (11th Cir. 2003)................................................................39

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) .......13, 14

*Wrobel v. County of Erie*, 692 F.3d 22 (2d Cir. 2012) ................................................................36

*Zephyr Aviation, L.L.C. v. Dailey*, 247 F.3d 565 (5th Cir. 2001)................................................28

## STATUTES, RULES, AND REGULATIONS

5 U.S.C. App. 3 §2 ............................................................................................22

5 U.S.C. § 701 ...............................................................................................6, 27

5 U.S.C. §703 ..........................................................................................6, 28, 32

5 U.S.C. §704 ....................................................................................................29

5 U.S.C. §706 ..........................................................................................6, 27, 28

5 U.S.C. §706(1) ................................................................................................32

26 U.S.C. §501(c) ................................................................................................5

26 U.S.C. §501(c)(3) ................................2, 3, 4, 5, 6, 7, 9, 10, 13, 20, 29, 30, 32, 40

26 U.S.C. §501(c)(4) ......................................................................................6, 8

26 U.S.C. §501(c)(5) ............................................................................................7

26 U.S.C. §501(c)(6) ............................................................................................7

26 U.S.C. §6213(a) ............................................................................................22

26 U.S.C. §6213(b) ............................................................................................22

26 U.S.C. §6330(b) ............................................................................................22

26 U.S.C. §7422 ............................................................................................5, 22

26 U.S.C. §7428 ............................................................5, 20, 21, 25, 28, 32

26 U.S.C. § 7428(a)(1)(A) ..................................................................................5

26 U.S.C. §7428(a)(2) ..........................................................................................5

26 U.S.C. §7428(b)(2) ............................................................................5, 20, 25

26 U.S.C. §7428(b)(3) ............................................................................5, 20, 25

26 U.S.C. §7431 ..................................................................................................6

26 U.S.C. §7432 ............................................................................................6, 22

26 U.S.C. §7433 ........................................................................................6, 23, 24

26 U.S.C. §7433(a) ............................................................................................22

26 U.S.C. §§ 7602(a)(2) ..................................................................................22

26 U.S.C. §§ 7604 ...........................................................................................22

26 U.S.C. § 7803(c) .........................................................................................22

42 U.S.C. § 1983 ........................................................................................26, 27

26 C.F.R. § 1.501(c)(3)-1 ................................................................................29

26 C.F.R. § 1.501(c)(3)-1(c)(1) .........................................................................3

26 C.F.R. § 1.501(c)(3)-1(c)(3) ...................................................................37, 40

26 C.F.R. § 1.501(c)(3)-1(c)(3) (ii) ...................................................................4

26 C.F.R. § 1.501(c)(3)-1(c)(3) (iii) ..................................................................4

26 C.F.R. 601.201(n)(7) ...................................................................................25

Fed. R. Civ. P. 4(k)(1)(a) .................................................................................11

D.C. Code § 13-423(a) .....................................................................................12

D.C. Code § 13-423(a)(1) .................................................................................13

D.C. Code § 13-423(a)(4) .................................................................................12

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VIII ...................................................................................16

U.S. Const. amend. V .......................................................................................18

U.S. Const. amend. I .........................1, 2, 15, 16, 17, 18, 19, 30, 31, 34, 35, 36, 38, 42

U.S. Const. amend. IV .................................................................................16, 41

## LEGISLATIVE MATERIALS

H.R. 634, 100th Cong., 1st Sess., § 9(a) (1987) ..............................................23

H.R. Conf. Rep. No. 100-1104 (1988) ..............................................................24

S. 579, 100th Cong., 1st Sess., § 3(a) (1987) ..................................................23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TRUE THE VOTE, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Civ. No. 13-cv-00734-RBW |
| | ) | |
| v. | ) | Judge Reggie B. Walton |
| | ) | |
| INTERNAL REVENUE SERVICE, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF THE CINCINNATI DEFENDANTS' MOTION TO DISMISS

Individual Defendants Susan Maloney, Ronald Bell, Janine L. Estes, and Faye Ng (the "Cincinnati Defendants") respectfully submit this memorandum in support of their Motion to Dismiss Count 3 of the First Amended Verified Complaint (the "Complaint").

This case arises out of Plaintiff True the Vote's application for tax-exempt status under the Internal Revenue Code. True the Vote has now been granted tax-exempt status. It claims, however, that it was unconstitutionally required to provide additional information and to respond to repeated inquiries in violation of its First Amendment rights. Count 3—the sole count against the individual defendants—seeks damages from IRS employees in their individual capacities under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971).

Dismissal is warranted for at least three reasons. First, the Complaint fails to establish this Court's personal jurisdiction over the Cincinnati Defendants. It identifies neither injuries occurring in the District of Columbia nor sufficient contacts between the Cincinnati Defendants and the District of Columbia to establish personal jurisdiction under the D.C. long-arm statute.

Second, the Complaint does not state a claim on which this Court can grant relief. Neither this Court, nor the D.C. Circuit, nor the Supreme Court, has extended the cause of action created in *Bivens* to First Amendment retaliation claims in the context of the complex administrative statute at issue here, the Internal Revenue Code. The Internal Revenue Code's complex remedial scheme, moreover, forecloses *Bivens*' extension to this new context.

Third, the Complaint fails to overcome the defense of qualified immunity—an immunity not merely from liability, but from suit. Government officials are entitled to immunity where their alleged conduct does not violate statutory or constitutional rights that were clearly established at the time of the conduct. The Complaint here fails to allege such a violation: It does not, consistent with the standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 127 S. Ct. 1955 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), properly allege a First Amendment violation. Neither injury nor causation is properly pleaded. There is no First Amendment right to be free from an allegedly retaliatory agency investigation where, as here, the agency had sufficient cause to investigate. And certainly no such right was clearly established at the time of the alleged violation.

## BACKGROUND

Plaintiff True the Vote is a not-for-profit Texas corporation.[1] The Complaint alleges that, when True the Vote applied for tax-exempt status under § 501(c)(3) of the Internal Revenue Code, its application was unduly delayed and it was subject to unnecessary and burdensome requests for additional information, as a result of an unwritten and unconstitutional IRS policy and practice. The IRS, it claims, identified § 501(c)(3) applications with names, purposes, or

---

[1] The allegations in the First Amended Verified Complaint are accepted as true for purposes of the motion to dismiss, and the motion to dismiss alone. *See Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 860 (2013).

2

missions indicating a conservative viewpoint supported by "Tea Party" organizations and subjected them to additional, heightened review and scrutiny (the "Identification Scheme"). The Cincinnati Defendants—Ms. Maloney, Mr. Bell, Ms. Estes, and Ms. Ng—were at all relevant times IRS Exempt Organization Specialists employed in the IRS Determinations Unit in Cincinnati, Ohio. Compl. ¶¶ 44-47; Compl. Exs. C, D, E, & G.

## I.   STATUTORY BACKGROUND

### A.   Tax-Exempt Status Under § 501(c)(3) of the Internal Revenue Code

The Internal Revenue Code exempts certain charitable, educational, and other not-for-profit organizations from taxation under 26 U.S.C. § 501(c)(3).[2]  Contributions to such tax-exempt organizations are also deductible from the donor's income taxes, estate taxes, and gift taxes. *Polm Family Found., Inc. v. United States*, 644 F.3d 406, 407-08 (D.C. Cir. 2011). To qualify for tax-exempt status under § 501(c)(3), an organization must meet three requirements: (1) it must be "organized and operated exclusively for [exempt] purposes"; (2) no part of its earnings may inure to the benefit of any private shareholder or individual; and (3) it must not participate or intervene in political campaigns or, to a substantial extent, in lobbying activities. *Id.*; *accord Family Trust of Mass., Inc. v. United States*, 722 F.3d 355, 359 (D.C. Cir. 2013).

IRS regulations implementing § 501(c)(3) explain that "[a]n organization will be regarded as operated exclusively for one or more exempt purposes only if it engages *primarily* in activities" that advance exempt purposes. 26 C.F.R. § 1.501(c)(3)-1(c)(1) (emphasis altered). Conversely, "[a]n organization will *not* be so regarded if *more than an insubstantial part of its*

---

[2] Potentially exempt organizations include "[c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals." 26 U.S.C. § 501(c)(3).

*activities*" furthers a non-exempt purpose.  *Id.* (emphasis added).  Thus, while incidental or minimal engagement in non-exempt purposes will not disqualify an organization, "the 'presence of a single [non-exempt] purpose, if substantial in nature, will destroy the exemption, regardless of the number or importance of truly [exempt] purposes.' "  *Airlie Found. v. IRS*, 283 F. Supp. 2d 58, 62-63 (D.D.C. 2003) (quoting *Better Bus. Bureau of Wash., D.C. v. United States*, 326 U.S. 279, 283, 66 S. Ct. 112, 114 (1945)); *see also Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 103 S. Ct. 1997 (1983) (affirming that non-profit groups engaged in substantial lobbying activities do not qualify for § 501(c)(3) treatment).

Section 501(c)(3) makes clear that political and lobbying activities are non-exempt activities.  "Activities which constitute participation or intervention in a political campaign . . . include, but are not limited to, the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to" any candidate for public office. 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii).  An organization engages in lobbying or "attempt[s] to influence legislation" if it: "(a) [c]ontacts, or urges the public to contact, members of a legislative body for the purpose of proposing, supporting, or opposing legislation; or (b) [a]dvocates the adoption or rejection of legislation."  *Id.* § 1.501(c)(3)-1(c)(3)(ii).

Section 501(c)(3)'s bar on earnings that inure to the benefit of private individuals includes insiders of the organization and their families.  *Family Trust of Mass.*, 892 F. Supp. 2d at 156; *Airlie Found.*, 826 F. Supp. at 549.  "Factors . . . indicative of prohibited inurement and private benefit include control by the founder over the entity's funds, assets, and disbursements; use of entity moneys for personal expenses; payment of salary or rent to the founder without accompanying evidence or analysis of the reasonableness of the amounts; and purported loans to the founder showing a ready private source of credit."  *Rameses Sch. of San Antonio, Tex. v.*

*Commissioner*, No. 23228-04X, 2007 WL 1061871, at *7 (Tax Ct. Apr. 10, 2007).  Close family relationships among members of an organization's board of directors may also be indicative of private inurement.  *Bubbling Well Church of Universal Love, Inc. v. Commissioner*, 74 T.C. 531, 534-35 (1981) (private inurement where family members "dominated" board of directors).  In addition, "[t]he potential for abuse may . . . exist when the [controlling individual at] an exempt organization also controls other non-exempt entities and those entities interact."  *Airlie Found.*, 826 F. Supp. at 550.

