# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUE THE VOTE, INC.,** | |
| *Plaintiff*, | |
| *v.* | Civ. No. 13-cv-00734-RBW |
| **INTERNAL REVENUE SERVICE,** *et al.*, | **Oral Hearing Requested** |
| *Defendants*. | |

# TRUE THE VOTE'S OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS COUNTS I, II, IV, AND V

Michael J. Lockerby (D.C. 502987)
Cleta Mitchell (D.C. 433386)
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street NW Suite #600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com
*Lead Counsel for Plaintiff*

William E. Davis (D.C. Bar No. 280057)
Mathew D. Gutierrez (Fla. 0094014)*
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
Counsel for Plaintiff

Kaylan L. Phillips (D.C. 1110583)
Noel H. Johnson (Wisc. 1068004)*
ActRight Legal Foundation
209 West Main Street
Plainfield, IN 46168
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@actrightlegal.org
njohnson@actrightlegal.org
*Counsel for Plaintiff*

John C. Eastman (Cal. 193726)*
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu
*Counsel for Plaintiff*

*Pro Hac Vice Motions granted

# TABLE OF CONTENTS

Table of Authorities ............................................................................................ iii

I.   PRELIMINARY STATEMENT ...................................................... 1

II.  STANDARD OF REVIEW ............................................................ 3

     A. Rule 12(b)(6) Requires the Court to Accept the Truth of the
        Amended Complaint's Factual Allegations ................................. 3

     B. Rule 12(b)(1) Permits the Court to Consider Extrinsic Evidence
        to Determine Whether Subject-Matter Jurisdiction Is Proper. ................. 5

III. ARGUMENT ................................................................................ 6

     A. The IRS's Belated Grant of Tax-Exempt Status to True the Vote
        Does Not Moot the Claims for Declaratory and Injunctive Relief ............. 6

        1. By way of Counts II and V, True the Vote seeks declaratory and
           injunctive relief against the IRS to prevent future harm ....................... 6

        2. The IRS cannot moot True the Vote's claims simply by ceasing
           part of its wrongful conduct ................................................................. 11

     B. Count II Is Not Subject to the Jurisdictional Prohibitions Set Forth in
        Either the Anti-Injunction Act or the Declaratory Judgment Act ............. 15

        1. Because the IRS has granted True the Vote tax-exempt status
           retroactive to its date of incorporation, there are no taxes to be
           assessed or collected. ......................................................................... 16

        2. Even if there were taxes to be assessed or collected, the relief
           sought would not restrain any lawful assessment or collection
           activity ............................................................................................... 18

        3. Count II satisfies the Williams Packing exception to the
           Anti-Injunction Act because under no circumstances could
           the Government prevail and equity jurisdiction exists. ....................... 25

     C. True The Vote Has Sufficiently Pleaded A Cause of Action
        Under Section 7431 in Count IV of the Amended Complaint................... 28

        1. The confidentiality provisions of Section 6103 were predicated on
           protecting taxpayers from an intrusive Executive Branch. .................. 29

i

2.  Section 7431 provides an express remedy for unauthorized
inspections of the tax returns. ...........................................................30

3.  True the Vote has sufficiently alleged the elements of a claim for
unauthorized inspection of its tax return information..........................32

4.  True the Vote certainly did not request inspection of return
information that was unnecessary to the determination of its
tax-exempt status and submitted under duress.....................................35

5.   The IRS was not authorized to inspect return information that is
unnecessary to determining True the Vote's tax-exempt..................39

D.  True The Vote Has Sufficiently Pleaded A Cause of Action
Under the Administrative Procedures Act In Count V. ............................42

IV.   CONCLUSION.................................................................................................45

# TABLE OF AUTHORITIES

*Cases*

*Abbott Labs. v. Gardner,*
  387 U.S. 136, 87 S. Ct. 1507 (1967) ........................................................45

*ACLU v. Mineta,*
  319 F. Supp. 2d 69 (D. D.C. 2004) ........................................................26

*Aloe Vera of Am., Inc. v. United States,*
  699 F.3d 1153 (9th Cir. 2012) ........................................................42 n.15

*Already, LLC v. Nike, Inc.,*
  133 S. Ct. 721, 2013 U.S. LEXIS 602 (2013) ................................. 11-12, 14

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937 (2009)...................................................... 3-4

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955 (2007) ........................................................4

*Bell v. Rossotti,*
  227 F. Supp. 2d 315 (M.D. Pa. 2002) ........................................................24

*Bowen v. Massachusetts,*
  487 U.S. 879, 108 S. Ct. 2722 (1988) ........................................................43

*Church of Scientology v. IRS,*
  484 U.S. 9, 108 S. Ct. 271 (1987) ........................................................30, 38

*City of Houston v. Dep't of Hous. & Urban Dev.,*
  24 F.3d 1421 (D.C. Cir. 1994) ........................................................7

*Cohen v. United States of America,*
  650 F.3d 717 (D.C. Cir. 2011) ................................................... 17-23, 25

*Conley v. Gibson,*
  355 U.S. 41, 78 S. Ct. 99 (1957) ........................................................4

*Davis v. Passman,*
  442 U.S. 228, 99 S. Ct. 2264 (1979) ........................................................44

*Dean v. United States,*
  2010 U.S. Dist. LEXIS 29576 (D.N.J. 2010) ...................................... 32-34

iii

*Diebold v. United States*,
  947 F.2d 787 (6th Cir. 1991) ......................................................................45

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ......................................................................3

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human
  Servs.*, 396 F.3d 1265 (D.C. Cir. 2005) ......................................................43

*Elrod v. Burns*,
  427 U.S. 347, 96 S. Ct. 2673 (1976) ..........................................................27

*Enochs v. Williams Packing & Navigation Co.*,
  370 U.S. 1, 82 S. Ct. 1125 (1962) ..............................................................26

*Erickson v. Pardus*,
  51 U.S. 89, 127 S. Ct. 2197 (2007) .......................................................3, 40

*Fostvedt v. United States, IRS*,
  824 F. Supp. 978 (D. Colo. 1993) .........................................................33 n.11

*Flynn v. Ohio Bldg. Restoration, Inc.*,
  260 F. Supp. 2d 156 (D.D.C. 2003) ..............................................................5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167, 120 S. Ct. 693 (2000) .................................................6, 11, 14

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232, 101 S. Ct. 488 (1980) ..........................................................14

*Fund for Animals v. Mainella*,
  335 F. Supp. 2d 19 (D.D.C. 2004) ................................................................5

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ....................................................................43

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir. 1987) ......................................................................5

*In re Fietz*,
  852 F.2d 455 (9th Cir. 1988) ...................................................................16 n.7

*Jericho Painting & Special Coating v. Richardson*,
  838 F. Supp. 626 (D. D.C. 1993) ................................................................26

*Johnson v. Sawyer*,
    640 F. Supp. 1126 (S.D. Tex. 1986) ........................................................................39

*Lehrfeld v. Richardson*,
    954 F. Supp. 9 (D.D.C. 1996) ............................................................................37 n.14

*Linn v. Chivatero*,
    714 F.2d 1278 (5th Cir. 1983) ...............................................................................20

*Lipsman v. Sec'y of the Army*,
    257 F. Supp. 2d 3 (D.D.C. 2003) .......................................................................5, 12

*May v. United States*,
    1992 U.S. Dist. LEXIS 16055 (W.D. Mo. Apr. 17, 1992) ...................................32-33

*McGlotten v. Connally*,
    338 F. Supp. 448 (D.C. Cir. 1972) ..........................................................................20

*Murphy v. Hunt*,
    455 U.S. 478, 102 S. Ct. 1181 (1982) .......................................................................6

*Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.*,
    208 F. Supp. 2d 46 (D.D.C. 2002) .....................................................................23 n.8

*Nat'l Taxpayers Union v. United States*,
    68 F.3d 1428 (11th Cir. 1995) ...........................................................................19, 26

*Payne v. United States*,
    289 F.3d 377 (5th Cir. 2002) .............................................................................42 n.15

*Payne Enterprises, Inc. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) .............................................................................7 n.3

*Ralpho v. Bell*,
    569 F.2d 607 (D.C. Cir. 1977) .................................................................................45

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819, 115 S. Ct. 2510 (1995) ......................................................................26

*Sea-Land Serv. (Pac. Div.) v. Int'l Longshoremen's & Warehousemen's Union, Locals 13, 63, & 94*, 939 F.2d 866 (9th Cir. 1991) .....................................................15

*Scandinavian Satellite Sys., AS v. Prime TV Ltd.*,
    291 F.3d 839 (D.C. Cir. 2002) ...................................................................................5

*Simpkins v. Dist. of Columbia Gov't*,
  108 F.3d 366 (D.C. Cir. 1997) ...............................................................27, 43

*South Carolina v. Regan*,
  465 U.S. 367, 104 S. Ct. 1107 (1984) .......................................................26

*Speiser v. Randall*,
  357 U.S. 513, 78 S. Ct. 1332 (1958) .......................................................27

*Stewart v. Nat'l Educ. Ass'n*,
  471 F.3d 169 (D.C. Cir. 2006) ...............................................................3, 34

*Stokwitz v. United States*,
  831 F.2d 893 (9th Cir. 1987) ...............................................................29-30

*Tax Analysts v. IRS*,
  117 F.3d 607 (D.C. Cir. 1997) ...............................................................30

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ...............................................................43

*United States v. Carey*,
  218 F. Supp. 298 (D. Del. 1963) ...........................................................37 n.14

*United States v. Crespo*,
  281 F. Supp. 928 (D. Md. 1968) ...........................................................37 n.14

*Venen v. United States*,
  38 F.3d 100 (3d Cir. 1994) ...............................................................29, 32 n.9

*Vitek v. Jones*,
  445 U.S. 480, 100 S. Ct. 1254 (1980) .......................................................14

*We the People Foundation, Inc. v. United States*,
  485 F.3d 140 (D.C. Cir. 2007) ...............................................................21-23

*Wilkerson v. United States*,
  67 F.3d 112 (5th Cir. 1995) ...............................................................32 n.9

### Statutes and Regulations

Federal Rule of Civil Procedure 8(a)(2) .......................................................4, 32

Federal Rule of Civil Procedure 12(b)(1) .......................................................5, 7

Federal Rule of Civil Procedure 12(b)(6) ............................................................. 1, 3-5, 23

5 U.S.C. § 552 ............................................................................................................. 44

5 U.S.C. § 704 ............................................................................................... 14, 42-43

26 U.S.C. § 6033 ......................................................................................................... 13

26 U.S.C. § 6033(j) ..................................................................................................... 13

26 U.S.C. § 6103(a) ................................................................................................... 39

26 U.S.C. § 6103(b)(2) ........................................................................................ 31-32

26 U.S.C. § 6103(b)(4) .......................................................................................... 33, 37

26 U.S.C. § 6103(b)(7) .......................................................................................... 30-31

26 U.S.C. § 6103(h)(1) ............................................................................................... 40

26 U.S.C. § 6104 ......................................................................................................... 10

26 U.S.C. § 6104(a)(1) ............................................................................................... 38

26 U.S.C. § 6104(a)(1)(A) .......................................................................................... 10

26 U.S.C. § 6104(d)(6) ............................................................................................... 10

26 U.S.C. § 6104(e)(2) ............................................................................................... 11

26 U.S.C. § 6652(c)(1) ............................................................................................... 11

26 U.S.C. § 6684 ......................................................................................................... 13

26 U.S.C. § 6852 ......................................................................................................... 13

26 U.S.C. § 7421(a) ............................................................................................. 15, 18

26 U.S.C. § 7428 ................................................................. 13, 18, 27, 36, 42, 44

26 U.S.C. § 7431(a)(1) ............................................................................................... 31

26 U.S.C. § 7431(d) ................................................................................................... 34

