UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUE THE VOTE, INC.,** | |
| *Plaintiff*, | |
| *v.* | Civ. No. 13-cv-00734-RBW |
| **INTERNAL REVENUE SERVICE,** *et al.*, | **Oral Hearing Requested** |
| *Defendants*. | |

# TRUE THE VOTE'S OPPOSITION TO
# INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS

Michael J. Lockerby (D.C. 502987)
Cleta Mitchell (D.C. 433386)
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street NW Suite #600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com
*Lead Counsel for Plaintiff*

Kaylan L. Phillips (D.C. 1110583)
Noel H. Johnson (Wisc. 1068004)*
ActRight Legal Foundation
209 West Main Street
Plainfield, IN 46168
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@actrightlegal.org
njohnson@actrightlegal.org
*Counsel for Plaintiff*

William E. Davis (D.C. Bar No. 280057)
Mathew D. Gutierrez (Fla. 0094014)*
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
*Counsel for Plaintiff*

John C. Eastman (Cal. 193726)*
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu
*Counsel for Plaintiff*

*Pro Hac Vice Motions granted

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.  PROCEDURAL STANDARDS ......................................................................... 3

    A.   Rule 12(b)(6) Requires the Court to Accept the Truth of the Factual
         Allegations of the Amended Complaint. ................................................. 3

    B.   Rule 12(b)(2) Permits the Court to Consider Extrinsic Evidence to
         Determine Whether the Exercise of Personal Jurisdiction Is Proper. .................... 4

III. ARGUMENT ................................................................................... 6

    A.   Defendant Thomas and the Cincinnati Defendants Are All Subject to
         Personal Jurisdiction in the District of Columbia. .................................... 6

         1.   This Court has general and specific jurisdiction over Defendant
              Thomas and the Cincinnati Defendants. ......................................... 7

         2.   This Court has personal jurisdiction over Defendant Thomas and
              the Cincinnati Defendants by virtue of their participation in a
              conspiracy. ............................................................. 10

             a.   True the Vote has sufficiently pleaded the existence of a
                 conspiracy involving Defendant Thomas and the Cincinnati
                 Defendants. ..................................................... 12

             b.   True the Vote has alleged that Defendant Thomas and the
                 Cincinnati Defendants participated in or agreed to join the
                 conspiracy. ..................................................... 19

                 i.   Allegations Common to Defendant Thomas and the
                     Cincinnati Defendants....................................... 19

                 ii.  Allegations Specific To Defendant Thomas .................... 20

                 iii. Allegations Specific to Defendant Maloney .................... 21

                 iv.  Allegations Specific to Defendant Bell........................... 22

                 v.   Allegations Specific to Janine L. Estes........................... 22

                 vi.  Allegations Specific to Faye Ng ...................................... 23

             c.   True the Vote has specifically alleged numerous overt acts
                 taken in furtherance of the conspiracy in Washington, D.C. ........ 23

B.     True the Vote Has Properly Stated Claims Against the Individual Defendants Under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics.* .................................................................................................... 24

     1.     The IRS has recognized that its agents and employees are subject to *Bivens* claims for constitutional violations. ........................................... 26

     2.     Congress intended the Internal Revenue Code's remedies to complement, not preempt, *Bivens* remedies. ............................................. 27

     3.     No adequate, alternative remedies exist for True the Vote's constitutional injuries caused by the Individual Defendants. ................... 30

          i.     A declaratory judgment action under 26 U.S.C. § 7428 is not an adequate alternative remedy for constitutional injuries......................................................... 32

          ii.     The Administrative Procedures Act does not provide adequate alternative remedies for constitutional injuries......................................................... 35

          iii.     Title 26, U.S.C. § 7431 does not provide adequate alternative remedies for True the Vote's constitutional injuries......................................................... 36

     4.     "Special factors" do not counsel hesitation under these circumstances. ............................................................................................. 37

     5.     The D.C. Circuit recognizes *Bivens* claims against federal officials who violate First Amendment rights......................................................... 37

     6.     The IRC does not categorically foreclose a *Bivens* claim against IRS Employees who violate First Amendment rights.............................. 39

     7.     "Special factors" weigh in favor of providing a *Bivens* remedy against the Individual Defendants in this case. ......................................... 42

C.     Defendants Are Not Entitled to Qualified Immunity Because They Violated True the Vote's Clearly Established First Amendment Rights. ............. 44

     1.     True the Vote has stated a valid claim for the Individual Defendants' violations of its First Amendment rights. ............................ 45

          a.     Viewpoint Discrimination............................................................ 46

          b.     First Amendment Retaliation........................................................ 50

D.    The Amended Complaint and Incorporated Exhibits Establish  Deliberate
      Actions by Each of the Individual Defendants. ................................................... 55

    1.    The Amended Complaint specifically identifies conduct by  and
          attributable to each of the Management Defendants................................. 55

        a.    Defendant Thomas ........................................................................ 56

        b.    Defendant Miller........................................................................... 57

        c.    Defendant Shulman........................................................................ 58

        d.    Defendant Wilkins ........................................................................ 59

        e.    Defendant Lerner .......................................................................... 60

        f.    Defendant Paz ............................................................................... 61

        g.    Defendant Grodnitzky................................................................... 62

        h.    Defendant Seto.............................................................................. 63

    2.    The Amended Complaint specifically identifies conduct by  and
          attributable to each of the Cincinnati Defendants.................................... 64

        a.    Defendant Maloney........................................................................ 64

        b.    Defendant Bell .............................................................................. 65

        c.    Defendant Estes ............................................................................ 65

        d.    Defendant Ng ................................................................................ 65

E.    True the Vote Established the Right to Be Free from Retaliation and
      Viewpoint Discrimination in Determination of its Tax-Exempt Status................ 66

IV.  CONCLUSION............................................................................................................ 70

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
  624 F. Supp. 2d 292 (S.D.N.Y. 2009)....................................................................................11

*Alexander v. "Americans United" Inc.*,
  416 U.S. 752, 94 S. Ct. 2053 (1974)..............................................................................33, 34

*Am. Action Network, Inc. v. Cater Am.*,
  LLC, 2013 U.S. Dist. LEXIS 140998 (D.D.C. Sept. 30, 2013).........................................5, 7

*Anderson v. Creighton*,
  483 U.S. 635, 107 S. Ct. 3034 (1987)............................................................................55, 67

*Artis v. Greenspan*,
  223 F. Supp. 2d 149 (D.D.C. 2002) .....................................................................................4

*Ashcroft v. al-Kidd*,
  131 S. Ct. 2074 (2011)...................................................................................................45, 66

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009).................................................3, 4, 45, 46, 47, 48, 50

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007)..........................................................4, 13, 14, 17, 45

*Bell v. Hood*,
  327 U.S. 678, 66 S. Ct. 773 (1946)......................................................................................25

*Bivens v. Six Unknown Fed. Narcotics Agents*,
  403 U.S. 388, 91 S. Ct. 1999 (1971)
  ......................3, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 56

*Bloem v. Unknown Dep't of the Interior Employees*,
  920 F. Supp. 2d 154 (D.D.C. 2013) .....................................................................................36

*Bob Jones University v. Simon*,
  416 U.S. 725, 94 S. Ct. 2038 (1974)............................................................33, 34, 52, 53, 70

*Boy Scouts of Am. v. Wyman*,
  335 F.3d 80 (2d Cir. 2003).................................................................................................46

iv

*Bush v. Lucas*,
   462 U.S. 367, 103 S. Ct. 2404 (1983) .......................................................................26, 31, 37

*Butz v. Economou*,
   438 U.S. 478, 98 S. Ct. 2894 (1978) ......................................................................................2

*Cammarano v. United States*,
   358 U.S. 498 (1959) .............................................................................................................69

*Caribbean Broad. Sys., v. Cable & Wireless PLC*,
   148 F.3d 1080 (D.C. Cir. 1998) ...........................................................................................6

*Carlson v. Green*,
   446 U.S. 14, 100 S. Ct. 1468 (1980) ......................................25, 29, 30, 31, 32, 34, 35, 36, 37

*Carrillo v. Carrillo*,
   2013 U.S. Dist. LEXIS 104166 (D.D.C. July 25, 2013) ......................................................5

*Chandamuri v. Georgetown Univ.*,
   274 F. Supp. 2d 71 (D.D.C. 2003) .....................................................................................51

*Church by Mail, Inc. v. United States*,
   No. 87-0754, 1988 WL 8271 (D.D.C. Jan. 22, 1988) .........................................................35

*Church of Lukumi Babalu Aye v. City of Hialeah*,
   508 U.S. 520 (1993) .............................................................................................................48

*Cincinnati v. Discovery Network*,
   507 U.S. 410 (1993) .............................................................................................................47

*City of Moundridge v. Exxon Mobil Corp.*,
   No. 04-940, 2009 U.S. Dist. LEXIS 123954 (D.D.C. Sept. 30, 2009) .......................14, 15, 16

*Companhia Brasileira Carbureto de Calcio - CBCC v. Applied Indus. Materials*
   *Corp.*,
   887 F. Supp. 2d 9 (D.D.C. 2012) .......................................................................................12

*Conley v. Gibson*,
   355 U.S. 41, 78 S. Ct. 99 (1957) ..........................................................................................4

*Cornell v. Kellner*,
   539 F. Supp. 2d 311 (D.D.C. 2008) .....................................................................................7

*Coulter v. Studeny*,
   522 Fed. Appx. 147 (3d Cir. 2103) ....................................................................................13

*Crawford* v. *Board of Ed. of Los Angeles*,
   458 U.S. 527, 102 S. Ct. 3211 (1982) ................................................................................46

*Crawford-El v. Britton*,
 93 F.3d 813 (D.C. Cir. 1996), *vacated on other grounds*, 523 U.S. 574, 118 S.
 Ct. 1584 (1998) .................................................................................................52, 54

*Davis v. Passman*,
 442 U.S. 228, 99 S. Ct. 2264 (1979)...............................................................24, 25, 31, 39

*Dellums v. Powell*,
 566 F.2d 167 (D.C. Cir. 1977), *cert. denied*, 438 U.S. 916, 98 S. Ct. 31 (1978) ........37, 38, 39

*Dooley v. United Technologies Corp.*,
 786 F. Supp. 65 (D.D.C. 1992) .....................................................................10, 12

*Edmond v. U.S. Postal Service General Counsel*,
 949 F.2d 415 (D.C. Cir. 1991) .......................................................................5, 12

*EEOC v. St. Francis Xavier Parochial Sch.*,
 117 F.3d 621 (D.C. Cir. 1997) ............................................................................3

*El-Fadl v. Central Bank of Jordan*,
 75 F.3d 668 (D.C. Cir. 1996) ........................................................................5, 10

*Elkins v. District of Columbia*,
 690 F.3d 554 (D.C. Cir. 2012) .................................56, 57, 58, 59, 60, 61, 62, 63, 64

*Erickson v. Pardus*,
 551 U.S. 89, 127 S. Ct. 2197 (2007)..............................................................3, 50

*FDIC v. Meyer*,
 510 U.S. 471, 114 S. Ct. 996 (1994) ..................................................................44

*Fletcher v. United States Parole Comm'n*,
 550 F. Supp. 2d 30 (D.D.C. 2008)..........................56, 57, 58, 59, 60, 61, 62, 63, 64

*Flynn v. Ohio Bldg. Restoration, Inc.*,
 260 F. Supp. 2d 156 (D.D.C. 2003) ..................................................................5, 11

*Frazier v. Dubois*,
 922 F.2d 560 (10th Cir.1990) ...........................................................................52

*Frost v. Catholic Univ. of Am.*,
 2013 U.S. Dist. LEXIS 115394 (D.D.C. Aug. 15, 2013) ........................................6

*Gibson v. United States*,
 781 F.2d 1334 (9th Cir. 1986) ..........................................................................39

*Gray v. Bell*,
 712 F.2d 490 (D.C. Cir. 1983) ...........................................................................7

*GTE New Media Servs. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000) ............................................................................8

*Halberstram v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................................13

*Harbert Int'l v. James*,
    157 F.3d 1271 (11th Cir. 1998) ............................................................................7

*Hartley v. Wilfert*,
    918 F. Supp. 2d 45 (D.D.C. 2013) ................................................................38, 53

*Hartman v. Moore*,
    547 U.S. 250, 126 S. Ct. 1695 (2006) ...........................................................38, 39

*Haynesworth v. Miller*,
    820 F.2d 1245 (D.C. Cir. 1987) ...................................................................38, 55

*Hobson v. Wilson*,
    737 F.2d 1 (D.C. Cir. 1984) ...............................................................................52

*Holzemer v. City of Memphis*,
    621 F.3d 512 (6th Cir. 2010) ..............................................................................54

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ..............................................................................66, 67, 69

*Int'l Union v. Johnson Controls*,
    499 U.S. 187 (1991) ......................................................................................49, 64

*Jung v. Ass'n of Am. Med. Colleges*,
    300 F. Supp. 2d 119 (D.D.C. 2004) ..............................................................12, 24

*Kim v. United States*,
    632 F.3d 713 (D.C. Cir. 2011) ...............................................................40, 41, 42

*Kim v. United States*,
    No. 09-5227 ...........................................................................................................42

*Land v. Dollar*,
    330 U.S. 731, 67 S. Ct. 1009 (1947) .....................................................................5

*Lewy v. S. Poverty Law Ctr., Inc.*,
    723 F. Supp. 2d 116 (D.D.C. 2010) .......................................................................5

*Marsoun v. United States*,
    591 F. Supp. 2d 41 (D.D.C. 2008) .......................................................................41

*Memphis Community Sch. Dist. v. Stachura*,
   477 U.S. 299, 106 S. Ct. 2537 (1986) ...................................................................52

*Miller v. Avirom*,
   384 F.2d 319 (D.C. Cir. 1967) ...............................................................................42

*Minneci v. Pollard*,
   132 S. Ct. 617 (2012) ...................................................................25, 31, 32, 35

*Moss v. U.S. Secret Serv.*,
   711 F.3d 941 (9th Cir. 2013) .....................................................................46, 49, 50

*Myers v. Bowman*,
   713 F.3d 1319 (11th Cir. 2013) ......................................................................13, 17

*Nat'l Cmty. Reinvestment Coalition v. NovaStar Fin., Inc.*,
   631 F. Supp. 2d 1 (D.D.C. 2009) ...........................................................................7

*Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*,
   886 F.2d 1240 (10th Cir. 1989) ...........................................................................41

*Nat'l Commodity & Barter Ass'n v. Archer*,
   31 F.3d 1521 (10th Cir. 1994) .............................................................................41

*Navab-Safavi v. Broad. Bd.*,
   650 F. Supp. 2d 40 (D.D.C. 2009) ......................................................................39

*Organization of Minority Vendors of Illinois C. G. R.R.*, 579 F. Supp. 574, 606
   (N.D. Ill. 1983 ......................................................................................................11

*Pahls v. Thomas*,
   718 F.3d 1210 (10th Cir. 2013) .............................................................55, 56, 57

*Paton v. La Prade*,
   524 F.2d 862 (3d Cir. 1975) .................................................................................39

*Payne v. D.C. Gov't*,
   722 F.3d 345 (D.C. Cir. 2013) .............................................................................42

*Pearson* v. *Callahan*,
   555 U.S. 223, 129 S. Ct. 808 (2009) ..............................................................45, 66

*Pedicord v. Swenson*,
   431 F.2d 92 (8th Cir. 1970) .................................................................................42

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ......................................................................................68, 70

*Pragovich v. United States*,
    602 F. Supp. 2d 194 (D.D.C. 2009) ........................................................................41

*Regan v. Taxation with Representation*,
    461 U.S. 540 (1983) .............................................................................................68, 69

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) .......................................................................................47, 48, 49

*Second Amendment Found. v. United States Conf. of Mayors*,
    274 F.3d 521 (D.C. Cir. 2001) ..............................................................................13

*Simpkins v. District of Columbia Gov't*,
    108 F.3d 366 (1997) ..............................................................................................55

*Speiser v. Randall*,
    357 U.S. 513 ......................................................................................................68, 69

*Stewart v. Nat'l Educ. Ass'n*,
    471 F.3d 169 (D.C. Cir. 2006) ................................................................................3

*Taylor v. FDIC*,
    132 F.3d 753 (D.C. Cir. 1997) ..............................................................................46

*Thompson Hine LLP v. Smoking Everywhere, Inc.*,
    840 F. Supp. 2d 138 (D.D.C. 2012) .....................................................................10

*Toolasprashad v. Bureau of Prisons*,
    286 F.3d 576 (D.C. Cir. 2002) ..............................................................................53

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) ..............................................................................................49

*United States v. Brown*,
    No. 12-2810, 2013 U.S. App. LEXIS 21298 (3d Cir. 2013) ................................13

*United States v. Dowlin*,
    408 F.3d 647 (10th Cir. 2005) ..........................................................................13, 17

*United States v. Hsia*,
    24 F. Supp. 2d 14 (D.D.C. 1998), *rev'd on other grounds,* 176 F.3d 517 (D.C.
    Cir. 1999) ...........................................................................................................17, 18

*United States v. Lee*,
    106 U.S. 196, 1 S. Ct. 240 (1882) ..........................................................................2

*United States v. Moore*,
    651 F.3d 30 (D.C. Cir. 2011) ...............................................................................13

*United States v. Norvell*,
No. 12-3415, 2013 U.S. App. LEXIS 18233 (8th Cir. 2013) ..................................13

*United States v. Sarault*,
840 F.2d 1479 (9th Cir. 1988) ...........................................................................18

*Whittington v. United States*,
439 Fed. Appx 2 (D.C. Cir. 2011) ......................................................................40

*Wilburn v. Robinson*,
480 F.3d 1140 (D.C. Cir. 2007) .........................................................................54

*Wilkie v. Robbins*,
551 U.S. 537, 127 S. Ct. 2588 (2007)........................25, 26, 32, 37, 38, 39, 40, 43

*Wilson v. Libby*,
498 F. Supp. 2d 74 (D.D.C. 2007) ......................................................................41

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) ...............................................26, 30, 32, 39, 40, 42

*World Wide Minerals, LTD. v. Republic of Kaz.*,
296 F.3d 1154 (D.C. Cir. 2002) .........................................................................23

## Statutes

5 U.S.C. § 702 ...................................................................................................36

26 U.S.C. § 501(c)(4)..................................................................................2, 20, 21

26 U.S.C. § 6103 ................................................................................................18

26 U.S.C. § 7423 ................................................................................................27

26 U.S.C. § 7428..........................................................26, 29, 32, 33, 34, 35, 36, 37

26 U.S.C. § 7428(a) .............................................................................................9

26 U.S.C. § 7428(b)(2) ........................................................................................35

26 U.S.C. § 7431...........................................................................................36, 37

26 U.S.C. § 7433........................................................................................27, 28, 29

42 U.S.C. § 1983 ................................................................................................39

26 U.S.C. § 501(c)(3)..................................................................33, 52, 57, 70

26 U.S.C. § 7421(a) ...........................................................................................33

x

D.C. Code § 13-422 ................................................................................................................7

D.C. Code § 13-423(a)(1) ...............................................................................8, 11, 12, 23

D.C. Code § 13-423(a)(4) .....................................................................................................8

Federal Tort Claims Act (FTCA) .....................................................................................31

FTCA ...........................................................................................................................31, 32

Internal Revenue Code ("IRC") ...................................................................................26, 40

IRC ...........................................................................27, 28, 30, 36, 40, 41, 42, 43, 70

## Other Authorities

28 C.F.R. § 50.15(a) ..........................................................................................................26

134 Cong. Rec. 28285 (Oct. 7, 1988) ..............................................................................28

"Lois Lerner's Own Words," *Wall Street Journal*, Sept. 11, 2013, *available at*
       http://online.wsj.com/news/articles/SB100014241
       2788732454900457906891419228086 ...............................................................9

*Conference Report to Accompany H.R. 4333*, Vol. 2, 100th ........................................29

100th Cong., 1st Sess. 177 (Apr. 10, 1987) (statement of Lawrence B. Gibbs,
       Commissioner, Internal Revenue Service) .........................................................28

Federal Rule of Civil Procedure 8(a) ...............................................................................45

Federal Rule of Civil Procedure 8(a)(2) ......................................................................4, 45

Federal Rule of Civil Procedure 12(b)(2) .................................................................4, 5, 11

Federal Rule of Civil Procedure 12(b)(6) ..............................................................1, 3, 4, 45

H.R. 634, 100th Cong., 1st Sess., § 9(a) (1987) ..............................................................27

H.R. 4333, 100th Cong., 2nd Sess. (1988) ......................................................................28

http://oversight.house.gov/wp-content/uploads/2013/08/8.2.13-Issa-to-Lew.pdf .........44

http://www.cnn.com/ 2013/05/13/politics/irs-conservative-targeting/ ...........................43

S. 579, 100th Cong., 1st Sess., § 3(a) (1987) .............................................................27, 28

S. 604 ...........................................................................................................................27, 28

S. 2238, 100th Cong., 2nd Sess., § 779 (1988)........................................................................28, 29

S. 7428 ...............................................................................................................................29, 35

S. 7431 .......................................................................................................................................29

S. 7433 .......................................................................................................................................27

June 10, 1976 Senate Committee on Finance on the Tax Reform Act of 1976...........................32

Plaintiff True the Vote, Inc. ("True the Vote"), by counsel, respectfully states as follows in opposition to the motion to dismiss (Dkt. # 63) filed by Defendants Steven Grodnitzky, Lois Lerner, Steven Miller, Holly Paz, Michael Seto, Douglas Shulman, Cindy Thomas, and William Wilkins (collectively, the "Management Defendants") and the motion to dismiss (Dkt. # 64) filed by Defendants Susan Maloney, Ronald Bell, Janine L. Estes, and Faye Ng (collectively, the "Cincinnati Defendants").[1]

## I.      PRELIMINARY STATEMENT

By challenging the legal sufficiency of True the Vote's allegations, the Individual Defendants have—pursuant to Rule 12(b)(6)—conceded for the purposes of the pending motions the truth of the factual allegations of the First Amended Complaint. (Dkt. #14, hereafter, the "Amended Complaint.") These include specific facts showing that the Individual Defendants developed and carried out against True the Vote an illegal and unconstitutional program that chilled True the Vote's First Amendment rights: the "IRS Targeting Scheme. " The "IRS Targeting Scheme" is "the written and unwritten policy for identifying and subjecting certain applicants for tax-exempt status to additional and heightened review and scrutiny, based solely on a notion by the IRS Defendants that groups should be targeted . . . based on their purpose, mission, and/or name(s)." (Dkt. #14 ¶ 73.) The existence of the IRS Targeting Scheme was confirmed by investigation of the Treasury Inspector General for Tax Administration ("TIGTA"). (*See* Dkt. #14-6, hereafter, the "TIGTA Report.") The TIGTA Report found that True the Vote and other nonprofit groups were subjected to unwarranted and significant delays,

---

[1] The Management Defendants and the Cincinnati Defendants are referred to collectively as the "Individual Defendants."

1

burdensome demands for information, and other disparate treatment based on inappropriate criteria. The inappropriate criteria by which organizations were targeted included their names and perceived conservative philosophy. This conclusion of the TIGTA Report is borne out by True the Vote's own experience. When True the Vote applied for tax-exempt status in July 2010, its name was "KSP/True the Vote." (Dkt. #14 ¶¶ 50-52.) Accordingly, True the Vote advised the IRS that KSP stood for "King Street Patriots," its affiliated Section 501(c)(4) social welfare organization. (Dkt. #14-2 at 18.) Thus, True the Vote unwittingly was thrust into the IRS Targeting Scheme by its choice of a **_name_**. This mistreatment violated numerous provisions of federal law, not the least of which is the First Amendment.

Now, the IRS officers and employees who developed and implemented the IRS Targeting Scheme have moved to dismiss True the Vote's claims against them. They ask this Court to conclude that their very employment with the IRS means that—no matter the magnitude of their transgressions—they cannot be made to answer for their actions. The import of this position is truly breathtaking. It collides head on with the founding principles of this country.

> Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law: 'No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

_Butz v. Economou_, 438 U.S. 478, 506, 98 S. Ct. 2894, 2910 (1978) (quoting _United States v. Lee_, 106 U.S. 196, 220, 1 S. Ct. 240, 261 (1882)).

The Supreme Court does not agree that the Individual Defendants are above the law and that True the Vote is without a remedy for the numerous constitutional and statutory provisions of which the IRS Targeting Scheme ran afoul. By way of their carefully choreographed motions to dismiss, the position of the Government and the Individual Defendants alike is that none of them can be held liable for damages, injunctive relief, or a declaratory judgment. In the case of

2

the Individual Defendants, this argument would deprive True the Vote the remedy recognized by the Supreme Court in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S. Ct. 1999 (1971). Only such a remedy can effectively ensure that citizens will not continue to be targeted by the IRS for their beliefs, their names, their mission, and their purposes. Only by denying the Individual Defendants' motions to dismiss can this Court ensure that American citizens are never again subjected to such mistreatment by IRS officials. Besides compensating True the Vote, the damages and other remedies sought will help deter similar actions in the future and begin the process of restoring the public's trust in IRS officials and the government at large. Denying the Individual Defendants' motions to dismiss is the right result on every level.

