# Exhibit A:

# Interim Update

DARRELL E. ISSA, CALIFORNIA
CHAIRMAN

JOHN L. MICA, FLORIDA
MICHAEL R. TURNER, OHIO
JOHN J. DUNCAN, JR., TENNESSEE
PATRICK T. McHENRY, NORTH CAROLINA
JIM JORDAN, OHIO
JASON CHAFFETZ, UTAH
TIM WALBERG, MICHIGAN
JAMES LANKFORD, OKLAHOMA
JUSTIN AMASH, MICHIGAN
PAUL A. GOSAR, ARIZONA
PATRICK MEEHAN, PENNSYLVANIA
SCOTT DesJARLAIS, TENNESSEE
TREY GOWDY, SOUTH CAROLINA
BLAKE FARENTHOLD, TEXAS
DOC HASTINGS, WASHINGTON
CYNTHIA M. LUMMIS, WYOMING
ROB WOODALL, GEORGIA
THOMAS MASSIE, KENTUCKY
DOUG COLLINS, GEORGIA
MARK MEADOWS, NORTH CAROLINA
KERRY L. BENTIVOLIO, MICHIGAN
RON DeSANTIS, FLORIDA

LAWRENCE J. BRADY
STAFF DIRECTOR

ONE HUNDRED THIRTEENTH CONGRESS

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

CAROLYN B. MALONEY, NEW YORK
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
STEPHEN F. LYNCH, MASSACHUSETTS
JIM COOPER, TENNESSEE
GERALD E. CONNOLLY, VIRGINIA
JACKIE SPEIER, CALIFORNIA
MATTHEW A. CARTWRIGHT, PENNSYLVANIA
MARK POCAN, WISCONSIN
L. TAMMY DUCKWORTH, ILLINOIS
ROBIN L. KELLY, ILLINOIS
DANNY K. DAVIS, ILLINOIS
PETER WELCH, VERMONT
TONY CARDENAS, CALIFORNIA
STEVEN A. HORSFORD, NEVADA
MICHELLE LUJAN GRISHAM, NEW MEXICO

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225–5074
FACSIMILE (202) 225–3974
MINORITY (202) 225–5051

http://oversight.house.gov

**September 17, 2013**

**TO:**        Members, Committee on Oversight and Government Reform

**FROM:**     Majority Staff, Committee on Oversight and Government Reform

**SUBJECT**:  Interim update on the Committee's investigation of the Internal Revenue
              Service's inappropriate treatment of certain tax-exempt applicants

---

The Committee on Oversight and Government Reform continues to investigate the Internal Revenue Service's inappropriate treatment of certain applicants for tax-exempt status. On May 10, 2013, IRS Exempt Organizations Director Lois Lerner acknowledged via a planted question at a Friday morning tax-law panel that the IRS engaged in inappropriate targeting of conservative-oriented tax-exempt applicants. Lerner's remarks were prompted by an audit that was to be issued the following week by the Treasury Inspector General for Tax Administration, which was requested by Chairman Issa and Subcommittee Chairman Jordan. Since confirmation of the targeting, the Committee has been vigorously investigating potential wrongdoing at the IRS with respect to tax-exempt organizations. This memorandum provides an interim update on the Committee's investigation.

## STATUS OF THE COMMITTEE'S INVESTIGATION

The Committee has conducted extensive fact-finding in this investigation via two primary methods: review of documents produced by federal agencies and transcribed interviews with IRS employees. To date, the Committee has received more than 80,000 pages of documents from the IRS, the Treasury Inspector General for Tax Administration (TIGTA), the Federal Election Commission (FEC), and the Department of Treasury. The Committee has also conducted transcribed interviews with twenty-four IRS employees. These interviews include eight IRS Exempt Organizations Determinations employees based in Cincinnati, Ohio; eleven IRS Exempt Organizations employees based in Washington, DC; and five IRS Chief Counsel's office attorneys.

On August 2, 2013, as a result of the IRS's obstruction of the Committee's investigation – including production of overly redacted and selectively redacted documents and the untimely productions of requested materials – Chairman Issa issued a subpoena to Treasury Secretary Lew

to compel the Administration's cooperation with the investigation.[1]  Since the issuance of the subpoena, the IRS has produced over 67,000 pages of documents – more than double the total amount of documents produced in the two months preceding the subpoena.

In August, the Committee pursued the investigation by requesting documents from additional custodians. Specifically, after it was reported that FEC and IRS employees may have inappropriately communicated about tax-exempt applications, Chairman Issa and Chairman Jordan sent a letter to the FEC on August 7, 2013, requesting all documents and communications between the FEC and IRS.[2]  To date, the FEC has produced about 1,800 pages of documents, which the Committee is currently reviewing.

On August 13, 2013, Chairman Issa and Chairman Jordan requested e-mails related to official IRS business housed in Lois Lerner's unofficial e-mail account after the Committee discovered the use of an unofficial e-mail account in documents produced by the IRS.[3]  The Committee received these documents from Lerner on September 6, 2013.  Similarly, on August 15, 2013, Chairman Issa wrote to Secretary of the Treasury Jack Lew reminding him of his obligation to collect and preserve all employees' personal e-mails related to official business.[4]

Finally, on August 20, 2013, Chairman Issa and Chairman Jordan wrote to Holly Paz, Director of Rulings and Agreements within the IRS Exempt Organizations Division, to ask that she address apparent inconsistencies in her testimony that have surfaced since her transcribed interview with Committee staff on May 21, 2013.[5]  Paz was the first interview conducted by the Committee.  Through subsequent interviews and documents obtained by the Committee, additional information has come to light that appears to contradict her testimony.  The Committee received Paz's clarifications on September 3, 2013.[6]

## INTERIM FINDING: THE IRS ENGAGED IN DISPARATE TREATMENT OF CONSERVATIVE-ORIENTED TAX-EXEMPT APPLICATIONS

While the Committee's discovery efforts are ongoing, it is apparent from material already available to the Committee that the IRS engaged in inappropriate and disparate treatment of conservative-oriented applicants for tax-exempt status.  The Internal Revenue Code allows a group recognized as tax-exempt under section 501(c)(4) to engage in unlimited issue advocacy and some campaign intervention, as long as the group's primary purpose is "social welfare."[7]  In

---

[1] *See* letter from Darrell Issa, H. Comm. on Oversight & Gov't Reform, to Jacob Lew, Dep't of the Treasury (Aug. 2, 2013).

