UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUE THE VOTE, INC.**, <br><br> *Plaintiff*, <br><br> v. <br><br> **INTERNAL REVENUE SERVICE**, *et al.*, <br><br> *Defendants*. | Civ. No. 13-cv-00734-RBW <br><br> **ORAL ARGUMENT REQUESTED** |

## Plaintiff's Reply to Federal Defendants' Opposition to Motion to Stay Agency Action

Plaintiff True the Vote, Inc. ("True the Vote"), by counsel, respectfully states as follows for its reply to the Opposition to Plaintiff's Motion to Stay Agency Action (Dkt. #73) filed by defendants the United States of America, Internal Revenue Service, and certain employees and officers of the Internal Revenue Service (together, the "Government").

**I.   5 U.S.C. § 705 Broadly Empowers this Court to Prevent Irreparable Harm and Preserve True the Vote's Rights Pending Review of the Lawfulness of the IRS Targeting Scheme.**

U.S. Code Title 5, § 705 provides for the relief sought by True the Vote, including, if necessary, temporary suspension of the public disclosure provisions of 26 U.S.C. § 6104. Indeed, the plain language of section 705 authorizes this Court, "to the extent necessary to prevent irreparable injury," to "issue *all necessary and appropriate process*…to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added). The Government points to no limitation on this power. *Cf. Valona v. United States Parole Comm'n*, 165 F.3d 508, 511 (7th Cir. 1998) (concluding, under 5 U.S.C. § 705, that the "necessary and appropriate step to preserve [plaintiff's] rights pending further proceedings is cessation of parole

1

supervision" even though federal statute required agency to determine whether to extend plaintiff's parole supervision). The Government merely repeats the disclosure requirements of the statute. (Dkt. #73 at 3-4.) But those requirements apply to information and documents that were lawfully made part of True the Vote's application only. *See Sklar v. Commissioner of IRS*, 282 F.3d 610, 614-15 (9th Cir. 2002) (return information of tax-exempt organizations protected from disclosure by 26 U.S.C. § 6103 if it is not part of the organization's application for exempt status). Whether the IRS acted lawfully in demanding certain information from True the Vote—and therefore whether the agency may now lawfully disclose that information as part of True the Vote's application—is precisely one of the agency actions that True the Vote has asked this court to review. (*See, e.g.*, Dkt. #14 ¶ 199 ("The IRS Defendants' application of the IRS Targeting Scheme to True the Vote, under which the IRS Defendants required True the Vote to provide information wholly unnecessary for a determination of True the Vote's tax-exempt status, violated the IRS Defendants' statutory and agency authority under the Internal Revenue Code and the rules and regulations promulgated thereunder."); (Dkt. #14 ¶ 194 (alleging the IRS Targeting Scheme "constitutes final agency action that is contrary to True the Vote's constitutional rights to due process under the Fifth Amendment, and freedom of speech and association under the First Amendment.").)

In fact, True the Vote has not requested the suspension of section 6104. Rather, it simply requests that the information obtained from True the Vote as a result of the IRS's improper actions be excluded from True the Vote's application. So, even if a silent limitation existed in section 705, this Court can grant the requested stay without affecting the operation of section 6104 by temporarily declaring that the requested information is not part of True the Vote's application.

The Government's claim that "there is no adverse administrative action for which True the Vote may seek judicial review" (Dkt. #73 at 5) depends on its incorrect assertion that True the Vote's APA claim is moot. As it did in moving to dismiss Counts II and V of the Amended Complaint, the Government again incorrectly frames True the Vote's challenge under the APA as being strictly about the deliberate delay by the IRS in processing and granting True the Vote's application for tax-exempt status. (Dkt. #73 at 5.) As True the Vote explained at length in its opposition to the Government's motion to dismiss (Dkt. #65 at 6-11), True the Vote challenges the creation and "further implement[ation]" of the IRS Targeting Scheme (Dkt. #14, p. 47, ¶ 3) in all its manifestations, only one of which was the deliberate delay of True the Vote's application.

