IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TRUE THE VOTE, INC. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:13-cv-00734-RBW |
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

### **REPLY IN SUPPORT OF MOTION TO DISMISS COUNTS I, II, IV AND V**

In an effort to survive dismissal of its claims against the federal defendants, True the Vote attempts to recast them. Now that True the Vote has obtained a favorable determination of its tax-exempt status, its claim for a determination of its tax status (Count I) is moot, as are its claims for declaratory and injunctive relief under the First Amendment and the Administrative Procedure Act (Counts II and V) to correct alleged "targeting" and delay during its application process. True the Vote does not contest that point as to its claim for a determination of its tax status. But, to try to avoid dismissal of the claims under the First Amendment and the APA, True the Vote now tries to recast them as seeking prospective relief from some indefinite future possibility of harm.[1] Even assuming True the Vote were allowed to further amend its complaint

---

[1] We also observe that True the Vote's efforts to salvage some cognizable cause of action have led it to misconstrue our position regarding its *Bivens* count against the individual defendants. (Doc. 72 at 39.) Far from endorsing the soundness of that count as True the Vote alleges in its response to the motions to dismiss filed by the individual defendants, we were very clear in footnote 1 on page 2 of our motion to dismiss that we were *not* addressing that count.

to encompass such claims, they would present no more "live" case or controversy for the Court to consider than the claims that are now moot.

Not satisfied with merely trying to recast those claims, True the Vote also attempts to recast the language of a federal statute in its effort to avoid dismissal of its claim for damages under Internal Revenue Code sections 6103 and 7431, which authorize damages related to the unauthorized *inspection* of tax returns or tax return information. True the Vote, however, complains of allegedly improper *requests* for information. Even assuming that True the Vote's allegations of fact are true – and that it would be allowed to amend its complaint yet again to include the "information handling" allegations, which are absent in the complaint as it has already been amended – the statutes that permit damages related to the unauthorized inspection of return information simply are not written in terms to afford True the Vote any relief here.

## ARGUMENT

I.  **The claims raised in Counts I, II and V are moot, and True the Vote is not entitled under Counts II and V to prospective relief from events that have not occurred.**

The fact that the IRS has granted True the Vote's application for tax-exempt status leaves no "live" case or controversy for the Court to consider as to the claims raised in Counts I, II and V. *See Munsell v. Dep't of Agriculture*, 509 F.3d 572, 581 (D.C. Cir. 2007) (describing how the mootness doctrine derives from the case-or-controversy requirement of Article III of the U.S. Constitution and that a case is moot when it no longer presents "live" issues). True the Vote does not argue otherwise with respect to its claim in Count I for a determination of its tax status.[2]

---

[2] Nevertheless, True the Vote does suggest that a final judgment in its favor as to Count I is appropriate. (Doc. 65 at 6.) A judgment, however, is unnecessary because it could only declare what already has been done. The claim for a determination of True the Vote's tax status is moot, (continued...)

It does, however, try to resurrect its claims in Counts II and V, which seek declaratory and injunctive relief under the First Amendment (Count II) and under the APA (Count V).  True the Vote attempts that feat by refocusing its claims to try to obtain prospective relief from events that have not occurred (Doc. 65 at 6), but to no avail.

**A.  *True the Vote has identified no ongoing harm to itself.***

Through Counts II and V, True the Vote says that it seeks declaratory and injunctive relief from being subjected to what it calls a "targeting scheme" by the IRS.  (Doc. 65 at 6.)  Specifically, True the Vote defines the so-called "targeting scheme" as the practice of subjecting certain applications for tax exemption to heightened scrutiny and delays in processing based on the applicants' purpose, mission and/or name, as well as the perception that the applicants espoused conservative points of view.  (Doc. 65 at 6, n.2; Doc. 14 ¶¶ 73-74.)  The definition focuses on alleged practices during the *application* process.  True the Vote's application, however, is no longer under consideration because the IRS has granted it, *i.e*, the application process is finished.  Specifically regarding its APA claim, True the Vote seeks judicial review of what it calls the "functional denial of tax-exempt status" because of alleged "deliberate delay" in acting on its application.  (Doc. 14 ¶ 204.)  With the determination of True the Vote's tax-exempt status in its favor, there is no denial – either actual or "functional" – for the Court to review.

