# Exhibit N:

# April 9, 2014 Ways & Means Letter Lerner Criminal Referral

DAVE CAMP, MICHIGAN,
   CHAIRMAN

SAM JOHNSON, TEXAS
KEVIN BRADY, TEXAS
PAUL RYAN, WISCONSIN
DEVIN NUNES, CALIFORNIA
PATRICK J. TIBERI, OHIO
DAVID G. REICHERT, WASHINGTON
CHARLES W. BOUSTANY, JR., LOUISIANA
PETER J. ROSKAM, ILLINOIS
JIM GERLACH, PENNSYLVANIA
TOM PRICE, GEORGIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
AARON SCHOCK, ILLINOIS
LYNN JENKINS, KANSAS
ERIK PAULSEN, MINNESOTA
KENNY MARCHANT, TEXAS
DIANE BLACK, TENNESSEE
TOM REED, NEW YORK
TODD YOUNG, INDIANA
MIKE KELLY, PENNSYLVANIA
TIM GRIFFIN, ARKANSAS
JIM RENACCI, OHIO

_____

JENNIFER SAFAVIAN,
   STAFF DIRECTOR

## Congress of the United States
### U.S. House of Representatives
COMMITTEE ON WAYS AND MEANS

1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225–3625

### Washington, DC 20515–6348

http://waysandmeans.house.gov

SANDER M. LEVIN, MICHIGAN, RANKING MEMBER
CHARLES B. RANGEL, NEW YORK
JIM MCDERMOTT, WASHINGTON
JOHN LEWIS, GEORGIA
RICHARD E. NEAL, MASSACHUSETTS
XAVIER BECERRA, CALIFORNIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL, JR., NEW JERSEY
JOSEPH CROWLEY, NEW YORK
ALLYSON SCHWARTZ, PENNSYLVANIA
DANNY K. DAVIS, ILLINOIS
LINDA SÁNCHEZ, CALIFORNIA

_____

JANICE MAYS,
   MINORITY CHIEF COUNSEL

April 9, 2014

The Honorable Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Attorney General Holder:

The Committee on Ways and Means (Committee) of the U.S. House of Representatives
has discovered information in the course of its ongoing investigation of the targeting by
the Internal Revenue Service (IRS) of taxpayers on the basis of their political views. This
information suggests willful misconduct by an IRS official, and also suggests that she
may have violated multiple federal criminal statutes.

Rule X.1(t) of the Rules of the House of Representatives for the 113th Congress
delegates to the Committee legislative jurisdiction over "[r]evenue measures generally,"
including the Internal Revenue Code (IRC or Code) and the Department of Treasury
(Treasury), which includes the IRS. As a result, the Committee is responsible for
considering all legislation that raises the revenue required to finance the federal
government. The raising of such revenue depends on voluntary compliance with the
IRC, which is undermined when taxpayers and exempt organizations perceive that the
administration of the IRC is unfair or, worse, is biased against them. Oversight of the
IRS, and particularly investigation of IRS activity that could undermine voluntary
compliance with the IRC, is thus a fundamental obligation of the Committee.[1] It is
pursuant to this authority and in discharge of this obligation that the Committee has
investigated allegations that the IRS mistreated certain taxpayers and exempt
organizations on the basis of their political beliefs.

---

[1] *See also* Rule X.2(b)(1), Rules of the House of Representatives, 113th Congress (vesting Committee with authority to
oversee and evaluate whether laws written by Committee are being administered consistent with congressional intent
and whether such laws should be changed); *cf.* IRC § 6103 (expressly authorizing Committee review of certain
material).

Exhibit N - Page 1 of 14

During the course of its investigation, the Committee has obtained information that reveals that former IRS Exempt Organizations Division (EO) Director Lois G. Lerner, while acting in her official capacity, may have violated one or more criminal statutes. Specifically, the Committee's investigation has uncovered conduct by Lerner that includes the following:

1. Lerner used her position to improperly influence agency action against only conservative organizations, denying these groups due process and equal protection rights under the law as guaranteed by the U.S. Constitution, in apparent violation of 18 U.S.C. § 242;

2. Lerner impeded official investigations by providing misleading statements in response to questions from the Treasury Inspector General for Tax Administration (TIGTA), in apparent violation of 18 U.S.C. § 1001; and

3. Lerner risked exposing, and may actually have disclosed, confidential taxpayer information, in apparent violation of IRC § 6103 by using her personal email to conduct official business.

These findings, supported by the evidence described below, suggest that Lerner may have violated multiple criminal statutes. The Committee asks that you pursue this evidence and ensure that the victims of IRS abuse do not also suffer neglect from the criminal justice system.

