CQ CONGRESSIONAL TRANSCRIPTS

Congressional Hearings

June 20, 2014 - Final

House Ways and Means Committee Holds Hearing on the IRS Tax-Exempt Investigation

LIST OF PANEL MEMBERS AND WITNESSES

---

CAMP:

Good morning. The committee will come to order. Well, good morning. Over three years ago, this committee started asking the IRS.

Was it targeting conservatives for their beliefs? Was it asking groups inappropriate questions? Was it harassing conservative donors?

The IRS assured this committee and even testified before Congress time and time again that no targeting was occurring. Then as we all recall, one year ago when a signature IRS Friday news dump (ph), then head of exempt organizations at the IRS, Lois Lerner, admitted to the American people that the IRS targeted conservative organizations.

The IRS lied to Congress and the American people. In fact, this committee has found that there's ample evidence to suggest the IRS violated the Constitutional rights of taxpayers.

As of today, the investigation into the IRS is intentional organized targeting of Americans for their beliefs has been ongoing for over a year. What we have found so far is outrageous.

The IRS spent over three years responding to top Democrat complaints and calls to action to stop all activities of conservative groups. The IRS in Washington, D.C. took their marching orders and subjected Americans to harassment going so far as to question the content of their prayers and their political beliefs while subjecting them to audits and leaking their personal taxpayer information.

When the scandal first broke out, the President vowed that his administration would work and I quote, "hand-in-hand with Congress to get this thing fixed," end quote.

And this spring, Commissioner Koskinen, you said your goal was to, quote, "find problems quickly, fix them promptly, make sure they stay fixed and be transparent about the entire process," end quote. Well, since my time in Congress, I have never seen an IRS so broken.

Last -- late last Friday, the IRS admitted to Congress that the agency had lost over two years' worth of Lois Lerner e-mails and blame the loss on a computer crash. My committee staff later learned in an



interview that it wasn't only Ms. Lerner's e-mails but the e-mails of six other individuals relevant to this investigation, including the former acting commissioner's chief of staff.

And just two days ago, we found out the IRS and White House have known for months and kept it a secret from Congress. This is not the most open and transparent administration the President promised.

This is about as far as you can get from getting -- from getting this thing fixed. Now, what does this really mean? It means that the IRS has claimed that Ms. Lerner's hard drive is really unrecoverable.

The public will never know the full extent of the abuse of Americans for exercising their first amendment rights. Let me give you an example. Ms. Lerner told TIGTA investigators that she first learned about the tea party targeting in July of 2011.

That wasn't true. In February 2011, Ms. Lerner told subordinates by e-mail, quote, "tea party matter dangerous," end quote, and discussed ways to deny the applications.

We only have this e-mail because it came from another employee's inbox. Had Ms. Lerner e-mailed this to the Treasury Department or Justice, for example, it would be gone forever according to the IRS.

We are missing a huge piece of the puzzle. The years between 2009 and 2011 are the very peak of when the IRS organized and gentlemen its targeting scheme. How convenient for the IRS and the administration.

I find it hard to believe and I don't believe that the IRS went through every possible exercise to recover these documents. We are missing the e-mails of seven IRS officials during periods critical to this investigation.

How is this possible? Making matters worse, the IRS kept all this a secret from the public for months while quickly informing political staff in the administration. After all the obstruction, I fear this Congress and the American people cannot take the IRS at its word.

One -- one thing is for certain. You can blame it on a technical glitch. But it's -- it is not a technical glitch to mislead the American people.

You say that you've lost the e-mails but what you've lost is all credibility. The IRS is in charge of hundreds of millions of taxpayers' information. And -- and you're now saying your technology system was so poor that years' worth of e-mails are forever unrecoverable.

How does that put anyone at ease? How -- how far would the excuse of "I lost it" get with the IRS for an average American trying to file their yearly taxes who may -- may have lost a few receipts?

Oddly enough, this seems a satisfactory answer for the attorney general. As far as I can tell, this administration has done nothing to investigate what truly happened, notwithstanding this committee sending the Department of Justice a detailed referral letter of nearly 100 pages.

They have repeatedly tried to sweep this under a rug and claim no wrongdoing without ever looking for the facts. The American people have no reason to trust the IRS or frankly, the administration on this issue. To wait years to reveal the fact, the IRS was targeting the American people and then wait months to reveal your conveniently missing years of documents.

Well, it's no wonder I've heard the word cover-up thrown about a lot this week. The time for denials, delays, obstructions and attempts to blow this off as a phony scandal are over.

This committee is fed up. And we expect some answers, not only -- from not only the IRS but the whole administration. It's time we restore the American people's trust in their government.

But I fear with recent events, that may not be possible.

And now, Mr. Levin, I'll recognize you for an opening statement.


LEVIN:

Thank you. On September 11, 2013, Internal Revenue Service provided this committee with one of the 770,000 pages of documents it has turned over since Ways and Means undertook its investigation into the IRS in May 2013. In total, more than 250 IRS employees has spent over a hundred and 20,000 hours working to produce documents at a cost of at least $16 million to taxpayers.

That document received last September -- last September, included an e-mail from Lois Lerner to other IRS personnel dated June 14, 2011. It began, "My computer crashed yesterday."

We now know the full extent of that equipment failure. Despite an exhaustive effort by forensic I.T. professionals at the IRS, they were unable to save her hard drive, and her e-mails between January 1, 2009, and April 2011.

Although her e-mails from June 1, '09, to April 2011 are unrecoverable from her hard drive, the IRS will produce 67,000 e-mails related to Lois Lerner. The IRS has or will be producing 24,000 e-mails that have been recovered from the period before her computer crashed.

They recovered these e-mails from other IRS employees. That is on top of more than 43,000 e-mails involving Ms. Lerner after April 2011 that have already been produced. There is absolutely no evidence -- absolutely no evidence to show that Ms. Lerner's computer crash was anything more than equipment failure.

At the time of the incident in June -- in June 2011, IRS computer experts reviewed the issue and informed Lois Lerner that, and I quote, "Unfortunately, the news is not good. The sectors on the hard drive were bad which made your data unrecoverable," end of quote.

Was your computer crash a conspiracy? No. Was the Internal Revenue Service's system for backing up its e-mail system entirely underfunded and wholly deficient? Clearly, yes.

In fact, Congress has cut the IRS budget for operations, which includes what it spends on computers and other information technology every year for the last five years. House Republicans are proposing to -- to slash it once again next year.

Commissioner Koskinen, whom we welcome here today, has informed this committee that the IRS has $1 billion worth of computer equipment, and that the agency should be spending $150 million to $200 on maintenance for that equipment. Instead, the agency spends virtually nothing because it cannot afford to properly maintain what it has.

It's important to remember that e-mails were routinely lost during the Bush administration. In one instance in 2007, according to report by Democrats on the Oversight and Government Reform Committee, the Bush White House acknowledged having lost nearly five million e-mails between March 2003 and October 2005, related to allegations of the politically motivated dismissal of U.S. attorneys.

Lost data under the Bush administration, coupled with a number of computer crashes at the IRS, clearly demonstrates a need for government agencies to have adequate budgets to invest, upgrade and maintain information technology. My colleagues on the other side of the aisle have taken this opportunity to rehash well-worn allegation, allegations of White House involvement, allegations that Republicans have made from the very moment the inspector general released his report more than a year ago.

On the day the report was released, before a Congressional investigation into the issue had even begun, Chairman Issa accused the White House of, and quote, "targeting its political enemies." Three days later, our Chairman, Mr. Camp, in your opening statement during the first hearing on this matter, you accused the White House of a culture of cover-up.

Congressional Republicans are so determined to find a needle in the haystack that they seek desperately to add to the haystack, even though no needle has been discovered. It was in that vein that Chairman Camp this week said that this entire case started with the White House, and sent a letter to the President requesting all correspondence between Lois Lerner and the executive office of the President between January 2009 and May 2011, the period before Ms. Lerner's hard drive crashed.

The White House has conducted that search, and what have they found? There was not a single e-mail correspondence sent to or from Ms. Lerner and the White House. This committee has been involved in this investigation for over a year.

Here is what we have learned. The 501(c)(4) applications of both conservative and progressive groups were inappropriately screened. There were long delays in processing applications.

There was serious mismanagement. And I was among the very first to call for Ms. Lerner and then Commissioner Miller to be relieved of their duties.

In all of the 770,000 pages of documents that the IRS has supplied Congressional committees, including ours, there has not been any evidence of political motivation or of White House involvement. Now, there have been computer failures at the IRS.

And Republican conspiracy theories have started anew. The evidence today reinforces this long evident truth, the prevailing conspiracy in this matter is that of the Republicans desire to stir their base, tied the problem to the White House, and keep up this drumbeat until the November election.

I'm glad that you, Commissioner Koskinen, is here with us today to set the record straight. We're glad that you're here.

You started at the IRS last December, after a distinguished career in the public and private sectors, at OMB, at Freddie Mac, as the Chair of President Clinton's Y2K computer consult. So again, we welcome your testimony. We're glad you're here.

We look forward to your testimony to set the record straight.


CAMP:

All right, thank you. Before I recognize Commissioner Koskinen for his opening statement, I asked that he stand to be sworn in.

Commissioner Koskinen, please raise your right hand. Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth and nothing but the truth, so help you god?


KOSKINEN:

I do.


CAMP:

Let the -- let the record reflect the witness answered in the affirmative. Thank you.

Commissioner Koskinen, thank you for being with us today. You will have five minutes to present your testimony with your full written statement submitted for the record.

You're now recognized for five minutes.


KOSKINEN:

Chairman Camp, Ranking Member Levin, and members of the committee, thank you for the opportunity to appear before you today to provide you with an update on recent IRS document productions to Congress. The IRS has, over the past year, made a massive document production in response to inquiries from Congress. In March, the IRS advised this committee and the Senate finance committee that we had completed the production of documents identified as relating to their investigation of the processing

and review of applications for tax exempt status as described in the May 2013 report from the Treasury Inspector General for Tax Administration known as TIGTA.

Those production efforts included 11,000 e-mails from Lois Lerner, former director of the IRS Exempt Organizations Division. This committee and the Senate Finance Committee has noted they have now received more than 770,000 pages of unredacted (ph) materials.

We are sending another production to you later today of additional Lois Lerner e-mails. You already have more than 25,000 e- mails from Ms. Lerner's computer account and more than 5,000 e-mails from other custodians' accounts for which which Ms. Lerner was an author or recipient.

The IRS expects as noted earlier in my conversation with you to complete its production of the remaining Lerner e-mails to this committee by the end of the month. At that time, you will have all of the e-mails, 43,000 of them, that we have from Ms. Lerner's computer and e-mail account for the period January 2009 through May 2013.

In addition, as noted, you will have 24,000 Lerner e-mails from other custodian accounts during the period that her hard drive was not -- was crashed, for a total of 67,000 Lerner e-mails. In the course of responding to Congressional requests, the IRS in February reviewed the e-mail available from Ms. Lerner's custodial computer accounts which had then (ph) date (ph) limited and limited by search terms, we had worked out with investigators, and identify the possibility of an issue because the date distribution of the e-mail was uneven. It was not clear then whether Lerner e-mails were overlooked, missing, or had other technical issues involved.

IRS information technology professionals identified documents that indicated Ms. Lerner had experienced a computer failure in 2011. As Congressman Levin noted, some of those e-mails had earlier been provided last fall to this committee.

In mid-March 4014, the IRS focused on redacting materials for (ph) the non-tax writing committees and processing the rest of Ms. Lerner's e-mail for production. As we reviewed additional Lerner e- mails, not limited by search terms, relevance or subject matter, in other words, all of her e-mails, the IRS review team learned additional facts regarding Ms. Lerner's computer crash in mid-2011, which occurred before these investigations opened or the I.G.'s report began.

We learned that in 2011, the IRS information technology division had tried using multiple processes at Ms. Lerner's request to recover the information stored on her computer's hard drive. A series of e- mails available after all of Ms. Lerner's e-mail was loaded recounts the sequence of events in 2011. A front-line manager in I.T. reported to Ms. Lerner in an e-mail on July 20 of 2011, and I quote, "I checked with the technician and he still has your drive."

He wanted to exhaust all avenues to recover the data before sending it to the hard drive cemetery. Unfortunately, after receiving assistance from several highly skilled technicians, including H.P. experts, he still cannot recover the data," unquote.

Ms. Lerner was told by e-mail on August 1 in 2011, and I quote, "As a last resort, we set your drive to c-high (ph), that's the IRS criminal investigation division, forensic lab to attempt data recovery," the end of that quote. In an e-mail on August 5, 2011, after three weeks of attempts to retrieve her e-mails at Lois Lerner's request, Ms. Lerner was advised, quote, "Unfortunately, the news is not good. The sectors on the hard drive were bad, which major data unrecoverable.

I am very sorry. Everyone involved tried their best," end of that quote. The committee has been provided earlier these e-mails, earlier this spring. In light of the hard drive issue, the IRS took multiple steps over the past months to assess the situation and produce as much e-mail as possible for which Ms. Lerner was an author or recipient.

We retraced the collection process for her e-mails. We located process that included e-mail from an unrelated 2011 data collection from Ms. Lerner. We confirmed -- confirmed the backup tapes from 2011 no longer existed because they have been recycled pursuant to the IRS normal policy.

We searched e-mail from other custodians, from material on which Ms. Lerner appears as author or recipient. From mid-March to late April, the IRS review team concentrated on loading for review all the remaining e-mail from Ms. Lerner's account and then repeating the entire process for quality control and to ensure that no new e-mails from Ms. Lerner were missing.

During this time and into May, we also were identifying and reviewing Lerner e-mails to and from 82 other custodians. By mid-May, as result of these efforts, the IRS had identified the 24,000 Lerner e-mails between January 1 and April 2011.

As the search for in production of Lerner e-mails was concluding, I asked those working on this matter to determine whether computer systems of the other 82 custodians had experienced any similar difficulties, especially in light of the aged equipment the IRS has been increasingly using as result of its budget provisions. After the IRS report on Ms. Lerner's e-mail production was delivered last Friday to Congress, it was determined earlier this week, actually on Monday, that seven additional custodians had experienced hard drive failures during the search period.

A hard drive failure does not automatically mean that any or all e-mails have been lost or cannot be reconstructed. Given the extremely broad scope of our production effort, it's not surprising that we would discover that some employees have encountered some technical issues especially in light of the aging -- aging information technology infrastructure.

As you know, the IRS described in great detail in its public report last week its effort to produce Lerner e-mails. We are still assessing what effect, if any, hard drive crashes had on the e-mails of any other custodian.

At this time, it is too early to know if any e-mails have been lost on any of those hard drives. We are committed to continuing to working cooperatively and transparently with you, this committee.

And we will continue to provide you with updates. This concludes my testimony. I'd be happy to take your questions.

CAMP:

Well, thank you. What I didn't hear in that that was an apology to this committee.

KOSKINEN:

I don't think an apology is owed. There had not a single e-mail has been lost since the start of this investigation. Every e-mail has been preserved that we have, we have produced or will produce by the end of this...

CAMP:

You don't think the time period between January 2009 and April 2011 is relevant to this investigation?

KOSKINEN:

It is a very relevant time frame...

(CROSSTALK)

CAMP:

Well, let me ask you this. The letter we received from the IRS on Friday the 13th admitted that Lerner e-mails were lost for this two-and-a-half-year period.

KOSKINEN:

They were lost on...

CAMP:

But you didn't...

KOSKINEN:

...they were lost on (ph) hard drive. We also advised (ph)...

CAMP:

Let me finish. I'm not finished with my question.


KOSKINEN:

I'm sorry.


CAMP:

And I'll give you an opportunity.


KOSKINEN:

That's fine.


CAMP:

But you failed to explain the timeline of events that led to that admission. And my question to you is, from the interviews that we've had with the deputy chief of information -- the deputy chief information officer for the IRS, I'm told that the IRS knew as early as February that her computer crashed supposedly caused a loss of her e-mails during the time period of January 2009 to 2011.

Has the IRS known since February?


KOSKINEN:

The IRS knew in February there was an issue. As noted, we all had e-mails from Ms. Lerner last fall in which she recited that she had had a hard drive crash.


CAMP:

So in February, you knew the e-mails were missing?


KOSKINEN:

No. In -- in February, what we knew was there was a problem because we were looking at it from the standpoint of where -- what time frame was it (ph) which her e-mails appeared. And it appeared that there were not enough e-mails in that time frame.


CAMP:

So why didn't you -- why didn't the IRS notify Congress at that time there was a problem with the potential loss of the e-mails we were investigating?

KOSKINEN:

Because I thought it was important. It was my decision that we complete the investigation so we could fully advise you as to what the situation was.

CAMP:

Now, I got a letter from the White House two days ago that says that Treasury contacted the White House in April -- in April of this year to tell them about the lost e-mails. Who told the Treasury Department?

KOSKINEN:

Pardon?

CAMP:

Who told the Treasury Department? The letter I received from the White House says that Treasury told them in April of 2014. So my question is who told the Treasury Department?

KOSKINEN:

My understanding only from that letter which I have seen, which does not say that e-mails had been lost, my understanding the letters says that someone in the general counsel's office at the IRS informed the general counsel's office at Treasury that there was an issue. And the IRS was investigating...

CAMP:

No, the letter says that Treasury was told that Treasury told the White House. We also have a letter from Treasury that says they learned in April of 2014.

Who told Treasury? And do know who in Treasury told the White House?

KOSKINEN:

I have no idea. I have no communications with the White House.

CAMP:

Well, you're the Head of the IRS. You don't know something this important, the contacts between your agency and the Executive Branch? You're unaware of them?

KOSKINEN:

We are part of the Executive Branch. We have regular communications with Treasury. We -- we issue regulations. We review them.

We're in the process of reviewing, for instance, the regulations on the 501(c) issue. We have regular communication, particularly between our counsel's office and the Treasury counsel...

(CROSSTALK)

CAMP:

If the IRS new in February or maybe even March and Treasury and White House knew at least in April but Congress and the American people didn't find out until June, were you purposefully not telling us?

KOSKINEN:

No...

(CROSSTALK)

CAMP:

Were you purposefully not revealing this to the American people?

KOSKINEN:

No, as I told you, my -- my proposal wasn't -- in fact, our original thought was to complete the Lois Lerner e-mail production, complete the review of what other custodians had a problem and produce a report to you laying it all out.

CAMP:

So why did you tell -- why did the IRS inform the Executive Branch agency, the Executive -- the White House, the administration, they kept it secret from the Congress who was conducting an investigation?

KOSKINEN:

We were not keeping it a secret. It was our public report to you that has, in fact, provided you this information. There has been no attempt to keep it a secret.

