CQ CONGRESSIONAL TRANSCRIPTS

Congressional Hearings

June 23, 2014 - Final

House Oversight and Government Reform Committee Holds Hearing on IRS Lois Lerner Missing Email, Part 1

[LIST OF PANEL MEMBERS AND WITNESSES](#)

---

ISSA:

The committee will come to order. The oversight committee exists to secure two fundamental principles. First, Americans have a right to know that the money Washington, through the IRS takes from them, is well-spent.

And second, Americans deserve and efficient effective government to work for them. Our duty on the Oversight Government Reform Committee is, in fact, to protect these rights.

Our solemn responsibility is to hold government accountable to taxpayers because taxpayers have a right to know what they get from their government.

Our job is to work tirelessly in partnership with citizen watchdogs to deliver the facts to the American people and bring genuine reform to the federal bureaucracy.

Would you go ahead and then -- hold on, I'll do it this way. Thank you. Thank you for looking for it. Without objection, the Chair has authorized to declare a recess of the committee at any time, without objection so ordered.

The committee meets today as we continue our effort to get the truth and the full truth on the obstruction by the IRS and the targeting of Americans because of their conservative political beliefs. When the IRS Commissioner, John Koskinen, appeared before this committee in March, he promised that he would produce what this committee had made its top priority -- all of Lois Lerner's e-mails.

The Commissioner made these promises without any qualification or limitation. He even reiterated that -- that statement to the Ranking Member when asked.

Could you please go ahead and play the video for reflection and memory.

(BEGIN VIDEOTAPE)

ISSA:



I requested that you produce all of Lois Lerner's e-mails to this committee. She won't talk to us. So these e-mails are the next best substitute.

JORDAN:

And all we're asking is give us the e-mails.

ISSA:

Our subpoena says all of Lois Lerner's e-mails.

JORDAN:

When we say all, we want every single e-mail in the time period in the subpoena that was sent to you.

(UNKNOWN)

We're talking about Lois Lerner, all of her e-mails.

GOWDY:

How long will it take you to produce Lois Lerner's e- mails that don't involve 6103 material from January of 2010?

(UNKNOWN)

Since Lois Lerner didn't comply with our questions, we need all those e-mails.

GOWDY:

When you have people in positions of authority and responsibility that are expressing overtly political commentary on government e-mail, I think we ought to be entitled to all of them.

ISSA:

Will you commit here today to provide all of the e-mails?

KOSKINEN:

Yes, as we say, we've never said we wouldn't produce those e-mails.

(UNKNOWN)

Wouldn't it seem to me that if you want to provide all and you said and I take you as your word, if you want to provide all, if this will be something that you would go ahead and get off the table as quickly as possible...

CHAFFETZ:

Are you or are you not going to provide this committee all of Lois Lerner's e-mails?

KOSKINEN:

We are already starting...

CHAFFETZ:

Yes or...

KOSKINEN:

Yes, we will do that.

ISSA:

For the record, on behalf of people on both sides that have spoken, Lois Lerner's e-mails -- all of Lois Lerner's e-mails is the highest current priority of this committee. And it will remain so as long as I'm Chairman.

CUMMINGS:

Gentlemen, the Commissioner has said, he's willing to produce the documents. We've got almost every member and they're all asking for the documents.

KOSKINEN:

February subpoena asked for all e-mails...

(UNKNOWN)

So I think -- you -- you understand the committee views Lerner's e-mails as the highest priority?

CUMMINGS:

So are you going to provide the documents of Lois Lerner?

KOSKINEN:

Yes.

CUMMINGS:

That was subpoenaed?

(END VIDEOTAPE)

ISSA:

The committee requested all of Lois Lerner's e-mails. Commissioner told us he would provide all of Lois Lerner's e-mails.

We requested them over a year ago. We, in fact, subpoenaed them in August in order to make it clear that we were not being complied with.

And again, a new one, when you became Commissioner in February of 2014, transparency clearly did not compel the IRS to tell the truth about Lois Lerner's lost e-mails. You worked to cover up the fact that there were missing e-mails and came forward to fess up only on Friday afternoon after you had effectively been caught red-handed.

I'm struck that your acknowledgement of missing Lois Lerner e-mails came just two weeks after we had found some of them at the Justice Department. When you were looking for e-mails, one of the questions today will be, did you look at the Justice Department where she had sent over 1.1 million documents including some that were 6103, in other words, prohibited to be released documents?

Did you ever give the committee the courtesy of a direct communication about missing e-mails after your false or misleading testimony? Instead, your -- your staff shared a communication you made to a Senate committee controlled by the President's Party.

In your previous testimony, you had said it might take years, I believe two years, to deliver all of these e-mails. Welcome back. It hasn't been two years.

Did you hope you could run out the clock on the scandal? Another question. Perhaps, you thought Congress would never realize that there were missing e-mails until we found them at the Justice Department perhaps.

Commissioner, I called you to testify tonight because the American people deserve answers about what happened to the Lois Lerner's e-mails and why the IRS hid this for years. This hiding did not begin, and I repeat, did not begin on your watch.

Clearly, the missing documents were known by many people who have jobs at the IRS today under your predecessor and your predecessor's predecessor. The fact that Lois Lerner's e-mails were ever transferred out of the exclusive custody of the IRS so that they could be lost or destroyed by Lois Lerner should concern all of us.

The Federal Records Act, and we will meet tomorrow with the archivists, the Federal Records Act envisions that important documents will be maintained not just for investigations of Congress but, in fact, in perpetuity for the benefit of the American people. This event in history like Watergate, like Teapot Dome, and like many other historic events will be studied by future generations without the benefit of many of the thoughts and actions of Lois Lerner and other at the IRS as a result of your organization's failure. I subpoenaed you here tonight because frankly, I'm sick and tired of your game-playing and response to Congressional oversight.

You, Commissioner, are the President's hand-picked man to restore trust and accountability at the IRS. You testified under oath in March that you would produce all of Lois Lerner's e-mails subpoenaed by this committee.

Before you testified, you took an oath you'll take again tonight to tell the truth, the whole truth and nothing but the truth. Mr. Commissioner, at a minimum, you did not tell the whole truth that you knew on that day.

You gave your commitment to produce all e-mails to the committee. You gave your word, sir. And we are just a little questioning what your word is worth if, in fact, you cannot enlighten us about what you know that is germane to our inquiry whether or not it is explicitly asked.

Do we have to grill you for days or weeks or months with every possible question, every possible way something could be asked? Or will the meaning of a question mean that you will, to the best of your ability, give us a true and complete answer?

The American people have no trust in the IRS by comparison to just a few years ago. The American people have never loved the IRS.

No one does love the organization that takes your taxes. And if they don't feel you treated them right, they don't feel they got the right amount, they come back and have huge power over your lives.

It's hard to love the IRS. But it should not be hard to trust the IRS. The American people deserve this agency which was previously believed to be non-partisan, they need to be able to trust that it will once again become non-partisan, non-political.

Your agency has a set of rules for taxpayers and apparently, another set of rules for themselves. The American people understand that if they cannot prove that they did the right thing in their tax return, five, six, and seven years ago, it will be disallowed.

And they will pay taxes with penalties. Well, in fact, you maintain only six months of records and then apparently count on people good and bad to maintain documents they think are important beyond that. And you do so without safeguards to protect the American people from the loss of those documents.

Commissioner, tonight, you will say that you have produced thousands of documents. It will be an impressive number. Quite frankly, that production is pushing a button and printing documents out and then having people scratch out almost everything of value in many cases.

It is not producing the documents that you don't want to produce, the documents that embarrass you. The fact is, it's the last documents, not the first documents that normally do us good.

It's the documents we receive the night before we're going to depose somebody that often tell us things we've waited months or years for. I know tonight will be difficult.

And it deserves to be difficult for both sides. We have a problem with you. And you have a problem with maintaining your credibility.

Again, you promised to produce documents. You did not. You promised to be forthcoming and candid, you and were not. In our first meeting, my Subcommittee Chairman who will also be making an opening statement, Mr. Jordan, irritated you because you felt he questioned your integrity.

I defended you at that time and I, quite frankly, gave you a bit of an apology that he meant no harm. It was just his style. Tonight, quite frankly, I wish I could take that back.

And I wish I could say what I'll say to you tonight. You believe you earned trust before you came here and it was yours to lose. I believe you needed to earn our trust and you failed at that task.

Either way, the American people do not believe the IRS is dealing fairly with them in this investigation.

With that, I recognize the Ranking Member for his opening statement.


CUMMINGS:

I want to get right down to the heart of the accusation Republicans have been making for the past week. And it is -- it is interesting, Commissioner, that you've been accused of false testimony or misleading testimony and then accused actually, if it's false testimony of committing a crime.

What are we really saying? And what -- what are the Republicans here saying? They're saying that Lois Lerner intentionally, intentionally destroyed our e-mails and the IRS officials helped her cover it up.

Chairman Issa has been leading the charge. Here are some of the accusations he's made. June 13, Chairman Issa suggested that this was, quote, "a nefarious conduct that went much higher than Lois Lerner," end of quote.

On June 18, he said, quote, "the e-mails of a prominent official don't just disappear without a trace unless that was the intention," end of quote. On June 19, he said Ms. Lerner, quote, "made the decision not to have this drive recovered," end of quote.

And just this morning, he said, quote, "The Justice Department, the IRS, and the White House, are interested in her succeeding in hiding what she's hiding," end of quote. Chairman Issa has made these accusations on national television without first obtaining a briefing from I.T. officials at the IRS who could have explained what really happened.

And he made them before hearing from the IRS Commissioner. Mr. Koskinen testified last Friday before the Ways and Means Committee. And now that we have the facts, they tell a vastly different story -- truth, whole truth, nothing but the truth.

Our committee has obtained no evidence to support Chairman Issa's claim that Lois Lerner intentionally destroyed her e-mails. To the contrary, we have now obtained contemporaneous evidence from 2011 showing the exact opposite, that this was a technological problem with her computer -- truth, whole truth, nothing but the truth.

In Mr. Koskinen's testimony last Friday, he walked through e-mail after e-mail for 2011, showing that Ms. Lerner sought help from I.T. staff at the IRS. And that they went to great lengths to recover her data.

But at the end of that process, they could not do so. Mr. Koskinen also testified last week that the IRS took extraordinary steps -- the extraordinary step of sending Ms. Lerner's hard drive to experts in the forensic lab at the IRS criminal investigation division.

But even they could not recover her data -- the truth, the whole truth, and nothing but the truth. On August 5, 2011, Ms. Lerner received an e-mail with the bad news.

And it said this, and I quote, "Unfortunately, the news is not good. The sectors on the hard drive were bad with major data unrecoverable.

I am very sorry. Everyone involved tried their best," end of quote. So if anyone wants the actual evidence of what happened in this case, now, we have it.

I ask unanimous consent that all of these e-mails from July 19, July 20, August 1 and August 5 be entered into the official hearing record.


ISSA:

Without objection. Any Lois Lerner e-mails that any members wants to put in the record be placed in the record in the next seven days.


CUMMINGS:

Thank you very much, Mr. Chairman. These e-mails are al from 2011, well before any Congressional investigation began.

And they showed that Ms. Lerner's computer crashed before she was informed that IRS employees in Cincinnati were using iappropriate search terms according to the inspector general.

I didn't say that, inspector general. Now, we can certainly take issue with why the IRS did not have backup tapes for this data.

As Mr. Koskinen testified last week, IRS policy in 2011 was to recycle backup tapes after six months to save money. He also explained that this policy was changed in 2013 to save all backup tapes.

The fact is that there are longstanding problem with electronic record-keeping at federal agencies. The Bush administration lost millions -- millions of e-mails relating to the U.S. attorney firings, the outing of covert CIA agent, Valerie Plame and other investigations -- millions.

In 2007, the White House spokeswoman, Dana Perino, admitted that they lost five million e-mails -- five million. As she said in the time, quote, "We screwed up and we're trying to fix it," end of quote.

There's been some progress since then. But I've always believed we need to do more. I've always believed that we could do better.

That is why nearly a year and a half ago, I introduced the electronic message preservation act. My bill would have required federal agencies to preserve e-mails, records electronically.

Although this committee voted on a bipartisan basis to approve my legislation, it is language since then. And the House Republicans have declined to bring it to the floor for a vote.

I believe our committee's work should be a responsible effort to obtain the facts and a responsible effort to find the truth, the whole truth and nothing but the truth. It should not be an unseemly race against other Republicans, the whole of first hearing in front of the cameras.

And this should not be a ludicrous competition but some hyperbolic sound bites based on a least amount of evidence. In this case, Republicans have been trying desperately and unsuccessfully for more than a year to link this scandal to the White House.

Rather than continuing on this path (ph), I sincerely (ph) hope that we will turn to the instructive legislation of concrete solutions to help federal agencies run more effectively and efficiently.

And with that, Mr. Chairman, I yield back.

ISSA:

I thank the gentleman. I might note for the record that in today's briefing, a briefing we asked for a week ago and we're denied repeatedly, in today's briefing, after we sent interrogatory questions to the commission, they said they would answer orally, which they did not.

However, in today's briefing, when asked, can you assure us that Lois Lerner did not intentionally crash her hard drive? They could not verify that she did or didn't.

Can you -- can you assure us that nothing nefarious in the loss -- there was nothing nefarious in the loss by Lois Lerner of her e- mails and your CIO could not answer definitively. So we still have a lot of facts to do.

CUMMINGS:

Mr. Chairman? May I be heard?

ISSA:

Of course.

CUMMINGS:

Just for today's hearing, both the Democratic and the Republican staff, as you said, had a briefing from the IRS deputy chief information officer, a career I.T. professional. While he was not involved in the original 2011 examination of Ms. Lerner's hard drive, he has reviewed documents surrounding the hard drive crash and the I.T. office's response to it.

He was asked, do you have any reason to believe that Ms. Lerner intentionally crashed her hard drive. And he responded, and this is a quote, "I have no reason to believe it and haven't seen anything that would say that she did that, no," end of quote.

He also told the committee, and I quote, "Ms. Lerner was insistent in trying to recover whatever documents she could." He further stated that I have no -- quote, "I have no indication that there was anything nefarious about the loss of Ms. Lerner's e-mails," end of quote.

And when asked whether he was, quote, "aware of anyone at the IRS intentionally, destroying documents that are relevant for Congressional investigation, he said, quote, "absolutely not," end of quote. Thank you very much, Mr. Chairman.

ISSA:

Thank you. I might note for the record, as I go to the Chairman of the subcommittee, that we sent you those interrogatories 48 hours plus ago. So we would not need to have an extensive long hearing.

It is likely that we will recess this hearing tonight and have you back after those interrogatories are fully answered since the briefing today in no way address any of the interrogatories.

With that, I go to the Chairman of the subcommittee, Mr. Jordan.


JORDAN:

First, they denied it, Mr. Chairman. Two years ago, Lois Lerner met with committee staff and said there's no targeting going on.

Doug Shulman came in front of the Congressional committee and says there's no targeting. I can assure you there's no targeting.

Then they tried to spin it, May 10, in an unprecedented fashion before the I.G.'s report went public. Lois Lerner, at a bar association speech, with the planned (ph) question, tried to put her spin on the story.

Then they tried to blame someone else. It wasn't us -- two rogue agents in Cincinnati. Then they attacked the messenger, the fact finder that said the I.G. report is flawed.

And now, Mr. Chairman, and now, they hide the evidence. This is as old as the hills. Any -- any third rate actor (ph) crime drama follows the same script, the bad guy always says, he denies it.

He spins. He blames someone else. He tells the police they got the wrong guy. And of course, he always says, officer, I didn't throw the gun in the river.

I don't know what happened to the murder weapon. I mean, this -- Mr. Chairman, this would be laughable if it wasn't so serious.

But here is -- here is one big difference between them. The common criminal on the street and this scandal, one huge, important difference, the bad guy on the street doesn't get to have his friends run the investigation. And I will -- I will talk about this until we get to the truth.

The fact that Barbara Bosserman, a maxed (ph) out (ph) contributor to the President's campaign is running this investigation is a joke. It is wrong. The fact that the FBI leaks to "The Wall Street Journal" on January 13 of this year, that no one's going to be prosecuted is wrong.

And the fact that the President of the United States, the highest official in the Executive Branch goes on national television and says there's no corruption, not even a smidgen, is wrong. The bad guy doesn't get to have his friends run the investigation like we see here.

Here is the important point, Mr. Chairman. I hope -- I've been hoping that someone in this administration would have the courage to step up and say, it's time for a special prosecutor.

In light of this fact (ph) pattern (ph), it is time for a special -- "Dallas Morning News" said it today. They said it's time for one. Five weeks ago, 26 Democrats had the courage to step up and vote with every single Republican to say it's time for a special prosecutor.

I would hope, if nothing more happens in tonight's hearing, I would hope that the guy who heads the agency, where the targeting of people for exercising their first amendment rights took place, I would hope that at a minimum, that guy, to show his independence, to show us he really wants to establish some credibility back in this agency, would have the courage to do what 26 Democrats did five weeks ago and say it's time for a special prosecutor so we can get to the truth and get past this sham of an investigation that the Justice Department is doing.

With that, Mr. Chairman, I yield back.


ISSA:

Would the gentleman yield to...


TURNER:

Be happy...


ISSA:

Mr. Turner?


TURNER:

Oh, be happy to yield.


ISSA:

You're -- you're good? OK. We now go the gentleman from Virginia, Mr. Connolly.


CONNOLLY:

Thank you, Mr. Chairman.

Mr. Koskinen, you and those watching this hearing now understand that the stage is set.

This is about theater -- fair play, presumption of innocence, civility, respect for an honored public servant who's serving this country yet again, are out the window because there's an agenda that

presupposes some guilt that is based in part on supposition, on paranoia, on conspiracy theory, all of which fires up the base of the of the other Party and plays well on right-wing media outlets, at the expense of course of the truth, at the expense of any semblance of bipartisan cooperation, at the expense of trying to fix problems where we find. You don't think for a minute, Mr. Koskinen, that part of the solution here is to provide the IRS with more resources to address its I.T. problem.

You don't think for a minute that the soln contemplated might involve more resources for more IRS agents to try to view with the backlog of tax exempt applications or to say nothing of money left in the table owed (ph) the government that can actually help reduce the debt, because for ideological reasons. Those are beyond the pail (ph).

And then we come to your honor, Mr. Koskinen. I first met you when we were worried about something called Y2K back in 1999, 1998, 2000. And it was an I.T. problem.

We were worried that at the -- at the stroke of midnight 2000, our banking systems would collapse, red lights would go off, you know, all of our computer systems would go a (ph) riot (ph). So we had to make investments to make sure that didn't happen.

And you were the Y2K czar. I saw then and I see now, an honorable public servant who cared about his country. He serves Republican as well as Democratic administrations and was cited explicitly, including in the Bush administration for his exemplary service and for his integrity and personal honor.

The fact that you would be subjected tonight, barrage of an innuendo and accusation backed up by nothing for the purpose of political theater is, to me, reckless and disgraceful and brings enormous dishonor on this committee.

And I want you to know personally, Mr. Koskinen, that there are a number of us who still honor your public service, who still respects your integrity and who understand this dynamic and are willing to call it out for what it is. So I hope none of that shakes your faith and your value and in your years of service.

And I hope you will continue your tenure at IRS to clean up what problems there are and to try to make the IRS a more accessible, more accountable and more efficient agency on behalf of the U.S. taxpayers in this country. That's why you undertook a thankless (ph) assignment.

Thank you for your service, Mr. Koskinen, and thank you for being here tonight. I yield back.


ISSA:

Thank the gentleman. I now ask unanimous consent that H.R.1234 be placed in the record at this time.

We now go to our one and only witness for this evening. John Koskinen is the Commissioner of the Internal Revenue Service. Pursuant to the committee, all members are being sworn.

Would you please rise to take the oath and raise your right hand? A little higher. Thank you. Do you solemnly swear or affirm that the testimony we'll (ph) give will be the truth, the whole truth, and nothing but the truth?

KOSKINEN:

I do...

ISSA:

Thank you. Please be seated. Let the record reflect, the witness answered in the affirmative. You're the only witness.

You certainly have some explaining to do. Take such time as you -- you need.

KOSKINEN:

Thank you, Chairman Issa, Ranking Member Cummings, and members of the committee. Thank you for the opportunity to appear before you this evening to provide you with an update on recent IRS document productions to Congress. The IRS, over the past year, made a massive document production in response to inquiries from Congress relating to the investigation of the processing and review of applications for tax-exempt status as described in the May 2013 report from the Treasury inspector general for tax administration.

This committee has received, has noted over 600,000 pages of materials redacted to protect taxpayer information. The tax-writing committees have received over 835,000 pages of unredacted materials.

As of last Friday, the tax-writing committee has already had more than 27,000 e-mails from Ms. Lerner's computer account and more than 18,000 e-mails from other custodians accounts for which Ms. Lerner was an author or recipient. I understand that this committee and the other investigators were provided beginning last fall with copies of e-mails indicating that Ms. Lerner had experienced difficulties with her computer three years ago.

So it should be clear that no one has been keeping this information from Congress. The IRS expects to complete its production of the remaining Lerner e-mails in unredacted form by the end of the month.

As soon as possible thereafter, we will complete redaction of those e-mails and produce them to this committee. At that time, this committee will have all the e-mails, 43,000 of them, that we have from Ms. Lerner's computer and e-mail account for the period January 2009 through May 2013.

In addition, this committee will have 24,000 Lerner e-mails from other custodians accounts for a total of 67,000 Lerner e-mails. And of course, of responding to Congressional request, the IRS in February reviewed the e-mail available for Ms. Lerner's custodial computer account, which was limited to search

terms developed in cooperation with the investigating committees and identified the possibility of an issue because the date distribution of the e-mail was uneven.

It was not clear whether Lerner e-mails were overlooked, missing or had other technical issues involved. IRS information technology professionals identified documents that indicated Ms. Lerner had experienced a computer failure in 2011.

In mid-March 2014, the IRS focused on redacting materials for the non-tax writers and processing the rest of Ms. Lerner's e-mails for production. As we reviewed additional e-mails, the IRS review team learned additional facts regarding Ms. Lerner's computer crash in mid 2011, which occurred long before these Congressional investigations opened or when I think their review began.

During this review, we learned that, as noted in 2011, the IRS information technology division had tried using multiple processes at Ms. Lerner's request to recover the information stored on her computer's hard drive, a series of e-mails available after all of Ms. Lerner's e-mail was loaded this spring recounts the sequence of events in 2011. A frontline manager and I.T. reported that Ms. Lerner in an e-mail on July 20, 2011, and I quote, "I checked with the technician. And he still has your drive.

He wanted to exhaust all avenues to recover the data before sending it to the hard drive cemetery. Unfortunately, after receiving assistance from several highly skilled technicians, including HP experts, he still cannot recover the data," unquote.

Ms. Lerner was told by e-mail on August 1, 2011, as a last resort, reset your hard drive to CIs, the IRS criminal investigation division forensic lab to attempt data recovery," unquote. In an e- mail already read on August 5, 2011, Ms. Lerner was advised, quote, "Unfortunately, the news is not good.

