IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

―――――――――――――――――――――――――― )
TRUE THE VOTE, INC.                    )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )          Civil Action No. 1:13-cv-00734-RBW
                                       )
UNITED STATES OF AMERICA, *et al.*,    )
                                       )
        Defendants.                    )
―――――――――――――――――――――――――― )


<u>DECLARATION OF TAMERA L. RIPPERDA</u>

I, TAMERA L. RIPPERDA, pursuant to the provisions of 28 U.S.C. § 1746, declare and say:

1.      The Internal Revenue Service (IRS) is divided into two primary organizations: the Deputy Commissioner for Services Enforcement (DCSE) and the Deputy Commissioner for Operations Support (DCOS). (Internal Revenue Manual (IRM) section 1.1.1.4 (June 2, 2015)). The DCSE, which is the largest organization within the IRS, oversees the four primary operating divisions responsible for the major customer segments, as well as other taxpayer facing functions. Wage & Investment (W&I) serves individual "taxpayers, including those who file jointly, with wage and investment income only." Small Business/Self-Employed (SB/SE) serves "small business/self-employed filers who are fully or partially self-employed individuals and small businesses." Large Business & International (LB&I) serves "corporations, subchapter S corporations, and partnerships with assets greater than $10 million. Also, it serves U.S. citizens and residents with offshore activities and non-residents with U.S. activities." Tax Exempt &

Government Entities (TE/GE) serves "three distinct taxpayer segments—Employee Plans, Exempt Organizations, and Government Entities."

2.      I am the Director of the Exempt Organizations Unit of TE/GE. I have held this position since January 2014. From January 2013 to January 2014, I was the Director of the Global High Wealth Industry of LB&I. From June 2010 to January 2013, I was the Director of the Abusive Transactions and Technical Issues Office of SB/SE. I have been employed by the IRS for 28 years.

3.      As Director of the Exempt Organizations Unit, I am responsible for planning, managing, directing, and executing nationwide IRS activities pertaining to tax exempt organizations. The IRM defines "exempt organizations" as:

> i.   Organizations exempt from income tax under IRC [Internal Revenue Code] Section 501 (including private foundations and organizations described in IRC 170(b)(1)(A) (except clause (v));
>
> ii.  Political organizations described in IRC 527, and organizations described in IRC 4947(a); and
>
> iii. Welfare benefit funds described in IRC 4976.

(IRM 1.1.23.5(3) (December 27, 2013).

4.      My duties require an understanding of the policies, procedures, laws, and regulations of exempt organizations. There are three offices under my supervision: (1) Rulings & Agreements, (2) Examinations, (3) and Program Management.[1]

---

[1] Prior to July 15, 2014, the office of EO Customer Education and Outreach was also under my supervision. This office was primarily responsible for developing nationwide education and outreach programs for EO customers to promote voluntary compliance, providing information to EO customers to assist them in understanding their tax (continued...)

5.      In this declaration, I will (1) provide background regarding the organization of IRS TE/GE, (2) address the changes that the IRS has made in order to respond to each of the relevant TIGTA recommendations as well as other changes made to improve the EO determinations process, (3) address the changes that the IRS has made in order to respond to each of the relevant recommendations found in the Senate Finance Committee Report, (4) detail other relevant changes that the IRS has made to its processing of applications for tax-exempt status, and (5) address the potential for future audits of class members based on the IRS's current audit selection process.

**TE/GE Exempt Organizations Unit**

*EO Organizational Chart[2]*



---

(… continued)

responsibilities, and developing and administering the EO segment on the intranet and Internet websites in coordination with Information Technology (IT) and other internal entities as appropriate.

[2] Prior to July 15, 2014, the office of EO Customer Education and Outreach would have been included in this chart.

*Rulings & Agreements—Structural Changes*

6.      All applications for tax exempt status under 26 U.S.C. § 501(c), including applications for organizations seeking recognition under 26 U.S.C. §§ 501(c)(3) and 501(c)(4), are processed by the Rulings and Agreements Office within the Exempt Organizations Unit of TE/GE.[3]

7.      Through its component offices, as described more fully below, EO Rulings & Agreements is responsible for processing applications for tax-exempt status, and providing technical interpretations of laws and procedures relating to exempt organizations.

8.      From June 2010 to May 14, 2013 (hereinafter referred to as the "relevant time period"), EO Rulings and Agreements consisted of four main component offices: (1) EO Determinations, (2) EO Determinations Quality Assurance, (3) EO Technical, and (4) EO Technical Guidance and Quality Assurance (Guidance). (IRM 1.1.23.5.2 (2-01-2007)).

9.      Since May 2013, EO Rulings & Agreements has modified its procedures and organizational structure to address the issues identified by the 2013 TIGTA Report and a Lean Six Sigma (LSS)[4] analysis of EO workflow structures.

---

[3] An "application" consists of the materials defined in 26 U.S.C. § 6104(d)(5) which are the "application for recognition of exemption under section 501 and any papers submitted in support of such application and any letter or other document issued by the Internal Revenue Service with respect to such application."

[4] Lean is a time and valued based process improvement philosophy designed to ensure continuous flow and eliminate waste and non-value added activities.

- For most processes, only 5 percent of activities add value, 35 percent are necessary non-value adding activities and 60 percent add no value at all.

- Lean methods focus the enterprise on using fast, flexible, flow to provide value as it is seen from the eyes of the customer.

Six Sigma is a business process improvement method that uses data and facts to produce bottom line measurable results through reduction in process variation.

(continued...)

10.     First, and as detailed in response to TIGTA Rec. No. 4, below, on January 12, 2015, most of the responsibilities of EO Technical and EO Guidance, the legal advice and guidance functions of EO Rulings & Agreements, were re-aligned to the IRS Office of Chief Counsel. Second, in Fiscal Year 2014, EO modified case processing procedures to reduce the average amount of time it takes to process applications and eliminate the backlog of applications. Third, EO Rulings & Agreements has undergone structural changes to realign most operations in Cincinnati. This involved moving the EO Rulings & Agreements director from Washington, D.C. to Cincinnati so that the director may provide in-person management and oversight. Finally, EO Rulings & Agreements streamlined its reporting structure by having the Area Managers report directly to the Director of Rulings & Agreements, eliminating intermediate levels of management.

