**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **TRUE THE VOTE, INC.,** | |
| *Plaintiff*, | |
| *v.* | Civ. No. 13-cv-00734-RBW |
| **INTERNAL REVENUE SERVICE**, *et al.*, | |
| | **Oral Argument Scheduled** |
| | **for March 2, 2017** |
| *Defendants*. | |

# TRUE THE VOTE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 4

    I.     The D.C. Circuit Has Foreclosed the Government's Argument that True the Vote Now Lacks Standing and Its Claims Are Not Ripe ................................................... 6

    II.    The Government's Motion Should Be Denied Because Summary Judgment is Inappropriate Prior to Discovery, Especially Where the Defendant Asserts Voluntary Cessation as the Basis for Mootness ....................................................................... 10

    III.   The Government's Motion Should Be Denied ....................................................... 14

        A.  The Summary Judgment Standard ................................................................. 14

        B.  The Government's Argument that This Case is Moot Because True the Vote's Application has been Granted Is Foreclosed by Circuit Precedent.................. 15

        C.  There are Material Facts in Dispute Regarding the IRS's Alleged Voluntary Cessation ........................................................................... 16

           1.  The Inspector General Report is Incomprehensive and Inherently Subject to Reasonable Dispute..................................................................................... 16

           2.  The IRS Has Not Demonstrated that the Discriminatory Conduct Will Not Recur and/or That it has Completely and Irrevocably Eradicated the Effects of the IRS's Discriminatory Conduct on True the Vote................................. 20

               a.  The Government's Own Evidence Undermines its Mootness Argument............................................................................. 21

               b.  The IRS Has Not Ceased Its Retention and Disclosure of Information Demanded from True the Vote .......................................................... 23

               c.  Other Sources of Evidence Demonstrate that the Government Has Not Permanently Ceased the Alleged Conduct and it is Likely to Recur.... 25

               d.  There are Questions of Fact Concerning the Ongoing Effects of the IRS's Dissemination of True the Vote's Application Material Within and Outside of the IRS.......................................................................... 31

CONCLUSION.................................................................................................................. 33

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abraham v. WPX Prod. Prods., LLC*,
    184 F. Supp. 3d 1150 (D.N.M. 2016) ..........................................................................7

*Aka v. Wash. Hosp. Ctr.*,
    156 F.3d 1284 (D.C. Cir. 1998) .................................................................................14

*AFL-CIO v. FEC*,
    333 F.3d 168 (D.C. Cir. 2003) ..................................................................................24

*Americable Int'l v. Dep't of Navy*,
    129 F.3d 1271 (D.C. Cir. 1997) .................................................................................10

*Am. Broad. Cos. v. United States Info. Agency*,
    599 F. Supp. 765 (D.D.C. 1984) ...............................................................................12

*\*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................................................3, 11-12, 14-15

*Benoit v. United States Dep't of Agric.*,
    577 F. Supp. 2d 12 (D.D.C. 2008) .............................................................................14

*Blackwell Publ'g, Inc. v. Excel Research Group, LLC*,
    2008 U.S. Dist. LEXIS 13233 (E.D. MI, Feb. 22, 2008) ........................................5 n.2

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................................10

*Church of Scientology v. United States*,
    506 U.S. 9 (1992) ......................................................................................................24

*Clark v. Library of Congress*,
    750 F.2d 89 (D.C. Cir. 1984) ...............................................................................10 n.4

*Colo. River Cutthroat Trout v. Salazar*,
    898 F. Supp. 2d 191 (D.D.C. 2012) ...........................................................................11

*County of San Miguel v. Kempthorne*,
    587 F. Supp. 2d 64 (D.D.C. 2008) .............................................................................16

*Del Monte Fresh Produce Co. v. United States*,
    570 F.3d 316 (D.C. Cir. 2009) ................................................................................6-7

*Dickerson v. United States*,
    530 U.S. 428 (2000) ..................................................................9

*DL v. District of Columbia*,
    302 F.R.D. 1 (D.D.C. 2013) .......................................................7

*DL v. D.C.*,
    2016 U.S. Dist. LEXIS 65151 (D.D.C. May 18, 2016) ..............11

*Donofrio v. Camp*,
    470 F.2d 428 (D.C. Cir. 1972) ..................................................11

*First Chicago Int'l v. United Exch. Co.*,
    836 F.2d 1375 (D.C. Cir. 1988) ................................................10

*Freedman v. Maryland*,
    380 U.S. 51 (1965) .....................................................................9

*\*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...........................................................*passim*

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ...................................................................9

*Linchpins of Liberty v. United States*,
    No. 13-cv-777 (D.D.C.) ............................................................15

*NAACP v. Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) ..................................................................24

*Nat'l Treasury Emples. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ..................................................7

*Price v. W. Res., Inc.*,
    232 F.3d 779 (10th Cir. 2000) ..................................................12

*Qassim v. Bush*,
    466 F.3d 1073 (D.C. Cir. 2006) ..................................................2

*Rattigan v. Holder*,
    982 F. Supp. 2d 69 (D.D.C. 2013) ...........................................11

*Richardson v. Gutierrez*,
    477 F. Supp. 2d 22 (D.D.C. 2007) ....................................13 n. 5

*Tao v. Freeh*,
   27 F.3d 635 (D.C. Cir. 1994) ...................................................................15

*True the Vote, Inc. v. IRS*,
   71 F. Supp. 3d 219 (D.D.C. 2014) .....................................................15, 23

*\*True the Vote, Inc. v. IRS*,
   831 F.3d 551 (D.C. Cir. 2016) ..........................................................*passim*

*United Presbyterian Church v. Reagan*,
   738 F.2d 1375 (D.C. Cir. 1984) ........................................................ 9-10

*Wiggins v. Powell*,
   2005 U.S. Dist. LEXIS 3984 (D.D.C. Mar. 27, 2005) .........................13 n. 5

*Z Street v. Koskinen, et al.*,
   Civil No. 1:12-cv-401-KBJ (D.D.C.) ................................................. 13-14

*Z St. v. Koskinen*,
   791 F.3d 24 (D.C. Cir. 2015) ...................................................................30

## Rules

Federal Rule of Civil 56(c)(4) ....................................................................15

*Federal Rule of Civil Procedure 56(d) ...............................................3, 5 n.2, 11, 32

Federal Rule of Evidence 602.......................................................................6

Federal Rule of Evidence 802(c) .................................................................18

Federal Rule of Evidence 803(8)(A)(iii) .....................................................18

## Other Authorities

Black's Law Dictionary, 2d Pocket Edition 228 (West Group 2001) .......................................8

Bloomberg BNA, Daily Tax Report, "IRS Exempt Organizations Director Switching
Roles Next Month" (Oct. 26, 2016) ...........................................................6

Government Accountability Office, Report to Congressional Requesters,
"IRS Examination Selection: Internal Controls for Exempt Organization Selection
Should Be Strengthened" (July 2015) .....................................................19, 27

Government Accountability Office, "IRS Needs to Define Field Program Objectives and Assess Risks in Case Selection," September 13, 2016 ......................................................32

House Ways and Means Committee, Brady and Roskam Letter to Commissioner Koskinen, Sep. 20, 2016 ...................................................................................................19, 32

Press Release, House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit *(Remarks as Prepared)* (Sept. 18, 2013) ............................................................................................18, 26

Report, United States Senate, Committee on Finance, "The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted by 'Political Advocacy' Organizations From 2010-2013," Part 1 of 4 (Aug. 5, 2015) ..........19. 28

Staff Report, House of Representatives Committee on Oversight and Government Reform, "How Politics Led the IRS to Target Conservative Tax-Exempt Applicants for their Political Beliefs," 113th Cong. (June 16, 2014) ............................................................................19, 30

Staff Report, House of Representatives Committee on Oversight and Government Reform, "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress," 113th Cong. (Dec. 23, 2014) .............................19, 30, 32

Treasury Inspector General For Tax Administration, "Status of Actions Taken to Improve the Processing of Tax-Exempt Applications Involving Political Campaign Intervention" (March 27, 2015) ...............................................................................................................*passim*

Plaintiff, True the Vote, Inc. ("True the Vote"), by counsel, respectfully states as follows in opposition to the Motion for Summary Judgment (Doc. 112) filed by Defendant the United States of America (the "Government").

