UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUE THE VOTE, INC.,** <br><br> *Plaintiff*, <br><br> v. <br><br> **INTERNAL REVENUE SERVICE,** *et al.*, <br><br> *Defendants*. | Civ. No. 13-cv-00734-RBW <br><br> **Oral Argument Scheduled for March 2, 2017** |

**TRUE THE VOTE'S RESPONSE TO UNITED STATES' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE AND TRUE THE VOTE'S ADDITIONAL MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT**

Response to Defendants' Statement of Material Facts As to Which There is No Genuine Issue

THE INTERNAL REVENUE SERVICE'S
APPLICATION REVIEW PROCESS

1.  On May 14, 2013, the Treasury Inspector General for Tax Administration ("TIGTA") issued a report finding that the Internal Revenue Service used inappropriate criteria to select for review certain applications for tax exempt status under 11 U.S.C. § 501(c)(3), (4). Specifically, the report stated the Service selected the applications of organizations based upon their names or policy positions, rather than indications in their applications of potential political campaign intervention. Part of this selection process involved the use of BOLO ("Be On the Lookout") lists. (Ripperda Decl. ¶ 20.)

**RESPONSE:** Undisputed that TIGTA issued the cited report in 2013 and that the report states, "The IRS used inappropriate criteria that identified for review Tea Party and other organizations

1

applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention." (Doc. 14-6 at Highlights.)

2. TIGTA further found the use of the criteria gave the impression that the IRS was not impartial, and that ineffective management and lack of procedures for tracking requests for guidance contributed to unwarranted delay in processing these applications. (*Id.*)

**RESPONSE:** Undisputed that these were some of TIGTA's findings, but not all.

3. The TIGTA report also determined that ineffective management and a lack of training resulted in IRS agents sending the affected organizations requests for additional information. TIGTA subsequently concluded that some of these requests for information were unnecessary. (*Id.*)

**RESPONSE:** Undisputed that these were some of TIGTA's findings, but not all.

4. Based on the findings in its report, TIGTA issued nine recommendations to the IRS aimed at reforming the screening and review processes to ensure that proper criteria were being used, ensuring the delivery of timely and appropriate guidance to the IRS employees doing the reviewing, developing additional training for the reviewers on identifying applications where political campaign intervention activities may require additional scrutiny, and ending the backlog of unprocessed applications and ensuring that future applications would be processed in a timely manner. (Ripperda Decl. ¶21.)

**RESPONSE:** Undisputed that TIGTA issued nine recommendations in its report. Disputed that TIGTA's recommendations—even if implemented—will "ensure" that the alleged conduct will never occur again. Disputed that the TIGTA Report is comprehensive. For nearly all nine recommendations, TIGTA describes its methodology as generic review of "e-mails, memorandums (sic), procedures and guidance." (*E.g.*, Doc. 112-1 at 21.) Interview subjects, for

example, were chosen randomly from a pool limited to "Determinations Unit and Quality Assurance first-line managers and employees responsible for processing applications." (*Id*. at 20.)

To date, True the Vote has not been permitted to conduct discovery of the IRS's "emails, memorandums (sic), procedures and guidance" (*id*. at 21) or to interview any IRS employees in any department who were present and involved with the IRS Targeting Scandal. Without the opportunity to do so, True the Vote cannot present the facts necessary to accept or oppose these statements of fact or to test their veracity.

     5.     In a subsequent report issued in 2015, TIGTA found that the Service had either taken corrective action or developed corrective procedures to address each of TIGTA's recommendations. (Ripperda Decl. ¶22.)

**RESPONSE:** Undisputed that TIGTA found that the IRS had taken some action with respect to TIGTA's nine recommendations. Disputed that TIGTA found that the actions taken by the IRS were sufficient to address TIGTA's concerns. Specifically, TIGTA describes the IRS's actions as "adequate" with respect to only 5 of its 9 recommendations. (*See* Doc. 112-1 at 7, 9, 18, 21, 24.) With respect to 4 of TIGTA's 9 recommendations, TIGTA refused to describe the IRS's actions as "adequate." (*See id*. at 12, 17.) In fact, TIGTA recommended that further action was necessary for 5 of its 9 recommendations. (*See id*. at 16, 18, 21.) Further, the Affiant, Ms. Ripperda, should be required to testify under oath regarding the statements in her Affidavit.

