

**United States Government Accountability Office**

Report to Congressional Requesters

**July 2015**

# IRS EXAMINATION SELECTION

# Internal Controls for Exempt Organization Selection Should Be Strengthened

Exhibit B



**GAO Highlights**

Highlights of GAO-15-514, a report to Congressional Requesters

**July 2015**

# IRS EXAMINATION SELECTION

## Internal Controls for Exempt Organization Selection Should Be Strengthened

## Why GAO Did This Study

IRS examines tax-exempt organizations to enforce their compliance with the tax code. Examinations can result in assessment of taxes or revocation of tax-exempt status, among other things.

GAO was asked to review IRS's criteria and processes for selecting exempt organizations for examination. This report (1) describes these processes and (2) assesses the adequacy of examination selection controls.

GAO reviewed IRS criteria, processes, and controls for selecting organizations for examination and spoke with IRS officials; assessed whether IRS controls followed *Standards for Internal Control in the Federal Government*; reviewed random probability samples from two populations of examination files; and conducted tests on populations and random probability samples from three databases used in EO examination selection to determine the adequacy of EO's control implementation (for files closed in fiscal year 2014). GAO also conducted eight focus groups on internal controls topics with EO staff who conduct research or make examination selection decisions.

## What GAO Recommends

GAO is recommending that IRS take 10 actions to improve selection control design and implementation, such as ensuring that all selection procedures are included in the IRM and thus subject to executive management approval, and developing additional examination selection monitoring procedures. IRS generally agreed with the recommendations.

View GAO-15-514. For more information, contact James R. McTigue, Jr. at (202) 512-9110 or mctiguej@gao.gov.

## What GAO Found

The Exempt Organizations (EO) unit within the Tax Exempt and Government Entities (TE/GE) division at the Internal Revenue Service (IRS) reviews organizations' applications for tax-exempt status to determine whether to grant status and oversees existing exempt organizations' compliance with the tax code. To identify exempt organizations for possible examination, EO uses a variety of information sources: for example, EO receives referrals of exempt organization noncompliance from third parties, such as the public, and other parts of IRS.

EO uses various controls intended to help it select exempt organizations for examination, in an effort to adhere to TE/GE's mission of "applying the tax law with integrity and fairness to all." For example, EO maintains well-documented procedures for several examination selection processes in the Internal Revenue Manual (IRM), IRS's primary, official source of instructions to staff; staff can deviate from procedures that are included in the IRM only with executive management approval. In focus groups, EO staff generally told GAO that these procedures were valuable tools to help them administer the tax law.

However, there are several areas where EO's controls were not well designed or implemented. The control deficiencies GAO found increase the risk that EO could select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views. Examples of internal control deficiencies GAO found include the following:

- **Staff could deviate from procedures for some selection processes without executive management approval.** GAO found that procedures for some processes—such as applying selection criteria to organizations under consideration for review—are not included in the IRM, as required by IRS policy. As a result, staff are not required to obtain executive management approval to deviate from these procedures. This increases the risk of unfair selection of organizations' returns for examination.

- **EO management does not consistently monitor selection decisions.** GAO found that IRS does not consistently monitor examinations and database files to ensure that selection decisions are documented and approved, to help ensure fairness. GAO's review of examination files found that approval of some selection decisions was not documented, as required by EO procedures. GAO's analysis of a sample of files suggests that an estimated 12 to 34 percent of cases where staff initially selected an organization for examination, but ultimately decided not to perform the examination, were missing the indication of management approval of the final decision, as required in the IRM. Continuous monitoring is an element of internal control; EO management has not been conducting sufficient monitoring to ensure that required approvals were taking place.

Exhibit B

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 5 |
| | EO Process for Selecting Exempt Organizations for Examination | 7 |
| | Design and Implementation of Some Controls Was Adequate; Other Controls Should Be Strengthened to Reduce the Risk of Unfair Examination Selection | 28 |
| | Conclusions | 51 |
| | Recommendations | 52 |
| | Agency Comments and Our Evaluation | 53 |
| Appendix I | Objectives, Scope, and Methodology | 55 |
| Appendix II | Effectiveness of Procedural Control Implementation for Selection Decisions and Approvals | 60 |
| Appendix III | Comments from the Internal Revenue Service | 64 |
| Appendix IV | GAO Contact and Staff Acknowledgments | 70 |

Tables

| | | |
|---|---|---|
| | Table 1: Examination Coverage Rate by Type of Tax-exempt Status, Fiscal Year 2014 | 6 |
| | Table 2: Closed Exempt Organization Examinations by Source, Fiscal Year 2014 | 9 |
| | Table 3: Compliance Checks and Compliance Reviews Closed in Fiscal Year 2014 | 13 |
| | Table 4: Reasons for Dismissed Examinations, Fiscal Year 2014 | 17 |
| | Table 5: Outcomes for Referrals Processed in Fiscal Year 2014, by Referral Type | 23 |
| | Table 6: Summary of Identified Internal Control Deficiencies by Examination Selection Process | 33 |
| | Table 7. Examples of EO Monitoring of Examination Selection Processes | 38 |

Exhibit B

Table 8: Number of Months Served by Current Referrals
Committee Members, as of April 30, 2015          50
Table 9: Exempt Organizations (EO) Selection Processes,
Population, and Sample Descriptions          57
Table 10: Effectiveness of EO Procedural Control Implementation
for Selection Decisions and Approvals, Cases Closed
Fiscal Year 2014          60

Figures

Figure 1: Exempt Organization Examination Selection (Excluding
Referrals)          8
Figure 2: Sources of Exempt Organization Referrals IRS Received
in Fiscal Year 2014          18
Figure 3: Exempt Organization Examination Selection Process for
Referrals          19
Figure 4: Using Internal Controls in Selecting Exempt
Organizations for Examination          28

**Abbreviations**

| | |
|---|---|
| EO | Exempt Organizations |
| EOCA | Exempt Organizations Compliance Area |
| IRC | Internal Revenue Code |
| IRM | Internal Revenue Manual |
| IRS | Internal Revenue Service |
| RCCMS | Reporting Compliance Case Management System |
| RICS | Returns Inventory and Classification System |
| TE/GE | Tax Exempt and Government Entities |

This is a work of the U.S. government and is not subject to copyright protection in the
United States. The published product may be reproduced and distributed in its entirety
without further permission from GAO. However, because this work may contain
copyrighted images or other material, permission from the copyright holder may be
necessary if you wish to reproduce this material separately.

Exhibit B



U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

July 13, 2015

The Honorable Charles E. Grassley
Chairman
Committee on Judiciary
United States Senate

The Honorable Peter Roskam
Chairman
Subcommittee on Oversight
Committee on Ways and Means
United States House of Representatives

The Honorable Charles W. Boustany
House of Representatives

There are 1.6 million tax-exempt organizations in the United States.
These organizations have varied purposes and missions, ranging from
small social services groups to large nonprofit health systems. Taken as a
whole, exempt organizations represent at least 5 percent of gross
domestic product.[1]

An exempt organization must be organized for one of the exempt
purposes in the Internal Revenue Code (IRC)—such as providing charity,
social welfare, programs for veterans, or furthering the interests of the
organization's membership—and must operate in accordance with that
purpose. Under the IRC, exempt organizations generally are not subject
to federal income taxes. For example, contributions received from
sources such as individual donations or grants are not taxable. However,
exempt organizations are required to pay employment taxes. In addition,
they may be required to pay taxes on unrelated business income, such as

---

[1]Gross domestic product is the market value of all goods and services produced within a
country during a given time period. See McKeever, Brice S and Pettijohn, Sarah L., *The
Nonprofit Sector in Brief 2014* (Washington D.C.: Urban Institute, October 2014); and
Sherlock, Molly F. and Gravelle, Jane G., *An Overview of the Nonprofit and Charitable
Sector*, CRS-R40919 (Washington, D.C.: Congressional Research Service, Nov. 17,
2009).

Exhibit B

from personal property rentals or web site advertising, and most domestic private foundations must pay excise taxes on net investment income.[2]

The Exempt Organizations (EO) unit within the Tax Exempt and Government Entities (TE/GE) division at the Internal Revenue Service (IRS) oversees exempt organizations' compliance with the tax code. EO reviews organizations' applications for exempt status and determines whether to grant it. Additionally, EO conducts examinations, which are reviews of the activities and finances of exempt organizations to determine whether they are operating in accordance with their exempt purposes, and have paid taxes they owe.[3] If IRS finds noncompliance, it may impose excise taxes for certain types of violations, or—if the violations are serious enough—it may revoke an organization's exempt status. In addition, IRS can assess taxes if an organization has not fully paid employment taxes or taxes on unrelated business income, as well as advise organizations on future tax compliance. In fiscal year 2014, IRS closed 8,084 examinations of exempt organizations.

You asked us to review IRS's criteria and processes for selecting exempt organizations for examination. This report (1) describes the processes for selecting exempt organizations for examination, and (2) assesses the adequacy of the controls (including procedures) for selecting examination

---

[2]Unrelated business income is the income from a trade or business regularly conducted by an exempt organization and not substantially related to the performance by the organization of its exempt purpose or function, except that the organization uses the profits derived from this activity. Certain trade or business activities are not treated as an unrelated trade or business. Organizations with $1,000 or more of gross income from unrelated businesses must report it on Form 990-T, *Exempt Organization Business Income Tax Return*.

[3]In the past, an inspector general report found that EO used inappropriate criteria to identify exempt organization applications for review. Our report does not cover EO's process for organizations applying for tax exempt status, it only covers examination selection of existing exempt organizations. Treasury Inspector General for Tax Administration, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review*, 2013-10-053 (Washington, D.C: May 14, 2013).

Exhibit B

cases that EO uses to achieve TE/GE's stated mission of "applying the tax law with integrity and fairness to all."[4]

For the first objective, we reviewed IRS documents that describe the criteria, processes, and controls for selecting exempt organization returns for examination. These documents included relevant sections of the IRC, regulations, the Internal Revenue Manual (IRM), EO procedures and training documents, worksheets to guide examinations and reviews, and summaries of processes prepared by EO officials. We also interviewed IRS officials responsible for overseeing each process. In addition, we obtained data from the following IRS databases: Return Inventory Classification System (RICS), Referrals database, Exempt Organizations Compliance Area (EOCA) database, and EOCA Classification database. The databases contain information on initiated and closed examinations, classification of referrals, and other reviews that can lead to an exempt organization's return(s) being selected for examination.[5] Based on our testing of the data and review of documentation and interviews, we determined that these data were reliable for the purposes of this report.

For the second objective, we reviewed EO's examination selection procedures and the related internal controls EO uses to help TE/GE achieve its stated mission of "enforcing the tax law with integrity and fairness to all."[6] We then assessed whether these procedures adhered to *Standards for Internal Control in the Federal Government*.[7] We also conducted six focus groups with selected EO staff who are responsible for selecting, or doing research to help select, exempt organization

---

[4]Internal Revenue Manual (IRM) Part 1, Chapter 1, Section 23.1 (the IRM can be accessed at http://www.irs.gov/irm/). TE/GE's mission, as set forth in the IRM, is "to provide its customers top quality service by helping them understand and comply with applicable tax laws and to protect the public interest by applying the tax law with integrity and fairness to all." TE/GE's mission closely aligns with the IRS-wide mission, as set forth in the IRS Strategic Plan for fiscal years 2014 to 2017, of providing "America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all." This report is the first of various reports on IRS examination and collection selection processes that we plan to issue this year.

[5]Classification is the process of identifying potential noncompliance in a return and making a recommendation on the examination potential for the return.

[6]IRM Part 1, Chapter 1, Section 23.1.

[7]GAO, *Standards for Internal Control in the Federal Government*, GAO-AIMD-00-21.3.1 (Washington, D.C.: November 1999).

Exhibit B

returns for examination, and two focus groups of selected EO staff who conduct examinations. We asked questions on internal control related topics, such as the clarity of EO procedures and the adequacy of training to apply these procedures. We used NVivo qualitative data analysis software to conduct a content analysis of themes from the focus groups.

To assess how well EO implemented its procedures and controls and applied examination selection criteria, we used IRM sections, EO procedures documents, and other documents as criteria. We reviewed databases used to document examination selection decisions and random probability samples of database files and examination files. We used the results of those reviews to determine whether selected controls were implemented effectively. We also reviewed a non-generalizable sample of 11 projects that were active during fiscal year 2014.[8] We selected those projects to include projects of various sizes (based on numbers of returns examined) and time frames, and we included politically sensitive projects and some projects that relied on data queries of Form 990, *Return of Organization Exempt From Income Tax*. We reviewed the project files for each project to test whether the documentation—such as development and approval of examination selection criteria—followed project development procedures. Finally, we interviewed EO officials about the processes and controls, and to discuss any potential deficiencies we identified.

We designed uniform data collection instruments for our file and database reviews to consistently capture information on the completeness of required documentation and approvals related to case selection. IRS verified the criteria we used in our instruments. To ensure accuracy, two analysts reviewed each file or database entry we assessed, and reconciled any differences in responses. We then analyzed the results of these data collection efforts to identify main themes and develop summary findings.

We conducted this performance audit from May 2014 to July 2015 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our

---

[8]EO initiates projects that focus on specific areas of potential noncompliance (such as fundraising) or specific types of organizations (such as community foundations).

Exhibit B

findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. More detailed information on our scope and methodology appears in appendix I.

## Background

The tax code provides for 35 different categories of exempt organizations, each covering one or more types of permissible activities. The majority of these organizations are covered by section 501 of the IRC. Section 501 includes private foundations and public charities, as well as other organizations, such as social welfare organizations, business leagues, and veterans' organizations.[9] However, other types of entities are also wholly or partially tax exempt, such as farmers' cooperatives and political organizations,[10] as are education-oriented programs such as educational savings accounts and tuition programs.[11]

Most organizations seeking exemption must submit an application to IRS.[12] If the information in the application meets the requirements for tax exempt status, IRS will issue a determination letter approving tax exempt

---

[9]Unless otherwise noted, all section numbers refer to the Internal Revenue Code found at Chapter 26 of the United States Code. Entities colloquially known as 501(c)(3) organizations are defined in the IRC as "corporations, and any community chest, fund, or foundations, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition, or for the prevention of cruelty to children or animals." 26 U.S.C.§ 501(c)(3). For more information on 501(c)(3) charitable organizations, see GAO, *Tax Exempt Organizations: Better Compliance Indicators and Data, and More Collaboration with State Regulators Would Strengthen Oversight of Charitable Organization*, GAO-15-164 (Washington, D.C.: Dec. 17, 2014).

[10]26 U.S.C. §§ 521 and 527.

[11]26 U.S.C. §§ 529-530.

[12]Exceptions to this requirement include churches and organizations (other than private charities) with annual gross receipts that are normally $5,000 or less. 26 U.S.C. 6033(a)(3). Also, section 501(c)(4), 501(c)(5), and 501(c)(6) organizations may "self declare" themselves to be exempt without filing an application. Although not a requirement, many of these organizations seek IRS exemption as an assurance for potential donors. Depending on the IRC section under which an exempt organization is seeking exemption, the organization will generally submit either Form 1023, *Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code*; Form 1023-EZ, *Streamlined Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code*; or Form 1024, *Application for Recognition of Exemption Under Section 501(a)*.

Exhibit B

status. Tax exempt organizations are generally not required to file an income tax return. Instead, if an organization normally has $50,000 or more in gross receipts, and meets other requirements, it must annually file one of three versions of the Form 990 information return, which require information on employees, revenue and income, assets and liabilities, program activities, and compensation.[13] Most organizations that fall below the gross receipt threshold of $50,000 and need not file a Form 990 information return are required instead to file an electronic postcard, Form 990-N, which asks for names and contacts associated with the organization, and confirmation of the organization's annual gross receipts.