## B.   Review of IRS Decisions

Congress provided an express statutory mechanism for obtaining review of § 501(c)(3) status determinations—a declaratory judgment action.  26 U.S.C. § 7428(a)(1)(A), (a)(2).  Under that provision, an applicant may seek review of an IRS determination denying it tax-exempt status.  *Id.* § 7428(a)(1)(A).  An organization may also sue under § 7428 if the IRS has not acted on its application within 270 days and the organization has acted reasonably to perfect its application.  *Id.* § 7428(b)(2).

Section 7428 imposes a statutory limitations period.  Any action challenging a final IRS determination of tax-exempt status under § 501(c) must be brought within 90 days of the date on which the IRS mails its notice of determination.  *Id.* § 7428(b)(3).  Section 7428 also imposes an exhaustion requirement, together with exceptions to ensure necessary flexibility.  *See id.* § 7428(b)(2).

The Internal Revenue Code includes other remedial provisions, each calibrated to the circumstances it addresses.  For example, a taxpayer erroneously assessed a tax or penalty may sue for a refund after paying the tax and filing a claim with the IRS.  26 U.S.C. § 7422.  If the IRS improperly fails to release a tax lien, a taxpayer may sue for damages in federal court.  *Id.* § 7432.  A taxpayer injured through the unauthorized disclosure or inspection of information

submitted on a tax return has a damages remedy against the United States.  *Id.* § 7431.  And if an IRS official intentionally, recklessly, or negligently disregards any provision of the Internal Revenue Code or IRS regulations in connection with any collection of federal tax, the injured taxpayer may seek damages from the United States.  *Id.* § 7433.

In the event a taxpayer alleges an injury that is not covered by the tax-specific remedies listed in the Internal Revenue Code, the taxpayer may seek review under the Administrative Procedure Act ("APA").  5 U.S.C. §§ 701-706; *id.* § 703 (judicial review of agency action must follow "the special statutory review proceeding relevant to the subject matter" where such a statutory remedy applies); *see, e.g.*, *Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011).

## II.     THE COMPLAINT'S ALLEGATIONS

### A.     IRS Identification Scheme

The Complaint alleges that, beginning in 2010, certain IRS employees in the Exempt Organizations Determinations Unit in Cincinnati, Ohio began searching for tax-exemption applications involving organizations with "political sounding" names, such as "Tea Party," "Patriots," "9/12," "We the People" or "Take Back The Country."  Compl. ¶¶ 83, 91.  "Determinations Unit management requested its specialists to be on the lookout for Tea Party applications" and developed a "Be On the Look Out" ("BOLO") list that included "Tea Party organizations applying for 26 U.S.C. § 501(c)(3) or 26 U.S.C. § 501(c)(4) status."  *Id.* ¶¶ 84-85.  Applications identified under the IRS Identification Scheme were then subjected to "additional and heightened review and scrutiny."  *Id.* ¶¶ 73, 77.

According to the Complaint, applications identified as potentially Tea Party-affiliated were transferred to IRS offices in Washington, D.C., for processing and "multi-tier review."  Compl. ¶¶ 88, 110-111.  The IRS Exempt Organizations Technical Unit and the IRS Office of Rulings and Agreements, both in Washington, D.C., allegedly developed "written and oral

guidance" for identifying and processing such applications.  *Id.* ¶ 96.  Exempt Organization Specialists in the Determinations Unit in Cincinnati are alleged to have "implemented and applied" that guidance, relying on it when issuing letters requesting additional information from organizations with names associated with Tea Party causes.  *Id.* ¶¶ 97, 98.

In May 2012, after several revisions, the BOLO criteria were updated to remove any reference to Tea Party organizations or conservative viewpoints.  Consistent with the established regulatory criteria, the updated BOLO list called for IRS employees to be on the lookout for "'501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention.'"  Compl. Ex. F at 47.  In addition, some organizations were informed that they need not respond to the requests for additional information.  *Id.* A number of organizations were informed that their applications had been approved, and procedures were established for review of those remaining applications that indicated the organization engaged in political campaign intervention.  *Id.* at 47-48.

The Treasury Inspector General for Tax Administration ("TIGTA") later conducted an independent investigation relating to the IRS Identification Scheme.  It concluded that "inappropriate criteria" had been used to identify organizations for review "based upon their names or policy positions," and that IRS practices "resulted in substantial delays in processing certain applications" and "allowed unnecessary information requests to be issued."  *Id.* ¶ 81.  The IRS has acknowledged that it was "incorrect, insensitive, and inappropriate" for it to select cases for further review on the basis of organizations' names.  *Id.* ¶¶ 78, 79.

### B.     True the Vote's Application for § 501(c)(3) Tax-Exempt Status

True the Vote applied for § 501(c)(3) tax-exempt status on July 15, 2010.  Compl. ¶ 53. In its application, True the Vote checked a "yes" box to indicate that it "attempt[s] to influence legislation."  Compl. Ex. B at 9.  It further stated that it expected to spend "20% of [its] budget"

to support the cause of "see[ing] Texas enact legislation to support use of a Voter ID Card." *Id.* at 17. According to True the Vote's application, its other initiatives included "mobilizing and training volunteers . . . to work as election monitors," "aggressively pursuing [voter] fraud reports to ensure prosecution when appropriate," and developing "[v]oter registration programs and efforts to validate existing registration lists." *Id.* True the Vote described itself as "a non-partisan initiative to recruit and train volunteers to work inside polling places for elections." *Id.*

The application also asked organizations whether "any of [their] officers, directors or trustees [were] related to each other through family or business relationships." Compl. Ex. B. at 7. True the Vote checked the "no" box in response, but disclosed that "Catherine Engelbrecht and Bryan Engelbrecht are both on the Board of Directors and are married." *Id.* at 7, 17. It also disclosed that it had a "close connection" with an organization called King Street Patriots (identified in the Complaint as "True the Vote's 26 U.S.C. § 501(c)(4) affiliated organization," Compl. ¶ 51). It stated that "King Street Patriots' leadership oversees the True the Vote Program." *Id.* at 12, 18.

On February 15, 2011, Cincinnati Defendant Susan Maloney sent True the Vote a letter requesting additional information. Compl. Ex. C. That letter explained that True the Vote's "board is narrow and related," which "could lead to substantial private benefit or inurement." *Id.* at 3. True the Vote was requested to either submit "names and qualifications of . . . new board members" or "explain [its] position." *Id.* The letter also requested that True the Vote "provide a job description of an election monitor," "explain how voter registration fulfills an exempt purpose," and otherwise explain how its activities fulfill an exempt purpose. *Id.* at 4. True the Vote alleges that it furnished the requested information by March 8, 2011. Compl. ¶ 57.

On October 12, 2011, True the Vote contacted the IRS regarding its application and was told by Cincinnati Defendant Ronald Bell that "True the Vote's Application was being overseen by and had been forwarded to the IRS office in Washington, D.C.," which "had assumed primary approval responsibility."  Compl. ¶ 60.  Approximately one month later, on November 8, 2011, Cincinnati Defendant Janine Estes sent True the Vote a letter informing it that the IRS "need[ed] more information before [it could] complete [its] consideration of [True the Vote's] application." Compl. Ex. D at 1.  The letter requested information on, among other things, any endorsements of candidates for public office; business dealings with candidates; advertisements or communications with elected officials regarding True the Vote's efforts to enact voter identification legislation; and True the Vote's relationship with King Street Patriots.  Compl. ¶ 129 & Ex. D at 3-9.  Ms. Estes also requested additional information on True the Vote's board members, officers, and key employees, including their relationships to each other and whether any of them "was, is or plans to be a candidate for public office."  Compl. ¶ 129(a).  True the Vote submitted the requested information to the IRS on March 20, 2012.  *Id.* ¶ 64.  In the meantime, it voluntarily submitted additional information regarding its "mission, purpose and activities."  *Id.* ¶ 61.

On October 9, 2012, Cincinnati Defendant Faye Ng sent True the Vote a letter informing it that, in order to qualify for § 501(c)(3) tax-exempt status, it needed to amend its articles of incorporation because they "permit [True the Vote] to operate for purposes beyond the scope of [§] 501(c)(3) exempt purposes."  Compl. Ex. E at 3.  Ms. Ng also requested further information regarding True the Vote's activities.  Compl. ¶ 66; Compl. Ex. E.  That request focused on the mobilization of True the Vote's volunteers as election workers and poll watchers, the appointment of those volunteers by political parties, and True the Vote and King Street Patriots' cost-

sharing arrangement for directors and officers.  Compl. ¶ 129(i) & (j); Compl. Ex. E at 3-5.  True the Vote submitted the requested information to the IRS on November 30, 2012.  Compl. ¶ 67.

On September 26, 2013, the IRS granted True the Vote's application for § 501(c)(3) tax-exempt status.  Dkt. No. 59 at 1.

## ARGUMENT

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007).  "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).  The court must accept as true all factual allegations and grant the plaintiff the benefit of all inferences that can be derived from those facts.  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).  But the factual allegations "must still 'be enough to raise a right to relief above the speculative level.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965).  "[T]he Court need not accept inferences drawn by the plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations."  *Id.*  Accordingly, a plaintiff must do more than merely allege "labels and conclusions"—"a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965.

The Complaint should be dismissed.  It does not establish personal jurisdiction over the Cincinnati Defendants (Part I, *infra*).  There is no cause of action under *Bivens* (Part II, *infra*).

And the Cincinnati Defendants are entitled to qualified immunity (Part III, *infra*).[3]

## I.     COUNT 3 MUST BE DISMISSED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER THE CINCINNATI DEFENDANTS

Because plaintiffs have the burden of establishing personal jurisdiction, *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008), the Complaint must make a *prima facie* showing of personal jurisdiction by alleging " '[s]pecific acts connecting [the] defendant with the forum.' " *Budik v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-329, 2013 WL 1386211, at *4 (D.D.C. Apr. 5, 2013) (quoting *First Chi. Int'l v. United Exch. Co.*, 836 F.3d 1375, 1378 (D.C. Cir. 1988)).  "[M]ere conclusory statements do not constitute the *prima facie* showing . . . of the pertinent jurisdictional facts." *Id.* (internal quotation marks omitted).