26 U.S.C. § 7605(b) ................................................................................................... 37

26 C.F.R. § 1.501(a)-1 .................................................................................36

26 C.F.R. § 301.6104(d)-1 ...........................................................................10

26 C.F.R. § 301.6104(d)-1(a)(3) ..................................................................10

28 U.S.C. § 2201(a) ................................................................................15, 18

## Other Sources

122 Cong. Rec. 24013 (1976) (remarks by Sen. Dole) ..................................30

143 Cong. Rec. H1461-08 (daily ed. Ap. 15, 1997) (statement of Rep. Dunn) ..............31

Allan Karnes Roger Lirely, *Striking Back at the IRS: Using Internal Revenue Code
    Provisions to Redress Unauthorized Disclosures of Tax Returns or Return
    Information*, 23 Seton Hall L. Rev. 924 (1993) ........................................29

Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt
    Organizations Division Post-TIGTA Audit *(Remarks as Prepared)*
    http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=350
    126................................................................................................8, 14

Department of Treasury, Office of Tax Policy, *Scope and Use of Taxpayer
    Confidentiality and Disclosure Provisions: Vol. I: Study of General Provisions* .......30

Internal Revenue Service, Charity and Nonprofit Audits: Exempt Organizations
    Examinations, http://www.irs.gov/Charities-&-Non-Profits/Exempt-
    Organizations-Examination-Division ........................................................13

IRS Pub. 557, *Tax-Exempt Status for Your Organization*, Ch. 1 (Rev. October
    2011); IRS Rev. Proc. 2011-09..............................................................35

IRS Rev. Proc. 2013-9, Sec. 4.04 ..................................................................9

Joint Committee on Taxation, *Study of Present-Law Taxpayer Confidentiality and
    Disclosure Provisions as Required by Section 3802 of the Internal Revenue
    Service Restructuring and Reform Act of 1998: Vol. I: Study of General
    Disclosure Provisions* ........................................................................29

S. Rep. No. 938, 94th Cong., 2nd Sess. (1976) ..............................................30

Staff of Joint Comm. on Int. Rev. Tax., 94th Cong., 2d Sess., General Explanation
    of the Tax Reform Act of 1976, C.B. (Vol. 2) ..........................................29

Statement by President William J. Clinton Upon Signing H.R. 1226 (Taxpayer
      Browsing Protection Act), 33 Weekly Comp. Pres. Doc. 1226 (Aug. 11, 1997) .......31

Taxpayer Browsing Protection Act, Pub. L. 105-35, 11 Stat. 1104 (1997) ............... 30-31

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRUE THE VOTE, INC.,** | |
| *Plaintiff*, | |
| *v.* | Civ. No. 13-cv-00734-RBW |
| **INTERNAL REVENUE SERVICE**, *et al.*, | **Oral Hearing Requested** |
| *Defendants*. | |

# TRUE THE VOTE'S OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS COUNTS I, II, IV, AND V

Plaintiff, True the Vote, Inc. ("True the Vote"), by counsel, respectfully states as follows in opposition to the Motion to Dismiss Counts I, II, IV, and V (Dkt. #54) (the "MTD") filed by Defendant the United States of America (the "Government").

## I.    PRELIMINARY STATEMENT

Although styled as a Rule 12(b)(6) motion, the Government's MTD is in large part based on matters outside the pleadings that occurred long after—and only because—True the Vote filed suit. Specifically, the Government has advised the Court that "[s]ince Plaintiff filed this action, the Service has determined…to grant Plaintiff's application for tax-exempt status and is in the process of issuing a favorable determination letter." (Dkt. #54 at 1.) Because of this belated decision, and in anticipation of the issuance to True the Vote of a Letter of Determination of Exempt Status ("the Letter"),[1] the Government asks the Court to dismiss the claims against the IRS.

---

[1] A true and correct copy of the Determination Letter, dated September 26, 2013 is attached as Exhibit A. The Determination Letter is a self-authenticating document pursuant to Federal Rule of Evidence 902(1) because it bears the seal of the Department of Justice and has been executed by an officer thereof.

True the Vote welcomes the decision by the Internal Revenue Service ("IRS") to finally grant True the Vote's tax-exempt status. But that decision, which the IRS admits was made "[s]ince Plaintiff filed this action," hardly warrants dismissal of the other claims against the Government.

The Letter has issued following a three-year delay resulting from an internal scheme within the IRS that targeted True the Vote as one of hundreds of citizens groups whose applications were quarantined and held in abeyance based solely on their perceived philosophical beliefs and for which the then-Director of the Exempt Organizations Unit Lois Lerner has publicly apologized. (Dkt. #14 ¶¶ 77-79.) It was issued only after multiple rounds of intrusive questions from the IRS, demanding confidential information and materials from True the Vote, which the Treasury Inspector General for Tax Administration ("TIGTA") has concluded were "unnecessary" for the determination of exempt status. (Dkt. #14-6 at 24.) True the Vote was *required* by the IRS to turn over confidential information to the IRS, and was advised by the IRS that its failure to provide the information demanded by the IRS by the deadline would result in the *closing* of its file and the future treatment of "[True the Vote] as a taxable entity." (*e.g.*, Dkt. #14-4 at 2.) And, contrary to the Government's assertions, (Dkt. #54 at 12-13), True the Vote did *not* "request the inspection" of its confidential and proprietary information; it was demanded by and provided to the IRS under duress. The IRS kept requiring more and more non-essential, confidential information from True the Vote regarding its officers, board members, volunteers, activities and participants. In a series of letters, the IRS posed more than one hundred and fifty distinct questions requiring nearly 800 pages of responsive documents. (Dkt. #14-1.) All of these were required to be provided to the IRS as a precondition for the continued consideration of True the Vote's application for exempt status. To suggest that such inspection was "requested" by

True the Vote is preposterous. It is certainly not a "reasonable" inference in favor of True the Vote as required by Rule 12(b)(6).

The Government's proposition that True the Vote's claims are moot because the IRS has now done what should have been done three years ago ignores the premise of True the Vote's claim: the ***undisputed*** and unconstitutional targeting of organizations based on their names, perceived viewpoints and associations ("the IRS Targeting Scheme"). (Dkt. #14 ¶ 74.) Recent events have only bolstered rather than resolved True the Vote's claims against the IRS. The allegations of the Amended Complaint are sufficient, as a matter of law, and True the Vote is entitled to proceed in this litigation to seek damages and injunctive and declaratory relief for the willful violation by the IRS of True the Vote's statutory and constitutional rights.

## II.  STANDARD OF REVIEW

### A. Rule 12(b)(6) Requires the Court to Accept the Truth of The Amended Complaint's Factual Allegations.

To determine the legal sufficiency of True the Vote's Amended Complaint, this Court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007). Rule 12(b)(6) also requires "construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

"In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Stewart*, 471 F.3d at 173 (citing *EEOC v. St. Francis Xavier*

*Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997)). This Court must accept as true not only those facts pleaded in the Amended Complaint, but also the facts contained in the TIGTA Report (Dkt. #14-6). The TIGTA Report contains the findings and conclusions of TIGTA's audit of the IRS Targeting Scheme as described throughout the Amended Complaint. These findings and conclusions must be accepted as true—not entirely disregarded as the Government seeks to have this Court do.

The Amended Complaint (including the TIGTA Report) is more than sufficient to satisfy Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957)). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]" *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964. Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations omitted). However, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

For purposes of its MTD, the Government must concede the truth of the allegation that the IRS implemented and executed a targeting scheme under which certain applications for tax-exempt status, including True the Vote's, were subjected to heightened review and scrutiny and

delays in processing. (Dkt. #14 ¶¶ 73-137.) The Government also must concede that the IRS

Targeting Scheme has not ceased, but continues to be carried out. (Dkt. #14 at 47, ¶ 3.) But at the

same time, the Government, in its MTD, does not accept any responsibility for its wrongdoing.

### B. Rule 12(b)(1) Permits the Court to Consider Extrinsic Evidence to Determine Whether Subject-Matter Jurisdiction Is Proper.

The Government has also raised a challenge to subject-matter jurisdiction on the grounds

of mootness. The Government's motion is therefore reviewed under 12(b)(1) of Federal Rule of

Civil Procedure. *Fund for Animals v. Mainella*, 335 F. Supp. 2d 19, 22 (D.D.C. 2004) (Walton,

J.) ("A motion to dismiss on the grounds of mootness is properly brought under Rule 12(b)(1).").

As with Rule 12(b)(6), "[i]n considering a motion to dismiss for lack of subject-matter

jurisdiction, the court should accept as true all of the factual allegations contained in the

complaint." *Lipsman v. Sec'y of the Army*, 257 F. Supp. 2d 3, 5-6 (D.D.C. 2003) (citing

*Scandinavian Satellite Sys., AS v. Prime TV Ltd.*, 291 F.3d 839, 844 (D.C. Cir. 2002)). This

Court may also consider materials outside of the pleadings in disposing of the Government's

motion. *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("In 12(b)(1) proceedings, it has

been long accepted that the judiciary may make appropriate inquiry beyond the pleadings to

satisfy itself on authority to entertain the case." (citations and quotations omitted)); *see also Artis*

*v. Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002) ("A court may consider material outside

of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction, or

subject-matter jurisdiction.") (citation omitted). However, "[b]y considering documents outside

the pleadings on a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(2), the Court does not

convert the motion into one for summary judgment." *Flynn v. Ohio Bldg. Restoration, Inc.*, 260

F. Supp. 2d 156, 161 (D.D.C. 2003).

## III.    ARGUMENT

### A.    The IRS's Belated Grant of Tax-Exempt Status to True the Vote Does Not Moot the Claims for Declaratory and Injunctive Relief.

Following several extensions of time to its deadline to respond to the First Amended Complaint, the Government announced by way of its MTD that the IRS "is in the process of issuing a favorable determination letter." (Dkt. #54 at 1.) The IRS has since issued the Letter, so the Government should have no objection to entry of final judgment in favor of True the Vote with respect to Count I. With respect to Counts II and V, the grant of tax-exempt status has no bearing on and does not provide all the relief that True the Vote seeks. In particular, the Government has not consented to the declaratory and injunctive relief sought by True the Vote to prevent "further implement[ation]" and application of the IRS Targeting Scheme[2] and "any other similar practices and policies." (Dkt. #14 at 47, ¶¶ 2-3.) The granting of the application did not, and could not, address such prospective relief. A live and ongoing controversy thus remains.

In any event, Counts II and V are not moot because "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 708 (2000).

### 1.    By way of Counts II and V, True the Vote seeks declaratory and injunctive relief against the IRS to prevent future harm.

A case becomes moot when the issues before the court are no longer "live" or the parties lack a legally cognizable interest in the outcome. *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S. Ct.

---

[2] The "IRS Targeting Scheme" is "the written and unwritten policy for identifying and subjecting certain applicants for tax-exempt status to additional and heightened review and scrutiny, based solely on a notion by the IRS Defendants that groups should be targeted for such review based on their purpose, mission, and/or name(s)." (Dkt. #14 ¶ 73.)

1181, 1183 (1982). In claiming that Counts II and V are moot, the Government incorrectly asserts that this case is strictly—or even primarily—about a mere delay by the IRS in processing and granting True the Vote's application for tax-exempt status. (Dkt. #54 at 3.) The challenged conduct is not so limited. The delay and functional denial of the application were but *effects* of the IRS Targeting Scheme. True the Vote has already suffered irreparable injury and damages. Both the creation and the ongoing implementation of the IRS Targeting Scheme violate True the Vote's First Amendment rights and the Administrative Procedure Act ("APA"). And such injury is likely to recur unless the IRS is enjoined from continuing to engage in viewpoint discrimination in the form of surveillance, watch lists, audits, and other similar burdensome administrative regulation based on True the Vote's purpose, mission, philosophical viewpoint and/or name. *See City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) ("It is well-established that if a plaintiff challenges both a specific agency action and *the policy that underlies that action*, the challenge to the policy is not necessarily mooted because the challenge to the particular agency action is moot.") (emphasis added).