## II.   PROCEDURAL STANDARDS

### A.   Rule 12(b)(6) Requires the Court to Accept the Truth of the Factual Allegations of the Amended Complaint.

To determine the legal sufficiency of True the Vote's Amended Complaint, this Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007). Rule 12(b)(6) also requires "construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

"In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Stewart*, 471 F.3d at 173 (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997)). This Court must accept as true not only

those facts pleaded in the Amended Complaint, but also the facts contained in the report of the

TIGTA Report. The TIGTA Report contains the findings and conclusions of TIGTA's audit of

the IRS Targeting Scheme as described throughout the Amended Complaint. These findings and

conclusions must be accepted as true—not utterly disregarded as the Individual Defendants seek

to have this Court do.

The Amended Complaint and exhibits are more than sufficient to satisfy Federal Rule of

Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "'a short and plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what

the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103

(1957)). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations[.]" *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964. Rather, "[t]o survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting

*Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* (citations omitted). However, "[t]he plausibility standard

is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id*.

**B.      Rule 12(b)(2) Permits the Court to Consider Extrinsic Evidence to**
**<u>Determine Whether the Exercise of Personal Jurisdiction Is Proper.</u>**

Certain Individual Defendants have also raised a challenge to personal jurisdiction. The

Court is not limited to the allegations of the Amended Complaint to decide this issue. *Artis v.*

*Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002) ("A court may consider material outside of

the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction, or subject-matter jurisdiction.") (citing *Land v. Dollar,* 330 U.S. 731, 735 n.4, 67 S. Ct. 1009, 1011 n.4 (1947)). However, "[b]y considering documents outside the pleadings on a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(2), the Court does not convert the motion into one for summary judgment." *Flynn v. Ohio Bldg. Restoration, Inc.*, 260 F. Supp. 2d 156, 161 (D.D.C. 2003). Further, the Court is not confined by "evidence that meets the standards of admissibility reserved for summary judgment and trial;" but may consider the pleadings "'bolstered by such affidavits and other written materials'" that are available. *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 118-119 (D.D.C. 2010) (citations omitted). "[T]he Court 'may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts.'" *Carrillo v. Carrillo*, 2013 U.S. Dist. LEXIS 104166, 4-5 (D.D.C. July 25, 2013) (citations omitted). The Court may order discovery on the issue of personal jurisdiction, *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996), which is appropriate before granting dismissal on such grounds. *Edmond v. U.S. Postal Service General Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991).

"To withstand a defendant's motion to dismiss under Rule 12(b)(2), a plaintiff bears the burden of making a prima facie showing of specific and pertinent jurisdictional facts." *Am. Action Network, Inc. v. Cater Am.*, LLC, 2013 U.S. Dist. LEXIS 140998 at *7 (D.D.C. Sept. 30, 2013). True the Vote may make "'such a showing by alleging specific acts connecting the defendant with the forum . . . .'." *Id.* (citations omitted). Also, while the Court need not "treat as true all of plaintiff's allegations when determining whether personal jurisdiction exists," as with a 12(b)(6) motion, "any factual discrepancies . . . must be resolved in favor of the plaintiff . . . and in the absence of an evidentiary hearing, the plaintiff need only make a prima facie showing

that the Court has personal jurisdiction." *Frost v. Catholic Univ. of Am.*, 2013 U.S. Dist. LEXIS

115394 at *6 (D.D.C. Aug. 15, 2013) (citations omitted).

### III.   ARGUMENT

**A.    Defendant Thomas and the Cincinnati Defendants Are All
       Subject to Personal Jurisdiction in the District of Columbia.**

Management Defendant Thomas and the Cincinnati Defendants seek dismissal for lack of

personal jurisdiction. (Dkt. #63 at 6, Dkt. #64 at 11.) However, the Amended Complaint and

exhibits, bolstered by relevant written materials, confirm that the Court has personal jurisdiction

over Defendant Thomas and the Cincinnati Defendants. Such relevant materials include the

report of the House of Representatives Committee on Oversight and Government Reform

entitled "Interim update on the Committee's investigation of the Internal Revenue Service's

inappropriate treatment of certain tax-exempt applicants," which further demonstrates the overt

collaboration between the D.C.-based Defendants, Defendant Thomas, and the Cincinnati

Defendants in the creation and application of the IRS Targeting Scheme. (Attached as Exhibit A,

hereafter, "Interim Update.") Notably, neither Defendant Thomas nor the Cincinnati Defendants

provided the Court with any evidence rebutting the Amended Complaint's factual allegations.

Instead, Defendant Thomas and the Cincinnati Defendants simply urge this Court to ignore the

significance of the allegations made.[2] But this they may not do. When properly considered, the

unrebutted factual allegations and related evidence confirm this Court's jurisdiction.

---

[2] True the Vote "had no obligation to make specific allegations relevant to personal jurisdiction in its complaint
because lack of personal jurisdiction is an affirmative defense and so must be raised by the defendant." *Caribbean
Broad. Sys., v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998).

1.      **This Court has general and specific jurisdiction over
        Defendant Thomas and the Cincinnati Defendants.**

Generally speaking, "[a] District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief." D.C. Code § 13-422. General jurisdiction requires that "contacts within the forum be 'continuous and systematic.'" *Nat'l Cmty. Reinvestment Coalition v. NovaStar Fin., Inc*., 631 F. Supp. 2d 1, 4 (D.D.C. 2009).

It is certainly true that "the presence of the IRS's headquarters in the District of Columbia ***alone*** is insufficient to confer personal jurisdiction over IRS employees who are [Ohio/Kentucky] residents." *Cornell v. Kellner*, 539 F. Supp. 2d 311, 315 (D.D.C. 2008) (emphasis added).[3] But that is immaterial here because True the Vote's allegations do not rest on such a bare theory of jurisdiction. Rather, True the Vote alleges, and its evidence demonstrates, that Defendant Thomas and the Cincinnati Defendants acted outside the scope of their official authority. "When a government official goes completely outside the scope of his discretionary authority, he ceases to act as a government official and instead acts on his own behalf." *Harbert Int'l v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998); *see also Gray v. Bell*, 712 F.2d 490, 502 n. 36 (D.C. Cir. 1983).

Defendant Thomas and the Cincinnati Defendants, by "continuously and systematically" carrying out the facially discriminatory IRS Targeting Scheme over several years, acted in such a way. For example, between 2010 and 2012, Defendant Thomas and the Cincinnati Defendants each worked in close connection with the D.C.-based IRS Exempt Organizations ("EO") Technical Unit and the D.C.-based IRS Office of Rulings and Agreements as they developed and

---

[3] The fact that Defendant Thomas and the Cincinnati Defendants are out-of-state residents is not dispositive as "personal jurisdiction may lie in more than one district." *Am. Action Network*, 2013 U.S. Dist. LEXIS 140998, *15.

revised written and oral guidance resulting in the IRS Targeting Scheme. Thereafter, the Individual Defendants—including Defendant Thomas and the Cincinnati Defendants—then implemented and applied the IRS Targeting Scheme to True the Vote. (Dkt. #14 ¶¶ 86, 90, 96-97, 135; Dkt. #14-6 at 11.) True the Vote has shown that Defendant Thomas and the Cincinnati Defendants had a close working relationship with the IRS's D.C. office, via actively transferring applications to the D.C. offices and communicating with individuals in D.C. frequently via telephone or email. (Dkt. #14 ¶¶ 59-60, 86, 88, 94; Dkt. #14-6 at 11.). The TIGTA Report conclusively demonstrates that Defendant Thomas repeatedly discussed and requested assistance from the IRS's D.C. offices concerning the application of the IRS Targeting Scheme. (Dkt. #14-6 at 38, 40, 41.)

This Court may also exercise specific jurisdiction over Defendant Thomas and the Cincinnati Defendants. In its Amended Complaint, True the Vote stated that specific jurisdiction is appropriate under D.C. Code § 13-423(a)(1) ("transacting…business in the District of Columbia") and D.C. Code § 13-423(a)(4) ("causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia" while "engag[ing] in [a] persistent course of conduct" within the District of Columbia). (Dkt. #14 ¶ 28(a).) Here, "a court must engage in a two-part inquiry: A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

True the Vote has shown that the Defendant Thomas and the Cincinnati Defendants, along with the other Individual Defendants, outside of the scope of their employment, transacted business in the District of Columbia by creating and implementing the IRS Targeting Scheme,

(Dkt. #14 ¶¶ 96, 97; Dkt. #14-6 at 11, Ex. A at 8-10, 12-16, 18-19.). The Cincinnati Defendants argue that True the Vote makes "no allegation that any of the Cincinnati Defendants transferred, or made the decision to transfer, True the Vote's application to IRS offices in Washington." (Dkt. #64 at 13.) But, True the Vote has shown that the Cincinnati Defendants requested, received, and inspected True the Vote's information, which was then, according to Defendant Bell himself, sent to the D.C. office for review. (Dkt. #14 ¶¶ 59-60.) Further because of the persistent and continuous participation of the Individual Defendants—including Defendant Thomas and the Cincinnati Defendants—in the IRS Targeting Scheme, True the Vote's application was put on ice in D.C., causing substantial and unwarranted harm to True the Vote. (*See*, *e.g.*, Dkt. #14 ¶¶ 5, 101, 151, 153, 154, 159, 209-13.)

The foregoing factual allegations demonstrate that for purposes of the implementing the IRS Targeting Scheme, the Cincinnati-based EO Determinations Unit, (Dkt. #14 ¶ 83), became merely an *extension* of the IRS's D.C. offices. *See* "Lois Lerner's Own Words," *Wall Street Journal*, Sept. 11, 2013, *available at* http://online.wsj.com/news/articles/SB100014241 27887324549004579068914192280866 (describing email from Defendant Paz and Defendant Lerner that states, "No decisions are going out of Cincy until we go all the way through the process with the c3 and c4 cases [in D.C.]"). True the Vote's application for exempt status was initially assigned to Cincinnati (like all applications for exempt status). But pursuant to the IRS Targeting Scheme, True the Vote's application quickly became the focus of the IRS offices in Washington D.C.[4]

---

[4] Because of the nature of the relief sought, True the Vote was *required* to bring its claim for a declaratory judgment relating to its tax-exempt status in D.C. *See* 26 U.S.C. § 7428(a).

Finding that this Court has personal jurisdiction over Defendant Thomas and the Cincinnati Defendants does "not offend 'traditional notions of fair play and substantial justice.'" *Thompson Hine LLP v. Smoking Everywhere, Inc.,* 840 F. Supp. 2d 138, 142 (D.D.C. 2012) (citations omitted). Given that "'notions of fundamental fairness require that the defendant's contacts with the forum be evaluated qualitatively rather than quantitatively,'" *id.* (internal citations omitted), True the Vote has established that—through their participation the IRS Targeting Scheme—Defendant Thomas and Cincinnati Defendants had significant contacts with the District of Columbia in a capacity outside the scope of their official duties such that it is not unfair to require them to defend themselves in this forum.[5]

### 2.    This Court has personal jurisdiction over Defendant Thomas and the Cincinnati Defendants by virtue of their participation in a conspiracy.

Additionally, this Court may exercise long-arm personal jurisdiction over Defendant Thomas and the Cincinnati Defendants because, as alleged in the Amended Complaint, they entered into a civil conspiracy to effectuate the IRS Targeting Scheme. Because of the agency relationship shared among co-conspirators, the overt acts of Defendant Thomas's and the Cincinnati Defendants' co-conspirators carried out within the District of Columbia, including their transactions of business from which True the Vote's causes of action arise, are attributable directly to Defendant Thomas and the Cincinnati Defendants. *Dooley v. United Technologies Corp.*, 786 F. Supp. 65, 79 (D.D.C. 1992) ("Jurisdiction under the [conspiracy] theory [of personal jurisdiction] is based on the agency relationship between the co-conspirators. The actions of co-conspirators acting as . . . agent[s], within the forum [are] attributed to the co-

---

[5] Even if the Complaint lacked sufficient jurisdictional allegations, the appropriate course of action would be to permit jurisdictional discovery rather than dismiss altogether. *See El-Fadl*, 75 F.3d at 676.

conspirators outside the forum.") (internal citations omitted). Thus, long-arm jurisdiction is proper over Defendant Thomas and the Cincinnati Defendants under D.C. Code § 13-423(a)(1).

In arguing to the contrary, Defendant Thomas vaguely, and without explanation, contends that: (1) "[t]he conspiracy allegations are nothing more than an attempt to aggregate the factual allegations against all individual defendants to establish personal jurisdiction over a non-resident"; and (2) "allegations of concerted action, without more, are insufficient for establishing personal jurisdiction." (Dkt. #63 at 8.) Each of these arguments lacks merit. As previously discussed, the Amended Complaint does not merely "aggregate factual allegations against all individual defendants" or set forth "allegations of concerted action, without more." Rather it sets forth in exacting detail each Individual Defendant's contributions—including those of Defendant Thomas—to the IRS Targeting Scheme and the conspiracy to execute it.[6]

Likewise, the Cincinnati Defendants contend that their lack of actual contacts with the District of Columbia cannot be overcome by the "conclusory allegation" in paragraphs 28(b) and 86 of the Amended Complaint "that the Cincinnati Defendants 'worked in concert' with one or more of the IRS Defendants in the District of Columbia 'in furtherance of a civil conspiracy.' Such a 'bare allegation' of conspiracy or agency is insufficient,'" they claim. (Dkt. #64 at 14.) In making this argument, the Cincinnati Defendants wrongfully attempt to confine this Court's focus to only two paragraphs of the Amended Complaint. It is well settled, however, that in ruling on a motion to dismiss, this Court should "look[]at the *entirety* of the Amended Complaint to determine whether there are specific enough allegations." *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 320 (S.D.N.Y. 2009) (emphasis added); *see also Organization of*

---

[6] Furthermore, for purposes of resolving this jurisdictional issue "pursuant to Rule . . . 12(b)(2), the Court may consider documents outside the pleadings to assure itself that it has jurisdiction." *Flynn*, 260 F. Supp. 2d at 161 (citations omitted.)

*Minority Vendors of Illinois C. G. R.R.*, 579 F. Supp. 574, 606 (N.D. Ill. 1983) ("The complaint **as a whole** does allege a conspiracy to violate § 1981 with sufficient specificity to survive a motion to dismiss") (emphasis added). When the Amended Complaint is read as a whole, it explains sufficient factual allegations to satisfy the pleading requirement for a conspiracy.

Long-arm personal jurisdiction over Defendant Thomas and the Cincinnati Defendants is proper in this case pursuant to the "conspiracy theory of jurisdiction" stemming from D.C. Code § 13-423(a)(1). (Dkt. #14 ¶ 28(a)(b).) *See Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 140-41 (D.D.C. 2004). "Conspiracy jurisdiction under this subsection presumes that 'persons who enter the forum and engage in conspiratorial acts are deemed to 'transact business' there 'directly'; [and] coconspirators who never enter the forum are deemed to 'transact business' there 'by an agent.'" *Id.* at 141 (citation omitted). Under the conspiracy theory of jurisdiction, "so long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all members of the conspiracy." *Id.* (citing *Dooley*, 786 F. Supp. at 78; *see also Companhia Brasileira Carbureto de Calcio - CBCC v. Applied Indus. Materials Corp.*, 887 F. Supp. 2d 9, 18 (D.D.C. 2012). To satisfy the pleading requirements of the conspiracy theory of jurisdiction, the plaintiff must allege, with particularity, "(1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries." *Jung*, 300 F. Supp. 2d at 141; *see also Edmond*, 949 F.2d at 425. For the reasons set forth below, True the Vote has satisfied each of these elements.

### a.   True the Vote has sufficiently pleaded the existence of a conspiracy involving Defendant Thomas and the Cincinnati Defendants.

First, True the Vote has pleaded, with particularity, the existence of a civil conspiracy.

In the District of Columbia, civil conspiracy has four elements: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act

in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

*Second Amendment Found. v. United States Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)

(quoting *Halberstram v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).

True the Vote has satisfied the first two elements by pleading sufficient facts to establish that Defendant Thomas and the Cincinnati Defendants entered into an "an agreement" with one another and the other Individual Defendants to participate in the unlawful acts of designing, creating, and executing the IRS Targeting Scheme in violation of True the Vote's statutory and constitutional rights. To satisfy these first two elements, it is not necessary to allege that Defendant Thomas or the Cincinnati Defendants reached an ***express*** agreement. *United States v. Norvell*, No. 12-3415, 2013 U.S. App. LEXIS 18233, at *14 (8th Cir. 2013). Indeed, "there is rarely an ***express*** agreement to break the law." *United States v. Brown*, No. 12-2810, 2013 U.S. App. LEXIS 21298, at *5 (3d Cir. 2013) (emphasis added). For this reason, it is well settled that "to properly plead an unconstitutional conspiracy," a plaintiff must only "assert facts from which a conspiratorial agreement can be ***inferred***." *Coulter v. Studeny*, 522 Fed. Appx. 147, 149 (3d Cir. 2103) (emphasis added); *see also United States v. Moore*, 651 F.3d 30, 97 (D.C. Cir. 2011). This standard is met when the complaint sets forth "enough factual matter (taken as true) to ***suggest*** that an agreement was made," and "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965 (emphasis added). "An agreement may be inferred" not only from "'from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct,'" *Myers v. Bowman*, 713 F.3d 1319, 1332 (11th Cir. 2013), but also "from a 'unity of purpose or common design and understanding' among conspirators to accomplish the objects of the conspiracy," *United States v. Dowlin*, 408 F.3d 647, 657 (10th Cir. 2005), and from parallel conduct if the allegations tend to

exclude the possibility of independent action. *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965; *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2009 U.S. Dist. LEXIS 123954, at *16 (D.D.C. Sept. 30, 2009).

Based on the foregoing authority, True the Vote has pleaded sufficient facts to give rise to a reasonable inference that Defendant Thomas and each of the Cincinnati Defendants reached an agreement with the remaining Individual Defendants to violate True the Vote's statutory and constitutional rights. Specifically, this inference is supported by the allegations, set forth below, that Defendant Thomas, the Cincinnati Defendants, and the remaining Individual Defendants, in the context of their relationships with each other, worked in concert, with a unity of purpose and common design, to effectuate the complex, multi-jurisdictional IRS Targeting Scheme. The relevant allegations illustrate that Defendant Thomas and each of the Cincinnati Defendants' parallel contributions to the IRS Targeting Scheme did not constitute merely independent conduct. In fact, many of their unconstitutional acts were made pursuant to "written and oral guidance" from other Individual Defendants regarding the IRS Targeting Scheme. (Dkt. #14 ¶¶ 96, 97.) Reading the allegations together, it is clear that the IRS Targeting Scheme was, and could only have been, effectuated by agreement and cooperation among the Individual Defendants.

The Amended Complaint specifically alleges that each of the Individual Defendants "worked in concert with one or more of the IRS Defendants…in furtherance of a civil conspiracy aimed at creating, revising, implementing, and applying the unlawful and discriminatory IRS Targeting Scheme…in violation of the statutory and constitutional rights of True the Vote…." (Dkt. #14 ¶ 28(b).) Additionally, the Amended Complaint states that all of the Individual Defendants played a part in "systematically target[ing] True the Vote's application for

14

unwarranted delay and heightened review and scrutiny." (*Id.* ¶ 5.) The Amended Complaint further alleges that each of the Individual Defendants worked together to "creat[e], develop[], implement[], and apply[] the IRS Targeting Scheme to True the Vote and…fail[ed] to prevent such development, implementation, and application by others under their direct supervision and control despite knowledge of such unconstitutional conduct." (*Id.* ¶ 165.)[7]

More specifically, the Amended Complaint and the TIGTA Report state that the "Determinations Unit," "under the control and direction of Defendant Ms. Thomas," "developed and began using criteria" that formed the basis for the IRS Targeting Scheme. (*Id.* ¶ 83; Dkt. #14-6 at 11.) The Determinations Unit first targeted "organizations with the words Tea Party in their names" and subsequently "expanded the criteria to inappropriately include organizations with other specific names (Patriots and 9/12) or policy positions." (*Id.*) "[T]he EO Determinations Unit," which was under the authority and control of Defendant Thomas, "and EO Specialists in the Cincinnati, Ohio IRS office…worked in concert with the IRS EO Technical Unit and other IRS offices in Washington, D.C. to develop and revise the unconstitutional IRS Targeting Scheme and to process applications in accordance with the IRS Targeting Scheme." (Dkt. # 14 ¶ 86.) Applications that were identified as being associated with the Tea Party, including True the Vote's, "were forwarded to a team of specialists for review." (Dkt. # 14-6 at

---

[7] The IRS Targeting Scheme was initiated by IRS employees in the IRS's Cincinnati office, and then spread to Washington, D.C. According to the Interim Report

In February 2010, a line screener in the IRS office in Cincinnati, Ohio, became aware of a tax-exempt application from a Tea Party group. The screener alerted his superiors, who in turn informed Washington IRS officials. In elevating the application to his superior, the screener noted: "Recent media attention to this type of organization indicates to me that this is a 'high profile' case." As the application continued to be elevated, another IRS employee called the application a "potentially politically embarrassing case" and also pointed out the "[r]ecent media attention to this type of organization." On this basis—"the potential for media attention"—the Washington office accepted the case.

(Ex. A at 8-9) (internal footnotes omitted).

11.) The "Determinations Unit management . . . requested its specialists to be on the lookout for Tea Party applications." (*Id.* at 12.) These specialists, including each of the Cincinnati Defendants, under the direction and control of Defendant Thomas, executed the IRS Targeting Scheme at the ground level by sending to True the Vote the burdensome and unnecessary requests for additional information. (*See* Dkt. # 14 ¶¶ 56, 63, 66, 128, 129; Dkts. #14-3–14-5.) "Between 2010 and 2012, the IRS EO Technical Unit—under the direction and control of either Defendant Ms. Paz, Defendant Mr. Grodnitzky, or Defendant Mr. Seto—the IRS Office of Rulings and Agreements—under the direction and control of either Defendant Ms. Paz or Defendant Mr. Fish—Defendant Ms. Lerner and unknown Named Employees of the IRS developed and revised ***written and oral guidance*** on how IRS Employees, including Defendant Ms. Thomas, Ms. Maloney, Ms. Estes, Mr. Bell, and Ms. Ng . . . were to identify and process applications in accordance with the IRS Targeting Scheme." (*Id.* ¶ 96 (emphasis added).) Pursuant to this guidance, "[b]etween 2010 and 2012, the EO Determinations Unit—under the direction and control of Defendant Ms. Thomas—and EO Specialists," which included Defendants Maloney, Bell, Estes, and Ng, "implemented and *applied this written and oral guidance* on how to identify and process applications in accordance with the IRS Targeting Scheme." (*Id.* ¶ 97 (emphasis added).)

Furthermore, "[i]n March 2010, Defendant Paz," the Acting Manager of the EO Technical Unit in D.C., "requested that certain applications being processed in accordance with the IRS Targeting Scheme in the . . . Determinations Unit . . . be transferred to IRS offices in Washington, D.C." (*Id.* ¶ 88.) With respect to the applications that were sent to D.C., Mr. Carter Hull, a tax law specialist at the IRS, "was instructed to scrutinize certain Tea Party applications by one of his supervisors in Washington." (Dkt. #14-8 at 1.) Thereafter, Defendant Lerner "gave

an atypical instruction that the Tea Party applications undergo special scrutiny that included an uncommon multi-layer review that involved a top advisor to Lerner as well as the Chief Counsel's [Defendant Wilkins's] office." (Dkt. #14 ¶¶ 110-11; Dkt. #14-8 at 2.)

As the above allegations make clear, the parallel, interrelated and coordinated efforts and communications of the Individual Defendants, across multiple jurisdictions, tend to exclude the possibility that each of the Individual Defendants acted independently in the creation, implementation, and execution of the unconstitutional IRS Targeting Scheme. In fact, the Amended Complaint specifically alleges that Defendants Thomas, Maloney, Estes, Bell, and Ng executed the IRS Targeting Scheme in consultation with the "written and oral guidance" of Defendants Paz, Grodnitzky, Seto, and/or Fish. (Dkt. #14 ¶¶ 96-97.) The inference that an agreement was made is further supported by the allegations concerning the Individual Defendants' "relationship . . ., overt acts and concert of action, and the totality of their conduct," *Myers*, 713 F.3d at 1332, and the "'unity of purpose or common design and understanding' . . . to accomplish the objects of the" IRS Targeting Scheme, *Dowlin*, 408 F.3d at 657. For these reasons, True the Vote has set forth "enough factual matter (taken as true) to," at the very least, "*suggest* that an agreement was made, and "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965 (emphasis added).

The above allegations also satisfy the third and fourth elements of a civil conspiracy. First, they set forth the requisite "overt acts" taken "in furtherance of the common scheme" to violate True the Vote's constitutional and statutory rights, as they demonstrate many of the "concrete step[s]" taken by the Individual Defendants "toward carrying out the agreement." *United States v. Hsia*, 24 F. Supp. 2d 14, 24 (D.D.C. 1998), *rev'd on other grounds,* 176 F.3d

517 (D.C. Cir. 1999); *see also United States v. Sarault*, 840 F.2d 1479, 1487 (9th Cir. 1988).