[2] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Ellen L. Weintrab, Fed. Election Comm'n (Aug, 7, 2013).

[3] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Lois Lerner, Internal Revenue Serv. (Aug. 13, 2013).

[4] Letter from Darrell Issa, H. Comm. on Oversight & Gov't Reform, to Jacob Lew, Dep't of the Treasury (Aug. 15, 2013).

[5] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Holly Paz, Internal Revenue Serv. (Aug. 20, 2013).

[6] Letter from Roel Campos, Locke Lord LLP, to Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform (Sept. 3, 2013).

[7] *See* I.R.C. § 501(c)(4).

2010, as the Obama Administration bemoaned the "shadowy" influence of so-called "special interest" groups, the IRS was not unaffected by this political rhetoric. Evidence available to the Committee shows that the IRS was acutely aware of this public rhetoric and that the initial Tea Party applications were first identified and elevated due to this media attention. Evidence further suggests that once the cases were identified, the IRS handled and processed the Tea Party applications in a manner distinct and unique from applications of groups engaged in similar activities.

### *The political climate in 2010 opposed tax-exempt involvement in politics and the emergence of conservative-oriented tax-exempt groups*

In 2010, the Obama Administration and its allies orchestrated a sustained public relations campaign seeking to delegitimize the lawful political activity of conservative tax-exempt organizations and to suppress these groups' right to assemble and speak. The impetus was a Supreme Court opinion, *Citizens United v. Federal Election Commission*, handed down on January 21, 2010.[8] In the wake of the Court's decision, senior Administration officials criticized the influence of so-called "corporate" money in the political process. The Administration and its allies in Congress repeatedly ridiculed the lawful political activity of tax-exempt entities, even calling out some conservative-leaning groups by name.

On the same day of the Supreme Court's *Citizens United* ruling, White House Press Secretary Robert Gibbs warned that "everybody should be worried that special interest groups that have already clouded the legislative process are soon going to get involved in an even more active way in doing the same thing in electing men and women to serve in Congress."[9] Two days later, on January 23, 2010, President Obama used his weekly address to lament that "the United States Supreme Court handed a huge victory to the special interests and their lobbyists – and a powerful blow to our efforts to reign in corporate influence. This ruling strikes at our democracy itself. . . . This ruling opens the floodgates for an unlimited amount of special interest money into our democracy."[10]

On January 27, 2010, President Obama stood before the assembled Congress and openly chastised the Supreme Court during his State of the Union address. He declared:

> With all due deference to separation of powers, last week the Supreme Court reversed a century of law that I believe will open the floodgates for special interests – including foreign corporations – to spend without limit in our elections. I don't think American elections should be bankrolled by America's most powerful interests, or worse, by foreign entities. They should be decided by the American people. And I'd urge Democrats and Republicans to pass a bill that helps to correct some of these problems.[11]

---

[8] Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010).

[9] The White House, Briefing by White House Press Secretary Robert Gibbs and PERAB Chief Economist Austan Goolsbee (Jan. 21, 2010).

[10] The White House, Weekly Address: President Obama Vows to Continue Standing Up to the Special Interest on Behalf of the American People (Jan. 23, 2010).

[11] The White House, Remarks by the President in the State of the Union Address (Jan. 27, 2010).

Exhibit A, Page 3

The President's congressional allies quickly followed suit. On February 3, 2010, Nancy Pelosi, then-Speaker of the House, created a task force of prominent Democratic congressman to consider options for overturning the Supreme Court's decision.[12]

In wake of *Citizens United*, conservative-leaning Tea Party groups began to face scorn inside and outside of government. The same month that Speaker Pelosi created a task force to overturn *Citizens United*, she referred to the Tea Party movement as "Astroturf"[13] – suggesting, as she had before, that it was a fake grassroots movement "that is bankrolled by some of the wealthiest people in America."[14] *Washington Post* columnists accused Tea Party groups of "smolder[ing] with anger"[15] and practicing a brand of patriotism reminiscent of the Ku Klux Klan.[16] Another *Post* columnist opined in late March 2010 that Tea Party rhetoric "is calibrated not to inform but to incite."[17] In April 2010, Reuters tied the Tea Party movement to "America's season of rage and fear."[18]

The drumbeat continued throughout the spring and summer of 2010 as President Obama continued to use his weekly address to criticize political activity by conservative groups. In one such address, the President said:

> We've all seen groups with benign-seeming names sponsoring television commercials that make accusations and assertions designed to influence the public debate and sway voters' minds. Now, of course every organization has every right in this country to make their voices heard. But the American people also have the right to know when some group like "Citizens for a Better Future" is actually funded entirely by "Corporations for Weaker Oversight."[19]

In July 2010, the President spoke from the White House Rose Garden to caution Americans that "shadow groups [were] already forming and building war chests of tens of millions of dollars to influence the fall elections."[20] In August 2010, the President stepped up his rhetoric and called out a well-known conservative nonprofit group by name for their political activities. The President stated:

> Right now all around this country there are groups with harmless-sounding names like Americans for Prosperity, who are running millions of dollars of ads against Democratic candidates all across the country. And they don't have to say who

---

[12] *See* Ryan Grim, *Pelosi Taps Task Force to Counter Supreme Court's Citizens United Ruling*, Huffington Post, Feb. 3, 2010.

[13] *Pelosi Claims Tea Party Hijacked by GOP*, Fox News, Feb. 28, 2010.

[14] Ryan Powers, *Pelosi: Tea Parties are part of a "Astroturf" campaign by "some of the wealthiest people in America,"* Think Progress, Apr. 15, 2009.

[15] Colbert King, *Faces We've Seen Before; the Deeper Roots of Tea Party Rage*, Wash. Post, Mar. 27, 2010.

[16] Courtland Malloy, *Tancredo Remarks at 'Tea Party' Event Have Familiar Ring*, Wash. Post, Feb. 17, 2010.

[17] Eugene Robinson, *Where the Rhetoric of Rage Can Lead*, Wash. Post, Mar. 30, 2010.