The Government's opposition to the pending motion confirms that True the Vote's broad challenge presents a live controversy and is therefore not moot. Indeed, the Government admits that it intends to "further implement" the IRS Targeting Scheme by publicly releasing True the Vote's application, including all confidential return information improperly demanded from True the Vote. (Dkt. #73 at 3-4, 14-15.)  In doing so, the Government confirms that True the Vote is in continuing need of relief that can only be provided by this Court. The Government asserts an unfettered right to demand at any time information from a tax-exempt organization concerning "*[a]ll aspects* of [its] personnel, relationships, activities, and management" under the guise of monitoring its qualification for tax-exemption. (Dkt. #73 at 11-12.) Such an assertion should seriously alarm this Court in light of the TIGTA Report, which concluded that the IRS exceeded its authority by sending requests for additional information that, "*in whole* or in part" (Dkt. #14-6 at 24 (emphasis added)), included "unnecessary, burdensome questions" (*id*. at 2) about such "aspects" of the targeted organizations. Indeed, according to the IRS, nothing is off limits when it is subjecting organizations to its tax-exempt recognition inquisition, which can, as this case

demonstrates, go on for years. These claims flatly contradict the findings of TIGTA and the public statements of the President and former Exempt Organizations Direction Lois Lerner. (Dkt. #14 ¶ 78(c).)

The inclusion of information unnecessary to the determination of True the Vote's tax-exempt status as a part of True the Vote's permanent public file is a direct consequence of the IRS Targeting Scheme, which forms the essence of this litigation The public release of that information, even if through the customary operation of section 6104, is part and parcel of the IRS's improper actions this Court has been asked to review. Indeed, had True the Vote's application been processed in accordance within the normal, customary, and lawful confines of the IRS's authority, the improperly-requested information would not now be subject to public disclosure. True the Vote's APA challenge asks this Court to prevent "further implement[ation]" of the IRS Targeting Scheme (Dkt. #14, p. 47, ¶ 3), which necessarily includes the public release of the information unlawfully demanded and collected by the IRS. Section 705 is the appropriate vehicle to prevent further deprivation of True the Vote's rights while this Court reviews its claims. *Marianas Ins. Co. v. Commonwealth Ports Auth.*, 2007 N. Mar. I. LEXIS 26, 23 (N. Mar. I. Nov. 7, 2007) ("Most litigants availing themselves of a judicial review under 5 U.S.C. § 705 request that the trial court halt the implementation of an agency decision so they are not harmed during the pendency of the judicial review.").

## II.     True the Vote Has Satisfied the Requirements for a Stay.

A party seeking a stay under 5 U.S.C. § 705 must satisfy four factors: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Affinity Healthcare Servs. v. Sebelius*, 720 F. Supp. 2d 12, 15 (D.D.C. 2010)

(citing *Cuomo v. United States NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985)). "To justify the granting of a stay, a movant need not always establish a high probability of success on the merits." *Cuomo*, 772 F.2d at 974. Rather, the "[p]robability of success is inversely proportional to the degree of irreparable injury evidenced." *Id*. "A stay may be granted with either a high probability of success and some injury, or *vice versa*." *Id*.

### A. True the Vote is Likely to Succeed on Its Claim that the IRS Targeting Scheme Violates the APA.

The Government's argument that True the Vote will not succeed on its APA claim is based solely on its insistence that that claim is moot. (Dkt. #73 at 8.) As explained, that belief is erroneous. *See supra* at 3; (Dkt. #65 at 6-11.)

Standing alone, the conclusions of the TIGTA Report provide strong evidence that True the Vote is likely to succeed on its claim that the IRS acted "in excess of [its] statutory… authority, or limitation, or short of [its] statutory right," 5 U.S.C. § 706(C), by demanding information from True the Vote that it knew or should have known to be unnecessary to the determination of True the Vote's tax-exempt status (Dkt. #14 ¶ 129 (identifying certain requests for information made of True the Vote specifically identified in the TIGTA Report as being unnecessary for the determination of True the Vote's tax-exempt status).)