True the Vote's claims for declaratory and injunctive relief hinge on the existence of an *ongoing* practice of "targeting" and delay in the consideration of *its* application for tax exemption, but any such "targeting" or delay that it might have experienced during the review of

---

(… continued)

which means no issue remains for the Court to consider.  With no remaining "live" issue, there is nothing to adjudicate as to Count I, and dismissal is the appropriate result.

its application necessarily ended when the IRS granted its application.  Even assuming that there is an ongoing "targeting scheme" in general, it is not ongoing with respect to True the Vote's application, which has been granted.  Assuming that all of True the Vote's factual allegations are true, at best True the Vote describes a past event that carries no present threat of injury *to True the Vote* now that its application for tax-exempt status has been granted.  None of True the Vote's arguments change that conclusion.

### B.  *True the Vote's reliance on the "voluntary cessation" exception to the mootness doctrine is inapposite.*

True the Vote relies on *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167 (2000), for the proposition that a defendant's voluntary cessation of a challenged action does not render a suit moot, and that a defendant bears a "formidable burden" to show that a challenged practice has stopped before it may invoke mootness in that situation. (Doc. 65 at 6, 10.)  But *Laidlaw* involved a private defendant, and courts frequently have given government actors greater leniency in invoking the mootness doctrine.  *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116 (10th Cir. 2010) ("In practice, however, *Laidlaw's* heavy burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case.").

*Laidlaw* also does not hold that a voluntary cessation of a challenged practice cannot moot a request for declaratory or injunctive relief, which is the type of relief True the Vote is seeking here.  The plaintiffs in *Laidlaw* brought a citizen suit under the Clean Water Act in which they sought both an injunction to bring the defendant within the authorized limits of its discharge permit, as well as civil penalties.  *See Laidlaw*, 528 U.S. at 173.  Because the defendant achieved substantial compliance with the terms of its permit *after* the suit was brought, the district court concluded that injunctive relief no longer was appropriate.  *Id.*  But the district

4

court also imposed a civil penalty, which the appellate court vacated because it believed the action for a civil penalty also was moot. *Id.* The Supreme Court, however, determined that the action *for civil penalties* was not rendered moot by the defendant's substantial compliance with its discharge permit after the litigation began. *Id.* The Supreme Court's decision did not address the mootness issue with respect to the part of the action that sought injunctive relief. *See Maydak v. United States*, 630 F.3d 166, 175 (D.C. Cir. 2010) (discussing the distinction of how *Laidlaw* addressed the mootness question only in the context of the request for civil penalties, and not in relation to the request for injunctive relief).

Nothing about *Laidlaw* or the "voluntary cessation" exception to the mootness doctrine gets True the Vote around the point made above in part I.A – that True the Vote identifies no present, ongoing harm for which a declaration or an injunction would give it relief. Instead, True the Vote now endeavors to recast its claim as one for relief of a prospective harm. (Doc. 65 at 6, 12-14.) As described next, any such attempt is pointless.

### C. *True the Vote lacks standing to challenge any speculative future injury.*

Although True the Vote's amended complaint focuses on allegedly improper actions during the consideration of its application for exemption from federal taxation, now that it has obtained tax-exempt status, True the Vote alleges that it still needs declaratory and injunctive relief to protect it from any possible future infringements. Even assuming True the Vote were allowed to further amend its complaint to encompass claims for prospective future injury, such amendment would be futile because True the Vote would lack standing to bring those claims.