I. Lerner Showed Extreme Bias and Prejudice in Exercising Her Power and Influence Over the Non-Profit Sector

As EO Director, Lerner had authority to act on behalf of the IRS.[2]  Lerner willfully used her authority to subject specific organizations to adverse treatment in defiance of IRS controls. Lerner directed subordinates to subject specific right-leaning groups to increased scrutiny and audits, and even the denial of exempt status.

a. *Lerner's Targeting of Crossroads GPS & Blind Eye to Priorities USA*

On October 19, 2010, Lerner explained to a group of Duke University students that 501(c)(4) organizations were spending money on campaign activity in the wake of the *Citizens United* decision.[3]  She said, "[E]verybody is screaming at us, 'fix it now before the election....'"[4]  At the same time, Assistant Senate Majority Leader Dick Durbin, wrote then IRS Commissioner Doug Shulman to demand an investigation of Crossroads GPS.[5] Lerner explained to the students, "I won't know until I look at their 990s next year

---

[2] See IRC § 7803 (setting out the authorities of the IRS Commissioner), *see also* Internal Revenue Manual (IRM) 1.1.23.5 (providing that Director of EO reports directly to Deputy Commissioner of TE/GE and, among other duties, "supervises and is responsible for the activities of . . . EO Rulings and Agreements and EO Examinations functions").
[3] *See generally, Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310 (2010).
[4] Transcribed from http://www.youtube.com/watch?feature=player_embedded&v=EH1ZRyq-1iM, Exhibit 1.
[5] *See* Letter from Assistant Majority Leader Dick Durbin to IRS Commissioner Doug Shulman on October 12, 2010. Available at: http://www.durbin.senate.gov/public/index.cfm/pressreleases?ID=833d8f1e-bbdb-4a5b-93ec-706f0cb9cb99.

whether they have done more than their primary activity as political or not, so I can't do anything right now."[6]  While Lerner's public comments seemingly cast a wide, unbiased net across the entire 501(c)(4) spectrum, her private actions were different.

Documents produced to the Committee further link Lerner's actions with complaints from Democracy 21.[7]  Those complaints chiefly focused on Crossroads Grassroots Policy Strategies (Crossroads) and other right-leaning groups, but also cite left-leaning groups such as Priorities USA.[8]  On October 5, 2010, just two weeks before her remarks at Duke University, Fred Wertheimer of Democracy 21 and Gerald Hebert of the Campaign Legal Center (CLC) wrote to then-Commissioner Shulman and Lerner to, "Request for IRS investigation to determine whether 'Crossroads GPS' is operating in violation of tax status."[9]  Later, on July 27, 2011, Democracy 21 and CLC sent the IRS a self-styled, "Petition for Rulemaking On Campaign Activities by Section 501(c)(4) organizations," in which they raised concerns about the political campaign activities of 501(c)(4) exempt organizations, including Crossroads and Priorities USA.[10]  Finally, on December 14, 2012, Democracy 21 requested a meeting with Lerner to discuss its July 27, 2011 petition.[11]

Lerner quickly organized a meeting for Democracy 21 not only with herself, but also with the Office of Chief Counsel and the Office of Tax Policy at the Department of the Treasury for January 4, 2013.[12]  In preparation for the meeting, Lerner asked David Fish, then acting Director of EO's Rulings and Agreement Division, and Andy Megosh with EO Guidance, for all "letters these orgs sent in asking for c4 guidance…."[13]  While Democracy 21's petition raised concerns about groups across the political spectrum, documents IRS produced to the Committee show an aggressive and improper pursuit of Crossroads by Lerner, but no evidence she directed reviews of similarly situated left-leaning groups.[14]

For example, on January 2, 2013, the IRS's Chief for Media Relations circulated a ProPublica article to Lerner and Nikole Flax, then chief of staff to Acting Commissioner Steve Miller, among others, "FYI—Here is the latest inbound for ProPublica."[15]  Following was an article titled: "Watchdog Groups Again Call on IRS to Deny Tax-Exempt Status to Karl Rove's Crossroads GPS, Cite $70 Million in 2012 Campaign

---

[6] Exhibit 1.

[7] Democracy 21 describes itself as a "nonprofit, nonpartisan organization that…promotes campaign finance reform, lobbying and ethics reforms…and other government integrity measures." *See* "Petition for Rulemaking On Campaign Activities by Section 501(c)(4) Organizations" at ¶10.  Available at: http://www.democracy21.org/uploads/D21_and_CLC_Petition_to_IRS_7_27_2011.pdf.

[8] *See* Democracy 21 "Letters to the IRS."  Available at: http://www.democracy21.org/wp-content/uploads/2013/05/Letters-to-IRS.pdf.

[9] *See* http://www.democracy21.org/wp-content/uploads/2013/05/Letters-to-IRS.pdf.