My position has been that when we provide information, we should provide completely. If we provide you incomplete information, people sometimes are tempted to lead to the wrong conclusion not based on any facts.

So we thought it would be important to give you the full description of what (ph) the (ph) problem (ph)...

(CROSSTALK)

CAMP:

It's OK for them to leap to a conclusion?

KOSKINEN:

Pardon?

KOSKINEN:

It's OK for the White House and Treasury to leap to a conclusion six weeks before the Congress. But my question also is, have there been discussions within the IRS about when to reveal this information to Congress?

KOSKINEN:

Certainly.

CAMP:

And obviously, these discussions included Treasury?

KOSKINEN:

No.

CAMP:

Well, then how did Treasury find out about it?

KOSKINEN:

Treasury in a conversation, I'm not aware of. Apparently, the first time I knew about that was that White House...

CAMP:

I'll have a lot of questions to write to you, to have to follow up with you.

(CROSSTALK)

KOSKINEN:

If you would read...

CAMP:

That's (ph) completely unacceptable.

KOSKINEN:

Can I answer that question and make the records...

CAMP:

Well, I don't think you're giving me an answer. I want to move onto another topic.

KOSKINEN:

All right.

CAMP:

Your letter describes the Lois Lerner e-mails as being unrecoverable.

KOSKINEN:

Correct.

CAMP:

But fails to mention where the damaged hard drive is today. Do you know where the actual hard drive is that crashed in 2011?

KOSKINEN:

Yes. I'm advised the actual hard drive, after it was determined that it was dysfunctional and that with experts, no e-mails could be retrieved was recycled and destroyed in the normal process. This was...

CAMP:

So was it physically destroyed?

KOSKINEN:

That's my understanding.

CAMP:

So was it melted down, do you know?

KOSKINEN:

I have no idea what the recycler does with it. This was three years ago.

CAMP:

Does the IRS have a system for tracking items?

KOSKINEN:

Tracking what?

CAMP:

Items -- does the IRS have a tracking system for items?

KOSKINEN:

We track items but we don't track every item that everybody has everywhere. But I'm sure we track some items. We track...

(CROSSTALK)

CAMP:

Does someone there have a serial number for that hard drive?

KOSKINEN:

I do -- I do not know whether they do or not. I am just advised that as a normal case, when a hard drive fails, the e- mails cannot be reconstructed. The hard drive is turned over to recyclers.

CAMP:

Well, it seems to me that if it was recycled, the government property would have been tracked.

KOSKINEN:

Pardon?

CAMP:

It seems to me that if it was recycled, government property would have been tracked or people could simply walk away with the property from the IRS. So I assume there's a tracking system for the disposal of government property.

KOSKINEN:

Right. There's tracking system for computers. My understand is that Lois Lerner's computer continue to be functioning with a new hard drive.

The hard drive fits with inside -- I'm not aware whether hard drives have computer -- have identifiers.

KOSKINEN:

Can we get the serial number of this hard drive and all the other employees that -- whose hard drives have been -- whose e-mails have been lost?

KOSKINEN:

If they have serial numbers, you're welcome to them.

CAMP:

All right. I -- I -- because I want that hard drive and I want the hard drive of every computer that crashed during that time frame. So you know, what I've learned in the last week, I think calls into question every document in response the IRS has given, or for that matter, has failed to give to (ph) this committee.

And the only way I can see any hope of restoring any confidence is to establish a special prosecutor with the authorities, the powers and the resources needed to uncover the truth. So for the sake of the agency and to restore the trust of the American people, will you support the appointment of a special prosecutor?

KOSKINEN:

There are six investigations going on at this event...

CAMP:

Yes or no?

KOSKINEN:

I.G. -- the I.G. is already investigating...

(CROSSTALK)

CAMP:

Can you give a definitive answer to this committee -- yes or no, do you support the appointment of a special prosecutor?

KOSKINEN:

I do. I do.

CAMP:

I'm controlling the time. I'm asking a question that can have a simple yes or no answer.

KOSKINEN:

I think...

CAMP:

Regular order.

KOSKINEN:

...I think the appointment of a special prosecutor after the six investigations on it going -- going and the I.G. investigation into this matter ongoing would be a monumental waste of taxpayer funds.

CAMP:

So is that a yes or a no?

KOSKINEN:

That's a no.

CAMP:

Thank you.

Mr. Levin is recognized. You have five minutes.

LEVIN:

You know, I think witnesses deserve some respect. I think it's in the tradition of this committee to give witnesses respect.

This is not the committee of decades ago, led by people who disrespected witnesses.

Mr. Koskinen, you had a long career. What have you done in the years of your career briefly?


KOSKINEN:

I'm sorry, what have I done what?


LEVIN:

What's your career have been like?


KOSKINEN:

My career has been 20 years in the private sector, turning around large troubled organizations. I started my career as the chief of staff for Senator Ribicoff for 4 years in the United States Senate, served on the presidential commission as a staff member, the Kennedy (ph) commission in late 1960s.

I represented New York City here for a year and a half. I was the Deputy Director for Management at OMB for three years. I was the Chair of the President's Council on year 2000 for two years, guiding the country through the year 2000 transition.

I was asked by the Bush administration to take over Freddie Mac as the Chairman of the board when the government took over those enterprises. And I was asked to come to the IRS which I did in last December when I was confirmed to stir (ph) the agency through these difficult times.


LEVIN:

The -- the letter that went from the counsel to the President to Mr. Camp and Mr. Wyden has spelled this out and indicated when the Treasury was notified or when the Treasury consult informed the White House counsel about this problem with the computer. It also has indicated, contrary to this effort by the committee and the Republicans are, to connect the problems, and there were serious problems with the White House, that there is no such connection.

They're desperate to find a connection. They've never found it. They'll keep looking because I think it makes sense for them politically.

I don't think whatever our political affiliations are we should be disrespectful. So will you repeat again what happened these last months after you found out about the computer crash, and why you decided to conduct yourself the way you did?


KOSKINEN:

We learned in February -- that I learned in February, there was a potential issue with her hard drive. That was investigated through March by -- into March into early April. The I.T. people had uncovered the e-mails training (ph), you can see the talked about -- the effort to restore her computer.

Those e-mails have been provided some time ago to this committee so they were not hidden or covered up. Thereafter, I told people that we needed to -- that we decided we would look at all the other custodians to produce as many e-mails as we could that were, in fact, within our system, which is the 24,000.

I also asked that we actually review all of the 82 custodians to see, what if any fails (ph) had happened then. Our plan was when we produced -- completed the production of all the Lois Lerner e-mails. At the end of this month, we will provide a full report.

And by the time, we would know what the situation was with custodians. There's been a question of why I didn't advise Congress earlier.

And my experience has been we do better to have a rational discussion when you know all the facts. It's shown by the fact that on Monday, we were advised Monday morning that there were preliminary indications, that there were difficulties with a handful of custodians.

That information was passed onto the staff of this committee on Monday afternoon. Immediately thereafter, rather than asking us for additional information, a press release went out from this committee identifying Nikole Flax as a particularly interesting person to this committee and stating that Nikole Flax e-mails have been lost.

Had the committee waited to issue that release, until we knew further information which were continuing to arrive, they would have discovered that Nikole Flax had two computers -- her office computer which she used during the day, and she had a travel computer -- a portable.

It was the portable computer that crashed. It ran on the same e- mail system as her office system. So it turns out there is no indication that a single Nikole Flax e-mail has been lost notwithstanding the press release and statements out of this committee.

So those press releases with regard to Nikole Flax were inaccurate and misleading. And it demonstrates why we will provide this committee a full report about the custodian review when it is completed. We're not going to dribble out the information and have it played out in the press.


CAMP:

Time has expired.

Mr. Johnson is recognized.


JOHNSON:

Thank you, Mr. Chairman. Thank you for holding this hearing. You know, learning about the loss of Lois Lerner's e-mails and other IRS officials is troubling.

And -- and we received that information with great skepticism. Americans have been waiting for the whole truth. And we hope to get it today.

It doesn't sound like we're getting it. It's past time to hold all of those responsible, accountable for targeting Americans for their beliefs.

Mr. Commissioner, welcome. I have some questions for you. You have argued that the IRS practice of destroying employee e-mails after six months was a cost-cutting measure. In fiscal year 2011, the IRS' enacted budget was $12 billion, a high watermark of spending.

Can you tell you whether in 2011 the IRS was engaged in a policy of destroying and reusing its backup tapes?

KOSKINEN:

Actually, what happened with the IRS, in 2008, when our new I.T. director came, the retention policy then was only for a less than three months. In 2008, he increased the retention backup policy to six months.

It's a disaster recovery system. So if the entire system goes down, you can reconstitute the e-mails. Those systems actually are usable. And then if there's no disaster, you continue to produce and back up the e-mails so they're available.

I would note as I did in my testimony, since the start of this investigation, every e-mail has been preserved. Nothing has been lost. Nothing has been destroyed.

JOHNSON:

Yes, which tells me that you got plenty of computer space. You know, I wondered at the time how you could keep track of everybody's IRS requirements when you lose your own.

Let me just ask you, didn't the IRS estimate that keeping and storing those dates (ph) would only cost $200,000 annually?

KOSKINEN:

Costs $200,000 annually every year. But as it grows, we collect -- we have trillions now of -- of terabytes as it's called. We have hundreds -- millions of e-mails stored over six months.

And the disaster recovery program was -- it's not -- the e-mail system as I said in my testimony is not a system of record. A system of record is, in fact, where the records act to produce hard copies and file (ph) what was in the record so that the IRS has historically only preserved backup tapes for six months.

We are reviewing all of this, I have told people some months ago. When we get through with this, we need to take a look at what we can do to actually create a more searchable e-mail process.

The problem right now is anytime anybody wants a piece of information, we have 90,000 employees. Whatever employees want, we have to pull their e-mail accounts. We have to pull their hard drives.

Then we have to take them load them into a search machine to be able to discover what's in them. That is an antiquated system. I finally referred to our I.T. system as a model T (ph) with a very nice GPS system and a sound system and a redone engine. But it's still a model T (ph).


JOHNSON:

You know, my constituents and I refuse to accept that in years of record high IRS budgets, you know, you wouldn't let us refuse to give you information on our tax returns. The IRS destroyed employee e-mails every six months just to save $200,000 annually.

I'm far too familiar with the rampant wasteful spending at the IRS during that time. To date, the committee has uncovered wasteful spending from the Star Trek videos to the spending on lavish conferences to an IRS estimated $23.5 million in spending on salaries and benefits due to union time, and two bonuses going to workers who owe back taxes.

Mr. Commissioner, you and I both know, the IRS' failure to back up employee e-mails began long before any budget cuts happened to that agency. There is simply no excuse for what happened.

I yield back.


CAMP:

All right, Mr. McDermott's recognized for five minutes.


MCDERMOTT:

Thank you, Mr. Chairman.

CAMP (ph): Thank you.


MCDERMOTT:

Today, we're here listening to a myth that there was a conspiracy by Ms. Lerner and whoever else to get rid of some data. And before I came to Congress, I was a physician.

And one of the things you always did with a patient was take the history. And I would like to review the history again with you, Mr. Koskinen.

On June 13, 2011, Lois lerner's hard drive failed, meaning all her e-mails were lost at that point, is that true?

KOSKINEN:

That's correct.

MCDERMOTT:

Sixteen days later, she was briefed that inappropriate criteria have been used in mismanagement in Cincinnati, according to the I.G.'s report, is that true?

KOSKINEN:

That's what the report reports.

MCDERMOTT:

Well, the question then is, did Lois Lerner preemptively crashed her hard drive?

KOSKINEN:

All the -- all the evidence is to the contrary. The e-mail string I told you shows that at her request, extraordinary efforts were made to retrieve the e-mails from her crashed hard drive.

MCDERMOTT:

Did -- did you think, did she foresee something happening in the future and make the decision to destroy her own hard drive?

KOSKINEN:

The record shows quite the contrary. Also, after the crash on April 11, she continued to send an archived e-mails on her computer.

We've produced -- we'll produce 43,000 of those. So if she was going to, in fact, try to hide e-mails, there is no indication in the record that her performance demonstrated that.

MCDERMOTT:

In all the e-mails that have been collected, is there any evidence to suggest that she called the White House or the White House called her and said, get those right wing organizations?

KOSKINEN:

There is none that we have been able to produce. And I understand, although I have not seen the production from the White House, that the White House did not find any e-mail to or from Lois Lerner.

MCDERMOTT:

And the inspector general didn't find them in his...

KOSKINEN:

No, I understand, the inspector general's report stated there's no evidence of political involvement.

MCDERMOTT:

In fact, as you quote, as you talked about, on July 19, 2011, Lerner wrote to Lily Wilburn (ph), who is the field director of customer service support for informational technology saying, whatever you can do is helpful, would be greatly appreciated. Now, in mid-July 2011, she learned about Cincinnati.

And for a couple of weeks, the I.T. division tried to repair her hard drive, bringing in experts inside I.T. and also the -- the forensic division of the IRS, is that correct?

KOSKINEN:

That's correct.

MCDERMOTT:

And they failed?

KOSKINEN:

They failed after three weeks of efforts. The e-mail trail (ph) was clear. I would note, as I did in my full testimony, the criminal investigation division is expert at -- in seizures from -- in civil and criminal cases seizing hard drives and restoring e- mails.

So we had, at that time, apparently great conference. If you could find those e-mails, they would find them. And they were unsuccessful.


MCDERMOTT:

Finally, she wrote, thanks for your efforts, to them. I really do appreciate the efforts. Sometimes, stuff happens. Now, is this a woman rejoicing over losing her hard drive and saying, thank god that thing is gone?

They're never going to get me? No. It's a woman who's resigned really to the fact that the thing is lost. In my office, we just upgraded.

We upgraded to Windows 10 and 2010. And my staff director in Washington state lost her hard drive. They fried (ph) it. I don't know how it happened.

Nobody knows how it happened. She lost all her records. She did not rejoice over that experience, I can tell you.

But then we come fast forward to February 24, 2014, and Chairman Camp asked for all, and I emphasize all Lois' e-mails. Is there anything you can see in the time that you've been there that they didn't -- that the IRS did not do to try and get all?


KOSKINEN:

There's no indication. I have said, we've gone to great lengths. We've retraced the process for producing her e-mail twice just to make sure that no e-mail was missing.

We understand the importance of this investigation. We've gone to great lengths to spend a significant amount of money trying to make sure that there is no e-mail that is required that has not been produced.


MCDERMOTT:

I understand you sort of backtracked and went out to 83 people in the agency that she had contact with and retrieved their e-mails to try and get the e-mails to (ph) that (ph) committee. KOSKINEN: That's correct. And that's why rather than having lost Lois Lerner's e-mails as if there are none of them, we have been able to produce over time and will, by the end of this month, 24,000 Lois Lerner e-mails from the time frame in question.

CAMP:

Time has expired.

MCDERMOTT:

Thank you.

CAMP:

I would ask unanimous consent to put into the record a letter from this committee from me, as a Chairman to then Commissioner Doug Shulman on June 3, 2011 asking for the names, titles, and divisions of any individuals who were involved in investigating taxpayer contributions to 501(c)(4)s, which was sent to the IRS 10 days before Lois Lerner's e-mail crash. And with that, I would yield to Mr. Brady.

BRADY:

Point of information, Mr...

CAMP:

Yes?

BRADY:

...Chairman...

CAMP:

So the letter without objection is put into the record.

BRADY:

Yes. Point of information, was that letter circulated to members of the committee?

CAMP:

The letter was signed by me and sent to the commissioner of the IRS.

BRADY:

Oh, so we have...

CAMP:

On behalf of the committee.

BRADY:

...none of us have seen it, OK. Thank you.

CAMP:

You may have seen it. It's certainly been -- we didn't get one to you. We'd get you a copy. But I think as long as you're bringing up the timeline, we ought to get a complete picture of the timeline, which is the e-mail crash occurred 10 days after the first letter went to the IRS investigation.

BRADY:

Appreciate this.

CAMP:

Mr. Brady is recognized for...

BRADY:

When were you told about the problems with the Lerner e- mails? I understand (ph) February (ph)?

KOSKINEN:

Pardon?

BRADY:

When were you told?

KOSKINEN:

In February, I was told that they had discovered there -- there was an issue with her e-mail?

BRADY:

In February?

KOSKINEN:

In February.

BRADY:

Why did you choose to withhold that information from this Congressional investigation?

KOSKINEN:

I had no intention of withholding that information. As I've stated, our plan was to investigate and find out what the details were. At that point, we did not know whether there had been a crash that had affected her e-mails or not. If you notice...

(CROSSTALK)

BRADY:

Great. You (ph) testified that you gave your agency three weeks to determine if it could be retrievable or not. They weren't successful. So giving you the benefit of the doubt, in March, you knew those e-mails were not available.

Why didn't you inform this Congressional investigation then?

KOSKINEN:

As I told you, my goal was to, in fact, determine all of the facts so we could give you a full report. As I noted earlier this...

BRADY:

Yes.

KOSKINEN:

...week -- earlier this week...

BRADY:

Yes.

KOSKINEN:

...we provided...

BRADY:

You informed...

(CROSSTALK)

KOSKINEN:

Why can't I answer the question?

LEVIN:

Could the witness answer the question?

CAMP:

You know, regular order, Mr. Levin, the gentleman from Texas has the time. And he is questioning appropriately. So please, no more interruptions.

LEVIN:

Regular order allows a witness to answer a question.

CAMP:

Regular order allows the witness to conduct his questioning as he sees fit. This committee has given broad latitude to members of both Parties to do that.

BRADY:

Mr. Chairman, parliamentary...

(CROSSTALK)

CAMP:

I'm giving (ph) the (ph) floor (ph) to Mr. Brady.

LEVIN (ph): ...Chairman, parliamentary...

CAMP:

Brady will continue.

LEVIN (ph): ...parliamentary -- parliamentary inquiry, Mr. Chairman.

CAMP:

The gentleman will state his parliamentary inquiry.

LEVIN (ph): Under the rules of the House, every member has five minutes to post questions to the witness. And the witness is given an opportunity and right to respond. Is the Chairman saying that the witness does not have a right to respond to the question?

CAMP:

We are -- the -- the gentleman has had plenty of time to respond. That is not a parliamentary inquiry.

Mr. Brady...

LEVIN (ph): Chairman, my question is, does the -- does the witness have a right to respond to the question?

CAMP:

The gentleman has not stated a parliamentary inquiry.

The gentleman from Texas?

BRADY:

Which you knew in March...

LEVIN (ph): Start again with a question.

BRADY:

...yet you withheld the information from this Congressional investigation. And in May, you assured this committee that all of Ms. Lerner's e-mails would be provided to us.

Yet you knew that that was not possible.