The sectors on the hard drive were bad, which made your data unrecoverable. I am very sorry. Everybody involved tried their best," unquote. In light of the hard drive issue, the IRS took multiple steps over the past months to assess the situation, ensure that no e-mails had been overlooked or lost during this investigation, is producing as much e-mail as they have for which Ms. Lerner was an author or recipient.

As the search for and production of Lerner e-mails was concluding, I asked those working on this matter to determine whether computer systems of the other 82 custodians had experienced any similar difficulties. After the IRS public report was delivered on June 13, the Congress sent the Treasury inspector general for tax administration, it was determined last week that several additional custodians may have experienced hard drive failures during the search period.

It's not unusual for computers anywhere to fail, especially at the IRS in light of the aged equipment IRS employees often have to use and light of the continual cuts in the budget these past four years. Since January 1 of this year, for example, over 2,000 IRS employees have suffered hard drive crashes.

It's important to remember that a hard drive failure does not automatically mean that all or even any e-mails have been lost or cannot be reconstituted. We are still assessing what effective any computer

failures had on the e-mails of any other custodians, although some custodians apparently lost no e-mails at all.

The question is what e-mails outside the agency prior to April 11, 2011, are not in the 24,000 Lois Lerner e-mails sent to other IRS employees during that period. Last week, I understand the White House and the Department of Treasury stated they were providing all of their Lois Lerner e-mails which should help fill those gaps and answer that question.

The Treasury inspector general for tax administration has already begun an investigation of this matter. And his report will provide an independent review of the situation concerning Ms. Lerner's computer three years ago.

We are committed to working cooperatively and transparently with this committee and the six other investigations going on. And we will continue to provide you with updates. This concludes my testimony.

I'd be happy to take your questions.


ISSA:

Thank you. Commissioner, do you -- you remember the Braulio Castillo?


KOSKINEN:

I do not.


ISSA:

Do you ever hear the name Gregory Roseman (ph)?


KOSKINEN:

No.


ISSA:

Well, Castillo is now on trial for murdering his wife. But before that, this committee discovered that he had wrongfully received $500 million in contracts -- I.T. contracts from the IRS.

And Gregory Roseman took the fifth. He was one of your employees who gave him -- helped get them that contract. When you go home, tomorrow, the next day, you might want to see Congresswoman Duckworth ask him how his ankle that he hurt at the prep school feels because, in fact, he claimed to be

a disabled veteran some 27 years later. And his old college buddy, a lifelong friend, helped him get that contract.

At that time and now, we rely on the ability to recover e-mails as part of the chain of discovery, TIGTA, Russell George, your I.G. require -- relies on that. Tomorrow, we'll hear from the national -- the head of the national archives -- the archivist.

He relies on the organization to comply with federal law. Question I have for you is how can we expect you have servers that run Microsoft exchange. It captures every e-mail in and out.

How can we sit here and expect to trust an organization in which the C-drive, the local hard drive of Lois Lerner is supposed to be the only place that e-mail existed.

KOSKINEN:

That is not the only place that e-mail existed. There is e-mail on her e-mail system in the server that has been found and produced. Any e-mail that existed anywhere, even any hard copy of official records that existed anywhere, has been or will be provided to this committee.

ISSA:

Right. So on -- in 2011, when her hard drive failed, if you were properly backing up all information required under the Federal Records Act, which would include the information she selected to have and apparently deleted from the exchange server, you would have had all of those e-mails in your backup, wouldn't you?

KOSKINEN:

All e-mails are not official records under any official records act. Only e-mails are saved that reflect agency actions or...

ISSA:

Would you put your mic pointed towards you so we could hear...

KOSKINEN:

Here (ph), sorry about that.

ISSA:

No pbm.

KOSKINEN:

OK.

ISSA:

So the bottom line is that you -- you apparently were not capturing all e-mails. You were allowing her to delete e-mails but retain e-mails on her C-drive so that six months after -- I just want to make sure we get the record straight, six months after she moved them to her C-drive, you were no longer in possession of those, is that correct?

KOSKINEN:

No.

ISSA:

Well, what is correct?

KOSKINEN:

What is correct is that each employee is limited to basically now 6,000 e-mails that they can hold on their e-mail account, which is stored on the agency's server. The reason there is a limitation is the agency does not have servers large enough to sustain the retention of all e-mails. The decision was made two years ago when people looked at that.

And it was determined it would cost anywhere from $10 to $30 million to upgrade the system so that, in fact, all e-mails on the server would be preserved. Because of the budget constraints the agency was operating two years ago, the decision was made...

(CROSSTALK)

ISSA:

One point eight billion dollars in I.T. is your budget -- $1.8 billion. On $1.8 billion, is it the retention of key documents that the American people need to count on like whether or not they're being honestly treated by your employees, and especially somebody at such a high level?

Isn't that, in fact, a priority they should have allowed for full retention?

KOSKINEN:

We had the right resources. There'd be a lot of priorities we've had. The budget for this year...

ISSA:

So the American people should believe that if they don't have the resources to pay their taxes, they shouldn't pay their taxes because if the IRS doesn't have the resources, it won't keep records. That's pretty much what you're telling us here tonight, is that -- that resources are a question of whether not you've maintained key documents.

Let me just go into one thing in my limited time. You came here and you said, put it up on the board, that you were going to -- as you did today, you're going to tell the truth, the whole truth, and nothing but the truth. You saw that montage in the opening.

You knew there was a problem with some of Lois -- Lois Lerner's e-mails when you came to testify in March, isn't that true?

KOSKINEN:

I knew that I've been told there was an issue that no one knew the ramifications of.

KOSKINEN:

Did you reasonably believe that at least one e-mail may have been lost?

KOSKINEN:

No, I did not have any basis for knowing what the answer to that was.

ISSA:

So you knew there was a problem. If you're going to...

KOSKINEN:

A (ph) problem (ph), somebody said there's an odd development in the way the e-mails are showing up. We're going to pull all of her e-mails and investigate it.

The first I knew that e-mails had been lost from her account was in April.

ISSA:

So when you knew in April that you said you were going to give us all of it -- you said to Mr. Cummings and (ph) my (ph) subject (ph), give us all, you went and told political appointees at Treasury, didn't you...

KOSKINEN:

I did not.

ISSA:

You did not?

KOSKINEN:

I did not.

ISSA:

So you -- who did you tell in April when you knew?

KOSKINEN:

Who did I tell? I didn't tell anybody. I was advised I -- had no one I was going to tell.

ISSA:

You didn't tell your I.G. that some of the documents weren't going to be provided? Or did you cause someone to find out at the White House, at Treasury or your I.G.?

KOSKINEN:

I did not. If you have any evidence of that, I'd be happy to see it.

ISSA:

I asked a question.

KOSKINEN:

And I answered it.

ISSA:

You did not cause anyone to find out?

KOSKINEN:

I absolutely did not.

ISSA:

So you told us that all e-mails will be provided when you discovered that all e-mails would not be provided? You did not come back and inform us, is that correct?

KOSKINEN:

All -- all the e-mails we have will be provided. I did not say I would provide you e-mails that disappeared.

If you have a magical way for me to do that, I'd be happy to know about it. I said I would provide all the e-mails. We are providing all the e-mails.

The fact that three years ago, some of them -- not all of them but some of them, were not available, I never said I would provide you e-mails we didn't have. And in fact, we are going to provide you 24,000 e-mails from the...

ISSA:

My time has expired and I've lost my patience with you.

We now go to the Ranking Member.

CUMMINGS:

I want you to talk about resources. Can you -- you were starting to say -- say something about resources?

KOSKINEN:

Resources -- we have a wide range...

CUMMINGS:

How does that affect what you do?

KOSKINEN:

What it affects is that we have a wide range of responsibilities. The I.T. budget has been cut by over a hundred million dollars over the last four years.

This year's budget for 2014 required $300 million just for the implementation of the Affordable Care Act. The Congress provided us zero.

That meant that that $300 million to implement a statutory mandate had to be taken from other I.T. programs. That's been our challenge for the last three or four years.

CUMMINGS:

Now, Commissioner Koskinen, last week, many members of Congress, including our own Chairman, suggested that Lois Lerner intentionally crashed her computer to destroy e-mails. But last Friday, you testified about the facts.

You provided Congress with the evidence from 2011, contemporaneous by the way e-mails, showing exactly the opposite that -- that this was a technological problem. Since some members of Congress are still pushing this accusation, I want to walk through these e-mails.

Let me ask staff to put up the slides. On July 19, 2011, Lois Lerner e-mailed associate chief information officer at the IRS for help in recovering her hard drive.

And it says, I quote, "I'm taking advantage of your offer to try and recapture my lost personal files. My computer skills are pretty basic. So nothing fancy.

But there were some documents in the files that are irreplaceable. Whatever you can do to help is greatly appreciated," end of quote. Commissioner Koskinen, is that -- is that right? Is that accurate?

KOSKINEN:

That's an e-mail that has been found and been produced, yes.

CUMMINGS:

Next slide, later that day, that I.T. employee sought help from the field director of the customer support division and he wrote, quote, "If she can't fix it, nobody can." Is that a document that you -- part of the document that you produced?

KOSKINEN:

Yes.

CUMMINGS:

Next slide. The next day, the field director that e- mailed Ms. Lerner and said, I quote, "I checked with the technician and he still has your drive. He wanted to exhaust all avenues to recover the data before sending it to the hard drive cemetery.

Unfortunately, after receiving assistance from several high- skilled technicians, including HP experts, he still cannot recover the data." Is that a part of a document that you supplied (ph) to...

KOSKINEN:

Yes.

CUMMINGS:

...our committee? Next slide, on August 1, 2011, the I.T. field director wrote again to Ms. Lerner and informed her that, quote, "As a last resort, we set your hard drive to CI's forensic lab to attempt data recovery," end of quote. Now, Mr. Koskinen, CI stands for criminal investigations division at the IRS.

And what do they do in the forensic lab in that division?

KOSKINEN:

They're an expert at in that lab taking hard drives in computers that have been seized by criminals, tax evaders and reconstituting e-mails wherever necessary.

CUMMINGS:

Now, is this a step typical when a -- an employee computer crashes and (ph) do you normally do that?

KOSKINEN:

No, it's extraordinary that we would -- the IRS would send the hard drive to a CI for their help.

CUMMINGS:

And why did you do that?

KOSKINEN:

Because Ms. Lerner -- I am advised insisted that all possible efforts be made.

CUMMINGS:

Now, despite all of these efforts, the field director finally e-mailed Ms. Lerner with the results. Next slide please. And -- and I quote, "Unfortunately, the news is not good.

These sectors on the hard drive were -- were bad which made your data unrecoverable. I'm very sorry. Everyone involved tried their best," end of quote.

So the technical experts concluded three years ago that the sectors on her hard drive were bad. Is that accurate?

KOSKINEN:

That's what the e-mail says.

CUMMINGS:

Now, these e-mails are concrete evidence of what really happened back in 2011. But my Republican colleagues just want to ignore them. They want to pretend they don't exist, those stubborn facts.

But they do exist. And they show this was not intentional. This was not nefarious. This was not a conspiracy. Mr. Koskinen, are you aware of any evidence, documents, e-mails and I remind you, you're under oath and I also remind you, you've been accused of false statements, are you aware of any evidence, documents, e-mails, or other information from I.T. professionals that calls into question the accuracy and the legitimacy of these e-mails?

KOSKINEN:

No.

CUMMINGS:

And finally, and just so everyone is clear, Mr. Koskinen, when you testified before this committee on March 26, did you know about this e-mail claim? Did you know Ms. Lerner's e-mails were lost forever?

KOSKINEN:

No.

CUMMINGS:

Thank you very much.

ISSA:

Thank you.

We now go to the gentlemen from Florida, Mr. Mica.

MICA:

Well, thank you, Mr. Chairman. I've known the Commissioner for many years. And I know him to be a good public servant. I'm a little bit baffled.

I know, John, I think that you're probably in a position of the guy at the end of the parade with the broom and shovel here and in a very difficult situation. Let me, if I can, just take people back to the history of this and to you, Commissioner.

This targeting began sometime in March or April of 2010. In June of 2010, Chairman Issa alerted IRS. And it made an inquiry.

In February of 2011, Lois Lerner sent an e-mail to IRS employees stating that the tea party is a very dangerous matter. Then, the Chairman of the committee with jurisdiction in June of 2011, June 3, Dave Camp, who you spent time with recently, sent a letter to IRS that he -- it looks like the heat really started to come on at that point.

Now, an -- an entire administration and one of the biggest scandals in government was back during Watergate when, what, 18 minutes of tape was lost and somehow, between -- between June 3 and June 13, Lois Lerner's hard drive crash has gone in 10 days. And it's not just a couple days or 18 minutes like Rosemary Woods (ph) had the misfortune of losing.

But 27 months, is that correct, of hard drive that's lost...

KOSKINEN:

All (ph) her e-mails before June...

MICA:

From June 9 -- June of '09 to April of '11. So it raises -- it raises many questions. Now, you came on in December, right, John?

MICA:

Yes, the end of December. They briefed you. You were briefed about this whole situation at the beginning, I guess, of January.

In February, you testified today that you learned that there was a problem recovering some of the e-mails, is that correct?

KOSKINEN:

No, yes, when I learned was that there was an issue with her e-mails, that there was a problem with the dates.

MICA:

But then in March, what -- what troubles me, you came to us and you said, last week, informed this committee and others, we believe, we completed our production to the Ways and Means Committee and all the documents that are asked for in light of this document production, this is to us here.

I hope the investigations can now be concluded in the very near future. You went through and told us what you just started out with how much money you spent and how many documents you -- you produced.

But nowhere did -- nowhere did we hear until just a few days ago that the hard drive crash and all of this was unrecoverable. But they -- again, the information we have is they briefed you in February, you gave us this testimony in March, and never spoke to this.

KOSKINEN:

Right. In February, as I said, they briefed me that with the e-mails that they had pulled subject to the search terms, they was -- they were concerned that there was an issue with the date issues. I did not -- was not advised -- did not know that there was a hard drive crash.

MICA:

John, I gave you the benefit of the doubt. I went back and looked through all of what you gave us. In March, this is your testimony and even what you gave us today conflicts.

So that does -- it raises questions because it appears that you knew and others knew and...

KOSKINEN:

Others knew but...

MICA:

...and we were -- the Congress wasn't informed until just recently. Now, I don't have much time. I understand, I just learned a little bit about this, Sonasoft backup contractor. And they were retained.

Are you familiar with them to back up e-mails?

KOSKINEN:

I was not familiar with them. But I do have the information, was provided to me today.

MICA:

Well, I have the same information and I understand that they were dismissed in 2011. And they had started 2005. And -- and actually, in their advertisements, they bragged about how they could retain e-mails.

Do you know if they have a backup that exists?

KOSKINEN:

They were under a contract with the chief counsel of the IRS for about 3,000 employees in an internal disaster recovery program that would allow you to move e-mails from one system to another as a backup. That contract was terminated when the IRS chief counsel upgrade to Outlook 2010 and that alternate system was no longer needed.

MICA:

But you don't know if they have that -- that backup exists?

KOSKINEN:

If the backup before...

MICA:

That they were in place -- they had that responsibility for backup between I think 2005 and 2011.

KOSKINEN:

But that's where the chief counsel -- yes, for 3,000 employees and the chief counsel, not for anybody else...

MICA:

That might exist -- that data may exist?

KOSKINEN:

If any of the data exist, it's been searched for all of the e-mails, I'm told, we've searched everywhere...

MICA:

Did you ask that company for that information?

KOSKINEN:

Now, the company didn't have any data on their servers. The data was all inside the IRS.

MICA:

And that's gone, too?

KOSKINEN:

Everything that we have and all the -- those -- that was a disaster recovery system for the chief counsel. All of those e- mails across the system have been anti-dated that the chief counsel has or that the IRS has has been searched.

MICA:

And Mr. Chairman, many questions (ph)...

ISSA:

I thank -- I thank the gentlemen.

We now go to the gentlelady from the district of Columbia, Ms. Norton.

NORTON:

Thank you, Mr. Chairman.

Like Mr. Mica, John Koskinen, I -- I -- I have known you well before you came to the Congress. Since coming to Congress, I have been impressed not a little bit by the confidence you have inspired in Republican and Democratic presidents alike.

It's as if they saved you for jobs that others couldn't do, didn't have the guts do to, or didn't have the integrity to do. And you are well-known on both sides of the aisle as the government's more versatile turnaround when agencies is in trouble, turn to John Koskinen.

Therefore, I'll begin my series of questions simply by offering you an apology. I deserve -- I believe you deserve one. You deserve one because of accusations designed to sacrifice the reputation of a public service with a spotless reputation for political advantage without a scintilla and I use my words advisibly (ph) of evidence. It's vile, you (ph) know (ph), to look a man in the face and accuse him of perjury without submitting any evidence.

It is much worse when all of the evidence supports the version of the facts of the man you are facing. Whether it is that the Lerner crash occurred well before this investigation began, she must be clairvoyant, whether it's been confirmed by the -- the criminalization lab, doesn't -- all the evidence is on your side, Mr. Koskinen.

And I want to point out for the record that the line of conspiracy hunting has shifted with the Lerner crash. For the longest time, the line of questioning was about one subject alone.

So we've moved from one scapegoat to another. The last -- what we've just moved off of the notion that this was all a conspiracy directed on behalf of the White House, that also without a crumb of evidence, lacking evidence, the crash provides new thought (ph).

Mr. -- just for the record, Mr. Koskinen, have you -- have you identified any evidence since you have been Commissioner that IRS employees before you came or now were part of a conspiracy to intentionally target the President's political enemy?

KOSKINEN:

No, I've -- I've done no investigations. I have read the I.G.'s report that said inappropriate criteria were used to identify organizations for review and the I.G. had nine recommendations. And we have accepted all of those recommendations.

I think it's important for the public to be confident that whoever they are, they're going to be treated fairly by the IRS, whether they're Republicans, Democrats, belong to organizations of one kind or another, wherever they show up, wherever they speak, they should understand they'll be treated fairly. If there's an issue, it's because something in their tax return.

If someone else had that issue, they'd get the same response from the IRS. I think it's critical that the public have that confidence.

And we're doing everything we can to restore that confidence.


NORTON:

Well, 41 individuals have testified just as you have that there is no evidence of the first conspiracy, now that we're onto the second conspiracy and so did the -- the -- the I.G. Do you recall that the I.G. also testified and I will quote, "The inspector general when asked by the Ways and Means committee, was there any evidence of political motivation from the White House? He said we have no -- we did not -- we had no -- did you have any evidence. We did not, sir.

So I just want to say that your strong reputation, your character should hold you in good stead as you face baseless accusations. And when a man faces accusations and no evidence is put before him, I don't think he's got nothing to worry about.

Thank you very much for your extraordinary service to the people of the United States.


ISSA:

Will the gentlelady yield?


NORTON:

Be happy to yield.


ISSA:

I appreciate it. I just would wonder if that quote from March, "We can find Lois Lerner's e-mails," would the Commissioner stand behind that statement or would you have to qualify it with we will find some of Lois Lerner's e-mails?

NORTON:

Well, I'm sure he was trying to find all of Lois Lerner's e-mails. And they were lost when the crash occurred before we even began.

ISSA:

But not -- but not after -- Mr. Camp had sent letters not after we had begun our investigation. Her crash came after we began investigating.

NORTON:

And therefore -- and therefore what, Mr. Chairman?

ISSA:

And therefore...

NORTON:

And therefore, she did what?

ISSA:

And therefore, documents disappeared after...

NORTON:

And therefore, she did what or Mr. Koskinen did what?

ISSA:

I didn't say Mr. Koskinen.

NORTON:

Well, that's we're here to -- that's what we're here to learn. And I repeat, there is no evidence that this man had anything to do with any malfeasance or that he should be accused of perjury before this committee.

ISSA:

Only that he said that he was aware that Lerner's e-mails were overlooked, missing or had other technical issues.

KOSKINEN:

There was no evidence at that time to know whether they had been overlooked, missing or had other issues. I did not say that we knew that.

I said, at the time, we had no idea whether any of those applied. That's why they were investigating. That's what I was told then in April when they came back with the findings as they had reviewed it all.

I never said at the time that, in fact, we had any idea whether any of that was true.

ISSA:

Right, and that's the inconsistency that we're talking about here tonight.

NORTON:

What's the inconsistency, Mr. Chairman?

ISSA:

If you know that you have a difference in the numbers and...

NORTON:

What numbers? We don't know the numbers yet, Mr. Chairman.

ISSA:

The commissioner knew that there was a problem but he didn't know the details. We were never told there was a problem...

NORTON:

So he should talk before he knows the details?

ISSA:

When every person up on the dias (ph) including the Ranking Member wants to know if you're going to get all and you know there's at least some sort of a problem or concern...

NORTON:

Mr. Koskinen, what is your response to that? You -- you said, we're going to get -- we're going to find them all. We're you lying when you said we're going to find them all?

KOSKINEN:

Absolutely not.

ISSA:

Thank you. We now go to Mr. Turner.

TURNER:

Mr. Koskinen -- Mr. Koskinen, you're touted as a man of integrity. And I've even heard you say it about yourself on television.

So I'm going to ask you to use that integrity to help me understand a few things that have become confusing to me. Now, you said that you want to restore confidence to the agency.

And I have no question to -- to question that. I have no basis upon which to -- to think that -- that isn't your goal. But you have to understand that this discussion of the missing e-mails goes right to the heart of the issue of confidence, and of the issue of your ability to do that and of -- of your integrity.

So let's -- let's start first with just some general concepts of ethics, back to your -- your integrity. Now, you agree, as Commissioner, that you can't both be the manager of the agency, the investigator of the agency, judge, jury and prosecutor of matters that are being undertaken under and by the agency, right?

There's inherent conflict and bias in those positions. You, by basic concepts of an ethics with integrity, can't fulfill all of those, correct?

KOSKINEN:

I'm not sure I understand that question. I'm in charge of the agency. I'm responsible for its activities. And I'm accountable for its activities.

TURNER:

So you believe that you can testify under oath today that no crime has been committed by Lois Lerner at the IRS?

KOSKINEN:

I can testify I have seen no evidence that...

TURNER:

I understand that. And -- and that is the question -- has been bantered (ph) back and forth here. I can tell you I have no evidence that -- that Lois Lerner has committed a crime.

But I don't have it within -- I don't have the agency and I certainly don't have the ability to go to the FBI and others and have them take things from you that can give that.

KOSKINEN:

All right...

TURNER:

Just because you haven't seen all the evidence doesn't mean that -- that -- that you have the ability to just bluntly (ph) say no crime was committed.

KOSKINEN:

I didn't say no crime. I've said I've seen no evidence. I would note again...

TURNER:

And that's the distinction.

KOSKINEN:

...the inspector general...

TURNER:

Because you can't testify here under oath that no crime was committed.

KOSKINEN:

The inspector general has started...

TURNER:

I'm asking you. Do you have any ability to say no crime has been committed?

KOSKINEN:

I have the ability to say I've seen no evidence of any crime.

TURNER:

Of course. But you cannot say what I've asked you that no crime was being committed. So let's go to Lois Lerner.

She came before this committee. And under -- while she was placed under oath, she evoked the fifth because she indicated that she wanted to assert those rights albeit that she did that incorrectly because she had fear of prosecution.