---

(… continued)

- Six Sigma is a standardized method of measurement that provides organizations proven world-class measurement of process effectiveness. An organization that acquires a Six Sigma level of performance virtually eliminates errors in its processes.

- Six Sigma is also a management philosophy that strives for ever-increasing levels of perfection across all public and private sector industries.

EO Rulings & Agreements Management Structure During Relevant Time Period:



Current, Streamlined EO Rulings & Agreements Management Structure:



*Rulings & Agreements—Component Offices*

11.     EO Determinations is primarily responsible for processing applications from organizations seeking tax exempt status under the relevant provisions of the Internal Revenue Code. *See* Rev. Proc. 2013-9, section 5.01, 2013-2 I.R.B. 255 (and its predecessors). Processing applications for tax exempt status involves applying statutory and regulatory requirements to determine whether the facts set forth in the application warrant its approval or denial. *See* IRM 7.20.1 (09-08-2014). In order to determine whether an organization qualifies for exemption, agents may, send development letters asking for information or clarification about facts represented in the application. *See* Rev. Proc. 2013-9, section 4.6, 2013-2 I.R.B. 255 (and its predecessors).

12.     EO Determinations Quality Assurance is responsible for conducting mandatory and sample reviews of EO Determinations case work. Based upon the reviews, this group writes reports detailing areas for improvement in the technical and procedural work. *See* IRM 7.20.5 (07-07-2009).

13.     During the relevant period, EO Technical in Washington, D.C., was the office responsible for case-specific interpretation of the tax law related to exempt organizations. Specifically, this included processing (including developing) applications for tax exempt status referred by EO Determinations; issuing private letter rulings, technical advice memoranda, and information letters pursuant to the procedures contained in annual revenue procedures; processing certain exempt organization changes in accounting period or accounting method; providing assistance to other IRS offices, Chief Counsel offices, and other government agencies

on exempt organization issues by responding to specific requests for information or technical assistance; responding to specific requests for information from taxpayers, media relations, other federal agencies, and Congress; processing disclosure requests; participating in multi-agency task forces formed to address broad concerns, and analyzing actions of other agencies that may affect the tax treatment of exempt organizations; and supporting the EO Customer Education and Outreach efforts by initiating or reviewing publication items and providing personnel to represent TE/GE before customer groups. *See* Rev. Proc. 2013-9, section 5.02, 2013-2 I.R.B. 255 (and its predecessors); IRM 7.29.1.2 (02-01-2008).

14.     During the relevant period, EO Guidance in Washington, DC was responsible for the interpretation of tax law applicable to exempt organizations as expressed in guidance with broader application than to a specific case. Specifically, this includes publishing guidance items such as revenue rulings, revenue procedures, announcements, and notices for the public in conjunction with the Department of the Treasury and the Office of Chief Counsel; working with other EO and IRS TE/GE offices to develop and participate in projects, identify and address emerging issues, and develop programs to increase the quality of EO Technical work products; supporting Customer Education and Outreach efforts by initiating or reviewing publication items, including Internet web pages, and providing personnel to represent TE/GE before customer groups; responding to specific requests for information from taxpayers, media relations, other federal agencies, and Congress; participating in multi-agency task forces formed to address broad concerns, and analyzing actions of other agencies that may affect the tax treatment of exempt organizations; processing disclosure requests; creating, updating, and reviewing tax forms. (See IRM 7.29.1.3 (02-01-2008)).

15.     As of January 12, 2015, the offices of EO Technical and EO Guidance were eliminated with the realignment of most of their responsibilities to the IRS Office of Chief Counsel.

16.     As of June 1, 2015, EO Rulings & Agreements now has a new office: Knowledge Management. This office provides EO function employees with easy access to information on a wide range of technical issues, such as unrelated business income tax and private foundations. The purpose of this office is to improve access to technical knowledge so that employees can better and more accurately do their jobs.

*EO Examinations*

17.     EO Examinations is the office responsible for enforcement activities, including both compliance checks and audits of exempt organizations. EO Examinations develops enforcement strategy, implements and evaluates EO examination policies and procedures, develops and implements the EO returns classification and selection process, and coordinates with other EO and TE/GE Offices to identify emerging noncompliance areas and develop proactive education efforts. *See* IRM 1.1.23.5.3 (02-01-2007). The office of EO Examinations is comprised of internal revenue agents trained and specializing in EO tax law, supervised by EO group managers who are supervised by the EO area manager within a given geographic area. EO Examinations is also comprised of the Exempt Organization Compliance Area (EOCA) which conducts compliance checks, and the Compliance Strategies Critical Initiatives (CSCI), which coordinates EO's strategic planning, monitors progress on critical initiatives, and analyzes the results of compliance efforts.

18.     During the relevant time period, EO Examinations also contained two groups known as Review of Operations (ROO). The ROO conducted non-contact compliance reviews of

tax exempt organizations. It was authorized to determine whether an organization's activities were consistent with its stated tax-exempt purpose and whether the organization was adhering to reporting requirements. However, the ROO was not authorized to contact an entity, examine an organization's books and records or to ask questions regarding tax liabilities. On September 10, 2013, the IRS issued TEGE-07-0913-14 providing that the ROO will no longer accept referrals from EO Determinations. As a result, two ROO groups were disbanded. As of October 4, 2015, the former ROO employees' only responsibility is the review of hospital organization's compliance with the Affordable Care Act and this group is now known as the Hospital, or ACA, Review Group.

*Program Management*

19.    The Office of EO Program Management is responsible for developing functional work plans in consultation with Directors, EO Rulings and Agreements and EO Examination, monitoring work plan accomplishments, developing and executing the EO labor and non-labor budgets, coordinating with TE/GE HQ on personnel and hiring, and monitoring timeliness and quality of responses to TIGTA, GAO, Taxpayer Advocate Service (TAS), and Legislative related matters.