## INTRODUCTION

The Government admits that True the Vote is entitled to discovery in this matter: "So they are entitled to discovery, we do not dispute that . . . ." Hearing Transcript, Status Conference before Judge Reggie B. Walton, 13:24-25, November 17, 2016 (hereinafter, "Transcript, November 17, 2016 Status Conference"). Indeed, the D.C. Circuit was clear: "The allegations of the complaint are quite sufficient to warrant a merits disposition based on adjudication of substantive evidence, not simply a dismissal at the pleadings stage." *True the Vote, Inc. v. IRS*, 831 F.3d 551, 563 (D.C. Cir. 2016). Despite its admission, the Government[1] now moves for summary judgment.

A motion for summary judgment under Rule 56 seeks a judgment on the merits of a case. The Government, however, does not argue the merits of this case, but rather argues this Court lacks subject matter jurisdiction. Perhaps that is because the D.C. Circuit has already deemed it "plain" that "that the IRS cannot defend its discriminatory conduct on the merits." *Id*. at 561. It is equally plain that this Court cannot rule for the Government on the merits of this dispute if it lacks jurisdiction to decide the merits in the first instance. Yet dismissal of this action would contravene the D.C. Circuit's instruction that the disposition of this case be based on "adjudication of substantive evidence," not "dismissal at the pleadings stage." *Id*. at 563.

---

[1] The term "Government" includes defendants United States of America, Internal Revenue Service, and Commission of the Internal Revenue Service.

1

For these reasons, it is unclear to True the Vote which legal principles—summary judgment or subject matter jurisdiction—govern this proceeding. But in any event, the burden of establishing that this case is moot is on the Government. Realizing that its burden is a "heavy" one, *True the Vote*, 831 F.3d at 556, the Government—again—tries to limit the relevant facts to the tax-exemption application process. That position, however, is foreclosed by the D.C. Circuit.

The D.C. Circuit was well aware that for True the Vote, the application process had ended prior to the Court's decision. The Court found that fact "immaterial to [its] ultimate decision," ruling that the Court's "statements of law . . . are applicable to both" True the Vote and groups whose applications remained pending at the time. *Id*. at 554. Recognizing that the "complaints alleged extensive discriminatory conduct," *id*. at 563, the D.C. Circuit remanded the case to this Court to ensure that there is no reasonable expectation that the conduct will recur and that all *effects* of such conduct have been "*completely and irrevocably* eradicated[.]" *Id*. at 561 (emphasis added) (quoting *Qassim v. Bush*, 466 F.3d 1073, 1075 (D.C. Cir. 2006)). The Government's evidence falls far short of demonstrating the permanent cessation and eradication the law requires.

As a last ditch effort, the Government attempts to flip the voluntary cessation doctrine on its head, arguing that it is True the Vote's burden to demonstrate that its claims are justiciable. That position, too, is foreclosed by the D.C. Circuit. True the Vote's standing to bring this action has long been established and cannot suddenly be 'lost' or be found lacking. The issue before the Court in this latest round of debate is about mootness, not standing, and the burden is on the Government to establish the claimed mootness—and True the Vote is entitled to discovery before the Court adjudicates the Government's mootness claims.

The D.C. Circuit prudently recognized, "the jurisdictional question before th[is] court is fact-dependent." *True the Vote*, 831 F.3d at 562. The Government asks this Court to decide the mootness question in its favor *before* any fact-finding has been conducted. Remarkably, the Government advances its mootness claim based upon a single, incomprehensive report that is, at best, one piece of evidence this Court may consider, but which True the Vote has every right to challenge and contravene. In essence, the Government wants to maintain a monopoly on the sources of proof, limiting the presentation of facts to only those facts which the Government chooses to disclose. This, the Government cannot do. The Government's request is fundamentally at odds with the basic principle of adversarial adjudication "that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986).

What facts True the Vote can marshal without the benefit of discovery plainly call into question the Government's claims that the changes it has allegedly made have "completely and irrevocably eradicated the effects of the" IRS's discriminatory treatment of certain non-profit groups both inside and outside the application process. Indeed, the Government's own evidence describes deficiencies within the agency that continue to pose threats to groups like True the Vote. Accordingly, the Government's Motion should be denied, or alternatively, deferred until such time as True the Vote has been able to test and rebut the Government's assertions through the normal and customary discovery process. (*See* Declaration of Cleta Mitchell in Support of Motion for Discovery Under Federal Rule of Civil Procedure 56(d).)

**ARGUMENT**

True the Vote alleged that the IRS developed and implemented a policy under which certain applicants for tax-exempt status were subjected to discriminatory and unconstitutional treatment. (*E.g.*, Doc. 14 ¶¶ 73-76.) True the Vote alleged that such treatment is ongoing and accordingly sought, in part, "[i]njunctive relief to prevent the IRS from further implementing and applying the IRS Targeting Scheme and any other similar practices and policies." (Doc. 14 Request for Relief at 3.) On appeal, the Government argued that this case is moot because it has permanently ceased the conduct which gave rise to the complaint. The D.C. Circuit disagreed, finding that "voluntary cessation has never occurred" in this case. *True the Vote*, 831 F.3d at 561. Even assuming that cessation has occurred, a live controversy remains because the Government failed to present "anything" which demonstrates "(1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *True the Vote*, 831 F.3d at 561, 563.

The D.C. Circuit was clear: "The allegations of the complaint are quite sufficient to warrant a merits disposition based on adjudication of substantive evidence, not simply a dismissal at the pleadings stage." *True the Vote*, 831 F.3d at 563. Notwithstanding these instructions, following remand, this Court offered the Government yet another chance to seek dismissal on the basis of mootness. The Court, however, gave clear instructions to the Government: address why True the Vote "will not experience any negative consequences resulting from the alleged discriminatory targeting scheme employed by the defendants *throughout its tenure as a tax-exempt entity*." (Doc. 109 (emphasis added).)

In response, the Government has submitted a single report of the Treasury Inspector General for Tax Administration (Doc. 112-1, hereafter "2015 TIGTA Report"), and an affidavit

that, for the most part, repeats the findings made in the report, (Declaration of Tamera L.

Ripperda, Doc. 112-3).[2] The 2015 TIGTA Report does not address True the Vote's Amended

Complaint, but rather addresses the IRS's response to recommendations TIGTA believed the IRS

should implement in order to improve its processing of tax-exemption applications. (*See* Doc.

112-1 at Highlights.) Although TIGTA concludes that the IRS has made *some* progress in

reforming its behavior, the Report falls well short of demonstrating that True the Vote "will not

experience any negative consequences . . . throughout its tenure as a tax-exempt entity." (Doc.

109.) In fact, the Report fails to address True the Vote at all. Instead, the Report discusses

general changes and only so far as they relate to the application process, not the continuing

oversight of non-profit groups by the IRS "throughout [their] tenure." *See id*. Specifically, the

Report fails to address the political motivation behind the Targeting Scheme and certain

persisting "effects" of the Targeting Scheme, including the IRS's retention of material

unlawfully collected from True the Vote. Moreover, the Report highlights ongoing deficiencies

within the IRS that continue to pose threats to groups like True the Vote.