To date, True the Vote has not been permitted to conduct discovery or to depose Ms. Ripperda or any other IRS employee. Without the opportunity to do so, True the Vote cannot present the facts necessary to sufficiently oppose these statements of fact.

6. On September 5, 2014, the United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, issued a report entitled, "IRS and TIGTA Management Failures Related to 501(c)(4) Applicants Engaged in Campaign Activity," S. Rpt. 113-26, *available at* https://www.gpo.gov/fdsys/granule/CPRT-113SPRT89800/CPRT-113SPRT89800/content-detail.html. *See also* S. Rep. No. 114-119, at 77 (2015). This report made findings similar to the ones outlined in the TIGTA Report and made further recommendations, which were implemented by the IRS, to ensure that the events would never occur again. (Ripperda Decl. ¶¶ 24, 25.)

**RESPONSE:** Undisputed that the Senate subcommittee issued the cited report. Disputed that the recommendations were implemented or implemented in such a way as to "ensure" that that the alleged conduct will never occur again. The Government's statements of fact are disputed by other sources of evidence, including reports issued by the Government Accountability Office (Exhibit B to Memorandum of Law In Opposition to the Government's Motion for Summary Judgment ("TTV Opposition Memorandum"), hereafter "GAO Report"), the U.S. Senate Committee on Finance (Exhibit E to TTV Opposition Memorandum, hereafter "Finance Committee Report"), and the House Oversight Committee House Oversight Committee (Exhibit D to TTV Opposition Memorandum). These reports conclude that concerns persist that the IRS will select organizations for examination and audit in "an unfair manner—for example, based on an organization's religious, educational, political, or other views" (GAO Report at Highlights), and that "further modifications" to the IRS's examination selection process were necessary in order to "ensure that [the IRS] carries out the enforcement function in a fair and impartial manner," (Finance Committee Report at 9). These reports included additional recommendations that the IRS should implement in order to prevent the alleged conduct from recurring. The

Government does not confirm whether it has implemented these recommendations or whether it intends to do so. In fact, it is the Government's position GAO's recommendations are irrelevant. (Doc. 112-3 ¶ 25 n.10.)

Furthermore, it is disputed whether the Government has cured defects in its procedures for requesting burdensome and unnecessary information from tax-exempt groups. In 2013, TIGTA found that it was unnecessary for the IRS to request the donor names of applicants for tax-exempt status. (Doc. 14-6 at 27.) Yet the Government maintains that the IRS can still request donor names if it believes them to be "necessary" to the applicant's determination. (Doc. 112-3 ¶ 25(a) at p. 23.) Furthermore, although the Government asserts that it has created "template questions specialists may use in developing applications for tax-exempt status" it readily admits that its specialists may deviate from those questions with "managerial approval." (*Id*.)

More importantly, to date, True the Vote has not been permitted to conduct discovery. Without the opportunity to do so, True the Vote cannot present the facts necessary to either dispute or accept these statements of fact.

7. In August 2016, the Commissioner of the Internal Revenue Service wrote Congress about the Court of Appeals' decision in *True the Vote, Inc. v. Internal Revenue Service*, 831 F.3d 551 (D.C. Cir. 2016). In its opinion, the Court noted language in the IRS's 2013 interim guidance announcing that the IRS was "suspending" the use of the BOLO lists. The Commissioner wrote:

> The Court construed this to mean it was possible that the IRS had not conclusively eliminated the use of the BOLO lists.
> I want to be clear that no matter how you say it – whether it's suspended, eliminated, or ended – the IRS stopped this practice long ago and is committed to never using such a list or process ever again.

(*Koskinen Tells Lawmakers That IRS No Longer Uses Lookout List*, 2016 TNT 167-30 (Aug. 29, 2016)).

**RESPONSE:** Disputed. The quoted statement of Commissioner Koskinen is hearsay, Fed. R. Evid. 801-02, and the Government has not provided any reason why it is admissible. The Government could have easily provided sworn, written testimony from Commissioner Koskinen, but chose not to do so. To consider the unsworn, out-of-court statement of Commissioner Koskinen would contravene the D.C. Circuit's instruction that the disposition of this case be "based on adjudication of substantive evidence." *True the Vote*, 831 F.3d at 563.

ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT

8.  In its Application, True the Vote stated under penalty of perjury that it did not "support or oppose candidates in political campaigns in any way[.]" (Exhibit B to the First Amended Complaint (Doc. 14-2) at 9.) As a Section 501(c)(3) organization, True the Vote engages in no partisan campaign intervention, endorses no political candidates and makes no political expenditures. (Doc. 14 ¶ 131.) Accordingly, the Government's reliance on the 2015 TIGTA Report regarding dealing with exempt organizations and applicants and political campaign intervention is actually demonstrative of the IRS's ongoing failure to treat True the Vote as it does any other applicant for 501(c)(3) status, and represents an ongoing discriminatory approach to True the Vote, somehow presuming that it engages in political campaign intervention when it has never done so.

9.  The Government systematically targeted True the Vote for unwarranted delay and heightened review and scrutiny. As a result, True the Vote was deliberately subjected to numerous unnecessary, burdensome, and unlawful requests for information about its operations, activities, leadership, volunteers, associations, and affiliations. (*See* Doc. 14 ¶¶ 5, 125-126, 128-130.)

10. The IRS remains in possession of this information and is required by law to publicly disclose it upon request. 26 U.S.C. § 6104(a)(1)(A). The Government has not identified how it has used or how it intends to use the unnecessary and irrelevant information it requested and received from True the Vote. (*See*, *e.g*. Docs. 112 and 112-3.)

11. The IRS claimed to have granted True the Vote's application in September 2013 but it did not add True the Vote to its published list of approved charitable organizations until over *eight months later*, and did so only when undersigned counsel alerted the Government to the omission. True the Vote learned that it was not listed as a recognized charity when a prospective donor attempted to confirm True the Vote's status on the IRS's website. Letters between Cleta Mitchell and Grover Hartt (May 9, 2014, May 16, 2014), *available at* http://publicinterestlegal.org/cases/true-the-vote-v-irs/.

12. Despite granting True the Vote's application for a tax exemption, the Government admits that it currently "lacks knowledge or information sufficient to form a belief" about whether True the Vote operates for charitable and educations purposes. (*Compare* Gov. Answer ¶ 3 (Doc. 117) with Doc. 14 ¶ 3.) The Government's understanding of True the Vote's activities is fundamental to its ability to oversee True the Vote in a fair and impartial manner. Yet the Government provides no assurance that True the Vote even continues to qualify for the tax-exemption it rightfully received after 3 years of unwarranted delay. And clearly the Government presumes that True the Vote is an organization that engages in political campaign intervention, which it does not do, because doing so would result in immediate revocation of True the Vote's exempt status.

13. The 2015 TIGTA Report addresses only the application process and does not address the interactions True the Vote might have with IRS for tax administration purposes in

which True the Vote would continue to experience discriminatory treatment for the same unlawful reasons its application was targeted in 2013 and from which it presently seeks relief. (*See* Doc. 14, Prayer for Relief.)

14. According to TIGTA, 21 percent of IRS employees required to take political campaign intervention training did not complete one or more of the training sessions and/or did not attend the training sessions for the required amount of time. (Doc. 112-1 at 13-14.)

15. TIGTA expressed concern that "[i]f employees miss key portions of training sessions, they may not have the knowledge needed to effectively and efficiently carry out their responsibilities." (Doc. 112-1 at 14.)

16. TIGTA discovered that as many as 6.15 percent of employees "do not know what information to consider when determining if there was potential political campaign intervention" problems with a particular organization." (Doc. 112-1 at 25.) However, TIGTA was only 90 percent sure the number of such employees was not higher. (*Id*.)

17. TIGTA found that "the IRS did not complete the process designed to evaluate the effectiveness of the training" its employees were allegedly completing. (Doc. 112-1 at 15.) Specifically, "the IRS did not compile or evaluate case study results completed by students to determine if they learned skills and acquired knowledge as a result of the training." (*Id*. at 16.) Consequently, TIGTA concluded: "Considering the importance of effectively training employees on proper handling of tax-exempt applications, *improvements in the timing and execution of future training are needed*." (*Id*.)

18. TIGTA discovered that as many as 2.67 percent of employees were still using BOLO listings or other similar listing to identify cases or issues for further review, (Doc. 112 at 25).