During examinations, EO reviews a specific return—such as a Form 990 or employment tax return—as well as the organization's activities. There can be open examinations on one organization spanning several years, or related returns for a single tax period for that same organization. Some examinations are a result of compliance projects that IRS initiates to identify areas of noncompliance or address known areas of noncompliance. For example, a project on gaming in charity fundraising activities, an activity often conducted by veterans organizations, led to a relatively high examination rate—compared with other rates by tax-exempt status—for those organizations in fiscal year 2014. Table 1 shows the examination rate by organization exempt status for fiscal year 2014.

**Table 1: Examination Coverage Rate by Type of Tax-exempt Status, Fiscal Year 2014**

| Type of tax-exempt status | Examination coverage rate |
|---|---|
| Charitable organizations, 501(c)(3) | 0.66 |
| Public charities | 0.68 |
| Private foundations | 0.52 |
| Social welfare organization, 501(c)(4) | 0.71 |
| Business league/trade association, 501(c)(6) | 0.41 |
| Fraternal societies, 501(c)(8) and 501(c)(10) | 0.71 |

[13]Form 990, *Return of Organization Exempt from Income Tax,* Form 990-EZ, *Short Form Return of Organization Exempt from Income Tax,* or Form 990-PF, *Return of Private Foundation or Section 4947(a)(1) Trust Treated as Private Foundation.* Churches are not required to submit a Form 990. The term "churches" includes all similar religious houses of worship entities, such as mosques, temples, and synagogues, among other entities. Church is defined as including any organization claiming to be a church, and any convention or association of churches. 26 U.S.C. § 7611(h)(1).

Exhibit B

| Type of tax-exempt status | Examination coverage rate |
|---|---|
| Social clubs, 501(c)(7) | 1.64 |
| Labor organization, 501(c)(5), agricultural/ horticulture organization | 0.34 |
| Veterans organizations, 501(c)(19) | 2.49 |
| Political organizations, 527 | 0.06 |
| Other 501(c) organizations | 1.08 |
| Other (related individual and for-profit entities) | —a |
| **Overall** | **0.73** |

Source: IRS Return Inventory Classification System data, end of fiscal year 2014, and TE/GE Research.

Notes: IRS defines the examination coverage rate as the number of examinations closed in the fiscal year for the population (type of organization status), expressed as a percentage of the corresponding number of returns filed in the previous calendar year.

aThis examination coverage rate is not included because it is not calculated using a population of exempt organizations in the denominator.

# EO Process for Selecting Exempt Organizations for Examination

EO's process for selecting returns for examination is complex and includes multiple steps (see figure 1). Referrals, which are complaints against exempt organizations submitted to EO, involve additional steps; they are excluded from figure 1 and discussed later in this report.

Exhibit B

**Figure 1: Exempt Organization Examination Selection (Excluding Referrals)**



Source: GAO analysis of IRS guidance. | GAO-15-514

Notes:

Some additional paths are possible but not common. For example, some compliance review cases are sent straight to case selection and delivery without being sent first for classification or to triage teams. Also, compliance check cases can be sent for compliance reviews, and vice versa.

Selection based on referrals, training, and work for other IRS divisions is not illustrated here.

[a]Cases that had compliance checks are classified by EOCA. Cases that had compliance reviews are classified by Exempt Organization Examinations. If a case classified by EOCA meets certain criteria, it may be forwarded to Exempt Organization Examinations classification. Cases that had neither compliance reviews nor compliance checks may be classified by either group, depending on the details of the case. The two groups have different criteria and procedures. Cases classified by EOCA as having examination potential are generally sent for correspondence examinations conducted by EOCA. Cases classified by Exempt Organization Examinations as having examination potential are sent to Case Selection and Delivery and are generally conducted as field examinations.

Exhibit B

EO uses a variety of sources to identify exempt organizations for possible examination, and conducts review steps that filter out some organizations. Through ongoing programs, time-limited projects, and data queries, EO identifies organizations with characteristics that may pose high noncompliance risks. Referrals point EO toward particular organizations that may be noncompliant. In addition, EO reviews organizations' claims for tax refunds and examines those that are questionable; EO selects examination cases for training examiners; and some cases are selected based on programs run by other parts of IRS that relate to exempt organizations. EO also identifies some organizations for examination in the course of conducting other examinations. For a breakdown of closed examinations by source during fiscal year 2014, see table 2. Primary examination sources are listed in the rows, and examinations that are initiated based on other examinations are reflected in the third and fourth columns.

**Table 2: Closed Exempt Organization Examinations by Source, Fiscal Year 2014**

| Primary Source | Primary examinations | Related pickups | Substitutes for return | Totals |
|---|---|---|---|---|
| Ongoing programs | 1,742 | 233 | 307 | **2,282** |
| Form 990 analytics queries | 1,233 | 254 | 250 | **1,737** |
| Referrals | 993 | 279 | 358 | **1,630** |
| Compliance projects | 724 | 198 | 256 | **1,178** |
| Work for other IRS divisions | 238 | 415 | 10 | **663** |
| Claims[a] | 480 | 15 | 5 | **500** |
| Training | 39 | 20 | 35 | **94** |
| **Total** | **5,449** | **1,414** | **1,221** | **8,084** |

Source: GAO analysis of IRS data from the Return Inventory Classification System, the end of fiscal year 2014. | GAO-15-514

Note:

[a]Most claims are allowable and are processed and issued in full. Claims that raise questions may result in an examination.

## EO Identifies Groups of Organizations with Characteristics That Pose Noncompliance Risks

**Ongoing programs**.[14] Every year, EO identifies organizations with characteristics that are known to pose a risk of noncompliance. For example, through a document matching program, EO matches wages reported on Form W-2, *Wage and Tax Statement*, to those reported on exempt organizations' employment tax returns; organizations with

[14]IRS does not have a particular term for such work. "Program" is our terminology.

Exhibit B

mismatches have an increased probability of noncompliance.[15] Additionally, ongoing programs are used in EO's oversight role. For example, EO performs annual reviews of a random sample of organizations that recently received favorable determination letters to check if the organizations are current with their filing requirements and are operating in accordance with their tax exempt purposes.

**Compliance projects** are time-limited efforts to study noncompliance risks. Through compliance projects, EO identifies specific areas of potential noncompliance (such as fundraising) or specific types of organizations (such as community foundations), selects and reviews a subset of relevant organizations, and addresses any noncompliance it finds. Compliance projects identify organizations for review using data queries, random samples, and/or nonprobability samples. A committee of TE/GE officials, including EO managers and analysts, has historically been tasked with developing new compliance projects and obtaining approval from EO executives.

Projects that identify areas of significant noncompliance—based on the nature of the issues involved and the number of examinations that result in tax assessments or organization status changes—become part of EO's ongoing programs. However, in the past few years, EO has decreased its focus on compliance projects and developed a new focus on Form 990 analytics queries (see below).

**Form 990 analytics queries** identify organizations for review with data queries on Form 990, *Return of Organization Exempt from Income Tax*. For example, some queries check for missing Form 990 schedules that should be filed, based on boxes checked on Form 990 or Form 990 responses above certain dollar thresholds. To assure alignment with IRS objectives, EO is in the process of aligning Form 990 analytics queries with five focus areas that correspond to agency-wide IRS objectives.[16] EO

**Primary Examination Sources**

**Ongoing Programs**
Reviews of organizations with characteristics known to pose noncompliance risks, including inconsistencies in employment tax reporting

**Compliance Projects**
Time-limited efforts to study noncompliance risks for specific activities or types of organizations

**Form 990 Analytics Queries**
Queries based on the various versions of Form 990

Source: GAO analysis of IRS guidance. | GAO-15-514

---

[15]The Combined Annual Wage Reporting program is a document matching program that compares federal income tax withheld, Medicare wages, Social Security wages, and Social Security tips reported to IRS on employment tax returns against the amounts reported to the Social Security Administration via the processed totals of Form W-2 and other information returns. When this reconciliation results in an apparent underpayment of employment taxes or overwithholding of income tax, a Combined Annual Wage Reporting case is created.

[16]EO refers to these focus areas as "pillars."

Exhibit B

|  | initiated the Form 990 analytics strategy in 2010, and developed and began testing about 150 data queries by 2012. Of the original 150 Form 990 analytics queries, EO had completed testing for 11 and was in the process of testing 20 others, as of April 2015. Successful queries are run on an ongoing basis. As with compliance projects, queries that identify areas of significant noncompliance—based on the nature of the issues involved and the number of examinations that result in tax assessments or organization status changes—become part of EO's ongoing programs. |
|---|---|
| **Referrals Identify Particular Organizations that May Be Noncompliant** | **Referrals** are complaints of exempt organization noncompliance made by third parties, including the public and other parts of EO and IRS. (Although referrals can be made from sources within EO, 90 percent of referrals are from sources external to EO.) Referrals will be discussed in greater detail later in this report. |
| **Some Examinations Are Conducted for Other IRS Divisions, and Some Are Used for Training** | **Examinations conducted in conjunction with other IRS divisions.** EO conducts some examinations as part of programs managed by other divisions of IRS. For example, EO conducts some examinations for the Global High Wealth program, managed by IRS's Large Business and International Division, which monitors high wealth individuals and the networks of enterprises and entities they control. Additionally, EO conducts some examinations of exempt organizations for the National Research Program, an IRS-wide effort to develop and monitor measures of taxpayer compliance run by IRS's Office of Research, Analysis, and Statistics. IRS initiated a National Research Program study on employment tax noncompliance in 2010, focusing on Form 941, *Employer's Quarterly Federal Tax Return*, for tax years 2008, 2009, and 2010. |
|  | **Training examinations**, used for training examiners, are identified through database queries selecting for lower-grade cases with compliance issues, and cases with particular topics relevant to training. |

Exhibit B

## Most Claims Are Allowed in Full, but Some Lead to Examinations

**Claims** are exempt organizations' requests for tax refunds, adjustments of tax paid, or credits not previously reported or allowed. For example, recognition of tax-exempt status occurs after an organization was formed, effective to the formation date. As a result, an organization can file a claim for refund of income taxes paid for the period for which its exempt status is recognized. Most claims are allowed in full, but claims that raise questions may be considered for examination.



**Primary Examination Sources**

**Claims**
Refund claims or requests for tax adjustments or credits

Source: GAO analysis of IRS guidance. | GAO-15-514

## EO Identifies Some Organizations to Examine Based on Other Examinations

In the course of examining an exempt organization's tax return, EO examiners may become aware of other tax returns that are at risk for noncompliance and should be examined. EO has two sets of procedures in place for opening examinations on those returns when this occurs.

**Related pickups.** Examiners may expand the examination of a return to include the organization's tax returns for prior or subsequent years. They may also expand the examination to include different forms filed by the organization—for example, by expanding the examination of a Form 990 to include Form 941, *Employer's Quarterly Federal Tax Return.* Examination staff must obtain manager approval for these examinations.

**Substitutes for return.** When beginning an examination of a particular tax return, EO examiners check whether the organization is current in its filing requirements for all its returns. If EO examiners find that a return is missing, and are unable to secure the return through contact with the organization, they may prepare a blank, "dummy" return called a substitute for return (necessary because IRS tracks its examinations based on returns). The organization's related activities, records, and/or documents may then be examined.

**Examinations and Examination-based Sources**

**Dismissals**
Examiners may dismiss certain returns from examination

**Examinations**
Correspondence or field examinations, or referrals to Criminal Investigation Division or Financial Investigations Unit

**Related Pickups**
Examiners' inspections of returns related to ones they examine, e.g., other tax forms and other years

**Substitutes for Return**
Examiners' inspections of activities and records related to missing returns

Source: GAO analysis of IRS guidance. | GAO-15-514

Exhibit B

# EO Conducts Research on Some Organizations as Part of the Selection Process



Source: GAO analysis of IRS guidance. | GAO-15-514

For some cases, EO's Exempt Organizations Compliance Area (EOCA) may conduct a compliance check or compliance review, processes that can serve as intermediate research steps (see table 3). Some organizations are filtered out through these steps, some are brought into compliance and do not require further work, and some are sent for classification (see below). Other cases are not sent for intermediate research and are sent directly for classification, or directly to Case Selection and Delivery, which manages the pool of returns that may be sent for examination.

**Table 3: Compliance Checks and Compliance Reviews Closed in Fiscal Year 2014**

|  | Cases closed | Delinquent returns secured | Organizations referred for examination | Examinations closed based on this type of case[a] |
|---|---|---|---|---|
| Compliance checks | 3,237 | 913 | 102 | 1,254 |
| Compliance reviews[b] | 2,005 | N/A | 152 | 241 |
| **Total Cases** | **5,242** | **913** | **254** | **1,495** |

Source: GAO and IRS analyses of IRS data. | GAO-15-514

Notes:

[a]An organization referred for examination based on a single compliance check or compliance review may be subject to examinations on multiple tax returns. Examinations counted in the final column are based on the types of cases listed, but do not necessarily result from the specific cases counted in the other columns, because compliance checks and compliance reviews closed in a particular fiscal year can result in examinations that close in future fiscal years.

[b]Excludes mandatory reviews conducted in accordance with Section 9007(c) of the Patient Protection and Affordable Care Act. EOCA conducts mandatory reviews of hospitals that wish to retain or obtain tax exempt status under requirements imposed by the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, § 9007, 124 Stat. 119 (2010), § 9007(a). Section 9007(a) imposed new requirements that a hospital organization must meet to qualify for tax exemption in tax years beginning after March 23, 2010. 26 U.S.C. § 501(r). The Secretary of the Treasury or the Secretary's delegate must review the community benefit activities of each hospital organization to which this section applies, at least once every 3 years. Pub. L. 111-148, 124 Stat. 857, § 9007(c). These mandatory reviews are outside the scope of this report. EOCA conducts these reviews as compliance reviews.

**Compliance checks** involve contact with an exempt organization through a letter or questionnaire. For example, in fiscal year 2014, EOCA sent compliance check letters to organizations that did not file a required Form 990, and to organizations that reported certain types of income on their Form 990 but did not file related required forms. These contacts are a form of education for an organization and can result in the organization coming into compliance with requirements—for example, by filing a required return. Compliance checks may also be used to determine whether an organization is adhering to record-keeping requirements, and

Exhibit B

they are used for document matching cases. With some compliance checks, the contact is sufficient to bring an organization into compliance, or to determine that it was already in compliance. Other cases may be sent to EOCA's classification group or a triage team (see below), which determines which cases meet criteria for examination.

**Compliance reviews** do not involve contacting the reviewed organization. EOCA conducts research using IRS data, external databases, and publicly available information, including information on the Internet.[17] Items reviewed may include tax returns, applications for exemption, and websites. For example, compliance reviews are used for the program mentioned above that reviews organizations that were recently granted exempt status, to determine whether they are now operating in accordance with their exempt purposes.[18]

## EO May Use Claims Classifiers, Other Classifiers, and Triage Teams to Determine Which Returns Have Examination Potential

Some cases identified through a compliance project may be sent straight to Case Selection and Delivery, the pool of returns that may be sent for possible examination (see below). For other cases, an intermediate research step may or may not be conducted (see above), and the next step is classification, a review of the examination potential of a return.



Source: GAO analysis of IRS guidance. | GAO-15-514

**Claims Classification.** Classifiers apply their experience and technical expertise to determine whether a claim is allowable by reviewing taxpayer documentation. With management approval, claims classifiers recommend processing refunds, credits, or adjustments for claims which are clearly allowable, as most claims are. Claims that raise questions are sent for possible examination.

---

[17]EO uses some proprietary third party databases of information which include public records.

[18]Compliance reviews are also used to gather information on certain organizations referred to EO as potentially noncompliant by the general public or another source. See below for further discussion on referrals.