Under Federal Rule of Civil Procedure 4(k)(1)(a), this Court has personal jurisdiction over a defendant only to the extent the D.C. Superior Court would have personal jurisdiction over that person.  True the Vote makes no effort to establish that the D.C. Superior Court would have general jurisdiction over the Cincinnati Defendants, *i.e.*, that they have such extensive contacts with the District of Columbia that jurisdiction could be exercised without regard to subject matter.  Nor could it:  The Cincinnati Defendants work in Ohio, not the District of Columbia.  They reside in Ohio (or Kentucky), not the District of Columbia.  And they are not alleged to be present in the District of Columbia on a regular, or even occasional, basis.  The Cincinnati Defendants are federal employees, but that is insufficient to establish personal jurisdiction over them in their individual capacities.  *See Walton v. Fed. Bureau of Prisons*, 533 F. Supp. 2d 107, 112 (D.D.C. 2008) (finding no jurisdiction over federal employee residing outside District of Columbia absent evidence of "persistent conduct undertaken in a person's individual capacity").

---

[3] The Cincinnati Defendants also adopt by reference the legal arguments made by co-defendants Daniel Werfel, Steven T. Miller, Douglas Shulman, William Wilkins, Lois Lerner, Holly Paz, Cindy M. Thomas, Steven Grodnitzky, and Michael C. Seto in their motion to dismiss.

The Complaint therefore seeks to establish only specific jurisdiction.  To proceed on that theory, the plaintiff "must establish that specific jurisdiction comports with the forum's long-arm statute, D.C. Code § 13-423(a), and does not violate due process."  *FC Inv. Grp.*, 529 F.3d at 1094-95; *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). True the Vote invokes subsections (a)(1) and (a)(4) of D.C.'s long-arm statute.  Compl. ¶ 28.  But neither provision supports personal jurisdiction here.

### A.   D.C. Code § 13-423(a)(4) Does Not Provide Jurisdiction

Subsection (a)(4) of D.C.'s long-arm statute establishes jurisdiction in the District of Columbia where the defendant "cause[d] tortious injury in the District of Columbia," provided that "he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423(a)(4).  The Complaint falls short of meeting either requirement.

The Complaint nowhere explains how True the Vote suffered "tortious injury" in the District of Columbia.  True the Vote is a Texas corporation.  Compl. ¶ 2.  It does not allege that it has operations, employees, members, or donors in the District of Columbia.  Given its lack of presence in the District of Columbia, True the Vote cannot establish tortious injury here.  *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 672 (D.C. Cir. 1996) (finding it "unlikely" that person "living and working in Jordan would be injured in the District of Columbia"), *abrogated by Samantar v. Yousuf*, 560 U.S. 305, 130 S. Ct. 2278 (2010); *GTE New Media Servs.*, 199 F.3d at 1349; *Walton*, 533 F. Supp. 2d at 113 (inmate incarcerated in Minnesota suffered no injury in the District); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 135-36 (D.D.C. 2004) (similar).

The Complaint likewise fails to allege facts establishing that the Cincinnati Defendants "solicit business" in the District of Columbia, engage in a "persistent course of conduct" here, or derive "substantial revenue from goods used or consumed, or service rendered" here.  The

Complaint alleges no conduct by them in the District of Columbia at all.  They are not alleged to have derived revenue from goods sold or services rendered here.  That requirement too is unmet.

### B.      D.C. Code § 13-423(a)(1) Does Not Provide Jurisdiction

D.C.'s long-arm statute also permits personal jurisdiction where the plaintiff's claim for relief arises from the defendant's "transact[ion of] any business" in the District of Columbia. D.C. Code § 13-423(a)(1).   Jurisdiction under subsection (a)(1) "'is limited to claims arising from the particular transaction of business' in the District."  *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1168 (D.C. Cir. 2002); *see AMAF Int'l Corp. v. Ralston Purina Co.,* 428 A.2d 849, 850 (D.C. 1981) (under the "'transacting any business' provision of our long-arm statute . . . jurisdiction is limited to claims arising from the particular transaction of business which forms the basis of jurisdiction").

1.      The Complaint nowhere alleges that the Cincinnati Defendants transacted any business relating to True the Vote's tax-exemption application in the District of Columbia.  To the contrary, every action they are alleged to have undertaken occurred in Ohio:  Ms. Maloney, Ms. Estes, and Ms. Ng prepared letters in *Ohio*, which they sent to True the Vote in Texas. Compl. ¶¶ 56, 63, 66; Compl. Exs. C, D, & E.   Mr. Bell informed True the Vote and the Taxpayer Advocate that True the Vote's application had been sent to Washington, D.C. for review, but he provided that information from his office in *Ohio*.  Compl. ¶¶ 59-60.  There is no allegation that any of the Cincinnati Defendants transferred, or made the decision to transfer, True the Vote's application to IRS offices in Washington, much less that they effected the transfer in the District of Columbia.  Nor are the Cincinnati Defendants alleged to have directed any IRS employee to take any action in the District of Columbia in connection with True the Vote's § 501(c)(3) application.  The Complaint thus fails to allege the requisite "specific acts"—

business the Cincinnati Defendants transacted in the District of Columbia—that would permit personal jurisdiction over them here.  *See First Chi. Int'l*, 836 F.2d at 1378.

2.    The Complaint alleges that, *in general*, the IRS "*Determinations Unit*" interacted with IRS employees in the District of Columbia in connection with the Identification Scheme. Compl. ¶¶93-97.  The Complaint does not, however, identify the alleged interactions; explain how they qualify as "transactions"; or indicate why the Cincinnati Defendants should be deemed to have engaged in them in the District of Columbia without having left Ohio.

More fundamentally, plaintiffs relying on subsection (a)(2)'s "transact business" standard must show that the cause of action "'arises from the particular transaction of business' in the District."  *World Wide Minerals*, 296 F.3d at 1168.  The Complaint here does not allege that.  It nowhere indicates that any of the interactions between the "Determinations Unit" and employees in D.C. involved *the Cincinnati Defendants* or *True the Vote*'s tax-exemption application. Conduct by other members of the same unit, or relating to other applications, is insufficient.  The allegations thus fail to meet the "specific acts" threshold.  *See First Chi. Int'l*, 836 F.2d at 1378. That gap cannot be filled by the conclusory allegation that the Cincinnati Defendants "worked in concert" with one or more of the IRS Defendants in the District of Columbia "in furtherance of a civil conspiracy."  *See* Compl. ¶¶28(b), 86.  Such a "'bare allegation' of conspiracy or agency is insufficient."  *First Chi. Int'l*, 836 F.2d at 1378-79; *see also El-Fadl*, 75 F.3d at 672.

3.    Even if the Cincinnati Defendants were properly alleged to have interacted with IRS officials operating from Washington, D.C., such actions would have been undertaken in their *official* capacities and therefore cannot establish personal jurisdiction over them in their *individual* capacities.  *See Ali v. District of Columbia*, 278 F.3d 1, 7 (D.C. Cir. 2002) (no jurisdiction where Virginia officials "undertake all . . .  actions [in connection with D.C.] in their

14

official capacities"). "The mere fact that [the Cincinnati Defendants are] employee[s] of the [IRS], which is headquartered in this district, does not render [them] subject to suit in [their] individual capacity in the District of Columbia." *Ballard v. Holinka*, 601 F. Supp. 2d 110, 118-19 (D.D.C. 2009); *see also Scinto v. Fed. Bureau of Prisons*, 608 F. Supp. 2d 4, 7-8 (D.D.C. 2009) (no jurisdiction over Bureau of Prisons warden employed in North Carolina); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13, 104 S. Ct. 1473, 1482 n.13 (1984) ("jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him").

\* \* \* \* \*

Simply put, the Cincinnati Defendants are employed in Ohio. They reside in Ohio (or across the river in Kentucky). The conduct they allegedly undertook all occurred in Ohio. And to the extent that Ohio conduct gave rise to any injury, it at most injured a Texas-based plaintiff in Texas. Because D.C.'s long-arm statute does not reach that far, the Cincinnati Defendants cannot be required to defend themselves, hundreds of miles from their homes and jobs, in the District of Columbia. The motion to dismiss for want of personal jurisdiction should be granted.

## II.   COUNT 3 MUST BE DISMISSED BECAUSE *BIVENS* SHOULD NOT BE EXTENDED TO THIS NEW CONTEXT

Alleging violations of True the Vote's First Amendment speech and association rights, the Complaint asserts individual-capacity damages claims against the Cincinnati Defendants under the implied cause of action recognized in *Bivens*. 403 U.S. at 391, 91 S. Ct. at 2002; *see* Compl. ¶¶162-167. The Supreme Court has, for three decades, consistently refused to extend the *Bivens* cause of action to any new context or class of defendants. It has never extended *Bivens* to First Amendment claims, and it has certainly not done so in the context of officers implementing the Internal Revenue Code's tax-exemption provisions. This Court should not

take that step.  Special factors and the existence of alternative remedies—remedies that are fundamentally incompatible with *Bivens*—preclude any such expansion.[4]

### A.    *Bivens* Should Rarely, If Ever, Be Extended to New Contexts

More than 40 years ago, *Bivens* "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S. Ct. 515, 519 (2001).  In *Bivens*, the Supreme Court "held that the victim of a Fourth Amendment violation by federal officers had a claim for damages." *Wilkie v. Robbins*, 551 U.S. 537, 549, 127 S. Ct. 2588, 2597 (2007).  In the following decade, the Supreme Court "recognized two more nonstatutory damages remedies, the first for employment discrimination in violation of the Due Process Clause, *Davis v. Passman*, 442 U.S. 228 (1979), and the second for an Eighth Amendment violation by prison officials, *Carlson v. Green*, 446 U.S. 14 (1980)." *Wilkie*, 551 U.S. at 549-50, 127 S. Ct. at 2597.

For the past 33 years, however, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants."  *Malesko*, 534 U.S. at 68, 122 S. Ct. at 520.  It has declined to extend *Bivens* to First Amendment violations arising in the federal employment context, *Bush v. Lucas*, 462 U.S. 367, 103 S. Ct. 2404 (1983); constitutional claims of military personnel arising from activity incident to service, *United States v. Stanley*, 483 U.S. 669, 107 S. Ct. 3054 (1987); *Chappell v. Wallace*, 462 U.S. 296, 103 S. Ct. 2362 (1983); due-process violations in the Social Security context, *Schweiker v. Chilicky*, 487 U.S. 412, 108 S. Ct. 2460 (1988); suits against federal agencies, *FDIC v. Meyer*, 510 U.S. 471, 114 S.

---

[4] This Court may dismiss the Complaint with prejudice for failure to state a claim—based on the absence of a cause of action or on qualified immunity grounds—without addressing personal jurisdiction.  *See Simpkins v. District of Columbia*, 108 F.3d 366, 370 (D.C. Cir. 1997) ("[T]o permit [plaintiff] to file another suit containing the same worthless claims would be inconsistent with the duty of lower federal courts to stop insubstantial *Bivens* actions in their tracks and get rid of them.").