In considering whether this case is moot, the Court should accept as true the allegations presented that the IRS implemented and executed the IRS Targeting Scheme. Under the IRS Targeting Scheme, certain applications for tax-exempt status, including True the Vote's, were subjected to heightened review and scrutiny and delays in processing using factors based on whether the group was affiliated with certain viewpoints. Rule 12(b)(1) also requires the Government to concede that, as alleged by True the Vote, the IRS Targeting Scheme has not ceased but continues.[3] (Dkt. #14 at 47, ¶ 3.) Notwithstanding these concessions, the Government

---

[3] Notably, "the fact that the practice at issue is informal, rather than articulated in regulations or an official statement of policy, is irrelevant to determining whether a challenge to that policy or practice is moot." *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988).

still refuses to admit that the IRS Targeting Scheme was unlawful, evades accepting responsibility for violating True the Vote's constitutional rights, and provides no assurance whatsoever that systems have been put in place to prevent its recurrence in other forms within the IRS.

Indeed, three months after the IRS Targeting Scheme was exposed, testimony taken by the House Ways and Means Committee revealed that the practice of targeting perceived Tea Party groups had not ceased but rather was ongoing at the IRS. Discriminatory treatment of applicants did not cease even after their applications were granted. The House Ways and Means Committee's IRS Oversight Subcommittee recently disclosed the existence of a scheme within the IRS in which organizations similar to True the Vote were granted tax-exempt status and were immediately subjected to a program of ongoing heightened review and potential audit. *See, e.g.*, Press Release, House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit *(Remarks as Prepared)* (Sept. 18, 2013) (http://waysandmeans.house.gov/news/documentsingle.aspx?Docum entID=350126 (accessed Nov. 15, 2013)). According to the statement from Congressman Boustany, Chairman of the IRS Oversight Subcommittee of the Ways and Means Committee:

> Additionally, we discovered that, through a process approved by [Lois] Lerner (former Director of the IRS Exempt Organizations Unit), EO Examinations itself flags groups for surveillance based on complaints received from inside and outside the agency. Ninety-four percent of all organizations flagged for surveillance by the Examinations unit were right leaning. Most startling, of the organizations referred for audit from this process, 100 percent were right leaning. To highlight the question of whether the examinations process is unbiased, the IRS informed the Committee two weeks ago that it had suspended both the surveillance orders from D.C. and the audits pending further review….

*Id.*

8

As a result, Counts II and V present actual, ongoing, live controversies. In fact, True the Vote stands in even greater need of relief than when the complaint was filed.

This case is about declaring the illegitimacy of the IRS Targeting Scheme in *all* its forms, enjoining its ongoing implementation, and rectifying the resulting damage to True the Vote. The recognition of True the Vote's tax-exempt status may resolve Count I, but it does not redress True the Vote's other claims. To the contrary, it serves only to intensify the need for the additional relief that True the Vote seeks.

Without that additional relief, the IRS can continue to employ its Targeting Scheme through other ongoing mechanisms within the agency. And, without a declaratory judgment that the IRS Targeting Scheme is unconstitutional and resulted in damage to True the Vote, the Targeting Scheme will continue to have a chilling effect on the First Amendment rights of True the Vote, its volunteers, current and prospective members, and donors. (Dkt. #14 ¶¶ 6, 152-54.) *See also* Press Release, House Ways and Means Committee, Camp: Did the IRS Improperly Target Donors? (Sept. 25, 2013) (http://waysandmeans.house.gov./news/documentssingle.aspx ?documentid=351147 (accessed Nov. 15, 2013)). In fact, the chill is only *increased* by the process by which the IRS belatedly granted True the Vote's exempt status. Recognizing True the Vote's tax-exempt status only *after* the filing of this litigation is yet another departure from ordinary IRS procedures, IRS Rev. Proc. 2013-9, Sec. 4.04, which envision that such determination will be made by the Court. It underscores that the IRS is still treating True the Vote differently, outside regular and nondiscriminatory IRS procedures.

If these counts are dismissed as moot, True the Vote and those associated with it will be left in limbo. The IRS would be free to perpetuate the IRS Targeting Scheme through surveillance, audit, or other enforcement actions, and to harass True the Vote with impunity. The

IRS could also continue to request confidential information unnecessary to the proper discharge of appropriate agency duties and solely to chill True the Vote's rights of association and speech. True the Vote would remain uncertain about whether it could continue to exercise its First Amendment Rights according to its viewpoint without fear of future discriminatory regulation and targeting by the IRS. Its volunteers and supporters would (reasonably) fear unnecessary inquiries about and disclosure of their identities and activities through irregular and unconstitutional investigations, audits and demands for information. Its donors, reported annually to the IRS, could reasonably fear audit by the IRS for contributing to an organization on an unlawful IRS "watch" or "target" list. Only a declaration by a federal court determining the constitutionality of the IRS Targeting Scheme and enjoining its future use in any form will protect True the Vote from the chilling effect of the IRS's conduct.

In addition, True the Vote now faces the actual and proximate reality that the confidential tax information that was improperly and unconstitutionally demanded from it by the IRS during its application process will be made public absent further action by the Court. By law, tax-exempt applications and all accompanying information and materials provided to the IRS during the application process become public information once tax-exempt status is granted. 26 U.S.C. § 6104(a)(1)(A); 26 C.F.R. § 301.6104(d)-1. This disclosure must include all papers submitted in support of the application, including those turned over in response to IRS demands. 26 U.S.C. § 6104(d)(6); 26 C.F.R. § 301.6104(d)-1(a)(3). The IRS belatedly granted True the Vote's status after being sued. Because of the IRS Targeting Scheme inflicted on True the Vote's application for exempt status, the IRS is now in possession of reams of True the Vote's confidential information and material which are now set to be publicly disclosed pursuant to 26 U.S.C. § 6104. The only way to right this wrong, and to protect True the Vote from the disclosure of the

information and materials unlawfully demanded from it by the IRS, is for the Court to declare

that the IRS Targeting Scheme is unconstitutional and violates the APA, and to enjoin its further

application in any form in the future, including protecting True the Vote from the release by the

IRS of the confidential information obtained by the IRS.[4]

     For these reasons, the Government's claim of "mootness" is wholly inaccurate.

**2.    The IRS cannot moot True the Vote's claims
simply by ceasing part of its wrongful conduct.**

     Counts II and V fit within the well settled exception to mootness that is applicable when

the defendant has voluntarily ceased the challenged conduct in response to plaintiff's legal

challenge. *Friends of the Earth*, 528 U.S. at 189, 120 S. Ct. at 708. That is precisely what the

Government has attempted to do here. (Dkt. #54 at 3) (arguing that True the Vote's First

Amendment harm "will have ended once Plaintiff is granted tax-exempt status"); (Dkt. #59 at 1)

("By letter dated September 26, 2013, the Service granted Plaintiff's application for tax–exempt

status. The claims raised in Counts I, II and V now are officially moot for the reasons given in

the motion to dismiss.").

     However, the Supreme Court very recently reaffirmed that a defendant cannot

automatically moot a case "simply by ending its unlawful conduct once sued." *Already, LLC v.

Nike, Inc.*, 133 S. Ct. 721, 727, 2013 U.S. LEXIS 602, 11-12 (2013). The Government thus bears

"the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior

could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190, 120 S. Ct. at

709. Otherwise, dismissal for mootness would leave the IRS "free to return to [its] old ways" of

suppressing constitutional rights. *Id*. at 189, 120 S. Ct. at 708 (internal citations omitted); *see*

---

[4] True the Vote itself is also required to turn over their application, together with all papers submitted, upon request. 26 U.S.C. § 6104(e)(2). Failure to do so results in penalties of $10 per day as long as the failure continues. 26 U.S.C. § 6652(c)(1).

*Payne Enter., Inc. v. United States*, 837 F.2d at 491 ("So long as an agency's refusal to supply information evidences a policy or practice of delayed disclosure or some other failure to abide by the terms of the FOIA, and not merely isolated mistakes by agency officials, a party's challenge to the policy or practice cannot be mooted by the release of the specific documents that prompted the suit.").

The Government thus has the burden of showing that the IRS Targeting Scheme—which consisted of unconstitutional viewpoint discrimination and irregular procedural practices—could not reasonably be expected to recur. *See Already*, 133 S. Ct. at 727.

The Government has not satisfied this burden in any respect.[5] In considering the Government's mootness argument, the Court should accept as true the existence of the Targeting Scheme as described in the Complaint. *Lipsman*, 257 F. Supp. 2d at 5-6. At the same time, the Government has not acknowledged the wrongfulness of the IRS Targeting Scheme[6] and has given no assurances—to say nothing of unconditional and irrevocable assurances as was the case in *Already*, 133 S. Ct. at 728—that the IRS Targeting Scheme has ceased and will never resume in any form whatsoever.

Unless enjoined from enforcing the IRS Targeting Scheme, the IRS will have plenty of opportunities to continue to single out True the Vote for discriminatory treatment under the guise of fulfilling the IRS's statutory responsibilities for monitoring True the Vote's tax-exempt status. For example, the IRS is empowered to audit and investigate True the Vote to assess whether it

---

[5] The cases that the Government cites in support of its mootness argument are not applicable or dispositive because they discuss mootness resulting from a change in position or circumstance on the part of the *plaintiffs*. In this case, it is the Government that has changed its position, through "voluntary cessation" in response to this litigation.

[6] Not only has the Government failed to acknowledge that the IRS Targeting Scheme was wrong and/or has been stopped, in seeking to have True the Vote's section 7431 claim dismissed for failure to state a claim, the Government falsely claims it was "authorized" to request all the intrusive and admittedly unnecessary information it requested of True the Vote. (Dkt. #54 at 13-16.)

12

has properly maintained its tax-exempt status. True the Vote must file annual tax information returns (the IRS Form 990) which the IRS may review for purposes of ascertaining the compliance by True the Vote with provisions of the Internal Revenue Code applicable to charitable and educational organizations. The IRS has the authority and duty to impose penalties, including termination of tax-exempt status. *See*, *e.g.*, 26 U.S.C. §§ 6033, 6684, 6852, and 7428. The IRS has an Exempt Organizations Compliance Unit within the agency that is dedicated to monitoring charities such as True the Vote. *See* Internal Revenue Service, Charity and Nonprofit Audits: Exempt Organizations Examinations, http://www.irs.gov/Charities-&-Non-Profits/Exempt-Organizations-Examination-Division (last visited Nov. 15, 2013). Through these ongoing oversight mechanisms, absent cessation of the IRS Targeting Scheme and a determination and order of this Court that such a program must *not* be instituted in the future, True the Vote could again be singled out for reasons unrelated to the provisions of the Internal Revenue Code and be subjected to ongoing viewpoint discrimination based on its mission, statement, purpose, and philosophy—finding itself in a situation where its exempt status is revoked, subjected to onerous penalties, and even forced to reapply in the future. *See*, *e.g.*, 26 U.S.C. § 6033(j). While conceding the existence and use of the IRS Targeting Scheme, the IRS is unrepentant about its actions. It is, therefore, far from "absolutely clear" that the wrongful behavior could not reasonably be expected to recur in the IRS's ongoing regulation of True the Vote.

In fact, there are indications that the IRS Targeting Scheme has not ceased, that it has spread beyond the application process, and that it is likely to continue. The granting of tax-exempt status to other conservative organizations, followed immediately by referral to ongoing surveillance and subsequent audit, has been documented and reported upon publicly. Press

Release, House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit *(Remarks as Prepared)* (Sept. 18, 2013) (http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=350126 (accessed Nov. 15, 2013)). Absent declaratory and injunctive relief from this Court, True the Vote could face a similar fate. *See Vitek v. Jones*, 445 U.S. 480, 486-87, 100 S. Ct. 1254, 1260 (1980) ("Against this background, it is not 'absolutely clear,' absent an injunction, 'that the allegedly wrongful behavior could not reasonably be expected to recur.'").