Importantly, it is well settled that each of the above actions can be considered an "overt act" even though any one of them may not have, by itself, "actually accomplish[ed] the goal of the conspiracy." *Hsia*, 24 F. Supp. 2d at 24. Furthermore, True the Vote has specifically alleged that these overt acts were "unlawful" because they were in violation of the First Amendment to the United States Constitution, (Dkt. #14 ¶¶ 148-61), 26 U.S.C. § 6103, (*id.* ¶¶ 168-87), and the Administrative Procedure Act ("APA"), (*id.* ¶¶ 188-206).

Finally, True the Vote has alleged that it was injured as a result of these overt acts. Specifically, the Amended Complaint alleges that, "[a]s a result of the IRS Targeting Scheme, True the Vote's application" endured "unwarranted delay" "by more than three years" while being subjected to "heightened review and scrutiny," including being "deliberately subjected to numerous unnecessary, burdensome, and unlawful requests about its operations, activities, leadership, volunteers, associations, and affiliations." (Dkt. #14 ¶ 5.) The unnecessary information demanded by the IRS "created a burden on" True the Vote because it was "required to gather and forward information that was not needed by the Determinations Unit and led to delays in processing the applications." (*Id.* ¶ 101.) "The [Individual] Defendants' conduct has caused True the Vote to incur substantial costs preparing responses to the [Individual] Defendants' unnecessary, burdensome and unconstitutional requests for information." (*Id.* ¶ 209.) "The mistreatment and mishandling of True the Vote's application for tax-exempt status . . . violate[d] True the Vote's constitutional rights and has caused the organization substantial damages and financial hardship." (*Id.* ¶ 134; *see also id.* ¶¶ 5, 151, 159). "The application of the IRS Targeting Scheme to True the Vote has impaired the expressive associational effectiveness of True the Vote and its members." (*Id.* ¶ 153.) "The conduct of

18

Defendants the IRS and Commissioner Werfel has had a chilling effect on the willingness and ability of potential donors, grant-making foundations, and others to provide financial support to True the Vote." (*Id.* ¶ 154.) "Because the [Individual] Defendants deliberately delayed the processing of True the Vote's Application, True the Vote was forced to forfeit a foundation grant in the amount of $25,000 that was contingent on True the Vote receiving its tax-exempt status," (*id.* ¶ 210), "return a foundation grant in the amount of $35,000 that was contingent on True the Vote receiving its tax-exempt status," (*id.* ¶ 211), "forgo applying for grants from other grant-making foundations that had committed to support True the Vote," (*id.* ¶ 212), and "forego other fundraising opportunities," (*id.* ¶ 213).

For these reasons, True the Vote has sufficiently pleaded each element of the existence of a civil conspiracy and therefore has satisfied the first requirement of the conspiracy theory of personal jurisdiction for Defendant Thomas and the Cincinnati Defendants.

**b.** **True the Vote has alleged that Defendant Thomas and the Cincinnati Defendants participated in or agreed to join the conspiracy.**

True the Vote has alleged with particularity that Defendant Thomas and each of the Cincinnati Defendants participated in the conspiracy.

**i.** **Allegations Common to Defendant Thomas and the Cincinnati Defendants**

Generally speaking, Defendant Thomas and the Cincinnati "Defendants . . . while acting under color of federal authority, violated True the Vote's constitutional rights to free speech and association. They did so by creating, developing, implementing, and applying the IRS Targeting Scheme to True the Vote and by failing to prevent such development, implementation, and application by others under their direct supervision and control despite knowledge of such unconstitutional conduct." (*Id.* ¶ 165.) More specifically, "[b]etween 2010 and 2012, the IRS EO Technical Unit . . . the IRS Office of Rulings and Agreements . . . [and] Defendant Ms. Lerner . .

. developed and revised written and oral guidance on how IRS Employees, including Defendant

Ms. Thomas, Ms. Maloney, Ms. Estes, Mr. Bell, and Ms. Ng . . . were to identify and process

applications in accordance with the IRS Targeting Scheme." (*Id.* ¶ 96 (emphasis added).)

Pursuant to this guidance, "[b]etween 2010 and 2012, the EO Determinations Unit—under the

direction and control of Defendant Ms. Thomas—and EO Specialists," which is what the

Cincinnati Defendants were, "implemented and applied this written and oral guidance on how to

identify and process applications in accordance with the IRS Targeting Scheme." (*Id.* ¶ 97

(emphasis added).) Defendant Thomas and the Cincinnati Defendants did not take "necessary

actions to halt the IRS Targeting Scheme and to ensure that applicants subject to the IRS

Targeting Scheme instead received a determination for tax-exempt status despite actual

knowledge that the IRS had received sufficient information from the applicants to make

determinations of exempt status." (*Id.* ¶ 123.)

### ii.    Allegations Specific To Defendant Thomas

With respect to Defendant Thomas, the Complaint alleges as follows. "Defendant Ms.

Thomas is the Program Manager, Exempt Organizations Determinations Unit, of the IRS." (*Id.* ¶

40.) "She is the highest ranking IRS employee in the Exempt Organizations Determinations Unit

of the IRS, located in Cincinnati, Ohio." (*Id.*) "She is responsible for processing determination

letter requests from exempt organizations seeking recognition of tax-exempts status, and

providing assistance and guidance to other IRS officers and employees involved in such

processing." (*Id.*) "In March and April of 2010, the IRS Exempt Organizations ("EO")

Determinations Unit in Cincinnati, Ohio, under the control and direction of Defendant Thomas,

'began searching for . . . requests for tax-exemption involving the Tea Party, Patriots, 9/12 and

26 U.S.C. § 501(c)(4) applications involving political sounding names, e.g., 'We the People' or

'Take Back the Country,'" (*id.* ¶ 83), and thereby "developed and began using criteria" that

formed the basis for the IRS Targeting Scheme, (Dkt. #14-6 at 11). "Applications that were identified as being associated with the Tea Party," including True the Vote's, "were forwarded" by the Determinations Unit, under the authority of Defendant Thomas, "to a team of specialists for review." (*Id.*). The "Determinations Unit management," under the authority of Defendant Thomas, "requested its specialists to be on the lookout for Tea Party applications." (*Id.* at 12.) Additionally, "[B]etween 2010 and 2012, the EO Determinations Unit and EO Specialists in the Cincinnati, Ohio IRS office, under the direction and control of ***Defendant Ms. Thomas, worked in concert with the IRS EO Technical Unit and other IRS offices in Washington, D.C.*** to . . . revise the unconstitutional IRS Targeting Scheme and to process applications in accordance with the IRS Targeting Scheme." (Dkt. #14 ¶ 86 (emphasis added).) During that same time period, "the EO Determinations Unit—under the direction and control of Defendant Ms. Thomas—and EO Specialists implemented and applied . . . written and oral guidance" from Defendants Paz, Grodnitzky, Seto, fish and/or Lerner "on how to identify and process applications in accordance with the IRS Targeting Scheme." (*Id.* ¶ 97.) As these allegations make clear, the Complaint alleges, with particularity, that Defendant Thomas participated in the conspiracy.

### iii.    Allegations Specific to Defendant Maloney

"Defendant Ms. Maloney is an IRS Exempt Organizations Specialist in the IRS Determinations Unit who oversaw the processing of True the Vote's application for tax-exempt status." (*Id.* ¶ 44.) The Complaint alleges that Ms. Maloney executed the IRS Targeting Scheme at the ground level, in accordance with "written and oral guidance" from other Individual Defendants, (*id.* ¶¶ 96, 97), by sending to True the Vote a letter on February 15, 2011, demanding additional, unnecessary, and burdensome "information from True the Vote in order to complete the IRS' consideration of True the Vote's Application," (*id.* ¶¶ 5, 56; *see also* Dkt.

21

#14-3; # 14-6 at 24). Finally, the Complaint alleges that Ms. Maloney, as part of the IRS Targeting Scheme, inspected True the Vote's "tax return information." (Dkt. #14 ¶ 181.)

### iv.   Allegations Specific to Defendant Bell

"Defendant Mr. Bell is an IRS Exempt Organizations Specialist in the IRS Determinations Unit who oversaw the processing of True the Vote's application for tax-exempt status." (*Id.* ¶ 45). "On October 12, 2011, True the Vote's legal counsel contacted the IRS and its agent, Defendant Mr. Bell, to inquire as to the status of True the Vote's application. During this phone conversation, Mr. Bell stated that True the Vote's application was being overseen by and had been forwarded to the IRS office in Washington D.C. for additional review. (Dkt. #14 ¶ 60; Dkt. #14-7 at 2.) According to Mr. Bell, who was "assigned to the case" (Dkt. #14-7 at 2), the Washington, D.C. office had assumed primary approval responsibility," (*id.* ¶ 60). On or around October 27, 2011, the IRS Taxpayer Advocate advised Sen. Cornyn—in response to his January 5, 2011, inquiry—that it had contacted Defendant Bell regarding the status of True the Vote's application and that Mr. Bell had informed the Taxpayer Advocate that he was waiting for a determination on True the Vote's application from the IRS Washington D.C. office. (*Id.* ¶ 59.) In addition, the Complaint alleges that Mr. Bell inspected True the Vote's "tax return information." (*Id.* ¶ 181.)

### v.   Allegations Specific to Janine L. Estes

"Defendant Ms. Estes is an IRS Exempt Organizations Specialist in the IRS Determinations Unit who oversaw the processing of True the Vote's application for tax exempt status." (*Id.* ¶ 46.) The Complaint alleges that Ms. Estes executed the IRS Targeting Scheme at the ground level, in accordance with "written and oral guidance" from other Individual Defendants, (*id.* ¶¶ 96-97), by sending to True the Vote, on behalf of the IRS, a letter on

February 8, 2012 demanding "even more" unnecessary and burdensome "information from True the Vote to complete the IRS's consideration of True the Vote's Application." (*Id.* ¶¶ 5, 63) (Dkt. # 14-6 at 24). Additionally, the complaint alleges that Mr. Bell inspected True the Vote's "tax return information." (*Id.* ¶ 181.)

### vi.     Allegations Specific to Faye Ng

"Defendant Ms. Ng is an IRS Exempt Organizations Specialist in the IRS Determinations Unit who oversaw the processing of True the Vote's application for tax-exempt status." (*Id.* ¶ 47.) The Complaint alleges that Ms. Ng executed the IRS Targeting Scheme at the ground level, in accordance with "written and oral guidance" from other Individual Defendants, (*id.* ¶¶ 96-97), by sending to True the Vote, on behalf of the IRS, a letter on October 9, 2012, demanding "still more" unnecessary and burdensome "information from True the Vote in order to complete its consideration for its Application." (*Id.* ¶ 66.) Additionally, the Complaint alleges that Ms. Ng inspected True the Vote's "tax return information." (*Id.* ¶¶ 5, 181.) (Dkt. # 14-6 at 24.)

### c.     True the Vote has specifically alleged numerous overt acts taken in furtherance of the conspiracy in Washington, D.C.

Finally, True the Vote has pleaded specific overt acts that took place within Washington D.C., and these acts confirm that True the Vote's causes of action arose from transacting business within the District of Columbia. *See World Wide Minerals, LTD. v. Republic of Kaz.*, 296 F.3d 1154, 1168 (D.C. Cir. 2002) (noting that personal jurisdiction under D.C. Code § 13-423(a)(1) "is limited to claims arising from the particular transaction of business" in the District). For example, the Amended Complaint states that "[i]n March 2010, Defendant Ms. Paz," the Acting Manager of the EO Technical Unit in D.C., "requested that certain applications being processed in accordance with the IRS Targeting Scheme in the . . . Determinations Unit . . . be transferred to IRS offices in Washington, D.C." (Dkt. #14 ¶ 88). With respect to the applications

that were sent to D.C., Mr. Carter Hull, a tax law specialist at the IRS, "was instructed to scrutinize certain Tea Party applications by one of his supervisors in Washington." (Dkt. #14-8 at 1.) Thereafter, Defendant Lerner, who is based in Washington, D.C., "gave an atypical instruction that the Tea Party applications undergo special scrutiny that included an uncommon multi-layer review that involved a top advisor to Lerner as well as the Chief Counsel's [Defendant Wilkins's] office," which is in Washington, D.C. (Dkt. #14-8 at 2; Dkt. #14 ¶¶ 110-11.) "[T]he EO Determinations Unit and EO Specialists in the Cincinnati, Ohio IRS office, under the direction and control of Defendant Ms. Thomas, worked in concert with the IRS EO Technical Unit and other IRS offices in Washington, D.C. to develop and revise the unconstitutional IRS Targeting Scheme and to process applications in accordance with the IRS Targeting Scheme." (Dkt. #14 ¶ 86.) And finally, it was "[t]he lengthy and unusual review of the test applications in Washington" that "created a bottleneck and caused the delay of other Tea Party applications in Cincinnati." (Dkt. #14-8 at 6.)

For the reasons set forth above, True the Vote has satisfied each of the requirements for the conspiracy theory of long-arm personal jurisdiction. *See Jung*, 300 F. Supp. 2d at 141. Therefore, this court may properly exercise personal jurisdiction over Defendant Thomas and the Cincinnati Defendants.

**B.      True the Vote Has Properly Stated Claims Against the Individual Defendants Under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics.***

In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S. Ct. 1999 (1971), the Supreme Court held that a damages remedy can be implied directly under the Constitution to vindicate a deprivation of the plaintiff's Constitutional rights.[8] The Court's holdings were

---

[8] *Bivens* recognized claims against individual federal agents under the Fourth Amendment. Subsequently, the Court recognized similar causes of action for damages to remedy violations of the Fifth Amendment, *Davis v. Passman*,

founded on the uncontroversial "presum[ption] that justiciable constitutional rights are to be enforced through the courts." *Davis*, 442 U.S. at 242, 99 S. Ct. at 2275. Indeed, the *Bivens* court declared that it is "'well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'" *Bivens*, 403 U.S. at 396, 91 S. Ct. at 2004 (quoting *Bell v. Hood*, 327 U.S. 678, 684, 66 S. Ct. 773, 777 (1946)). Because "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," a *Bivens* action gives plaintiffs like True the Vote, which have no other remedy to redress their constitutional injuries, the right to recover money damages from the responsible federal officials. *Bivens*, 403 U.S. at 395, 91 S. Ct. at 2004.

The Supreme Court counsels that "the decision whether to recognize a *Bivens* remedy may require two steps." *Wilkie v. Robbins*, 551 U.S. 537, 550, 127 S. Ct. 2588, 2598 (2007). The first steps asks "'whether any alternative, existing process for protecting the [constitutionally-recognized] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *Minneci v. Pollard*, 132 S. Ct. 617, 621 (2012) (quoting *Wilkie*, 551 U.S. at 550, 127 S. Ct. at 2598) (brackets in original). Step two "is a subject of judgment." *Id*. Where no adequate, alternative remedy exists, "'the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.'" *Id*. The "special factors" inquiry requires the court to "weigh[] reasons *for and against* the creation of a new cause of action, the way common law judges have

---

442 U.S. 228, 99 S. Ct. 2264 (1979), and the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468 (1980).

always done." *Wilkie*, 551 U.S. at 554, 127 S. Ct. 2588, 2600 (2007) (citing *Bush v. Lucas*, 462 U.S. 367, 378, 103 S. Ct. 2404, 2411 (1983)) (emphasis added). The presence of "special factors" will not defeat a *Bivens* action where Congress's omission of a damages remedy for certain claims or claimants was "inadvertent" or where Congress has indicated that a *Bivens* remedy should be preserved. *Wilson v. Libby*, 535 F.3d 697, 706 (D.C. Cir. 2008).

Neither the Internal Revenue Code ("IRC") nor any other existing statutory scheme provides True the Vote an adequate, alternative remedy for protecting its constitutionally recognized interests. In fact, legislative history, demonstrates that Congress intended the IRC's remedies to complement, not supplant, a remedy under *Bivens*. The Government, in its Motion to Dismiss (Dkt. #54), has confirmed this. Far from counseling hesitation, the "special factors" present in this case—namely, the wide-spread and egregious nature of the IRS Targeting Scheme—weigh in favor of recognizing a *Bivens* remedy for True the Vote.

      1.      **The IRS has recognized that its agents and employees<br>are subject to *Bivens* claims for constitutional violations.**

The Government, in its motion to dismiss True the Vote's claims against the IRS in Counts II, IV, and V, argues as grounds for dismissal that a *Bivens* remedy remains available to True the Vote in this case. *See* (Dkt. #54 at 2 ("Plaintiff has two alternative legal remedies, namely a section 7428 action and a *Bivens* action.").); (Dkt. #54 at 16 ("Plaintiff has available – and again has raised – claims under *Bivens* (Count III of the Amended Complaint).").) These are not "hollow" concessions by the IRS. The Government is bearing the cost of the Individual Defendants' legal representation in this case. Further, the IRS Manual specifically anticipates and recognizes *Bivens* claims against its employees. *See* 28 C.F.R. § 50.15(a); Internal Revenue Manual, § 5.17.5.14(3) ("When *Bivens* suits are filed against Internal Revenue Service or other government employees, the Department of Justice provides representation of employees who

26

were acting within the scope of their employment if it is in the interest of the United States to do so."). And the Government is authorized to pay judgments rendered against IRS employees found liable under a *Bivens* claim. *See* 26 U.S.C. § 7423 ("The Secretary…is authorized to repay…[a]ll damages and costs recovered against any officer or employee of the United States in any suit brought against him by reason of anything done in the due performance of his official duty under this title."); *see also* Internal Revenue Manual, § 5.17.5.14(3) ("The Service may pay judgments rendered against IRS employees" in *Bivens* actions.). The Individual Defendants' arguments are directly contradicted by the IRS, the Internal Revenue Code, and the IRS Manual.

### 2. Congress intended the Internal Revenue Code's remedies to complement, not preempt, *Bivens* remedies.

The Cincinnati Defendants selectively point to portions of the legislative history of 26 U.S.C. § 7433 as evidence that Congress deliberately omitted damages remedies for constitutional violations. (Dkt. #64 at 23-24.) They argue that before the passage of section 7433, Congress did not pass two proposed bills that provided for a civil action against IRS employees who commit constitutional violations. *See* S. 579, 100th Cong., 1st Sess., § 3(a) (1987); H.R. 634, 100th Cong., 1st Sess., § 9(a) (1987). They further argue that an action brought under section 7433 was limited by Congress to alleged violations of the IRC that are related to the collection of taxes. (Dkt. #64 at 23-24.) However, these arguments do not tell the whole story.

Around the time of the enactment of section 7433, Senator David Pryor, the Chairman of the Subcommittee on Private Retirement Plans and Oversight of the Internal Revenue Service of the Senate Committee on Finance and the primary sponsor of the Taxpayer Bill of Rights, conducted hearings on bills similar to section 7433—Senate Bills 579 and 604. Senate Bill 579 contained a provision that allowed taxpayers to sue employees of the Internal Revenue Service for civil rights violations. S. 579, 100th Cong., 1st Sess., § 3(a) (1987).

27

Among those providing testimony on Senate Bill 579 was IRS Commissioner Lawrence B. Gibbs, who also submitted into the record an item-by-item analysis of its provisions.[9] Commissioner Gibbs's analysis explained that Senate Bill 579's provision providing a cause of action for constitutional violations was not necessary in light of the availability of *Bivens* remedies:

> A right of action against [Internal Revenue] Service employees currently exists. The Supreme Court recognized a cause of action directly under the Constitution in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics. Bivens* suits are an available remedy for those whose Constitutional rights have been violated by Federal employees acting under the color of Federal law. In fact, more than 1000 *Bivens* suits were filed against [Internal Revenue] Service employees during fiscal years 1980 through 1986. It should be noted, however, that none of these suits has been ultimately successful.

Hearing on S. 579 at 243. Senate Bill 579 was subsequently not enacted, but only after Congress was advised it was not necessary. (Dkt. #64 at 23.)

Contemporaneously, Congress proposed two similar bills to add section 7433 to the IRC. As proposed, this legislation provided in part:

> If, in connection with any determination or collection of Federal tax, any officer or employee of the Internal Revenue Service carelessly, recklessly, or intentionally disregards any provision of Federal law, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

S. 2238, 100th Cong., 2nd Sess., § 779 (1988); H.R. 4333, 100th Cong., 2nd Sess. (1988). During consideration of Senate Bill 2238, Senator Pryor entered into the record a staff summary, which explained "what the taxpayers' bill of rights does and what it does not do." 134 Cong.

---

[9] *See* Taxpayers Bill of Rights: Hearings on S. 579 and S. 604 Before the Subcommittee on Private Retirement Plans and Oversight of the Internal Revenue Service of the Senate Committee on Finance at 223-243, 100th Cong., 1st Sess. 177 (Apr. 10, 1987) (statement of Lawrence B. Gibbs, Commissioner, Internal Revenue Service) (hereafter "Hearing on S. 579").

Rec. 28285, 29271 (Oct. 7, 1988). Like Commissioner Gibb's testimony, Senator Pryor's

summary explained that a cause of action under *Bivens* is available against IRS officials:

> Presently, the only avenue open for taxpayers to recover losses sustained from
> wrongful actions by the IRS is a cause of action against IRS employees under
> *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403
> U.S. 388 (1971). … The courts have created a clear cause of action for injured
> taxpayers.

*Id*. at 29273.[10] Two weeks later, Congress agreed to omit from section 7433 relief from

violations of "Federal law," limiting such relief to violations of the Internal Revenue Code. *See*

*Conference Report to Accompany H.R. 4333*, Vol. 2, 100th Cong. 2nd Sess. (Oct. 21, 1988).

In short, when Congress omitted statutory relief for constitutional injuries, it did so with

the explicit understanding that taxpayers already enjoyed a remedy for such injuries under

*Bivens*. Though Commissioner Gibbs and Senator Pryor explained that *Bivens* remedies had not

been largely successful to date, there is nothing in the "legislative history to show that Congress

meant to pre-empt a *Bivens* remedy," *Carlson*, 446 U.S. at 19, 100 S. Ct. at 1472, or intended

that it no longer be available to those who wished to pursue such an action.[11] Instead, the

legislative history plainly indicates that that Congress understood that *Bivens* remedies were

available against IRS officials and intended to provide remedies for harms for which taxpayers

had no available remedy under the present law, which would complement, not supplant, *Bivens*.

"Where Congress decides to enact a statutory remedy which it views as fully adequate only in

---

[10] The remedies that Congress provided via 26 U.S.C. §§ 7428 and 7433, and the Administrative Procedure Act
were enacted before the enactment of section 7433. Congress's statements, explaining that *Bivens* remedies were
then available in 1988, discredit the argument that Congress intended sections 7428 and 7431 and the APA to pre-
empt a *Bivens* remedy. (Dkt. #63 at 12-13, 64 at 27-28).

[11] The success rate of *Bivens* claims against particular federal officials has never played a part of the "special
factors" analysis and Defendants' provide no reason such speculation should now control whether True the Vote
may pursue its claims against IRS officials here.

combination with the *Bivens* remedy…that congressional decision should be given effect by the courts." *Id*.

Congress and the IRS have both "expressed an intention that the courts preserve *Bivens* remedies." *Wilson*, 535 F.3d at 705. As a result, the existence of the IRC, even if considered a "comprehensive remedial scheme," does not foreclose a *Bivens* remedy for True the Vote's constitutional injuries.[12]

### 3.   No adequate, alternative remedies exist for True the Vote's constitutional injuries caused by the Individual Defendants.

Despite the Government's recognition of the availability of *Bivens* claims by True the Vote, the Management Defendants list various statutory remedies they contend preclude a *Bivens* action in this case (Dkt. #63 at 12-13), and the Cincinnati Defendants contend that True the Vote has adequate alternative remedies available to it that preclude a *Bivens* action in this case. (Dkt. #64 at 32, 32 n.12.) Yet none of these remedies satisfies the Supreme Court's "alternative remedy" standard and therefore do not prevent True the Vote's reliance on *Bivens* to redress the violation(s) of its First Amendment rights.

A *Bivens* remedy will not be precluded under the "adequate, alternative remedy" prong absent an "explicit congressional declaration that persons injured by a federal officer's violation…may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress." *Bivens*, 403 U.S. at 397, 91 S. Ct. at 2005; *see also Carlson*, 446 U.S. at 23, 100 S. Ct. at 1474 ("without a clear congressional

---

[12] Congress's clear indication that a *Bivens* remedy is available against IRS officials also defeats the Individual Defendants' argument that recognition of such a remedy would "interfere with the affective administration of the tax system" (Dkt. #63 at 10 n.4) and the "discretionary determinations" that must be made by IRS officials, (Dkt. #64 at 29.) These arguments are also severely discredited by the IRS's concession in its motion to dismiss that a *Bivens* action may be pursued against its officials and employees. (Dkt. #54 at 16 ("Plaintiff has available – and again has raised – claims under *Bivens* (Count III of the Amended Complaint).").)

mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy").