[18] Bernd Debusmann, *America's Season of Rage and Fear*, Reuters, Apr. 1, 2010.

[19] The White House, Weekly Address: President Obama Calls on Congress to Enact Reforms to Stop a "Corporate Takeover of Our Elections" (May 1, 2010).

[20] The White House, Remarks by the President on the DISCLOSE ACT (July 26, 2010).

exactly the Americans for Prosperity are. You don't know if it's a foreign-controlled corporation. You don't know if it's a big oil company, or a big bank. You don't know if it's a insurance [*sic*] company that wants to see some of the provisions in health reform repealed because it's good for their bottom line, even if it's not good for the American people.[21]

The following month, the President doubled down on his statements critical of *Citizens United* and of conservative nonprofits engaged in political activity. "[A]s an election approaches," the President proclaimed, "it's not just a theory. We can see for ourselves how destructive to our democracy this can become. We see it in the flood of deceptive attack ads sponsored by special interests using front groups with misleading names."[22] Days later, the President admitted that his concern was specific to "special interests . . . running millions of dollars of attack ads against *Democratic* candidates."[23] [emphasis added]

In October 2010, only weeks before the 2010 congressional election, President Obama tied his vitriol toward *Citizens United* with the rise of Tea Party groups. He stated at a youth town hall:

I do think that what has happened is layered on top of some of that general frustration that has expressed itself through the Tea Party, there is an awful lot of corporate money that's pouring into these elections right now. I mean, you've got tens of millions of dollars in what are called third-party expenditures that are being spent basically on negative ads. . . . But if you're in a battleground state right now, you are being bombarded with negative ads every single day and nobody knows who is paying for these ads. They've got these names like "Americans for Prosperity" or "Moms for Motherhood" or – actually that last one I made up. But you have these innocuous-sounding names, and we don't know where this money is coming from. I think that is a problem for our democracy. And it's a direct result of a Supreme Court decision that said they didn't have to disclose who their donors are.[24]

Meanwhile, the President's allies in Congress continued to urge action to stop political activity by conservative tax-exempt entities. Senator Max Baucus wrote to the IRS Commissioner to "request that [he] and [his] agency survey major 501(c)(4), (c)(5) and (c)(6) organizations involved in political campaign activity to examine whether they are operated for the organization's intended tax exempt purpose and to ensure that political campaign activity is not the organization's primary activity."[25] Senator Dick Durbin followed suit and asked the IRS to "quickly examine the tax status of Crossroads GPS and other (c)(4) organizations that are directing millions of dollars into political advertising . . . ."[26]

---

[21] The White House, Remarks by the President at a DNC Finance Event in Austin, Texas (Aug. 9, 2010).
[22] The White House, Weekly Address: President Obama Castigates GOP Leadership for Blocking Fixes for the Citizens United Decision (Sept. 18, 2010).
[23] The White House, Remarks by the President at Finance Reception for Congressman Sestak (Sept. 20, 2010).
[24] The White House, Remarks by the President in a Youth Town Hall (Oct. 14, 2010).
[25] Letter from Max Baucus, S. Comm. on Finance, to Douglas H. Shulman, Internal Revenue Serv. (Sept. 28, 2010).
[26] Press Release, Durbin Urges IRS to Investigate Spending by Crossroads GPS (Oct. 12, 2010).

Exhibit A, Page 5

This pressure was not limited to the 2010 election cycle.  In following years, congressional Democrats continued to press for close scrutiny of 501(c)(4) groups engaged in political activity.  In February 2012, seven Democratic senators wrote to the IRS Commissioner urging the IRS to investigate whether 501(c)(4) groups are engaged in "a substantial or even a predominant amount of campaign activity."[27]  Later, in July 2012, Senator Carl Levin wrote to the IRS Commissioner, imploring the agency to "immediately review the activities of 501(c)(4) entities engaging in running partisan political ads . . . ."[28]  Around the same time that Oversight Committee Ranking Member Elijah Cummings was publicly targeting the Tea Party-affiliated group True the Vote,[29] his staff contacted the IRS to request information about the group.[30]  In January 2013, five Democratic Members wrote to President Obama asking him to highlight "the corrosive influence of money in our democratic process."[31]  These calls to arms did not fall on deaf ears at the IRS.

### *The IRS was cognizant of the political climate surrounding tax-exempt organizations and the media attention given to conservative-oriented tax-exempt groups*

From materials available to the Committee, it is evident that all levels within the IRS were highly attentive to the political climate surrounding tax-exempt applications in the wake of *Citizens United*.  The IRS maintained an agency-wide culture that incentivized employees to alert their superiors to any application with the potential for media attention.  Cindy Thomas, the program manager of the IRS's Cincinnati office, testified about this media-conscience culture, explaining that the "expectation that we ha[d] from Washington" was to elevate any issues with the potential for media attention.[32]

The political rhetoric criticizing the *Citizens United* opinion and imploring the IRS to crack down on political activity for tax-exempt entities was not lost on the senior leadership of the IRS.  On October 19, 2010, Exempt Organizations Director Lois Lerner spoke at an event sponsored by Duke University's Sanford School of Public Policy.  At the event, Lerner discussed the political pressure on the IRS to "fix the problem" of 501(c)(4) groups engaged in political activity.[33]  Echoing President Obama's public statements, she said:

> What happened last year was the Supreme Court – the law kept getting chipped away, chipped away in the federal election arena.  The Supreme Court dealt a huge blow, overturning a 100-year old precedent that said basically corporations couldn't give directly to political campaigns.  And everyone is up in arms because they don't like it.  The Federal Election Commission can't do anything about it.

---

[27] Letter from Michael F. Bennet et al., U.S. Senate, to Douglas Shulman, Internal Revenue Serv. (Feb. 16, 2012).
[28] Letter from Carl Levin, S. Comm. on Homeland Sec. & Gov't Affairs, to Douglas H. Shulman, Internal Revenue Serv. at 4 (July 27, 2012); *see also* Letter from Carl Levin, S. Comm. on Homeland Sec. & Gov't Affairs, to Douglas H. Shulman, Internal Revenue Serv. (Aug. 31, 2012).
[29] *See* Letter from Elijah Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Oct. 4, 2012).
[30] E-mail form Catherine Barre, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (Jan. 25, 2013).
[31] Letter from James McGovern et al., U.S. House of Representatives, to President Barack Obama (Jan. 29, 2013).
[32] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C., at 34 (June 28, 2013).
[33] John Sexton, *Lois Lerner Discusses Political Pressure on the IRS in 2010*, Breitbart.com, Aug. 6, 2013.