The TIGTA Report also strongly supports True the Vote's claims that the IRS Targeting Scheme's use of viewpoint-based criteria was "contrary to [True the Vote's] constitutional right[s]" under the First Amendment to the Constitution. 5 U.S.C. § 706(B). Indeed, the TIGTA Report confirms that applicants for tax exemptions were subjected to discriminatory treatment in the processing of their applications "based on their names or policy positions instead of…criteria based on tax-exempt laws and Treasury Regulations." (Dkt. #14-6 at 11.) "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v.*

*Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828, 115 S. Ct. 2510, 2516 (1995) (internal citations omitted). No amount of proffered explanations of legitimacy or neutrality in its adoption and even application (Dkt. #73 at 11-12) can change the facially discriminatory character of the IRS Targeting Scheme. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642-643, 114 S. Ct. 2445, 2459 (1994) ("[T]he mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on content"); *Moss v. U.S. Secret Serv.*, 711 F.3d 941, 960 (9th Cir. 2013*)* ("[T]he assertion of a viewpoint-neutral rationale cannot transform a facially discriminatory policy…into a valid one.")

### B. True the Vote Will Be Irreparably Harmed if Its Confidential Information is Publicly Released.

It is well settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976). It is also beyond debate that the compelled disclosure of an organization's associations, internal communications, and other expressive conduct can chill First Amendment freedoms. *See, e.g.*, *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462, 78 S. Ct. 1163, 1171 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association."); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1142 (9th Cir. 2010) (compelled disclosure of internal strategy communications can chill First Amendment rights); *AFL-CIO v. FEC*, 333 F.3d 168, 176-177 (D.C. Cir. 2003) ("disclos[ure of] detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies" "does implicate significant First Amendment interests in associational autonomy"). These are the type of things True the Vote was forced to provide to the IRS and that will be disclosed publicly absent relief

from this Court.[1] (*See, e.g.*, Dkt. #14 at 31 (asking True the Vote to "[d]escribe in detail the nature of [its] relationship" with the King Street Patriots); Dkt. #14-4 at 4-6 (asking for details regarding training strategies and the materials used in training volunteers); Dkt. #Dkt 14-4 at 3 (asking for "minutes of all board meetings since your creation").)

Information demanded from True the Vote by the IRS that this Court determines is not part of True the Vote's application is not subject to public disclosure under section 6104, but is "return information" made confidential pursuant to section 6103. Absent relief, True the Vote thus also risks permanently losing its privacy in its tax information, harm Congress considers to be of such magnitude as to warrant the imposition of civil and criminal penalties on those who cause it. 26 U.S.C. §§ 7213, 7431.

The Government's suggestion that True the Vote must wait until a request has been made for inspection before it may seek a stay is impracticable because True the Vote's application must be made available for public inspection ***immediately*** upon request to the IRS, without notice to True the Vote.[2] The high profile nature of True the Vote's application makes the probability that there will be requests for its application high, especially in light of the constitutional claims involved in this lawsuit. Temporary relief is needed now to prevent irreparable harm while this Court conducts its review of the merits of True the Vote's claims. Absent relief, True the Vote will be powerless to protect its confidential information if the IRS begins fulfilling requests for True the Vote's application. *Doe v. Reed*, 697 F.3d 1235, 1240 (9th

---

[1] The IRS incorrectly claims that True the Vote could have withheld requested information it believed to be unnecessary for a determination under section 501(c)(3). (Dkt. #73 at 10 n.5.) In fact, each request for additional information received by True the Vote from the IRS warned that if the requested information was not provided, True the Vote would either be treated as a taxable entity or lose its rights to seek a declaratory judgment as to its tax-exempt status in federal district court. (*See* Dkt. #14-3 at 1.) In either event, True the Vote would lose its tax-exemption.

[2] The IRS faults True the Vote for not seeking a stay of disclosure immediately after its application was granted, but at the same time claims True the Vote, even today, faces no risk of imminent injury because no requests have been made for its application. (Dkt. #73 at 10.) The IRS cannot have it both ways.