Standing, like mootness, derives from the "case-or-controversy" requirement of Article III of the Constitution. The concept of Article III standing is based on the principles of separation of powers, and it "serves to prevent the judicial process from being used to usurp the

5

powers of the political branches." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). "In keeping with the purpose of this doctrine, '[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal government was unconstitutional.'" *Id.* at 1147 (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). Future injury that is merely possible does not qualify to give a plaintiff Article III standing. The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added and internal quotation marks omitted)).

Here, True the Vote suggests that, at some indeterminate time in the future, the IRS *might* select True the Vote for audit to examine whether it continues to meet the qualification for tax-exempt status and further, *if* the IRS later audits True the Vote, that the IRS *might* have a discriminatory motive for its audit selection. (*See* Doc. 65 at 12-13.) The threat of injury that True the Vote suggests is far too tenuous and too speculative to support any claim to standing. Those potential harms are not "certainly impending," and as a result, True the Vote lacks standing to bring claims for them now. *See also Munsell*, 509 F.3d at 581 (finding that, even if plaintiff could prove past violation of its First Amendment rights, past conduct did not demonstrate "real and immediate threat" of future harm to justify declaratory and injunctive relief).[3]

---

[3] Even if True the Vote somehow could clear the standing hurdle, the Declaratory Judgment Act and the Anti-Injunction Act still preclude the declaratory and injunctive relief True the Vote seeks under the First Amendment in Count II. As described in the federal defendants' motion to dismiss, the Declaratory Judgment Act and the Anti-Injunction Act operate to prohibit suits that seek declaratory relief regarding federal taxes and/or that seek to interfere with the assessment or (continued...)

## D. *The APA also does not give True the Vote a path to obtaining speculative relief.*

True the Vote's recasting of its claims does not create a valid cause of action under the APA, for reasons in addition to the ones described above. Through its APA claim, True the Vote seeks judicial review of what it calls the "functional denial of tax-exempt status" because of alleged "deliberate delay" in acting on its application. (Doc. 14 ¶ 204.) With the determination of True the Vote's tax-exempt status in its favor, there now is no denial – either actual or "functional" – for the Court to review. To try to circumvent that problem, True the Vote asserts that the alleged "functional denial" of its application qualifies as final agency action for which it may obtain review under the APA. (Doc. 65 at 15.) That argument does not advance True the Vote's cause.

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. But that seemingly broad grant of judicial review is limited to "*final* agency action for which there is *no other adequate remedy* in a court." *Id*. § 704 (emphases added). Any intermediate events that might have occurred during the process of reviewing True the Vote's application for tax-exempt status do not carry the finality necessary to obtain review under the APA.

---

(… continued)

collection of any tax. Although True the Vote argues that those Acts do not apply now that its tax-exempt status is determined (Doc. 65 at 16), True the Vote conveniently forgets that it now is trying to obtain prospective relief. As described herein, True the Vote is not entitled to obtain prospective relief as to its claims either under the First Amendment (Count II) or under the APA (Count V). In any event, any current declaration or injunction regarding future tax administration necessarily would interfere with the ability of the IRS in the future to make determinations regarding whether True the Vote continues to meet the qualifications for tax-exempt status and, thus, whether it owes federal tax.

To qualify as a "final" agency action, two conditions must be met. "First, the action must mark the consummation of the agency's decisionmaking process" and, "second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations and citations omitted). Here, the consummation of the IRS decisionmaking process did not occur until it concluded its review of True the Vote's application and issued its determination. Surely True the Vote does not seek to challenge the administrative action that has been rendered in its favor.