[10] *See* fn 7.

[11] IRS00000122502-122505, Exhibit 2.  *See* fn 8 for "Petition for Rulemaking."

[12] *See id.*

[13] *See id.*

[14] *See* Letter from House Ways and Means Committee Chairman Dave Camp to IRS Acting Commissioner Daniel Werfel of September 20, 2013 (requesting returns and return information of right-leaning American Crossroads, Crossroads GPS, and Americans for Prosperity, as well as left-leaning Priorities USA, Priorities USA Action, and Organizing for Action), Exhibit 3.  The documents show no special scrutiny of the left-leaning groups.

[15] IRS0000122515-6, Exhibit 4.

Expenditures as *Prima Facie* Evidence Group is Campaign Operation, not 'Social Welfare' Group."[16] The "watchdog" groups to which the article refers are Democracy 21 and Campaign Legal Center (CLC). This email prompted Lerner to give notice to Flax and others about the meeting scheduled for January 4 with these groups:

> Just FYI for everyone's information—I received the incoming and will refer it to Exam as we do with any complaint. Ruth Madrigal, Vickie Judson and I are meeting with Democracy 21 and some others regarding their request for guidance on c4. This has been set up for some time. I plan to have David Fish there and begin the meeting by telling them we cannot discuss specific taxpayers… We will be very cautious.[17]

Notwithstanding Lerner's apparent careful adherence to the rule against discussing specific cases with people outside of the IRS, emails with her subordinates show a focused interest in Crossroads immediately following the meeting. Again, these emails show no apparent interest in left-leaning groups.

Lerner's calendar shows the January 4, 2013 meeting with Democracy 21 blocked off for 11:00 AM-Noon and, based on Lerner's subsequent actions, it is clear that the meeting went forward as planned.[18] Before or soon after the meeting, Lerner apparently contacted Tom Miller (EO Technical) to ask about the status of Crossroads (whether the group had been audited or selected for audit) because he replied by email at 1:55 PM the same day that the group had twice been before the Political Action Review Committee (PARC), in November 2010 and June 2011, but was not selected for audit.[19]

Following Tom Miller's response, Lerner sent an email to Nanette Downing, the Director of the EO Examinations Unit in Dallas, TX, demanding to know why Crossroads had not been audited.

---

[16] Available at: http://www.propublica.org/article/watchdogs-to-irs-reject-rove-groups-tax-application. (The article updates an earlier ProPublica story from December 14, 2012 that was based on an IRS- leaked copy of Crossroads application for exempt status.)

[17] Exhibit 5. A "referral" is, in lay terms, a complaint; pursuant to the IRM it means:
>    A. A document or other communication, including an electronic communication, received by EO Classification-Referrals from a source outside the Internal Revenue Service, which alleges possible noncompliance with a tax law on the part of an exempt organization, political organization, taxable entity, or individual.
>    B. An internal document (referral) prepared by an Internal Revenue Service employee and forwarded to EO Classification-Referrals, which identifies current or potential noncompliance discovered during either the processing of an assigned case, or at any other time in the performance of official duties.

IRM 4.75.5.2 (05-13-2005).

[18] IRS0000378449 (displaying calendar entry), Exhibit 5. *See also,* Complaint of Van Hollen et al. v. IRS (D.D.C. August 21, 2013) at ¶41 (noting that "On January 4, 2013, representatives of Democracy 21 and the Campaign Legal Center met with Ms. Lerner and other IRS officials regarding the petition for rulemaking."). Available at: http://www.democracy21.org/wp-content/uploads/2013/08/Complaint-August-20-final-for-filing.pdf.

[19] IRS0000122549-122551, Exhibit 6. The PARC is responsible for determining whether allegations of improper political activity by an exempt organization merit an audit. *See* IRS0000378444-378446, IRS Memorandum to Congress, "IRS Exempt Organizations Processes with Respect to Examinations," Exhibit 7. At the direction of Lois Lerner, Nanette Downing created a special process for reviewing complaints of political activity by exempt organizations following the *Citizens United* decision. *See* Subcommittee on Oversight, Committee on Ways and Means, U.S. House of Representatives, Interview of: Nanette Downing, December 6, 2013 at 33-37, Exhibit 8.

I had a meeting today with an organization that was asking us to consider guidance on the c4 issue. To get ready for the meeting, I asked for every document that (sic) had sent in over the last several years because I knew they had sent in several referrals. I reviewed the information last night and thought the allegations in the documents were really damning, so wondered why we hadn't done something with the org. The first complaint came in 2010 and there were additional ones in 2011 and 2012... The organization at issue is Crossroads GPS... I know the org is now in the ROO--based on allegations sent in this year, but this is an org that was a prime candidate for exam when the referrals and 990s first came in.[20]

*** 

You should know that we are working on a denial of the application, which may solve the problem because we probably will say it isn't exempt. Please make sure all moves regarding the org are coordinated up here before we do anything.[21]

On the following Monday, January 7, 2013, Lerner sent a follow-up email to Downing which states, "As I said, we are working on the denial for the [Crossroads] 1024, so I need to think about whether to open an exam. I think yes, but let me cogitate a bit on it."[22] Interviews of IRS personnel and a review of Crossroad's file shows that Lerner was in fact actively seeking to ensure a denial of the group.