KOSKINEN:

No, in fact, I knew that, in fact, we would provide you all the Lois Lerner's e-mails that we had.

BRADY:

You already knew in March they were not retrievable. A, you didn't inform the Congressional investigation. B, two months later, you told us you would provide all t he e-mails without limitations.

And you knew you didn't have them.

KOSKINEN:

By March, I did not know that they were not retrievable. And in fact, we have -- we have retrieved...

(CROSSTALK)

BRADY:

You -- you just testified to Mr. McDermott...

KOSKINEN:

...twenty-four thousand of those e-mails.

BRADY:

...that was the case, you knew. And in April, your agency your informed Treasury about the problem. And Treasury agreed with you that Congress should be told as soon as it was able to.

KOSKINEN:

Our -- our...

BRADY:

Yet you didn't provide the information. And then you assured us you would provide all the e-mails without limitation with no mention that you then knew two, three months into this that they weren't retrievable.

KOSKINEN:

Has noted and I think the record should make it clear, all of this issue is a result of our providing you a public and fulsome document about this matter. So we have not been hiding...

BRADY:

Mr. Commissioner, sending a letter months after you knew the e-mails were supposedly lost, withholding the information from the investigation, you were aware there was a Congressional investigation, correct?

KOSKINEN:

I was aware there was an investigation.

BRADY:

So you withhold the information.

KOSKINEN:

We did not withhold the information.

BRADY:

You misled Congress in May when you said those e-mails would be provided.

(CROSSTALK)

KOSKINEN:

We have -- we have -- we have provided you the information. And it turns out, you had information for some time.

BRADY:

Mr. Commissioner, you did not tell me under oath that you told us in February, in March, in April, in May that the information was lost. That was just what you said. Tell us that again that we knew that.

KOSKINEN:

In February, March and until April, I did not know if any information was lost.

BRADY:

Yet, your agency had already in April communicated with Treasury Department about the problem. In the letter we have from Treasury, says we agreed with the IRS that it should inform Congress as soon as it is able.

That -- that is the letter today that exactly disputes what you just told us under oath -- exactly disputes it.

KOSKINEN:

That letter from Treasury reveals and provides you all of the Lois Lerner e-mails so that there is no issue that any Lois Lerner e-mail provided to anyone outside...

BRADY:

Mr. Fitzpayne, assistant secretary for legislative affairs, quote, "Treasury agreed with the IRS that it should inform Congress as soon as it was able." Yet you did not.

KOSKINEN:

We actually have provided you the information. My goal was...

BRADY:

You had not provided us any information.

KOSKINEN:

Well...

BRADY:

In fact, we didn't learn until last week, and then this week that you had supposedly lost the e-mails, not just from Ms. Lerner but other persons of interest in IRS.

KOSKINEN:

There is no evidence that any of those e-mails have been lost either. And, in fact, as I said earlier, my process has been to make sure that we had all of the facts...

BRADY:

Mr. Commissioner...

KOSKINEN:

...when we've provided them to you so that, in fact...

BRADY:

Why at this point -- why should anyone believe you? The IRS denied for two years targeting of America's based on their political beliefs. That wasn't the truth.

They said it was a few rogue agents in Cincinnati. That wasn't the truth. You said you were targeting liberal organizations. That wasn't the truth.

And then you assured us you would provide us all the e-mails in May. And that wasn't the truth. And today, you're telling us out of thousands of IRS computers, the one that lost the e-mails was the person of interest in an ongoing Congressional investigation.

And that is not the truth either. This is the most corrupt and deceitful IRS in this history.

CAMP:

Time has expired.

Mr. Lewis is recognized for five minutes.


LEWIS:

Mr. Commissioner, first of all, I want to thank you for your service. Thank you for your patience. And I want to apologize to you for the way you have been treated this morning.

I thought this was a hearing and not a trial. I want you to take the five minutes that I have and use it to say anything that you hadn't had an opportunity to -- to say.


KOSKINEN:

Thank you. I think that between my full testimony and my oral testimony and my response to the questions that I hope is clear, that we have not, in this investigation, lost any e-mail from the start of the investigation until now. I hope it is clear that by the end of this month, we will have provided all of the Lois Lerner e- mails that we have, that those will number 67,000.

It should be clear that in the period of Ms. Lerner's hard drive crashed, we have located 24,000 e-mails that Lois Lerner sent or received. It should be clear on the basis of the e-mail track that Lois Lerner was not trying to destroy e-mail.

In fact, was working very hard and asked for extraordinary efforts to try to restore her e-mails at that time so that it doesn't appear to be any attempt on her part as noted to rejoice over the loss of those emails.

It should be clear that when we did provide this committee with, on Monday, preliminary information reporting, the net result of that was a press release erroneously making -- leaping to conclusions that Nikole Flax had -- e-mails had been lost along with others. It turns out on further investigation and we're continuing that investigation, that none of the Nikole Flax's e-mails appear to have been lost.

We will provide this committee a full report on the other custodians as we complete that work. Thus far, it has been clearly demonstrated that piecemealing up information about there's a possible problem simply results in press releases and angry letters to me.

So my position from the start and will continue to be, we will, as we have, continue to keep this committee fully informed of the facts as we find them. If there are situations, we will investigate those and give you all of the information about them.

I did not come out of retirement to run an agency that did not create transparency, responsiveness to Congressional inquiries, Congressional letters or otherwise. This is an important agency.

It provides critical work for the government, collecting 93 percent of the money the government uses to run. But more importantly, it touches virtually every American.

And I think it is important for every American taxpayer to feel comfortable and confident that when they treat -- when they deal with the IRS, they're going to be treated fairly no matter who they are, whether they're rich or poor, whether they're Republicans or Democrats, whoever they voted for in the last election.

And to say that this is the most corrupt IRS in history ignores a lot of history and seems to me again is a classic overreaction to a series problem which we are dealing with seriously. And I would just like that to be our record.

I am comfortable with it. I am confident about it. and I am willing to stand on that record in the six months that I have been the IRS Commissioner.


CAMP:

All right, thank you.


LEWIS:

Thank you, Mr. Commissioner.

I yield back.


CAMP:

I -- I ask unanimous consent to place into the record a June 18 letter from Neil Eggleston, counsel to the President as well as a June 20 letter of this year from Alastair and Fitzpayne, assistant secretary for legislative affairs at the Department of Treasury. Without objection, so ordered.


LEVIN:

Can (ph) I (ph) -- reserving my right to object.


CAMP:

Yes, you may reserve your right to object.

LEVIN:

And -- and I'll tell you why. I hope everybody will read the letter from Mr. Fitzpayne, which said...

CAMP:

That is the purpose of placing it in the record.

LEVIN:

OK, I just want to continue with my -- I know -- and I want to continue with my reservation.

CAMP:

All right. The gentleman has reserved his objection...

LEVIN:

And I want to tell you why.

CAMP:

...to letters from the administration.

LEVIN:

It says in response to your questions, IRS informed Treasury in 2014 that Ms. Lerner's custodial in the e-mail box appear to contain very few e-mails prior to 2011. Treasury agreed with the IRS that it should inform Congress as soon as it was able to provide accurate and complete information, although Treasury ultimately deferred to the IRS in how to handle the matter.

CAMP:

Right.

LEVIN:

I withdraw my...

Mr. Chairman, are those letters being distributed to the...

CAMP:

We're making copies now. You know, we just -- the committee just received these pretty recent. So yes, copies will be made available to every member of the committee.

So without objection, so ordered.

Mr. Ryan is recognized for five minutes.

RYAN:

This is unbelievable. The apology that ought to be given is to the American taxpayer, not to a government agency that is abusing its power. I am sitting here listening to this testimony.

I just -- I don't believe it. That's your problem. Nobody believes you.

LEVIN (ph): Come on.

RYAN:

The Internal Revenue Service comes to Congress a couple of years ago and misleads us and says no targeting is occurring. Then it said it was a few rogue agents in Cincinnati.

Then it said it was also unprogressive. All of those things have been proven untrue. This committee sent a criminal referral of possible criminal wrongdoing just a month ago to the Justice Department.

We've heard nothing. You very (ph), in a 27-page letter to the Senate asking for them to conclude the investigation that you've lost Lois Lerner's e-mails during the time in question because of a hard drive crash. Monday, our investigators asked your agency whether any other hard drives crashed.

And we learned that six other hard drives of the people we're investigating were involved. You didn't tell us that.

KOSKINEN:

We told you on Monday.

RYAN:

On Monday.

KOSKINEN:

And what did you do with the...

RYAN:

Because we asked you.

KOSKINEN:

Right. And what did you do with that information?

RYAN:

You told us on Monday because we asked you whether any hard drives crashed. This is unbelievable.

KOSKINEN:

We answered (ph) your question (ph)...

RYAN:

You -- you told us on May that you were going to give us all of Lois Lerner's e-mails and you learned in February that this crashed.

KOSKINEN:

I did not learn in February there's a crash. And we told you on Monday...

RYAN:

You -- I'm not asking you a question. I'm just making a statement.

KOSKINEN:

All right. Well, that's my -- my apologies.

RYAN:

You are the Internal Revenue Service. You can reach into the lives of hard-working taxpayers. And with a phone call and e-mail or a letter, you can turn their lives upside down.

You ask taxpayers to hand in seven years of their personal tax information in case -- in case they're ever audited. And you can't keep six months' worth of employee e-mails?

And now that we are seeing this investigation, you don't have the e-mails. Hard drives crashed. You learned about this months ago. You just told us. And we had to ask you on Monday.

This is not being forthcoming. This is being misleading again. This is a pattern of abuse, a pattern of behavior that is not giving us any confidence that this agency is being impartial. I don't --I don't believe you. This is incredible.


KOSKINEN:

I have a long career. That's the first time anybody has said that you do not believe me.


RYAN:

I don't believe you.


KOSKINEN:

That's fine. We can have a disagreement. I'm willing to stand on our record. I'm willing to remind you that it was not buried in 27 pages.

Most of that 27 pages exhibits, when asked about the custodians, we advised you what we knew...


RYAN:

Being forthcoming...


KOSKINEN:

...which we knew for one day.


RYAN:

...being forthcoming is to say...


KOSKINEN:

I'm sorry...

RYAN:

...you know what, investigators -- Congress was investigating...

LEVIN:

Let him answer the question.

RYAN:

I didn't ask him a question.

LEVIN:

Yes, you did.

RYAN:

It seems (ph) forthcoming...

CAMP:

Gentleman -- the gentleman -- gentleman from Wisconsin has the time.

RYAN:

I control (ph) time. I control the time.

CAMP:

I realized that disrupting a hearing sort of...

LEVIN:

No, come on...

RYAN:

No, no...

CAMP:

...these (ph) sort of people. But the gentleman from Wisconsin...

RYAN:

I am not yielding time. I control the time.

CAMP:

He has the time.

RYAN:

Here is what being forthcoming is.

CAMP:

Regular order.

RYAN:

If we are investigating, criminal wrongdoing, targeting of people based on their political beliefs and the e-mails in question are lost because of a hard drive crash that is apparently unrecoverable which a lot of I.T. professionals would question and you don't tell us about it until we ask you about it, that is not being forthcoming.

KOSKINEN:

And that's not true.

RYAN:

I -- I yield back the balance of my time.

KOSKINEN:

That's not true.

(CROSSTALK)

CAMP:

The gentleman yield back.

KOSKINEN:

Pardon?

CAMP:

The gentleman has yielded back his time.

KOSKINEN:

Good. Thank you.

CAMP:

Mr. Neal is recognized.

NEAL:

Well, I'm actually going to let you answer Mr. Ryan's question. Go ahead.

KOSKINEN:

Right. Mr. Ryan tried to leave the impression that only by being asked that we reveal the information about the hard drive crash. First of all, I would reiterate, the information about the hard drive crash is in the e-mails that you and your staff had for some time.

Secondly, we produced that public report telling you about the e- mail loss on our own. It was not in response to a question. Third, we learned on Monday morning about the custodians.

We were asked -- our staff was asked on Monday afternoon. We told them all we knew, which was there was an indication there had been a hard drive problem with six others.

The next morning, this committee put out a release asserting, leaping to the conclusion that therefore, e-mails have been lost, particularly Nikole Flax's e-mails. It turns out as we've continued to work and we have more work to do, that there is no evidence that any Nikole Flax e-mail was lost.

We are responding what we are trying to do as the Treasury letter suggested is as soon as we are able to give you a full picture of it, we are providing that. It's not in response to a question. That was...

NEAL:

Right.

KOSKINEN:

...a public report we've provided you. We will continue to provide you documents. You have 770,000 pages. You will have 67,00 Lois Lerner e-mails. Twenty-four of Lois Lerner e-mails in the period when it crashed have not been lost.

They will be produced to you.

NEAL:

Commissioner...

CAMP:

Mr. Neal, on this point, may I ask you a question -- may I ask a question here in your time. And I'll give you some more time. There is a distinction, yes.

The committee did know about the hard drive. But we did not know about the server. There is a distinction. We did not know about the server.

And the server, what -- what came in the carbon copy of the letter you sent to the Senate, the server means they're lost forever. A hard drive crash doesn't necessarily mean that the e-mails are lost forever.

So there is a significant distinction here that has not been made yet today.

KOSKINEN:

No.

CAMP:

So Mr. Neal, you have -- I'll make sure you have more time.


NEAL:

Would you like to respond?


CAMP:

You -- you may, yes, at this time.


KOSKINEN:

And that's -- that's an important question. And one of the reasons that we did not immediately say we discovered a hard drive crash because as you just noted, a hard drive crash does not mean that e-mails have been lost forever.

And in -- in the case of Lois Lerner, 24,000 of her e-mails were not lost. They have actually been found. They will be produced. You have 5,000 of them already. You'll have 24,000 of them by the end of the month.

So when a hard drive crashes, the e-mails do not necessarily disappear. Her e-mail account -- any e-mails in those accounts, which were the e-mails we could find in that period, were included and did not crash.


NEAL:

Thank you, Commissioner. Commissioner, I must tell you that based on what we've heard so far today, if you came in here and said you agreed with everything that the Republicans have suggested, then they would say, we don't believe you. They have come to a conclusion, not based upon the facts, but upon what they might promote as a conspiracy.

The only thing that's missing is Oliver Stone (ph) but there's time for that because there's an election five months from now. So there'll be plenty of opportunity for them to do this.

Let me say something, having served in this committee for a long period of time, you have an individual here today who has a distinguished career, who has served in Republican and Democratic administrations, coupled with the fact, he took an oath today. Unless those here didn't hear him take the oath or witnessed him taking the oath, for him to take the oath and then to have people suggest to him, we don't believe you, that is not the way this committee has functioned in the past.

And it ought not be the way we function going forward. Now, just a couple of quick questions and then I want to offer something to you. The tax investigator general has said, there wasn't a cover-up, is that correct?

KOSKINEN:

That's correct.

NEAL:

There was not a conspiracy based on that assertion that he has made?

KOSKINEN:

That's my understanding.

NEAL:

That's your understanding. And to the moment, there is no smoking gun linking the administration to Lois Lerner.

KOSKINEN:

That's also my understanding.

NEAL:

Now, I would hope that at some point, this committee might spend a hearing, maybe a morning talking about the success that you've had with offshoring accounts for individual taxpayers, the numbers -- pretty stunning in what you have begun to collect from those that have voluntarily complied in Switzerland and other tax havens.

And it's a story that I would hope we'd have an opportunity to talk about. Mr. Camp is correct when he says the tax system works on the basis of people believing that there's equity in it for all, and that everybody caries their burden.

And spending some time on offshoring and spending some time on compliance might be equally good for a hearing. But I know it doesn't fit with the determination that was made this morning for the purpose of this hearing. Thank you, Commissioner.

CAMP:

All right, Mr. Nunes is recognized.

NUNES:

Thank you, Mr. Chairman.

Mr. Commissioner, in September, a letter from Chairman Bacchus asking for an investigation of a political 501(c)4 groups, that would have went to Mrs. Lerner, correct?

KOSKINEN:

Pardon? It would have gone to her. I don't know where it would have gone. I was not there.

NUNES:

But if it went to her, assuming that it did like it should have, she would have responded?

KOSKINEN:

If you are the agency, that she had, the agency will respond. And I haven't seen the letter. I don't know what the response would have been.

NUNES:

Would -- would we have that e-mail?

KOSKINEN:

I'm sorry, which e-mail?

NUNES:

Would we have that -- would we have the response?

KOSKINEN:

The response, I assume, would not have been by e-mail.

NUNES:

But would there be a letter?

KOSKINEN:

There would be a letter.

NUNES:

I assume back to a Senator that shares this finance...

(CROSSTALK)

KOSKINEN:

If there -- if there's a letter comes in from a Senator, there should be a response back.

NUNES:

Then there was in October of 2010, Senator Durbin wrote Commissioner Shulman, urging him to investigate conservative groups, specifically crossroads GPS. That letter would have likely been sent to Ms. Lerner.

Did Ms. Lerner ever write Senator Durbin or his staff back?

KOSKINEN:

I have no idea.

NUNES:

If she did, would we have any of the e-mails associated with it?

KOSKINEN:

She would have if there -- if she wrote back of if the agency wrote back, there'd be a hard copy and there'd a letter in the file as to what it said.

NUNES:

And during the period before the crash, liberating groups, Democracy 21 repeatedly wrote to IRS asking for an investigation of conservative-leaning groups. Did Lois Lerner ever write them back?

KOSKINEN:

I don't whether she wrote them back or not.

NUNES:

Would you have a copy of those letters?

KOSKINEN:

You would have a copy of those letters.

NUNES:

Could we get those letters?

KOSKINEN:

If -- if we have those letters, they've probably already been produced.

NUNES:

In June 2011, Chairman Camp sent a letter to the IRS asking about abuses of the gift tax targeting. And just so you know, we do have that letter.

We didn't receive a response. So the point here is that there there's -- there were 83 specific employees that we asked for all of their e-mails on. You're aware of that, right?

KOSKINEN:

Aware of that. You asked for all the e-mails. We worked with the investigators to select the 83 that seemed to be most likely to be involved in a selected range of search terms that would actually produce the e-mails that would be relevant to the investigation.

NUNES:

But that was only the e-mails between the 83.

KOSKINEN:

No, that's any e-mail...

NUNES:

For -- for example, if Lois Lerner sent an e-mail to Secretary Lew...

KOSKINEN:

That would be in those e-mails searched for. There was no limitation that they would only be e-mails within the agency. The search terms were any e-mails to anyone.

That just the 83 were the e-mail accounts that were searched to see what they -- any of (ph) the (ph) 83 wrote to anybody else about any of those search terms, those e-mails would be produced.

NUNES:

But Secretary Lew is not one of 83.

KOSKINEN:

No...

NUNES:

You're telling me if there was an e-mail...