Let's say that again. Prosecution -- fear of criminal prosecution -- now, you can't testify today that Lois Lerner has no need for fear of criminal prosecution because you can't testify that Lois Lerner didn't commit a crime. Here is what I am concerned about since you are a man who's placed before us with integrity.

If -- if in the process of these e-mails being destroyed, there were those in your agency that knew that it was a possibility that a crime was committed, then they committed a crime because destruction of evidence of a crime is, in fact, a crime. And you can't testify today that no one, that -- that there was no crime committed in the destruction of her e-mails, right?

You can only say you have no evidence of a crime having been committed in the destruction of these e-mails, right?

KOSKINEN:

I have no evidence whether she beat her dog, whether she beat children. I have no evidence of a whole series of things.

TURNER:

Right. That's why it's so important getting to what Jim Jordan has said about a special prosecutor. And that's what my question is to you today.

If you are truly a man of integrity and you know the difference between you -- you -- there's no -- that you -- you don't have any evidence that the crime has been committed versus you know no crime has been committed. You have to understand that the -- the whole integrity of your agency is at risk.

You possibly have people at the IRS who are committing crimes. And they're not being held accountable. The only way you can know that is to -- by -- pick up the phone, call the FBI and ask them to come in and do an investigation of the disappearance of these e-mails.

So my question to you is will you call the FBI and ask them to come in and investigate these missing e-mails that their destruction could possibly have been a crime?

KOSKINEN:

At this time, the inspector general, an independent agency, not controlled by us, started that investigation...

TURNER:

They are not a criminal investigating agency.

KOSKINEN:

They are actually capable of doing criminal investigations as well as civil. They make recommendations.

TURNER:

Will you call the FBI because the integrity of your agency is absolutely at stake. It is -- we have Lois Lerner having -- having invoked the fifth in front of this committee, indicating that she's fearful of criminal prosecution, which should be enough for you, a man of integrity, to pause and think, maybe crimes were committed within my agency. And now, that these e-mails are missing, maybe someone not of integrity committed a crime in destroying them.

You should call the FBI. You should call for a special prosecutor.

KOSKINEN:

I cannot enter into Lois Lerner's mind. I've never met her as to what she...

TURNER:

I asked you to pick up the phone and call the FBI, not into Lois Lerner's mind.

KOSKINEN:

I am not going to -- I am -- I am not going to call the FBI. The inspector general has started -- when the...

TURNER:

That is an issue of your -- your personal integrity because the integrity of this -- of this agency and the concern that Americans have of it is at stake.

KOSKINEN:

I reject the suggestion. And my integrity depends upon my calling the FBI. The inspector general will issue a report. We will all get the benefit of that report.

And then we can determine what the appropriate action is...

TURNER:

I have always believed that what happened in your agency with Lois Lerner is a crime. I believe that there were others involved.

I believe the e-mails that are missing are the ones that would probably give us an ability to establish that. And I believe that somebody undertook criminal act and (ph) its (ph) destruction.

And I believe that since you can't tell me I'm wrong, and it's enough of a doubt in your mind, as the Commissioner of that agency, you should call the FBI.

KOSKINEN:

That's an interesting...

(CROSSTALK)

ISSA:

Gentleman's time has expired.

KOSKINEN:

...no facts behind them.

ISSA:

Thank the gentleman.

And we now go to the gentlemen from Massachusetts, Mr. Tierney.

TIERNEY:

Thank you.

Mr. Koskinen, good evening and thank you for being here tonight. I don't think I have seen a display of this kind of disrespect in all the time I've been here in Congress.

And it's unfortunate that anybody would have to be subjected to it. This is an incredible thing. A public servant being...

ISSA (ph): Would the gentlemen yield?

TIERNEY:

No, I will not yield.

ISSA (ph): OK, the gentleman will suspend. Is the gentleman...

TIERNEY:

No, I don't want to suspend either. I mean, this (ph) is (ph) my time.

(CROSSTALK)

ISSA (ph): Is the gentleman asking...

TIERNEY:

And I will continue to ask questions.


ISSA:

The gentleman will...


TIERNEY:

This is my time. I won't suspend. Please stop the clock.


ISSA:

The time is suspended. I would caution all members not to characterize the intent or the character of your fellow members here on the dias (ph).

KOSKINEN (ph): But it's -- I'm (ph) going (ph) to say but it's fair game to question the integrity of the witness?


ISSA:

With all due respect, the rules -- the rules of the House do -- excuse me, the rules of the House speak to questioning the integrity of members. I would caution all of us that, well, the Chair has questioned the testimony earlier as whether it was the truth or the whole truth, that, in fact, to -- to question the motives of the witness should be done only on evidence.

But to question the motives of your fellow member is, in fact, within the rules of the House, an action for which the floor can take down word (ph).


MALE:

Mr. Chairman?


ISSA:

Yes, of course.


MALE:

Thank you. You talk about the rules of the committee and the rules...

ISSA:

The gentleman will state his parliamentary please.

JORDAN (ph): Use your mic. Use your mic.

MALE:

Has -- have -- has the Chairman violated the rules of the committee?

ISSA:

Please state your point of parliamentary inquiry.

MALE:

When the Chairman cut off...

ISSA:

If the gentleman will state a point of parliamentary...

MALE:

Has the Chairman violated his own rules in the -- in...

ISSA:

That's a question. Do you -- do you have a question of approval. May I ask (ph) you (ph) -- ask the question...

MALE:

You stated in a point -- as a point of order.

CUMMINGS:

Just let him ask the question please.

ISSA:

I will not. State a point of inquiry. If not, we will go on. The gentlemen may continue.

TIERNEY:

You know, I think the understanding is the rules of the House say that members should conduct themselves in a way that reflects creditability on the House. I think people watching this hearing today can decide whether or not that's been -- been followed.

Look, I think what you're trying to tell people at one point is that the inspector general's responsibility to review this matter and file a report and in that report make recommendations as to what action might be done or upon reviewing that report, you or others might make recommendations of what might be done such as referred to another body like the FBI or somebody else, is that correct?

KOSKINEN:

That's correct.

TIERNEY:

So we're not -- we're not even to that point yet.

KOSKINEN:

That's correct.

TIERNEY:

I guess, you know, as opposed to shooting an aim, we might be trying to first gather some information and decide where we go from there.

KOSKINEN:

Correct.

TIERNEY:

All right. Have you testified tonight to anything that was not discussed at last Friday's hearing?

KOSKINEN:

I'm sorry, did I what?

TIERNEY:

Have you discussed tonight with this committee anything, any matter pertinent to this subject that is not -- was not discussed last Friday?

KOSKINEN:

Thus far, no.

TIERNEY:

So just to get it right, you -- you were scheduled to testify originally in front of Chairman Camp's committee tomorrow, on the 24th. Is that correct?

KOSKINEN:

That's correct.

TIERNEY:

Have they been in touch with you or your staff before scheduling that date?

KOSKINEN:

Yes, they actually had asked whether I would be available in the morning on Tuesday. And I was not. And we agreed that I would testify in the afternoon.

TIERNEY:

So you agreed to testify voluntarily?

KOSKINEN:

I've always agreed to testify voluntarily over the course of the last 20 years.

TIERNEY:

So after you discussed and agreed to testify before Chairman Camp, you received the unilateral subpoena from Chairman Issa, is that correct?

KOSKINEN:

That's correct.

TIERNEY:

And that subpoena actually to come here, in fact, he compelled you to come here tonight?

KOSKINEN:

Correct.

TIERNEY:

Did Mr. Issa ever call you and ask you to come voluntarily?

KOSKINEN:

No.

TIERNEY:

Did any of the staff ever call you and ask you to come voluntarily?

KOSKINEN:

No.

TIERNEY:

Did he ever explain to you why it was so urgent that you come here at 7:00 on Monday when you were already scheduled to appear voluntarily before a different committee of jurisdiction on Tuesday, the 24th, following day?

KOSKINEN:

No.

TIERNEY:

Now, I -- I won't ask you to speculate. But I think some might speculate that either people don't think that Mr. Camp could do the job which I would (ph) sort (ph) of (ph) think (ph) as a suspect (ph). He's been on (ph) a (ph) pretty good number or that there's some sort of competition going on here.

I don't know. Some might speculate that. But when Chairman Camp heard that Chairman Issa had subpoenaed you for tonight, you were all of a sudden notified that there was going to be a hearing in Chairman Camp's committee on Friday of last week, is that correct?

KOSKINEN:

How were you notified of that?

KOSKINEN:

The staff asked if I was available -- would be available on Friday. They had to get approval agreement of the minority since I understand there's a seven-day rule.

I told them that I could make myself available on Friday.

TIERNEY:

Now, how long did you testify on Friday?

KOSKINEN:

Total of (ph) -- the hearing was four and a half hours with a recess for about 45 minutes in the middle.

TIERNEY:

I would think that having testified all that time with the subject matter, tonight's hearing might be somewhat redundant. And -- and so far, it has been, is that correct?

KOSKINEN:

It has similarities to Friday.

TIERNEY:

And I -- looking on this, I think the only thing that might be different in the sequence of what's going on is now I understand that Chairman Issa has invited Ms. Jennifer O'Connor to testify tomorrow.

Do you think Ms. O'Connor?

KOSKINEN:

I do not.

TIERNEY:

Do you know whether or not she worked at the IRS from May to November of 2013?

KOSKINEN:

I do understand she did.

TIERNEY:

Now, she left in -- in May -- November of last year, is that right?

KOSKINEN:

That's my understanding.

TIERNEY:

And that would have been well before there was any discovery of Ms. Lerner's e-mails going missing, is that correct?

KOSKINEN:

That's correct.

TIERNEY:

Do you know where Ms. O'Connor works now?

KOSKINEN:

My understanding, she works at the White House.

TIERNEY:

So I think some would speculate that maybe people on this committee think they've now trumped Mr. Camp and his committee. And maybe, that them cameras on the actual hearing.

But no one (ph) will speculate like that. Again, I just -- in my questioning here, by saying that I think it's -- it's unfortunate that you had to be subjected to this after going having go through it last Friday. And I hope that members will reflect the creditability of the House from here on, at least, if it hasn't been done so far. Thank you.

ISSA:

I thank the gentlemen.

We now go to the gentlemen from Tennessee, Mr. Duncan.

DUNCAN:

Well, thank -- thank you very much. And first, Mr. Chairman, let me thank you for pursuing this investigation in the way you have because in a free country, no individual, no group of individuals should be targeted for their political beliefs.

And certainly, I think almost everyone who has looked closely at this feels that that happened in this situation. Although, on March 26, when Mr. Koskinen was here before us, he said there had been no targeting just inappropriate criteria.

The "Washington Post" said Mr. Koskinen, quote, "failed back on your (ph) expertise (ph)." And the "Washington Post," of course, is probably the main defender of the federal bureaucracy.

And their fact -- fact checker said that Mr. Koskinen should should be given three Pinocchios for that testimony. And they -- in their classification, three Pinocchios is on Pinocchio under what they call whoppers (ph).

So I don't know if -- what this -- what his opinion is on that. But I will say this all over the country. People are saying that there's one -- there's a double standard being applied here.

They're saying there's one standard for everybody else and one standard for the IRS. And I can tell you that, you know, I've been following politics and government ever since I was in high school.

And I can tell you that I believe there's more anger and resentment and disgust toward the federal government today than any time in my lifetime because everybody seems to feel today that -- that we've ended up with a government of that (ph) -- for the bureaucrats instead of the one that's by and for the people. Mr. Koskinen was given a chance on Friday to apologize on behalf of the IRS.

And he didn't do so. But I can tell you that I think the people of this country deserve at least an apology that a different standard has been applied by the IRS than would be applied to individuals who were having problems on their taxes.

And this -- it seems that every time the federal government screws up, which is often, they always fall back on one or both of two excuses. They always say they're either underfunded or their technology is out of date.

And of course, that's what we've heard today. But I can tell you, the people of this country are sick and tired of arrogance within the federal government. And this hearing -- and others that will follow about this, I think will help assure that this does not happen again.

And so I commend you for it, Mr. Chairman. And I yield back the balance of my time.


ISSA:

The gentleman -- would the gentlemen yield?


DUNCAN:

Yes, sir.


ISSA:

I thank the gentlemen.

I'd like to go through the question one more time, Commissioner. When you testified that, in fact, you knew there was this problem when you were here last time but you didn't know that, in fact, e-mails were lost? Is that correct?

KOSKINEN:

That's correct.

ISSA:

But you knew there was a problem? You knew that there was this sequence problem or numbering problem, is that correct?

KOSKINEN:

Correct.

ISSA:

Did you take any steps to find out what that sequence or numbering problem went? I mean, people tell you there's a problem almost at least in my experience as a CEO. You -- you say, well, tell me about the problem.

What does the problem mean? Did you do that?

KOSKINEN:

No, I asked to be kept updated. There were 200 people working on this issue. And they said they would let me know.

And they did let me know.

ISSA:

So there's 200 people working on the problem of delivering e-mails.

KOSKINEN:

Correct.

ISSA:

And it took this long to find out that they were missing ones from Lois Lerner.

KOSKINEN:

It took until...

ISSA:

It's almost a year.

KOSKINEN:

Well, that's right. From the time there was anybody thought there was a problem, it took about two months.

ISSA:

OK so...

KOSKINEN:

Nobody -- nobody knew there was a problem last year.

ISSA:

But you knew there was this inconsistency when you came before us.

KOSKINEN:

Yes, I knew that (ph) identified -- that a problem had been identified and was under investigation.

ISSA:

Why is it you did not answer when asked a dozen times really, on both sides of the aisle -- will you deliver -- we can't find Lois Lerner's e-mails?

KOSKINEN:

Right. And that was my assumption at the time.

ISSA:

But you knew there was some problem with some part of her e-mails. You'd been briefed on that.

KOSKINEN:

We have. But we had no idea -- well, at that time, nobody understood what the ramifications were. Were there e-mails, that it was a part of the production process.

They ran the whole production process again. They searched all the files again to make sure that the production process itself hadn't caused e-mails to be lost.

So at the time I testified, no one had any idea whether there were any e-mails missing or not.

ISSA:

Right. But were you aware when you testified the last time that there had been a crash in Lois Lerner's disk drive some years before?

KOSKINEN:

When I testified here?

ISSA:

Yes.

KOSKINEN:

No.

ISSA:

Were the people reporting to you aware of that?

KOSKINEN:

The I.T. people apparently were. I (ph) advised that they knew that -- they discovered there was an issue with her computer in late February.

ISSA:

Thank you.

We now go to the gentlemen from Massachusetts, Mr. Lynch. Sir, yes, Mr. Stephen Lynch.


LYNCH:

Thank you, Mr. Chairman. I do want to raise the -- the issue that while the IRS is not held in very high repute these days, neither -- neither is the United States Congress.

And I want to thank you for your willingness to testify. I would like to refocus on the evidence here. You know, I -- I -- I'm a little bit surprised at the chronology that Mr. Tierney has laid out here where you originally invited by Mr. Camp in the Ways and Means Committee to testify.

And then it seems like when Mr. Issa found out about that and you were subpoenaed -- unilaterally subpoenaed here to testify before you. We're (ph) going to testify tomorrow at that other hearing.

And then Mr. Camp jumps in front of him. And now, I have billboards and I had a -- I had a video -- video clip up there earlier -- great showmanship.

And I'm -- I'm just worried I'll come in here tomorrow, there'll be a -- a 16-piece orchestra to sort of cap out the show. That's not the way this is supposed to happen.

That's not the way this is supposed to go down. I mean, there's some serious issues here that we have to get to. But all of this fanfare, all of this showmanship is clouding it over.

And I think we're doing a disservice to the people that we represent. I -- and I think we are failing greatly in meeting the high expectations of the American people.

I think that's probably an understatement. I would like to focus on the evidence. And going back to the heart of this issue, we did have a -- a situation where there was evidence, and admission on the part of the IRS, that they were using search terms such as tea party, Patriots, 9/12 project in terms pf being on the lookout for for -- for groups that were applying with those characteristics.

They also were looking for any issues in an application that -- that included government spending or government debt or taxes. They're also looking for statements in the case file criticizing how the country was run. That's evidence. When the IRS goes after citizens of the United States because of -- of this criteria, that is evidence of their state of mind.

That is relevant evidence. Now, that's not they -- they looked for. They also looked for any search terms regarding progressives, or -- or these emerge groups which were also very progressive groups, 501(c) applications.

They also went after any successor (ph) organizations to acorn (ph) because they were highly progressives. So there was -- there was a widespread.

It's not -- it's not just going after conservative groups. But it's -- it's going after American citizens who have various political views.

And that is evidence. That's hard evidence. Would you agree?

KOSKINEN:

Is (ph) there (ph) evidence -- exactly.

LYNCH:

Right, OK. So when these e-mails go missing for 27 months on -- on Lois Lerner's account, you realize how that -- that just feeds into the suspicion that -- that there's something going on here.

KOSKINEN:

I understand that. Why I think it's important to understand we were able to find 24,000 e-mails in that period.

LYNCH:

I know what you found. I appreciate that. And I think you went at it legitimately and honestly.

Let me ask you, when the -- when Mr. Russell, the -- the I.G. for -- for the IRS, when he looked at it, he was looking at the search term issue for us. Did he look at the -- the other issue of -- of the missing e-mails?

Did he do any of that? Or was that -- was that known to him?

KOSKINEN:

It was not known to anyone at that time.

LYNCH:

OK, so we didn't look at that?

KOSKINEN:

Pardon?

LYNCH:

We didn't look at that?

KOSKINEN:

The I.G. to my understanding did not look at that. He has started investigation of that now.

LYNCH:

OK. Well, I think that's -- that's something we might want to revisit, then. And do you think that it would be worthwhile to have the inspector general go back and look at -- look at the way these e-mails went missing?

And I also...

KOSKINEN:

Yes.

LYNCH:

...know there's some allegations -- unfounded allegations about six other employees about their e-mails going missing.

KOSKINEN:

No, he should look at it. And he is looking at it. I expect that when they complete that investigation, they'll provide a report to the public, us and this -- and this committee and other investigators.

LYNCH:

OK. My time has expired. I yield back.

ISSA:

Thank you. The gentlemen just said it was unfounded. Are other drives that led to other e-mails not being being available to your knowledge?

KOSKINEN:

At this point, there aren't. There -- we -- we noted last week, I had asked, as I said in my testimony in May, as we were finally getting (ph) the arms around Lois Lerner, I said could we look at the other 82 custodians and determine whether there are other hard drives that would affect this.

As I noted, we now found several custodians. It's not clear why e-mails, if any, were lost. Again, that was part of what we had hoped to complete in our full review of all this, at which point, we would have provided you with that information.

ISSA:

OK, so we don't know today about others? There maybe others because there were other crash...

KOSKINEN:

There maybe others, yes. We have -- we have provided information of what we know. We just knew -- learned about that last Monday.

LYNCH:

Just to follow-up on that.

ISSA:

Of course.

LYNCH:

I'm trying to remember her name, Nikole Flax?

ISSA:

Flax.

LYNCH:

Flax. There was a story last week that her e-mails were missing. Is that -- have we made any progress on trying to figure out her e-mail?

ISSA:

I think -- I think that was cleared up that it was just one of her two computers...

LYNCH:

Right.

ISSA:

...that they weren't -- her e-mail's missing.

KOSKINEN:

There's no evidence now any e-mail is missing.

LYNCH:

OK, thank you.

ISSA:

Thank you. I now ask unanimous consent that the 141-page staff report from April 7, 2014 be placed in the record. Without objection, so ordered. The title of it is, "Debunking the Myth that -- that the IRS targeted progressives."

We recognize the gentlemen from North Carolina, Mr. McHenry.

MCHENRY:

Mr. Koskinen, there's a lot of discussion. And you've -- you've been through multiple hearing related to this Lois Lerner targeting of conservative groups.

Do you understand what the fuss and fury is about this week? Do you understand the -- the reason why many folks are really upset about this?

KOSKINEN:

I understand -- I haven't been around Washington a long time.

MCHENRY:

Yes, I mean, you've had a long career. I mean...

KOSKINEN:

We're (ph) in (ph) that (ph) but then one of the reasons we've taken it seriously is that if there has been a hard drive crash and e-mails disappear, oh, that's a matter that should be reviewed. As I say, we provided all the information we have about the e-mails.

And in fact, it appears that and Ms. Lerner was working very hard to retrieve them, not to lose them.

MCHENRY:

Yes, but -- but you had the ability to share with Congress in real time and share with the American people in real-time what you're finding. Why didn't you do that?

KOSKINEN:

Because my judgment was that what we should do is produce all of the information when we had it, not dribble (ph) it out. We actually provided...

MCHENRY:

Even if that meant along the way, people are questioning how you answer Congressional inquiries.

KOSKINEN:

We've answered the Congressional inquiries weekly (ph) and totally (ph).

(CROSSTALK)

MCHENRY:

Well, I know you have. No, I understand that. But for me, this is really not about you. it's not about anybody up here on the dias (ph).

It's not about a hearing. It's about the American people. Your agency sends fear up the spines of every American when you contact them.

And if there's one receipt missing, a small business person goes and searches far and wide for that one last receipt. And yet, we have evidence that -- and you've testified that, you know, Lois Lerner's hard drive crashed and that, you know, erased e-mails from January 2009 to April 2011 -- just the time period that Congress was most concerned about with the targeting of conservative and tea party groups.

So -- so look. I mean, I understand. And you've -- you can answer -- answer very reasonably. But when you see that type of thing happen, it almost defies anyone sense of -- of capacity that that could happen, that this...

(CROSSTALK)

KOSKINEN:

I would note that Congress is very interested in what happened from April of 2011 until May of 2013. And we have produced -- all of those are in the process...

MCHENRY:

Yes.

KOSKINEN:

...of producing all of those e-mails. So we have significant amounts of e-mails...

MCHENRY:

I understand.

KOSKINEN:

...not lost that we...

MCHENRY:

But...

KOSKINEN:

...determined from Lois Lerner e-mail -- 43,000 Lois (ph) -- Lois Lerner e-mails. Plus, we've been able to find another 24,000. But the point I think is important as I've said, the question is, in the period in which

we found the 24,000, what are the e-mails that she sent outside the agency that would not be reflected in anybody's accounts and...

(CROSSTALK)

MCHENRY:

Right. And -- and how are they going to magically come forth? The other thing that's interesting...

(CROSSTALK)

KOSKINEN:

They were -- they're going to come forth because the White House and Treasury have provided this committee and other committee...

MCHENRY:

So that means you didn't e-mail outside the White House or Treasury?

KOSKINEN:

Pardon?

MCHENRY:

That -- that means you didn't e-mail outside of White House or Treasury. OK, but the point about this, and -- and what's...

KOSKINEN:

Well, I'm sorry but that was I thought was a big issue was whether, in fact, this was all part of her hiring (ph)...

MCHENRY:

It is. But it's not the question I'm asking you, sir.

KOSKINEN:

I'm sorry, I'm sorry. Go ahead.

MCHENRY:

And I've been very respectful of your time in giving you an opportunity to answer.

KOSKINEN:

I appreciate that.

MCHENRY:

So the reason why I'm asking this question is I just want you to be able to convey to the American people that running the IRS -- a very frightening agency, right -- a very frightening agency for my constituents at home, that you get it. You understand why the American people look at this and say, this is so far beyond my ability to reason.