**IRS Changes to Improve EO Determinations Process and Address Each Recommendation in the 2013 TIGTA Report**

20.    On May 14, 2013, the Treasury Inspector General for Tax Administration (TIGTA) released a report entitled *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review*, (reference number 2013-10-053) (hereinafter referred to as "2013 TIGTA Report") which found that the Determinations Unit used inappropriate criteria which identified for review and coordination applicants for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention (hereafter

referred to as "potential political cases"). As TIGTA found, the use of this inappropriate criteria

gave the appearance that the IRS was not impartial in conducting its mission. TIGTA further

found that ineffective management and lack of procedures for tracking guidance requests

contributed to unwarranted delay in the processing of the potential political cases. Finally, the

TIGTA Report found that, because of a lack of management oversight and because EO

specialists lacked knowledge of what activities are allowed by I.R.C. § 501(c)(3) and I.R.C.

§ 501(c)(4) tax-exempt organizations, the Determinations Unit sent potential political case

organizations additional information requests later determined by TIGTA to be unnecessary.

21.    Based on the findings in the 2013 TIGTA Report, TIGTA issued nine

recommendations to the IRS, and as detailed below, the IRS has made significant changes to

address each of these recommendations, as well as other changes to improve the EO

determinations process. Overall, these recommendations concern, and the IRS's actions address,

(1) reforming EO screening and review processes to ensure use of proper criteria and procedures,

(2) ending the backlog of applications and ensuring expeditious processing of applications in the

future, (3) ensuring delivery of timely and appropriate guidance to EO Determinations agents,

and (4) providing updated training to enable EO specialists to appropriately process applications

that involve potential political campaign intervention and administering that training in advance

of each election cycle.

     a. Reforming EO Screening and Review Processes to Ensure Use of Proper Criteria and Procedures.

*Recommendation & Action Taken*:

     Ensure that the memorandum requiring the Director, Rulings and
     Agreements, to approve all original entries and changes to criteria

included on the BOLO [be-on-the lookout][5] listing prior to implementation be formalized in the appropriate Internal Revenue Manual. (TIGTA Rec. No. 1.)

As an initial matter, the IRS has ceased using the BOLO list. As Commissioner Koskinen stated in his September 21, 2016 written testimony before the House Judiciary Committee, "our Exempt Organizations division ended the use of the BOLO lists more than three years ago." Accordingly, I would like to emphasize, unequivocally, that use of the BOLO list has been ended permanently.

Specifically, and in response to TIGTA's recommendation, the IRS initially suspended the BOLO list on June 20, 2013. *See* Interim Guidance Memorandum (IGM)[6] TEGE-07-0613-0006 suspending use of the BOLO spreadsheet and outlining alternative procedures. Then, on August 9, 2013, the acting Director of EO Rulings & Agreements issued a memo that stated, "As Acting Commissioner Danny Werfel has said, the IRS has taken decisive action to eliminate the use of inappropriate political labels in the screening of 501(c)(4) applications. IRS policy is now clear that screening is based on activity, not words in a name." The new steps and current policies were outlined in the June 24, 2013 report that noted, "In the absence of BOLO lists, the

---

[5] The BOLO list was a spreadsheet that was used by the IRS EO to assist screeners in identifying applications that presented certain issues and routing those applications to the EO Groups specializing in those issues. One of the listings concerned the "Tea Party" cases. (The BOLO list contained many other listings besides the listing for potential political cases. For example, it contained listings for groups advocating medical marijuana and information on how to spot groups that may be engaged in supporting terrorist activities abroad.) The title and criteria listed changed several times before the use of the BOLO was suspended in June 2013. That suspension has since been made permanent.

[6] Interim Guidance Memoranda are internal management documents issued by the IRS for the purpose of providing immediate, time-sensitive, or temporary instructions to employees. The guidance communicates procedural directions, guidelines, or standards to employees in the performance of their assigned duties. They can remain in place for up to two years. IRM 1.11.10 (April 25, 2014). The author/originating office must incorporate permanent guidance into a published IRM by the expiration date of the interim guidance. IRM 1.11.10.8 (April 25, 2014).

Determinations Unit will continue to screen for information affecting the determination of applications for tax exempt status, including activity tied to political campaign intervention, but it will be done without regard to specific labels of any kind." *See* IGM TEGE-07-0913-15 (September 30, 2013), attaching August 9, 2013 Memo, which dealt with the initial classification and screening of applications. Finally, on July 8, 2014, the IRS updated the Internal Revenue Manual (IRM) 7.20.2 to delete the procedures that referenced the use of a BOLO list. On October 22, 2015, following a LSS review of all EO Determinations procedures, IRM 7.20.2 was further revised eliminating the use of both initial and secondary screening, as well as accelerated and intermediate processing. Under the new procedures, and because of training to ensure that all agents can work any issue presented, cases are no longer centralized with revenue agent groups based on the issues in the application.  Rather applications are assigned on a first in first out basis while taking into account the grade level of the agent working the case.

*Recommendation and Action Taken*

> Develop procedures to better document the reason(s) applications are chosen for review by the team of specialists (*e.g.*, evidence of specific political campaign intervention in the application file or specific reasons the EO function may have for choosing to review the application further based on past experience). (TIGTA Rec. No. 2.)

In response to this recommendation, the IRS, on September 30, 2013, informed all EO Determinations specialists of new procedures to use for screening applications for tax exempt status. The new procedures were outlined in IGM TEGE-07-0913-0015 and IGM TEGE-07-0913-0017. These memoranda addressed the EO screening process and provided written instruction on classifying applications when issuing an approval based on the original submission is not an option. IGM TEGE-07-0913-0015 provided procedures to the EO Determinations Unit regarding the initial classification of applications. Subsequently, in July 2014, the IRS updated

its procedures to eliminate the screening process *See* IRM 7.20.2. Specifically, the memo addressed how a classifier identifies and routes specialty issues:

> [The] Classifier reviews the application and determines if it should be routed to a specialty group. This determination is based upon facts and circumstances of the stated activities within Part II of the application rather than names or labels.

Subsequently, in July 2014, the IRS updated its procedures to eliminate the screening process, and specialty groups, as detailed in response to TIGTA Rec. No. 1, above.

b. Ending the Backlog & Ensuring Expeditious Processing.

*Recommendation & Action*:

> Provide oversight to ensure that potential political cases, some of which have been in process for three years, are approved or denied expeditiously. (TIGTA Rec. No. 7.)

As of November 8, 2016, all entities that were the subject of the 2013 TIGTA Report have received an approval, an adverse determination, a proposed adverse determination, withdrew their application, or were closed for failure to establish, with the exception of one entity.[7] This remaining entity is a plaintiff in litigation against the government, in a case in another district, related to its applications for tax exempt status, and the IRS is currently processing the application.

c. Ensuring Delivery of Timely and Appropriate Guidance to EO Specialists.