   Importantly, the 2015 TIGTA Report is only one of several sources of evidence that

concern the IRS Targeting Scheme. Other sources—which have been ignored by the

---

[2] As True the Vote explains in its Motion for Discovery Pursuant to Federal Rule of Civil Procedure 56(d), the Government's Motion cannot be granted before allowing True the Vote to opportunity depose Ms. Ripperda or another individual with the necessary personal knowledge. Indeed, Ms. Ripperda is the Government's star—and only—witness. As another court succinctly explained,

[I]t is axiomatic that when a party files an affidavit or declaration in support of a motion for summary judgment under Fed. R. Civ. P. 56, the opposing party has the right to depose the affiant or declarant on the assertions made. *See Vance, by and Through Hammons v. U.S.*, 90 F.3d 1145, 1148 (6th Cir. 1996) (stating that "[t]he general rule is that summary judgement is improper if the non-movant is not afforded a sufficient opportunity for discovery."); *Wilfong v. Hord*, No. CS-05-746, 2007 U.S. Dist. LEXIS 25137, 2007 WL 1057396, *2 (S.D. Ohio Apr. 4, 2007) (allowing plaintiff to depose defendant who filed an affidavit in support of summary judgment, noting that "[p]rohibiting Plaintiff to depose [defendant] would only present one version of the facts at issue in this case.")

*Blackwell Publ'g, Inc. v. Excel Research Group, LLC*, 2008 U.S. Dist. LEXIS 13233 at *2-3 (E.D. MI, Feb. 22, 2008).

Government—contradict the Government's arguments and demonstrate that the Government's "facts" are subject to dispute. At minimum, these sources demonstrate the need for discovery and full adjudication of the merits of True the Vote's equitable claims.

The testimony of the Government's sole witness, Tamera L. Ripperda, does little to cure the defects of the 2015 TIGTA Report. Ms. Ripperda states that she is the current director of the IRS's Exempt Organization Division. (Doc. 112-3 ¶ 2.) However, Ms. Ripperda departed that position just *three* days after the Government submitted her testimony. *See* Bloomberg BNA, Daily Tax Report, "IRS Exempt Organizations Director Switching Roles Next Month" (Oct. 26, 2016), https://www.morganlewis.com/~/media/files/news/2016/bloombergbna_irs-exempt-organizations-director-switching-roles-next-month_26oct16.ashx?la=en (last accessed Jan. 19, 2017). Ms. Ripperda's departure means she is no longer in a position to oversee any recommendations the Government claims to have made within the IRS. Moreover, Ms. Ripperda was not in the position of EO Director—or even in a position within the EO unit—until years after the conduct alleged in the Amended Complaint occurred. (Doc. 112-3 ¶ 2 ("I have held this position since January 2014."). This raises serious questions regarding whether Ms. Ripperda has the requisite personal knowledge necessary to testify as to the IRS's conduct, the effects of that conduct, and the alleged eradication of those effects. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Consequently, the Government is entitled to neither summary judgment nor dismissal.

## I.     The D.C. Circuit Has Foreclosed the Government's Argument that True the Vote Now Lacks Standing and Its Claims Are Not Ripe.

The D.C. Circuit prudently recognized that "[t]he IRS has not disputed that this litigation began with a case or controversy." *True the Vote*, 831 F.3d at 558; *see also Del Monte Fresh*

*Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009) ("[S]tanding is assessed as of the time a suit commences.") In other words, the IRS has never disputed that when this action was filed, True the Vote had standing and its claims were ripe. Indeed, "if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Nat'l Treasury Emples. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996).

Relying on the Supreme Court's decision in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167 (2000), this Court recently explained that once established, standing cannot be lost.

> Standing—the requirement that plaintiffs have suffered a concrete injury caused by the defendant and capable of judicial redress—is "assessed as of the time a suit commences." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324, 386 U.S. App. D.C. 406 (D.C. Cir. 2009). So long as the named plaintiffs met this requirement at the time that the initial complaint was filed, Article III standing is satisfied. Events subsequent to the filing of the complaint may *moot* the plaintiffs' claims, but the plaintiffs do not lose *standing*.

*DL v. District of Columbia*, 302 F.R.D. 1, 19 (D.D.C. 2013) (emphasis in original); *see also Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150 (D.N.M. 2016) ("[W]hile mootness, a statute of limitations, or some other legal doctrine may eventually bar a suit, one cannot lose standing once one has it."). This Court, the D.C. Circuit, and even the Government have not disputed that that True the Vote established standing at the time the initial complaint was filed. *True the Vote*, 831 F.3d at 558 ("The IRS has not disputed that this litigation began with a case or controversy."). The Government's new argument that True the Vote has somehow *lost* standing is preposterous and has long since been foreclosed.

The issue before this Court is not standing, but mootness. But not just mootness— mootness as a result of the Government's alleged voluntary cessation of the challenged conduct.

"For a defendant to successfully establish mootness by reason of its voluntary cessation of the controversial conduct, the defendant must show that (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *True the Vote*, 831 F.3d at 561; *see also Friends of the Earth*, 528 U.S. at 190 (describing Government's burden as "formidable.").

Like its mootness argument, the Government's arguments concerning standing and ripeness turn on its erroneous belief that True the Vote may not seek relief from harm *outside* the tax-exempt application process. The Government misunderstands the nature of True the Vote's allegations and ignores its own burden of proof. The discriminatory conduct of which True the Vote complains is viewpoint discrimination in violation of the First Amendment. (*See* Doc. 14 ¶¶ 148-161.) That the IRS first subjected True the Vote to such discrimination in the processing of its application does not change the voluntary cessation standard which the Government must meet. The Government must demonstrate that "interim relief or events have completely and irrevocably eradicated the *effects* of the alleged violation," *True the Vote*, 831 F.3d at 561 (emphasis added).

An "effect" is "[t]hat which is produced by an agent or cause; a result, outcome, or consequence." Black's Law Dictionary, 2d Pocket Edition 228 (West Group 2001). There is nothing in the D.C. Circuit's opinion to support the Government's assertion that the Court placed limitations on which "effects" the Government must address. (*See* Doc. 112-3 (arguing that only evidence related to the processing of applications for tax exempt status is relevant).) Rather, it must address all of them.

The Government's characterization of "effects" falling outside of the application process as speculative "future harm" is nothing more than purposeful conflation of the legal principles of

8

mootness and standing in order to avoid the clear instructions from the D.C. Circuit requiring the Government to address all "effects of the alleged violation." Therefore, all injuries, whether present or future, that are a "consequence" of True the Vote having been discriminatorily targeted in the application process fall under the IRS's burden under the voluntary cessation doctrine.[3]

True the Vote has identified, *infra*, numerous "effects" of the IRS's conduct that go beyond the application process, but are left unaddressed by the Government, including the retention of True the Vote's application materials, the surveillance of targeted organizations immediately following the approval of their applications, the threat of unfair referral and selection for audit, the failure of the IRS to identify True the Vote as a recognized tax exempt public charity for months following the granting of its exempt status, and the dissemination of True the Vote's application within and outside the IRS, including whether and to what extent such dissemination led to the unfair targeting of True the Vote's founder, Catherine Engelbrecht, other officers and board members of True the Vote, their families and Ms. Engelbrecht's family businesses.

True the Vote has also alleged that the Targeting Scheme was designed to, and did, chill "the freedom of speech and association rights of [TTV]…in violation of the First Amendment." (Doc. 14 ¶¶ 151-52.) The Supreme Court "view[s] the importation of 'chill' as *itself* a violation of the First Amendment." *Dickerson v. United States*, 530 U.S. 428, 459 (2000) (Scalia, J., dissenting) (referencing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 342 (1974) and *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). A "chilling effect" constitutes an actionable

---

[3] The Government may, of course, dispute that a particular injury is not an "effect" of its discriminatory conduct, but such a dispute is a factual matter that should not be resolved prior to discovery.

injury where "the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984). It cannot be denied that True the Vote has suffered concrete harm at the hands of the Government.[4]

By resorting to jurisdictional arguments instead of addressing the "effects" of its unlawful conduct, the Government has ignored not only the D.C. Circuit's instructions, but also a clear order from this Court to "address[] why the plaintiff will not experience any negative consequences resulting from the alleged discriminatory targeting scheme employed by the defendants *throughout its tenure as a tax-exempt entity*." (Doc. 109 (emphasis added).) By its very text, this order instructs the Government to address harm that may occur in the future as a result of the alleged violation. The Government's standing and ripeness arguments are unavailing, have been foreclosed by the D.C. Circuit and must, accordingly, be rejected.