19.     The House Ways and Means Committee's IRS Oversight Subcommittee revealed the existence of a scheme within the IRS in which organizations who were targeting for special scrutiny during the application process were immediately subjected to a program of ongoing heightened review and potential audit *after* their applications were approved. *See, e.g.*, Press Release, House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit *(Remarks as Prepared)* (Sept. 18, 2013) (http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=350126 (accessed Jan. 15, 2017)). According to the statement from Congressman Boustany, Chairman of the IRS Oversight Subcommittee of the Ways and Means Committee:

> Additionally, we discovered that, through a process approved by [Lois] Lerner (former Director of the IRS Exempt Organizations Unit), EO Examinations itself flags groups for surveillance based on complaints received from inside and outside the agency. Ninety-four percent of all organizations flagged for surveillance by the Examinations unit were right leaning. Most startling, of the organizations referred for audit from this process, 100 percent were right leaning.

*Id*. In response, the IRS merely *suspended* the surveillance program pending further review. *Id*.

20.     In July 2015—*after* the release of the 2015 TIGTA Report—the Government Accountability Office (GAO) released a report entitled "IRS Examination Selection: Internal Controls for Exempt Organization Selection Should be Strengthened," which examined the possibility that existing tax-exempt organizations would be subjected to viewpoint-based discrimination in examination selection (i.e., audit). (Exhibit B to TTV Opposition Memorandum at Highlights.) GAO found that (1) "control deficiencies . . . increase the risk that EO could select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views"; (2) because procedures for

9

applying selection criteria are not included in the Internal Revenue Manual as required by IRS policy, there is an increased "risk of unfair selection of organizations' returns for examination"; and, (3) management does not consistently monitor the selection of organizations for examination. *Id*.

21. In August 2015, the United States Senate Committee on Finance issued a report entitled "The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted by 'Political Advocacy' Organizations From 2010-2013," Part 1 of 4 (August 5, 2015) (Exhibit E to TTV Opposition Memorandum.) The Committee found that between 2010 and 2014, the IRS attempted to implement a new process for selecting cases for examination. *Id*. at 9. An internal memo revealed that this new approach "[gave] the impression that somehow the political leanings of [the organizations] mentioned were considered in making the ultimate decision." *Id*. Although the IRS eventually discontinued the use of its new approach, the Committee recommended that "further modifications" to the IRS's examination selection process were necessary in order to "ensure that [the IRS] carries out the enforcement function in a fair and impartial manner." *Id*. These recommendations included full implementation of the recommendations made by GAO in its report. *Id*.

22. The IRS has instituted no formal and permanent prohibition on viewpoint-based treatment of tax-exempt groups like True the Vote. (*See* Docs. 112, 112-1, 112-2, 112-3.)

23. In June 2014, the U.S. House of Representatives Committee on Oversight and Government Reform released a report entitled "How Politics Led the IRS to Target Conservative Tax-Exempt Applicants for their Political Beliefs," which, as the name suggests, concludes that groups like True the Vote were targeted because of their political beliefs, actual or perceived. (*See* Exhibit C to TTV Opposition Memorandum.)

24. In 2014, the House Oversight Committee released a second report entitled "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress." (Exhibit D to TTV Opposition Memorandum.) The report concluded that there developed a "culture of bias against conservative organizations among certain IRS employees," Exhibit D at 209-210, which ultimately manifested itself as the IRS Targeting Scheme. The Report contains an entire section on the discriminatory treatment of True the Vote by the IRS and a high-ranking member of the Democratic Party. Exhibit D at 203-207.

25. Defendant IRS Chief Counsel William Wilkins was involved "in creating, overseeing, revising, and implementing the IRS Targeting Scheme." (Doc. 14 ¶ 109.) Mr. Wilkin's office even "review[ed] the applications of the Targeted Organizations." (*Id*. ¶ 110.)

26. The House Oversight Committee discovered that in January 2013

> Democratic staff of the House Oversight Committee asked the IRS for material relating to the tax-exempt application of True the Vote, a Tea Party-related organization. Holly Paz, director of Exempt Organizations Rulings and Agreements, authorized the IRS to release information to the Democratic staff, but it is unclear what information the IRS eventually provided.

Exhibit D at 159.

27. In 2010, Catherine Engelbrecht founded True the Vote along with another non-profit group, King Street Patriots, and sought a tax-exemption from the IRS for both organizations. (*See* Declaration of Catherine Engelbrecht ¶¶ 1-4 (attached as an exhibit to True the Vote's Motion for Discovery Under Federal Rule of Civil Procedure 56(d).) Shortly thereafter, Ms. Engelbrecht, her non-profit organizations, and her family business were subjected to repeated visits, audits, and investigations by three different federal agencies, as well as the IRS, which, for the first time ever, audited Ms. Engelbrecht, her husband (also a True the Vote office and board member) and her family business. (*Id*. ¶¶

6-13.) Ms. Engelbrecht and True the Vote attempted to utilize the Freedom of Information Act to ascertain the circumstances surrounding the government's sudden and probing interest in her life. Yet the recipient agencies of those requests withheld documents that would allow for such an understanding. (*Id*. ¶¶ 21-35.)