Exhibit B



Source: GAO analysis of IRS guidance. | GAO-15-514

**Other Classification.** Classification of most non-claims cases is done by experienced examiners who conduct further research on an organization. They decide which returns to filter out and which to send forward for possible examination, based on their professional judgment of the likelihood of noncompliance and the significance of the identified issues. Returns are classified by one of two groups, EOCA classification and Exempt Organizations Examinations classification, depending on how the case originated and the details of the case. The two groups use different criteria and procedures, but have similar functions and results; classification by either group may result in a correspondence examination, a field examination, or accepting a return as filed and filtering it out from further review.[19]



Source: GAO analysis of IRS guidance. | GAO-15-514

**Triage Teams.** For some EOCA compliance projects, examination selection decisions are made using project-specific criteria applied by project-specific teams, called triage teams, instead of through the usual classification groups. For example, compliance projects that use questionnaires may have triage teams compare questionnaire responses with Form 990 data to select organizations for examination. Triage teams look at the compliance check or compliance review results and apply the project-specific criteria to determine which returns to filter out, and which to send forward for possible examination.

---

[19]Cases that had compliance checks are classified by EOCA, and cases that had compliance reviews are classified by Exempt Organizations Examinations. If a case classified by EOCA meets certain criteria, it may be forwarded to Exempt Organization Examinations classification. Cases that had neither compliance reviews nor compliance checks may be classified by either group, depending on the details of the case. Returns classified by EOCA as having examination potential are generally sent for correspondence examinations conducted by EOCA. Returns classified by Exempt Organization Examinations as having examination potential are sent to Case Selection and Delivery and are generally conducted as field examinations.

## Returns Selected for Potential Examination May or May not Be Sent to Examiners, Depending on Resources



Source: GAO analysis of IRS guidance. | GAO-15-514

**Case Selection and Delivery.** After identification of organizations for possible examination, and after any intermediate research steps and classification, most returns that are selected for possible examination are sent to EO's Case Selection and Delivery unit. (Returns that were classified by EOCA generally skip this step and may be sent straight to examination by EOCA examiners.) At Case Selection and Delivery, the returns become part of a pool of returns that may be sent for examination. Claims that raise questions (see above) are sent for examination. High-priority and certain other referrals (discussed below) are also sent for examination, according to EO officials. Aside from these referrals and claims, decisions are made based on available resources.[20] Different examinations must be conducted by different grades of examination staff, depending on the nature of the issues involved and the level of income on the return; large and complex organizations are examined through EO's Team Examination Program.[21] Additionally, field examinations generally involve in-person contact and so must be conducted in the geographic area of the exempt organization. Examination offices tell the Case Selection and Delivery unit the grades of examiners available. The unit then sends returns to the offices based on those grades and, in the case of field exams, on the locations of the offices. In fiscal year 2014, 93 percent of returns sent to the Case Selection and Delivery Unit were ultimately sent to examination offices.

---

[20]In fiscal year 2014, decisions were based on a priority list in a memorandum from the Director of EO Examinations. Memorandum for All EO Examinations Managers from Director, EO Examinations, Internal Revenue Service, *FY 2014 EO Examinations Program Priorities* (Oct. 17, 2013), at 2.

[21]Team Examination Program examinations typically involve significant resources and multiple team members, and may involve coordination with other IRS divisions. There were 269 Team Examination Program examinations initiated in fiscal year 2014. The IRM includes two criteria for including a return in the Team Examination Program: 1) for Form 990 filers, total income or beginning or end of year assets greater than $250 million, and 2) for Form 990-PF and filers of Form 5227(*Split-Interest Trust Information Return*), income or end-of-year assets greater than $500 million (IRM Part 4, Chapter 75, Section 29.2). In addition to these criteria, project teams—such as triage teams—may identify returns to examine, in consultation with Team Examination Program staff. Team Examination Program examinations also occur when EO staff work with IRS's Large Business and International Division on an examination involving an exempt organization.

Exhibit B

## Examiners and Managers Make the Final Decision on Whether to Conduct an Examination



Source: GAO analysis of IRS guidance. | GAO-15-514

**Dismissals.** After selected returns arrive at examination offices, managers and examiners conduct risk assessments on the returns. They may choose not to conduct the examinations, if returns seem to pose limited noncompliance risk or for other reasons. In this report we use the term "dismissed" to refer to such returns.[22] There were 1,858 returns dismissed in fiscal year 2014, for reasons summarized in table 4. The most frequent reason for dismissing a return was that the return was approaching its statute of limitations; IRS must ensure there is adequate time to complete the examination.[23] Other reasons for dismissal included lack of examination potential, and finding no concerns with a claim for a tax refund. A manager may make the decision to dismiss a return if it has not yet been assigned to an examiner. Examiners who identify returns that they believe should be dismissed are required to fill out a form stating the reason and have that form signed by their manager.

**Table 4: Reasons for Dismissed Examinations, Fiscal Year 2014**

| Reason | Percentage of examinations dismissed |
|---|---|
| Expiring statute of limitations | 37 |
| Returns with no examination potential for other reasons[a] | 32 |
| Claims allowed in full | 23 |
| No large, unusual, or questionable items | 5 |
| Lack of resources | 3 |

Source: RICS data. | GAO-15-514

NOTES:

[a]Examples of other reasons are the examination being unlikely to result in a material change, the examination of a prior year return resulting in no change, and the organization having already taken steps to correct a reported issue.

---

[22]IRS uses the term "survey" for examinations that are not initiated or not pursued after pre-examination reviews reveal a reason not to conduct the examination; the term is used IRS-wide. See IRM Part 4, Chapter 75, Section 16.3.2.

[23]The Internal Revenue Code has limitations on assessment and collection which require that the IRS assess, refund, credit, and collect taxes within specific time limits. See e.g., 26 U.S.C. §§ 6501, 7611(c)(1). Such a limit is called the statute of limitations. When it expires, IRS can no longer assess additional tax, allow a claim for refund by the taxpayer, or take collection action.

Exhibit B

## EO Processes Thousands of Referrals on Potential Noncompliance Each Year

EO has special procedures for processing referrals—complaints of potential noncompliance of exempt organizations—and selecting organizations for possible examination based on referrals. Referrals are the third largest source of EO examinations. EO receives referrals from many sources. They may originate externally—most commonly from the general public—or from other IRS divisions that identify potential noncompliance. Figure 2 summarizes the sources of referrals received in fiscal year 2014; data from recent years showed similar breakdowns.

**Figure 2: Sources of Exempt Organization Referrals IRS Received in Fiscal Year 2014**



Source: GAO analysis of IRS data. | GAO-15-514

Note: Data from fiscal years 2012 and 2013 showed similar results, although for both years, referrals from other TE/GE and EO employees were lower, and there were more referrals from "other" sources. Also, there were slightly fewer (about 74 percent of referrals) referrals from the general public in 2012. "Other" includes referrals from news sources, congressional members or staff, and other federal agencies and sources that could be internal or external to TE/GE.

Processing referrals involves several steps, depending on the allegation in the referral or the type of organization involved. Figure 3 summarizes the steps for different referral types.

Exhibit B

**Figure 3: Exempt Organization Examination Selection Process for Referrals**



Source: GAO analysis of IRS guidance. | GAO-15-514

Notes:

Some referrals are filtered out through each of these steps, excepting compliance reviews.

[a]Certain referrals that raise limited concerns are worked as compliance checks rather than examinations.

**Referral classification.** EO currently has five classifiers, part of Exempt Organization Examinations, who sort incoming referrals into basic categories, based on an initial review of the referral. All referrals are to be logged into the Referral Database. Referrals are sorted to identify those that do not involve exempt organizations and therefore should go to other IRS divisions (misroutes), referrals that do not mention an organization or a violation of the tax code ("no issue" referrals), and referrals that should

be classified for possible examination. After sorting, EO sends an acknowledgment letter to the individual who submitted the referral (except IRS employees).

Each of these classifiers specializes in one or more types of referrals, such as political activity referrals, and reviews those referrals for examination potential, according to the EO referrals manager. The majority of referrals are considered general referrals, meaning that a single classifier makes a decision about examination potential. For these referrals, there are no specific criteria for identifying examination potential. Instead, referrals are classified using the facts and circumstances of each referral, which involves a classifier using his or her experience, and all available data on the referral, to determine whether potential noncompliance exists. Some referrals, such as those originating with whistleblowers[24] or those pertaining to the Tax Equity and Fiscal Responsibility Act,[25] have additional steps or criteria for classification. The classifier is responsible for documenting his or her decision in the Referral Database, as well as providing an explanation for the decision. According to the EO referrals manager, this includes mentioning any research conducted to corroborate the allegation and, for referrals classified as "no issue," an explanation of the decision not to pursue.

**Referral committees.** Referrals that deal with political activity allegations or what IRS has identified as sensitive allegations or organizations are also reviewed by a three person committee.[26] The committees are composed of a rotating set of senior examination staff or managers who make the final decision about examination potential. According to the Internal Revenue Manual (IRM), committee members should rotate every 12 months on a staggered schedule to maintain continuity and expertise;

---

**The Referral Database**

The Referral Database houses information on each exempt organization referral, even for referrals that do not go through the full classification process, such as referrals that were mistakenly sent to EO rather than other units, or referrals that do not have enough information to classify. Throughout the classification process, the database is used to log the actions on the referral. Specifically, the database includes

- the classifier's comments;

- codes, which categorize the complaint(s);

- for committee referrals, the comments and decisions for each of the three committee members reviewing the referral;

- the final determination (decision) of whether the referral is selected for examination, not selected for examination, selected for compliance check or compliance review, or transferred to another IRS division; and

- for referrals selected for examination, a priority level.

Source: GAO analysis of IRS guidance. | GAO-15-514

---

[24]Whistleblowers are individuals who spot problems in their workplace, while conducting day-to-day personal business, or anywhere else.

[25]The Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, (Sept. 3, 1982) established a complex set of examination, processing, and judicial procedures that affect the way IRS works with the partnerships and limited liability companies that file as partnerships and not with the separate partner level examinations. These referrals are reviewed to determine if any tax exempt partners need to be examined to reflect any adjustment made by the partnership.

[26]EO does not have a complete definition of "sensitive" referrals, although IRM Part 4, Chapter 75, Section 5 provides the example of the information submitted by an elected official (other than Congress or Executive Branch).

Exhibit B

volunteers are to be solicited in a memorandum from the Director of Examination for EO.[27] EO has three types of committees to review referrals.

1. **Political Activities Referral Committee.** Reviews allegations of potentially noncompliant exempt organization political activities, including churches.[28] The Political Activities Referral Committee reviewed 501 referrals in fiscal year 2014.

2. **Church Committee.** Reviews referrals concerning churches for allegations other than political activity.[29] EO currently has two Church Committees, which handle the same types of cases. Church and High Profile Committees (see below) combined reviewed 43 referrals in fiscal year 2014.[30]

3. **High Profile Committee.** Reviews referrals concerning exempt organizations that have attracted media attention, that have financial transactions with known or suspected terrorist organizations, or are referrals from elected officials.

---

[27]IRM Part 4, Chapter 75, Section 5.6.

[28]If workload is heavy, the committee that reviews political activities identified through Form 990 queries will review political activity referrals, according to an EO official.

[29]The term Churches includes all similar religious houses of worship entities, such as mosques, temples, and synagogues, among other entities. Church is defined as including any organization claiming to be a church, and any convention or association of churches. 26 U.S.C. 7611(h)(1).

[30]The Referral Database does not have an identifier to differentiate between Church and High Profile Committee Referrals.

Exhibit B

**The Reasonable Belief Standard for Referrals**

The reasonable belief standard for referrals in the IRM (Part 4, Chapter 75, Section 5.7) states that the requirements are met when "the information item when considered fairly and in light of other reliable information, if available, demonstrates that a violation of the EO tax laws may have occurred or appears likely to lead to the discovery of a violation upon examination. In making this determination, EO Referral Committee members are expected to use their experience, judgment, and concern for fairness."

Source: Internal Revenue Manual. | GAO-15-514

A committee may also review referrals involving other factors, identified by a classifier, which indicate that committee review is desirable for reasons of "fairness and integrity," according to the *Referrals Procedures* document.[31]

Each committee member is responsible for reviewing the referral and providing a determination on examination potential, along with comments, into the Referral Database. Political activity referrals, and other referrals as requested, are sent for a compliance review to provide additional information to committee members to inform their decisions. Referral committee members are to use the reasonable belief standard as criteria for examination selection. The outcome for the referral is determined by a majority, i.e., at least two of the three committee members being in agreement. This outcome is automatically tallied in the database when members enter a decision. Committee decisions are considered final and cannot be overturned, although, as discussed below, church examinations must go through additional steps before initiation.

**Referrals prioritization.** For each referral selected for potential examination in fiscal year 2014, a priority level was assigned that guides how quickly the referral is sent to the field for examination. For political activity referrals, the Political Activities Referral Committee determines whether a political activity referral is high priority or "other," based on criteria in the *Referrals Procedures* document.[32] All other referrals are assigned one of seven priority levels. For fiscal year 2014, priority levels were intended to feed into 16 workload priorities, as laid out in a memorandum from the Director of EO Examinations.[33] These priorities guided examination management in deciding which cases to work. EO management has discontinued the prioritization memoranda, according to EO officials. Instead, starting with fiscal year 2015, referrals requiring

---

[31]IRS, Tax Exempt and Government Entities Division, *Exempt Organizations Referral Procedures* (revised September 2014).

[32]These criteria are the amount of money expended, size of audience for the alleged activity, significance of the political campaign, frequency of the alleged activity, degree of specificity to identify a candidate or the support/opposition, degree of candidate participation in the activity, and the degree to which the organization is soliciting contributions to support its political campaign activity.

[33]Memorandum for All EO Examinations Managers from Director, EO Examinations, Internal Revenue Service, *FY 2014 EO Examinations Program Priorities* (Oct. 17, 2013), at 2.

collaboration with another IRS business division and those dealing with fraud are considered high priority, and therefore will be examined before other referrals. The Case Selection and Delivery unit assigns other referrals to the field based on grade level and location of examination staff, as described earlier in this report. Referrals that are assigned for examination may be dismissed if examination management or staff do not find examination potential, if the return is approaching the statute of limitations, or for other reasons.

**Referral outcomes.** Most referrals are not selected for potential examination; referrals that are selected may not actually become examinations due to resource constraints, or other considerations, according to EO officials. Table 5 summarizes referrals processing during fiscal year 2014.

**Table 5: Outcomes for Referrals Processed in Fiscal Year 2014, by Referral Type[a]**

|  | Duplicates[b] | In process[c] | Selected for potential examination | Not selected for examination[d] | Total |
|---|---|---|---|---|---|
| General | 912 | 1,900 | 946 | 3,453 | **7,211** |
| Political Activities Referral Committee | 188 | 281 | 169 | 356 | **994** |
| Church or High Profile Committees | 338 | 86 | 27 | 444 | **895** |
| Misroutes and uncategorized | 4 | 5 | 2 | 923 | **934** |
| **Total** | **1,442** | **2,272** | **1,144** | **5,176** | **10,034** |

Source: GAO analysis of IRS Exempt Organizations Referral Database, as of Sept. 26, 2014.| GAO-15-514

[a]The table shows all referrals that had processing activity during fiscal year 2014; some referrals were received in previous years.

[b]Duplicates are either a referral on the same organization and issue sent in by multiple people, or the same referral sent in by the same person.

[c]As of the end of the fiscal year, these referrals had not yet completed the classification process.

[d]Referrals not selected for examination include no issue referrals, referrals to be reviewed for possible future examination, and those that were transferred to compliance reviews, compliance checks, or other groups.

Exhibit B

## Churches Undergo Additional Reviews before Examinations Are Initiated

Statutory requirements must be met before EO can initiate an examination on a church.[34] Specifically, after determining that there is reasonable belief (based on facts and circumstances recorded in writing) that a church may not qualify for exemption, IRS must first issue a *Notice of Inquiry* to the church.[35] An inquiry serves as a basis for determining whether the organization qualifies for exemption as a church, whether it is engaged in activities subject to tax, or whether an excess benefit transaction has occurred.[36] If there is a reasonable belief that an inquiry is necessary—based on facts and circumstances of the case, including committee review if a referral is involved—then the information is sent to a designated official, who must be an "appropriate high-level Treasury official."[37] Currently, the designated official is the Director, Exempt Organizations, who must also get concurrence from the TE/GE Commissioner, according to EO officials. Under the statute, an "appropriate high-level Treasury official" must reasonably believe that an inquiry is necessary.[38]

According to the IRM, division counsel and an EO area manager must review the notice before it can be issued.[39] If a church does not respond to the inquiry or cannot resolve IRS's concerns, EO examination staff will prepare a *Notice of Examination* and a memorandum on why an examination is necessary, according to the IRM.[40] Two levels of division counsel and the designated official must approve the notice. These statutory procedures are followed for employment tax issues, but do not

---

[34]26 U.S.C. § 7611.