Ct. 996 (1994); suits against private prison corporations and their employees, *Malesko*, 534 U.S. 61, 122 S. Ct. 515; *Minneci v. Pollard*, 132 S. Ct. 617 (2012); and retaliation against the exercise of ownership rights, *Wilkie*, 551 U.S. 537, 127 S. Ct. 2588.

The Supreme Court's "repeated reluctance to extend *Bivens* is not without good reason." *Holly v. Scott*, 434 F.3d 287, 289 (4th Cir. 2006). Because the *Bivens* cause of action "is implied without any express congressional authority whatsoever," it is "hardly the preferred course." *Id.* Rather, the "decision to create a private right of action" is generally "better left to legislative judgment." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727, 124 S. Ct. 2739, 2736 (2004). " 'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562, 127 S. Ct. at 2605 (quoting *Bush*, 462 U.S. at 389, 103 S. Ct. at 2417). Because a remedy would "come better, if at all, through legislation," *id.*, the Supreme Court has "responded cautiously to suggestions that *Bivens* remedies be extended," *Schweiker*, 487 U.S. at 421, 108 S. Ct. at 2467.

True the Vote claims that IRS officials violated its First Amendment rights in administering the Internal Revenue Code's provisions governing tax-exempt status. But the Supreme Court has "*never held* that *Bivens* extends to First Amendment claims" of *any* sort. *Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012) (emphasis added). This Court and the D.C. Circuit have made that extension only in the limited context of retaliatory arrests, prosecutions, and similar misconduct, *see, e.g.*, *Dellums v. Powell*, 566 F.2d 167, 194-96 (D.C. Cir. 1977); *Haynesworth v. Miller*, 820 F.2d 1245, 1255 (D.C. Cir. 1987) (retaliatory prosecution); *Oberwetter v. Hilliard*, 639 F.3d 545, 554 (D.C. Cir. 2011) (retaliatory arrest); *Lederman v. United States*, 291 F.3d 36, 39 (D.C. Cir. 2002) (retaliatory arrest); *Weise v. Jenkins*, 796 F. Supp. 2d 188, 196-97 (D.D.C. 2011) (retaliatory ejection from event). Those courts have never

17

extended the *Bivens* cause of action to alleged First Amendment violations in the context of the administration of the Internal Revenue Code.   To the extent *Bivens* may someday warrant extension to a new context, this is not it.   To the contrary, the standards that govern *Bivens'* extension preclude that expansion.

**B.      Special Factors Counsel Hesitation Before—Indeed, Preclude—Extending *Bivens* to This New Context**

Whether to extend *Bivens* is a highly "context-specific" inquiry.   *Wilson v. Libby*, 498 F. Supp. 2d 74, 86 (D.D.C. 2007); *see also Arar v. Ashcroft*, 585 F.3d 559, 572 (2d Cir. 2009) (en banc).[5]   Courts should decline to extend *Bivens* to a new context if "special factors counsel[] hesitation before authorizing a new kind of federal litigation.'"   *Wilkie*, 551 U.S. at 550, 127 S. Ct. at 2598 (quoting *Bush*, 462 U.S. at 378, 103 S. Ct. at 2411).   The "special factors counseling hesitation" threshold is "remarkably low."   *Arar*, 585 F.3d at 573-74.   "Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require.   'Hesitation' is 'counseled' whenever thoughtful discretion *would pause even to consider*."   *Id.* at 574 (emphasis added).   Here, the relevant factors do not merely "counsel hesitation" in extending *Bivens* to this new context; they compel rejecting it.   Congress has created a highly calibrated, comprehensive remedial regime to address IRS determinations of this sort.   Superimposing a judicially created *Bivens* action would be fundamentally incompatible with that regime.   The very nature of these

---

[5] For example, it is not enough that a court has extended *Bivens* to a particular *constitutional provision*; the question depends instead on the specific *factual context* of the extension.   *See Arar*, 585 F.3d at 572 ("context" means "a potentially recurring scenario that has similar legal and factual components").   Thus, courts have concluded that "a *Bivens* action alleging a violation of the Due Process Clause of the Fifth Amendment may be appropriate in some contexts," but that does not mean that it will be permissible "in others."   *Meyer*, 510 U.S. at 484 n.9, 114 S. Ct. at 1005 n.9.   *Contrast Davis*, 442 U.S. at 248-49, 99 S. Ct. at 2279 (permitting *Bivens* action for employment discrimination by Member of Congress), *with Chappell*, 462 U.S. at 302-05, 103 S. Ct. at 2366-68 (precluding *Bivens* action for employment discrimination in military context).

claims, and the determinations that IRS officials must make in this context, likewise militates against expanding *Bivens* here.

### 1. Congress's Provision of a Comprehensive Remedial Regime Counsels Hesitation

"One 'special factor' that precludes creation of a *Bivens* remedy is the existence of a comprehensive remedial scheme."  *Wilson*, 535 F.3d at 705.  In *Bush v. Lucas*, for example, the Supreme Court held that the Nation's civil service laws were a special factor that prevented extending *Bivens* to federal employees alleging retaliation in violation of their First Amendment rights.  462 U.S. at 388-90, 103 S. Ct. at 2417.  The Court so held even though that "existing remed[y] d[id] not provide complete relief."  *Id.* at 388, 103 S. Ct. at 2416; *see also Schweiker*, 487 U.S. at 425, 108 S. Ct. at 2468-69 (refusing to create a *Bivens* action even though Congress had not "given a remedy in damages for emotional distress or for other hardships suffered because of delays" in processing a disability benefits application); *Wilson*, 535 F.3d at 709 (comprehensive statutory scheme presents a special factor even when the statute does not "provide[ ] a remedy to the particular plaintiff for the particular claim he or she wishes to pursue").  The special factors analysis, the Supreme Court emphasized, "relate[s] to the question of who should decide whether such a remedy should be provided"—Congress or the courts. *Bush*, 462 U.S. at 380, 103 S. Ct. at 2413.  Where Congress has already legislated in the area and created its own remedial scheme, the judiciary should not risk displacing Congress's judgment by invoking *Bivens* to superimpose its own, extra-statutory scheme.  Courts thus "must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988).

Those principles control this case.  Congress has provided an alternative remedy through which True the Vote could vindicate its interests in a timely and proper determination of its tax-exempt status—26 U.S.C. § 7428.  Under § 7428, an organization may seek a declaratory judgment with regard to its tax-exempt classification if the IRS has either denied it § 501(c)(3) status or failed to make a determination with respect to its status within 270 days after the organization submitted its application.  *Id.*  Congress carefully calibrated that mechanism for judicial review to the tax-exemption context.  For example, § 7428 imposes an exhaustion requirement, together with an adapted set of exceptions to provide needed flexibility:  It provides that the "organization involved [must have] exhausted administrative remedies available," but it deems the exhaustion requirement satisfied if the IRS has taken more than 270 days to process the application and the applicant "has taken, in a timely manner, all reasonable steps to secure" a decision.  *Id.* § 7428(b)(2).  Section 7428 also imposes a specific limitations period:  Where the IRS has denied the organization's application for tax-exempt status, the organization may not seek review unless that "pleading is filed before the 91st day after the date" notice of the adverse determination was mailed.  *Id.* § 7428(b)(3).  Here, True the Vote did not merely have a right to seek relief under § 7428.  It has actually sought such relief in this case.  Compl. ¶¶ 139-147.

The specific mechanism in § 7428 is part of a complex and comprehensive regulatory scheme governing IRS actions and challenges thereto.  That scheme reflects "a considered congressional judgment about which remedies should be available for claims that fall within [their] ambit."  *Davis v. Billington*, 681 F.3d 377, 383 (D.C. Cir. 2012).  Because Congress has provided a specific remedy designed to address True the Vote's interest in obtaining a timely and proper tax-exemption determination from the IRS, this Court should not imply a new and different cause of action under *Bivens.  See Wilkie*, 551 U.S. at 552-53, 127 S. Ct. at 2599.  For

those reasons, the only other court in this district to have directly addressed the availability of a *Bivens* action in connection with a tax-exemption application declined to extend *Bivens* to this context. *Church by Mail, Inc. v. United States*, No. 87-0754, 1988 WL 8271, at *3-4 (D.D.C. Jan. 22, 1988) (Oberdorfer, J.). "The court should not create a damages remedy," it concluded, "where plaintiff clearly has an adequate remedy under 26 U.S.C. § 7428." *Id.* at *3; *see also Am. Ass'n of Commodity Traders v. Dep't of Treasury*, 598 F.2d 1233, 1236 n.2 (1st Cir. 1979) (noting that § 7428 provided "direct means for redress already available").

The D.C. Circuit, moreover, has held that the Internal Revenue Code provides a "comprehensive remedial scheme" that precludes *Bivens* claims. *Kim v. United States*, 632 F.3d 713, 717-18 (D.C. Cir. 2011). So has every other circuit to have addressed the question. *See McMillen v. U.S. Dep't of Treasury*, 960 F.2d 187, 190-91 (1st Cir. 1991) (per curiam); *Shreiber v. Mastrogiovanni*, 214 F.3d 148, 152-53 (3d Cir. 2000); *Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 410-13 (4th Cir. 2003); *Baddour, Inc. v. United States*, 802 F.2d 801, 807-09 (5th Cir. 1986); *Fishburn v. Brown*, 125 F.3d 979, 982-83 (6th Cir. 1997); *Vennes v. Unknown Number of Unidentified Agents of the U.S.*, 26 F.3d 1448, 1453-54 (8th Cir. 1994); *Adams v. Johnson*, 355 F.3d 1179, 1185-86 (9th Cir. 2004).

Those decisions apply with full force here. The Internal Revenue Code is both complex and comprehensive. "Indeed, '[i]t would be difficult to conceive of a more comprehensive statutory scheme, or one that has received more intense scrutiny from Congress, than the Internal Revenue Code.'" *Hudson Valley Black Press v. IRS*, 409 F.3d 106, 113 (2d Cir. 2005) (quoting *Judicial Watch*, 317 F.3d at 410). The Internal Revenue Code comprehensively regulates, for example, the process by which a taxpayer may challenge an improper request for information

issued by the IRS as part of an audit.[6]  It also provides means for challenging IRS determinations generally.  *See, e.g.*, 26 U.S.C. §§ 7422, 7432.