Likewise, with respect to the IRS's violation of the APA (as alleged in Count V), the Government cannot moot the claim by ceasing only some of its wrongful conduct, and without making it absolutely clear that such conduct could not reasonably be expected to recur. *Already*, 133 S. Ct. at 727. The Government has not carried that "formidable burden." *Friends of the Earth*, 528 U.S. at 190, 120 S. Ct. at 709.

The case cited by the Government, *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 101 S. Ct. 488 (1980), is not instructive here. That case dealt with whether a plaintiff had standing to enter federal court to seek review of agency action before it was final. *Id.* at 233. The FTC had brought an administrative complaint against Standard Oil, which sought injunctive relief in federal court on the grounds that the agency action was politically motivated. *Id.* at 234. The Supreme Court held that the APA required the company to await "final agency action" before seeking relief in court. *Id.* at 243. *Standard Oil* is entirely silent regarding whether an agency can render moot a case in federal court that was brought *after* final agency action by the simple expedient of announcing a change in enforcement policy.

The Government's reliance on *Standard Oil* is thus misplaced. Final agency action is a prerequisite for judicial review under the APA. 5 U.S.C. § 704. In other words, absent final

agency action, a case is not *ripe* and the potential plaintiff must wait to bring his claim. Though related, the doctrines of mootness and ripeness entail different inquiries. "Mootness . . . suggests that the 'live controversy' has passed, while ripeness suggests that such controversy has yet to occur." *Sea-Land Serv. (Pac. Div.) v. Int'l Longshoremen's & Warehousemen's Union, Locals 13, 63, & 94*, 939 F.2d 866, 869 (9th Cir. 1991). By arguing that the present controversy is moot, the Government thus concedes that the claims in this case were ripe at the time of filing. Therefore, there was final agency action here. As a result, it is entirely appropriate for the court to review Count V under the APA. Once there has been final agency action, the "voluntary cessation" doctrine prevents an agency from evading judicial review by revising or changing its stance as a result of the litigation.

The IRS's deliberate delay of True the Vote's application pursuant to the IRS Targeting Scheme was the functional equivalent of denying tax-exempt status. It thus constituted final agency action. (Dkt. #14 ¶ 194.) This case is ripe for review by this Court, and the IRS cannot negate ripeness by belatedly granting True the Vote's application in response to this litigation.

**B.**     **Count II Is Not Subject to the Jurisdictional Prohibitions Set Forth in Either the Anti-Injunction Act or the Declaratory Judgment Act.**

The Government contends that True the Vote's "claims in Count II are . . . barred by operation of the Declaratory Judgment Act and the Anti-Injunction Act" (Dkt. #54 at 2), which prohibit claims seeking relief that would restrain the assessment or collection of taxes. *See* 28 U.S.C. § 2201(a); 26 U.S.C. § 7421(a). In support of this contention, the Government argues that True the Vote's "tax exempt status—and thus whether it owes federal taxes—remains at the heart" of Count II. (Dkt. #54 at 6.) The Government's argument is without merit for two reasons. First, by granting True the Vote's tax-exempt status retroactive to the date of True the Vote's incorporation, the Government has conceded that there are no, and never were any, taxes to be

assessed for or collected from True the Vote. As a result, the relief sought in Count II could not have, *at any point*, affected the assessment or collection of any taxes. Second, even if there were taxes to be assessed for or collected from True the Vote, Count II is a straight First Amendment claim that does not seek to restrain any lawful assessment or collection activity. Rather, Count II seeks to enjoin the IRS from applying criteria and demanding confidential information that in no way relate to the assessment or collection of taxes. For these reasons, as expounded upon below, Count II is not barred by the Anti-Injunction Act or the Declaratory Judgment Act.

### 1. Because the IRS has granted True the Vote tax-exempt status retroactive to its date of incorporation, there are no taxes to be assessed or collected.

The positions taken by the Government in its motion to dismiss are inherently contradictory. On the one hand, the Government argues that True the Vote's First Amendment claim in Count II is barred by the Anti-Injunction Act and the Declaratory Judgment act because the relief sought would restrain the assessment or collection of taxes. (Dkt. #54 at 5-6) (Dkt. #59 at 1.) On the other hand, in a transparent litigation strategy to attempt to moot this lawsuit, the Government assures this Court that it has now recognized True the Vote's tax-exempt status, (Dkt. #54 at 1-5), which necessarily means that there are no taxes to be assessed for or collected from True the Vote. Equally as important is the fact that, in its Determination Letter, the IRS clarified that True the Vote's tax-exempt status has been granted retroactive to the date True the Vote was incorporated. (Exhibit A.) Therefore, by the IRS's own admission, there ***never*** were any taxes to be assessed for or collected from True the Vote.[7]

---

[7] The IRS's admission negates any argument by the IRS that this Court lacked subject matter jurisdiction on the date True the Vote filed its complaint. *See In re Fietz*, 852 F.2d 455, 457 n.4 (9th Cir. 1988) ("Subject matter jurisdiction should be determined as of the date that the complaint . . . was filed.").

This case is similar to *Cohen v. United States of America*, 650 F.3d 717, 727, 729-30 (D.C. Cir. 2011). In *Cohen*, the plaintiffs challenged a refund procedure created by the IRS for taxpayers to recoup an illegally collected excise tax. *Id*. at 719-20. The plaintiffs alleged that the procedure was substantively flawed because it undercompensated many taxpayers and was procedurally flawed because it did not comply with the notice and comment procedures set forth in the APA. *Id*. at 721. On appeal, the IRS argued that the Anti-Injunction Act and the Declaratory Judgment Act deprived the Court of subject matter jurisdiction. *Id.*at 722.

The D.C. Circuit, sitting *en banc*, disagreed. One of the primary grounds underpinning the Court's conclusion that the relief sought was not precluded by the Anti-Injunction Act or the Declaratory Judgment Act was that "the legal right" to the relevant tax "ha[d] been previously determined," since "[t]he IRS ha[d] previously assessed and collected the excise tax at issue." *Cohen*, 650 F.3d at 725 (emphasis added). For this reason, the Court held that because there was no longer any relevant tax to be assessed or collected, the Anti-Injunction Act and the Declaratory Judgment Act were simply inapplicable. *See id*.

The same logic applies here. In this case, as in *Cohen*, "the legal right" to True the Vote's taxes "has been previously determined" by the IRS, *see id.*, and that determination is that there are no, and never were any, taxes to be assessed for or collected from True the Vote. (*See* Exhibit A.) Thus, the precedent established in *Cohen* makes clear that, because there are no relevant taxes to be assessed or collected, the jurisdictional bars in the Anti-Injunction Act and the Declaratory Judgment Act are simply inapplicable, and thus do not preclude the relief sought in Count II. *See id*.

### 2.   <u>Even if there were taxes to be assessed or collected, the relief sought would not restrain any lawful assessment or collection activity.</u>

On its face, Count II alleges a "straight" First Amendment claim. It seeks to prevent the IRS from further engaging in First Amendment discrimination and/or retaliation by: (1) subjecting True the Vote to *heightened* scrutiny based on criteria that are *not* relevant to the assessment or collection of taxes; and (2) in the process, demanding that True the Vote produce confidential information that is likewise ***not*** relevant to the assessment or collection of taxes. (*See* Dkt. #14 ¶¶ 6, 128-130, 148-161; p. 47, ¶¶ 2, 3.) The IRS's application of discriminatory criteria and its attendant demands for unnecessary confidential information are inconsequential to whether True the Vote owes federal taxes. Therefore, enjoining the IRS from engaging in these activities would, by definition, not restrain the assessment or collection of any tax. As a result, the relief sought in Count II does not trigger the jurisdictional bars set forth in the Declaratory Judgment Act or the Anti-Injunction Act. *See* 28 U.S.C. § 2201(a); 26 U.S.C. § 7421(a). For these reasons, the Government's arguments in favor of dismissing Count II are entirely without merit.

As it pertains to this case, the Declaratory Judgment Act, 28 U.S.C. § 2201(a), prohibits a federal court from entering a declaratory judgment "with respect to Federal taxes *except* for actions brought under section 7428 of the Internal Revenue Code." Similarly, the Anti-Injunction Act, codified in 26 U.S.C. § 7421(a), strips federal courts of subject matter jurisdiction over cases filed "for the purpose of restraining the assessment or collection of any tax." Because the Declaratory Judgment Act and the Anti-Injunction Act ultimately serve similar functions, the jurisdictional bars in each of them are to be read "coterminously." *Cohen*, 650 F.3d at 727. As worded, the Declaratory Judgment Act's prohibition of declaratory judgments "with respect to Federal taxes" is perhaps broader than the Anti-Injunction Act's prohibition of suits "for the

purpose of restraining the assessment or collection of any tax." *Id.* However, the D.C. Circuit's decision in *Cohen* has established that the more narrow prohibition in the Anti-Injunction Act governs the interpretation of *both* statutes. *Id.* As a result, relief under either statute is barred only to the extent that it restrains "the assessment or collection of any tax." *Id.* ("[P]recedent interprets the DJA and AIA as coterminous. In other words, 'with respect to Federal taxes' means 'with respect to the assessment or collection of taxes.'") (citations omitted); *see also Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1435 (11th Cir. 1995) ("Because the AIA and DJA operate coterminously, the following analysis of the impact of the AIA upon [the] complaint also determines the effect of the DJA.").

In arguing that Count II is barred by the Anti-Injunction Act and the Declaratory Judgment Act, the Government broadly contends that "*[a]ny* injunctive relief aimed at the Service's processes for determining Plaintiff's tax status necessarily interferes with the Service's tax collection." (Dkt. #54 at 6) (emphasis added). This argument comports with the IRS's vision of "a world in which no challenge to its actions is ever outside the closed loop of its taxing authority." *Cohen*, 650 F.3d at 726.

In *Cohen*, the D.C. Circuit expressly **rejected** that vision. There, the IRS contended that the "assessment or collection of any tax" should be read to broadly encompass anything tangentially related to the "single mechanism" of tax assessment or collection that ultimately determines the amount of revenue the Treasury retains. *Id.* at 726. The D.C. Circuit disagreed. In a sharply-worded rebuke, the *Cohen* Court noted that "the Supreme Court rejected" the IRS's "'single mechanism' theory of assessment and collection . . . choosing instead to define 'assessment and collection'" more narrowly "as is done in the Internal Revenue Code." *Id.* at 726. The D.C. Circuit emphasized that "'[a]ssessment' is **not** 'synonymous with the entire plan

of taxation,' but rather with 'the trigger for levy and collection efforts,'" and that "'collection' is the actual imposition of a tax against a plaintiff." *Id*. at 726 (emphasis added). On this basis, the court explained that "[t]he AIA, as its plain text states, bars suits concerning the 'assessment or collection of any tax.' It is no obstacle to other claims seeking to enjoin the IRS, regardless of any attenuated connection to the broader regulatory scheme." *Id*. at 727; *see also Linn v. Chivatero*, 714 F.2d 1278 (5th Cir. 1983) (reversing the dismissal of a claim for injunctive relief seeking to prevent IRS agents from examining or using documents produced during an IRS investigation because, contrary to the district court's decision, the primary purpose of the claim was the unlawful retention of the plaintiff's records—not the assessment or collection of taxes); *McGlotten v. Connally*, 338 F. Supp. 448, 453-54 (D.C. Cir. 1972) (holding that the Anti-Injunction Act did not bar an action seeking to enjoin income-tax exemptions to fraternal orders that exclude nonwhites because the plaintiff "d[id] not contest the amount of his own tax, nor d[id] he seek to limit the amount of tax revenue collectible by the United States") (footnote omitted).