"[T]he inquiry is whether Congress has created what it views as an *equally* effective remedial

scheme. Otherwise the two can exist side by side." *Carlson*, 446 U.S. at 23 n.10, 100 S. Ct. at

1474 n.10 (emphasis in original). "When Congress provides an alternative remedy, it

may…indicate its intent, by statutory language, by clear legislative history, or perhaps even by

the statutory remedy itself." *Bush*, *v. Lucas*, 462 U.S. at 378, 103 S. Ct. at 2411. For example, in

*Carlson*, the Supreme Court recognized a *Bivens* remedy for the violation of Eighth Amendment

rights, despite the availability of the Federal Tort Claims Act, because "nothing in the Federal

Tort Claims Act (FTCA) or its legislative history…show[ed] that Congress meant to pre-empt a

*Bivens* remedy or to create an equally effective remedy for constitutional violations." 446 U.S. at

18, 100 S. Ct. at 1472. Similarly, in *Davis*, the Court recognized a *Bivens* remedy for a

congressional employee's allegedly discriminatory termination in violation of her due process

rights because there were no "equally effective alternative remedies" and "no explicit

congressional declaration" that the plaintiff may not recover money damages. 442 U.S. at 245-

48, 99 S. Ct. at 2278.

In its most recent application of the "alternative remedy" test, the Supreme Court

explained that while an alternative remedy "and a potential *Bivens* remedy need not be perfectly

congruent," it must "provide roughly similar incentives for potential defendants to comply with

the [Constitution] while also providing roughly similar compensation to victims of violations."

*Minneci*, 132 S. Ct. at 624-26 (holding *Bivens* remedy unavailable for federal prisoner seeking

damages from privately employed personnel working at a privately operated federal prison,

where the conduct allegedly amounts to a violation of the Eighth Amendment because state tort

law provided adequate alternative remedies).[13] Where a suggested alternative remedy falls short

of this standard, it supports the inference that Congress did not intend for it to serve as an

alternative to a claim for damages under *Bivens*. For example, in *Carlson*, along with the

FTCA's legislative history, "four additional factors, each suggesting that the *Bivens* remedy is

more effective than the FTCA remedy, also support[ed the] conclusion that Congress did not

intend to limit respondent to an FTCA action." *See Carlson*, 446 U.S. at 20-21, 100 S. Ct. at

1472. Among these factors was the deterrent effect a suit for money damages would have on

individual federal officers: "[T]he *Bivens* remedy, in addition to compensating victims, serves a

deterrent purpose. Because the *Bivens* remedy is recoverable against individuals, it is a more

effective deterrent than the FTCA remedy against the United States."[14] *Id*. at 21, 100 S. Ct. at

1473.

### i.    A declaratory judgment action under 26 U.S.C. § 7428 is not an adequate alternative remedy for constitutional injuries.

Like the FTCA in *Carlson*, a declaratory judgment action under 26 U.S.C. § 7428 does

not provide True the Vote an adequate, alternative remedy for the constitutionally-recognized

interests at issue for at least two reasons. First, nothing in the legislative history of section 7428

shows that Congress meant to "pre-empt a *Bivens* remedy or to create an equally effective

remedy for constitutional violations." *Carlson*, 446 U.S. at 18, 100 S. Ct. at 1472. The June 10,

1976 report of the Senate Committee on Finance on the Tax Reform Act of 1976 (HR 10612)

---

[13] The Individual Defendants may argue that the D.C. Circuit has interpreted *Wilkie* as obviating the requirement that an alternative remedy be "equally effective" in order to defeat a *Bivens* claim. *See Wilson v. Libby*, 535 F.3d 697, 708 (D.C. Cir. 2008). Yet *Mennici* shows that *Wilkie* did no such thing. *Mennici* is clear that to defeat a *Bivens* claim under the "alternative remedy" prong the proffered alternative must at least "provide roughly similar incentives for potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims of violations." 132 S. Ct. at 625.

[14] The Court also noted that FTCA remedies were inadequate because the statute barred punitive damages, *Carlson*, 446 U.S. at 22, precluded the possibility of trial by jury, *id*. at 22-23, and required plaintiffs to defend on "the vagaries of the laws of the several States" upon which an FTCA claim must be based, *id*. at 23. For these reasons, the Court held that the "FTCA is not a sufficient protector of the citizens' constitutional rights." *Id*.

("Senate Report") explains that section 7428 was enacted in response to two Supreme Court cases decided in 1974: *Bob Jones University v. Simon*, 416 U.S. 725, 94 S. Ct. 2038 (1974) and *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 94 S. Ct. 2053 (1974). In these cases, the Supreme Court held that the Anti-Injunction Act, 26 U.S.C. § 7421(a), barred pre-enforcement judicial review of a decision by the IRS to revoke legal recognition of an organization's tax-exempt status. *See Bob Jones Univ.*, 416 U.S. at 727, 94 S. Ct. 2038 at 2041. As a result, organizations whose recognition had been revoked were forced to litigate their status "in the context of a suit to redetermine a tax deficiency or to determine eligibility for a refund," Senate Report at 586, a process that could take "one to two years from the time of revocation." *Americans United*, 416 U.S. at 778, 94 S. Ct. at 2067 (Blackmun, J., dissenting). The primary concern of the Supreme Court and Congress alike was not the constitutional violations alleged by the plaintiff organizations. Rather, the concern was the effect that an unreviewable revocation would have on the organization's ability to raise money and ultimately survive:

> [A]ppearance on the Cumulative List[15] is a prerequisite to successful fund raising for most charitable organizations. Many contributors simply will not make donations to an organization that does not appear on the Cumulative List. Because of the importance of inclusion in the Cumulative List, revocation of a § 501 (c)(3) ruling letter and consequent removal from the Cumulative List is likely to result in serious damage to a charitable organization.

*Bob Jones Univ.*, 416 U.S. at 729-730, 94 S. Ct. at 2042; s*ee also* Senate Report at 585 ("[A]s a practical matter, most organizations hoping to qualify for exempt status find it imperative to obtain a favorable letter ruling from the Service and to be listed in the Service's 'blue book' (Cumulative List….)"). Though the Supreme Court recognized the present regime was

---

[15] The "Cumulative List" is the IRS's "official roster of tax-exempt organizations." *Bob Jones Univ.*, 416 U.S. at 729, 94 S. Ct. at 2042. An organization's inclusion on the Cumulative List "signifies it has received a ruling or determination letter . . . stating that contributions by donors to the organization are deductible." *Id*. (citations and quotations omitted).

"especially harsh," it saw Congress as the appropriate body to craft an effective remedy for "organizations threatened with loss of tax-exempt status and with withdrawal of advance assurance of deductibility of contributions." *Bob Jones Univ.*, 416 U.S. at 749, 94 S. Ct. at 2052.

In accordance with the "line of reasoning outlined by the Supreme Court in [*Bob Jones University* and '*Americans United*']," Congress enacted section 7428 "[i]n order to provide an effective appeal from an Internal Revenue Service determination that an organization is not exempt from tax, or is not an eligible done for charitable contributions…." Senate Report at 587. Nowhere in the Senate Report does Congress indicate that section 7428 was meant to pre-empt a *Bivens* actions or provide a remedy for constitutional injuries sustained as a result of improper actions taken against an applicant by agents and employees of the IRS.[16]

Second, additional factors, each suggesting that a *Bivens* remedy is more "effective" than a section 7428 action, indicate that Congress did not intend to limit plaintiffs to a declaratory judgment action. A *Bivens* remedy is meant to compensate victims and serve a deterrent purpose. *Carlson*, 446 U.S. at 20-21, 100 S. Ct. at 1472-1473 Yet a declaratory judgment action does neither. Damages of any kind are unavailable under the statute. And "[b]ecause the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the [declaratory judgment] remedy against the United States." 446 U.S. at 21, 100 S. Ct. at 1473. Moreover, a *Bivens* action permits a plaintiff to seek immediate relief from constitutional violations, whereas an organization seeking initial qualification of its status (like True the Vote) must wait *at least* 270 days[17] before initiating a declaratory judgment proceeding. 26 U.S.C. §

---

[16] Though the *Bob Jones* and "*Americans United*" alleged unconstitutional conduct in the revocation of their recognition as tax-exempt entities, nothing in the legislative history indicates section 7428 was concerned with remedying constitutional injuries.

[17] Even if 270 days have elapsed since the filing of an application, an organization may not petition the court for a declaratory judgment unless "the organization has taken, in a timely manner, all reasonable steps to secure such

7428(b)(2). It is illogical to believe Congress intended victims of civil rights violations to endure them for at least 9 months before affording them judicial relief. Like the FTCA, section 7428 is "plainly…not a sufficient protector of the citizens' constitutional rights." *Carlson*, 446 U.S. at 23, 100 S. Ct. at 1474.

The Individual Defendants argue that True the Vote's use of section 7428 in this case demonstrates its adequacy. (Dkt. #63 at 12; Dkt. #64 at 32.) The Individual Defendants are wrong. True the Vote has availed itself of section 7428 in Count One of its Amended Complaint to obtain the Court's declaratory judgment that it is a tax-exempt organization. The Individual Defendants do not point to anything in the text or legislative history of section 7428 to suggest that Congress intended this process to remedy claims for constitutional violations. Nor does the Cincinnati Defendants' sole authority for this contention—*Church by Mail, Inc. v. United States*, No. 87-0754, 1988 WL 8271 (D.D.C. Jan. 22, 1988)—compel that result. (Dkt. #64 at 20-21.) That case contains absolutely no discussion or application of the Supreme Court's "alternative remedy" standards. Its limited usefulness is highlighted by the standard articulated in *Minneci*, 132 S. Ct. at 625. (holding that an alternative remedy must "provide roughly similar incentives for potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims of violations"). Because a declaratory judgment action under section 7248 falls well short of that standard it does not preclude a *Bivens* remedy here.

### ii.     The Administrative Procedures Act does not provide adequate alternative remedies for constitutional injuries.

Contrary to the Management Defendants' contentions, (Dkt. #63 at 12), relief under the APA cannot be considered an "adequate, alternative remedy" for the same reasons that section

---

determination." 26 U.S.C. § 7428(b)(2). "All reasonable steps" includes timely responses to all IRS requests for additional information. Therefore, the IRS may be able to prevent an eligible organization from using section 7428 beyond the 270-day threshold by serving on that entity additional requests for information.

7428 is not a sufficient remedy or a bar to *Bivens* claims. The APA cannot compensate victims of constitutional violations and does not serve an effective deterrent because it offers only "relief other than money damages." 5 U.S.C. § 702. *Carlson*, 446 U.S. at 21 ("It is almost axiomatic that the threat of damages has a deterrent effect, . . . surely particularly so when the individual official faces personal financial liability.") (citations omitted). Further, according to the Government's Motion to Dismiss (Dkt. #54 at 15-16), relief under the APA is not even an *available* alternative—let alone an adequate one. According to the Government, True the Vote has other available relief, namely, a *Bivens* actions. (Dkt. #54 at 16 ("Plaintiff has available—and again has raised—claims under *Bivens* (Count III of the Amended Complaint).").) Although the APA claims against the Government are proper, they do not substitute as a remedy precluding True the Vote's *Bivens* claims against the Individual Defendants.

### iii. Title 26, U.S.C. § 7431 does not provide adequate alternative remedies for True the Vote's constitutional injuries.

Likewise, contrary to the Management Defendants' contentions (Dkt. #63 at 12), money damages under 26 U.S.C. § 7431 are inadequate to remedy True the Vote's constitutional violations. Indeed, section 7431 is designed specifically to compensate taxpayers whose returns or return information have been disclosed or inspected in a way not authorized by the IRC. True the Vote's section 7431 claim against the Government is *not* a substitute for its *Bivens* claims against the Individual Defendants. "[T]he constitutional interest[] at issue here—freedom of speech… [is] a far cry from the interests safeguarded by" section 7431. *Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154, 163 (D.D.C. 2013) (rejecting government's claim that damages remedy available under federal small-claims statute provides an alternative remedy for constitutional violations). Further, like section 7428 and the APA, relief under section 7431 is available only against the United States, and thus does not serve *Bivens'*

important deterrent effects against the individuals. *See Carlson*, 446 U.S. at 20-21, 100 S. Ct. at 1472.

### 4.    "Special factors" do not counsel hesitation under these circumstances.

Because no adequate, alternative remedy is available for True the Vote's constitutional injuries, a *Bivens* remedy should lie unless "special factors" weigh against the creation of such a remedy. The "special factors" step of the *Bivens* analysis requires the Court to "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done." *Wilkie*, 551 U.S. at 554, 127 S. Ct. at 2600 (citing *Bush*, 462 U.S. at 367, 103 S. Ct. at 2412-413). The arguments advanced by the Individual Defendants cannot tip the scales in their favor in light of the clear statements from the IRS and Congress explaining that a *Bivens* remedy is available against IRS officials. Furthermore, the unprecedented and egregious nature of the IRS Targeting Scheme presents a "special factor" that decidedly defeats the Individual Defendants' motions to dismiss.

### 5.    The D.C. Circuit recognizes *Bivens* claims against federal officials who violate First Amendment rights.

Contrary to the Cincinnati Defendants' assertion, True the Vote's First Amendment claims do not require this Court to extend *Bivens* to a new context. (Dkt. #64 at 16-18.) Over thirty-five years ago, the D.C. Circuit recognized the availability of a *Bivens* action to compensate victims of First Amendment retaliation. *Dellums v. Powell*, 566 F.2d 167, 194-96 (D.C. Cir. 1977), *cert. denied*, 438 U.S. 916, 98 S. Ct. 31 (1978) (noting that given the "broad familiarity of federal courts with equitable relief for First Amendment violations, it is difficult to identify here the impediments" to recognizing a *Bivens* remedy). Contrary to the Cincinnati Defendants' contention, this recognition has not been limited to "retaliatory arrests, prosecutions, and similar misconduct." (Dkt. #64 at 17.) In fact, "the specific question before the [*Dellums*

court] was whether there was a 'cause of action under *Bivens* for redress of First Amendment violations,'… and the court's analysis focused on the harm that would result from the loss of an ability to express oneself[….]" *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 50 (D.D.C. 2013) (quoting *Dellums*, 556 F.2d at 194); *Haynesworth v. Miller*, 820 F.2d 1245, 1257 (D.C. Cir. 1987) (affirming *Dellums* and remarking, "[W]e see no reason to retreat from the settled principle that it is 'patently unconstitutional' to 'penaliz[e] those who choose to exercise' constitutional rights.") (citation omitted)).

Courts in this circuit have also rejected the invitation—made here by the Cincinnati Defendants (Dkt. #64 at 16-18)—to infer from the Supreme Court's rejection of certain *Bivens* claims premised on First Amendment violations that such claims are categorically foreclosed. *Hartley*, 918 F. Supp. at 52 ("Even if Defendants are correct in predicting the Supreme Court's response to questions not yet before it, this Court cannot accept its invitation to depart from this Circuit's binding precedent [in *Dellums*]"). Though it has yet to formally recognize them, the Supreme Court has strongly suggested that the claims asserted by True the Vote are available. In *Hartman v. Moore*, 547 U.S. 250, 256, 126 S. Ct. 1695, 1701 (2006), the Court explained, "[o]fficial reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right…. When the vengeful officer is federal, he is subject to an action for damages on the authority of *Bivens*." (citations and quotations omitted). In *Wilkie*, the Court contrasted the issue before it—"whether to devise a new *Bivens* damages action for retaliati[on] against the exercise of ownership rights" under the Fifth Amendment, 551 U.S. at 549—with First Amendment retaliation cases, explaining that, with respect to the latter, "we have established methods for identifying the presence of an illicit reason (in competition with others), not only in retaliation cases but on claims of discrimination based on race or other

characteristics," 551 U.S. at 556. Following *Wilkie*'s signals, this Court has recognized *Bivens* remedies for First Amendment retaliation. *See Navab-Safavi v. Broad. Bd.*, 650 F. Supp. 2d 40, 75 (D.D.C. 2009) ("Plaintiff's claims of discrimination and retaliation are readily 'judicially manageable,' because they present 'focused remedial issue[s] without difficult questions of valuation or causation.'") (quoting *Passman*, 442 U.S. at 245, 99 S. Ct. at 2277).

The D.C. Circuit, too, recognizes that "[t]here is nothing novel about a *Bivens* remedy for a First Amendment retaliation claim against federal officials." *Wilson*, 535 F.3d at 721 (citing *Hartman* and *Dellums*). After all, "a *Bivens* action is the federal analog to suits brought against state officials under…42 U.S.C. § 1983." *Hartman*, 547 U.S. at 267. As the Third Circuit prudently observed, "[t]here is no reason to allow federal officials to act with impunity in this context and to bar state officials. The damage to the individual's first amendment interests is the same regardless of the perpetrator of the violation. Thus, we believe the extension of the *Bivens* rule to violations of first amendment rights to be both justifiable and logical." *Paton v. La Prade*, 524 F.2d 862, 870 (3d Cir. 1975); *see also Gibson v. United States*, 781 F.2d 1334, 1345 (9th Cir. 1986) ("Given the availability of § 1983 relief against state agents who infringe First Amendment rights…it is hard to see why *Bivens* relief should not be available to redress equivalent violations perpetrated by federal agents."). The Individual Defendants provide no reason to reach a contrary conclusion under the present circumstances.

6.   **The IRC does not categorically foreclose a *Bivens* claim against IRS Employees who violate First Amendment rights.**

While conceding that the Internal Revenue Code ("IRC") does not afford True the Vote a damages remedy for its claims (Dkt. #64 at 23), the Individual Defendants nonetheless assert that the mere existence of the IRC categorically forecloses a *Bivens* claim against IRS officials, (Dkt #63 at 10; Dkt. #64 at 21). The Individual Defendants rely on conclusory statements from the

D.C. Circuit, which denied a *Bivens* claim against IRS officials under materially different circumstances on the grounds that the IRC is a "comprehensive remedial scheme." (Dkt #63 at 21, Dkt. #64 at 10-11.)

To be sure, a comprehensive remedial scheme is one "special factor" that may weigh against the creation of a *Bivens* remedy for a particular claim or claimant. *Wilson*, 535 F.3d at 705. The existence of a comprehensive remedial scheme is not, however, dispositive on its own. Where, as here, the availability of a remedial scheme is arguable at best, categorical dismissal is not appropriate. Rather, even if a comprehensive remedial scheme exists, this Court must still inquire "whether [Congress] has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Id.* at 706. It must also ask whether any "special factors" weigh in *favor* of a creation of a *Bivens* remedy for a particular claim or claimant. *Wilkie*, 551 U.S. at 554, 127 S. Ct. at 2600.

For these reasons, the cases on which the Management Defendants' rely (Dkt. #63 at 10-11) do not categorically preclude a *Bivens* action here. Nor are those cases particularly helpful in resolving this case. To begin with, each of these cases involved claims and claimants distinct from those present here. *See, e.g.*, *Kim v. United States*, 632 F.3d 713, 714 (D.C. Cir. 2011) (tax protesters asserted, *inter alia*, *Bivens* claims under Due Process Clause); *Whittington v. United States*, 439 Fed. Appx 2, 3 (D.C. Cir. 2011) (*pro se* taxpayer denied leave to amend to add unspecified *Bivens* claims); *Marsoun v. United States*, 591 F. Supp. 2d 41, 47 (D.D.C. 2008) (*pro se* taxpayer "characterize[d] his complaint as also seeking damages under *Bivens* for constitutional due process violations by the IRS."); *Pragovich v. United States*, 602 F. Supp. 2d 194, 195 (D.D.C. 2009) (*pro se* tax protesters sought "money damages for asserted violations of the Internal Revenue Code"). Notably, the plaintiffs in those cases were not similarly situated to

True the Vote, nor did any of them assert claims for First Amendment violations in connection with a scandal for which the IRS has publicly apologized and admitted wrongdoing. (*See, e.g.*, Dkt. #14 ¶ 78(a) (IRS's actions were "wrong…absolutely incorrect, insensitive, and inappropriate").) These factual and legal disparities are not inconsequential, for as the Cincinnati Defendants admit (Dkt. #64 at 18), *Bivens* is a highly "context-specific" inquiry. *Wilson v. Libby*, 498 F. Supp. 2d 74, 86 (D.D.C. 2007). Under contexts involving First Amendment interests, the Tenth Circuit has held that the comprehensiveness of the IRC did not outweigh the plaintiffs' need for a *Bivens* remedy.

> [W]hile the comprehensive scheme of the Internal Revenue Code should not be indiscriminately disrupted by the creation of new remedies, certain values, such as those protected by the first and fourth amendments, may be superior to the need to protect the integrity of the internal revenue system. We therefore recognize that the [plaintiff] may bring a *Bivens* action for violations of the first and fourth amendments.

*Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*, 886 F.2d 1240, 1248 (10th Cir. 1989); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1524 (10th Cir. 1994) (same).[18]

*Kim* also lacks any meaningful application of the Supreme Court's *Bivens* doctrine and omits entirely an inquiry into "whether [Congress] has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Wilson*, 535 F.3d at 706; *see supra* at 27-30 (showing that Congress plainly understands *Bivens* remedies to be available against IRS officials). Moreover, a close inspection of the *Kim* briefing submitted to the D.C. Circuit reveals that the plaintiff-appellants did not even

---

[18] The Cincinnati Defendants urge this Court to reject the Tenth Circuit's rationale on the grounds that the court's decisions lack discussion of the legislative history of certain IRC provisions. (Dkt. #64 at 24 n.7.) Curiously, though, the Cincinnati Defendants rely heavily on *Kim*, which suffers from the same alleged shortcomings. The Cincinnati Defendants cannot have it both ways.

address these issues. The D.C. Circuit therefore had no basis to assess their impact, *Kim v. United States*, No. 09-5227, *Brief of Appellant*, Doc. #1225972 (filed Jan. 14, 2010); *see Payne v. D.C. Gov't*, 722 F.3d 345, 354 (D.C. Cir. 2013) ("[A court] does not normally consider 'points not asserted with sufficient precision to indicate distinctly the party's thesis.'") (quoting *Miller v. Avirom*, 384 F.2d 319, 322 (D.C. Cir. 1967); *see also Pedicord v. Swenson*, 431 F.2d 92, 93 (8th Cir. 1970) ("[Q]uestions not raised, briefed or argued will ordinarily be given no consideration by an appellate court"). The Cincinnati Defendants' authorities are therefore of limited or no precedential value.

Circuit precedent mandates a more thorough inquiry than suggested by the Cincinnati Defendants. The Management Defendants point to nothing in the legislative history of the IRC to support their argument that IRS agents and employees may violate the constitutional rights of an organization with impunity from any claim or remedy. Aside from their blind reliance on *Kim* and other distinguishable district court opinions, the Management Defendants do not meaningfully address the "special factors" prong of the *Bivens* analysis. Notably, the Management Defendants make no attempt to address whether the legislative history demonstrates that Congress has inadvertently omitted damages remedies for certain claimants or an intention that the courts preserve *Bivens* remedies. A proper inquiry, as demonstrated above reveals that Congress did not intend to foreclose a *Bivens* remedy against IRS officials.

**7.   "Special factors" weigh in favor of providing a *Bivens* remedy against the Individual Defendants in this case.**

In *Wilkie*, the Supreme Court explained that the "special factors" analysis is a balancing test requiring this Court to "weigh[] reasons for and against the creation of a new cause of action." 551 U.S. at 554. Even if the existence of the IRC presents a "special factor" that weighs against recognizing a cause of action under *Bivens* here, it should not outweigh the need to

provide a remedy for the unprecedented, egregious, and prolonged abuses perpetrated by the IRS officials implicated in the IRS Targeting Scheme and to restore the public's faith in the IRS and the wholly nonpolitical and unbiased treatment of taxpayers.

Of course, there is nothing unusual about disagreements between taxpayers and the IRS. The circumstances of this case, though, are far from ordinary. The conduct alleged here has been decried by the President, who has called for accountability by those responsible:

> If in fact IRS personnel engaged in the kind of practices that have been reported on and were intentionally targeting conservative groups, then that's outrageous. And there's no place for it.… And they have to be held fully accountable. Because the IRS as an independent agency requires absolute integrity, and people have to have confidence that they're…applying the laws in a nonpartisan way.

"Obama: Alleged IRS political targeting 'outrageous'," CNN, May 14, 2013, http://www.cnn.com/2013/05/13/politics/irs-conservative-targeting/. The IRS has even admitted wrongdoing. (Dkt. #14 ¶¶ 78-79.)

Unlike those cases on which the Individual Defendants attempt to rely, the facts in the Amended Complaint have been confirmed by TIGTA, the entity charged with investigating the allegations raised almost two years ago that the IRS was engaged in viewpoint discrimination against conservative organizations. The findings in the TIGTA Report have since drawn the intense scrutiny of multiple congressional committees. One such committee has accused the IRS of "engag[ing] in a systematic effort to delay, frustrate, impede, and obstruct" its ongoing investigation. Letter of Congressman Darrell Issa to Treasury Secretary Jacob Lew, Aug. 2, 2013, http://oversight.house.gov/wp-content/uploads/2013/08/8.2.13-Issa-to-Lew.pdf.