They want the IRS to fix the problem. The IRS laws are not set up to fix the problem: (c)(4)s can do straight political activity. They can go out and pay for an ad that says, "Vote for Joe Blow." That's something they can do as long as their primary activity is their (c)(4) activity, which is social welfare.

So everybody is screaming at us right now: "Fix it now before the election. Can't you see how much these people are spending?" I won't know until I look at their 990s next year whether they have done more than their primary activity as political or not. So I can't do anything right now.[34]

Lerner told TIGTA substantially the same story, according to documents produced to the Committee by TIGTA. Lerner told TIGTA investigators: "The Citizens United decision allows corporations to spend freely on elections. Last year, there was a lot of press on 501(c)(4)s being used to funnel money on elections and the IRS was urged to do something about it."[35]

The IRS's awareness of this rhetoric was not just limited to the abstract. The day after Lerner's discussion at Duke University, senior IRS official Joseph Urban circulated a press release from Senator Dick Durbin, entitled "Durbin urges IRS to investigate spending by Crossroads."[36] This press release called upon the IRS to "quickly investigate the tax status of Crossroads GPS and other organizations that are directing millions of dollars into political advertising without disclosing their funding sources."[37] Crossroads GPS, a conservative-oriented applicant for tax-exempt status, was the only entity mentioned by name in the e-mail sent by Urban.

As the political rhetoric critical of conservative-leaning tax-exempt groups continued, IRS employees remained informed of the ongoing public discourse via the *EO Tax Journal*, an e-mail publication about issues relating to tax-exempt law.[38] For instance, in October 2011, the *EO Tax Journal* reported on a letter sent by Democracy 21 to IRS Commissioner Shuman and Lois Lerner calling on the IRS to investigate certain conservative-leaning tax-exempt entities.[39] IRS Deputy Division Counsel Janine Cook sent the report and the letter to IRS Division Counsel Victoria Judson, calling the matter a "very hot button issue floating around."[40] Later, in 2012, Cook forwarded to Lois Lerner an *EO Tax Journal* article about congressional investigations into the IRS's treatment of tax-exempt applicants.[41] Lerner replied in part: "we're going to get

---

[34] *See* "Lois Lerner Discusses Political Pressure on IRS in 2010," www.youtube.com (last visited Aug. 30, 2013) (transcription by authors).
[35] Treasury Inspector General for Tax Admin., Memo of Contact (Apr. 5, 2012).
[36] E-mail from Joseph Urban, Internal Revenue Serv., to Joseph Urban, Internal Revenue Serv. (Oct. 20, 2010). [IRS1810]
[37] *Id.*
[38] *See, e.g.*, e-mail from Monice Rosenbaum, Internal Revenue Serv., to Kenneth Griffin, Internal Revenue Serv. (Sept. 30, 2010). [IRSR 15430]
[39] E-mail from Paul Streckfus to Paul Streckfus (Oct. 3, 2011) (EO Tax Journal 2011-163).
[40] E-mail from Janine Cook, Internal Revenue Serv., to Victoria Judson, Internal Revenue Serv. (Oct. 10, 2011).
[41] E-mail from Janine Cook, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (Mar. 2, 2012). [IRSR 56965]

creamed."[42]  Similarly, when an IRS employee e-mailed Lerner an article about allegations that unknown conservative donors were influencing Senatorial races, Lerner replied: "Perhaps the FEC will save the day."[43]

Other IRS employees also monitored news about conservative-leaning groups applying for tax exemption.  In March 2012, a line attorney in the IRS Chief Counsel's office circulated a *New York Times* editorial entitled "The I.R.S. Does its Job" to three colleagues.[44]  The first sentence of the editorial read: "Taxpayers should be encouraged by complaints from Tea Party chapters applying for nonprofit tax status at being asked by the Internal Revenue Service to prove they are 'social welfare' organizations and not the political activities they so obviously are."[45]  The same day, one of the recipients forwarded the e-mail to Chief Counsel William Wilkins and Deputy Chief Counsel Erik Corwin, referencing the "Hill interest in IRS processing of c4 applications of advocacy organizations."[46]

Like any other political actor, the IRS was cognizant of and attentive to the prevailing rhetoric surrounding the laws and regulations it controls.  As the prevalent political discourse became a sustained assault on the Supreme Court's *Citizens United* opinion and the appropriateness of tax-exempt status for certain groups, the IRS was not oblivious to this political sentiment.  Material available to the Committee shows that the IRS was actively cognizant of public calls for the IRS crack down on secret money in politics and the rise of conservative-oriented groups opposed by certain segments of the Administration.

### *The IRS first identified and elevated the Tea Party applications due to media attention surrounding the Tea Party*

At the same time the IRS was being lobbied very publicly to crack down on tax-exempt entities engaged in political activities, IRS employees identified and elevated a Tea Party application due to public attention surrounding the Tea Party.  Later, when other Tea Party applications were discovered, the cases were classified as "sensitive" due to media attention and two more were transferred to Washington to be processed.