Cir. 2012) ("once a fact is widely available to the public, a court cannot grant any 'effective relief' to a person seeking to keep that fact a secret").

The cases on which the Government relies are not helpful in resolving the present disclosure issue because they involved neither disclosure disputes nor approved applications, but rather concerned tax-emption denials or an investigation aimed at revoking an existing exemption.[3] (Dkt. #73 at 11-12.) The rules governing disclosure of approved applications do not apply in such cases. In the case of a denied application, the applicant is given seventy-five days advanced notice of the IRS's intention to disclose an application, 26 U.S.C. § 6110(f)(1), and afforded the opportunity to seek administrative, *id*. § 6110(f)(2)(B), and even judicial review of the agency's decision to disclose the application, *id*. § 6110(f)(3). Furthermore, the IRS is ***required*** to redact certain personal information including "names, addresses, and other identifying details of the person" *id*. § 6110(c)(1), and "information the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," *id*. § 6111(c)(5). Under section 6104, True the Vote receives none of these procedural safeguards.

C. **The Public Release of Information Not Relevant to Determining True the Vote's Tax-Exempt Status Does Not Further the Interests Undergirding Section 6104.**

The law is clear: the IRS may not release confidential tax information absent a clear exception. *Tax Analysts v. IRS*, 117 F.3d 607, 615 (D.C. Cir. 1997) (citing *Church of Scientology v. IRS*, 484 U.S. 9, 16, 108 S. Ct. 271, 275 (1987)) (section "6103's core purpose [is] protecting taxpayer privacy"). Disclosure pursuant to one such exception, section 6104, is premised on the assumption that disclosure of such information will permit the public to monitor and evaluate the operations of the IRS in recognizing tax exemptions. However, True the Vote seeks to stay the

---

[3] Nor do any of the IRS's authorities involve allegations of viewpoint discrimination or First Amendment retaliation. However, the IRS's reliance on these authorities to support its fact-dependent arguments regarding the necessity of its requests for additional information highlights the need for discovery in this matter.

release of information *not* relevant to the determination of its tax-exempt status, but rather requested on the impermissible basis of True the Vote's perceived philosophy, mission, and associations, all in violation of the APA and of True the Vote's constitutional rights. In other words, the disclosure of the information that is the subject of the requested stay will not further the purpose of section 6104. Given the potential for irreparable harm in this case, the balance of equities tips decidedly in favor of temporarily preventing disclosure until a decision can be made on the underlying APA claim.

### D. Protecting True the Vote's Constitutional Rights Pending Judicial Review of Its Claims is In the Public's Interest.

In constitutional challenges, "the determination of where the public interest lies…is dependent on the determination of the likelihood of success on the merits …because it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). In contrast, the IRS has no interest in carrying out an unconstitutional and unlawful targeting scheme. As True the Vote has demonstrated a likelihood of success on the merits, the public interest weighs strongly in its favor.

The IRS maintains that it is in the public's interest to provide a "complete record" of True the Vote's application, including documents unlawfully obtained, so as to hold the IRS accountable. On the contrary, it is emphatically in the public's interest to hold the IRS accountable for violating the APA and the constitutional rights of those it regulates, while preserving the rights and mitigating damage to True the Vote pending this Court's examination of the IRS's actions.

## **Conclusion**

Without a stay preventing the IRS's release of its confidential return information, True the Vote faces the very harm that the IRS Targeting Scheme sought to inflict. True the Vote therefore respectfully requests that a stay be granted.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2013, I caused the foregoing to be filed with the United States District Court for the District of Columbia via the Court's CM/ECF system.

I further certify I will cause a true and correct copy of the foregoing to be served upon the following at his last known addresses via U.S. Certified Mail:

**DAVID FISH**
3623 37th St. N.
Arlington, VA  22207


Dated: December 9, 2013                     /s/ *Cleta Mitchell*
                                            Cleta Mitchell
                                            cmitchell@foley.com
                                            *Lead Counsel for Plaintiffs*