Nor do any intermediate steps in the consideration of any of the applications qualify as "final" agency action. True the Vote's situation is similar to other cases in which courts have denied judicial review of administrative actions that occur before the conclusion of the overall administrative process. For example, the Supreme Court has found that an agency's decision to issue an administrative complaint – which had yet to be followed by a complete adjudication – did not qualify as final agency action. *FTC v. Standard Oil Co. of Calif.*, 449 U.S. 232, 239, 242-43 (1980). The United States Court of Appeals for the District of Columbia relied in significant part on *Standard Oil* in denying review of a preliminary determination by the Consumer Product Safety Commission that a manufacturer's sprinkler head was hazardous. *See Reliable Automatic Sprinkler Co., Inc. v. Consumer Product Safety Comm'n*, 324 F.3d 726, 729, 731-32 (D.C. Cir. 2003). The court noted the further steps necessary for the agency to complete its administrative process and concluded that the agency's preliminary determination, along with its request for voluntary corrective action, did not constitute final agency action within the meaning of the APA. *Id*. at 731-32. Similarly, the Eastern District of Virginia recently denied judicial review under the APA to a patent holder that sought review of the Patent and Trademark Office's decision to reevaluate the claimed patent after the patent previously had been granted.

8

*Versata Development Corp. v. Rea*, No. 1:13-cv-328, 2013 WL 4014649, at *10 (E.D. Va. Aug. 7, 2013). That court reasoned that the agency's decision to engage in post-grant review of a patent, rather than marking the consummation of the agency's decisionmaking process, was the beginning of the process that ultimately would decide the legal rights and remedies of the applicant. *Id*. *11-12. Each of those cases highlights the point that an agency action cannot be considered final for purposes of the APA until the administrative process in question has been allowed to run its course.

In this case, regardless of any steps that might have been taken during the course of considering True the Vote's application, those intermediate steps did not mark the consummation of the agency's decisionmaking process, nor did those steps determine True the Vote's rights or obligations regarding the ultimate question – whether it would be granted tax-exempt status.

The fact that True the Vote now tries to seek relief from possible future events further emphasizes why it may not now proceed under the APA. The function of the APA is to provide judicial *review* of an agency action. *See* 5 U.S.C. § 702. "Review" of an action necessarily contemplates that the action already has taken place. True the Vote, however, now tries to obtain prospective relief from speculative events that *might* occur in the future. The APA does not provide a crystal ball through which a court may "review" an agency action before it happens. The review function of the APA reiterates the point made above about lack of standing – True the Vote simply may not obtain relief from hypothetical future harms that may never befall it.

## II.     True the Vote continues to fail to state a viable claim in Count IV.

We acknowledge True the Vote's recitation of the history and purpose of sections 6103 and 7431, since that history plainly illustrates True the Vote's misguided reliance on those statutes to cure the alleged harms of IRS "targeting" and overly broad *requests* for information.

9

We ask the Court to look carefully at a particularly telling portion of True the Vote's brief, where the choice of words confirms that True the Vote is wrong to seek damages under section 7431.

On pages 28 through 31 of its brief (Doc. 65 at 38-41), True the Vote describes the Taxpayer Browsing Protection Act as protecting the "confidentiality" of information in the IRS's possession from "inspection," "examination," and "review."  The purpose was to defend a "justifiable expectation of privacy in the extensive information [taxpayers] furnish to the IRS." (Doc. 65 at 39.)  The statute provided a civil remedy for "breaching the confidentiality" of information held by the IRS.  (Doc. 65 at 40.)  All of these descriptors depict protections for information held by the IRS.

**But** the Court should take notice of the stark change as True the Vote's brief turns to discuss *this* case.  It begins: "True the Vote has properly alleged that the IRS ***demanded*** information from True the Vote regarding its officers, employees, activities, associates, and volunteers." (Doc. 65 at 41.)  That is an example of the dissonance between section 6103 and True the Vote's claims seeking to impose liability, and the incongruity continues throughout True the Vote's brief.