In a transcribed interview of Victoria Judson, Associate Chief Counsel (Tax Exempt & Government Entities), Committee staff asked Judson about Lerner's interest in Crossroads:

Q: I think you said that it was in the spring of 2012 that you discussed with Ms. Lerner a Crossroads GPS case and she gave you advance notice that that might be a denial. Is that correct?

A: That's the best of my recollection. And I don't know if I would characterize it as "discuss" as opposed to "she told me that..."[23]

Lerner's plan to deny the Crossroad application is evident from the work log for the Cincinnati-based revenue agent assigned to the case, as after her January 4, 2013 meeting with Democracy 21, the agent sprung into action. In the seven business days following her meeting, the revenue agent Joseph Herr, logged more time on the application than the entire year preceding.[24] But more, the log shows that Herr was directed to reach a particular result with Crossroads. Herr's log shows, in part:

---

[20] Exhibit 6.
[21] *See id.*
[22] *See id.*
[23] Subcommittee on Oversight, Committee on Ways and Means, U.S. House of Representatives, Interview of: Victoria Ann Judson, Wednesday, September 11, 2013, at 57 (quotation marks added), Exhibit 9.
[24] *See* IRS00071224-71226, Exhibit 10.

Exhibit N - Page 5 of 14

On January 4, 2013, Herr notes a conference call with EOT [Exempt Organizations Technical Division] in DC where specific guidance is given to him on "how to best proceed with the [Crossroads] case."

On January 7, this guidance from EOT was memorialized in Herr's time sheet, "[b]ased on conference begin reviewing case information, tax law, and draft/template advocacy denial letter, all to think about how best to compose the denial letter."[25]

In the next journal entry from Herr, he notes,"[w]rite-up summary of idea on how I plan to make denial argument and share with Sharon Light, the Special Advisor to EO Director in Washington DC, for her opinion on whether the idea seems valid."[26] Nowhere in his 2012 log entries is there any discussion of denial. In fact, in an analysis of the Crossroads application in November 2011, among many others, EO Technical lawyer Hillary Goehausen makes no recommendation for denial.[27]

The Committee subsequently learned that the agency was in the process of denying Crossroads' application for exempt status and selecting them for audit. Judson informed staff the organization would be receiving a proposed denial letter.[28] An IRS representative separately told staff that Crossroads had also been selected for audit.[29] The evidence shows that without Lerner's intervention, neither adverse action would have been taken against Crossroads. Again, the Committee has found no record of Lerner pursuing similarly situated left-leaning groups, despite receiving similar public complaints.[30]

In fact, during the same time period Lerner was engineering a denial and audit of Crossroads, documents show Lerner had a favorable disposition toward left-leaning groups, including considering future employment with one. In response to a news story about the formation of Organizing For Action, a 501(c)(4), Lerner remarked to EO Senior Technical Advisor Sharon Light, "Oh—maybe I can get the DC office job!"[31] Light then forwarded Lerner's comment to Holly Paz wondering if Lerner was considering retirement to pursue a potential job opportunity at this left-leaning group.[32]

---

[25] *See id.*

[26] *See id.*

[27] IRS0000063029, Exhibit 11.

[28] Exhibit 9.

[29] Telephone briefing by IRS staff to Oversight Subcommittee staff of September 3, 2013.

[30] *See* http://www.democracy21.org/wp-content/uploads/2013/05/Letters-to-IRS.pdf.

[31] *See* Email from Lois Lerner to Sharon Light of January 24, 2013, IRSC007157-60, Exhibit 12. *N.b.* Democracy 21 is highly critical of Organizing For Action. *See, e.g.,* " Statement by Fred Wertheimer" January 22, 2013 (stating with reference to the formation of Organizing For Action that, "In taking this step, the President has opted for 'the ends justify the means' approach that is fraught with danger. It opens the door to opportunities for government corruption.") Available at: http://www.democracy21.org/money-in-politics/press-releases-money-in-politics/statement-by-fred-wertheimer-president-obama-opts-for-the-ends-justify-the-means; *see also,* "Is Organizing For Action Too Close To The White House?" National Public Radio (March 19, 2014)(quoting Democracy 21's Fred Wertheimer, "The best thing the president of the United States could do is shut [Organizing for Action] down. This is a danger to the integrity and credibility of his presidency.") Available at: http://www.npr.org/2014/03/19/291312006/is-organizing-for-action-too-close-to-the-white-house.