KOSKINEN:

If there was an e-mail from any of the 83 to Secretary Lew, that e-mail would be in their e-mail box and would have been found and -- and produced. They were not -- the limitation was not to communications back and forth among the 83.

It was the 83 custodians, as they are called, their e-mails -- any e-mail that in the time frame, met any of the search terms that were agreed to, all of those e-mails were produced whether they were to someone within the 83, outside the 83 in the agency were or outside the agency.

NUNES:

But do you understand Mr. Ryan's point when the letter you sent to the Senate last week on Friday, which is exactly what had happened when Lois Lerner planted a question in the audience way back, if this shows a pattern of abuse and a pattern of dumping things on Fridays and then specifically -- I'm not trying to get into a tit-for- tat with you here, OK?

I'm just saying that why -- why it's not believable is because you have -- you only talked about Lois Lerner's hard drive, which is one of the 83, but there were six additional folks in that 83 that have disappeared, too. And you didn't tell us about it on Friday.

KOSKINEN:

Right. Can I explain?

NUNES:

Sure.

KOSKINEN:

Fine. We originally, as I said, hoped to complete the production of all Lois Lerner e-mails, complete the investigation which you just started of the other 82 and provide a complete report. Senate Finance Committee indicated that they were nearing conclusion -- closure on their report.

And they wanted an update on our letter in mid-March to this committee and finance that we had found -- that we had produced all the relevant e-mails to the I.G. investigation. We provided that letter.

They also asked for an update on all of our production. And they asked what -- no later than last Friday. The reason it was produced Friday rather than at the end of this month was in response to the request from finance.

At the time we produced that report on Friday, we had no information about the other custodians that I had asked people to review. That information was provided to our I.T. person -- people on Monday morning who happened to be then be briefing your staff Monday afternoon.

NUNES:

Are there any...

(CROSSTALK)

KOSKINEN:

I am -- I am under a lot of heat from the Senate...

CAMP:

Time -- time has expired.

KOSKINEN:

...because I didn't know on Monday and I didn't tell them on Monday because I didn't know. It was not included in the Friday report produced in response to a finance committee request because when that report was prepared, no one in the agency knew which, if any of the other 82 custodians, were involved.

CAMP:

Time has expired.

Mr. Becerra?

BECERRA:

Commissioner, thank you for being here. And let me add my regrets to you that this has been held - this hearing has been conducted as less as a hearing then it has been as an inquisition. And you deserve better.

You certainly are obligated to give us truthful answers. And we appreciate that you are trying to. Let me suggest to you one thing.

You have a right to try to respond to any question. If you find that you are being badgered or not given an opportunity to respond, take a breath and then try to get your answer out. If you are not given that opportunity, then recognize that again, this is -- maybe not a hearing but an inquisition.

But you have a right to make sure the record reflects what you, under oath, would like to say. Somewhat confused the real issue that's been raised by this investigation.

Let me ask you a question. In this added scrutiny that IRS was given to the so-called social welfare organizations, is there evidence that shows that any number of different types of organizations other than just far right or conservative organizations were being scrutinized?


KOSKINEN:

There is -- is evidence that organizations across the spectrum were reviewed. The bulk of the applications were from conservative groups or the bulk of the reviews (ph) were of conservative groups.


BECERRA:

But it wasn't just of conservative groups?


KOSKINEN:

That's correct.


BECERRA:

OK, so some would like to portray this as just targeting or an attack on conservative groups. But the evidence, which has been revealed to everyone, including members in this committee is otherwise.

I think we are -- we're watching how people are trying to confuse the issue here. This investigation should truly be about what's really wrong with the system.

And that is that today in America, these so-called social welfare organizations, these not-for-profit organizations that get special tax breaks that ordinary Americans don't get, they pay less in taxes than an organization that doesn't have tax status a 501(c)4, they spent in the last election cycle, 2012, more money as social welfare organizations than the two political parties combined -- $256 million spent by so-called social welfare organizations to conduct political campaigns.

While the two parties, which are there to conduct political campaigns spent less than the $256 million then that these social welfare organizations spent. I hope at some point, Commissioner, we'll have a chance to get into that because my understanding is that we're seeing now the seeds of this dark money that's being spent.

My understanding is there is an investigation by the state prosecutors in the state of Wisconsin of the Wisconsin governor for perhaps coordinating illegally campaign activities in ways that might violate the law. What we're finding is that fewer and fewer of these organizations that are applying for this tax-exempt status that gives them special tax treatment are doing social welfare.

They're doing nothing more than campaigning. Is -- is that something that the IRS is concerned about that what was to be a tax provision and tax status are reserved for organizations that want to do social welfare is being used to conduct campaign activity?

KOSKINEN:

Our concern at this point is to try, as I've testified in numerous occasions, to take our review of the regulations governing all -- see (ph) organizations to determine can we provide clarity as to what's allowable activity, the amount of it that you can engage in without jeopardizing your tax exemption and to which organization should it apply. As you know, we've had over a hundred and 50,000 comments on that draft regulation.

We have announced that sometime probably in the early next year, we will review and re-propose, ask for more comments, have a public hearing. I do think it's important. We're not in the political business.

I think what is important is to provide clarity. Right now, it's an unclear standard. It's hard for people running those organizations to know what's allowable and not allowable.

They should not operate those organizations and worry that somebody's going to say the facts and circumstances changed, and now, you're not eligible. So that our goal is to have, as I've said, a rule that's fair to everyone, clear and easy to administer.

And we're going to try to do that.

BECERRA:

Final question. You're under oath. To your knowledge, are there any documents or requests for information that you have not responded to completely?

KOSKINEN:

There are -- we're responding as quickly as we can. We have a far-flung request for documents that we have not been able to respond to now.

There is no document request or information request that we are not going to respond to as quickly as we can. We will...

(CROSSTALK)

BECERRA:

All right, thanks. I yield back.

KOSKINEN:

...and anything the committee would like.

BECERRA:

Thank you.

CAMP:

Mr. Tiberi is recognized.

TIBERI:

Commissioner, you have a really important job. A lot of Americans fear the IRS, a very important agency that has struggled to have a leader with any consistency over the last several years. And -- and this Congress and this committee have heard from a lot of different leaders who come and go.

And it's been quite frustrating for us and many of our constituents regarding -- and I won't rehash the concern. But I think every member of this committee ought to do something this weekend and -- and maybe Monday.

Go talk to your caseworker who deals with the IRS for your constituents. Get an earful from them. And maybe, we wouldn't be apologizing to the IRS.

Let me tell you a story, sir. Small businessman in my district paid his taxes on time forever -- forever. He had an automatic payment setup, in fact, with his bank to pay the IRS, probably like you've done as a businessman in the past.

October of last year, he found out one day, actually, the day that his payment was due for -- to the IRS, that his account had been hacked. No fault of his own -- fraud -- fraud. He did what any law- abiding citizen would do. He worked with the bank.

He closed the account. The IRS had already accessed the account but it had already been closed. And he knew that. He called the IRS and said, hey, my account had been hacked.

A payment was made. It was made incorrectly because they closed the account. So the payment's going to bounce. I don't want to get penalized.

I don't want interest. What do I do? Well, thank you for letting us know. Send us a letter. Get us a check immediately. And it'll -- all will be good.

It's in the middle of June, sir. He's being charged penalty and interest because of that fraudulent payment -- no fault of his own. He fears the IRS. That's just one case.

That's one case, ladies and gentlemen. And when these constituents have watched long before you got to the IRS by the way -- long before you got there, has seen the IRS continually delay when there's no delay on their part of the IRS once (ph) information.

If -- if they say, well, my document got destroyed, sorry, buddy -- not an excuse. There seems to be two sets of rules, sir. And -- and the frustration that we have is quite frankly everybody knows this has been going on for -- for year -- for three years.

And so if the President would have asked me to go over and -- and commission the IRS and I found out in May, April, March, February what you found out, rather than bury it in a letter on page 15, here is what I would have done. Just a suggestion because of the lack of confidence the American people and this committee have, because of how our constituents are treated differently than how the IRS leadership treats America, is Mr. Camp, Mr. Levin, this just -- I just found out this happened.

It wouldn't cost a cent (ph). Just pick up the phone. The President has a phone. You probably have a phone. Pick up the phone, call Mr. Wyden and say, something very bad just happened.

I don't know why. I don't think it's a cover-up. I don't think it's criminal. But because of the past and the lack of transparency in the past and because we are a really important agency that the American people need to have confidence in and Congress needs to have confidence in, I just wanted you to be aware of this. And we're going to continue to try to get to the bottom of this.

When you don't do that, for what reasons I understand completely what you're saying, don't necessarily agree, but I understand where you're coming from, but when we find it buried in a letter and then on Monday because we asked the question, not because you provided the information, because we asked the right question and there's probably a lot of questions that we haven't figured out the right questions yet, we get the right answer, there is a feeling here that oh, my gosh, the IRS has no credibility. And it doesn't need to be that way.

This isn't about Republicans and Democrats. This is about our constituents, ladies and gentlemen. Talk to your IRS caseworker.

I can give you 12 more. I did IRS casework. Americans fear the IRS. And now, unfortunately, with a pattern of -- of delay and -- and disrespect and deceit in many cases, not from you, sir, there is just no credibility.

This is not good for our country. And my hope is is that you can clean this up. But I've got to tell you, I don't even have a question for you. This is -- this is amazingly awful.

This is absolutely awful. This is not partisan. Just talk to your caseworkers, guys. This is not partisan. This is just Americans frustrated with arrogance of an agency that is above the law in their opinion.

I yield back.


CAMP:

Thank you.

Mr. Doggett is recognized.


DOGGETT:

Well, the first thing I did in preparing for today's hearing was to talk with my caseworkers or constituent service representatives as we call them in Austin and San Antonio.

And what I found, Commissioner, is that when 250 IRS employees spend over a hundred and 20,000 hours and almost $20 million on responding to Congress, those employees are not able to respond to their ordinary duties. I found, for example, that as far as nonprofit community service organizations, that the Austin African-American cultural center, that a small-town area community foundation that wanted to raise money in that small town for the first time to support community activities, that a neighborhood community association in San Antonio, that the Unitarian, universalist (ph) justice ministry, that a video service that covers community organizations in San Antonio and tries to spread the word about their activities, all of them had waited months, and in some cases, over a year to try to get approval of their application because it would appear to me, your folks are so busy responding to one claim after another, you -- you have no additional resources.

You're not able to respond to the job that the law asked you to do. I believe that there has been a long-term commitment to hamstring, to encumber, to underfund the Internal Revenue Service and discredit it and the whole concept of progressive taxation in this country.

Now, let me ask you as to the seriousness of this investigation. Sir, have you ever been in Benghazi?


KOSKINEN:

No.


DOGGETT:

Do you know if you or Ms. Lerner have ever had any responsibility for anything having to do with Benghazi and -- and our embassy there?


KOSKINEN:

No.

DOGGETT:

How about area 51 out in Roswell, New Mexico, where all those space aliens allegedly came? Have you ever had any responsibility for that?

KOSKINEN:

No.

DOGGETT:

Have you ever had custody of the President's birth certificate?

KOSKINEN:

No.

DOGGETT:

Well, Commissioner, I believe, one of the mistakes that you've made in dealing with the committee today is that you did assume professionally that this was a serious inquiry. I believe it is an endless conspiracy theory that's involved here, that is being exploited solely for political purposes.

I don't approve of Ms. Lerner. I don't approve of the way the IRS handled all these matters. But I think there is a much larger cover-up issue here.

And it is the desire of our Republican colleagues to cover up these purported social welfare organizations that don't want to disclose the secret corporate campaign contributions that they rely on to pollute our democracy. It's not surprising to me that without a letter from a member of Congress, that the Internal Revenue Service would have at least questioned why one organization headed by Karl Rove of Texas, crossroads (ph) GPS, was spending $71 million in election cycle 2012.

My concern is that it doesn't appear from the public record that there's been a determination as to whether that was a legitimate social welfare organization or not. As my colleague, Mr. Becerra indicated, we know from today's papers and elaborate chart that another of these social welfare organizations headed by Mr. Rove, called Citizens for a Strong America.

And we're sure all for that, but that that organization apparently was involved in polluting the political process in the state of Wisconsin. I believe that this is a serious matter.

The use of corporate secret money is a problem enough. But the determination to have that money be taxpayer subsidized in social welfare organizations, in some cases, headed by individuals who never had

any interest in social welfare until they could claim it for themselves to pollute our democracy, that that is a serious problem.

I'm pleased you're going to be coming forward with anything else that you can find, because though this is not a serious investigation, but the endless pursuit, the obsession with conspiracy and conspiracies, we do need to have every bit of information -- every shred of information that you can find even though the people I talked about in Texas who have legitimate issues before the IRS are collateral damage in the process. But then I guess, Mr. Rove, and some of his colleagues, never much cared about collateral damage in other context anyway.

I yield back.


CAMP:

Mr. Reichert is recognized.


REICHERT:

Thank you, Mr. Chairman.

Mr. Koskinen, I -- I believe that you're an honest man, and that you want to do the right -- the right thing, and that you took this job to improve the IRS and -- and serve the American people. And so I -- I just have a few questions.

I used to be -- I was a cop for 33 years. So I just want to kind of go through some questions and try to understand this thing because it's pretty confusing, I think, to the American people. Would you agree with that?


KOSKINEN:

It is confusing. Technology is confusing to all of us.


REICHERT:

Yes. OK, well, so there -- there is an I.G. investigation currently ongoing, right?


KOSKINEN:

There is an I.G. -- two I.G. investigations.


REICHERT:

Yes.

KOSKINEN:

One on the response to the first I.G. report and another I.G. investigation going on and to, in fact, the hard drive crash of Lois Lerner.

REICHERT:

And you're fully cooperating with -- with the I.G.'s office...

(CROSSTALK)

KOSKINEN:

We've always fully cooperated. I once Chaired the intergovernmental agency...

REICHERT:

OK.

KOSKINEN:

...of correlation (ph) all inspector general. I'm a big supporter.

REICHERT:

All right. And -- and you've provided them with all the information that they've asked for in...

KOSKINEN:

Yes.

REICHERT:

...in the process of their investigation, the request that they -- and you've kept them updated as much as you can on -- on all the information that's developed on this investigation?

KOSKINEN:

As they investigate, we've provided all the documents they want. They...

REICHERT:

So -- so I'm a little confused today when I learned that the I.G.'s office called our office here and our staff people here on the Ways and Means Committee and said that they didn't learn about the hard drive issue until the Ways and Means committee put out their press release. How could that happen?

The I.G. is conducting an investigation. And they have no idea.

KOSKINEN:

Their...

REICHERT:

Is (ph) there (ph) any hard drive issues or lost e- mails? Can you answer that question?

KOSKINEN:

The investigation they were doing is the investigation of their response to their report. They have started an investigation on issues regarding the hard drive.

They were not doing an investigation of that.

REICHERT:

But you just said you fully cooperated...

(CROSSTALK)

KOSKINEN:

We (ph) tried (ph) to (ph) cooperate (ph). I meet with the I.G...

(CROSSTALK)

REICHERT:

They have to learn, Mr. Koskinen -- they have to learn through a press release from the Ways and Means Committee, United States Congress. They have to learn from that that there is a -- an issue that I would think is -- as an old cop again, I -- I would need to know.

If I was conducting that investigation and you were a part of that and you were helping me and assisting me in that investigation, does that not make sense to you that that would be information that you would provide to the I.G.'s office?

KOSKINEN:

We're -- we're providing the...

(CROSSTALK)

REICHERT:

Yes or no -- yes or no because my time is limited. Would that not be information that you would provide tot the I.G.'s office? I just need a yes or no.

KOSKINEN:

Yes, and we have provided and we will continue to provide...

(CROSSTALK)

REICHERT:

I think that's important -- well, you didn't provide it to them because they learned it in a press release. So that's -- that's not correct?

I -- I think you want to be honest. But -- but there's been some mistakes made. And I can understand -- understand that. You know, so let's just go through this, you know, very quickly.

So we have -- you know, a flaggin of the tea party applications. People have gone over kind of the timeline here. Lois Lerner sends her e-mails to IRS employees since they should not -- probably not have these cases -- tea party matter is very dangerous.

We began our investigation. We're told that any potential targeting was conducted by rogue employees in Ohio. We request all of Lois Lerner's e-mails. The internal review then we find out that e- mails are destroyed.

Now, we find out the hard drive was destroyed. Mr. Koskinen, American people don't believe this. They can't -- I can't -- if you had an employee under investigation or some violation of your policy internally, you wouldn't accept, Mr. Koskinen, Mr. Supervisor, Madam -- I -- I lost my e-mails...

KOSKINEN:

No, I would accept.

KOSKINEN:

...my hard drive. But it blew up. So would you stop your investigation?

KOSKINEN:

No, I would accept...

REICHERT:

You destroy...

KOSKINEN:

...if I found...

(CROSSTALK)

REICHERT:

What happened if they would say, you know, I've destroyed -- I've destroyed my hard drive?

KOSKINEN:

If I found contemporaneous (ph)...

(CROSSTALK)

REICHERT:

What -- what would you do, sir? What would you do, sir? What would you do, sir?

My time? Thank you, Mr. Levin? What would you do...

CAMP:

Regular order -- regular order.

REICHERT:

What would you do, sir, if an employee came to you and said, my hard drive is -- is -- I destroyed it? I've destroyed my hard drive?

KOSKINEN:

Can I -- if I found -- investigated -- found contemporaneous information from three years earlier that he, in fact, had worked very hard to restore his hard drive, he had got the best experts available to try to reconstitute the e-mail and that failed, I would tend to believe him.

REICHERT:

The other six hard drives, they -- they destroyed, too?

KOSKINEN:

At this point, we're still investigating the other hard drives. As I noted on one of them, well, actually, one of the ones on Monday turned out to have a failure in February...

REICHERT:

I yield back.

KOSKINEN:

...this year which is outside the timeline. Ms. Flax's hard drive appears not to have caused the loss of a single e- mail. Hard drive crashes alone do not cause e-mail to be destroyed.

If we don't know that information, we will get it to you...

(CROSSTALK)

CAMP:

All right, time has expired. Time has expired, Mr. Koskinen.

KOSKINEN:

All right.

CAMP:

And now, Mr. Thompson.

THOMPSON:

Thank you, Mr. Chairman.

Mr. Commissioner, thank you very much for being here. I'd still want to thank you for your public service and your distinguished career. And I don't want to apologize to the IRS.

But I do want to apologize to you as a professional in the way that you've been -- been treated today. You know, if you could cut through a lot of the political theater that we see taking place in this dias (ph) today, I think there is actually some things that we can all, from both sides of the aisle, agree to.