An agency that has more than a billion dollar -- nearly $2 billion I.T. budget, let a hard drive crash. It just seems absolutely ridiculous and beyond comprehension that this would happen in such a convenient context.

And yet, we have Lois Lerner's been a major focus on this inquiry. And she's the one who's searching desperately to make sure that we recover her hard drive that may incriminate her.

We won't know, though, because this has been recycled.

I'll yield the balance of my time to Mr. Jordan.

JORDAN:

I thank the gentleman for yielding. I just have one question in the few seconds we have. What date did you learn that you could not get all of her e-mails?

KOSKINEN:

I learned that in April. I don't recall when.

JORDAN:

You don't know the day?

KOSKINEN:

I do not know the day.

JORDAN:

Early April?

KOSKINEN:

I have no recollection.

JORDAN:

Mid-April?

KOSKINEN:

April. Well, we know that. I'll -- I'll yield back the time, wait for my five minutes. Thank you.

ISSA:

Would -- would the gentleman yield...

JORDAN:

Yes, I'd be happy to.

ISSA:

You only know within a month? Could you provide the committee with some evidence from the calendar that would indicate what day you were briefed?

KOSKINEN:

I'd be delighted to. There's going to be nothing on my calendar that shows that. But you can look at the entire month of my calendar.

ISSA:

But who briefed you?

KOSKINEN:

Pardon?

ISSA:

Who told you that e-mail had been lost?

KOSKINEN:

I don't recall who. I meet with -- I've addressed all of the people doing the work. I've talked to people as it goes along. There's not a...

ISSA:

OK, so your testimony today is you don't remember the name of the person that told you sometime in April...

(CROSSTALK)

KOSKINEN:

All I know is that by -- sometime in April, I was aware, A, that there had been e-mails lost, B, that we were reconstituting e-mails to the extend we could with other custodians.

And by mid-May, we were able to determine...

(CROSSTALK)

ISSA:

Right. But you don't remember the name of the people who told you that?

KOSKINEN:

I do not remember when I was told or by whom. I just know it was in that time frame.

ISSA:

OK, I don't remember is an answer.

We now go to gentleman from Virginia, Mr. Connolly.

CONNOLLY:

Thank you, Chairman. I'd ask unanimous consent that an article dated July 4, 2013 by Jonathan Weisman of "The New York Times," taking direct issue with your staff report that you entered into the record with unanimous consent be entered into the record at this time.

ISSA:

Would the gentlemen state the date of that article please?

CONNOLLY:

Yes, July 4, 2013.

ISSA:

So somebody disputes my April 7, 2014 with a July 2013 article?

CONNOLLY:

Mr. Chairman, he kind of lays out a pretty good case. But I think it should be in the record just like your staff...

ISSA:

I certainly think that I t's fine for somebody to determine almost a year ahead of a report that the report is invalid. Without objection, so ordered.

CONNOLLY:

I thank the Chair for his courtesy.

Mr. Koskinen, from your testimony, the IRS does not permit all of its 90,000 employees to store all of their e-mail in their active inbox, is -- is that correct?

KOSKINEN:

That's correct.

CONNOLLY:

Why is that?

KOSKINEN:

We don't have the server capacity to absorb all of those e-mails.

CONNOLLY:

Why don't you have the server capacity to absorb all of those e-mails?

KOSKINEN:

Because of the expense.

COLLINS:

What would be the cost of having (ph) that capacity?

KOSKINEN:

The -- the estimate made when the IRS considered expanding its system was -- would cost somewhere between $10 and $30 million. That was an estimate two years ago.

CONNOLLY:

OK. IRS employees instead moved their e-mails when they want to store in the archived files on the their hard drives, is that correct?

KOSKINEN:

That's correct.

CONNOLLY:

Would one alternative be the cloud?

KOSKINEN:

There's no way the e-mails in the IRS go into the cloud at this time.

CONNOLLY:

Why?

KOSKINEN:

Because we're very sensitive. The security of taxpayer information and so thus far, the IRS has not moved any information to the cloud.

Although my understanding is that I.T. department continues to look at that issue.

CONNOLLY:

Hard drives crash especially in older computers. Industry experts say that businesses should replace their employees' computers every three to four years, is that correct?

KOSKINEN:

That's the general industry standard.

CONNOLLY:

And how often does the IRS meet that standard?

KOSKINEN:

We refresh them over time. Sometimes, it takes as long as five to seven years.

CONNOLLY:

So could that part of the problem be we're dealing with an aging set of PCs in IRS because we haven't invested in new equipment?

KOSKINEN:

There's no doubt about that. As I noted on Friday, we have thousands of employees still running windows XP. We're trying to move on to Windows 7.

Windows XP is not longer supported by Microsoft.

CONNOLLY:

Well, surely -- surely, this concern we have up here with hard drives crashing and e-mails not -- not being properly archived or stored and all kinds of other problems and given precisely the sensitivity of the data that the IRS possesses, surely, the Congress has provided an investment portfolio, a set of resources to you to quickly update your computer technology, your information technology in the IRS? Is that correct?

KOSKINEN:

We are provided significant amounts of money but significantly less than we need.

CONNOLLY:

Has your budget gone up or down in the last...

KOSKINEN:

Budget -- budget has gone down regularly every four years.

CONNOLLY:

How much is your budget decline?

KOSKINEN:

Budget has declined over the last four years, $850 million dollars as the number of taxpayers has gone up by seven million. And we've been asked to implement a Foreign Account Tax Compliance Act and the Affordable Care Act.

CONNOLLY:

Your budget's gone down $800 million dollars -- real dollars?

KOSKINEN:

Yes.

CONNOLLY:

Nominal dollars, not -- not including index for inflation?

CONNOLLY:

That's right. That's the -- the actual dollar number.

CONNOLLY:

That's amazing given our concern that we wouldn't be providing you with resources to try to turn this around and make sure this kind of thing doesn't happen again.

KOSKINEN:

The House mark for this year's upcoming fiscal year '15 cuts us by another $350 million.

CONNOLLY:

Three hundred and $50 million in one fiscal year?

KOSKINEN:

Yes.

CONNOLLY:

Well, surely, that will change in light of our deep and profound concern for what happened to Lois Lerner's hard drive?

KOSKINEN:

We have high hopes.

CONNOLLY:

Well -- well, surely, you've been called to these midnight sessions to try to see what help you need, right? You've been asked?

Have you been subpoenaed or voluntarily requested before any committee of the House of Representatives to testify as to what your needs are and why the $350 million cut on top of the $800 million cut over the last four years might do to your agency?

KOSKINEN:

I've testified before the House Appropriations Subcommittee. And we have provided updated information through the House and the Senate appropriators about the negative impact of a $350 million cut.

CONNOLLY:

And their heart...

ISSA:

Gentleman's time has expired.

CONNOLLY:

...their heart bled for you undoubtedly. Thank you, Mr. Koskinen.

ISSA:

I thank the gentlemen.

For what purpose does the gentleman seek recognition?

MICA:

I seek (ph) unanimous consent request. I'd like entered in the record without objection, if I may, the "Reason Magazine" article from the weekend of June 21 that the IRS had a contract with the e-mail backup service from vendor, Sonasoft starting in 2005.

And then I'd like to also put into the record the -- the model (ph) of Sonasoft from an e-mail they have which said, if the IRS uses Sonasoft products to back up their services, why wouldn't you chose them to protect their services?

And then they had this in service that way to have a -- a second -- a third article. "The Daily Caller" on June 21 this weekend said, Sonasoft -- it's an article year that cites Sonasoft six years relationship with IRS came to an abrupt close at the end of fiscal year 2011 as Congressional investigators began looking into IRS conservative-targeting scandal.


ISSA:

Without -- without objection. It will be all be placed into (ph) record.

With that, we go to the gentleman from Ohio, Mr. Jordan.


JORDAN:

I -- I thank the Chairman. Mr. Koskinen, I want to go to your testimony. IRS in February of 2014 identified documents indicating that Ms. Lerner had experienced a computer failure in 2011.

In mid-March 2014, again, your testimony, the IRS focused on Lerner e-mail for production. During this review, during the mid- March review, the data stored on her computer hard drive was determined at the time to be unrecoverable.

So mid-March, you knew the data was unrecoverable. Late March, you came in front of this committee and did not tell us that -- you didn't tell us her computer failed.

You didn't tell us we can't recover e-mails. You said, we're going to give them all to you. Fine. Your -- your testimony is, you know, I was still checking.

I wasn't quite sure we lost them all even though the I.T. professional said we lost them all. I wasn't quite sure. Last round, I just asked you, when did you learn?

You said sometime in April.


KOSKINEN:

Correct.

JORDAN:

I want to -- I want to focus on when you did officially learned according to your definition. The Chairman asked you, who told you this information?

You can't remember?

KOSKINEN:

No, I do not remember.

JORDAN:

Was it -- did someone say in person? Did they send you an e-mail? How did you get the information?

KOSKINEN:

I don't recall. I did not get e-mails on these subjects so I'm sure -- I'm sure it was someone in person.

JORDAN:

Someone in -- this has been a major news story for the last 13 months. And you don't remember who came up to you and said, hey, boss, we lost Lois Lerner's e-mails?

You don't even remember anything about that situation?

KOSKINEN:

I remember being told in April.

JORDAN:

But you don't remember who told you?

KOSKINEN:

I do not recall who told me, no.

JORDAN:

Something -- something that's been on front-page first (ph) where you would state that wasn't significant enough to remember how it happened, when they told you, what the actual date was.

KOSKINEN:

Got to remember...

JORDAN:

You might even remember where you were standing.

KOSKINEN:

Remember, I'm running an agency with 90,000 people. We are dealing with all...

JORDAN:

And this has been the biggest issue in front of your agency for the last year.

(CROSSTALK)

KOSKINEN:

...we're in -- we're in the middle of filing season...

(CROSSTALK)

JORDAN:

OK, so here we go. Here we go. So you find out sometime in April, you don't know who told you. What did you do then?

KOSKINEN:

I was advised -- I didn't do anything. I was advised that they were reconstituting as many e-mails as they could from other...

(CROSSTALK)

JORDAN:

No, no, no, who did you tell? Did you tell the White House?

KOSKINEN:

I never told the White House.

JEFFREY:

"Politico" reports you told the White House in April. You didn't tell anyone at the White House?

KOSKINEN:

I don't think that's what "Politico" reported.

JORDAN:

Did you tell anyone at Treasury? Did you tell any of your bosses, you (ph) know (ph), Treasury secretary?

(CROSSTALK)

KOSKINEN:

I did not tell anybody. I did not tell anybody at Treasury either.

JORDAN:

You talked to anyone about this?

KOSKINEN:

No.

JORDAN:

Talked to anyone outside the agency about when...

KOSKINEN:

Not outside the agency. I talked in the agency about it. I get the report...

JORDAN:

And then when did you tell Congress?


KOSKINEN:

Pardon?


JORDAN:

When did you tell Congress?


KOSKINEN:

We produced the public report 10 days ago.


JORDAN:

So you knew in April and you waited two months to tell this body...


KOSKINEN:

Correct.


JORDAN:

...the body that's been looking into this. Why did you wait so long?


KOSKINEN:

Because we actually we're going to wait until we've produced all of Lois Lerner's e-mails. You said you viewed all the -- I'm telling you...

(CROSSTALK)


JORDAN:

No, no, no, what -- no, no, no, you can't get -- hey, hey hey, you can't give us all our e-mails. You don't (ph) lose (ph) some (ph). So don't give me that statement.

KOSKINEN:

Can I give you an answer?

JORDAN:

I want to know why you didn't tell us you had lost some of her e-mails because that's what we care about.

KOSKINEN:

Can I give you the answer?

JORDAN:

Sure.

KOSKINEN:

All right. Our -- our program was to complete the production of all Lois Lerner e-mails, complete the review of all custodians and provide...

(CROSSTALK)

JORDAN:

But it's kind of important, Mr. -- Mr. Commissioner, to tell us when you lost e-mails for the person that we're focused on, don't you think? Let me ask you this.

Let me ask a more important question. Did you tell the Justice Department?

KOSKINEN:

No.

JORDAN:

Why not? There's a criminal investigation going on. Don't you think that's a pertinent fact that they'd like to know?

KOSKINEN:

We have no evidence that there's any criminal violation involved.

JORDAN:

I didn't ask you that. There's a criminal -- the President of the United States said on May 15, we've got to get to the bottom of this. The attorney general said, we're going to do everything we can to find out what happened here.

And you have information -- you still have -- have you talked to the FBI at all?

KOSKINEN:

I have never talked to the FBI about it.

JORDAN:

Don't you think it's incumbent upon the -- the Commissioner of the Internal Revenue Service, when he gets a -- think about this. Think about the average citizen out there.

FBI is investigating some -- some citizen. And they lose documents over a two-year time period that are crucial -- critical to the investigation. And they say, you know what, we're not going to tell the FBI.

And then the FBI learns later. Do you think that person is in trouble? Heck, yes, they are. But you, as a Commissioner, you say, I don't need to tell anybody.

You didn't tell the -- tell the inspector general?

KOSKINEN:

We issued a public report...

JORDAN:

No, no, no, no. Back in April, you told us just a few minutes ago, you learned in April.

KOSKINEN:

In April.

JORDAN:

Did you tell the inspector general in April that you lost Lois Lerner's e-mails?


KOSKINEN:

No, because we didn't know how many -- whether we'd lost...

(CROSSTALK)


JORDAN:

How long were you -- here is what I'd like to know. If you wait -- you waited two months to tell anyone. At what point does it become obstruction of justice?

Three months? Four months? Two weeks? When you got that kind of critical information, you say, you know, I'm going to hang onto this. We've got to wait. Next year, we can spin this better, do -- whatever it was.

The fact that you -- you didn't tell us and we've been after this for 13 months, we've subpoenaed six months ago for this. Yet, a hearing on the 26th, where everyone on this dias (ph) went after you and said, we want all the e-mails and you assured us you'd get them all to us, and then you learned you can't, and you don't tell anybody?

And you give us a report that you sent to Senator Hatch and Senator Wyden, and on page nine in some report, you say, oh, by the way, we lost the e-mails.


KOSKINEN:

Actually, half the report -- it starts on page five. It's half of the seven-page...


JORDAN:

Page five. Imagine -- I'd like for you to tell us, not send us in some 37-page document on page five on a Friday afternoon for goodness sake.


KOSKINEN:

It's a seven-page -- it's a seven-page document.

JORDAN:

Seven-page document on page five. This is ridiculous, Mr. Chairman, that we did not know this when he first knew and that he almost knew everything on the 26th and wouldn't tell us -- you wouldn't tell us the computer crashed, wouldn't tell us we think we think we might have lost them all.

We're not quite sure. We're 99 percent sure. And you wouldn't tell us and then wait two months before he does. Ridiculous.

ISSA:

I thank the gentlemen.

JORDAN:

I...

ISSA:

For the record, Ways and Means Committee referred four criminal charges to Justice against Lois Lerner months ago.

Ms. Speier?

SPEIER:

Mr. Chairman, I implore you to enforce the rules of this committee. Rule 11, page four, ask that you control this committee, that we operate with decorum and professional ism and order.

Badgering witnesses is inappropriate and shameful for this committee to conduct itself in that manner. And I would implore you in the future to rely more heavily on this rule.

I would now like to ask unanimous consent...

ISSA:

Is the gentlelady making a motion?

SPEIER:

No, I'm just -- at this point, I just want us to get back to basics and to run this committee as it should be run with respect and decorum and badgering this Commissioner as virtually every member on the Republican side has done is shameful.

And it's got to stop. Or else, I'm telling you, one member here is going to walk out and not return.

(CROSSTALK)

JORDAN:

Mr. Chairman -- Mr. Chairman? Mr. Chairman?

ISSA:

It's the gentlelady's time.

SPEIER:

And I'm not yielding.

JORDAN:

Would the gentlelady yield?

SPEIER:

No, the gentlelady is not yielding.

JORDAN:

Gentlelady, please yield?

SPEIER:

I'm sorry, I didn't hear you.

JORDAN:

I said, would the gentlelady please yield?

SPEIER:

That was better.


JORDAN:

Thank you.


SPEIER:

But no.


SPEIER:

Mr. Chairman, I would like unanimous consent to put into the record the Democratic staff report of May 6, 2014, no evidence of White House involvement or political motivation in IRS screening of tax exempt applicants.


ISSA:

Absolutely, without objection, so ordered.


SPEIER:

All right, thank you.

Commissioner Koskinen, why you are serving our country at this point in time is beyond me. But thank you on behalf of all of us because you are a sterling (ph) example of what we do need in this country, in government. And that is someone who knows exactly what they're doing.

It's not going to be bully. And it's going to state the facts as they see them. Now, let us start from the very beginning in this timeline.

Based on the e-mails we have obtained, Ms. Lerner's hard drive crashed on June 13, 2011. Is that not so?


KOSKINEN:

Yes.

SPEIER:

All right, June 13, 2011, her first indication -- the first time she was informed by IRS employees in Cincinnati that they were using inappropriate search terms, did not happen until after her computer crashed, is that not true?

KOSKINEN:

That's correct.

SPEIER:

And what date was that?

KOSKINEN:

That's a week or two or thereafter...

(CROSSTALK)

SPEIER:

It was June 29, 2011. So June 13, it crashes. June 29, she is informed that they may be using inappropriate search terms. And the Congressional investigation and the inspector general's audit also did not start until after the computer crashed, is that correct?

KOSKINEN:

That's correct.

SPEIER:

So I just want to make sure I have this clear. Ms. Lerner's computer crashed before she was informed that the IRS employees in Cincinnati were using inappropriate search terms and before there was any Congressional or inspector general investigation.

KOSKINEN:

That's correct. And we also have e-mails from April 11 in 2011 forward because apparently, she archived materials on her hard drive but kept e-mails in her e-mail account, which did not go down with her hard drive.

SPEIER:

And all of my colleague to my left, who was talking about the system that exists now, when you archive in the IRS right now because you don't have the data ability because you don't have the $30 million invested. You actually have e-mails.

It has to be determined that an -- an e-mail is appropriate or unnecessary to be archived. And it has to be printed. Is that correct?

KOSKINEN:

That's correct.

SPEIER:

That's how archaic it is. All right, so let's move on to the hearing last Friday. Some of the Republican members there sprung a document on you that you had not reviewed beforehand.

They argued that Chairman Camp had sent a letter to the IRS on these exact issues 10 days before Ms. Lerner's computer crashed. And therefore, as Representative Roskam said, Chairman Camp sent a letter on this whole issue.

And then 10 days later, so think about the duration of 10 days. Ten days is the ability to panic within the IRS, reflect, plan, talk and execute.

And there was a crash 10 days after the Chairman's letter. Now, I have a copy of the Chairman's letter here. You probably had an opportunity to review it, June 3, 2011.

And as I understand it, the question that was asked by the Chairman of the Ways and Means Committee to the then commissioner was whether donations to a 501(c)(4) were taxable gifts and if a gift tax returns should be filed. So there already is law that says that says and asserts the applicability of gift taxes to 501(c)(4) donations.

And in his own letter, he says, it's unsettled area of tax law. But he further notes that it has been applied in some cases. Is that is not what the gist of that letter was all about?

KOSKINEN:

That is correct. It was about the application of the gift tax laws to (c)(4) organizations.

SPEIER:

All right. So the letter had nothing to do with the issue of 501(c)(4)'s inappropriate -- inappropriate terms being used to identify certain organizations?

KOSKINEN:

I did not mention inappropriate terms at all as far as I recall.

SPEIER:

All right, I yield back.

ISSA:

I thank the lady for yielding back.

We now go to the gentleman from Utah, Mr. Chaffetz.

CHAFFETZ:

Thank...

ISSA:

Would the gentleman -- hold off the time. I just -- I apologize, I'd like to ask unanimous consent so that's in with Ms. Speier, that the June 16, 2014 majority staff report be placed in the record. Without objection, so ordered.

It is titled "How Politics Led to the IRS to Target Conservative Tax-Exempt Applicants for Their Political Beliefs." I think it'll go well with the minority report.

Mr. Chaffetz?

SPEIER:

Mr. Chairman, can I...

ISSA:

This -- this is going to be some record. It is going to be some record.

Actually Commissioner, we looked at the -- the rule 11. And it turns out what was cited was the audio/video in proceedings. So we're going to have to figure out how that applies, too.

SPEIER:

Rule 11 pay (ph) for (ph), Mr. Chairman.

ISSA:

That's what we're looking at.

SPEIER:

Mr. Chairman, can I ask that this letter from the Chairman of Ways and Means to Doug Shulman be...

ISSA:

Of course, that'll be placed in the record.

Mr. Chaffetz is recognized.

CHAFFETZ:

Thank the Chairman. My understanding is that the backup of e-mails was the only -- only lasted for six months, that's correct?

KOSKINEN:

Yes, it's actually a disaster recovery system. And it backs up for six months in case the entire system goes down.

CHAFFETZ:

And that was in place in 2011?

KOSKINEN:

That was the rule in 2011 policy.

CHAFFETZ:

So when Lois Lerner figured out on 13 that her computer crashed, and you -- there have been e-mails showing that she was going to great lengths to try to get that recovered, why didn't they just go to that six-month tape?

KOSKINEN:

Because that six-month tape is a disaster recovery tape that has all of the e-mails on it. And it's a very complicated tape to actually extract e-mails for it.

But I have not seen any e-mails to explain why they didn't do it. So I -- it would be difficult but I don't know why...

CHAFFETZ:

But you said that the IRS was going to extraordinary lengths to give it to the -- to the recovery team, is that correct?

KOSKINEN:

Correct. That's correct.

CHAFFETZ:

But it's backed up on tape.

KOSKINEN:

For six months, yes.

CHAFFETZ:

And that was within the six-month window. So why didn't you get them off the backup?

KOSKINEN:

All I know about that is that the backup tapes are disaster recovery tapes that put everything in one lump in extracting individual e-mails out of that is very costly and difficult. And it was not the policy at the time.

CHAFFETZ:

Did anybody try?

KOSKINEN:

I have no idea of indication that they did.

CHAFFETZ:

So you have multiple e-mails showing that she was trying to recover this. It's the testimony of the IRS that they were trying desperately.

In fact, you got a forensic team to try to extract this. You went to great lengths. You made a big point over the last week about all of the efforts you're going through.

But they're backed up on tape. And you didn't do it?

KOSKINEN:

As far as I know, they did not. But they did, as I noted, the e-mails. She had three months' worth of e-mails at that time going from April -- two months from April.

CHAFFETZ:

That would have fortuitous with the six-month backup available.

And we need to explore this, Mr. Chairman.

Did I hear you right, in the answer to Mr. Lynch that when the Treasury Inspector General was doing their work, that they were unaware that her e-mail had crashed?

KOSKINEN:

This is last summer.

CHAFFETZ:

No, the -- the question that Mr. Lynch just asked here.

KOSKINEN:

Yes, he asked whether the inspector general, when they did their review of the determination process was aware that her e- mail had crashed. And I said, I do not think they were.

CHAFFETZ:

So the inspector general is trying to get to the bottom of this matter. And nobody informs them that her computer had crashed, and that her e-mails are lost?