*Recommendation & Action:*

---

[7] For the entities who have received a proposed adverse determination letter, they now have the opportunity to seek administrative review of their proposed adverse determination with the IRS Office of Appeals, an independent office within the IRS. To take advantage of that option, each group must submit a statement of facts, law and argument in support of its position within 30 days of the date of the proposed denial letter. Rev. Proc. 2016-5, § 7.02, available at 2016 WL 20937 (2016).

> Develop a process for the Determinations Unit to formally request assistance from the Technical Unit and the Guidance Unit. The process should include actions to initiate, track, and monitor requests for assistance to ensure that requests are responded to timely. (TIGTA Rec. No. 4.)

In response to this recommendation, the IRS issued IGM TE/GE-07-0713-11 (July 15, 2013); incorporated into IRM 7.1.2 (September 22, 2014), creating a formal process for Determinations Unit specialists to request assistance from EO Technical. Pursuant to the IGM, all requests for technical assistance must be in writing and accompanied by a completed EO Technical Assistance Request Form and tracking sheet. Specific time frames are included in the procedures for completing different steps in the process. For example, EO Technical must acknowledge receipt of the request within two workdays and enter the request on the Technical Unit case tracking system. Follow-up on the status of outstanding requests is required every 30 days, and EO Technical must provide a response within 120 days. In its 2015 Report, TIGTA concluded that these new procedures adequately address Recommendation No. 4.

Separate from the implementation of this recommendation, on January 12, 2015, responsibility for the legal work formerly handled by EO Technical and Guidance moved to the Office of Chief Counsel. The IRS has a long-established and widely used formal process for requesting legal advice and guidance from the Office of Chief Counsel. *See* Rev. Proc. 2016-2, 2016-1 I.R.B. 102, detailing process for the IRS to request legal advice and guidance from the Office of Chief Counsel. This realignment resulted in the obsolescence of the procedures laid out in IGM TE/GE-07-0713-11. The Office of Chief Counsel also went through an internal functional realignment that created a newly-formed office of Tax Exempt & Government Entities (TEGE) Division Counsel. This new office provides advice and assistance to the IRS TE/GE Division, including Exempt Organizations, on enforcement and compliance issues. The TE/GE Commissioner and Director of EO have frequent meetings and telephone calls with the Division

Counsel regarding issues and cases pending in EO. Similarly, the Directors of EO Rulings &
Agreements and EO Examinations have frequent meetings with the Deputy Division Counsel
regarding issues pending in their respective organizations. As a result of these actions, there is
now a clear separation of duties, as well as well-defined procedures and improved lines of
communication between TE/GE leaders and their counterparts in the Office of Chief
Counsel.

*Recommendation & Action:*

> Recommend to IRS Chief Counsel and the Department of the
> Treasury that guidance on how to measure the "primary activity"
> of I.R.C. § 501(c)(4) social welfare organizations be included for
> consideration in the Department of the Treasury Priority Guidance
> Plan. (TIGTA Rec. No. 8.)

Proposed regulations under § 501(c) relating to political campaign intervention are on the
IRS's priority guidance plan. However, in December 2015, Congress passed legislation
prohibiting the IRS from issuing new regulations regarding § 501(c)(4) during FY 2016. *See* §
127 of the Department of the Treasury Appropriations Act, 2016 (Title I of Division E of the
Consolidated Appropriations Act, 2016). This prohibition was extended through December 9,
2016. *See* § 104 of the Continuing Appropriations Act, 2017. Accordingly, as required by
Congress, the IRS suspended the project.

*Recommendation & Action:*

> Develop guidance for specialists on how to process requests for
> tax-exempt status involving potentially significant political
> campaign intervention. This guidance should also be posted to the
> Internet to provide transparency to organizations on the application
> process. (TIGTA Rec. No. 5.)

The IRS has developed relevant guidance, originally through IGMs which were later
incorporated into the IRM, which have been issued internally and posted publicly on the internet.
Guidance addressed the optional expedited process for I.R.C. § 501(c)(4) organizations involving

potential political campaign intervention that had already applied for tax-exempt status. *See* IRM 7.20.2.3.2 (October 22, 2015). The optional expedited process, instituted in June 2013, allowed entities whose applications for 501(c)(4) status had been pending for more than 120 days as of May 28, 2013, and which had indicia of political activity, to get immediate resolution of their applications.[8]

The IRS also developed a template with prewritten questions that specialists could choose from when preparing an additional information request letter. *See* IRM 7.20.4.5 (October 6, 2015). Specialists may adapt the template questions or compose unique questions to solicit additional information from the applicant. Unique question require prior management approval. The template questions are publicly available online.

The revised letter and all of the template questions went through a comprehensive review process prior to implementation in January 2014. Subject matter experts from across the EO function, along with the TE/GE Division Counsel Office, the Office of Taxpayer Correspondence, and the Office of the TAS, reviewed the revised letter prior to implementation. In addition, the IRS revised its process to require managers or EO Quality Assurance to review additional request letters involving potential political campaign intervention prior to issuance.

In June 2013, the IRS sent letters to all applicants whose applications had been pending for more than 120 days as of May 28, 2013 informing them of their eligibility to participate in

---

[8] The optional expedited process is for applicants for 501(c)(4) status whose applications indicate the organization may engage in political campaign intervention activities or private benefit to a political party and the application does not otherwise present any issues that would bar tax exempt status. Under the optional expedited process, these entities may attest that those activities will amount to no more than 40% of their total expenditures and total time. This percentage is not an interpretation of law but is a "safe harbor" for those organizations that chose to participate in the optional process. This type of "safe harbor" is used by the IRS in other fact-specific areas in which reasonable people can disagree and the law is not well-developed. Entities that chose not to participate in this program were then processed by EO and not adversely affected by their decision not to make the "safe harbor" representation.

the new optional expedited process. *See* IGM TEGE-07-0613-0008 for description of this program. On December 23, 2013, further interim guidance was issued (IGM TEGE-07-1213-0024) expanding this optional expedited process to all section 501(c)(4) applicants whose applications indicate that the organization may be involved in political campaign intervention or in providing private benefit to a political party and that otherwise do not present any issue with regard to exempt status, not just those pending for 120 days as of May 28, 2013. IRS officials decided to implement the optional expedited process because it quickly addressed the backlog of cases identified in the 2013 TIGTA Report and it was an efficient use of taxpayer and Government resources.

      d. Training EO Specialists, Each Election Cycle, to Appropriately Process Applications that Involve Potential Political Campaign Intervention.