II.     **The Government's Motion Should Be Denied Because Summary Judgment is Inappropriate Prior to Discovery, Especially Where the Defendant Asserts Voluntary Cessation as the Basis for Mootness.**

The Supreme Court and the D.C. Circuit instruct that "summary judgment ordinarily 'is proper only after the plaintiff has been given adequate time for discovery.'" *Americable Int'l v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988)); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[4] This case closely resembles *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984), in which the plaintiff alleged that he was subjected to an eight-month FBI investigation at the request of his employer, the Library of Congress, as a result of his association with a group affiliated with the Socialist Workers Party. *Id.* at 91. The plaintiff sought, *inter alia*, "an injunction against any Library requests for further investigations." *Id.* at 92. The court dismissed his complaint. On appeal, the D.C. Circuit held that the plaintiff's claim for injunctive relief to prevent the chilling of his First Amendment rights could proceed because the defendants engaged in a "targeted investigation of an individual based solely on the exercise of his associational rights resulting in concrete harms." *Id.* at 93. Similarly, apart from the unnecessary inquiries into True the Vote's activities and associations, the Targeting Scheme resulted in concrete harm to True the Vote, including the forfeiture of a $25,000 grant and the return of a $35,000 grant, both of which had been contingent on True the Vote receiving its tax-exempt status on a timely basis. (Doc. 14 ¶¶ 210-11.)

322 (1986) (summary judgment appropriate only "after adequate time for discovery"); *Anderson*, 477 U.S. at 257 (summary judgment should "be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition"). That is because the disposition of a summary judgment motion requires the court to assess the presence or absence of disputed facts. Naturally, where only one party has presented its version of the facts, the court is, with limited exception, unable to resolve the motion.

The purpose of this principle and Federal Rule of Civil Procedure 56(d) "is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Rattigan v. Holder*, 982 F. Supp. 2d 69, 76 (D.D.C. 2013) (citations and quotations omitted). This rule, like all rules governing discovery, is "to be construed liberally to prevent injustice." *Donofrio v. Camp*, 470 F.2d 428, 431 (D.C. Cir. 1972).

Consideration of the Government's motion is especially inappropriate here because the Government relies on its voluntary cessation as the basis for its motion. "[W]hether or not defendants have met their burden [under that doctrine] is a factual inquiry," *DL v. D.C.*, 2016 U.S. Dist. LEXIS 65151, *22 (D.D.C. May 18, 2016), that, for the reasons stated, does not lend itself to resolution prior to discovery. *See also Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 212 (D.D.C. 2012) ("Whether a practice is likely to recur is a factual matter.") (citing *Friends of the Earth*, 528 U.S. at 193 ("The effect of both Laidlaw's compliance and the facility closure on the prospect of future violations is a disputed factual matter.").

The gravity of the Government's burden in this case provides an additional basis to deny the motion or continue its consideration to allow for discovery. "[T]he standard for determining whether a case has been mooted by the defendant's voluntary conduct is *stringent*" and the

Government's burden is "formidable." *Friends of the Earth*, 528 U.S. at 189-90 (emphasis added). The Government must clearly demonstrate that "(1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *True the Vote*, 831 F.3d at 561. It is contrary to the weight of that burden to assert, as the Government does, that this case can be resolved on the word of the Government alone.

In order to oppose the Government's motion, True the Vote must necessarily utilize information and witnesses in the possession and control of the IRS. In such a case, the Supreme Court instructs that the plaintiff must be given a full opportunity to conduct discovery.

> [T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, **as long as the plaintiff has had a full opportunity to conduct discovery.** We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial.

*Anderson*, 477 U.S. at 257 (emphasis added).

Accordingly, this Court instructs that the defendant's exclusive control of discoverable information weighs in favor of granting a request for discovery. *Am. Broad. Cos. v. United States Info. Agency*, 599 F. Supp. 765, 770 (D.D.C. 1984); *see also Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000) ("The movant's exclusive control of … information is a factor weighing heavily in favor of relief under Rule 56(f).").

By seeking summary judgment prior to discovery, the Government "wants to maintain a monopoly on the sources of proof, and insulate the persons most knowledgeable about the events . . . limiting the presentation of facts to only those facts which the [Government] desires to disclose." *Am. Broad. Cos.*, 599 F. Supp. at 770. This Court has described such circumstances as

"the very situation in which a Rule 56[(d)] continuance for additional discovery is most appropriate." *Id.*[5]

Importantly, a similarly-situated Plaintiff in another case pending before this Court has recently been permitted to proceed with discovery regarding its challenge to the processing of its application for tax-exempt status. *See Z Street v. Koskinen, et al.*, Civil No. 1:12-cv-401-KBJ (D.D.C.) During the November 17, 2016 Status Conference, the Government referred to *Z Street*, as presenting "a similar issue" to the issue here. Transcript, November 17, 2016 Status Conference at 12:6. As explained by the Government at the November 17, 2016 conference, "[i]n that case recently the IRS approved the Z Street application and then the judge…issued an issue to show cause as to why the case shouldn't be dismissed." *Id.* at 12:10-13; *see also* Minute Order, *Z Street v. Koskinen, et al.*, Civil No. 1:12-cv-401-KBJ (D.D.C. Oct. 20, 2016). On November 11, 2016, Z Street filed a Response to the Order of the Court explaining why the case was not moot. Doc. 99, *Z Street v. Koskinen, et al.*, Civil No. 1:12-cv-401-KBJ (D.D.C. Nov. 11, 2016). On November 30, 2016, the Government filed a 30-page response requesting that the case be dismissed as moot. Doc. 100, *Z Street v. Koskinen, et al.*, Civil No. 1:12-cv-401-KBJ (D.D.C. Nov. 30, 2016).[6] The very next day, the Court ordered that the parties confer and submit a joint proposed schedule including "(1) a proposed deadline for the conclusion of the discovery period, and (2) a proposed schedule for the filing of dispositive motions, including any motions that the

---

[5] The Government might argue that discovery is not appropriate in light of the Congressional investigations into the IRS Targeting Scheme. But those investigations do not obviate True the Vote's need for discovery here. First, True the Vote does not have access to all the information provided to Congress and, second, even if it did, discovery is still warranted even where some material has been made available to the parties prior to discovery. *See Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 30 (D.D.C. 2007) (summary judgment inappropriate prior to discovery "even if a plaintiff has had an opportunity to collect evidence through the EEO administrative process") (citing *Wiggins v. Powell*, 2005 U.S. Dist. LEXIS 3984, *24 (D.D.C. Mar. 27, 2005)).

[6] In the alternative, the Government requested "a scheduling order providing that the parties conclude discovery in no more than 90 days." *Id.* at 29. In contrast to the present case where TTV has not been permitted any discovery, the Government and Z Street have been engaged in discovery since August 25, 2015. *Id.*

parties intend to file related to the issues discussed in the parties' 99 , 100 Responses." Minute Order, *Z Street v. Koskinen, et al.*, Civil No. 1:12-cv-401-KBJ (D.D.C. Dec. 1, 2016). This Court then adopted the parties' proposed schedule, including the parties' agreed-to date of April 28, 2017 for the close of discovery. Doc. 103, Order, *Z Street v. Koskinen, et al.*, Civil No. 1:12-cv-401-KBJ (D.D.C. Dec. 22, 2016). At a minimum, the Court's actions in *Z Street* indicate that the Government's arguments regarding justiciability were untimely and that further discovery was appropriate. Likewise, the Government's similar justiciability arguments here should be rejected.

Even the limited facts that True the Vote has been able to marshal without the benefit of discovery underscore the feebleness of the Government's claims that the changes it has allegedly made have "completely and irrevocably eradicated the effects of the" IRS's discriminatory treatment of certain non-profit groups. Indeed, the Government's own evidence describes deficiencies within the agency that continue to pose threats to groups like True the Vote.