28. The GAO Report found that "the IRS does not have protections in place to ensure that taxpayers are treated fairly when being selected for audits." House Ways and Means Committee, Brady and Roskam Letter to Commissioner Koskinen, Sep. 20, 2016 (Exhibit A to TTV Opposition Memorandum) (citing Government Accountability Office (GAO), "IRS Needs to Define Field Program Objectives and Assess Risks in Case Selection," September 13, 2016, *available at* http://www.gao.gov/assets/680/679711.pdf.

29. The Government's sole witness, Tamera L. Ripperda, states that she is the current director of the IRS's Exempt Organization Division. (Doc. 112-3 ¶ 2.) However, Ms. Ripperda departed that position just *three* days after the Government submitted her testimony. *See* Bloomberg BNA, Daily Tax Report, "IRS Exempt Organizations Director Switching Roles Next Month" (Oct. 26, 2016), https://www.morganlewis.com/~/media/files/news/2016/bloombergbna_irs-exempt-organizations-director-switching-roles-next-month_26oct16.ashx?la=en (last accessed Jan. 19, 2017). Ms. Ripperda's departure means she is no longer in a position to oversee the alleged implementation of TIGTA's recommendations. Moreover, Ms. Ripperda was not in the position of EO Director—or even in a position within the EO unit—until years after the conduct alleged in the Amended Complaint occurred. (Doc. 112-3 ¶ 2 ("I have held this position since January 2014.")). This raises serious questions regarding whether Ms. Ripperda has the requisite personal knowledge necessary to testify as to the IRS's conduct, the effects of

that conduct, and the alleged eradication of those effects. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Respectfully submitted this 19th day of January, 2017,

| | |
|---|---|
| Michael J. Lockerby (D.C. 502987)<br>Cleta Mitchell (D.C. 433386)<br>FOLEY & LARDNER, LLP<br>Washington Harbour<br>3000 K Street NW Suite #600<br>Washington, DC 20007<br>(202) 672-5300 (telephone)<br>(202) 672-5399 (fax)<br>mlockerby@foley.com<br>cmitchell@foley.com<br>*Lead Counsel for Plaintiff* | William E. Davis (D.C. Bar No. 280057)<br>Mathew D. Gutierrez (Fla. 0094014)*<br>FOLEY & LARDNER, LLP<br>One Biscayne Tower<br>2 South Biscayne Boulevard<br>Suite 1900<br>Miami, FL 33131<br>(305) 482-8404 (telephone)<br>(305) 482-8600 (fax)<br>wdavis@foley.com<br>mgutierrez@foley.com<br>*Counsel for Plaintiff* |
|   /s/   Noel H. Johnson<br>Kaylan L. Phillips (D.C. 1110583)<br>Noel H. Johnson (Wisc. 1068004)*<br>Public Interest Legal Foundation<br>32 E. Washington, Suite 1675<br>Indianapolis, IN 46204<br>(317) 203-5599 (telephone)<br>(888) 815-5641 (fax)<br>kphillips@publicinterestlegal.org<br>njohnson@publicinterestlegal.org<br>*Counsel for Plaintiff*<br>*Pro Hac Vice Motions granted | John C. Eastman (Cal. 193726)*<br>Center for Constitutional Jurisprudence<br>c/o Chapman University School of Law<br>One University Drive<br>Orange, CA 92866<br>(877) 855-3330 x2 (telephone)<br>(714) 844-4817 (fax)<br>jeastman@chapman.edu<br>*Counsel for Plaintiff* |

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2017, I caused the foregoing TRUE THE VOTE'S RESPONSE TO UNITED STATES' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE AND TRUE THE VOTE'S ADDITIONAL MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT to be filed with the United States District Court for the District of Columbia via the Court's CM/ECF system.


Dated: January 19, 2017                                                          /s/ Noel H. Johnson
                                                                                                   Noel H. Johnson
                                                                                                   *Counsel for Plaintiff*