[35]26 U.S.C. § 7611(a)(1)-(3).

[36]An excess benefit transaction is one in which an economic benefit is provided by an applicable tax-exempt organization, directly or indirectly, to or for the use of a disqualified person, and the value of the economic benefit provided by the organization exceeds the value of the consideration received by the organization. A disqualified person is someone in a position to exercise substantial influence over the affairs of the applicable tax-exempt organization.

[37]An "appropriate high-level Treasury official" is defined as "the Secretary of the Treasury or any delegate of the Secretary whose rank is no lower than that of a principal Internal Revenue officer for an internal revenue region." 26 U.S.C. § 7611(h)(7).

[38]26 U.S.C. § 7611(a)(2).

[39]IRM Part 4, Chapter 76, Section 7.5.2.

[40]IRM Part 4, Chapter 76, Section 7.5.

Exhibit B

apply to routine requests, such as solicitation of a delinquent employment tax return or information requested to resolve inconsistencies revealed in the matching program, among other things.[41]

EO initiated one examination on a church in fiscal year 2014, and two in fiscal year 2013.[42] EO officials told us they suspended new church examinations from 2009 to January 2013[43] after a 2009 district court case,[44] which ruled that, at the time, the designated official was not the "appropriate high-level Treasury official" envisioned by Congress.[45] In 2009, IRS issued a Notice of Proposed Rulemaking putting forward the Director of EO as the designated (i.e. "appropriate high-level Treasury") official; to date, final regulations have not been issued.[46] EO officials said they resumed church examinations, based on existing regulations, and modified the process by adding another level of review, as the designated

---

[41]26 C.F.R. § 301.7611-1.

[42]We identified at least 72 referrals on potential political activity in churches in the Referral Database that were selected for examination by classifiers in fiscal year 2014 and 40 in fiscal 2013. Although selected by classifiers, these referrals would not necessarily become examinations, as they would need to follow the notice of inquiry procedures under IRC §7611. Also, between June 2013 and April 2014, EO suspended examinations on new political activity issues, while procedures related to political activity examinations were being reviewed and updated, according to EO officials. That hiatus likely also affected the number of church exams.

[43]Examinations on church noncompliance related to political activity issues, such as campaigning for a candidate, did not resume until April 2014, according to IRS officials, when EO resumed examinations that were previously started and suspended on political activity allegations.

[44]*United States v. Living Word Christian Center*, 103 AFTR 2d 714, Civil No. 08-mc-37 ADM/JJK, D.Minn. (Jan. 30, 2009).

[45]IRS established that an appropriate high-level Treasury official was a "Regional Commissioner (or higher Treasury official)." 26 C.F.R. § 301.7611-1, Q&A (1). However, the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 1001(a), 112 Stat. 685 (1998), eliminated the position of Regional Commissioner. IRS officials stated that starting in 2013, the review process changed and the Director of Exempt Organizations solicited the review and concurrence of the TE/GE Commissioner.

[46]*Amendments to the Regulations Regarding Questions and Answers Relating to Church Tax Inquiries and Examinations*, 74 Fed. Reg. 39,003 (Aug. 5, 2009).

Exhibit B

official is the Director of EO, who acts in concurrence with the TE/GE Commissioner.[47]

## Organizations with Complex Financial Transactions May Be Reviewed for Potential Fraud

The Financial Investigations Unit examines exempt organizations that are selected as a result of projects or queries, or have been identified with potential indicators of fraud. There were 121 Financial Investigations Unit examinations of exempt organizations initiated in fiscal year 2014. Classifiers and examination staff may refer returns to the Financial Investigations Unit if they believe indicators of fraud or other criteria are met, as listed in the IRM.[48] Examination staff who suspect fraud fill out a form describing the issues and consult with an exempt organizations fraud specialist. A Fraud Technical Advisor must approve placing the return in fraud development status. If the Financial Investigations Unit finds indicators of fraud, the case will be referred to IRS's Criminal Investigation division. The Financial Investigations Unit has also provided classifiers with supplemental criteria to help identify potential fraud. Classifiers may also refer a return to the Financial Investigations Unit.

The Criminal Investigation division investigates potential criminal fraud.[49] There were 96 criminal investigations initiated on exempt organizations in fiscal year 2014. Criminal investigations of exempt organizations can originate in one of two ways, according to a senior IRS analyst working in Criminal Investigations.

- **Referrals from EO Examination.** Examination staff may recommend a case if they identify general fraud indicators and the case meets criminal criteria. They will suspend the examination, and Criminal Investigation will review the case. EO Examination makes referrals via a form, which explains the basis for the suspected fraud. Criminal Investigation staff will develop the case, identify any possible charges, and make a recommendation to the

---

[47]In April 2015, a Freedom of Information Act lawsuit was filed in the U.S. District Court for the District of Columbia, against the IRS by an entity called Alliance Defending Freedom, for the failure to release documents related to church inquiries and examinations since January 2009, and documents related to 26 C.F.R. § 301.7611-1. *Alliance Defending Freedom v. IRS* (No. 1:15-cv-00525).

[48]IRM Part 25, Chapter 1, Section 2 and IRM Part 4, Chapter 75, Section 21.8.

[49]The Criminal Investigation division is not part of TE/GE, but they do investigate cases involving exempt organizations.

U.S. Attorney for prosecution, which may lead to an indictment and eventual trial.

- **Referrals from U.S. Attorneys, local law enforcement, and other informants.** Criminal Investigation staff conduct preliminary reviews of the referral, and then develop cases in the same manner as those originating from EO Examination.

The criteria for moving forward with a prosecution resulting from a referral are based on the judicial district of the taxpayer. Each U.S. Attorney has different types of cases or minimum tax revenue loss they are willing to prosecute; there is no checklist of criteria, according to a senior IRS analyst working in Criminal Investigations. For example, one region may prosecute a tax revenue loss of $250,000, while another region may prosecute a loss of $100,000.

# Design and Implementation of Some Controls Was Adequate; Other Controls Should Be Strengthened to Reduce the Risk of Unfair Examination Selection

**What Are Internal Controls and Why Do They Matter?**

One way federal agencies can improve accountability in achieving their missions is by implementing an effective internal control system. Internal control is not one event, but rather is a series of actions and activities that occur throughout an entity's operations and on an ongoing basis. Internal controls provide reasonable, not absolute, assurance of meeting agency objectives. Two examples of internal control standards are that an agency should ensure that significant events are clearly documented, and that key duties should be divided among different people. For more information on internal control standards, see the Green Book, GAO/AIMD-00-21.3.1, *Standards for Internal Control in the Federal Government* (November 1999, Washington, D.C.). A newer version of the Green Book, GAO-14-704G, *Standards for Internal Control in the Federal Government* (September 2014, Washington, D.C.), goes into effect in fiscal year 2016.

Source: GAO. | GAO-15-514

We found that the design of certain examination selection controls aligned with the IRM or with standards for effective internal control (see sidebar and figure 4). We also found that the implementation of some of these controls (i.e. the steps used for examination selection) aligned with these standards. As such, these controls may serve as tools to help EO meet TE/GE's mission of applying the tax law with integrity and fairness. However, we found that other controls were deficient in either their design or their implementation. These control deficiencies increase the risk that EO could fall short of TE/GE's mission and select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views. Effective internal control helps agencies adapt to shifting environments, evolving demands, and new priorities. As programs change and agencies strive to improve operational processes and implement new technology, management should continually evaluate its internal control system so that it is effective and updated when necessary.

**Figure 4: Using Internal Controls in Selecting Exempt Organizations for Examination**



**Goal**
Select exempt organizations for examination with integrity and fairness

**Control Design**
Procedures and other rules IRS sets to carry out the goal efficiently and effectively

**Control Implementation**
IRS adherence to relevant procedures and other rules on an ongoing basis as it selects exempt organizations for examination

Source: GAO. | GAO-15-514

Exhibit B

## Multiple Examination Selection Processes Met Both Design and Implementation Control Standards

We found several examples of examination selection processes that met design and implementation internal control standards.

**Design of Internal Controls.** Agency management designs control activities in response to its objectives and risks to achieve an effective internal control system. Control activities are the policies, procedures, techniques, and mechanisms that enforce management directives to achieve an agency's objectives and address related risks. Internal control standards require control activities to be effective and efficient in accomplishing an agency's control objective. As part of their control activities, agencies must ensure that internal controls are clearly documented. IRS requires primary sources of guidance with an IRS-wide or division-wide impact—such as policy documents, procedures, and guidelines—to be included in the IRM.[50] This requirement is intended to ensure that IRS employees have the approved policy and guidance they need to carry out their responsibilities in administering the tax laws.



Source: GAO. | GAO-15-514

---

[50]IRM Part 1, Chapter 11, Section 2.2

Exhibit B

**Internal Control Standard: Establish Effective and Efficient Control Activities.**

Establish control activities, to include ensuring that internal controls are clearly documented.

Source: GAO. | GAO-15-514

In alignment with IRM requirements, EO maintains well-documented procedures for several examination selection processes. For example, EO management has developed IRM sections for referrals classification, claims processing, Financial Investigations Unit case processing, and examinations. During our focus groups, employees working closely with these IRM procedures generally reported they were useful.[51] For examinations, there were IRM sections on several different types of examinations and steps in the process, including substitutes for return, related pickups, the Team Examination Program (used for large and complex organizations), and church examinations.

In focus groups, we found that staff who use these (and other IRM sections) to conduct their work generally view them as valuable tools that help them administer the tax law (see text box).

---

**Selected EO employee focus group participants' statements regarding IRM procedures:**

*"I came off the streets and can read the IRM and understand it. Kudos to the IRM to the degree that this is my springboard to know what to do and how to do it."*

*"The IRM is excellent, it tells you everything."*

*"I go straight to the IRM. It's there to provide fair and consistent treatment."*

---

To further align with IRM requirements, EO is working to draft and implement IRM procedures for testing and adopting 990 analytics queries.[52] For example, EO will likely formalize its current practice of requiring approval to test queries not already listed in EO's annual

---

[51]We consider examinations to be case selection processes because examinations may be dismissed and examinations may be expanded to include related pickups and substitutes for returns.

[52]EO officials provided us complete drafts of two IRM sections in April 2015. One IRM section, the Small Business/Self-Employed division's IRM for Compliance Initiative Projects (IRM Part 4, Chapter 17, Sections 1.1 - 4.11), is being revised to incorporate EO language and contains procedures for developing, approving, and managing Compliance Initiative Projects, which will include EO projects and queries. The second IRM section (IRM Part 4 Chapter 75 Section 8) is a new EO-specific section on projects and queries that outlines specific roles and responsibilities of certain EO staff during this process.

Exhibit B

workplan, according to one of the draft IRM sections. This new draft IRM also describes certain development work to be conducted prior to implementing a query. EO plans for both IRMs to be implemented in the last quarter of this fiscal year, according to EO officials. Having written procedures will help ensure that EO is taking action to address internal control risks. EO's publishing these procedures in the IRM increases transparency to the public.



Source: GAO. | GAO-15-514

**Implementation of Internal Controls.** Internal control standards require that control design be adhered to in practice, known as control implementation. EO's control design for examination selection includes requirements for various types of documentation of examination decisions and approvals. We found that multiple EO processes successfully implemented several types of such controls. For example, both EOCA procedures and referrals procedures require Case Chronology Records—records that track actions taken on a case—and we found that in practice, 100 percent of cases closed in fiscal year 2014 contained Case Chronology Records.[53] See appendix II for more examples of successful implementation of controls for recording decisions and approvals.

---

[53]Our tests for Case Chronology Records for both EOCA and referrals were population-level tests of cases closed fiscal year 2014. For EOCA, each of 5,242 cases had Case Chronology Records. For referrals, each of 5,317 cases had Case Chronology Records.

Exhibit B

## EO Has Established Key Factor for Building a Positive Control Environment

**Internal Control Standard: Establish a Positive Control Environment.**

Management and employees should establish and maintain an environment throughout the organization that sets a positive and supportive attitude toward internal control and conscientious management. Several key factors affect the control environment, including integrity and ethical values maintained and demonstrated by staff.

Source: GAO. | GAO-15-514

Internal control standards require that management and employees establish and maintain an organization-wide environment that sets a positive and supportive attitude toward internal control and conscientious management. An agency's management plays a key role in providing leadership in this area, especially in setting guidance for proper behavior. The IRM sets standards of conduct for treating taxpayers fairly, stating that it is the duty of agency officials to determine the correct amount of tax owed with strict impartiality as between the government and taxpayer, and without favoritism or discrimination between taxpayers.[54] It also says that agency representatives must adhere to the law and recognized standards of legal construction in making conclusions of fact or application of the law.[55] We found in focus groups that EO employees who conduct examinations and other reviews consistently equated fairness with assessing organizations strictly by whether they comply with tax law and with treating similar types of taxpayers equally. EO employees' relatively uniform understanding of fairness and the alignment of their understanding with the IRM is a significant step toward EO achieving a positive control environment, the foundation for all other control standards.

**Selected EO employee focus group participants' statements regarding the meaning of fairness:**

*"(You should) treat everyone alike, it doesn't matter who filed the information, it's what they filed. (You look to see) are they doing the right activity (as permitted by their tax exempt status), organizing properly, and capturing transactions accurately. It doesn't matter the perspective of an organization. And you should support everything you do by regulations and code."*

*"You should treat each organization in a specific regulation section in the same manner. If it's a 501(c)(4), if one organization is allowed to do something, then they all are—they are treated fairly and equally."*

---

[54]IRM Part 1, Chapter 2, Section 13.1.5.

[55]IRM Part 1, Chapter 2, Section 13.1.5.

Exhibit B

## Other Controls Needed Improvement or Standards Were Not Followed

We found that while EO had established various procedures over its examination selection processes, there were several areas where EO's controls were not well designed or implemented (see table 6). Taken as a whole, these control deficiencies increase the risk that EO could select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views.

**Table 6: Summary of Identified Internal Control Deficiencies by Examination Selection Process**

|  | Identified deficiency | Affected process(es) |
|---|---|---|
| **Control Design** | Procedures not documented in IRM | Compliance checks |
|  |  | Compliance reviews |
|  |  | EOCA classification |
|  | Some outdated or inaccurate aspects of procedures | Referrals |
|  |  | Dismissed examinations |
|  |  | Team Examination Program[a] |
|  | Insufficient monitoring requirements for case approvals and explanations | EOCA classification |
|  |  | Dismissed examinations |
|  |  | Examinations (Claims) |
|  |  | Referrals[b] |
|  | Inadequate IRS process for tracking and maintaining closed case files | Examinations[c] |
|  | Some inadequate documentation of project selection criteria and controls for certain project activities | Form 990 data analytics |
|  |  | Ongoing programs |
|  |  | Projects |
| **Control Implementation** | Lack of data dictionaries for databases | Compliance checks |
|  |  | Compliance reviews |
|  |  | EOCA classification |
|  |  | Examinations |
|  |  | Referrals |
|  | Lack of Privacy Impact Assessments for databases | Compliance checks |
|  |  | Compliance reviews |
|  |  | EOCA classification |
|  |  | Referrals |
|  | Only one classifier is reviewing each type of referral | Referrals |
|  | Referral committee members are not rotating | Referrals |

Source: GAO analysis. | GAO-15-514

NOTES:

[a]The Team Examination Program conducts examinations on large and complex organizations.

[b]The results of our review were statistically indeterminate, but of potential concern.

[c]Claims and related pickup files.