Congress has even addressed alleged misconduct by individual IRS employees.  Congress ensured that there would be independent oversight of IRS actions through the creation of both the Treasury Inspector General for Tax Administration ("TIGTA") and the Office of the Taxpayer Advocate.  TIGTA is an entity distinct from the IRS that investigates claims of IRS employee misconduct.  *See* 5 U.S.C. App. 3 § 2; Compl. Ex. F; *Hudson Valley*, 409 F.3d at 111; *Judicial Watch*, 317 F.3d at 411-12.  The Taxpayer Advocate is responsible for, among other things, "assist[ing] taxpayers in resolving problems with the Internal Revenue Service" and "identify[ing] areas in which taxpayers have problems in dealings with the Internal Revenue Service."  26 U.S.C. § 7803(c).  In this case, TIGTA has already conducted an investigation and made various recommendations regarding the processing of tax-exemption applications, Compl. Ex. F, and the Taxpayer Advocate has specifically assisted True the Vote with the tax-exemption application process, Compl. Ex. G.

Congress, moreover, has provided a specific civil damages remedy that "complements the other administrative remedies which Congress has provided in regulating the relationship between those who pay taxes and those who collect them."  *Hudson Valley*, 409 F.3d at 111. Aggrieved taxpayers may bring a civil action for damages resulting from misconduct of IRS employees in connection with the collection of taxes.  26 U.S.C. § 7433(a).  Section 7433 states:

---

[6] If a taxpayer resists the request, the IRS must issue a formal summons and move to compel production in the district court.  *See* 26 U.S.C. §§ 7602(a)(2), 7604.  Alternatively, a taxpayer may comply and then (1) challenge the audit findings in an internal IRS appeal, *id.* § 6330(b), (2) appeal directly to the United States Tax Court, *id.* § 6213(a), or (3) pay the alleged tax deficiency and bring suit for a refund in district court, *id.* § 7422.  *See Hudson Valley*, 409 F.3d at 111; *Judicial Watch*, 317 F.3d at 410.

> If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employer of the Internal Revenue Service recklessly or intentionally, or by reason of negligence, disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

*Id.* That provision is the "exclusive remedy for recovering damages from such actions." *Id.*

Although that particular remedy is not available here, that unavailability counsels against expanding *Bivens*, not in favor of it. When Congress has explicitly rejected a particular remedy, courts should not second-guess that judgment by imposing a *Bivens* remedy nonetheless:

> The question . . . is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff.

*Bush*, 462 U.S. at 388. To the contrary, if Congress has made a deliberate decision regarding the scope of relief, "a comprehensive statutory scheme precludes a *Bivens* remedy even when the scheme provides the plaintiff with 'no remedy whatsoever.' " *Wilson*, 535 F.3d at 709 (quoting *Spagnola*, 859 F.2d at 228).

Here, Congress made a deliberate decision not to provide a broader civil damages remedy. In 1987, before enactment of the damages remedy in § 7433, Congress considered various bills that would have authorized a private civil action against IRS employees for violating constitutional rights. *See* S. 579, 100th Cong., 1st Sess., § 3(a) (1987); H.R. 634, 100th Cong., 1st Sess., § 9(a) (1987). Those bills were never enacted. With respect to damages, Congress instead enacted § 7433, authorizing actions only for alleged *statutory and regulatory* violations in connection with *tax collection* activities. The Conference Report for § 7433 explained that the final version was "limited to reckless or intentional disregard *in connection with the collection of tax*. . . . An action *may not be brought* under this provision based on an

*alleged violation of a Federal law other than the Internal Revenue Code* or a regulation promul-

gated thereunder." H.R. Conf. Rep. No. 100-1104, at 229 (1988) (emphasis added).

Simply put, Congress carefully considered monetary remedies in connection with IRS tax

determinations and chose to limit those remedies. With respect to § 501(c) determinations—the

type at issue here—Congress chose to offer only *declaratory* relief. Its failure to provide a

damages remedy for constitutional violations in this context was "not inadvertent[ ]." *Spagnola*,

859 F.2d at 228. In light of the comprehensive procedures Congress has provided under the

Internal Revenue Code, the creation of a new *Bivens* damages remedy "could wreck havoc" with

those procedures and with the federal tax system. *Baddour, Inc. v. United States*, 802 F.2d 801,

807 (5th Cir. 1986).[7]

### 2. Extending *Bivens* Would Be Incompatible with the Existing Remedial Scheme

Implying a *Bivens* action here would not merely be inappropriate in light of the compre-

hensive remedial scheme Congress has established; it would also be at war with that scheme.

For tax-exempt determinations, Congress provided a cause of action limited to declaratory relief.

---

[7] That clear record of congressional intent forecloses the Tenth Circuit's rationale for extending *Bivens* to First Amendment claims against IRS employees. *See Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1248 (10th Cir. 1989); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994). *Gibbs* acknowledged that "the comprehensive scheme of the Internal Revenue Code should not be indiscriminately disrupted by the creation of new remedies," but it nevertheless did just that, deciding that "certain values, such as those protected by the first and fourth amendments, may be superior to the need to protect the integrity of the internal revenue system." 886 F.2d at 1248. That weighing of interests, however, is for Congress to make, *see Malesko*, 534 U.S. at 72, 122 S. Ct. at 522; *Bush*, 462 U.S. at 380, 103 S. Ct. at 2412, and here Congress has reached the opposite conclusion. Indeed, *Gibbs* has been roundly rejected for lacking "any discussion of § 7433, much less its legislative history evidencing Congress's considered decision to forego creating a damages remedy for misconduct by IRS employees in connection with the determination of taxes." *Judicial Watch*, 317 F.3d at 412-13. *Gibbs* cannot support the extraordinary extension of *Bivens* that True the Vote seeks here.

26 U.S.C. § 7428; *see* pp. 5-6, 21-24, *supra*.  That provision deliberately omits the monetary relief against individual IRS employees that True the Vote seeks here.  Although Congress did provide monetary relief in connection with IRS actions for other types of violations, it excluded tax-exemption decisions and the sorts of claims asserted here.  *See* pp. 5-6, 21-24, *supra*. Plaintiff's effort to expand *Bivens* in effect asks this Court to overturn Congress's deliberate choices.

Expanding *Bivens* here would be at odds, moreover, with Congress's procedural choices. In § 7428, Congress imposed specific requirements that are wholly incompatible with allowing a *Bivens* cause of action.  First, § 7428 requires exhaustion of administrative remedies (subject to exceptions that preserve necessary flexibility).  26 U.S.C. § 7428(b)(2) ("A declaratory judgment . . . under this section shall not be issued unless . . . the organization involved has exhausted administrative remedies available to it within the Internal Revenue Service."); *see also Educ. Assistance Found. v. United States*, 904 F. Supp. 2d 95, 98 (D.D.C. 2012).  The IRS has established procedures tailored to that administrative process.  *See* 26 C.F.R. § 601.201(n)(7). Second, § 7428 imposes a relatively short limitations period for seeking review of agency determinations—90 days.  26 U.S.C. § 7428(b)(3).

Permitting suits under *Bivens* would be inconsistent with those calibrated statutory requirements.  Unlike parties suing under § 7428, *Bivens* plaintiffs typically are not required to exhaust.[8]  More important, *Bivens* actions are subject to a limitations period measured in years, not days.  *See Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1428-29 (D.C. Cir. 1986) (most *Bivens* actions subject to three-year limitations period in the District of Columbia);

---

[8] *See McCarthy v. Madigan*, 503 U.S. 140, 112 S. Ct. 1081 (1992) (declining to impose exhaustion on federal prisoner *Bivens* actions); *but see Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983 (2002) (requiring exhaustion where Congress specifically imposed it for all prisoner suits).

*id.* at 1434 (suits akin to libel, slander, assault, battery, mayhem, wounding, malicious prose-cution, false arrest, or false imprisonment subject to one-year limitations period); *Bame v. Clark*, 466 F. Supp. 2d 105, 108-09 (D.D.C. 2006).   Those incompatibilities counsel decisively against extending *Bivens* here.  Allowing organizations to bypass the express statutory remedy Congress prescribed, and bring suit under *Bivens* instead, would "render superfluous most of the detailed procedural protections outlined in the statute." *Smith v. Robinson*, 468 U.S. 992, 1011, 104 S. Ct. 3457, 3468 (1984).

The Supreme Court has found those considerations dispositive in the related context of §1983 actions.  In *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 125 S. Ct. 1453 (2005), for example, the Court addressed whether a plaintiff was required to bring his claim against state officials under the express remedy provided by the Telecommunications Act of 1996, or could instead assert the claim as a civil rights violation under 42 U.S.C. §1983.  The Court explained that the "provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under" more general provisions like §1983.  544 U.S. at 121, 125 S. Ct. at 1458.  The Court found that permitting suit under §1983 was incompatible with the express cause of action, which "limits relief in ways that §1983 does not." *Id.*, 125 S. Ct. at 1459.  In particular, judicial review under the Telecommunications Act "must be sought within 30 days," whereas a "§1983 action, by contrast, can be brought much later." *Id.* at 122-23, 125 S. Ct. at 1459-60.  The remedies differed as well, potentially with respect to compensatory damages and certainly with respect to attorney's fees and costs. *Id.*

The judiciary, the Supreme Court explained, must presume "that limitations upon the remedy contained in the statute are deliberate and are not to be evaded through §1983." *Ran-*

*chos Palos Verdes*, 544 U.S. at 124, 125 S. Ct. at 1460.  Permitting "enforcement of" the rights at issue "through § 1983 would distort the scheme of expedited judicial review and limited remedies" Congress had created.  *Id.* at 127, 125 S. Ct. at 1462.  Accordingly, the Court held that "the [Telecommunications Act]—by providing a judicial remedy different from § 1983 . . . — precluded resort to § 1983."  *Id.*; *see also id.* at 128, 125 S. Ct. at 1462-63 (Breyer, J., concurring) (permitting § 1983 action was incompatible with statute because Congress intended review to resemble review under the Administrative Procedure Act).  The Supreme Court has repeatedly invoked similar considerations to find resort to § 1983 foreclosed.  *Smith*, 468 U.S. at 1011-12, 104 S. Ct. at 3468; *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20-21, 101 S. Ct. 2615, 2626-27 (1981).

Those same considerations necessarily foreclose expansion of *Bivens* here.  The specific statutory remedy Congress provided in § 7428 imposes a limitations period much shorter than the period for *Bivens* actions, *i.e.*, 90 days versus a year or more.  Likewise, the specific statutory relief authorized—declaratory judgment—is more restrictive than the expansive monetary relief available under *Bivens*.  In *Rancho Palos Verdes*, the Supreme Court found those incompatibilities so compelling as to preclude resort to § 1983, an express *statutory* cause of action.  *A fortiori*, those same incompatibilities should preclude expansion of *Bivens*, a *judicially created* cause of action.  At the very least, they "counsel hesitation"—they offer reasons "thoughtful discretion would pause even to consider"—that forecloses *Bivens* expansion.