Ultimately, the *Cohen* court held that the injunctive relief sought was not barred by the Anti-Injunction Act or the Declaratory Judgment Act because "hearing [the case]—whatever its merit—w[ould] not obstruct the collection of revenue," "alter Appellants' future tax liabilities," or "shift the risk of insolvency." *Cohen*, 650 F.3d at 725 (citations omitted). In other words, regardless of "whether the IRS's procedures [were] upheld or the Appellants [would] succeed in forcing a different set of procedures . . . they [would] not and [could not] affect the assessment or collection of taxes . . . ." *Id*. at 725-26. That litany of reasons for rejecting the IRS arguments is present in this case as well.

The D.C. Circuit's decision in *Cohen* is not the first time the court has held that a claim against the IRS is not be barred by the Anti-Injunction Act when it seeks relief that would not restrain the assessment or collection of any tax. As the D.C. Circuit observed in *Cohen*, 650 F.3d at 726-27, it had previously so held in *We the People Foundation, Inc. v. United States*, 485 F.3d 140, 143 (D.C. Cir. 2007), a case concerning First Amendment claims. In *We the People*, the plaintiffs had submitted extensive lists of inquiries to various government agencies seeking answers to, among other subjects, what the plaintiffs perceived as the government's "violation of the taxing clauses of the Constitution." 485 F.3d at 141. After the plaintiffs' inquiries went unanswered, some of the plaintiffs protested by refusing to pay their income taxes. *Id*. Based on their view that the Government did not sufficiently respond to their petitions, the plaintiffs filed suit in the United States District Court for the District of Columbia, raising two claims. *Id*.

First, the plaintiffs argued that the Government violated their First Amendment right to petition the government for a redress of grievances by failing to adequately respond to their petitions. *Id*. at 141. As relief, the plaintiffs sought to require the government to provide "documented and specific answers" to the questions posed in the petitions. *Id*. 141-42. Second, the plaintiffs alleged that the government, by seeking to collect the plaintiffs' unpaid taxes, had retaliated against the plaintiffs' exercise of their First Amendment rights. *Id*. at 142. In connection with the second claim, ***the plaintiffs sought to prevent the government from collecting taxes from them***. *Id*.

In analyzing whether the Anti-Injunction Act deprived the court of jurisdiction to hear the claims, the D.C. Circuit noted the distinction between the relief sought in each. The court characterized the first claim as a "straight" First Amendment Claim because it sought only to vindicate First Amendment rights and did not seek relief that would restrain the assessment or

collection of any tax. *See id*. at 143. Conversely, the D.C. Circuit characterized the plaintiffs' second claim as merely a tax collection claim "couched" in "constitutional terms" because it directly sought to restrain the collection of the plaintiffs' taxes. *Id*. at 142-43. On these grounds, the D.C. Circuit held that the "straight" First Amendment claim was not barred by the Anti-Injunction Act, while the tax claim merely couched in constitutional terms was. *Id*. In expounding on the analysis in *We the People*, the *Cohen* court explained that, to determine whether a claim constitutes a true First Amendment claim or a tax collection claim "merely couched in constitutional terms," a court must engage in "a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on assessment and collection." *Cohen*, 650 F.3d at 727.

Under the foregoing standard, the Anti-Injunction Act and the Declaratory Judgment Act raise no bar to True the Vote's claim in Count II. Under the D.C. Circuit's analysis, Count II is a "straight" First Amendment claim that does not seek relief that would restrain the assessment or collection of any tax. In its First Amended Complaint, True the Vote has alleged that the IRS Targeting Scheme involved the application of criteria that are not relevant to the assessment or collection of any taxes owed by True the Vote. (Dkt. #14 ¶¶ 73-74, 76-78, 81.) The First Amended Complaint states that the criteria applied in the IRS Targeting Scheme focused on True the Vote's name, mission and perceived political and philosophical associations. (*Id.*) Furthermore, pursuant to the IRS Targeting Scheme, the First Amended Complaint alleges that the IRS demanded that True the Vote produce information and confidential materials that in no way related to the determination regarding True the Vote's eligibility for tax-exempt status under Code section 501(c)(3) or, therefore, the assessment or collection of taxes. (Dkt. #14 ¶¶ 5, 6, 100,

128-30, 148-61.) Assuming these factual allegations to be true, as required by Rule 12(b)(6),[8] enjoining the IRS from further employing the IRS Targeting Scheme and all its manifestations, would—by definition—in no way interfere with the assessment or collection of any tax or otherwise have any effect upon whether a tax is due.

True the Vote is well aware of its ongoing compliance obligations under the Internal Revenue Code applicable to 501(c)(3) organizations. What True the Vote seeks in Count II is simply this Court's relief to ensure that *only* the duly promulgated provisions of the Internal Revenue Code are applied to True the Vote in the future, and not an extraneous, secret Targeting Scheme that singles out True the Vote for reasons unrelated to its compliance with applicable law. As a consequence, "regardless of any attenuated connection to the broader regulatory scheme," Count II is not barred by the Anti-Injunction Act or the Declaratory Judgment Act because, as in *Cohen*, "hearing [the case]—whatever its merit—w[ould] not obstruct the collection of revenue," "alter [True the Vote's] future tax liabilities," or "shift the risk of insolvency." *See Cohen*, 650 F.3d at 725-26 (citations omitted). In other words, regardless of "whether the IRS's procedures are upheld or [True the Vote] succeed[s] in forcing a different set of procedures . . . [True the Vote's claim in Count II] [will] not and [cannot] affect the assessment or collection of taxes . . . ." *See id*. at 725-26. For these reasons, Count II is not merely a tax collection claim couched in constitutional terms, as the Government argues. Rather, it is a "straight" First Amendment claim that is not subject to the restrictions in the Anti-Injunction Act or, therefore, the Declaratory Judgment Act. *We the People*, 485 F.3d at 142-43.

In arguing to the contrary, the Government may cite case law supporting the unremarkable proposition that "[i]nformation gathering **that may lead to the assessment or**

---

[8] *Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am*., 208 F. Supp. 2d 46, 49 (D.D.C. 2002).

*collection of taxes* falls within this tax anti-injunction provision." *Bell v. Rossotti*, 227 F. Supp. 2d 315, 318 (M.D. Pa. 2002) (emphasis added). But even accepting that premise as true, it is of no application here, as True the Vote seeks to enjoin the unconstitutional targeting of True the Vote for information that would *not* lead to the assessment or collection of any tax.

At its core, the Government's position seems to be that, once an organization submits an application for tax-exempt status, the IRS may—under the guise of its taxing authority—treat the entity in any manner it chooses, subject the organization to whatever unlawful processes and procedures it creates at the time, and demand from the organization any and all information of interest to the IRS, regardless of whether it is necessary for the determination of exempt status or the assessment or collection of taxes. In this regard, the Government essentially advances the notion that the IRS is permitted to intentionally harass any organization of its choosing based on that organization's perceived philosophical viewpoint. In this case, for example, the IRS on three separate occasions demanded that True the Vote produce additional information by answering approximately 152 discrete and burdensome questions. Of these questions, no more than 11 were propounded for legitimate reasons. (*See* Dkt. #14-3.) Among the intrusive and unnecessary requests, the IRS demanded to know or receive: (1) the identity of each past or present board member, officer, key employee, and members of their families who served on the board of another organization or who has or will run for public office (Dkt. #14-4 at 3); (2) a copy of each past or present board member's, officer's, and key employee's resumé. (Dkt. #14-4 at 3); (3) a detailed description of True the Vote's relationship with King Street Patriots and any other non-profit organization (Dkt. #14-4 at 8); (4) the political affiliation of any person or organization that has ever provided educational services to True the Vote (Dkt. #14-4 at 9); (5) a breakdown of the total number of volunteers True the Vote has trained as poll watchers or workers that were

24

appointed by Republicans, Democrats or another political party (Dkt. #14-5 at 4); and (6) details regarding all activity on Facebook and Twitter (Dkt. #14-4 at 3). This is the very type of information the TIGTA Report deemed 'unnecessary' and inappropriate. (Dkt. #14-6 at 26.)

If this Court allows the IRS's unapologetic behavior to continue, what, then, is to stop the IRS from later demanding that an organization such as True the Vote provide the political party registrations of its donors and volunteers, their personal emails, bank account statements, records of political contributions or support for other causes and organizations, or similar intrusive and burdensome inquiries unrelated to whether it is in compliance with the IRC rules for charitable organizations. Such demands would be entirely irrelevant to the "assessment or collection of any tax." Yet, the IRS would apparently be free to propound such demands with impunity by the simple expedient of claiming they were made pursuant to the "single mechanism" for assessing or collecting taxes. As the *Cohen* court made clear, however, that is not the law. 650 F.3d at 726.

In sum, Count II seeks only to prevent the IRS from further targeting True the Vote based on its perceived philosophical viewpoint and, in the process, treating True the Vote in a manner that could subject it to unlawful, discriminatory and burdensome demands by the IRS in a variety of potential scenarios. Because the relief sought in Count II would not restrain the assessment or collection of any tax, this Court should find that it is not barred by the Anti-Injunction Act or the Declaratory Judgment Act.

**3.    Count II satisfies the *Williams Packing* exception to the Anti-Injunction Act because under no circumstances could the Government prevail and equity jurisdiction exists.**

Even *if* Count II sought relief which would restrain the assessment or collection of a tax (which it clearly doesn't), the claims against the IRS in Count II are not precluded because they qualify under the judicially-created *Williams Packing* exception to the Anti-Injunction Act, set

forth in in *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7, 82 S. Ct. 1125, 1129 (1962). Under the *Williams Packing* exception, an injunction that would restrain the assessment or collection of a tax will not be barred by the Anti-Injunction Act if two conditions are met: (1) under no circumstances could the government ultimately prevail; and (2) equity jurisdiction otherwise exists, *i.e.*, the plaintiff has alleged the threat of irreparable harm and lacks an adequate remedy at law. *Id.*; *see also South Carolina v. Regan*, 465 U.S. 367, 374, 104 S. Ct. 1107, 1112 (1984); *Nat'l Taxpayers Union*, 68 F.3d at 1436; *Jericho Painting & Special Coating v. Richardson*, 838 F. Supp. 626, 630 (D. D.C. 1993). Both factors exist here.

In arguing that Count II does not qualify under the *Williams Packing* exception, the Government does not contest the fact that "under no circumstances could the Government ultimately prevail" on the merits in Count II. (*See* Dkt. #54 at 6). Indeed, the IRS admitted publicly that it targeted conservative organizations such as True the Vote in the context of their applications for tax-exempt status based solely on their perceived political viewpoints, subjecting them to more burdensome reviews and demanding information from them that was "far too broad, asking questions of these organizations that weren't really necessary for the type of application." (Dkt. #14 ¶ 78.) Because such blatant viewpoint discrimination constitutes a plain violation of True the Vote's First Amendment rights, it is clear that under no circumstances could the Government ultimately prevail against Count II on the merits. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828, 115 S. Ct. 2510, 2516 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.") (internal citations and quotations omitted); *ACLU v. Mineta*, 319 F. Supp. 2d 69, 78 (D. D.C. 2004) (same); *see also*

*Speiser v. Randall*, 357 U.S. 513, 518, 78 S. Ct. 1332, 1338 (1958) ("It is settled that speech can be effectively limited by the exercise of the taxing power. To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech.") (internal citation omitted).

The Government also does not contest the fact that True the Vote has sufficiently pleaded the threat of irreparable harm in Count II. (*See* Dkt. #54 at 6.) The Government would be hard pressed to advance any argument to the contrary, since it is well settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976).