Despite this, the Individual Defendants ask this Court to hold that their very employment with the IRS means that no matter the magnitude of their transgressions, they may not be made to answer for their actions. It is not enough that the IRS, after the fact, be ordered to now conduct itself in accordance with federal law. Declaratory and injunctive relief cannot make True the

Vote and the hundreds of other targeted groups whole again. Nor will such a "remedy" effectively ensure that citizens are not again targeted for the beliefs they hold. After all, "[i]t must be remembered that the purpose of *Bivens* is to deter *the officer*." *FDIC v. Meyer*, 510 U.S. 471, 485, 114 S. Ct. 996, 1005 (1994) (emphasis in original).

The IRS Targeting Scheme has taken the public's trust in the IRS to new lows. In a nation where the effective functioning of our tax system depends on taxpayers' voluntary compliance, the public must know that those in power at the IRS are actually accountable to the People. Affording a damages remedy in this case would not only vindicate True the Vote, but would begin the process of restoring the public's trust in IRS officials and our government at large. These "special factors" weigh in favor of a *Bivens* remedy.

True the Vote is entitled to be made whole. The Supreme Court's recognition of a *Bivens* remedy is tailor made for a situation such as this—and only such a remedy can accomplish the purpose for which *Bivens* was intended.

**C.     Defendants Are Not Entitled to Qualified Immunity Because They Violated True the Vote's Clearly Established First Amendment Rights.**

The Individual Defendants seek dismissal on the basis of Qualified Immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). The court may exercise discretion in determining which of the two questions to address first. *See Pearson* v. *Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808 (2009).

1.      **True the Vote has stated a valid claim for the Individual Defendants' violations of its First Amendment rights.**

The Management Defendants claim that True the Vote has not alleged sufficient facts to establish that they have violated True the Vote's clearly established constitutional rights and that consequently, the Management Defendants are entitled to qualified immunity.

The defense of qualified immunity does not change the standard for assessing the sufficiency of the pleadings. For a complaint to survive a Rule 12(b)(6) motion, Federal Rule of Civil Procedure 8(a) requires only that it provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As recently articulated by the Supreme Court, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). "Facial plausibility" does *not* equate to facial "probability." *Id*. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations omitted). Dismissal is only "proper when, taking the material allegations of the complaint as admitted…and construing them in plaintiffs' favor…the court finds that the plaintiffs have failed to allege all the material elements of their cause of action." *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997).

True the Vote has pled claims for viewpoint discrimination and First Amendment retaliation. (*See* Dkt. #14 ¶ 156 (viewpoint discrimination claim); ¶ 157 (First Amendment retaliation claim).)

The facts alleged, along with the reasonable inferences that may be drawn from those facts, plausible demonstrate that True the Vote has been subject to such discrimination and retaliation. Put another way, the Individual Defendants have not established that, while accepting

as true all factual allegations, including those in the TIGTA Report, the claims of unconstitutional viewpoint discrimination and retaliation are "implausible." *Moss v. U.S. Secret Serv.*, 711 F.3d 941, 964 (9th Cir. 2013). Given the admissions publicly made by some of these same individuals, this attempted argument stretches credulity.

### a.     **Viewpoint Discrimination**

The Individual Defendants are incorrect that True the Vote must "plead and prove that the defendant[s] acted with discriminatory purpose." (Dkt. #64 at 36 (quoting *Iqbal*, 556 U.S. at 676, 129 S. Ct. at 1948); Dkt. #63 at 14 (arguing that True the Vote must show each defendant "purposefully and personally infringed on True the Vote's First Amendment Rights")).) A regulation is viewpoint-based if, on its face, it distinguishes between speakers based on the viewpoint expressed *or*, though neutral on its face, the regulation is motivated by the desire to suppress a particular viewpoint. *Moss*, 711 F.3d at 959. Thus, a showing of unconstitutional motive is required only where a law is viewpoint neutral on its face. *See Crawford* v. *Board of Ed. of Los Angeles*, 458 U.S. 527, 544, 102 S. Ct. 3211 (1982) ("[A] law neutral on its face still may be unconstitutional *if motivated by a discriminatory purpose*") (emphasis added); *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 94 (2d Cir. 2003) ("*Where a law is on its face viewpoint neutral . . .* but has a differential impact among viewpoints, the inquiry into whether the law is in fact *viewpoint discriminatory turns on the law's purpose.*") (emphasis added). Where a law discriminates against certain viewpoints on its face, it cannot be neutral and discriminatory purpose is *presumed*.

> Discrimination against speech because of its message is presumed to be unconstitutional….When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

46

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-829 (1995) (internal citations omitted); *see also Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993) (explaining that "the *mens rea* of the city" is irrelevant where, by its terms, the law discriminates based on content).

*Iqbal* is not to the contrary, but involved government action that was not discriminatory on its face. *Iqbal* involved a challenge to the FBI's policy of detaining in restrictive conditions "high-interest" individuals "with suspected links to the [September 11] attacks or to terrorism in general." 556 U.S. at 667, 129 S. Ct. at 1943. The plaintiff alleged that such a policy was unconstitutionally adopted on account of race, religion, or national origin. *Id*. at 666, 129 S. Ct. at 1942. But, the challenged policy was neutral on its face. *See id*. at 682 (describing the policy as "a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks"). The plaintiff "ask[ed] [the court] to infer" "purposeful, invidious discrimination" from the policy's impact on him. However, the policy's facial neutrality did not permit such an inference absent allegations sufficient to show "that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin." *Id*. at 677, 129 S. Ct. at 1949.

The *Iqbal* Court explained "[g]iven that the September 11 attacks were perpetrated by Arab Muslims, it [was] not surprising that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the policy's purpose was to target neither Arabs nor Muslims." *Id.* at 682, 129 S. Ct. at 1951. Here, by the Individual Defendants' admission, the very opposite is true. Their explanation for the IRS Targeting Scheme is that, because *some* Tea

Party groups were merely suspected of political activity,[19] the IRS may discriminate against *all* organizations applying for exempt status based on whether they associated with "Tea Party" organizations or espouse viewpoints perceived to be held by the "Tea Party." Applying such logic to the facts of *Iqbal* would mean the Department of Justice would have been justified in enacting and enforcing a written policy of targeting *all* Arab Muslims because the Department merely suspected, but had no evidence, that the perpetrators of the September 11 attacks were Arab Muslims.

"To determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533, 113 S. Ct. 2217, 2226 (1993). The written forms of the IRS Targeting Scheme utterly fail this basic test of neutrality. By its very terms, it discriminated based on applicant's names and perceived political and philosophical viewpoints. In other words, "the specific motivating ideology or the opinion or perspective of the [applicant] [was] the rationale for the" Targeting Scheme. *Rosenberger*, 515 U.S. at 829, 115 S. Ct at 516. As the TIGTA Report concludes, "[b]y July 2010"—the time True the Vote submitted its application to the IRS—"Determinations Unit management stated that it had requested its specialists to be on the lookout for Tea Party applications." (Dkt. #14-6 at 12.) In August 2010, the criteria were formalized into a "be on the lookout" (BOLO) listing that was "distributed" throughout the Determinations Unit. (*Id.*) Subsequently, "expanded criteria" were developed that included "additional names (Patriots and 9/12 Project) as well as policy positions espoused by organizations in their applications." (*Id.*) "The criteria focused narrowly on the names and policy

---

[19] The Individual Defendants' alleged suspicions do not arise from True the Vote's actual activities as described in its application, which are non-partisan and aimed at encouraging reform in our Government in conformity with the mandates of the Constitution, as discerned from the viewpoint of its members. (*See* Dkt. #14 ¶ 3.)

positions of organizations instead of tax-exempt laws and Treasury Regulations." (*Id.* at 12-13.) Indeed, the following name and viewpoint-based criteria were used to determine that an applicant would be subjected to a more scrutinizing and substantially more time-consuming and expensive review process than applicants that did not share these names and philosophies.

- "Tea Party," "Patriots," or "9/12 Project" is referenced in the case file;
- Issues include U.S. Government spending, U.S. Government debt, or taxes;
- Education of the public via advocacy/lobbying to "make America a better place to live."; and/or
- Statements in the case file critical of how the country is being run.

(Dkt. #14-6 at 12; *see also*, Dkt. #14 ¶ 77 (applications for tax-exempt status selected for further review and scrutiny "simply because the applications" "used names like Tea Party or Patriots").)

No amount of proffered explanations of neutrality in its adoption and even application (Dkt. #63 at 2-4; Dkt. #64 at 40) can change the facially discriminatory character of the Targeting Scheme. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642-643 (1994) ("[T]he mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on content"); *Moss*, 711 F.3d at 960 ("[T]he assertion of a viewpoint-neutral rationale cannot transform a facially discriminatory policy…into a valid one."); *see also Int'l Union v. Johnson Controls*, 499 U.S. 187, 199 (1991) ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."). In fact, these arguments make it even more plausible that the Targeting Scheme is both facially discriminatory and also was motivated by an intent to discriminate. The Management Defendants suggest that they did not intend to target groups based on viewpoint, but simply used terms such as "Tea Party" as a "'centralization' approach"

(Dkt. #63 at 4) for groups who were suspected of political activity. In other words, the Management Defendants instituted a policy of equating certain names and viewpoints, e.g., "Tea Party" and "Patriots," with "those likely to be violating tax-exempt laws and regulations. Again, by comparison to *Iqbal*, the Management Defendants are suggesting that the Department of Justice could have lawfully enacted and enforced a policy of equating all "Arab Muslims" with "those likely involved in the September 11 attacks."

The use of facially viewpoint-based criteria to discriminate among applicant's for tax-exempt status is virtually undeniable in this case. To suggest otherwise, the Individual Defendants must downplay, ignore, or flatly contradict the specific allegations in True the Vote's Amended Complaint, along with the attached and incorporated TIGTA Report. Yet such tactics are impermissible in a 12(b)(6) motion, *Erickson*, 551 U.S. at 94, 127 S. Ct. at 2200 (court "must accept as true all of the factual allegations contained in the complaint" in disposing of motion to dismiss for failure to state a claim), and therefore do not provide grounds to dismiss the Amended Complaint. Under the proper standard at this stage in the litigation, True the Vote's allegations concerning its viewpoint discrimination claims are exceedingly sufficient. *See Moss*, 711 F.3d at 965.

### b.    First Amendment Retaliation.

True the Vote has also validly stated a plausible claim for First Amendment retaliation. Though the elements of such a claim may differ depending on the context, a claim for First Amendment retaliation generally requires the plaintiff to satisfy a three-part test: (1) he engaged in protected activity; (2) he was subjected to adverse action; and (3) there existed a causal link between the adverse action and the protected activity." *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 84 (D.D.C. 2003). True the Vote's allegations, and the reasonable inferences that may be drawn from them, plausibly satisfy these elements.

50

The Individual Defendants do not seriously contest that True the Vote has engaged in protected First Amendment activity. In fact, True the Vote was required as part of the application process to provide a recitation of its activities, which included numerous acts of protected expression, such as providing support and information to volunteers; creating documentaries and instructional videos; raising awareness of its mission through advertising, social media, media relations and relational marketing; conducting voter registration programs; and educating the public on the need for voter identification laws in the state of Texas. (Dkt. #14-2 at 17.) True the Vote also informed the IRS of its protected association with King Street Patriots (*id.* at 18), a non-profit organization that also found itself subject to the Targeting Scheme. In fact, at the time its application was filed, True the Vote's name—KSP/True the Vote (Dkt. #14 at 50-52)— expressed its close association with King Street Patriots.

As to the second element, adverse action, the Individual Defendants concede, as they must at this stage, that True the Vote was subjected to the Targeting Scheme. (Dkt. #63 at 4; Dkt. #64 at 40.) The Individuals Defendants, however, contest that the adverse effects of the Targeting Scheme are insufficient to support a First Amendment claim because, in their view, they would not "chill or silence a 'person of ordinary firmness' from future First Amendment activities." (Dkt. #63 at 17; Dkt. #64 34-35 (citing *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *vacated on other grounds*, 523 U.S. 574, 601, 118 S. Ct. 1584, 1598 (1998)).

*Crawford-El* explained, "the effect on freedom of speech of retaliations need not be great in order to be actionable." 93 F.3d at 826 (citing *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306-311, 106 S. Ct. 2537 (1986) (out-of-pocket and mental distress damages recoverable for violation of Due Process Clause and First Amendment right to academic freedom); *Hobson v. Wilson*, 737 F.2d 1, 61-62 (D.C. Cir. 1984) (mental distress damages

recoverable for violation of First Amendment right of political association); *Frazier v. Dubois*, 922 F.2d 560, 561 (10th Cir.1990) (transfer of prisoner in retaliation for exercise of First Amendment rights is unconstitutional injury; citing cases)). Indeed, in that case, the D.C. Circuit found that "pecuniary losses Crawford-El sustained in the form of the costs of shipping his boxes and replacing clothing, though small, might well deter a person of ordinary firmness in Crawford-El's position from speaking again." *Crawford-El*, 93 F.3d at 826. True the Vote, similarly, has alleged pecuniary loss in the form of (1) legal and personnel expenses associated with responding to the IRS's intrusive inquiries (Dkt. #14 at 71); and (2) substantial donations it was forced to forfeit or return as a result of the significant and deliberate delay in the granting of its recognition as a tax-exempt entity. (Dkt. #14 ¶¶ 210-11 ($25,000 grant forfeited, $35,000 grant returned).)

The Individual Defendants cannot deny the role donations play in the fulfillment of a tax-exempt organization's mission and its ultimate survival. It was concern over this very issue that led Congress to waive the Government's sovereign immunity and permit organizations to petition the court for a declaratory judgment as to their tax-exempt status. *See Bob Jones Univ.*, 416 U.S. at 729-730, 94 S. Ct. at 2042 ("[R]evocation of a § 501 (c)(3) ruling letter and consequent removal from the Cumulative List is likely to result in serious damage to a charitable organization"). The TIGTA Report also highlights fundraising issues as a major and troublesome consequence of the Targeting Scheme. (Dkt. #14-6 at 18 (delays in processing meant "that potential donors and grantors could be reluctant to provide donations or grants" to 501(c)(3) applicants).)

The Individual Defendants wrongly assert that True the Vote has not explained in what ways its First Amendment interests have been impacted by the Targeting Scheme. (Dkt. #63 at

17.) In fact, as just explained, True the Vote has alleged that the Individual Defendants' actions prevented it from associating with organizations that wished to support its mission through grants and donations. (Dkt. #14 ¶¶ 210-11.) It also alleged that as a result of lost donations of at least $60,000, (*id.*), its "ability to build its organization has been hindered," (*id.* ¶ 72).[20] Moreover, in light of the conclusions in *Bob Jones* and the TIGTA Report concerning the essential nature of donations, it is more than reasonable to infer that True the Vote's speech and other expressive activity was negatively affected in other ways.

But even if those things were not true, it would not defeat the claim here because the inquiry is objective: whether the adverse action "would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Hartley*, 918 F. Supp. 2d at 53 (applying "an objective test"); *see also Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) ("The relevant question is not whether a transfer actually interferes with a particular prisoner's ability to exercise his rights but whether the threat of a transfer would, in the first instance, inhibit an ordinary person from speaking."); *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) ("[T]he issue is whether a person of ordinary firmness would be deterred, not whether the [plaintiff] himself actually was deterred"). Under that standard, the forfeiture of major foundation grants, which interfered with organizational growth and associative activity, and the imposition of legal and personnel costs, would likely deter an applicant from continuing to advance his views and hold his associations, where he reasonable believed such activity to be the cause of his harm.

---

[20] The Cincinnati Defendants bizarrely state that True the Vote's allegations concerning the costs incurred as a result of the Targeting Scheme (Dkt. #14 ¶ 71) and the hindrance of its ability to build its organization as a result of lost donations (*id.* ¶ 72) are "legal conclusions, not facts." These allegations contain no legal conclusions but are wholly factual in nature.

The causation element of First Amendment retaliation is also satisfied. At minimum, it is reasonable to infer from the facts alleged that True the Vote's original name—KSP/True the Vote—and thus its perceived association with King Street Patriots and the philosophical viewpoints advanced by the Tea Party were "a substantial or motivating factor in prompting the retaliatory or punitive act." *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007). To suggest otherwise would require the Individual Defendants to ignore the written criteria identified by TIGTA that included whether the term "Patriots" was referenced in the case file. (Dkt. #14-6 at 12.) Such criteria determined whether applicants "would undergo special scrutiny that included an uncommon multi-layer review." (Dkt. #14-8 at 2.)

At this stage of the case, the Individual Defendants cannot claim qualified immunity by simply rejecting True the Vote's factual assertions and inserting their own version of what they believed happened. *See Crawford-El*,, 523 U.S. at 598, 118 S. Ct. at 1597 (to "resolve [a] threshold question" of qualified immunity, the court "assum[es] the truth of the plaintiff's allegations.") As explained, True the Vote's factual assertions plausibly state a claim for viewpoint discrimination and First Amendment retaliation. If the Individual Defendants wish to contest the strength of those facts, those arguments must come *after* discovery in a summary judgment motion. Dismissal at this stage is inappropriate. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6, 107 S. Ct. 3034 (1987) ("[I]f the actions [the defendant] claims he took are different from those the [plaintiffs] allege (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before [defendants] motion for summary judgment on qualified immunity grounds can be resolved.").

An actionable claim will also lie where the facts plausibly demonstrate that "different officials agreed to work collaboratively to execute their respective policies or to take certain

actions—each viewpoint-neutral in isolation—with the intent of disadvantaging some message or speaker." *Pahls v. Thomas*, 718 F.3d 1210, 1236 (10th Cir. 2013). Here, the policies and actions were not even viewpoint neutral.

**D.     The Amended Complaint and Incorporated Exhibits Establish Deliberate Actions by Each of the Individual Defendants.**

   **1.     The Amended Complaint specifically identifies conduct by and attributable to each of the Management Defendants.**

Contrary to the Management Defendants' contentions (Dkt. #63 at 5), True the Vote *most certainly did* allege that the Management Defendants were involved in "creating, developing, implementing, and applying" the IRS Targeting Scheme, (Dkt. #14 ¶ 7). (*See also* Dkt. #14 ¶¶ 35-41, 43) (outlining duties and responsibilities of each Management Defendant).) In fact, True the Vote provided factual allegations showing that each Individual Defendant violated clearly established law by knowingly participating in a constitutional wrong. *See Haynesworth v. Miller*, 820 F.2d 1245, 1258 (D.C. Cir. 1987) ("It seems beyond peradventure that a complaint averring knowing participation by the defendant in an actionable constitutional deprivation sets forth a colorable claim."). These allegations sufficiently demonstrate "that [each defendant] was personally involved in the illegal conduct." *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 369 (1997).

Further, in addition to liability for his or her own actions, each Management Defendant is liable for lack of or improper training and supervising under the doctrine of supervisory liability. *See Elkins v. District of Columbia*, 690 F.3d 554, 565 (D.C. Cir. 2012) (explaining that supervisory liability will lie where the plaintiff can show that "a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances"); *Fletcher v. United States Parole Comm'n*, 550 F. Supp. 2d 30, 39 (D.D.C. 2008) ("Judge (now Chief Justice) Roberts later cautioned that there cannot be 'liability for general inaction,' which would run the

risk of subjecting officials to impermissible *respondeat superior* liability, but reiterated the

viability of supervisory liability where the officials 'know about the conduct and facilitate it,

approve it, condone it, or turn a blind eye for fear of what they might see.'") (citations omitted);

*see also*, *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) ("[G]overnment officials may

be held responsible for constitutional violations under a theory of supervisory liability.").

### a.   Defendant Thomas

The Management Defendants claim that True the Vote's Amended Complaint and

supporting documents allege merely that the IRS Targeting Scheme "was created *under* Ms.

Thomas' 'control and direction' but does not allege that she was personally involved in creating

it." (Dkt. #63 at 15.) This contention assumes, incorrectly, that **only** those responsible for

**creating** a policy are liable under *Bivens*. *Bivens*, in fact, is broader, affording a remedy against

those causing constitutional harm. In any event, True the Vote's factual allegations regarding

Defendant Thomas' role in the IRS Targeting Scheme include the following:

1. No later than June 29, 2011, Defendant Thomas was aware of the existence and application of the IRS Targeting Scheme. (Dkt. #14 ¶ 107.)
2. Defendant Thomas personally and in concert with other defendants, was involved in the creation, development, implementation, and application of the IRS Targeting Scheme. (*Id*. ¶ 86, 88, 90, 96, 97. 135, 165; Dkt. #14-6 at 11.)
3. In May 2010, the Determinations Unit—under the direction and control of Defendant Thomas—began developing a spreadsheet that would become known as the "BOLO" listing, which included the "emerging issue" of Tea Party applications. In June 2010, the Determinations Unit began training its specialists on issues to be aware of, including Tea Party cases. By July 2010, Determinations Unit management had requested its specialists to "be on the lookout" for Tea Party applications. (*Id*. at 12.)
4. TIGTA found that the criteria developed by the Determinations Unit—under the direction and control of Defendant Thomas—were inappropriate and created the appearance that the IRS is not impartial in conducting its mission. (*Id*. at 12-13.)
5. TIGTA found that the inappropriate criteria remained in place for more than 18 months. These inappropriate criteria led to the request of unnecessary information from applicants such as True the Vote. (*Id*. at 13, 20, 24.)
6. In April 2010, Defendant Thomas requested assistance from the Technical Unit regarding processing the applications. But Defendant Thomas and her Unit waited for assistance from the Technical Unit instead of continuing to process the cases. (*Id*. at 19-20.)

7. TIGTA found that Defendant Thomas and her Unit did not timely approve or deny applications for § 501(c)(3) tax-exempt status for potential political cases. (*Id*. at 22.)

Based upon these factual allegations, it is reasonable to infer that Defendant Thomas was intimately involved in the development and implementation of the IRS Targeting Scheme. She and her office allowed applications to languish for inordinate lengths of time. (Dkt. #14-6 at 19-20.) She knew that this happened solely because of the applicant's viewpoint, mission, purpose, name, or other inappropriate criteria. Moreover, these facts support the reasonable inference that Defendant Thomas acted with a discriminatory purpose. Even if her acts alone were viewpoint neutral, she worked with the Technical Unit (whose actions were not viewpoint neutral) to implement the intrusive questioning and thereby further delay applications. *Pahls*, 718 F.3d at 1236. Under the circumstances, it is also reasonable to infer that Defendant Thomas condoned or approved of the IRS Targeting Scheme, *Fletcher*, 550 F. Supp. 2d at 39, and improperly supervised or trained those employees under her direction and control, (Dkt. #14-6 at 13, 18-20, 24). *See Elkins*, 690 F.3d at 565.

### b.    **Defendant Miller**

The Management Defendants claim that the "sole contention" regarding Defendant Miller was that he "became 'aware' of the 'targeting' policy in the Spring of 2012." (Dkt. #63 at 15.)

To the contrary, the Amended Complaint alleges the following specific conduct on the part of Defendant Miller:

1. No later than March 2012, Defendant Miller was aware of the existence and application of the IRS Targeting Scheme. (Dkt. #14 ¶ 119.)
2. Defendant Miller worked in concert with one or more of the Individual Defendants in the creation, development, implementation, and application of the IRS Targeting Scheme. (*Id.* ¶¶ 28b, 135.)
3. During the time that the IRS Targeting Scheme was created, implemented and applied, Defendant Miller was responsible for managing, directing, and supervising the activities of the IRS and executing and implementing the laws, regulations, and policies governing the activities of the IRS. (*Id.* ¶ 35.)

4. Defendant Miller failed to reverse or correct the development, implementation, and application of the IRS Targeting Scheme, either personally or by those under his direct supervision and control, despite the constitutional harm. (*Id.* ¶ 165.)

5. In March 2012, Defendant Miller was Deputy Commissioner, Services and Enforcement. At the time, he spoke with and directed a Senior Technical Advisor to Defendant Lerner to look at and make a recommendation regarding concerns raised by the media about delays in processing applications for tax-exempt status from Tea Party groups and the nature of the questions being asked related to the applications. (Dkt. #14-6 at 20, 25, 46.)

6. Defendant Miller directed that, if a taxpayer called about having to provide donor information, the Determinations Unit would allow the taxpayer to not send the donor names but would inform the taxpayer that the IRS may need it later. (*Id.* at 45.)

From the foregoing fact, it is reasonable to infer that Defendant Miller was intimately involved in the development and implementation of the IRS Targeting Scheme. The foregoing factual allegations support the reasonable inference that Defendant Miller condoned or approved of the IRS Targeting Scheme, *Fletcher*, 550 F. Supp. 2d at 39, and improperly supervised or trained those employees under his direction and control, *Elkins*, 690 F.3d at 565.

      c.      **Defendant Shulman**

The Management Defendants claim that the "sole contention" regarding Defendant Shulman was that he "became 'aware' of the 'targeting' policy in the Spring of 2012." (Dkt. #63 at 15.). The allegations of the Amended Complaint are not so limited, however. Rather, True the Vote has established the following conduct on the part of Defendant Shulman:

1. No later than March 2012, Defendant Shulman was aware of the existence and application of the IRS Targeting Scheme. (Dkt. #14 ¶ 121.)