In February 2010, a line screener in the IRS office in Cincinnati, Ohio, became aware of a tax-exempt application from a Tea Party group.  The screener alerted his superiors, who in turn informed Washington IRS officials.[47]  In elevating the application to his superior, the screener noted: "Recent media attention to this type of organization indicates to me that this is a 'high

[42] E-mail from Lois Lerner, Internal Revenue Serv., to Janine Cook, Internal Revenue Serv. (Mar. 2, 2012).  [IRSR 56965]
[43] E-mail from Lois Lerner, Internal Revenue Serv., to Sharon Light, Internal Revenue Serv. (July 10, 2010) [IRS 179093]
[44] E-mail from David Marshall, Internal Revenue Serv., to Don Spellmann et al., Internal Revenue Serv. (Mar. 8, 2012).  [IRSR 14601]
[45] *The I.R.S. Does its Job*, N.Y. Times, Mar. 7, 2012.
[46] E-mail from Janine Cook, Internal Revenue Serv., to Erik Corwin & William Wilkins, Internal Revenue Serv. (Mar. 8, 2013). [IRSR 14477]
[47] *See* E-mail from Cindy Thomas, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Feb. 25, 2010) [Muthert 2-3]

Exhibit A, Page 8

profile' case."[48]  As the application continued to be elevated, another IRS employee called the application a "potentially politically embarrassing case" and also pointed out the "[r]ecent media attention to this type of organization."[49]  On this basis – "the potential for media attention" – the Washington office accepted the case.[50]

```
From: Camarillo Sharon L
Sent: Thursday, February 25, 2010 5:19 PM
To: Thomas Cindy M
Subject: FW: Case # REDACTED
Importance: Low

Cindy:  Please let 'Washington' know about this potentially politically
embarassing case involving a 'Tea Party' organization.  Recent media
attention to this type of organization indicates to me that this is
a "high profile" case.  In addition to 501(c)(4) typical legisslative
activities, the applicant, in answer to Part II, item 15 of the of the
1024 application indicates possible future political candidate
support.  Shown below are excerpts from the application describing its
legislative and possible future political activities.

The case is currently being held in the Screening group, pending a
response from EOT.
```

The potential for media attention continued to be a concern for IRS officials once Washington received additional sample cases in late March 2010.  Upon receiving the cases in Washington, an IRS employee reviewing the applications reiterated that "[t]he concern is potential for media attention."[51]  Around the same time that the *Washington Post* was running columns critical of the Tea party, she added that "[t]he Tea Party movement is covered in the *Post* almost daily.  I expect to see more applications."[52]  She also made special mention of the groups' perceived political affiliation, commenting that the group's activity "looks more educational but with a republican slant obviously."[53]

Aware that additional cases remained in Cincinnati, Steven Grodnitzky, the Acting Manager of EO Technical in Washington, D.C., asked for information on the remaining Tea Party applications pending there.[54]  He asked, in particular, for any information that makes the

[48] E-mail from John J. Koester, Internal Revenue Serv., to John Shafer, Internal Revenue Serv. (Feb. 25, 2010). [Muthert 4-5]

[49] E-mail from Sharon Camarillo, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 25, 2010). [Muthert 3]

[50] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 26, 2010). [Muthert 2]

[51] E-mail from Donna Elliot-Moore, Internal Revenue Serv., to Steven Grodnitzky, Internal Revenue Serv. (Mar. 31, 2010).  [Muthert 7-8]

[52] E-mail from Donna Elliot-Moore, Internal Revenue Serv., to Steven Grodnitzky & Ronald Shoemaker, Internal Revenue Serv. (Apr. 2, 2010).  [Muthert 7].

[53] E-mail from Donna Elliot-Moore, Internal Revenue Serv., to Steven Grodnitzky & Ronald Shoemaker, Internal Revenue Serv. (Apr. 1, 2010).  [Muthert 7]

[54] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Apr. 5, 2010). [Muthert 6-8]

cases "stand out," such as "a high profile Board member, etc.," writing that he was "[r]eally thinking about possible media attention on a particular case."[55]

> **From:** Grodnitzky Steven
> **Sent:** Monday, April 05, 2010 12:14 PM
> **To:** Thomas Cindy M
> **Cc:** Shoemaker Ronald J; Shafer John H
> **Subject:** RE: two cases
>
> Cindy,
>
> Information would be the number of cases and the code sections in which they filed under. Also, if there is anything that makes one stand out over the other, like a high profile Board member, etc.., then that would be helpful. Really thinking about possible media attention on a particular case. Just want to make sure that Lois and Rob are aware that there are other cases out there, etc..... .

Grodnitzky directed the Washington office to begin drafting a "sensitive case report," which is a monthly report created for the purpose of informing senior IRS leadership about a particular issue or application.[56] He directed a sensitive case report to be prepared for the Tea Party applications given the potential for "media attention."[57] The sensitive case report eventually created for the Tea Party applications emphasized the media attention surrounding the cases:

> The various "tea party" organizations are separately organized, but appear to be a part of a national political movement that may be involved in political activities. The "tea party" organizations are being followed closely in national newspapers (such as The Washington Post) almost on a regular basis.[58]

Grodnitzky also testified to the Committee that the only "sensitive case" criterion selected for the Tea Party applications was "[l]ikely to attract media or Congressional attention."[59]

### *Media attention caused the IRS to treat conservative-oriented tax-exempt applications differently*

Documents and other evidence obtained by the Committee suggest that the public rhetoric criticizing conservative tax-exempt organizations affected how the IRS identified and evaluated Tea Party applications. Although IRS employees have denied any overt bias in transcribed interviews with Committee staff, documentary and testimonial evidence indicates that this media attention caused the IRS to screen, group, and evaluate Tea Party applications in a manner distinct from other applications for tax exemption.

---

[55] *Id.*

[56] *See* Transcribed interview of Robert Choi, Internal Revenue Serv., in Wash., D.C., at 51 (Aug. 21, 2013); Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C., at 37 (July 11, 2013).

[57] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Apr. 5, 2010). [Muthert 6-8]

[58] Internal Revenue Serv., Sensitive Case Report (May 2011). [IRS1332-1334]

[59] Transcribed interview of Steven Grodnitzky, Internal Revenue Serv., in Wash., D.C., at 64 (July 16, 2013).

During his transcribed interview with Committee staff, Grodnitzky explained that the media attention surrounding the Tea Party applications distinguished the cases from other cases. Grodnitzky testified:

Q     And did you understand these [sample] applications to be filed by Tea Party groups, that is groups affiliated with the Tea Party movement?

A     That was my understanding.

Q     And were these applications for (c)(3) or (c)(4) or some other subsection of 501?

A     My recollection is that it was not for another subsection and that it was for, I believe, (c)(3) and (c)(4).

Q     And just to be clear, you have seen applications before from 501(c)(3) organizations applying for exempt status?

A     I have.

Q     And you've seen applications applying for 501(c)(4) status?

A     Correct.

Q     Those are both something the IRS sees regularly?

A     Correct.

Q     Was there anything different about these cases?