True the Vote, perhaps even acknowledging its misapplication of section 7431, now tries to escape dismissal by re-casting its claim in an entirely different light.  In a footnote, True the Vote now claims that its section 7431 claim is based on the IRS's "information handling" (Doc. 65 at 42 n.9), but that is not what True the Vote pled in its now-twice-amended complaint.  True the Vote even tries to distinguish similar cases as "improper collection cases," as if that were different from Count IV of the action True the Vote filed.  (*Id.*)  Its complaint alleges harm under section 6103 because the IRS "knowingly requested information from True the Vote" that it contends was unnecessary.  (Doc. 14 ¶¶ 174-175.)  If True the Vote wants to change its

allegations and claims, it must seek leave to amend the complaint a third time or file some new suit asserting its new theory; it cannot hide from or argue away the entire basis for its section 7431 claim.  True the Vote did not allege facts to support a separate claim that the information provided to the IRS was improperly "handled."  Without more, it is also not clear how True the Vote believes that would be actionable under section 7431, which only waives sovereign immunity for claims for unauthorized inspection and disclosure.

True the Vote's opposition also falls far short in attempting to cure other deficiencies raised in the United States' motion to dismiss.  First, True the Vote offers nothing to support its claim that any inspection of the information submitted to support its application for tax-exempt status would be "per se not 'for tax administration purposes.'"  (Doc. 65 at 43, 47.)  True the Vote only repeats the conclusory legal statements that appear in the complaint.  (*Id.*)  It is elementary that such repetition is procedurally insufficient to withstand a motion to dismiss.  As stated in our opening brief, the term "for tax administration purposes" is broad and covers the IRS's reviewing of information in order to make a determination on True the Vote's application for tax-exempt status.  *Cf. Lehrfeld v. Richardson*, 954 F. Supp. 9, 13 (D.D.C. 1996).  As True the Vote acknowledges elsewhere in its opposition, the IRS requested "information we need to enable us to act on your application."  (Doc. 65 at 46.)  The information, submitted to support an application for tax-exempt status, could be reviewed "for tax administration purposes."

Second, True the Vote states that it has identified what return information was wrongfully inspected. (Doc. 65 at 43-44.)  But it only points to the various allegations about *all of the information* that True the Vote submitted.  (*Id.*)  Through its failure to identify specifically any particular information it asserts was wrongfully inspected, True the Vote fails to state a claim.  Certainly, it cannot be suggesting that *none* of its submissions should have been reviewed by the

11

IRS in the process of making a determination on its application for tax-exempt status. That proposition is implausible, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and would make a mockery of section 7431 by enabling taxpayers to submit information to the IRS and then seek damages and a wholesale judicial review of every request for information under a statute limited to unauthorized inspection or disclosure of information.

Third, and similarly, True the Vote states that it did not request the IRS to review the information it submitted. However, that notion is contrary to the plain allegations that it relies on for all of its claims in this case. Instead, True the Vote again turns to discuss what it believes the IRS *should have **requested*** for its review of the application. (Doc. 65 at 47 (quoting regulations and TIGTA report).) But that contention does not alter the undisputed fact that the information the IRS "inspected" was submitted by True the Vote to the IRS in order to have the IRS review the information in connection with True the Vote's application for tax-exempt status. True the Vote's belief, hope, and purpose of submitting the information was that the IRS *would inspect* the information.

Finally, what is missing from True the Vote's discussion is the recognition that an application for tax-exempt status is a voluntary choice, and tax-exempt status is an earned privilege, not a right. True the Vote defends its claim by asserting it had "no real choice" to submit the information. (Doc. 65 at 46.) It elaborates on this point by asserting that the consequence of choosing not to submit information would have been the "forfeiture of True the Vote's tax exempt status." (*Id.*) Crucially, True the Vote fails to explain how *that* assertion supports a claim under section 7431, which provides damages for unauthorized inspection or disclosure of tax return information. Tax-exempt status is not automatically bestowed upon all entities that file an application. The application must be supported, and the IRS is tasked with

12

vetting and evaluating the entity's eligibility for tax-exempt status, which may require more information than the applicant chose to submit with the application.