[32] *See* Exhibit 12.

b.  *Evidence Suggests Lerner Targeted Other Right-Leaning Groups*

Evidence discovered by the Committee also suggests that Lerner targeted other right-leaning groups.  On January 2, 2013, ProPublica separately published an article titled, "Controversial Dark Money Group Among Five That Told IRS They Would Stay Out of Politics, Then Didn't" that was circulated within the IRS.[33]  Forwarding the ProPublica article, Lerner asked Holly Paz, David Fish and Sharon Light to "meet on the status of these applications please.  Can we talk Friday?"[34]  The five groups named in the article are:

- o  Americans for Responsible Leadership
- o  Freedom Path
- o  Rightchange.com
- o  America is Not Stupid
- o  A Better America.[35]

Information later provided to the Committee regarding IRS EO examinations processes showed that four of the five groups were subject to extra-scrutiny; two of the groups were placed in the IRS' surveillance program, called a "Review of Operations," and two were selected to be put before the Political Activity Review Committee, which determines whether a group will be audited.[36]  Ultimately three of the groups were selected for audit.[37]

c.  *Lerner's Defiance of Internal Controls and Abuse of Authority*

The evidence demonstrates Lerner acted in defiance of IRS internal controls.  Internal IRS policies and procedures, which would be well known to Lerner, deter any one person from deciding the disposition of a group based on political or personal animus.  Joseph Grant, former Commissioner of the Tax Exempt and Government Entities Division, and former boss of Lerner, told the Committee in a transcribed interview that it would be "completely" inappropriate for a manager to target a specific organization for exam or adverse determination.[38]  The IRS put in place these safeguards "in the 1990's to ensure

---

[33] *See* http://www.propublica.org/article/controversial-dark-money-group-among-five-that-told-irs-they-would-stay-out.

[34] IRS0000122510, Exhibit 13.

[35] fn 33.

[36] Telephone briefing by IRS staff to Oversight Subcommittee staff of September 3, 2013.

[37] Telephone briefing by IRS staff to Oversight Subcommittee staff of March 27, 2014.

[38] *See* Subcommittee on Oversight, Committee on Ways and Means, U.S. House of Representatives, Interview of: Joseph H. Grant, Sept. 20, 2013, at 39, Exhibit 14.  Under questioning:

Q:  Would it be appropriate for a manager at IRS to refer a specific taxpayer to Exams or to intervene on their own on -- I mean, their own volition to Determ[ination]s?

A:  I believe it would be completely -- it would not be appropriate to intervene on their own.  So -- and I'm not aware of that occurring.

*See also*, Testimony IRS Commissioner Douglas Shulman before the U.S. House Committee on Appropriations Subcommittee on Financial Services and General Government Hearing on the FY 2013 Internal Revenue Service Budget, March 21, 2012.  Per Shulman:

[W]e have the safeguards built in to this process so that no one person can decide to examine an organization based on political activities. So you've got your peers watching. You can't just get a case, go off in the corner,

equity and transparency and that no *one individual* could select organizations within certain classes for examination."[39]

These safeguards are reflected in current EO Examinations Unit procedures adopted during Lerner's tenure that she nonetheless circumvented. From the FY2013 EO work plan:

> EO will have a PARC (Political Action Review Committee) operating at all times comprised of three experienced career civil servant employees…. PARC operations are overseen by the Managers of EPR and EOCA; *however, they shall not override or influence any case selection decision of the PARCs.*[40]

The PARC determines whether organizations about which referrals are made are to be subject to audit.[41] The PARC had twice refused to target Crossroads, yet Lerner stated to the head of EO Examinations that, "we are working on the denial for the [Crossroads] 1024, so I need to think about whether to open an exam. I think yes, but let me cogitate a bit on it," in defiance of IRS policy.[42] Lerner makes clear that she believes she is entitled to approve or disapprove an application or subject an organization to an audit based on her say so alone and irrespective of the PARC's decision.