I think we're all pretty upset if, in fact, there was any inappropriate behavior on the part of the IRS. And I think most of us in previous hearings have expressed that.

I don't care if you're a Democrat -- or actually, I do care if you're a Democrat or Republican but it doesn't matter if you're a Democrat or you're Republican and a conservative or a liberal. You should receive equal and transparent treatment from the IRS.

And if there's any targeting done, it was absolutely inexcusable. I think we're all at the least disappointed that Ms. Lerner took the fifth. I think that helped create a lot of the -- of the -- of the political nonsense that we're seeing playing out today.

I wish that would have gone smoother. And we could have gotten to the bottom of some of these problems from the start. And I certainly hope that we all agree, that given all of these hearings that we're having or raise (ph) to have our hearing before the other committee has theirs, and all the effort that's gone into this, it's really been a distraction from us being able to address the problems -- a lot of the problems that are important to the American people, everything from tax reform to immigration reform, highway repair, transportation bill.

If we could just take a little bit of this time, maybe we could get some of the issues that would help put America back to work, dealt with. And -- and I think all of us experienced the same situations my friend from Ohio.

We all can tell stories about -- about constituent problems with not just the IRS but with anything. I've got -- well, I'll take the opportunity -- I'll take the lead for my friend from Ohio and the opportunity given that you're here to tell you I personally have been trying for weeks to get an appointment in my district with the IRS over a constituent matter that had -- of a small businessman in my district has been dealing with for a couple of years. And it all based on a bill that the Chairman and I co-authored and had signed into law, dealing with conservation easements.

So if you have any influence on your California office, please ask them to return my calls. I'd -- I'd like to -- like to deal with that. But the thing that I found that -- that has really pricked my interest today in addition to getting this thing cleaned up and -- and done with, is the issue of the lost and misplaced and not knowing where they are or where -- what the process for dealing with them is, hard drives.

A number of years ago, because of legislation that I have carried dealing with electronic waste, we found out not through our own resources, through press reports, that a number of hard drives from our intelligence committee and from the Department of Defense were found in third world countries in disposal sites. And that was a terrible breach of national security and caused me to amend our intelligence bill. And probably, everybody here who was there then voted for that -- for that amendment and -- and that bill. And we've -- we've figured out how to deal with that in the intelligence community.

But it sounds like we have the same security problem with some of the hardware and software in your agency. And I'd like to know if you think that's something that we should try and collaborate on to make sure that we can protect the records of -- of the public and as they're stored in your equipment.

KOSKINEN:

No, it is an important issue which is why when there is a hard drive that no longer is usable, it goes to a recycler and is destroyed rather than put in a waste dump or sent out somewhere else.

THOMPSON:

Well, I'd be happy to share with you the intel approach we took if you think that might help. And the remainder of my time...

KOSKINEN:

Thank you.

THOMPSON:

...I know you -- you had some things you were trying to say to the last -- my last colleague who -- who spoke. I'll yield my remaining time to you to answering those questions.

KOSKINEN:

Thank you. And I -- I appreciate that. I think the important thing to note is I would encourage everybody to talk to their caseworkers and let -- let us know if there are issues. I've spent a significant amount of time visiting 25 -- the 25 largest IRS offices across the country, encouraging, I've met with over 10,000 IRS employees, encouraging frontline employees who often know best what's going on, to let me know if there is an issue, to give us their best insights and advices and suggestions for how to improve our operations.

I'm particularly concerned and we're working on the backlog in the 502(c)3 organizations and while we are doing our best to work that backlog down so that your constituents actually get an appropriate and prompt answer to their applications.

CAMP:

All right, time has expired.

Dr. Bustani?

BOUSTANY:

Thank you, Mr. Chairman.

Commissioner, good to see you. I have to tell you, I was damned angry on Friday when we got word about what happened with Lois Lerner's hard drive and all the news that's broken since then on this. And I'm even angrier today about this.

And it's interesting, you know, Chairman Camp and I sent a letter to Secretary Lew on Monday. And after months of stonewalling about documents, we finally got 2,500 documents 30 minutes before this -- this committee convened its hearing.

It's just amazing that the White House or the Treasury can respond that quickly when spurred to do so. And we're still waiting for a lot of this information from your agency.

But I have -- I want to explore some questions with regard to Nikole Flax. She had two computers, correct?

KOSKINEN:

Correct.

BOUSTANY:

She had one -- a desktop and a laptop, is that right?

KOSKINEN:

Right. Yes.

BOUSTANY:

Yes, OK. Which -- which hard drive failed?

KOSKINEN:

I've been advised that it was her laptop that failed, not her office computer.

BOUSTANY:

OK. And so how do you even know where she's archived or do you know where she's archived the key documents from the time frame that we're interested in?

KOSKINEN:

The time frame you're interested in, they (ph) -- everyone archives their -- their documents on their hard drive in the office because that's where most of the work is done. And they want to be retrievable.

BOUSTANY:

So can you attest that all relative e-mail and documents, memos from Nikole Flax, related to targeting are producible? You have these?

KOSKINEN:

I can attest at this point, I'm advised there's no evidence that any e-mail was lost by Nikole Flax. I have not personally talked to her.

And again, this is all information that's being developed as we talk.

BOUSTANY:

Right. E-mail, memos, all documents?

KOSKINEN:

My understanding is no e-mail of hers has been lost as a result of her hard drive crash.

BOUSTANY:

OK. And where is the laptop now which supposedly has hard drive problems?

KOSKINEN:

I don't know. As I said...

BOUSTANY:

You don't know?

KOSKINEN:

...we just started -- we just got the list on Monday ourselves. We've been pursuing this. And we will, in fact, give you a full report on all the custodians, now seven.

The eighth one is one that actually failed this year. And it doesn't count.

BOUSTANY:

So we don't know where those hard drives are right now?

KOSKINEN:

We do not know where those are. We will give you a full...

(CROSSTALK)

BOUSTANY:

That's just unbelievable to me. You don't have that information as this -- I mean, it's been weeks since this information was made public to us.

KOSKINEN:

The information was made public by you. We advised you in committee on Monday that this is -- all we had was the names. We are actually working through a review to find out what's the status of those, how many e-mails were lost.

We will find out. And we'll know where the hard drives are. On many times, you reconstitute the hard drive. And it continues to function.

We will give you that information as we have it. Part of the issue as I said earlier...

BOUSTANY:

All right, so...

KOSKINEN:

...with providing partial information is then we get immediately asked, well, what's the answer to this. And we don't know the...

BOUSTANY:

All right. So we can expect this information in a timely manner.

KOSKINEN:

In a timely manner, we...

BOUSTANY:

All right.

KOSKINEN:

...will get you all of the information we're able to discuss.

BOUSTANY:

When was Lois Lerner's hard drive recycled and made irretrievable?

KOSKINEN:

All I know is that she was advised as I noted in the summer of 2011 that the criminal investigation division had been unable to retrieve any e-mails off her hard drive. And it was recycled.

I will get you the date to the extent we have it or when...

BOUSTANY:

Get us that -- that precise date. But I'm -- I'm really, really disturbed that it took this long for the committee to find out this information, buried (ph) in the letter that we received on Friday.

KOSKINEN:

As I noted, there were e-mails that actually -- as I said, we've got a good close working relationship with your staff. There were e-mails last fall in the productions that referenced her hard drive crash no -- no one was paying attention to because they were looking at all of the relevant information. As we proceeded through, it was not until into April that we understood there was a crash.

And it was not until mid-May that we could actually bound the issue and determine how many e-mails were available and how many were not.

BOUSTANY:

But why -- why wasn't this committee notified before a decision was made to completely recycle her hard drive?

KOSKINEN:

The committee was not notified because that decision would have been made three years ago. That's not a decision none of this had anything to do with the investigation.

It was...

BOUSTANY:

Well, I would submit it does have to do with the investigation because we're trying to get necessary information.

KOSKINEN:

The...

BOUSTANY:

And I know you were not there at the time. But I -- I just thought maybe in your investigation of what's going on, you might be able to shed some light as to why we were not notified.

And it -- it disturbs me that this -- this decision was made internally without any kind of outside consultation when this committee was vigorously pursuing information regarding this -- this targeting scandal.


KOSKINEN:

Right. I would like to make the record very clear. The decision about that hard drive was made three years ago. There has been no decision made since this investigation started and certainly, since I started, to have anything destroyed.

Every e-mail, every hard drive that people are using now is -- Lois Lerner's hard drive after the crash is now in the possession of the I.G.


BOUSTANY:

OK. I want -- I just to make it very clear that any decisions that are made, we need to be notified. This committee needs to be notified prior to any decisions made about the disposition of those hard drives.


CAMP:

All right. Thank you. Time has expired.


BOUSTANY:

Thank you.


CAMP:

We'll be going two to one.

Mr. Roskam's recognized.


ROSKAM:

Thank you, Mr. Chairman.

Commissioner, I'm -- I'm going to make an observation. It will sound condescending. And I don't mean it to be condescending.

So go -- go really deep into the meaning of what I'm communicating. Growing up, my father would always tell me, Peter, make good choices. And we kind of have a running joke when my kids go out of the door in the morning or particularly in the evening.

Make good choices. And so I think you've made a bad choice. And it's not a bad choice based on invective or bad motivation. I think the administration came to you singularly as a person, as a white knight, as someone of a sterling reputation, someone who has had experience turning around bad organizations.

And I think the administration is trading on your representation. So I think you've made a bad choice. Now, you're in it now.

But I think the decision to accept this responsibility as the IRS Commissioner and defending this -- this administration was a bad choice. And I'll make a prediction.

I'll make a prediction that in several months or in a year, you're not the Commissioner of the IRS anymore and that they will go out to someone else because now, you're the third person in this. And will (ph) not (ph) ask (ph) you to respond to that but it is an observation.

And I mean no condescension in it. So here is the point. You're being characterized today by the other side as a victim. I mean, the IRS as a victim is so richly ironic, you can hardly believe it.

So you're not a victim today. The IRS is not a victim today. And here is fundamental problem. Chairman Camp sent a letter on this whole issue.

And then 10 days later -- so think about the duration of 10 days. Ten days is the ability to panic at the IRS, reflect, plan, talk and execute. And there was a crash -- 1- days after the Chairman's letter.

Now, I've got a slide. That's a fire. And inside that fire is a hard drive. I've got another slide. That's the hard drive after it was burned. And you know what, Commissioner, you know what was recoverable from that? One hundred percent of the data. So the notion that a hard drive or a server in the midst of this entire situation has been lost into oblivion is a case that even a white knight can't make.

I yield back.


KOSKINEN:

Mr. Chairman, can I make a comment?


CAMP:

He has yielded back his time. You may seek time from the other side.

KOSKINEN:

All right. Perhaps someone...

(CROSSTALK)

CAMP:

It is now Mr. Blumenauer's time.

SCHWARTZ ((ph): Mr. Chairman, I ask unanimous consent to allow the witness some time to respond to the...

CAMP:

He can respond...

SCHWARTZ (ph): ...allegation that Lois Lerner's drive was thrown into a fire and a hundred percent of it was recoverable because it's ridiculous.

CAMP:

There's not a question pending for the witness. Mr. Roskam made a statement. I object myself to that.

Mr. Blumenauer, you're recognized. And you may use your time as you see fit.

BLUMENAUER:

Well, thank you. I appreciate that. And I'll try and be brief and turn a couple of those minutes over to you.

First of all, thank you for appearing. Mr. Roskam said, you know, that you're not going to be doing this forever. I'm surprised anybody takes this job based on the treatment that has been accorded to people who had better things to do with their lives, had credible careers and you (ph) stepped into difficult circumstances.

Thank you. I appreciate it. I appreciate the fact that you are managing or attempting to -- 90,000 employees. You have a budget of almost $11 billion. And I appreciate that you're doing this with a workforce since I've been in a Congress that shrunk 25,000 employees -- 10,000 in the last four days -- four years.

But the budget -- if this Congress in its wisdom, my Republican colleagues are cutting your budget. The training budget, I think, went from a hundred and $72 million to $22 million for a tax code that we consistently make more complex.

And oftentimes, we don't get our job done in time so that your employees can do their job. And then somehow, we're pillaring (ph) you and some of this does sound condescending, I will say, or not allowing you to answer questions for a situation that Congress has made worse and has systematically assaulted the IRS in its capacity to function.

What did we do in the government shutdown? What business furloughs its accounts receivables department? Not one that stays in business very long.

Not one that has the capacity to deal with layers and layers of complexity and a vast system where people pound away on the IRS and the people who work there. I'm amazed that anybody takes those jobs from you on down.

And I appreciate they do. You know, it's certain irony that is now the victor (ph) of the Republican Party to assault the IRS at every turn and undercut its ability to function.

Gee, it was Republican presidents starting with Lincoln and Taft and Roosevelt that promoted the income tax, which doesn't collect itself. I appreciate the hard work. I appreciate being able to tease out this and I appreciate my friend, Mr. Doggett's reference to all manner of things that are being laid at your doorstep.

I hope before we get through this budget process, we take a hard look at what this critical agency needs to function like training, like people on the job, not have budget cuts that we are told by the tax advocate a budget cut of $1 dollar costs the federal government seven, and undercutting enforcement, which every dollar is over $250 that's returned to the taxpayers for veteran services, for environmental protection, for defense. I'm sorry.

I'm taking more time than I wanted. I'd like to turn you to give you an unfettered minute or two if there's something that you would like to say.


KOSKINEN:

Thank you very much.


BLUMENAUER:

And I will just conclude with my thanks for your being here.


KOSKINEN:

With regard to bad choices, I'm sorry, the Congressman has left. I have noted that when people ask why I took this job, that perhaps I need counseling to make decisions going forward.

But I think if there's one issue I would like to have come out this hearing, we have 90,000 dedicated employees that I've said I've talked to and listened to 10,000 of them. There is one point I want to come out from this as I want to totally refute this suggestion that sometime in the next six to 12 months, I'm going to fade away.

I am firmly committed that I will serve the remaining three and a half years of my term, come whatever it may be. And I think it's important for those employees dedicated as they are to the mission of this agency to have confidence that they're a leader.

The Commissioner of the IRS is not going to cut and run, is not going to decide it was a bad choice to take this job, is delighted to be working with them and that I look forward to the next three and a half years of my term doing that. I would also like to note the reference again that somehow it's unbelievably we lost the hard drive now is unbelievable because it was not lost now.

It was not destroyed now. That was a decision made three years ago before any of these investigations started. There should be no implication that anything has been destroyed or tampered with since this investigation started and certainly, since I became Commissioner.


CAMP:

Time has expired.


GERLACH:

Thank you, Mr. Chairman.

Commissioner, on numerous occasions during your testimony here this morning as well as on the first page of your written testimony that you presented to the committee, you cite numerous statistics of the amount of e-mails and other communications that the IRS has produced for this committee and certainly for the Senate Finance Committee.

But frankly, all of these statistics are relevant if the effort doesn't get us to the full truth. And certainly, all of these statistics are minuscule when compared to the Constitutional rights of the average citizens that have been trampled on through the process that was, at this point, as to our understanding, guided by Lois Lerner, perhaps others within the IRS.

Since you've been on board at the IRS, you've had opportunity, obviously, to try to get your head around and hands around the scope of this investigation and the work that was actually conducted by Lois Lerner and perhaps others. So I'd like to ask you, based upon your understanding of all that, what do

you think Lois Lerner did wrong or did inappropriately in the healing of her duties while she was in charge of the tax-exempt organization application review process?

KOSKINEN:

Good question. I have not independently investigated the matter, as I've said, on occasions in the past. We have a lot of investigations going on.

But I think it is clear, to the extent as the I.G. found that inappropriate criteria were used to select applications for our further review to the extent that applicants were required or requested to provide voluminous improper information that was a mistake. It shouldn't have happened.

And we should do everything we can to make sure it doesn't happen again.

GERLACH:

OK.

KOSKINEN:

The I.G. made recommendations of what should be done. We have accepted all of those. We are implementing those. We are providing appropriate training and safeguards because as I said earlier, I think it is critical for every American, no matter what their political beliefs, whether they go to church or they don't go to church, whatever meeting they went to last week, if they wrote an op- ed some place, should be confident.

If they hear from us, it's because of something in their return.

GERLACH:

So you're...

KOSKINEN:

And if anybody else had something in their return that looked like that, they'd hear from us again. And I think that's critical. And that is a commitment we have made.

GERLACH:

So you are basing that upon the I.G.'s report and investigation but yet you just said that you didn't do your own investigation.

KOSKINEN:

I have not.

GERLACH:

I would think, however, that if I were to become Head of an agency like the IRS, I'd want to conduct an internal investigation of my own agency to understand fully what happens. So I knew what happened because I'm in charge of that agency.

Do you have any plans to do your own internal investigation of this activity?

KOSKINEN:

When I arrived, it was very clear with all the investigations going on. A, the last thing I wanted to do was appear to be interfering with those investigations, talking to any of the potential witnesses. Secondly, my thought has been and continues to be with six investigations and the amount of time going on.

What I'm looking forward to is being educated by the reports of those committees. They're going to -- you all have spent more and more time. I have an agency to run with 90,000 employees...

GERLACH:

OK, so you're -- you're not going to do your own investigation?

KOSKINEN:

I'm not going to do an (ph) investigation.

GERLACH:

OK.

KOSKINEN:

I'm looking forward to your facts. I'm looking forward to your recommendations. We will take those recommendations.

GERLACH:



But it won't be our (ph) facts (ph). They'll -- they'll be everybody's fact.


KOSKINEN:

Everybody's fact. Whatever...

(CROSSTALK)


GERLACH:

Let me ask you this in the time that I have. The new head of the Tax Exempt and Government Entities Division,Sunita Lough recently announced that the IRS will restart audits of 501(c)4 organizations that were selected for examination during the targeting and due to political activity.

These audits were suspended after Acting Commissioner Wuerffel expressed concerns that they may have -- may have been tainted by the targeting. Indeed, the committee has found evidence that Lois Lerner, in fact, bypass internal controls as you just indicated and reached into hand select, a right-leaning group for audit.

Given these concerns and the evidence that Lois Lerner improperly influenced the audit selection of these groups, why would the IRS choose to reopen these audits?


KOSKINEN:

Because we think and I think it's in -- unfair to them to leave them in limbo, that they deserve to have closure. We've made it clear and are reaching...


GERLACH:

According (ph) to this process, their application and -- and provide the answer to them without auditing the process.


KOSKINEN:

We're going to actually and we've -- we've noted that we're -- any request for information that was inappropriate, they don't have to respond to. They will be new appropriate request for the normal follow-up.

We want to close those investigations so those organizations are not left in limbo and not unable to function. We will proceed with those effectively.