KOSKINEN:

Nothing to my understanding, no. I'm not...

CHAFFETZ:

Were they withholding information from the inspector general?

KOSKINEN:

I wasn't there. I don't know what the inspector general has access to all e-mails. He has access to any records he would like.

And I have no indication that anybody did not provide him all of the records.

CHAFFETZ:

Did he -- did they ask for the Lois Lerner e-mail?

KOSKINEN:

I have no idea. I was not there then.

CHAFFETZ:

Do you think it's unreasonable for us to ask that question?

KOSKINEN:

I beg your pardon, you could ask the inspector general, that would be fine.


CHAFFETZ:

We -- we plan to. June 2, 2011, I'm glad you brought this up because Dave Camp did -- did ask on page two, the names, titles, divisions and/or offices of any and all individuals who were involved or contributed to the decision to investigate whether taxpayer contributions to 501(c)(4) organizations should be subject to gift rules. It goes on and talks about -- actually, before that, organizations were (ph) targeted (ph) an IRS audit based on the political activities of an organization, May 14 -- that was in 2011.

He's asking for all these e-mails. Why wasn't it brought to the attention of the committee that all her e-mails were not available back then?


KOSKINEN:

At that time?


CHAFFETZ:

Yes.


KOSKINEN:

I have no idea. I was not there at that time.


CHAFFETZ:

May 14, 2013 also asked for those e-mails. Didn't get a response. You have a -- you have a subpoena for the United States Congress.

And I recognize you personally weren't there. But I don't understand why the IRS wasn't diving into this to figure out -- this is August of 2013.

This committee issues a subpoena asking for her e-mails. It was known years before that some of her e-mails were gone, correct?


KOSKINEN:

Yes, obviously, people knew in 2011 that there had been a crash.

CHAFFETZ:

When you came in and testified on March 26, did you know or should you have reasonably known that you did not have all of her e-mail?

KOSKINEN:

I did not know.

CHAFFETZ:

Did you think you had all the e-mails?

KOSKINEN:

At that point, I had -- my understanding was that they were -- reviewing the entire process to find out where the e-mails might be. I had no idea whether we had more or less.

CHAFFETZ:

So you didn't know if we had them all?

KOSKINEN:

At that time.

CHAFFETZ:

At that time, March 26.

KOSKINEN:

All I knew was that they were investigating. And we were going to provide all the e-mails we had. And that's what we're in the process of doing.

CHAFFETZ:

But did you or did you not know that you had all the e-mail?

KOSKINEN:

I did not have any idea one way or the other.

CHAFFETZ:

Then why did you say...

KOSKINEN:

I said we can't find...

CHAFFETZ:

...we can't find...

KOSKINEN:

...Lois Lerner's e-mails. And we did find them. And we -- we're...

CHAFFETZ:

Did you find all? What percentage of them? Are we supposed to ask you what percentage? I mean, is that not clear when I asked you?

KOSKINEN:

At that point -- at that point, I would have told you we're going to give you 100 percent of the e-mails we have. And that's what we're going to do.

CHAFFETZ:

They know you're qualified -- you had reason to know for years. You had reason to know.

KOSKINEN:

I haven't been there for years. I've been there for five -- six months. CHAFFETZ: You had reason to know. This is a hot investigation. You had reason to know that there was a problem.

And you did nothing to indicate there was a problem, correct?

ISSA:

Gentleman's time has expired but you may answer.

KOSKINEN:

Pardon?

ISSA:

You may answer, yes.

KOSKINEN:

I did not indicate at that time because I did not know the nature of the problem. But you thought that there might be a problem.

ISSA:

Gentleman's time has -- has expired.

CHAFFETZ:

If the Chairman, if you will please answer that question. Did you or did you not think that it's a problem?

ISSA:

The gentleman's time has expired.

Commissioner, you may answer that last question.

KOSKINEN:

No, I have testified before that at that time, I did not know the nature of the problem. All I knew, there was a question being investigated.

ISSA:

I thank the gentleman. I apologize that time is up.

We now go to the gentlelady from Illinois, Ms. Duckworth.


DUCKWORTH:

Thank you, Mr. Chairman.

Mr. Commissioner, good to see you here. Thank you for coming on such short notice. You know, it's really amazing to me to read that IRS requires employees to print and file e-mails that they decide are relevant to the official record or that the IRS does not necessarily think that all e-mails are part of the official record that's relevant to the Federal Records Act.

E-mail is critical. And I really feel like it's absolutely unacceptable that a government agency with such a critical public mission cannot produce e-mail request during an investigation.

But what's troubling to me is that this is not an issue with just the IRS but is, in fact, government-wide. It's also not just with this administration.

I'm looking at a report, a GAO (ph) report from the -- that is entitled, "National Archives and Selected Agencies Need to Strengthen E-mail Management," dated June of 2008, that basically addresses the inadequate e-mail preservation procedures across government.

And Mr. Chairman, I'd like to ask unanimous consent that this report be inputted into the record.


ISSA:

Without objection, so ordered.


DUCKWORTH:

Thank you.

Mr. Commissioner, I'd like to hear what steps you've taken or plan to take to ensure better electronic records-keeping at the IRS going forward?


KOSKINEN:

Long before this arose (ph), I asked earlier this spring when I arrived, for us to take a look at what it would take to develop an e-mail system that was much easier to search. Right now, as I've noted, if you want to see anything from 90,000 employees, you've got to go to 90,000 hard drives.

I was told more recently that we had looked at creating, in effect, a broader -- a server that would allow us to preserve e-mails. And that's the $10 to $30 million cost. We are reviewing that.

We're also going to review whether we can move for the national records act from paper system to an electronic system. But that's part of the upgrade of the e-mail system.

DUCKWORTH:

Thank you. On June 17, the National Archives and Records Administration sent a letter to the Office of Records and Information Management at the IRS regarding the loss of Ms. Lerner's e-mails. Is that correct?

KOSKINEN:

That's my understanding. I have not seen the letter.

DUCKWORTH:

OK. So what they -- what they're required to do, the National Archives and Records Administration, is required to request a report of investigations from any agency that has an unauthorized disposal of federal records, is that correct?

KOSKINEN:

That's my understanding.

DUCKWORTH:

It turns out that these requests from the archives are commonplace among federal agencies. And according to the National Archives, they sent (ph) 92 similar requests to federal agencies during the Bush administration.

Were you aware of that?

KOSKINEN:

I was not.

DUCKWORTH:

You know, I -- I believe that the federal -- federal agencies should take this increase from the archives very seriously. Were you cooperative with their request for the IRS to further investigate this matter?

KOSKINEN:

We -- we'd delighted to do that. We'd cooperate with all investigations.

DUCKWORTH:

And what steps have -- has the IRS already taken to understand the circumstances around the loss of Ms. Lerner's documents?

KOSKINEN:

I've testified at some length that we've reviewed all of the e-mails of Ms. Lerner and all e-mails subject to the search terms of the custodians that we've been working with to reconstitute as many e-mails as possible. And we provided -- or we'll provide 24,000 of those e-mails.

DUCKWORTH:

So would it be accurate to say that when in April, when you found out that some of the e-mails had been lost, that your understanding was that the team (ph) was still going to try to recover as many of those e-mails that have been lost from her crashed hard drive, but that they would be located in other people's systems hard drives. For example, if she sent an e-mail from her to another IRS official, that you could probably recover that e-mail that was lost when her hard drive crashed because it's (ph) too (ph) existed somewhere else, is that correct?

KOSKINEN:

That's correct. If it was in the other e-mail of one of the 82 custodians and those were selected because they were the most -- they were the operatives working in the exempt organization area.

DUCKWORTH:

So in April when you found out that her hard drive had crashed and it was unlikely that you would be able to recover from the lost e-mails, the IRS and the appropriate people, technical people in IRS were



still trying to recover -- recover as many of those lost e-mails as possible in one of those 82 other repositories, correct?

KOSKINEN:

Correct. And we're also continuing to produce her e- mails post the crash, the 43,000 that we're committed to produce.

DUCKWORTH:

OK, thank you. The IRS previously proposed reallocating a hundred and $80 million in agency funds to sustain and replace its I.T. infrastructure. Is it fair to say that these long- standing financial and budgetary issues that contributed to the current records retention challenges at the IRS?

KOSKINEN:

It is true. It's our challenge of -- as I say, we're -- we're still moving people off Windows XP onto Windows 7.

DUCKWORTH:

Thank you. I'm almost out of time. I just want to thank you so much for your continuing public service.

I yield back, Mr. Chairman.

ISSA:

I thank the gentlelady.

We now go to the gentleman from Michigan, Mr. Walberg.

WALBERG:

I thank the Chairman.

And Mr. Koskinen, thank you for being here. You said several times that Lois Lerner was very concerned that her e-mails be found and was attempting to do above and beyond efforts to keep that, am -- am I correct?

KOSKINEN:

That's correct.

WALBERG:

You probably then could understand why there are some who might conjecture that Lerner, by the fifth, wrongly but by the fifth, because she felt her (ph) answer might incriminate her and that incrimination could possibly come from the information that were in those e-mails. Could you understand that?

KOSKINEN:

But I have no way of knowing what her concerns are as to what exposure she might have and...

WALBERG:

And -- and we never will, at least at this point, unless some of those e-mails can be found because it's interesting that that took place. Let me ask you, have you fired anybody on your staff that didn't give you enough information so that you would have made that statement more accurate for us about information contained in e-mails that you couldn't provide to us.

But now, we find out that people Knew that e-mails had been lost but didn't tell you.

KOSKINEN:

I have not fired anyone and no one in my staff that I'm aware of has committed any...

WALBERG:

Nobody's been fired for not giving adequate information...

(CROSSTALK)

KOSKINEN:

And there's no basis for firing (ph)...

WALBERG:

...answer -- answer accurately and correctly and fully the oversight committee of Congress?

KOSKINEN:

Yes, and in fact, the purpose of that hearing was to talk generally about the investigation. Great lengths of that hearing were spent about productions and responses to subpoena.

And the Chairman and I talked at length about that. The Lois Lerner e-mails were then ultimately agreed upon...

WALBERG:

Can you understand why there's anger out there about this situation?

KOSKINEN:

I can understand people's concerns about the fact that we do not have...

WALBERG:

All the information.

KOSKINEN:

...knowing whether we have all of her e-mails. I think we, as I say, last week, the White House and Treasury provided e-mails.

WALBERG:

And why it's so difficult for us to get to the bottom of it because there isn't much help coming. The President, himself, on May 15 said it's inexcusable and Americans are right to be angry about that.

And I'm angry about it. I will not tolerate this kind of behavior in any agency, especially in the IRS, given the power that it has and the reach that it has into all of our lives. And he said, I will do everything in my power to make sure nothing like this happens again by holding the responsible parties accountable.

Someone much more astute than I once said that the power and the ability or the power to tax is the power to destroy. We've seen that, Mr. Koskinen.

Before you came and took your position, we've seen people with first-amendment liberties being targeted by the IRS, the agency with the power to destroy and they attempted to do it. And now, we can't get answers completely.

Let me -- let me go on further here with something that you said to me back on March 26 in a hearing, where you had indicated that you were trying to get to the bottom of the controversy. And you said, Congressman, just to make you comfortable, and I don't know if we can have that up on the screen, just

to make you comfortable, if there is a problem that I don't know about, then that is my fault, because that means that I haven't created a culture where problems and issues get raised from frontline workers and go easily and freely to the tax.

Do you stand by your earlier statements to me on March 26?

KOSKINEN:

I do.

WALBERG:

Are these issues still not getting raised to the top or are you withholding them from us?

KOSKINEN:

These issues were raised. Over time, I've told you about that and we would produce the public record discussing all of those.

So I'm satisfied that in regard to this issue, the...

WALBERG:

How many -- how many hard drives fail annually at the IRS?

KOSKINEN:

I -- I noted that since January 1, 2,000 have failed this year alone. In your professional career, how many times had your hard drive failed?

KOSKINEN:

My hard drive failed once, the average...

WALBERG:

Once?

KOSKINEN:

...per hard drive failures is three to five percent. That would mean that with 90,000 employees, we would expect that we would have between two and five percent.

We'd have 15,000...

WALBERG:

Can it -- can it -- can it be really understood by our people then involved in this greatest investigation in the IRS' history that -- that all of these people -- several people, in fact, and especially the one at the center of this investigation has a mysterious experience of a hard drive crash on this information -- information that probably caused Lois Lerner to plead the fifth.

KOSKINEN:

I don't know if you can say probably or not, and I will tell you, it's not a mysterious crash, as you say. We've had 2,000...

WALBERG:

This is mysterious for the American people. They don't' understand it. They're angry. We need to get to the bottom of it.

And frankly, I think there is all sorts of verification (ph) going on, stonewalling. And I'm very disappointed in that.

I -- I yield back.

ISSA:

I thank the gentleman.

We now go to...

CHAFFETZ:

Mr. Chair -- Mr. Chair, can I ask unanimous consent to simply enter into the record the -- the op-ed forum that "Chicago Tribune" yesterday, more smoke at the IRS and not only from the hard drives.

ISSA:

Without objection, so ordered.

We now go to the gentleman from Nevada for five minutes.


HORSFORD:

This hearing has been quite an embarrassment. For over a year now, Republicans have alleged that the IRS was engaged in a conspiracy directed by or on behalf of the White House to target its political enemies.

But neither this committee nor the inspector general has identified any evidence to back up this allegation. The whole charade and Mr. Chairman, you say that we're not allowed to ask about the motives of other members, then how about asking about the motives of the hearing itself, the integrity of the hearing itself.

The fact that the Chairman has continued to conclude the outcome without allowing the information to be presented in an impartial and complete way so that the members can do our job as we are elected to do. And this is a serious committee that has serious responsibilities.

And I've said before that I want to get to the bottom of things that there was wrongdoing at the IRS and that we should fix it. But we can't fix when the House Republicans continue to establish unfair, unsubstantiated, and unfounded allegations against what we do have which are the facts.

So you may be entitled to your own opinion. But you're not entitled to your own facts.

Commissioner, have you, since you've been in this position, identified any evidence that IRS employees were part of a conspiracy to intentionally target the President's political enemies?


KOSKINEN:

I'm not aware of any evidence.


HORSFORD:

Thank you, much (ph) of (ph) it (ph). This is the same answer that we've received now from 41 other witnesses interviewed by this committee including senior officials at the IRS, the Treasury Department and the Department of Justice.

The senior group manager in Cincinnati told us that it was his employees who first came up with the inappropriate screening criteria in an attempt to treat similar cases consistently. Is that your understanding of how that process came about?


KOSKINEN:

That's my understand, although I would say I haven't done any independent investigation.

HORSFORD:

This employee told us that he is a conservative Republican. In fact, none of the 41 individuals told the committee that the White House directed, suggested or even knew about their conduct when it was going on.

The Inspector General Russell George told us the same thing, that he identified no evidence of White House involvement. He confirmed that IRS employees in Cincinnati and I quote, "developed and implemented inappropriate criteria," unquote.

Is that your understanding as well?

KOSKINEN:

That's my understand from what I've read in the newspapers and heard in hearings. I did not, myself, independently determined that.

HORSFORD:

When the inspector general testified before the Ways and Means on May 17, 2013, the inspector general was asked by Ranking Members Sandy Levin whether he had found any evidence of political motivation in the selection of the tax-exempt applicants.

In response, the inspector general answered, we did not, sir.

Commissioner, do you have any reason to doubt the inspector general's findings?

KOSKINEN:

I do not.

HORSFORD:

In addition to all of these findings, on June 18, 2014, the White House sent a letter to the -- to Ways and Means Chairman Dave Camp. This letter explained that the White House also searched its records and did not identify any e-mails between Ms. Lerner and any member of the executive office of the President, from January 2009 to 2011.

I ask unanimous consent to enter this letter from the White House dated June 18, 2014.

ISSA:

Without objection, so ordered.

HORSFORD:

Allegations that the White House directed or subliminally coerced the IRS target applicants for tax-exempt status are unfounded. And I hope that we put these reckless accusations to rest and finally began focusing on the facts.

I agree -- one statement that I agree with the other side about, the public is upset. Part of the reason they're upset is the behavior of the Chairman and this committee of how they have politicized this issue. When I look into my constituents...

ISSA:

The gentleman's time has expired.

HORSFORD:

...what they tell me, Mr. Chairman...

(CROSSTALK)

ISSA:

The gentleman's time has expired.

HORSFORD:

...is that they're sick and tired (inaudible) we are one nation and time for us to act like it.

ISSA:

I thank the gentleman. I now ask unanimous consent that the article dated February 4 of this year by Josh Hicks he placed in the record in which it shows that the bonuses paid to IRS employees in fiscal year 2012 were $89 million as opposed to $10 million it would take to maintain critical documents.

With that, we go to the gentleman from Arizona, Mr. Gosar.

GOSAR:

Thank you, Mr. Chairman. I appreciate the gentleman's comments fired to me. I really want to ask you, do you understand really the gravity of what America feels in regards to the IRS?

KOSKINEN:

Because I think if the question goes in the earlier one about people being upset about the IRS using inappropriate criteria, any indication that the IRS is anything other than apolitical are issues that are serious that we need to address and that I am committed to addressing.

GOSAR:

I love that. Are you aware that in the articles of impeachment of Richard Nixon, in articles two, item number one and let me quote this, "He has actingly (ph) personally and through his subordinates and agents, endeavored to obtain through the Internal Revenue Service in violation of the Constitutional rights of citizens confidential information contained in income tax returns for purposes not authorized by law and to cause, in violation of the Constitutional rights of citizens, income tax audits or other income tax investigations to be initiated or conducted in a discriminatory manner."

Are you aware of that?

KOSKINEN:

I do recall that from years ago.

GOSAR:

That's why it's serious, I mean, because this is, I mean, if -- if there's one thing I can tell you, that's the dark light on -- on our history. And we talked about missing data.

Once again, missing data with (ph) Richard Nixon tapes some similarities, once again getting information. So another investigation that we have here, it takes judicial watch to get information that was supposed to be given to this committee, yet not given to it (ph).

So you're aware of all this, right?

KOSKINEN:

I'm not aware of the judicial watch problem.

GOSAR:

You read the paper?


KOSKINEN:

I do read the newspaper, yes.


GOSAR:

Then you should aware of it because that's how we came about in regards to Benghazi and on the select committee. That was the -- the kicker because we didn't have that information until we had judicial watch get it for us.

So let's go back to the mindset here because I'm -- I'm a dentist than first being (ph) being a politician and you are an attorney, right?


KOSKINEN:

I'm an attorney but I gave up practice years ago.


GOSAR:

Well, but you know, the fundamentals never leave you, right?


KOSKINEN:

I would -- would hope so.


GOSAR:

And -- and you're also a businessman?


KOSKINEN:

Yes, I spent 20 years in the private sector.


GOSAR:

So when we have a problem and you -- you came into this -- this -- this forest fire, I'm going to call it, you had your eyes wide open, right?

KOSKINEN:

Yes.

GOSAR:

Because you knew you were going to have lots of scrutiny?

KOSKINEN:

Yes, I understood that this was a high-profile challenge.

GOSAR:

So you'd really want to got your Is and cross your Ts, right?

KOSKINEN:

I'm -- yes.

GOSAR:

Dot your Is and cross your Ts.

KOSKINEN:

That's always actually been my approach to everything I've done in 45 years.

GOSAR:

So in -- in a big problem, you've also said you have 90,000 employees, right?

KOSKINEN:

Correct.

GOSAR:

So obviously, you divide and -- and conquer the problem, right?

KOSKINEN:

I'm not sure I'd approach it quite that way.

GOSAR:

So what -- what you do is -- is you have people that you trust formulate battle plans in a consensus aperture and then you hold them accountable, right?

KOSKINEN:

Actually, I spend a lot of time going to the 25 largest offices, talking to 10,000 IRS employees, primarily frontline workers to hear from them as well.

GOSAR:

So -- so let me ask you a question coming into this. Were you bothered by Lois Lerner's conduct?

KOSKINEN:

No.

GOSAR:

I mean, you had to know about it. Here's a lady that seeds (ph) a question in an audience. That's kind of odd, wouldn't you say?

KOSKINEN:

It's not the normal way people would behave. I would think that's right (ph).

GOSAR:

Well, once again, you know, we're talking about the IRS. And we're seeding a question out there. That's really kind of odd.

And what was your comment? What did you take for her comments sitting here, where you sat and taking the fifth but not really taking the fifth? What did you think about that?

Was that kind of odd?


KOSKINEN:

I didn't have any thought. She's got her own lawyers. I don't know her.


GOSAR:

Is that -- well, let me ask you this as an attorney. Is that typically how the fifth amendment is -- is taken?


KOSKINEN:

I'm not aware of fifth amendment practices whether that's the way it's done or not.


GOSAR:

Have you seen anybody else take the -- the fifth that way?


KOSKINEN:

Actually, I don't think I've ever seen anybody else take the fifth.


GOSAR:

Well, that's kind of a nice scapegoat because that's really odd. I mean, I'm just a dentist. And I've seen a number of people take the fifth.

And I've never seen anybody take the fifth like that. And that's pretty contentious. In fact, my good friend over here, Trey Gowdy had a problem with the way she took the fifth.

And I trust, though, his interpretation of the fifth pretty well. But it seems to me that if you were -- if you had this management style, you would know exactly the -- the precipitant person who told you about the problem with the -- the hard drive.


KOSKINEN:

There are at least five different people who will report to me about this situation. We have a major effort going on.


GOSAR:

Oh, but once again, it seems that if they're reporting to you, you're asking them a question and holding them responsible, right? So you should know.

Do you all have the same task?

KOSKINEN:

There are -- there are four or five people who are actually involved regularly in this -- this production effort. I get information from several different people.

GOSAR:

Oh, my time has expired. I've run out of time. I yield back.

ISSA:

I thank the gentleman.

We now go to the gentleman from Tennessee, Mr. DesJarlais.

DESJARLAIS:

Thank you, Mr. -- thank you, Mr. Chairman.

Thank you, Mr. Koskinen, for appearing for us today. I know it's getting late and there's been a lot of repetition. But let's talk a little bit about revenues again.

We had a discussion earlier about the -- the problem with backing up e-mails in the IRS. And it was because why?

KOSKINEN:

Problems because basically, the server -- IRS servers can only hold so much data.

DESJARLAIS:

OK. And the reason they haven't been upgraded?

KOSKINEN:

Because I understand the cost.

DESJARLAIS:

OK. And you had a number earlier that it would take to upgrade those systems.

KOSKINEN:

To actually turn it into an electronic system where the broader server would be somewhere between $10 and $30 million depending on, you know...

DESJARLAIS:

All right.

KOSKINEN:

...software and what you wanted to do with it.

DESJARLAIS:

Now, the Chairman mentioned earlier how many bonuses were given by the IRS to its employees in 2012. Did you know what that number was?

KOSKINEN:

I did not until I heard the Chairman say it. So $89 million were given in bonuses to employees in the IRS, just in 2012 alone.

You've talked about how the IRS has been underfunded now for at least four years. If you want to extrapolate that math, I would say that we probably could have upgraded the equipment.

So the IRS could do a better job. Would you agree?

KOSKINEN:

There are 90,000 employees. So at $89 million, it's less than a thousand dollars or about a thousand dollars am employee...