*Recommendations & Action* (TIGTA Rec. Nos. 3, 6, 9)

TIGTA recommended that the EO Director develop "training or workshops to be held before each election cycle" on four topics (1) "the proper ways to identify applications that require review of political campaign intervention activities," (2) "what constitutes political campaign intervention versus general advocacy," (3) "the ability to refer for follow-up those organizations that may conduct activities in a future year which may cause them to lose their tax-exempt status," and (4) how to "word questions in additional information requests letters and what additional information should be requested."

EO has implemented a training program to address each of these subjects. The training covers political campaign intervention in the context of 501(c) organizations. The training has

18

been held twice, starting in January 2014, and it will be held before each federal election cycle.[9]

In addition to the training, EO Rulings & Agreements developed Letter 1312, which provides

template development questions to be used when an EO agent needs additional information from

an entity before making a determination on its application. Letter 1312, Schedule K contains the

template questions for political campaign intervention.

      22.      In 2015, TIGTA issued a report confirming that the IRS took "significant action"

to address each of its nine recommendations. This report was based on TIGTA's audit of the IRS

conducted after the issuance of the 2013 TIGTA Report. On March 27, 2015, TIGTA issued a

report entitled *Status of Actions Taken to Improve the Processing of Tax-Exempt Applications

Involving Political Campaign Intervention* [2015 TIGTA Report] (attached to Memorandum).

TIGTA concluded that the IRS "has taken significant actions to eliminate the selection of

potential political cases based on names and policy positions, expedite processing of [26 U.S.C.]

§ 501(c)(4) social welfare organization applications, and eliminate unnecessary information

---

[9] In its 2015 report, TIGTA found that:

> The required training appropriately addressed: 1) the use of activities, instead of names and policy positions, to identify applications for further review, 2) what constitutes political campaign intervention versus general advocacy, 3) the type of additional information that should be requested and the appropriate wording of questions in additional information request letters, and 4) a change in process for referring organizations to the EO function Examinations office.

> In addition, this training included a detailed case study with handouts and exercises the staff was asked to complete related to organizations seeking tax-exempt status under I.R.C. §§ 501(c)(3) and 501(c)(4) and how to address issues presented in the case study to determine if potential political campaign intervention is indicated in the application. The case study was subsequently discussed in the smaller individual group sessions. 2015 TIGTA Report at 8.

In its 2015 report, TIGTA recommended that the IRS complete training earlier in the election cycle so employees can effectively apply it. The IRS agreed with this recommendation and committed to beginning delivery of training on political activities on March 1 of election years. In 2016, the IRS met this commitment.

requests." (Id. at 2.) With regard to the nine specific recommendations made in its 2013 TIGTA Report, the 2015 TIGTA Report found that the IRS has either taken corrective action or developed corrective procedures to address each recommendation. For example, TIGTA found that the IRS "eliminated the use of Be On the Look Out (BOLO) listings" and "developed preapproved [development] questions and has instituted a quality review process to provide better assurance that unnecessary information requests are not sent to applicants." (Id.)

**Senate Finance Committee (SFC) Findings and Recommendations**

23.　　On May 20, 2013, the Senate Finance Committee initiated a bipartisan investigation into allegations of potential targeting of certain tax-exempt organizations by the IRS.

24.　　On August 5, 2015, the Senate Finance Committee released a thorough and detailed bipartisan report (hereinafter referred to as "Committee Report") entitled *The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted by "Political Advocacy" Organizations from 2010-2013*.

25.　　The Committee Report contained a number of specific and focused bipartisan findings and related bipartisan recommendations related to ensuring applications for tax exempt status are processed timely and appropriately.[10] The Committee Report also contained additional

---

[10] Four recommendations concern issues not directly related to the processing of applications for tax exempt status. These are Committee Recommendations 8 and 9 regarding the processing of FOIA requests and Committee Recommendation 10 concerning the IRS's use of Office Communicator Server, an instant-messaging type application and ensuring that it complies with federal record retention guidance, and Committee Recommendation 7b regarding the implementation of all recommendations of the Government Accountability Office in their July 2015 report entitled, *IRS Examination Selection: Internal Controls for Exempt Organization Selection Should be Strengthened*, GA0-15-514. This declaration does not address the IRS's detailed responses to these recommendations, as they are not relevant to the processing of applications for tax exempt status.

recommendations prepared by the Majority and Minority staffs. Many of the recommendations were directed at Congress, such as recommendations to amend the Hatch Act, while others were directed at agencies other than the IRS.[11] The IRS has taken action to address all recommendations within its control, which involve (1) ensuring the use of objective criteria for evaluating applications for tax exempt status and eliminating unnecessary burden in the application process, (2) ending the backlog of applications and ensuring expeditious processing in the future, (3) ensuring there are procedures in place to provide timely guidance to EO specialists, and (4) ensuring appropriate and timely management oversight to troubleshoot future problems and ensuring managers are adequately trained.

---

[11] The following Committee Report Recommendations are outside the control of the IRS: 1b (revision to Hatch Act), 1c (creation of new position within Taxpayer Advocate Service dedicated to helping entities applying for tax exemption), and 7c (calling for additional review by TIGTA).

The following recommendations of the Majority Staff are outside the control of the IRS: 1 (remove IRS from the authority of the Treasury Department and established as an independent stand-alone agency), 2 (amend Federal Service Labor- Management Relations Statute to designate the IRS as an agency that is exempt from labor organization and collective bargaining requirements), 3 (amend 26 U.S.C. § 7428 of the Internal Revenue Code to enable applicants for tax-exempt status under 501(c)(4), (5), and (6) to seek a declaratory judgment if the IRS has not rendered a decision on whether or not it will approve an application within 270 days) [In 2015, Congress amended § 7428 to expand relief to encompass 501(c)(4) applicants.], 6 (enact legislation to require near-universal disclosure of donors).