For the reasons that follow, the Government's motion for summary judgment should be denied, or at minimum, deferred until such time has True the Vote has had the opportunity to discover facts essential to its opposition.

## III.    The Government's Motion Should Be Denied.

### A.  The Summary Judgment Standard.

"[A] party is only entitled to summary judgment if the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (citations omitted). "When a motion for summary judgment is under consideration, 'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his or her] favor.'" *Benoit v. United States Dep't of Agric.*, 577 F. Supp. 2d 12, 15 (D.D.C. 2008) (quoting *Anderson*, 477 U.S. at

255. "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248. "If material

facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary

judgment is not available." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

Further, "[s]upporting and opposing affidavits shall be made on personal knowledge,

shall set forth such facts as would be admissible in evidence, and shall show affirmatively that

the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(c)(4).

### B. The Government's Argument that This Case is Moot Because True the Vote's Application has been Granted Is Foreclosed by Circuit Precedent.

In September 2013, more than three years after the IRS branded True the Vote as an

entity deserving of heightened review and scrutiny, the IRS finally recognized True the Vote as a

tax-exempt entity. Immediately thereafter, the IRS moved to dismiss True the Vote's Amended

Complaint on the grounds that the equitable claims against the agency were now moot. This

Court agreed that they were, holding that "[t]he allegedly unconstitutional conduct, which

delayed the processing of the plaintiff's tax exempt application and brought about this litigation,

is no longer impacting the plaintiff." *True the Vote, Inc. v. IRS*, 71 F. Supp. 3d 219, 226-27

(D.D.C. 2014).

On appeal, the D.C. Circuit heard argument in this case alongside the related case

*Linchpins of Liberty v. United States*, No. 13-cv-777 (D.D.C.), which at the time of the D.C.

Circuit's decision, included plaintiff-organizations whose applications for tax-exemptions

remained pending at the IRS. With respect to True the Vote, and all other plaintiffs before the

court—both those whose applications had been granted and those whose applications were still

pending—the panel held that the equitable claims for declaratory and injunctive relief were not

moot. *True the Vote*, 831 F.3d at 561.

The court plainly indicated that the status of True the Vote's application—or that of any other targeted organization— was "immaterial" to the court's mootness determination:

> Although these cases are not officially consolidated, they were separately argued before the same panel on the same day and are governed by the same legal principles on decision. We have therefore determined that a single opinion is sufficient for the disposition of both. **Although there are differences in factual detail, those differences are immaterial to our ultimate decision on all issues, and therefore, all our statements of law hereinafter are applicable to both.**

*True the Vote*, 831 F.3d at 554 (emphasis added.)

Undeterred, the Government again argues to this Court that True the Vote's claims are moot because its application has been granted. (MSJ at 8.) Nothing has changed with respect to True the Vote's application—it was granted at the time the D.C. Circuit issued its decision. The D.C. Circuit's decision on this issue remains controlling and the Government's argument must fail, again.

### C. There are Material Facts in Dispute Regarding the IRS's Alleged Voluntary Cessation.

#### 1. The Inspector General Report is Incomprehensive and Inherently Subject to Reasonable Dispute.

The Government effectively asks this Court to treat the 2015 TIGTA Report as a conclusive substitute for discovery. This Court has previously refused a far narrower request and should do so again in this case. In *County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64 (D.D.C. 2008) (Walton, J.), this Court refused to even take judicial notice of an inspector general report, concluding that the "report is not the type of document about which there can be no reasonable dispute. *Id*. at 78. The Court reached its conclusion because it independently "[knew] nothing about the investigative process which led to the report's conclusions, and it [could not] assess the report's validity." *Id*.

The same concerns are present here. Although the 2015 TIGTA Report describes its "objective, scope, and methodology," (Doc. 112-1 at 20), it does so at such a high level of generality that it cannot be determined which documents TIGTA reviewed nor which officials TIGTA interviewed. For nearly all nine recommendations, TIGTA describes its methodology as generic review of "e-mails, memorandums, procedures and guidance." (*E.g.*, Doc. 112-1 at 21.) Furthermore, interview subjects were chosen randomly from a pool limited to "Determinations Unit and Quality Assurance first-line managers and employees responsible for processing applications." (*Id.* at 20.) In other words, the Report falls woefully short of addressing myriad other interactions True the Vote might have with IRS personnel beyond the application process in which they will continue to experience discriminatory treatment for the same unlawful reasons its application was targeted.

The Government has repeatedly pointed to True the Vote's reliance on the 2013 TIGTA Report as a reason this Court should afford great weight to TIGTA as a source of evidence. (*See, e.g.*, Doc. 112 at 8-9.) However, TIGTA's findings are not the equivalent of True the Vote's Amended Complaint. TIGTA's findings are simply one source of evidence that demonstrates the veracity of the allegations in the Amended Complaint. More fundamentally, the parties' mutual reliance on a particular source does not substitute for the rules of evidence. Even assuming TIGTA's reports are subject to judicial notice, those reports, "like any other evidence, [are] subject to a trial court's determination as to [their] weight, effect, and consistency with other evidence." *True the Vote*, 831 F.3d at 562. Accordingly, weight given to TIGTA as a source of evidence must depend on its "consistency with other evidence" offered by True the Vote, evidence that plainly contradicts the Government's arguments concerning its legal sufficiency of its alleged voluntary cessation.

The Government makes no attempt to even establish the admissibility of the 2015 TIGTA Report. The D.C. Circuit stated that the Government is "free to offer the document in the district court" but did not rule on its admissibility. *True the Vote*, 831 F.3d at 562 ("The 2015 report *may* be noticeable.") (emphasis added). Yet the Government does not even ask for judicial notice. The Government has simply attached the document to its summary judgment motion and has asked this Court to accept—as *undisputed facts*—all statements contained within the document.

The Government's submission and reliance upon the 2015 TIGTA Report is contrary to the rules of evidence. All factual statements in the 2015 TIGTA Report offered by the Government to establish their truth are hearsay. Federal Rule of Evidence 802(c). Those statements might be admissible under the exception to the rule against hearsay for records of a public office setting out "factual findings from a legally authorized investigation," Federal Rule of Evidence 803(8)(A)(iii), but the Government makes no attempt to prove that they are.[7]

Nevertheless, to admit and consider the Government's reports without admitting and considering the evidence and alternative reports offered by True the Vote would contravene the D.C. Circuit's instruction the disposition of this case be "based on adjudication of substantive evidence." *Id.* at 563. Accordingly, True the Vote requests that the Court take judicial notice of or admit under Rule 803(8)(a)(iii) the following investigative reports and statements:[8]

- Press Release, House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit *(Remarks as Prepared)* (Sept. 18, 2013)

---

[7] Conversely, statements of the IRS and its agents one which True the Vote relies do not present the same hearsay problems if they are "statements against interest," as that phrase is defined in Federal Rule of Evidence 804(b)(3).

[8] All reports were downloaded from the websites of the entity that issued the report or statement.

(http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=350126 (accessed Jan. 15, 2017));

- House Ways and Means Committee, Brady and Roskam Letter to Commissioner Koskinen, Sep. 20, 2016 (attached as Exhibit A);

- Government Accountability Office, Report to Congressional Requesters, "IRS Examination Selection: Internal Controls for Exempt Organization Selection Should Be Strengthened" (July 2015) (attached as Exhibit B);

- Staff Report, House of Representatives Committee on Oversight and Government Reform, "How Politics Led the IRS to Target Conservative Tax-Exempt Applicants for their Political Beliefs," 113th Cong. (June 16, 2014) (attached as Exhibit C).

- Staff Report, House of Representatives Committee on Oversight and Government Reform, "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress," 113th Cong. (Dec. 23, 2014) (attached as Exhibit D); and

- Report, United States Senate, Committee on Finance, "The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted by 'Political Advocacy' Organizations From 2010-2013," Part 1 of 4 (Aug. 5, 2015)[9] (attached as Exhibit E).