Exhibit B

## Deficiencies in Control Design



Source: GAO. | GAO-15-514

**Compliance Check, Compliance Review, and EOCA Classification Procedures Are Not Documented in the IRM as Required**

Internal control standards require that controls, and an agency's documentation of them, should be properly managed and maintained. As noted previously, IRS requires primary sources of guidance with an IRS-wide or organizational impact—such as policy documents, procedures, and guidelines—to be included in the IRM.[56] This requirement is intended to ensure that IRS employees have the approved policy and guidance they need to carry out their responsibilities in administering the tax laws. Moreover, including primary guidance in the IRM fulfills certain legal requirements. For example, one way IRS complies with the Freedom of Information Act is by making most IRM guidance available online to the public.[57]

**Internal Control Standard: Properly Manage and Maintain Documentation.**

Controls and an agency's documentation of them should be properly managed and maintained.

Source: GAO. | GAO-15-514

EO's primary sources of guidance for compliance checks, compliance reviews, and EOCA classification are not included in the IRM, as required by the IRM. In 2008, EO officials drafted high-level descriptions of compliance checks and compliance reviews for the IRM, but these were never published. According to EO officials, staffing levels were insufficient to complete this work. Instead, EO has developed procedure documents for compliance checks, compliance reviews, and EOCA classification

---

[56]IRM Part 1, Chapter 11, Section 2.2.

[57]5 U.S.C. § 552(a)(2)(c).

Exhibit B

outside of the IRM. These documents provide instructions to staff about the required approvals, documentation, and other steps taken as part of each case selection process. The compliance check and compliance review processes also have job aid documents with information relevant to processing cases.

By not complying with agency requirements and standards for internal control, the internal procedures for compliance checks, compliance reviews, and EOCA classification are not covered by the same standards as the IRM. For example, deviations from the IRM are only allowed with approval by executive management and with appropriate communication to employees, whereas these standards do not explicitly apply to other documents. Reliance on procedures that are outside of the IRM creates the risk that EO staff could deviate from procedures without executive management approval, which could result in unfair selection of organizations' returns for examination. Excluding these procedures from the IRM also reduces transparency, since they would be available to the public if they were in the IRM.

## Some Aspects of Procedures for Examination Selection Are Outdated or Inaccurate

**Internal Control Standard: Document Internal Controls.**

Controls should be documented and properly managed and maintained.

Source: GAO. | GAO-15-514

Internal control standards require that controls should be documented and properly managed and maintained. According to the IRM, IRS program managers are responsible for ensuring that IRM content is reviewed annually for accuracy and completeness and for analyzing issues that may necessitate changes.[58] Likewise, supplemental guidance—such as job aids and desk guides—must be reviewed at least annually to ensure the content remains accurate.[59] We found that EO examination selection procedures, including the IRM, contained outdated and, in some cases, inaccurate material, such as the following examples:

- A provision in the IRM for manually selecting returns for the Team Examination Program, rather than using standardized criteria based on an organization's income and assets, is not actually used, according to EO officials.[60] Further, the IRM requires that a worksheet be completed for returns under consideration for the program. The worksheet includes a section on factors considered in the examination

---

[58]IRM Part 1, Chapter 11, Section 1.6.5.

[59]IRM Part 1, Chapter 11, Section 2.2.1.

[60]IRM Part 4, Chapter 75, Section 29.2. The IRM refers to the standardized criteria for the Team Examination Program as "bright line standards."

Exhibit B

selection decision and a section for reviews and signatures. EO officials stated that the worksheet has not been used since 2012 and they are currently updating that section of the IRM.

- A section on closing dismissed examinations requires that a stamp with management signatures be placed on original, non-electronic, returns that are dismissed.[61] However, this requirement is not implemented consistently—in our file review, we found very few of the paper files had this stamp—and given the increasing reliance on electronic copies of returns, this requirement may be becoming less relevant. Further, EO has another control in place (discussed in appendix II) which suffices to document management approval for dismissed returns. EO management said they will use the signatures on paper returns until all forms can be electronically signed.

- A section on requirements for opening an examination of a related return states that staff should document the manager's approval to expand the examination, and a written statement of approval should be included in the examination file.[62] EO officials told us that managers approve related pick-ups within the Reporting Compliance Case Management System (RCCMS), the database EO uses for tracking examinations, which has replaced the need for written documentation of approval within the file.[63]

We also found examples of outdated and inaccurate guidance in procedures documents. Specifically, in the September 2014 *Referrals Procedures* document we found the following:

- The procedures include criteria for sending a referral to a "High Priority Committee." However, there is no High Priority Committee, according to EO officials. The EO officials described this as a "typo" and said that all mentions of the High Priority Committee should be replaced with "High Profile Committee." This mistake was also in the previous year's version of the document.

---

[61] IRM Part 4, Chapter 75, Sections 16.3.2.1 and 16.3.2.2.

[62] IRM Part 4, Chapter 75, Section 12.9.

[63] RCCMS is an information system that supports examination selection and processing by providing case management, inventory control and routing capabilities. Managers receive a notice within RCCMS, though an email-like prompt, that examination staff have requested approval for a related-pickup.

Exhibit B

- The procedures include a requirement that subject matter experts periodically review referrals screened out by the classifier responsible for political activity referrals to confirm that exclusion from committee review is appropriate. EO officials stated that this requirement was originally formulated in 2012, but the reviews have not been conducted because of a subsequent decision to send all political activity referrals for committee review.

We provided EO with these, and other, citations of outdated or inaccurate procedures. The EO Director acknowledged that there are outdated procedures and IRM sections for EO processes, and that many of these are the result of changes that have occurred over the past 18 months. EO officials said they were in the midst of an effort to update outdated and inaccurate guidance in the IRM and anticipated completing this process by the end of August 2015. Outdated and inaccurate procedures pose the risk that employees might follow incorrect procedures and therefore inconsistently administer tax laws.

## Monitoring to Ensure Case Files Procedures Were Followed Is Not Sufficient

**Internal Control Standard: Conduct Continuous Monitoring.**

Conduct monitoring to assess quality over time. Monitoring activities should be continuous and built in, effected by people, and conducted during the course of normal operations.

Source: GAO. | GAO-15-514

According to internal control standards, controls should generally be designed to assure that ongoing monitoring occurs in the course of normal operations. Monitoring involves management assessments of the design and operating effectiveness of internal control systems. It also includes ensuring that individual managers and supervisors know their responsibilities for internal control and the need to make control and control monitoring part of their regular operating processes. We found several deficiencies in closed examination and dismissed examination files, as well as the Referrals, EOCA, and EOCA Classification database files that did not follow procedures. For example, 4 out of 15 committee referrals (political activities, churches, and high profile committees) we reviewed that were selected for examination were missing a required description of the allegation for the committee. Also, an estimated 22 percent of examination returns that were dismissed in fiscal year 2014 did not have the required management signature.[64] Taken as a whole, the deficiencies we found point to insufficient monitoring of case processing. See appendix II for details on the deficiencies.

---

[64]The 95 percent confidence interval for this estimate is (12 percent, 34 percent).

Exhibit B

For each of the processes above, EO provided information on its monitoring activities to help ensure that procedures were followed and that internal controls were operating effectively (see examples in table 7).

**Table 7. Examples of EO Monitoring of Examination Selection Processes**

| Process | Monitoring activities |
|---|---|
| Referrals | • The EO referrals manager said that he randomly reviews one referral per month from each of the five classifiers, and documents the results. |
| | • By having multiple reviewers assess certain referrals, the referrals committees also play a role in ensuring examination selection criteria are applied appropriately. |
| Compliance checks | • The EOCA manager said that an analyst conducts quality reviews of a random sample of compliance checks, although these are not conducted regularly due to limited resources. A review of the EOCA database showed that out of 61 quality reviews performed for fiscal year 2014, 30 were performed in the approximately 3-month period between February 3 and May 9, 2014, and 24 were performed in the month-and-a-half period between June 30 and August 11, 2014. Seven reviews were performed in the remaining 7-and-a-half months of the fiscal year. |
| Examinations | • For claims that are dismissed and approved within the Case Selection and Delivery group, the manager said she conducts a review for the required forms and of claim dollar amounts to ensure the correct claim amount is in RCCMS. |
| | • EO has procedures that require mandatory reviews of certain examinations, such as those of church tax audits and revocations, to ensure technical and procedural accuracy. EO also has procedures for conducting quality reviews on a sample of cases to evaluate the managerial, technical, and procedural aspects of examination cases. While these reviews span many issues, many unrelated to examination selection processes, certain procedural issues related to examination selection may be assessed, such as whether prior year, subsequent year, or related returns were included in the examination where warranted. |

Source: GAO interviews with EO managers and analysis of EO documentation. | GAO-15-514

In spite of these monitoring activities, we found that EO employees were not always following documentation requirements for select EO examination selection procedures. As such, the current level of ongoing monitoring of examination and database files to ensure that selection decisions are documented and approved, to help ensure fairness, is inadequate. Additional monitoring may help management further evaluate EO's internal control system and make changes to ensure staff are consistently following procedures.

Exhibit B

## IRS's Process for Tracking and Maintaining Closed Case Files is Inadequate

**Internal Control Standard: Properly Manage Documents.**

Files should be readily available for review and properly managed and maintained.

Source: GAO. | GAO-15-514

Internal control standards require that files be readily available for review and properly managed and maintained.[65] The IRM also states that all records are required to be efficiently managed until final disposition.[66] Yet IRS was not able to locate all of the examination files we requested for review in a timely way.[67] Based on our estimates, 13 percent[68] of the closed examination files could not be located in time for us to review them during the audit. Specifically, IRS could not locate the files until June 2015, whereas we submitted our original request for the files in early February 2015.

Initially EO officials said the IRS unit that stores the files was unable to locate some of the files. More specifically, EO was told that the unit was unable to locate 3 of 13 of these files' blocks—group of files with consecutive control numbers. This can mean that the block was not created or it was shelved in the wrong location. Other files showed as checked out by IRS staff and not returned to their proper file location. At the end of our audit, IRS located 10 of the missing files after undertaking a specific search for the files. However, the length of time it took to locate these files—nearly 4 months—shows that IRS's process does not ensure that all files are readily available for review.

According to EO officials, missing claims files are generally due to the difficulties of working with paper files. Missing case files can result in lost revenue to the federal government (if a case goes to court), create unnecessary taxpayer burden (if EO later needs to contact the taxpayer regarding material that would have been in the file), make cases

---

[65]GAO, *Tax Administration: The Internal Revenue Service Can Improve Its Management of Paper Case Files*, GAO-07-1160 (Washington D.C., September 2007). We found that IRS did not have an effective process to ensure that paper case files can be located within the requesters' time frames; however, this review did not include TE/GE files. We made five recommendations, which IRS implemented.

[66]IRM Part 1, Chapter 15, Section 1.4.

[67]EO officials said they completed forms showing that the completed case files were transferred and received by the IRS unit in charge of storing them. Once the acknowledged forms for the files are received, EO no longer has jurisdiction over them.

[68]The 95 percent confidence interval around this estimate is 7 percent to 21 percent. We requested 100 closed examination files. EO provided 87 files but was unable to locate 13 files in a timely manner. Ten of 13 files not located in a timely manner were electronic files for examinations that originated as related pick-ups; the other 2 were paper files for claims for refunds.

Exhibit B

unavailable for other units such as quality review groups or advisory groups, and hinder congressional oversight.

## EO Lacked Clearly Documented Selection Criteria for Some Projects and Controls for Certain Project Activities

> **Internal Control Standard: Document Internal Controls and Other Significant Events.**
>
> Internal controls and all transactions and significant events need to be clearly documented, and all documentation and records should be properly managed and maintained.
>
> Source: GAO. | GAO-15-514

Internal control standards require that internal controls and all transactions and significant events need to be clearly documented, and that all documentation and records should be properly managed and maintained. EO projects must adhere to certain requirements as they are developed, and these requirements can vary depending on the type of project.[69] All project teams are required to develop project-specific procedures. For projects not associated with Form 990 analytics queries, project teams are required to obtain managerial approval of a proposal. The project proposal should contain, among other things, a description of the project objectives, the criteria to be used to select returns, and the signatures of EO executives and select functional directors. Other requirements depend on whether the cases selected for review are sent directly for field examination, or whether the cases are subject to an intermediate step like a compliance check or compliance review, or an examination through the office/correspondence examination program.[70] The documents associated with a project—such as the proposal, procedures, selection criteria, and training materials—are maintained by the project team leader.

We identified select areas where project documentation could be improved. Our review of 11 project files found that some project requirements were not always met:[71]

---

[69]Here we use the term projects broadly to include Form 990 analytics queries and projects deemed successful and continued on an ongoing basis, unless otherwise noted in the text.

[70]For example, the latter types of projects require that project teams develop training materials.

[71]We reviewed a purposive sample (a type of non-probability sample) of projects that had cases closed in fiscal year 2014. These projects were selected to cover a variety of sizes (in terms of number of cases closed), ages (in terms of project start dates), type of project (whether it used a query or not), and other factors. We did not review the project files for 2 of the original 13 projects in our sample because EO officials told us that these projects were not active in fiscal year 2014, as further described below. These 11 projects represent about 2,100 examinations closed and about 2,700 other types of reviews closed in fiscal year 2014.

Exhibit B

- For one project in our sample, EO officials were unable to provide any documentation to support the project requirements we assessed in our project file review, including an approved project proposal.[72]

- Of the seven projects requiring a project proposal—specifically, those projects not associated with 990 analytics queries—we found that none of the project proposals fully described the criteria to be used for the project, including the one project missing documentation. For example, three project proposals described that a judgmental (non-probability) sample would be used but the judgmental sample was not fully described.[73] One of these projects' proposals listed criteria for its first phase, conducted several years ago, but did not reflect selection criteria for a subsequent phase of the project. There was a memorandum in the file describing selection criteria for the more recent phase, but no documented management approval. Another project proposal described how the original sample of cases for which compliance reviews would be conducted was to be pulled, but not how information gathered during the compliance reviews would be used to select cases for examination. EO officials told us that when criteria are added or changed for a project, executives may be briefed and any briefing documents should be included in the project file. However, of the seven projects with incomplete criteria, we only found one file with an executive briefing document describing selection criteria. Two other projects had memoranda in the file describing selection criteria but lacked evidence of executive review or approval.

EO officials told us about improvements they had made to project controls over the past few years. For example, EO officials told us that over the past year they increased efforts to reorganize how project file documentation is stored to help ensure consistency across projects. Likewise, projects using a compliance review or using the office/correspondence examination program had an added control developed toward the end of fiscal year 2013—a document capturing the date on which certain control activities were performed and the individual

---

[72]According to EO officials, this project—which examines a sample of organizations that received a determination letter 5 years prior—was implemented in fiscal year 2005.

[73]For one of these projects, EO officials said that the box on the project proposal indicating a judgmental sample was to be used was erroneously checked, and that only a statistical sample was to be used.

Exhibit B

responsible for each activity.[74] Yet these and other improvements do not address the need to fully describe selection criteria in a project proposal, or document executive briefings and approvals when criteria are added or changed. With project proposals lacking clear selection criteria, EO management risks the potential of projects selecting organizations for review in an unfair manner.

**Internal Control Standard: Establish Control Activities To Enforce Management Directives.**

Procedures that enforce management directives help ensure that management directives are carried out.

Source: GAO. | GAO-15-514

According to internal control standards, procedures that enforce management directives help ensure that management directives are carried out. Yet EO does not have procedures describing the steps or requirements for triage teams—project team members responsible for deciding which organizations will be examined—when making or documenting examination selection decisions in the project files.[75] Specifically, there is no procedure requiring that triage teams document the specific selection criteria they use to identify organizations for examination. While broad selection criteria are generally described in the project proposal, the triage team may apply additional criteria to filter out cases and align with available resources for working examinations. EO officials told us that these selection criteria decisions would generally be documented in meeting minutes or elsewhere in the project files. Of the two projects using triage teams with closed examinations in fiscal year 2014, one project had dozens of files in the meeting minutes project folder, making it difficult to assess documentation of selection criteria, while the other project was missing documentation altogether.