### 3.   The Administrative Procedure Act Underscores the Existence of Special Factors

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, reinforces that conclusion.  Under the APA, parties with no other adequate remedy may challenge "unreasonable delay" in agency action, as well as conduct alleged to be "not in accordance with law" or

"contrary to constitutional right."  5 U.S.C. § 706; *cf.* Compl. ¶¶ 5, 132, 194.[9]  Court after court

has recognized that the APA—even though it affords no monetary remedies and applies broadly

to agency actions—represents a comprehensive remedial scheme that precludes resort to the

more general *Bivens* remedy.[10]  There is no reason for a different result under § 7428, which

provides a remedy geared specifically to tax-exemption determinations.  Indeed, the APA itself

directs that, where Congress has prescribed a "special statutory review proceeding" like § 7428,

aggrieved parties must invoke that context-specific form of action for judicial review.  5 U.S.C.

§ 703.[11]

---

[9] The APA authorizes a reviewing court to:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to
>     be . . .
>     (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accord-
>         ance with law; [or]
>     (B) contrary to constitutional right, power, privilege, or immunity . . . .

5 U.S.C. § 706.

[10] *See W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("APA leaves no room for *Bivens* claims based on agency action or inaction"); *Robbins v. Wilkie*, 300 F.3d 1208, 1212 (10th Cir. 2002) ("[i]f [a plaintiff] attempted to hold [d]efendants liable for alleged constitutional violations committed while reaching a final agency decision, a *Bivens* action would not be available" because "[t]he APA is the proper avenue for reviewing an agency's action or decision"); *Neb. Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005) ("When Congress has created a comprehensive regulatory regime, the existence of a right to judicial review under the APA is sufficient to preclude a *Bivens* action."); *Zephyr Aviation, L.L.C. v. Dailey*, 247 F.3d 565, 572 (5th Cir. 2001) ("Parties may not avoid administrative review simply by fashioning their attack on an [agency] decision as a constitutional tort claim against individual officers."); *see also Webster v. Doe*, 486 U.S. 592, 599, 108 S. Ct. 2047, 2051 (1988) (referring to "APA's comprehensive provisions"); *Heckler v. Chaney*, 470 U.S. 821, 828, 105 S. Ct. 1649, 1654 (1985) (discussing the APA's "comprehensive provisions for judicial review" of "agency actions").

[11] For that reason, True the Vote must proceed according to § 7428—with its accompanying conditions and limitations—and cannot assert a bare APA claim.  Parties cannot evade the requirements of a special statutory review mechanism by purporting to proceed under the APA alone.  *FCC v. ITT World Commc'ns Inc.*, 466 U.S. 463, 468-69, 104 S. Ct. 1936, 1939-40

The APA, moreover, functions as a gap-filler, which itself counsels against further judicial supplementation.  Suit under the APA is available where there is "no other adequate remedy in a court."  5 U.S.C. § 704.  Congress thus intended that the APA—not a judicially implied damages suit—serve as the stopgap where no other remedy for federal agency action is available.  That weighs against further augmentation through an extension of *Bivens*.  *W. Radio Servs.*, 578 F.3d at 1123.

### 4.    The Content and Context of the Asserted Violation Counsel Against Expanding *Bivens*

Finally, the nature of the violation alleged by True the Vote counsels decisively against *Bivens'* expansion here.  This case arises out of implementation of the Internal Revenue Code, an extraordinarily complex and intricate set of statutory and regulatory provisions that can require detailed analysis of taxpayer records and information.  IRS officials thus must make myriad discretionary determinations every day.  Expanding *Bivens* here would expose such officials to the threat of personal lawsuits and liability for each of those decisions.  If such suits are to be allowed, that authorization—along with relevant parameters and limits—should come from Congress, not the courts.

That is particularly true with respect to IRS consideration of applications for tax-exempt status.  Identifying organizations eligible for tax-exempt status requires an intensive factual inquiry into the organization's activities and purposes.  *See* 26 U.S.C. § 501(c)(3); 26 C.F.R. § 1.501(c)(3)-1.  Unhappy applicants would have little difficulty alleging impropriety:  Disap-

---

(1984) (Hobbs Act directive that review of FCC rulemakings be sought in court of appeals means suit cannot be filed in district court); *Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 78 (D.C. Cir. 1984) (similar); *see ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282, 107 S. Ct. 2360, 2367 (1987) ("[T]he Hobbs Act [provision for judicial review] specifies the form of proceeding for judicial review . . .  orders," while the APA "codifies the nature and attributes of judicial review.").

pointed liberal organizations could accuse reviewers of conservative bias; minorities could claim improper ethnic or racial bias; everyone could accuse the agency of skewing its filters; the potential list is endless.  The Internal Revenue Code's requirements exacerbate the risk.  Section 501(c)(3) tax-exempt status is not available for organizations engaged in certain political activities, such as campaigning for candidates or substantial lobbying, 26 U.S.C. § 501(c)(3); *Regan*, 461 U.S. at 543, 103 S. Ct. at 2000, even though those are themselves First Amendment protected activities.  As a result, the process of identifying organizations that engage in disqualifying activities inevitably requires an examination of political conduct—and can invariably lead to assertions that identification techniques or individual implementation decisions are biased or less than even-handed.  In *Bush v. Lucas*, the Supreme Court warned that imposing *Bivens* liability on government managers for personnel decisions allegedly taken to retaliate against protected speech "would . . . deter[ ] [managers] from imposing discipline in future cases."  462 U.S. at 389, 103 S. Ct. at 2417; *see also Benzman v. Whitman*, 523 F.3d 119, 126 (2d Cir. 2008) (need for "discretionary decision[making] when engaged in disaster relief efforts" is special factor counseling hesitation).  The same risk exists here.  Confronted with potential personal liability for the denial of a tax-exemption application, IRS Specialists may favor—even subconsciously—granting applications that actually merit denial, or simply decide that further inquiry is not worth the risk.  The potential "havoc with the federal tax system" that would result should not be undertaken lightly.  *Baddour*, 802 F.2d at 807.

By contrast, True the Vote's interests in a *Bivens* remedy are attenuated.  It has already obtained precisely the tax-exemption determination it sought after invoking the review mechanism Congress provided.  And it does not claim that the IRS, or any of the individual IRS employees, directly interfered with, regulated, or prevented the exercise of its free speech and

association rights.  It claims improper denial of a tax exemption—in effect, a tax benefit.  But the denial of a tax benefit does not itself violate the First Amendment.  The Supreme Court has repeatedly rejected the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Regan*, 461 U.S. at 545-46, 103 S. Ct. at 2001 (quoting *Cammarano v. United States*, 358 U.S. 498, 515, 79 S. Ct. 524, 534 (1959) (Douglas, J., concurring)).  And a constitutional violation does not necessarily arise whenever there is an indirect, tangential imposition on a party's First Amendment rights.  Rather, in the freedom of association context, "indirect restraints"—as opposed to those that directly "order" or "prevent" association—"violate the Constitution only if they 'directly and substantially' interfere" with the exercise of that right.  *Pathfinder Fund v. Agency for Int'l Dev.*, 746 F. Supp. 192, 195 (D.D.C. 1990) (quoting *Lyng v. Int'l Union, United Auto. Workers of Am.*, 485 U.S. 360, 366, 367 n.5, 108 S. Ct. 1184, 1190 n.5 (1988)).  Being forced to make certain choices—such as choosing between qualifying for tax-exempt status or participating in lobbying activities—does not directly or substantially interfere with associational or free speech rights.  *See Lyng*, 485 U.S. at 366, 368, 108 S. Ct. at 1189-90; *Kraham v. Lippman*, 478 F.3d 502, 508 (2d Cir. 2007).  Although denial of a tax exemption on the ground that the applicant engages in certain forms of speech has constitutional implications, *Speiser v. Randall*, 357 U.S. 513, 518, 78 S. Ct. 1332, 1338 (1958), the absence of any direct effort to regulate or silence First Amendment conduct counsels hesitation here.

That is not to say that this Court must decide whether the potential costs of imposing personal liability outweigh the posited benefits, or vice versa.  The question instead is whether such weighing is "the kind of remedial determination that is appropriate for a common-law tribunal." *Wilkie*, 551 U.S. at 550, 127 S. Ct. at 2598.  As in *Bush*, "Congress is in a far better

position than a court to evaluate the impact of a new species of litigation . . . on the efficiency of" IRS officials and to make a "policy judgment . . . informed by a thorough understanding of the existing regulatory structure and the costs and benefits that would result from the addition of another remedy for violations of" § 501(c)(3) applicants' constitutional rights. *Bush*, 462 U.S. at 388-89, 103 S. Ct. at 2417; *see also Schweiker*, 487 U.S. at 426-28, 108 S. Ct. at 2469-70. Congress, not the courts, should decide how best to balance the relevant interests, determine whether to create a new cause of action with monetary liability, and impose any necessary limits. The Court should not extend *Bivens* here.

### C.    True the Vote Had Adequate Alternative Remedies

*Bivens* also cannot be extended to a new context when Congress has provided an "alternative, existing process for protecting the interest." *Wilkie*, 551 U.S. at 550, 127 S. Ct. at 2598. Here, the declaratory judgment action authorized in § 7428 is precisely such a remedy. Section 7428 provides a direct means of redress for improper denials or improper delay beyond 270 days. *See Church by Mail*, 1988 WL 8271, at *3 ("The court should not create a damages remedy in this case where plaintiff clearly has an adequate remedy under 26 U.S.C. § 7428."); *see also Am. Ass'n of Commodity Traders*, 598 F.2d at 1236 n.2 (noting § 7428 provided "direct means for redress already available"). True the Vote cannot deny the availability of that relief — it has already pursued it here. *See* Compl. ¶¶ 139-47. Because existing statutory remedies protect True the Vote's interests, creating a new remedy under *Bivens* is unnecessary and unwarranted.[12]

---

[12] Even if True the Vote had alleged conduct for which § 7428's "special statutory review proceeding," 5 U.S.C. § 703, would be inadequate—and it has not—True the Vote would have adequate remedies under the APA. It can, for example, ask a federal court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). True the Vote recognizes

III.    **COUNT 3 MUST BE DISMISSED BECAUSE THE CINCINNATI DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

Qualified immunity protects government officials from suit "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).  That objective inquiry looks to the law and circumstances in existence at the time the officers acted, *id.* at 232, giving "government officials breathing room to make reasonable but mistaken judgments," and "protect[ing] 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986)).