Instead, the Government's sole contention is that the *Williams Packing* exception does not apply because, according to the Government, True the Vote "has adequate legal remedies available" to redress the harm sought to be enjoined in Count II. (Dkt. #54 at 6.) First, the Government argues that "Plaintiff not only has, but also has exercised, its alternative legal remedy to obtain a determination of its tax status under section 7428." (Dkt. #54 at 6.) But, as already explained at length, Count II does not seek a determination of True the Vote's tax-exempt status. Rather, Count II seeks to enjoin the IRS's unconstitutional targeting of True the Vote in ways ***not*** relevant to the determination of whether True the Vote is entitled to tax-exempt status. (Dkt. #14 ¶¶ 6, 128-130, 148-161; p. 47, ¶¶ 2, 3.) Because section 7428 cannot provide such relief, it is not an adequate remedy at law. *See* 26 U.S.C. § 7428.

Second, the Government argues that True the Vote's *Bivens* claim is an adequate remedy at law "to the extent that [True the Vote] seeks a remedy directly dealing with its constitutional rights." (Dkt. #54 at 6.) A *Bivens* action, however, allows claims for constitutional violations to be brought only against individuals, not government agencies like the IRS. *Simpkins v. Dist. of*

27

*Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997) (holding that "defendants in *Bivens* actions must be served as individuals" and that *Bivens* actions "cannot be viewed as actions against the government"). Because True the Vote has alleged constitutional violations against both the individual defendants and the IRS itself, a *Bivens* claim does not constitute an adequate remedy to redress the IRS's violations of True the Vote's constitutional rights. If True the Vote were forced to proceed under a *Bivens* suit against the individual defendants alone, it would leave the IRS free to direct other employees now and in the future who are ***not*** individual defendants in this lawsuit to continue to perpetrate the IRS Targeting Scheme in other contexts. Thus, contrary to the Government's position, True the Vote lacks an adequate legal remedy for purposes of the *Williams Packing* exception to the Anti-Injunction Act.

Because Count II satisfies all the criteria for the *Williams Packing* exception, even if the relief sought in Count II would restrain the assessment or collection of True the Vote's taxes, neither the Anti-Injunction Act nor the Declaratory Judgment Act pose any jurisdictional bar to Count II.

### C.    True The Vote Has Sufficiently Pleaded A Cause of Action Under Section 7431 in Count IV of the Amended Complaint.

The Government frames True the Vote's section 6103 claim as based on "the nature of the Service's requests for information," calls such a claim "flawed," and seeks to have it dismissed as a matter of law. (Dkt. #54 at 10-11.) Fundamentally, the Government misunderstands True the Vote's claim as well as the purpose and effect of the confidentiality provisions found in section 6103 and the remedy available in section 7431. The Government's arguments do not warrant dismissal of Count IV.

1.      **The confidentiality provisions of Section 6103 were predicated on protecting taxpayers from an intrusive Executive Branch.**

The Government ignores the protection that Congress has afforded citizens and taxpayers in enacting section 6103. In fact, Congress added significant amendments to the tax disclosure laws in the wake of a previous abuse of power by the Executive. As the Joint Committee on Taxation found:

> Taxpayers have a justifiable expectation of privacy in the extensive information they furnish to the IRS under penalty of fine or imprisonment. This justifiable expectation of privacy was breached in the Watergate era. Prior law afforded the President broad discretion to determine who had access to returns and return information. Hearings revealed that the Nixon Administration was using information obtained from the IRS in connection with an "enemies list." The President's ability to control the dissemination of returns and returns information was eliminated when section 6103 was amended.

Joint Committee on Taxation, *Study of Present-Law Taxpayer Confidentiality and Disclosure Provisions as Required by Section 3802 of the Internal Revenue Service Restructuring and Reform Act of 1998: Vol. I: Study of General Disclosure Provisions* at 127 (internal citations omitted). "Congress recognized that the IRS may possess more information about more people than any other agency in the United States[,]" and, therefore, increasing confidentiality protections was critical. Allan Karnes Roger Lirely, *Striking Back at the IRS: Using Internal Revenue Code Provisions to Redress Unauthorized Disclosures of Tax Returns or Return Information*, 23 Seton Hall L. Rev. 924, 965 (1993) (citing Staff of Joint Comm. on Int. Rev. Tax., 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) at 314.) "By the amendment of section 6103, Congress sought to restore taxpayer confidence in the privacy of return information." *Venen v. United States*, 38 F.3d 100, 105 (3d Cir. 1994).

"In short, section 6103 was aimed at curtailing abuse by government agencies of information filed with the IRS." *Stokwitz v. United States*, 831 F.2d 893, 895 (9th Cir. 1987) (citing S. Rep. No. 938, 94th Cong., 2nd Sess. 318-19, 345 (1976)). "Congress also sought to end 'the highly publicized attempts to use the Internal Revenue Service for political purposes.'" *Stokwitz*, 831 F.2d at 894 (quoting 122 Cong. Rec. 24013 (1976) (remarks by Sen. Dole)). As this Circuit has put it, section "6103's core purpose [is] protecting taxpayer privacy." *Tax Analysts v. IRS*, 117 F.3d 607, 615 (D.C. Cir. 1997) (citing *Church of Scientology v. IRS*, 484 U.S. 9, 16, 108 S. Ct. 271, 275 (1987)). The provisions of 6103 are essential as breaching the confidentiality of returns and return information is known to detrimentally affect the country's system of voluntary compliance. *See* Department of Treasury, Office of Tax Policy, *Scope and Use of Taxpayer Confidentiality and Disclosure Provisions: Vol. I: Study of General Provisions* at 34-37.

### 2.  Section 7431 provides an express remedy for unauthorized inspections of the tax returns.

The Government claims that section 7431 is inapplicable to this case because the statute "does *not* limit what the Service's officers and agents can ask for in the course of an investigation." (Dkt. #54 at 11.) Such an argument ignores the plain language of the Taxpayer Browsing Protection Act and section 7431.

Congress unambiguously stated that the Taxpayer Browsing Protection Act "amend(s) the Internal Revenue Code of 1986 to prevent the unauthorized inspection of tax returns or tax return information." Taxpayer Browsing Protection Act, Pub. L. 105-35, 11 Stat. 1104 (1997). Indeed, the law retained the definition of "inspection" from section 6103, which provides: "The terms 'inspected' and 'inspection' mean *any* examination of a return or return information." 26 U.S.C. § 6103(b)(7) (emphasis added). The plain language of the statute confirms that it is

intended to remedy all unauthorized *inspections*, not just "browsing" celebrity files as the Government suggests. (Dkt. #54 at 12.)

The Taxpayer Browsing Protection Act was intended to protect taxpayers from an increasingly-unaccountable IRS. As Representative Dunn, the author of the amendment allowing for a civil remedy for unauthorized inspection, stated:

> The IRS deserves closer scrutiny when certain agents go beyond acceptable enforcement procedures and commit outright intimidation or when it is unable to use common sense as a yardstick. This bill . . . will ensure that the powerful government agency, the IRS, will no longer scoff at the rights of well-intentioned and law-abiding taxpayers.

143 Cong. Rec. H1461-08 (daily ed. Ap. 15, 1997) (statement of Rep. Dunn). And though the Government quotes a portion of President Clinton's statement upon signing the law (Dkt. #54 at 11-12), the Government omits the President's clear and unambiguous statement that returns and return information "should be inspected or reviewed only for proper purposes, including tax administration, in accordance with the criteria established by law. It is my Administration's clear policy that unauthorized inspection of tax information will not be tolerated." Statement by President William J. Clinton Upon Signing H.R. 1226 (Taxpayer Browsing Protection Act), 33 Weekly Comp. Pres. Doc. 1226 (Aug. 11, 1997).

True the Vote has properly alleged that the IRS demanded information from True the Vote regarding its officers, employees, activities, associates, and volunteers. (Dkt. #14 ¶ 129.) True the Vote showed that even the Government acknowledged that such information was not necessary for purposes of determining True the Vote's exempt status. (Dkt. #14 ¶¶ 77-79.) Such information, once obtained by the IRS, becomes "return information" 26 U.S.C. § 6103(b)(2). True the Vote has further properly alleged that multiple IRS employees then reviewed and examined its return information on multiple occasions for purposes not authorized by section

31

6103. (Dkt. #14 at ¶¶ 179-87.) Such examinations are "inspections" under 6103(b)(7). By its very text, then, section 7431 provides the proper remedy here. 26 U.S.C. § 7431(a)(1) (providing for a civil action where "any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103).[9]

### 3.      True the Vote has sufficiently alleged the elements of a claim for unauthorized inspection of its tax return information.

The "short plain statement" standard of pleading found in Federal Rule of Civil Procedure 8 governs True the Vote's section 7431 claim. Fed. R. Civ. P. 8(a)(2). Where "[a] plaintiff allege[s] a Section 7431 claim," his short plain statement need only "provide the United States with fair notice of the allegations made." *Dean v. United States*, 2010 U.S. Dist. LEXIS 29576, 11 (D.N.J. 2010). A pleading is sufficient if it "allow[s] the United States to determine whether the disclosure [or inspection] was authorized by § 6103 or fits within one of its many exceptions." *May v. United States*, 1992 U.S. Dist. LEXIS 16055, 14 (W.D. Mo. Apr. 17, 1992). Though the Government advances a heightened pleading standard not adopted by this Circuit (Dkt. #54 at 10), True the Vote has also satisfied that standard.

As the Government recognizes, all information furnished by True the Vote to the IRS is the "return information" of True the Vote pursuant to 26 U.S.C. § 6103(b)(2). (Dkt. #54 at 9) (*see also* Dkt. #14 ¶ 171.) Yet as True the Vote alleges, the IRS was not authorized by section 6103 to inspect all of True the Vote's "return information." Inspection of return information

---

[9] The improper collection cases cited by the Government are not applicable to the present case but do serve to confirm that section 7431 provides a remedy for the IRS's mishandling of True the Vote's information. *See Venen*, 38 F.3d at 105 ("The history of section 6103 indicates that Congress enacted the provision to regulate a discrete sphere of IRS activity—information handling."); *Wilkerson v. United States*, 67 F.3d 112, 116 (5th Cir. 1995) ("Congress enacted separate and distinct provisions concerning collection activities and information handling.") True the Vote's section 7431 claim is premised on the improper handling of its information.

furnished by True the Vote to the IRS "in response to questions the IRS Defendants knew or should have known to be unnecessary to the determination of True the Vote's tax-exempt status" or "requested in furtherance of the IRS' Targeting Scheme" is not authorized under 26 U.S.C. § 6103 because it is *per se* not "for tax administration purposes" under 26 U.S.C. § 6103(b)(4). (Dkt. #14 ¶¶ 177-78.)

Though the Government contests the sufficiency of True the Vote's Amended Complaint, it is clear from the Government's motion that it has received "fair notice of the allegations made." *Dean*, 2010 U.S. Dist. LEXIS at 11. Indeed, the Government asserts (wrongly) that the inspections of which True the Vote complains were both requested by the True the Vote (Dkt. #54 at 12-13) and "authorized" under one of section 6103's enumerated exceptions, (Dkt. #54 at 13-14). Regardless of their merit, these assertions demonstrate the sufficiency of the pleadings. *See May*, 1992 U.S. Dist. LEXIS 16055 at 7 ("By having the alleged illegally [inspected] information properly pleaded, the Defendant is able to identify which exception, if any, the disclosure will fall into under § 6103.").

The Government also incorrectly states that True the Vote has not identified what portions of its return information were illegally inspected in violation of 26 U.S.C. § 6103. (Dkt. #54 at 9-10.) In fact, True the Vote has identified the specific requests for information propounded on True the Vote by the IRS that TIGTA identified (Dkt. #14-6 at 26) as unnecessary for the determination of True the Vote's tax-exempt status. (*See* Dkt. #14 ¶¶ 129(a)-(j).)[10] True the Vote further identified the dates on which this information was demanded and then provided to the IRS (*id*. ¶ 181), and those defendants known to have inspected it, (*id*. ¶ 182).