2. During the time that the IRS Targeting Scheme was created, implemented and applied, Defendant Shulman was responsible for managing, directing, and supervising the activities of the IRS and executing and implementing the laws, regulations, and policies governing the activities of the IRS. (*Id.* ¶ 36.)

3. Defendant Shulman, individually and in concert with one or more of the Individual Defendants, was involved in the creation, development, revision, implementation and application of the IRS Targeting Scheme. (*Id.* ¶¶ 28b, 122, 123, 135, 165.)

The foregoing factual allegations support the reasonable inference that Defendant Shulman was intimately involved in the development and implementation of the IRS Targeting Scheme. Reasonable inferences may also be drawn to conclude that Defendant Shulman

condoned or approved of the IRS Targeting Scheme, *Fletcher*, 550 F. Supp. 2d at 39, and

improperly supervised or trained those employees under his direction and control, *Elkins*, 690

F.3d at 565.

      **d.**    **Defendant Wilkins**

The Management Defendants claim that True the Vote merely alleges that Defendant

Wilkins "discussed" the IRS Targeting Scheme. (Dkt. #63 at 15-16.). To the contrary, True the

Vote's allegations regarding Defendant Wilkins's role in the IRS Targeting Scheme include the

following:

1. As Chief Counsel for the IRS, Defendant Wilkins was responsible for interpreting, administering, and enforcing the Internal Revenue Code, representing the IRS in litigation, and providing all other legal support needed by the IRS. (Dkt. #14 ¶ 37.)
2. Defendant Wilkins—individually and in concert with one or more of the Individual Defendants—was involved in creating, developing, revising, implementing and applying the IRS Targeting Scheme. (*Id.* ¶¶ 28b, 37, 109, 117, 123, 135, 165.)
3. In the winter of 2010-2011, Defendant Lerner's Senior Advisor told Mr. Hull, an IRS employee, that Defendant Wilkins's office needed to review the applications of the Targeted Organizations. (*Id.* ¶ 110.)
4. On August 4, 2011, personnel from the Office of Rulings and Agreements, Defendant Paz, and other IRS Employees held a meeting with Defendant Wilkins "so that everyone would have the latest information on the [IRS Targeting Scheme]." (*Id.* ¶ 113.)
5. Months later, Defendant Wilkins's office instructed Mr. Hull that "more information" was needed from the Targeted Organizations to process their applications. (*Id.* ¶ 114.)
6. An IRS tax law specialist and Defendant Wilkins's office prepared a "template" of questions to be sent to Targeted Organizations, such as True the Vote. (*Id.* ¶ 115.)

The foregoing facts support the reasonable inference that Defendant Wilkins was

intimately involved in the development and implementation of the IRS Targeting Scheme.

Reasonable inferences may also be drawn to conclude that Defendant Shulman condoned or

approved of the IRS Targeting Scheme, *Fletcher*, 550 F. Supp. 2d at 39, and improperly

supervised or trained those employees under his direction and control, *Elkins*, 690 F.3d at 565.

     e.  **Defendant Lerner**

   The Management Defendants claim that True the Vote's Amended Complaint and supporting documents allege merely that Defendant Lerner "had some role" regarding the IRS Targeting Scheme and that she merely "reviewed a briefing paper" and "informed" another Individual Defendant about the "'targeting'" policy. (Dkt. #63 at 15.) This contention is squarely contradicted by the numerous specific allegations of Lerner's involvement in the IRS Targeting Scheme. These include the following:

1. No later than June 29, 2011, Defendant Lerner was aware of the existence and application of the IRS Targeting Scheme. (Dkt. #14 ¶¶ 103-04, 107.)

2. Defendant Lerner—personally and in concert with other Defendants—was involved in creating, overseeing, revising, and implementing the IRS Targeting Scheme and failed to prevent such development, implementation, and application by others under her direct supervision, and control despite the constitutional harm. (*Id.* ¶¶ 28b, 109, 135, 165.)

3. Defendant Lerner has not taken necessary actions to halt the IRS Targeting Scheme and to ensure that applicants subject to the IRS Targeting Scheme instead received a determination for tax-exempt status despite actual knowledge that the IRS had received sufficient information from the applicants to make determinations of exempt status. Rather, starting in "January 2012 criteria again focused on the policy positions of organizations instead of tax-exempt laws and Treasury Regulations." (*Id.* ¶¶ 108, 123.)

4. During the time the IRS Targeting Scheme was being developed and applied, Defendant Lerner was responsible for planning, managing, directing, administering, enforcing, and executing the rules, policies, and practices of the EO Division of the IRS. (*Id.* ¶ 38.)

5. On May 10, 2013, Defendant Lerner admitted in response to a planted question in the audience that the IRS had selected applications for tax-exempt status for further review and scrutiny "simply because the applications" "used names like Tea Party Patriots." (*Id.* ¶ 77.)

6. Defendant Lerner apologized on behalf of the IRS for the way the IRS handled the applications of the Targeted Organizations, (*id.* ¶ 79), with the following specific statements, (*id.* ¶ 78):

 a. "That was wrong, that was absolutely incorrect, insensitive, and inappropriate—that's not how we go about selecting cases for further review. We don't select for review because they have a particular name."

 b. "The other thing that happened was that they also, in some cases, sat around for a while. "[The IRS] sent some letters out that were far too broad, asking questions of these organizations that weren't really necessary for that type of application."

 c. "[The IRS] went back and looked at questions that had been sent out to folks because some of them were extensive and where the questions weren't necessary we gave the organizations flexibility as to which questions they needed to answer and gave them more time to answer them. In some cases we told them to just ignore the letter we already sent and sent a new list of questions. In some cases we said we don't need

those questions answered. We can deal with your application without responses to those questions.

7. Defendant Lerner received a chart summarizing the Sensitive Case Report. (*Id*. ¶ 92.)

8. Between 2010 and 2012, Defendant Lerner developed and revised written and oral guidance on how IRS Employees were to identify and process applications in accordance with the IRS Targeting Scheme. (*Id*. ¶¶ 96, 110, 111.)

9. No later than April 2012, Defendant Lerner was informed that the BOLO listing criteria had been changed on January 25, 2012. (*Id*. at 46.)

10. Defendant Lerner was aware of the troubling questions, which organizations received them, and which members of the team of specialists asked them. (*Id*.)

Reasonable inferences, bolstered by Defendant Lerner's own acknowledgment of wrongdoing, may be drawn that Defendant Lerner was intimately involved in the development and implementation of the IRS Targeting Scheme. Reasonable inferences may also be drawn to conclude that Defendant Lerner condoned or approved of the IRS Targeting Scheme, *Fletcher*, 550 F. Supp. 2d at 39, and improperly supervised or trained those employees under his direction and control, *Elkins*, 690 F.3d at 565.

## f.    Defendant Paz

The Management Defendants claim that True the Vote's Amended Complaint and supporting documents are insufficient to overcome Defendant Paz's qualified immunity defense because the complaint "does not allege that the True the Vote application was among those applications" that Paz requested be transferred from Cincinnati to Washington, D.C. (Dkt. #63 at 15.) In so doing, the Management Defendants ignore the numerous factual allegations regarding Defendant Paz's involvement in the IRS Targeting Scheme. These include the following:

1. No later than March 2010, Defendant Paz was aware of the existence and application of the IRS Targeting Scheme. (Dkt. #14 ¶¶ 87, 107.)

2. Defendant Paz—personally and in concert with one or more of the Individual Defendants—created, developed, revised, implemented, and applied the unlawful and discriminatory IRS Targeting Scheme. (*Id*. ¶¶ 28b, 135, 165.)

3. At times relevant to this Complaint, Defendant Paz was responsible for processing determination letter requests from exempt organizations seeking recognition of tax-exempt status, and providing assistance and guidance to other IRS officers and employees involved in such processing. (*Id*. ¶ 39.)

61

4. In March 2010, Defendant Paz requested that certain applications being processed in accordance with the IRS Targeting Scheme in the IRS EO Determinations Unit be transferred to the IRS offices in Washington, D.C. (*Id*. ¶ 88.)

5. Between 2010 and 2012, the IRS EO Technical Unit—at times, under the direction and control of Defendant Paz—and the IRS Office of Rulings and Agreements—at times under the direction and control of Defendant Paz—developed and revised written and oral guidance on how IRS Employees were to identify and process applications in accordance with the IRS Targeting Scheme. (*Id*. ¶ 96.)

6. On August 4, 2011, personnel from the Office of Rulings and Agreements—under the direction of Defendant Paz—and other IRS Employees held a meeting with Defendant Mr. Wilkins and his office "so that everyone would have the latest information on the [IRS Targeting Scheme]." (*Id*. ¶ 113.)

7. Between March 16-17, 2010, ten cases were identified pursuant to the IRS Targeting Scheme and that Defendant Paz requested that two more cases be referred to Washington, D.C. Not all of the ten cases had Tea Party in their names. (Dkt. #14-6 at 37.)

Reasonable inferences may be drawn that Defendant Paz was intimately involved in the development and implementation of the IRS Targeting Scheme. Reasonable inferences may also be drawn to conclude that Defendant Paz condoned or approved of the IRS Targeting Scheme, *Fletcher*, 550 F. Supp. 2d at 39, and improperly supervised or trained those employees under his direction and control, *Elkins*, 690 F.3d at 565.

### g.   **Defendant Grodnitzky**

The Management Defendants claim that True the Vote's Amended Complaint and supporting documents allege merely that Defendant Grodnitzky "had some role" regarding the IRS Targeting Scheme and that he "'suggested' and 'directed' the creation of a report regarding tax-exempt applications by targeted organizations." (Dkt. #63 at 15.). To the contrary, True the Vote has made a number of specific allegations regarding Defendant Grodnitzky's role in the IRS Targeting Scheme. These include the following:

1. Defendant Grodnitzky is a Manager of the IRS Exempt Organizations Technical Unit. He is responsible for processing determination letter requests from exempt organizations seeking recognition of tax-exempt status, and providing assistance and guidance to other IRS officers and employees involved in such processing. (Dkt. #14 ¶ 41.)

2. No later than April 2010, Defendant Grodnitzky was aware of the existence and application of the IRS Targeting Scheme. (*Id*. ¶ 89.)

3. In April 2010, Defendant Grodnitzky suggested the need for and directed the preparation of a "Sensitive Case Report" regarding applications being processed in accordance with IRS Targeting Scheme. (*Id*. ¶¶ 90-91.)

4. Between 2010 and 2012, the IRS EO Technical Unit—at times, under the direction and control of Defendant Grodnitzky—and the IRS Office of Rulings and Agreements developed and revised written and oral guidance on how IRS Employees were to identify and process applications in accordance with the IRS Targeting Scheme. (*Id*. ¶ 96.)

5. Defendant Grodnitzky—personally and in concert with one or more of the Individual Defendants—created, developed, revised, implemented, and applied the IRS Targeting Scheme. (*Id*. ¶¶ 28b, 135, 165.)

Reasonable inferences may be drawn that Defendant Grodnitzky was intimately involved in the development and implementation of the IRS Targeting Scheme. Reasonable inferences may also be drawn to conclude that Defendant Grodnitzky condoned or approved of the IRS Targeting Scheme, *Fletcher*, 550 F. Supp. 2d at 39, and improperly supervised or trained those employees under his direction and control, *Elkins*, 690 F.3d at 565.

### h.  **Defendant Seto**

The Management Defendants claim that True the Vote's Amended Complaint and supporting documents allege merely that Defendant Seto "had some role" regarding the IRS Targeting Scheme and that he merely "reviewed a briefing paper" or was "informed" by another Individual Defendant about the "'targeting'" policy. (Dkt. #63 at 15.) To the contrary, True the Vote has established specific facts regarding Defendant Seto's role in the IRS Targeting Scheme. These include the following:

1. No later than June 29, 2011, Defendant Seto was aware of the existence and application of the IRS Targeting Scheme. (Dkt. #14 ¶ 107.)

2. Defendant Seto—personally and in concert with one or more of the Individual Defendants—was involved in creating, revising, implementing and applying the unlawful and discriminatory IRS Targeting Scheme. (*Id*. ¶¶ 28b, 135, 165.)

3. Between 2010 and 2012, the IRS EO Technical Unit—at times, under the direction and control of Defendant Seto—and the IRS Office of Rulings and Agreements developed and revised written and oral guidance on how IRS Employees, were to identify and process applications in accordance with the IRS Targeting Scheme. (*Id*. ¶ 96.)

4. Defendant Seto briefed Defendant Lerner on the IRS Targeting Scheme and received directions about the next steps. (*Id*. ¶¶ 43, 106, 111.)

On the contrary, reasonable inferences may be drawn that Defendant Seto was intimately involved in the development and implementation of the IRS Targeting Scheme. Reasonable inferences may also be drawn to conclude that Defendant Seto condoned or approved of the IRS Targeting Scheme, *Fletcher*, 550 F. Supp. 2d at 39, and improperly supervised or trained those employees under his direction and control, *Elkins*, 690 F.3d at 565.

### 2. The Amended Complaint specifically identifies conduct by and attributable to each of the Cincinnati Defendants.

The Cincinnati Defendants claim that the Amended Complaint contains only "generalized allegations referring only to a governmental unit" and lacking specific allegations regarding Defendants Maloney, Bell, Estes, and Ng's "discriminatory animus." (Dkt. #64 at 36, 38.) However, such a showing is not required when, as here, the policy is discriminatory on its face. *See Johnson Controls*, 499 U.S. at 199 ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect."). Further, the Cincinnati Defendants argue that there are no allegations against Defendant Bell that show he "'personally conducted' any portion" of the IRS Targeting Scheme. (Dkt. #64 at 41.) To the contrary, True the Vote has established and alleged specific facts regarding the role of each of the Cincinnati Defendants in the IRS Targeting Scheme, including Defendant Bell. These factual allegations with regard to each of the Cincinnati Defendants are set forth below.

### a. Defendant Maloney

1. Between 2010 and 2012, the D.C.-based IRS EO Technical Unit and the D.C.-based IRS Office of Rulings and Agreements developed and revised written and oral guidance on how IRS Employees, including Defendant Ms. Maloney, were to identify and process applications in accordance with the IRS Targeting Scheme. (Dkt. #14 ¶ 96.)
2. Defendant Maloney participated in creating, developing, implementing, and applying the IRS Targeting Scheme to True the Vote. She also failed to prevent further development, implementation, and application despite the constitutional harm. (*Id*. ¶ 165.)

3. Defendant Maloney specifically inspected True the Vote's tax return information during the time that the unconstitutional IRS Targeting Scheme was in place and requested additional information. (*Id.* ¶ 56, 181.)

      **b.**    **Defendant Bell**

1. Between 2010 and 2012, the D.C.-based IRS EO Technical Unit and the D.C.-based IRS Office of Rulings and Agreements developed and revised written and oral guidance on how IRS Employees, including Defendant Mr. Bell, were to identify and process applications in accordance with the IRS Targeting Scheme. (Dkt. #14 ¶ 96.)
2. Defendant Mr. Bell specifically inspected True the Vote's tax return information during the time that the unconstitutional IRS Targeting Scheme was in place. (*Id.* ¶¶ 60-61, 181.)
3. Defendant Mr. Bell participated in creating, developing, implementing, and applying the IRS Targeting Scheme to True the Vote. She also failed to prevent further development, implementation, and application despite the constitutional harm. (*Id.* ¶¶ 123, 165.)
4. On or around October 27, 2011, the IRS Taxpayer Advocate advised Sen. Cornyn—in response to his January 5, 2011, inquiry—that it had contacted Defendant Bell regarding the status of True the Vote's application and that Mr. Bell had informed the Taxpayer Advocate that he was waiting for a determination on True the Vote's application from the IRS Washington D.C. office. (*Id.* ¶ 59.)
5. On October 12, 2011, True the Vote's legal counsel contacted Defendant Bell to inquire as to the status of True the Vote's application. During this phone conversation, Defendant Bell stated that True the Vote's application was being overseen by and had been forwarded to the IRS office in Washington D.C. for additional review. (*Id.* ¶ 60.)

      **c.**    **Defendant Estes**

1. Between 2010 and 2012, the D.C.-based IRS EO Technical Unit and the D.C.-based IRS Office of Rulings and Agreements developed and revised written and oral guidance on how IRS Employees, including Defendant Estes, were to identify and process applications in accordance with the IRS Targeting Scheme. (Dkt. #14 ¶ 96.)
2. Defendant Estes specifically inspected True the Vote's tax return information during the time that the unconstitutional IRS Targeting Scheme was in place and stated that the IRS needed even more information from True the Vote to complete the IRS's consideration of True the Vote's Application. (*Id.* ¶ 63, 181.)
3. Defendant Estes participated in creating, developing, implementing, and applying the IRS Targeting Scheme to True the Vote. She also failed to prevent further development, implementation, and application despite the constitutional harm. (*Id.* ¶ 165.)

      **d.**    **Defendant Ng**

1. Between 2010 and 2012, the D.C.-based IRS EO Technical Unit and the D.C.-based IRS Office of Rulings and Agreements developed and revised written and oral guidance on how IRS Employees, including Defendant Ms. Ng, were to identify and process applications in accordance with the IRS Targeting Scheme. (Dkt. #14 ¶ 96.)

2. Defendant Ng participated in creating, developing, implementing, and applying the IRS Targeting Scheme to True the Vote. She also failed to prevent further development, implementation, and application despite the constitutional harm. (*Id.* ¶ 165.)

3. Defendant Ng specifically inspected True the Vote's tax return information during the time that the unconstitutional IRS Targeting Scheme was in place and stated that the IRS needed even more information from True the Vote to complete the IRS's consideration of True the Vote's Application. (*Id.* ¶ 66, 181.)

The facts alleged, along with the reasonable inferences that may be drawn from those facts, plausible demonstrate that True the Vote has been subject to discrimination and retaliation by each of Individual Defendants.

**E.     True the Vote Established the Right to Be Free from Retaliation and Viewpoint Discrimination in Determination of its Tax-Exempt Status.**

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations and quotation omitted). This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 243-244 (2009). A "case directly on point" is not required to show that a legal rule was "clearly established." *Ashcroft*, 131 S. Ct. at 2083. Indeed, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Hope*, 536 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640).

The Cincinnati Defendants frame the question before this Court as "whether there was a specific right to be free from a retaliatory investigation that is otherwise supported by adequate cause." (Dkt. #64 at 43.) That is the wrong question to ask. As the Cincinnati Defendants concede, the qualifying phrase "that is otherwise supported by adequate cause" is an extracted

variation of the probable-cause requirement native to cases involving retaliatory criminal prosecutions (*id.* at 38-39), cases that bear no similarity to the exempt-organizations application process. The Cincinnati Defendants simply reason that because it was at one point not clearly established whether the absence-of-probable-cause requirement in retaliatory prosecution cases extended to retaliatory *arrest* cases, that it was also not clearly established whether an absence-of-probable-cause requirement was extended to a "retaliatory investigation by an administrative agency." (*Id.* at 43.) Though they cite no law in support, the Cincinnati Defendants believe such a requirement simply "makes sense in this context." (*Id.* at 39.) The Cincinnati Defendants are wrong. Probable cause is a standard largely unique to criminal law and plays no role in the determination of an applicant's qualification for tax-exempt status. The Cincinnati Defendants provide no reason for this Court to conclude that a reasonable IRS agent would think that it does.

Further, the Cincinnati Defendants improperly assume that they had good cause to subject True the Vote to three years of heightened scrutiny and delay. That assumption is not supported but is rebutted by the facts. As the TIGTA Report confirms, True the Vote's application was targeted for further review based on criteria not relevant to its qualification for a tax-exemption. (Dkt. # 14-6 at 11 ("The Determinations Unit developed and began using criteria to identify potential political cases for review that inappropriately identified specific groups applying for tax-exempt status based on their names or policy positions *instead of developing criteria based on tax-exempt laws and Treasury Regulations*.") (emphasis added.) There is no escaping this fact.

Existing case law demonstrates that the properly focused inquiry for this Court is whether True the Vote had a right to be free from First Amendment retaliation and viewpoint discrimination in the qualification and conferral of a government benefit—here, recognition as a

tax-exempt organization. On that issue, the law is clear, and has been so for decades. The

Supreme Court

> has made clear that even though a person has no "right" to a valuable
> governmental benefit and even though the government may deny him the benefit
> for any number of reasons, there are some reasons upon which the government
> may not rely. It may not deny a benefit to a person on a basis that infringes his
> constitutionally protected interests—especially, his interest in freedom of speech.
> For if the government could deny a benefit to a person because of his
> constitutionally protected speech or associations, his exercise of those freedoms
> would in effect be penalized and inhibited. This would allow the government to
> "produce a result which [it] could not command directly." *Speiser v. Randall*, 357
> U.S. 513, 526. Such interference with constitutional rights is impermissible.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The Supreme Court "ha[s] applied this general

principle to denials of tax exemptions." *Id.* In *Speiser*, California established a rule requiring

anyone who sought to take advantage of a property tax exemption to sign a declaration stating

that he did not advocate the forcible overthrow of the Government of the United States. The

Supreme Court was clear: "It is settled that speech can be effectively limited by the exercise of

the taxing power." 357 U.S. at 518. "To deny an exemption to claimants who engage in certain

forms of speech is in effect to penalize them for such speech." *Id.* Later, in *Regan v. Taxation*

*with Representation*, 461 U.S. 540, 548 (1983), though the Supreme Court ruled that to deny tax-

exemption to an organization engaged in substantial lobbying did not violate the First

Amendment, the Court explained that "[t]he case would be different if Congress were to

discriminate invidiously in its subsidies in such a way as to "'[aim] at the suppression of

dangerous ideas.'" (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959).) True the

Vote's allegations present such a case. (*See, e.g.*, Dkt. #14 ¶ 6 ("The IRS Defendants' repeated

requests for additional information and documents were intended to harass True the Vote and to

have a chilling effect on the First Amendment rights of current and prospective members and

donors."); ¶ 152 ("The IRS Targeting Scheme was applied to True the Vote for the purpose of

chilling True the Vote's expression of its views and right of free association in violation of the First Amendment.").) Indeed, only those applicants "who engage in certain forms of speech" were subjected to IRS Targeting Scheme. *Speiser*, 351 U.S. at 518. Such a scheme is clearly forbidden by *Speiser* and *Taxation with Representation*.

It is no answer to argue, as Individual Defendants might, that True the Vote's application was not actually denied. For over three years, True the Vote was subjected to repeated and intrusive requests for information based on nothing more than its name and *perceived* viewpoint and associations. The intentional delay of its application was nothing short of a functional denial. Nor does the distinction between a discriminatory denial and a discriminatory review matter. The "general statements of the law" enunciated in the discriminatory denial cases "apply with obvious clarity to the specific conduct in question." *Hope*, 536 U.S. at 741. No reasonable IRS employee would believe that it was unclear whether he could discriminate or retaliate against an applicant for tax-exempt status based on the applicant's perceived name or viewpoint so long as she stops short of denying the application.

Every IRS employee was also keenly aware that True the Vote's ability to associate with donors and pursue its mission would be inhibited by the prolonged delay of True the Vote's application. Over forty years ago, the Supreme Court recognized that "[m]any contributors simply will not make donations to an organization that does not [receive a tax-exemption]." *Bob Jones Univ.*, 416 U.S. at 729-730. The Court further recognized that the inability to associate with like-minded donors is "likely to result in serious damage to a charitable organization." *Id.* *See also* Dkt. #14-6 at 18 ("[T]he IRS delayed the issuance of letters to organizations approving their tax-exempt status. For I.R.C. § 501(c)(3) organizations, this means that potential donors and grantors could be reluctant to provide donations or grants. In addition, some organizations

withdrew their applications and others may not have begun conducting planned charitable or social welfare work. The delays may have also prevented some organizations from receiving certain benefits of the tax-exempt status.").

It is likewise no answer to argue, as do the Management Defendants, that "[a]ll applicants for § 501(c)(3) status face some level of scrutiny" and that the IRC permits IRS officials to request additional information from applicants. (Dkt. #63 at 19.) True the Vote does not allege that the application process itself is a violation of the First Amendment; True the Vote alleges that the application process has been applied to it "on a basis that infringes [its] constitutionally protected interests—especially, [its] interest in freedom of speech." *Perry*, 408 U.S. at 597. The Supreme Court, long ago, clearly established that such conduct contravenes True the Vote's basic liberties. Consequently, the Individual Defendants are not immune from suit.

## IV.   CONCLUSION

For the foregoing reasons, the Management Defendants and the Cincinnati Defendants' motions to dismiss should be denied.

Dated: November 15th, 2013

Respectfully submitted,

/s/Cleta Mitchell
Cleta Mitchell (D.C. 433386)
Michael J. Lockerby (D.C. 502987)
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street NW Suite #600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com
*Lead Counsel for Plaintiff*

William E. Davis (D.C. Bar No. 280057)
Mathew D. Gutierrez (Fla. 0094014)*
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
Counsel for Plaintiff

70

Kaylan L. Phillips (D.C. 1110583)
Noel H. Johnson (Wisc. 1068004)*
ActRight Legal Foundation
209 West Main Street
Plainfield, IN 46168
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@actrightlegal.org
njohnson@actrightlegal.org
*Counsel for Plaintiff*

John C. Eastman (Cal. 193726)*
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu
*Counsel for Plaintiff*

*\*Pro Hac Vice Motions granted*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2013, I caused TRUE THE VOTE'S

OPPOSITION TO INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS, EXHIBIT, and

PROPOSED ORDER to be filed with the United States District Court for the District of

Columbia via the Court's CM/ECF system.