A     In what respect?

Q     In any respect.

A     Well, I – it was my understanding that the reason they were identified is because they were likely to attract media attention.

Q     That's what made them distinct, the likelihood of media attention?

A     Yes, in my mind, yes.[60]

Another supervisory IRS employee in Washington, Ronald Shoemaker, similarly explained that media attention was the reason the Tea Party applications were unique in his mind. Shoemaker testified:

---

[60] Transcribed interview of Steven Grodnitzky, Internal Revenue Serv., in Wash., D.C., at 27-28 (July 16, 2013).

Exhibit A, Page 11

Q    Other than Mr. Grodnitzky designating the cases as sensitive cases, was
     there anything else different about the Tea Party applications as compared
     to your experience with other 501(c)(3)s or 501(c)(4)s with political
     activity?

A    No, other than there was certain media attention involved with those cases,
     which was the basis for the significant case report.

Q    And were you aware of the media attention at that time?

A    I was aware of media attention, yes.[61]

     After the first applications were identified and elevated due to media attention, the
criteria used by IRS employees to screen for additional Tea Party cases were a distinct reflection
of the public perception of the activities of those groups.  A briefing paper prepared for Lois
Lerner in July 2011 described the groups as "organizations [that] are advocating on issues related
to government spending, taxes and similar matters."[62]  The same briefing paper went on to list
the criteria used to identify Tea Party cases, including the phrases "Tea Party," "Patriots," or
"9/12 Project" or "[s]tatements in the case file [that] criticize how the country is being run."[63]

---

Increase in (c)(3)/(c)(4) Advocacy Org. Applications

Background:
- EOD Screening has identified an increase in the number of (c)(3) and (c)(4) applications
  where organizations are advocating on issues related to government spending, taxes and
  similar matters.  Often there is possible political intervention or excessive lobbying.

- EOD Screening identified this type of case as an emerging issue and began sending cases to
  a specific group if they meet any of the following criteria:
  o  "Tea Party," "Patriots" or "9/12 Project" is referenced in the case file
  o  Issues include government spending, government debt or taxes
  o  Education of the public by advocacy/lobbying to "make America a better place to live"
  o  Statements in the case file criticize how the country is being run

---

     These criteria captured predominately conservative-leaning organizations.  An
independent analysis conducted by *USA Today* found that beginning in February 2010, the IRS
approved no applications from Tea Party groups for 27 months, while "[i]n that time, the IRS
approved perhaps dozens of applications from similar liberal and progressive groups."[64]

     In addition, the sample cases transferred from Cincinnati and worked by veteran
Washington IRS official Carter Hull in 2010 were applications filed by groups affiliated with the
Tea Party movement.  The briefing paper prepared for Lerner in July 2011 summarized these

---

[61] Transcribed interview of Ronald Shoemaker, Internal Revenue Serv., in Wash., D.C., at 28 (June 21, 2013).
[62] Internal Revenue Serv., Increase in (c)(3)/(c)(4) Advocacy Org. Applications.  [IRSR 2735]
[63] *Id.*
[64] Gregory Korte, *IRS Approved Liberal Groups while Tea Party in Limbo*, USA Today, May 15, 2013.

12

sample cases.[65]  The paper noted that the applicant for 501(c)(4) status "stated it will conduct advocacy and political campaign intervention, but *political campaign intervention will be 20% or less of activities.  A proposed favorable letter has been sent to Counsel for review*."[66] [emphasis added]  Despite the fact that the applicant represented that it would engage in only a limited amount of campaign intervention and that a proposed favorable letter had been sent to the IRS Chief Counsel's office, Hull told the Committee that the 501(c)(4) application was still open as of June 2013.[67]

---

- Two sample cases were transferred to EOT, a (c)(3) and a (c)(4).
  - The (c)(4) stated it will conduct advocacy and political intervention, but political intervention will be 20% or less of activities.  A proposed favorable letter has been sent to Counsel for review.
  - The (c)(3) stated it will conduct "insubstantial" political intervention and it has ties to politically active (c)(4)s and 527s.  A proposed denial is being revised by TLS to incorporate the org.'s response to the most recent development letter.

---

Rather than approving the case as recommended by Hull in 2011, evidence suggests that the IRS subjected the case to additional delays by requesting additional information about the group's activities during the 2010 election cycle for all the sample Tea Party cases.  The decision to develop the 2010 election cycle information appears to have been made precipitately. According to testimony, the decision was made by a senior attorney in the IRS Chief Counsel's office, before the line attorney even had an opportunity to independently evaluate the case assigned to her.  The line attorney testified:

Q     And whose decision was it to recommend further development?

A     [Senior attorney in IRS Chief Counsel's office].

Q     Did you concur in that recommendation?

A     It made sense to me.

Q     Did you have that belief before you met with [the senior attorney]?

A     His opinion was made known to me before I looked through the case file.

Q     How was it made known to you before you looked at the case file?

A     He told me.

Q     What did he say to you?

---

[65] Internal Revenue Serv., Increase in (c)(3)/(c)(4) Advocacy Org. Applications.  [IRSR 2735]
[66] *Id.*
[67] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C., at 53 (June 14, 2013).

Exhibit A, Page 13

A He said, "I am thinking we need to see the 2010 election year to see what this group does."

Q When did he tell you this?

A Probably – he told me this orally, I think, in early July. . . .

Q At that point when he had this discussion with you in early July, had he seen the case file?

A Yes. He read the case file before I did.

***

Q So he reviewed the case file and then discussed with you his beliefs about the case before you had a chance to look at it independently?