True the Vote may believe that it suffered harm in the course of the IRS's review of its application, but that is insufficient to assert a colorable claim under section 7431. When True the Vote now complains that the materials it submitted may be open to the public under 26 U.S.C. § 6104, that is immaterial to section 7431. When it now complains that the IRS "demanded" additional information that it asserts was overbroad and unnecessary, that too is immaterial to section 7431. Because True the Vote admits it submitted information to the IRS in order to have that information reviewed, it is immaterial to section 7431 that True the Vote did not want to submit the information.

True the Vote, offended that it had to submit certain information to the IRS, now seeks to recover damages through a variety of legal theories and claims. As to the section 7431 theory, however, it fails to state a claim upon which relief may be granted. A properly pled claim of unauthorized inspection and disclosure of tax return information is actionable under section 7431, but a claim of unauthorized *requests* for information is not. Nor is any claim under section 7431 actionable if the taxpayer requested that the IRS inspect or disclose the information, or if the IRS could inspect the information "for tax administration purposes," including review of an application for tax-exempt status. In this case, no section 7431 claim lies for the information that True the Vote submitted to the IRS with the purpose and hope that the IRS would inspect the same information.

## **CONCLUSION**

True the Vote's various attempts to recast its claims in the face of the federal defendants' motion to dismiss do not save this suit from dismissal. Now that True the Vote has obtained a

favorable determination of its tax-exempt status, its claim for a determination of its tax status (Count I) is moot, as are its claims for declaratory and injunctive relief under the First Amendment and the Administrative Procedure Act (Counts II and V).  Although True the Vote now tries to recast the claims in Counts II and V as seeking prospective relief from some indefinite future possibility of harm, True the Vote would lack standing to pursue those claims, even if it were allowed to further amend its complaint to seek the prospective relief that it now describes.

True the Vote's attempts to recast its claims for damages in Count IV are equally unavailing.  Although True the Vote now complains of allegedly improper *requests* for information, the statutes under which True the Vote proceeds permit damages only for the unauthorized *inspection* of return information.  Accordingly, those statutes do not afford True the Vote any relief here.

WHEREFORE, the United States respectfully prays the Court dismiss Counts I, II and V under Fed. R. Civ. P. 12(b)(1) for mootness and dismiss Count IV under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

DATED: December 17, 2013

          Respectfully submitted,

          KATHRYN KENEALLY
          Assistant Attorney General, Tax Division

          <u>/s/ *Grover Hartt, III*</u>
          GROVER HARTT, III (TX 09174500)
          Senior Litigation Counsel
          CHRISTOPHER R. EGAN (TX 24036516)
          Trial Attorney
          U.S. Department of Justice, Tax Division
          717 N. Harwood Street, Suite 400
          Dallas, Texas  75201
          (214) 880-9733
          (214) 880-9741 (FAX)
          Grover.Hartt@usdoj.gov

          JOSEPH A. SERGI (DC 480837)
          Senior Litigation Counsel
          U.S. Department of Justice, Tax Division
          555 4th Street, N.W., JCB 7207
          Washington, D.C.  20001
          (202) 305-0868
          (202) 307-2504 (FAX)
          Joseph.A.Sergi@usdoj.gov

          JENNIFER D. AUCHTERLONIE (WA 29481)
          LAURA C. BECKERMAN (CA 278490)
          CHRISTOPHER D. BELEN (VA 78281)
          LAURA M. CONNER (VA 40388)
          JEREMY HENDON (OR 982490)
          PHILIP M. SCHREIBER (DC 502714)
          U.S. Department of Justice, Tax Division
          555 4th Street, N.W.
          Washington, D.C.  20001
          (202) 514-2000

          Trial Attorneys

Of Counsel:
RONALD C. MACHEN, JR. (DC 447889)
United States Attorney

          ATTORNEYS FOR THE UNITED STATES

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TRUE THE VOTE, INC. | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:13-cv-00734-RBW |
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2013, I caused the Reply in Support of Motion to Dismiss Counts I, II, IV, and V in the above-captioned matter to be filed with the United States District Court for the District of Columbia via the Court's CM/ECF system.

/s/ *Grover Hartt, III*
GROVER HARTT, III