### d. *Lerner Seeks to Influence the IRS' Independent Appeals Process*

In addition to IRS safeguards against interfering in the determinations and exams functions, there are internal controls in place with regard to the IRS's Appeals Division that Lerner sought to circumvent. If EO Determinations reaches the conclusion that an application for exempt status does not satisfy the requirements under the Code, the IRS generally will issue a proposed adverse determination letter to the applicant and give notice of the opportunity to appeal.[43] The Appeals Division is independent of the EO Division and thus outside of the EO Director's chain of command.[44] Furthermore, as a matter of law and not just IRS policy, *ex parte* communications between appeals officers or settlement officers and other IRS employees, to the extent that those communications appear to compromise the independence of Appeals, are prohibited.[45]

---

and run with your own agenda. Available at:
http://appropriations.house.gov/uploadedfiles/hhrg-112-ap23-wstate-dhshulman-20120321.pdf.
[39] IRS, FINAL REPORT, PROJECT 302 Political Activities Compliance Initiative at 3 (emphasis added). Available at: http://www.irs.gov/pub/irs-tege/final_paci_report.pdf.
[40] IRS0000410461-62, Exhibit 15. "EPR" refers to Examinations Programs & Review and EOCA to Exempt Organizations Compliance Area. *See also,* IRS Exempt Organizations FY 2012 Annual Report & FY 2013 Work Plan at 2. Available at: http://www.irs.gov/pub/irs-tege/FY2012_EO_AnnualRpt_2013_Work_Plan.pdf .
[41] Exhibit 7.
[42] Exhibit 6.
[43] Internal Revenue Bulletin: 2013-2, Jan. 7, 2013, Rev. Proc. 2013-9, sec. 7.01.
[44] *See* Section 1001(a)(4) of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685, 26 USC 7801 note. The provision requires:

> The Commissioner of Internal Revenue shall…ensure an independent appeals function within the Internal Revenue Service, including the prohibition in the plan of ex parte communications between appeals officers and other Internal Revenue Service employees to the extent that such communications appear to compromise the independence of the appeals officers.

[45] *See id.*

An email from Lerner to the Chief of IRS Appeals, Chris Wagner, on January 31, 2013, shows she sought to influence the independent appeals process notwithstanding a prohibition against such contact.  Lerner offers unsolicited advice about how to handle incoming c4 denials:

> I gave [your people] a heads up that, in the next few months we believe they will get a lot of business from our [taxpayers] regarding denials on 501(c)(4) applications. I explained the issue is whether they are primarily involved in social welfare activities and whether their political intervention activities…I explained the issue was very sensitive and visible and there is a lot of interest--Congress, press, political groups, you name it… I offered a general tutorial session (noncase-related) on the law and the complexities because--as I pointed out… I told them this is a place where we have worked very hard to be consistent and have all our cases worked by one group, and suggested they might want to do something similar. (PS we are under audit by TIGTA because of allegations of political bias on these cases)… If you think it would be useful to have a meeting on this –let me know.[46]

Ironically, Lerner's communication closes with, "Hope this doesn't [sound] like I'm trying to run your shop." The purpose of this email could not be clearer.  Lerner explained that her team worked very hard both to get what Lerner characterized as a highly technical law right and also to apply it consistently to the circumstances of each applicant.  She further characterized the cases as "sensitive and visible" and suggested that Wagner should consult her.[47]  Notwithstanding agency safeguards, the message from Lerner to the Appeals chief was unequivocal:  EO got these denials right and Appeals should affirm them.

## II.   Lerner Provided the Treasury Inspector General with Misleading Statements

The Committee has found documents that suggest Lerner's written statement to TIGTA, submitted during the course of TIGTA's audit, was knowingly misleading (Reference Number:  2013-10-053).  The document titled, *EO Director's responses to 3 questions asked by Director Paterson*, which Lerner drafted and submitted to TIGTA on November 2, 2012, contained specific statements that are contradicted by the documentary evidence reviewed by the Committee.[48]

TIGTA asked:

> When did you become aware the IRS was targeting applications for tax exemption that mention: 1) the "Tea Party," "Patriots," or the "9/12 Project", 2) government spending, government debt or taxes, 3) education

---

[46] IRS0000122863-122864, Exhibit 16.

[47] *See* Exhibit 16.  The applicable Revenue Procedure allows Appeals to seek technical advice from EO, but that request for advice would come from Appeals in the first instance and would be documented, not behind the scenes.

[48] EO Director's responses to 3 questions asked by Director Paterson, produced to the Committee by the Treasury Inspector General for Tax Administration, Exhibit 17. *See also*, telephone briefing by TIGTA staff to Oversight Subcommittee staff of September 12, 2013.

of the public by advocacy/lobbying to "make America a better place to
live", or 4) criticizing how the country is being run?

Lerner began her response with the statement:

> In early 2010, EO Determinations witnessed an uptick in the number of applications
> for §501(c)(3) or 501(c)(4) status that contained indicators of potentially significant
> amounts of political campaign intervention ("advocacy organizations")."[49]

Lerner here seeks to establish that there was an increase in the number of applications
received in Cincinnati that contained political campaign activity to minimize her
responsibility for the targeting. However, the statement is the first of a compilation of
misleading half-truths.