It was my determination that we ought not to leave them out there, that we ought to appropriately review them and -- and most of these cases, they get approved. And if they're going to get approved, we should do -- we should do that.

GERLACH:

Thank you.

CAMP:

Dr. Price?

PRICE:

Thank you, Mr. Chairman.

Commissioner, I want to also thank you for your service. There is this notion that we decided (ph) that (ph) I (ph) don't (ph) appreciate what public servants do. And we do. But this is serious stuff.

This is serious stuff. The perception of my constituents and many folks across this great land is that there has been a chilling activity on the part of the internal revenue service to target folks because of their political views and not just target those organizations. But then the IRS took donor lists from organizations, shared them with other groups.

And then those individuals on those donor lists were audited at a degree higher than the usual rate -- significantly higher than the usual rate. That's chilling, chilling stuff.

So that's -- that's the sense that -- that many of us have and -- and our constituents have. Your job is to rebuild this trust. And with all due respect, the comments that we've heard today, the processes that you've gone through, haven't begun to rebuild that trust.

You've -- you've said that -- that the work continues. The ongoing work continues. So isn't it true that -- that -- that our friends who draw the conclusion of innocence is -- is likely premature, is that not -- is that not correct?

KOSKINEN:

I'm not sure whose innocence you're worried about. I would like to note that the statistics we've shared with this committee and we're happy to continue to work with you, do not show that any donors were audited at a higher rate than people in the public generally.

PRICE:

The information...

KOSKINEN:

But if they were, it was a mistake. But there's no evidence that there was any systematic attempt of audit.

PRICE:

We'll -- we'll -- we'll go (ph) to the information that we have because it's clear that the individuals who have been -- and -- and anecdotally, there's no doubt about it. But -- but the -- the statistics will show that folks who donated to these groups were audited at -- at -- at a higher rate.

I want to get to the -- a couple of specific questions. You -- you said that you knew -- you learned about the crash of this hard drive in February of this year?

KOSKINEN:

I learned there was a problem -- a potential problem in February. We did not know and I was not advised that there had been a crash until (ph) into May when our I.T. people discovered it. And it wasn't until end in May that we understood and we're able to complete the investigation of what the ramifications were, how many e- mails still existed and then started the investigation of how many other...

(CROSSTALK)

PRICE:

When was Treasury informed?

KOSKINEN:

I don't know when Treasury was informed. I did not do...

(CROSSTALK)

PRICE:

They had to have been informed by the IRS, though, correct?

KOSKINEN:

My understanding from the White House letter is that in sometime by mid-April, in a conversation between counsel and the IRS and counsel at Treasury, they were advised that there was a problem with the -- with Lois Lerner's e-mails, and that there (ph) was (ph) being fully (ph)...

PRICE:

It was IRS counsel that informed the Treasury?

KOSKINEN:

That's my understanding. And that they were advised that we were investigating it.

PRICE:

Now, Secretary Lew has refused to date to provide e-mails as it relates to -- to Lois Lerner and other items to this committee. Don't you think it would be appropriate given -- or maybe his computer has crashed -- you don't know -- you don't know if Secretary Lew's computer has crashed, do you?

KOSKINEN:

My understanding is that you now, as of this morning, I haven't seen any of these documents or the presentation...

(CROSSTALK)

PRICE:

Don't you think it would be appropriate for Secretary Lew?

KOSKINEN:

The Treasury Department -- the Treasury Department has provided you all of their Lois Lerner e-mails.

PRICE:

This morning...

KOSKINEN:

This morning.

PRICE:

...this (ph) is (ph) Dr. (ph) Price (ph), this morning, we have not reviewed them yet.

KOSKINEN:

None -- none of us have had a chance to review those. But that's m understanding. So you do have now those e-mails.

And if there are any from -- to or from Lois Lerner and Secretary Lew, you will have those.

PRICE:

Do you have -- if Lois Lerner had a Blackberry or an iPhone?

KOSKINEN:

I do not know.

PRICE:

You don't know?

KOSKINEN:

I do not know.

PRICE:

Do employees of the Internal Revenue Service carry mobile devices that are issued to them by the government?

KOSKINEN:

They carry mobile devices. The mobile devices run off the -- run the same e-mail system. People do not have on their office Blackberries if they have them or whatever mobile devices they have.

(CROSSTALK)

PRICE:

Do (ph) they (ph)...

KOSKINEN:

They all run against -- all run against the same e- mail account.

PRICE:

Can you find out if Lois Lerner had an -- had an iPhone or a Blackberry for us?

KORNACKI:

I can find that out and be happy to let you know.

PRICE:

There's a notion on the other side that the -- that the IRS just strap (ph) for money -- doesn't have any money at all, can't do a dogone thing because they don't have any money. You are aware that the IRS has a studio that produced the famous Star Trek video that spends about $5 million annually on that studio, are you not?

KOSKINEN:

No longer. That studio has been closed. We now have a review board and produce very few videos and they're not done in that -- in that fancy studio.

And that was all four years ago. Since then, our budget has been cut by $850 million.

PRICE:

You are also aware that IRS employees use 521,000 hours in fiscal year 2013 at a rate of about $23.5 million for union activities, are you not?

KOSKINEN:

That's right. That's consistent across the government in terms of union employees and all federal agencies have a right to spend some portion of their time on official business for the union. And the IRS has a union.

And those employees, pursuant to that process, do spend time on union time.

PRICE:

Might be appropriate for them to spend time on something else other than that.

KOSKINEN:

As long as...

PRICE:

Thank you, Mr. Chairman.

KOSKINEN:

...as long as there's a union, they'll spend time.

CAMP:

Time -- time has expired.

Mr. Kind?

KIND:

Thank you, Mr. Chairman.

Mr. Commissioner, I want to thank you for your incredible patience and your testimony here today. And Mr. Commissioner, this -- what you're seeing is a -- expected reaction from an overzealous committee that is so desperate to find any type of evidence, any type of fact that may point to a cover-up that does not exist, point to a conspiracy that does not exist, and have instead chosen to go after a public servant who, by all accounts, is a model of integrity, honesty and professionalism.

I think you're the right person at the right place at the right time to help turn around a troubled agency. And this committee and this Congress should be working with you to get an IRS that's more responsive to the needs of the American public than this fishing expedition on which on -- which has been going on for too long right now.

But Mr. Chairman, I also want to ask unanimous consent to get two articles inserted in today's record, one dated July 20, 2011, a "New York Times" article that's titled, "Three Groups Denied Break by IRS are Named," and another one by the Center for Public Integrity titled, "IRS As Liberal Group to Political or Social Welfare Status."


CAMP:

Without objection so ordered.


KIND:

And the reason I want those articles inserted today, Mr. Chairman, is to point out the extreme irony of this investigation. The only organizations that were applying for 501(c)(4) status with the IRS that were denied that application were organizations that were affiliated with Democratic candidates for office, not conservative organizations.

In the -- in the case of the three groups that were denied status, they were Emerge Nevada, Emerge Maine, Emerge Massachusetts but only supported Democratic candidates for office. And in the other article, it was -- its subtitle is agency rejects tax-exempt application of a pro-blanche Lincoln Arkansas for common sense. They were denied their application because they were viewed as too political.

And that's -- and there's no evidence at all that the IRS has denied any conservative group applying for (c)(4) status during the entire course of this investigation. So this fake rage occurring from the other side is just that.

They're going after an IRS because of the political fodder that it brings to their base. And it's unfortunate that we're having to conduct yet another witch hunt here today.

Mr. Commissioner, let me ask you some quick questions with the remaining time because you are under oath. And we want to make this explicitly clear with your testimony.

But to your knowledge, has anyone at the IRS deliberately withheld any e-mails requested by this committee?


KOSKINEN:

No.

KIND:

To your knowledge, has anyone at the IRS withheld any information specifically requested by this committee?

KOSKINEN:

No, and we would note that we haven't produced all the information we have because it's voluminous. But we've withheld no information.

KIND:

Has there been any attempt within the IRS to destroy any evidence to your knowledge?

KOSKINEN:

No attempt by anyone during the course of this investigation to destroy any evidence. As noted, we freeze the e- mail. In the past, e-mails were only retained for six months.

KIND:

And to your knowledge, has there been any attempt to tamper with any evidence or information requested by this committee?

KOSKINEN:

None.

KOSKINEN:

And since you been Acting Commissioner at the IRS, have you seen any evidence of any attempt to cover up information pertinent to this committee's investigation?

KOSKINEN:

No.

KIND:

What about any information requested by the other investigations that have been -- I think you testified to six investigations that are still pending with the IRS?

KOSKINEN:

We are providing the same information to all investigators. The tax writing committees get unredacted information. The non-tax writing committees get redacted information.

So they've got about a hundred and 70,000 pages fewer than information than this committee and Senate finance.

KIND:

Have you seen any evidence of any direct involvement by the White House in the screening of (c)(4) applications that are the subject and involved in this investigation?

KOSKINEN:

I've seen none.

KIND:

And has there been any evidence of any White House involvement in the IRS responses to the information requested by this committee?

KOSKINEN:

I've seen none.

KIND:

And could you just give us a quick status update on the computer system at the IRS, that -- that you encountered when you took over as Commissioner?

KOSKINEN:

Computer system as I said is somewhat antiquated. We have been updating as much as we can. As noted in my testimony, we have about a billion-dollar infrastructure as a result of the budget constraints.

This year, we're spending minimal amounts on that as I noted. We still can't get all of the employees onto window seven. I heard a reference earlier to somebody going to windows 10.

We should be so fortunate to get everybody out on window seven. So we are significantly constrained. And our budget has been significantly underfunded on a declining basis on the last four years.

KIND:

So if we ask specific request for this committee, this Congress, in regards to what we can do to assist the IRS to get an updated, more modern, functioning computer system, what would that be?

KOSKINEN:

We've given you a proposal. The President's budget would allow us to continue to make progress in that regard. We have at this point, four to $500 million of modernization and improvement activities that we would undertake.

CAMP:

All right, thank you.

KIND:

Thank you, Mr. Chairman.

CAMP:

Thank you.

Mr. Smith?

SMITH:

Thank you, Mr. Chairman.

And to our witness here for your time today, thank you. I -- I realize I think we have a large issue. I know it's been dismissed as an overzealous reach of the committee or a conspiracy similar to various others over history, political theater.

I -- I think you agree that this is a serious issue. And -- and I think that moving forward, I would ask for full cooperation. It's been frustrating with the various responses that -- that have been offered over the last I think 13, 14 months now.

You mentioned contemporaneous documentation. Could you expound on that? I have an idea of what that is but I Would like you to...

KOSKINEN:

I'm sorry, contemporaneous...

SMITH:

Contemporaneous documentation that you referenced earlier...

KOSKINEN:

I was talking about -- by the way, if you wouldn't mind, maybe give you the time (ph), in the middle of this two hours, last question I answered about what we knew when, as I've noted in...

SMITH:

Sir, time is limited. If -- if you would answer my question.

KOSKINEN:

OK, I'll answer. Contemporaneous means that the e- mail traffic that we have found in -- in our search, about the crash was e-mail traffic at the time of the crash when in the time of the attempted restoration three years ago.

SMITH:

OK. And various documentation is recommended by the IRS with -- with tax filers. Documentation is required to be retained how long?

KOSKINEN:

Generally, as a general matter, people are subject to audits for three years unless there's criminal activity and then we can go back actually, in some cases, unlimited amounts. But as a general matter, unless you're a willful evader, we limit our audits to three years.

SMITH:

OK. Now, given -- shifting gears just a bit here, when you look at the size of the IRS, 90,000 people, that we are reminded that $2.4 trillion revenue, many would say that the core of power in Washington, D.C. is the tax code, 10,000 pages in length, various other descriptions of this. And -- and it was noted earlier that a budget cut of $1 in the operating cost of the IRS results in costing revenues $7. Would you agree with that assessment?

KOSKINEN:

Could I what?

SMITH:

That a -- a $1 budget cut would result in a $7 cost to revenue?

KOSKINEN:

It -- it depends on whom you ask, as to whether it's $4, $6 or $8 or $7, a dollar, but it's clear, as I've said, for instance, if we had the pre-sequester 500 million that were denied this year, we would have provided back over $2 billion of revenue. So we do provide -- we collect and our personal activities four times -- over four or five times the entire budget of the agency.

SMITH:

OK. Obviously, there are many opinions here. And -- and I have to tell you that given the complexity of the tax code, and I think that's the -- the main reason why we're trying to reform the tax code to come up with a -- a simpler approach, my question, how possible it is to iron these issues out, that some dismissed, others find very serious.

And I would hope that we could have the full cooperation as we do move forward. I -- I would hope that you agree that this is not a finished case.

So would you agree with that?

KOSKINEN:

No. And -- and we are anxious and delighted to continue to cooperate. As I've noted, I think it's important for the record again, we've had a very good working relationship with your staff.

And we've followed leads that they wanted us to follow. And it's been, I think, productive. And we continue to hope to do that. And we will be as responsive as we can to requests of the committee.

I think it's important for us to do that.


SMITH:

Well, Mr. Chairman, I -- I certainly hope that we can continue to get -- get this resolved. I know that there are various characterizations here.

It's disappointing that to somewhat dismiss this situation here today. I hope that we can move forward. Thank you.


CAMP:

Thank you.

Mr. Paulsen?


PAULSEN:

Thank you, Mr. Chairman.

Mr. Koskinen, I wont' go down the same line of questioning as been used already. But I do want to highlight an example of a case in my district as well, small businessperson and went out on a tour this small business in Minnesota.

This individual small businessperson at their company had been involved and subject to four different IRS audits over the past 10 years. The most of which, the most recent is actually still going on.

So far, each of these audits has resulted in minimal or zero -- zero changes to the company's income tax returns. And the most recent audit that's going on right now has been going on for 18 months.

This cost the company over about a hundred and $10,000. It's an audit that is done to help train IRS employees, ironically at the cost of the company. The agency has asked the company to produce an inordinate amount of information even requesting a receipt or a $10 cab fare that occurred months ago.

I'm curious, Commissioner, if the -- if the company came forward tomorrow and said, this information has been lost, this $10 cab fare, we cannot find it, similar to the hard drives being -- being undiscoverable, you'd understand that, right?


KOSKINEN:

Yes.

PAULSEN:

You'd understand that and you wouldn't hold them accountable? They wouldn't have to produce that -- that record?

KOSKINEN:

I'm -- I'm not an exam agent. But if as in this case he said I don't have the receipt but I can, by other information, demonstrate that pretty close to $10 is what I spent, that would be allowed just as our providing you 24,000 Lois Lerner e-mails from the time of the crash.

PAULSEN:

If they had a system of hard drive crashes that went forward and they came forward and said there's nothing we can do, the servers are down, the hard drives are gone, we have no recollection, we can't retrieve the data, would you end the audits?

KOSKINEN:

As I say, I'm not an exam auditor expert. I can tell you that those trying to become compliant whether their individuals or businesses, we reach out to them. We're trying and anxious to work with taxpayers trying to become compliant.

The ones we're concerned about are other people willingly and consciously avoiding taxes especially those offshores. Those were -- I'm happy to chase to the end of the earth and throw them to jail.

But the people trying to become compliant, we reach out to and do the best we can to, in fact, work with them.

PAULSEN:

And this is following, just clearly on the same situation that Mr. Tiberi identified earlier or that others have identified with individual cases in their district, but our constituents who look to the IRS for impartial judgment obviously...

KOSKINEN:

Right.

PAULSEN:

...and understanding, let me ask you, Commissioner Koskinen, if an employee at the IRS has a computer problem, is there a way to track when that employee called regarding the computer problem?

KOSKINEN:

Yes. There are tickets which is how we actually in February discovered that there had been a computer crash. I misspoke the end of the middle of two hours of the last questioner, I said we didn't about the crash until the end of April.

We didn't know about the ramifications of the crash as I said in my organized testimony. There was the ticket, in fact, the information from I.T. that said there was a crash which caused us to then take the time to figure out what did that mean, had their e-mails been lost.

That's when we then discovered in the production of the e-mails, the track of the e-mails that confirmed that, in fact, there had been a crash. They're going to -- significant effort trying to retrieve (ph) the e-mails.

PAULSEN:

So with -- with that ticket, would the IRS be able to track what the I.T. issue was that was actually being handled?

KOSKINEN:

I don't know the details of the ticket are but I do know from the correspondence in the e-mails that it was a hard drive crash and from some of Ms. Lerner's e-mails that she was unable to get to her e-mails.

PAULSEN:

Would you be able to check based on the ticket who handled that particular I.T. and how it was resolved, tracking mechanism within the IRS?

KOSKINEN:

I -- I don't know what the ticket would show but we'll be happy to make sure you have the ticket and any information related to it.

PAULSEN:

Can you identify or tell me who at the IRS in the I.T. area handled Ms. Lerner's computer crash issue in 2011? Is that knowable, who handled that I.T. crash issue?

KOSKINEN:

Yes, it was a front-line -- correspondence was within a frontline I.T. manager. What was not ordinary was when it couldn't be retrieved by the normal I.T. experts to have it sent to the experts at the criminal investigation division, which was an additional step taken...

(CROSSTALK)

PAULSEN:

Can you tell me what caused Ms. Lerner's hardware crash?

KOSKINEN:

Pardon?

PAULSEN:

Can you tell me what caused the crash itself?

KOSKINEN:

I do not know what caused the crash. And in fact, my understanding, with computers, three to five percent them crash as a general industry standard.

And there's no way to know why they crashed.

PAULSEN:

Can you rule out, Commissioner, what you know are based on these tickets, can you rule out that Lois Lerner destroyed her own computer? Can you rule that out?

KOSKINEN:

There's no evidence that she did. And in fact, if she had done that...

PAULSEN:

You ruled that out, though?

KOSKINEN:

Well, you can never rule out something you don't know. But at this point, there is no evidence. The evidence is she worked very hard to try to restore her e-mail.

PAULSEN:

And can you -- can you answer the questions about the hard drive crashes for the other six employees as well that were involved in the targeting, similar situation? Can we identify and make sure that they were not intentionally...

(CROSSTALK)

KOSKINEN:

We are investigating that right now. And as I've said, we'll give you all of the information we're able to determine about when those computers crashed, whether any e-mails were lost, what's been done with the hard drive to the extent they are still available.

They'll be made available.

CAMP:

Thank you.

Mr. Pascrell is recognized.

PASCRELL:

Thank you, Mr. Chairman.

Let me -- let me give you 15, 20 seconds, sir. I'm over here.

CAMP (ph): I'm sorry. Behind (ph) the stenographer.

PASCRELL:

Thank you. To answer one of the questions you weren't able to answer before, and question and you wanted to correct the record.

KOSKINEN:

No, I was just -- and I started to correct the record that as I said in my testimony -- written testimony, we knew with the I.T. ticket in February there had been a crash. What we didn't know until late April was what the implications were.