(CROSSTALK)

DESJARLAIS:

Did you know that the IRS...

KOSKINEN:

We -- we could fund a lot if we didn't any bonuses, we gave no pay raises, actually continue to shrink the organization, we'll have more money. That's not exactly what you would design is the best way to organize the agency.

DESJARLAIS:

Did you know that a million dollars in bonuses were given to IRS employees with (ph) back taxes?

KOSKINEN:

That issue has come up more recently. And we actually have a program. And we're negotiating an agreement with the union because we have a commitment that every IRS employee will be current in their taxes.

And even if you're three or five days late, you get a letter of admonishment.

DESJARLAIS:

You probably wouldn't do that for the rest of America, though, would you?

KOSKINEN:

Well, to hold (ph) everybody to paying their taxes on time?

DESJARLAIS:

The same standards as yours?

KOSKINEN:

Pardon?

DESJARLAIS:

The same standards as yours, you would give bonuses to people for not paying taxes?

KOSKINEN:

As we go forward, anyone who willfully doesn't comply with...

(CROSSTALK)

DESJARLAIS:

Are going (ph) forward (ph). All right, OK.

KOSKINEN:

Won't -- won't get a -- won't get a bonus. And we've negotiated that with the union.

DESJARLAIS:

OK. I don't think that necessarily sets well that that's fine. Do you think that the IRS improperly targeted conservative groups?

KOSKINEN:

My understanding is what I know and I support the I.G.'s report that said, an this report improper criteria were used. The issue has been whether that then turns into targeting or not they earlier referenced to the "Washington Post."

But the report itself -- itself says improper criteria were used. And we have taken all at the I.G.'s recommendations, accepted them and are implementing them.

So our goal is for this not to happen again.

DESJARLAIS:

During the -- the hearing in March, you testified that you never referred to the IRS' targeting. The "Washington Post" found that this statement was also not true.

Do you want to revise that statement?

KOSKINEN:

I don't know. They find an occasion once in the past where I had used the word targeting once. And they also noted that the I.G. had himself used the word targeting.

And my point was the I.G. report says the improper criteria. But once I did use the word targeting, I have now mentioned it in -- in this criteria again. But again, the I.G.'s report was improper criteria.

Either way, my point very strongly has been from the start. The American public deserves to feel that there will not be improper criteria used, that people will not be selected by any means other than...

(CROSSTALK)

DESJARLAIS:

Were you ever coached on how to say that? Did anyone ever coach you to say -- say it that way as opposed to targeting? Does it sound more palatable?

KOSKINEN:

No...

(CROSSTALK)

DESJARLAIS:

No one -- no one ever coached you?

KOSKINEN:

No, that's what the I.G. report says.

DESJARLAIS:

So no one at all ever told not to call the IRS conduct targeting.

KOSKINEN:

Nobody tells me what to say. I actually am responsible for what I say. People talk about a lot of different things.

The I.G. report said inappropriate criteria were used. That's why I referred to in that hearing.

DESJARLAIS:

So you're the kind of guy that believes leadership starts at the top?

KOSKINEN:

I believe it starts at the top and I believe that the leader is held accountable for what happens in his agency.

DESJARLAIS:

So the IRS acted inappropriately. We can't get to the bottom of this. We have lost e-mails. Do you think it's time that we ask for a select committee or special prosecutor?

KOSKINEN:

No.

DESJARLAIS:

You wouldn't? Why not?

KOSKINEN:

There are six -- now, seven investigations going on. My position has been that once we get somebody to write a report and particularly, in this case, where the I.G completes his review and issues a report on this very issue, we can all then decide what the appropriate next step is, to have yet another investigation start especially while the I.G. is going forward seems to me a waste of money...

(CROSSTALK)

DESJARLAIS:

Well, you're the face of the IRS right now. And right now, that face doesn't look too good. Don't you think it would be better to clean the image of the IRS for the people who are sitting and watching this hearing tonight?

KOSKINEN:

We'll clean the image of the IRS when we hear from the inspector general and see whether he finds that there was any malfeasance at all.

DESJARLAIS:

Yes, OK, well, my time has expired. And I think that we owe the people a little better than what we're seeing here.

ISSA:

I thank the gentleman.

We now go to the gentleman from South Carolina, Mr. Gowdy.

GOWDY:

Thank you, Mr. Chairman.

Commissioner, you're an attorney. Can you explain for our fellow citizens what the phrase foliation of evidence means?

KOSKINEN:

I have no idea what that means.

GOWDY:

Well, I will help you with it, OK? Foliation of evidence is when a Party fails to preserve evidence. There is a negative inference that the jury can draw from their failure to preserve the evidence.

Are you with me? If you destroy documents, the jury can infer that those documents weren't going to be good for you. If you fail to keep documents, the jury can infer that those documents were not going to be good for you.

You've heard the phrase foliation of evidence, haven't you?

KOSKINEN:

I can't recall every hearing.

GOWDY:

It's true the administrative hearings, civil hearings, criminal hearings?

KOSKINEN:

I practiced law once 45 years ago, gave it up for lent (ph) for one year and never went back.

GOWDY:

All right. Well, let me tell you what you would have found if you had stuck with it. When a party has a duty to preserve evidence or records, and they fail to do so, there is a negative inference that is drawn from their failure to preserve the evidence.

It's common sense, right? If you destroyed something, the jury has a right to infer that whatever you destroyed would not have been good for you. Or else, every litigate would destroy whatever evidence was detrimental to them, agreed?

KOSKINEN:

I'm not sure. I think if you destroy the evidence and people can prove it, it wouldn't be a good thing for your defense.

GOWDY:

Well, no, it's worse than that. The jury can draw and they're instructed -- they can draw a negative inference.

KOSKINEN:

All right.

GOWDY:

And that's true if a taxpayer is being sued by the IRS administratively, civilly or prosecuted criminally and they fail to keep documents, the jury can draw a negative inference from the fact that they didn't keep receipts or e-mails or documents. So if it's true and it applies to a taxpayer, it ought to apply to the IRS as well, agreed?

KOSKINEN:

Is this a trial? Is this a jury? Is that what you're...

GOWDY:

I'll say the administrative, civil or criminal, if you want to -- if want to go down that road, I'm happy to go down there with you because, in fact, I'm glad you mentioned it.

You have already said multiple times today that there was no evidence that you found of any criminal wrongdoing. I want -- I want you to tell me what criminal statutes you've evaluated.

KOSKINEN:

I have not looked at any.

GOWDY:

Well, then how can you possibly tell our fellow citizens that there's no criminal wrongdoing if you don't even know what statutes to look at.

KOSKINEN:

Because I've seen no evidence that anyone consciously...

(CROSSTALK)

GOWDY:

Well, how would you know what elements of the crime existed? You don't even know what statutes are applied? I will ask you again.

KOSKINEN:

I think...

GOWDY:

What statutes have you evaluated?

KOSKINEN:

...I think you can rely on common sense that nothing I have seen...

(CROSSTALK)

GOWDY:

Common sense, instead of the criminal code, you want to rely on common sense? No, Mr. -- you can shake your head all you want to, Commissioner.

You have said today tht there's evidence of criminal wrongdoing. And I'm asking you what criminal statutes you have reviewed to reach that conclusion.

KOSKINEN:

I reviewed no criminal statute.

GOWDY:

All right, so you don't have any idea whether there is any criminal conduct or not because you don't know the elements of the offense.

KOSKINEN:

I've seen no evidence of wrongdoing.

GOWDY:

Well, that's very different than no evidence of criminal misconduct, Commissioner.

KOSKINEN:

It seems to me, if you haven't done wrongdoing, it'd be pretty hard to argue that you've had some criminal violation if you...

GOWDY:

Well, what did Lois Lerner mean when she said perhaps the FEC will save the day?

KOSKINEN:

I have no idea.

GOWDY:

What did she say when -- what did she mean when she said we need a project. But we need to be careful that it doesn't appear to be per se political?

You don't think that was a potential violation of 18242?

KOSKINEN:

I have no idea...

(CROSSTALK)

GOWDY:

Because you haven't looked at 18242. And you don't have any idea, Commissioner, you don't have any idea whether there's any criminal wrongdoing or not.

KOSKINEN:

With regard to the production of the evidence, the production of Lois Lerner e-mails, I have seen no evidence of wrongdoing. What else...

(CROSSTALK)

GOWDY:

Well, if there were, that would be a separate criminal offense.

KOSKINEN:

What else -- what else went on with Lois Lerner, I said in the past...

GOWDY:

So what you're saying is you don't have any idea whether she engaged in criminal wrongdoing. You're just saying that you did not engage in any with respect to the e-mails?

KOSKINEN:

I haven't seen any wrongdoing with regard to the production of Lois Lerner's e-mails.

GOWDY:

But you are not saying there was no criminal wrongdoing with respect to the targeting of conservative groups. I want to be very clear. You're not saying that.


KOSKINEN:

I have made no judgments.


GOWDY:

So you disagree with the President when he says there's not a smidgen of corruption? KOSKINEN: There are people who have been making judgments both sides of the aisle (ph), whether there were...


GOWDY:

And you know what, I'm not one of those. I'm just simply saying we will never know because you didn't keep the evidence. The evidence was foliated.

And whether it's negligent, whether it's intentional, whether it's reckless, we still don't have the evidence, Commissioner.


KOSKINEN:

Well, you have the evidence that there is no e-mails from the White House. You have all of the Treasury e-mails. So the basic premise that this was an argument in a conspiracy driven by the White House does not...

(CROSSTALK)


GOWDY:

No, sir, you're wrong about that. You're wrong about that that you're repeating a talking point from our colleagues on the other side that we're obsessed with the White House.

It was Jay Carney who perpetuated the myth that it was two rogue agents in Ohio. It wasn't any of us. Was that accurate?

Was that first initial line of defense that these are just two rogue agents in Ohio, was that accurate, Commissioner?

KOSKINEN:

Not that I know of.

GOWDY:

All right. So that wasn't accurate. And that came from the White House. Who said there's not a smidgen of corruption?

Who said that, Commissioner?

KOSKINEN:

My understanding is that was the President.

GOWDY:

It was the President. So that's Jay Carney and the President both inserting themselves into the IRS scandal. And you want to blame us for -- for...

KOSKINEN:

I haven't...

GOWDY:

...bringing the White House into it?

KOSKINEN:

...I haven't blamed you at all.

GOWDY:

You just did, Commissioner. You just did.

KOSKINEN:

Well, it's a good argument. All I said was the White House has revealed there were no Lois Lerner e-mails. Treasury has given you all of their e-mails.

So to the extent that the argument was that Lois Lerner was conspiring and e-mailing back and forth thus far, I haven't seen any...

(CROSSTALK)

GOWDY:

Well, you can be engaged in the conspiracy that doesn't include the White House.

ISSA:

Gentleman, time is up. Right. Thank you, sir. Well, I was (ph) one (ph) to -(ph) let him go but the guy was (ph) tied (ph) at (ph) the desk, kept grabbing me.

The gentleman from Texas is recognized.

FARENTHOLD:

Thank you very much, Mr. Commissioner. And there's a lot of passion on this especially on my side of the aisle. I was at home this weekend.

And it's all anybody was talking about. The American people don't believe for a second that this stuff was lost accidentally. My cringe (ph) line (ph), a friend of mine used to work at my computer consulting company, still in the business, e-mailed me, "Blake, there's no way this could happen.

You -- you've got to do something about it." And that's -- that's the frustration that I'm getting from the American people.

And if we came back to you and said, oh, I don't have the resources to save all the records to comply with the IRS tax law, you -- we wouldn't -- I wouldn't go (ph) -- wouldn't let me escape. So I don't think you guys ought to be able to escape on the resource issues.

And I'll get back to that in a second. You -- in the Clinton administration, You worked in the OMB, didn't you and part of your job was to oversee the Executive Branch recordkeeping and these Federal Records Act type requirements, did you not do that?

KOSKINEN:

That was actually done by the Office of Information and Regulatory Affairs.

FARENTHOLD:

But you -- you were -- were you involved in that when you were with the Clinton administration?

KOSKINEN:

I was not involved personally. But it was under -- I was the Deputy Director for Management.

FARENTHOLD:

Like I said, are you familiar with the Federal Records Act?

KOSKINEN:

I am familiar with the Federal Records Act.

FARENTHOLD:

It says the head of each federal agency shall make and preserve record containing adequate proper documentation of the organization's functions, policies, decisions, procedures and essential transactions of the agencies and goes all along those lines. Your IRS manual says the way you all do that is to print out the e- mails...

KOSKINEN:

Official records -- any official record...

(CROSSTALK)

FARENTHOLD:

Anything that's official record. Who decides what's an official record?

KOSKINEN:

The employees are provided background information. And then they make a judgment as to whether it's an official record or not.

FARENTHOLD:

Right. And so if you're doing something that you might believe is questionable, you might lean towards not deciding that...

KOSKINEN:

It's possible. Well, we've trained over 2,000 information resource coordinators across the agency to continue to oversee and encourage and make sure that they would comply.

FARENTHOLD:

All right. So in -- in responses to some earlier questions, you indicated in going through Lois Lerner's e-mails that you used searched terms, is that correct?

KOSKINEN:

That there were search terms were used for all of the searches...

(CROSSTALK)

FARENTHOLD:

All right, so how do you use search terms on the hardcopy e-mails if she would have been required to print out from that lost hard drive? Did somebody gone through all of her files and the files of people she routinely corresponded with to search those hardcopy records?

KOSKINEN:

Yes.

FARENTHOLD:

All right. Don't you think it would have been easier and save some money if you'd have that in electronic form?

KOSKINEN:

No doubt.

FARENTHOLD:

All right, let me -- you -- you -- we heard from the other side that there's an issue with respect to the resources there now. All right, I did this on my cell phone and let me find my notes here because you've got to -- you, guys, got a lot of people good at math at the IRS.

So I'm going to assume you guys could figure this out, all right? So let's say, your -- your procedure is to print the records out. All right, so I went on to -- did a Google search, say, all right, what's the average size of a -- of a Word document.

And they said, well, you could get 64,782 Word documents of about nine pages per gigabyte. A terabyte is a thousand gigabytes. So that's 64.8 million documents, all right?

Now, I went on Amazon and saw I could buy a terabyte hard drive for $59 -- about $59. Buy two of them so, you know, hundred and 20 bucks. Statistics in the industry average cost to print a page of documents, that's about five to eight cents when you include paper and toner and wear and tear on the printer.

So if you do that math and multiply it out, it looks to me like for every terabyte of storage you added to the e-mail, you'd save $21 million in printing fees, not to mention the greenest of it.

How come some of the mathematicians at the IRS didn't realize, hey, we've got -- all right, let's -- let's say you've got to buy a computer and hook it up, all right, so let's spend five grand on a -- on a backup system for our e-mail and save $21 million. That's...

KOSKINEN:

We have $90,000 employees. You get one of those for each employee.

FARENTHOLD:

Well, each employee is not going to have millions of pages of e-mails and documents. You could do it on a system-wide basis.

KOSKINEN:

Not on our system you can't.

FARENTHOLD:

It's not -- it's not stored on exchange server? Can't you get a Barracuda backup that you see advertised on TV that captures all the e-mail?

KOSKINEN:

That's right (ph). That's one of the things that we -- when we looked at it, I'm told the estimate was $10 to $30 million to create a server that would hold all of that.

FARENTHOLD:

All right, $10 million, $21 million to print. You've already saved $10 million.

KOSKINEN:

If we're printing $21 million worth of stuff, probably.

FARENTHOLD:

Well, if your -- you'd be -- no question you're complying with the Federal Records Act because you're saving everything. You're not -- wouldn't be relying on the judgment.

So this lack of resources thing doesn't fly. I'm sorry. I ran out of time. I had some other questions but I will yield back.

ISSA:

Thank the gentleman.

Gentleman from Kentucky is recognized.

Thank you, Mr. Chairman.

Mr. Chaffetz says, why the six-month backup wasn't applied to Lois Lerner's e-mails. You -- you suspected that it was too much effort. Do you have any e-mails to indicate there was a discussion about going to the backups to try and get hers?

KOSKINEN:

There's nothing that I know of.

MASSIE:

Have you looked for any...

KOSKINEN:

I'm not...

MASSIE:

...to see -- to see what the I.T. staff, what sort of effort. You mentioned they made an effort to retrieve the hard drive. But what about the software from (ph) the (ph) servers?

KOSKINEN:

They actually, as far as I understand, her e-mail was in her -- from April on, she... MASSIE: Right, that there was some on the servers...

KOSKINEN:

...she had that e-mail. They then were focused primarily on the hard drive which is where she had archived her e- mails.

MASSIE:

Right. Well, that hard drive's, you're saying it's gone. And I'll, you know, I'll accept that it's gone. But what about the software banks (ph)?

There's -- you don't see any evidence of an e-mail trail where the I.T. department was trying to go to the servers to get those e- mails?

KOSKINEN:

No, they went to -- they had on the server e-mails from April forward. In terms of whether they went -- actually went to the back...

(CROSSTALK)

MASSIE:

I understand that. I mean -- I mean...

(CROSSTALK)

KOSKINEN:

Yes, I haven't seen anything about the backup tapes.

MASSIE:

Her hard drive crashed in June of 2011. I assume...

KOSKINEN:

I'm sorry, June -- in June 11, we have e-mails from April of 2011.

MASSIE:

OK. All right, I'm onto another question. Did -- was that hard drive replaced?

KOSKINEN:

Yes.

MASSIE:

Are you in possession of that hard drive?

KOSKINEN:

The inspector general has it.

MASSIE:

So could we look at that hard drive to see if she was in the habit of deleting e-mails?

KOSKINEN:

You're welcome to ask the inspector general for it. He's...

MASSIE:

But I mean, wouldn't it be possible because you're collecting e-mails from her associate. So you know which e-mail she sent and retrieved.

Did it occur to you to look on her hard drive to see if she purposefully deleted any?

KOSKINEN:

No, we haven't looked at that. But we do have, as I say, we've produced all of these e-mails. It'd be possible to take a look at that.

MASSIE:

So next question. You said there's about a three to five percent chance that a hard drive will fail. That's in a year. You testified at that last week and also tonight, right?

KOSKINEN:

That's right. That's why my advice is the industry standard?

MASSIE:

So that's about a one in 30 chance if it were there percent. But -- but see, the Chairman Camp sent a letter to the IRS demanding the IRS explain allegations of targeting tea party and other groups. And her hard drive failed within 10 days.

Just doing a little math here. The probability of that failing in 10 days instead of a year is actually one in a thousand.

KOSKINEN:

Well, that's not the way -- that's not the way probability works.

MASSIE:

I understand.

KOSKINEN:

Everyday...

MASSIE:

A lot of bad things could've happened. So maybe it was one in a hundred or one in 10 that something bad happened.

KOSKINEN:

The way probability works is the same probability everyday. It's like when you flip a coin...

MASSIE:

Yes, but...

KOSKINEN:

...you can have head 10 times in a row...

MASSIE:

You can tell me how probability works. I took the class at MIT. It's about one in a thousand that it would fail within the 10 days that she received that letter.

KOSKINEN:

We must -- we must have taken a different probability class.

MASSIE:

I think so. So can you tell me the timing of the other hard drives that failed that were her associates? Were there any that failed in that same time period or near that?

KOSKINEN:

I don't know. But we've...

MASSIE:

Can you let us know?

KOSKINEN:

...I haven't -- I don't know what the list looks like.

MASSIE:

Because if -- if another one failed one of her associates within that same 10 days, that means it's a one in a million probability that two hard drives failed with somebody dealing with this case in that 10-day window if there's a three percent annual probability?

KOSKINEN:

As I've said, we're investigating that. We'll provide -- we'll provide you a full report including the names and hard drives when they failed and whether e-mails were lost as a result of the failure.

MASSIE:

Correct. And notice, I'm not questioning your integrity...

KOSKINEN:

I appreciate that.

MASSIE:

We're talking about numbers here.

KOSKINEN:

Right.

MASSIE:

I do -- I do, though, sort of question your judgment of a little bit about not sharing this bad information with us. You had some suspicion in February and then in March that maybe all the e- mails might not be retrievable.

There's a saying the bad news never gets better with age, never improves with age. And what I -- what I want to ask you now is are there any other anomalies in the data or in the retrieval of e-mails that you can think of now so we can avoid having a second hearing on this in six months?

KOSKINEN:

That's a -- that's a fair question and a good question. I'm not aware of any.

MASSIE:

OK, so there's nothing like...

(CROSSTALK)

KOSKINEN:

Other -- other than we're pursuing the other custodians.

MASSIE:

Right, the other eight hard drives that have failed.

KOSKINEN:

Right. That's what we knew last week. We're still looking. And I don't know what the final number will be.

MASSIE:

OK. So you understand my question.

KOSKINEN:

I understand your question.

MASSIE:

In (ph) terms (ph) of bad news that with similar to the bad news you had in February, I'm asking you to share it now.

KOSKINEN:

That's right. And I've said, I do not know of any other bad news as you put it.

MASSIE:

OK. One final question. If we had a flat tax or a fair tax, would we be here today?

KOSKINEN:

No, I'm a big supporter of tax simplification. I support Chairman Camp's attempt to move that dialogue forward provided (ph) just be as helpful as I can.

MASSIE:

I do, too. Thank you very much.

ISSA:

Gentleman from Kentucky with several patents and a degree from MIT in engineering made some great points.

We will now go to the gentleman from Georgia.

COLLINS:

Thank you, Mr. Chairman. I appreciate that I am not a student of MIT. I have three degrees ranging from a bachelor's degree to a theology degree to a law degree. And this has been an amazing story to sit here in front just a few weeks ago relative timeframe.

And I asked you, you know, interested (ph) without any definition, it (ph) was (ph) right (ph) all of it. I'm just saying you agreed to. But when you just take a step back, this has just got to be -- I have a 15-year-old that I love dearly.

He's different than my other two children because my 15-year-old has an active imagination. His active imagination can lead you on some pretty amazing trips. And let's just think about this for just a moment.

You have an agency supposedly in Cincinnati that decides on its own just to -- just to say we're going to start looking into certain files. By the way, then we don't tell Washington.

We don't let anybody else know although pretty well set (ph) back (ph) that that was probably not accordance to good policy. When the chairman of our -- one of our committees makes an inquiry concerning this kind of information, a hard drive fails.

Two weeks later, all of a sudden, then Cincinnati decides to tell that we have an issue. We move forward in this progression. And -- and we -- we have seen the fifth taken.

We've had evidence come here when you say we're going to have, you know, all of the evidence, all the facts that's in it. And again, it's still sort of hard to believe that even -- it should have at least come up, I'll produce all that I have.

Oh, by the way, we've got a problem. It also seems hard to believe as you go through this whole story that when the inspector general was going through this whole thing, nobody seems to have told him, oh, by the way, we're missing some e-mails.

It -- it, according to...

KOSKINEN:

That's right. But nobody that I know knew that it was dealing with the inspector general there were missing e-mails.

COLLINS:

But we're investigating. But at that time, it was investigating this whole thing which Ms. Lerner was a big part of.

KOSKINEN:

Correct.