The following recommendations of the Minority Staff are outside the control of the IRS: 1 (require (c)(4)s, (5)s, and (6)s to file notice of formation within 24 hours (same as 527s)), 2 (create a bright-line test on political activity), 3 (apply § 4955 penalty to (c)(4)s-excise tax on excess political expenditures) 4 (require the disclosure of donors who contribute over $200 to 501(c)(4)s who engage in political activity (same as 527 organizations), or $1,000), 5 (require FEC filings to be attached to 990s), 6 (require electronic filing of 990s), 7-9 (alternative recommendations concerning requiring "electioneering communications" to be funded through a § 527 entity or for donors to such activities to be disclosed), 10 (enact Follow the Money Act, which requires all individuals and entities engaged in independent political spending, including 501(c)(4)s, disclose the names of donors that contribute over $1,000 per year).

    a.  Ensuring the Use of Objective Criteria for Evaluating Applications for Tax Exempt Status & Eliminating Unnecessary Burden.

*Recommendation & Action:*

> Publish in the instructions to all relevant application forms objective criteria that may trigger additional review of applications for tax-exempt status and the procedures IRS specialists use to process applications involving political campaign activity. Prohibit the IRS from requesting individual donor identities at the application stage, although generalized donor questions should continue to be allowed, as well as requests for representations that, e.g., there will be no private inurement. (Comm. Rec. 1a.)

Since the release of the 2013 TIGTA Report, the EO function has made substantive updates to the Internal Revenue Manual (IRM) sections and revenue procedures related to the application process. It has made significant progress in facilitating public access via the IRS website to these materials. Regarding adding information to the instructions that accompany the Forms 1023 and 1024 (applications for tax exempt status), EO and the IRS's Tax Forms & Publications (TF&P) function worked together to examine this recommendation. They concluded that adding information regarding the criteria and application processing procedures to the formal instructions would make those instructions too long and burdensome for taxpayers. Rather than add to the instructions, EO and TF&P concluded that it made more sense to include this information on the product page. The product page is the IRS website page that contains the relevant form and instructions. (*See* https://www.irs.gov/uac/about-form-1023; https://www.irs.gov/uac/about-form-1024.) Putting this information on the product page also made sense because form instructions are updated on a set schedule and cannot be updated each time the IRS issues a relevant IRM, IGM, or Revenue Procedure. Product pages, in contrast, may be updated more frequently. So, including this information on the product page, rather than in the

formal instructions, also reduces the risk that a change in an IRM would lead to inaccurate information in the formal instructions.

In line with this, TF&P updated the product pages for the Forms 1023 and 1024 to contain a box on the left-hand side of the website with links to EO information. These links cover topics such as things to know before applying for tax exempt status and 10 tips to shorten the exempt application process, as well as links to sample development questions, sample determination guide sheets, and information regarding the optional expedited program for 501(c)(4) organizations. Moving forward, the EO function will review the current instructions for Form 1023 and Form 1024 to determine whether references to any of the resources available on the IRS's website need to be added.

EO has also taken steps to ensure that donors names will not be requested, unless necessary to an applicant's determination. Letter 1312 contains the template questions specialists may use in developing applications for tax-exempt status, and none of the template questions relate to donor identities. If an EO specialist believes it necessary to send a question that is not on the template, they must first receive managerial approval of the question. *See* IRM 7.20.2.3.2(5) (October 22, 2015). Additionally, this IRM provision cautions that agents should not "ask for information already in the case file or [information] you don't need to make a determination." Further, it reminds agents that "[g]enerally, donor names aren't necessary to make a determination and should not be requested."

*Recommendation & Action:*

> Review the recently-enacted procedures to determine if: (1) the process enables the IRS to impartially evaluate allegations of impermissible political activity; (2) any of the referrals have resulted in the IRS opening an examination related to political activity, and if so, whether such an examination was warranted; and (3) if necessary, the IRS should make further modifications

> to ensure that it carries out the enforcement function in a fair
> and impartial manner. (Comm. Rec. 7a.)

In order to enable the IRS to more accurately and impartially evaluate allegations of impermissible political activity, the Department of the Treasury and the IRS began the process of developing guidance under section 501(c)(4) on how to measure social welfare and non-social welfare activities. As required by Congress, the IRS suspended this project. EO issued revised procedures for the composition and operation of the Political Activity Referral Committee, whose job it is to review referrals for exam involving political campaign intervention and recommend referrals for audit in an impartial and unbiased manner. The Committee consists of three EO managers, selected at random. *See* Interim Guidance TEGE-04-0715-0018, July 16, 2015. These managers receive appropriate training and serve on the committee for two years. In order to recommend a case for examination, the Committee members must identify and document in the case file that the referral and associated publicly available records establish that an organization and any relevant persons associated with that organization may not be in compliance with Federal tax laws. The inaugural members of the newly composed Committee were selected in the beginning of August 2015. EO will conduct annual reviews to ensure that the committee members are operating in accordance with the Interim Guidance. The first such review by the manager overseeing the Committee was completed on January 14, 2016.

*Recommendation & Action:*

> A key finding of this report is that many small organizations with
> limited resources were overwhelmed by unduly burdensome IRS
> demands. We recommend that the IRS establish a streamlined
> application process for small organizations applying for tax
> exemption under 501(c)(3) and 501(c)(4) that enables them to
> avoid unnecessary administrative burdens, provided that
> appropriate conditions are satisfied. (Maj. Rec. 4.)

In order to ease the burden on applicants and streamline procedures, EO has modified procedures for all applications, including those with potential political campaign intervention activities. First, in February 2014, EO adopted Streamlined Case Processing, which allows applicants to make attestations regarding certain issues, instead of submitting additional information, in order to simplify the process for smaller applicants. Second, in addition to Streamlined Case Processing, in July 2014, EO introduced Form 1023-EZ, Streamlined Application for Recognition of Exemption Under Section 501(c)(3).[12] Third, as described, above, in response to TIGTA Rec. No. 7, the IRS created an optional expedited process so that § 501(c)(4) applicants with potential political campaign intervention activities whose applications had been pending could receive a determination immediately, if they fell within the safe harbor.

      b. Ending the Backlog of Applications and Ensuring Expeditious Processing in the Future.