The Government's burden is to submit evidence demonstrating that *all effects* of the Targeting Scheme have permanently ceased and will not recur. The evidence submitted by the Government is disputed and incomprehensive and thus fails to satisfy that stringent standard, certainly at the summary judgment stage.

---

[9] To reduce the size of this exhibit, the appendices have been omitted.

### 2. The IRS Has Not Demonstrated that the Discriminatory Conduct Will Not Recur and/or That it has Completely and Irrevocably Eradicated the Effects of the IRS's Discriminatory Conduct on True the Vote.

Perhaps the most troubling aspect of the Government's motion is the absence of any assurances concerning its treatment of True the Vote and the extent to which True the Vote is to be protected from the effects of that discriminatory treatment. The Government's burden in this case is to demonstrate with clarity that the effects of the discriminatory treatment of True the Vote have been completely and irrevocably eradicated. Logically, in order to demonstrate that its conduct—and all its attendant effects—have ceased, the conduct must first be described. Yet nowhere does the Government describe the unlawful treatment to which it subjected True the Vote, the effects of that treatment, and why such effects have been permanently eradicated. Instead, the Government holds steadfast to its erroneous belief that this case is limited to the application process and describes generally the changes it has allegedly made to that process at the behest of TIGTA.

Only the Government knows precisely the harm it inflicted on True the Vote and the full effect of that harm. The Government's failure to acknowledge and describe that harm is fatal to its argument. This Court cannot determine whether *all* effects of the Targeting Scheme have been "completely and irrevocably" eradicated absent full disclosure of those effects by the Government.

The Government's silence might be easily explained by the fact that it simply cannot make the necessary showing to establish mootness under the voluntary cessation doctrine. For starters, the Government's own evidence undermines its argument. Furthermore, the Government wholly ignores its retention of material it inappropriately demanded from True the Vote as a direct result of the Targeting Scheme. The Government also ignores numerous other sources of

evidence that prevent the Government from satisfactorily demonstrating that True the Vote will

"not experience any negative consequences resulting from the alleged discriminatory targeting

scheme employed by the defendants throughout its tenure as a tax-exempt entity," as this Court

requires. Lastly, there are triable questions of fact concerning the dissemination and sharing of

True the Vote's application material both inside and outside the IRS.

### a. The Government's Own Evidence Undermines its Mootness Argument.

The Supreme Court holds that "a defendant claiming that its voluntary compliance moots

a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful

behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190.

Hoping to make the required showing of absolute clarity, the Government, not surprisingly,

chooses to address only the positive aspects of the 2015 TIGTA Report. The Report, however, is

not the ally the IRS believes it to be. Rather, the Report highlights numerous deficiencies that

persist within the IRS and which contradict the Government's own assertions that the application

process has been permanently reformed or that the tax administration procedures and practices of

the IRS are free from bias against True the Vote.

According to TIGTA, 21 percent of IRS employees required to take political campaign

intervention training did not complete one or more of the training sessions and/or did not attend

the training sessions for the required amount of time. (Doc. 112-1 at 13-14.) TIGTA expressed

concern that "[i]f employees miss key portions of training sessions, they may not have the

knowledge needed to effectively and efficiently carry out their responsibilities." (*Id*. at 14.)

Rather than institute measures to ensure its employees were attending the necessary training

sessions, the IRS *increased* the grace period for permissible missed training (*id*. at 15), meaning

that employees may now miss even more training. The consequences of missed training were

evident. TIGTA discovered that as many as 6.15 percent of employees "do not know what information to consider when determining if there was potential political campaign intervention" problems with a particular organization." (*Id.* at 25.) However, TIGTA was only 90 percent sure the number of such employees was not higher. (*Id.*)

Even more alarming is that the 'training' that the Government relies on as the guarantee against future discrimination against True the Vote doesn't even *apply* to True the Vote, or any other Section 501(c)(3) applicant or exempt organization. Such organizations are prohibited by law from engaging in ANY political campaign intervention – and the reliance by the Government on this 'training' only further undermines its argument as related to True the Vote. The entire subject suggests that the IRS *to this day* considers that an organization such as True the Vote, which appears to the Government to represent a conservative point of view, will automatically be subjected to heightened scrutiny for *potential* political campaign intervention That is what worries True the Vote and certainly forms no basis for acceptance of the Government's representations that the viewpoint discrimination has ceased. If anything, the reliance by the Government on the 2015 TIGTA Report further demonstrates that the IRS has learned little or nothing from this entire sordid episode.

Assuming, *arguendo*, that a cause of the IRS Targeting Scheme was "ineffective management,"[10] (Doc. 14-6 at 2), the 2015 TIGTA Report reveals that such ineffectiveness continues to persist. TIGTA found that "the IRS did not complete the process designed to evaluate the effectiveness of the training" its employees were allegedly completing. (Doc. 112-1 at 15.) Specifically, "the IRS did not compile or evaluate case study results completed by students to determine if they learned skills and acquired knowledge as a result of the training."

---

[10] True the Vote denies that "ineffective management" was the cause of the IRS Targeting Scheme.

(*Id*. at 16.) Consequently, TIGTA concluded: "Considering the importance of effectively training employees on proper handling of tax-exempt applications, *improvements in the timing and execution of future training are needed*." (*Id*.)

Finally, although the IRS claims that it has permanently ceased its use of BOLO listings in its administration of the tax laws (Doc. 112 ¶ 21(a)), TIGTA discovered that as many as 2.67 percent of employees were still using BOLO listings or other similar listing to identify cases or issues for further review, (*id*. at 25).

In light of these persistent deficiencies, by no means can it be said that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. at 190.

### b. The IRS Has Not Ceased Its Retention and Disclosure of Information Demanded from True the Vote.

True the Vote alleged that the IRS "made multiple, unnecessary, burdensome, and voluminous requests for information and documentation wholly unnecessary to the determination of [TTV's] tax-exempt status." (Doc. 14 ¶ 128.) The IRS remains in possession of this information and is required by law to publicly disclose it upon request. 26 U.S.C. § 6104(a)(1)(A).

The IRS's possession of this material is a direct consequence of the Targeting Scheme and an "effect" that continues to persist. Yet mention of it is glaringly absent from the Government's motion papers despite the Government's burden to clearly demonstrate that all "effects" of its improper conduct have been completely and irrevocably eradicated.

While this Court previously held that the injury caused by retention and public disclosure of True the Vote's confidential information was both too "speculative" and "different than the [harm] identified in the complaint," *True the Vote*, 71 F. Supp. 3d at 228, the D.C. Circuit

highlighted similar allegations in the *Linchpins* Complaint and held that the Government had not presented anything demonstrating that the alleged "unconstitutional requests for addition information" has been remedied such that the claims for relief were moot. *True the Vote*, 831 F.3d at 563.

The IRS's mere possession of information unlawfully collected injuries True the Vote. *Church of Scientology v. United States*, 506 U.S. 9, 13 (1992) ("Taxpayers have an obvious possessory interest in their records. When the Government has obtained such materials as a result of an unlawful summons, that interest is violated and a court can effectuate relief by ordering the Government to return the records."). And the public disclosure of that information separately injures True the Vote. *See, e.g.*, *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958); *AFL-CIO v. FEC*, 333 F.3d 168, 176-177 (D.C. Cir. 2003).

True the Vote is entitled to the return of all information inappropriately demanded in connection with the IRS Targeting Scheme. The scope of that information is disputed by the parties. The IRS contends that nearly all of the requests alleged by True the Vote to be unlawful—even those identified by TIGTA as "unnecessary"— were not even improper. (Government's Answer, Doc. 117 ¶ 129.)