Similarly, no written procedures exist to ensure that specific triage team examination decisions are documented in the project files. EOCA project procedures require that EOCA staff document triage team examination selection decisions in the EOCA database, but we found that this step did not always occur, and EO officials agreed that our assessment was accurate. EO officials also said that decisions should be documented by triage teams within the project files, which would help ensure that selection decisions at the project-level were readily available for review. Of the two projects using triage teams with closed examinations in fiscal

---

[74]Projects using compliance checks and case building had already been using this document since around fiscal year 2010, according to EO officials.

[75]Triage teams are composed of subject matter experts, including project leads, analysts, and managers. They review the results of compliance checks or compliance reviews and, using their professional knowledge and expertise, apply project-specific criteria to make selection decisions.

Exhibit B

year 2014, the same project as mentioned above was missing project file documentation altogether. The other project had several spreadsheets that tracked examination selection decisions, but it was not always clear which organizations had been selected. More than 2,000 of the compliance checks and compliance reviews conducted in fiscal year 2014 were, or will be, subject to triage team review. Having procedures to ensure triage teams documenting selection criteria and decisions clearly and consistently will help EO ensure that management directives are consistently followed and that examination selection decisions are made fairly.

**Internal Control Standard: Record and Communicate Information To Management.**

Program managers need operational data to determine whether they are meeting their agencies' strategic and annual performance plans and meeting their goals for accountability for effective and efficient use of resources.

Source: GAO. | GAO-15-514

Internal control standards also state that program managers need operational data to determine whether they are meeting their agencies' strategic and annual performance plans and meeting their goals for accountability for effective and efficient use of resources. We did not review the project files for 2 of the 13 projects in our sample because EO officials told us that these projects were not active in fiscal year 2014. Although no examinations should have been conducted as part of these older projects, we found 156 closed examinations attributed to them in the Returns Inventory and Classification System (RICS) database.[76] For one project, EO officials said that the majority of the project work was conducted between 2006 and 2008 and that the project was concluded by 2009. EO officials said it was likely that EO examination staff miscoded these examinations, and that this is more likely to happen when an examination is associated with a newer project of a similar name. EO uses data on closed examinations, by project, to track performance against workplan goals. Without adequate controls to ensure that examinations are appropriately coded—for example, by ensuring that project codes for closed projects without anticipated future examinations are not utilized by staff—EO management may not have the information it needs to ensure the efficient and effective use of resources.

---

[76]Examination closures for projects are tracked using project codes, which correspond with codes used in the EO's annual examination work plan. A miscoding can occur if examination staff close a case and attribute it to the wrong project code.

Exhibit B

## Deficiencies in Control Implementation



Source: GAO. | GAO-15-514

### EO Lacks Complete Data Dictionaries for Examination Selection Databases

The IRM states that all data elements in IRS databases should be defined and documented as part of the database design process.[77] However, EO does not have complete and up-to-date data dictionaries—documents that define each data element in an information system—for the systems it uses to track and document examination selection decisions. EO does not have a data dictionary for the Reporting Compliance Case Management System (RCCMS)—which EO uses for tracking examinations and will use for additional selection purposes in the future—nor for the EOCA or EOCA classification databases.[78] EO's data dictionary for the referrals database is incomplete, as it defines fewer than half of the data elements in the database. In addition, EO has an outdated data dictionary for RICS, which it uses to identify populations of cases for review.[79] For all of these systems, EO describes selected data elements

---

[77]IRM Part 2, Chapter 5, Section 13.1.

[78]According to EO officials, in late March 2015 referrals classifiers began working new cases in RCCMS.

[79]EO calls some of these systems inventory management databases; however, we consider them to be examination selection databases for the purposes of this report, as EO uses them to document examination selection decisions. According to EO officials, the RICS data dictionary was updated in 2005 and had a minor update in 2010, but is currently outdated.

Exhibit B

and how they are to be used in procedure, training, or other documents. For example, EOCA procedure and job aid documents define several codes used in the EOCA database and define common data elements from the database.

EO officials cited various reasons for not having data dictionaries or for having outdated dictionaries. For RCCMS, EO officials said they use as their data dictionary a document which lists the data elements within each data table. The document shows the relationships between data elements, but does not contain a description of each data element. Officials overseeing the EOCA and EOCA classification databases said they did not have adequate resources to develop this type of documentation, and also that data elements are already defined in other documents.[80] The manager overseeing the referrals database said that the database predates his tenure, but fields have been added over the years, particularly in response to audits conducted by the Treasury Inspector General of Tax Administration. Finally, EO officials said the RICS data dictionary is outdated due to lack of staffing and because documents listing transcribed lines from Form 990 filings, which are used by staff to develop examination selection queries, were kept up to date instead.

Without complete and up-to-date data dictionaries, data element definitions are not available in a single document for individuals newly using the system, including EO employees and system developers. Also, since data dictionaries assist users and developers with understanding these databases, not having an adequate and up-to-date dictionary may result in an increased risk of data elements not being used accurately. To illustrate, the referrals database has certain obsolete data elements used to document decisions when procedures were different, yet we found that individuals were sometimes still entering information into these fields.

---

[80]Besides some data elements being defined in the EOCA procedures and job aid documents, several others are based on naming conventions outlined in an agency-wide reference document. Yet other data elements, such as those used for a quality review process, are defined in training documents.

Exhibit B

**EO Lacks Required Privacy Impact Assessments for Some Examination Selection Databases**

The E-Government Act of 2002 requires agencies to conduct a Privacy Impact Assessment before developing or procuring information technology systems or projects that collect, maintain, or disseminate information about members of the public or initiating a new electronic collection of information for 10 or more persons.[81] EO has not conducted Privacy Impact Assessments for three of its databases used in examination selection processes—specifically, the referrals, EOCA, and EOCA classification databases.[82] These systems house thousands of records describing reviews conducted on exempt organizations, including organizations' names, Employer Identification Numbers, and other taxpayer information.

We were initially told that the Tax Exempt and Government Entities (TE/GE) division does not consider the databases to be systems, and therefore they were not covered by requirements in the E-Government Act. However, in responding to our subsequent questions on the subject, IRS Chief Counsel stated that these databases likely fall within the purview of the Act. Accordingly, in early April, EO officials began to evaluate whether the databases require a Privacy Impact Assessment with IRS's Office of Privacy, Governmental Liaison, and Disclosure (henceforth, the Privacy Office). This evaluation involved TE/GE responding to a questionnaire and the Privacy Office assessing these responses to determine whether Privacy Impact Assessments are necessary to comply with E-Government Act requirements.[83] As a result of the assessment, the Privacy Office determined that Privacy Impact Assessments were required for each of these three systems. According to

---

[81]Pub. L. No. 107-347, 116 Stat. 2899, 44 U.S.C. 3501 note. Privacy Impact Assessments are intended to define how a system affects taxpayer or IRS employee privacy and can help eliminate unanticipated weaknesses in a system when conducted during the planning and design phases.

[82]The Department of the Treasury and its various bureaus and offices, including IRS, refer to Privacy Impact Assessments as Privacy and Civil Liberties Impact Assessments. We use the term Privacy Impact Assessment as cited in the E-Government Act of 2002.

[83]In 2013, the Treasury Inspector General of Tax Administration reported that IRS identified 184 systems and collections of information that required but did not have a Privacy Impact Assessment IRS agreed to review and take action on this deficiency. See Treasury Inspector General for Tax Administration, *Improvements are Needed to Ensure the Effectiveness of the Privacy Impact Assessment Process*, 2013-20-023 (Washington, D.C.: Feb. 27, 2013). A Treasury Inspector General of Tax Administration official reviewed the list of 184 databases for us and did not find these 3 EO databases on the list.

Exhibit B

a Privacy Office official, creating a final approved Privacy Impact Assessment can take 1 to 3 months.

## Only One Classifier Reviews Each Type of Referral, Risking Potential Perception of Unfairness and Succession Planning Problems

**Internal Control Standard: Segregate Duties.**

Key duties and responsibilities need to be divided or segregated among different people to reduce the risk of error.

Source: GAO. | GAO-15-514

Internal control standards require that key duties and responsibilities be divided or segregated among different people to reduce the risk of error and to achieve organizational goals. Referrals classification divides work among its five classifiers based on expertise for a particular type of referral. One classifier is responsible for each of the following area(s):

1. Fraud and terrorism referrals, and referrals that request collaboration with another IRS division.

2. Political activity referrals.

3. Tax Equity and Fiscal Responsibility Act and state referrals.

4. Employee status,[84] whistleblower, and international referrals.

5. High profile and church committee referrals.

In addition, each classifier, except for the individual responsible for political activity referrals, also reviews general referrals, which are referrals that do not fit into these categories.[85] The classifiers review the referrals they are responsible for and make classification determinations. Each classifier has several years of experience and some have received specialized training to work with the types of referrals under his or her specialty. Aside from general referrals, classifiers are not cross-trained on referral specialties, according to the EO referrals manager.

---

[84]EO receives referrals from IRS's Small Business/Self Employed Division, which processes forms from entities requesting determination of worker status for purposes of ascertaining the applicability of federal employment taxes and income tax withholding.

[85]As described above, the five classifiers take turns sorting incoming referrals into categories based on an initial read of the referral.

Exhibit B

**Internal Control Standard: Effectively Manage Human Capital.**

Management should ensure that skill needs are continually assessed and that the organization is able to obtain a workforce that has the required skills that match those necessary to achieve organizational goals.

Source: GAO. | GAO-15-514

The specialization of the classifiers allows for in-depth knowledge of complex issues and for the opportunity to apply experience; however, internal control risks accompany this approach. First, for political activity, church, and high profile referrals, the classifier appears to serve as an initial gatekeeper for determining whether a referral is reviewed by a committee. Although committee reviews are intended as a safeguard against unfairness in the examination selection process, referrals that do not make it past the classifier do not undergo committee review. For example, according to the EO referrals manager, all political activity referrals are supposed to go to the Political Activities Referral Committee to ensure that they receive the benefits of committee review. However, the political activity referrals classifier exercises some judgment in determining which referrals are categorized as political activity referrals. Further, in our review of the Referrals Database, we found that about 5 percent of political activity referrals classified in fiscal year 2014 were not reviewed by the committee. The classifier for the high profile and church referrals has more discretion in deciding which referrals go to the committee. In our database review, we found that about 91 percent of these referrals were not reviewed by the committee. According to the EO referrals manager, this is often because they did not contain enough information or did not deal with tax issues (known as "no issue" referrals).[86] These numbers highlight the extent to which classifiers make decisions outside of the committee review process.

According to internal control standards, key duties and responsibilities should be divided or segregated among different people to reduce the risk of error. Spreading classification responsibilities for sensitive referrals to more than one classifier could help decrease the potential influence of any one classifier. Even if other safeguards are in place, having the same individual initially classify all political activity or all high profile or church referrals creates the potential for unfairness, particularly for referrals that the classifier labels as "no issue" and therefore are not sent for committee review.

The lack of cross-training among the classifiers also creates concerns about succession planning. For example, three of the five classifiers are eligible for retirement, according to the EO referrals manager. Internal control standards require that management should ensure that skill needs

---

[86]There may be several reasons why these referrals were not reviewed by a committee; however, a single classifier was the only person to review them.

Exhibit B

are continually assessed and that the organization is able to obtain a workforce that has the required skills that match those necessary to achieve organizational goals. As a part of its human capital planning, management should also consider how best to retain valuable employees, plan for their eventual succession, and ensure continuity of needed skills and abilities. The EO referrals manager agreed that they should have a succession plan, but said that they are working with a "bare bones" staff and do not have the resources to take time away from current classifiers' duties for training. TE/GE executives agreed that cross-training classifiers is ideal, but also stated that it is currently not feasible given existing resources. However, without cross-training or provisions for succession planning, EO is risking its ability to process referrals upon the departure of one of its classifiers. It is inevitable that classifiers will eventually need to be replaced. By completing some cross-training ahead of those departures, referrals classification could benefit from overlapping specialties and spreading responsibility for classifying sensitive referrals to reduce the potential for error and potential unfairness.

## Referral Committee Membership is Not Rotating as Required

**Internal Control Standard: Establish Control Activities To Enforce Management Directives.**

Procedures that enforce management directives help ensure that management directives are carried out.

Source: GAO. | GAO-15-514

According to internal control standards, procedures that enforce management directives, such as IRM requirements on the rotation of staff, help ensure that management directives are carried out. Management should also design and implement internal controls based on the related costs and benefits. The IRM requires that committee members rotate every 12 months, on a staggered schedule.[87]

The members of the referral review committees are not rotating every 12 months. Based on start dates for committee members provided by EO and our database review, we found 87 percent of current committee members were serving for more than a 12 month period, as of April 30, 2015.[88] Specifically, current committee members who exceeded their 12-month tenures have been serving on the committees for an average of 34 months (see table 8). In addition, although not reflected in this table, some committee members may have served on another committee prior to their current term, according to the EO referrals manager. Our

---

[87]IRM Part 4, Chapter 75, Section 5.6.

[88]We compared the start dates provided by IRS with activity from each committee member documented in the Referrals Database. We found that, in general, the dates IRS provided align with activity recorded in the database.

Exhibit B

database review showed that some committee members have served on committees since 2009.

**Table 8: Number of Months Served by Current Referrals Committee Members, as of April 30, 2015**

| | Committees | | | | |
|---|---|---|---|---|---|
| | High Profile | Political Activity | Political Activity | Churches | Churches |
| Member 1 | 39 | 34 | 34 | 40 | 34 |
| Member 2 | 25 | 34 | 34 | 40 | 34 |
| Member 3 | 28 | 7 | 20 | 40 | 9 |

Source: IRS officials. | GAO-15-514

NOTE: The second political activity committee listed here is primarily respons ble for reviewing returns identified through data analytics queries. However, when workload is high for the Political Activities Referral Committee, the second committee reviews referrals, according to the EO referrals manager.

Rotating staff may help ensure that a variety of staff serve on the committees, which serve as a safeguard in the classification of political activity and sensitive referrals. If the required committee rotation serves as an internal control to address risks in the referrals examination selection process, then by not following its procedures, EO has the potential to fall short of its goal of fairness.

Committee member volunteers are to be senior EO technical employees, and should be solicited in an annual memorandum from the Director of EO Examinations, according to the IRM.[89] EO did not have records of an issued memorandum soliciting volunteers, although all of the current members are volunteers, according to an EO official.[90] The EO referrals manager told us that it is difficult to get volunteers because of the potentially high volume of work, particularly for political activity referrals, and the difficulty providing prospective committee members with an estimate of the time commitment required. However, by not utilizing all avenues for soliciting volunteers—such as the memorandum from the Director of EO Examinations—EO is not reaching the pool of potential volunteers and maximizing opportunities to rotate committee members.

---

[89]IRM Part 4, Chapter 75, Section 5.6.

[90]EO drafted a memorandum in February 2014, but it was never issued.

Exhibit B

Yet management should also design and implement internal controls based on the related costs and benefits. The current committee members have likely developed an expertise in assessing these cases, and training new members may require additional resources. Although a provision for rotations is consistent with internal controls, it is possible that a rotation of more than 12 months may suffice. If EO believes that to be the case, it could revise the IRM accordingly.

# Conclusions

The Exempt Organizations unit (EO) is faced with the challenging task of overseeing the diverse population of exempt organizations and enforcing their compliance with the tax laws. EO's reliance on a variety of sources and processes to select organizations' returns for examination underscores the importance of it having a robust internal control system to ensure selection fairness and integrity, in accordance with the Tax Exempt and Government Entities (TE/GE) division's mission. EO has some controls in place that are consistent with internal control standards, and has implemented some of these controls successfully. However, there are several areas where EO's control system could be strengthened, as noted by the control deficiencies identified in this report. Many of these deficiencies pose a risk that could lead to returns being selected, or not selected, for examination based on criteria or practices that fall short of TE/GE's mission of ensuring fairness and integrity. For example, internal controls monitoring is one way to help reduce risk, but without consistent monitoring, there is the possibility returns could be selected for unfair reasons.