"To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question *beyond debate*."  *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (emphasis added) (citations omitted).  "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized."  *Malley*, 475 U.S. at 341, 106 S. Ct. at 1096.  Federal officers, moreover, must have participated personally in the alleged constitutional wrongdoing.  Even in the "limited settings where *Bivens* does apply," "a plaintiff must plead that *each* Government-official defendant, through the official's *own individual actions*, has violated the Constitution."  *Iqbal*, 556 U.S. at 675-76, 129 S. Ct. at 1948 (emphasis added).

---

that APA remedies would redress the injuries it allegedly suffered, raising claims under the APA alongside its request for relief under § 7428.  *See* Compl. ¶ 188-206

Courts typically proceed in two steps in determining whether a government official is protected by qualified immunity. First, they ask "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232, 129 S. Ct. at 815-16 (citation omitted). If so, they then ask "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* Courts may, however, proceed directly to the second step. *Reichle*, 132 S. Ct. at 2093.

### A.   The Complaint Does Not Allege That the Cincinnati Defendants Violated True the Vote's First Amendment Rights

To state a claim that an officer retaliated in violation of the First Amendment, the Complaint must allege facts sufficient to show that:

> (1) [the plaintiff] engaged in conduct protected under the First Amendment, (2) the defendant took retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link existed between the protected expression and the adverse action allegedly taken against [the plaintiff].

*Aref v. Holder*, No. 10-539(BJR), 2013 WL 3488487, at *8 (D.D.C. July 12, 2013). The allegations here do not meet those requirements. The Complaint alleges no conduct by the Cincinnati Defendants that would "deter a person of ordinary firmness in plaintiff's position from speaking again." Nor has it properly alleged that each Cincinnati Defendant engaged in retaliatory action because of animus toward True the Vote's exercise of First Amendment rights.

### 1.   The Alleged Retaliation Would Not Deter a Person of Ordinary Firmness from Speaking Again

A constitutional tort action for viewpoint discrimination cannot survive absent some "showing" of "non-de minimis . . . injury." *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *rev'd on other grounds*, 523 U.S. 574, 118 S. Ct. 1584 (1998). If the government official's acts would not "chill or silence a 'person of ordinary firmness' from future First Amendment activities," the claim must be dismissed. *Id.*; *see also Toolasprashad v. Bureau of*

*Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002).  Courts in this district thus have repeatedly held that "where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."  *Hatfill v. Ashcroft*, 404 F. Supp. 2d 104, 119 (D.D.C. 2005); *Krieger v. U.S. Dep't of Justice*, 529 F. Supp. 2d 29, 58 (D.D.C. 2008).

The Complaint here fails for precisely those reasons.  It nowhere alleges any facts to support the conclusion that True the Vote has been materially deterred, or even would be materially deterred, from engaging in First Amendment activities because of the alleged inquiries or delays in connection with its application for tax-exempt status.  Instead, it offers only the conclusory allegations that its First Amendment rights have been "materially interfered with" by the IRS Identification Scheme.  Compl. ¶ 137.  But the Federal Rules require the plaintiff to allege the necessary *facts*; mere "labels and conclusions"—the "formulaic recitation of the elements of a cause of action" together with an assertion they are met—"will not do."  *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965; *see Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1965.  The Complaint alleges that True the Vote "has incurred substantial cost and expenses in responding to the IRS . . . requests for information" and that its "ability to build its organization has been hindered." Compl. ¶¶ 71-72.  But those are legal conclusions, not facts.  The Complaint does not identify the costs and expenses associated with the IRS investigation.  Nor does True the Vote describe *how* the investigation hindered its ability to build its organization.   Most fundamentally, the Complaint nowhere pleads facts sufficient to show that IRS inquiries deterred True the Vote from engaging in protected First Amendment activity—speaking in accord with its stated charitable and educational purpose.  In fact, True the Vote does not identify *any* behavioral change arising from the IRS investigation or the alleged delay in granting its tax-exemption

application.  Because True the Vote "can show no change in [its] behavior, [it] has quite plainly

shown no chilling of [its] First Amendment right to free speech."  *Hatfill*, 404 F. Supp. 2d at 119.

Nor would any person of ordinary firmness be reasonably deterred from exercising his

First Amendment rights—or altering his viewpoint—by a delay in obtaining tax-exempt status or

the minimal burden of having to provide information in response to an IRS request.  Participation

in limited investigatory actions, including official "questioning," is no more than a "*de minimis*

slight."  *Wrobel v. County of Erie*, 692 F.3d 22, 31-32 (2d Cir. 2012).  Notably, the IRS inquiry

carried no threat of criminal—or even monetary—sanction.  The worst prospect True the Vote

faced was delay or denial of its application.   In either case, True the Vote could continue

engaging in protected speech without tax-exempt status, just as it had before applying.  These

consequences would not deter a person of ordinary firmness from protected conduct.

### 2.   True the Vote Has Not Alleged the Required Discriminatory Intent by Each Defendant

To sustain a First Amendment discrimination claim, "the plaintiff must plead and prove

that the defendant acted with discriminatory purpose."  *Iqbal*, 556 U.S. at 676, 129 S. Ct. at

1948.  "Mere knowledge of, or acquiescence in . . .  potentially discriminatory practices would

not constitute purposeful discrimination."  *Johnson v. Gov't of D.C.*, 780 F. Supp. 2d 62, 77-79

(D.D.C. 2011).  Instead, the plaintiff must allege "sufficient factual matter" to show that the

defendant acted "for the purpose of discriminating on account of" the plaintiff's exercise of First

Amendment rights.  *Iqbal*, 556 U.S. at 676-77, 129 S. Ct. at 1948-49.  Far from pleading facts to

support that discriminatory purpose, the Complaint and the materials it incorporates by reference

destroy any such inference.

As an initial matter, the Complaint does not properly allege discriminatory animus for

any of the Cincinnati Defendants.  Instead, it resorts to group pleading, repeatedly treating all

"IRS Defendants" as a single entity.  *See, e.g.*, Compl. ¶¶ 6, 73, 76, 126, 128, 132.  The Complaint thus alleges that True the Vote's tax-exemption application was singled out by the "IRS Defendants" "based on its name, its affiliation with . . . Tea Party groups, and the mission of True the Vote to protect the integrity of elections."  Compl. ¶¶ 125, 128, 132.  But "undifferentiated" allegations directed towards "Defendants" generally are insufficient even at the pleading stage.  *See Arar*, 585 F.3d at 569.  Such generalized allegations do not show "that *each* Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676, 129 S. Ct. at 1948 (emphasis added).  And "conclusory statements" of the sort True the Vote offers are insufficient to plead the requisite personal participation.  *Id.* at 678, 129 S. Ct. at 1949; *see also Rice v. Holder*, 898 F. Supp. 2d 291, 293-94 (D.D.C. 2012) (conclusory allegations that defendant "consented to" and was "complicit" in constitutional violations failed to establish personal involvement).

The Complaint's few specific factual allegations regarding the Cincinnati Defendants do not "plausibly suggest[ ]" they acted with discriminatory purpose, *see Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966, nor do they rise above the speculative level.  To the contrary, they suggest only that the Cincinnati Defendants were following policies in fulfillment of their job duties.  As in *Iqbal*, an "obvious alternative explanation" suggests that the defendants acted "for a neutral, investigative reason," rendering the "invidious discrimination [the plaintiff] asks us to infer . . . not a plausible conclusion."  556 U.S. at 676-77, 82, 129 S. Ct. at 1948-49, 1951-52.  Here, the "obvious alternative explanation" for the inquiry into True the Vote's activities was that True the Vote's application explicitly acknowledged conduct that could render it ineligible for tax-exempt status:  It reported that it "attempts to influence legislation," Compl. Ex. B at 9, an activity that is disqualifying if sufficiently "substantial," 26 C.F.R. § 1.501(c)(3)-1(c)(3).  And it reported that

two of its three board members were married to each other, Compl. Ex. B at 17, raising the possibility of improper and disqualifying private inurement, *Bubbling Well Church*, 74 T.C. at 534-35. Notably, there is nothing in the Complaint suggesting that the Cincinnati Defendants—all line-level IRS employees—harbored ill-will toward conservative or "Tea Party" organizations, much less that they delayed and scrutinized True the Vote's application for that reason.

Nor does anything in the Complaint suggest that any of the four Cincinnati Defendants—Ms. Maloney, Ms. Ng, Mr. Bell, or Ms. Estes—participated in or contributed to the creation of the "be on the lookout" ("BOLO") policies alleged to target conservative or "Tea Party" organizations. Instead, the Complaint generally alleges that the "IRS Exempt Organizations ('EO') Determinations Unit" instituted the Identification Scheme and created the BOLO lists. Compl. ¶¶ 83-85. Such generalized allegations referring only to a governmental unit do not support an inference that "each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S. Ct. at 1948 (emphasis added). Even assuming the Cincinnati Defendants knew of the IRS Identification Scheme, the failure to plead facts suggesting those specific individuals acted with retaliatory animus—rather than some other purpose such as concern that True the Vote did not qualify for tax-exempt status—is fatal to True the Vote's claims against them. *See Klay v. Panetta*, 924 F. Supp. 2d 8, 22 (D.D.C. 2013) (no liability for "knowledge" that "inaction . . . would result in ongoing Constitutional deprivations").

### 3.     The Complaint Fails Under *Hartman v. Moore*

For similar reasons, the Complaint is barred by *Hartman v. Moore*, 547 U.S. 250, 126 S. Ct. 1695 (2006). In that case, the Supreme Court held that an action against investigators for retaliatory prosecution in violation of the First Amendment cannot proceed unless "want of probable cause" is both "alleged and proven." *Id.* at 252, 126 S. Ct. at 1699; *see id.* at 265, 126

S. Ct. at 1706 ("Because showing an absence of probable cause will have high probative force, and can be mandatory with little or no added cost, it makes sense to require such a showing as an element of a plaintiff's case, and we hold that it must be pleaded and proven.").  Where there is sufficient cause to prosecute, the Supreme Court held, the plaintiff cannot show that animus was the but-for cause of his alleged injury.  And an "action colored by some degree of bad motive," the Court explained, "does not amount to a constitutional tort if that action would have been taken anyway."  *Id.* at 260, 126 S. Ct. at 1704 (citations omitted).