---

[10] Paragraph 179 of the Amended Complaint (Dkt. #14) inadvertently cites paragraph 117(a)-(j) of the Amended Complaint as the location of the sampling of unnecessary questions.

Even under the Government's heightened pleading standard, True the Vote has met its burden.[11]
*See Dean*, 2010 U.S. Dist. LEXIS 29576 at 12 (allegations sufficient where "plaintiff…properly alleges who made the disclosures, to whom they were made, and the dates of and circumstances surrounding the disclosure.").

Though True the Vote, through no fault of its own, cannot at this time identify with specificity every *additional* IRS employee who illegally inspected its return information, that is of no moment. As they must be under section 7431, True the Vote's claims under Count IV are not against individual IRS employees, but against the Government. The Government has conceded both publicly (Dkt. #14 ¶ 78) and in its motion (*e.g.*, Dkt. #54 at 14) that the IRS inspected return information that was unnecessary to the determination of True the Vote's tax-exempt status. At the motion to dismiss stage, this Court must construe "the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart*, 471 F.3d at 173. From the Government's concessions and True the Vote's detailed allegations concerning the IRS Targeting Scheme and the known involvement of certain named defendants (*e.g.*, Dkt. #14 ¶¶ 73-123)—as confirmed by the TIGTA Report (Dkt. #14-6)—this Court may reasonably infer that return information unnecessarily and unconstitutionally requested from True the Vote was inspected by named and unnamed defendants, for purposes not authorized by section 6103, at dates and times to be proven through the discovery process.[12]

---

[11] The authorities cited by the Government present circumstances and allegations not present here. For example, the plaintiff in *Fostvedt v. United States, IRS*, 824 F. Supp. 978, 986 (D. Colo. 1993) not only "failed to present a short and plain statement showing that [he] is entitled to relief," but his pleading lacked the "barest allegation of a colorable claim." *Id.* In short, the plaintiff sought discovery "to attempt to construct his entire case." *Id.* Therefore, unlike the Government here, "[t]he United States [was] unable to formulate a defense and the Court [was] unable to establish whether the government ha[d] waived its immunity to suit." *Id.*

[12] The Government incorrectly asserts than any claims for unauthorized inspections that occurred prior to May 21, 2011 are time barred by the two-year statute of limitations for such claims. (Dkt. #54 at 10 n.3.) Section 7431(d) requires an action for unauthorized inspection to be brought "within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure." True the Vote did not discover that the IRS had inspected its

4.    **True the Vote certainly did *not* request inspection of return information that was unnecessary to the determination of its tax-exempt status and submitted under duress.**

In claiming that it is immune from liability under section 7431, the IRS contends that True the Vote "requested" that the IRS review the mountains of confidential, unnecessary information demanded by the IRS during the course of True the Vote's seeking of tax-exempt status. (Dkt. #54 at 12.) Such a contention by the Government utterly disregards the deliberate perversion of the normal exempt organization application process caused by the IRS Targeting Scheme, and ignores the limitations on the IRS imposed under section 6103.

While True the Vote's submission of its Form 1023 application was made willingly, it was submitted with an expectation that its application would be received, processed and acted upon in the normal and customary manner. *See, e.g.*, IRS Pub. 557, *Tax-Exempt Status for Your Organization*, Ch. 1 (Rev. October 2011); IRS Rev. Proc. 2011-09. True the Vote certainly could not have foreseen and did not envision that the IRS would develop a Targeting Scheme whereby its application and those of other conservative organizations would be segregated and subjected to prolonged review accompanied by demands for documents, materials and information wholly unnecessary to the processing of its Form 1023. While other organizations were allowed to submit the duly promulgated Form 1023 published on the IRS website, following the extensive IRS instructions for completing the Form 1023, and have their applications duly and timely processed, True the Vote found itself caught in a web devised by the IRS to burden it with *impromptu* and complicated information demands extending well beyond the normal procedures

_____

return information without authorization until or around May 10, 2013, when Defendant Lerner, then Director of the Exemption Organizations unit of the IRS, confirmed for the first time publicly that the IRS had impermissibly subjected "conservative" applicants for tax-exempt status to heightened review and scrutiny. (*See* Dkt. #14 ¶¶ 77-78.) The Government provides no basis for its claim that True the Vote discovered that such inspections were unauthorized before May 10, 2013.

for consideration of such applications. True the Vote's compliance with the IRS's burdensome requests for this *additional* information was hardly voluntary. Rather, each request for additional information received by True the Vote from the IRS contained the following stern warning:

> If we don't hear from you by the response due date shown above, we will assume you no longer want us to consider your application for exemption and will close your case. As a result, the Internal Revenue Service will treat you as a taxable entity. If we receive the information after the response due date, we may ask you to send us a new application.

> In addition, if you don't respond to the information request by the due date, we will conclude that you have not taken all reasonable steps to complete your application for exemption. Under Internal Revenue Code section 7428(b)(2), you must show that you have taken all the reasonable steps to obtain your exemption letter under IRS procedures in a timely manner and exhausted your administrative remedies before you can pursue a declaratory judgment. Accordingly, if you fail to timely provide the information we need to enable us to act on your application, you may lose your rights to a declaratory judgment under Code section 7428.

(*See* Dkt. #14-3 at 1; Dkt. #14-4 at 2; Dkt. #14-5 at 2.) The Government's suggestion that True the Vote could have withheld the unnecessary information from the IRS is specious because failing to respond truthfully and completely[13] to the IRS's demands would have resulted in the forfeiture of True the Vote's exempt status. Even though the nature of the IRS's inquiries struck True the Vote as exceeding the boundaries of the agency's authority, True the Vote had no real choice but to comply. Moreover, with each request for additional information, the IRS represented it was requesting "information we need to enable us to act on your application." (*See, e.g.*, Dkt. #14-3 at 1.) As confirmed by the TIGTA Report, the IRS was *lying*. (*See, e.g.*, Dkt. #14-6 at 24.) True the Vote's submissions of additional information thus were not only coerced under penalty of forfeiture of exempt status, they were made under false pretenses.

---

[13] Each request also required True the Vote to declare "[u]nder penalties of perjury" that all information it is providing is "true, correct, and complete." (*See, e.g.*, Dkt. #14-5 at 1.)

The IRS apparently believes that the facts contained in the pleadings are irrelevant. It argues that by merely cooperating, even if under duress, True the Vote "requested" that its unlawfully-obtained return information be inspected. First and foremost, the IRS's position ignores the limitations of the application process. Title 26, C.F.R. § 1.501(a)-1 permits the IRS to request from applicants only "additional information deemed *necessary* for a proper determination of whether a particular organization is exempt under section 501(a)." (emphasis added).[14] As the TIGTA Report explains, not only did the IRS make numerous requests for unnecessary information (Dkt. #14-6 at 26), it identified applicants for additional scrutiny "based on their names or policy positions instead of developing criteria based on tax-exempt laws and Treasury Regulations," (Dkt. #14-6 at 11). The IRS thus exceeded its authority by knowingly requesting unnecessary information from True the Vote and other applicants for tax-exempt status. The IRS does not—and cannot—explain how information unnecessary to the determinations process can be used for the lawful purpose of "tax administration." 26 U.S.C. § 6103(b)(4). But for the false representations made to it concerning the necessity of the information requested, True the Vote would not have provided that information to the IRS. In that regard, True the Vote no more requested its return information be inspected than Bernie Madoff's investors requested that he defraud them.

Second, the Government's position cannot be squared with Congress's intentions in enacting the privacy protections found in section 6103. Accepting such a position would permit

---

[14] If the initial inquiry of True the Vote's qualification for tax-exempt status is an "investigation" related to True the Vote's tax liability as the Government claims (Dkt. #54 at 14 (citing *Lehrfeld v. Richardson*, 954 F. Supp. 9 (D.D.C. 1996)), then the IRS has also violated 26 U.S.C. § 7605(b), which provides unequivocally "No taxpayer shall be subjected to unnecessary examination or investigations[.]" An investigation or examination is "unnecessary" if it is "needless, useless or *not required under the circumstances.*" *United States v. Carey*, 218 F. Supp. 298, 301 (D. Del. 1963) (emphasis added). By prohibiting such investigations, Congress sought to ensure that taxpayers like True the Vote "are not harassed by investigations which are prolonged beyond any reasonable need[.]" *United States v. Crespo*, 281 F. Supp. 928, 934 (D. Md. 1968).

the IRS to effectively condition the recognition of exempt status on the surrender of any information the IRS may want to know about an applicant, its board of directors, its members, its volunteers, its activities and speakers, and its donors. The IRS is then free to inspect such information and disclose it to other agents and employees, all under the guise of "investigating" the applicant. Whether such information is "necessary" for the determination of the applicant's status would be irrelevant. Of course, this is not speculation. This is precisely what occurred under the IRS Targeting Scheme. (*See* Dkt. #14-6 at 26 (describing unnecessary questions asked by the IRS).) Remarkably, the Government not only fails to acknowledge its wrongdoing in requesting and inspecting unnecessary information, it actually claims the unfettered right to do so. (Dkt. #54 at 12-15 (arguing that inspections of any information submitted by True the Vote is authorized by section 6103).)

More troubling is that now that True the Vote's application has been granted, the IRS is required by law to make publicly available the information it collected from applicants for tax-exempt status during the determinations process. *See* 26 U.S.C. § 6104(a)(1). "One of the major purposes in revising § 6103 was to tighten the restrictions on the use of return information by entities other than the [IRS]." *Church of Scientology*, 484 U.S. at 16, 108 S. Ct. at 275. Yet under the approach advanced by the Government, the IRS is permitted to demand and receive whatever information it chooses, which sensitive return information is then *required* under the statute to be shared with every other government agency and the public at large. The potential for abuse of such a system is self-evident.

Lastly, the Government makes no attempt to justify inspections of return information True the Vote was required to provide solely as a result of the IRS's Targeting Scheme, *i.e.* those inspections made on the basis of impermissible viewpoint discrimination. (*See, e.g.*, Dkt. #14 ¶¶

174-75.) The inspection of *necessary* information properly submitted as part of the normal application process is appropriate, but the limitations of section 6103 remain binding on the IRS throughout the determinations process. That is, *every* inspection of True the Vote's return information must be expressly authorized by section 6103. For over three years True the Vote's application remained pending at the IRS. Only as a result of this litigation did the IRS grant True the Vote's application. (*See* Dkt. #59.) As the TIGTA Report details, the scrutiny given to the targeted applications was based on the names and policy positions of the applicants, rather than on their qualifications for exempt status. (Dkt. #14-6 at 11.) It is more than reasonable to infer from the facts alleged that numerous unauthorized inspections of True the Vote's return information occurred during such time as its application remained pending and subject to the IRS Targeting Scheme.

     **5.**     **The IRS was not authorized to inspect return information that is unnecessary to determining True the Vote's tax-exempt status.**

Contrary to the Government's thinking, True the Vote does not imply that *no one* at the IRS can inspect information submitted in connection with its application. (Dkt. #14 at 13.) True the Vote understands that to make the determination of True the Vote's exempt status, the IRS must inspect certain information *necessary* for that determination—for example, True the Vote's IRS Form 1023. (*See* Dkt. #14-2.) However, authorization to inspect return information extends only so far as section 6103 permits. Indeed, confidentiality is the rule and inspection the exception. In fact, the IRS is expressly prohibited from demanding and inspecting *any* return information unless such inspections are expressly authorized by section 6103. *See Johnson v. Sawyer*, 640 F. Supp. 1126, 1132 (S.D. Tex. 1986) ("Congress made the language of § 6103 quite clear: any disclosure of return information is illegal 'except as authorized *by this title*.'") (citing 26 U.S.C. § 6103(a) (emphasis in original)). The limitations of section 6103 thus apply

even if the IRS was at some early time or for some other purpose authorized to inspect certain return information.