I further certify I will cause a true and correct copy of the foregoing to be served upon the

following at his last known addresses via U.S. Certified Mail:

**DAVID FISH**
3623 37th St. N.
Arlington, VA  22207

Dated: November 15, 2013                    /s/ *Cleta Mitchell*_____
                                            Cleta Mitchell
                                            cmitchell@foley.com
                                            *Lead Counsel for Plaintiffs*

# Exhibit A:

# Interim Update

DARRELL E. ISSA, CALIFORNIA
CHAIRMAN

JOHN L. MICA, FLORIDA
MICHAEL R. TURNER, OHIO
JOHN J. DUNCAN, JR., TENNESSEE
PATRICK T. McHENRY, NORTH CAROLINA
JIM JORDAN, OHIO
JASON CHAFFETZ, UTAH
TIM WALBERG, MICHIGAN
JAMES LANKFORD, OKLAHOMA
JUSTIN AMASH, MICHIGAN
PAUL A. GOSAR, ARIZONA
PATRICK MEEHAN, PENNSYLVANIA
SCOTT DesJARLAIS, TENNESSEE
TREY GOWDY, SOUTH CAROLINA
BLAKE FARENTHOLD, TEXAS
DOC HASTINGS, WASHINGTON
CYNTHIA M. LUMMIS, WYOMING
ROB WOODALL, GEORGIA
THOMAS MASSIE, KENTUCKY
DOUG COLLINS, GEORGIA
MARK MEADOWS, NORTH CAROLINA
KERRY L. BENTIVOLIO, MICHIGAN
RON DeSANTIS, FLORIDA

LAWRENCE J. BRADY
STAFF DIRECTOR

ONE HUNDRED THIRTEENTH CONGRESS

## Congress of the United States

### House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5074
FACSIMILE  (202) 225–3974
MINORITY  (202) 225–5051

http://oversight.house.gov

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

CAROLYN B. MALONEY, NEW YORK
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
STEPHEN F. LYNCH, MASSACHUSETTS
JIM COOPER, TENNESSEE
GERALD E. CONNOLLY, VIRGINIA
JACKIE SPEIER, CALIFORNIA
MATTHEW A. CARTWRIGHT, PENNSYLVANIA
MARK POCAN, WISCONSIN
L. TAMMY DUCKWORTH, ILLINOIS
ROBIN L. KELLY, ILLINOIS
DANNY K. DAVIS, ILLINOIS
PETER WELCH, VERMONT
TONY CARDENAS, CALIFORNIA
STEVEN A. HORSFORD, NEVADA
MICHELLE LUJAN GRISHAM, NEW MEXICO

**September 17, 2013**

**TO:**  Members, Committee on Oversight and Government Reform

**FROM:**  Majority Staff, Committee on Oversight and Government Reform

**SUBJECT:**  Interim update on the Committee's investigation of the Internal Revenue
Service's inappropriate treatment of certain tax-exempt applicants

---

The Committee on Oversight and Government Reform continues to investigate the
Internal Revenue Service's inappropriate treatment of certain applicants for tax-exempt status.
On May 10, 2013, IRS Exempt Organizations Director Lois Lerner acknowledged via a planted
question at a Friday morning tax-law panel that the IRS engaged in inappropriate targeting of
conservative-oriented tax-exempt applicants. Lerner's remarks were prompted by an audit that
was to be issued the following week by the Treasury Inspector General for Tax Administration,
which was requested by Chairman Issa and Subcommittee Chairman Jordan. Since confirmation
of the targeting, the Committee has been vigorously investigating potential wrongdoing at the
IRS with respect to tax-exempt organizations. This memorandum provides an interim update on
the Committee's investigation.

### STATUS OF THE COMMITTEE'S INVESTIGATION

The Committee has conducted extensive fact-finding in this investigation via two primary
methods: review of documents produced by federal agencies and transcribed interviews with IRS
employees. To date, the Committee has received more than 80,000 pages of documents from the
IRS, the Treasury Inspector General for Tax Administration (TIGTA), the Federal Election
Commission (FEC), and the Department of Treasury. The Committee has also conducted
transcribed interviews with twenty-four IRS employees. These interviews include eight IRS
Exempt Organizations Determinations employees based in Cincinnati, Ohio; eleven IRS Exempt
Organizations employees based in Washington, DC; and five IRS Chief Counsel's office
attorneys.

On August 2, 2013, as a result of the IRS's obstruction of the Committee's investigation
– including production of overly redacted and selectively redacted documents and the untimely
productions of requested materials – Chairman Issa issued a subpoena to Treasury Secretary Lew

to compel the Administration's cooperation with the investigation.[1]  Since the issuance of the subpoena, the IRS has produced over 67,000 pages of documents – more than double the total amount of documents produced in the two months preceding the subpoena.

In August, the Committee pursued the investigation by requesting documents from additional custodians.  Specifically, after it was reported that FEC and IRS employees may have inappropriately communicated about tax-exempt applications, Chairman Issa and Chairman Jordan sent a letter to the FEC on August 7, 2013, requesting all documents and communications between the FEC and IRS.[2]  To date, the FEC has produced about 1,800 pages of documents, which the Committee is currently reviewing.

On August 13, 2013, Chairman Issa and Chairman Jordan requested e-mails related to official IRS business housed in Lois Lerner's unofficial e-mail account after the Committee discovered the use of an unofficial e-mail account in documents produced by the IRS.[3]  The Committee received these documents from Lerner on September 6, 2013.  Similarly, on August 15, 2013, Chairman Issa wrote to Secretary of the Treasury Jack Lew reminding him of his obligation to collect and preserve all employees' personal e-mails related to official business.[4]

Finally, on August 20, 2013, Chairman Issa and Chairman Jordan wrote to Holly Paz, Director of Rulings and Agreements within the IRS Exempt Organizations Division, to ask that she address apparent inconsistencies in her testimony that have surfaced since her transcribed interview with Committee staff on May 21, 2013.[5]  Paz was the first interview conducted by the Committee.  Through subsequent interviews and documents obtained by the Committee, additional information has come to light that appears to contradict her testimony.   The Committee received Paz's clarifications on September 3, 2013.[6]

## INTERIM FINDING: THE IRS ENGAGED IN DISPARATE TREATMENT OF CONSERVATIVE-ORIENTED TAX-EXEMPT APPLICATIONS

While the Committee's discovery efforts are ongoing, it is apparent from material already available to the Committee that the IRS engaged in inappropriate and disparate treatment of conservative-oriented applicants for tax-exempt status.  The Internal Revenue Code allows a group recognized as tax-exempt under section 501(c)(4) to engage in unlimited issue advocacy and some campaign intervention, as long as the group's primary purpose is "social welfare."[7]  In

---

[1] *See* letter from Darrell Issa, H. Comm. on Oversight & Gov't Reform, to Jacob Lew, Dep't of the Treasury (Aug. 2, 2013).

[2] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Ellen L. Weintrab, Fed. Election Comm'n (Aug, 7, 2013).

[3] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Lois Lerner, Internal Revenue Serv. (Aug. 13, 2013).

[4] Letter from Darrell Issa, H. Comm. on Oversight & Gov't Reform, to Jacob Lew, Dep't of the Treasury (Aug. 15, 2013).

[5] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Holly Paz, Internal Revenue Serv. (Aug. 20, 2013).

[6] Letter from Roel Campos, Locke Lord LLP, to Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform (Sept. 3, 2013).

[7] *See* I.R.C. § 501(c)(4).

Exhibit A, Page 2

2010, as the Obama Administration bemoaned the "shadowy" influence of so-called "special interest" groups, the IRS was not unaffected by this political rhetoric. Evidence available to the Committee shows that the IRS was acutely aware of this public rhetoric and that the initial Tea Party applications were first identified and elevated due to this media attention. Evidence further suggests that once the cases were identified, the IRS handled and processed the Tea Party applications in a manner distinct and unique from applications of groups engaged in similar activities.

### The political climate in 2010 opposed tax-exempt involvement in politics and the emergence of conservative-oriented tax-exempt groups

In 2010, the Obama Administration and its allies orchestrated a sustained public relations campaign seeking to delegitimize the lawful political activity of conservative tax-exempt organizations and to suppress these groups' right to assemble and speak. The impetus was a Supreme Court opinion, *Citizens United v. Federal Election Commission*, handed down on January 21, 2010.[8] In the wake of the Court's decision, senior Administration officials criticized the influence of so-called "corporate" money in the political process. The Administration and its allies in Congress repeatedly ridiculed the lawful political activity of tax-exempt entities, even calling out some conservative-leaning groups by name.

On the same day of the Supreme Court's *Citizens United* ruling, White House Press Secretary Robert Gibbs warned that "everybody should be worried that special interest groups that have already clouded the legislative process are soon going to get involved in an even more active way in doing the same thing in electing men and women to serve in Congress."[9] Two days later, on January 23, 2010, President Obama used his weekly address to lament that "the United States Supreme Court handed a huge victory to the special interests and their lobbyists – and a powerful blow to our efforts to reign in corporate influence. This ruling strikes at our democracy itself. . . . This ruling opens the floodgates for an unlimited amount of special interest money into our democracy."[10]

On January 27, 2010, President Obama stood before the assembled Congress and openly chastised the Supreme Court during his State of the Union address. He declared:

> With all due deference to separation of powers, last week the Supreme Court reversed a century of law that I believe will open the floodgates for special interests – including foreign corporations – to spend without limit in our elections. I don't think American elections should be bankrolled by America's most powerful interests, or worse, by foreign entities. They should be decided by the American people. And I'd urge Democrats and Republicans to pass a bill that helps to correct some of these problems.[11]

---

[8] Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010).
[9] The White House, Briefing by White House Press Secretary Robert Gibbs and PERAB Chief Economist Austan Goolsbee (Jan. 21, 2010).
[10] The White House, Weekly Address: President Obama Vows to Continue Standing Up to the Special Interest on Behalf of the American People (Jan. 23, 2010).
[11] The White House, Remarks by the President in the State of the Union Address (Jan. 27, 2010).

The President's congressional allies quickly followed suit.  On February 3, 2010, Nancy Pelosi, then-Speaker of the House, created a task force of prominent Democratic congressman to consider options for overturning the Supreme Court's decision.[12]

In wake of *Citizens United*, conservative-leaning Tea Party groups began to face scorn inside and outside of government.  The same month that Speaker Pelosi created a task force to overturn *Citizens United*, she referred to the Tea Party movement as "Astroturf"[13] – suggesting, as she had before, that it was a fake grassroots movement "that is bankrolled by some of the wealthiest people in America."[14]  *Washington Post* columnists accused Tea Party groups of "smolder[ing] with anger"[15] and practicing a brand of patriotism reminiscent of the Ku Klux Klan.[16]  Another *Post* columnist opined in late March 2010 that Tea Party rhetoric "is calibrated not to inform but to incite."[17]  In April 2010, Reuters tied the Tea Party movement to "America's season of rage and fear."[18]

The drumbeat continued throughout the spring and summer of 2010 as President Obama continued to use his weekly address to criticize political activity by conservative groups.  In one such address, the President said:

> We've all seen groups with benign-seeming names sponsoring television commercials that make accusations and assertions designed to influence the public debate and sway voters' minds.  Now, of course every organization has every right in this country to make their voices heard.  But the American people also have the right to know when some group like "Citizens for a Better Future" is actually funded entirely by "Corporations for Weaker Oversight."[19]

In July 2010, the President spoke from the White House Rose Garden to caution Americans that "shadow groups [were] already forming and building war chests of tens of millions of dollars to influence the fall elections."[20]  In August 2010, the President stepped up his rhetoric and called out a well-known conservative nonprofit group by name for their political activities.  The President stated:

> Right now all around this country there are groups with harmless-sounding names like Americans for Prosperity, who are running millions of dollars of ads against Democratic candidates all across the country.  And they don't have to say who

---

[12] *See* Ryan Grim, *Pelosi Taps Task Force to Counter Supreme Court's Citizens United Ruling*, Huffington Post, Feb. 3, 2010.
[13] *Pelosi Claims Tea Party Hijacked by GOP*, Fox News, Feb. 28, 2010.
[14] Ryan Powers, *Pelosi: Tea Parties are part of a "Astroturf" campaign by "some of the wealthiest people in America,"* Think Progress, Apr. 15, 2009.
[15] Colbert King, *Faces We've Seen Before; the Deeper Roots of Tea Party Rage*, Wash. Post, Mar. 27, 2010.
[16] Courtland Malloy, *Tancredo Remarks at 'Tea Party' Event Have Familiar Ring*, Wash. Post, Feb. 17, 2010.
[17] Eugene Robinson, *Where the Rhetoric of Rage Can Lead*, Wash. Post, Mar. 30, 2010.
[18] Bernd Debusmann, *America's Season of Rage and Fear*, Reuters, Apr. 1, 2010.
[19] The White House, Weekly Address: President Obama Calls on Congress to Enact Reforms to Stop a "Corporate Takeover of Our Elections" (May 1, 2010).
[20] The White House, Remarks by the President on the DISCLOSE ACT (July 26, 2010).

exactly the Americans for Prosperity are.  You don't know if it's a foreign-controlled corporation.  You don't know if it's a big oil company, or a big bank.  You don't know if it's a insurance [*sic*] company that wants to see some of the provisions in health reform repealed because it's good for their bottom line, even if it's not good for the American people.[21]

The following month, the President doubled down on his statements critical of *Citizens United* and of conservative nonprofits engaged in political activity.  "[A]s an election approaches," the President proclaimed, "it's not just a theory.  We can see for ourselves how destructive to our democracy this can become.  We see it in the flood of deceptive attack ads sponsored by special interests using front groups with misleading names."[22]  Days later, the President admitted that his concern was specific to "special interests . . . running millions of dollars of attack ads against *Democratic* candidates."[23] [emphasis added]

In October 2010, only weeks before the 2010 congressional election, President Obama tied his vitriol toward *Citizens United* with the rise of Tea Party groups.  He stated at a youth town hall:

> I do think that what has happened is layered on top of some of that general frustration that has expressed itself through the Tea Party, there is an awful lot of corporate money that's pouring into these elections right now.  I mean, you've got tens of millions of dollars in what are called third-party expenditures that are being spent basically on negative ads. . . .  But if you're in a battleground state right now, you are being bombarded with negative ads every single day and nobody knows who is paying for these ads.  They've got these names like "Americans for Prosperity" or "Moms for Motherhood" or – actually that last one I made up.  But you have these innocuous-sounding names, and we don't know where this money is coming from.  I think that is a problem for our democracy.  And it's a direct result of a Supreme Court decision that said they didn't have to disclose who their donors are.[24]

Meanwhile, the President's allies in Congress continued to urge action to stop political activity by conservative tax-exempt entities.  Senator Max Baucus wrote to the IRS Commissioner to "request that [he] and [his] agency survey major 501(c)(4), (c)(5) and (c)(6) organizations involved in political campaign activity to examine whether they are operated for the organization's intended tax exempt purpose and to ensure that political campaign activity is not the organization's primary activity."[25]  Senator Dick Durbin followed suit and asked the IRS to "quickly examine the tax status of Crossroads GPS and other (c)(4) organizations that are directing millions of dollars into political advertising . . . ."[26]

---

[21] The White House, Remarks by the President at a DNC Finance Event in Austin, Texas (Aug. 9, 2010).
[22] The White House, Weekly Address: President Obama Castigates GOP Leadership for Blocking Fixes for the Citizens United Decision (Sept. 18, 2010).
[23] The White House, Remarks by the President at Finance Reception for Congressman Sestak (Sept. 20, 2010).
[24] The White House, Remarks by the President in a Youth Town Hall (Oct. 14, 2010).
[25] Letter from Max Baucus, S. Comm. on Finance, to Douglas H. Shulman, Internal Revenue Serv. (Sept. 28, 2010).
[26] Press Release, Durbin Urges IRS to Investigate Spending by Crossroads GPS (Oct. 12, 2010).

Exhibit A, Page 5

This pressure was not limited to the 2010 election cycle. In following years, congressional Democrats continued to press for close scrutiny of 501(c)(4) groups engaged in political activity. In February 2012, seven Democratic senators wrote to the IRS Commissioner urging the IRS to investigate whether 501(c)(4) groups are engaged in "a substantial or even a predominant amount of campaign activity."[27] Later, in July 2012, Senator Carl Levin wrote to the IRS Commissioner, imploring the agency to "immediately review the activities of 501(c)(4) entities engaging in running partisan political ads . . . ."[28] Around the same time that Oversight Committee Ranking Member Elijah Cummings was publicly targeting the Tea Party-affiliated group True the Vote,[29] his staff contacted the IRS to request information about the group.[30] In January 2013, five Democratic Members wrote to President Obama asking him to highlight "the corrosive influence of money in our democratic process."[31] These calls to arms did not fall on deaf ears at the IRS.

### *The IRS was cognizant of the political climate surrounding tax-exempt organizations and the media attention given to conservative-oriented tax-exempt groups*

From materials available to the Committee, it is evident that all levels within the IRS were highly attentive to the political climate surrounding tax-exempt applications in the wake of *Citizens United*. The IRS maintained an agency-wide culture that incentivized employees to alert their superiors to any application with the potential for media attention. Cindy Thomas, the program manager of the IRS's Cincinnati office, testified about this media-conscience culture, explaining that the "expectation that we ha[d] from Washington" was to elevate any issues with the potential for media attention.[32]

The political rhetoric criticizing the *Citizens United* opinion and imploring the IRS to crack down on political activity for tax-exempt entities was not lost on the senior leadership of the IRS. On October 19, 2010, Exempt Organizations Director Lois Lerner spoke at an event sponsored by Duke University's Sanford School of Public Policy. At the event, Lerner discussed the political pressure on the IRS to "fix the problem" of 501(c)(4) groups engaged in political activity.[33] Echoing President Obama's public statements, she said:

> What happened last year was the Supreme Court – the law kept getting chipped away, chipped away in the federal election arena. The Supreme Court dealt a huge blow, overturning a 100-year old precedent that said basically corporations couldn't give directly to political campaigns. And everyone is up in arms because they don't like it. The Federal Election Commission can't do anything about it.

---

[27] Letter from Michael F. Bennet et al., U.S. Senate, to Douglas Shulman, Internal Revenue Serv. (Feb. 16, 2012).
[28] Letter from Carl Levin, S. Comm. on Homeland Sec. & Gov't Affairs, to Douglas H. Shulman, Internal Revenue Serv. at 4 (July 27, 2012); *see also* Letter from Carl Levin, S. Comm. on Homeland Sec. & Gov't Affairs, to Douglas H. Shulman, Internal Revenue Serv. (Aug. 31, 2012).
[29] *See* Letter from Elijah Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Oct. 4, 2012).
[30] E-mail form Catherine Barre, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (Jan. 25, 2013).
[31] Letter from James McGovern et al., U.S. House of Representatives, to President Barack Obama (Jan. 29, 2013).
[32] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C., at 34 (June 28, 2013).
[33] John Sexton, *Lois Lerner Discusses Political Pressure on the IRS in 2010*, Breitbart.com, Aug. 6, 2013.

They want the IRS to fix the problem.  The IRS laws are not set up to fix the problem: (c)(4)s can do straight political activity.  They can go out and pay for an ad that says, "Vote for Joe Blow."  That's something they can do as long as their primary activity is their (c)(4) activity, which is social welfare.

So everybody is screaming at us right now: "Fix it now before the election.  Can't you see how much these people are spending?"  I won't know until I look at their 990s next year whether they have done more than their primary activity as political or not.  So I can't do anything right now.[34]

Lerner told TIGTA substantially the same story, according to documents produced to the Committee by TIGTA.  Lerner told TIGTA investigators: "The Citizens United decision allows corporations to spend freely on elections.  Last year, there was a lot of press on 501(c)(4)s being used to funnel money on elections and the IRS was urged to do something about it."[35]

The IRS's awareness of this rhetoric was not just limited to the abstract.  The day after Lerner's discussion at Duke University, senior IRS official Joseph Urban circulated a press release from Senator Dick Durbin, entitled "Durbin urges IRS to investigate spending by Crossroads."[36]  This press release called upon the IRS to "quickly investigate the tax status of Crossroads GPS and other organizations that are directing millions of dollars into political advertising without disclosing their funding sources."[37]  Crossroads GPS, a conservative-oriented applicant for tax-exempt status, was the only entity mentioned by name in the e-mail sent by Urban.

As the political rhetoric critical of conservative-leaning tax-exempt groups continued, IRS employees remained informed of the ongoing public discourse via the *EO Tax Journal*, an e-mail publication about issues relating to tax-exempt law.[38]  For instance, in October 2011, the *EO Tax Journal* reported on a letter sent by Democracy 21 to IRS Commissioner Shuman and Lois Lerner calling on the IRS to investigate certain conservative-leaning tax-exempt entities.[39]  IRS Deputy Division Counsel Janine Cook sent the report and the letter to IRS Division Counsel Victoria Judson, calling the matter a "very hot button issue floating around."[40]  Later, in 2012, Cook forwarded to Lois Lerner an *EO Tax Journal* article about congressional investigations into the IRS's treatment of tax-exempt applicants.[41]  Lerner replied in part: "we're going to get

---

[34] *See* "Lois Lerner Discusses Political Pressure on IRS in 2010," www.youtube.com (last visited Aug. 30, 2013) (transcription by authors).
[35] Treasury Inspector General for Tax Admin., Memo of Contact (Apr. 5, 2012).
[36] E-mail from Joseph Urban, Internal Revenue Serv., to Joseph Urban, Internal Revenue Serv. (Oct. 20, 2010). [IRS1810]
[37] *Id.*
[38] *See, e.g.*, e-mail from Monice Rosenbaum, Internal Revenue Serv., to Kenneth Griffin, Internal Revenue Serv. (Sept. 30, 2010). [IRSR 15430]
[39] E-mail from Paul Streckfus to Paul Streckfus (Oct. 3, 2011) (EO Tax Journal 2011-163).
[40] E-mail from Janine Cook, Internal Revenue Serv., to Victoria Judson, Internal Revenue Serv. (Oct. 10, 2011).
[41] E-mail from Janine Cook, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (Mar. 2, 2012). [IRSR 56965]

Exhibit A, Page 7

creamed."[42]  Similarly, when an IRS employee e-mailed Lerner an article about allegations that unknown conservative donors were influencing Senatorial races, Lerner replied: "Perhaps the FEC will save the day."[43]

Other IRS employees also monitored news about conservative-leaning groups applying for tax exemption.  In March 2012, a line attorney in the IRS Chief Counsel's office circulated a *New York Times* editorial entitled "The I.R.S. Does its Job" to three colleagues.[44]  The first sentence of the editorial read: "Taxpayers should be encouraged by complaints from Tea Party chapters applying for nonprofit tax status at being asked by the Internal Revenue Service to prove they are 'social welfare' organizations and not the political activities they so obviously are."[45]  The same day, one of the recipients forwarded the e-mail to Chief Counsel William Wilkins and Deputy Chief Counsel Erik Corwin, referencing the "Hill interest in IRS processing of c4 applications of advocacy organizations."[46]

Like any other political actor, the IRS was cognizant of and attentive to the prevailing rhetoric surrounding the laws and regulations it controls.  As the prevalent political discourse became a sustained assault on the Supreme Court's *Citizens United* opinion and the appropriateness of tax-exempt status for certain groups, the IRS was not oblivious to this political sentiment.  Material available to the Committee shows that the IRS was actively cognizant of public calls for the IRS crack down on secret money in politics and the rise of conservative-oriented groups opposed by certain segments of the Administration.

### *The IRS first identified and elevated the Tea Party applications due to media attention surrounding the Tea Party*

At the same time the IRS was being lobbied very publicly to crack down on tax-exempt entities engaged in political activities, IRS employees identified and elevated a Tea Party application due to public attention surrounding the Tea Party.  Later, when other Tea Party applications were discovered, the cases were classified as "sensitive" due to media attention and two more were transferred to Washington to be processed.

In February 2010, a line screener in the IRS office in Cincinnati, Ohio, became aware of a tax-exempt application from a Tea Party group.  The screener alerted his superiors, who in turn informed Washington IRS officials.[47]  In elevating the application to his superior, the screener noted: "Recent media attention to this type of organization indicates to me that this is a 'high

---

[42] E-mail from Lois Lerner, Internal Revenue Serv., to Janine Cook, Internal Revenue Serv. (Mar. 2, 2012).  [IRSR 56965]

[43] E-mail from Lois Lerner, Internal Revenue Serv., to Sharon Light, Internal Revenue Serv. (July 10, 2010) [IRS 179093]

[44] E-mail from David Marshall, Internal Revenue Serv., to Don Spellmann et al., Internal Revenue Serv. (Mar. 8, 2012).  [IRSR 14601]

[45] *The I.R.S. Does its Job*, N.Y. Times, Mar. 7, 2012.