A Yes.[68]

According to recent reports, the IRS is now seeking information about activities during the 2012 election cycle from some of the same groups whose applications have been delayed.[69]

Additional evidence suggests that the IRS viewed Tea Party cases as fundamentally different from other applications for tax exemption. One Cincinnati IRS employee testified that the activities of the Tea Party applicants differed from those of other 501(c)(4) applications. He stated:

> Normal (c)(4) cases we must develop the concept of social welfare, such as the community newspapers, or the poor, that types. These [Tea Party] organizations mostly concentrate on their activities on the limiting government, limiting government role, or reducing government size, or paying less tax. I think it[']s different from the other social welfare organizations which are (c)(4).[70]

The employee explained that the political ideology of the Tea Party groups made their applications different, and that the Tea Party applications were not treated in same manner as other applications with indications of political activity that he had worked in the past.[71]

Other documents appear to show disdain among IRS employees toward the Tea Party and similar conservative-oriented applications. In one July 2011 e-mail, Holly Paz wrote to an attorney in the IRS Chief Counsel's office with apparent reluctance to approve the Tea Party applications. She wrote: "Lois would like to discuss our planned approach for dealing with these

---

[68] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C., at 34-35 (Aug. 9, 2013).
[69] *See* Ben Wolfgang, *IRS Continues to Hound Tea Party Patriots, Demands More Data for Tax-exempt Status*, Wash. Times, Aug. 29, 2013.
[70] Transcribed interview of Stephen Seok, Internal Revenue Serv., in Wash., D.C. at 87 (June 19, 2013).
[71] *Id.* at 88-89.

14

cases. We suspect we will have to approve the majority of the c4 applications."[72] Similarly, in January 2012, a branch manager in the IRS Chief Counsel's office e-mailed his supervisor a *Talking Points Memo* article about the IRS's disclosure of the tax-exempt application filed by Crossroads GPS.[73] The employee derisively characterized the group as "Rove's Crossroads."[74]

One IRS document in particular vividly illustrates the agency's apparent views toward conservative ideologies. The document, entitled "EO Case Studies Politics," describes a hypothetical scenario involving potential political campaign intervention.[75] The language used in the scenario provides a disparaging characterization of the Republican candidate, "President Billy Bob," and a flattering characterization of the Democratic candidate, "Nancy Nice." The hypothetical also presents an allusion to President Obama's "change we can believe in" campaign rhetoric during the 2008 presidential election.[76]

---

**Scenario One**　　　　Vote for a Change

During a Presidential election campaign, the Republican incumbent, President Billy Bob, is campaigning against Democratic challenger Nancy Nice. An issues oriented charity named Transform.org with a liberal reputation recently sponsored a TV advertisement that appeared in a major television market that serves several highly contested states. The advertisement featured a student, a woman, a construction worker, and a soldier looking upset under a stormy sky. An unseen announcer made the following statement. "This time it's really important. Unemployment is up, education is down, gender equality is static, and the war goes on." The sky then begins to clear as an announcer intones, "Vote for a change to improve our nation!" The advertisement states that it is sponsored by Transform.org. Nancy Nice has occasionally used the phrase "a change to improve our nation" as a campaign slogan.

---

The slanted language used by the IRS in this hypothetical scenario is more striking in context of a more neutral version on which the slanted version appears to be based. In the neutral version, the party affiliations and names of the candidates are removed and the content of the advertisement is decidedly more neutral.[77]

---

[72] E-mail from Holly Paz, Internal Revenue Serv., to Janine Cook, Internal Revenue Serv. (July 19, 2011). [IRSR 14372-73]

[73] E-mail from Kenneth Griffin, Internal Revenue Serv., to Janine Cook, Internal Revenue Serv. (Dec. 17, 2012). [IRSR 15354]

[74] *Id.*

[75] Internal Revenue Serv., EO Case Studies Politics. [IRSR 9376-90]

[76] *Id.*

[77] Internal Revenue Serv., EO Case Studies Politics. [IRSR 9391-94]

Exhibit A, Page 15

---

*HYPOTHETICAL EXAMPLES*

**Scenario One**                    Vote for New Blood

During a Presidential election campaign, the incumbent, President A, is campaigning against challenger Candidate B.  Charity C is an issue-oriented charity with a viewpoint that is frequently associated with Candidate B's political party.  Charity C recently sponsored a TV advertisement that appeared in a major television market that serves several highly contested states.  The advertisement featured a student, a nurse, and an astronaut looking upset under a stormy sky.  An unseen announcer made the following statement.  "This time it's really important.  Parents can't afford to send their children to college, health care costs have skyrocketed and the space program is withering away."  The sky then begins to clear as an announcer intones, "Vote for new blood to improve our nation!"  The advertisement states that it is sponsored by Charity C.  Candidate B has campaigned against President A on these issues and occasionally used the phrase "new blood to improve our nation" as a campaign slogan.

---

Material available to the Committee shows that while the IRS should be a fair and neutral steward of our nation's tax laws, the agency is in fact affected by popular political rhetoric.  As prominent politicians publicly urged the IRS to take action on tax-exempt groups engaged in legal campaign intervention activities, the IRS treated Tea Party applications differently.  Applications filed by Tea Party groups were identified and grouped due to media attention surrounding the existence of the Tea Party in general.  One such application was subjected to a multi-year delay, even after it had been recommended for approval.  This treatment was distinct for the applications filed by groups affiliated with the Tea Party movement.

### *The IRS treated conservative-oriented applications differently from past liberal applications*

Finally, it is evident that the IRS systematically evaluated conservative-oriented tax-exempt applicants differently than other applicants, including liberal- or progressive-oriented applicants.  From 2004 to 2008, the IRS evaluated and approved five applications from affiliates of the progressive-oriented group, Emerge America,[78] which describes itself as "the premier training program for Democratic women."[79]  According to one IRS employee, some of these five applications were approved by Cincinnati employees in a "matter of hours."[80]

Later, in 2010, the IRS Chief Counsel's office evaluated another progressive application, described by the IRS employee as "a (c)(4) that was going to be training women to become candidates" for the Democratic Party.[81]  The same employee testified that at the time, the IRS had "two or three other applications" from affiliated groups.[82]  However, there are several

---

[78] *See* E-mail from Donna Abner, Internal Revenue Serv., to Cindy Wescott, Sharon Camarillo, & Brenda Melahn, Internal Revenue Serv. (Sept. 6, 2008).  [IRSR12289]

[79] Emerge America, www.emergeamerica.org (last visited Aug. 20, 2013).

[80] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C., at 64, 86 (Aug. 9, 2013).

[81] *Id.* at 61.

[82] *Id.*

distinctions between the manner in which the IRS evaluated Emerge America applications and the manner in which the IRS evaluated conservative-oriented applications.