Just a few months before, on July 17, 2012, Lerner sent an email to Holly Paz and Nikole
Flax offering comments on a talking point drafted for then-Deputy Commissioner for
Services and Enforcement Steve Miller about a perceived uptick in political advocacy
cases:

> Only one comment--I know we don't have published SOI stats for the uptick, but our
> Cincy folks saw it happening –can we get Nikole whatever "inside" info we have that
> led to that conclusion--she can then figure out how to use it.[50]

Holly Paz sought assistance from Nanlee Park,[51] who responded later that evening and
included Lerner on the response:

> [A]s Holly pointed out in her comment, we do not have a reliable method
> for tracking data by issue such as political activity. This is consistent with our
> congressional responses where we had explained we would have to manually go
> through each application, etc.
>
> Because of the above points, the first bullet that presently reads as:
> Starting in 2010, EO observed an increase in the number of section 501(c)(3)
> and section 501(c)(4) determination applications from organizations
> that appeared to be potentially engaged in political advocacy activities.
>
> Recommend it be revised (i.e., along the lines of the following):
> For about the past five years [alternative verbiage: From FY 2008 through
> June 30th of FY 2012], EO has observed an increase in the number of section
> 501(c)(4) determination applications filed, as well as a general upward
> trend in section 501(c)(3) application filings.[52]

---

[49] Exhibit 17.
[50] IRS0000179271, Exhibit 18.
[51] IRS0000179269-179270, Exhibit 19.
[52] IRS0000179389-179390, Exhibit 20.

Despite being told that "political advocacy activities" could not be substantiated in her proposed talking point, Lerner used almost the exact same words in her response to federal law enforcement. Lerner knew her answer could not be substantiated, and yet provided it in response to TIGTA's audit in an attempt to minimize her role in the agency's management failures.

Lerner then answered the question of when she first learned "the IRS was targeting applications…that mention…the 'Tea Party," by saying that she:

> First became aware that the BOLO referenced 'tea party' organizations and EO Determinations was using the above criteria to determine what organizations met that description when I was briefed on these cases on June 29, 2011.[53]

This half-truth appears calculated to obscure her knowledge that "Tea Party" cases were being treated differently, in part, at her direction, and far earlier than she acknowledged. A series of emails show that Lerner knew as early as April 2010 that tea party cases were being flagged and held in Cincinnati.

- On April 28, 2010 Lerner was told by email, "there are 13 tea party cases out in EO Determinations." The attached spreadsheet even identifies the issue involved "whether a tea party organization meets the requirements under 501(c)(3) and is not involved in political intervention" and notes that there is a grouping of tea party cases.[54]

- On May 13, 2010, Lerner responded to a detailed summary of the tea party cases and even inquires about the status of the cases. Upon review of the email, she asked follow-up questions regarding the tea party cases, "[Are the] tea party cases – applications for c3? What's their basis?" In response, she is explicitly told "[w]e have tea party cases here in EOT in Cincy. In EOT, there is a (c)(3) application. In Cincy there are 10 (c)(4)s and a couple of (c)(3)s."[55]

- In an email dated August 3, 2010, Lerner specifically asked her assistant to print out a Sensitive Case Report (SCR) on the handling of the tea party cases, for her review. The SCR noted that the cases were being held due to the likelihood of attracting media attention, contrary to Lerner's assertion that the targeting was prompted by the "uptick in applications" with these characteristics.[56]

- On January 1, 2011, Lerner received an SCR that flagged issues with "tea party organization[s]."[57] The next day, Lerner responded, "Tea Party Matter very dangerous…. Counsel and Judy Kindell need to be in on this. Cincy should

---

[53] Exhibit 17.
[54] IRS0000141809-141811, Exhibit 21.
[55] IRS0000167872-167873, Exhibit 22. Pursuant to the Internal Revenue Manual (IRM) 7.29.3.2 (07-14-2008), Sensitive Case Reports are written for the benefit upper management.
[56] IRS0000163358-163359, Exhibit 23.
[57] IRS0000147507-147509, Exhibit 24.

probably NOT have these cases."[58]  Less than hour later, Lerner appeared to be
directing staff to find a way to deny both c3 and c4 applications--"[I]t would be
great if we can get there without saying the only reason they don't get a 3 is
political activity."[59]

These email exchanges memorialize Lerner's knowledge that, as early as April 2010, the
IRS was targeting applications for tax-exemption involving the name "Tea Party" and
holding these cases pending review from EO Technical in Washington, D.C.