Had -- had their e-mails been lost? If so, whether other e-mails that were from Lois in that time frame. So I've been consistent except for that one point I'm told (ph).

PASCRELL:

Thank you. Do you agree when the IRS grants a group tax exempt status, now, that -- that means that there is an advantage of one group as compared to another group and how they're taxed. This is important.

KOSKINEN:

Yes.

PASCRELL:

And I -- I don't know what the numbers of how much money the federal government doesn't take in because we do exempt, I mean, the total amount of money. I'm not -- that's not my question -- conveys a significant tax advantage to a group, whether they're left, right, north, south, doesn't matter, a significant tax advantage to that group.

And its operations are being implicitly subsidized by you and me, you and I.

KOSKINEN:

That's correct.

PASCRELL:

OK? Is that correct?

KOSKINEN:

That is correct, yes.

PASCRELL:

I'm not -- I'm not using hyperbole here, am I? That's exactly what happens.


KOSKINEN:

That's exactly what happens.


PASCRELL:

So the taxpayers -- do you actually think I'm going to ask your opinion? Do you actually think they understand about what this is all about?

I mean, this is not about what happened to the black box. This is about protecting the coverage that we have decided in our infinite wisdom to provide certain groups that are social groups but not political groups. Now, do you believe the IRS has a responsibility to protect the taxpayers of this country by ensuring that the groups that we allow to operate as tax-exempt are operating in a way that is consistent with the law?


KOSKINEN:

Doing that applies to all 501(c) organizations.


PASCRELL:

Now, according to the law in this area, tax exempt 501(c)(4) groups are required to operate exclusively for social welfare and that that must be their primary purpose. Am I correct or incorrect?


KOSKINEN:

That is correct. The regulation provides that your primary purpose has to be social welfare exercise.


PASCRELL:

Now, let -- let me ask you this then. Can you describe the process that the IRS currently uses to determine a 501(c)(4) group is really a social welfare group, or is engaging in inappropriate amount of political activity? Is that an intensive process that requires a lot of money, requires a lot of manpower?

Explain.

KOSKINEN:

It is a complicated process. We have 1,600,000 tax- exempt organizations.

PASCRELL:

How many?

KOSKINEN:

A million 600,000 total of which somewhere in the range of a hundred or a hundred 50,000 are (c)(4) social welfare organizations.

PASCRELL:

Right.

KOSKINEN:

A lot of them are garden (ph) clubs. People have nothing to do with the advocacy. When an organization applies for exemption, the historic process has been their activities or proposed activities will be determined on a facts and circumstances test.

And then there are a long set of examples and complicated regulations that describe how to determine the amount of activity that is social welfare activity and what kinds of activities in the facts and circumstances are political activities. And so it is a complicated process.

PASCRELL:

But it is intensive?

KOSKINEN:

And it is intensive.

PASCRELL:

And it should be.

KOSKINEN:

And it's what?

PASCRELL:

And it should be.

KOSKINEN:

Yes, we take seriously across the all the 501(c)s our determination process.

PASCRELL:

In the last four years, how many organizations went from 501(c)(4)s to like any other organization in the last four years?

CAMP:

Answer quickly please.

KOSKINEN:

I don't know that -- the answer but I will get that for you.

PASCRELL:

All (ph) right (ph), thank (ph) you (ph).

CAMP:

OK (ph), Mr. Marchant?

Mr. Chairman -- Mr. Chairman?

CAMP:

Yes.

Parliamentary inquiry.

CAMP:

Yes, please state the parliamentary inquiry.

Since it -- we are being summoned to vote and not all members will be given a chance to ask questions, I would like to know if those of us who do not have an opportunity to question the witness may submit comments and questions for the record?

CAMP:

Yes. And my plan is to recess and come back after votes. But...

Some of us have travel plans after voting.

CAMP:

Yes, I understand. Yes, but members will be able to submit questions.

Mr. Marchant? Your microphone.

MARCHANT:

I keep forgetting to turn mine on as well. This one's working. This one's working. I'm privileged to have a district that has a vast number of people that are very high-tech.

So Mr. Chairman, I'd like to submit for the record a letter from one of my high-tech people that have some suggestions on how you may recover some of these e-mails that we're looking for.

CAMP:

Without objection, so ordered.

MARCHANT:

This...

CAMP:

Can I -- can I have a copy of that letter as well -- as well as for the record?

MARCHANT:

Be happy to provide it to you.

CAMP:

That'd be great.

MARCHANT:

This Inquiry was started because there are constituents in our district that were harassed and treated differently by the IRS. And whether we get all the e-mails, ever get all the e-mails involved in this, I think that it has already been established that this -- this committee is dealing with this issue today not because it's a witch hunt but because we had -- our own -- our citizens in our districts were discriminated against and treated badly by the IRS.

So that -- that is why we are here today. Do you believe it's important for this committee to receive all of the e-mails from Ms. Lerner's e-mail account and all of the e-mails from all the persons that have been identified of interest in this case?

KOSKINEN:

I have always thought that was important.

MARCHANT:

Is the IRS and its e-mails exempt from monitoring by the FBI or the NSA?

KOSKINEN:

I have no information about that. But I have no indication that we are exempt from anybody's monitoring.

MARCHANT:

So we don't know that the e-mails are not totally all recoverable in some process?

KOSKINEN:

If -- if the NSA was monitoring all of our e-mails and collecting them and saving them someplace, then they might be there. But I'm not aware that that was done.

MARCHANT:

Have you, as a Commissioner, personally contacted the White House, the Treasury, the federal Elections Commission and any other possible federal agency that Lois Lerner may have contacted by e-mail?

KOSKINEN:

I have not contacted any of those agencies about any of the issues involved in this investigation, including her e-mail.

MARCHANT:

Would you be willing to commit to this committee that you will contact these agencies and request from them that all e-mails that they have -- that they have on their records and can produce for Lois Lerner and all of the people of interest and requested them that they furnish them to you?

KOSKINEN:

This committee, I think has already requested. And we don't have authority over them. And I am delighted to know that the White House and Treasury already have produced those. But with the other committees, I'm happy to, on behalf of the committee, make a request that they provide any e-mails they may have.

If you'll give me that, remind me the list of the agencies again, that would be helpful.

MARCHANT:

I'll submit it to you in writing.

Great, thank you, Mr. Chairman.

CAMP:

Thank you.

Ms. Black?

BLACK:

Thank you, Mr. Chairman.

And thank you, Commissioner, for being here today. I'm a bit confused about the timeline here and what was known or was not known about Ms. Lerner's computer and the crash of her computer and, therefore, the lack of our ability to be able to get all of the e- mails.

And this has gone all for about a year and a half now. And I read in your testimony, before you came and that I know you read your testimony to us. It appears that the first time you were made aware that there was actually a crashed computer was when you saw that the date distribution of the e-mail was uneven.

KOSKINEN:

Yes. I did do that. I was...

(CROSSTALK)

BLACK:

Am I assuming that correctly that that is the first time...

KOSKINEN:

Pardon?

BLACK:

...that you knew about the crashed computer was when you determined, after all these files were given and you went back to look at them, you did a limited search there and you said, oh, there is something wrong here because there is an uneven distribution.

Was that the first time that you were made aware that there was a crashed computer?

KOSKINEN:

That's the first time I was aware. That pattern caused people to do an investigation. And they found that there been a crash.

So I wasn't told two separate issues. I was told that there was a pattern problem. And I.T. had determined that there had been a computer crash.

BLACK:

So during this period of time, I find it very interesting that as we're asking for these e-mails and we're asking for them over and over and over again and they're not coming back to us in a timely fashion, and this was prior to your even getting there, that all of a sudden, you look and say, well, wait a minute, we don't have e-mails from this time period.

Something else might have gone on. But that's when we find out or you find out or anybody in the agency that has been getting this request from us and other -- from the OGR committee, for e-mails, that's the first time it's found out, I find that to be very curious.

No one else knew? No one else would come and say that, you have to find this out because you saw that there was some kind of uneven distribution in the dates? Does that seem odd to you?

KOSKINEN:

No. The way the e-mails are pulled out of pool of e- mails that are in the server there is they're all pulled together in just a pool. The e-mails were extracted initially.

And 11,000 of them were provided in response to the search terms so they don't get pulled out by time...

(CROSSTALK)

BLACK:

Commissioner, I know how many e-mails. You have talked about that so many times...

(CROSSTALK)

KOSKINEN:

No, no, if they come -- they get pulled out initially -- I understand -- they get pulled out initially by subject matter, which...

BLACK:

This -- let me just finish this because I only limited amount of time. But this discussion, and you say here, the discussion of a hard -- the hard drive was made three years ago. And the hard drive is in the hands of the I.G.

So is that -- I'm confused here. Does the (ph)...

KOSKINEN:

Two hard drives.

BLACK:

OK.

KOSKINEN:

The hard drive that was recycled and destroyed was the hard drive that crashed in 2011. A new hard drive was provided to Ms. Lerner.

And she used that from then on and that -- that hard drive...

BLACK:

But the crashed hard drive is gone. It's not...

(CROSSTALK)

KOSKINEN:

Crashed -- crashed hard drive was gone three years ago. This replacement hard drive was preserved and is in the hands of the inspector general.

BLACK:

OK, so we still do have a crashed hard drive that is not recoverable, that is missing that information and we'll never get it because it's somewhere gone...

(CROSSTALK)

KOSKINEN:

Three -- three years ago...


BLACK:

Is it not true that there are also a requirement by law that you keep paper records as well if computers do go down? Do you not have paper records that are required?

That is my understanding.


KOSKINEN:

We're -- we're required by law to keep paper records of official records. And there is a definition under the federal records act what are official records are for agency transactions.

And then the employee is to print them out, create a hard copy of it and preserve it.


BLACK:

OK, so I find all of that to be very curious that in all of these questions of us asking for these e-mails, that all of a sudden, just Recently, someone comes up to say, oh, by the way, Lois Lerner's e- mail or hard drive has crashed. And we destroyed it. It's just gone, can't -- can't retrieve it.

Now, these six other computers that we talk about that -- or the other custodians...


KOSKINEN:

Right.


BLACK:

...I find that really curious, too, that that would be limited to that. So maybe you can help me out. Are there other computers that you have found?

What percentage of computers, total computers have crashed within the department? Are there more than just the six because it seems like if there are six people that are connected with this, then you may have had a huge crash over there with this many computers being crashed in just what we're asking for?


KOSKINEN:

Right. The industry standard is you get three to five percent failures, which means that we have...

(CROSSTALK)

BLACK:

Is this three to five percent...

KOSKINEN:

No, it means across 95,000 employees, we're having...

BLACK:

So six of them that are related to this custodians...

KOSKINEN:

The 82 -- the 82 we have looked at had, at this point, we're looking at seven, which is within what the industry normally expects, which is why I asked...

(CROSSTALK)

BLACK:

I have one more question for you...

KOSKINEN:

Sure.

BLACK:

...because my time is going to run out here. Have you had any information that is taxpayer information loss due to these crashes?

KOSKINEN:

I've had no indication that taxpayer information has been lost.

BLACK:

So this information is lost but all of this information -- you have millions of taxpayers have not crashed, not been lost, not been destroyed, is that correct?

KOSKINEN:

There have been -- there have been thousands of hard drive crashes in the IRS across time.

BLACK:

But we haven't lost any taxpayer information?

KOSKINEN:

That I know of. But I don't know -- the taxpayer information is saved in separate files. So we have access to it.

BLACK:

Thank you, Mr. Chairman. I (ph) have follow-up questions in writing.

(CROSSTALK)

CAMP:

All right. Thank you.

Mr. Crowley and then the committee will recess.

CROWLEY:

Mr. Chairman, thank you very much.

Commissioner, welcome. Let me start by saying I understand the suspicions of the majority upon hearing two years' worth of e-mails just disappeared. Put the shoe on the other foot, when Democrats were investigating the lies and the incompetence of the Bush administration, we would be in disbelief at this ineptitude as well.

As we were, for example, when we learned that the Bush White House admitted that it lost nearly five million -- five million e- mails between March 2003 and October 2005 related to the allegations of the politically motivated dismissal of then U.S. attorneys. Fortunately, we can put suspicions -- suspicious minds at ease today.

The inspector general for the IRS, a man named J. Russell George, who was a Republican political appointee of President George W. Bush, has already testified that Ms. Lerner did not learn about the inappropriate criteria being used in local Cincinnati IRS office until a meeting of June 29, 2011, least 16 days after Ms. Lerner's hard drive crashed. Yes, sir, computer crashed more than two weeks before she -- she was notified about the inappropriate actions happening in Cincinnati.

Now, like those who continue to refuse to believe that the birth certificate from the state of Hawaii is actually real, a conspiracy theorist will continue to rattle savers (ph). But really, does anyone in this room want to be seen in that light?

Commissioner, as I mentioned, welcome. Today, the IRS has provided over 770,000 pages of documents involved in this investigation, is that correct, sir?

KOSKINEN:

That's correct.

CROWLEY:

And included in these -- in -- in those thousands of pages of e-mails, Powerpoint presentations and notes delivered to Congress over nine months ago, wasn't there information that specifically mentions the crash of Ms. Lerner's computer?

KOSKINEN:

Yes. Over -- over time, starting in the fall and through the spring, the e-mails from Lois about her failure -- or computer failure and the e-mails about the attempts to restore it have all been provided to this committee.

CROWLEY:

So the crash of Ms. Lerner's computer should come as no surprise, well, no surprise if the majority were actually reading the documents that the IRS was sending up. You may not want to answer that -- that question.

Do you think American taxpayers would be upset to know that this phony investigation has already cost them over $60 million and counting when the Republicans aren't even doing the basic due diligence of reading the documents that you are providing and sending to Congress? I wouldn't necessarily want you to answer that question...

KOSKINEN:

I understand. I might not answer that.

CROWLEY:

Commissioner, or could it be that the majority in their zeal for an academy award for the best outrage and a fake drama are more upset that they were caught not actually reading the documents the IRS had sent up here, thereby providing -- proving -- sorry, proving that they are more concerned with a show trial than an actual -- than actually finding answers? Once again, I'm not going to ask you to answer that question.

The Democrats in this committee have been outraged as has been said over and over again from the first day we heard about Ms. Lerner's apology to a tax conference. We are angered by any singling out of any tax-exempt application based on ideology, whether it be for progressive groups or tea party extremists.

And contrary to what Mr. Ryan said, progressive groups were targeted as well. That's a false statement that he made. We've led the charge for hard to be fired.

We have agreed to oversight hearings with a determined zeal to find answers.

And for that reason, Mr. Chairman, in an effort to get to the truth, the next hearing on this matter should be with the inspector general of the IRS who has not been before this committee for over a year. Anything else would -- would show that this committee is not using its time and resources seriously.

With that, I thank the Commissioner for being here today.

And I yield back the balance of my time.

CAMP:

Thank you. The committee stand in recess until shortly after votes are concluded.

11:38

(RECESS)

12:34

CAMP:

The committee will resume.

Mr. Reed is recognized for five minutes.

REED:

Thank you, Mr. Chairman.

And thank you, Commissioner, for being here today. And thank you for allowing us to go vote and come back and continue this hearing, Mr. Chairman.

This is -- this is a really important issue obviously to now hear the loss of some critical e-mails to me is something that I don't understand how that could happen, why that could happen. But I -- I want to get to the bottom of it as much as possible.

And one of the things I found in your testimony that was intriguing was the actual referral of Lois Lerner's hard drive, and how she went about to try to "recover," quote-unquote, these e-mails. So my understand is that she asked the I.T. representative to -- my hard drive failed.

There's a problem with it. Can you take a look at it? That makes sense to me. But then there's another step. There's a step where it was referred to your criminal investigation department, your forensic experts in the IRS. Now, those are the folks that are well-trained in the area of criminal investigations.

And these are top-notch forensic people, correct?

KOSKINEN:

Correct.

REED:

OK. So there's a -- there's a -- about 11-day, maybe 12 days like July 20 where the technician, the I.T. guy goes to Lois Lerner supposedly and says, we can't do anything about it. And then all of a sudden, she's told about 12 days later as a last resort, we're sending your hard drive to the CI, the criminal investigation IRS division for the forensic lab.

Who -- who was involved in any of those decision-makings that you're aware of during that period of time to send it to the forensic lab?

KOSKINEN:

I don't know any of the names of people who caused it to go there. As I noted in my testimony, it's an extraordinary step in the sense of normally if a hard drive is irretrievable, it would simply be destroyed.

REED:

That's -- that's my question because you're referencing your testimony. This is an extraordinary effort. And so we're dealing with a normal hard drive situation according to you for three years -- from three years ago.

KOSKINEN:

Right.

REED:

And yet, there's an extraordinary step taken sent into the forensic lab.

KOSKINEN:

Correct.

REED:

I'm very interested to know who made that decision, why that decision was made and I'll submit some follow-up questions in writing so I can get that response...

(CROSSTALK)

KOSKINEN:

That would be fine. My -- my understanding just from the e-mails that are in that train and otherwise is that it was a reflection of Ms. Lerner's strong attempt to try to recover her e- mail.

REED:

So do you think Ms. Lerner is the one who asked it to go to the criminal investigation...

KOSKINEN:

I don't know whether she was or not. I know she was pushing very hard to try to get the e-mails. On occasion, criminal investigation will do that.

But it's an extraordinary step because as you note, they are very good at this. But they're spending most of their time with drug dealers and...

(CROSSTALK)

REED:

And -- and I know I'm on a -- I'm running on a limited time. On the forensic -- these are the well-trained people.

KOSKINEN:

Right.

REED:

Now, when I've ever dealt with criminal investigations, people in that -- people like David Reichert, police officers, there's reports that they go through.

Have you seen the report that the criminal investigation forensic report people provided as they did their review of Lois Lerner's hard drive?

KOSKINEN:

I have not.

REED:

Are there any reports that exist that the criminal investigating forensic unit will have completed?

KOSKINEN:

I don't know. Or we can...

REED:

Well, do they typically? I mean, they're -- they're your criminal investigators. You've referred this matter three years ago supposedly to the criminal investigation unit to do a complete forensic.

These are like the CSI guys. These are the guys that we watch on TV.

KOSKINEN:

That's right. They could restore the e-mails, they would have been able to do it.

REED:

But also, they're doing an investigation as to why this hard drive failed is my understanding, too. Isn't that correct?

KOSKINEN:

Another (ph) -- any number of reasons as to why a hard drive fails. They would care -- my assumption would be they wouldn't care why it failed.

Their request was can you reconstitute (ph) the e-mails (ph)?

REED:

Oh, no, no, no, see, they're criminal investigators because if there is malfeasance, if there's...