COLLINS:

OK. So again, I guess as I go back to my -- my 15- year-old here, at a certain point in time, I have to just look at him and I have to say, Cameron, at a certain point in time, the load you're caring in the bull, in the back of the truck don't add up anymore. And nobody believes it.

It's a bad position for you. I hate to be in your position. You've had an extensive life of great service to this country. But what is really troubling and for the people in my district of Georgia whether you figure probabilities or not, they have a pretty good meter.

And the meter right now both really -- both Democrats that I know and Republicans I know has just gotten full. They -- this story is just becoming more implausible as it goes.

It crashes at a certain time. We can't find it a certain time. No one was told about it at a certain time. I'm going to take you seriously that you really take responsibility for your job at the IRS, is that correct?

KOSKINEN:

Yes.

COLLINS:

And you take responsibility for custodians of the records because you're the man at the top as you've said before?

KOSKINEN:

Correct.

COLLINS:

OK. Then did you notify the archivist when you learned of the destruction of Ms. Lerner's e-mails early this year?

KOSKINEN:

It was not a destruction of her e-mails.

COLLINS:

Or loss of.

KOSKINEN:

And the loss of e-mails. I did not.

COLLINS:

OK. And that is supposed to be because now, let me ask you this. In Ms. Lerner's e-mails, did you find out that we may not be able to obtain -- you've talked about this before -- some things are supposed to be kept, some things are not supposed to be kept.

If you knew that there were some e-mails, you might not could have found there probably or possibly could have been e-mails. And they should have been kept under the Records Act, correct?

KOSKINEN:

If there were e-mails to be kept under the records at, they would have been printed out. The responsibility is if you have an e-mail that's a record, you print it out in hard copy.

It's an archaic system. But that's the...


COLLINS:

But you can't say -- especially, if there was a possibility of something not right, you can't have -- you cannot sit here and say, that Ms. Lerner would have kept or print it all of the e-mails she would not have wanted to kept, correct?

If you can, you know, there's a whole lot of questions, a whole lot of people we're (ph) going (ph) to (ph) come (ph) back (ph) for (ph).


KOSKINEN:

No, no, my understanding is the -- every employee is supposed to print records of -- that are official records on hard copy and keep them. She had hard-copy records.

I don't know whether anything that was lost was an official record or not.


COLLINS:

So it would be a matter of then just caution or prudence, that you should have probably told archive (ph) assist (ph)?


KOSKINEN:

No, I'm supposed to tell the archives if there's been a destruction of records...


COLLINS:

If, well, a hard drive destroyed, would that not classify as destruction or are we back parsing terms again?


KOSKINEN:

Now, this is -- I heard you. Their archives for record purposes are hard copies printed out of record...


CUMMINGS:

That you know of.

KOSKINEN:

...that's -- I don't know what she knows. That's what she was supposed to do.

COLLINS:

But again -- but again, I'm not taking it all on (ph) you. What you know of -- but in a set (ph) where you've lost it and has since been destroyed, no way to go back and find the hard drive is destroyed.

Only what was printed was left. There is no way for you to tell if you should or should not have told archives, correct? So in prudence, you should have told the archives, would that not be true?

KOSKINEN:

I could do that, yes.

COLLINS:

OK. Mr. Koskinen, again, this is a long story. The people are just looking for the truth. And there are a lot of problems with parents and non-parents and grandparents out there who trailed (ph) the story this long together (ph).

And they just don't understand. They don't get it because they don't get the same -- they can come to a story at the IRS. And IRS would just basically say, we don't want the story.

We don't care how much you're broke. We don't care how much you couldn't afford to keep it. We just want the records that you're supposed to provide.

KOSKINEN:

Right.

COLLINS:

It's (ph) a sad trail down a wrong road. Mr. Koskinen, your service has been good. Unfortunately, you're running into a dead end. And the American people are tired of it.

Mr. Chairman, I yield back.

ISSA:

The gentleman yields back.

We now go to the gentleman, Mr. Massie.

CUMMINGS (ph): We've had him already.

ISSA:

You've already gone?

MASSIE:

Yes.

ISSA:

Thank you, my order here.

MASSIE (ph): It's an interesting conversation. But we're done.

ISSA:

Well, you may stay again, you never know. We now go to Mr. Meadows.

MEADOWS:

Thank you, Mr. Chairman.

And thank you for your patience. So let me -- let me follow up on Mr. Collins' line of questioning. Federal Records Act requires e- mails to be part of the record to be printed out, is that correct?

KOSKINEN:

Yes, if -- if the e-mail is a record, it should be printed out in hard copy as the IRS policy.

MEADOWS:

So what is your definition of a record?

KOSKINEN:

The record is the act provides, any record of agency actions or policies. If you're just sending e-mails, conversing back and forth, those aren't records.

MEADOWS:

Conversing back and forth with regards to what? Because that's not what your manual says.

KOSKINEN:

Pardon?

MEADOWS:

That's not what your manual says.

KOSKINEN:

Manual says any record of agency actions, policies or anything that would reveal important agency policies.

MEADOWS:

It says specifically, e-mails are records when they are created or received in the transaction of agency business.

KOSKINEN:

That's correct. So if we're doing an exam, or we have a litigation, all of the information about that exam and that information is...

MEADOWS:

So what you're saying is that none of Lois Lerner's e- mails are part of the agency business?

KOSKINEN:

Lois Lerner printed hard copy e-mails which have been provided to you.

MEADOWS:

Hard copy of how many e-mails?

KOSKINEN:

I have no idea.

MEADOWS:

Of all of them?

KOSKINEN:

All of her e-mails were not official records.

MEADOWS:

And under what definition? Because I pulled the definition -- because you know, really, all I have to go by is the law. And that's what you would have to go by.

And I've pulled the definition our of policy book.

KOSKINEN:

I would -- I would -- I would assure you, I have not read very many Lois Lerner e-mails. But of the 67,000 you'll ultimately have, I will guarantee you, a reasonable number of them are not going to be official records.

MEADOWS:

Under what definition?

KOSKINEN:

Under the definition in that brochure.

MEADOWS:

Well, this definition says that they need to be machine-readable materials. That qualifies to almost every single e- mail. Machine-readable is what this said.

KOSKINEN:

That's -- in terms of...

MEADOWS:

I would -- I'd like to ask that we put this in the record, if we could.

ISSA:

Without objection, so ordered.

MEADOWS:

So if I'm following your manual, and there has been no wrongdoing, I think is what your testimony says, there's been no wrongdoing -- ain't that what you said?

KOSKINEN:

Yes, no wrongdoing in terms of potential loss of these e-mails.

MEADOWS:

All right. So when someone did not notify the national archives, was that wrongdoing? When -- when you lost these, when you automatically said, Kelly, we can't find the e-mails, there might be just one e-mail in there that's a record.

Would that be a wrongdoing or breaking the law?

KOSKINEN:

If we didn't advise the archivist that we lost...

(CROSSTALK)

MEADOWS:

Well, you didn't. You didn't advise them because I have...

KOSKINEN:

We did not have any evidence at this point whether they were official records or not. As stated by Mr. Collins, we could have called and said we've lost some e-mails.

And we don't know whether they were records or not. We thought we would let you know. But we did not do that.

MEADOWS:

OK. Can I submit for the record a letter from the National Archives expressing their concern over the fact that there may be official records that were not...

ISSA:

Without objection, so ordered.

MEADOWS:

So all of this, and not following up is really, according to the Democrats, really a money problem. And you've concurred with that, is that what you would indicate?

KOSKINEN:

We would be in much better shape if we had an electronic record system that was...

MEADOWS:

And -- and the reason you don't is because of money.

KOSKINEN:

I'm told that two years ago, when they considered trying to do that, they didn't have the funds to do it.

MEADOWS:

So can we tell the American taxpayers, then, that if they just don't have really the money to comply with IRS statutes, that that's OK, that it's OK to break the law as long as they don't have the money to comply?

KOSKINEN:

I don't think we've established that the IRS broke the law.

MEADOWS:

Well, there is wrongdoing in terms of not keeping all the records according to the Federal Records Act. All of the records -- would you agree, some of the records are missing?

KOSKINEN:

I have no idea whether official records are missing or not...

MEADOWS:

So you're here -- your testimony today -- let me make sure -- your testimony today is that you do not know whether there are missing e-mails?

KOSKINEN:

You just asked about missing official records. I do know there are missing e-mails.

MEADOWS:

Would a normal person assume there may be one record in all of those e-mails that are missing?

KOSKINEN:

We don't know how many are missing.

MEADOWS:

A reasonable person -- no, you're an attorney -- a reasonable person -- wouldn't a reasonable person think that in thousands of e-mails, there would be one official record?

KOSKINEN:

We don't know if thousands are missing or not. We are producing 24,000...

MEADOWS:

I -- I didn't ask you that. I said, a reasonable person, wouldn't they agree? Are you a reasonable person?

KOSKINEN:

Last time I checked.

MEADOWS:

OK, wouldn't you think that there might be one record in there? All right, let me -- let me finish out because you say it's a money issue. Are you aware that $49 million were spent on conferences during this same time period -- $49 million?

LAMBORN:

That was in...

MEADOWS:

Between 2010 and 2012, $49 million according to the -- the TIGTA report.

KOSKINEN:

Substantial number, those are training conferences bringing...

MEADOWS:

I didn't ask you. Were you aware that $49 million was -- yes or no?

KOSKINEN:

I was not aware of the number.

MEADOWS:

OK, $49 million, some of that, $3,500 a night. We've already talked about a "Star Trek" video. Do you think you could have moved some of that $49 million to pay to make sure that the federal records were really preserved?

ISSA:

The gentleman's time has expired. You may answer.

KOSKINEN:

I don't know the details of those events and what were training and what were wasted funds. And it's all three and four years ago, long before I arrived.

ISSA:

But that wasn't the gentleman's question. The gentleman's question was do you think any of the, quote, "money" on those conferences, including the one for making "Star Trek" video, whether or not that could have been used properly for this purpose?

KOSKINEN:

We needed $10 to $30 million, whether there was $30 million or $10 million in that or not, I don't know. If there was money wasted, they certainly could have used it for this purpose. That is -- that's clear.

ISSA:

I thank the gentleman.

We now go to the gentleman from Michigan, Mr.

Thank you very much, Mr. Chairman.

Nice to see you again, Commissioner. Before I forget, I have two questions -- there are two lines of questioning. You said four to five people report to you regularly. Who are they? Can we have their names and titles?

KOSKINEN:

Of the people who report to me, I actually have about 30 people who report to me regularly. There have been four or five who report to me in this area.

BENTIVOLIO:

OK. Can we have their names and titles?

KOSKINEN:

I'd be happy to provide those.

BENTIVOLIO:

Great, great. Do you believe there's a difference between objectivity and neutrality?

KOSKINEN:

Now, that's an interesting question. I'm -- I suppose you could be objective -- I don't know. I think most of the -- both terms would imply that you're not involved personally in an issue.

You're objective about it or you're neutral about it.

BENTIVOLIO:

So they're synonyms.

KOSKINEN:

I would think they are, could be (ph) viewed as synonyms, yes.

BENTIVOLIO:

OK, well, objectivity is the ability to judge fairly despite bias, and neutrality is to have no stance regarding a particular issue. Do you think that employees at the IRS have any self-interest in who's elected as President of the United States?

KOSKINEN:

I think as individuals, every American has an interest in who's elected President of the United States.

BENTIVOLIO:

Could you say they're trying to be nonpartisan, IRS -- nonpartisan?

KOSKINEN:

IRS is nonpartisan. It doesn't mean they can't have an interest in understanding the importance of the presidential election.

BENTIVOLIO:

OK, but they -- they're not supposed to have to back one Party or another, are they?

KOSKINEN:

The Hatch Act does not prohibit IRS employees on their own time.

BENTIVOLIO:

In their official duty.

KOSKINEN:

Pardon?

BENTIVOLIO:

In their official duty.

KOSKINEN:

In their official duty, it's absolutely prohibited.

BENTIVOLIO:

OK, so my question is about self-interest. Do you believe that employees at the IRS can remain objective when analyzing the tax implications of groups and people that want them to lose their jobs?

KOSKINEN:

That could lose their jobs? I think so. I think that they are professionals. They're dedicated to...

BENTIVOLIO:

I have no doubt in their professionalism. I'm not asking you about that. I'm asking you about their neutrality and how it affects their objectivity. Do you believe that any person can sustain objectivity towards someone that they perceive as the threat to their livelihood?

KOSKINEN:

I think they could be objective about it. I'm objective about continuing to hear. This is my eighth hearing and I'm objective about it.

I have good friends on all the committees, even though some of these hearings are little more contentious than others. But I can be objective about it.

BENTIVOLIO:

So...

KOSKINEN:

It comes with the territory.

BENTIVOLIO:

So what are they afraid of? I mean, they -- e- mails, just provide all the information. It seems to me that if it was just -- let's say, somebody got carried away, you could have said, well, we apologize.

We'll fix it. It will never happen again. But the IRS isn't doing that, are they?

KOSKINEN:

That's (ph) far (ph) sense (ph), as I recall, Commissioner Werfel and I have said that there are people were unfairly selected. That was a mistake.

I have apologized to anyone who was actually discriminated against. And I've said, I am committed that that won't happen again.

BENTIVOLIO:

But we're concerned about where it comes from, because it wouldn't be this big of an issue if -- if it was really just some loose cannon in the outfit, so to speak. I mean, it seems to me that you could have said, they made a mistake.

They shouldn't have done it. We punished them. Let's move on. But they -- they didn't really do that.

KOSKINEN:

The people involved in the chain of command in this issue are all gone.

BENTIVOLIO:

I think there's -- or retired?

KOSKINEN:

They're no longer with the agency.

BENTIVOLIO:

Right, except the ones in 1600 Pennsylvania Avenue. Thank you very much. I yield back.

JORDAN:

Will (ph) the gentlemen yield?

BENTIVOLIO:

Yes. I yield to...

ISSA:

Will the gentleman yield to the gentleman...

CUMMINGS (ph): He's already yielded to the gentleman from Ohio.

JORDAN:

I thank the gentleman.

And Mr. Koskinen, earlier, you said that you did not tell Treasury. When you learned in April from who you can't remember, when you can't remember, sometime in April, you said you did not communicate with -- with the White house or with Treasury. Is that accurate?

KOSKINEN:

That's correct.

JORDAN:

Here's a story from last week in "Politico." It says, "April of this year," this is from Neil Eggleston, White House Counsel, "April of this year, the Treasury's Office of General Counsel informed the White House Counsel's office that it appeared Ms. Lerner's e-mail account had contained very few e-mails. So they were informed in April, the White House Counsel, from the Treasury's chief counsel.

So how did the Treasury chief counsel find out?

KOSKINEN:

I don't know.

KENNEDY:

No? Well, did you tell people in the IRS don't go tell anybody this stuff until we get all the information? Did you give that instruction to your folks?

KOSKINEN:

No.

JORDAN:

So someone -- did you -- so someone at IRS told Treasury's chief counsel?

KOSKINEN:

I assume that must be what happened. We meet with the Treasury regularly. I meet every...

JORDAN:

Why didn't you tell him then?

KOSKINEN:

Pardon?

JORDAN:

Why didn't you tell them?

KOSKINEN:

Because I have not reporting to the Treasury about this investigation. It's under -- it's our entire responsibility. And we're taking responsibility...

(CROSSTALK)

JORDAN:

And you don't know who told them?

KOSKINEN:

Pardon?

JORDAN:

You don't know who told them?

KOSKINEN:

I have no idea who told...

JORDAN:

Did you -- did you tell someone else to go tell Treasury just so you won't have to?

KOSKINEN:

No, no.

JORDAN:

You have no idea how the White House and how Treasury learned that this happened, the Lerner e-mails were lost in April. And we didn't know until June.

You have no idea how that happened?

KOSKINEN:

No. I've not had any discussions...

(CROSSTALK)

JORDAN:

Well, we'd like to know who at IRS told the Treasury chief counsel who then told the White House chief counsel and they knew two months before we did. So we'd like to know who that person at the IRS is, who informed them about something that important.

And you didn't feel it was incumbent upon you to tell us. Could you find that person?

(CROSSTALK)

KOSKINEN:

I wasn't -- I thought I was -- I don't know who it is.

JORDAN:

Well, find out. You run the agency.

KOSKINEN:

Fine. As I say, the...

JORDAN:

Why don't you send an e-mail to all the employees in the IRS that whoever told the White House counsel that we lost Lois Lerner e-mail, or at least that was the potential that they were going to -- we're going to lose, I want to know who that person is so I can tell -- I can tell the Chairman of this committee.

And we can question them. Can you do that for us?

ISSA:

Gentleman's time has expired.

You may answer.

KOSKINEN:

All right. So you can question them. And what were you...

JORDAN:

Of course. We want to know why they told them. You -- you didn't -- didn't want to tell them.

KOSKINEN:

I didn't -- I didn't -- not (ph) one (ph) guy (ph) -- I told you, we run the investigation. I have not talked to -- in the production of documents, I have not -- Treasury doesn't tell me what to do.

I don't tell Treasury what we're doing.

JORDAN:

I'm not talking Treasury. I'm talking IRS. Someone from the IRS told the Treasury. We want to know who that person is because it wasn't you.

ISSA:

Regular order, please. Regular order.

HORSFORD:

Mr. Chairman, point of order. He's gone over a minute.

ISSA:

State your -- state your point of order.

HORSFORD:

The point of order is the gentleman's over one...

ISSA:

State your -- state your point of order.

HORSFORD:

The point of order is the gentleman is over his time.

JORDAN:

The real point of order is he won't answer the question.

HORSFORD:

Point of order, the Chairman cut me off when...

ISSA:

I'm cutting you off again. We will maintain decorum. The parliamentarians will provide anyone with the proper weight to state a point of order, which is as Ms. Speier did to cite within the rules a point of order as to whether rules are being properly adhered to.

Congresswoman Speier did a very good job of citing a point of order. And I would ask all folks to please use the parliamentarians before they cite a point of order.

We now go -- we now go to the gentleman from Florida, Mr. DeSantis, for five minutes.

DESANTIS:

Commissioner, have you reviewed Dave Camp's letter from June 3, 2011 that he sent to the IRS?

KOSKINEN:

I have not reviewed it. I only saw it this afternoon briefly.

DESANTIS:

Well -- well, this is one of the -- so he writes a letter, Lois Lerner's hard drive crashes 10 days later. You're supposedly now in charge of writing the IRS. And you haven't looked at that letter?

You haven't reviewed that letter?

KOSKINEN:

I -- I scanned that letter. I'm not doing the investigation of what happened around...

DESANTIS:

Well, that letter requested that e-mail records be preserved, and -- and turned over to the committee, the Ways and Means Committee. And according to your testimony, when her hard drive crashed, they never went to the backup servers to retrieve her e- mails, correct?

KOSKINEN:

No, no, they never went to the backup tapes.

DESANTIS:

Exactly. So...

KOSKINEN:

Now, the backup server is very different. There is no backup server. There is a server that operates the e-mails.

DESANTIS:

Right. And then the tapes that they're stored on offsite, they never got the e-mails back. So even though the Congress requested it, the IRS didn't care.

They just decided they're not going to go the extra mile to get those. Now, you testified last week at the Ways and Means Committee that you knew there was a problem, February 2014 with Lois Lerner's e-mails, correct?

KOSKINEN:

I was advised there was an issue. DESANTIS: Right. And in mid-March, the IRS, according to your testimony, review team learned additional facts about her mysterious computer crash, correct?

KOSKINEN:

That's correct.

DESANTIS:

And then you testified in this committee at the end of March. And you promised this committee, they played the montage -- Gowdy, Chaffetz, Gordon, Issa, everyone, get us Lois Lerner's e-mails. Get Lois Lerner's e-mails.

You said yes, we'll do it. You never mentioned, you never disclosed that there were real problems about whether you were, in fact, going to be able to turn over those e-mails, correct?

KOSKINEN:

At -- at that time, I did not know there were real problems. At that time...

DESANTIS:

Well, here is what you -- here is what you told Dave Camp. You said in February -- this is page six of your testimony last week -- in February, what we knew was there was a problem because we were looking at it from the standpoint of where, what time frame was in which her e-mails appeared.

And it appeared that there were not enough e-mails in that time frame. So in mid-February, you had reason to believe that you were short of e-mails in that critical time frame, per your testimony last week, correct?

KOSKINEN:

When I say, we, the review team did that. I knew simply that there was a problem in the way the e-mails were spread throughout the time frame. I did not know the details of it.

DESANTIS:

Well, your testimony said, we, meaning the IRS.

KOSKINEN:

The IRS, correct.

DESANTIS:

But that now, you're saying that you did not know that, that you were somehow, even though the Commissioner, you're not in the loop.

KOSKINEN:

No, I...

DESANTIS:

Now, here is the issue.

KOSKINEN:

Good.

DESANTIS:

Jason Chaffetz was going back and forth with you at the March hearing. And you basically told him, we will get Lerner's e-mails. They are stored in servers, is what you said.

Now, my question for you is, why say that if you knew, one, there were a problem with Lerner's e-mails and, two, you knew that the backup tapes were only saved for six months? Why tell Chaffetz that you were going to be able to retrieve it when you had reason to believe that that may not be the case?

KOSKINEN:

Because at that time, we were -- pulled all of the e-mails out of her hard drives and others and had put them into a server system known as Clearwell, is my understanding, which is the way we search them. Now, they have to be searched -- it's a pool.

You have to then pull out. It's got...

DESANTIS:

No, I understand that. but -- but again, your testimony -- there was reason in mid-February that there were not enough e-mails. So whatever pool you had, the time period in question when the computer crashed, you testified that -- that there was a possibility that this was coming up short. So the question is is you made a choice as you testified not disclose this back to Congress.

Now, you've been asked, when did you know for sure there were e- mails. You said April. When in April?

KOSKINEN:

Right.

DESANTIS:

You said April. You wouldn't get any more definitive from that. Then you said you were advised not to disclose it. Who advised you not to disclose it?

KOSKINEN:

No, but I did not say I was advised not to disclose it.

DESANTIS:

Then why didn't you disclose it?

KOSKINEN:

Because my sense that what we needed to do was find out the facts and the details. And when we found those, we would give you all of the information.

My experience, as I explained to Congress with Camp last Monday, we did provide information that we had just learned that day, our staff did, that we had custodians who had lost -- had hard drive crash...

(CROSSTALK)

DESANTIS:

I understand that. But that you've in knowledge...

KOSKINEN:

Immediately thereafter, people leaped to conclusions in the public with press releases which three days later turned out to be wrong. So my...

(CROSSTALK)

DESANTIS:

I --I think that you have a duty of candor to Congress and the American people. And you certainly had some reason to believe that there were going to be issues with producing her e-mails in your March testimony because you've admitted it with Ways and Means that there were issues.

Now, maybe you weren't -- maybe you weren't kept up or maybe you weren't following closely enough. I don't know. But I think this is very important because the average taxpayer looks at this.

And if they're ever in a situation where they can't produce documents, they are presumed guilty, period, end of story. It's not even a question. And yet, the IRS is in a situation where they can say, well, we had a computer crash.

The probability of that is very small, as Mr. Massie indicated. Just so happened to happen -- happen 10 days after Dave Camp asked for information. And so I don't think that the American people are satisfied with this.