*Recommendation & Action:*

> The Exempt Organizations division should track the age and cycle time of all of its cases, including those referred to EO Technical, so that it can detect backlogs early in the process and conduct periodic reviews of over-aged cases to identify the cause of the delays. A list of over-aged cases should be sent to the Commissioner of the Internal Revenue Service quarterly. (Comm. Rec. 2a.)

and

---

[12] On July 1, 2014, the IRS issued form 1023-EZ. Instead of the 26-page standard Form 1023, the Form 1023-EZ is only three pages long. Small organizations, comprising approximately 70 percent of all applicants, may qualify to use the new streamlined form. Since implementation of the Form 1023-EZ, processing times for Form 1023 applicants for exempt status has decreased. For example, for applications received during the first year following implementation of the Form 1023-EZ, the average cycle time for the Form 1023 was 191 days. For applications received from September 2015 to June 2016, this time had dropped significantly for Form 1023 applicants to 97 days. The average cycle time for Form 1023-EZ applicants was 14 days.

> The Internal Revenue Manual contains standards for timely processing of cases. Enforce these existing standards and discipline employees who fail to follow them. Managers should also be held accountable if their subordinates fail to follow these standards. (Comm. Rec. 3a.)

EO has modified its processes and procedures to ensure that cases are processed expeditiously, as the EO function is committed to resolving all determination cases within 270 days. In 2014, the EO function modified its internal processes by requiring status reports if a case becomes over-aged. This procedure allows EO managers to ensure that any potential barriers to resolution of the application are identified and addressed early on. The EO function also revised its procedures for technical assistance requests so that specialists handling those requests are required to respond by memoranda within 60 days.

TE/GE has also taken steps to ensure consistent management oversight of case age. Beginning in FY 2015, all TE/GE managers are required to conduct regular workload reviews with their employees. The managers then report the results of the reviews to their respective directors. Information about cycle time – the time to process applications from the date the application was mailed until the case is closed in the IRS system[13] – was, and continues to be, provided on a monthly basis to the EO Director and TE/GE Commissioner. Finally, cycle time data, including the number of over-age cases, are reported to the TE/GE Commissioner and the IRS Deputy Commissioner for Services and Enforcement quarterly,

---

[13] When a case is in "suspense" the time is not counted as part of the cycle time. A case is in suspense when an activity is occurring outside the control of EO, such as when the case is in IRS Appeals or a response to development questions is pending.

via the Business Performance Review process. Every six weeks, the IRS Commissioner is informed of the number of cases that have been pending for more than 270 days.

Employees are also being held accountable for meeting timeliness requirements. TE/GE employee job requirements include the expected time frames for taking action on cases. If an employee fails to meet performance timeliness standards, management will address the issues in a manner consistent with the negotiated contract between IRS Management and the National Treasury Employees Union. Similarly, if managers fail to meet performance standards, senior management will address the issues in a manner consistent with the manager's performance agreement. If an employee or manager is not meeting performance timeliness standards, those issues will also be addressed through employee performance appraisals.

*Recommendation & Action:*

> For all types of tax-exempt applicants, IRS guidelines should direct employees to come to a decision on whether or not it will approve an application for tax-exempt status within 270 days of when an application is filed. (Comm. Rec. 3b.)

EO has changed both its internal processes and introduced a new streamlined application form in order to achieve efficiencies in the processing of applications and put steps into place to resolve all determination cases within 270 days. In 2014, the EO function modified its internal processes to require status reports for over-age cases to ensure that potential barriers to resolution were identified and addressed early on. Following a thorough review of workflow processes aimed at reducing cycle times, the EO function introduced Streamlined Case Processing and the Form 1023-EZ, as detailed in response to Maj. Rec. 4, above. These actions complemented measures already adopted in response to the 2013

27

TIGTA Report, such as the optional expedited process for 501(c)(4) organizations with

potential political campaign intervention activities.

      c.  Ensuring Procedures to Provide Timely Guidance to EO Specialists.

*Recommendation & Action:*

> The Exempt Organizations division should track requests for
> guidance or assistance from the EO Technical Unit so that
> management can assess the timeliness and quality of the
> guidance and assistance it provides to both Determinations Unit
> employees and the public. (Comm. Rec. 2b.)

> and

> The Exempt Organizations division should track requests for
> guidance or assistance from the Office of Chief Counsel so that
> management can assess the timeliness and quality of the
> guidance and assistance it provides to both the Determinations
> Unit employees and the public. Any requests for guidance or
> assistance from the Office of Chief Counsel that have not been
> responded to on a timely basis should be promptly reported to
> the Commissioner of the Internal Revenue Service. (Comm.
> Rec. 2c.)

The IRS and the Office of Chief Counsel have completed realignments designed to

streamline the guidance process and better ensure timeliness of response. On January 12,

2015, part of the IRS's Tax Exempt and Government Entities Division realigned into the

Chief Counsel's Associate Office of TEGE. As a result of the realignment, the legal work

that was done in EO Technical and Guidance is now performed by the Office of Chief

Counsel. Accordingly, requests for legal work or guidance are tracked by the Office of Chief

Counsel's tracking system, Counsel Automated Systems Environment Management

Information System (CASE MIS). The process for requesting formal legal advice is laid out

in Rev. Proc. 2016-2, 2016-1 I.R.B. 102. In addition, the Office of Chief Counsel went

through a functional internal realignment to create a new office of Tax Exempt and

Government Entities Division Counsel, which is responsible for providing advice and

assistance to the IRS TE/GE. This realignment is detailed in response to TIGTA Rec. No. 4, above.

*Recommendation & Action:*

> Any further attempt by the IRS to promulgate regulations revising the standard for determining whether section 501(c)(4) organizations have engaged in political campaign intervention must not chill the free exercise of political speech by those organizations, nor disproportionately affect organizations on either side of the political spectrum. (Maj. Rec. 5.)

The Department of the Treasury and the IRS had begun the process of developing guidance under section 501(c)(4) on how to measure social welfare and non-social welfare activities, but this project was suspended, pursuant to mandate from the Congress.

*Recommendation & Action:*

> A final option which would not require changes in law envisions the IRS reversing its decision in 1959 to interpret "exclusively" as meaning "primarily." The regulatory decision that has led to hundreds of millions of dollars of political spending by "social welfare" organizations could be cancelled by another regulatory decision setting the same standards that applied before 1959. (Min. Rec. 11.)