True the Vote intends to use the discovery processes to discovery precisely what information was demanded from True the Vote for tax administration reasons and what information was demanded in perpetration of the Targeting Scheme. That information is essential to True the Vote's opposition because it shows both the presence of disputed facts and True the Vote's entitlement to relief such that the Government's request for summary judgment should be denied.

True the Vote is unable to presently produce the facts it intends to discover because those facts are in the possession of the IRS. Indeed, communications or records revealing an improper motive or otherwise demonstrating the impropriety of certain requests for information are not available to True the Vote through any source other than the IRS.

True the Vote's allegations are not confined to TIGTA's findings. As averred in the Amended Complaint, the requests for information identified as "unnecessary" by TIGTA are only a "sampling" of the requests propounded on True the Vote in perpetration of the Targeting Scheme. (Doc. 14 ¶ 130.) True the Vote intends to prove that additional information was unlawfully collected by the IRS, but can do so only through the use of information in the possession of the IRS.

### c. Other Sources of Evidence Demonstrate that the IRS Has Not Permanently Ceased the Alleged Conduct and it is Likely to Recur.

As noted, the TIGTA reports are not the only evidence concerning the IRS Targeting Scheme. Numerous other sources contradict the Government's assertions regarding its voluntary cessation and demonstrate that the Government has not provided the complete and irrevocable assurances needed to establish mootness.

Most notably, even after IRS claimed to have granted True the Vote's application in September 2013, it did not add True the Vote to its published list of approved charitable organizations until over *eight months later*, and did so only when undersigned counsel alerted the Government to the omission. Letters between Cleta Mitchell and Grover Hartt (May 9, 2014, May 16, 2014).[11] True the Vote learned that it was not listed as a recognized charity when a

---

[11]   *Available at* http://publicinterestlegal.org/cases/true-the-vote-v-irs/. TTV requests that the Court take judicial notice of these documents.

prospective donor attempted to confirm True the Vote's status on the IRS's website. True the Vote is left to wonder how many donations were lost as result of the IRS's failure to add True the Vote to its list of approved charities. The Government makes no reference to this fact.

Other sources also indicate that the Government has not carried its burden. Three months after the IRS Targeting Scheme was exposed, testimony taken by the House Ways and Means Committee revealed that the practice of targeting perceived Tea Party groups had not ceased but rather was ongoing at the IRS. Discriminatory treatment of applicants did not cease even after their applications were granted. The House Ways and Means Committee's IRS Oversight Subcommittee revealed the existence of a scheme within the IRS in which organizations who were targeting for special scrutiny during the application process were immediately subjected to a program of ongoing heightened review and potential audit *after* their applications were approved. *See, e.g.*, Press Release, House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit *(Remarks as Prepared)* (Sept. 18, 2013), available at http://waysandmeans.house .gov/news/documentsingle.aspx?DocumentID=350126 (accessed Jan. 15, 2017)). According to the statement from Congressman Boustany, Chairman of the IRS Oversight Subcommittee of the Ways and Means Committee:

> Additionally, we discovered that, through a process approved by [Lois] Lerner (former Director of the IRS Exempt Organizations Unit), EO Examinations itself flags groups for surveillance based on complaints received from inside and outside the agency. Ninety-four percent of all organizations flagged for surveillance by the Examinations unit were right leaning. Most startling, of the organizations referred for audit from this process, 100 percent were right leaning.

*Id*. In response, the IRS merely *suspended* the surveillance program pending further review. *Id*. The IRS makes no mention of and gives no assurances regarding these facts.

In July 2015—*after* the release of the 2015 TIGTA Report—the Government Accountability Office (GAO) released a report entitled "IRS Examination Selection: Internal Controls for Exempt Organization Selection Should be Strengthened," which examined the possibility that existing tax-exempt organizations would be subjected to viewpoint-based discrimination in examination selection (i.e., audit). Government Accountability Office, Report to Congressional Requesters, "IRS Examination Selection: Internal Controls for Exempt Organization Selection Should Be Strengthened" (July 2015) (attached as Exhibit B, hereafter "GAO Report"). GAO found that (1) "control deficiencies . . . increase the risk that EO could select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views"; (2) because procedures for applying selection criteria are not included in the Internal Revenue Manual as required by IRS policy, there is an increased "risk of unfair selection of organizations' returns for examination"; and, (3) management does not consistently monitor the selection of organizations for examination. *Id.* at Highlights.

GAO's findings are particularly troubling for True the Vote. Despite granting True the Vote's application for a tax exemption in September 2013, the Government admits that it *currently* "lacks knowledge or information sufficient to form a belief" about whether True the Vote operates for charitable and educations purposes. (*Compare* Gov. Answer ¶ 3 (Doc. 117) *with* Amended Complaint ¶ 3 (Doc. 14).) The Government's understanding of True the Vote's activities is fundamental to its ability to oversee True the Vote in a fair and impartial manner. Yet the Government provides no assurance that True the Vote even continues to qualify for the tax-exemption it rightfully received after 3 years of unwarranted delay.

In August 2015, the United States Senate Committee on Finance issued a report entitled
""The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-
Exempt Status Submitted by 'Political Advocacy' Organizations From 2010-2013," Part 1 of 4
(Aug. 5, 2015) (attached as Exhibit E, hereafter, "Finance Committee Report"). The Committee
found that between 2010 and 2014, the IRS attempted to implement a new process for selecting
cases for examination. *Id*. at 9. An internal memo expressed concern that this new approach
"arguably [gave] the impression that somehow the political leanings of [the organizations]
mentioned were considered in making the ultimate decision." *Id*. Although the IRS eventually
discontinued the use of its new approach, the Committee recommended that "further
modifications" to the IRS's examination selection process were necessary in order to "ensure
that [the IRS] carries out the enforcement function in a fair and impartial manner." *Id*. These
recommendations included full implementation of the recommendations made by GAO in its
report. *Id*.

The burden is on the Government to dispel these findings, but it has not done so. The
Government does nothing more than flatly state that True the Vote is not "more or less likely" to
be selected for audit than any other organization as a result of the scrutiny it received during the
application process. (Doc. 112-3 at 33; *see also* n.2, *supra*.) But there are at least two problems
with that statement. First, the Government limits its application to selections made by the
"automated case selection model," which the Government claims removes any subjectivity. (*Id*.
32-33.) Even if that is true, it says nothing about the potential for unfair treatment through other
avenues for selection, such as referrals "from individuals or groups outside the IRS or from other
divisions within the IRS." (*Id*. at 32.) Indeed, the Ways and Means Committee found precisely
that complaints from within and outside the IRS resulted in the surveillance and audit of

organizations targeted by the IRS during the application process. Second, whether True the Vote is more or less likely to be selected for audit based the additional scrutiny it received during the application process is a question of fact. In light of the findings of the Ways and Means Committee and the GAO Report, this Court should, at minimum, allow for further examination of this issue through the ordinary discovery mechanisms.

As a result of its findings, GAO recommended that the IRS take ten actions to improve its processes for examination selection. Yet, the Government is silent on whether it has taken *any* action to cure the deficiencies identified by GAO. In fact, the IRS has not provided any evidence that an organization's policy positions or associations cannot continue to form the basis for heightened scrutiny or review in any aspect of tax administration. At most, the Internal Revenue Manual instructs that new applications should be processed "based upon facts and circumstances of the stated activities within . . . the application rather than *names or labels*." (Doc. 112-3 at 14.) The IRS has instituted no formal and permanent prohibition on viewpoint-based treatment of tax-exempt groups like True the Vote.

Such a prohibition is a crucial component to the Government's case because the evidence indicates that it was politics, not "ineffective management," which led the IRS to discriminate against groups with views contrary to that of the Obama Administration. In June 2014, the U.S. House of Representatives Committee on Oversight and Government Reform released a report entitled "How Politics Led the IRS to Target Conservative Tax-Exempt Applicants for their Political Beliefs," which, as the name suggests, concludes that groups like True the Vote were targeted because of their political beliefs, actual or perceived. Staff Report, House of Representatives Committee on Oversight and Government Reform, "How Politics Led the IRS to

Target Conservative Tax-Exempt Applicants for their Political Beliefs," 113th Cong. (June 16, 2014) (attached as Exhibit C).