**Control design improvements.** To reduce the risk of returns being selected unfairly, EO could make several improvements to its examination selection control design. Formalizing additional procedures in the Internal Revenue Manual (IRM) would ensure coverage using standards that dictate when deviations from selection procedures are appropriate, and would increase transparency. Ensuring that all procedures are current and accurate would reduce the risk of employees following incorrect procedures and administering tax laws inconsistently. Enhancing both the monitoring of database files used to document examination selection decisions and monitoring the content of examination files would increase EO management's ability to address and rectify problems such as missing signatures, errors in applying criteria, and inappropriate justifications for case selection or dismissals—each of which might result in case selection decisions inconsistent with TE/GE's mission. Improving tracking of closed examination files would have multiple benefits, including facilitating congressional oversight. More

Exhibit B

consistent documentation and approval of criteria in EO's project files would reduce the risk that inappropriate selection criteria could be developed. Finally, more accurate coding of examinations would reduce the risk of ineffective or inefficient resource allocation decisions for compliance activities.

**Control implementation improvements.** EO could also make several improvements to control implementation that would reduce the risk of returns being selected unfairly. Maintaining up-to-date EO database documentation of data element definitions used to track case selection would reduce the risk of inaccurate use of data elements. Additionally, EO has the opportunity to provide cross-training for referrals classifiers and to quickly benefit from their resulting skills enhancements. This would allow shared responsibility for reviewing political activity and sensitive referrals, and also could reduce the potential for unfairness. Providing training for classifiers currently onboard, rather than waiting until a classifier departs and it becomes a necessity, would help preempt a significant void of knowledge and an increased backlog of work. Finally, rotating the staff who serve on referral review committees would help ensure that a variety of staff serve on committees, providing a safeguard for maintaining fairness and objectivity in the classification of political activity and sensitive referrals.

## Recommendations

To better ensure the Exempt Organization (EO) unit's adherence to the Tax Exempt and Government Entities (TE/GE) division's mission of "applying the tax law with integrity and fairness to all" in selecting exempt organizations to review or examine, we recommend that the Commissioner of Internal Revenue direct EO to take the following nine actions:

1. Complete the development and formally issue the Internal Revenue (IRM) sections on compliance checks and compliance reviews, and develop and formally issue an IRM section on Exempt Organization Compliance Area (EOCA) classification.

2. Develop, document, and implement a process to ensure that Internal Revenue Manual (IRM) sections and other procedures are reviewed and updated annually, and that updates reflect current practice, as required.

3. Develop, document, and implement additional monitoring procedures in order to ensure case selection controls, including ensuring that procedures for obtaining required signatures and

Exhibit B

documenting explanations for selection decisions, are being followed.

4. Develop, document, and implement procedures to ensure that all criteria or methods used in projects to select returns for examination are consistently documented and approved, including procedures related to documenting changes that occur during the course of a project, or new phases of a project.

5. Develop, document, and implement procedures for examination selection done by triage teams, including a process to consistently document selection criteria and triage team examination selection decisions.

6. Determine what additional controls may be needed to ensure examinations related to projects are properly coded.

7. For the databases EO uses during examination selection, develop complete and up to date data dictionaries to define data elements used in the databases.

8. Provide cross-training for referrals classifiers, prioritizing training for classifiers who work with political activity, high profile, and church referrals; and develop, document, and implement a system to ensure that those referrals are not always reviewed by the same classifier.

9. Ensure that referral committee members rotate every 12 months by soliciting volunteers. If EO does not believe that 12 months is an appropriate rotation length, then the Internal Revenue Manual (IRM) should be revised to require an alternative rotation schedule.

In addition, we recommend that the Commissioner of Internal Revenue take the following action:

1. Determine what additional controls may be needed to ensure that all closed examination files are tracked and maintained accurately.

## Agency Comments and Our Evaluation

We provided a draft of this report to IRS for review and comment. In its written comments, reproduced in appendix III, IRS generally agreed with our findings and recommendations. In its comments, IRS described the steps it plans to take to implement the recommendations. IRS also provided technical comments, which we incorporated where appropriate.

Exhibit B

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will plan to send copies of this report to the Secretary of the Treasury, the Commissioner of Internal Revenue, and other interested parties. The report is available at no charge on the GAO website at http://www.gao.gov.

If you or your staff has any questions about this report, please contact us at (202) 512-9110 or mctiguej@gao.gov. Contact points for our offices of Congressional Relations and Public Affairs are on the last page of this report. GAO staff members who made major contributions to this report are listed in appendix IV.

James R. McTigue, Jr.
Director, Tax Issues
Strategic Issues

Exhibit B

# Appendix I: Objectives, Scope, and Methodology

This report (1) describes the processes for selecting tax-exempt organizations for examination, and (2) assesses the adequacy of the controls (including procedures) for selecting examination cases that the Exempt Organizations (EO) unit uses to achieve the Tax Exempt and Government Entities (TE/GE) division's stated mission of "applying the tax law with integrity and fairness to all."

For the first objective, we reviewed Internal Revenue Service (IRS) documents that describe the processes and criteria for selecting exempt organization returns for examination. These documents included sections of the Internal Revenue Manual (IRM), procedures documents, training documents, worksheets for reviewing files, and summaries of selection processes prepared by EO officials. We also interviewed IRS officials responsible for overseeing examination selection. In addition, we obtained data from the following IRS databases: Returns Inventory and Classification System (RICS), Referral database, Exempt Organizations Compliance Area (EOCA) database, and EOCA Classification database. The databases contain information on initiated and closed examinations, classification of referrals, and compliance reviews and compliance checks.[1] Based on our testing of the data and review of documentation and interviews, we determined that these data were reliable for the purposes of this report.

For the second objective, we reviewed EO's examination selection procedures and related internal controls intended to help TE/GE achieve its stated mission of "enforcing the tax law with integrity and fairness to all."[2] We then assessed whether these procedures followed standards from *Standards for Internal Control in the Federal Government* that were relevant to examination case selection.[3] We also conducted six focus groups with selected EO staff who are responsible for selecting, or doing research to help select, exempt organization returns for examination, and

---

[1]A compliance review determines whether an organization is operating in accordance with its exempt purpose and is current with its filing requirements, based on document review and research without direct taxpayer contact. A compliance check is a correspondence contact with an organization to inquire about compliance.

[2]IRM, Part 1, Chapter 1, Section 23.

[3]GAO, *Standards for Internal Control in the Federal Government*, GAO-AIMD-00-21.3 (Washington, D.C., November 1999).

Exhibit B

two focus groups of selected EO staff who conduct examinations.[4] In total, our groups involved 41 participants with an average of about 17 years of IRS experience, with a range from 8 months to 37 years of experience. The focus groups were held at IRS offices in Ogden, Utah; Dallas; and Atlanta. We asked questions on internal control related topics, such as the clarity of EO procedures and the adequacy of training to apply these procedures. We used NVivo qualitative data analysis software to conduct a content analysis of themes from the focus groups.

To assess how well EO implemented its procedures and applied examination selection criteria, we used IRM sections, EO procedures documents, and other documents as criteria. We reviewed the populations of cases or referrals closed during fiscal year 2014 in the Referral, EOCA, and EOCA Classification databases.[5] Within the populations, we looked for completeness of required fields used in conducting research or selecting returns for examination. For our population-level analyses, we considered any control with a non-adherence rate greater than 5 percent to be ineffective. We also selected random probability samples of the database files to review required text, such as justifications for selecting or not selecting a return for

---

[4]For the six groups of staff who work in the examination selection process, who were located in Ogden, Utah; Dallas; and Atlanta, we were able to invite all staff, with exception of one group where we randomly selected participants in order to have a manageable group size. Staff who conduct examinations are located all over the country. We invited all examination staff based in Dallas for the two relevant focus groups so that we could conduct the groups in person.

[5]The Referral Database contains records of all referrals received in EO, including those that were mistakenly sent to EO (misroutes) and those that do have not have enough information to classify (no issue referrals). For other referrals, the database serves as a log of actions on a referral, including the classification decision and explanation for the decision. In our population and samples, we only reviewed referrals that completed the classification process in fiscal year 2014. We excluded duplicate referrals (referrals on the same issue for an organization), misroutes, and referrals that were still being classified. The EOCA Database contains records of all compliance review and compliance check cases worked by EOCA. We only reviewed cases that were closed in fiscal year 2014. We excluded reviews of operations performed for the Patient Protection and Affordable Care Act because there were no selection decisions related to those reviews. The EOCA Classification Database contains records of all tax returns classified by EOCA. We only reviewed cases that were closed in fiscal year 2014.

Exhibit B

**Appendix I: Objectives, Scope, and Methodology**

examination or review. Finally, we selected random probability samples of dismissed examination files, and closed examination files from processes described earlier in this report.[6] Table 9 summarizes the probability samples we reviewed.

**Table 9: Exempt Organizations (EO) Selection Processes, Population, and Sample Descriptions**

| Selection process | Selection decision | Records we reviewed | Unit of analysis | Population size (closed in fiscal year 2014) | Sample size (closed in fiscal year 2014) |
|---|---|---|---|---|---|
| Exempt Organizations Compliance Area (EOCA) – Compliance checks and compliance reviews | All | EOCA database | Organization | 5,242 | 100 |
| EOCA Classification | All | EOCA classification database | Tax return | 2,355 | 100 |
| Referrals processing[a] | Selected for examination | Referral database | Referral | 1,143 | 89 |
| Referrals processing | Not selected for examination | Referral database | Referral | 4,173 | 94 |
| Examinations[b] | Dismissed | Paper and electronic case files | Tax return | 1,858 | 100 |
| | Examined | Paper and electronic case files | Tax return | 606[c] | 100 |

Source: GAO analysis of IRS data. | GAO-15-514.

NOTES:

[a]We selected a stratified random sample in order to have generalizable samples for referrals based on whether they were selected for examination or not. We included referrals selected for compliance reviews, compliance checks, transfers, and future year referrals in the population of referrals not selected for examination.

[b]We consider examinations to be case selection processes because examinations may be dismissed, and related pick-ups and substitutes for return may be developed in the course of examinations.

[c]We excluded certain closed examination cases from our review population: we excluded examination cases originating from referrals and EOCA processes because we reviewed those processes directly, we excluded cases for which no staff discretion was involved, and we excluded cases of limited value to our sample for other reasons. Therefore, the examination population number presented here will not match up with elsewhere in our report.

[6]Once an examination is sent to an examination group, the manager or examination staff may dismiss the return from examination. Typically, this is done because a return is nearing the date that limits the time period during which IRS may impose taxes or penalties on the return, based on statutory requirements.

Exhibit B

The file and database review samples were obtained by following a probability procedure based on the selection of random samples. The database and examination files we reviewed were closed in fiscal year 2014, and we assessed them against requirements that were in effect during that time. For the populations and samples we reviewed, we used a 5 percent tolerable error rate to assess the adequacy of internal controls. Within the probability samples, we reviewed certain controls that were only applicable to a subgroup of the files in the sample. We reported on problems identified in those subgroups, but we did not design our samples to support estimation for those sub-categories. In those cases, we present our results as numbers of instances where the control was not effective.

Because we followed a probability procedure based on random selections, our sample is only one of a large number of samples that we might have drawn. Since each sample could have provided different estimates, we express our confidence in the precision of our particular sample's results as a 95 percent confidence interval (e.g., plus-or-minus 10 percentage points). This is the interval that would contain the actual population value for 95 percent of the samples we could have drawn. For our random probability samples, we considered a control to be ineffective if the entirety of the confidence interval around our estimated non-adherence rate was greater than 5 percent, and to be effective if the entirety of the confidence interval was less than or equal to 5 percent. If the confidence interval overlapped 5 percent, we considered our test to be inconclusive.

We also reviewed a non-generalizable sample of 11 projects that were active during fiscal year 2014.[7] We selected those projects to include a variety of sizes (based on number of returns examined), ages (start dates for the project), as well as some projects that relied on Form 990 data queries and politically sensitive projects. We reviewed the project files for each project to test whether the documentation—such as development and approval of examination selection criteria—followed project development procedures. We also reviewed a non-generalizable sample of 11 closed examination files that originated with whistleblowers to check that IRM and referrals procedures were followed with regard to ensuring

---

[7]EO initiates projects that focus on specific areas of potential noncompliance (such as fundraising) or specific types of organizations (such as community foundations).

Exhibit B

whistleblower information is not kept in the examination file. Finally, we interviewed EO officials about the processes and discussed deficiencies we identified.

We designed uniform data collection instruments for our file and database reviews to consistently capture information on the completeness of required documentation and approvals related to case selection. IRS verified the criteria we used in our instruments, and identified any outdated criteria we had planned to use. To ensure accuracy, two analysts reviewed each file or database entry we assessed, and reconciled any differences in responses. We then analyzed the results of these data collection efforts to identify main themes and develop summary findings. Based on reviews of related documentation, interviews with knowledgeable agency officials, and electronic testing for missing data, we determined that these data were sufficiently reliable for our purposes.

We conducted this performance audit from May 2014 to July 2015 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Exhibit B

# Appendix II: Effectiveness of Procedural Control Implementation for Selection Decisions and Approvals

The Exempt Organizations (EO) unit has procedures in place to document multiple types of examination selection decisions and approvals. Internal control standards state that control activities such as these procedures help ensure that management directives are carried out. Table 10 summarizes our findings on the effectiveness of implementation of the procedures, using a tolerable error rate of 5 percent (meaning that up to 5 percent of cases could fail to adhere to a procedure, and the procedure would still be considered effective). We found that some procedures were implemented successfully, and some were not. For some procedures, we were unable to obtain sufficient information to make a conclusive determination about whether implementation was successful.[1] See appendix I for more details on our sampling methodology.

**Table 10: Effectiveness of EO Procedural Control Implementation for Selection Decisions and Approvals, Cases Closed Fiscal Year 2014**

| Selection process and primary source for procedures | Selection decision | Procedure | Effectiveness of procedure[a] | Error rate, cases failing to adhere to procedure | Sample or population size[b] | Confidence interval, for samples |
|---|---|---|---|---|---|---|
| Exempt Organizations Compliance Area (EOCA) —compliance checks and compliance reviews *Compliance check and compliance review general procedures* | All | Cases should have Case Chronology Records (records that track actions taken on a case) | Effective | 0 cases | Population 5,238 | N/A |
| | | Cases should have lead sheets (records used to gather research information and record the final conclusion for the case) | Effective | 1 case | Population 3,230 | N/A |
| | | Cases should have final conclusions noted on their lead sheets | Indeterminate | 3% | Sample 100 | 1–9% |

[1]There were a few situations in which we could not make a conclusive determination about whether implementation was successful. We reviewed certain sub-categories of samples, and we did not design our samples to support estimation for these sub-categories. Similarly, in the case of examination files that originated with whistleblower referrals, we reviewed a number of files that was not designed to support estimation. Additionally, in some cases, the 95 percent confidence intervals around our estimates overlapped the 5 percent tolerable error rate.