Courts regularly apply that same absence-of-probable-cause requirement to retaliatory arrest claims.  *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *Keenan v. Tejeda*, 290 F.3d 252, 261-62 (5th Cir. 2002); *Barnes v. Wright*, 449 F.3d 709, 720 (6th Cir. 2006); *McCabe v. Parker*, 608 F.3d 1068, 1079 (8th Cir. 2010); *Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002); *see also Anderson v. City of Naples*, 501 F. App'x 910, 916 (11th Cir. 2012) (citing *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003)).  And the requirement makes sense in this context—where the plaintiff claims the defendants sought information from it for improper reasons—as well.  When sufficient cause for further investigation exists, the plaintiff cannot show that the inquiry resulted from, and would not have occurred absent, the improper animus.  *See Hartman*, 547 U.S. at 260, 126 S. Ct. at 1704.[13]

---

[13] There is a circuit conflict on the scope of *Hartman*'s absence-of-cause requirement, as a few courts have limited it to retaliatory prosecution cases because, in that context, the ultimate decision to prosecute is made not by the defendant who allegedly harbors the animus but by a prosecutor (who is absolutely immune) or a grand jury.  *See Kennedy v. City of Villa Hills*, 635 F.3d 210, 217 n.4 (6th Cir. 2011); *Skoog v. County of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (no need to plead and prove the absence of probable cause).  The Supreme Court has left that conflict unresolved.  *Reichle*, 132 S. Ct. at 2096 (concluding only that the law is not clearly established).  But that conflict is irrelevant here because, like the criminal prosecution in *Hartman*, an IRS investigation involves a complex causal chain:  The Complaint alleges that supervisors made the policy while Specialists, such as the Cincinnati Defendants, merely conducted investigations.  *Compare, e.g.*, Compl. ¶96 ("the IRS EO Technical Unit—under the direction

In this case, there was ample cause for further inquiry.  As explained above, True the Vote admitted that two of its directors were married to each other, Compl. Ex. B at 17, and a close familial relationship between two of the organization's three directors suggests a degree of control that could permit improper and disqualifying private inurement.  *Bubbling Well Church*, 74 T.C. at 534-35.  Moreover, True the Vote noted on its application that it "attempts to influence legislation," directing about 20% of its budget toward education on desired legislative initiatives.  Compl. Ex. B at 9, 17.  Those expenditures may exceed the limits placed on tax-exempt organizations, which may not devote "substantial" spending to lobbying and lobbying-related activities.  *See* 26 C.F.R. § 1.501(c)(3)-1(c)(3).  Finally, True the Vote provided election monitors and voter registration programs, Compl. Ex. B at 17, which might amount to participation in or intervention in campaign activities.  Indeed, once that information was disclosed, a reasonable officer would have been entitled to conclude that they *must* request additional information before approving True the Vote's § 501(c)(3) tax-exemption application.  *See* 26 U.S.C. § 501(c)(3) (excluding from exemption organizations where earnings inure to the benefit of any private individual, organizations that participate or intervene in political campaigns, and organizations that engage in substantial lobbying activities); *see also Varrone v. Bilotti*, 123 F.3d

---

and control of either Defendant Ms. Paz, Defendant Mr. Grodnitzky, or Defendant Mr. Seto—the IRS Office of Rulings and Agreements—under the direction and control of either Defendant Ms. Paz or Defendant Mr. Fish—Defendant Ms. Lerner, and Unknown Named Employees of the IRS developed and revised written and oral guidance on how IRS Employees, including Defendant Ms. Thomas, Ms. Maloney, Ms. Estes, Mr. Bell, [and] Ms. Ng . . . were to identify and process applications"); Compl. ¶ 135 (IRS Identification Scheme "developed, revised, and implemented under the authority of Defendants the IRS, Mr. Miller, Mr. Shulman, Mr. Wilkins, Ms. Lerner, Ms. Paz, Mr. Fish, Mr. Grodnitzky, Mr. Seto, Mr. Thomas, and Unknown Named IRS Employees"); *with* Compl. ¶¶ 56, 59-60, 63, 66 (noting only that individual Cincinnati Defendants sent letters and fielded questions about True the Vote's application status).  As in *Hartman*, if the Specialists had cause to further investigate and scrutinize True the Vote's application, any retaliatory animus by IRS supervisors would be irrelevant, since the investigation would have proceeded in any event.

75, 81-82 (2d Cir. 1997) (officers have qualified immunity for carrying out an order that was not "facially invalid or obviously illegal").

### 4.     The Claims Against Mr. Bell Fail for Failure To Plead Personal Participation of Any Sort in Discriminatory Conduct

The claim against Mr. Bell fails regardless. *Bivens* requires, at a minimum, well-pleaded facts that each defendant personally engaged in the identified discriminatory conduct. The gist of True the Vote's claim is that its application was unduly delayed and improperly scrutinized. But Mr. Bell is not alleged to have delayed or scrutinized True the Vote's application. He is not alleged to have done *anything* other than provide the Taxpayer Advocate and True the Vote updates as to the status of the application. Compl. ¶¶59-60. In the absence of any allegation that Mr. Bell "personally conducted" any portion of an improper investigation or participated in creating the alleged delay, the claims against him must fail. *See Johnson*, 780 F. Supp. 2d at 77-79; *Iqbal*, 556 U.S. at 675-76, 129 S. Ct. at 1948.

### B.     At the Very Least, the Complaint Fails To Allege a Violation of "Clearly Established Law"

To overcome qualified immunity, the Complaint must go beyond alleging facts that would establish a constitutional violation. The pleaded facts must establish a violation of rights that were "clearly established" when the defendants acted. In making that inquiry, it is not enough that "the relevant 'legal rule'" or "right" is "clearly established" at a high level of generality—*e.g.*, that the Fourth Amendment bars searches without probable cause or that due process bars torture. *Anderson*, 483 U.S. at 639, 107 S. Ct. at 3038-39. Instead, the "contours of the right must be sufficiently clear" that any competent officer "would understand that *what he is doing violates that right*." *Id.* at 640, 107 S. Ct. at 3039 (emphasis added). The "right allegedly violated must be established not as a broad general proposition, but in a particularized sense." *Reichle*, 132 S. Ct. at 2094 (citations and alterations omitted).

As a result, True the Vote cannot avoid dismissal merely by urging that there was a clearly established "right to be free from retaliation for one's speech." *Reichle*, 132 S. Ct. at 2094. Rather, it must show that, at the time the defendants acted, the right's contours were so clear that "*every* reasonable official would have understood that" the challenged conduct "violates that right"—"existing precedent" must have placed the conduct's lawfulness "beyond debate." *Id.* at 2093 (emphasis added) (citations omitted).

The Complaint fails to do that. First, putative retaliation does not violate the First Amendment unless it would "chill or silence a 'person of ordinary firmness' from future First Amendment activities." *Crawford*, 93 F.3d at 826. As explained above (at pp. 34-36, *supra*), the Cincinnati Defendants' alleged conduct does not rise to that level. Even if the Court were to conclude otherwise, the Cincinnati Defendants' conduct was not so far over the hazy boundary between impermissibly chilling conduct and conduct lacking such a chilling effect that their conduct's unconstitutionality would have been patent to any and all reasonable officers. *Cf. Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (officer entitled to immunity for use of excessive force unless he went "so far beyond the hazy border between excessive and acceptable force" that every reasonable officer would "know he was violating the Constitution"). To the contrary, because reasonably competent officers "could disagree on this issue, immunity should be recognized." *Malley*, 475 U.S. at 341, 106 S. Ct. at 1096.

Second, officers are entitled to immunity if they reasonably (even if mistakenly) could have believed there was sufficient cause to investigate. *See Anderson*, 483 U.S. at 641-42, 107 S. Ct. at 3039 (where violation turns on probable cause or its absence, officer is entitled to immunity unless it was "clearly established that the circumstances with which [the officer] was confronted did not constitute probable cause"). As explained above (at pp. 38-40, *supra*), the

grounds for further inquiry here were ample.  But at the very least, they were not so thin, so far from potential sufficiency, that it was "'entirely unreasonable' for an officer to believe" they were adequate.  *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1246 (2012).  Even if such a belief "may have been mistaken, . . . it was not 'plainly incompetent.'"  *Id.* at 1249 (quoting *Malley*, 475 U.S. at 341, 106 S. Ct. at 1096); *see also Thayer v. Chiczewski*, 705 F.3d 237, 250 (7th Cir. 2012) (officers entitled to qualified immunity even though it was "questionable whether [they] had probable cause"); *Rushing v. Parker*, 599 F.3d 1263, 1268 (11th Cir. 2010) (officer entitled to qualified immunity for arrest where investigation was imperfect but not "plainly incompetent").  For that reason too, qualified immunity must be granted.

It is no answer to suggest, as True the Vote might, that the absence-of-probable-cause requirement is limited to retaliatory prosecution cases, or does not extend to retaliatory arrest and investigation claims.  Myriad courts (including the Second, Fifth, Sixth, Eighth, and Eleventh Circuits) have held otherwise, *see* p. 39, *supra*, and the D.C. Circuit has not addressed the issue.  Thus, at the time of the investigation, "it was at least arguable that *Hartman*'s rule" extended beyond retaliatory prosecution to include allegations of retaliatory investigation by an administrative agency.  *Reichle*, 132 S. Ct. at 2096.  On that issue, there was no "clearly established law."  Nor does it matter that the D.C. Circuit has since held that the absence-of-probable-cause requirement goes to causation, not whether there was a constitutional violation.  *Moore v. Hartman*, 704 F.3d 1003, 1004 (D.C. Cir. 2013).  The specific question here—whether there was a "specific right to be free from a retaliatory [investigation] that is otherwise supported" by adequate "cause"—was unresolved at the time the Cincinnati Defendants acted.  *Reichle*, 132 S. Ct. at 2094.  Indeed, the officers in *Reichle* were entitled to qualified immunity precisely because reasonable officers could have thought *both* that *Hartman* required absence of

probable cause in retaliatory arrest cases *and* that absence of probable cause was necessary to establish a constitutional violation.  *Id.* at 2095-96 & n.6.  Because a reasonable officer at the time of the alleged conduct here could have thought there was no violation where there were adequate grounds for further inquiry, qualified immunity should be granted.

## **CONCLUSION**

For the foregoing reasons, the individual-capacity claims asserted against Ms. Maloney, Mr. Bell, Ms. Estes, and Ms. Ng in Count 3 of the First Amended Verified Complaint should be dismissed.


October 18, 2013                                    Respectfully submitted,

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken (D.C. Bar No. 440547)
Justin V. Shur (D.C. Bar No. 973855)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000 (phone)
(202) 556-2001 (fax)
jlamken@mololamken.com
jshur@mololamken.com

*Counsel for Susan Maloney, Ronald Bell,
Janine L. Estes, and Faye Ng*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of October, 2013, I electronically filed the Cincinnati Defendants' Motion to Dismiss, Statement of Supporting Points and Authorities, and Proposed Order with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken (D.C. Bar No. 440547)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000 (phone)
(202) 556-2001 (fax)
jlamken@mololamken.com

*Counsel for Susan Maloney, Ronald Bell,*
*Janine L. Estes, and Faye Ng*