The Government contends that because it was authorized to recognize True the Vote's tax-exempt status, requiring the inspection of *properly* required information, that *every* inspection that occurred during the three-year-long "investigation" of True the Vote's application was authorized by section 6103. (Dkt. #54 at 14.) To make this argument, the Government must ignore the allegations and the findings of TIGTA's audit concerning the IRS Targeting Scheme, allegations that must be accepted as true for the purposes of this motion. *Erickson*, 551 U.S. at 94, 127 S. Ct. at 2200.

As the Government recognizes, section 6103(h)(1) permits Treasury Department employees to inspect returns and return information only if such inspections are made for "tax administration purposes." (Dkt. #54 at 8.) While the definition of "tax administration" means many things, nowhere is it defined to include viewpoint discrimination based on the applicant's purpose, mission and/or name. (*See* Dkt. #14-6 at 11 (explaining that applicants were targeted for additional scrutiny "based on their names or policy positions").) Nor does the Government point to anything in section 6103 permitting inspection of return information when that return information is not necessary to the tax administration task being conducted. It is likely that the Government would not argue that section 6103 permits its agents to inspect the President's tax returns to determine the tax liability of True the Vote. Of course, such inspections would be wholly unnecessary to that determination. How, then, can the Government argue that the inspection of information confirmed by TIGTA to be knowingly unnecessary to the same determination, but requested solely on the basis of True the Vote's perceived policy position, is authorized by section 6103? It cannot. The assertion that the IRS requested and inspected

40

information solely for the authorized purpose of determining True the Vote's tax-exempt status is flatly refuted by the TIGTA Report. And, at the very least, the scope of that information necessary to the determination (and, therefore, authorized under section 6103) and the reason for which it was asked is a factual matter and does not entitle the Government to prevail upon its motion to dismiss.

Lastly, the Government asks this Court to reject True the Vote's claims on the grounds that holding it liable would "cause drastic consequences for the federal tax system." (Dkt. #54 at 14-15.) But whether *other plaintiffs* could succeed on claims under section 7431 has no bearing on whether the plaintiff before this Court has properly stated a claim for relief. Such hypothetical claims are not a proper consideration in disposing of the Government's motion.

The Government's argument in this regard is unfounded. In the typical audit or investigation concerning an income tax deduction, the tax code provides safeguards that limit the IRS's liability. For example, section 7431(b)(1) affirmatively shields the IRS from liability for an unauthorized inspection if such an inspection "results from a good faith, but erroneous, interpretation of section 6103." Similarly, section 7431(b)(2), which immunizes the IRS from liability for inspections requested by the taxpayer, guards against the possibility that the IRS could be "tricked" into violating section 6103 by a taxpayer who sends unsolicited information to the IRS.

But that is not what happened here. This case does not involve a typical audit or investigation; it presents a confirmed, multi-year scheme under which the IRS deliberately targeted certain applications for heightened review, scrutiny, and delay based on viewpoint discrimination, which inherently had *nothing* to do with their qualification for tax-exempt status. This is not a case where requests for additional information were thought necessary at the time

41

they were made but later determined to be otherwise. Rather, the IRS knowingly requested and inspected return information it knew or should have known to be unnecessary to the determination of True the Vote's tax-exempt status.[15] True the Vote is not merely "second-guessing" the IRS's decision to request and inspect this information (Dkt. #54 at 15); True the Vote has alleged that the IRS knowingly violated section 6103. To hold the IRS liable for its actions here would not cause "drastic consequences," but would cause substantial justice to be done.[16]

#### D.  True The Vote Has Sufficiently Pleaded A Cause of Action Under the Administrative Procedures Act In Count V.

The Government notes that the judicial review provisions of the APA apply only when "there is no adequate remedy in a court," 5 U.S.C. § 704, and argues that True the Vote has failed to state a cause of action under the APA because True the Vote has two adequate remedies at law. (Dkt. #54 at 15-16.) First, the Government contends that "[t]o the extent that Plaintiff seeks review of its application for tax-exempt status, Plaintiff has available—and has raised—a claim to determine whether it qualifies for tax-exempt status under 26 U.S.C. § 7428 (Count I of the Amended Complaint)." (Dkt. #54 at 15-16.) Second, the Government states that "[t]o the extent that Plaintiff seeks review to vindicate any alleged violations of its constitutional rights,

---

[15] The Government has not attempted to invoke the "good faith defense" here. Nor could it. Knowingly unnecessary and unconstitutional actions cannot be made in good faith, nor can any law be interpreted in good faith to permit unconstitutional conduct or conduct knowingly outside of its permissible scope. *See Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1166 (9th Cir. 2012) ("A knowingly false disclosure could not be made in good faith because it would be contrary to established statutory rights of which a reasonable person would have known."); *see also Payne v. United States*, 289 F.3d 377, 384 (5th Cir. 2002) ("A reasonable IRS agent can be expected to know statutory provisions governing disclosure, as interpreted and reflected in IRS regulations and manuals. An agent's contrary interpretation is not in good faith.").

[16] The Government's argument implies that restricting the IRS's ability to engage in viewpoint discrimination in the execution of its duties would cause drastic consequences for the federal tax system. If discrimination is so intrinsic to the federal tax system, perhaps drastic consequences are precisely in order.

Plaintiff has available—and again has raised—claims under *Bivens* (Count III of the Amended Complaint)." (Dkt. #54 at 16.)[17] The Government, in both instances, is incorrect.

"An alternative remedy will not be adequate under § 704 if the remedy offers only 'doubtful and limited relief.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 901, 108 S. Ct. 2722, 2736 (1988)). To be considered an "alternative legal remedy" that would preclude review under the APA, the alternative must at the very least "offer[] relief of the 'same genre'" as the relief available under the APA. *Garcia*, 563 F.3d at 522 (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005)). Under this standard, the alternative legal remedies identified by the Government in this case are not "adequate" because they do not provide ***any*** redress for several aspects of True the Vote's APA claim in Count V.

First, as explained in detail above, True the Vote has alleged constitutional violations against both the (1) IRS as a federal agency and (2) the individual IRS Defendants. A *Bivens* action, however, allows claims for constitutional violations to be brought only against individuals, not government agencies. *See Simpkins*, 108 F.3d at 369 (holding that "defendants in *Bivens* actions must be served as individuals" and that *Bivens* actions "cannot be viewed as actions against the government"). Indeed, the very purpose of the waiver of sovereign immunity in 5 U.S.C. § 702 of the APA is to allow claims seeking relief other than money damages to be filed against federal government agencies directly. *See* 5 U.S.C. § 702; *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("[T]here is no doubt that § 702 waives the Government's immunity from actions seeking relief other than money damages.") (internal quotation marks

---

[17] In an apparent shell game, the motions to dismiss filed by the Individual Management Defendants and the Cincinnati Defendants argue that a *Bivens* remedy is *not* available under these circumstances. (*See* Dkt. #63 at 9-18; Dkt. #64 at 15-41.)

omitted). Thus, if forced to travel under *Bivens* and not the judicial review provisions of the APA, True the Vote would be limited to suing the Individual Defendants for their constitutional violations, and would be unable to seek redress against the IRS itself for its violations of True the Vote's guarantees of notice and due process under both the Constitution and the APA. As a consequence, the IRS would be free to direct its employees who are not defendants in this case to continue effectuating the viewpoint discrimination campaign against True the Vote.

Second, neither a *Bivens* action nor a declaratory judgment action under 26 U.S.C. § 7428 would enable True the Vote to challenge the IRS's deviation from its duly established procedures for determining the tax-exempt status of section 501(c)(3) applicants or the IRS's failure to adhere to the notice and publication procedures set forth in the APA in altering those procedures. In Count V of its Amended Complaint, True the Vote alleges that the IRS has "departed from customary and established procedures in the processing [of] the application[]" of True the Vote, and that the criteria forming the basis of the IRS Targeting Scheme "were created and implemented without observance of procedures required by law." (*See* Dkt. #14 ¶ 202.) The very procedures to which the allegations refer are creatures of the APA, and are specifically set forth in 5 U.S.C. § 552 (FOIA publication procedures), and 5 U.S.C. § 553 (notice and comment procedures). Because a *Bivens* action only provides redress for constitutional, rather than statutory, violations, *see Davis v. Passman*, 442 U.S. 228, 234, 99 S. Ct. 2264, 2271 (1979), a *Bivens* action does not constitute an adequate remedy at law for the IRS's violations of the APA's statutory notice and publication requirements. Moreover, since a claim under 26 U.S.C. § 7428 merely enables a plaintiff to seek a declaration that it is entitled to tax-exempt status under section 501(c)(3), it cannot be said to provide an adequate remedy at law for the IRS's failure to adhere to the procedural requirements of the APA.

44

For these reasons, True the Vote lacks an adequate remedy at law and has otherwise sufficiently stated a cause of action under the APA. The Government's arguments to the contrary are without merit. Accepting them would undermine the legislative intent of the APA's judicial review provisions and would essentially allow the IRS to stand above and beyond the reach of the Constitution and federal law. As the Supreme Court has explained, the APA "embodies the basic presumption of judicial review" to those affected by agency action. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140, 87 S. Ct. 1507, 1511 (1967). "[T]he legislative history concerning the APA indicate[s] Congress's strong commitment to providing judicial review of agency action." *Diebold v. United States*, 947 F.2d 787, 795 (6th Cir. 1991). Indeed, the APA was enacted to serve as "'a bill of rights for the hundreds of thousands of Americans whose affairs are controlled or regulated in one way or another by agencies of the Federal Government.'" *Id*. Because of the pervasiveness of agency action and potential for it to run afoul of constitutional protections, the APA "invites judicial scrutiny of the broadest gauge." *Ralpho v. Bell*, 569 F.2d 607, 617 (D.C. Cir. 1977). Despite this clear legislative intent, the Government's motion to dismiss advances an exceptionally narrow reading of the APA which would insulate the IRS's unlawful actions from proper judicial scrutiny. But, as confirmed by the enactment of the APA, neither the IRS nor any other government agency is above the law, and this Court should reject the Government's argument to the contrary.

## IV. CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss should be denied.

45

Dated: November 15th, 2013

Respectfully submitted,


/s/Cleta Mitchell
Cleta Mitchell (D.C. 433386)
Michael J. Lockerby (D.C. 502987)
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street NW Suite #600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com
Lead Counsel for Plaintiff

William E. Davis (D.C. Bar No. 280057)
Mathew D. Gutierrez (Fla. 0094014)*
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
Counsel for Plaintiff


Kaylan L. Phillips (D.C. 1110583)
Noel H. Johnson (Wisc. 1068004)*
ActRight Legal Foundation
209 West Main Street
Plainfield, IN 46168
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@actrightlegal.org
njohnson@actrightlegal.org
Counsel for Plaintiff

John C. Eastman (Cal. 193726)*
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu
Counsel for Plaintiff

*Pro Hac Vice Motions granted

46

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2013, I caused TRUE THE VOTE'S

OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS COUNTS I, II, IV, AND

V, EXHIBIT, and PROPOSED ORDER to be filed with the United States District Court for

the District of Columbia via the Court's CM/ECF system.

I further certify I will cause a true and correct copy of the foregoing to be served upon the

following at his last known addresses via U.S. Certified Mail:


**DAVID FISH**
3623 37th St. N.
Arlington, VA  22207



Dated: November 15, 2013                    /s/ *Cleta Mitchell*_____
                                            Cleta Mitchell
                                            cmitchell@foley.com
                                            *Lead Counsel for Plaintiffs*