[46] E-mail from Janine Cook, Internal Revenue Serv., to Erik Corwin & William Wilkins, Internal Revenue Serv. (Mar. 8, 2013). [IRSR 14477]

[47] *See* E-mail from Cindy Thomas, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Feb. 25, 2010) [Muthert 2-3]

Exhibit A, Page 8

profile' case."[48]  As the application continued to be elevated, another IRS employee called the application a "potentially politically embarrassing case" and also pointed out the "[r]ecent media attention to this type of organization."[49]  On this basis – "the potential for media attention" – the Washington office accepted the case.[50]

---

From: Camarillo Sharon L
Sent: Thursday, February 25, 2010 5:19 PM
To: Thomas Cindy M
Subject: FW: Case # REDACTED
Importance: Low

Cindy:  Please let 'Washington' know about this potentially politically embarrassing case involving a 'Tea Party' organization. Recent media attention to this type of organization indicates to me that this is a "high profile" case.  In addition to 501(c)(4) typical legisslative activities, the applicant, in answer to Part II, item 15 of the of the 1024 application indicates possible future political candidate support.  Shown below are excerpts from the application describing its legislative and possible future political activities.

The case is currently being held in the Screening group, pending a response from EOT.

---

The potential for media attention continued to be a concern for IRS officials once Washington received additional sample cases in late March 2010.  Upon receiving the cases in Washington, an IRS employee reviewing the applications reiterated that "[t]he concern is potential for media attention."[51]  Around the same time that the *Washington Post* was running columns critical of the Tea party, she added that "[t]he Tea Party movement is covered in the *Post* almost daily.  I expect to see more applications."[52]  She also made special mention of the groups' perceived political affiliation, commenting that the group's activity "looks more educational but with a republican slant obviously."[53]

Aware that additional cases remained in Cincinnati, Steven Grodnitzky, the Acting Manager of EO Technical in Washington, D.C., asked for information on the remaining Tea Party applications pending there.[54]  He asked, in particular, for any information that makes the

---

[48] E-mail from John J. Koester, Internal Revenue Serv., to John Shafer, Internal Revenue Serv. (Feb. 25, 2010). [Muthert 4-5]
[49] E-mail from Sharon Camarillo, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 25, 2010). [Muthert 3]
[50] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 26, 2010). [Muthert 2]
[51] E-mail from Donna Elliot-Moore, Internal Revenue Serv., to Steven Grodnitzky, Internal Revenue Serv. (Mar. 31, 2010).  [Muthert 7-8]
[52] E-mail from Donna Elliot-Moore, Internal Revenue Serv., to Steven Grodnitzky & Ronald Shoemaker, Internal Revenue Serv. (Apr. 2, 2010).  [Muthert 7].
[53] E-mail from Donna Elliot-Moore, Internal Revenue Serv., to Steven Grodnitzky & Ronald Shoemaker, Internal Revenue Serv. (Apr. 1, 2010).  [Muthert 7]
[54] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Apr. 5, 2010). [Muthert 6-8]

cases "stand out," such as "a high profile Board member, etc.," writing that he was "[r]eally thinking about possible media attention on a particular case."[55]

> **From:** Grodnitzky Steven
> **Sent:** Monday, April 05, 2010 12:14 PM
> **To:** Thomas Cindy M
> **Cc:** Shoemaker Ronald J; Shafer John H
> **Subject:** RE: two cases
>
> Cindy,
>
> Information would be the number of cases and the code sections in which they filed under.  Also, if there is anything that makes one stand out over the other, like a high profile Board member, etc., then that would be helpful.  Really thinking about possible media attention on a particular case.  Just want to make sure that Lois and Rob are aware that there are other cases out there, etc.....

Grodnitzky directed the Washington office to begin drafting a "sensitive case report," which is a monthly report created for the purpose of informing senior IRS leadership about a particular issue or application.[56]  He directed a sensitive case report to be prepared for the Tea Party applications given the potential for "media attention."[57]  The sensitive case report eventually created for the Tea Party applications emphasized the media attention surrounding the cases:

> The various "tea party" organizations are separately organized, but appear to be a part of a national political movement that may be involved in political activities. The "tea party" organizations are being followed closely in national newspapers (such as The Washington Post) almost on a regular basis.[58]

Grodnitzky also testified to the Committee that the only "sensitive case" criterion selected for the Tea Party applications was "[l]ikely to attract media or Congressional attention."[59]

### *Media attention caused the IRS to treat conservative-oriented tax-exempt applications differently*

Documents and other evidence obtained by the Committee suggest that the public rhetoric criticizing conservative tax-exempt organizations affected how the IRS identified and evaluated Tea Party applications.  Although IRS employees have denied any overt bias in transcribed interviews with Committee staff, documentary and testimonial evidence indicates that this media attention caused the IRS to screen, group, and evaluate Tea Party applications in a manner distinct from other applications for tax exemption.

---

[55] *Id.*
[56] *See* Transcribed interview of Robert Choi, Internal Revenue Serv., in Wash., D.C., at 51 (Aug. 21, 2013); Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C., at 37 (July 11, 2013).
[57] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Apr. 5, 2010). [Muthert 6-8]
[58] Internal Revenue Serv., Sensitive Case Report (May 2011).  [IRS1332-1334]
[59] Transcribed interview of Steven Grodnitzky, Internal Revenue Serv., in Wash., D.C., at 64 (July 16, 2013).

Exhibit A, Page 10

During his transcribed interview with Committee staff, Grodnitzky explained that the media attention surrounding the Tea Party applications distinguished the cases from other cases. Grodnitzky testified:

Q      And did you understand these [sample] applications to be filed by Tea Party groups, that is groups affiliated with the Tea Party movement?

A      That was my understanding.

Q      And were these applications for (c)(3) or (c)(4) or some other subsection of 501?

A      My recollection is that it was not for another subsection and that it was for, I believe, (c)(3) and (c)(4).

Q      And just to be clear, you have seen applications before from 501(c)(3) organizations applying for exempt status?

A      I have.

Q      And you've seen applications applying for 501(c)(4) status?

A      Correct.

Q      Those are both something the IRS sees regularly?

A      Correct.

Q      Was there anything different about these cases?

A      In what respect?

Q      In any respect.

A      Well, I – it was my understanding that the reason they were identified is because they were likely to attract media attention.

Q      That's what made them distinct, the likelihood of media attention?

A      Yes, in my mind, yes.[60]

Another supervisory IRS employee in Washington, Ronald Shoemaker, similarly explained that media attention was the reason the Tea Party applications were unique in his mind.  Shoemaker testified:

---

[60] Transcribed interview of Steven Grodnitzky, Internal Revenue Serv., in Wash., D.C., at 27-28 (July 16, 2013).

Exhibit A, Page 11

Q       Other than Mr. Grodnitzky designating the cases as sensitive cases, was there anything else different about the Tea Party applications as compared to your experience with other 501(c)(3)s or 501(c)(4)s with political activity?

A       No, other than there was certain media attention involved with those cases, which was the basis for the significant case report.

Q       And were you aware of the media attention at that time?

A       I was aware of media attention, yes.[61]

After the first applications were identified and elevated due to media attention, the criteria used by IRS employees to screen for additional Tea Party cases were a distinct reflection of the public perception of the activities of those groups.  A briefing paper prepared for Lois Lerner in July 2011 described the groups as "organizations [that] are advocating on issues related to government spending, taxes and similar matters."[62]  The same briefing paper went on to list the criteria used to identify Tea Party cases, including the phrases "Tea Party," "Patriots," or "9/12 Project" or "[s]tatements in the case file [that] criticize how the country is being run."[63]

---

### Increase in (c)(3)/(c)(4) Advocacy Org. Applications

**Background:**

- EOD Screening has identified an increase in the number of (c)(3) and (c)(4) applications where organizations are advocating on issues related to government spending, taxes and similar matters.  Often there is possible political intervention or excessive lobbying.

- EOD Screening identified this type of case as an emerging issue and began sending cases to a specific group if they meet any of the following criteria:
  - "Tea Party," "Patriots" or "9/12 Project" is referenced in the case file
  - Issues include government spending, government debt or taxes
  - Education of the public by advocacy/lobbying to "make America a better place to live"
  - Statements in the case file criticize how the country is being run

---

These criteria captured predominately conservative-leaning organizations.  An independent analysis conducted by *USA Today* found that beginning in February 2010, the IRS approved no applications from Tea Party groups for 27 months, while "[i]n that time, the IRS approved perhaps dozens of applications from similar liberal and progressive groups."[64]

In addition, the sample cases transferred from Cincinnati and worked by veteran Washington IRS official Carter Hull in 2010 were applications filed by groups affiliated with the Tea Party movement.  The briefing paper prepared for Lerner in July 2011 summarized these

---

[61] Transcribed interview of Ronald Shoemaker, Internal Revenue Serv., in Wash., D.C., at 28 (June 21, 2013).
[62] Internal Revenue Serv., Increase in (c)(3)/(c)(4) Advocacy Org. Applications.  [IRSR 2735]
[63] *Id.*
[64] Gregory Korte, *IRS Approved Liberal Groups while Tea Party in Limbo*, USA Today, May 15, 2013.

sample cases.[65]  The paper noted that the applicant for 501(c)(4) status "stated it will conduct advocacy and political campaign intervention, but *political campaign intervention will be 20% or less of activities.  A proposed favorable letter has been sent to Counsel for review.*"[66] [emphasis added]  Despite the fact that the applicant represented that it would engage in only a limited amount of campaign intervention and that a proposed favorable letter had been sent to the IRS Chief Counsel's office, Hull told the Committee that the 501(c)(4) application was still open as of June 2013.[67]

- Two sample cases were transferred to EOT, a (c)(3) and a (c)(4).
  - The (c)(4) stated it will conduct advocacy and political intervention, but political intervention will be 20% or less of activities.  A proposed favorable letter has been sent to Counsel for review.
  - The (c)(3) stated it will conduct "insubstantial" political intervention and it has ties to politically active (c)(4)s and 527s.  A proposed denial is being revised by TLS to incorporate the org.'s response to the most recent development letter.

Rather than approving the case as recommended by Hull in 2011, evidence suggests that the IRS subjected the case to additional delays by requesting additional information about the group's activities during the 2010 election cycle for all the sample Tea Party cases.  The decision to develop the 2010 election cycle information appears to have been made precipitately.  According to testimony, the decision was made by a senior attorney in the IRS Chief Counsel's office, before the line attorney even had an opportunity to independently evaluate the case assigned to her.  The line attorney testified:

Q      And whose decision was it to recommend further development?

A      [Senior attorney in IRS Chief Counsel's office].

Q      Did you concur in that recommendation?

A      It made sense to me.

Q      Did you have that belief before you met with [the senior attorney]?

A      His opinion was made known to me before I looked through the case file.

Q      How was it made known to you before you looked at the case file?

A      He told me.

Q      What did he say to you?

---

[65] Internal Revenue Serv., Increase in (c)(3)/(c)(4) Advocacy Org. Applications.  [IRSR 2735]
[66] *Id.*
[67] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C., at 53 (June 14, 2013).

Exhibit A, Page 13

A      He said, "I am thinking we need to see the 2010 election year to see what this group does."

Q      When did he tell you this?

A      Probably – he told me this orally, I think, in early July. . . .

Q      At that point when he had this discussion with you in early July, had he seen the case file?

A      Yes. He read the case file before I did.

***

Q      So he reviewed the case file and then discussed with you his beliefs about the case before you had a chance to look at it independently?

A      Yes.[68]

According to recent reports, the IRS is now seeking information about activities during the 2012 election cycle from some of the same groups whose applications have been delayed.[69]

Additional evidence suggests that the IRS viewed Tea Party cases as fundamentally different from other applications for tax exemption.  One Cincinnati IRS employee testified that the activities of the Tea Party applicants differed from those of other 501(c)(4) applications.  He stated:

> Normal (c)(4) cases we must develop the concept of social welfare, such as the community newspapers, or the poor, that types.  These [Tea Party] organizations mostly concentrate on their activities on the limiting government, limiting government role, or reducing government size, or paying less tax.  I think it[']s different from the other social welfare organizations which are (c)(4).[70]

The employee explained that the political ideology of the Tea Party groups made their applications different, and that the Tea Party applications were not treated in same manner as other applications with indications of political activity that he had worked in the past.[71]

Other documents appear to show disdain among IRS employees toward the Tea Party and similar conservative-oriented applications.  In one July 2011 e-mail, Holly Paz wrote to an attorney in the IRS Chief Counsel's office with apparent reluctance to approve the Tea Party applications.  She wrote: "Lois would like to discuss our planned approach for dealing with these

---

[68] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C., at 34-35 (Aug. 9, 2013).
[69] *See* Ben Wolfgang, *IRS Continues to Hound Tea Party Patriots, Demands More Data for Tax-exempt Status*, Wash. Times, Aug. 29, 2013.
[70] Transcribed interview of Stephen Seok, Internal Revenue Serv., in Wash., D.C. at 87 (June 19, 2013).
[71] *Id.* at 88-89.

Exhibit A, Page 14

cases.  We suspect we will have to approve the majority of the c4 applications."[72]  Similarly, in January 2012, a branch manager in the IRS Chief Counsel's office e-mailed his supervisor a *Talking Points Memo* article about the IRS's disclosure of the tax-exempt application filed by Crossroads GPS.[73]  The employee derisively characterized the group as "Rove's Crossroads."[74]

One IRS document in particular vividly illustrates the agency's apparent views toward conservative ideologies.  The document, entitled "EO Case Studies Politics," describes a hypothetical scenario involving potential political campaign intervention.[75]  The language used in the scenario provides a disparaging characterization of the Republican candidate, "President Billy Bob," and a flattering characterization of the Democratic candidate, "Nancy Nice."  The hypothetical also presents an allusion to President Obama's "change we can believe in" campaign rhetoric during the 2008 presidential election.[76]

| Scenario One | Vote for a Change |
|---|---|

During a Presidential election campaign, the Republican incumbent, President Billy Bob, is campaigning against Democratic challenger Nancy Nice.  An issues oriented charity named Transform.org with a liberal reputation recently sponsored a TV advertisement that appeared in a major television market that serves several highly contested states. The advertisement featured a student, a woman, a construction worker, and a soldier looking upset under a stormy sky.  An unseen announcer made the following statement. "This time it's really important.  Unemployment is up, education is down, gender equality is static, and the war goes on."  The sky then begins to clear as an announcer intones, "Vote for a change to improve our nation!"  The advertisement states that it is sponsored by Transform.org.  Nancy Nice has occasionally used the phrase "a change to improve our nation" as a campaign slogan.

The slanted language used by the IRS in this hypothetical scenario is more striking in context of a more neutral version on which the slanted version appears to be based.  In the neutral version, the party affiliations and names of the candidates are removed and the content of the advertisement is decidedly more neutral.[77]

---

[72] E-mail from Holly Paz, Internal Revenue Serv., to Janine Cook, Internal Revenue Serv. (July 19, 2011).  [IRSR 14372-73]

[73] E-mail from Kenneth Griffin, Internal Revenue Serv., to Janine Cook, Internal Revenue Serv. (Dec. 17, 2012). [IRSR 15354]

[74] *Id.*

[75] Internal Revenue Serv., EO Case Studies Politics.  [IRSR 9376-90]

[76] *Id.*

[77] Internal Revenue Serv., EO Case Studies Politics. [IRSR 9391-94]

---

*HYPOTHETICAL EXAMPLES*

**Scenario One**                    Vote for New Blood

During a Presidential election campaign, the incumbent, President A, is campaigning against challenger Candidate B.  Charity C is an issue-oriented charity with a viewpoint that is frequently associated with Candidate B's political party.  Charity C recently sponsored a TV advertisement that appeared in a major television market that serves several highly contested states.  The advertisement featured a student, a nurse, and an astronaut looking upset under a stormy sky.  An unseen announcer made the following statement.  "This time it's really important.  Parents can't afford to send their children to college, health care costs have skyrocketed and the space program is withering away."  The sky then begins to clear as an announcer intones, "Vote for new blood to improve our nation!"  The advertisement states that it is sponsored by Charity C.  Candidate B has campaigned against President A on these issues and occasionally used the phrase "new blood to improve our nation" as a campaign slogan.

---

Material available to the Committee shows that while the IRS should be a fair and neutral steward of our nation's tax laws, the agency is in fact affected by popular political rhetoric.  As prominent politicians publicly urged the IRS to take action on tax-exempt groups engaged in legal campaign intervention activities, the IRS treated Tea Party applications differently. Applications filed by Tea Party groups were identified and grouped due to media attention surrounding the existence of the Tea Party in general.  One such application was subjected to a multi-year delay, even after it had been recommended for approval.  This treatment was distinct for the applications filed by groups affiliated with the Tea Party movement.

### The IRS treated conservative-oriented applications differently from past liberal applications

Finally, it is evident that the IRS systematically evaluated conservative-oriented tax-exempt applicants differently than other applicants, including liberal- or progressive-oriented applicants.  From 2004 to 2008, the IRS evaluated and approved five applications from affiliates of the progressive-oriented group, Emerge America,[78] which describes itself as "the premier training program for Democratic women."[79]  According to one IRS employee, some of these five applications were approved by Cincinnati employees in a "matter of hours."[80]

Later, in 2010, the IRS Chief Counsel's office evaluated another progressive application, described by the IRS employee as "a (c)(4) that was going to be training women to become candidates" for the Democratic Party.[81]  The same employee testified that at the time, the IRS had "two or three other applications" from affiliated groups.[82]  However, there are several

---

[78] *See* E-mail from Donna Abner, Internal Revenue Serv., to Cindy Wescott, Sharon Camarillo, & Brenda Melahn, Internal Revenue Serv. (Sept. 6, 2008).  [IRSR12289]
[79] Emerge America, www.emergeamerica.org (last visited Aug. 20, 2013).
[80] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C., at 64, 86 (Aug. 9, 2013).
[81] *Id.* at 61.
[82] *Id.*

16

distinctions between the manner in which the IRS evaluated Emerge America applications and the manner in which the IRS evaluated conservative-oriented applications.

According to testimony from an IRS attorney in the Chief Counsel's office, tax law specialists in EO Technical had recommended denying the Emerge application before the case was sent to the IRS Chief Counsel's office in 2010.[83]  The Chief Counsel's office agreed with the recommended denial, and the application was subsequently denied in early 2011.[84]  Conversely, three tax law specialists who worked a conservative (c)(4) application in 2011 all separately recommended *approving* the group for exempt status.[85]  Despite the proposed approval from three different IRS employees, the case was nonetheless sent to the IRS Chief Counsel office, which asked the tax law specialists to gather additional information about the group's activities during the 2010 election cycle.[86]  To the best of the Committee's information, this application is still pending.

Unlike the conservative applications pending at the IRS – which were filed by unaffiliated organizations espousing similar ideologies and goals – the Emerge applications worked by the IRS in 2010 were all affiliated entities.  According to one IRS attorney, "they were essentially the same organization.  I mean, every – the applications all presented basically identical facts and basically identical activities."[87]  Another IRS employee described the relationship between the progressive applications as follows: "[T]he organizations were related in the sense that they were – how can I say this? – sort of like an – I am going to call, for lack of a better term, like when you have in a veterans-type organization, you have posts, and there is one in each state.  And that is sort of what it was like."[88]

Most importantly, the IRS successfully evaluated and made a determination on the Emerge applications it considered, whereas it allowed the conservative-oriented applications to languish without a resolution.  Furthermore, the central issue in the Emerge cases was whether the organizations conveyed an inappropriate private benefit to the Democratic Party, not whether the organization was engaged in campaign intervention activities.[89]  Whereas the IRS Chief Counsel's office spent seven months evaluating the legal issue of private benefit in the 501(c)(4) context for the Emerge case, it performed only a perfunctory review of the conservative case in 2011 and passed it along for further development, where the application has since apparently languished.  Tellingly, although Lois Lerner publicly apologized for the IRS's improper handling of conservative-oriented applications, she never offered a similar apology for Emerge America applications.  When asked during a media conference call about targeting of non-conservative organizations, Lerner answered: "I don't have any information on that."[90]

---

[83] *Id.*  The IRS Chief Counsel's office reviews, as a matter of course, all "501(c)(3) cases where the [IRS] is prepared and decided to issue a final adverse letter. . . .  So that's the only class, 501(c)(3) final adverse letters[,] where the applications are sent to counsel for review."  Transcribed interview of Don Spellman, Internal Revenue Serv., in Wash., D.C., at 31 (July 12, 2013).

[84] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C., at 66-68 (Aug. 9, 2013).

[85] *Id.* at 26-27.

[86] *Id.* at 29.

[87] *Id.* at 87.

[88] Transcribed interview of Steven Grodnitzky, Internal Revenue Serv., in Wash., D.C., at 57 (July 16, 2013).

[89] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C., at 88 (Aug. 9, 2013).

[90] Aaron Blake, *'I'm Not Good at Math': The IRS's Public Relations Disaster*, Wash. Post, May 10, 2013.

There are also differences between the treatment of "Emerge" and "ACORN successors" groups and "Tea Party" groups on the "Be on the Look-Out" (BOLO) lists and IRS training documents that have been produced by the IRS. The ACORN entry appears primarily on the Watch List tab of the BOLO spreadsheet whereas the Tea Party entry appears on the Emerging Issues tab of the spreadsheet. Documents produced by the IRS illustrate the difference between issues on the Watch List, which include potential applications that the IRS has not yet received, and issues labeled as an emerging issue, which includes issues arising from "significant current events."[91] Moreover, notes from the July 2010 screening group workshop state that while progressive applications should be "flagged," only Tea Party applicants were to be sent to a special coordinator.[92] The notes specifically remind the IRS screeners that "'Progressive' applications are not considered 'Tea Parties.'"[93]

Cindy Thomas informed the Committee that, unlike the systematic scrutiny given to the conservative-oriented applications as a result of the BOLO, progressive cases were never automatically elevated to the Washington office as a whole. She testified:

Q      Okay. And were [the progressive] cases sent to Washington?

A      I'm not – I don't know.

Q      Not that you are aware?

A      I'm not aware of that.

Q      As the head of the Cincinnati office you were never aware that these cases were sent to Washington?

A      There could be cases that are transferred to the Washington office according to, like, our [Internal Revenue Manual] section. I mean, there's a lot of cases that are processed, and I don't know what happens to every one of them.

Q      Sure. But these cases identified as progressive as a whole were never sent to Washington?

A      Not as a whole.[94]

As this evidence demonstrates, there are several key distinctions between how the IRS treated progressive-oriented Emerge cases and how the IRS evaluated and failed to resolve the conservative-oriented applications. Despite repeated attempts to conflate the issues and downplay the IRS's treatment of conservative-oriented applications, the facts are clear that the

---

[91] Internal Revenue Serv., Heightened Awareness Issues. [IRSR 6655-72]
[92] Internal Revenue Serv., Screening Workshop Notes (July 28, 2010). [IRS 6703-04]
[93] Id.
[94] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C., at 55-56 (June 28, 2013).

IRS systematically processed conservative-oriented applications in a wholly disparate and unique manner. The treatment received by Tea Party applicants was unprecedented for tax-exempt applicants engaged in political activity.

## THE COMMITTEE'S NEXT STEPS

In the coming weeks, the Committee will continue to vigorously investigate the Internal Revenue Service's inappropriate treatment of certain applicants for tax-exempt status. To date, the IRS has produced to the Committee only about 10 percent of all responsive material that it has identified.[95] The Committee will continue to review documents as they are produced by the IRS and other custodians. The Committee will continue to conduct transcribed interviews with senior-level officials at the IRS and, if necessary, other federal agencies. At each stage of this process, the Committee will proceed with every resource at its disposal to thoroughly uncover the truth. Despite the Obama Administration's obstruction and obfuscation of the facts, the Committee is committed to continuing with this important investigation to hold wrongdoers accountable and bring reform to the government bureaucracy.

---

[95] In his letter of August 2, 2013, Acting Commissioner Werfel represented to the Committee that the IRS has identified 660,000 responsive documents. Letter from Daniel Werfel, Internal Revenue Serv., to Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform (Aug. 2, 2013). The Committee has received only 63,000 pages.

Exhibit A, Page 19

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRUE THE VOTE, INC.,** | |
| *Plaintiff*, | |
| *v.* | Civ. No. 13-cv-00734-RBW |
| **INTERNAL REVENUE SERVICE**, *et al*., | |
| *Defendants*. | |

## Order

      This matter comes before the Court on the Motion to Dismiss filed by Defendants Steven Grodnitzky, Lois Lerner, Steven Miller, Holly Paz, Michael Seto, Douglas Shulman, Cindy Thomas and William Wilkins (the "Management Defendants' Motion to Dismiss") and the Motion to Dismiss filed by Defendants Susan Maloney, Ronald Bell, Janine L. Estes, and Faye Ng (the "Cincinnati Defendants' Motion to Dismiss"). Upon consideration of the motions and plaintiff's opposition, it is hereby:

      ORDERED that the Management Defendants' Motion to Dismiss is DENIED; and

      ORDERED that the Cincinnati Defendants' Motion to Dismiss is DENIED.

SO ORDERED.


DATED: _____

                                 _____
                                 The Honorable Reggie B. Walton
                                 United States District Judge