According to testimony from an IRS attorney in the Chief Counsel's office, tax law specialists in EO Technical had recommended denying the Emerge application before the case was sent to the IRS Chief Counsel's office in 2010.[83] The Chief Counsel's office agreed with the recommended denial, and the application was subsequently denied in early 2011.[84] Conversely, three tax law specialists who worked a conservative (c)(4) application in 2011 all separately recommended *approving* the group for exempt status.[85] Despite the proposed approval from three different IRS employees, the case was nonetheless sent to the IRS Chief Counsel office, which asked the tax law specialists to gather additional information about the group's activities during the 2010 election cycle.[86] To the best of the Committee's information, this application is still pending.

Unlike the conservative applications pending at the IRS – which were filed by unaffiliated organizations espousing similar ideologies and goals – the Emerge applications worked by the IRS in 2010 were all affiliated entities. According to one IRS attorney, "they were essentially the same organization. I mean, every – the applications all presented basically identical facts and basically identical activities."[87] Another IRS employee described the relationship between the progressive applications as follows: "[T]he organizations were related in the sense that they were – how can I say this? – sort of like an – I am going to call, for lack of a better term, like when you have in a veterans-type organization, you have posts, and there is one in each state. And that is sort of what it was like."[88]

Most importantly, the IRS successfully evaluated and made a determination on the Emerge applications it considered, whereas it allowed the conservative-oriented applications to languish without a resolution. Furthermore, the central issue in the Emerge cases was whether the organizations conveyed an inappropriate private benefit to the Democratic Party, not whether the organization was engaged in campaign intervention activities.[89] Whereas the IRS Chief Counsel's office spent seven months evaluating the legal issue of private benefit in the 501(c)(4) context for the Emerge case, it performed only a perfunctory review of the conservative case in 2011 and passed it along for further development, where the application has since apparently languished. Tellingly, although Lois Lerner publicly apologized for the IRS's improper handling of conservative-oriented applications, she never offered a similar apology for Emerge America applications. When asked during a media conference call about targeting of non-conservative organizations, Lerner answered: "I don't have any information on that."[90]

[83] *Id.* The IRS Chief Counsel's office reviews, as a matter of course, all "501(c)(3) cases where the [IRS] is prepared and decided to issue a final adverse letter. . . . So that's the only class, 501(c)(3) final adverse letters[,] where the applications are sent to counsel for review." Transcribed interview of Don Spellman, Internal Revenue Serv., in Wash., D.C., at 31 (July 12, 2013).
[84] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C., at 66-68 (Aug. 9, 2013).
[85] *Id.* at 26-27.
[86] *Id.* at 29.
[87] *Id.* at 87.
[88] Transcribed interview of Steven Grodnitzky, Internal Revenue Serv., in Wash., D.C., at 57 (July 16, 2013).
[89] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C., at 88 (Aug. 9, 2013).
[90] Aaron Blake, *'I'm Not Good at Math': The IRS's Public Relations Disaster*, Wash. Post, May 10, 2013.

Exhibit A, Page 17

There are also differences between the treatment of "Emerge" and "ACORN successors" groups and "Tea Party" groups on the "Be on the Look-Out" (BOLO) lists and IRS training documents that have been produced by the IRS. The ACORN entry appears primarily on the Watch List tab of the BOLO spreadsheet whereas the Tea Party entry appears on the Emerging Issues tab of the spreadsheet. Documents produced by the IRS illustrate the difference between issues on the Watch List, which include potential applications that the IRS has not yet received, and issues labeled as an emerging issue, which includes issues arising from "significant current events."[91] Moreover, notes from the July 2010 screening group workshop state that while progressive applications should be "flagged," only Tea Party applicants were to be sent to a special coordinator.[92] The notes specifically remind the IRS screeners that "'Progressive' applications are not considered 'Tea Parties.'"[93]

Cindy Thomas informed the Committee that, unlike the systematic scrutiny given to the conservative-oriented applications as a result of the BOLO, progressive cases were never automatically elevated to the Washington office as a whole. She testified:

Q     Okay. And were [the progressive] cases sent to Washington?

A     I'm not – I don't know.

Q     Not that you are aware?

A     I'm not aware of that.

Q     As the head of the Cincinnati office you were never aware that these cases were sent to Washington?

A     There could be cases that are transferred to the Washington office according to, like, our [Internal Revenue Manual] section. I mean, there's a lot of cases that are processed, and I don't know what happens to every one of them.

Q     Sure. But these cases identified as progressive as a whole were never sent to Washington?

A     Not as a whole.[94]

As this evidence demonstrates, there are several key distinctions between how the IRS treated progressive-oriented Emerge cases and how the IRS evaluated and failed to resolve the conservative-oriented applications. Despite repeated attempts to conflate the issues and downplay the IRS's treatment of conservative-oriented applications, the facts are clear that the

---

[91] Internal Revenue Serv., Heightened Awareness Issues. [IRSR 6655-72]

[92] Internal Revenue Serv., Screening Workshop Notes (July 28, 2010). [IRS 6703-04]

[93] *Id.*

[94] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C., at 55-56 (June 28, 2013).

18

IRS systematically processed conservative-oriented applications in a wholly disparate and unique manner. The treatment received by Tea Party applicants was unprecedented for tax-exempt applicants engaged in political activity.

## THE COMMITTEE'S NEXT STEPS

In the coming weeks, the Committee will continue to vigorously investigate the Internal Revenue Service's inappropriate treatment of certain applicants for tax-exempt status. To date, the IRS has produced to the Committee only about 10 percent of all responsive material that it has identified.[95] The Committee will continue to review documents as they are produced by the IRS and other custodians. The Committee will continue to conduct transcribed interviews with senior-level officials at the IRS and, if necessary, other federal agencies. At each stage of this process, the Committee will proceed with every resource at its disposal to thoroughly uncover the truth. Despite the Obama Administration's obstruction and obfuscation of the facts, the Committee is committed to continuing with this important investigation to hold wrongdoers accountable and bring reform to the government bureaucracy.

---

[95] In his letter of August 2, 2013, Acting Commissioner Werfel represented to the Committee that the IRS has identified 660,000 responsive documents. Letter from Daniel Werfel, Internal Revenue Serv., to Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform (Aug. 2, 2013). The Committee has received only 63,000 pages.

Exhibit A, Page 19