III.    Lerner Used Her Personal Email for Official Business, Including Confidential
        Return Information; Further Investigation Could Review Unauthorized Disclosure

In an email dated October 29, 2012, Lerner sent TIGTA's draft chronology containing
confidential return information of taxpayers, protected by 26 U.S.C section 6103, to her
personal email address:

> From: Lerner Lois G
> Sent: Monday, October 29, 2012 10:51 AM
> To: 'tobomatic@msn.com'
> Subject: Fw: Revised timeline
> Attachments: Long Political Advocacy Timeline HOP comments.doc
>
> Lois G. Lerner------------------------- Sent from my BlackBerry Wireless Handheld[60]

A review of the redacted chronology shows that nine of the 17 pages contain section
6103 material.[61]

The next evening, Lerner sent this material back to her official email address and to
others in the IRS with her comments:

From: Toby Miles <tobomatic@msn.com>
>        Sent: Tuesday, October 30, 2012 9:16 PM
>        To: Paz Holly O; nancy.marks@irs.gov; Lerner Lois G
>        Subject: Long Timeline from LOIS
>        Attachments: Long Political Advocacy Timeline HOP comments.doc
>        Looks pretty good--a couple questions/comments[62]

More recently on May 4, 2013, EO Senior Technical Advisor Meghan Biss, apparently at
Lerner's request, sent a summary of One Fund Boston's 501(c)(3) application, which
consisted almost entirely of section 6103 material, to Lerner's personal email address.[63]

---

[58] IRS0000147510-147513, Exhibit 25.
[59] Exhibit 25.
[60] IRS0000062811-28, Exhibit 26.
[61] Exhibit 26.
[62] IRS0000062829, Exhibit 27. "Miles" is Lerner's husband's, Michael R. Miles, last name. The source of the name "Toby" is not known.
[63] IRS0000322610, Exhibit 28. The application has since been approved and is available for public inspection.

12

Sending confidential taxpayer information to a personal email address is prohibited by IRS policy, but is not illegal.[64] However, it is a crime to disclose taxpayer return information.[65] If persons other than Lerner had access to her personal email account, tobomatic@msn.com, and accessed this protected section 6103 material, then Lerner may have violated a criminal statute for which the penalty is up to $5,000 fine and/or up to five years in prison.[66]

IV.    Conclusion

Contrary to reports that IRS' Administrative Review Board found no political bias or willful misconduct by Lois Lerner, the Committee's investigation has uncovered such evidence.[67] After reviewing these same emails, Acting Commissioner Danny Werfel himself conceded that there was evidence that raised questions about wrongdoing at the agency.  At a September 18, 2013 hearing, Oversight Subcommittee Chairman Charles Boustany asked Werfel whether Lerner acted in violation of internal agency controls:

> Chairman Boustany.  Did Lois Lerner seek to intervene in the examinations process or audit process?

> Mr. Werfel.  I am not sure that I can fully answer that question because all those documents in Lois' email file need to be further reviewed.  I will say this, that there were emails that we turned over to you… that I thought raised questions, [which] I provided directly to TIGTA and I also provided them to the Accountability Review Board.[68]

Werfel's testimony is the first public admission by an IRS official that evidence may show intentional wrongdoing; this concession is wholly consistent with the Committee's investigation.

Notwithstanding the Werfel Report and other IRS statements, the foregoing sets forth evidence that tends to show intentional wrongdoing, including targeting specific taxpayers for adverse treatment, making misleading statements to law enforcement, and

---

[64] *See* IRM 11.3.1.14.2 — Electronic Mail and Secure Messaging *[Last Revised: 03-07-2008]*
    (1) a. Employees may not use E-mail to transmit SBU [(Sensitive but Unclassified)] data unless they use the IRS Secure Messaging (SM) system…Both the sender and recipient must have SM in order for the E-mail to be protected.
    b. SBU information **includes taxpayer data**, Privacy Act protected information, some law enforcement information, and other information protected by statute or regulation…
    d. SBU data may not be sent to parties outside of IRS, including other government agencies , taxpayers, or their representatives…**Employees cannot send E-mails containing SBU data outside the IRS network**, even if specifically authorized by the taxpayer. (emphasis added)
[65] *See* IRC § 7213.  Unauthorized disclosure of information.
[66] *See id.*
[67] Stephen Ohlemacher, "IRS official at heart of tea party scandal retires," Associated Press, Sept. 23, 2013.  Available at:  http://bigstory.ap.org/article/irs-official-heart-tea-party-scandal-retires.
[68] U.S. House Committee on Ways and Means Oversight Subcommittee Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit, September 18, 2013.

Exhibit N - Page 13 of 14

the possible disclosure of confidential taxpayer information.  The Committee requests that you act on the findings within this letter and the attached documentation to ensure the rights of law-abiding taxpayers are protected.  Please contact Committee staff at (202) 225-3625 if you have any questions.

Sincerely,

DAVE CAMP
Chairman

cc:  The Honorable J. Russell George, TIGTA
      The Honorable John Koskinen, Commissioner, IRS

14