KOSKINEN:

They're also civil investigators. They...

REED:

Yes, but they're criminal investigators in your agency that are -- are designed to catch criminals. And they're trying to figure out what criminal behavior potentially could -- if I get a referral, if you send it to the -- the hard drive to a criminal investigator in the IRS, my understanding, they're looking for illegal activity.

They're looking to somebody -- did somebody potentially damage this hard drive on purpose? What -- what caused the damage? I mean, isn't that something they would do in the normal course of business?

KOSKINEN:

I know. They also do civil cases. All of our civil prosecutions and cases are investigated by criminal investigators.

REED:

Would you agree with me -- could you agree with me that the criminal investigators are looking for criminal activity? And if someone is trying to hide evidence, destroy evidence that is relevant to a tax

proceeding, that they're the guys who'd look into the forensics of the computer program to figure out what's going on?

KOSKINEN:

They will do that on occasion. There's no indication they were doing anything other than retrieving e-mail.

REED:

Yes, so they -- they received -- they received this hard drive on something as critical as this. And that's what I'm having those questions.

I'm very interested...

KOSKINEN:

Yes, good.

REED:

...in knowing what -- what those forensic folks, who they were -- do you know who they were?

KOSKINEN:

I have -- I don't who they were.

REED:

I'd like to really know who they were, when they completed it, the paperwork and the documentation for chain of evidence purposes that they're trained in, I would definitely like to know what those records are and have them provided to our office.

And I guess my time has expired.

KOSKINEN:

Good. That's fine.

REED:

And with that, I yield back. Thank you.


KOSKINEN:

Good.


CAMP:

Thank you.

Mr. Young is recognized.


YOUNG:

Mr. Commissioner, you've mentioned a number of times today that the IRS learned of -- of certain things at certain periods of time, that perhaps even your office has learned of certain things in different periods of time. I'd like to know, and you correct me if you've already spoken to this, when you knew personally as Commissioner of the IRS, when you knew that we had a problem here, that e-mails were lost or destroyed, that that constituted a larger issue and so forth.


KOSKINEN:

When I first was advised about it, we didn't k now whether e-mail -- any e-mails have been lost or destroyed. But in February...


YOUNG:

When we first advised (ph), just so I'm clear. February?


KOSKINEN:

In -- in February, I was advised that there was an issue with her e-mails. And subsequently, in the same time, I was advised about that.

And there was evidence that there had been a hard drive crash. But nobody knew what the implications of that were in terms of whether any of the e-mails have been lost or whether the hard drive had been recovered. All -- all I knew was advised and in February, was that there was an issue with the initial production review of e-mails once we had started looking at all of her e-mails, and that there was a hard drive crash and we needed to investigated what that meant.

And that's what proceeded. Going forward by mid-March, we had determined, found the fact that there had been an attempt to reconstitute the hard drive unsuccessfully, then started reprocessing all of her e-mails to make sure they were not missing and reprocessing all of the custodial e-mails to see what e-mails of Ms. Lerner's were available.

YOUNG:

OK. So you thought it was presumably premature at that point. You -- given the opportunity, you'd offer all the context you -- you wanted to.

Premature to notify this committee or -- or anyone else of your knowledge -- your personal knowledge?

(CROSSTALK)

KOSKINEN:

My -- my approach that was we needed to know, a, what this meant, what had been the result and ultimately, what e-mails, if any, were available and what e-mails to the extend we could find them, were not available, and that what we gave a fulsome report, it would be more productive.

And, in fact, that's been my normal...

YOUNG:

And others have spoken to the fulsomeness of that report. So I won't get into that, sir.

KOSKINEN:

Right.

YOUNG:

We've invoked the federal record-keeping act. You, yourself, invoked it on at least one occasion, the federal records act that requires agencies to store and preserve certain documents. Why did the IRS changed its document retention policy in May of 2013, the same month Lois Lerner announced this targeting initiative?

KOSKINEN:

IRS -- I wasn't here but my understanding, they changed their document retention policy in May in response to this investigation. In other words, once the investigation started, the instructions went out

to save all e-mails of everyone, that they would -- would no longer recycle them every six months, that we would, in fact, make sure that nothing was changed.

YOUNG:

OK. Thank you, sir. Please explain to me why the IRS did not instead change its document retention policy when TIGTA initiated its investigation and started working with the IRS whereupon it presumably became clear that there was a document retention problem?

KOSKINEN:

I wasn't there. And that started the TIGTA investigation. But I would note there is no evidence at this point we know of that any e-mails were lost after that point in time.

YOUNG:

OK.

KOSKINEN:

But then I would stress as I've noted several times, the final request I made was to review all custodians and that process has been going on -- we got the identification of those this week.

And we're reviewing that. And we'll share all of that information with you as well.

YOUNG:

OK. It's my understanding thatSunita Lough, who is the new head of the Tax Exempt and Government Entities Division has resumed audits of 501(c)(4) organizations that were selected for examination during the targeting and due to political activity. These audits were suspended after the Acting Commissioner Wuerffel expressed concerns they may have been tainted by targeting.

Given these concerns and the evidence Lois Lerner improperly influenced the audit selection of right-leaning groups, why would the IRS choose to reopen these audits?

KOSKINEN:

Well, they're actually -- they were left as pending. It's my decision that those organizations deserve the right to get the closure on that.

We made it clear to them that whatever request for documentation in the past, which may or not have been overreaching would not apply. We would do this in a straightforward way.

My thought was it was important to let them know that they could get to closure. And we expect that we will.


YOUNG:

But -- but these groups were targeted, we now know. And -- and you resumed audits among a body of different groups that may have been improperly targeted.

And that seems not only counterintuitive but certainly ill- advised.


KOSKINEN:

Well...


CAMP:

Time has expired, if you could answer briefly.


KOSKINEN:

I'm sorry.


CAMP:

If you could answer briefly.


KOSKINEN:

To the -- to the extent that an audit had begun, it seemed to me better for them and better for the process to close those so that there's no implication that had we completed the audit, they might have actually been de-certified or had a problem. So that we are moving toward closure and we don't have any reason to assume that they won't all be cleared and that they will be able to operate appropriate.


YOUNG:

My time has expired. Thank you, sir.

CAMP:

Thank you.

Mr. Kelly?


KELLY:

Thank you, Chairman. Thank you for having the hearing.

Commissioner, good to see you again. We had about an hour's conversation earlier this week. I think the one thing we both agreed on is that I believe there's almost irreparable damage done to the agency.

And the process is this continues to unwind, makes it harder for the American people. Now, I'm talking about average everyday people who are held to an entirely different set of standards when it comes to what the IRS needs (ph) for them, documents, information that they need to keep for a long, long time.

And when you're on the other side of the table, you're really not allowed to say, well, my hard drive crashed. I mean, you know how this stuff goes.

I just can't get to it. But one of the things I think that really makes this important, this has nothing to do with the IRS, by the way. And you and I agreed on that Tuesday.

But we do agree on is that again, the irreparable damage and kind of building back again what people have known for a couple hundred years, I mean, if you go back to -- I think it's Daniel Webster and Chief Justice Marshall, they say the power to tax is the power to destroy.

So for over two hundred years, this is in the back of people's minds. And this -- I've sat in the private sector and watched the IRS come in.

There is nothing more chilling than to get that letter or that call or that visit because you know right away it's going to be a tough day for you. Now, whether people actually do that or not is another question.

It's what people believe because perception is reality. I would just say to you on this. See, the only thing I looked at -- we knew well in advance that Ms. Lerner's e-mails were not going to be available.

I mean, years ago, we know they weren't going to be available. And I think the thing that bothers people on the committee is that we were told, no, you're going to get everything.

Just give us a little more time. Just give us a little more time. How much more time do you think not just this committee but the American people can withstand?

I think we've reached a point now where they are exhausted of waiting. This is not an indictment of you because I think you're trying to do the right thing.

But the agency right now is tainted. And it's kind of reaffirmed what most of us believe that we're guilty until we prove ourselves innocent.

Now, in this case, I'm looking at this information. I can understand why, with all the knowledge that we knew, going back as far as 2011, that this stuff wasn't retrievable until Ms. Lerner, herself, hey (ph), listen, sorry. Can't get it for you.

As a last resort, we sent your hard drive to CI, the IRS criminal investigation forensic lab to attempt a data recovery. In August 5, 2011, after three -- three weeks of attempts to retrieve her e-mails, Ms. Lerner was advised, unfortunately, the news is not good.

The sectors on the hard drive were -- were bad, which made your data unrecoverable. I'm very sorry. Everyone involved tried to do their best.

And so the IRS knew this. You see where I'm coming from. If -- if you knew it so long ago, why is it so difficult to just tell people the truth? Not accusing you but this is a -- this is a very dangerous slope that we're on.

When do we tell the American people the truth, that truthfully, right now, we're not going to be able to answer what you're asking us? I just don't get it. What is the strategy as you move forward?

How do you restore the faith and confidence of the people of the United States in this agency and in this body? We've all taken an oath to defend the Constitution. And yet, I see a Constitution (ph) -- there's two sets of rules.

There's one for the general public. There's one for your agency. General public is not allowed to keep bad record. General public is not allowed to have hard -- hard drives crash.

The general public is not allowed to do some of the same things that we've allowed the agency to do. And they (ph) say (ph), well, (ph) so you (ph) don't understand.

This is the way it has to play out. Again, going back to our conversation, on Tuesday, where do you see this going because I don't see a bright end to this anywhere along the way.

At the very least, it's going to come out that somehow, people knew about this but refuse to be forthcoming about it. That's the best you can do on this.


KOSKINEN:

It should -- record should note that no one knew in the IRS about this at the time we've been working on until we actually in February discovered it. The e-mails involved, in fact, were provided to this committee along the way in the normal production.

And nobody was...

KELLY:

No, no, no, no, Commissioner, that's not true. You knew in August -- not you because you weren't there. The agency knew in August of 2011 that they couldn't retrieve this information.

Yet, we've been constantly told we'll get you everything. And the fact that you haven't been forthcoming -- not you but your agency, adds to the dilemma that -- that now we face.

We have reinforced the people's greatest fear that the IRS works at a completely different set of rules than the general public. People's Constitutional rights have been violated.

But we have chosen to turn a blind eye and a deaf ear to the American people and have to stonewall them, hoping that somehow, we can run out the clock. This is not a partisan issue.

This is bipartisan. And I don't want to hear anybody say it's about an election. Is it about an election? I would say, it is about election.

But it's not the way they intone (ph) it. So listen, I appreciate you being here. I admire what you're trying to do. But I've got to tell you, this is a long uphill climb to restore faith and confidence the American people have to have in this former government we have that's what it comes down to.

CAMP:

Time has expired.

KELLY:

It's all about trust. And nobody trusts the IRS right now. In fact, they don't trust us as much as they need to...

CAMP:

Thank you. Time has expired.

Mr. Griffin?

GRIFFIN:

Thank you, Mr. Chairman.

Thank you, Commissioner, for being in here. I just want to follow up on a few of the issues. When asked by my colleagues why the timing of the disclosure regarding the hard drives was -- was June as opposed

to May or April or -- or March or earlier, you indicated that you thought it made sense to just wait until you got all the information or did your analysis, or what have you and to sort of once you've got all of that figured out, then let us know.

I would just tell you having been a counsel on the House Government Reform Committee, having served on this committee, having served in the White House and the Department of Justice, I wouldn't take that approach anymore. That's not the way this city works.

When you know and anyone at the IRS -- in fact, I would say that you were disserved by the legislative folks at the IRS, if -- if they did not tell you when you started. They should've walked in and said, this is a hot topic.

There are numerous hearings on the Hill. Senators and members of Congress, particularly the Ways and Means Committee, is going to want to know what's going on with this Lois Lerner situation. By the way, we have some hard drive problems.

And we never told anybody. Let's not wait. It's in everybody's interest to tell the Hill. Now, I know about the 770,00 documents and all that stuff.

I used to be the guy on the House Government Reform Committee who on a Friday night got a box -- got 10 boxes from the White House in the late '90s. I was the guy that actually went through those thousands.

And I can tell you that the numbers are misleading, because you get a bunch of blank sheets. You get a bunch of nothingness.

There's not a lot of substance there usually. Yes, I understand your producing them, a bunch of them. But the number in and of itself doesn't tell you a lot.

But the bottom line is I would have just -- I would just approach this committee differently. And I think you would get a different response from now on because people here feel like they need to know.

And they want it to be a conversation. They don't want it to be a situation. And I -- I know how this works, where the left folks say and the White House says, don't answer that unless they ask you specifically.

If they don't ask the right question, don't give them that answer. Now, I can tell you that happens all the time. And I know for a fact that it happened to one of my colleagues here that was telling me earlier, not necessarily with you but with someone else.

I'll give an example. So you were interviewed in March of this year in a -- in a fellow committee and you were interviewed standing up here, Dr. Boustany. And there were numerous times where you were asked about the Lois Lerner e-mails.

And you would say things like, we're going to produce them. We're working on redactions. We're looking at this. We're looking at that.

There was never one mention of an issue as you describe it. There was never one mention of a glitch. And you know, with all due respect, my daughter was here with me this week.

That's like when she -- I don't ask the right question about what she ate, and then I find out that she ate a box of cookies, and she didn't tell me because I didn't ask the right question. Well, she didn't tell me because she knew I'd be mad.

And I think you had numerous opportunities in these transcripts to just say, hey, we're going you all the e-mails that we have. But I want you to know, we've got some problems.

And you should know about the hard drive. And it never happened. We faced this with Lois Lerner when we asked about the (c)(4)s. We never asked them the precise right question.

So we never got our answer. I know how that game's played. I've been up here long enough. And I'm saying if you want to get a different attitude from this committee, go ahead and share what the political people are telling you not to share.

Just tell us. Just tell us, share it, and if it's -- if it's surplusage (ph), we'll ignore it. And one more thing, I do have a question. Do you know of anyone in the IRS who has gone before a grand jury on this issue?

Or do know of any grand jury subpoenas that have been issued on this investigation?


KOSKINEN:

I know of none.


GRIFFIN:

None -- none whatsoever. Do you know of a Department of Justice investigation on this at all, criminal investigation?


KOSKINEN:

I don't know anything about that investigation. I have not -- not interfered with anybody's investigation.


GRIFFIN:

Thank you.


CAMP:

Thank you.

Mr. Renacci?

RENACCI:

Thank you, Mr. Chairman.

Thank you, Commissioner, for being here and thank you for sticking around. Just a couple of things to try and wrap up some things I heard.

You testified earlier that three to five percent is a normal crash rate for hard drives.

KOSKINEN:

That's what I'm advised.

RENACCI:

OK. And there were 82 IRS employees with some -- with some potential political role in political targeting. Seven hard drives failed. That's approximately nine percent.

Can you get me some information as to what the normal crash rate is for the IRS computers?

KOSKINEN:

Be delighted to get that. I am advised that once you get outside the warranty period, the failure rate goes to 10 to 16 percent. But we'll get you all of that information.

RENACCI:

I would appreciate that. The other thing that concern me based on what I've been hearing today is that there was a hard drive failure. It was realized. It was then investigated.

At some point in time, someone said we can't get the information off of it. And then it was destroyed. Is that a normal process to destroy, especially in the middle of an investigation, to destroy a hard drive?

KOSKINEN:

I would stress again that that hard drive was never destroyed during an investigation. Nothing has been destroyed during this investigation.

That hard drive was destroyed three years ago after it was irretrievable in terms of e-mail. And it had nothing to do with this investigation.

RENACCI:

OK, well, I would also tell you that I've practiced in front of the IRS for about 25 years as a CPA. I've had to -- I've had some very unusual clients, I will tell you, that had some information that wasn't around, had their hard drives lost, had a lot of things occur and had to listen to the IRS say to them, why did you destroy, even though you weren't being audited back then -- why would you destroy something that has information that might be needed?

And I know you talked about the three years and the 10 years. But I've also seen the IRS bring a guy down on his knees in tears because they said we're going to prosecute you to the full extent of the law because you don't have the proper information.

Now, when did the standard change that the individual that you're auditing has to do certain things but the IRS doesn't have to keep information or have to keep hard drives or have to make sure that their documentation is safe?

KOSKINEN:

As the record will note, from all the indications we have, Ms. Lerner worked very hard and the I.T. department worked very hard to restore that information, not to lose it.

RENACCI:

I understand that. But when -- when did it change that there will be a destruction of a document which is a hard drive, knowing that it could potentially -- there's data on there that might be needed?

KOSKINEN:

Nobody at that time viewed the date as being related to an investigation. As a general matter, if an employee's hard drive fails and the information cannot be retrieved, it is regularly recycled and destroyed.

RENACCI:

Yes. I will also tell you that it's interesting how you answer those questions. And your answers, I think you've heard people saying.

We have to restore trust to the American people. Your answers probably should be that we're going to make sure that we look at our processes in the future.

I wasn't here three years ago. And -- and we're going to make sure we're not destroying hard drives until we fully know that they're not going to be an issue for the future.

That would be what something I think the American people would rather hear and, well, it was destroyed, especially in this situation that we have today.

KOSKINEN:

It's a very good suggestion. But I think it's important not to leave any implication here that there was any attempt to get rid of evidence even before the investigation started.

I think it's important to remind people that the evidence demonstrates Ms. Lerner worked very hard. The I.T. system people worked very hard.

The CI division worked very hard trying to restore the e-mails.

RENACCI:

I don't practice in front of the IRS anymore. Of course, I'm here. But if I did, I wonder how that answer would be taken in front of an IRS agent.

KOSKINEN:

If a client came before the IRS and said, I've lost the data but here is all the evidence, and when I lost it, all I did to try to retrieve, here is alternate evidence, like the 24,000 e- mails that we have provided. I would hope that the IRS -- IRS would look at the person as somebody who's trying to comply, not somebody who's trying to evade.

RENACCI:

Well, I can tell you from past history, that doesn't happen. And in many cases, I'm not going to tell you in all cases, because you do have some very good employees, but in some cases, I've seen them actually prosecute to a full extent of the law, which is not fair when an individual says I don't have it, I've lost it.

I don't have the opportunity to get it. And I don't have other information available to bring it together. So again, this is all about the American people and them having an opportunity to -- to get some full faith back in the IRS.

But at the same time, how are they ever going to do that? When you stand there and say, I did -- we didn't do anything wrong, we destroyed the hard drive, it wasn't part of the process.

But yet, when the other side, when the shoes (ph) on the other side, and the individual taxpayer sits in front of you and says, I don't have the information, they are always prosecuted to the full extent of the law.

Thank you. I yield back.

CAMP:

Thank you very much. Mr. Renacci is our last questioner. With that, this hearing is now adjourned.

CQ Transcriptions, June 20, 2014