And with all due respect, I don't think your testimony is going to be satisfactory to those who have real concerns about whether we're going to get to the bottom of what happened with the IRS. And I yield back.

KOSKINEN:

Can I make just one point?

ISSA:

Oh, it is the practice of the committee to always let a witness answer a question if there's a question pending. The gentleman may answer.

KOSKINEN:

I appreciate. This is just a statement I want the public to be confident about. And that is when we're dealing with taxpayers and if they can't produce a record, we are open to their producing other evidence that would be consistent with that.

So if somebody said, we've lost some e-mails, we reconstructed 24,000 of them, we would take that into consideration. And in fact, there's a legal precedent that says, if your actions and the evidence generally produces support for what you say happened, even if you don't have the documents, that's acceptable.

So the idea that that if you've lost the document, it means you've lost the case with the IRS, that's incorrect. We actually will work with taxpayers, trying to make sure that they've got supporting information of any kind.

Our notices out to corporations say, here is what we'd like in documents. But if you haven't got them all, if you've got something close to that, you can give us other information, we'll take that.

So I just want the record to be clear.

DESANTIS (ph): Well, we'd be happy to accept whatever alternatives you could produce to show what Lerner...

KOSKINEN:

Yes, we (ph) could produce other...

ISSA:

The gentleman's time is expired.

Commissioner, the good news is there aren't many members left for the second round. So this should be fairly brief.

KOSKINEN:

I liked it in the old days, where you only had one round.

ISSA:

How old is that?

KOSKINEN:

Oh, I must be very old.

ISSA:

Well, we'll try to be fairly short.

Mr. Cummings?

CUMMINGS:

Commissioner, let me say this. I -- I really thank you. I thank you from the depths of my heart for taking on this task. I cannot begin to tell you how pained I feel listening to all of this.

You know, when you got up first and who has given what you've given, and have been brought into difficult circumstances, and I don't know how old you are, but you know, at my age, I began to stop and think about my own mortality and think about my reputation.

First of all, I want to thank you for being who you are. I want to thank you for giving a damn and caring about our country.

Some of the statements that had been made here today make it look like, you know, you just coming up here, trying to fool people, when under Republican and Democratic administrations, you have been highly regarded. I've said it before and I'll say it again.

We're better than that. We are a better country than that. And we are a better committee than that. You know, when I re-reviewed the IRS employees interviews, you know what o said, it was very interesting, it said something similar to what you said.

They said they were constantly asked about their Party affiliation and that kind of thing. Some of them were Republicans. Some were Democrats. One even described himself as a very conservative Republican.

But you know what they said? They said they left their Party hats at the door. You know why? Because they wanted to make sure when they went in there, and did their job, that they did it in a way that was fair to all Americans.

And so, yes, there are issues. But I don't -- you know, sometimes, I sit here and I listen to all of this, and somebody asked me about this committee the other day. They said that if you were to leave the committee today, what would you most regret?

I said I would mourn for what could have been. I would mourn for what could have been. We are a Committee of Oversight and Government Reform. And I'm glad that the IRS took the non-recommendations of the I.G., who, by the way, was appointed by Republicans -- the same I.G. that said no White House involvement.

But we just push the facts over there, say let's get -- let's see -- oh, he -- he's coming up here. Let's see what we can do to him. But you know what, after the hearing is over, I care about your reputation.

I care about what people think of you. And I really mean that. And I don't -- I don't want a moment to go by without you knowing that I appreciate you coming into this institution, giving it the best you got, and then having to come in here and go through this hell.

And next, I'd have to say everything was done perfectly. I don't think anybody up here is perfect. All of us have had problems. As I say to my constituents, all of us are the walking wounded.

And if we aren't the walking wounded, we just keep on living. And so again, I want to thank you very much. And by the way, if there was any kind of inappropriate criteria, I've said it before, I have a problem with that with regard to conservatives.

I also have a problem with regard to progressives and anybody else. And I'm sure I speak for all our members when I say -- I -- I really do thank you.


KOSKINEN:

Thank you.


CUMMINGS:

With that, I yield back.


ISSA:

Thank the gentleman.

The gentleman from Ohio is next in seniority.


JORDAN:

I thank the -- I thank the Chairman. Look, I agree with the Ranking Member. We're all imperfect. We all are in need of god's grace.

And we do appreciate the public servants who work hard everyday on behalf of the American people. But I will tell you something. I also care about the thousands of people who were denied their first amendment rights when this targeting scheme took place.

I care about people like Catherine Engelbrecht. who was visited six times by the FBI after she applied for tax-exempt status, who, after she applied, had her personal and business finances audited by the IRS for the previous two years, got visited by ATF, OSHA -- I care about those people, too.

And that's why we're so concerned about getting to the truth. And so I just have one question. I'll be quick.

Mr. Koskinen, you've testified several times here tonight, answered many questions. Well, we talked about -- you knew their problems in February. You knew there were more problems in mid-March.

You came in front of this committee in late March. You didn't disclose to us. But then someone -- and the reason you said you didn't disclose is because this was so important, so critical, that you get all the information, get all the facts, get all the information, and then give it to us, correct?

You wanted to get the full story before you went public with any of this, correct?

KOSKINEN:

And I would remind you when I testified here in March, I had no idea whether there was a serious problem or not. I just knew there was an issue.

JORDAN:

You knew there was an issue. You knew there was problems.

KOSKINEN:

Right.

JORDAN:

Based on your testimony, you knew that there had been a crash of her computer in your (ph) testimony. But your testimony is you wanted to get all the facts before you went public, right?

KOSKINEN:

Yes.

JORDAN:

You thought that was important?

KOSKINEN:

Yes.

JORDAN:

Get all the information.

KOSKINEN:

Yes.

JORDAN:

And yet, one of your employees told the Treasury and the White House in early April and you didn't...

KOSKINEN:

On (ph) what (ph)...

JORDAN:

Oh, oh, oh, all I'm asking is if it was so important, so critical to get the full picture before this information got out, why didn't -- why didn't you tell all the people who work in your agency, we're not going to say anything. We're not going to communicate about this, until we get the full picture.

Why didn't you give that instruction to -- if it's so critical that you can't share with Congress, you waited two months after you knew in April that they -- there (ph) were (ph) lost e-mails, if it's that important, then why didn't you tell your employees, don't talk about this.

Don't tell the White House Counsel. Don't tell the Treasury Counsel. Why didn't you give that instruction?

KOSKINEN:

Because I didn't think that if somebody actually told anyone if they -- I didn't tell them they shouldn't tell this committee. I was not telling people what not to do.

I set forward a program in which I said, we need to find all of the facts. We need to pull it all together and we will make a public disclosure of it, which we did.

JORDAN:

But that's not what happened, Mr. Koskinen. The chief counsel of Treasury knew about it and talked to the chief counsel at the White House in April, right after you found out about it.

That's what we're concerned about. All I'm saying is if it's so important, I think proactive leader, a good manager would say, hey, let's get to the truth first. Let's get all this.

Let's not communicate this. Let's -- let's tell everyone at the same time. Let's tell Congress the same -- if it's OK to tell the White House, why isn't it OK to tell the people's House?

KOSKINEN:

The White House is not going to do what the Ways and Means Committee did with the piece of information we gave them piecemeal, that is they're not going to make a big issue about it until all the facts are out.

JORDAN:

Maybe it's because the White House is the same Party, right? Maybe that had -- could that have anything to do with it, Mr. Koskinen? KOSKINEN: I have no idea. But I would stress again and your earlier statement (ph)...

JORDAN:

Oh, well, you don't (ph) have any idea. But the facts are the facts.

KOSKINEN:

The facts are the facts...

JORDAN:

Treasury knew.

KOSKINEN:

No one in the...

JORDAN:

White House knew in April. We didn't know until late June.

KOSKINEN:

No one in the IRS talked to the White House. You (ph)...

(CROSSTALK)

JORDAN:

Oh, oh, oh, then how did they find out?

KOSKINEN:

Pardon?

JORDAN:

How did they find out?

KOSKINEN:

I'm told by the -- the people who have read the White house letter, the White House found out from Treasury. Nobody from the IRS talked to the White House.

JORDAN:

Someone from the IRS talked to Treasury, then.

KOSKINEN:

That's what I understand.

JORDAN:

Well, and as I've said before, we'd like to know who that person is.

KOSKINEN:

Fine.

JORDAN:

I hope you'll find out. Can you make a commitment to this committee tonight that you're going to go find out who that individual was, who those individuals were, who talked to the Treasury chief counsel, who then talked to the White House two months before the people's House got that same information? Can you make that commitment?

KOSKINEN:

I'll -- I'll do my best.

JORDAN:

Well, let's hope it's better then (ph). I yield back.

ISSA:

Will the gentleman yield?

JORDAN:

I'd be happy to yield.

ISSA:

And I appreciate you trying to find out. It would save us a lot of trouble of going to through all the people to find out.

But you just said something that I wanted to make sure I understood, you said, and I'm paraphrasing, maybe, the White House wouldn't release it the way Ways and Means released a document, is that right?

KOSKINEN:

Yes. In other words, my experience has been in this issue that any information that comes out piecemeal immediately gets an overreaction to it.

ISSA:

So well, your overreaction is your statement. I guess the question I have is, hasn't the White House selectively leaked documents in the past?

KOSKINEN:

I have no -- I'm not involved in any of those issues that they have.

ISSA:

You -- you probably read "The Wall Street Journal" and "New York Times" or the "Washington Post." Isn't it true the White House does put out piecemeal documents that favor them when they get them, and hold back ones when they don't?

KOSKINEN:

I'm not familiar with what the White House activities are.

ISSA:

I guess I'll wait for my own time. But I must admit I'm a little insulted to hear that the White House is trustworthy and Congress isn't, in your opinion.

The gentleman from Nevada, Mr. horsford, is recognized.

HORSFORD:

Thank you, Mr. Chairman.

It's kind of interesting how positions change over time because looking back on some of the record, it appears that when the Bush White House lost millions of e-mails related to the leak of covert CIA agent Valerie Plame's identity, and the U.S. attorney firing, this same committee held a hearing in 2008. At that hearing, Chairman Issa said this, and I quote, "I think it is fair that we recognize that software moves on and that archiving in the digital age is not as easy as it might seem to the public."

At the same hearing, Chairman Issa discussed how Congress needs to provide more funding to help agencies improve their archiving technology. He said this and I quote, "The House of Representatives needs to begin making sure you are funded.

And that is part of what we do in oversight -- funded to deal with ever-evolving technologies where archiving isn't just putting them away. It is being able to retrieve it." Now, it appears that Chairman Issa's perspective has changed.

With respect to the loss of Ms. Lerner's e-mails, he believes the loss of her e-mails is evidence of, quote, "nefarious conduct." Chairman Issa has repeatedly stated this assertion, but yet, said something completely different in -- in a previous hearing.

Commissioner, as far as you can tell, the only difference between the statements Chairman Issa made in 2008 and the statements he made now, is that there was a Republican administration then and that

there is a Democratic administration now. The fact is that the IRS and many other federal agencies have struggled to improve their electronic record retention for years.

GAO, the National Archivist, and others have been reporting on these problems repeatedly. So I have a main question that I'd like to ask, Commissioner, and that's, what can you do to explain to this committee the steps that are being taken to restore the public's trust in the IRS and the function that it provides to the American people in this regard to the data and the protection of that data?


KOSKINEN:

We are reviewing all of our activities. So I've asked for this sometime ago to see if at a minimum, we couldn't create an electronic record system that would be more searchable. We have spent -- as everybody now knows close to $18 -- between $18 and $20 million trying to produce documents as quickly as we can and e-mails as quickly as we can because of the archaic system that requires us go to 90,000 individual hard drives or in this case, 83 custodian individual hard drives.

We're going to continue to do that. The archivist last year made a recommendation that as a way to begin to do this, we take the top 35. It's called the capstone proposal. I'm sure you'll testify tomorrow about it.

That is a start, recognizing the costs that we developed systems with the top 35 people in the agency, where their records are automatically electronically put into a records system as the first step. And we're going to take a look at that, which would obviously be less expensive than trying to archive the entire agency's records.

But I do think it's important for us to preserve official records. It's important for history. It's important for people to understand the basis on which we make decisions.

And we're going to continue to do that. We are constrained. The issues are how we spend our money -- it's an important issue as to how we do it. But it is in a situation where we have substantially fewer funds than we had four years ago, 10,000 fewer employees, and substantially increased responsibilities.

But it is an important issue for us to consider. And we're going to do that.


HORSFORD:

Thank you, Commissioner. And again, I want to commend you. You know, I -- I say often on this committee, we are the oversight committee but we're also the government reform committee.

And I would like to hear your recommendations as we move forward on how we put those recommendations in place and what this committee can do to support you in those endeavors. It's one thing to have as many hearings as we've had without any substantiated evidence to suggest continuing.

But to not have one hearing on how we can implement any of the recommendations to improve the system, I think is a flaw in the way this committee is managed.

And, Mr. Chairman, I know my time is up. But under rule nine, sub A., I think that the Chairman needs to ensure that there is equal time given to each side and that members should not have their mics cut off and then members in the majority allowed to speak well over their permitted time.

ISSA:

We now go to Mr. Massie for five minutes, or such time, sub -- less he may consume.

MASSIE:

Thank you. Thank you.

ISSA:

It is not required to use the full five minutes, right?

MASSIE:

And I'll -- I'll try not to.

ISSA:

It's not required but seldom yielded back.

MASSIE:

It depends -- it really depends on the answer. I'm going to try and be short. And I really appreciate your patience and your stamina here tonight. So I'll be short with this question.

On June 3, 2011, Ways and Means Chairman Dave Camp sent the IRS a letter demanding to explain the allegations of targeting tea party and other conservative groups. He also requested that e-mails be provided or preserved.

Within 10 days, Lois Lerner's hard drive crashed. Now, we know her hard drive crashed because there was a -- we know this for sure because it was a ticket filed with the I.T. department, is that correct, for a repair?

JOHNSON:

That's correct.

MASSIE:

Could you provide us with all the tickets filed in the month of June, 2011, at the IRS for failed hard drives?

KOSKINEN:

Yes.

MASSIE:

Thank you very much. I yield back.

ISSA:

Would the gentleman yield?

MASSIE:

Yes.

ISSA:

I thank the gentleman. We are nearing the end. But there'll be -- I'll need a few more minutes. So I want to be -- I want to be brief but I want to be thorough.

Ms. Lerner, you didn't know. You say you never met her. My understanding is from the reports that the hard drive that failed was on her laptop, is that correct?

KOSKINEN:

I'm not familiar. I know Nikole Flax's travel computer is where the hard drive failed, not her office computer.

ISSA:

Right.

KOSKINEN:

I'm assuming in light of where the archives went that it was her office computer where the hard drive failed.

ISSA:

So I just want to understand from a procedural standpoint, employees of the IRS download e-mails which may include 6103 information, to their laptops and leave the building with them, is that correct?

KOSKINEN:

That's right. Most -- a number of employees, their office commuter is, in fact, a laptop.

ISSA:

And as a result, when they leave the office, they take with them e-mails that may include 6103 information.

KOSKINEN:

That's possible, yes.

ISSA:

To your knowledge are laptops, in the IRS, universally limited so they may not implore USB drives?

KOSKINEN:

They are now. There was, as I understand, as situations some years ago, in which they were -- well, I guess what I should say is years ago, USB drives, thumb drives, were usable that were not encrypted. And there was an issue that came to my attention three or four months ago where fortunately no information was misused by the public.

Since that time, which is several years ago, all thumb drives are encrypted, so that if a thumb drive is lost, nobody can access the data.

ISSA:

I appreciate that. Congress has implemented a similar thing. But we also can go by a Best Buy normal thumb drive. So if Lois Lerner's laptop was, in fact, or any of these other people's laptops or office computers, in fact, had the USB on any of them that downloaded information, including 6103 information to their local drives, could have, in fact, moved them to USB-based external drives or to thumb drives of their own purchase, is that correct?

KOSKINEN:

That sounds right. I don't know what the equipment looked like three years ago. But I would assume that that sounds right.

ISSA:

So for the American people, it is very possible, and in fact, probable, that every day, individuals leave the IRS with personally identifiable information covered under 6103 on their hard drives, inside laptops that they take home, on trips to conferences and the like?

KOSKINEN:

That's correct, to the extent of my knowledge. I may be corrected when I get back but that sounds correct.

ISSA:

So that means that, in fact, Lois Lerner, an attorney, may have made a copy of information on her hard drive that died and she could have it on a USB product or, you know, any kind of product, but normally, a USB-based thumb drive or external hard drive. To your knowledge, you have no reason to know that she couldn't have done that.

KOSKINEN:

That's correct.

ISSA:

So in fact, Lois Lerner may have made copies of this before the failure of her computer. To your knowledge, when the Department of Justice questioned Lois Lerner, was she asked any of those questions?

KOSKINEN:

I have no idea.

ISSA:

To your knowledge, did she have a USB or any other product that could have taken copies off of her computer?

KOSKINEN:

I have no knowledge that she did.

ISSA:

To your knowledge, did she also have a laptop or dual- purpose computer that she took home with her or left the building with?

KOSKINEN:

I don't know.

ISSA:

OK. I would now ask unanimous -- or let me rephrase that. Let me just one more -- you have 90,000 computers that basically use their local hard drives to store information, e-mails, instead of on the server, because after so many days, it disappears off of -- after half a year, they disappear off the server, is that right?

KOSKINEN:

No, no, no. The server will keep your e-mails until you get to 6,000. And then you'll get a notice saying you have to either archive them or delete them. The backup tapes that preserve information for six months are separate.

The server -- you may have e-mails on your server for five years if you've...

ISSA:

If you don't hit that number.


KOSKINEN:

If you don't hit the 6,000.


ISSA:

OK, obviously, Lois Lerner with tens of thousands did. I now would recognize myself for my own time. Continuing on, I spent a lot of time in the electronics industry.

And so I -- I have a bit of a passion for this. Are you aware that if you back up your systems every six months, that the -- the cost that we would be looking at for what it would have cost to have backed them up, essentially once a month, would be cost of the tape drive that, in fact, those tapes or cartridges that would be retained? And my understanding pretty obviously is that wouldn't be $10 million, would it be?


KOSKINEN:

No, I don't think so.


ISSA:

So with your limited budget, if, instead of throwing away or recycling after six months a -- the cartridges and simply reusing them because you're only using them for disaster recovery, if you bought 12 sets of cartridges so that every month you made a backup and then, in fact, use the incremental backup systems that exist, you could have backed up your systems, retain for seven years for a fraction of $10 million, couldn't you?


KOSKINEN:

That's right. But you would simply have a capacity to, as a disaster recovery system, it's that process is not a searchable e-mail system.


ISSA:

I appreciate your telling me that because I served on this committee in this room in that position. When Henry Waxman, because the Bush White House, in conversion from Lotus Notes to Windows Exchange

Server -- Microsoft Exchange Server, failed to have good backups and they used their image backups at a cost of a great deal of money to restore countless e-mails so that the Presidential Records Act, the Federal Records Act will be fully maintained. Do you have any recollection of those hearings or that activity?

KOSKINEN:

I do not.

ISSA:

To this committee, it's pretty famous. Mr. Waxman did not care that it cost an estimated $24 million to recover every single one of those e-mails. This committee aggressively said they had to do it.

And they did image-back restorations. Had you done image backups and retained them prior to your arrival but had the IRS done it, it would have cost probably tens of thousands of dollars to maintain six or seven years' worth of those. And we wouldn't be having this same discussion today, would we?

KOSKINEN:

No, it would have cost a lot of money as you know to then get e-mails off of those recovery tapes. But that's right, if we had -- if we had them, we could then spend millions of dollars it would take to pull it off the disaster recovery tapes.

But that's not what the disaster recovery tapes are meant to do.

ISSA:

What's interesting is the -- the images or disaster recovery tapes. The reason they cost so much with the White House is they wanted every e-mail retained or recovered. We only wanted Lois Lerner's.

I'd like to enter in the record now a document given to us by the National Archives and I'll show it because it's a little hard to see. But there we go -- a little hard to read from here.

ISSA:

Well, I'll read you just a piece of it. Andrew Jackson of the state of Tennessee, the first day of December, 1799, is still burned (ph). And he's complaining through Congress -- this is from -- this is essentially a Congressional effort, right -- record where he petitions the United States Congress in 1803 to recover and it started in 1801 with an affidavit for his loss of revenues paid in 1799 because his stills burned after they collected the revenue in advance for his hundreds of gallons of liquor.

I only put that into record for one reason. The National Archives and the Archivists will be with us tomorrow, maintains an amazing amount of documents and recovers documents.

Now, Andy Jackson (ph), General Jackson wanting his money back on his still may not be anything other than humorous this late at night. But it's part of the wealth of information the American people have access to just across the street.

Your agency came here and said on a $1.8 billion budget, you did this tonight, that, in fact, you needed more money if you were going to maintain records. I would certainly hope that when you go back and you scrub that $10 million in order to do x and in order to do y, that you go back and you really ask within the best practices whether or not to meet -- for your CIO, to meet the requirement of the National Archives having access to the kind of information -- the wealth of information they need, working with the National Archives.

You can do it and do it for a reasonable price. Mr. Horsford was correct. I have been a big believer that, in fact, maintaining for the American people the transparency not just so what Mr. Cummings and I are doing here tonight but for the next generation and generation beyond as much information as we possibly can as an obligation. Earlier, Mr. DesJarlais maybe cynically, maybe just doing the arithmetic looked at that sort of nickel of page to print out and stick in a file drawer and later turn over to the National Archives paper. I strongly suggest that this committee and you -- you for your agency, this committee for all of government really take a look at how much less expensive it is to maintain it digitally, to deliver it digitally so that it can be machine searchable for the next generation and, in fact, be of benefit to all of us.

Lastly, I'm going to guess that out of the $111 per employee's computer, because that's what $10 million is, you could easily have covered that expense, that $10 million expense, by simply downgrading those local drives because, in fact, there's very little reason for them to have large local drives. Lastly, and I'm going to close with this and this is really not as much questions, you're familiar with the interrogatories we sent some 50 questions?


KOSKINEN:

Saturday afternoon, yes.


ISSA:

Yes, 48 hours before the hearing. You are aware that for the most part, there was no response other than a short oral briefing this afternoon in which presentations were made that were not part of the interrogatories in some case (ph).


KOSKINEN:

Little -- little hard to get everybody together on a Sunday even though it is counted as the 48 hours. We got...

ISSA:

And I understand.

KOSKINEN:

...we got your e-mail request at about 4:30 Saturday afternoon.

ISSA:

No, I understand that. But there was eight hours of work day-to-day. The questions we have for the most part of the questions that you should have already asked, they should have been answerable immediately, there will be some additional questions that I will send interrogatories to you.

They will ask you to please see if you could figure out whether it was the first of April that you learned about the -- the real loss of documents, seven days after you testified or 30 days after, to narrow down the April and to narrow down who told you about -- who told you about it. There obviously is the question of how the White House came to know while Congress was never informed about these losses of documents until your seven-page letter.

So for that purpose, we will now recess. If unable to get the interrogatories and the follow-up calls done in a timely fashion, I will be pleased to adjourn this. But for now, we are recessing subject to recall. We stand in recess.

CQ Transcriptions, June 23, 2014