The EO function has taken definitive steps to ensure a neutral review process for organizations applying for tax-exempt status. The Department of the Treasury and the IRS have also begun the process of developing guidance under section 501(c)(4) on how to measure social welfare and non-social welfare activities. Treasury and the IRS asked for, and received, comments on several areas, including three major issues: the proposed definition of political campaign activity; to which organizations that definition should apply; and the amount of political activity an organization can engage in consistent with a particular tax-exempt status. Ultimately, Treasury and the IRS strive to develop guidance that is clear, fair

to everyone, and easy to administer. However, as noted above, the Congress has mandated

the suspension of this project.

*Recommendation & Action:*

> The Democratic staff recommends that additional work be done
> to determine what reforms to 501(c)(5) and 501(c)(6)
> organizations are needed. (Min. Rec. 12.)

As the Commissioner has noted publicly, in considering proposed regulations for

political campaign intervention activities, the IRS was exploring the use of consistent

definitions and expanding applicability beyond just 501(c)(4) organizations before the

regulations project was suspended in accordance with § 127 of the Department of the Treasury

Appropriations Act, 2016 (Title I of Division E of the Consolidated Appropriations Act, 2016)

and § 104 of the Continuing Appropriations Act, 2017 (effective until Dec. 9, 2016).

    d.  Ensure Appropriate and Timely Management Oversight and Management
        Training

*Recommendation & Action:*

> Revise the Sensitive Case Report process or develop a more
> effective way to elevate important issues within the organization
> other than the Sensitive Case Reports system. Require the senior
> recipient of each Sensitive Case Report within the Division (a
> member of the Senior Executive Service) to memorialize
> specific actions taken in relation to each issue raised in the
> report, and require such report to be forwarded to the IRS
> Commissioner for review. (Comm. Rec. 4.)

Beginning in FY 2014, TE/GE established a new Risk Management Process as part of

the IRS's development of an agency-wide risk management program. This new mechanism

allows issues to be elevated from the group level to the executive leadership for review and

discussion in order to ensure that sensitive issues are timely elevated within the organization.

In addition to creating a process to elevate issues, the EO function revised several IRM

provisions to clarify the definitions of the types of issues requiring a Sensitive Case Report

(SCR), when and why to elevate issues, and the difference between elevating issues for manager and executive awareness versus to obtain a decision from the manager or executive on how to proceed. *See* IRM 1.54.1 (August 31, 2016). Issues are now elevated during monthly management updates, and SCRs are sent to executives who conduct a comprehensive review, ask necessary follow-up questions, request further briefings when appropriate, and determine potential next steps when needed. The EO Director also holds monthly technical briefings with the Director of Rulings & Agreements and Director of Examinations to discuss technical issues that require managerial input and awareness.

*Recommendation & Action:*

> Evaluate whether current organizational structures and workplace locations [decentralization] are inhibiting performance. Make appropriate adjustments to improve communication between employees and their managers. (Comm. Rec. 5.)

Following an evaluation of whether current organizational structures and workplace locations were inhibiting performance, the IRS made several notable structural changes aimed at enabling performance improvements. First, the assigned offices of the positions of EO Director and Director of EO Rulings & Agreements were relocated from Washington, D.C. to Cincinnati, Ohio. This change ensures that EO leadership is in the same office location as most EO employees who process applications.

TE/GE also recognized the importance of timely and useful guidance from its legal counsel, and to achieve this, TE/GE realigned the functions that perform legal analysis, as detailed in response to TIGTA Rec. No. 4, above.

*Recommendation & Action:*

> Set minimum training standards for all managers within the EO division to ensure that they have adequate technical ability to perform their jobs. (Comm. Rec. 6.)

EO has increased both its level of formal training and created a new system for informal knowledge sharing and guidance. EO previously held mandatory training for all EO employees on political campaign intervention activities. This training comprises written materials, virtual e-Learning sessions, and face-to-face, small-group, and technical workshops. In addition, starting in 2014, the EO function began holding quarterly continuing professional education sessions and Interim Guidance Awareness training. In addition to formal training, EO has implemented a new system for knowledge sharing by creating a knowledge management network. This knowledge management network provides EO function employees with easy access to information on a wide range of technical issues, such as unrelated business income tax and private foundations. The information highlights the relevant law, applicable revenue rulings and guidance, and frequently encountered issues. Employees also have access to knowledge management subject-matter experts for additional guidance and assistance. This network will increase information sharing across EO.

**Potential for Future Audits of Plaintiff**

26.    Tax exempt entities generally may be selected for audit by EO Examinations through referrals, which can come from individuals or groups outside the IRS or from other divisions within the IRS, or analysis of Form 990 series data.[14] This data analysis is done by an automated case selection model that uses the core Form 990 and supplementary forms and schedules to identify possible issues of noncompliance.[15] The model removes the subjectivity of

---

[14] The Form 990 series comprises the information returns used by tax exempt entities to fulfill their reporting obligations under 26 U.S.C. § 6033 and the associated Treasury Regulations.

[15] The case selection model combines over 150 data queries into one master query which is run against all filed Forms 990 to identify organizations with the most potential noncompliance. The individual queries are categorized (continued...)

case selection and applies a system that looks at multiple issues for case evaluation to identify potential problems with the return before the agent receives the cases to facilitate focused examinations.

27.     True the Vote, a § 501(c)(3) organization, does not differ from other tax exempt entities, in that it may be audited, based on either referrals or analyses of the information contained in its Form 990.

28.     True the Vote is not more or less likely to be audited based on any additional scrutiny using inappropriate criteria that may have taken place during its application process because actions taken during the application process are not considered by the automated case selection models.

29.     True the Vote has not had its Form 990 return or notice selected for audit.

30.     Because future audits could be based on referrals or analyses of filed Forms 990 that have not happened yet, there is no way to determine now whether True the Vote will be selected for audit at a future time.

---

(… continued)

by the significance (or risk) of the potential issue and use return information and internal data sources to identify organizations with potential non-compliance.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 11th day of November, 2016.

_____
TAMERA L. RIPPERDA
Director, Exempt Organizations
Tax Exempt and Government Entities
Internal Revenue Service
Cincinnati, OH