Later than year, the House Oversight Committee released a second report entitled "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress." Staff Report, House of Representatives Committee on Oversight and Government Reform, "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress," 113th Cong. (Dec. 23, 2014) (attached as Exhibit D). The Report concluded that there developed a "culture of bias against conservative organizations among certain IRS employees," *id*. at 209-210, which ultimately manifested itself as the Targeting Scheme. The Report contains an entire section on the discriminatory treatment of True the Vote by the IRS and a high-ranking member of the Democratic Party. *Id*. at 203-207.

The D.C. Circuit reiterated that "'to process exemption applications pursuant to different standards and at different rates depending upon the viewpoint of the applicants' is 'a blatant violation of the First Amendment.'" *True the Vote*, 831 F.3d at 560-61 (quoting *Z St. v. Koskinen*, 791 F.3d 24, 32 (D.C. Cir. 2015)). Indeed, True the Vote alleged that the IRS's conduct amounted to viewpoint-based discrimination in violation of the First Amendment. Despite its heavy burden, the Government addresses none of this, offering no assurances, irrevocable or otherwise, that the effects of such political targeting have ceased and will not recur.

Instead, the IRS has doubled down. During the height of the IRS Targeting Scheme, IRS agents requested legal and technical guidance from two separate offices staffed by career employees—EO Technical and EO Guidance. As part of its implementation of TIGTA's

recommendations, the Government explains that "responsibility for the legal work formerly handled by EO Technical and Guidance [has been] moved to the Office of Chief Counsel." (Doc. 112-3 at 15.) In other words, legal questions concerning the oversight of tax-exempt groups will now be handled exclusively by the only politically-staffed office within the IRS.

As alleged, Defendant IRS Chief Counsel William Wilkins was involved "in creating, overseeing, revising, and implementing the IRS Targeting Scheme." (Doc. 14 ¶ 109.) Mr. Wilkin's office even "review[ed] the applications of the Targeted Organizations." (*Id.* ¶ 110.) It is by no means helpful to the Government's case for Defendant Wilkins to now be *more* involved in the oversight of True the Vote than he was previously. Of course, with the benefit of discovery, True the Vote would be better situated to oppose the Government's change in policy and to describe to the Court with particularity why such a change makes the alleged conduct likely to recur.

The 2015 TIGA Report is simply one source this Court may consider. The aforementioned reports of other federal entities are others. The Court cannot consider one source and not others. What can be determined on the current record is that there are, at minimum, disputed issues of fact as to the cessation of the effects of the IRS's conduct. The Government has thus not carried its burden and its motion should be denied.

### d. There are Questions of Fact Concerning the Ongoing Effects of the IRS's Dissemination of True the Vote's Application Material Within and Outside of the IRS.

True the Vote does not need to speculate as to whether its application material was in fact shared outside of the IRS. The House Oversight Committee discovered that in January 2013

> Democratic staff of the House Oversight Committee asked the IRS for material relating to the tax-exempt application of True the Vote, a Tea Party-related organization. Holly Paz, director of Exempt Organizations Rulings and

31

> Agreements, authorized the IRS to release information to the Democratic staff, but it is unclear what information the IRS eventually provided.

Exhibit D at 159.

The conduct of the IRS and other federal agencies strongly suggests that True the Vote's application material was shared with others both within and outside the IRS. In 2010, Catherine Engelbrecht founded True the Vote along with another non-profit group, King Street Patriots, and sought a tax-exemption from the IRS for both organizations. (*See* Declaration of Catherine Engelbrecht ¶¶ 1-4 (attached as an exhibit to the True the Vote's Motion for Discovery Under Federal Rule of Civil Procedure 56(d).) Shortly thereafter, Ms. Engelbrecht, her non-profit organizations, and her family business were subjected to repeated visits, audits, and investigations by three different federal agencies, as well as the IRS, which, for the first time ever, audited Ms. Engelbrecht, her husband (also a board member of True the Vote) and their family business. (*Id*. ¶¶ 6-13.) These audits are particularly troubling in light of another recent GAO Report, which found that "the IRS does not have protections in place to ensure that taxpayers are treated fairly when being selected for audits." House Ways and Means Committee, Brady and Roskam Letter to Commissioner Koskinen, Sep. 20, 2016 (attached as Exhibit A) (citing Government Accountability Office, "IRS Needs to Define Field Program Objectives and Assess Risks in Case Selection," September 13, 2016, *available at* http://www.gao.gov/assets/680/679711.pdf).

Ms. Engelbrecht and True the Vote attempted to utilize the Freedom of Information Act to ascertain the circumstances surrounding the government's sudden and probing interest in her life. Yet the recipient agencies of those requests (including the IRS) withheld documents that

would allow for such an understanding. (Engelbrecht Decl. ¶¶ 21-35.) Discovery is therefore True the Vote's only avenue through which to gather this information.[12]

The IRS does not address the dissemination of True the Vote's application material nor confirm that any information shared with Democratic staff was returned, destroyed and not disseminated further. Without such confirmation, the Government cannot satisfy its burden under the voluntary cessation doctrine. At minimum, True the Vote is entitled to investigate through the discovery process the dissemination of its application material and the adverse effects of such dissemination.

## CONCLUSION

The Government's burden is "formidable." *Friends of the Earth*, 528 U.S. at 190. The Government must clearly demonstrate that there are no factual disputes about whether it has "completely and irrevocably eradicated" all *effects* of its discriminatory conduct. The evidence True the Vote can offer without the benefit of discovery plainly demonstrates the existence of factual disputes. Even the Government's own evidence reveals glaring deficiencies that continue to persist within the IRS and which continue to pose threats to groups like True the Vote. The Government's motion should be accordingly denied.

At the very least, True the Vote is entitled to conduct discovery into the facts the IRS contends are undisputed. It is only with the benefit of discovery that this Court can carry out the D.C. Circuit's instruction to dispose of this case on the basis of "adjudication of substantive

---

[12] The Government will likely argue that Ms. Engelbrecht is not a party to this case and this Court therefore cannot remedy any alleged harm to her, her family or her family's businesses. Such an argument would miss the mark. True the Vote does not seek a remedy for Ms. Engelbrecht or her family. Ms. Engelbrecht's testimony is offered for its probative value to demonstrate that True the Vote's application material was shared within and outside the IRS for reasons not related to tax administration. To what extent that material remains in the possession of government officials is a question of fact that directly pertains to the legal issue of whether the Government has eradicated all effects of the IRS Targeting Scheme.

evidence." *True the Vote*, 831 F.3d 551. Consideration of the Government's motion should, at

minimum, be deferred to allow time to conduct discovery.


Respectfully submitted this 19th day of January, 2017,

Michael J. Lockerby (D.C. 502987)
Cleta Mitchell (D.C. 433386)
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street NW Suite #600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com
*Lead Counsel for Plaintiff*

William E. Davis (D.C. Bar No. 280057)
Mathew D. Gutierrez (Fla. 0094014)*
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
mgutierrez@foley.com
*Counsel for Plaintiff*


_____/s/ Noel H. Johnson_____
Kaylan L. Phillips (D.C. 1110583)
Noel H. Johnson (Wisc. 1068004)*
Public Interest Legal Foundation
32 E. Washington, Suite 1675
Indianapolis, IN  46204
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@publicinterestlegal.org
njohnson@publicinterestlegal.org
*Counsel for Plaintiff*
*Pro Hac Vice Motions granted*

John C. Eastman (Cal. 193726)*
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2017, I caused the foregoing TRUE THE VOTE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT to be filed with the United States District Court for the District of Columbia via the Court's CM/ECF system.


Dated: January 19, 2017

             /s/ Noel H. Johnson
             Noel H. Johnson
             njohnson@publicinterestlegal.org