Exhibit B

Appendix II: Effectiveness of Procedural
Control Implementation for Selection
Decisions and Approvals

| Selection process and primary source for procedures | Selection decision | Procedure | Effectiveness of procedure[a] | Error rate, cases failing to adhere to procedure | Sample or population size[b] | Confidence interval, for samples |
|---|---|---|---|---|---|---|
| | | Lead sheets should align with disposal codes (codes used to note the decision on the case) | Indeterminate | 5% | Sample 100 | 2–11% |
| | | On the Case Chronology Record, the findings should be explained and the final disposition of the review should be documented | Indeterminate but may be potential concern | 6% | Sample 100 | 2–13% |
| | | Lead sheets should be fully completed | Indeterminate but may be potential concern | 6% | Sample 99 | 2–13% |
| EOCA Classification *EOCA classification procedures* | All | The classification input form should have a conclusion/summary of the classification process and, if an exam was recommended, should include a clear description of the issue | Indeterminate but may be potential concern | 6% | Sample 86 | 2–13% |
| | | All of the questions on the main tab of the classification input form should be answered | Ineffective | 13% | Sample 79 | 6–22% |
| Referrals *Referrals Procedures* | All | Referrals should have Case Chronology Records | Effective | 0% | Population 5,317 | N/A |
| | Selected | Actions on the referral reflect the classifier's determination | Effective | 0% | Sample 89 | 0–3% |
| | | The classifier's determination for the referral should be consistent with the classifier's explanation[c] | Indeterminate | 1% | Sample 84 | 0–7% |
| | | Referrals selected for examination should be assigned a priority level | Effective | 3% | Population 1,143 | N/A |
| | | Referrals should have an explanation for the classifier's determination in the comments field of the Referral Database | Indeterminate | 3% | Sample 87 | 1–10% |
| | | Classifiers sending referrals to the political activities, church, and high profile committees should provide a description of the allegation for the committee | Indeterminate but may be potential concern | 4 out of 15 cases | N/A (sub-category)[d] | N/A |
| | | Political activity referrals selected for examination contain a justification of the priority level that the Political Activities Referral Committee assigned the referral[e] | Indeterminate but may be potential concern | 14 out of 14 cases | N/A (sub-category)[d] | N/A |

Exhibit B

Appendix II: Effectiveness of Procedural
Control Implementation for Selection
Decisions and Approvals

| Selection process and primary source for procedures | Selection decision | Procedure | Effectiveness of procedure[a] | Error rate, cases failing to adhere to procedure | Sample or population size[b] | Confidence interval, for samples |
|---|---|---|---|---|---|---|
| | Not selected | Actions on the referral reflect the classifier's determination | Effective | 0% | Sample 94 | 0–3% |
| | | Referrals should have an explanation for the classifier's determination in the comments field of the Referral Database[f] | Indeterminate but may be potential concern | 9% | Sample 90 | 4-17% |
| | | The classifier's determination for the referral should be consistent with the classifier's explanation[c] | Indeterminate | 1% | Sample 91 | 0–6% |
| | | Classifiers sending referrals to the political activities, church, and high profile committees should provide a description of the allegation for the committee | Indeterminate | 0 out of 18 cases | N/A (sub-category)[d] | N/A |
| Examinations *Internal Revenue Manual* | Dismissed | Examinations that were dismissed must have explanations for the dismissal[g] | Ineffective | 12% | Sample 66 | 5-23% |
| | | Examinations that were dismissed must have management signatures[h] | Ineffective | 22% | Sample 65 | 12-34% |
| | Examined (Whistleblower) | Examinations that originated with whistleblower referrals must not contain forms or information that may identify a whistleblower[i] | Indeterminate but may be potential concern | 3 out of 11 cases[j] | N/A[k] | N/A |
| | Examined (Claims) | Examinations that originated as claims should have a statement from the classifier about why the claim was sent for examination[l] | Ineffective | 95% | Sample 76 claims | 87-99% |

Source: GAO analysis of IRS data. | GAO-15-514

Notes: We made our assessments based on requirements in effect in fiscal year 2014. We excluded certain file review findings because IRS told us that the requirements were obsolete, or because full information was not available to make the assessment.

[a]We used a tolerable error rate of 5 percent. For population-level tests, if the percentage of deviations from the procedure was less than or equal to 5 percent, we considered the procedure to have been implemented effectively. For random probability samples, if the upper bound of the 95 percent confidence interval for the estimated percentage of deviations from a procedure was less than or equal to 5 percent, we considered the procedure to have been implemented effectively, and if the lower bound of the confidence interval was greater than 5 percent, we considered the procedure to have been implemented ineffectively. If neither of these was the case, we considered our test to be statistically indeterminate.

[b]Sample and population sizes include cases where the procedure was implemented or not implemented; they exclude cases where the procedure was not applicable, or where we were unable to make a determination.

[c]This is not an explicit requirement in the *Referrals Procedures* document. However, the procedures do require the classifier to explain their determination for the referral. Therefore, we determined that it was reasonable to infer that the classifier's explanation should match his or her determination

Exhibit B

**Appendix II: Effectiveness of Procedural
Control Implementation for Selection
Decisions and Approvals**

(decision) on the referral. If the two did not match, it may suggest an error in explaining the reason or coding the determination.

[d]We did not design our sample to support estimation for these sub-categories, so we are reporting out counts for what we found.

[e]Referrals procedures do not require a justification for the priority level. However, given that the priority level, as used in fiscal year 2014, could determine whether or not a referral is examined, a justification could be considered a significant event. Internal control standards require that significant events be clearly documented.

[f]We reviewed the classifier's comments to look for justification for the classification decision. Although 99 percent of referrals not selected for examination had some kind of text entered in the database box for classifier's comments, the text was not always descriptive. We did not count statements that simply said "no issue" as an explanation, as it does not describe what made the referral a "no issue" referral. This is in contrast to most of the referrals which included a description of the complaint or allegation against the organization and a reason why EO could not pursue the referral. For example, in one explanation, the classifier stated that the organization was not an exempt organization and was filing corporate returns, and in another referral, the classifier stated that the allegation was a management issue and there was nothing to substantiate that a tax law was violated.

[g]IRM Part 4, Chapter 75, Section 16. For claims, a dismissal means that adequate information was in the claim file to allow processing of the refund, credit, or adjustment.

[h]IRM Part 4, Chapter 75, Section 16.3.2.4.

[i]It is the examination team's responsibility to protect the identity and existence of the whistleblower from both the taxpayer and others without a need to know by segregating information about the whistleblower from the regular examination workpapers. This requirement is covered in IRM Part 4, Chapter 75, Section 4.7.5 and the 2014 Memorandum for Commissioner, Large Business and International; Commissioner, Small Business/Self-Employed; Commissioner, Tax Exempt and Government Entities; Chief, Criminal Investigation; Director, Whistleblower Office from Deputy Commissioner for Services and Enforcement, Internal Revenue Service, *IRS Whistleblower Program* (Aug. 20, 2014), at 2.

[j]In fiscal year 2014, EO closed 133 examinations that originated with whistleblowers. Three out of eleven cases we reviewed included information that could allow the whistleblower to be identified, such as the Social Security number and address for the whistleblower.

[k]The number of examination files that originated with whistleblower referrals that we reviewed was not designed to support estimation.

[l]IRM Part 4, Chapter 75, Section 4.5.2, Para. 2.A.

# Appendix III: Comments from the Internal Revenue Service



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

DEPUTY COMMISSIONER

June 29, 2015

James R. McTigue, Jr.
Director, Tax Issues
United States Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. McTigue:

Thank you for the opportunity to review the draft report of the Government Accountability Office entitled "IRS Examination Selection: Internal Controls for Exempt Organization Selection Should Be Strengthened" (GAO-15-514, JC 451095). The draft report acknowledges that the IRS Exempt Organizations (EO) unit's reliance on a variety of sources to select returns for examination underscores our "recognition of the importance of having a robust and effective internal control system to ensure selection fairness and integrity." The draft report also makes recommendations for improvements to our database documentation, our referrals process, and IRS file tracking and maintenance. We have reviewed the draft report and, to the extent discussed in this letter, generally agree with its findings and recommendations. We have provided technical corrections and comments under separate cover.

EO continually strives to meet the Tax Exempt/Government Entities (TE/GE) Division's mission of applying the tax law with integrity and fairness to all. This is evident from the results of your focus groups with EO employees who conduct examinations and other reviews wherein you have observed that the employees "consistently equated fairness with assessing organizations strictly by whether they comply with tax law and with treating similar types of taxpayers equally."

We agree that internal controls are necessary to ensure that we meet our mission of applying the tax law with integrity and fairness. Although the report states that a hypothetical risk exists that returns could be selected unfairly, the draft report did not find any evidence that this has happened. Nevertheless, EO is committed to further strengthen our internal controls to ensure that we continue to select organizations for examination in a fair and consistent manner.

GAO-15-514

Exhibit B

2

It is important to note that EO has taken measures consistent with your recommendations to update the EO Internal Revenue Manual (IRM) sections so that our employees have the guidance they need to carry out their responsibilities. We appreciate your acknowledgment that we maintain well-documented procedures for several examination selection processes, and that our employees use those procedures to conduct their work and view those procedures as valuable tools in carrying out their responsibilities.

In particular, the draft report states that guidance for the EO Compliance Area (EOCA) is not included in the IRM, but acknowledges that EO has developed applicable procedure documents outside of the IRM. The difference, according to the draft report, is that the IRM generally prohibits deviation from standard procedures, whereas a prohibition on deviation does not explicitly apply to the non-IRM procedure documents. As a practical matter, however, EO requires adherence to both the IRM and the non-IRM procedure documents, and the draft report does not identify any evidence of deviation from either source of guidance.

EO is in the second year of a three-year plan to update all 145 IRM sections that are applicable to EO. The draft report observes that some IRM provisions may become obsolete over time. As an example, the draft report acknowledges that an IRM provision that required stamping certain paper returns may have less relevance given the increasing incidence of electronic returns. Consequently, we continually update the IRM. New IRM sections are created as new processes are put into place. As examples, EO is currently developing IRM sections for the simplified and streamlined exemption application processes, the recently implemented post-determination process, and the new data-driven compliance strategy.

EO will continue to review and improve its efforts to maintain appropriate oversight of, and promote compliance by, the tax-exempt sector, including, in particular, our examination case selection internal control system. According to the draft report, many case referrals were not reviewed by the relevant committee assigned to review those referrals because the referrals raised "no issue." By design, classifiers review referrals – which could be complaints from members of the public not versed in tax law – to identify those that identify potential violations of the federal tax laws. If a referral poses a potential tax violation, it is referred to the appropriate committee. Committee review of referrals that do not identify federal tax issues would be inefficient and out of scope. Additionally, with respect to committee membership, the draft report notes that the referral committees are staffed by qualified employees who volunteer for this assignment with the expectation of being relieved of the assignment in 12 months. As committee workload has increased, fewer qualified employees have volunteered for this assignment and, as a result, this has extended the service of committee members. In recognition of this dynamic, EO plans to staff the referral committees by collateral assignment and not through the volunteer process on a going forward basis.

Exhibit B

3

We appreciate having the opportunity to review and comment on the draft report.
Responses to your specific recommendations are enclosed.  If you have any questions,
please contact me, or a member of your staff may contact Tamera Ripperda, Director,
Exempt Organizations at (202) 317-8989.

Sincerely,

John M. Dalrymple
Deputy Commissioner for Services and Enforcement

Enclosure

Exhibit B

Enclosure

**GAO Recommendations and IRS Responses to GAO Draft Report**
**IRS Examination Selection: Stronger Internal Controls Would Reduce Risk of**
**Unfair Exempt Organization Selection**

To better ensure EO adherence to TE/GE's mission of "applying the tax law with
integrity and fairness to all" in selecting exempt organizations to review or examine, we
recommend that the Commissioner of Internal Revenue direct EO to take the following
10 actions:

**Recommendation 1:** Complete the development and issue the IRM sections on
compliance checks and compliance reviews, and develop and formally issue an IRM
section on EOCA classification.

**Comment:** The Exempt Organizations Compliance Area (EOCA) has completed a draft
IRM section that provides guidance on compliance checks and compliance reviews.
This IRM section is currently under review and is expected to be finalized by October
2015. An IRM section on EOCA classification will be added to the IRM in Fiscal Year
2016.

**Recommendation 2:** Develop, document and implement a process to ensure that IRM
sections and other procedures are reviewed and updated annually, and that updates
reflect current practice, as required.

**Comment:** EO is currently in the second year of a three-year plan to update 100% of its
IRM sections. EO Examinations is expected to complete its review and update 46 of the
62 IRM examination sections in FY 2015. The remaining sections are scheduled to be
reviewed and updated in FY 2016. After all IRM examination sections have been
updated, EO Examinations will review and update all the IRM examination sections on
an annual basis.

**Recommendation 3:** Develop, document and implement additional monitoring
procedures in order to ensure case selection controls, including ensuring that
procedures for obtaining required signatures and documenting explanations for
selection decisions, are being followed.

**Comment:** EO will review its current monitoring procedures, e.g., periodic sampling for
required signatures and templates for approvals and explanations, and identify and
implement any additional monitoring procedures that are needed to ensure case
selection controls continue to be followed. The monitoring procedures will be reviewed
through operational reviews by the appropriate EO executives. These reviews will
document whether the appropriate documentation for case selection decisions is
maintained and if periodic adjustments are needed.

Exhibit B

2

**Recommendation 4:** Develop, document and implement procedures to ensure that all criteria or methods used in projects to select returns for examination are consistently documented and approved, including procedures related to documenting changes that occur during the course of a project, or new phases of a project.

**Comment:** Although EO is decreasing its focus on compliance projects, EO Examinations has begun following the Compliance Initiative Projects (CIP) IRM 4.17 to ensure that all criteria used to select returns for examination and executive approvals for added or changed criteria will be documented, including changes that occur during the project or in a new phase of a project.

**Recommendation 5:** Develop, document and implement procedures for examination selection done by triage teams, including a process to consistently document selection criteria and triage team examination selection decisions.

**Comment:** IRM sections are being written for the Compliance Strategies and Critical Initiatives (CSCI) and EOCA procedures for examination selection followed by triage teams, including a process to ensure the criteria and selection decisions are consistently documented.

**Recommendation 6:** Determine what additional controls may be needed to ensure examinations related to projects are properly coded.

**Comment:** In addition to continuing to monitor discrepancies and providing monthly reports to the Area Managers, EO will include a procedure in the CSCI IRM for these discrepancy reports and consider other controls that may be effective in addressing this issue.

**Recommendation 7:** For databases, EO uses during examination selection, develop data dictionaries to define data elements used in the databases.

**Comment:** For the two formal systems, Reporting Compliance Case Management System (RCCMS) and Return Inventory Classification System (RICS), EO will work with TE/GE Business Systems Planning (BSP) to propose a system change request to Information Technology (IT) in either creating (RCCMS) or updating (RICS) the associated system's dictionary. Finalizing these changes is subject to Information Technology resources. For the internal databases (EOCA and EOCA classification), as resources permit, EO will develop data dictionaries for these internal systems that will aid in the transitioning of the databases into RCCMS during FY 2016.

Exhibit B

3

**Recommendation 8:** Provide cross-training for referrals classifiers, prioritizing training for classifiers who work with political activity, high profile, and church referrals; develop, document and implement a system to ensure that those referrals are not always reviewed by the same classifier.

**Comment:** EO will provide its classifiers with cross-training, prioritize the training of classifiers working with political activity, high profile and church referrals, and develop, document and implement a process to ensure that the referrals are reviewed on a rotating basis.

**Recommendation 9:** Ensure that referral committee members rotate every 12 months by soliciting volunteers. If EO does not believe that 12 months is an appropriate rotation length, then the IRM should be revised to require an alternative rotation schedule.

**Comment:** We will determine the appropriate rotation timeframe for the referral committee members, and will update our internal management documents, as necessary, for any changes.

**Recommendation 10:** Determine what additional controls may be needed to ensure that all closed examination files are tracked and maintained accurately.

**Comment:** EO will review, and if needed, clarify our internal processes within TE/GE regarding monitoring and shipping case files, and if necessary, will initiate discussions with Wage and Investment Files Office to clarify and improve the coordination between our business operating divisions with regard to the process of requesting, shipping, tracking and monitoring closed case files.

Exhibit B

# Appendix IV: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **Contact** | James R. McTigue, Jr. (202) 512-9110, mctiguej@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Jeff Arkin, Assistant Director; Carl Barden; Jehan Chase; Deirdre Duffy; Ted Hu; Laurie C. King; Meredith Moles; Jessica Nierenberg; Neil Pinney; Amy Radovich; Robert Robinson; Cynthia Saunders; Albert Sim; Lindsay Swenson; and James R. White made major contributions to this report. |

Exhibit B

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Website: http://www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately. |

Exhibit B

Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548

## Public Affairs

Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548

Exhibit B