### U.S. House of Representatives
# Committee on Oversight and Government Reform
### Darrell Issa (CA-49), Chairman



## The Internal Revenue Service's Targeting of Conservative Tax-Exempt Applicants: Report of Findings for the 113th Congress

Staff Report
113th Congress

December 23, 2014

Exhibit D

*"I've reviewed the Treasury Department watchdog's report, and the misconduct that it uncovered is inexcusable.  It's inexcusable, and Americans are right to be angry about it, and I am angry about it.  I will not tolerate this kind of behavior in any agency, but especially in the IRS, given the power that it has and the reach that it has into all of our lives."*

— President Barack Obama, May 15, 2013.[*]

*"If, on the other hand, you've got an office in Cincinnati, in the IRS office that – I think, for bureaucratic reasons, is trying to streamline what is a difficult law to interpret about whether a non-profit is actually a political organization, deserves a tax exempt agency.  And they've got a list, and suddenly everybody's outraged."*

— President Barack Obama, December 5, 2013.[†]

*"[T]here were some bone-headed decisions . . . out of a local office . . . .  Not even mass corruption, not even a smidgeon of corruption, I would say."*

— President Barack Obama, February 2, 2014.[‡]

---

[*] The White House, Statement by the President (May 15, 2013).
[†] *Hardball with Chris Matthews* (MSNBC television broadcast Dec. 5, 2013) (interview with President Barack Obama).
[‡] *"Not even a smidgeon of corruption": Obama downplays IRS, other scandals*, FOX NEWS, Feb. 3, 2014.

Exhibit D

# Executive Summary

On October 14, 2010, President Barack Obama stood before a youth town hall in Washington, D.C., fielding questions during the combative midterm election campaign season. When asked about the rising Tea Party movement, the President responded that "what has happened is layered on top of some of that general frustration that has expressed itself through the Tea Party, there is an awful lot of corporate money that's pouring into these elections right now."[1]   The President continued: "But you have these innocuous-sounding names, and we don't know where this money is coming from. I think that is a problem for our democracy. And it's a direct result of a Supreme Court decision that said they didn't have to disclose who their donors are."[2]

Five days later, Lois Lerner addressed a much smaller audience at Duke University. Speaking about the upcoming election, Lerner echoed the President's sentiments.  "The Supreme Court dealt a huge blow," she said, "overturning a 100-year old precedent that basically corporations couldn't give directly to political campaigns.  And everyone is up in arms because they don't like it. . . .   They want the IRS to fix the problem. . . .  I won't know until I look at their [tax return form] 990s next year whether they have done more than their primary activity as political or not.  So I can't do anything right now."[3]

The pressure to "fix the problem," as articulated by Lois Lerner, originated with President Obama and senior party leadership.  The pressure on the IRS to regulate political speech by tax-exempt organizations mounted in the wake of the Supreme Court's decision in *Citizens United v. Federal Election Commission*.  Barnstorming the country, President Obama derided conservative tax-exempt groups as "shadowy," "phony," and even "a threat to our democracy."[4]   Other prominent Democratic leaders joined the President's call to arms, pressuring the IRS to take an aggressive stance against political speech by tax-exempt entities.[5]

For twenty-seven months, from February 2010 until May 2012, the Internal Revenue Service systematically targeted conservative tax-exempt applicants for additional scrutiny and delay.  The IRS's targeting of conservative tax-exempt applications was just one symptom of the Administration's broader response to perceived shortcomings of federal campaign-finance law and the *Citizens United* decision.  As prominent Democratic politicians and the media condemned conservative non-profit groups, the IRS sought ways to rein in the groups' political speech.  Lois Lerner initiated a "c4 project" – careful to ensure that it was not "*per se* political" – and called applications filed by Tea Party groups "very dangerous" because she believed that they could undo existing IRS limits on non-profit political speech.

---

[1] The White House, Remarks by the President in a Youth Town Hall (Oct. 14, 2010).
[2] *Id.*
[3] *See* "Lois Lerner Discusses Political Pressure on IRS in 2010," YOUTUBE (Dec.. 10, 2013), http://www.youtube.com/watch?v=EH1ZRyq-1iM (transcription by Committee).
[4] *See* H. COMM. ON OVERSIGHT & GOV'T REFORM, HOW POLITICS LED THE IRS TO TARGET CONSERVATIVE TAX-EXEMPT APPLICANTS FOR THEIR POLITICAL BELIEFS (June 16, 2014) [hereinafter "HOW POLITICS LED THE IRS TO TARGET CONSERVATIVE TAX-EXEMPT APPLICANTS"].
[5] *Id.*

Exhibit D

The rhetoric led the IRS to hold a deeply skeptical view of the merits of applications filed by new conservative groups.  Line-level IRS employees, trained to identify and elevate any applications that could draw media attention, flagged the first Tea Party applications for their Washington superiors.  As Washington employees evaluated the applications, they wondered whether the groups' activities were "good" non-profit activities or merely "emotional" propaganda with "little educational value."[6]  With heavy skepticism, the IRS subjected these groups to years of needless delays and burdensome questioning, causing real harm to many of the applicants.  Of the applications that received additional scrutiny, only seven contained the word "progress" or "progressive,"[7] all of which were subsequently approved by the IRS,[8] while Tea Party groups received unprecedented review and experienced years-long delays.  Unlike the applications from conservative groups, the small batch of applications from liberal-oriented groups received additional scrutiny for non-political reasons.

Flagrant and pervasive management failures by Washington officials contributed substantially to the misconduct.  When asked to answer questions about allegations of IRS targeting, these senior officials – including former Commissioner Doug Shulman and Exempt Organizations Director Lois Lerner – covered up the wrongdoing by providing incomplete and misleading information to Congress.  Shulman specifically gave Congress "assurances" that the IRS was not targeting Tea Party groups, when he knew at that time that those groups had been identified using inappropriate criteria, that they had been subjected to excessive delays, and that they had been harassed with unnecessary and burdensome questioning.  Lerner, likewise, made several false statements to the Committee, and specifically defended to the Committee the IRS's use of certain questions that the IRS had already identified internally as inappropriate.

The IRS's misconduct had real consequences, and its leadership's knowing failure to be fully candid with Congress exacerbated the injuries of the groups awaiting a resolution.  The targeting silenced conservative non-profits during the 2012 election cycle.  As the IRS ignored tax-exempt applications, donors stopped giving to the groups, overall interest waned, and some groups even stopped their operations.[9]  The IRS's delays also resulted in the automatic revocation of some groups' exemptions by operation of law because the groups had been waiting for resolutions so long that they did not file for renewal within the statutorily proscribed period.

The Committee's investigation highlights the unfortunate reality of the IRS.  Because "[t]he power to tax involves the power to destroy,"[10] American taxpayers expect the IRS to be neutral, independent, and apolitical.  The modern-day IRS, however, with its vast authority, has violated these basic tenets.  The IRS's outsized role in implementing ObamaCare – a highly partisan law rammed through Congress without any meaningful bipartisan compromise – has fundamentally transformed the tax agency.  Evidence shows an IRS responsive to the partisan

---

[6] *See* Gregory Korte, *IRS List Reveals Concerns over Tea Party 'Propaganda,'* USA TODAY, Sept. 18, 2013.

[7] "The IRS's Systematic Delay and Scrutiny of Tea Party Applications": Hearing before the H. Comm. on Oversight & Gov't Reform, 113th Cong. (2013) (statement of J. Russell George).

[8] Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit: Hearing before the Subcomm. on Oversight of the H. Comm. on Ways & Means, 113th Con. (2013) (opening statement of Chairman Boustany).

[9] *See* Patrick O'Connor, *Groups Recount Tax Battle's Toll*, WALL ST. J., May 14, 2013.

[10] McCulloch v. Maryland, 17 U.S. 316, 431 (1819).

Exhibit D

policy objectives of the White House and an IRS leadership that coordinates with political appointees of the Obama Administration.

The Treasury Department – the IRS's absentee parental agency – is not blameless in this scandal.  With the IRS, the Treasury Department secretly considered potential regulations on the political speech of 501(c)(4) non-profits.  As the IRS considered how to leak information about the targeting before the TIGTA audit report's release, it informed and coordinated with the Treasury Department.  Senior Departmental leadership, after consulting with the White House, tacitly condoned the IRS's ill-advised strategy of minimizing the fallout by apologizing for the targeting through a planted question at an obscure tax conference.  Most disconcerting, according to the IRS's independent inspector general, the Treasury Department's senior leadership was informed of the IRS targeting before the 2012 presidential election.

Lois Lerner's faux apology on May 10, 2013, sparked a firestorm that led to the departure of five IRS officials and caused fundamental damage to the agency's credibility.  Lerner's words triggered initial outrage.  From the White House, President Obama called the targeting "inexcusable," promising to work "hand in hand" with Congress as "it performs it oversight role" in examining the IRS's misconduct.[11]  But as weeks wore on and the initial outrage faded, a deliberate effort emerged to minimize and obfuscate the misconduct.  The Administration claimed the misconduct was the responsibility of rogue line-level agents in the IRS Cincinnati office.[12]  A senior congressional Democrat proclaimed the "case is solved" just as the investigation began.[13]  Treasury Secretary Lew implied that the misconduct amounted to a "phony" scandal.[14]  The President, who had earlier called the conduct "inexcusable," now wrote it off to a bureaucratic "list" in "an office in Cincinnati."[15]

The Obama Administration refuses to accept any responsibility or accountability in wake of the IRS's targeting of conservative tax-exempt applicants.  Attorney General Eric Holder appointed a substantial contributor to President Obama as a leading Justice Department investigator.  The other Justice Department entities involved in the IRS investigation – the Public Integrity Section and the Federal Bureau of Investigation – are similarly conflicted, meeting with Lois Lerner and the IRS in 2010 to discuss the possible prosecution of non-profit groups.  Before all the facts were gathered, politicized leaks from the Justice Department promised that no criminal charges would be filed.  A week later, President Obama told a national television audience that there was "not even a smidgeon of corruption" in the IRS targeting.[16]  Meanwhile,

---

[11] The White House, Statement by the President (May 15, 2013).

[12] The White House, Press Briefing by Jay Carney (May 21, 2013) (noting that "IRS line personnel had improperly targeted conservative groups"); Chelsea J. Carter, Drew Griffin, & David Fitzpatrick, *'Angry' Obama Announces IRS Leader's Ouster after Conservatives Targeted*, CNN (May 16, 2013), http://www.cnn.com/2013/05/15/politics/irs-conservative-targeting/ (noting that "the IRS has identified two 'rogue' employees in the agency's Cincinnati office as being principally responsible").

[13] *State of the Union with Candy Crowley* (CNN television broadcast June 9, 2013) (interview with Rep. Elijah E. Cummings).

[14] *Fox News Sunday* (Fox News television broadcast July 28, 2013) (interview with Treasury Secretary Jacob Lew).

[15] *Hardball with Chris Matthews* (MSNBC television broadcast Dec. 5, 2013) (interview with President Barack Obama).

[16] *"Not even a smidgeon of corruption": Obama downplays IRS, other scandals*, FOX NEWS, Feb. 3, 2014.

Exhibit D

the Obama White House, which earlier pledged its unfettered assistance, outright refused to cooperate with the Committee's fact-finding.

Not to be outdone, the IRS and congressional Democrats sought to obstruct the investigation and confuse the facts. Ranking Member Elijah Cummings publicly declared the "case is solved" only weeks after the investigation began. Working with the IRS, congressional Democrats peddle a false narrative of bipartisan targeting using self-serving documents produced by the IRS on a prioritized schedule. The IRS slow-rolled document productions to the Committee, delayed the Committee's access to key witnesses, and withheld documents prior to Committee interviews. The IRS has still not fully complied with three Committee subpoenas for documents.

The Committee on Oversight and Government Reform has conducted a comprehensive investigation to date of the IRS's inappropriate treatment of conservative applicants for tax-exempt status. The Committee released a series of reports to update the public on the findings to date and to recommend reforms. To date, the Committee has released five reports:

- "Interim update on IRS Investigation of tax exempt applicants" (September 17, 2013);

- "Lois Lerner's Involvement in the IRS Targeting of Tax-Exempt Organizations (March 11, 2014)";

- "Debunking the Myth that the IRS Targeted Progressives (April 7, 2014)";

- "Pressure from the Left Led the IRS and DOJ to Restrict Freedom of Speech (June 16, 2014)"; and,

- "Making Sure Targeting Never Happens: Getting Politics Out of the IRS and Other Solutions" (July 12, 2014).

This staff report updates the five that precede it and details the Committee's investigative findings as of the end of the 113th Congress. The fact-finding is not yet complete. Several categories of documents and records subpoenaed by the Committee have not been produced. Additionally, TIGTA recently announced that it restored approximately 30,000 e-mails to and from Lois Lerner that the IRS previously claimed were permanently lost or destroyed. While investigators continue to gather information from all sources, the Committee releases the findings contained herein to improve the transparency and accountability of the nation's tax administration.

Exhibit D

# Findings

The Committee's investigation has resulted in the following findings to date about the Internal Revenue Service's inappropriate treatment of tax-exempt applicants:

- The Internal Revenue Service targeted conservative-oriented applicants for tax-exempt status;

- Unlike applications from conservative groups, the small batch of applications from liberal-oriented groups received additional scrutiny for non-political reasons.  Of the applications that received additional scrutiny, only seven contained the word "progress" or "progressive," all of which were subsequently approved by the IRS, while Tea Party groups were subjected to an unprecedented degree of review and years-long delays.

- Senior Internal Revenue Service officials covered up the misconduct and misled Congress about the existence and nature of the targeting;

- The Internal Revenue Service sought to rein in conservative-oriented non-profits as early as 2010;

- The Administration is using the targeting as pretext to support its proposed regulation to limit political speech of conservative non-profits;

- Mismanagement among the senior leadership of the Internal Revenue Service contributed to the targeting;

- The Internal Revenue Service and the Obama Administration knowingly and wrongly blamed line-level employees for the misconduct;

- Employees of the Internal Revenue Service inappropriately used non-official e-mail to conduct official government business;

- The Internal Revenue Service has compromised its traditional position as an independent tax administrator;

- The Obama Administration exhibited a lack of accountability for the IRS misconduct;

- Lois Lerner's refusal to testify hindered the Committee's investigation;

- The Internal Revenue Service obstructed the Committee's investigation; and

- The White House and congressional Democrats obstructed the Committee's investigation.

Exhibit D

# Table of Contents

Executive Summary .......................................................................................................... i

Findings........................................................................................................................... v

Findings........................................................................................................................... v

Table of Contents ........................................................................................................... vi

Table of Names .............................................................................................................. ix

    Internal Revenue Service ........................................................................................... ix

    Department of the Treasury ........................................................................................ xi

    Department of Justice ................................................................................................ xii

    The White House ...................................................................................................... xii

Table of Figures .......................................................................................................... xiii

Introduction.................................................................................................................... 1

Background of the targeting........................................................................................... 3

    Section 501 organizations and political speech .......................................................... 3

    Citizens United v. Federal Election Commission....................................................... 5

    Rhetorical Backlash to Citizens United ..................................................................... 6

How the IRS targeted conservatives: A narrative of wrongdoing ................................... 9

    February 2010: The initial applications are identified and elevated to Washington due to "media attention" .................................................................................................... 9

    March 2010: Washington requests additional Tea Party applications to work as "test" cases and orders Cincinnati to "hold" the rest.................................................................. 11

    April 2010: Washington creates a Sensitive Case Report to alert senior IRS leadership about the potential for Tea Party "media attention" ........................................................... 12

    April 2010: Washington employee Carter Hull is assigned to work the test applications and oversee Cincinnati's work .......................................................................................... 14

    Summer 2010: Hull works the test applications as other applications sit in Cincinnati........... 15

    Fall 2010: Cincinnati's requests for guidance go unanswered ................................... 16

    February 2011: Lerner orders a "multi-tier review" of the Tea Party test applications .......... 17

    April 2011: Lerner's advisor Judith Kindell reviews the test applications............................... 19

    June-July 2011: Lerner is fully briefed on the treatment of Tea Party applications................ 21

    Summer 2011: Chief Counsel's office reviews the test applications ........................................ 23

    Summer 2011: Hull is replaced by novice IRS specialist Hilary Goehausen.......................... 24

    Fall 2011: Goehausen futilely attempts to triage the growing Tea Party backlog.................... 25

    Fall 2011: Washington develops a guide sheet to shape Cincinnati's review of the backlogged applications .............................................................................................................. 27

    January 2012: Washington's guide sheet leads to objectionable questions to applicants ........ 28

    February 2012: The Oversight Committee seeks information from Lerner ............................. 29

    Spring 2012: The IRS's internal review identifies misconduct................................................ 30

Exhibit D

May 2013: The IRS finally acknowledges and apologizes for the targeting ........................... 35

Lessons from the targeting: What the Committee has found about the IRS's inappropriate treatment of conservatives ................................................................................................ 37

    The IRS targeted conservative groups ......................................................................... 38

        The IRS was acutely aware of political rhetoric pressing the IRS to regulate conservative tax-exempt groups engaged in political activity .................................................. 39

        The IRS treated conservative-affiliated applicants distinctly from other similarly situated applicants ......................................................................................................... 47

    Senior IRS officials covered up and misled Congress about the existence and nature of the IRS's targeting ............................................................................................................. 54

        Lerner made false statements to the Committee ................................................... 54

        Shulman gave false statements to Congress ......................................................... 57

        Miller withheld information from Congress about the targeting .......................... 62

    The IRS's false claim that key evidence was lost or destroyed prolonged the investigation ... 66

        The IRS claimed that years of e-mails sent and received by Lois Lerner and other IRS employees were destroyed ................................................................................... 67

        IRS Commissioner John Koskinen misled Congress about the IRS's destruction of Lois Lerner's e-mails ............................................................................................ 70

        IRS employees openly sought to avoid congressional scrutiny by shielding e-mail communications ..................................................................................................... 76

    The IRS targeting and cover-up directly harmed conservative groups applying for tax-exempt status ........................................................................................................................ 78

        IRS actions suppressed conservative voices during the 2012 election ................ 79

        IRS delays in processing applications led to the auto-revocation of exempt status ............ 80

    There is conflicting evidence on whether the Treasury Department was aware of the IRS targeting in 2012 ........................................................................................................ 81

    The IRS sought other methods to rein in politically active non-profits as early as 2010 ......... 87

        The IRS sought to curb politically active non-profits ........................................... 88

        The IRS sought to deny tax-exempt applicants engaged in political speech ....................... 94

        The IRS sought to publicize that it was taking action on tax-exempt groups engaged in political speech ..................................................................................................... 96

        The IRS sought to regulate politically active social-welfare groups ................... 102

        The IRS's plans mirrored Administration-wide attempts to stifle free political speech ..... 104

    The IRS targeting is a pretext for the Administration's  proposed regulation on political speech of social welfare organizations ............................................................................... 106

    Mismanagement by senior IRS leadership failed to effectively prevent and later to stop the targeting of conservative-oriented groups .......................................................................... 111

        Doug Shulman, former Commissioner ............................................................... 112

        Jonathan Davis, Chief of Staff to Commissioner Shulman ................................ 116

        Steven Miller, Acting Commissioner ................................................................. 119

Exhibit D

Nikole Flax, Chief of Staff to Steven Miller......................................................... 124

William Wilkins, Chief Counsel............................................................................. 126

Joseph Grant, Acting Commissioner, Tax Exempt and Government Entities.................... 128

Lois Lerner, Director, Exempt Organizations........................................................ 131

Holly Paz, Director, Rulings and Agreements........................................................ 140

The IRS and the Obama Administration knowingly and wrongly blamed line-level IRS
employees for the misconduct .............................................................................. 143

Washington was involved from the beginning .................................................... 144

Washington was heavy handed in its approach to the cases................................ 146

The IRS and the Obama Administration coordinated on Lerner's apology ...................... 147

Cincinnati IRS employees felt that Washington threw them "under the bus"................... 153

The Obama Administration's IRS is not an independent tax administrator........................... 157

ObamaCare has politicized the IRS ................................................................... 157

The IRS acts as a political arm of the Obama Administration, rather than an independent tax
administrator ........................................................................................................... 159

There are indications of political bias in the IRS................................................ 161

The Administration's investigation of the targeting............................................. 165

The Department of Justice's role in the targeting............................................... 172

Administrative oversight of the IRS failed to prevent the targeting or disclose the misconduct
in a timely manner ................................................................................................... 180

Lois Lerner's refusal to testify hindered the Committee's investigation................................ 181

Lerner's failed assertion of her Fifth Amendment privilege ................................ 182

Lerner continued to defy the Committee's subpoena ......................................... 186

Lerner's testimony is critical to the Committee's investigation ........................... 189

The IRS obstructed and delayed the Committee's investigation............................................. 191

The IRS failed to comply with three Committee subpoenas ................................ 192

The IRS destroyed documents relevant to the Committee's investigation ......................... 194

The IRS slow-rolled document productions and excessively redacted documents ............ 196

The IRS withheld documents relevant to witness interviews and prolonged the Committee's
investigative efforts................................................................................................... 198

The White House and Congressional Democrats obstructed the Committee's investigation  199

The White House refused to assist the Committee's fact-finding efforts.......................... 199

The Ranking Member sought to disrupt the investigation................................... 201

The case of True the Vote ................................................................................... 203

Tax administration working for the taxpayers:  Suggested reforms ........................................... 207

Conclusion ................................................................................................................ 208

Exhibit D

# Table of Names

## *Internal Revenue Service*

| Name | Title |
|---|---|
| Catherine Barre | Acting Director, Legislative Affairs |
| Ronald Bell | Exempt Organizations Specialist, Exempt Organizations Determinations Unit |
| Steven Bowling | Senior Manager, Exempt Organizations Determinations Unit |
| Robert Choi | Director, Employee Plans (January 2011 – present)<br>Director, Exempt Organizations, Rulings and Agreements (April 2007 – December 2010) |
| Janine Cook | Deputy Division Counsel/Deputy Associate Chief Counsel, Office of Chief Counsel, Tax Exempt and Government Entities |
| Eric Corwin | Deputy Chief Counsel, Technical, Office of Chief Counsel |
| Jonathan Davis | Chief of Staff to Douglas Shulman |
| Nanette Downing | Director, Exempt Organizations, Examinations |
| Catherine Duval | Counselor to the Commissioner (November 2013 – August 2014) |
| Donna Elliot-Moore | Tax Law Specialist, Exempt Organizations Technical Unit |
| David Fish | Manager, Exempt Organizations Guidance Unit |
| Nikole Flax | Chief of Staff to Steven Miller |
| Amy Franklin-Giuliano | Attorney-Advisor, Office of Chief Counsel, Tax Exempt and Government Entities, Exempt Organizations Branch |
| Hilary Goehausen | Tax Law Specialist, Exempt Organizations Technical Unit |
| Joseph Grant | Commissioner, Tax Exempt and Government Entities Division (May 2013 – June 2013)<br>Acting Commissioner, Tax Exempt and Government Entities Division (December 2010 – May 2013) |
| Steven Grodnitzky | Group Manager, Exempt Organizations Technical Unit |

ix

| Name | Title |
|---|---|
| Joseph Herr | Revenue Agent, Exempt Organizations Determinations Unit |
| Elizabeth Hofacre | Revenue Agent, Exempt Organizations Determinations Unit |
| Carter Hull | Senior Tax Law Specialist, Exempt Organizations Technical Unit |
| Sarah Hall Ingram | Director, Affordable Care Act Office (December 2010 – April 2014)<br>Commissioner, Tax Exempt and Government Entities Division (April 2009 – December 2010) |
| Victoria Judson | Division Counsel/Associate Chief Counsel, Office of Chief Counsel, Tax Exempt and Government Entities |
| Thomas Kane | Deputy Associate Chief Counsel, Procedure and Administration, Office of Chief Counsel |
| Elizabeth Kastenberg | Tax Law Specialist, Exempt Organizations Technical Unit |
| Frank Keith | Chief, Communications and Liaison |
| Judith Kindell | Senior Technical Advisor to the Director, Exempt Organizations |
| John Koester | Revenue Agent, Exempt Organizations Determinations Unit |
| John Koskinen | Commissioner (December 2013 – present) |
| Lois Lerner | Director, Exempt Organizations |
| Sharon Light | Senior Technical Advisor to the Director, Exempt Organizations |
| Justin Lowe | Technical Advisor to the Commissioner, Tax Exempt and Government Entities Division |
| Nancy Marks | Senior Technical Advisor to the Commissioner, Tax Exempt and Government Entities Division |
| David Marshall | Attorney, Office of Chief Counsel, Tax Exempt and Government Entities, Exempt Organizations Branch |
| Steven Miller | Acting Commissioner (November 2012 – May 2013)<br>Deputy Commissioner for Services and Enforcement (2009 – November 2012) |
| Gary Muthert | Revenue Agent, Exempt Organizations Determinations Unit |
| Jennifer O'Connor | Counselor to the Commissioner (May 2013 – November 2013) |

x

Exhibit D

| Name | Title |
|---|---|
| Leonard Oursler | Director, Legislative Affairs |
| Holly Paz | Director, Exempt Organizations, Rulings and Agreements (January 2011 – June 2013); Acting Manager, Exempt Organizations Technical Unit (September 2009 –March 2010, September 2010 – December 2010) |
| Stephen Seok | Group Manager, Exempt Organizations Determinations Unit |
| Michael Seto | Manager, Exempt Organizations Technical Unit |
| John Shafer | Group Manager, Exempt Organizations Determinations Unit |
| Ronald Shoemaker | Supervisory Tax Law Specialist, Exempt Organizations Technical Unit |
| Douglas Shulman | Commissioner (March 2008 – November 2012) |
| Don Spellmann | Senior Counsel, Office of Chief Counsel, Tax Exempt and Government Entities, Exempt Organizations Branch |
| Christopher Sterner | Deputy Chief Counsel, Operations, Office of Chief Counsel |
| Cindy Thomas | Manager, Exempt Organizations Determinations Unit |
| Joseph Urban | Technical Advisor to the Commissioner, Tax Exempt and Government Entities Division |
| Daniel Werfel | Principal Deputy Commissioner (May 2013 – December 2013) |
| William Wilkins | Chief Counsel |

## *Department of the Treasury*

| Name | Title |
|---|---|
| Adewale "Wally" Adeyemo | Deputy Chief of Staff |
| Hannah Stott-Bumsted | Senior Counsel, Office of General Counsel |
| J. Russell George | Treasury Inspector General for Tax Administration |
| Ruth Madrigal | Attorney-Advisor, Office of Tax Policy |

Exhibit D

| Name | Title |
|------|-------|
| Mark Mazur | Assistant Secretary for Tax Policy |
| Christopher Meade | General Counsel |
| Mark Patterson | Chief of Staff (January 2009 – May 2013) |
| Christian Weideman | Chief of Staff (May 2013 – present)<br>Deputy General Counsel (March 2010 – May 2013) |

## *Department of Justice*

| Name | Title |
|------|-------|
| Barbara Bosserman | Attorney, Civil Rights Division |
| James Cole | Deputy Attorney General |
| James Comey | Director, Federal Bureau of Investigation |
| Eric Holder | Attorney General |
| Richard Pilger | Director, Election Crimes Branch, Public Integrity Section, Criminal Division |
| Jack Smith | Chief, Public Integrity Section, Criminal Division |
| Andrew Strelka | Attorney, Tax Division |

## *The White House*

| Name | Title |
|------|-------|
| Mark Childress | Deputy Chief of Staff |
| Eric Schultz | Deputy Press Secretary |
| Ed Siskel | Deputy White House Counsel |
| Jonathan Su | Special Counsel to the President |

Exhibit D

# Table of Figures

Figure 1: E-mail from Sharon Camarillo to Cindy Thomas, Feb. 25, 2010 .................................. 10
Figure 2: E-mail from Steven Grodnitzky to Lois Lerner & Robert Choi, Apr. 28, 2010 ........... 13
Figure 3: E-mail from Lois Lerner to Michael Seto, Feb. 1, 2011 ................................................ 18
Figure 4: E-mail from Judith Kindell to Lois Lerner & Holly Paz, Apr. 7, 2011 ........................ 20
Figure 5: IRS Briefing Document Prepared for Lois Lerner ......................................................... 22
Figure 6: E-mail from Lois Lerner to Sarah Hall Ingram, Aug. 31, 2010 .................................... 40
Figure 7: E-mail from Sarah Hall Ingram to Terry Lemons et al., Sept. 21, 2010 ....................... 41
Figure 8: IRS Significant Case Report Summary, August 2011 (enlarged) .................................. 49
Figure 9: E-mail from Judith Kindell to Lois Lerner, July 18, 2012 ............................................ 53
Figure 10: E-mail exchange between Steven Miller & Nikole Flax, June 18, 2012 ................... 63
Figure 11: E-mail from Lois Lerner to Joseph Urban, July 25, 2012 ........................................... 65
Figure 12: E-mail from Lois Lerner to David Fish & Nikole Flax, June 29, 2011 ..................... 70
Figure 13: E-mail from Lois Lerner to Sarah Hall Ingram, Aug. 31, 2010 ................................. 88
Figure 14: E-mail from Lois Lerner to Judith Kindell et al., Sept. 15, 2010 ............................... 89
Figure 15: E-mail from Lois Lerner to Cheryl Chasin et al., Sept. 16, 2010 ............................... 89
Figure 16: E-mail from Lois Lerner to Christopher Giosa, Nov. 29, 2012 ................................. 90
Figure 17: E-mail from Hilary Goehausen to Jodi Garuccio, Apr. 22, 2013 ............................... 96
Figure 18: E-mail exchange between Lois Lerner & Nancy Marks, Apr. 1, 2013 ...................... 97
Figure 19: E-mail from Lois Lerner to Christopher Wagner, Jan. 31, 2013 ................................. 99
Figure 20: E-mail from Lois Lerner to Nikole Flax et al., Mar. 27, 2013 .................................. 101
Figure 21: TEGE (EO) New Projects Proposed for FY 2013-2014 PGP .................................. 103
Figure 22: E-mail from Ruth Madrigal to Victoria Judson et al., June 14, 2012 ...................... 107
Figure 23: E-mail from Lois Lerner to Sharon Light, July 10, 2012 ......................................... 132
Figure 24: E-mail from Lois Lerner to Sharon Light, Jan. 24, 2013 ......................................... 133
Figure 25: E-mail from Lois Lerner to Holly Paz, Mar. 27, 2013 ............................................. 134
Figure 26: E-mail exchange between Lois Lerner & Meghan Biss, May 4, 2013 .................... 135
Figure 27: E-mail from Lois Lerner to Maria Hooke, Apr. 9, 2013 .......................................... 137
Figure 28: E-mail from Holly Paz to Lois Lerner et al., Feb. 2, 2011 ....................................... 141
Figure 29: E-mail from Nikole Flax to Adewale Adeyemo, Apr. 22, 2013 .............................. 149
Figure 30: E-mail exchange between Christian Weideman & Jonathan Su, Apr. 24, 2013 ....... 152
Figure 31: E-mail from Jonathan Su to Christian Weideman, Apr. 25, 2013 ............................ 152
Figure 32: E-mail from Cindy Thomas to Lois Lerner, May 10, 2013 ..................................... 154
Figure 33: E-mail from Pamela LaRue to Jonathan Davis & Beth Tucker, Sept. 19, 2012 ....... 160
Figure 34: E-mail from Floyd Williams to Doug Shulman et al., Mar. 8, 2012 ........................ 160
Figure 35: E-mail exchange between Don Spellmann & Janine Cook, July 19, 2011 .............. 163
Figure 36: E-mail from Holly Paz to Cindy Thomas, June 1, 2011 .......................................... 164
Figure 37: E-mail from Ronald Shoemaker to Andrew Strelka et al., Mar. 17, 2010 ............... 169
Figure 38: E-mail exchange between Lois Lerner & Andrew Strelka, Aug. 23, 2013 .............. 170
Figure 39: E-mail from Lois Lerner to Nikole Flax, May 8, 2013 ............................................ 173
Figure 40: E-mail from Jack Smith to Raymond Hulser et al., Sept. 21, 2010 ......................... 174
Figure 41: E-mail from Sarah Hall Ingram to Steve Miller et al., Sept. 29, 2010 ..................... 175
Figure 42: E-mail exchange between Joseph Urban & Nancy Marks, Oct. 19, 2010 ............... 176
Figure 43: E-mail exchange between Cheryl Chasin & Judith Kindell, Oct. 5, 2010 ............... 177

Exhibit D

Figure 44: E-mail from Lois Lerner to Sherry Whitaker et al., Oct. 5, 2010 ............................ 177
Figure 45: E-mail exchange between Lois Lerner & Richard Pilger, Oct. 6, 2010 ................... 178
Figure 46: E-mail from Richard Pilger to Unnamed FBI Agent, Oct. 5, 2010 ......................... 179
Figure 47: Excessive IRS redaction ............................................................................................. 197
Figure 48: E-mail from William Norton to Catherine Barre & Floyd Williams, Mar. 28, 2012 202

Exhibit D

# Introduction

The Committee on Oversight and Government has conducted a thorough investigation of the IRS misconduct reported in an audit conducted by the Treasury Inspector General for Tax Administration (TIGTA).[20]  Since May 10, 2013 – when former IRS official Lois Lerner leaked the findings of the TIGTA report – the Committee has reviewed more than 1,317,000 pages of documents from the IRS, TIGTA, the Department of Treasury, the Department of Justice, the Federal Election Commission, the IRS Oversight Board, former and current IRS employees, and other sources.  The Committee shared documents and information with House Ways and Means Committee investigators, and relied on the Ways and Means Committee's unique ability to obtain documents covered by Section 6103 of Title 26 of the U.S. Code, which generally prohibits the release of tax information by an IRS employee.

The Committee conducted 44 comprehensive transcribed interviews of current and former IRS officials, ranging from front-line employees in the IRS's Cincinnati office to the former Commissioner of the IRS.  The Committee conducted six transcribed interviews with current and former Treasury Department officials and two transcribed interviews with Justice Department attorneys.  The Committee also held several public hearings on the misconduct.  The findings contained herein represent the state of the Committee's investigation as of the end of the 113th Congress.  In light of the November 2014 discovery that TIGTA located an estimated 30,000 e-mails to and from Lois Lerner that the IRS had previously declared to be lost forever, and because the IRS has still not fully complied with three Committee subpoenas, the investigation is ongoing.

The Committee found that the IRS targeted conservative-oriented applicants for tax-exemption by treating them in a manner distinct from other applicants.  This disparate treatment of conservative tax-exempt applicants grew out of Democratic rhetoric critical of the Supreme Court decision in *Citizens United v. Federal Election Commission* and calling on the IRS to carefully scrutinize the groups.

Beginning in February 2010, conservative tax-exempt applicants were identified for additional scrutiny based solely upon their name and political beliefs.  Upon direction of Lois Lerner, the IRS did not process these applications until Washington IRS employees – including attorneys in the IRS Chief Counsel's office – evaluated and developed two "test" cases.  As a result, a large backlog of overwhelmingly conservative-oriented applicants developed and these applicants suffered substantial and unjustified delays.  When the IRS attempted to work through this backlog in late 2011 and early 2012, the agency asked inappropriate and burdensome questions of these groups, including questions about the identity of the organizations' donors.  Only seven applications in the IRS backlog contained the word "progress" or "progressive,"[21] all

---

[20] *See* TREASURY INSPECTOR GEN. FOR TAX ADMIN., INAPPROPRIATE CRITERIA WERE USED TO IDENTIFY TAX-EXEMPT APPLICATIONS FOR REVIEW (May 14, 2013) [hereinafter "TIGTA Audit Rpt."].

[21] "The IRS's Systematic Delay and Scrutiny of Tea Party Applications": Hearing before the H. Comm. on Oversight & Gov't Reform, 113th Cong. (2013) (statement of J. Russell George).

Exhibit D

of which were then approved by the IRS,[22] while Tea Party groups received unprecedented review and experienced years-long delays. While some liberal-oriented groups were singled out for scrutiny, evidence shows it was for reasons other than their political beliefs.

Senior leadership within the IRS knew about the inappropriate treatment of tax-exempt applicants as early as 2011. In 2012, Commissioner Doug Shulman and Chief Counsel William Wilkins separately became aware of the backlog of tax-exempt applicants. Commissioner Shulman, despite knowing of the backlog and delays and the IRS's use of inappropriate donor questions, gave "assurances" to Congress in March 2012 that the IRS was not targeting conservative-oriented applicants. His testimony, then and now, was misleading and incomplete at best. Although the witnesses interviewed by the Committee have denied any knowledge of intentional targeting, the fundamental fact remains that the IRS systematically treated conservative-oriented applicants in a manner different from other applicants. This disparate treatment began because of IRS concern about the extension of the *Citizens United* holding to federal tax law.

This report details the Committee's investigation to date. This investigation has furthered the findings explained in TIGTA's audit report dated May 14, 2013. Although TIGTA admirably highlighted the grievous problems present in the IRS, the nature of its review as an audit, rather than an investigation, prevented a better examination. Other serious deficiencies existed in TIGTA's review. First, TIGTA allowed a senior IRS official to be present every time it interviewed an IRS employee, thereby contaminating the information given in those sessions. In addition, TIGTA regularly updated the IRS of its findings and also shared multiple versions of its audit report with IRS management, affording the IRS an opportunity to preemptively spin the contents of the nonpublic audit report and then attempt to bury the news by acknowledging the misconduct at a Friday morning tax-law seminar.

Based on lessons learned during this investigation, one matter is clear: the Internal Revenue Service is broken and in need of serious reform. Toward that end, the Committee released a report in July 2014 that contained fifteen proposals to address politicization of the IRS.[23] The report recommended, among other things, that the IRS is removed as a regulator of political speech for social-welfare groups. On September 17, 2014, the U.S. House of Representatives approved five bills by voice vote that respond to the Internal Revenue Service's targeting of conservative organizations and other abuses of taxpayers at the IRS.[24] Two of the bills were authored by Oversight and Government Reform Committee members, and three were written by Ways and Means Committee members.

---

[22] Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit: Hearing before the Subcomm. on Oversight of the H. Comm. on Ways & Means, 113th Con. (2013) (opening statement of Chairman Boustany).

[23] H. Comm. on Oversight & Gov't Reform, Staff Report: *Making Sure Targeting never Happens: Getting Politics out of the IRS and Other Solutions*, 113th Cong. (July 12, 2014).

[24]

Exhibit D

# Background of the targeting

Tax-exempt organizations have existed since the birth of the United States.  Legislators have considered tax exemption for certain organizations as far back as 1894, during the first attempt at instituting a federal income tax.[25]  The Revenue Act of 1913, which established the federal tax system, included numerous exemptions for organizations usually operated not-for-profit.[26]  In the 1950s, a revision of the tax code established the current categories of tax exemption in section 501 of the Internal Revenue Code.[27]  Since then, federal law has recognized several categories of tax-exemption.

In 2010, the Supreme Court issued an opinion that found a federal election law to be an unconstitutional limitation of free speech.[28]  Affirming fundamental rights to free speech, the Court held that Congress could not bar a corporation or union from independently expressing support or disapproval of a candidate for public office.  The decision incited criticism from many members of the media and the Obama Administration.  The resulting political backlash was swift and severe.  President Obama, allies in Congress, and the media started a public relations campaign to demonize the Court's decision and delegitimize the non-profit organizations affected by it.  This political atmosphere created the conditions for the IRS's targeting of conservative groups.

## *Section 501 organizations and political speech*

The Internal Revenue Code recognizes several different types of organizations exempt from federal taxation.[29]  The most common types are § 501(c)(3) for charitable, religious, and educational organizations; § 501(c)(4) for organizations promoting social welfare; § 501(c)(5) for labor unions; and § 501(c)(6) for business and trade associations.[30]  Federal law protects the names and identities of contributors to organizations that qualify for exemption under § 501(c).[31]  The law also restricts the level of political speech permissible by the various categories of tax-exempt organizations.

Section 501(c)(4) of the federal tax code explicitly recognizes as tax-exempt any "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare."[32]  The applicable Treasury regulation, issued in 1959, clarifies the statute.  The regulations states: "An organization is operated exclusively for the promotion of social welfare if

---

[25] *See* PAUL ARNSBERGER, MELISSA LUDLUM, MARGARET RILEY, AND MARK STANTON, A HISTORY OF THE TAX-EXEMPT SECTOR: AN SOI PERSPECTIVE, *available at* http://www.irs.gov/pub/irs-soi/tehistory.pdf.
[26] Tariff Act, ch. 16, §2(G) (1913) (current version at I.R.C. §501).
[27] ARNSBERGER, LUDLUM, RILEY, AND STANTON, *supra* note 25.
[28] Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010).
[29] *See* I.R.C. § 501(c).
[30] *See* ERIKA K. LUNDER, CONG. RESEARCH SERV., TAX-EXEMPT ORGANIZATIONS: POLITICAL ACTIVITY RESTRICTIONS AND DISCLOSURE REQUIREMENTS (2010), *available at* https://www.charitableplanning.com/cpc_1790452-1.pdf.
[31] *See* I.R.C. § 6104.
[32] I.R.C. § 501(c)(4).

Exhibit D

it is primarily engaged in promoting the common good and general welfare of the people of the community."[33]  The IRS reiterated in 1981 that an entity organized under § 501(c)(4) could engage in political speech, stating that "an organization may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is primarily engaged in activities that promote social welfare."[34]

For decades, the IRS has interpreted the law to mean that a § 501(c)(4) group must be primarily engaged in social welfare activities.[35]  However, under § 501(c)(4), an organization could still lawfully engage in political speech.  A § 501(c)(4) group may engage in unlimited issue advocacy – that is, activities in support or opposition of a public policy issue – and a limited amount of political campaign intervention.[36]  The IRS makes this determination using an informal 51 to 49 percent ratio and a "facts and circumstances" test to assess whether a group is primarily engaged in social welfare.[37]  Under the IRS's long-held interpretation, a § 501(c)(4) group's primary purpose may be social welfare even if the group engages in a significant amount of political campaign intervention.

Some Democratic politicians and commentators have vocally lobbied that the IRS should abandon its decades-long interpretation of tax law.  They argue that the IRS should bar § 501(c)(4) organizations from engaging in political activity.[38]  Some assert, incorrectly, that § 501(c)(4) groups should not conduct political advocacy because the groups receive taxpayer-funded benefits as public charities.[39]  But § 501(c)(4) groups are not charities; they are *social welfare* organizations.  Their statuses as social welfare organizations make them fundamentally different from public charities organized under § 501(c)(3), which receive a benefit derived from their eligibility to receive tax-deductible contributions.[40]  Entities organized under § 501(c)(4) do not receive any tax-deductible contributions; there is no revenue effect to their tax-exemption.

If, as some Democrats and members of the media have urged, the IRS changes the way it treats § 501(c)(4) groups, those groups would have to reorganize as § 527 organizations, subject to disclosure requirements under federal law.[41]  This change would allow political adversaries of those groups, or the causes that they advocate for, to identify and harass their donors.  For this reason, and others, the Supreme Court protects anonymous political speech.[42]  In fact,

---

[33] Treas. Reg. § 1.501(c)(4)-1(a)(2).

[34] Revenue Ruling 81-95, 1981-1 C.B. 332.

[35] *See* ERIKA K. LUNDER & L. PAIGE WHITAKER, CONG. RESEARCH SERV., 501(C)(4)S AND CAMPAIGN ACTIVITY: ANALYSIS UNDER TAX AND CAMPAIGN FINANCE LAWS (2013), *available at* http://electionlawblog.org/wp-content/uploads/CRS-Report-on-IRS-Line-Between-Issue-Advocacy-and-Campaign-Activity-2013.pdf.

[36] I.R.C. § 501(c)(4); Treas. Reg. § 1.501(c)(4)-1a(2).

[37] *See, e.g.*, Transcribed interview of Ronald Bell, Internal Revenue Serv., in Wash., D.C. (June 13, 2013); Raymond Chick & Amy Henchey, M. Political Organizations and IRC 501(c)(4), I.R.S. Cont. Prof. Ed. Text (1995), *available at* http://www.irs.gov/pub/irs-tege/eotopicm95.pdf.

[38] *Cf., e.g., "A Review of Criteria Used by the IRS to Identify 501(c)(4) Applications for Greater Scrutiny": Hearing before the S. Comm. on Finance*, 113th Cong. (2013) (statement of Senator Carper) ("[T]he code says that these 501(c)(4) non-profit organizations, their activities must be, I think, exclusive for social welfare. . . .  And it doesn't say anything about giving tax-exempt status for any political activity.  It says exclusively for social welfare.").

[39] *See* Bradley A. Smith, *The Latest IRS Power Grab*, WALL ST. J., Dec. 8, 2013.

[40] I.R.C. § 170.

[41] I.R.C. § 527(j).

[42] *See, e.g.*, NAACP v. Alabama, 357 U.S. 449 (1958).

Exhibit D

harassment of the sort that the Supreme Court sought to prevent has already occurred.  In 2008, the general counsel to President Obama's campaign wrote the Department of Justice demanding a criminal investigation into the "anonymous donors" of a prominent conservative non-profit.[43]

The calls for greater disclosure coincided with the emergence of grassroots conservative-leaning groups organized in opposition to Obama Administration policies during the 111th Congress, when Democrats controlled Congress.[44]  As more groups formed in opposition to the President's policies, specifically his economic and health reform agenda, they coalesced into a loose affiliation that came to be known as the Tea Party movement.[45]  Many of these new community-based, conservative-leaning groups began to seek tax-exempt status under § 501(c)(4).  As they did, Democrats called for greater donor disclosure.[46]  These calls only grew louder in the wake of a 2010 Supreme Court decision that President Obama himself declared "damaging to our democracy" because it would "allow corporate and special interest takeovers of our elections."[47]  At a time when Democrats controlled both chambers of Congress, President Obama expressed a specific concern that "no one will actually know who's really behind" campaign advertisements that are run against incumbent politicians.[48]

## Citizens United v. Federal Election Commission

In 2008, Citizens United – a non-profit that advocates for "traditional American values of limited government, freedom of enterprise, strong families, and national sovereignty and security"[49] – released a documentary critical of then-Senator Hillary Clinton.  Expecting the documentary to air through the Democratic primary and in anticipation of possible Federal Election Commission (FEC) enforcement action, Citizens United sought an injunction to prevent the FEC's enforcement and allow the group to air the documentary without any campaign finance liability.[50]  The case eventually made its way up to the Supreme Court as *Citizens United v. Federal Election Commission*.

The Supreme Court issued its decision on January 21, 2010.  The Court struck down parts of speech restrictions in the Bipartisan Campaign Reform Act as violations of the First Amendment's guarantee of free speech.  The Court "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment" and upheld numerous precedents that recognized First Amendment protections for corporations.[51]  Describing the law as "an unprecedented governmental intervention into the realm of speech," the Court noted that "[n]o sufficient governmental interest justifies limits on

---

[43] *See* Kimberley A. Strassel, *Conservatives became targets in 2008*, WALL ST. J., May 23, 2013.

[44] *See, e.g.*, Ben McGrath, *The Movement*, THE NEW YORKER, Feb. 1, 2010.

[45] *See* Andres Madestam, Daniel Shoag, Stan Veuger, & David Yanagizawa-Drott, *Do Political Protests Matter? Evidence from the Tea Party Movement*, 128 Q.J. OF ECON. 1633, 1666 (Nov. 2013).

[46] *See, e.g.*, Press Release, Durbin Urges IRS to Investigate Spending by Crossroads GPS (Oct. 12, 2010), *available at* http://www.durbin.senate.gov/public/index.cfm/pressreleases?ID=833d8f1e-bbdb-4a5b-93ec-706f0cb9cb99.

[47] The White House Blog (Jul. 26, 2010).

[48] *Id.*

[49] Citizens United, *Who We Are*, http://www.citizensunited.org/who-we-are.aspx (last visited July 8, 2014).

[50] Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010).

[51] *Id.* at 342-45.

Exhibit D

the political speech of non-profit or for-profit corporations."[52]  The Court therefore struck down the arbitrary restrictions on free political speech, explaining that "political speech must prevail against laws that would suppress it, whether by design or inadvertence."[53]

## *Rhetorical Backlash to Citizens United*

As the Committee detailed in its June 2014 staff report, the reaction to the *Citizens United* opinion was immediate.[54]  On the same day of the decision, Robert Gibbs, President Obama's Press Secretary, warned that Americans "should be worried that special interest groups that have already clouded the legislative process are soon going to get involved in an even more active way in doing the same thing in electing men and women to serve in Congress."[55]  On January 23, 2010, President Obama proclaimed that the "ruling strikes at our democracy itself" and "opens the floodgates for an unlimited amount of special interest money into our democracy."[56]  Less than a week later, the President publicly chastised the Supreme Court during his State of the Union address.  With Justices in attendance, the President declared:

> With all due deference to separation of powers, last week the Supreme Court reversed a century of law that I believe will open the floodgates for special interests – including foreign corporations – to spend without limit in our elections. I don't think American elections should be bankrolled by America's most powerful interests, or worse by foreign entities. They should be decided by the American people.[57]

The *Citizens United* decision sparked a prolonged campaign to disparage conservative-leaning groups that many left-leaning politicians and commentators feared would be aided by the decision.  From January 2010 through the November 2010 election, President Obama and his allies orchestrated a rhetorical assault against conservative-leaning groups.  In speeches around the country, the President derided these organizations as "shadowy" groups with "benign-sounding" names that are pouring millions of dollars into "attack ads against Democratic candidates."[58]  The President called these groups "phony" and urged a "fix" to the Supreme Court's *Citizens United* decision.[59]

Throughout this rhetorical campaign, the President and other prominent Democratic politicians questioned the legitimacy of conservative-leaning tax-exempt groups and accused them of deception and ill-intent.  For example, in a weekly address in May 2010, President Obama stated:

---

[52] *Id.* at 336, 365.

[53] *Id.* at 336-37.

[54] How Politics Led the IRS to Target Conservative Tax-Exempt Applicants, *supra* note 4.

[55] The White House, Briefing by White House Press Secretary Robert Gibbs and PERAB Chief Economist Austan Goolsbee (Jan. 21, 2010).

[56] The White House, Weekly Address: President Obama Vows to Continue Standing Up to the Special Interest on Behalf of the American People (Jan. 23, 2010).

[57] The White House, Remarks by the President in the State of the Union Address (Jan. 27, 2010).

[58] *See* How Politics Led the IRS to Target Conservative Tax-Exempt Applicants, *supra* note 4.

[59] *Id.*

Exhibit D

We've all seen groups with benign-seeming names sponsoring television commercials that make accusations and assertions designed to influence the public debate and sway voters' minds.  Now, of course every organization has every right in this country to make their voices heard.  But the American people also have the right to know when some group like "Citizens for a Better Future" is actually funded entirely by "Corporations for Weaker Oversight."[60]

Later, in a July 2010 White House Rose Garden speech, the President proclaimed:

Because of the Supreme Court's decision earlier this year in the *Citizens United* case, big corporations . . . can buy millions of dollars worth of TV ads – and worst of all, they don't even have to reveal who's actually paying for the ads. . . .  These shadow groups are already forming and building war chests of tens of millions of dollars to influence the fall elections.[61]

The next month, the President sounded the same theme, this time singling out one conservative group by name.  He declared:

Right now all around this country there are groups with harmless-sounding names like Americans for Prosperity, who are running millions of dollars of ads against Democratic candidates all across the country.  And they don't have to say who exactly the Americans for Prosperity are.  You don't know if it's a foreign-controlled corporation.  You don't know if it's a big oil company, or a big bank.  You don't know if it's a [*sic*] insurance company that wants to see some of the provisions in health reform repealed because it's good for their bottom line, even if it's not good for the American people.[62]

As the 2010 midterm election neared, President Obama amplified his rhetoric.  In a September campaign stop, he stated:

[L]ast year, there was a Supreme Court decision called Citizens United. They're allowed to spend as much as they want without ever revealing who's paying for the ads.  That's exactly what they're doing.  Millions of dollars.  And the groups are benign-sounding: Americans for Prosperity. Who's against that?  Or Committee for Truth in Politics.  Or Americans for Apple Pie.  Moms for Motherhood.  I made those last two up.  None of them will disclose who's paying for these ads.  You don't know if it's a Wall Street bank.  You don't know if it's a big oil company.  You don't

---

[60] The White House, Weekly Address: President Obama Calls on Congress to Enact Reforms to Stop a "Corporate Takeover of Our Elections" (May 1, 2010).
[61] The White House, Remarks by the President on the DISCLOSE ACT (July 26, 2010).
[62] The White House, Remarks by the President at a DNC Finance Event in Austin, Texas (Aug. 9, 2010).

Exhibit D

know if it's an insurance company. You don't even know if it's a foreign-controlled entity."[63]

Days later during his weekly radio address, the President said:

> Now, as an election approaches, it's not just a theory. We can see for ourselves how destructive to our democracy this can become. We see it in the flood of deceptive attack ads sponsored by special interests using front groups with misleading names. We don't know who's behind these ads or who's paying for them.[64]

During another campaign event two days later for a Democratic Senatorial candidate, the President made it clear that his concern stemmed from how *Citizens United* affected the electoral prospects of Democratic candidates. He proclaimed:

> Right now, all across this country, special interests are running millions of dollars of attack ads against Democratic candidates. And the reason for this is last year's Supreme Court decision in *Citizens United*, which basically says that special interests can gather up millions of dollars – they are now allowed to spend as much as they want without limit, and they don't have to ever reveal who's paying for these ads.[65]

Senior White House advisor David Axelrod similarly warned that conservative groups were "spending tens of millions of dollars. In some districts, they're spending more money than the candidate – candidates themselves on negative ads from benign-sounding Americans for Prosperity, the American Crossroads Fund. No. These are front groups for special interests."[66]

The rhetorical campaign culminated only weeks before the election, as President Obama tied his disdain for *Citizens United* with the emergence of conservative-leaning groups. During a youth town hall event, the President stated:

> I do think that what has happened is layered on top of some of that general frustration that has expressed itself through the Tea Party, there is an awful lot of corporate money that's pouring into these elections right now. . . . But if you're in a battleground state right now, you are being bombarded with negative ads every single day and nobody knows who is paying for these ads. They've got these names like "Americans for Prosperity" or "Moms for Motherhood" or – actually that last one I made up. But you have these innocuous-sounding names, and we don't know

---

[63] The White House, Remarks by the President at a Reception for Connecticut Attorney General Richard Blumenthal (Sept. 16, 2010).

[64] The White House, Weekly Address: President Obama Castigates GOP Leadership for Blocking Fixes for the Citizens United Decision (Sept. 18, 2010).

[65] The White House, Remarks by the President at Finance Reception for Congressman Sestak (Sept. 20, 2010).

[66] ABC News, *'This Week' Transcript: Axelrod, McConnell, and Queen Rania* (Sept. 26, 2010), available at http://abcnews.go.com/ThisWeek/week-transcript-axelrod-mcconnell-queen-rania/story?id=11729101 &singlePage=true.

Exhibit D

where this money is coming from.  I think that is a problem for our democracy.  And it's a direct result of a Supreme Court decision that said they didn't have to disclose who their donors are.[67]

Throughout 2010, President Obama forcefully pushed his rhetoric against *Citizens United*, so-called "secret money" in politics, and the emergence of conservative non-profit groups.  The President very publicly called these groups "shadowy" front groups for foreign special interests.  He challenged the motives of these conservative groups and implied that their donors sought to remain anonymous for nefarious reasons.  In short, the President questioned the legitimacy of these groups and their political activities, going so far as to call them a "threat to our democracy."  Indisputably, this persistent and very public campaign had a real effect on how the IRS approached these groups.

## How the IRS targeted conservatives: A narrative of wrongdoing

Within the backdrop of *Citizens United* and anonymous political speech, the IRS systematically targeted and delayed tax-exempt applications filed by conservative-leaning organizations.  The story of how the targeting began and how it progressed is a complex narrative.  The audit report issued by the Treasury Inspector General for Tax Administration in May 2013 only tells part of the story.  This report attempts – with the information known at this time – to present the narrative of bias, mismanagement, and wrongdoing within the Obama Administration's IRS.

### February 2010: The initial applications are identified and elevated to Washington due to "media attention"

In late February 2010, a screener in the IRS's Cincinnati office spotted an application for tax-exempt status from a Tea Party group whose identity has still not been disclosed.  Although two similar applications had been processed and approved previously, the Cincinnati office elevated this application to the Washington office due to "media attention" surrounding the Tea Party movement.  The next day, the Washington office confirmed that it would work the application due to the potential for media attention.  Over the next two-plus years, the IRS would not approve any application for tax-exempt filed by a Tea Party-related group.

On February 25, 2010, Jack Koester, a Cincinnati screener, alerted his supervisor, John Shafer, about the Tea Party application, noting "**[r]ecent media attention to this type of organization indicates to me that this is a 'high profile' case**."[68]  Shafer forwarded Koester's e-mail to his supervisor, Sharon Camarillo.[69]  Camarillo, in turn, elevated the e-mail to her

---

[67] The White House, Remarks by the President in a Youth Town Hall (Oct. 14, 2010).

[68] E-mail from John Koester, Internal Revenue Serv., to John Shafer, Internal Revenue Serv. (Feb. 25, 2010) (emphasis added) [IRSR 428452].

[69] E-mail from John Shafer, Internal Revenue Serv., to Sharon Camarillo, Internal Revenue Serv. (Feb. 25, 2010) [IRSR 428452].

Exhibit D

supervisor, Exempt Organizations Determinations ("EO Determinations") Manager Cindy Thomas.[70]   Camarillo wrote:

> Cindy:   **Please let 'Washington' know about this potentially politically embarrassing case involving a 'Tea Party' organization.   Recent media attention to this type of organization indicates to me that this is a 'high profile' case**.[71]

Thomas likewise elevated the application to the attention of her supervisor, Holly Paz, the then-Manager of the Exempt Organizations Technical Unit in Washington ("EO Technical"), asking "whether EO Technical wants this case because of recent media attention."[72]   The following day, February 26, Paz responded, writing: "I think sending it up here is a good idea given the potential for media interest."[73]

**Figure 1: E-mail from Sharon Camarillo to Cindy Thomas, Feb. 25, 2010**

**From:** Camarillo Sharon L
**Sent:** Thursday, February 25, 2010 5:19 PM
**To:** Thomas Cindy M
**Subject:** FW: Case #  ████████████  6103
**Importance:** Low

Cindy:   Please let 'Washington' know about this potentially politically embarasing case involving a 'Tea Party' organization. Recent media attention to this type of organization indicates to me that this is a "high profile" case.   In addition to 501(c)(4) typical legisslative activities, the applicant, in answer to Part II, item 15 of the of the 1024 application indicates possible future political candidate support.   Shown below are excerpts from the application describing its legislative and possible future political activities.

The case is currently being held in the Screening group, pending a response from EOT.

At the time, the Tea Party movement was in the news often.   The movement arose in response to the economic and healthcare policies of the Obama Administration and the Democratic-led 111th Congress.[74]   The media covered various Tea Party-led protests in Washington, D.C., and other cities in opposition to the President's policies, including ObamaCare.[75]   News outlets also covered the movement's opposition to the President's policies during the inaugural Tea Party convention, held in early February 2010.[76]   As the movement

---

[70] E-mail from Sharon Camarillo, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 25, 2010) [IRSR 428451].
[71] E-mail from Sharon Camarillo, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 25, 2010) (emphasis added) [IRSR 428451].
[72] E-mail from Cindy Thomas, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Feb. 25, 2010) [IRSR 428451].
[73] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 26, 2010) [IRSR 428451].
[74] Philip Rucker, *Tea Party convention begins in Nashville*, WASH. POST, Feb. 5, 2010.
[75] *See, e.g.*, David Barstow, *Tea Party lights fuse for rebellion on right*, N.Y. TIMES, Feb. 15, 2010.
[76] Kate Zernike, *Palin assails Obama at Tea Party meeting*, N.Y. TIMES, Feb. 6, 2010.

Exhibit D

grew, some – including then-Speaker Nancy Pelosi – used the national media to publicly question the funding sources for the groups and the level of grassroots support.[77]

### March 2010: Washington requests additional Tea Party applications to work as "test" cases and orders Cincinnati to "hold" the rest

The Washington IRS office's interest in the initial Tea Party application forced the Cincinnati office to assess how many similar applications were pending in the IRS's queue. When the line employees discovered several additional applications by mid-March 2010, the Washington office asked for two additional applications to work as "test" cases. It ordered the Cincinnati employees to "hold" the remainder of the applications until Washington specialists evaluated the test cases.

Following the Washington office's acceptance of the initial application, Cincinnati screening group manager John Shafer asked his employees to identify similar applications pending at that time with the phrase "Tea Party."[78] By March 16, 2010, the screening group had identified ten more Tea Party applications.[79] Cincinnati manager Cindy Thomas notified Holly Paz, asking: "Did you know about these additional 10 tea party cases? Do you want all of them or do you want a few and then give us advice as to what to do with remaining?"[80] Paz replied: "I think we should take a few more cases (I'd say 2) and would ask that you hold the rest until we get a sense of what the issues may be."[81] On April 2, Washington received the two applications, a 501(c)(3) application filed by the Prescott Tea Party, and a 501(c)(4) application filed by the Albuquerque Tea Party.[82]

Meanwhile, at the same time that Paz ordered Cincinnati to hold all Tea Party applications, the Washington IRS office sought to determine whether it held any additional Tea Party cases. Ronald Shoemaker, a group manager in EO Technical, sent an e-mail to a number of IRS agents with the subject "lookout," writing: "Be on the lookout for a tea party case. If you have received or do receive a case in the future involving an exemption for an organization having to do with [the] tea party let me know."[83]

As a result of Paz's order to "hold" the remaining Tea Party applications in Cincinnati, the front-line screeners conducted a more thorough search for similar applications already

---

[77] *See* Peter Overby, *Who's raising money for Tea Party movement*, NAT'L PUBLIC RADIO, Feb. 19, 2010; *Pelosi claims Tea Party hijacked by GOP*, FOX NEWS, Feb. 28, 2010.

[78] Transcribed interview of Gary Muthert, Internal Revenue Serv., in Wash., D.C. (May 30, 2013).

[79] E-mail from John Shafer, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Mar. 16, 2010) [IRSR 428450].

[80] E-mail from Cindy Thomas, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Mar. 17, 2010) [IRSR 428450].

[81] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Mar. 17, 2010) [Muthert 33].

[82] *See* Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[83] E-mail from Ronald Shoemaker, Internal Revenue Serv., to Ellen Berick et al., Internal Revenue Serv. (Mar. 17, 2010) [IRSR 631577].

Exhibit D

received by the IRS.  Shafer testified that he asked his screeners to develop criteria for identifying other Tea Party applications so that the group ensured the applications did not "go into the general inventory as we were looking for consistency."[84]  Gary Muthert, one of Shafer's screeners, created the criteria of "Tea Party," "Patriots," and "9/12" by searching the public websites of Tea Party groups.[85]  Other screeners developed criteria such as "issues include government spending, government debt and taxes"; "educate the public through advocacy/legislative activities to make America a better place to live"; and "statements in the case file that are critical of how the country is being run."[86]

By early April 2010, at the request and direction of the Washington office, Cincinnati screeners began to identify and hold any tax-exempt application meeting any of these criteria. These applications were removed from the IRS's general inventory and held in a special group assigned to the Tea Party applications.

### *April 2010: Washington creates a Sensitive Case Report to alert senior IRS leadership about the potential for Tea Party "media attention"*

The sensitivity surrounding the "test" Tea Party applications was not lost on the Washington employees who examined the cases.  When the Technical Unit received these two "test" cases in late March 2010, Steve Grodnitzky, the Unit's then-acting manager,[87] asked for more information about the applications.[88]  Donna Elliot-Moore, a Washington tax law specialist who processed the arrival of the applications, casually replied that the case looked "more educational but with a republican slant obviously."[89]  Grodnitzky, reiterating the applications' potential for media attention, assigned group manager Ronald Shoemaker to have a "sensitive case report" prepared for the Tea Party applications.[90]

According to IRS employees, a sensitive case report is a monthly report prepared within the Exempt Organizations Division and designed to inform senior IRS leadership about particular issues or applications.[91]  The reports are collected from all units within Exempt Organizations and elevated through the IRS chain of command.  The Exempt Organizations

---

[84] Transcribed interview of John Shafer, Internal Revenue Serv., in Wash., D.C. (June 6, 2013).

[85] Transcribed interview of Gary Muthert, Internal Revenue Serv., in Wash., D.C. (May 30, 2013).

[86] E-mail from John Shafer, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (June 2, 2011) [71-000048].

[87] Holly Paz began maternity leave on Mar. 17, 2010.  Transcribed  interview of Holly Paz, Internal Revenue Serv., in Wash., D.C. (May 21, 2013).

[88] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Donna Elliot-Moore & Ronald Shoemaker, Internal Revenue Serv. (Mar. 31, 2010) [Muthert 7].

[89] E-mail from Donna Elliot-Moore, Internal Revenue Serv., to Steven Grodnitzky & Ronald Shoemaker, Internal Revenue Serv. (Apr. 1, 2010) [Muthert 7].

[90] E-mail from Steven Grodnitzky, Internal Revenue Serv., Ronald Shoemaker & Cindy Thomas, Internal Revenue Serv. (Apr. 5, 2010) [Muthert 6]; E-mail from Steven Grodnitzky, Internal Revenue Serv., to Donna Elliot-Moore & Ronald Shoemaker, Internal Revenue Serv. (Apr. 1, 2010) [Muthert 7].

[91] *See* Transcribed interview of Robert Choi, Internal Revenue Serv., in Wash., D.C. (Aug. 21, 2013); Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. (July 11, 2013).

Director Lois Lerner typically received a chart compiling and summarizing the various reports at the end of each month.[92]

On April 28, 2010, Grodnitzky e-mailed a summary chart of sensitive case reports to Lerner, specifically alerting her to the inclusion of information about the Tea Party cases. Grodnitzky wrote to Lerner:

> Of note, we added one [sensitive case report] concerning 2 Tea Party cases that are being worked here in DC.  Currently, there are 13 Tea Party cases out in EO Determinations [in Cincinnati] and we are coordinating with them to provide direction as to how to develop those cases based on our development of the ones in DC.[93]

Grodnitzky testified that he included the Tea Party applications on the sensitive case report due to their potential for media attention.[94]  The Tea Party movement continued to be in the media during this time, most notably due to a large-scale April 2010 tax day protest in Washington.[95]

**Figure 2: E-mail from Steven Grodnitzky to Lois Lerner & Robert Choi, Apr. 28, 2010**

| | |
|---|---|
| **From:** | Grodnitzky Steven |
| **Sent:** | Wednesday, April 28, 2010 5:23 PM |
| **To:** | Lerner Lois G; Choi Robert S |
| **Cc:** | Letourneau Diane L; Grodnitzky Steven |
| **Subject:** | SCR Chart |
| **Attachments:** | SCR report Table 2010 Final.doc |

Please find attached a copy of the SCR chart for cases in EO Technical for the period ending April 28, 2010.

Of note, we added one new SCR concerning 2 Tea Party cases that are being worked here in DC.  Currently, there are 13 Tea Party cases out in EO Determinations and we are coordinating with them to provide direction as to how to develop those cases based on our development of the ones in DC.  We also closed one significant case last month -- 6103
 6103  --  6103  .

Later, in May 2010, Lerner acknowledged the existence of the Tea Party applications in response to Grodnitzky's summary chart of sensitive case reports.  Lerner wrote to him: "Tea Party cases – applications for c3?  What's their basis?"[96]  Grodnitzky responded:

> The organizations are arguing education, but the big issue for us is whether they are engaged in political campaign activity. . . .  I have asked the [tax law specialist] and front line manager to coordinate with Cincy as

---

[92] Transcribed interview of Steven Grodnitzky, Internal Revenue Serv., in Wash., D.C. (July 16, 2013).

[93] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Lois Lerner & Robert Choi, Internal Revenue Serv. (Apr. 28, 2010) [IRSR 141809].

[94] Transcribed interview of Steven Grodnitzky, Internal Revenue Serv., in Wash., D.C. (July 16, 2013).

[95] *See Tea Party protestors descend on D.C. with new 'Contract from America,'* FOX NEWS, Apr. 15, 2010.

[96] E-mail from Lois Lerner, Internal Revenue Serv., to Steven Grodnitzky & Robert Choi, Internal Revenue Serv. (May 13, 2010) [IRSR 167872-73].

Exhibit D

to how to develop their cases, but not resolve anything until we get clearance from you and Rob [Choi].[97]

In August 2010, after Lerner received another sensitive case report, she asked her assistant to print out the report prepared for the Tea Party applications for her review.[98]

## *April 2010: Washington employee Carter Hull is assigned to work the test applications and oversee Cincinnati's work*

The Washington IRS office began to exert near-total control over the evaluation and processing of the Tea Party tax-exempt applications in April 2010. At the same time that Grodnitzky instructed Shoemaker to initiate a sensitive case report, he also asked Shoemaker to assign a tax law specialist to "coordinate with Cincy as they have a number of Tea Party cases as well."[99] Shoemaker assigned tax law specialist Carter Hull to the task. Hull, a federal employee with almost fifty years of experience, was a recognized expert in § 501(c)(4) applications with indications of political activity.[100]

Meanwhile, in Cincinnati, veteran revenue agent Elizabeth Hofacre drew the assignment of working the Tea Party applications pending in the Determinations Unit that were awaiting guidance from Washington.[101] On April 30, 2010, Hofacre was assigned about twenty Tea Party applications that were pending in Cincinnati at that time.[102] Around this time, Hofacre created an alert for revenue agents to identify other, similar cases "involv[ing] local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)."[103] This language became the first iteration of the "Tea Party" entry on the now-infamous "Be on the Lookout" (BOLO) list.

Although intended to aid Cincinnati revenue agents, the BOLO found its way into the in-boxes of Washington personnel as well. When Hofacre first circulated the BOLO in August 2010, she mistakenly sent the e-mail to the IRS Washington office as well as the Cincinnati office.[104] Both Rob Choi, then-Director of Rulings and Agreements, and tax law specialist Elizabeth Kastenberg, testified that they received the BOLO list at that time.[105] Neither, however, took any action after receiving the BOLO list.

---

[97] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (May 13, 2010) [IRSR 167872].

[98] E-mail from Lois Lerner, Internal Revenue Serv., to Akaisha Douglas et al., Internal Revenue Serv. (Aug. 3, 2010) [IRSR 163358].

[99] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Cindy Thomas & Ronald Shoemaker, Internal Revenue Serv. (Apr. 5, 2010) [Muthert 6].

[100] Transcribed interview of Carter Hull Internal Revenue Serv., in Wash., D.C. (June 14, 2013).

[101] *See* Transcribed interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. (May 31, 2013).

[102] *Id.*

[103] Internal Revenue Serv., BOLO Iteration History.

[104] Transcribed interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. (May 31, 2013).

[105] Transcribed interview of Robert Choi, Internal Revenue Serv., in Wash, D.C. (Aug 21, 2013); Transcribed interview of Elizabeth Kastenberg, Internal Revenue Serv., in Wash., D.C. (July 31, 2013).

Exhibit D

### *Summer 2010: Hull works the test applications as other applications sit in Cincinnati*

As the Washington office began to evaluate the test applications, the Cincinnati office continued to hold the growing queue of applications pending there.  Only seven applications in the backlog were identifiable as from "progressive" groups,[106] and all seven were subsequently approved by the IRS.[107]  Meanwhile, applications from Tea Party groups received an unprecedented degree of scrutiny and years-long delays.  Revenue agent Elizabeth Hofacre, unable to make determinations without Washington's approval, grew increasingly frustrated.  By the time Hofacre transferred out of EO Determinations in October 2010 due to her frustration, the backlog of Tea Party cases awaiting Washington's guidance had swelled to about 60 applications and was still growing.[108]

In late spring 2010, Washington tax law specialist Carter Hull began to develop the two test applications by issuing letters to both applicants requesting additional information or clarifications about information on their applications.  Hull sent letters to the Prescott Tea Party and the Albuquerque Tea Party on April 14, and April 21, respectively.[109]  The IRS received the Albuquerque Tea Party's response on June 8.[110]  The IRS, however, did not receive a response from the Prescott Tea Party.  On May 26, the IRS closed its application on the grounds of "failure to establish."[111]

The closure of the Prescott Tea Party's application left Washington without a 501(c)(3) test application.  To ensure that it had both a 501(c)(3) and 501(c)(4) to work as test cases, the Washington office asked Cincinnati for a replacement 501(c)(3) application in late May 2010.[112]  On June 30, the Cincinnati office transferred an application for 501(c)(3) status filed by American Junto, Inc. to Washington to replace the Prescott Tea Party's application.[113]

Meanwhile, as Hull developed the test cases, Hofacre attempted to work the applications pending in Cincinnati.  Starting in April 2010, Hofacre began drafting information-request letters for the applicants.  However, rather than sending the letters immediately as typically done, Hofacre sent them to Hull for his review and editing.[114]  When the applicants sent responses to

---

[106] "The IRS's Systematic Delay and Scrutiny of Tea Party Applications": Hearing before the H. Comm. on Oversight & Gov't Reform, 113th Cong. (2013) (statement of J. Russell George).

[107] Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit: Hearing before the Subcomm. on Oversight of the H. Comm. on Ways & Means, 113th Con. (2013) (opening statement of Chairman Boustany).

[108] Transcribed interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. (May 31, 2013).

[109] Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[110] Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[111] Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[112] *See* Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013); Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[113] Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[114] Transcribed interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. at 34 (May 31, 2013).

Exhibit D

Hofacre, she forwarded that information to Hull as well.[115]  Hofacre testified that she had "no autonomy or no authority to act on [Tea Party applications] without Carter Hull's influence or input."[116]  Hull testified that he could not provide any information to Hofacre "until I knew which way the Service was going."[117]  Until Hull's superiors informed him on "which way the Service was going," Hull could not provide this information to Hofacre and Hofacre could not process the applications.

The lack of autonomy frustrated Hofacre.  She testified: "I was preparing these letters, sending them to Carter Hull, being micromanaged to death, and it was just really frustrating."[118] She explained that this Washington review delayed the evaluation process, testifying that "at first [Hull's response] was more timely, but then as I was being assigned more cases, his responsive time really dropped down, to by the time I finished, I had numerous letters up there that I never got any feedback on."[119]  The delays became so frustrating that Hofacre sought a transfer to another IRS division in July 2010, which she received in October 2010.[120]  Her replacement would fare no better in awaiting Washington's assistance.

## Fall 2010: Cincinnati's requests for guidance go unanswered

By fall 2010, the delays continued.  Applications continued to come in to Cincinnati, which sought to process them, but could not due to the lack of direction from Washington. Recognizing the problem, Cincinnati manager Cindy Thomas questioned the close Washington oversight of the Tea Party applications and repeatedly sought the status of Washington's promised guidance.  That guidance never came.

In October, Ron Bell replaced Hofacre as the coordinator of the Tea Party applications. He, however, had no better luck in processing the growing backlog of applications.  When Bell asked his supervisor, Steve Bowling, about what to do with the applications, Bowling told him, "we're holding them pending, we're waiting for guidance from headquarters."[121]  The guidance never came.  Bell testified to the Committee that he "took the cases in October/November 2010, and they were reassigned in November 2011 [and] I didn't get any guidance during that timeframe."[122]

The lack of guidance was not for failure to ask.  Several times during the latter months of 2010, Cindy Thomas inquired of Holly Paz about the status of Washington's long-promised guidance.  In one e-mail from late-October 2010, Thomas voiced her unit's frustration with the process:

---

[115] *Id.* at 37.
[116] *Id.*
[117] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013).
[118] Transcribed interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. (May 31, 2013).
[119] *Id.*
[120] *Id.*
[121] Transcribed interview of Ronald Bell, Internal Revenue Serv., in Wash., D.C. (June 13, 2013).
[122] Transcribed interview of Ronald Bell, Internal Revenue Serv., in Wash., D.C. at 21 (June 13, 2013).

Exhibit D


> I have a concern with the approach being used to develop the tea party
> cases we have here in Cincinnati. . . .   Personally, I don't know why
> [Carter Hull] needs to look at each and every additional information letter.
> It seems to me that if he reviewed a template letter and approved it we
> should be good to go.  Then when we get responses, we need to coordinate
> these cases as a group and not try to work them one by one.  Right now, I
> believe we have approximately 45 or more of these cases. . . . .  [C]ould
> we schedule some time to discuss the approach that is being used and
> come up with a process so we can get these moving?[123]

Despite her frustration, the Washington office could not provide Thomas with a date certain for
the guidance.  In each response, the proposed timeline became later and later.[124]

Hull could not provide guidance until he knew how the IRS as an agency would approach
the Tea Party applications.  Despite his decades of experience and his recognized expertise in the
area, Hull could not make the determinations on his own.  Instead, the test applications wound
their way further up the IRS bureaucracy.

## February 2011: Lerner orders a "multi-tier review" of the Tea Party test applications

Almost a year after the initial application was identified and evaluated to Washington, the
IRS was no closer to resolving the burgeoning backlog of applications in Cincinnati.  As 2011
opened, veteran employee Carter Hull had made recommendations on how to resolve the two test
cases in Washington based on his decades of experience and expertise.  His recommendations
were not carried out.  Instead, in February 2011, Exempt Organizations Director Lois Lerner
ordered the Tea Party test applications to undergo an unprecedented "multi-tier" review.

On February 1, Michael Seto sent Lois Lerner the chart of sensitive case reports from
January 2011, including information about the Tea Party test cases.[125]  Lerner responded the
same day, opining that the "Tea Party Matter [is] very dangerous" and ordering the test
applications to be reviewed by Kindell and the Chief Counsel's office.[126]  She wrote:

> Tea Party Matter very dangerous.  This could be the vehicle to go to court
> on the issue of whether Citizen's [*sic*] United overturning ban on
> corporate spending applies to tax exempt rule.  Counsel and Judy Kindell

---

[123] E-mail from Cindy Thomas, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Oct. 26, 2010) [IRSR 66846].

[124] *See* E-mail from Michael Seto, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 3, 2011); E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Dec. 13, 2010) [IRSR 66844-445].

[125] E-mail from Michael Seto, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (Feb. 1, 2011) [IRSR 161810].

[126] E-mail from Lois Lerner, Internal Revenue Serv., to Michael Seto, Internal Revenue Serv. (Feb. 1, 2011) [IRSR 161810].

Exhibit D

need to be in on this one please . . . .  Cincy should probably NOT have these cases . . . .[127]

Paz responded to Lerner, assuaging her concerns and confirming the heavy-handed Washington control over the applications.  She wrote:

> Tea Party – Cases in Determs are being supervised by [Carter Hull] at each step – he reviews info from TPs, correspondence to TPs, etc.  No decisions are going out of Cincy until we go all the way through the process with the c3 and c4 cases here.  I believe the c4 will be ready to go over to Judy [Kindell] soon.[128]

Apparently seeking an alternative ground for denying the applications, Lerner replied, "even if we go with a 4 . . . , they may want to argue they should be 3s, so **it would be great if we can get there without saying the only reason they don't get a 3 is political activity**."[129]  Paz separately instructed Michael Seto, the manager of EO Technical, that "Tea Party needs to go to Judy, then Counsel (we were already planning on going to Judy and guess we'll do Counsel too)."[130]

**Figure 3: E-mail from Lois Lerner to Michael Seto, Feb. 1, 2011**

From: Lerner Lois G
Sent: Tuesday, February 01, 2011 6:28 PM
To: Seto Michael C
Cc: Paz Holly O; Trilli Darla J; Douglas Akaisha; Letourneau Diane L; Kindell Judith E
Subject: RE: SCR Table for Jan. 2011

Thanks--a couple comments

1. Tea Party Matter very dangerous.  This could be the vehicle to go to court on the issue of whether Citizen's United overturning the ban on corporate spending applies to tax exempt rules.  Counsel and Judy Kindell need to be in on this one pl ease needs to be in this.  Cincy should probably NOT have these cases --Holly please see what exactly they have please.

Seto described Lerner's instructions for the "multi-tier" review of the Tea Party test applications during his transcribed interview with Committee staff.  He testified:

> A    She sent me e-mail saying that when these cases need to go through multi-tier review and they will eventually have to go to Ms. Kindell and the chief counsel's office.

---

[127] *Id.*

[128] E-mail from Holly Paz, Internal Revenue Serv., to Lois Lerner & Michael Seto, Internal Revenue Serv. (Feb. 2, 2011) [IRSR 156543].

[129] E-mail from Lois Lerner, Internal Revenue Serv., to Holly Paz & Michael Seto, Internal Revenue Serv. (Feb. 2, 2011) (emphasis added) [IRSR 147510].

[130] E-mail from Holly Paz, Internal Revenue Serv., to Michael Seto, Internal Revenue Serv. (Feb. 2, 2011) [IRSR 159428].

Exhibit D

Q Ms. Lerner told you this in an e-mail?

A That's my recollection.

Q Okay.  Just for clarification, we're talking about January-February of 2011. So is that the time period that you recall receiving?

A I think so.

<div align="center">***</div>

Q An e-mail from Ms. Lois Lerner directing you that these cases, these Tea Party cases would need to go through a multi-level review?

A Yes, it has to go to, yes, Counsel, yep.[131]

Lerner ordered the multi-tier review even though veteran tax law specialist Carter Hull had already developed recommendations on the applications.  By late 2010, Hull had recommended "the (c)(4) be recognized as exempt, and . . . the (c)(3) should not be recognized as exempt."[132] As a matter of practice within the Technical Unit, Hull shared the applications and his recommendations with a colleague, Elizabeth Kastenberg, for her review.[133]  In March 2011, Kastenberg independently reviewed the applications and suggested – just as Lerner ordered – that she and Hull seek subject-matter guidance from Judy Kindell, Lerner's senior technical advisor.[134]  Kindell's review marked the beginning of the multi-tier review.

### April 2011: Lerner's advisor Judith Kindell reviews the test applications

Judith Kindell served as Lois Lerner's senior technical advisor.  In that position, she advised Lerner on technical issues relating to tax law for exempt organizations, including issues relating to political activities for tax-exempt groups.[135]  In April 2011, Kindell reviewed the two test applications and, consistent with Lerner's directive, suggested that the Chief Counsel's office review the cases.

By April 1, Carter Hull and Elizabeth Kastenberg had completed their reviews of the test cases and had scheduled a meeting with Kindell to discuss the applications.[136]  Kindell met with Hull and Kastenberg on April 7, in which she recommended that they gather more information to

---

[131] Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. (July 11, 2013).
[132] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 16, 2013).
[133] Transcribed interview of Elizabeth Kastenberg, Internal Revenue Serv., in Wash., D.C. (July 31, 2013).
[134] *Id.*
[135] Transcribed interview of Judith Kindell, Internal Revenue Serv., in Wash., D.C. (Oct. 29, 2013).
[136] E-mail from Elizabeth Kastenberg, Internal Revenue Serv., to Michael Seto, Ronald Shoemaker, & Carter Hull, Internal Revenue Serv. (Apr. 1, 2011) [IRSR 69910].

Exhibit D

develop a basis for denying the applications on another ground.[137]  Later that day, she e-mailed
Lerner and Paz about the "sensitive (c)(3) and (c)(4) applications," writing:

> I just spoke with Chip Hull and Elizabeth Kastenberg about two cases they
> have that are related to the Tea Party – one a (c)(3) application and the
> other a (c)(4) application.  I recommended that they develop the private
> benefit argument further and that they coordinate with Counsel.  They also
> mentioned that there are a number of other (c)(3) and (c)(4) applications of
> orgs related to the Tea Party that are currently in Cincinnati.[138]

Lerner responded by reiterating her direction for Washington control: "[T]hese could blow up
like crazy if the Determs folks let one out incorrectly . . . .  Can Cindy [Thomas] have all of them
assigned to one or two folks who don't make a move without Counsel/Judy involvement?"[139]
Paz assured Lerner: "They have been told not to issue [determinations] until we work through
the test cases we have here."[140]  Separately, Paz informed Lerner that the Cincinnati office was
then holding 102 additional Tea Party applications pending the completion of the test cases.[141]

**Figure 4: E-mail from Judith Kindell to Lois Lerner & Holly Paz, Apr. 7, 2011**

**From:** Kindell Judith E
**Sent:** Thursday, April 07, 2011 10:16 AM
**To:** Lerner Lois G; Paz Holly O
**Cc:** Light Sharon P; Letourneau Diane L; Neuhart Paige
**Subject:** sensitive (c)(3) and (c)(4) applications

I just spoke with Chip Hull and Elizabeth Kastenberg about two cases they have that are related to the Tea Party - one a (c)(3) application and the other a (c)(4) application. I recommended that they develop the private benefit argument further and that they coordinate with Counsel. They also mentioned that there are a number of other (c)(3) and (c)(4) applications of orgs related to the Tea Party that are currently in Cincinnati. Apparently the plan had been to send one of each to DC to develop a position to be applied to the others. Given the sensitivity of the issue and the need (I believe) to coordinate with Counsel, I think it would be beneficial to have the other cases worked in DC as well. I understand that there may be TAS inquiries on some of the cases.

Following Kindell's review of the applications, the IRS sent a second development letter
to American Junto on April 27, 2011.[142]  American Junto responded on May 18, 2011.[143]
Nonetheless, despite the responsiveness of the applicants, the IRS did not act.  The test

---

[137] *See* Transcribed interview of Judith Kindell, Internal Revenue Serv., in Wash., D.C. (Oct. 29, 2013).
[138] E-mail from Judith Kindell, Internal Revenue Serv., to Lois Lerner & Holly Paz, Internal Revenue Serv. (Apr. 7, 2011) [IRSR 66847].
[139] E-mail from Lois Lerner, Internal Revenue Serv., to Holly Paz & Judith Kindell, Internal Revenue Serv. (Apr. 7, 2011) [IRSR 350220].
[140] E-mail from Holly Paz, Internal Revenue Serv., to Lois Lerner & Judith Kindell, Internal Revenue Serv. (Apr. 7, 2011) [IRSR 350220].
[141] E-mail from Holly Paz, Internal Revenue Serv., to Lois Lerner & Judith Kindell, Internal Revenue Serv. (Apr. 7, 2011) [IRSR 350219].
[142] Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].
[143] *Id.*

applications continued through the multi-tier review as the backlog in Cincinnati continued to grow.

### June-July 2011: Lerner is fully briefed on the treatment of Tea Party applications

Exempt Organizations Director Lois Lerner became fully aware of the nature and extent of the IRS's treatment of Tea Party applications during the summer of 2011. While evidence shows that Holly Paz, Lerner's top deputy in the division that handles applications for tax-exempt status, likely had awareness of the applications as early as March 2010, Lerner asked in May 2011 for Cincinnati to send a copy of the Crossroads GPS application to Washington for review by her office. Later, in July 2011, Lerner requested a briefing on the specific criteria used by the IRS to identify Tea Party applications. Although she ordered the label and the criteria to be changed, the multi-tier review and delays continued.

In late May 2011, Lerner requested that Paz arrange a briefing for her on "a whole passel of 'tea Party related' [*sic*] cases being worked in Cincy that [Carter Hull] is overseeing/ coordinating."[144] In preparation for the briefing, Paz e-mailed Cincinnati manager Cindy Thomas requesting the criteria used by the screening agents to "label a case a 'Tea Party case'" due to concerns about "over-inclusion."[145] Paz also asked Thomas to send "a copy of the Crossroads Grassroots Policy Strategies . . . application[.] Lois wants Judy to take a look at it so she can summarize the issues for Lois."[146] It is unclear why Lerner specifically requested the application filed by Crossroads GPS, a well-known and visible conservative group. To the best of the Committee's awareness, the Crossroad GPS application was the only application pending in Cincinnati at that time to be specifically requested by Lerner for review.

The briefing for Lerner occurred on July 5.[147] Tax law specialist Justin Lowe led the meeting, which included Paz, Hull, Kastenberg, Thomas, and others.[148] At this briefing, Lowe told Lerner that the backlog of Tea Party applications pending in Cincinnati had grown to "over 100."[149] He also notified her about the specific criteria used by IRS personnel to screen cases into this backlog.[150] A briefing paper prepared by Lowe for the meeting summarized the criteria:

> [EO Determinations] Screening identified this type of case as an emerging issue and began sending cases to a specific group if they meet any of the following criteria:
> - o "Tea Party," "Patriots" or "9/12 Project" is referenced in the case file

---

[144] E-mail from Lois Lerner, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (May 27, 2011) [IRSR 196483].
[145] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (June 1, 2011) [IRSR 69914-15].
[146] *Id.*
[147] Transcribed interview of Holly Paz, Internal Revenue Serv., in Wash., D.C. (May 21, 2013).
[148] *Id.*
[149] Justin Lowe, Internal Revenue Serv., Increase in (c)(3)/(c)(4) Advocacy Org. Applications (2011); Transcribed interview of Justin Lowe, Internal Revenue Serv., in Wash., D.C. (July 23, 2013).
[150] *Id.*

Exhibit D

- o  Issues include government spending, government debt or taxes
- o  Education of the public by advocacy/lobbying to "make America a better place to live"
- o  Statements in the case file criticize how the country is being run . . . .[151]

**Figure 5: IRS Briefing Document Prepared for Lois Lerner**

**Background:**
- EOD Screening has identified an increase in the number of (c)(3) and (c)(4) applications where organizations are advocating on issues related to government spending, taxes and similar matters. Often there is possible political intervention or excessive lobbying.

- EOD Screening identified this type of case as an emerging issue and began sending cases to a specific group if they meet any of the following criteria:
  - o  "Tea Party," "Patriots" or "9/12 Project" is referenced in the case file
  - o  Issues include government spending, government debt or taxes
  - o  Education of the public by advocacy/lobbying to "make America a better place to live"
  - o  Statements in the case file criticize how the country is being run

Although Lerner and others regularly referred to the applications as "Tea Party" cases since February 2010, Lerner directed her staff to change the label for the cases and the criteria used to identify the applications. Hull told Committee staff that Lerner ordered the cases now to be labeled as "advocacy organizations" because "[s]he said that the Tea Party was just too pejorative."[152] Hull's supervisor, Ron Shoemaker, testified that Lerner "raised a concern about the name that we were using for these cases. We were using Tea Party cases. And she thought that advocacy cases would be a better term because there's a suggestion that Tea Party may be a partisan or prejudicial kind of term."[153]

During the meeting, reflecting her feeling that the term "Tea Party" was "pejorative," Lerner ordered a change in the BOLO criteria away from its Tea Party-related criteria.[154] The new BOLO language became: "Organization involved with political, lobbying, or advocacy for exemption under 501(c)(3) or 501(c)(4)."[155] Lerner also directed the Technical Unit to conduct a "triage" of over-100 applications in the backlog and to develop a "guide sheet" document to assist revenue agents in Cincinnati with processing the cases.[156] Lerner, however, did not stop, and the harassment and delays continued.

A contemporaneous IRS document shows that the Lerner and her staff discussed during the meeting adding further restrictions on 501(c)(3) and 501(c)(4) groups. According to a memorandum prepared for EO Technical Manager Michael Seto, Lerner recommended requiring tax-exempt groups to "make certain representations regarding compliance with the checklist and certain issues (i.e. they won't politically intervene) in order to pin them down in the future if they

---

[151] *Id.*
[152] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013).
[153] Transcribed interview of Ronald Shoemaker, Internal Revenue Serv., in Wash., D.C. (June 21, 2013).
[154] Transcribed interview of Holly Paz, Internal Revenue Serv., in Wash., D.C. (May 21, 2013).
[155] Internal Revenue Serv., BOLO Iteration History.
[156] Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. (July 11, 2013).

Exhibit D

engage in prohibited activities."[157]  Lerner also recommended that the line-level employees research whether tax-exempt applicants are registered with the Federal Elections Commission and, if so, "ask additional questions."[158]

## Summer 2011: Chief Counsel's office reviews the test applications

As summer 2011 progressed, the test Tea Party applications continued to weave through the IRS bureaucracy.  Pursuant to Lerner's multi-tier review, the Exempt Organization Division sent both test cases to the IRS Chief Counsel's office for review.  The Chief Counsel's office, after only a cursory review of the applications, returned them to Exempt Organizations for even more work.

The Chief Counsel's office received the Albuquerque Tea Party's § 501(c)(4) application and case file on June 27, 2011.[159]  It is unclear when it received the American Junto's § 501(c)(3) materials.  In late July, Janine Cook, the Deputy Division Counsel, and Don Spellmann, a senior counsel, met with Lerner, Paz, and senior IRS executive Nan Marks about how to process the Tea Party cases.[160]  According to Spellmann, "[t]he meeting in July was to talk about just this large group of cases.  And what – what we were told by Exempt Organizations was that they were going to send over two for counsel to review.  My understanding, subsequently, is that counsel already had those two cases . . . ."[161]

Though the Chief Counsel's office had the test applications, its review was not conducted with any particular urgency.  The applications had been assigned to David Marshall and Amy Franklin-Giuliano, attorneys in the Exempt Organizations branch within the Chief Counsel's office.[162]  However, neither Marshall nor Franklin-Giuliano began their reviews immediately.[163]  As Marshall wrote in a late-July e-mail, "Amy and I have both been sufficiently busy that we have not turned much attention to the case.  We presently are scheduled to talk preliminarily about how to proceed in processing the case next Wednesday afternoon.  We wanted to wait until we heard from Don [Spellmann] the results of this week's meeting [with Lerner]."[164]

When Marshall and Franklin-Giuliano finally reviewed the applications, their reviews were cursory at best.  Their work took only a week to complete.[165]  Marshall described his review as merely a "legal judgment based on what we have, do we believe it is favorable, do we

---

[157] Memorandum from Hilary Goehausen, Internal Revenue Serv., to Mike Seto, Internal Revenue Serv. (July 6, 2011) [IRSR 487709].

[158] *Id.*

[159] Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[160] Transcribed interview of Don Spellmann, Internal Revenue Serv., in Wash., D.C. (July 12, 2013); Transcribed interview of Janine Cook, Internal Revenue Serv., in Wash., D.C. (Aug. 23, 2013).

[161] Transcribed interview of Don Spellmann, Internal Revenue Serv., in Wash., D.C. (July 12, 2013).

[162] *See* Transcribed interview of David Marshall, Internal Revenue Serv., in Wash., D.C. (July 26, 2013); Transcribed interview of Amy Franklin-Giuliano, Internal Revenue Serv., in Wash., D.C. (Aug. 9, 2013).

[163] *See* E-mail from David Marshall, Internal Revenue Serv., to Kenneth Griffin, Internal Revenue Serv. (July 26, 2011) [IRSR 1330].

[164] *Id.*

[165] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C. (Aug. 9, 2013).

Exhibit D

believe it is not favorable, or do we have insufficient information to make a determination."[166] Franklin-Giuliano similarly described the narrow scope of her review during a transcribed interview.  She testified:

Q      Were you able to make a recommendation on this case?

A      I wasn't really asked for a recommendation.  I was asked to go through the case file to identify – because it was such a close call, to kind of focus on what I thought the underlying social welfare purpose was, as well as to be aware of the political advocacy.[167]

The reviews were also severely limited as a result of Cook and Spellmann's meeting with Lerner in July 2011.  From that meeting, the decision was made to return the applications to Exempt Organizations so that it could gather information about the groups' activities during the 2010 election cycle.[168]  This decision was made even before Marshall or Franklin-Giuliano had an opportunity to independently evaluate the applications.[169]  In this way, it appears as if the outcome of the review by the Chief Counsel's office was predetermined.

In early August, consistent with the decision to develop the 2010 election information, the Chief Counsel's office returned the two test applications to Exempt Organizations.  Around the same time, Marshall and Franklin-Giuliano led a meeting to instruct Exempt Organizations personnel on "the kinds of information that might be of assistance in getting information about what may have occurred during that latter part of 2010 when there was an election going on."[170] Even after eighteen months of review by several segments of the agency, the IRS's delays continued and the Cincinnati backlog grew unaddressed as the IRS sought further information to deny the applications.

### Summer 2011: Hull is replaced by novice IRS specialist Hilary Goehausen

At some point during the summer of 2011, Technical Unit Manager Michael Seto removed Carter Hull from the Tea Party test applications.  He replaced Hull, a decades-long IRS veteran, with rookie IRS employee Hilary Goehausen, who had joined the agency only months before.[171]  This decision exacerbated the already-lengthy delays experienced by the Tea Party groups applying for tax-exempt status.

Seto testified that he reassigned Hull because Hull was "going way, way, way too slow" on the applications.[172]  This explanation is curious given that Hull had completed his review by

---

[166] Transcribed interview of David Marshall, Internal Revenue Serv., in Wash., D.C. (July 26, 2013).

[167] Transcribed interview of Amy Franklin-Giuliano, Internal Revenue Serv., in Wash., D.C. (Aug. 9, 2013).

[168] E-mail from Don Spellmann, Internal Revenue Serv., to David Marshall & Kenneth Griffin, Internal Revenue Serv. (July 28, 2011) [IRSR 1330].

[169] Transcribed interview of Amy Franklin Giuliano, Internal Revenue Serv., in Wash., D.C. (Aug. 9, 2013).

[170] Transcribed interview of David Marshal, Internal Revenue Serv., in Wash., D.C. (July 26, 2013).

[171] Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. (July 11, 2013); Transcribed interview of Hilary Goehausen, Internal Revenue Serv., in Wash., D.C. (July 2, 2013).

[172] Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. (July 11, 2013).

Exhibit D

late 2010 and that it was Lerner who had created additional delays due to the multi-tier review. Seto replaced Hull, a veteran IRS employee with recognized expertise in § 501(c)(4) organizations, with novice tax law specialist Hilary Goehausen with the apparent goal of training her as an expert.[173]

In light of the perceived sensitivities of these test applications, which Lerner had recognized as "dangerous" and for which she ordered an unprecedented "multi-tier" review, it would have made sense to assign them to an IRS veteran like Hull. The decision to address the backlog by replacing Hull, an employee with 48 years of experience, in favor of training Goehausen, a new employee with only months of experience, creates the appearance that IRS managers wanted to install someone who could be more easily trained to handle applications from conservative groups in a way that deviated from well-established IRS processes for reviewing § 501(c)(4) applications.

The test applications, however, were not transferred to Goehausen immediately. In fact, following the August meeting with the Chief Counsel's office, Hull began drafting a new information-request letter for one of the test applications but he never sent it.[174] Goehausen completed Hull's draft and drafted an additional letter, which were sent to American Junto and the Albuquerque Tea Party on November 18 and November 16, respectively.[175] Goehausen received a response from the Albuquerque Tea Party on January 11, 2012.[176] American Junto, however, did not response to the letter, telling the IRS they "couldn't take it anymore."[177]

### Fall 2011: Goehausen futilely attempts to triage the growing Tea Party backlog

By fall 2011, the backlog of Tea Party applications awaiting guidance in Cincinnati had grown to well over 150 applications.[178] IRS leadership assigned Hilary Goehausen to conduct a "triage" of the backlogged applications. While this triage ultimately proved futile to resolving the backlog, it illuminated how the IRS skeptically viewed the activities of the Tea Party applicants.

Using a list of the backlogged applications sent from Cincinnati, Goehausen reviewed each application and offered comments intended to assist the Cincinnati employees process the case.[179] In an e-mail describing her findings, Goehausen explained:

---

[173] Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. (July 11, 2013); Transcribed interview of Hilary Goehausen, Internal Revenue Serv., in Wash., D.C. (July 2, 2013).

[174] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013).

[175] Transcribed interview of Hilary Goehausen, Internal Revenue Serv., in Wash., D.C. (July 2, 2013); Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[176] Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[177] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013); Internal Revenue Serv., Timeline for the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[178] See Gregory Korte, *IRS List Reveals Concerns over Tea Party 'Propaganda,'* USA TODAY, Sept. 18, 2013

[179] Transcribed interview of Hilary Goehausen, Internal Revenue Serv., in Wash., D.C. (July 2, 2013); Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

Exhibit D

> Where I had concerns about whether the (c)(3)s and (c)(4)s were actually engaging in good (c)(3)/(c)(4) activities – and not just making inflammatory, emotionally charged statements without any factual support or educational aspects to activities – I made notes reflecting such.  Where it simply states "general advocacy" or "general advocacy/legislative advocacy" (or lobbying), without comments, those organizations appeared to be fine (no development).[180]

Goehausen also evaluated the applications for "propaganda," which she identified as "a kind of inflammatory, emotionally charged statement giving one side, trying to say the public on an issue by only being one-sided and not giving – not discussing both sides of an issue."[181]

In an attachment to the e-mail, Goehausen provided specific comments for each backlogged application.  These comments are illustrative of how the IRS viewed the merits of the applications.  According to a version published by *USA Today*, in addition to describing some groups as "anti-Obama," the comments questioned the legitimacy of the applicants' activities.[182]  For example, the comment to the application filed by the 1776 Tea Party read in part: "[P]ostings on website show little educational value; appear primarily emotional."[183]  The comment to the application filed by the Patriots of Charleston read: "Both general advocacy and some apparent political campaign activities (ie negative Obama commentary); more development may be needed to determine if *good c4 activities*."[184]  The comment to Crossroads GPS's application read: "Lobbying and general advocacy org; *however, significant anti-Obama rhetoric and articles; appears to be an anti-Obama Administration website*; however there are educational materials on site."[185]  Several other comments characterized groups' activities as having "little to no educational value"; being "highly inflammatory"; exhibiting "emotional rhetoric, nothing objective or informational"; and containing "substantial anti-Obama information."[186]

The triage was not helpful for the Cincinnati office's purposes in working through the backlog.[187]  Rather than advising the Cincinnati office on which applications could be approved, Goehausen provided value-laden comments that were not helpful.  As Cindy Thomas testified:

> I didn't think [the triage] was helpful at all because what I was looking for is a quick look . . . to like just tell us can this can be approved or should not be approved or we need additional information?  And [the triage] was more comments written and I could not tell.[188]

---

[180] E-mail from Hilary Goehausen, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Oct. 26, 2011) [IRS 287].

[181] Transcribed interview of Hilary Goehausen, Internal Revenue Serv., in Wash., D.C. (July 2, 2013).

[182] Gregory Korte, *IRS List Reveals Concerns over Tea Party 'Propaganda*,' USA TODAY, Sept. 18, 2013.

[183] *Id.*

[184] *Id.* (emphasis added).

[185] *Id.* (emphasis added).

[186] *Id.*

[187] Transcribed interview of Cindy Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

[188] Transcribed interview of Cindy Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

Exhibit D

The triage conducted in fall 2011 did nothing to resolve the pending applications or reduce the backlog of Tea Party applications.  As a missed opportunity, it instead only served to broadcast the IRS's institutional skepticism of the legitimacy of tax-exempt activities conducted by the Tea Party applicants.

## Fall 2011: Washington develops a guide sheet to shape Cincinnati's review of the backlogged applications

Since March 2010, the IRS Cincinnati office had been holding all incoming Tea Party applications pending guidance from the Washington office.  During this time, the backlog of cases had grown from 10 to over 160 as the test applications bounced around the IRS bureaucracy in Washington.  Finally, in fall 2011, the Washington office began to prepare its oft-promised guidance, even though the test applications were not yet finalized.  This assistance came in the form of a "guide sheet" initially authored by novice tax law specialist Hilary Goehausen with assistance from senior Exempt Organizations leaders.

Technical Unit manager Michael Seto tasked Goehausen with creating the guide sheet in late July 2011.[189]  Goehausen began the drafting process in August 2011, compiling statutes, regulations, and other pertinent information to assist revenue agents in Cincinnati in evaluating applications with indications of political activity.[190]  By November 2011, Goehausen had a completed draft, which was reviewed by fellow tax law specialist Justin Lowe and group manager Steve Grodnitzky.[191]  Other, more senior officials also reviewed the draft guide sheet, including Judy Kindell and Sharon Light, Lerner's senior technical advisors.[192]

The close involvement of Lerner's team shows the degree of importance that the IRS placed utilizing the guide sheet to influence how Cincinnati reviewed the backlogged applications.  Seto explained that the guide sheet was intended to be a template for Cincinnati employees in evaluating and processing backlogged applications.  He testified:

Q     Was the guide sheet intended to be used as a template for [EO Determinations] personnel to base development – further development letters?

A     Yes, the guide sheet look at the element [*sic*], and the EO Determinations specialists would analyze – analyze the facts against the guide sheet and see whether it is educational, political

---

[189] E-mail from Michael Seto, Internal Revenue Serv., to Hilary Goehausen & Justin Lowe, Internal Revenue Serv. (July 24, 2011)  [IRSR 69916].
[190] Transcribed interview of Hilary Goehausen, Internal Revenue Serv., in Wash., D.C. (July 2, 2013); E-mail from Michael Seto, Internal Revenue Serv., to Hilary Goehausen & Justin Lowe, Internal Revenue Serv. (July 24, 2011) [IRSR 69916].
[191] Transcribed interview of Hilary Goehausen, Internal Revenue Serv., in Wash., D.C. (July 2, 2013).
[192] Transcribed interview of Judith Kindell, Internal Revenue Serv., in Wash., D.C. (Oct. 29, 2013).

Exhibit D

intervention and so forth, so they could develop and process the case.[193]

To this end, Seto sent the guide sheet to Thomas in November 2011.[194]

Once the Cincinnati office received the guide sheet, it assembled a team of senior agents to use the document to begin processing the application backlog.  Cindy Thomas testified that Washington approved and supported this approach for processing the backlog.[195]  She testified:

> A      When – in November of 2011 we got this like guide sheet and then it was, the discussions were going to be moving forward with getting these cases. So I believe it was a discussion with the Washington office about how are we going to start processing these cases. . . . So [we] put this team together and then have them start sending out the development letters. Also we have a representative from [EO Quality Assurance] that would be involved, and also two tax law specialists from the Washington office would be involved. So that team would be in place that I had been looking for many months prior or years prior.
>
> Q      And so Washington knew you were putting this team together and they approved of this process?
>
> A      Oh, yes.
>
> Q      They were supportive of the efforts to try to put this team together?
>
> A      Yes.[196]

Cincinnati revenue agent Stephen Seok was selected to lead this "advocacy team."[197]  At the time, there were about 160 to 170 pending Tea Party applications in the Cincinnati backlog.[198]  As the advocacy team began to process this backlog using Washington's guide sheet, the guide sheet's use led to objectionable and harassing information-request letters.

## January 2012: Washington's guide sheet leads to objectionable questions to applicants

[193] Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. (July 11, 2013).

[194] *Id.*; E-mail from Michael Seto, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Nov. 6, 2011) [IRSR 69902].

[195] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

[196] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

[197] Transcribed interview of Stephen Daejin Seok, Internal Revenue Serv., in Wash., D.C. (June 19, 2013).

[198] *Id.*

28

Exhibit D

After almost two years of inaction, the IRS Cincinnati office began to process backlogged Tea Party applications in January 2012 using the guide sheet drafted by the Washington office. Using this guide sheet, the agents drafted questions – later deemed to be inappropriate – designed to solicit information mandated by the guide sheet.  These inappropriate questions raised significant public and congressional interest in how the IRS was processing Tea Party tax-exempt applications.

Beginning in January 2012, the Cincinnati advocacy team began using the guide sheet to draft questions in information-request letters sent to applicants.[199]  Specifically, team leader Stephen Seok testified that he "developed those questions mostly out of the EO Tech guidance worksheet. . . .  [T]he EO Tech guidance worksheet did not give us the sample of questions, but has very . . . detailed, extensive, the issues and questions there.  So I took those, made into the questionnaire – questions, most of my questions."[200]  The questions developed based on the guide sheet included questions asking for information about groups' donors, which Seok said were "consistent" with the guide sheet.[201]  The IRS and the inspector general later found some of these questions to be inappropriate.

Separately in January 2012, Cincinnati revenue agents began to realize the screening criteria used to identify applications were overly broad.  The BOLO language instituted in July 2011 by Lois Lerner had resulted in the over-inclusion of applications, capturing some applications that had absolutely no indications of political activity.[202]  For that reason, in late January 2012, the BOLO was again changed to read: "Political action type organizations involved in limiting/expanding Government, educating on the Constitution and Bill of Rights, social economic reform/movement."[203]  The January 2012 change would mark the final iteration of inappropriate BOLO criteria language.

## February 2012: The Oversight Committee seeks information from Lerner

The information-request letters sent by the IRS in early 2012 raised considerable alarms among the groups that received them.  In particular, the IRS's request for information about groups' donors and other questionable information concerned applicants who had already waited years for resolutions.  After some of these groups contacted their congressmen, the House Oversight and Government Reform Committee requested a meeting with the IRS to discuss the treatment of Tea Party applications.

In February 2012, Lerner briefed staff of the Oversight Committee about the IRS's process for evaluating tax-exempt applications.  Lerner never informed the Committee about the true nature of the IRS's treatment of the applications.  Instead, she told Committee staff that the IRS's criteria for evaluating tax-exempt applications had not changed.  Lerner also mentioned to the staff the guide sheet developed by the Washington office and used by revenue agents to

---

[199] *Id.*
[200] *Id.*
[201] *Id.*
[202] *See* Transcribed interview of Ronald Bell, Internal Revenue Serv., in Wash., D.C. (June 13, 2013).
[203] Internal Revenue Serv., BOLO Iteration History.

Exhibit D

process applications.  Lerner agreed to provide a copy of the guide sheet to the Committee.[204]
As a product of this meeting, Chairman Issa and Chairman Jordan later sent a formal letter to
Lerner requesting information in March 2012.[205]

Following the Committee's briefing with Lerner, Committee staff contacted the Treasury
Inspector General for Tax Administration (TIGTA) to discuss how the IRS processes tax-exempt
applications.  Committee staff met with TIGTA representatives on March 8, 2012.[206]  After the
meeting, TIGTA began an audit into the IRS's process for evaluating tax-exempt applications.
Despite a formal request from Chairman Issa and Chairman Jordan for periodic briefings[207] – as
well as multiple requests from Committee staff – TIGTA did not inform the Committee of its
findings until late on May 10, 2013.[208]

Lerner's promise to provide the Committee with the guide sheet sparked a mild panic
within the IRS, because the guide sheet had not been vetted for release outside of the IRS by the
Chief Counsel's office.  Lerner asked the Chief Counsel's office to conduct a rushed, twenty-
four-hour review of the document.[209]  Although they worked hard to review and edit the
document, the attorneys in the Chief Counsel's office did not believe the guide sheet was ready
for "prime time."[210]  Lerner's staff, conversely, believed the version edited by the attorneys was
too wonky and not practical.

For two months, Lerner's staff traded versions with Chief Counsel attorneys, until finally
Lerner decided not to publicize the guide sheet or to provide it to the Committee – despite her
promise to do so.[211]  By that time, the IRS's own internal review had identified serious problems
with the treatment of the Tea Party applications.

### Spring 2012: The IRS's internal review identifies misconduct

By early 2012, questions about the IRS's treatment of conservative-leaning tax-exempt
applicants began to receive significant public attention.  This public scrutiny and congressional
attention led the IRS to initiate an internal review of the allegations of harassment and
inappropriate treatment of Tea Party tax-exempt applicants.  By early May 2012, this internal
review identified the same severe misconduct that the inspector general's report documented a
year later.

---

[204] Briefing by Lois Lerner, Internal Revenue Serv., to H. Comm. on Oversight & Gov't Reform staff (Feb. 24,
2012).
[205] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Lois Lerner, Internal
Revenue Serv. (Mar. 27, 2012).
[206] Treasury Inspector Gen. for Tax Admin., What is the timeline for TIGTA's involvement with this tax-exempt
issue (provided to the Committee May 2013).
[207] See Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to J. Russell George,
Treasury Inspector Gen. for Tax Admin. (June 28, 2012).
[208] Treasury Inspector Gen. for Tax Admin., What is the timeline for TIGTA's involvement with this tax-exempt
issue (provided to the Committee May 2013).
[209] Transcribed interview of David Marshall, Internal Revenue Serv., in Wash., D.C. (July 26, 2013); Transcribed
interview of Janine Cook, Internal Revenue Serv., in Wash., D.C. (Aug. 23, 2013).
[210] Transcribed interview of Don Spellmann, Internal Revenue Serv., in Wash., D.C. (July 12, 2013).
[211] Transcribed interview of Judith Kindell, Internal Revenue Serv., in Wash., D.C. (Oct. 29, 2013).

Exhibit D

In late February 2012, following Lerner's briefing with the Oversight Committee, Deputy Commissioner Steve Miller requested a meeting with Lerner to discuss the IRS's treatment of these applications.  Lerner informed Miller that there was a backlog of about 200 applications, that the applications were severely delayed, and that the IRS had issued development letters asking for donor information from applicants.[212]  Miller passed along this information to IRS Commissioner Doug Shulman.[213]

Meanwhile, Congress began to ask critical questions.  During a hearing before the Ways and Means Subcommittee on Oversight on March 22, 2012, Subcommittee Chairman Charles Boustany asked Commissioner Shulman about the reports of IRS harassment of Tea Party groups.  Shulman testified:

> Rep. BOUSTANY.    One other question.  It's come to my attention, I've gotten a number of letters, we've seen some recent press allegations that the IRS is targeting certain Tea Party groups [a]cross the country — requesting owners' documents requests, delaying approval for tax-exempt status and that kind of thing.  Can you elaborate on what's going on with that?  **Can you give us assurances that the IRS is not targeting particular groups based on political leanings**?

> Mr. SHULMAN.    Thanks for bringing this up because I think there's been a lot of press about this and a lot of moving information, so I appreciate the opportunity to clarify.  **First, let me start by saying, yes, I can give you assurances**.[214]

Whether a coincidence or not, the day after Commissioner Shulman's "assurances," on March 23, Miller convened a meeting of his senior staff to discuss the Tea Party applications.[215]  Miller opted to launch an internal review of the processing of the cases "to find out why the cases were there and what was going on."[216]  Miller articulated a concern that the IRS's requests for applicants' donor information "were not very good."[217]

Miller chose senior IRS employee Nan Marks to conduct the internal review.  A veteran of the IRS Chief Counsel's office and the TEGE Commissioner's office, Miller respected

---

[212] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).
[213] *Id.*
[214] *"Internal Revenue Service Operations and the 2012 Tax Return Filing Season": Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways &Means*, 112th Cong. (2012) (question and answer with Chairman Boustany) (emphasis added).
[215] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).
[216] *Id.*
[217] *Id.*

Exhibit D

Marks's judgment and independence.[218]   Miller asked Marks to investigate the allegations of misconduct that had been made in the media and in congressional letters.  Marks testified:

> Q    How was the purpose of the review described to you?
>
> A    [Mr. Miller] discussed the allegations that he was hearing that cases were being targeted based on possibly who they were or what they believed; that people were getting questions that went beyond the scope of normal case development; that cases were staying open for a long time.  And he said, I want you to find out if any of these problems are actually present, and if they are, I want you to come back and tell me what you're finding and tell me what you think we could do to get the cases back on the right track and ensure that this isn't happening.
>
> ***
>
> Q    Was any part of your review intended to determine whether Tea Party organizations were being treated similarly to other types of organizations on different parts of the political spectrum?
>
> A    Well, the allegation that they were being treated differently was one of the concerns.  So, yeah, part of what I would have been looking at is were taxpayers being treated differently based on who they were. I'm not sure at the time whether that was said as Tea Party or whether that was said as conservative, I don't know.  But one of the allegations was that taxpayers were being treated differently based on who they were.  And if that was happening, that's wrong.  I mean, taxpayers should be treated based on what they do.[219]

Marks began the internal review in April 2012.[220]   She traveled from Washington to Cincinnati with a team of Washington officials to conduct the review.[221]   Her team reviewed a sampling of application files and information-request letters, and also conducted a group interview with several Cincinnati employees.[222]   Early on, it became apparent to Marks's team that misconduct had occurred, particular with respect to IRS requests for applicants' donor information.  Marks testified: "Judy Kindell and somebody else did that [information-request letter] review, and before I went down to Cincinnati they came back and reported that they were seeing some questions that they thought were overreaching in almost any context."[223]

---

[218] *Id.*
[219] Transcribed Interview of Nancy Marks, in Wash., D.C. (Oct. 8, 2013).
[220] *Id.*
[221] Marks herself traveled twice – once from April 23 to 26, 2012, and again from April 30 to May 2, 2012 – to Cincinnati.  E-mail from Cathy Barre, Internal Revenue Serv., to Oversight Committee staff (July 10, 2013).
[222] Transcribed interview of Nancy Marks, in Wash., D.C. (Oct. 8, 2013).
[223] Transcribed Interview of Nancy Marks, in Wash., D.C. (Oct. 8, 2013).

Exhibit D

By late April 2012, Marks and her team had completed the review.  She presented her findings at a meeting on May 3 to Miller; Lerner; Miller's Chief of Staff, Nikole Flax; EO Rulings and Agreements Director, Holly Paz; Acting TEGE Commissioner, Joseph Grant; and TEGE Commissioner, Sarah Hall Ingram.[224]  Marks informed the group about the use of the BOLO and inappropriate screening criteria to identify applications, the excessive processing delays experienced by the applicants, the use of inappropriate questions, and the fact that Washington had worked two test cases years earlier.[225]

Miller described Marks's findings during his transcribed interview with Committee staff. He testified:

> A   She said that there were cases there, that there were problems in training, there were problems in coordination, there were problems in development. She indicated that the cases needed development, and that was the first I heard about the BOLO list. She also told me that the BOLO list was fixed. She gave me a rough timeline of when it changed and the variations on a theme, and she told me they found no evidence of wrongdoing, intentional wrongdoing, that this seemed to be inappropriate and foolish, but not intentionally political or otherwise.

<div align="center">***</div>

> Q   Sir, when Ms. Marks informed you of the BOLO, did she explain to you what the criteria was in each iteration of the BOLO?
>
> A   Roughly.
>
> Q   Do you recall what she told you?
>
> A   She told me about the names and that it had changed at one point. I don't think she was precise on the time.  She walked me through the names, Lois' revision, the subsequent change again, and where they were then.
>
> Q   She told you initially it was Tea Party, Patriots, 9/12?
>
> A   I believe so.

<div align="center">***</div>

---

[224] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013); Transcribed interview of Nancy Marks, in Wash., D.C. (Oct. 8, 2013); Transcribed interview of Sarah Hall Ingram, Internal Revenue Serv., in Wash., D.C. (Sept. 23, 2013); Transcribed interview of Joseph Grant, in Wash., D.C. (Sept. 25, 2013); Transcribed interview of Nikole Flax, Internal Revenue Serv., in Wash., D.C. (Oct. 22, 2013).
[225] *Id.*

<div align="center">33</div>

<div align="right">Exhibit D</div>

Q     And did Ms. Marks give you any information about how long the cases had been pending, the delays?

A     She gave me some sense that they had been waiting a long time, the original 2010 date, and that they were not being worked on as actively as they needed to be.

<center>***</center>

Q     And did Ms. Marks explain to you any information on the specific questions asked of the applicants in the development letters?

A     So I think there was a discussion of some coordination that was going on, but I get a little confused, frankly, as to whether that was part of the discussion in February or May, but I think there was some in both.

Q     I see.  And, sir, at this time, in May of 2012, did Ms. Marks give you any information about these two or three cases being sent to Washington for development?

A     I think as she wound me through how this had happened, I think she did at that point talk about that.

Q     Do you recall what she told you about that?

A     It was just – my impression is it was not dissimilar from what was said in the TIGTA report itself.  There were a couple of cases that were sent and sent back and that they worked on them, but it was not – there was not a heavy discussion on that.  It's just how we got into the flow of the discussion.

Q     I see.  And did Ms. Marks give you any sense of the fact that the backlogged cases in Cincinnati were waiting pending guidance from the specialists in Washington?

A     Yes.  There was clearly a disconnect between the specialists in Washington and the Cincinnati office.

Q     Sir, what was your reaction to hearing Ms. Marks present this information to you?

A     Well, I thought we needed to move the cases along, we needed to get the people the help they needed to move those cases along, and those cases that should have been approved should have been moving.

<center>34</center>

Exhibit D

Q       Did you see the situation she described as a problem?

A       Yes.[226]

The findings of the IRS internal review in May 2012 mirrored the same conclusions that TIGTA identified in its May 2013 audit.  In fact, Holly Paz admitted that the IRS reached the same conclusions as TIGTA in her transcribed interview with Committee staff.  She testified:

Q       Ms. Marks actually briefed [the Oversight Committee after May 10, 2013] and informed us that essentially her findings [after the internal review in May 2012] were essentially the same as what ultimately TIGTA reported this year.  Is that consistent with your understanding?

A.      Yes.  That is consistent with my understanding.[227]

Miller also agreed, testifying that he was aware of the issues identified by TIGTA in the first week of May 2012, and that Commissioner Shulman "probably knew shortly after that."[228] Despite these findings of serious wrongdoing and the awareness of interest from Members of Congress, the IRS never disclosed the results of its internal review until after Lois Lerner's staged apology in May 2013.

In May 2012, the Washington tax law specialists assisted the Cincinnati office in implementing a new "bucketing" system to process the backlog.  Miller initially received weekly updates on the progress throughout the summer.[229]  During this time, both Commissioner Shulman and Deputy Commissioner Miller testified before Congress.[230]  Neither raised the findings of the internal review in that setting or apologized for the IRS's inappropriate treatment of tax-exempt applicants.  The full extent of the IRS's misconduct would not be known for another year.

## May 2013: The IRS finally acknowledges and apologizes for the targeting

Over three years since the initial Tea Party application was identified and elevated, the IRS was prepared finally to acknowledge and apologize for its targeting of conservative tax-exempt applicants.  Senior leaders in the agency sought a venue in which to release the information to a friendly audience as a way to minimize the fallout of the soon-to-be-released

---

[226] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).

[227] Transcribed interview of Holly Paz, Internal Revenue Serv., in Wash., D.C. (May 21, 2013).

[228] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).

[229] Id.

[230] See, e.g., "IRS: Enforcing ObamaCare's New Rules and Taxes": Hearing Before the H. Comm. on Oversight & Gov't Reform, 112th Cong. (2012); See "Public Charity Organizational Issues, Unrelated Business Income Tax, and the Revised Form 990": Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways & Means, 112th Cong. (2012).

Exhibit D

inspector general report. They ultimately selected an obscure tax-law panel event on Friday morning, May 10, 2013.

By spring 2013, the Treasury Inspector General for Tax Administration (TIGTA) was preparing to finalize and issue its audit on the IRS's evaluation of tax-exempt applications. This audit had been requested by the Oversight Committee in March 2012. As TIGTA completed its work, it kept IRS leadership – including Lois Lerner and Holly Paz – fully informed of its progress, even sending drafts of the audit report to the IRS for comments. This awareness allowed the IRS to plan its apology to preempt any publicity around TIGTA's audit report.

In April, Acting Commissioner Steve Miller and his chief of staff, Nikole Flax, considered various venues for releasing the information. One such venue was an April 25 Georgetown University tax conference at which Lois Lerner was scheduled to speak. Miller and Flax drafted remarks for Lerner to insert into her speech for that event.[231] The IRS's planning went so far as to include sharing these remarks with senior political and public affairs employees at the Treasury Department.[232] According to Miller, although the Treasury Department "didn't have a view that we shouldn't . . . start the ball rolling," it vetoed the announcement at that time.[233]

Miller and Flax considered two other possible venues in early May – two congressional hearings featuring Miller and Lerner, respectively – before settling on an American Bar Association panel event in early May. On May 7, during a meeting in Miller's office, Miller handed Lerner his handwritten talking points for the apology and directed her to make the apology at the ABA event three days later.[234] Miller also spoke with Mark Patterson, chief of staff at the Treasury Department, about the planned apology. According to Miller, Patterson told him: "I'm not against trying to get in front of this, but let me think about this one."[235] When Patterson did not object, Miller went forward with the plan.[236]

The IRS public affairs team notified selected reporters in advance of Lerner's apology. The IRS apparently stressed that the announcement would concern 501(c)(4) groups and political speech. In an e-mail from one reporter to IRS public affairs officials, he wrote: "Thanks for the heads-up. . . . My colleague . . . is going to be at the conference tomorrow. He covers campaign finance issues for us and has written a lot on 501c3 and related issues."[237]

On May 9, in a closed-door meeting with members of the American Bar Association, Miller and other IRS executives softened the ground for Lerner's apology. Miller's handwritten notes reflect that he provided a "short outline of what happened," including that the targeting was

---

[231] *See* E-mail from Nikole Flax, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (Apr. 23, 2013) [IRSR 189013].
[232] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013); E-mail from Nikole Flax, Internal Revenue Serv., to Adewale Adeyemo, Dep't of the Treasury (Apr. 22, 2013) [IRSR 466707].
[233] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).
[234] Transcribed interview of Sharon Light, in Wash., D.C. (Sept. 5, 2013).
[235] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).
[236] *Id.*
[237] E-mail from Richard Rubin, Bloomberg News, to Dean Patterson & Michelle Eldridge, Internal Revenue Serv. (May 9, 2013) [IRSR 544994].

Exhibit D

the result of "not [a] political vendetta by low-level [staff,] but dumb" actions.[238]  Miller also tied the actions back to the Supreme Court's *Citizens United* decision, indicating that after the decision "a wave of cash" "chose a favorable port due to disclosure and unenforced gift tax rules."[239]  The IRS asked for "how the ABA might help."[240]

On May 10, the IRS made its apology.  In response to a planted question from tax attorney Celia Roady, Lois Lerner told the audience about the IRS's treatment of Tea Party applicants.  She said:

> So our line people in Cincinnati who handled the applications did what we call centralization of these cases.  They centralized work on these in one particular group. . . .  However, in these cases, the way they did the centralization was not so fine.  Instead of referring to the cases as advocacy cases, they actually used case names on this list.  They used names like Tea Party or Patriots and they selected cases simply because the applications had those names in the title.  **That was wrong, that was absolutely incorrect, insensitive, and inappropriate – that's not how we go about selecting cases for further review.  We don't select for review because they have a particular name.**[241]

In making these statements, Lerner disclosed details about an audit report prepared by TIGTA, an independent inspector general, before it was made public by the inspector general.  Inspector General J. Russell George testified to the Committee that he had never seen an IRS official leak the findings of a TIGTA report before it was made public by the agency.[242]  Lerner's disclosure occurred even before TIGTA had finished its clearance process for the report.[243]

Lerner's apology on May 10, 2013, did not tell the whole story of the IRS's misconduct.  As the Committee's investigation shows, there is far more to how the IRS mistreated conservative-oriented tax-exempt applicants.

## Lessons from the targeting: What the Committee has found about the IRS's inappropriate treatment of conservatives

The Committee's investigation to date has found that the IRS targeted conservative-leaning organizations applying for tax-exempt status.  The investigation has also found that senior IRS officials knew of the targeting and made false and misleading statements to Congress in 2012 when asked about allegations of misconduct.  The targeting of conservative tax-exempt applicants and the deliberate efforts to mislead Congress about it directly harmed those

---

[238] Internal Revenue Serv., Handwritten Notes of "ABA Closed Door" (May 9, 2013) [IRSR 505855-58].
[239] *Id.*
[240] *Id.*
[241] Rick Hasen, *Transcript of Lois Lerner's Remarks at Tax Meeting Sparking IRS Controversy*, ELECTION LAW BLOG (May 11, 2013, 7:37AM), http://electionlawblog.org/?p=50160 (emphasis added).
[242] *"The IRS: Targeting Americans for their Political Beliefs": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013) (question and answer with Rep. Clay).
[243] *Id.*

Exhibit D

applicants and prevented the truth from emerging until a planted question at a Friday morning tax conference.  As a whole, these findings show deep and troubling flaws in how the IRS evaluates applications for tax-exempt status and how it views itself as a tax administrator.

## *The IRS targeted conservative groups*

The Internal Revenue Serve targeted conservative tax-exempt applicants.  The IRS targeting manifested in four distinct ways: (1) the use of inappropriate screening criteria to identify and set aside applications; (2) the backlog of applications that were held pending guidance from Washington; (3) the substantial delays in processing these applications; and (4) the burdensome and inappropriate development letters sent to applications, including questions asking for donor information.  In each of these ways, the IRS treated conservative groups applying for tax-exempt status in a manner distinct from other groups engaged in similar activities.

The Committee's finding supports the independent conclusions reached by the Treasury Inspector General for Tax Administration in its May 2013 audit report.[244]  Documents and testimony obtained by the Committee disprove the narrative that the IRS did not specifically target conservative groups.  Congressional Democrats and others claimed that the IRS did not scrutinize § 501(c)(4) applicants based on their political affiliation because some groups with non-conservative affiliations were affected by the inappropriate screening criteria.[245]  This is false.  Documents and testimony show that conservative groups were targeted on the basis of their political beliefs, unlike liberal groups, whose applications were snared in the targeted screening process inadvertently.

The IRS's three "test" cases were all conservative organizations.  Only seven applications in the IRS backlog contained the word "progress" or "progressive,"[246] all of which were then approved by the IRS,[247] while Tea Party groups received unprecedented review and experienced years-long delays. While some liberal-oriented groups were singled out for scrutiny, evidence obtained by the Committee shows these applications were scrutinized for non-political reasons. A 141-page staff report released in April 2014 contains the Committee's findings with respect to the myth that the IRS targeted liberal- and progressive-leaning groups.[248]  Additionally, according to publicly available information, over 80 percent of the 162 applications in the IRS's

---

[244] *See* TIGTA Audit Rpt., *supra* note 20.

[245] *See* Lauren French & Rachael Bade, *Democratic Memo: IRS Targeting Was Not Political*, POLITICO, July 17, 2013.

[246] "The IRS's Systematic Delay and Scrutiny of Tea Party Applications": Hearing before the H. Comm. on Oversight & Gov't Reform, 113th Cong. (2013) (statement of J. Russell George).

[247] Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit: Hearing before the Subcomm. on Oversight of the H. Comm. on Ways & Means, 113th Con. (2013) (opening statement of Chairman Boustany).

[248] H. COMM. ON OVERSIGHT & GOV'T REFORM, DEBUNKING THE MYTH THAT THE IRS TARGETED PROGRESSIVES: HOW THE IRS AND CONGRESSIONAL DEMOCRATS MISLED AMERICA ABOUT DISPARATE TREATMENT (Apr. 7, 2014).

Exhibit D

backlog were readily identifiable as submitted by conservative-leaning organizations.[249]  Only 11 total applications were readily identifiable as submitted by liberal-leaning organizations.[250]

The Committee also found that the IRS was acutely aware of political pressure from the Obama Administration, Congressional Democrats, and the media to crack down on conservative tax-exempt groups engaged in lawful political speech activities.  The IRS subsequently treated conservative-leaning tax-exempt applicants in a manner different from other applications for tax exemption.

## The IRS was acutely aware of political rhetoric pressing the IRS to regulate conservative tax-exempt groups engaged in political activity

The Committee's September 2013 interim update memorandum on the investigation explained how officials at every level within the IRS were aware of political rhetoric urging the agency to aggressively pursue conservative groups engaged in political activity.  The Committee explained:

> Like any other political actor, the IRS was cognizant of and attentive to the prevailing rhetoric surrounding the laws and regulations it controls. As the prevalent political discourse became a sustained assault on the Supreme Court's *Citizens United* opinion and the appropriateness of tax-exempt status for certain groups, the IRS was not oblivious to this political sentiment.  Material available to the Committee shows that the IRS was actively cognizant of public calls for the IRS to crack down on secret money in politics and the rise of conservative-oriented groups opposed by certain segments of the Administration.[251]

Since then, additional documents produced to the Committee confirm the IRS's keen awareness of calls from the media and prominent public figures to crack down on conservative-oriented tax-exempt groups engaged in political activity.

Throughout 2010, President Obama publicly and repeatedly criticized the *Citizens United* decision and lamented the "flood of deceptive attack ads sponsored by special interests using front groups with misleading names."[252]  As the President and his allies publicly attacked conservative tax-exempt groups engaged in political speech, the IRS received regular media inquiries about the matter.  For example, on August 6, 2010, Michelle Eldridge, an IRS media relations employee, e-mailed senior IRS officials, including Steve Miller, Sarah Hall Ingram,

---

[249] *See* Gregory Korte, *IRS List Reveals Concerns over Tea Party 'Propaganda,'* USA TODAY, Sept. 18, 2013.
[250] *Id.*
[251] Memorandum from Majority Staff, H. Comm. on Oversight & Gov't Reform, to Members, H. Comm. on Oversight & Gov't Reform, "Interim update on the Committee's investigation of the Internal Revenue Service's inappropriate treatment of certain tax-exempt applicants, (Sept. 17, 2013).
[252] *See id.*, at 3-6; HOW POLITICS LED THE IRS TO TARGET CONSERVATIVE TAX-EXEMPT APPLICANTS, *supra* note 4.

Exhibit D

Lois Lerner, and IRS Chief of Staff Jonathan Davis, about a forthcoming *Washington Post* article on 501(c)(4) groups engaged in political activity.[253]  She wrote:

> *Washington Post* reporter . . . is working on a story that as he explains it, is
> about the new importance of IRS regulations covering campaign/election-
> related activity for section 501c4 and 527 groups in light of a recent
> Supreme Court decision freeing corporations to run campaign ads.  The
> premise of his story, in his words, is that the IRS has a harder time
> regulating money in politics than the FEC because it is primarily a bill
> collector and not an enforcement agency.[254]

Later in August, Lerner e-mailed Ingram an article that the Democratic Congressional Campaign Committee had filed a complaint with the IRS about the conservative group, Americans for Prosperity.[255]  Lerner recognized how the prevailing political environment affected the IRS, opining: "We won't be able to stay out of this – we need a plan!"[256]

**Figure 6: E-mail from Lois Lerner to Sarah Hall Ingram, Aug. 31, 2010**

| From: | Lerner Lois G |
|---|---|
| Sent: | Tuesday, August 31, 2010 6:36 PM |
| To: | Ingram Sarah H |
| Subject: | FW: New York Times:  Group Is Accused on Tax Exemption |

We won't be able to stay out of this--we need a plan!

Lois G. Lerner
Director, Exempt Organizations

In September 2010, as President Obama routinely criticized *Citizens United* during campaign stops for Democratic candidates, the *New York Times* sought to write an article about "a large upswing in the money donated to 501(c)(4)'s [and] that the IRS has too few resources to monitor and deal with compliance and enforcement issues in this area."[257]  The IRS allowed the reporter to speak to Lerner and her team about 501(c)(4) organizations.[258]  The article was published on the front page of the *Times* on September 21, 2010.[259]  In an e-mail that day, Ingram told her colleagues to expect that the "'secret donor' theme will continue – see Obama salvo and today's Diane Reehm [*sic*]."[260]  The *Diane Rehm Show* that aired that day discussed

---

[253] E-mail from Michelle Eldridge, Internal Revenue Serv., to Steven Miller et al., Internal Revenue Serv. (Aug. 6, 2010) [IRSR 452184].

[254] *Id.*

[255] E-mail from Lois Lerner, Internal Revenue Serv., to Sarah Hall Ingram, Internal Revenue Serv. (Aug. 31, 2010) [IRSR 632342].

[256] *Id.*

[257] E-mail from Michelle Eldridge, Internal Revenue Serv., to Doug Shulman et al., Internal Revenue Serv. (Sept. 20, 2010) [IRSR 250053].

[258] *Id.*

[259] *See* Michael Luo & Stephanie Strom, *Donor Names Remain Secret as Rules Shift*, N.Y. TIMES, Sept. 21, 2010.

[260] E-mail from Sarah Hall Ingram, Internal Revenue Serv., to Terry Lemons et al., Internal Revenue Serv. (Sept. 21, 2010) [IRSR 508974].

non-profit political speech, and featured an interview with Representative Chris Van Hollen (D-MD) discussing the shortcomings of *Citizens United* and campaign finance law.[261]

**Figure 7: E-mail from Sarah Hall Ingram to Terry Lemons et al., Sept. 21, 2010**

| From: | Ingram Sarah H |
| --- | --- |
| Sent: | Tuesday, September 21, 2010 7:52 AM |
| To: | Lemons Terry L; Pyrek Steve J; Lerner Lois G; Kindell Judith E; Grant Joseph H; Eldridge Michelle L |
| Subject: | RE: NY Times:  As Rules Shift, Donor Names Stay Secret |

Thanks, as always, for the excellent support from Media.  I do think it came out pretty well.  The "secret donor" theme will continue – see Obama salvo and today's Diane Reehm (sp).  At least SS started the idea that we don't have the law to do something, although Marcus had a flavor that we just don't care because we are a tax agency.  He should know better even if he is unhappy with the environment and the tax laws.

Later that month, Steve Pyrek, another IRS media official, circulated a *New York Times* article entitled, "Hidden Under Tax-Exempt Cloak, Political Dollars Flow."[262]  The article stated in part:

> With every election cycle comes a shadow army of benignly titled non-profit groups like Americans for Job Security, devoted to politically charged "issue advocacy," much of it negative. But they are now being heard as never before — in this year of midterm discontent, Tea Party ferment and the first test of the Supreme Court decision allowing unlimited, and often anonymous, corporate political spending. Already they have spent more than $100 million — mostly for Republicans and more than twice as much as at this point four years ago.[263]

The publication of two *New York Times* articles about the rise of tax-exempt groups engaged in political speech certainly did not escape the attention of the IRS.  The high-profile nature of the issue – generated by the President's almost daily stump speeches – ensured that the IRS would exert special scrutiny on conservative tax-exempt applicants engaged in the political process.

While the IRS assisted reports preparing articles that pushed for IRS action, it apparently took a different tack with articles critical of the IRS's actions on politically active tax-exempt entities.  In early October 2010, another IRS media affairs official, Terry Lemons, circulated a *New York Times* article entitled, "Republicans See a Political Motive in I.R.S. Audits."[264]  After Jonathan Davis forwarded the article to Doug Shulman, the former Commissioner's reply – "Let's discuss if we should put out a statement" – suggests that he may have wanted to issue a

---

[261] *The Diane Rehm Show* (Nat'l Public Radio radio broadcast Sept. 21, 2010), *transcript available at* http://thedianerehmshow.org/shows/2010-09-21/campaign-spending/transcript.

[262] E-mail from Steve Pyrek, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (Sept. 24, 2010) [IRSR 230887].

[263] Mike McIntire, *Hidden Under Tax-Exempt Cloak, Political Dollars Flow*, N.Y. TIMES, Sept. 23, 2010.

[264] E-mail from Terry Lemons, Internal Revenue Serv., to Jonathan Davis et al., Internal Revenue Serv. (Oct. 7, 2010) [IRSR 452205].

Exhibit D

statement to rebut the conservative allegations.[265]  Similarly, days later, in response to a *Wall Street Journal* editorial entitled, "Shutting up Business: Democrats unleash the IRS and Justice on donors to their political opponents," Lemons noted that the media affairs team would leave the editorial out of the IRS daily clips.[266]

Other documents show that the Treasury Department also paid close attention to media interest in *Citizens United* and 501(c)(4) political speech.  In response to one *Washington Post* story from August 2010, Ruth Madrigal, an attorney in the Department's Office of Tax Policy wrote her supervisor, Jeffrey Van Hove, a summary of the core issues.  She wrote:

> Before Citizens United, corporations (including c4s) were limited by the FEC rules re: campaign spending and disclosure and subject to immediate FEC enforcement action. . . .   Now that the FEC cannot prohibit corporations (including c4s) from making such expenditures . . . , there is some concern that aggressive c4s will be bolder and multiply, intervening in campaigns with relative impunity.  Also, as discussed, there may be a risk that temporary shell c4s will be set up for single elections to make expenditures for undisclosed donors, then shut down after the election.[267]

The next month, in September 2010, Madrigal sent to Van Hove an article from CBS News about anonymous donors to political campaigns.  She wrote: "Yet another one – CBS news picked up the story re: anonymous spending on campaign ads last night – they don't reference 501c4s specifically, but it seems this is what they are talking about.  This one tries to quantify the spending ($14 MM Republican, $3 MM Democrat in Aug/early Sept on Congressional TV ads)."[268]

This close attention to media interest surrounding non-profit political speech continued throughout 2013.[269]  Media reports during the period even encouraged the IRS to scrutinize conservative tax-exempt applicants.  In February 2012, an IRS line employee e-mailed his colleagues an article about Democratic attention to a conservative non-profit, writing: "Crossroads GPS in the news again."[270]  In May 2012, Michelle Eldridge e-mailed Lois Lerner a *USA Today* article reporting that an "anonymous donor gave $7 million to the American Action Network, a conservative group that spent millions to aid Republicans in the 2010 midterm

---

[265] E-mail from Doug Shulman, Internal Revenue Serv., to Jonathan Davis, Internal Revenue Serv. (Oct. 7, 2010) [IRSR 452205].

[266] E-mail from Terry Lemons, Internal Revenue Serv., to Frank Keith et al., Internal Revenue Serv. (Oct. 12, 2010) [IRSR 452185].

[267] E-mail from Ruth Madrigal, U.S. Dep't of the Treasury, to Jeffrey Van Hove, U.S. Dep't of the Treasury (Aug. 23, 2010) [OGR 11-7-13 2260].

[268] E-mail from Ruth Madrigal, U.S. Dep't of the Treasury, to Jeffrey Van Hove, U.S. Dep't of the Treasury (Sept. 22, 2010) [OGR 11-7-13 1840].

[269] *See, e.g.*, E-mail from Joseph Urban, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (Mar. 10, 2011) (circulating *Washington Post* article entitled, "Lax Internal Revenue Service rules help groups shield campaign donor identifies") [IRSR 350198]; E-mail from Michelle Eldridge, Internal Revenue Serv., to Patricia Haynes et al., Internal Revenue Serv. (Apr. 9, 2013) (circulating *Tax Notes Today* article entitled, "The intersection of the tax code and Citizens United") [IRSR 349473].

[270] E-mail from Joseph Herr, Internal Revenue Serv., to Steven Bowling & Stephen Seok, Internal Revenue Serv. (Feb. 17, 2012) [IRSR 529987].

Exhibit D

congressional elections . . . ."[271]  Lerner forwarded the article to Nan Downing, the manager of the unit within the IRS responsible for auditing tax-exempt groups, writing: "[redaction].  Let's talk."[272]  The IRS redacted a portion of Lerner's response for taxpayer confidentiality purposes pursuant to § 6103 of the tax code.  The fact that the IRS redacted Lerner's note for taxpayer confidentiality suggests that Lerner mentioned a particular taxpayer to Downing and sent her the article for auditing purposes.

Similarly, in June 2012, Lerner received a *Mother Jones* article in her e-mail entitled, "How Dark-Money Groups Sneak by the Taxman."[273]  The article described how "dark money in 2012 is being raised and spent by tax-exempt groups that aren't required to disclose their financial backers" and listed several conservative-oriented groups, including the American Action Network, Crossroads GPS, Americans for Prosperity, Freedom Works, and Citizens United.[274]  Lerner forwarded this article to Nan Downing as well.[275]  The IRS redacted Lerner's message to Downing for taxpayer confidentiality, suggesting again that Lerner referred a particular taxpayer for examination.

Throughout this time, as documented in the Committee's June 2014 staff report, the IRS faced substantial pressure from politicians as well.[276]  In September 2010, IRS employee Joseph Urban alerted senior Exempt Organizations leadership to a press release from the Democratic Congressional Campaign Committee that urged the IRS to investigate the conservative-leaning Americans for Prosperity.[277]  The next month, in October 2010, Urban circulated a press release from Senator Dick Durbin (D-IL), entitled "Durbin urges IRS to investigate spending by Crossroads."[278]  This press release urged the IRS to "quickly investigate the tax status of Crossroads GPS and other organizations that are directing millions of dollars into political advertising without disclosing their funding sources."[279]  Senator Max Baucus (D-MT) likewise urged the IRS to "survey major 501(c)(4), (c)(5) and (c)(6) organizations involved in political campaign activity to examine whether they are operated for the organization's intended tax exempt purpose and to ensure that political campaign activity is not the organization's primary activity."[280]  In March 2013, when asked about 501(c)(4) groups, Senator Carl Levin (D-MI) unabashedly told the *New York Times* "we're going to go after them."[281]

---

[271] E-mail from Michelle Eldridge, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (May 16, 2012) [IRSR 177205].

[272] E-mail from Lois Lerner, Internal Revenue Serv., to Nan Downing, Internal Revenue Serv. (May 16, 2012) [IRSR 177205].

[273] E-mail from Roberta Zarin, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (June 13, 2012) [IRSR 177479].

[274] Gavin Aronsen, *How Dark-Money Groups Sneak by the Taxman*, MOTHER JONES, June 13, 2013.

[275] E-mail from Lois Lerner, Internal Revenue Serv., to Nan Downing, Internal Revenue Serv. (June 13, 2012) [IRSR 177479].

[276] *See* HOW POLITICS LED THE IRS TO TARGET CONSERVATIVE TAX-EXEMPT APPLICANTS, *supra* note 4.

[277] E-mail from Joseph Urban, Internal Revenue Serv., to Sarah Hall Ingram et al., Internal Revenue Serv. (Sept. 1, 2010) [IRSR 487782].

[278] E-mail from Joseph Urban, Internal Revenue Serv., to Joseph Urban, Internal Revenue Serv. (Oct. 20, 2010) [IRS1810]; see *also* E-mail from Brad McConnell, U.S. Senate, to Jonathan Davis, Internal Revenue Serv. (Oct. 12, 2010) [IRSR 459311].

[279] *Id.*

[280] Letter from Max Baucus, S. Comm. on Finance, to Douglas H. Shulman, Internal Revenue Serv. (Sept. 28, 2010).

[281] Joe Nocera, *The Senate's Muckraker*, N.Y. TIMES, Mar. 18, 2013.

Exhibit D

Testimony from senior IRS officials during transcribed interviews with Committee staff confirms their awareness of this political pressure from public officials and the media. Former Commissioner Doug Shulman testified:

> Q    And, sir, were you aware of inquiries from Members of Congress about the potential illegality or inappropriateness of 501(c) status for groups engaged in political activities?
>
> A    I'm not sure I understand the question.
>
> Q    It's my understanding, sir, that Members of Congress were advocating for 501(c) status to be exclusive of groups that were involved in the political process, political campaign intervention.
>
> A    Well, so back, you know, around this time, 2012, I was getting lots of letters, you know, some from Congress, asking, you know, why are you asking these intrusive questions, and some from Members of Congress saying, why isn't the IRS doing more, you know, to enforce the 501(c)(4) laws.
>
>                                       \*\*\*
>
> Q    [I]t sounds like you were getting inquiries from Members of Congress that were urging you – some urging you to be less intrusive, and other urging you to sort of be more intrusive. Is that sort of a fair characterization?
>
> A    That's my memory, you know, that it felt like.[282]

Deputy Commissioner Steve Miller testified:

> Q    And, sir, you mentioned before you were aware of inquiries from Members of Congress about the potential inappropriateness of 501(c)(4) status for certain groups engaged in political activities?
>
> A    I don't know that I mentioned that, but there were letters all over the place. And some of them were about, you know, that there was too much politics going on in this area, and, you know, it went all over the place.
>
> Q    Sir, were you aware of any public discourse or debate about the appropriateness of (c)(4) status for certain conservative groups?
>
>                                         \*\*\*

---

[282] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).

Exhibit D

A       Well, I mean the *Politico* article that you showed me in the last hour obviously is one of those and there were other, similar discussions like that. But that had both sides of the argument on it.[283]

Miller also explained that the IRS "had, you know, Mr. Levin complaining bitterly to us about – Senator Levin complaining bitterly about our [section 501(c)(4)] regulation . . . ."[284]  Miller's chief of staff, Nikole Flax, testified:

Q       Were you aware of any inquiries from Members of Congress about the potential illegality or inappropriateness of (c)(4) status for certain groups engaged in political activity?

A       I'm aware of inquiries from Members of Congress where they asked about the status of particular organizations. I don't know if that is answering your question.

Q       About particular organizations –

A       Yes.

Q       By name?

A       Yes.

Q       Were you ever aware of any public discourse or debate about the appropriateness of 501(c)(4) status for certain conservative oriented groups?

A       I mean, I have seen, you know, public articles where folks have talked about that, but just like stuff in the press.

Q       Were you ever aware of any requests for the IRS to crack down on 501(c)(4)'s engaged in political activity?

A       There were Congressional requests that asked what we were doing in the area, that kind of thing.[285]

Joseph Grant, Acting Commissioner for Tax Exempt and Government Entities, testified:

---

[283] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).
[284] *Id.*
[285] Transcribed interview of Nikole Flax, Internal Revenue Serv., in Wash., D.C. (Oct. 22, 2013).

Exhibit D

Q      Were you ever aware of any public discourse or debate of the appropriateness of 501(c)(4) status for certain groups involved in political advocacy?

*** 

A      Well, I believe that some of the clips that would come across had Members of Congress talking about it, and there were editorials in the papers about it, and to the extent that I read newspapers and look at the comments, I'm aware that there's a public conversation going on, yes.[286]

Judith Kindell, Lerner's senior technical advisor, testified:

Q      Ms. Kindell, were you ever aware of any public discourse or debate about the appropriateness of 501(c)(4) status for certain groups involved in political activity?

A      Yes.

Q      Were you ever aware of requests for the IRS to crack down on 501(c)(4)s engaged in political activity?

A      Yes.

Q      Were you ever aware of any public comments from politicians of the potential illegality of secret money in politics?

A      Yes.[287]

Lois Lerner, likewise, in explaining American tax-exempt laws to an international colleague, described the pressure on the IRS to curb political activity of non-profit groups.  She wrote:

Of course we, the USA, have probably made things as complicated as possible and as a result, **there is a lot of screaming going on here about how many zillions of dollars are going into the political process**.  Of course, if you limit it just to charities, we have an absolute ban on political intervention, but the devil is in the details – what is and what is not political intervention![288]

---

[286] Transcribed interview of Joseph Grant, in Wash., D.C. (Sept. 25, 2013).
[287] Transcribed interview of Judith Kindell, Internal Revenue Serv., in Wash., D.C. (Oct. 29, 2013).
[288] E-mail from Lois Lerner, Internal Revenue Serv., to Cathy Hawara, Canada Revenue Agency (Sept. 10, 2012) (emphasis added) [IRSR 651662].

Exhibit D

Evidence uncovered by the Committee in the course of this investigation makes clear that the IRS was acutely aware of the prevalent political rhetoric pushing for the IRS to rein in political activities by conservative-leaning tax-exempt groups.  As the President and his allies repeated and forcefully denounced the lawful political activity of conservative-oriented 501(c)(4) groups, the IRS internalized these calls for reform.  The result was the disparate treatment of conservative applicants for tax-exempt status.

## The IRS treated conservative-affiliated applicants distinctly from other similarly situated applicants

The Committee's investigation determined that the IRS responded to this political pressure by treating conservative-oriented tax-exempt applicants in a manner distinct from other applicants.  Although IRS employees interviewed by the Committee deny any intentional political bias, documentary and testimonial evidence shows political rhetoric led to the IRS processing tax-exempt applications filed by conservative groups differently from similarly situated applicants.

The President's bully pulpit is an indisputably powerful tool of persuasion.  It extends not only to the policymakers in Washington, but also to the employees who implement the policy.  According to one study, "presidential rhetoric can be an effective means for altering how field agents implement public policy . . . ."[289]  The study examined how U.S. Attorneys responded to presidential rhetoric on the "War on Drugs."[290]  The authors explained their findings:

> [T]hese results provide strong and clear evidence for a managerial effect in the president's use of rhetoric to send policy signals and set the national agenda.  By going beyond traditional notions of presidential influence on the public agenda, the media, and Congress, these results reveal a direct mechanism the president wields in shifting compliance with their desires for public policy, if only because of their inability to personally oversee the vast majority of agents located throughout the country and around the world.  **Rhetoric provides a direct mechanism for the managerial influence of the president.**  What may be more surprising is how powerful this route is actually.[291]

They concluded: "Because of the wide discretion bureaucrats wield, rhetoric offers a substantial – and direct – role for presidential influence on field agencies."[292]

President Obama's rhetoric against conservative-oriented groups – rhetoric parroted by Democrats in Congress and the national media – influenced how the IRS engaged with these groups.  From his bully pulpit, the President repeatedly delegitimized the lawful political activities of conservative-oriented tax-exempt entities, prompting the IRS to view these groups

---

[289] Andrew B. Whitford & Jeff Yates, *Policy Signals and Executive Governance: Presidential Rhetoric in the "War on Drugs,"* 65 J. OF POL. 995, 996 (Nov. 2003).
[290] *Id.*
[291] *Id.* at 1004 (emphasis added).
[292] *Id.*

Exhibit D

with skepticism.  When a Cincinnati screener identified the first Tea Party application, he wrote to his supervisor: "Recent media attention to this type of organization indicates to me that this is a 'high profile' case."[293]  As the application continued to be elevated up the IRS, another employee called it a "potentially politically embarrassing case" and pointed out the "[r]ecent media attention to this type of organization."[294]  One IRS employee called the Tea Party a "loud group."[295]  Even Lois Lerner, the head of the Exempt Organization Division, echoed the President's view that conservative tax-exempt groups were a threat to democracy, calling the Tea Party applications "very dangerous."[296]

This rhetoric had a real effect.  The manner in which the IRS identified conservative-leaning groups was distinct from the manner in which it identified groups holding other political beliefs.  From February 2010 until July 2011, the IRS used screening criteria that captured predominantly conservative-leaning organizations.  According to the briefing paper prepared for Lerner in July 2011, the IRS identified applications and held them if they met any of the following criteria:

- "Tea Party," "Patriots" or "9/12 Project" is referenced in the case file
- Issues include government spending, government debt or taxes
- Education of the public by advocacy/lobbying to "make America a better place to live"
- Statements in the case file criticize how the country is being run . . . .[297]

Even after Lerner directed the criteria to be changed, the IRS still targeted only conservative groups.  Lerner viewed the term "Tea Party" to be "too pejorative."[298]  Her change to the criteria, accordingly, was only cosmetic.  Documents produced to the Committee verify this fact.  On a version of a summarized sensitive case report prepared for Lerner in August 2011 – after Lerner ordered the criteria changed – the entry labeled "political advocacy organizations" still read: "Whether a **tea party organization** meets the requirements under section 501(c)(3) and is not involved in political intervention.  Whether organization is conducting excessive political activity to deny exemption under section 501(c)(4)."[299]  On other documents, the IRS merely replaced the phrase "tea party" with the phrase "advocacy organizations" with no substantive changes to how it approached the applications.[300]

---

[293] E-mail from John J. Koester, Internal Revenue Serv., to John Shafer, Internal Revenue Serv. (Feb. 25, 2010) [Muthert 4-5].

[294] E-mail from Sharon Camarillo, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 25, 2010) [Muthert 3].

[295] Transcribed interview of David Fish, Internal Revenue Serv., in Wash., D.C. (Oct. 2, 2014).

[296] E-mail from Lois Lerner, Internal Revenue Serv., to Michael Seto, Internal Revenue Serv. (Feb. 1, 2011) [IRSR 161810].

[297] Justin Lowe, Internal Revenue Serv., Increase in (c)(3)/(c)(4) Advocacy Org. Applications (2011) [IRSR 2735].

[298] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013).

[299] Internal Revenue Serv., EO Technical Significant Case Report (Aug. 31, 2011) (emphasis added) [IRSR 151653].

[300] *Compare* Internal Revenue Serv., Sensitive Case Report (June 17, 2011) [IRSR 151687-88], *with* Internal Revenue Serv., Sensitive Case Report (Sept. 18, 2012) [IRSR 150608-09].

Figure 8: IRS Significant Case Report Summary, August 2011 (enlarged)

| | Name of Org/Group | Group #/Manager | EIN | Received | Issue |
|---|---|---|---|---|---|
| 1. | Political Advocacy Organizations | T2/Ron Shoemaker | 6103 6f... ▮ | 4/2/2010 | Whether a tea party organization meets the requirements under section 501(c)(3) and is not involved in political intervention. Whether organization is conducting excessive political activity to deny exemption under section 501(c)(4) |

The disparate treatment is also seen in significant differences between how the IRS used the "Be on the Look-Out" (BOLO) lists to screen liberal-leaning groups and conservative-oriented groups. Entries for "ACORN successors," which are liberal-leaning groups, appear on the "Watch List" tab of the BOLO spreadsheet whereas the conservative "Tea Party" criteria appear on the "Emerging Issues" tab. The Watch List includes potential applications that the IRS has not yet received, while entries labeled as an emerging issue include issues in applications received by the IRS arising from "significant current events."[301] Similarly, notes from a July 2010 screening group workshop ask employees to merely flag liberal-leaning applications, while directing them to send Tea Party applicants to a special coordinator.[302] The implication from these documents is that unlike liberal-leaning applications, the IRS actively identified and segregated conservative-oriented applications for special treatment. There is also no evidence that ACORN successors experienced any additional scrutiny as a result of being screened.

The President's political rhetoric also affected how applications were evaluated. According to information available to the Committee, the magnitude of review given to conservative-oriented applications was inordinate. In February 2011, Lerner directed Michael Seto, the manager of Exempt Organizations Technical Unit, to conduct a "multi-tier" review of the Tea Party test applications pending in Washington.[303] Lerner wrote: "This could be the vehicle to go to court on the issue of whether Citizen's [sic] United overturning ban on corporate spending applies to tax exempt rule. Counsel and Judy Kindell need to be in on this one please."[304]

Carter Hull, a veteran tax law specialist assigned to develop the test applications, testified that this multi-tier level of review was unusual in his experience with the IRS. He testified:

Q      Have you ever sent a case to Ms. Kindell before?

A      Not to my knowledge.

---

[301] Internal Revenue Serv., Heightened Awareness Issues [IRSR 6655-72].
[302] Internal Revenue Serv., Screening Workshop Notes (July 28, 2010) [IRS 6703-04].
[303] Transcribed interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. (July 11, 2013).
[304] E-mail from Lois Lerner, Internal Revenue Serv., to Michael Seto, Internal Revenue Serv. (Feb. 1, 2011) [IRSR 161810].

Q       This is the only case you remember?

A       Uh-huh.

Q       Correct?

A       This is the only case I remember sending directly to Judy.

***

Q       Had you ever sent a case to the Chief Counsel's office before?

A       I can't recall offhand.

Q       You can't recall. So in your 48 years of experience with the IRS, you don't recall sending a case to Ms. Kindell or a case to IRS Chief Counsel's office?

A       To Ms. Kindell, I don't recall ever sending a case before. To Chief Counsel, I am sure some cases went up there, but I can't give you those.

Q       Sitting here today you don't remember?

A       I don't remember.[305]

Similarly, Elizabeth Hofacre, the Cincinnati-based revenue agent initially assigned to develop cases, told the Committee during a July 2013 hearing that the involvement of Washington was "unusual."[306]  She testified:

I never before had to send development letters that I had drafted to EO Technical for review, and I never before had to send copies of applications and responses that were assigned to me to EO Technical for review.  I was frustrated because of what I perceived as micromanagement with respect to these applications.[307]

Hofacre's replacement on the cases, Ron Bell, also told the Committee that it was "unusual" to have to wait on Washington to move forward with an application.[308]  He testified:

---

[305] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013).
[306] *"The IRS's Systematic Delay and Scrutiny of Tea Party Applications": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013) (statement of Elizabeth Hofacre).
[307] *Id.*
[308] Transcribed interview of Ronald Bell, Internal Revenue Serv., in Wash., D.C. (June 13, 2013).

Exhibit D

Q      In your experience, was there anything different about the way that the Tea Party 501(c)(4) cases were treated that was as opposed to the previous 501(c)(4) applications that had some level of political engagement?

A      Yes.

Q      And what was different?

A      Well, they were segregated.  They seemed to have been more scrutinized.  I hadn't interacted with EO technical [in] Washington on cases really before.

Q      You had not?

A      Well, not a whole group of cases.[309]

Another Cincinnati employee, Stephen Seok, testified that the type of activities that the conservative applicants conducted made them different from other similar applications he had worked in the past.  He testified:

Q      And to your knowledge, the cases that you worked on, was there anything different or novel about the activities of the Tea Party cases compared to other (c)(4) cases you had seen before?

***

A      Normal (c)(4) cases we must develop the concept of social welfare, such as the community newspapers, or the poor, that types.  These organizations mostly concentrate on their activities on the limiting government, limiting government role, or reducing government size, or paying less tax.  I think it[']s different from the other social welfare organizations which are (c)(4).

***

Q      So the difference between the applications that you just described, the applications for folks that wanted to limit government, limit the role of government, the difference between those applications and the (c)(4) applications with political activity that you had worked in the past, was the nature of their ideology, or perspective, is that right?

A      Yeah, I think that's a fair statement.  But still, previously, I could work, I could work this type of organization, applied as a (c)(4),

---

[309] *Id.*

Exhibit D

that's possible, though.  Not exactly Tea Party, or 9-12, but dealing with the political ideology, that's possible, yes.

Q        So you may have in the past worked on applications from (c)(4), applicants seeking (c)(4) status that expressed a concern in ideology, but those applications were not treated or processed the same way that the Tea Party cases that we have been talking about today were processed, is that right?

A        Right.  Because that [was] way before these – these organizations were put together.  So that's way before.  If I worked those cases, way before this list is on.[310]

Cindy Thomas, manager of the Cincinnati office, likewise told the Committee that, unlike the systematic scrutiny given to the conservative-oriented applications as a result of the BOLO, liberal cases were never automatically elevated to the Washington office as a whole.  She testified:

Q        And were [the liberal] cases sent to Washington?

A        I'm not – I don't know.

Q        Not that you are aware?

A        I'm not aware of that.

Q        As the head of the Cincinnati office you were never aware that these cases were sent to Washington?

A        There could be cases that are transferred to the Washington office according to, like, our [Internal Revenue Manual] section. I mean, there's a lot of cases that are processed, and I don't know what happens to every one of them.

Q        Sure.  But these cases identified as progressive as a whole were never sent to Washington?

A        Not as a whole.[311]

The disparate treatment is most evident in the political breakdown of applications caught in the backlog.  As a result of the multi-tier review and the micromanagement from Washington, an excessive backlog of applications developed in Cincinnati.  The applications in this backlog were predominantly conservative.  Internally, the IRS acknowledged in 2012 that at least 75

---

[310] Transcribed interview of Stephen Daejin Seok, Internal Revenue Serv., in Wash., D.C. (June 19, 2013).

[311] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

Exhibit D

percent of 501(c)(4) applicants in the backlog were conservative.[312]  An independent analysis conducted by *USA Today* in 2013 confirmed this conclusion, finding that over 80 percent of the applications in the backlog were filed by conservative-leaning groups.[313]  A separate *USA Today* article reported that beginning in February 2010, the IRS approved no applications from Tea Party groups for 27 months, while "[i]n that time, the IRS approved perhaps dozens of applications from similar liberal and progressive groups."[314]

**Figure 9: E-mail from Judith Kindell to Lois Lerner, July 18, 2012**

| From: | Kindell Judith E |
|---|---|
| Sent: | Wednesday, July 18, 2012 10:54 AM |
| To: | Lerner Lois G |
| Cc: | Light Sharon P |
| Subject: | Bucketed cases |

Of the 84 (c)(3)

cases, slightly over half appear to be conservative leaning groups based solely

on the name.  The remainder do not obviously lean to either side of the

political spectrum.

Of the 199 (c)(4)

cases, approximately 3/4 appear to be conservative leaning while fewer than 10

appear to be liberal/progressive leaning groups based solely on the name.

The remainder do not obviously lean to either side of the political

spectrum.

Testimony from IRS revenue agents supports this conclusion.  Hofacre testified that she worked only Tea Party applications.[315]  Bell similarly testified that he handled exclusively Tea Party applications until the BOLO criteria were broadened in July 2011.[316]  Hull also stated that

---

[312] *See* E-mail from Judith Kindell, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (July 18, 2012) [IRSR 179406].

[313] *See* Gregory Korte, *IRS List Reveals Concerns over Tea Party 'Propaganda,'* USA TODAY, Sept. 18, 2013.

[314] Gregory Korte, *IRS Approved Liberal Groups while Tea Party in Limbo*, USA TODAY, May 15, 2013.

[315] Transcribed interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. (May 31, 2013).

[316] Transcribed interview of Ronald Bell, Internal Revenue Serv., in Wash., D.C. (June 13, 2013).

the two test cases he worked in the Washington office were both applications filed by Tea Party-related organizations.[317]

Despite efforts to confuse extraordinary scrutiny on Tea Party applications with routine examination of liberal groups, the facts tell a different story.  The IRS treated conservative tax-exempt applications in a manner different from other groups.  There is evidence that the President's rhetoric affected the IRS's treatment of conservative-leaning tax-exempt applicants.  Testimony shows the manner in which the IRS selected, processed, and evaluated these applications was distinct from other groups.  This treatment made it more difficult for conservative-oriented groups, most of which were formed in opposition to the President's policies, to engage in lawful political speech.

## Senior IRS officials covered up and misled Congress about the existence and nature of the IRS's targeting

The Committee has found that senior IRS officials – including former Commissioner Doug Shulman and Exempt Organizations Director Lois Lerner – covered up the existence and nature of the IRS's targeting of conservative-oriented tax-exempt applicants and knowingly misled Congress about the misconduct.  Lerner falsely justified the IRS's actions in two separate letters to the Oversight Committee and in two informal settings with Committee staff in spring 2012.  Shulman, likewise, erroneously gave the Ways and Means Committee "assurances" that targeting was not occurring in March 2012.  He did so despite knowing at the time about the backlog of applications, delays in processing, and the use of inappropriate development questions.  In addition, Deputy Commissioner Steven Miller withheld relevant and material information from Congress during congressional testimony.

### Lerner made false statements to the Committee

Beginning in June 2010, the IRS began receiving dozens of inquiries from Members of Congress asking about the handling of applications for tax-exempt status.[318]  One such inquiry came from Congressman Jim Jordan, Chairman of the Oversight Committee's Subcommittee on Regulatory Affairs, Stimulus Oversight, and Government Spending, in February 2012.[319]  Later, Chairman Issa and Chairman Jordan formally requested information from the IRS on March 27, 2012.[320]  Over this period, Lerner participated in two briefings with Committee staff and wrote two letters to Chairman Issa and Chairman Jordan.  In the course of these interactions, Lerner made several false statements.

---

[317] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013).

[318] *See* Letter from Kirsten Wielobob, Internal Revenue Serv., to Darrell Issa, H. Comm. on Oversight & Gov't Reform (May 21, 2013).

[319] *See* E-mail from Floyd Williams, Internal Revenue Serv., to Steven Miller et al., Internal Revenue Serv. (Feb. 17, 2012) [IRSR 1981-82].

[320] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Lois Lerner, Internal Revenue Serv. (Mar. 27, 2012).

Exhibit D

During a February 24, 2012, briefing, Committee staff asked Lerner whether the criteria for evaluating tax-exempt applications had changed at any point. Lerner responded that the criteria had not changed. In fact, they had. According to TIGTA and the Committee's own fact-finding, in summer 2011, Lerner directed that the criteria used to identify applications be changed.[321] This was the first time Lerner made a false or misleading statement during the Committee's investigation.

During another telephonic briefing on April 4, 2012, Lerner told Committee staff that the information the IRS was requesting in follow-up letters to conservative-leaning groups – which, in some cases, included a complete list of donors and their respective contributions – was not out of the ordinary. Similarly, on April 26, 2012, in Lerner's first written response to the Committee's request for information, Lerner wrote that the follow-up letters to conservative applicants were "in the ordinary course of the application process to obtain the information as the IRS deems it necessary to make a determination whether the organization meets the legal requirements for tax-exempt status."[322] Lerner's Executive Assistant, Dawn Marx, confirmed that Lerner prepared and signed this letter.[323]

In fact, the scope of the information that EO requested from conservative groups was extraordinary. At a briefing on May 13, 2013, IRS officials, including Nikole Flax, the IRS Acting Commissioner's Chief of Staff, could not identify any other instance in the agency's history in which the IRS asked groups for a complete list of donors with corresponding amounts.[324] These marked the second and third times Lerner made a false or misleading statement during the Committee's investigation.

Next, on May 4, 2012, in her second written response to the Committee, Lerner justified the extraordinary requests for additional information from conservative applicants for tax-exempt status.[325] Among other things, Lerner stated that IRS's "requests for information . . . are not beyond the scope of Form 1024 [the application for recognition under section 501(c)(4)]."[326] Lerner provided justification for 16 questions asked by the IRS of tax-exempt applicants, including requests for donor information, policy positions on important issues, and communications with elected representatives.[327] Lerner's Executive Assistant, Dawn Marx, testified that Lerner prepared and signed this letter as well.[328]

However, by April 25, 2012, the IRS had already identified seven types of information, including requests for donor information and policy positions, which it had inappropriately

---

[321] Briefing by Internal Revenue Serv. staff to Committee staff (May 13, 2013); TIGTA Audit Rpt., *supra* note 20.
[322] Letter from Lois G. Lerner, Internal Revenue Serv., to Darrell Issa, H. Comm. on Oversight & Gov't Reform (Apr. 26, 2012).
[323] *See* Transcribed interview of Dawn Marx, Internal Revenue Serv., in Wash., D.C. (Sept. 30, 2014).
[324] Briefing by Internal Revenue Serv. staff to Committee staff (May 13, 2013).
[325] Letter from Lois G. Lerner, Internal Revenue Serv., to Darrell Issa, H. Comm. on Oversight & Gov't Reform (May 4, 2012).
[326] *Id.* at 1.
[327] *Id.* at 23-25, 30-32, 42-44.
[328] *See* Transcribed interview of Dawn Marx, Internal Revenue Serv., in Wash., D.C. (Sept. 30, 2014).

Exhibit D

requested from conservative groups.[329]  According to the TIGTA audit report, Lerner had received a list of these unprecedented questions the same day – more than a week before she sent a letter to Chairman Issa defending the additional scrutiny applied to certain applicants.  In addition, on April 30, 2012, Lerner acknowledged in an e-mail to Nikole Flax that there was no "precedent" for the IRS to ask groups about their positions on issues important to them.[330]  Lerner's statement defending the information requests, when she knew they were inappropriate, was the fourth time she made a false or misleading statement during the Committee's investigation.

During a May 10, 2013, American Bar Association tax conference, Lerner revealed, through a question she planted with an audience member,[331] that the IRS knew that certain conservative groups had in fact been targeted for additional scrutiny.[332]  She blamed the inappropriate actions of the IRS on "line people" in Cincinnati.  She stated:

> So our line people in Cincinnati who handled the applications did what we call centralization of these cases.  They centralized work on these in one particular group. . . .  However, in these cases, the way they did the centralization was not so fine.  Instead of referring to the cases as advocacy cases, they actually used case names on this list.  They used names like Tea Party or Patriots and they selected cases simply because the applications had those names in the title.  **That was wrong, that was absolutely incorrect, insensitive, and inappropriate — that's not how we go about selecting cases for further review.  We don't select for review because they have a particular name.**[333]

This revelation occurred two days after Members of the House Ways and Means Subcommittee on Oversight had asked Lerner for an update on the IRS's internal investigation into allegations of improper targeting at a hearing.[334]  During the hearing, she declined to answer and directed Members to questionnaires on the IRS website.  Lerner's failure to disclose relevant information to the House Ways and Means Committee – opting instead to leak the damaging information during an obscure tax conference – was the final instance of Lerner's pattern of obstruction.

---

[329] *See* E-mail from Judith Kindell, Internal Revenue Serv., to Holly Paz & Sharon Light, Internal Revenue Serv. (Apr. 25, 2012) [IRSR 13868].

[330] E-mail from Lois Lerner, Internal Revenue Serv., to Nikole Flax, Internal Revenue Serv. (Apr. 30, 2012) [IRSR 464416].

[331] *Hearing on the IRS Targeting Conservative Groups: Hearing Before the H. Comm. on Ways & Means*, 113th Cong. (2013) (question and answer with Rep. Nunes); Bernie Becker, *Question that Revealed IRS Scandal was Planted, Chief Admits*, THE HILL, May 17, 2013; Abby Phillip, *IRS Planted Question About Tax Exempt Groups*, ABC NEWS, May 17, 2013.

[332] John D. McKinnon & Corey Boles, *IRS Apologizes for Scrutiny of Conservative Groups*, WALL ST. J., May 10, 2013; Jonathan Weisman, *IRS Apologizes to Tea Party Groups Over Audits of Applications for Tax Exemption*, N.Y. TIMES, May 10, 2013; Abram Brown, *IRS, to Tea Party: Sorry We Targeted You & Your Tax Status*, FORBES, May 10, 2013.

[333] Rick Hasen, *Transcript of Lois Lerner's Remarks at Tax Meeting Sparking IRS Controversy*, ELECTION LAW BLOG (May 11, 2013, 7:37AM),  http://electionlawblog.org/?p=50160 (emphasis added).

[334] "Hearing on the Oversight of Tax-Exempt Orgs.": Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways & Means,, 113th Cong. (2013).

Exhibit D

**Shulman gave false statements to Congress**

On March 22, 2012, then-IRS Commissioner Doug Shulman testified during a hearing of the Ways and Means Subcommittee on Oversight.  During the hearing, Shulman had an exchange with Subcommittee Chairman Boustany in which Shulman provided "assurances" that the IRS was not targeting conservative groups.  Shulman testified:

Rep. BOUSTANY.   One other question. It's come to my attention, I've gotten a number of letters, we've seen some recent press allegations that the IRS is targeting certain Tea Party groups [a]cross the country – requesting owners' documents requests, delaying approval for tax-exempt status and that kind of thing.  Can you elaborate on what's going on with that?  **Can you give us assurances that the IRS is not targeting particular groups based on political leanings?**

Mr. SHULMAN       Thanks for bringing this up because I think there's been a lot of press about this and a lot of moving information, so I appreciate the opportunity to clarify.  **First, let me start by saying, yes, I can give you assurances**. As you know, we pride ourselves on being a non-political, non-partisan organization.  I am the only – me and our chief counsel – are the only presidential appointees, and I have a five-year term that runs through presidential elections, just so we will have none of that kind of political intervention in things that we do.  For 501 (c)(4) organizations, which is what's been in the press, organizations do not need to apply for tax exemption.  Organizations can actually hold themselves out as 501 (c)(4) organizations and then file a 990 with us.  The organizations that have been in the press are all ones that are in the application process.  First of all, I think it's very important to emphasize that all of these organizations came in voluntarily.  They did not need to engage the IRS in a back-and-forth.  They could have held themselves out, filed a 990, and if we had seen an issue, we would have engaged but otherwise we wouldn't.  The basic rules around 501 (c)(4) organizations are that they need to be primarily engaged in promoting the common good and general welfare of their community.  They can be involved in political and campaign activity, but it can't be their primary purpose.  When people apply for 501 (c)(4) status, what we do is engage them in a number of questions about making sure that we understand their primary purpose around this and other sorts of engagement.   And so what's been

57

> happening has been the normal back-and-forth that happens
> with the IRS.   None of the alleged taxpayers – and
> obviously I can't talk about individual taxpayers and I'm
> not involved in these – are in an examination process.
> They're in an application process which they moved into
> voluntarily.  **There is absolutely no targeting.  This is the
> kind of back-and-forth that happens when people apply
> for 501 (c)(4) status.**[335]

TIGTA's subsequent audit report calls into question the veracity of Shulman's testimony.
TIGTA found that the IRS targeted groups using criteria based on the groups' names and
political orientations.[336]  TIGTA also found that tax-exempt applications experienced
"substantial delays" and that the IRS asked inappropriate and burdensome questions of
applicants.[337]  TIGTA's findings are at odds with Shulman's unequivocal "assurances" that there
was "absolutely no targeting" and that "this is the kind of back-and-forth that happens when
people apply for 501 (c)(4) status."

The Committee's investigation confirms that Shulman knowingly provided false and
incomplete information to the Ways and Means Committee.  During a transcribed interview with
Committee staff, Shulman acknowledged that he was aware of the processing delays and the
IRS's use of inappropriate donor questions at the time to his testimony to Congress.[338]  Shulman
testified:

> Q      And, sir, at the time of this March 2012 hearing before Ways and
>          Means, you were aware of the congressional inquiries into the IRS
>          about the treatment of Tea Party groups.  Is that right?
>
> A      I don't have a firm command that it was – that members had
>          written me about Tea Party groups, but I was aware of – for sure, I
>          remember I was aware of the donor letter.  You know, I had seen
>          the letters that had come in to me.  The questions about donors and
>          the backlog were the things that I had awareness of that I – for
>          sure.
>
> Q      And at the time of the March 2012 hearing before Ways and
>          Means, were you aware of the delays in processing the cases?
>
> A      Yeah.  I mean, my – I think – let me just premise, you know, I'm
>          going to do my best, I want to be forthcoming.  I'm going to try to
>          summon my memory from a long time ago.  So, to the best of my

---

[335] *"Internal Revenue Service Operations and the 2012 Tax Return Filing Season": Hearing Before the Subcomm.
on Oversight of the H. Comm. on Ways &Means*, 112th Cong. (2012) (question and answer with Chairman
Boustany).
[336] TIGTA Audit Rpt., *supra* note 20.
[337] *Id.*
[338] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).

Exhibit D

memory, you know, I was aware that – I was under the impression that kind of every case that was, you know, deemed to potentially need to be looked at for primary activity for political had gotten – there was a real backlog, you know, kind of across the board in those cases.

Q      And did you understand those cases to be set aside from the other cases the IRS was processing?

A      Yeah. I think by that time, and it was probably subsequent to the letters, I had an understanding that in order to have consistent treatment, that there were groupings of cases, and they do this in – you know, I had learned – probably around that time is when I learned about the tax-exempt organizations had done this in other contexts as well, but would group cases for consistency to have similar – you now, the same people or group of people work the cases.[339]

Although Shulman was aware of these facts prior to this testimony, he failed to divulge them to the Ways and Means Committee.  This information was certainly germane and responsive to Chairman's Boustany's question – indeed, Chairman Boustany specifically mentioned both development letters and delays – and yet Shulman omitted these facts from his answer.

More troubling, not only did Shulman fail to provide relevant information to Congress, but he affirmatively gave "assurances" that targeting was not occurring.  This statement implied that he had a basis upon which to guarantee that there was no cause for concern.  Committee staff questioned Shulman about this statement during his transcribed interview.  Shulman testified:

Q      With respect, you didn't just say it's not happening or I'll look into it, you gave assurances to the members that it was not occurring. How did you have the confidence to provide that assurance to Congress if you knew that there were backlogs and there were objectionable letters going out and there were delays in processing the cases?

A      Well, I don't think anybody was – you know, I didn't give assurances that there weren't backlogs or that people weren't worried about the questions they were getting, but I didn't have the impression in my mind at that point that there were – you know, I don't remember exactly what the questions were, but I think the questions were targeted – were asking about targeting, and at that point, you know, I didn't have a reason to believe that there was targeting going on.

[339] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).

59

Exhibit D

Q      Sir, you told Congress in March 2012, quote, "There is absolutely no targeting.  This is the kind of back and forth that happens when people apply for a 501(c)(4) status," end quote.  So there you're relating it to the development letters and the back and forth between the IRS and the applicant.  How, if you knew these letters had been sent asking for donor information, could you say there was no targeting if you knew they were asking for donor information?

A      You know, again, the things that were in my mind, if you look at when I said "no targeting," I said it's normal back and forth, and so there's no targeting, and was relating it to the fact they had come in voluntarily and I was thinking, you know, of this notion of reaching out, finding someone, you know, in the sense of targeting.  The other is my understanding was that donor letters weren't just being sent to conservative groups. And so that's – you know, that's what was in my mind then and that's what I said.[340]

Shulman's testimony affirmatively declared that the IRS was not mistreating conservative-leaning applicants.  At the time of his testimony, Shulman knew about the processing delays, the backlog of applications, and the questions asking for donor information.  Yet, Shulman portrayed the IRS's actions as part of the normal "back and forth" during the application process.  That Shulman did so with knowledge of the IRS's misconduct suggests that he knowingly provided misleading testimony to Congress.

Shulman stated during his transcribed interview that he believed his testimony was truthful at the time.[341]  Even so, by May 2012, Shulman was aware that "there's a list that was used in Tax-Exempt Organizations at some point, and . . . that the word 'Tea Party' was on the list at some point."[342]  At that time, Shulman should have known that his testimony to the Ways and Means Committee in March 2012 was inaccurate.  Although he had a duty as IRS Commissioner to keep Congress fully informed, Shulman testified that the IRS never discussed amending his testimony.[343]  He testified:

Q      At that time, sir, in May of 2012 [after the completion of the IRS internal review], were there any discussions about correcting your testimony to Congress?

A      Not that I remember.

*** 

---

[340] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).
[341] *Id.*
[342] *Id.*
[343] *Id.*

Exhibit D

Rep. JORDAN.      Okay.  After this briefing by Mr. George on May 30th, . . . did you at that point talk to any of your staff, or did you in your mind say, you know what, I should probably go back to Congress and correct what I said at the March 22nd hearing in front of the Ways and Means committee.

A                 I don't remember having those conversations. . . .  I don't remember thinking it.

Rep. JORDAN.      Okay.

A                 I just didn't – wasn't something that, you know, occurred to me.

Rep. JORDAN.      Did anyone on your staff bring it up and say, hey, we might want to rethink about, you know, what you said, normal back and forth, assurances that nothing bad's going on here, we might want to rethink in light of the new information we received.

A                 I certainly don't remember that happening. I don't think it did.

<div align="center">***</div>

Q                 Upon learning about the results of TIGTA's audit when it came out in May of 2013, did you consider going back to Congress to amend your previous testimony?

A                 No, that's not something I considered.

Q                 Why not?

A                 I didn't think it needed to be amended.[344]

A contemporaneous e-mail produced to the Committee suggests that even if Shulman was not concerned about the accuracy of his testimony, other IRS leaders were.  In response to an *Associated Press* article about Shulman's testimony entitled "IRS chief says agency not targeting tea party groups due to their political views," an employee in the legislative affairs office wrote to his colleagues: "This is what the front office and [IRS Chief of Communications and Liaison] Frank [Keith] are spinning about now."[345]

---

[344] *Id.*

[345] E-mail from William Norton, Internal Revenue Serv., to Floyd Williams & James Glenn, Internal Revenue Serv. (Mar. 22, 2012) [IRSR 617626].

Exhibit D

Shulman's incomplete and false testimony in March 2012 allowed the IRS's misconduct to continue.  By affirmatively and categorically denying any targeting, Shulman provided cover for the IRS through the 2012 election and allowed the targeting to be hidden from public scrutiny until May 2013.  Only then, upon the release of the TIGTA audit report, did Congress discover the value of Shulman's "assurances."

## Miller withheld information from Congress about the targeting

Steven Miller testified before Congress on at least six occasions as Deputy Commissioner and later Acting Commissioner from May 2012 until May 10, 2013.  Although Miller was never asked as directly as Shulman about the targeting of conservative tax-exempt applicants, Miller likewise never told Congress about the IRS misconduct.  Miller's multiple missed opportunities to tell Congress about the targeting continued the IRS's pattern of failing to inform Congress.

Miller testified during his transcribed interview that he became aware of possible IRS misconduct in February 2012 when "the press and the congressionals started."[346]  At that time, Lerner told Miller about the backlog of applications and the delays in processing the applications.  By May 3, 2012, after Nan Marks reported about the findings of her internal review, Miller was fully aware of the IRS's targeting, including the use of inappropriate screening criteria, the objectionable development questions, and the extensive delays.[347]

In mid-June 2012, the House Ways and Means Committee notified the IRS that it sought to conduct a hearing in July 2012 on tax-exempt organizations.[348]  As the hearing date approached, Miller prepared to use the hearing to discuss the targeting publicly.  A month before the hearing, Miller pondered whether he should testify – rather than TEGE Commissioner Sarah Hall Ingram – to "affirmatively use [the hearing] to put a stake in politics and c4."[349]  Miller's chief of staff, Nikole Flax, agreed that the IRS's treatment of 501(c)(4)s would likely be a topic of interest, writing that it "[w]ould be silly to think the c4 issues won't come up."[350]  In early July, IRS staff even began drafting sample questions for Miller relating to political speech of 501(c)(4) organizations.[351]

---

[346] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).

[347] *Id.*

[348] *See* E-mail from Catherine Barre, Internal Revenue Serv., to Steven Miller et al., Internal Revenue Serv. (June 13, 2012) [IRSR 190774].

[349] E-mail from Steven Miller, Internal Revenue Serv., to Nikole Flax & Catherine Barre, Internal Revenue Serv. (June 18, 2012) [IRSR 465424].

[350] E-mail from Nikole Flax, Internal Revenue Serv., to Steven Miller & Catherine Barre, Internal Revenue Serv. (June 18, 2102) [IRSR 465424].

[351] *See* E-mail from Joseph Urban, Internal Revenue Serv., to Justin Lowe et al., Internal Revenue Serv. (July 6, 2012) [IRSR 462278].

Exhibit D

Figure 10: E-mail exchange between Steven Miller & Nikole Flax, June 18, 2012

| From: | Flax Nikole C |
|---|---|
| Sent: | Monday, June 18, 2012 8:29 AM |
| To: | Miller Steven T; Barre Catherine M |
| Subject: | RE: Rainy but really nice |

On EO, I have mixed views -- if the hearing really is as generic as I recall, seems like you are too senior.  Would be silly to think the c4 issues won't come up -- but I think Sarah could handle it fine as well.  (I realize this isn't too helpful.)

-----Original Message-----
From: Miller Steven T
Sent: Monday, June 18, 2012 8:26 AM
To: Flax Nikole C; Barre Catherine M
Subject: Rainy but really nice

The place is great.

We need to make sure Rebecca is ready to succeed at the hearing. Going to take some work and I will want to have at least one (maybe 2) prep(s) with her.

And while I have lined up Sarah I am beginning to wonder whether I should do Boustany and affirmatively use it to put a stake in politics and c4.
Thoughts?
-------------------------
Sent using BlackBerry

Miller testified before the Ways and Means Subcommittee on Oversight on July 25, 2012.  Despite having relevant information about the IRS's treatment of tax-exempt applicants and preparing to address the matter, Miller declined to raise the issue with the Subcommittee. Miller testified during his transcribed interview:

Q    At the time, in June of 2012, you were aware of the backlog of cases pending in Cincinnati?

A    I was.

Q    And you were aware of the screening criteria used to identify those cases?

A    I was.

Q    And you were aware of the delay those cases had experienced?

A    I was.

Q    Was there any discussion about making those facts public at this July 2012 hearing?

A    No.  We prepared for anything that could happen.

63

Q       Did you expect the issue to come up?

A       Thought it might, so we prepared, but no certainty at all.

Q       And how did you prepare for it?

A       General hearing preparation.

Q       So . . . did you assemble material?

A       There would have been probably some material, yeah.

Q       Did you get involved in data on the cases?

A       I got where the cases were and probably a talking-points sheet as to what happened.[352]

Although he prepared to address the issue, Miller stated that there "was no reason for [him] to *sua sponte* . . . raise it."[353]   When Congressman Kenny Marchant asked Miller about groups that "feel like they have been harassed and feel like the IRS is threatening them with some kind of action or audit," Miller failed to mention anything about the inappropriate screening criteria or excessive delays experienced by these groups.[354]   Instead, Miller said: "We received an uptick, an increase in the number of (c)(4) organizations that were advocacy organizations, they were advocating on various things, which is a fine thing for a 501(c)(4) to do. . . .   We continue to work those cases."[355]   Miller's answer was incomplete at best.

Lerner, who was apparently away on vacation at the time, also seemed to believe that questions about the targeting of conservative applicants would be raised during Miller's appearance.  The morning of the hearing, Lerner e-mailed Joseph Urban, writing:

> I sit looking out at the Bay on this lovely morning – a little breeze blowing and the sun sparkling on the water.  I must say, it changes one's perspective and all the press about c4 and the hearing sounds a lot like "blah, blah, blah . . . ."  No wonder the country is such a mess.[356]

Lerner separately wrote to Miller after the hearing: "Glad it turned out to be far more boring than it might have been."[357]

---

[352] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).

[353] *Id.*

[354] *See "Public Charity Organizational Issues, Unrelated Business Income Tax, and the Revised Form 990": Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways & Means*, 112th Cong. (2012) (question and answer with Rep. Marchant).

[355] *Id.*

[356] E-mail from Lois Lerner, Internal Revenue Serv., to Joseph Urban, Internal Revenue Serv. (July 25, 2012) [IRSR 179761].

[357] E-mail from Lois Lerner, Internal Revenue Serv., to Steven Miller, Internal Revenue Serv. (July 25, 2012) [IRSR 179767].

Exhibit D

**Figure 11: E-mail from Lois Lerner to Joseph Urban, July 25, 2012**

| From: | Lerner Lois G |
|---|---|
| Sent: | Wednesday, July 25, 2012 6:53 AM |
| To: | Urban Joseph J |
| Subject: | Howdy |

So, here I sit looking out at the Bay on this lovely morning--a little breeze blowing and the sun sparkling on the water. I must say, it changes one's perspective and all the press about c4 and the hearing sounds a lot like "blah, blah, blah....". No wonder the country is such a mess. The disconnect between our usual everyday and that of most folks is enormous! Can't wait to hear how it goes--wishing Miller the very best. Please give me a big picture report when you can. Thanks Lois G. Lerner------------------------ Sent from my BlackBerry Wireless Handheld

During his transcribed interview, Committee staff asked Miller about his decision to not inform Congress once he learned the extent of the IRS's misconduct. Miller testified:

Q    After you received this information from Ms. Marks about what she and her team had found in Cincinnati [in May 2012], given the congressional interest in the treatment of the Tea Party cases, were there any discussions about sending new or amended responses to Congress with more information?

A    I don't recall any conversation like that.

Q    Sitting here today, do you regret that?

A    Probably not, because I didn't know the facts. I didn't. And I knew what – I knew what Nan had found in that 2-week period, and TIGTA was taking a look. We were sure that the offensive BOLO was no more. I believed that those cases should have been in the centralized process and that the real problem was that they were getting moldy waiting for decisions to be made. And that's what I concentrated on. And TIGTA had it.

Q    So why not tell the Committee those facts?

A    TIGTA was working on it, and I was concentrating on what I knew to be the problem.

Q    As Acting Commissioner, did you feel any sense of being forthcoming with the Committee when the Committee inquired of the IRS?

A    I wasn't Acting Commissioner during this time period.

Q    As Deputy Commissioner?

65

Exhibit D

A        I thought we were fine.  We were answering questions truthfully, and we were working hard to move those cases.

Q        So you felt that the information that you had discovered at that point wasn't relevant to include in the letters and the responses to Congress?

A        I felt the letters were fine and that we were pursuing the cases and that TIGTA was working on the issue.[358]

Miller's response is disappointing.  An ongoing audit is no basis to withhold information from Congress, especially when the information is particularly sensitive as to the targeting of Americans for their political beliefs.  The conclusions that Nan Marks presented to Miller on May 3, 2012, were essentially the same as the findings that TIGTA announced a year later. Miller's rationale for not disclosing the targeting in 2012 due to the TIGTA audit rings hollow because TIGTA was still working on the audit and had not released its final report when the IRS eventually decided to apologize for the targeting.  Miller's decision to withhold information from the American people caused the affected taxpayers prolonged pain by keeping the circumstances of the targeting inside the IRS and away from public scrutiny and congressional oversight.

The Committee's investigation confirms that senior levels within the IRS knew about the misconduct and failed to disclose their knowledge to Congress, despite considerable congressional interest.  On separate occasions, Lerner and Shulman informed Congress that the misconduct was the normal evaluation process for tax-exempt applications.  Miller, likewise, failed to fully inform Congress about the targeting when asked during a hearing in July 2012. Because of this, Congress and the public did not become aware of the targeting until May 2013.

### The IRS's false claim that key evidence was lost or destroyed prolonged the investigation

Late on a Friday afternoon, buried on page seven of the third attachment to a letter to the Senate Finance Committee, the IRS acknowledged that it had destroyed e-mails sent and received by Lois Lerner between January 2009 and April 2011.[359]  The IRS's acknowledgement on June 13, 2014, stood in stark contrast to promises made by IRS Commissioner John Koskinen under oath in March 2014 that he would produce all of Lerner's e-mails to the Committee. Commissioner Koskinen made these promises without qualification or limitation.  The IRS subsequently claimed to have lost Lerner's e-mails from this pivotal period in the targeting timeline.  Then, in November 2014, TIGTA told the Committee that it had found approximately 30,000 of the e-mails that the IRS claimed were permanently missing.  This chain of events undercut public confidence in Commissioner Koskinen and delayed  the Committee's effort to fully analyze all facets of the IRS targeting program.  The issue with Lerner's missing e-mails

---

[358] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).

[359] Letter from Leonard Oursler, Internal Revenue Serv., to Ron Wyden & Orrin Hatch, S. Comm. on Finance (June 13, 2014).

Exhibit D

also spotlights a serious problem within the IRS about record retention and willful efforts to shield communications to avoid congressional scrutiny.

## The IRS claimed that years of e-mails sent and received by Lois Lerner and other IRS employees were destroyed

The Committee was advised that e-mails sent and received by Lois Lerner and at least five other key figures in the IRS's targeting matter were destroyed during the period under investigation.  The IRS's inspector general, however, has informed Congress that as many as eight custodians could have lost e-mails during the same period.[360]  The Committee continues to gather evidence about the destroyed e-mails, approximately 30,000 of which were recovered by TIGTA as of November 2014.

According to the IRS, Lerner's laptop computer crashed on June 13, 2011, causing the data on her hard drive to be deemed "unrecoverable" by computer professionals.[361]  Lerner's hard drive was examined initially in June 2011 by Aaron Signor, an IRS IT specialist who provided computer-related assistance to the Exempt Organizations Division.[362]  Signor removed the computer from Lerner's office and conducted tests to determine that a problem existed with the computer's hard drive.[363]  Signor attempted unsuccessfully to retrieve data from the hard drive before discarding the hard drive in a cardboard box containing roughly 30 other crashed drives.[364]  Signor closed the fix-it ticket on June 21, 2011.[365]

In July or August 2011, Signor received a phone call from Lillie Wilburn, an IT manager, asking whether he still had Lerner's hard drive.[366]  She asked Signor to ship the hard drive to another technician for additional examination.[367]  John Minsek, a senior investigative analyst in the IRS's Criminal Investigations (CI) unit, eventually received Lerner's hard drive.[368]  Minsek understood that the hard drive was from "a computer of importance" and that there was a "sense of urgency" to recover data.[369]  Using the CI unit's digital forensic facilities, Minsek opened the hard drive and conducted additional tests.[370]  Once he opened the hard drive, Minsek noticed "well-defined scoring creating a concentric circle in the proximity of the center of the disk."[371]  According to Minsek, the scoring covered less than one percent of the surface of the disk.[372]

---

[360] Conference call between Treasury Inspector Gen. for Tax Admin. and Congressional Staff (Sept. 4, 2014).
[361] Letter from Leonard Oursler, Internal Revenue Serv., to Ron Wyden & Orrin Hatch, S. Comm. on Finance (June 13, 2014).
[362] Transcribed interview of Aaron Signor, Internal Revenue Serv., in Wash., D.C. (Aug. 1, 2014).
[363] *Id.*
[364] *Id.*
[365] *Id.*
[366] *Id.*
[367] *Id.*
[368] Transcribed interview of John Minsek, Internal Revenue Serv., in Wash., D.C. (July 24, 2014).
[369] *Id.*
[370] *Id.*
[371] *Id.*
[372] *Id.*

Exhibit D

Following Minsek's examination of the hard drive, he returned the drive to the IRS's IT team.[373]  In a subsequent conversation with IRS IT personnel, Minsek also raised the possibility that the IRS could send Lerner's hard drive to data recovery service, believing it was "possible that they had techniques, methods, perhaps proprietary tools that I did not have."[374]  Instead, Lerner's hard drive was sent to an IRS facility and eventually recycled by an outside contractor.[375]

The destruction of Lerner's e-mails in June 2011 occurred right in the middle of the IRS's targeting of conservatives.  Just four months earlier, in February 2011, Lerner called the Tea Party applications "very dangerous" and ordered that the cases undergo an unprecedented "multi-tier" review.[376]  In early June 2011, Lerner requested a copy of the tax-exempt application filed by the prominent conservative group, Crossroads GPS, for review by her senior technical advisor.[377]

Testimony shows that Lerner maintained a significant amount of information on her computer's hard drive.  According to Signor, the IT technician who regularly serviced Lerner's computer, Lerner maintained a large volume of data on the hard drive of her computer.[378]  Signor recommended that Lerner back up her data on a network server, but he was told that Lerner did not have the time or responsibility to save her data.  Signor testified:

Q      Do you recommend your end users to save data onto the [network shared] drive?

A      Yes.

Q      That's something you do in the normal course of your work?

A      Yes.

***

Q      You stated at the onset of the last round that you would recommend to end users that they back up their work. Do you recall that?

A      Yes.

Q      Did you have occasion to make that recommendation to Ms. Lerner prior to working on her laptop in the summer of 2011?

---

[373] *Id.*
[374] *Id.*
[375] Transcribed interview of Thomas Kane, Internal Revenue Serv., in Wash., D.C. (July 17, 2014).
[376] E-mail from Lois Lerner, Internal Revenue Serv., to Michael Seto, Internal Revenue Serv. (Feb. 1, 2011) [IRSR 161810].
[377] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (June 1, 2011) [IRSR 69914-15].
[378] Transcribed interview of Aaron Signor, Internal Revenue Serv., in Wash., D.C. (Aug. 1, 2014).

Exhibit D

A   Yes.

Q   When?

A   There were probably several occasions between 2007 and 2011. I couldn't say exactly when.

Q   Do you know in what context?

A   It would have been in the context of another ticket where I was working on her computer and maybe noticed the volume of data and suggested it.

Q   Do you have reason to know whether she followed your suggestion or not?

A   Yes.

Q   What do you know?

A   I was told that she didn't have backups at one point.

<p style="text-align:center">***</p>

Q   And when you say you told her about backups, what exactly do you remember telling Ms. Lerner's assistant about backups?

A   There was one day where she and I were in Lois's office. I can't remember if Lois was present or not.  But I had said, you know, "Lois has plenty of data. We really should get backups of her data."  And her response was, "Well, I don't think that Lois has the time to do it, and it's not her responsibility."  That's what was said, something – I'm not quoting exactly, but something like that would have been said.[379]

On September 5, 2014, the IRS notified Congress that it had lost e-mails from five other custodians.[380]  In addition to Lois Lerner, the IRS destroyed e-mails sent and received by Judy Kindell, Lerner's senior technical advisor and expert on non-profit political speech; Justin Lowe, a tax law specialist who briefed Lerner on the "Tea Party cases in June 2011; Ronald Shoemaker, a Washington manager who oversaw work on the applications; and Julie Chen and Nancy Heagney, two Cincinnati-based Determinations Specialists.[381]  Several of the e-mail losses

---

[379] *Id.*
[380] Letter from Leonard Oursler, Internal Revenue Serv., to Dave Camp, H. Comm. on Ways & Means (Sept. 5, 2014) (carbon copy to Darrell Issa, H. Comm. on Oversight & Gov't Reform).
[381] *Id.*

Exhibit D

occurred at significant points during the IRS's targeting of conservative tax-exempt applicants. Judy Kindell's e-mail loss occurred in August 2010, right as the IRS began to receive media inquiries related to the President's rhetoric critical of *Citizens United* and political speech by conservative non-profit groups. According to the IRS, Kindell was instructed to save old e-mails on her computer's hard drive and "when her hard drive failed, she lost e-mail that resided on that drive."[382] Justin Lowe's e-mail loss occurred in June 2011, right as he prepared to brief Lerner on the details about the "test" Tea Party applications worked in the Washington office. While the IRS maintains that it has recovered thousands of e-mails sent by these employees, it cannot guarantee that it has produced all appropriate e-mails to the Committee. It remains to be seen whether e-mails from these five custodians are among the 30,000 e-mails restored by TIGTA.

The IRS later acknowledged that a total of eighteen employees experienced hard drive crashes during the period under examination – meaning that some of these additional hard drive failures may have resulted in e-mail losses.[383] In June 2011, right after Lerner's e-mails were destroyed, she wrote to David Fish, who also experienced a hard drive failure. "No one will ever believe," she wrote, "that both your hard drive and mine crashed within a week of each other!"[384] Because of the epidemic of hard drive failures and e-mails losses, the Committee's effort to fully understand how and why the IRS targeted conservative applicants for tax-exempt status has been delayed. The 30,000 Lerner e-mails that TIGTA restored will answer some of the outstanding questions about Lerner's role in the targeting program.

**Figure 12: E-mail from Lois Lerner to David Fish & Nikole Flax, June 29, 2011**

| From: | Lerner Lois G |
|---|---|
| Sent: | Wednesday, June 29, 2011 5:12 PM |
| To: | Fish David L; Flax Nikole C |
| Cc: | Urban Joseph J; Downing Nanette M; Grant Joseph H |
| Subject: | RE: Comments |

No one will ever believe that both your hard drive and mine crashed within a week of each other!  Life is strange.

*Lois G. Lerner*
Director of Exempt Organizations

## IRS Commissioner John Koskinen misled Congress about the IRS's destruction of Lois Lerner's e-mails

The difficulties associated with Lois Lerner's destroyed e-mails were compounded by IRS Commissioner John Koskinen's evolving and misleading statements about the matter. For several months, Commissioner Koskinen's unwillingness to present completely accurate and

---

[382] *Id.*

[383] *Id.*

[384] E-mail from Lois Lerner, Internal Revenue Serv., to David Fish & Nikole Flax, Internal Revenue Serv. (June 29, 2011) [IRSR 903314].

Exhibit D

straightforward information about the missing e-mails unnecessarily delayed and hindered the Committee's fact-finding efforts.

Following Lois Lerner's staged apology at the ABA conference on May 10, 2013, the Committee requested relevant material necessary to begin investigating the IRS's targeting of conservative tax-exempt applicants.[385]  These requests included the production of all correspondence sent or received by Lois Lerner since January 1, 2009.[386]  The IRS was unwilling to cooperate voluntarily.[387]  On August 2, 2013, the Committee issued a subpoena to Treasury Secretary Jacob Lew, as the custodian of IRS documents, for eight categories of IRS material – including "[a]ll communications sent or received by Lois Lerner, from January 1, 2009 to August 2, 2013."[388]  After John Koskinen was confirmed as the permanent IRS Commissioner, the Committee reissued the subpoena on February 14, 2014, to him.[389]

On March 26, 2014, Commissioner Koskinen appeared before the Committee to testify about the IRS's compliance with congressional subpoenas and document requests.[390]  During the hearing, Commissioner Koskinen was repeatedly asked whether the IRS would commit to producing all of Lerner's e-mails.  Commissioner Koskinen testified repeatedly that he would.  In an exchange with Representative Jason Chaffetz, Commissioner Koskinen testified:

> Rep. CHAFFETZ.     Sir, are you or are you not going to provide this committee all of Lois Lerner's emails?
>
> Mr. KOSKINEN.     We are already starting –
>
> Rep. CHAFFETZ.     Yes or –
>
> Mr. KOSKINEN.     Yes, we will do that.[391]

Additionally, in an exchange with Ranking Member Elijah Cummings, Commissioner Koskinen testified:

> Rep. CUMMINGS.     Well, reclaiming just for a second.  I just want us to be clear.   I mean, time is precious, money is precious.   Just tell us.   I mean, you talk about

---

[385] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Lois Lerner, Internal Revenue Serv. (May 14, 2013); Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Daniel Werfel, Internal Revenue Serv. (June 4, 2013).

[386] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Daniel Werfel, Internal Revenue Serv. (June 4, 2013).

[387] *See* Letter from Darrell Issa, H. Comm. on Oversight & Gov't Reform, to Daniel Werfel, Internal Revenue Serv. (July 30, 2013).

[388] H. Comm. on Oversight & Gov't Reform, Subpoena to Jacob Lew, Sec'y, Dep't of the Treasury (Aug. 2, 2013).

[389] H. Comm. on Oversight & Gov't Reform, Subpoena to John Koskinen, Comm'r, Internal Revenue Serv. (Feb. 14, 2014).

[390] *See* Memorandum from Majority Staff, H. Comm. on Oversight & Gov't Reform, to Members, H. Comm. on Oversight & Gov't Reform (Mar. 21, 2014).

[391] *"Examining the IRS Response to the Targeting Scandal": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014) (question and answer with Rep. Jason Chaffetz).

Exhibit D

> relevance.  You said if a lawyer were to see this subpoena, they would have some concerns.  I just want to be clear.  I mean, it sounds like, again, I am saying what I said before, you seem to have an understanding and we seem to have an understanding, and they don't seem to be the same. So are you going to provide the documents for Lois Lerner?

Mr. KOSKINEN.        Yes.

Rep. CUMMINGS.        That were subpoenaed.

Mr. KOSKINEN.        Yes.[392]

According to testimony later received by the Committee, the IRS knew at the time of Commissioner Koskinen's appearance in March 2014 that Lerner's e-mails had been destroyed. In particular, the IRS Deputy Associate Chief Counsel, Thomas Kane – who had responsibility for the IRS's document production process in response to congressional oversight – testified that senior IRS leadership became aware of problems with Lerner's e-mails in early February 2014.[393]  Kane testified that on February 2, 2014, Catherine Duval, Counselor to the Commissioner, noticed a discrepancy in the number e-mails gathered from Lerner's account.[394] The IRS had gathered 16,000 e-mails from the period after April 2011 and "less than 100" from the period before April 2011.[395]

After becoming aware of the discrepancy in the number of e-mails, Kane asked a subordinate, Paul Butler, to look into the cause of the discrepancy.[396]  Two days later, on February 4, senior IRS leadership learned that Lerner's hard drive had crashed in 2011 from her former administrative assistant, Dawn Marx.[397]  Kane testified:

> Q        And so do you remember precisely when you became aware of the hard drive crash?
>
> A        We were – Paul Butler had talked to someone who worked for Lois at about the time when the emails had a great discrepancy and was told by her that there had been a hard drive crash at that particular point in time.
>
> Q        Do you know the name of the person that Mr. Butler spoke with?

---

[392] *Id.* (question and answer with Ranking Member Elijah E. Cummings).
[393] Transcribed interview of Thomas Kane, Internal Revenue Serv., in Wash., D.C. (July 17, 2014).
[394] *Id.*
[395] *Id.*; Letter from Leonard Oursler, Internal Revenue Serv., to Ron Wyden & Orrin Hatch, S. Comm. on Finance encl. 3 at 6 (June 13, 2014).
[396] Transcribed interview of Thomas Kane, Internal Revenue Serv., in Wash., D.C. (July 17, 2014).
[397] *Id.*

Exhibit D

A      Dawn Marx. Marx with an "x."

                        \*\*\*

Q      Do you know, sir, when Ms. Marx informed Mr. Butler about the hard drive crash?

A      February 4th.

Q      Of 2014?

A      Correct.

Q      And why does that date stand out to you in your memory?

A      The date stands out to me because we first found out about it on February 2nd, and it was only 2 days afterwards.

Q      So it didn't take long then for you to figure out what happened?

                        \*\*\*

A      It didn't take us long to figure out that it was reported that there was a hard drive crash at or about the time that the discrepancy in the emails took place.

                        \*\*\*

Q      And upon learning on February 4th of the hard drive crash, who did you communicate that to?

A      That was relayed to Kate [Duval].

Q      By who?

A      I would have been the one to do it, yes.[398]

Kane also noted that senior IRS leadership became aware in mid-February 2014 that Lerner's hard drive had been recycled and that any e-mails on the hard drive were "unrecoverable."[399] He testified:

Q      And do you recall when Mr. Butler gave you that information, the hard drive had been recycled?

---

[398] *Id.*
[399] *Id.*

A     I don't recall a specific date or time period, or time, but it certainly would have been within the period of time when he was actively interacting with the IT people, in early to mid February.

*** 

Q     Do you have an understanding now as to what that term, "recycled," means?

A     I do have some knowledge as to what happened to the hard drive.

Q     What happened to the hard drive?

A     After the CI forensic analysis determined that it was – that the material on it was unrecoverable, it was returned to the IT people, who at some point in time degaussed it to make sure that if there was anything else on it, particularly from a 6103 perspective, that it would not be recovered.  It was then sent to New Carrollton again. A lot of our IT functions are housed out there, and they have a recycling function out there where material is eventually recycled to an outside contractor.  And I have no idea what the outside contractor does with these materials.[400]

From mid-February 2014 to April 2014, the IRS attempted to recover some of the missing Lois Lerner e-mails by other means.[401]  However, it is clear from this testimony that the IRS knew no later than mid-February 2014 that a portion of Ms. Lerner's e-mails were missing. In fact, Commissioner Koskinen acknowledged during a July 2014 hearing: "If you told me now that Tom Kane said he knew in February, **I would henceforth say we, as the IRS, knew in February**."[402]

Despite knowing about the missing e-mails, Commissioner Koskinen failed to mention anything about the e-mail problems during his sworn testimony on March 26, 2014.  Instead, he affirmatively promised the Committee that the IRS would produce all of Lerner's e-mails.  In addition, Commissioner Koskinen's chief lawyer, Catherine Duval, and the IRS's National Director for Legislative Affairs, Leonard Oursler, failed to mention any problems with Lerner's e-mails during a meeting with bipartisan Committee staff on April 4, 2014.[403]  Duval requested this meeting specifically to discuss how the IRS would execute the Commissioner's promise to produce the subpoenaed Lerner e-mails.  The fact that both Commissioner Koskinen and his chief lawyer, Catherine Duval, failed to inform the Committee about the problems with Lerner's e-mails on separate occasions suggests a deliberate attempt to mislead the Committee.

---

[400] *Id.*

[401] *Id.*

[402] *"An Update on the IRS Response to Its Targeting Scandal": Hearing Before the Subcomm. on Econ. Growth, Job Creation & Reg. Affairs of the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014) (emphasis added).

[403] Meeting between Committee staff and Catherine Duval & Leonard Oursler, Internal Revenue Serv. (Apr. 4, 2014).

Exhibit D

Even when the IRS finally acknowledged the missing e-mails on June 13, 2014, the misleading information continued. First, the IRS stated that it "confirmed" that back-up tapes from the relevant period had been destroyed.[404] Commissioner Koskinen repeated this information during his sworn testimony to the House Ways and Means Committee on June 20, 2014. He testified:

> In light of the hard-drive issue, the IRS took multiple steps over the past months to assess the situation and produce as much email as possible for which Ms. Lerner was an author or recipient. We retraced the collection process for her emails. We located, processed and included email from an unrelated 2011 data collection for Ms. Lerner. **We confirmed that backup tapes from 2011 no longer existed because they have been recycled, pursuant to the IRS normal policy**. We searched email from other custodians for material on which Ms. Lerner appears as author or recipient.[405]

During the same hearing, Koskinen also testified that the IRS went to "great lengths" and made "extraordinary efforts" to recover Lerner's emails.[406]

Subsequently, however, the Committee learned that back-up material may exist, contrary to Commissioner Koskinen's assertions. Kane testified during a transcribed interview that "[t]here is an issue as to whether or not . . . all of the backup recovery tapes were destroyed on the 6-month retention schedule."[407] Oursler confirmed this information, testifying during a transcribed interview that he became aware of the existence of back-up tapes around July 4, 2014.[408] The IRS's inspector general similarly informed the Committee that as many as nine back-up tapes that were not overwritten by the IRS.[409] The inspector general also told the Committee that it located 760 Microsoft Exchange server drives that from the relevant period that the IRS had not searched because it was under the mistaken belief that the drives had been destroyed.[410] Apparently, due to budgetary constraints, the drives had not been destroyed.[411]

For four months, from February 2014 to June 2014, IRS Commissioner John Koskinen withheld vital information about the IRS's ability to comply with the Committee's subpoena for all of Lois Lerner's e-mails. Even after claiming that Lerner's e-mails were missing, Koskinen continued to provide incomplete and misleading information about the IRS's efforts to recover them. As recently as September 12, 2014, Koskinen insisted that Lerner's e-mails were

---

[404] Letter from Leonard Oursler, Internal Revenue Serv., to Ron Wyden & Orrin Hatch, S. Comm. on Finance encl. 3 (June 13, 2014).

[405] *"Recent Developments in the Committee's Investigation into the Internal Revenue Service's Use of Inappropriate Criteria to Process Applications of Tax-Exempt Organizations": Hearing Before the H. Comm. on Ways & Means*, 113th Cong. (2014) (statement of John Koskinen, IRS Commissioner) (emphasis added).

[406] *Id.*

[407] Transcribed interview of Thomas Kane, Internal Revenue Service, in Wash., D.C. (July 17, 2014).

[408] Transcribed interview of Leonard Oursler, Internal Revenue Serv., in Wash., D.C. (July 22, 2014).

[409] Conference call between Treasury Inspector Gen. for Tax Admin. and Congressional Staff (July 29, 2014).

[410] *Id.*

[411] *Id.*

Exhibit D

permanently missing.  In a letter to Subcommittee on Economic Growth, Job Creation, and Regulatory Affairs Chairman Jim Jordan regarding whether Lerner's e-mails might be recoverable from back-up tapes maintained by the IRS, Koskinen wrote:  "We have seen no indication that any email data from the June 2011 timeline exists or is accessible on these [back-up] tapes."[412]

Koskinen was wrong.  On November 21, 2014, TIGTA notified congressional investigators that it located approximately 30,000 of Lerner's "missing" e-mails.[413]  TIGTA found the e-mails among hundreds of "disaster recovery tapes" that were used to back up the IRS e-mail system.[414]  TIGTA is expected to release a report that provides additional detail about why the e-mails were destroyed, and how they were recovered.

Koskinen's posture with respect to the Committee's efforts to obtain Lerner's e-mails delayed the Committee's investigation.  Koskinen's credibility was further damaged when TIGTA found approximately 30,000 Lerner e-mails that Koskinen had previously claimed were permanently lost.

## IRS employees openly sought to avoid congressional scrutiny by shielding e-mail communications

In the course of the Committee's investigation, it became apparent that the IRS tacitly condoned an environment in which IRS employees sought to evade congressional oversight of their official business.  Not only did senior IRS employees regularly utilize their private, non-official e-mail accounts to conduct official IRS business, but Lois Lerner even warned her colleagues to "be cautious about what we say in emails."[415]  These actions not only potentially violate federal law, but they frustrate congressional oversight of the executive branch.  Even worse, the Committee found that IRS employees sent confidential taxpayer information using non-official e-mail accounts, which potentially compromised the security of this information.  Although the IRS provides senior employees with portable official laptops,[416] the use of non-official e-mail accounts to conduct official business within the IRS is prevalent and reoccurring.

The Federal Records Act requires the preservation of all communications connected to official government business, including the use of official e-mail accounts.[417]  The IRS maintains a records-retention policy that specifically prohibits the use of a non-official e-mail account to conduct official IRS business.[418]  The IRS considers e-mails to be official records when "they are created or received in the transaction of agency business, appropriate for preservation as

---

[412] Letter from John Koskinen, Internal Revenue Serv., to Rep. Jim Jordan, Chairman, Subcomm. on Economic Growth, Job Creation, and Regulatory Affairs (Sep. 12, 2014).

[413] Rachel Bade, *Thousands of lost Lois Lerner IRS e-mails found by IG,* POLITICO, Nov. 23, 2014.

[414] Susan Ferrechio, *30,000 missing e-mails from IRS' Lerner recovered,* WASH. EXAMINER, Nov. 22, 2014.

[415] E-mail from Lois Lerner, Internal Revenue Serv., to Maria Hooke, Internal Revenue Serv. (Ap. 9, 2013) [IRSR 726247].

[416] *See* Transcribed interview of Sarah Hall Ingram, Internal Revenue Serv., in Wash., D.C. (Sept. 23, 2013).

[417] 44 U.S.C. ch. 31.

[418] *See* I.R.M. § 10.8.1.4.6.3.1; *see also* Letter from Daniel Werfel, Internal Revenue Serv., to Darrell Issa, H. Comm. on Oversight & Gov't Reform (Sept. 16, 2013).

Exhibit D

evidence of the government's function and activities, or valuable because of the information they contain."[419]

The Committee's investigation has found that several IRS employees – including former Commissioner Doug Shulman and former Exempt Organizations Director Lois Lerner – sent or received material relating to official IRS business on their non-official e-mail accounts. For example, material produced to the Committee included draft IRS documents that Lerner sent to a non-official msn.com e-mail account from her official IRS account.[420]  Lerner's use of her non-official e-mail account appears to have been so prevalent as to be saved in her IRS e-mail with the shorthand label, "Lois Home."[421]

Judith Kindell, Lerner's former senior technical advisor, also used her non-official e-mail account to conduct official IRS business.[422]  Documents produced to the Committee show that Kindell transmitted confidential taxpayer information, redacted by the IRS for § 6103 purposes, from her official e-mail account to her non-official Verizon.net e-mail account and to Lerner's non-official msn.com e-mail account.[423]  The transmission of this material over unsecure e-mail channels threatened the security of the information and may have compromised sensitive taxpayer information.

In August 2013, Chairman Issa wrote to Treasury Secretary Lew to remind him of his obligation to ensure that all e-mails related to official business are preserved for congressional oversight.[424]  Then-acting IRS Commissioner Daniel Werfel responded, assuring the Committee that the IRS has taken all "necessary steps to preserve emails" and to evaluate any personnel actions for the use of non-official e-mail accounts.[425]  The Committee, however, is not aware of any IRS disciplinary action on the violations of federal law and IRS policy uncovered by the Committee.

The Committee also learned in the course of its investigation that the IRS maintained a wholly separate instant-messaging communication system that it did not regularly archive.[426]  According to one IRS employees, the system – known as "Office Communication Server," or OCS – is "not set to automatically save as the standard; however, that functionality exists within the software."[427]  The fact that the IRS did not automatically archive these messages as a matter of course speaks loudly to the agency's disregard of preserving communications records for congressional oversight or other needs.

---

[419] I.R.M. § 1.10.3.2.3.

[420] *See* Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Lois G. Lerner, Internal Revenue Serv. (Aug. 13, 2013).

[421] *Id.*

[422] *See* Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Judith Kindell, Internal Revenue Serv. (Sept. 30, 2013).

[423] *See, e.g.*, E-mail from Judith Kindell to Lois Lerner (Aug. 23, 2011) [LERNER-OGR205 – 224].

[424] Letter from Darrell Issa, H. Comm. on Oversight & Gov't Reform, to Jacob Lew, U.S. Dep't of the Treasury (Aug. 15, 2013).

[425] Letter from Daniel Werfel, Internal Revenue Serv., to Darrell Issa, H. Comm. on Oversight & Gov't Reform (Sept. 16, 2013).

[426] E-mail from Maria Hooke, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (Apr. 9, 2013) [IRSR 726247].

[427] *Id.*

Exhibit D

Worse still, evidence obtained by the Committee suggests that Lois Lerner actively sought to hide information from Congress.  In one e-mail, Lerner spoke of counseling her colleagues to be "cautious" of what they write in e-mail due to congressional oversight interests in the subject matter.  She wrote:

> I was cautioning folks about email and how we have had several occasions where Congress has asked for emails and there has been an electronic search for responsive emails – so we need to be cautious about what we say in emails.[428]

In the same e-mail, Lerner went on to ask whether the IRS's internal instant-messaging OCS system was automatically archived.  When told it was not, Lerner responded in one word: "Perfect."[429]

The IRS clearly has an irresponsibly – and potentially illegally – lax attitude toward record retention.  The Archivist of the United States, David Ferriero, testified to the Committee that the IRS did not follow the law in retaining Lois Lerner's destroyed e-mails.[430]  The IRS fostered an atmosphere that allowed senior employees, such as Lerner, to encourage colleagues to avoid written records for fear of public scrutiny.  This work environment allowed employees to use personal e-mail accounts for official business, including the transmittal of confidential taxpayer information.  The failure of the IRS to properly preserve e-mail and other records, coupled with its apparent institutional disregard for federal records laws, frustrates congressional oversight and prevents the American people from learning the full truth about the IRS's targeting.

## The IRS targeting and cover-up directly harmed conservative groups applying for tax-exempt status

The misconduct by the IRS had real and appreciable effects on the conservative groups that applied for tax-exempt status.  As explained, the IRS targeted conservative-oriented applicants based on their names and political beliefs, these groups faced substantial delays, and the IRS asked these groups burdensome and inappropriate questions.  In addition to these primary harms, conservative-leaning tax-exempt applicants experienced ancillary affects of the IRS targeting.  Most notably, the IRS misconduct and misleading statements to Congress stifled the constitutional speech of conservative-groups in the 2012 election season.  The IRS's inaction also caused conservative-oriented groups to receive revocation of their exempt status by operation of law almost as soon as it was granted.

---

[428] E-mail from Lois Lerner, Internal Revenue Serv., to Maria Hooke, Internal Revenue Serv. (Ap. 9, 2013) [IRSR 726247].

[429] E-mail from Lois Lerner, Internal Revenue Serv., to Maria Hooke, Internal Revenue Serv. (Ap. 9, 2013).  [IRSR 726247].

[430] *See "IRS Obstruction: Lois Lerner's Missing E-mails, Part II": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014).

Exhibit D

## IRS actions suppressed conservative voices during the 2012 election

The IRS's targeting of conservative-oriented tax-exempt applicants stifled their rights to constitutional speech during the 2012 presidential election. Two years earlier, some of the very same conservative groups were active in the 2010 campaign cycle, which resulted in a Republican-controlled House of Representatives. President Obama called the 2010 election a "shellacking."[431] The conservative gains in the House of Representatives in 2010 were widely attributed to the grass-roots Tea Party movement, which emerged in opposition to the policies of the Obama Administration.[432]

There is no doubt that the nascent Tea Party movement had an appreciable effect on the 2010 midterm election. A November 2013 study suggests that the Tea Party had "an estimated nationwide effect on the 2010 midterm election corresponding to 3.2 – 5.8 million additional votes for the Republican Party in the 2010 House elections."[433] This enormous influence was widely noted at the time. After the 2012 election, however, with many Tea Party tax-exempt applications in limbo at the IRS, commentators began speculating whether the Tea Party movement was "dead."[434] Exit polling in 2012 showed that only 21 percent supported the Tea Party, down from 41 percent support in 2010.[435]

The IRS's targeting of conservative applicants had a real effect on their activities. As conservative-leaning applicants waited for the IRS to make a decision on their tax-exempt applications, the mounting delays hurt the applicants. Without an IRS determination letter, donors stopped giving to these groups, interest waned, and some groups suspended their work.[436] Frustrated applicants called revenue agents in Cincinnati, who expressed sympathy but were told to respond that the applicant was "under review."[437] Some groups even withdrew their applications due to the excessive delays, unaware that their applications were under review in Washington.[438] The IRS's inaction essentially prevented these groups from operating at full bore, and from exercising their constitutionally protected rights to free speech and free association.

Adding insult to injury, senior IRS officials were fully aware of the IRS's inappropriate treatment of conservative-leaning tax-exempt applicants before the 2012 election and never disclosed their findings. Their efforts to keep this information from the American people – and, indeed, to purposefully not inform Congress – virtually ensured that Tea Party participation in the 2012 election would be limited. Without sunlight to expose the IRS's misdeeds, the applicants continued to feel intimidated by the machinery of the IRS. As groups ceased their

---

[431] The White House, Press Conference by the President (Nov. 3, 2010).

[432] Lisa Lerer & Alison Fitzgerald, *Tea Party Wins House for Republicans, Wants Rewards in Congress*, BLOOMBERG, Nov. 4, 2010.

[433] *See* Andres Madestam, Daniel Shoag, Stan Veuger, & David Yanagizawa-Drott, *Do Political Protests Matter? Evidence from the Tea Party Movement*, 128 Q.J. OF ECON. 1633, 1666 (Nov. 2013).

[434] Chris Cillizza, *Is the Tea Party Dead?  Or Just Resting?*, WASH. POST, Dec. 4, 2012.

[435] *Id.*

[436] *See* Patrick O'Connor, *Groups Recount Tax Battle's Toll*, WALL ST. J., May 14, 2013.

[437] Transcribed interview of Ronald Bell, Internal Revenue Serv., in Wash., D.C. (June 13, 2013); Transcribed interview of Stephen Daejin Seok, Internal Revenue Serv., in Wash., D.C. (June 19, 2013).

[438] Transcribed interview of Stephen Daejin Seok, Internal Revenue Serv., in Wash., D.C. (June 19, 2013).

Exhibit D

operations and donors stopped contributing, the IRS's targeting suppressed conservative voices during the 2012 presidential election. Because of the IRS cover-up, millions of Americans went to the polls in November 2012 with no awareness of the IRS's inappropriate treatment of conservative tax-exempt applicants.

## IRS delays in processing applications led to the auto-revocation of exempt status

The excessive delays in processing conservative-oriented applicants for tax exemption led to the IRS revoking exempt status for some groups almost immediately after it was granted. The Pension Protection Act of 2006 changed filing requirements for exempt organizations. The law included a provision requiring the automatic revocation of a group's tax-exempt status if it has not filed an annual return or notice for three consecutive years.[439] Lerner's advisor Sharon Light explained the provision during her transcribed interview with Committee staff. She testified: "So many organizations that previously hadn't had to file tax information returns, 990 series returns, had to file. The act also introduced a penalty for not filing for three consecutive years – revocations automatically revoked."[440] For groups that received auto-revocation, it meant that they would be taxable.[441]

The IRS published its first list of revoked organizations in June 2011 – roughly the same time Lerner became aware of the inappropriate screening criteria.[442] As late as June 2012, Lerner became aware of several pending applications within the backlog of conservative-oriented applications that would be subject to automatic revocation. On June 11, Holly Paz e-mailed Lerner about revenue agents calling applicants in the backlog, telling her that "[w]e are not calling anyone who appears to fall into auto rev. Cindy's folks research potential auto rev cases before calls are made. We are sitting [sic] those aside now pending direction. We are compiling data for you on these cases."[443] Days later, Paz informed Lerner that there were already 14 applications that would be auto-revoked by "operation of law" and that "[t]hey are mostly [§ 501(c)(4)s and larger orgs."[444] On June 26, Lerner wrote to Deputy Commissioner Steve Miller that several § 501(c)(4) applicants "will be auto-revoked as soon as we provide them with an approval" because of the processing delays.[445]

The excessive delays and the resulting auto-revocation also affected some applicants that should have received a determination in a timely manner. Holly Paz told the Committee that the use of term "Tea Party" to screen applications resulted in the delay of at least one application that should have been approved promptly. She testified that at least one application that did not

---

[439] Pub. L. 109-280, § 1223(b), 120 Stat. 780, 1090 (2006).

[440] Transcribed interview of Sharon Light, in Wash., D.C. (Sept. 5, 2013).

[441] Transcribed interview of David Fish, Internal Revenue Serv., in Wash, D.C. (Oct. 2, 2014).

[442] *See* Transcribed interview of Holly Paz, Internal Revenue Serv., in Wash., D.C. (May 21, 2013).

[443] E-mail from Holly Paz, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (June 11, 2012) [IRSR 366415].

[444] E-mail from Holly Paz, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (June 14, 2012) [IRSR 352645].

[445] E-mail from Lois Lerner, Internal Revenue Serv., to Steven Miller & Sarah Hall Ingram, Internal Revenue Serv. (June 26, 2012) [IRSR 199331].

Exhibit D

have indications of political activity or inconsistencies in its application was caught in the backlog of about 300 cases because of the IRS's use of inappropriate screening criteria.  She stated:

| | |
|---|---|
| Chm. ISSA | So at least one of these 300, but 20 or 30 that you [personally] looked at, should have flown through [the determinations process] just fine and was tied up with the word Tea Party or some other buzz word for 2 or 3 years? |
| A | I think yes, there's probably at least one that falls into that situation.[446] |

The delays caused by the IRS's inappropriate treatment of conservative-oriented tax-exempt applicants had an appreciable effect on the exempt status of some groups.  In addition to having their political speech suppressed, some organizations that had applied for exempt status over three years ago became subject to the auto-revocation provisions of the Pension Protection Act.  Their exempt status was automatically revoked almost immediately after it was granted.  For groups that spent over three years waiting for the IRS to process their application, it meant that they would have to apply for reinstatement.  Their long ordeal with the IRS was not over.

### There is conflicting evidence on whether the Treasury Department was aware of the IRS targeting in 2012

With the demonstrable harm that the IRS targeting caused conservative groups involved in political speech, an important question is why the targeting was not disclosed until *after* the 2012 presidential election.  Although the most senior levels of the IRS knew of the targeting well before the election, it has been an open question as to whether other elements of the Administration were simultaneously aware.  On this point, the Committee's investigation has uncovered conflicting evidence as to whether the Obama Treasury Department was aware of the IRS targeting before the 2012 presidential election.

On June 4, 2012, Treasury Inspector General for Tax Administration J. Russell George met with Christopher Meade, the General Counsel of the Treasury Department.[447]  Days earlier, on May 30, 2012, George had fully briefed IRS Commissioner Doug Shulman about TIGTA's audit of the IRS's treatment of tax-exempt applicants and about preliminary findings that the IRS had used inappropriate criteria – including the phrase "Tea Party" – to identify and segregate applicants.[448]  George told the Committee that he conveyed similar information to Treasury General Counsel Meade on June 4, 2012.  In a letter to Chairman Jordan, George wrote:

The June 4, 2012, meeting with Mr. Meade was my regular monthly meeting with him.  In fact, between June 2012 and the issuance of the

---

[446] Transcribed interview of Holly Paz, Internal Revenue Serv., in Wash., D.C. (May 21, 2013).
[447] U.S. Dep't of the Treasury, Monthly Meeting w/ GC & TIGTA IG (June 4, 2012) (Microsoft Outline calendar invitation) [OGR-WM 21].
[448] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).

Exhibit D

audit report on May 14, 2013, I had standing monthly meetings with Mr. Meade as needed, directly following the Bureau Heads meeting hosted by the Treasury Secretary.   My calendar for June 2012 shows that I had a scheduled Bureau Heads meeting on June 4, 2012.   No one else from TIGTA attended the June 4, 2012, meeting with me.  I did not keep notes of any of my discussions with Mr. Meade.  **My recollection, however, is that at that meeting, which occurred early in the audit process, I advised him that TIGTA was conducting an audit of the IRS's processing of applications for tax-exempt status, and I may have advised him that we were looking at allegations that the IRS was using names such as "tea party" to identify tax-exempt applications for review**.[449] (emphasis added).

During his transcribed interview with Committee staff, however, Meade testified that George talked about the audit at "a high level" and did not provide any specifics about TIGTA's preliminary findings.[450]  Meade testified:

Q       Okay. Now, sir, according to Mr. George's public testimony, he met with you on June 4, 2012; is that right?

A       I recall meeting with him on June 4th, 2012.

                                    ***

Q       Let me show you a document that has been produced to the committee by TIGTA. I'll mark it as Exhibit 1. . . .  This is a document produced to the committee by TIGTA and prepared by TIGTA for Mr. George's use during an earlier briefing on May 30th, 2012, to Commissioner Shulman.  Sir, please take as much time as you would like to review the document and let me know when you are ready to proceed.

A       Okay.

Q       Sir, have you seen this document before?

A       I did not see it at the time. I believe it was a link to a Washington Post article sometime last fall.

                                    ***

Q       Sir, I want to draw your attention to the section labeled "Audit Status" towards the bottom of the first page. Do you see that?

---

[449] Letter from J. Russell George, Treasury Inspector Gen. for Tax Admin., to Jim Jordan, H. Comm. on Oversight & Gov't Reform (Mar. 12, 2014).
[450] Transcribed interview of Christopher Meade, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 26, 2014).

Exhibit D

A    I do.

Q    The first two sentences read, quote, "Due to the sensitivity of this issue, we are providing information identified during planning for this audit.  We obtained documentation indicating that certain organizations' applications for tax-exempt status were targeted by the Exempt Organizations Determinations office based on the organizations' name or political beliefs."  Do you see that?

A    I see that you're reading from the document.

Q    And did I read that correctly?

A    Yes.

                              ***

Q    I would like to show you one more document.  This was produced to the committee by TIGTA as well.  I will mark this as Exhibit 2. . . .  Sir, as you read the document, I will note for the record this is an email from Michael Phillips of TIGTA to J. Russell George of TIGTA, dated June 1st, 2012, at 2:37 p.m.

                              ***

Q    Sir, have you seen this document before?

A    I did not see it at the time.  I saw it was linked in a Washington Post article that was published sometime last fall.

Q    Okay, sir, the email reads: "Hi Russell.  Mike prepared the information below related to your request yesterday during the senior staff meeting for brief details about the three audits discussed during the Commissioner's meeting this week.  You asked for this information for the Secretary's meeting on Monday." And underneath that the first bolded item reads: "Applications for tax-exempt status by section 501(c)(4) social welfare organizations.  We obtained documentation indicating that certain organizations' applications for tax-exempt status were targeted by the Exempt Organizations Determinations office based on the organizations' name or political beliefs."  Do you see that?

A    Yes.

Q    Did I read that correctly?

Exhibit D

A Yes. You might want to read the next sentence as well.

Q "Additional audit work is needed to determine the extent, if any, of inconsistent treatment of these organizations' applications for section 501(c)(4) tax-exempt status."  Did I read that correctly?

A Yes.

<div align="center">***</div>

Q This material [was] prepared for Mr. George for his use as of June 4, 2012, did you and Mr. George talk about any of this material in your discussion on June 4, 2012?

<div align="center">***</div>

A Mr. George did not convey to me the information that you read in this email.

Q He didn't convey anything to you about this?

A I can tell you what I recall.

Q What do you recall?

A He stated at a high level that he was beginning an audit relating to tax-exempt status at the request of Congress.  He raised a handful of other audits at a high level.  The rest of the meeting was spent talking about my predecessor and general getting to know each other.  He did not provide the information that you read in this document.

<div align="center">***</div>

Q So, Mr. Meade, is it your testimony that Mr. George did not convey to you anything about the preliminary indications of TIGTA's audit?

A Yes, that is my testimony. I can tell you at some much later point in the first quarter of 2013, he raised to me that there could be troubling findings from the audit.  At that point I recall that as being significant.  I have no recollection and I do not believe he conveyed anything along those lines when I met with him in June 2012.[451]

---

[451] *Id.*

<div align="center">84</div>

<div align="right">Exhibit D</div>

Similar to the conflicting evidence about Meade's awareness of the targeting in 2012, there is conflicting evidence about the awareness of Mark Patterson, the Treasury Department's chief of staff.  George informed the Committee that he briefed Patterson about the audit and the IRS's use of the phrase "Tea Party" in September 2012.  In a letter to Chairman Jordan, George wrote:

> With regard to my meeting with Mr. Patterson on September 14, 2012, I have checked my calendar and it shows that I was scheduled for a meeting with him on that day from 2 p.m. to 4 p.m.  In addition, I inquired with Treasury's Director, Office of Security Programs, and she confirmed to me that I entered the Main Treasury building on that day at 1:35 p.m.  I also attended that meeting by myself.  I did not keep notes of our discussion, but my recollection is that I advised Mr. Patterson that TIGTA was conducting an audit of the IRS's processing of applications for tax-exempt status, and that **I conveyed the general sense that the IRS had selected applications from certain political groups for additional scrutiny, including using descriptors such as "tea party" to identify such applications**.  However, I do not recall verbatim what I discussed with Mr. Patterson at that meeting.[452]

Like Meade, Patterson denied being aware of TIGTA's preliminary audit findings in 2012.  Patterson also testified that he did not recall a meeting with George in September 2012.  He testified during a transcribed interview:

> Rep. JORDAN.        Mr. George also told us – you said the first time you learned of the TIGTA report was early 2013.  Mr. George said he had a meeting with you on September 4th – excuse me, September 14th, 2012, where he informed you of what was going on and the Inspector General's audit of the targeting.  Do you recall that meeting?
>
> Mr. PATTERSON.    I don't.
>
> Rep. JORDAN.        He said he conveyed to you actually that there was targeting going on and groups were being scrutinized.  He said he conveyed that to you personally in a personal meeting September 14th, 2012.
>
> Mr. PATTERSON.    I don't remember that meeting, no. I don't.

<div align="center">***</div>

---

[452] Letter from J. Russell George, Treasury Inspector Gen. for Tax Admin., to Jim Jordan, H. Comm. on Oversight & Gov't Reform (Mar. 12, 2014) (emphasis added).

Exhibit D

Rep. JORDAN.      Mr. Patterson, how many meetings did you have, just individual meetings, with the Inspector General?

Mr. PATTERSON.     I don't have any way of counting that, Congressman. I don't –

Rep. JORDAN.      But was it a handful of times or was it – I mean, you talked about this group meeting, but Mr. George told us on September 14th, 2012, it was just the two of you, it was just him and you.

Mr. PATTERSON.     How many times did I meet with him just the two of us?

Rep. JORDAN.      Yeah.

Mr. PATTERSON.     I don't know.  I mean, I don't have a way of estimating that. I mean, I would say – it would have to be a guess, okay?  Which I know I was instructed at the beginning, don't guess if I don't know the answers on things.  But I met with him it was periodically.  I only met with him, really, at his initiative, and he would stop by my office.  Sometimes he would stop by my office –

Rep. JORDAN.      Would you describe it as frequent or infrequent?

Mr. PATTERSON.     I would describe it as infrequent.

Rep. JORDAN.      Okay. So when he stopped by, was it – so it's not customary, it's not ordinary. So, obviously –

Mr. PATTERSON.     It's not unusual.  As I said, I saw Russell [George] once a month at the staff meeting.  He was a friendly guy.  And, from time to time, he would post me on things that he was working on.  And he also, from time to time, would post me on things that were about to come out the next day.

*** 

Mr. PATTERSON     Again, I said I don't remember him talking to me about it.

86

| | |
|---|---|
| Rep. JORDAN. | I understand.  You said you don't recall learning about this until 2013.  Russell George said he told you September 14th. . . .  And it's not just that, it's not, hey, there's a negative IG report coming, like all the others.  He specifically used these terms.  That's what we are trying to get at. |
| Mr. PATTERSON. | I understand where you're coming from.  All I can tell you is what I remember, okay? |
| Rep. JORDAN. | Well, we appreciate that.  That's what we're here for.  All I know is Russell George remembers it differently.[453] |

The Committee's investigation has uncovered conflicting evidence as to whether senior executives in the Treasury Department were aware of the IRS targeting in 2012.  Certainly, if the Obama Administration was aware of the IRS's harassment of Tea Party applicants prior to the 2012 election – as Inspector General J. Russell George indicated in his letter to Chairman Jordan – then its refusal to notify the public or Congress in a timely manner was a serious dereliction of its duty and a failure of government.

## *The IRS sought other methods to rein in politically active non-profits as early as 2010*

The Committee has uncovered evidence that the IRS sought to use its tremendous power to unilaterally rein in politically active non-profits soon after *Citizens United*.  From 2010 until 2013, the IRS planned and even attempted several methods of measuring and curbing the political activities of tax-exempt groups.  These plans and attempts went beyond the IRS's duties as a neutral administrator of tax law, amounting to the informal regulation of non-profit political activity.  Succumbing to the political pressure it faced, the IRS sought ways to make its actions public – in essence, to show that it was cracking down on 501(c)(4) groups and deter likeminded groups from similar political activity.  This IRS effort was symptomatic of attempts across the Obama Administration to stifle conservative political speech.

The IRS has repeatedly explained away the targeting as the result of an "uptick" in tax-exempt applications in the wake of *Citizens United*.[454]  Documents uncovered during the investigation eviscerate this excuse.  An internal IRS analysis shows that the IRS began identifying a substantial amount more applications with indications of political activity *after* Lerner changed the criteria.  Through June 2011, the IRS identified at most 10 applications per month that it classified as involving "political advocacy."[455]  After Lerner broadened the criteria, the IRS identified an average of over 35 applications per month until the screening criteria was

---

[453] Transcribed interview of Mark Patterson, in Wash., D.C. (Feb. 4, 2014).
[454] Rick Hasen, *Transcript of Lois Lerner's Remarks at Tax Meeting Sparking IRS Controversy*, ELECTION LAW BLOG (May 11, 2013, 7:37AM), http://electionlawblog.org/?p=50160.
[455] *See* Internal Revenue Serv., Receipts of Political Advocacy Cases by Control Date (undated)  [IRSR 536645].

Exhibit D

changed again.[456]  In the crucial period when the IRS first identified and elevated the Tea Party "test" cases in 2010, however, the IRS received only a handful of applications per month.[457]

## The IRS sought to curb politically active non-profits

In the wake of *Citizens United*, the IRS sought to curb political speech by tax-exempt groups.  This task fell to the Exempt Organizations Division and Lois Lerner, who according to one IRS employee, believed the decision would cause "questions and work" for the IRS.[458]  In fall 2010, as the media and Democrats in Congress questioned the legitimacy of conservative-oriented non-profits engaged in political speech, Lerner wrote to her boss, Sarah Hall Ingram **"we won't be able to stay out of this – we need a plan!"**[459]  Lerner proposed a "c4 project" to examine more closely self-declared non-profits engaged in political activities.[460]  Lerner noted "there is a perception out there" that some 501(c)(4) groups are established only to engage in political activity.[461]  After an advisor assured Lerner that "[i]t's definitely happening,"[462] Lerner replied: "We need to have a plan.  **We need to be cautious so it isn't a per se political project**.  More a c4 project that will look at levels of lobbying and pol. activity along with exempt activity."[463] (emphasis added).

**Figure 13: E-mail from Lois Lerner to Sarah Hall Ingram, Aug. 31, 2010**

| | |
|---|---|
| From: | Lerner Lois G |
| Sent: | Tuesday, August 31, 2010 6:36 PM |
| To: | Ingram Sarah H |
| Subject: | FW: New York Times:  Group Is Accused on Tax Exemption |

We won't be able to stay out of this--we need a plan!

Lois G. Lerner
Director, Exempt Organizations

---

[456] *Id.*

[457] *Id.*

[458] Transcribed interview of Sarah Hall Ingram, Internal Revenue Serv., in Wash., D.C. (Sept. 23, 2013).

[459] E-mail from Lois Lerner, Internal Revenue Serv., to Sarah Hall Ingram, Internal Revenue Serv. (Aug. 31, 2010) [IRSR 632342].

[460] *See* E-mail from Lois Lerner, Internal Revenue Serv., to Cheryl Chasin, Laurice Ghougasian, & Judith Kindell, Internal Revenue Serv. (Sept. 15, 2010) [IRSR 191031-32].

[461] E-mail from Lois Lerner, Internal Revenue Serv., to Cheryl Chasin, Laurice Ghougasian, & Judith Kindell, Internal Revenue Serv. (Sept. 15, 2010) [IRSR 191031].

[462] E-mail from Cheryl Chasin, Internal Revenue Serv., to Lois Lerner, Judith Kindell, & Laurice Ghougasian, Internal Revenue Serv. (Sept. 15, 2010) [IRSR 191030].

[463] E-mail from Lois Lerner, Internal Revenue Serv., to Cheryl Chasin, Laurice Ghougasian, & Judith Kindell, Internal Revenue Serv. (Sept. 16, 2010) [IRSR 191030].

Exhibit D

**Figure 14: E-mail from Lois Lerner to Judith Kindell et al., Sept. 15, 2010**

**From:** Lerner Lois G
**Sent:** Wednesday, September 15, 2010 1:51 PM
**To:** Kindell Judith E; Chasin Cheryl D; Ghougasian Laurice A
**Cc:** Lehman Sue; Kall Jason C; Downing Nanette M
**Subject:** RE: EO Tax Journal 2010-130

I'm not saying this is correct--but there is a perception out there that that is what is happening. My guess is most who conduct political activity never pay the tax on the activity and we surely should be looking at that. Wouldn't that be a surprising turn of events. My object is not to look for political activity--more to see whether self-declared c4s are really acting like c4s. Then we'll move on to c5,c6,c7--it will fill up the work plan forever!

*Lois G. Lerner*
Director, Exempt Organizations

**Figure 15: E-mail from Lois Lerner to Cheryl Chasin et al., Sept. 16, 2010**

**From:** Lerner Lois G
**Sent:** Thursday, September 16, 2010 9:58 AM
**To:** Chasin Cheryl D; Kindell Judith E; Ghougasian Laurice A
**Cc:** Lehman Sue; Kall Jason C; Downing Nanette M
**Subject:** Re: EO Tax Journal 2010-130

Ok guys. We need to have a plan. We need to be cautious so it isn't a per se political project. More a c4 project that will look at levels of lobbying and pol. activity along with exempt activity. Cheryl- I assume none of those came in with a 1024?
Lois G. Lerner-------------------------------

What followed was a prolonged and coordinated project to determine the amount and type of political activity done by tax-exempt organizations. One aspect of this project was the creation of a questionnaire to be sent to groups that held themselves out as tax-exempt in the 2010 and 2011 tax years.[464] Former Acting Commissioner Steven Miller explained the "self-declarer" questionnaire during his transcribed interview with Committee staff. He testified:

Q    Do you recall a project related to a questionnaire for (c)(4), (5), and (6) organizations?

A    Yes.

Q    Can you explain what that project was?

A    So, it was in the Exempt Organizations work plan. . . .  That was a proposed questionnaire to organizations that had not come into the Internal Revenue Service for the – an exemption letter, and the thought was that we would go out and find out what they were doing, and it had political activity as a portion, but it was also inurement and a batch of other activities, discussions through it.[465]

[464] *See* E-mail from Shirley White, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (Mar. 27, 2013) [IRSR 203136].
[465] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).

Exhibit D

The questionnaire included questions about the groups' political activities, including the amount of political activity, volunteers used, and percentage of time spent.[466]  Recognizing the sensitivity of the questions, the IRS purposefully delayed sending the questionnaires until after the 2012 presidential election.[467]  Lerner cautioned against waiting too long to send the questionnaires, because, as she wrote to Miller's chief of staff, "**if we don't move before the end of the year, all the criticism that we didn't do anything during the election gets louder**."[468]

In addition to asking groups about their political activities in the questionnaire, the IRS simultaneously scoured public data to determine the level of political activity by non-profits. Lerner directed one IRS agent to analyze data using OpenSecrets.org, a website run by the Center for Responsive Politics.  In sending him a newsletter from OpenSecrets, Lerner wrote that the group was "[o]ne org that analyzes money in politics.  There are many.  You may want to look at their site to see if there are things there or old issues that could provide you with stuff."[469]

**Figure 16: E-mail from Lois Lerner to Christopher Giosa, Nov. 29, 2012**

| From: | Lerner Lois G |
|---|---|
| Sent: | Thursday, November 29, 2012 4:34 PM |
| To: | Giosa Christopher P |
| Cc: | Marks Nancy J |
| Subject: | FW: OpenSecrets Newsletter: The political cash behind domestic drones, and more |

One org that analyses money in politics.  There are many.  You may want to look at their site to see if there are things there or old issue that could provide you with stuff

*Lois G. Lerner*
Director of Exempt Organizations

From these data sources, the IRS prepared an explanatory document for Lerner that presented a hypothesis that *Citizens United* "has led to increased donations to, and political activities of non-profit corporations."[470]  The document posed several open questions, such as "[w]hat are the trends of how many of these organizations affiliate themselves with specific political parties and specific issues" and "[w]hat are the trends in the number of each type of exempt organization conducting political activities."[471]

---

[466] *See* E-mail from Lois Lerner, Internal Revenue Serv., to Stephen Clarke et al., Internal Revenue Serv. (Oct. 21, 2012) [IRSR 184591].

[467] *See* E-mail from Lois Lerner, Internal Revenue Serv., to Nikole Flax, Internal Revenue Serv. (Sept. 18, 2012) [IRSR 184149]; E-mail from Lois Lerner, Internal Revenue Serv., to Nikole Flax, Internal Revenue Serv. (Sept. 12, 2012) [IRSR 201036].

[468] E-mail from Lois Lerner, Internal Revenue Serv., to Nikole Flax, Internal Revenue Serv. (Nov. 14, 2012) (emphasis added) [IRSR 654057].

[469] E-mail from Lois Lerner, Internal Revenue Serv., to Christopher Giosa, Internal Revenue Serv. (Nov. 29, 2012) [IRSR 656231].

[470] Internal Revenue Serv., Trends in Donations to, and the Political Activities of Certain Non-profit Corporations: Background on What Data May be Available [IRSR 185324-27].

[471] *Id.*

Exhibit D

Lerner's team set out to answer these questions.  A subordinate explained the IRS's extensive research in one e-mail to Lerner in late-March 2013.  He wrote:

> Generally, we have looked at the trends in the numbers, revenue, and expenses . . . of 501(c)(4)s from 2008 – 2011 who have reported political campaign activity to the IRS and compared them to the overall 501(c)(4) population.  We also have looked in-depth at larger 501(c)(4)s (top 25 or so) as well as looked for trends of one tax year "pop-ups."  In the past week, we also assembled data from the FEC online electioneering communication data to compare spending reported to FEC vs. spending reported to IRS as political campaign activity . . . .  We're looking forward to iterating this with you and gaining the benefit of your expertise in interpreting what we are seeing in the data.[472]

By April 2013, the IRS had finished a draft analysis of the trends in 501(c)(4) groups with indications of political activity.[473]  Like the explanatory document, the analysis grounded the issue in *Citizens United*, stating: "Since Citizens United (2010) removed the limits on political spending by corporations and unions, concern has arisen in the public sphere and on Capitol Hill about the potential misuse of 501(c)(4)s for political campaign activity due to their tax exempt status and the anonymity they can provide to donors."[474]  Not surprisingly given the manner in which the IRS framed the problem, the analysis found an increase in the number of groups engaging in political activities and an increase in the amount of political expenditures.[475]

Documents show that Lerner's team had a special interest in restricting anonymous donors to 501(c)(4) groups.  For example, in July 2012, in response to a news article about anonymous donors to 501(c)(4)s, Lerner wrote to her team about how to measure donor anonymity.  She wrote: "Have we ever looked at a random sample of donors on c4s?  Can we add that look to the dual tracks to see if there are a lot of anonymous donors reported or a few anonymous donors who have e [*sic*] given huge amounts? . . . Please put together a proposal for how we will do this and keep track."[476]  Two weeks later, an IRS employee circulated a list of 501(c)(4) groups that had received anonymous donations.[477]  Simultaneously, Washington-based tax law specialist Justin Lowe proposed including a disclosure requirement for 501(c)(4) groups in the Administration's legislative proposals for fiscal year 2014.[478]

---

[472] E-mail from Justin Abold, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (Mar. 22, 2013) [IRSR 556193].

[473] *See* Internal Revenue Serv., Baseline Analysis of 501(c)(4) Form 990 Filers with Schedule C *Political Campaign and Lobbying Activities* (Apr. 15, 2013) [IRSR 195642-65].

[474] *Id.* at 3.

[475] *Id.* at 4.

[476] E-mail from Lois Lerner, Internal Revenue Serv., to Nanette Downing, Internal Revenue Serv. (July 25, 2012) [IRSR 496747].

[477] *See* E-mail from Karen Hood, Internal Revenue Serv., to Kathie Averett, Internal Revenue Serv. (Aug. 6, 2012) [IRSR 497501].

[478] E-mail from Justin Lowe, Internal Revenue Serv., to Andy Megosh & David Fish, Internal Revenue Serv. (Aug. 9, 2012) [IRSR 462574].

91

Exhibit D

Separately, the IRS also pursued regulation of politically active non-profit groups through other means.  In late 2010 and early 2011, the IRS initiated audits of five individuals who had donated to 501(c)(4) organizations.[479]  Although the IRS denied any broader attempt to tax gifts to 501(c)(4) groups,[480] internal documents suggest otherwise.  In May 2011, an attorney in the IRS Chief Counsel's office wrote to his superiors that the "plan is to elevate the issue of asserting gift tax on donors to 501(c)(4) organizations to the Chief Counsel and the Commissioner."[481]  On July 1, 2011, IRS Associate Chief Counsel Curt Wilson issued a memorandum to Chief Counsel William Wilkins on the gift tax issue.[482]  Wilson concluded that "[b]ecause there is no specific exemption from the gift tax for a contribution to an organization exempt from income tax under § 501(c)(4), a contribution to such an organization is subject to gift tax under § 2501."[483]  Lerner, another e-mail shows, supported this conclusion: "[T]o be clearer, the courts have said specifically that contributions to 527 political organizations are not subject to the gift tax – nothing that I am aware of about contributions to organizations that are not political organizations."[484]

Although 501(c)(4) groups are not strictly political organizations, the IRS was very aware of the constitutional implications of imposing gift-tax consequences on transfers to these groups. Joseph Urban wrote to Lerner: "There is also a constitutional angle that has been raised – whether imposing the tax on a contribution for political purposes is an infringement on donors' First Amendment free speech rights . . . ."[485]  Lerner immediately grasped the significance, replying: "The constitutional issue is the big Citizens United issue.  I'm guessing no one wants that going forward."[486]  Separately the same day, Lerner wrote to another colleague about how the gift-tax project could result in a court challenge to the IRS's limits on political speech by non-profits.  She wrote: "This is so ironic.  We build a cathedral to avoid getting to [court] on c3 issue and innocently, folks follow the rules and it turns into a big broohaha [*sic*].  This could be the issue that gets this to the [Supreme Court] on the IRS piece an[d] it isn't even ours!"[487]

Deputy Commissioner Steve Miller eventually quashed the gift-tax possibility in the wake of significant congressional concern.[488]  However, officials in Exempt Organizations continued to consider how to rein in politically active non-profits.  In fiscal year 2011, Exempt Organizations started a "redesigned Form 990" project to utilize information in an exempt

---

[479] *See* John D. McKinnon, *Is IRS Eyeing Gift Tax Rules to Rein In Non-profits' Political Activities?*, WALL ST. J., May 12, 2011.

[480] *Id.*

[481] E-mail from Don Spellmann, Internal Revenue Serv., to Nan Marks & Janine Cook, Internal Revenue Serv. (May 9, 2011) [IRSR 14956].

[482] Memorandum from Curt Wilson, Internal Revenue Serv., to William Wilkins, Internal Revenue Serv. (July 1, 2011) [IRSR 463169-79].

[483] *Id.* at 1.

[484] E-mail from Lois Lerner, Internal Revenue Serv., to Floyd Williams et al., Internal Revenue Serv. (May 13, 2011) [IRSR 14902].

[485] E-mail from Joseph Urban, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (May 17, 2011) [IRSR 196471].

[486] E-mail from Lois Lerner, Internal Revenue Serv., to Joseph Urban, Internal Revenue Serv. (May 17, 2011) [IRSR 196471].

[487] E-mail from Lois Lerner, Internal Revenue Serv., to Roberta Zarin, Internal Revenue Serv. (May 17, 2011) [IRSR 196468].

[488] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).

Exhibit D

organization's annual filing form to determine whether the group engages in political activity.[489] Judy Kindell explained the resigned Form 990 project during her transcribed interview.  She testified:

> As part of our overall project of looking at the redefined form 990, we were doing data analytics.  We were looking at the answers to questions and trying to come up with triggers for what might be indicators of potential noncompliance.  And so one of our tracks that we eventually developed in this process was to develop some triggers, some queries that we could run on the 990 data to see – and test them to see whether they were in fact indicators of noncompliance.[490]

Using certain "triggers" on the redesigned Form 990, the IRS selected certain organizations for compliance audits.[491]  IRS personnel also utilized this information to develop a report for Lerner in August 2011 about the number of groups engaged in political activity.[492]

In addition to using the redesigned Form 990, Lerner's team pursued allegations of political activity in the media or referred to the IRS by a third party.  The IRS called this process the "dual track" approach.[493]  Documents demonstrate that the IRS used this process to examine conservative groups.  In one e-mail, in response to a news article about anonymous donors to conservative tax-exempt groups, Lerner wrote: "Have we ever looked at a random sample of donors on c4s?  Can we add that look to the dual tracks to see if there are a lot of anonymous donors . . .?"[494]  Another e-mail indicated that the IRS was examining the American Legislative Exchange Council, a conservative group referred to the IRS for additional scrutiny by the liberal group Common Cause.[495]

Where the voluntary nature of IRS filings prevented the agency from verifying allegations of excessive political activity, Lerner sought other methods of reining in politically active non-profits.  In a June 2012 e-mail entitled "May I pick your brain?," Lerner posed a question to IRS veteran Nan Marks about how the IRS could better regulate politically active non-profits.  She wrote:

> We have received several referrals on orgs that have not applied for exemption and have not yet filed a [form] 990.  Some of the allegations are that the org is just a political committee in c4 clothing and that once the election is over, it will go away without ever filing.  I'm thinking if we can go back and look at when they received their [employer identification number], we may have a way to move a bit faster.  So, for example, if an

---

[489] *See* Internal Revenue Serv., Redesigned Form 990 Project (Aug. 19, 2011) [IRSR 197270-88].

[490] Transcribed interview of Judith Kindell, Internal Revenue Serv., in Wash., D.C. (Oct. 29, 2013).

[491] *Id.*

[492] *See* Internal Revenue Serv., Redesigned Form 990 Project (Aug. 19, 2011) [IRSR 197270-88].

[493] Internal Revenue Serv., Dual Track Approach [IRSR 184699].

[494] E-mail from Lois Lerner, Internal Revenue Serv., to Nanette Downing et al., Internal Revenue Serv. (July 25, 2012) [IRSR 183812-13].

[495] E-mail from Nanette Downing, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (Apr. 27, 2012) [IRSR 314120].

Exhibit D

org. received its EIN over a year and a half ago, but has not applied or filed, but our internet research shows it is active, is there any reason we couldn't send them a compliance check saying, we noticed you haven't filed and it looks like you may owe us a return, so either file or explain why you don't have to?  So long as we are only looking at the filing piece, I don't see why not.  Otherwise, there is truly a way for an org to be out there doing stuff forever (or at least 3 years), so long as it doesn't file.[496]

Two days later, Urban circulated a *New York Times* article entitled, "Obama's Lawyer Demands Information on Group's Donors," to several IRS employees, including Lois Lerner.[497] The article reported: "The lawyer for President Obama demanded on Tuesday that Crossroads GPS disclose its donors, saying in a complaint to the Federal Election Commission that the group is plainly a 'political committee' subject to federal reporting requirements."[498]  The article also noted:

> So far this year, Democrats have been severely out-raised by groups like Crossroads GPS, which have tapped millionaires and billionaires to build war chests for the coming Congressional and presidential campaigns. . . .

> Those organizations can raise unlimited sums from wealthy individuals without ever disclosing where the money came from.  It is information from those groups that Mr. Obama's campaign is hoping to pry open with the complaint.[499]

Lerner responded to the article with support, writing: "Makes total sense.  They don't need to wait for a [form] 990."[500]

Departing from its role as a neutral tax administrator, the IRS affirmatively sought a way to measure and depress otherwise lawful political speech by tax-exempt groups.  As a result of *Citizens United*, the IRS instituted and carried out a coordinated effort to assess, examine, and discourage political speech by non-profits.

## The IRS sought to deny tax-exempt applicants engaged in political speech

Evidence before the Committee suggests that the IRS sought to deny tax-exempt applicants engaged in political speech.  As a prime example, veteran IRS tax law specialist Carter Hull recommended approving the tax-exempt application filed by the Albuquerque Tea

---

[496] E-mail from Lois Lerner, Internal Revenue Serv., to Nancy Marks, Internal Revenue Serv. (June 18, 2012) [IRSR 178003].
[497] E-mail from Joseph Urban, Internal Revenue Serv., to Sarah Hall Ingram et al., Internal Revenue Serv. (June 20, 2012) [IRSR 315438].
[498] Michael D. Shear, *Obama's Lawyer Demands Information on Group's Donors*, N.Y. TIMES, June 19, 2012.
[499] *Id.*
[500] E-mail from Lois Lerner, Internal Revenue Serv., to Joseph Urban et al., Internal Revenue Serv. (June 20, 2012) [IRSR 315438].

Exhibit D

Party.[501]  However, after the IRS Chief Counsel's office and Lois Lerner's senior technical advisor reviewed the application, the decision was made to recommend a denial of the application.[502]  The only significant change, according to Hull, was the IRS's "position" on the Tea Party applications.[503]

The IRS's institutional disapproval of non-profit political speech is evident in other material produced to the Committee.  For example, one IRS agent in Cincinnati e-mailed tax law specialist Hilary Goehausen in April 2013 with a question about a tax-exempt applicant engaged in political speech.[504]  The agent wrote: "It appears that the org is funneling money to other orgs for political purposes.  However, I'm not sure we can deny them because, technically, I don't know that I can deny them simply for donating to another 501(c)(4). . . .  Any thoughts or feedback would be greatly appreciated."[505]  Goehausen replied in part: "I think there may be a number of ways to deny them.  Let me talk to Sharon [Light] tomorrow about it and get some ideas from her as well. . . .  **This sounds like a bad org. :/** . . .  **This org gives me an icky feeling**."[506] (emphases added).

---

[501] Transcribed interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013); Internal Revenue Serv., Timeline from the 3 exemption applications that were referred to EOT from EOD [IRSR 58346-49].

[502] Internal Revenue Serv., Timeline from the 3 exemption applications that were referred to EOT from EOD  [IRSR 58346-49].

[503] *"The IRS's Systematic Delay and Scrutiny of Tea Party Applications": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013) (question and answer with Rep. James Lankford).

[504] E-mail from Jodi Garuccio, Internal Revenue Serv., to Hilary Goehausen, Internal Revenue Serv. (Apr. 22, 2013) [IRSR 547115].

[505] *Id.*

[506] E-mail from Hilary Goehausen, Internal Revenue Serv., to Jodi Garuccio, Internal Revenue Serv. (Apr. 22, 2013) [IRSR 547116].

Exhibit D

Figure 17: E-mail from Hilary Goehausen to Jodi Garuccio, Apr. 22, 2013

| From: | Goehausen Hilary |
|---|---|
| Sent: | Monday, April 22, 2013 8:58 AM |
| To: | Garuccio Jodi L |
| Subject: | RE: Question |

Hey Jodi! Things are going well here. Sharon and I were just talking last week about how it's almost been our one year anniversary since our trip to Cinci☺ I can't believe it's already been a year.

Hmmm…good question and you're probably definitely right with what they're doing with their money. I have a couple thoughts on this, and I'll actually run it by Sharon as well.

The article also appears to suggest that the org isn't even conducting any activities…does that seem to be what you've seen from their responses? If they aren't and/or haven't shown us that they are, this could potentially go the FTE route. What's their EIN and I can look them up on TEDS?

Also, if they have told us they contribute to other c4s to promote their c4 purposes, then they need to establish to our satisfaction the funds are actually being used for exempt purposes, and they probably haven't done that? If they have no grant agreements to show us that the money is being used for proper c4 purposes, I'd maybe ask follow up questions on the contributions to the orgs since they've told us that's what they're doing. Maybe explain in detail how they ensure each contribution is used for c4 purposes? What documentation from the other orgs to they request to ensure the $ is used properly? Provide us copies. We both know there isn't going to be any documentation, but then they'll have to explain that to us.

He is also the sole director? Maybe we should ask additional questions on that as well?

I think there may be a number of ways to deny them. Let me talk to Sharon tomorrow about it and get some ideas from her as well. Personally, I'm hesitant to send news articles to the orgs and ask for comment, but I'll Sharon if/when she thinks doing that is appropriate and would help. This sounds like a bad org.:/ And as far as ▬▬ *(e103)* calling for updates, just tell him his application is still in the review process. This org gives me an icky feeling.

Shoot me the EIN and I'll look it up on TEDS. And talk to Sharon tomorrow. Thanks for sending! Interesting…

Another e-mail from the same period confirms the IRS's position. In response to a question from Joseph Herr, a Cincinnati IRS agent, about a "high profile" application, Washington-based IRS official Sharon Light wrote: "Holly [Paz] is going to elevate their response, but in the meantime, with what they've given us, do you think we have enough to deny them? We'd rather deny than close FTE [failure to establish]."[507]

## The IRS sought to publicize that it was taking action on tax-exempt groups engaged in political speech

By late March 2013, the Exempt Organization Division was poised to issue its first letter denying exempt status to an applicant involved in political speech. By law, however, complete denial letters are not made public; names, addresses, and other identifying information are redacted.[508] For the IRS, which desperately wanted to show that it was cracking down on politically active tax-exempt groups, the private nature of the denial letters prevented any public showcase of its actions. Lerner sought a work-around.

---

[507] E-mail from Sharon Light, Internal Revenue Serv., to Joseph Herr, Internal Revenue Serv. (Apr. 12, 2013) [IRSR 549953].

[508] See I.R.C. § 6110(c).

In an e-mail exchange with her senior staff, Lerner brainstormed how to make the IRS's work public. She suggested designating the denials of conservative-oriented applicants for litigation, meaning the cases would bypass the IRS's normal administrative appeal procedure and would proceed directly to court.[509] Lerner assumed that the applicants "all want to go to court – so we figured, why not get there sooner and save Appeals some time – they will be dying with these cases."[510] When a colleague doubted Lerner's assumption, Lerner responded tartly: "Sorry. These guys are itching for a Constitutional challenge. Not you[r] father's [Exempt Organizations]."[511]

**Figure 18: E-mail exchange between Lois Lerner & Nancy Marks, Apr. 1, 2013**

| | |
|---|---|
| **From:** | Lerner Lois G |
| **Sent:** | Monday, April 01, 2013 8:56 AM |
| **To:** | Marks Nancy J; Paz Holly O; Fish David L |
| **Subject:** | Re: HMMMM? |

Sorry. These guys are itching for a Constitutional challenge. Not you father's EO
Lois G. Lerner--------------------------
Sent from my BlackBerry Wireless Handheld

---

**From:** Marks Nancy J
**Sent:** Friday, March 29, 2013 05:55 PM Eastern Standard Time
**To:** Lerner Lois G; Paz Holly O; Fish David L
**Subject:** Re: HMMMM?

I guess I'd never assume that. Court is an expensive crap shoot with the potential for a public record the org might not want. This changes the odds some not sure it is a lot (unless most have no liability)
--------------------------
Sent using BlackBerry

---

**From:** Lerner Lois G
**Sent:** Friday, March 29, 2013 05:43 PM Eastern Standard Time
**To:** Marks Nancy J; Paz Holly O; Fish David L
**Subject:** RE: HMMMM?

When we were talking, we were thinking they would all want to go to court--so we figured, why not get there sooner and save Appeals some time--they will be dying with these cases. We were thinking c3 rules. As to taxes owed--if IRS hasn't assessed, it's hard to get to court without paying yourself and making a claim

*Lois G. Lerner*
Director of Exempt Organizations

---

[509] *See* E-mail from Lois Lerner, Internal Revenue Serv., to Nikole Flax, Internal Revenue Serv. (Mar. 29, 2013) [IRSR 466650].

[510] E-mail from Lois Lerner, Internal Revenue Serv., to Nancy Marks et al., Internal Revenue Serv. (Mar. 29, 2013) [IRSR 188429].

[511] E-mail from Lois Lerner, Internal Revenue Serv., to Nancy Marks et al., Internal Revenue Serv. (Apr. 1, 2013) [IRSR 188429].

Exhibit D

In fact, other documents confirm that Lerner expected the IRS's denials of conservative tax-exempt applications to be appealed by the applicants.  In an earlier e-mail to Christopher Wagner, Chief of the IRS Office of Appeals, Lerner detailed her quarterly meeting with the appeals team.  She noted to Wagner that "in the next few months we believe [the Office of Appeals] will get a lot of business from our [taxpayers] regarding denials on 501(c)(4) applications."[512]  Calling the issue "very sensitive and visible," Lerner explained the reason for the new "business" as "a new issue driven by a recent Supreme Court case expanding spending in elections to corporations, and a desire of some to make the expenditures without having their names show up on Federal Election Reports."[513]  She cautioned Wagner: "If I were you, this is definitely something I'd want to be aware of and have a high level person overseeing and reporting regularly to me.  You were in TEGE long enough to understand how dangerous what we do can be."[514]

---

[512] E-mail from Lois Lerner, Internal Revenue Serv., to Christopher Wagner, Internal Revenue Serv. (Jan. 31, 2013) [IRSR 122863].
[513] *Id.*
[514] *Id.*

Exhibit D

**Figure 19: E-mail from Lois Lerner to Christopher Wagner, Jan. 31, 2013**

| From: | Lerner Lois G |
|---|---|
| Sent: | Thursday, January 31, 2013 1:07 PM |
| To: | Wagner Christopher (Chief Appeals) |
| Subject: | A Couple Items |

I just got off our quarterly meeting with Appeals and wanted to raise a couple issues to make sure we are all on the same page. I'm raising with you because I am not familiar enough with your organization to know where I should be going, and at least with the second item, I think you do need to be aware.

1. Apparently Appeals is going through a Lean Six Sigma process. One thing they brought to our attention is that Appeals believes the time between when a TP first requests to go to Appeals and the time the case gets to Appeals is too long. They have provided us with data, but also told us they think it isn't very good--so we're not sure of their basis for the claim that things are taking too long. They have spoken to some of our managers about the process, but without data that we can look at and an explanation about how they are going about this, it is hard to understand where the starting point is and where the pain points may be. They have not met with either Holly and Nan, who are the Directors of the programs they are looking at, and who I believe could save them a lot of time. Thought you might want a briefing on this from them--you may be perfectly OK with their approach, but we are baffled.

2. During the meeting I gave them a heads up that, in the next few months we believe they will get a lot of business from our TPs regarding denials on 501 (c)(4) applications. I explained the issue is whether they are primarily involved in social welfare activities and whether their political intervention activities, along with other non-social welfare activities mean they don't meet the c4 requirements. I explained the issue was very sensitive and visible and there is a lot of interest--Congress, press, political groups, you name it. I personally have been up to the Hill at least 8 times this past year to explain the complexities of the rules--they are not black and white and they are not always intuitive. I offered a general tutorial session (non-case-related)on the law and the complexities because--as I pointed out--this is a new issue driven by a recent Supreme Court case expanding spending in elections to corporations, and a desire of some to make the expenditures without having their names show up on Federal Election Reports. The fact that these orgs can do some of this activity and still be a c4 further complicates the issue. I told them this is a place where we have worked very hard to be consistent and have all our cases worked by one group, and suggested they might want to do something similar. (PS we are under audit by TIGTA because of allegations of political bias on these cases) If I were you, this is definitely something I'd want to be aware of and have a high level person overseeing and reporting regularly to me. You were in TEGE long enough to understand how dangerous what we do can be.

By designating the conservative tax-exempt cases for litigation, the IRS hoped to make its actions public. David Fish, a senior official in the IRS's Exempt Organizations Division, explained how litigation would publicize the IRS's work. He wrote to Lerner and others:

> If you designate a case for litigation, the redacted denial [letter] will still be public, won't it?
>
> Even redacted, you still will get a flavor for the activity conducted, the proximity to an election, and the presence (or more important, absence) of vote for or against. **The mere fact that we are doing anything at all in**

Exhibit D

**this area will be huge.  I have only seen one denial in passing, but I would not presume that redaction would make it completely unhelpful.**[515]

Fish's e-mail is illuminating on the IRS's thinking.  Notably, it mirrored that of Lois Lerner, who wrote in a separate e-mail around the same time that "one IRS prosecution would make an impact and they [501(c)(4) groups] wouldn't feel so comfortable doing the stuff."[516]  Lerner also prodded Holly Paz to expedite the IRS's denial process, writing: "[N]eed to move c4 denials along – really need to get one out of here."[517]

During a transcribed interview with Committee staff, Fish elaborated about the importance of the IRS publicly demonstrating its action on tax-exempt groups engaged in political speech.  He testified:

> Q      Sir, if I could turn your attention back to your email on page one of Exhibit 5.  In the second paragraph, the second sentence, you wrote, quote, "The mere fact that we are doing anything at all in this area will be huge." What area are you referring to?
>
> A      Political activity of (c)(4)s.
>
> Q      What would be huge about the mere fact that the IRS is doing anything in the area of political activity of (c)(4)s?
>
> A      It tells people we're doing something, because people might have thought we were just neglecting and not doing anything.
>
> Q      And why is that important, to tell people the IRS is doing something on the political activity of (c)(4)s?
>
> A      Because there are legitimate concerns about whether and how much they're supposed to be doing.[518]

As Fish and Lerner articulated, the "mere fact" that the IRS was "doing anything" would be "huge" to showing that the agency was taking action on politically active 501(c)(4) organizations and those groups would not "feel so comfortable" engaging in political speech.  Publicized IRS action would also assuage the prominent Democratic politicians and media voices who had forcefully lobbied the IRS to crack down on 501(c)(4)s groups engaged in political speech.

---

[515] E-mail from David Fish, Internal Revenue Serv., to Nancy Marks et al., Internal Revenue Serv. (Apr. 1, 2013) (emphasis added) [IRSR 188427].
[516] E-mail from Lois Lerner, Internal Revenue Serv., to Nikole Flax et al., Internal Revenue Serv. (Mar. 27, 2013) [IRSR 188329].
[517] E-mail from Lois Lerner, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Mar. 27, 2013) [IRSR 659092].
[518] Transcribed interview of David Fish, Internal Revenue Serv., in Wash., D.C. (Oct. 2, 2014).

Exhibit D

**Figure 20: E-mail from Lois Lerner to Nikole Flax et al., Mar. 27, 2013**

| From: | Lerner Lois G |
|---|---|
| Sent: | Wednesday, March 27, 2013 12:39 PM |
| To: | Flax Nikole C; Sinno Suzanne; Barre Catherine M; Landes Scott S; Amato Amy; Vozne Jennifer L |
| Subject: | RE: UPDATE - FW: Hearing |

As I mentioned yesterday--there are several groups of folks from the FEC world that are pushing tax fraud prosecution for c4s who report they are not conducting political activity when they are(or these folks think they are). One is my ex-boss Larry Noble(former General Counsel at the FEC), who is now president of Americans for Campaign Reform. This is their latest push to shut these down. One IRS prosecution would make an impact and they wouldn't feel so comfortable doing the stuff.

So, don't be fooled about how this is being articulated--it is ALL about 501(c)(4) orgs and political activity

*Lois G. Lerner*
Director of Exempt Organizations

On another level, publicizing the "flavor for the activities conducted" would be helpful for the IRS in preventing other likeminded groups from engaging in similar political speech. In this way, any publicity given to the IRS's denial letters would set a precedent and serve to deter other groups from engaging in political speech. The IRS would, in effect, regulate the amount and type of political speech by tax-exempt groups through the agency's enforcement mechanism rather than by public notice-and-comment rulemaking.

By early May 2013, the IRS was prepared to issue its first denial. Lerner had taken the unusual step of requesting a briefing on the denial, according to her senior technical advisor, because "these were very important cases in her area. . . . [T]here had been a lot of effort put into this project, and this was the first denial to be going out."[519] The draft denial letter was vetted by Lerner personally, in addition to senior IRS official Nan Marks and attorneys from the IRS Chief Counsel's office.[520] Holly Paz asked EO Determinations Quality Assurance – the office responsible for vetting final denial letters – to make the denial its "top priority," reminding the office "this case and the denial letter have been heavily vetted so we are hopeful that that will allow Quality [Assurance] to conduct a focused and quick review."[521] It is unclear, however, whether the IRS ever issued the denial letter in the wake of Lerner's apology just days later.

---

[519] Transcribed interview of Sharon Light, in Wash., D.C. (Sept. 5, 2013).
[520] *See* E-mail from Sharon Light, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Apr. 30, 2013) [IRSR 554695].
[521] E-mail from Holly Paz, Internal Revenue Serv., to Donna Abner, Internal Revenue Serv. (May 1, 2013) [IRSR 562176].

## The IRS sought to regulate politically active social-welfare groups

As early as 2009, the IRS began internal discussions about defining the exemption standard – that is, the level of permissible exempt activities – as it relates to 501(c)(4) organizations.[522]  The exemption standard, according to one undated IRS document, was the "topic of perennial discussion within the IRS."[523]  The same document specifically cited outside proposals from the American Bar Association and Democracy 21 to limit political speech of 501(c)(4) groups to as little as five percent of total expenditures.[524]  With these proposals and "perennial" internal IRS deliberations, it is apparent that the IRS seriously pursued regulations on politically active social-welfare groups.

By 2011, internal IRS discussions about 501(c)(4) regulations continued.  In spring 2011, attorneys from the IRS chief counsel's office initiated a meeting with Exempt Organizations personnel to discuss the "primarily" versus "exclusively" standards.[525]  Senior counsel Don Spellmann, who attended the meeting, explained the purpose of the meeting during his transcribed interview.  He testified:

> We initiated the discussion because we became aware that the Service had a compliance program at the exam level under (4)s, (5)s, and (6)s. And so we said, since you've got this compliance program starting up, this would seem like a good time, before we don't have any actual cases, to see if we can't reach a common understanding on what the standard is on primarily/exclusively. We did not have any details about that plan. We just knew that it was in Exempt Organizations' business plan, and that was one thing we wanted to ask about in the meeting, of what the scope of that exam program was.[526]

Following the meeting, tax law specialist Justin Lowe prepared a document outlining the various authorities.[527]  The Chief Counsel's office even prepared a draft memorandum for the Commissioner of Tax Exempt and Government Entities interpreting the 501(c)(4) standard.  The memo was not finalized.[528]

By 2012, the Administration considered further regulation of social-welfare groups.  In June, Ruth Madrigal in the Treasury Department's Office of Tax Policy wrote to IRS Division Counsel Victoria Judson and others about "addressing" 501(c)(4) organizations "off-plan" in 2013.[529]  By working on 501(c)(4) regulations "off-plan," the Treasury Department and the IRS could keep the work secret and off of the Department's official published guidance plan.  In July, IRS Chief Counsel William Wilkins, along with Judson and Nancy Marks, met with staff

---

[522] *See* Transcribed interview of Don Spellmann, Internal Revenue Serv., in Wash., D.C. (July 12, 2013).

[523] Internal Revenue Serv., Proposals to Alter the 501(c)(4) Regulations (undated) [IRSR 505762-63].

[524] *Id.*

[525] Transcribed interview of Don Spellmann, Internal Revenue Serv., in Wash., D.C. (July 12, 2013).

[526] *Id.*

[527] *Id.*

[528] *Id.*

[529] E-mail from Ruth Madrigal, Dep't of the Treasury, to Victoria Judson et al., Internal Revenue Serv. (June 14, 2012) [IRSR 305906].

Exhibit D

members for several Democratic Senators to discuss regulations relating to 501(c)(4) groups.  In a memorandum prepared for Treasury Secretary Timothy Geithner, the meeting was described as "an overview of the law for 501(c)(4)s, the process for changing regulations, and process for priority guidance plan."[530]

By early 2013, the IRS had identified potential regulations on 501(c)(4) groups as "far and away the most important" guidance proposal.[531]  Another IRS Chief Counsel office document from May 2013 called regulations on 501(c)(4) groups "EO's priority #1."[532]  It elaborated: "Significant congressional and public interest.  Last year, suggested guidance on meaning of 'operated exclusively' in context of 501(c)(4) and the decision was made to work off-plan."[533]  The IRS attributed the need for new regulations to "changing times," finding that "[t]he regulations are getting a lot of public attention today for reasons the original drafters could not have anticipated."[534]

**Figure 21: TEGE (EO) New Projects Proposed for FY 2013-2014 PGP**

| Business Unit | PGP Category | Project ID in TECHMIS (if applicable) | PGP Description of Subject Matter/Issue & Code Section | Proposed by (Source) | Assoc. Office: Add or Exclude | Comments | CC Decision Add or Exclude |
|---|---|---|---|---|---|---|---|
| TEGE | Exempt Organizations | | Amend 501(c)(4) regulations to state that an organization will not be described in 501(c)(4) if more than an insubstantial part of its activities is not in furtherance of its exempt purpose (consistent with regulations and court decisions regarding 501(c)(3)) | Area Counsel (Mark Weiner); EO function | ADD [TBD?] | EO priority #1.  The nature and extent of this project remains TBD.  Significant congressional and public interest.  Last year suggested guidance on meaning of "operated exclusively" in context of 501(c)(4) and the decision was made to work off-plan. | |

"Amend 501(c)(4) regulations to state that an organization will not be described in (501)(c)(4) if more than an insubstantial part of its activities is not in furtherance of its exempt purpose (consistent with regulations and court decisions regarding 501(c)(3)"

"EO priority #1.  The nature and extent of this project remains TBD.  Significant congressional and public interest.  Last year suggested guidance on meaning of 'operated exclusively' in context of 501(c)(4) and the decision was made to work off-plan."

By May 2013, the IRS initiated discussions with the American Bar Association about potential regulatory action on the political speech of 501(c)(4) organizations.  In a closed-door meeting with representatives of the ABA on May 9 – the day before Lerner's apology – Acting Commissioner Miller and other senior IRS officials convened a discussion of the "current conundrum" of the IRS's regulation of 501(c)(4) organizations and political speech.[535]  The meeting referenced "a wave of cash unleashed" by the *Citizens United* decision, "and that cash chose a favorable port due to disclosure and underenforced gift tax rules."[536]  Miller's handwritten notes indicated that his "little hope of peace was dashed" by the decision: "I can now have a c4 – 100% of which is political and close to the line education issue ads . . . **So I**

---

[530] Memorandum from Frank Keith, Internal Revenue Serv., "Information Memorandum for Secretary Geithner" (July 3, 2012) [IRSR 415870-72].

[531] E-mail from David Fish, Internal Revenue Serv., to Nancy Marks et al., Internal Revenue Serv. (Mar. 29, 2013) [IRSR 190599].

[532] Internal Revenue Serv., TEGE (EO) New Projects Proposed for FY 2013-2014 PGP – 5-03-13 [IRSR 547444].

[533] *Id.*

[534] Internal Revenue Serv., Background document on regulations of 501(c)(4) organizations [IRSR 459073-76].

[535] Internal Revenue Serv., Handwritten notes of "ABA Closed Door" (May 9, 2013) [IRSR 505855-58].

[536] *Id.*

103

**would prefer a legislative fix – disclosure would be best but open to looking at regulation**."[537]   The meeting considered different options for reform, including "better definitions"; a study sponsored by the ABA; and a "push for disclosure of c4s and gift tax."[538]

Given the information available to the Committee, it is clear that the IRS began seriously considering regulating the political speech of 501(c)(4) organizations well before the public release of the IRS targeting.  The IRS continued this process up to the day before Lois Lerner's public apology.  It is clear that the IRS's goal was to quell the "wave of cash" flowing to 501(c)(4) organizations as a result of the Supreme Court's affirmation of free political speech.

## The IRS's plans mirrored Administration-wide attempts to stifle free political speech

The IRS's attempts to reign in politically active non-profits did not occur in a vacuum. These efforts mirrored similar attempts by agencies across the Obama Administration to compel disclosure and thereby identify, isolate, and marginalize individuals who oppose the Administration's favored policies.  From the Securities and Exchange Commission to the Federal Communications Commission, the Administration is systematically attempting to stifle free political speech.

The Committee has documented previously how Democratic elected officials and special interest groups pressured the SEC to develop a political disclosure rule.[539]  In early 2012, the SEC considered whether to publish its intention to propose a rule that would require public companies to disclose the use of corporate resources for political activities.[540]  The SEC ultimately voted to publish its regulatory agenda without the political disclosure rule included.

Subsequently, elected officials and others began to lobby the SEC to change its mind.  In July 2012, a staff member for then-Congressman Barney Frank, the Ranking Member of the House Financial Services Committee, wrote to the SEC Office of Legislative and Intergovernmental Affairs about the SEC's authority to compel disclosure of corporate contributions.  The staff member specifically framed the issue in terms of § 501(c)(4) organizations, writing:

> We have gotten a question from [House Democratic] leadership about SEC authority to require disclosure on corporate charitiable [sic] contributions  **There is particular interest in what the authority is for disclosure of 501(c)(4) contributions** (political contributions).[541]

The legislative affairs official forwarded the e-mail to other senior SEC officials, writing:

---

[537] *Id.*
[538] *Id.*
[539] *See* Memorandum from Majority Staff, H. Comm. on Oversight & Gov't Reform, to Members, H. Comm. on Oversight & Gov't Reform, "The SEC and Political Speech" (July 22, 2013).
[540] *Id.*
[541] *Id.* (emphasis added).

Exhibit D

> Please see inquiry below from Barney Frank's staff.  Can you please provide a response?  I suspect the answer to the actual question is relatively easy, but **I'm including all of you on the email so you'll be aware that House Democratic Leadership is interested**.[542]

An SEC employee in the Division of Corporate Finance responded that the focus on § 501(c)(4) groups was unusual for corporate governance.  He wrote:

> I have not heard the request framed as precisely as [the staff member] frames it – 501(c)(4) contributions.  Typically one hears it in terms of political contributions more broadly with some folks wanting to know about contributions to organizations/groups that may then in turn use that money for political contributions.[543]

The SEC also received considerable pressure from Public Citizen to promulgate a regulation compelling disclosure of corporate contributions to § 501(c)(4) groups and § 501(c)(6) groups.[544]

The political pressure exerted by Democratic elected officials and their special interest allies initially succeeded.  Contrary to the opinion of SEC career professional staff, the SEC included the proposed political disclosure rule in a draft regulatory agenda prepared in September 2012.[545]  The SEC provided no explanation for the change.  After public outcry about the SEC's drastic departure from its core mission, the Commission ultimately dropped its plans in November 2013.[546]

Like the SEC and the IRS, other federal agencies have considered efforts to compel disclosure relating to political activities.  The FCC, for example, promulgated a rule in 2012 requiring television stations to submit detailed records about political advertising sold by the stations.[547]  This initiative was just the beginning for FCC disclosure efforts.  More recently, Democratic Members in the House have pressured the FCC to require political advertisers to disclose their contributors.[548]  New FCC Chairman Tom Wheeler has resisted this political pressure, vowing not to compel disclosure of contributors during his confirmation process.[549]

The Supreme Court has recognized the need for citizens to make political speech anonymously, without fear of repercussion or harassment.[550]  The Administration's campaign of compelled political disclosure, however, violates this fundamental right.  This disclosure campaign – though presented in terms of transparency – is an effort to identify and intimidate

---

[542] *Id.* (emphasis added).

[543] *Id.*

[544] *Id.*

[545] *Id.*

[546] *See* Dina El Boghdady, *SEC drops disclosure of corporate political spending from its priority list*, WASH. POST, Nov. 30, 2013.

[547] T.W. Farnam, *FCC to require more disclosure about political ads*, WASH. POST, Apr. 27, 2012.

[548] *See* Brendan Sasso, *Democrats turn to FCC to unveil secret donors behind political ads*, THE HILL, Mar. 2, 2013.

[549] Edward Wyatt, *New chief of the F.C.C. is confirmed*, N.Y. TIMES, Oct. 29, 2013.

[550] *See, e.g.*, NAACP v. Alabama, 357 U.S. 449 (1958).

vocal citizens who oppose the Administration's policies.  Already, some prominent conservative figures face harassment and even death threats due to their right-leaning political beliefs.[551]  The Administration's efforts – of which the IRS is only one symptom – threaten to discourage open political participation and stifle free political speech.

### The IRS targeting is a pretext for the Administration's  proposed regulation on political speech of social welfare organizations

On November 29, 2013, the IRS and the Treasury Department issued a proposed regulation related to the political speech of tax-exempt groups organized under section 501(c)(4) of the tax code.  Purportedly, the Administration's regulation is intended to clarify the tax-exemption determinations process and resolve problems identified in TIGTA's audit report of the IRS targeting.[552]  In reality, however, the IRS and the Treasury Department's interest in regulating in this area arose long before the release of the TIGTA audit report and the public awareness of the targeting.  Moreover, the regulation, as written, will stifle free speech and may be used to legitimize the targeting of organizations whose views are at odds with those of the Administration.

Section 501(c)(4) of the federal tax code explicitly recognizes as non-profit any "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare."[553]  Under current law, a § 501(c)(4) group may engage in political speech as long as its primary purpose promotes social welfare.  The Administration's proposal, however, broadens the exclusion of political speech well beyond any reasonable interpretation of the statutory text.  The proposal prohibits any "candidate related political activity," including the distribution of voter guides and the hosting of elected officials near an election.[554]  The indiscriminate breadth of this proposal threatens the free political speech rights of non-profit organizations.

Also troubling, the Administration has used the controversy surrounding the IRS targeting of conservative tax-exempt applicants to wrongly justify the need for this regulation.  Contrary to the Administration's assertion, TIGTA did not recommend that the IRS issue regulations narrowing the type of permissible political speech by § 501(c)(4) organizations.  Instead, TIGTA recommended that the IRS consider proposals to clarify the *amount* of permissible political speech – not the *type* of permissible political speech, as this proposal does.[555]

---

[551] Matea Gold, *Koch-backed political coalition, designed to shield donors, raised $400 million in 2012*, WASH. POST, Jan. 5, 2014.
[552] Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related Political Activities, 78 Fed. Reg. 71,535 (proposed Nov. 29, 2013) (to be codified at 26 C.F.R. pt. 1) (quoting the "Charting a Path Forward at the IRS: Initial Assessment and Plan of Action" report) [hereinafter "Proposed Regulation"].
[553] I.R.C. § 501(c)(4).
[554] Proposed Regulation, *supra* note 552.
[555] TIGTA Audit Rpt., *supra* note 20.

Exhibit D

Moreover, the Committee's investigation has uncovered evidence that the Administration considered regulating § 501(c)(4) organizations well before the publication of the TIGTA audit. Indeed, in June 2012, Ruth Madrigal of the Treasury Department's Office of Tax Policy wrote to several IRS leaders about potential § 501(c)(4) regulations. She wrote: "Don't know who in your organization is keeping tabs on c4s, but since we mentioned potentially addressing them (off-plan) in 2013, I've got my radar up and this seemed interesting."[556] Madrigal forwarded a short article about a court decision with "potentially major ramifications for politically active section 501(c)(4) organizations."[557]

Figure 22: E-mail from Ruth Madrigal to Victoria Judson et al., June 14, 2012

| From: | Ruth.Madrigal |
|---|---|
| Sent: | Thursday, June 14, 2012 3:10 PM |
| To: | Judson Victoria A; Cook Janine; Lerner Lois G; Marks Nancy J |
| Subject: | 501(c)(4)s - From the Nonprofit Law Prof Blog |

Don't know who in your organizations is keeping tabs on c4s, but since we mentioned potentially addressing them (off-plan) in 2013, I've got my radar up and this seemed interesting...

In a transcribed interview with Committee staff, Madrigal discussed her e-mail. She explained that the Department worked with Lerner and her IRS colleagues to develop the § 501(c)(4) regulation "off-plan." She testified:

Q    And ma'am, you wrote, "potentially addressing them." Do you know what you meant by, quote, "potentially addressing them?"

A    Well, at this time, we would have gotten the request to do guidance of general applicability relating to (c)(4)s. And while I can't – I don't know exactly what was in my mind at the time I wrote this, the "them" seems to refer back to the (c)(4)s. And the communications between our offices would have had to do with guidance of general applicability.

Q    So, sitting here today, you take the phrase, "potentially addressing them" to mean issuing guidance of general applicability of 501(c)(4)s?

A    I don't know exactly what was in my head at the time when I wrote this, but to the extent that my office collaborates with the IRS, it's on guidance of general applicability.

Q    And the recipients of this email, Ms. Judson and Ms. Cook are in the Chief Counsel's Office, is that correct?

---

[556] E-mail from Ruth Madrigal, Dep't of the Treasury, to Victoria Judson, Internal Revenue Serv. (June 14, 2012) [IRSR 305906].
[557] Id.

Exhibit D

A       That's correct.

Q       And Ms. Lerner and Ms. Marks are from the Commissioner side of the IRS?

A       At the time of this email, I believe that Nan Marks was on the Commissioner's side, and Ms. Lerner would have been as well, yes.

Q       So those are the two entities involved in rulemaking process or the guidance process for tax exempt organizations, is that right?

A       Correct.

***

Q       What did the term "off plan" mean in your email?

A       Again, I don't have a recollection of doing – of writing this email at the time.  I can't say with certainty what was meant at the time.

Q       Sitting here today, what do you take the term "off plan" to mean?

A       Generally speaking, off plan would refer to guidance that is not on – or the plan that is mentioned there would refer to the priority guidance plan.  And so off plan would be not on the priority guidance plan.

Q       And had you had discussions with the IRS about issuing guidance on 501(c)(4)s that was not placed on the priority guidance plan?

A       In 2012, we – yes, in 2012, there were conversations between my office, Office of Tax Policy, and the IRS regarding guidance relating to qualifications for tax exemption under (c)(4).

Q       And this guidance was in response to requests from outside parties to issue guidance?

A       Yes.  Generally speaking, our priority guidance plan process starts with – includes gathering suggestions from the public and evaluating suggestions from the public regarding guidance, potential guidance topics, and by this point, to the best of my recollection, we had had requests to do guidance on this topic.[558]

---

[558] Transcribed interview of Ruth Madrigal, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 3, 2014).

Exhibit D

Former Acting IRS Commissioner Steve Miller clarified that the internal discussions on political regulations resulted from political pressure placed on the IRS by congressional Democrats.  He testified that after reading an article entitled "The IRS's 'Feeble' Grip on Big Political Cash," he brainstormed ideas with his chief of staff, Nikole Flax, and IRS Legislative Affairs Director, Catherine Barre, to "level the playing field" between § 501(c)(4) groups and § 527 organizations.  He testified:

Q    Why did you want to discuss this article with Ms. Flax and Ms. Barre?

A    So, I was interested in thinking about what we might be able to do into the future in the area.

Q    What do you mean by "the area"?

A    The area of what constitutes political activity for a 501(c)(4) organization. That's my recollection, anyway.

Q    And what kind of ideas did you have in mind?

A    So, there were issues around the regulation and the definition of "exclusively" as "primarily" in the regulation.  And there were other things gone on. I don't even know what else. It actually was a brainstorming session, is my suspicion.

Q    Okay. But refining the regulation was one idea that you were brainstorming?

A    That had been on – that had been thought about.  But I'm not sure we were brainstorming specifically on that.

                                        ***

Q    What were the other ideas that you brainstormed, to your recollection?

A    I think what could be done in terms of, if anything, in terms of a legislative disclosure rule.  That's a recollection.  I may be wrong on that, but that's the only other one that I can remember right now.

Q    And, sir, what do you mean by "legislative disclosure rule"?

A    So, under the rules – and, you know, this is a long piece.  But under the rules, 501(c)(4) donors are not disclosed to the public. And there is an argument made here and elsewhere that that's a

109

> reason why money is flowing into those organizations for political purposes – for purposes of spending on politics.  I'm sorry.  I'll be more precise.

Q     And so you wanted to implement a disclosure rule that would take away that advantage for (c)(4)s?

A     Did I want to do that?  No.  But in terms of brainstorming things that would level the playing field between 527 organizations and 501(c)(4) organizations, that was one thing that was talked about. [559]

These discussions, according to Miller, arose as a result of political pressure from Democratic elected officials.  He testified:

Q     And, sir, what did you see as the problem that needed to be addressed through either a regulatory change or a legislative change?

A     **So I'm not sure there was a problem, right?  I mean, I think we were – we had, you know, Mr. Levin complaining bitterly to us about – Senator Levin complaining bitterly about our regulation that was older than me, where we had read "exclusively" to mean "primarily" in the 501(c)(4) context.  And, you know, we were being asked to take a look at that.  And so we were thinking about what things could be done**.[560]

The Administration's proposal has attracted significant negative feedback from all corners of the country and both ends of the political spectrum.  New IRS Commissioner John Koskinen has said that the rule has generated over 150,000 public comments, elaborating: "I'm told if you take all the comments on all the Treasury and IRS regulations for the last seven years, double that number, you are close to the number of comments that we have on this single regulation."[561]  The widespread backlash to the Administration's proposal led Commissioner Koskinen to announce on April 14, 2014 – just over a month after the comment period closed – that the IRS would reissue a redrafted rule to address deficiencies in the current proposal.[562]

The Economic Growth Subcommittee convened a hearing about the proposed rule on February 27, 2014.[563]  This hearing featured testimony from a diverse swath of citizens – including the Tea Party, the American Civil Liberties Union, the American Motorcyclist Association, and the Home School Legal Defense Association – all in opposition to the

---

[559] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013) (emphasis added).

[560] *Id.*

[561] *The IRS Reconsiders*, WALL ST. J., Apr. 7, 2014.

[562] *See* Susan Page, *IRS chief: New rule on the way for tax-exempt groups*, USA TODAY, Apr. 14, 2014.

[563] *"The Administration's Proposed Restrictions on Political Speech: Doubling Down on IRS Targeting": Hearing Before the Subcomm. on Economic Growth, Job Creation, & Regulatory Affairs of the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014).

proposal.[564]  One witness, Allen Dickerson of the Center for Competitive Politics, elegantly explained why the Administration's proposal was so misguided.  He testified:

> And I think it is important to deal with the elephant in the room, which is disclosure.  The fact, as I said earlier, is that **there is no revenue purpose to this rule.  It is about the disclosure of people's donors**.  And I want to tackle that head on.  The reason 501(c)(4)s do not disclose their donors is because Congress said so.   When the Internal Revenue Code was passed, it creates criminal penalties for the unauthorized disclosure of the donors to these organizations.  And the reason for that is that it has always been understood that 501(c)(4)s are the beating heart of civil society.  **These are the organizations, like the NRA and the Sierra Club, which go out there and take unpopular positions and move the national debate and make this a vibrant and functioning democracy.  Requiring unpopular organizations to give up their donor list to public scrutiny is not only contrary to Congress's intention in the Internal Revenue Code, it is also contrary to constitutional law**.[565]

The Administration's proposed regulation of social welfare organizations is precisely the action that President Obama and Congressional Democrats sought when they implored the IRS to crack-down on 501(c)(4) groups engaged in political speech.  The regulation is the culmination of a concerted effort to muzzle conservative tax-exempt groups and force the disclosure of their donors for harassment and intimidation.  The Administration's regulation is not responsive to, and it does not address, the IRS's misconduct.  The fact that the Administration is using the IRS's targeting of conservative tax-exempt applicants as a pretext for this proposed rule adds further insult to the injuries these groups experienced.  The regulation effectively continues the IRS's targeting program.

### *Mismanagement by senior IRS leadership failed to effectively prevent and later to stop the targeting of conservative-oriented groups*

The Committee's investigation has found that serious leadership and management failures contributed to the IRS's inability to prevent and, subsequently, to stop the targeting of conservative-oriented groups.  From the very top of the IRS on down, bad judgment, inexperience, and bureaucratic rigidity contributed to a perfect storm of mismanagement.  The Committee has identified eight senior leaders who were in a position to prevent or to stop the IRS's targeting of conservative applicants.  Each of these leaders could have and should have done more to prevent the IRS's targeting of conservative tax-exempt applicants.

---

[564] *Id.*
[565] *Id.* (statement of Allen Dickerson, Center for Competitive Politics) (emphases added).

Exhibit D

## Doug Shulman, former Commissioner

Doug Shulman served as IRS Commissioner during the majority of the IRS's targeting of conservative tax-exempt applicants.  On this basis alone, Shulman deserves a substantial portion of the responsibility for what occurred.  Yet, in public testimony after the scandal broke in May 2013, Shulman disclaimed responsibility, stating: "I don't accept responsibility for . . . putting a name on a list with inappropriate criteria."[566]  The Committee's investigation has found that Shulman was aware of the targeting in 2012 and failed to do anything.  As the leader of the IRS, he should have done much more.

Shulman became IRS Commissioner in March 2008.  Nominated by President Bush in late 2007 and confirmed by the Democratic-controlled Senate, Shulman is a Democratic donor.[567]  During his transcribed interview with Committee staff, Shulman discussed how he approached his role as IRS Commissioner.  He testified:

> Here is how I thought about the position and think about leadership positions in general, which is to set the direction of the agency, make sure the right team is in place to execute on those, focus on the priorities that will drive the agency forward, engage with the team in ensuring they are managing the operation well, as well as pushing major initiatives forward, and then having good relationships and engagement with all of the stakeholders in the IRS, whether it is Congress, the administration, the taxpayer community, et cetera.[568]

Tragically, in this instance, Shulman failed to deliver on each of these points.  He failed to put the right team in place to prevent the targeting.  He failed to engage with the team as it responded to the targeting.  He failed to engage with Congress about the targeting despite knowing first-hand of significant congressional interest in the matter.

Most seriously, Shulman failed to fully inform Congress about the IRS's inappropriate treatment of conservative-oriented tax-exempt applications, despite his awareness of inappropriate treatment.  Shulman testified that in early 2012 he became aware that the IRS had a backlog of tax-exempt applications, "that applications had been sitting there for a long time," and that the IRS had sent out letters requesting donor information.[569]  Nonetheless, in March 2012, Shulman testified before the House Ways and Means Subcommittee on Oversight, during which he provided "assurances" to Congress that the IRS was not targeting conservative groups.[570]  In his transcribed interview with Committee staff, Shulman attempted to explain his assurances.  He testified:

---

[566] *"The IRS: Targeting Americans for their Political Beliefs": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013) (question and answer with Rep. Massie).
[567] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).
[568] *Id.*
[569] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).
[570] *"Internal Revenue Service Operations and the 2012 Tax Return Filing Season": Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways & Means*, 112th Cong. (2012) (question and answer with Chairman Boustany).

Exhibit D

Q        And, sir, at the time of this March 2012 hearing before Ways and
         Means, you were aware of the congressional inquiries into the IRS
         about the treatment of Tea Party groups.  Is that right?

A        I don't have a firm command that it was – that members had
         written me about Tea Party groups, but I was aware of – for sure, I
         remember I was aware of the donor letter.  You know, I had seen
         the letters that had come in to me.  The questions about donors and
         the backlog were the things that I had awareness of that I – for
         sure.

Q        And at the time of the March 2012 hearing before Ways and
         Means, were you aware of the delays in processing the cases?

A        Yeah. I mean, my – I think – let me just premise, you know, I'm
         going to do my best, I want to be forthcoming.  I'm going to try to
         summon my memory from a long time ago.  So, to the best of my
         memory, you know, I was aware that – I was under the impression
         that kind of every case that was, you know, deemed to potentially
         need to be looked at for primary activity for political had gotten –
         there was a real backlog, you know, kind of across the board in
         those cases.

Q        And did you understand those cases to be set aside from the other
         cases the IRS was processing?

A        Yeah. I think by that time, and it was probably subsequent to the
         letters, I had an understanding that in order to have consistent
         treatment, that there were groupings of cases, and they do this in –
         you know, I had learned – probably around that time is when I
         learned about the tax-exempt organizations had done this in other
         contexts as well, but would group cases for consistency to have
         similar – you now, the same people or group of people work the
         cases.[571]

When asked about his basis for providing "assurances" to Congress, Shulman justified
his testimony by explaining that he understood the application process to be voluntary and that it
captured more than just conservative applicants.  He testified:

Q        With respect, you didn't just say it's not happening or I'll look into
         it, you gave assurances to the members that it was not occurring.
         How did you have the confidence to provide that assurance to
         Congress if you knew that there were backlogs and there were

---

[571] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).

Exhibit D

objectionable letters going out and there were delays in processing the cases?

A    Well, I don't think anybody was – you know, I didn't give assurances that there weren't backlogs or that people weren't worried about the questions they were getting, but I didn't have the impression in my mind at that point that there were – you know, I don't remember exactly what the questions were, but I think the questions were targeted – were asking about targeting, and at that point, you know, I didn't have a reason to believe that there was targeting going on.

Q    Sir, you told Congress in March 2012, quote, "There is absolutely no targeting.  This is the kind of back and forth that happens when people apply for a 501(c)(4) status," end quote.  So there you're relating it to the development letters and the back and forth between the IRS and the applicant.  How, if you knew these letters had been sent asking for donor information, could you say there was no targeting if you knew they were asking for donor information?

A    You know, again, the things that were in my mind, if you look at when I said "no targeting," I said it's normal back and forth, and so there's no targeting, and was relating it to the fact they had come in voluntarily and I was thinking, you know, of this notion of reaching out, finding someone, you know, in the sense of targeting. The other is my understanding was that donor letters weren't just being sent to conservative groups. And so that's – you know, that's what was in my mind then and that's what I said.[572]

Shulman further stated that after his testimony before the Ways and Means Committee, Steve Miller told him that he had asked Nan Marks to travel to Cincinnati "and take a look at this backlog."[573] Shulman testified:

Q    Were you informed of the internal review that was undertaken at the request of Steve Miller at Nan Miller's direction to determine what problems existed concerning the IRS's treatment of advocacy cases?

A    I was informed – what I remember is I was informed that Nan Marks was going to go down to Cincinnati and take a look at what was going on. I wasn't – you know, you used a term of art there that wasn't my memory of what it was.

---

[572] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).
[573] *Id.*

Exhibit D

Q        Is the term of art "internal review"?

A        Yeah. I mean, that's – again, my understanding was Nan Marks
         was going to go down and take a look and see what was happening
         with these cases in Cincinnati at some point.[574]

Shulman testified that Miller also informed him in May 2012 about Marks's findings.
Shulman recalled the conversation during his transcribed interview with Committee staff:

The things I remember from the conversation are the fact . . . there's a list
that was used in Tax-Exempt Organization at some point, and my memory
of this is that the word "Tea Party" was on the list at some point, didn't
know when, didn't know how it was used, didn't know how long ago it
was used.  Those kind of things was my impression coming out of that.

Either in that conversation or in a very tight timeframe around that, in or
about that conversation, the fact that, you know, whatever this list was, the
understanding was it's not being used anymore or is in the process of
being stopped and that TIGTA is aware of this issue and is starting to –
and either has been, has been down in Cincinnati, is looking at, you know,
the whole issue around the Determinations Unit process and is going to be
conducting a review.[575]

Despite this awareness of the backlog of applications, the processing delays, the use of
inappropriate development questions, and the use of the phrase "Tea Party" to screen cases,
Shulman stated that the IRS never considered informing the public of these facts.  Shulman
testified:

Q        Sir, following your conversation with Mr. Miller in May of 2012,
         were there any discussions within the IRS about informing the
         public of what Ms. Marks had found?

A        Not that I remember.

Q        Were there any discussions about informing Congress about what
         Ms. Marks had found?

A        No, I don't remember that.

Q        At that time, sir, in May of 2012, were there any discussions about
         correcting your testimony to Congress?

A        Not that I remember.[576]

---

[574] *Id.*
[575] *Id.*
[576] *Id.*

Exhibit D

When the scandal broke in May 2013, Shulman called both Jonathan Davis and Nikole Flax to ask for their help in reconstructing his recollection of when he knew about the screening criteria.[577]   A more engaged executive could have better harnessed the resources of the IRS to address the crisis and bring transparency and accountability at the time of the misconduct.  As a result of Shulman's inaction, applicants targeted by the IRS and subjected to burdensome and inappropriate development questions experienced several more months of uncertainty and neglect.

## Jonathan Davis, Chief of Staff to Commissioner Shulman

Jonathan Davis, the chief of staff to Commissioner Shulman, had no prior experience with tax administration and, as a consequence, likewise did not assert himself into the IRS's handling of allegations of inappropriate treatment.  A more robust response from the Commissioner's office could have ensured that the misconduct was identified and remedied earlier.  Davis's inexperience with tax administration and his willful neglect of the problems once he became aware of them contributed to the IRS's misconduct.

Unlike a traditional chief of staff, Davis narrowly defined his role as the Commissioner's top aide, explaining to the Committee that he worked primarily on a "strategic portfolio" and an "administrative portfolio."[578]   He stated that he did not concern himself with enforcement matters like tax-exempt applications.[579]   Davis also testified that he had no experience with tax law or the IRS prior to becoming the top aide to the commissioner.  He testified:

Q      And, sir, prior to becoming chief of staff of the IRS, how familiar were you with tax law issues?

A      I didn't have any background in tax law.

Q      None whatsoever?

A      I was a taxpayer.

Q      So paying taxes was the only experience you had with the IRS prior to becoming chief of staff at the IRS?

A       I believe so, yes.[580]

Despite his lack of experience with tax policy, Davis appears to have been a frequent visitor to the White House, appearing on public visitor records 310 times according to a news report.[581]

---

[577] *Id.*; Transcribed interview of Jonathan Davis, in Wash., D.C. (Nov. 21, 2013); Transcribed interview of Nikole Flax, Internal Revenue Serv., in Wash., D.C. (Oct. 22, 2013).
[578] Transcribed interview of Jonathan Davis, in Wash., D.C. (Nov. 21, 2013).
[579] *Id.*
[580] *Id.*

Davis testified that after becoming aware of allegations of targeting in early 2012, he purposefully did not involve himself in the review and response.  He testified:

Q      Sir, when you read the media reports and the congressional inquiries, were you concerned at all by the allegations [of targeting]?

A      Of course anytime there is an allegation that the IRS is anything but fair and impartial, of course, it's of concern.

Q      And because it was of concern, would that change how you would treat the matter?

A      Again, I – it's just – these matters were just not something I was involved with.  This was not – I don't have a background in these matters.  I talked about my role at the IRS, and I think there was a clear group of folks in the chain of command that had expertise in these matters, a clear oversight of them, so these were just not things that – that I was working on.

Q      But you read the reports and you read the letters and it concerned you.  Did it concern you enough to speak to Mr. Miller about it or Mr. Shulman?

                                    ***

A      Again, these generally are not things that I worked on.  These are – you know, these concern sensitive enforcement matters, and these are things that were managed by a group of people with longstanding expertise in the area, and it just wasn't something that I was working on, so there was no reason for me to be involved with them.

Q      As chief of staff to the Commissioner, did you see a reason to ensure that those responsib[le] were . . . carrying out their duties on these matters?

A      Again, there was a clear, you know, group of people with expertise on these matters, and so these people had expertise in these areas.  I don't have a background in tax, in tax law, and so there was just – there was no reason for me to be involved with it.

Q      Even though it concerned you?

---

[581] Susan Ferrechio, *Top Shulman aide frequent White House visitor*, WASH. EXAMINER, June 21, 2013.

Exhibit D

A       You asked – I believe the question was whether allegations like this would concern me, and I think every employee of the IRS would be concerned, no matter what their level, what their rank, responsibility.  I think it's important to the agency, and that's the context in which I was concerned.

Q       But with respect, sir, not every employee at the IRS is the chief of staff [to] the Commissioner.  Did you feel you had responsibility to ensure that the IRS' response to these inquiries w[as] handled appropriately?

A       Again, I – I had a clear – you know, there was a group of folks who had a background and an expertise in these matters, they were clearly under their authority, and you know, I as somebody who has no background in – in tax law in these matters and as somebody who had not spent a career at the IRS, there was just no reason for me to insert myself into this.

Davis also denied any regret that he should have been made aware of the targeting earlier. He testified: "[T]his was not something that I worked on, it wasn't something that I was really involved with.  It was assigned to people that had the expertise in this area, and I believe that it was being – it was being handled."[582]  Even after the targeting made national headlines, Davis denied responsibility and said he did not have a "fact base" to offer any suggestions on what the IRS could have done differently.  He testified:

Q       Given the attention that this issue received after Ms. Lerner's announcement on May 10th [2013], did you think you should have been more involved in how the IRS handled this process in 2012?

A       Like I said, I had a lot of things that I was responsible for.  This issue was in the hands of people who were – had expertise in this area, and you know, it's just not something I was involved in.

Q       So, no?

A       It's just – no. I mean, I – no.

Q       Is there anything the IRS could have done differently to prevent this issue from exploding the way it did?

A       I would leave that to the people who know a lot more about this than I do.

Q       Sir, you were the chief of the staff to the Commissioner of the IRS, you have a certain unique perspective on how the IRS operates.  In

---

[582] Transcribed interview of Jonathan Davis, in Wash., D.C. (Nov. 21, 2013).

your opinion, based on your experience, is there anything the IRS could have done differently to prevent a situation like this from occurring?

A     Again, in the question you reference, you know, my experience. I think the issues at stake here are, I think, issues that relate to, you know, very specific sort of tax law and tax enforcement issues that I wasn't a part of. So I don't really have any – I don't have a unique perspective on it.

Q     Aside from the enforcement issues that you referenced, how could the IRS have handled the situation better?

A     I just – I'm sorry, I don't know how to answer the question without – without a sense of – I just don't have a fact base on which to base any response.[583]

## Steven Miller, Acting Commissioner

Steven Miller served as Deputy Commissioner for Services and Enforcement during the time that the IRS targeted conservative applicants and later served as Acting Commissioner when the IRS conspired to leak information from the independent TIGTA audit before its public release. Miller's management and leadership failures allowed the targeting to occur and the IRS to escape accountability for far too long. In his managerial role, Miller failed to prevent the targeting. As a leader of the IRS, he likewise failed to promptly inform Congress of the misconduct, despite his intimate awareness of and personal involvement in the matter.

When Miller became aware of aspects of the IRS targeting in February 2012, he informed Commissioner Shulman and Shulman's chief of staff, Jonathan Davis.[584] Miller soon thereafter dispatched Nan Marks to Cincinnati for an internal review of the allegations and, upon Marks's return, took steps to end the targeting.[585] Miller, however, failed to immediately inform Congress and the public about the targeting. With wrongdoing as fundamental and as persistent as the IRS targeting, he had a duty to immediately acknowledge the misconduct.

After learning the findings of Marks's internal review, Miller acknowledged that the IRS was facing a "serious problem."[586] He stated in a transcribed interview with Committee staff:

Q     Sir, what was your reaction to hearing Ms. Marks present this information to you?

---

[583] *Id.*
[584] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).
[585] *Id.*
[586] *Id.*

119

A      Well, I thought we needed to move the cases along, we needed to get the people the help they needed to move those cases along, and those cases that should have been approved should have been moving.

Q      Did you see the situation she described as a problem?

A      Yes.

Q      Was it a serious problem?

A      Yeah, it was a serious problem. I wanted those cases moving. There was no reason for them to be sitting.

Q      And did what she told you concern you?

A      Yes.[587]

However, despite his serious concerns, Miller testified that the IRS never considered informing the public or Congress about the targeting at that time. He testified:

Q      Sir, at the time that Ms. Marks reported her findings to you in May of 2012 was there any discussion about making her findings public?

A      No, I don't believe so. We were focusing on moving the cases along.

Q      Was there any discussion about informing Congress about the findings in Ms. Marks' review?

A      I don't remember that.

Q      Sir, was there any discussion about correcting any testimony given to Congress on this issue?

A      I have no recollection of that discussion.[588]

In addition, Miller purposely avoided an opportunity to inform Congress about the IRS targeting during a July 2012 hearing before the Ways and Means Subcommittee on Oversight, chaired by Congressman Boustany. At a hearing about exempt organizations, Miller declined to inform Congress, even though he had prepared to address the issue. Miller testified to the Committee staff:

---

[587] *Id.*
[588] *Id.*

Exhibit D

Q       At the time, in June of 2012, you were aware of the backlog of cases pending in Cincinnati?

A       I was.

Q       And you were aware of the screening criteria used to identify those cases?

A       I was.

Q       And you were aware of the delay those cases had experienced?

A       I was.

Q       Was there any discussion about making those facts public at this July 2012 hearing?

A       No.  We prepared for anything that could happen.

Q       Did you expect the issue to come up?

A       Thought it might, so we prepared, but no certainty at all.

Q       And how did you prepare for it?

A       General hearing preparation.

Q       [D]id you assemble material?

A       There would have been probably some material, yeah.

Q       Did you get involved in data on the cases?

A       I got where the cases were and probably a talking-points sheet as to what happened.[589]

Although he prepared to address the issue, Miller stated that there "was no reason for [him] to *sua sponte* . . . raise it."[590]  When Congressman Kenny Marchant asked Miller about groups that "feel like they have been harassed and feel like the IRS is threatening them with some kind of action or audit," Miller failed to mention anything about the inappropriate screening criteria or excessive delays experienced by these groups.[591]

---

[589] *Id.*
[590] *Id.*
[591] *See "Public Charity Organizational Issues, Unrelated Business Income Tax, and the Revised Form 990": Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways & Means*, 112th Cong. (2012) (question and answer with Rep. Marchant).

Exhibit D

E-mails, however, show that Miller considered acknowledging the IRS targeting at the July 2012 hearing.  In one e-mail to Nikole Flax, Miller wrote: "I am beginning to wonder whether I should do [Chairman] Boustany['s hearing] and affirmatively use it to put a stake in politics and c4."[592]  Flax responded: "[I]f the hearing is as generic as I recall, seems like you are too senior.  Would be silly to think the c4 issues won't come up – but I think Sarah [Hall Ingram] could handle it fine as well."[593]  It is not clear why Miller chose not to acknowledge targeting after considering using the hearing to affirmatively "put a stake in politics and c4," but certainly when asked by Congressman Marchant about the issue, he should have acknowledged the misconduct then.  Because he did not, he did a great disserve to the American taxpayers.

Miller also bears responsibility for the IRS's ill-advised strategy of disclosing the targeting in advance of TIGTA's public release of the audit.  Miller testified that it was his decision to have Lerner acknowledge and apologize for the inappropriate treatment.[594]  He also testified that he informed his superiors at the Treasury Department – including Mark Patterson, the Department's chief of staff, and Mark Mazur, the Assistant Secretary for Tax Policy – about the IRS's plan.  Miller testified:

Q  Now, in public statements, the Treasury Department has said that they expressed some concern about Ms. Lerner making an announcement about the TIGTA report before the report had been released publicly but that ultimately they deferred to the IRS's desire to issue an apology for the conduct.  Is that consistent with your recollection of how that happened?

A  Generally, but let me walk through a little bit here.  There were two instances in which we were considering having Lois say something.  One was in a speech at Georgetown University.  And we, I think through public affairs to public affairs, and I might have sent it over to [Treasury Chief of Staff Mark] Patterson as well, shared a piece of the speech.  I believe that Treasury came back and said they were not comfortable with that.  I subsequently talked to Mark Patterson about the ABA question and answer, and I think I walked him through what we would say.  And he was going to get back to me, he never did, and we went forward.  And that's sort of how all that happened.

Q  So when you in April of 2013 discussed Ms. Lerner's potential remarks at the Georgetown conference, what concerns did Mr. Patterson raise with you?

[592] E-mail from Steven Miller, Internal Revenue Serv., to Nikole Flax & Catherine Barre, Internal Revenue Serv. (June 18, 2012) [IRSR 465424].
[593] E-mail from Nikole Flax, Internal Revenue Serv., to Steven Miller & Catherine Barre, Internal Revenue Serv. (June 18, 2102) [IRSR 465424].
[594] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).

Exhibit D

A      I think they said they were just uncomfortable with it.  And I don't really remember particulars.  And I'm not sure whether I heard it directly from him or whether I heard it from public affairs through our public affairs person.

*** 

Q      Do you recall having an understanding that Treasury's concern was about the substance of the intended remarks from Ms. Lerner or whether it was the timing of the remarks, or something else entirely?

A      I think it was the level of depth that we were going into, possibly.  I don't think it was – I know Patterson didn't have a view that we shouldn't do this, we shouldn't, you know, start the ball rolling here and release.  So I don't believe it was that.  But particularly what it was – my recollection is it was maybe length, but I don't remember that that well, so.

*** 

Q      Now, turning to the May 2013 timeframe, who was contacted at the Treasury Department about the possibility of Ms. Lerner issuing an apology at the May 10th ABA conference?

A      So I know I had a conversation with Mark Patterson.  And I gave, I think, a heads-up to [Assistant Secretary] Mark Mazur because he had an individual that was on that panel that she was going to do it on.

*** 

Q      You stated that you ultimately did not get a response from the Treasury Department about this proposed announcement?

A      Right.

Q      Did you inform anyone at the Treasury Department that there was going to be a planted question by Celia Roady?

A      Well, that was the discussion I had with Mr. Patterson – not with Celia Roady, but a planted question.

Q      What was Mr. Patterson's response?

123

A        Let me – **I think what he said was, I'm not against trying to get in front of this, but let me think about this one**.  And then, the night before, I talked to Mr. Mazur, saying, by the way, there's going to be a – it was, like, a Wednesday to Friday, sort of.  That was one of the problems.  It was a tighter schedule than I – it was too tight a schedule.[595]

Miller's decision to leak details of the TIGTA audit – apparently with the Treasury Department's tacit consent – shows incredibly poor judgment.  In choosing to discuss the nonpublic audit, the IRS breached fundamental tenets of trust and transparency that exist between TIGTA and the IRS to support effective oversight.  The IRS chose to violate these duties for purely political benefit – to "get in front" of TIGTA's report before the independent watchdog was ready to publicly release it.  This is unacceptable conduct for the head of the IRS.  Miller's decision to leak the TIGTA audit may have irreparably harmed the relationship between the IRS and its administrative watchdog.

As Deputy Commissioner and later as Acting Commissioner, Steven Miller could have and should have done more to inform Congress and the American public about the IRS's targeting of conservative tax-exempt applicants.  Although he informed his bosses at the Treasury Department when preparing Lerner's apology, Miller purposely chose not to inform the elected representatives in Congress.  His failure to act caused conservative voices to be stifled during the 2012 presidential election and delayed justice to groups seeking constitutional free speech and free association.

## Nikole Flax, Chief of Staff to Steven Miller

Nikole Flax served as chief of staff to Acting Commissioner Steve Miller.  Previously, Flax had served as deputy chief of staff to Commissioner Shulman and, before that, as Assistant Deputy Commissioner under Steve Miller.[596]  From the time she became aware of the allegations of IRS targeting in early 2012, Flax was very involved in the IRS's review, response, and cover-up of the misconduct.  Like her boss, Steve Miller, Flax did not inform Congress or the public in a timely manner.  She also played a large role in the IRS's decision to inappropriately leak details about TIGTA's audit.

By early 2012, Miller and Flax knew that the IRS had targeted conservative-oriented applicants with inappropriate criteria, burdensome development questions, and substantially delayed processing.  By then, the IRS had received several inquiries from Members of Congress about potential targeting and Commissioner Shulman had given "assurances" that the IRS was not targeting conservative groups.  Nonetheless, Flax was in a position to urge the IRS to publicly disclose the targeting program, but she never did so.  She testified to Committee staff:

Q        Was there any discussion about informing the public about the criteria used?

---

[595] *Id.* (emphasis added).
[596] Transcribed interview of Nikole Flax, Internal Revenue Serv., in Wash., D.C. (Oct. 22, 2013).

Exhibit D

A      In May of 2012?

Q      Yes.

A      No, I think we felt we didn't know all of the facts yet and TIGTA was looking at it, and we would let TIGTA do their review and then that would become public.

Q      Was there any discussion about coming to Congress with what Ms. Marks found [during the internal IRS review]?

A      I mean, to be honest with you, we knew that TIGTA was looking because you guys asked them to look at it, and so we like – Nan [Marks] made sure that TIGTA – what Nan told us was she made sure TIGTA had everything that she observed and that they were doing their review.  And when [TIGTA Inspector General] Russell [George] came in at the end of May [2012], it sounded like they were going to wrap up quickly, and we would have all of the facts. I think at that point we really didn't feel like we had the full picture of what had been the criteria the year before that, and I, even now, my understanding of the issues is – the problematic issues, the asking for donor names and taking too long, and the over-burdensome requests, those would have existed whether an organization was selected for the, you know, absolute appropriate criteria, or the inappropriate criteria, and so we were focused on moving the cases, and making sure those issues, that all of the full development cases were getting – were taken care of.

Q      Was there any discussion about correcting Commissioner Shulman's testimony to the Appropriations Committee or the Ways and Means Committee?

A      No.[597]

Although Flax cited the ongoing TIGTA audit as a reason for not disclosing the IRS's misconduct in May 2012, the audit was not public when Lerner leaked its findings in May 2013. Flax was intimately involved in planning Lerner's apology during the American Bar Association panel event on May 10, 2013.[598]  She testified that the IRS leaked details of the TIGTA audit because, although the audit report had not been released publicly, "We had TIGTA's facts.  I think at that point, we felt like we could talk about it.  We had what TIGTA – you know, the universe of what TIGTA learned."[599]

---

[597] Transcribed interview of Nikole Flax, Internal Revenue Serv., in Wash., D.C. (Oct. 22, 2013).
[598] *Id.*
[599] *Id.*

Exhibit D

Flax's justification for failing to inform Congress is unpersuasive.  Her explanation that the IRS had to wait until TIGTA could finalize their review is merely an excuse for failing to report the misconduct in 2012.  As a senior IRS leader, Flax should have ensured that the agency informed Congress and the public about the targeting in a timelier manner.

## William Wilkins, Chief Counsel

William Wilkins is the current Chief Counsel of the IRS.  A generous contributor to Democratic candidates,[600] Wilkins oversaw the IRS's legal team that reviewed conservative-oriented applications in 2011 and a guide sheet in 2012.  However, during his transcribed interview with Committee staff, Wilkins stated "I don't recall" 80 times in full or partial response to questions.  His inability or unwillingness to recollect important aspects of the misconduct – after over five months to prepare and refresh his recollection – suggests a deliberate attempt to obfuscate his role.

Wilkins testified that he was aware of "complaints" in the media about the IRS's process for evaluating tax-exempt applications from conservative organizations in 2011 and 2012.[601]  Yet, he testified that he did not become aware of the IRS's targeting – including its use of inappropriate screening criteria – until he read the final TIGTA report in spring 2013.[602]  He further testified that he had no knowledge that his attorneys reviewed and advised on the Tea Party "test" cases in 2011 until he read the final TIGTA report.[603]  If accurate, this testimony amounts to a startling admission of mismanagement.  The disengagement of the IRS's top attorney on a matter as significant as the IRS targeting signals a serious lapse of management.

Wilkins also testified that he was aware that attorneys in his office worked on a guide sheet in spring 2012.[604]  Although he acknowledged that the purpose of the guide sheet was to process applications pending in Cincinnati, he testified that he had no knowledge of the number of cases in the application backlog or the length of delays.[605]  Remarkably, despite the seriousness of the matter, Wilkins probed no deeper.  He testified:

> Q    Sir, if I could turn your attention back to the guide sheet we were discussing earlier.  I believe you mentioned that you understood that the guide sheet was prepared to assist the determination specialists in developing cases.  Is that right?
>
> A    In processing applications, yes.
>
> Q    So you understood then, at the time you received the draft of the guide sheet, that there were cases to be used with this guide sheet?

---

[600] *See* Eliana Johnson, *Targeting from the Top of the IRS*, NAT'L REVIEW, July 18, 2013.
[601] Transcribed interview of William Wilkins, Internal Revenue Serv., in Wash., D.C. (Nov. 6, 2013).
[602] *Id.*
[603] *Id.*
[604] *Id.*
[605] *Id.*

A      Yes.

Q      Did you have a sense of how many cases there were?

A      No.  I knew there were concerns about how long some of the reviews were taking.

Q      And what was your understanding of the length of time the reviews were taking?

A      I didn't have data on the actual time, but I knew that TEGE management was concerned that they were taking too long.

Q      How long is too long?

A      I don't know.

Q      Did you ever ask?

A      No.

Q      You never asked what "too long" meant?

A      No.

Q      Did you have any understanding as to what the status of these cases w[as]?

A      No.[606]

Although Wilkins received a copy of the draft TIGTA audit report in April 2013, he did not read the report at that time.[607]  When Wilkins read the report, he testified that it was of "concern" and he saw the report as a "serious matter" that was "[w]orthy of the attention of all IRS leadership," including himself.[608]  However, when Steve Miller told Wilkins that Lerner was going to leak the report at ABA conference, he testified that he had no particular reaction to the plan.  He stated:

A      [M]y reaction was it was going to be in – it was going to wind up being discussed in a variety of different settings, and that one reaction was having it discussed by tax professionals that worked in Exempt Organizations would add some knowledge to the

---

[606] *Id.*
[607] *Id.*
[608] *Id.*

discussion that might not occur if the professionals weren't involved.

Q     That was your reaction?

A     That was my reaction.

Q     Did you think that Mr. Miller's plan was a good idea?

A     It didn't turn out to be a good idea.

Q     Did you think it was a good idea at the time?

A     I'm not sure I thought about it that much.

Q     And why didn't you think about it that much at the time?

A     I don't know.  I can't answer that question.

                              ***

Q     Did you ever offer any advice to Mr. Miller about how to approach making this news public?

A     No.

Q     Did you ever try to stop him from having Ms. Lerner make the announcement at the ABA?

A     No.[609]

William Wilkins was the chief lawyer for the IRS, reporting directly to the IRS Commissioner and the General Counsel of the Treasury Department.[610]  Taking his testimony at face value suggests that Wilkins failed in his duties to advise and guide the IRS as it reviewed and responded to serious allegations of unfair treatment of conservative tax-exempt applicants. His failure to do so resulted in a serious blow to the reputation of his client.  It did not have to be so.  A better chief counsel could have helped the IRS respond more expeditiously and more responsibly to the IRS's misconduct.


## Joseph Grant, Acting Commissioner, Tax Exempt and Government Entities

Joseph Grant, Acting Commissioner for Tax Exempt and Government Entities (TEGE), was a long-time public servant handcuffed by the bureaucratic nature of the IRS and personality

---

[609] *Id.*
[610] *Id.*

Exhibit D

conflicts with both subordinates and superiors.  With a background in IRS employee plans, Grant also lacked relevant experience with exempt organizations.  Perhaps as a result, Grant was unable to provide the appropriate attention needed to ensure that the IRS properly addressed allegations of misconduct with respect to tax-exempt applicants.

Grant began serving as Acting Commissioner in December 2010, when then-Commissioner Sarah Hall Ingram was detailed to stand up the IRS's ObamaCare office.[611]  Grant remained in an indefinite acting status for almost three years, as Ingram's detail was periodically extended.[612]  Grant testified that he believed the assignment was temporary and that he expected Ingram to return.  He stated:

> [C]ertainly for the first year or even year and a half, you know, through mid-2012, I expected [Ingram] to come back and was always conscious of the fact that she would someday come back.  And I was, while I'm running things and responsible for things, it's with the anticipation that she'll come back before I retire.[613]

Grant told Committee staff that, early on, he largely deferred to Steve Miller, who had a background in Exempt Organizations.  Grant testified:

> Q       And when you were Deputy TEGE Commissioner did your duties differ at all compared to when you were acting as the Commissioner?

> A       Well, ultimately the Commissioner or the Acting Commissioner has the sort of the hat if you will, the final leadership. The jobs were coequal in terms of their described duties.  My background was clearly one of retirement income security and employee plans, so I would be more involved and engaged on that side. **When I first held that position, Steve Miller was the Division Commissioner, his background was he had previously served as the Director of Exempt Organizations, so he would have more leadership responsibilities and understanding in that area.**[614]

This lack of a permanent Commissioner from December 2010 until May 2013 undermined effective leadership and prevented complete ownership of the problems identified in Exempt Organizations.

The uncertain leadership at the TEGE Commissioner level was a direct byproduct of ObamaCare in that then-Commissioner Sarah Hall Ingram left TEGE to stand up the IRS ObamaCare office.  Even if Ingram remained at TEGE, however, it is not certain that the IRS

---

[611] *See* Transcribed interview of Joseph Grant, in Wash., D.C. (Sept. 25, 2013).
[612] *Id.*
[613] *Id.*
[614] Transcribed interview of Joseph Grant, in Wash., D.C. (Sept. 25, 2013) (emphasis added).

Exhibit D

would have avoided the controversy.  The Committee's investigation showed Ingram counseled the White House on controversial tax matters.[615]  The void that was created at TEGE when Ingram was detailed to stand up the ObamaCare office left Grant to assume a senior leadership position for which he was not well-suited.

Personality conflicts contributed to Grant's ineffective leadership.  According to witnesses interviewed by the Committee, style conflicts existed between Grant and Miller and between Grant and Lerner.  Nan Marks, a veteran IRS official and senior technical advisor to Grant, described Grant's working relationship with Miller during her transcribed interview with Committee staff.  She testified:

Q       Were you aware of . . . how Mr. Miller interacted with Mr. Grant, of their working relationship?

A       I had some chance to observe that, yes.

Q       What w[ere] your observations about that relationship?

A       I – I thought they had a style conflict.  They are both nice guys and they were polite and respectful to each other and, you know, everything was calm and everything moved forward, but Joseph is a very smart man, and in my experience, quite capable of making decisions and good decisions that – or good recommendations that should be given respect and should be listened to, but Joseph has what I call a slow windup.  So, when he's starting into a topic, he'll circle it a little bit.  He'll tell some stories.  He has a military background from his father, and you know, so he uses those stories.  He used to work for somebody up on the Hill, and he'd use some of those stories.  He just – he had stories, and he'd tell these stories, and he'd be circling the topic, and even I sometimes would get a little frustrated, like,  Okay, let's get to the kernel, but if you let him do that, he was getting there.  But it sort of drove Steve crazy, and **I think it caused Steve sometimes to think not to – not to respect or rely on Joseph as much as I think he could have**. . . .          Because he just wasn't sure where Joseph was coming from.  **He wasn't sure whether Joseph was decisive enough or tough enough.**  Joseph was also an incredibly courteous person. . . .  And Steve's absolutely courteous, but he's a little more rough and ready and – so, you know, obviously, I didn't see all of their interactions.  They had a whole history before I came into the picture, and I only got to see them together a limited number of times.[616]

---

[615] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to J. Russell George, Treasury Inspector Gen. for Tax Admin. (Oct. 21, 2013).
[616] Transcribed interview of Nancy Marks, in Wash., D.C. (Oct. 8, 2013) (emphasis added).

Exhibit D

Marks also testified that "not infrequent[ly]" Lerner would bring matters directly to Miller rather than "working it up through her chain" to Grant first.[617]  Marks told the Committee that Lerner cancelled many check-in meetings with Grant and that Grant's other subordinates "tended to brief up a lot more than [Lerner] did."[618]  For this reason, Marks was not surprised that Grant was unaware of the IRS's misconduct until May 2012.[619]

As Acting Commissioner for Tax Exempt and Government Entities, Grant directly supervised Lerner and reported directly to Miller.  Due to the uncertainty surrounding the appointment and the personality conflicts with both Miller and Lerner, Grant was effectively shut out of meaningful oversight over the activities of Exempt Organizations.  A more permanent or a more forceful leader in this position may have prevented or helped to minimize harm done to conservative-oriented applicants.

## Lois Lerner, Director, Exempt Organizations

Lois Lerner reigned as the director of Exempt Organization throughout the entirety of the IRS targeting.  As the director, Lerner oversaw the actions of both the Exempt Organizations Technical Unit in Washington, D.C., and the Exempt Organizations Determinations Unit in Cincinnati, Ohio.  Documents and information provided to the Committee show Lerner's political bias against conservative viewpoints and her willful neglect of conservative-oriented tax-exempt applications.  By several accounts, Lerner abused and belittled subordinates and colleagues, creating an atmosphere hostile to cooperation and accountability.  As a result, the applications within her jurisdiction experienced substantial delays, intrusive questioning, and inappropriate treatment.

Lerner's involvement with the Tea Party applications extended to almost the very beginning.  In April 2010, only two months after the first case was identified and elevated, Steven Grodnitzky put Lerner on notice of "2 Tea Party cases that are being worked here in DC."[620]  In February 2011, Lerner ordered the cases to be subjected to a "multi-tier" review, calling them "very dangerous" because they "could be the vehicle to go to court on the issue of whether Citizen's [*sic*] United overturning the ban on corporate spending applies to tax exempt rules."[621]  In June 2011, Lerner asked Judith Kindell, her senior technical advisor, to review the application filed by Crossroads Grassroots Policy Strategies – a conservative-oriented 501(c)(4) applicant – and summarize the issues for Lerner.[622]

Documents suggest that Lerner harbored a political bias against conservatives and conservative non-profits engaged in political activity.  In response to one article about

---

[617] *Id.*

[618] *Id.*

[619] *Id.*

[620] E-mail from Steven Grodnitzky, Internal Revenue Serv., to Lois Lerner & Robert Choi, Internal Revenue Serv. (Apr. 28, 2010) [IRSR 141809].

[621] E-mail from Lois Lerner, Internal Revenue Serv., to Michael Seto, Internal Revenue Serv. (Feb. 1, 2011) [IRSR 161810]; *see also* Transcribed interview of Michael Seto, in Wash., D.C. (July 11, 2013).

[622] *See* E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (June 1, 2011) [IRSR 69915].

Exhibit D

anonymous contributors hurting Democratic Senatorial candidates, Lerner responded: "Perhaps the FEC will save the day."[623]   In an e-mail sent on the day of the 2012 election, Lerner opined that it was "important" for Democrats to retain control of the Senate because otherwise "it would be the same as a Rep[ublican] president!"[624]   When informed that the victory of Senator Joe Donnelly (D-IN), Lerner replied "WooHoo!"[625]   After the election, when discussing with her colleagues President Obama's Organizing for Action group, which intended to organize as a 501(c)(4) group, Lerner wrote: "Oh – maybe I can get the DC office job!"[626]   One IRS employee testified that it was evident Lerner was a Democrat from statements she made in conversations.[627]

**Figure 23: E-mail from Lois Lerner to Sharon Light, July 10, 2012**

| From: | Lerner Lois G |
|---|---|
| Sent: | Tuesday, July 10, 2012 9:31 AM |
| To: | Light Sharon P |
| Subject: | Re: this morning on NPR |

Perhaps the FEC will save the day
Lois G. Lerner--------------------------
Sent from my BlackBerry Wireless Handheld

---

[623] E-mail from Lois Lerner, Internal Revenue Serv., to Sharon Light, Internal Revenue Serv. (July 10, 2012)  [IRSR 179093].

[624] E-mail from Lois Lerner, Internal Revenue Serv., to Meredith Miles (Nov. 7, 2012) [IRSR 317155].

[625] *Id.*

[626] E-mail from Lois Lerner, Internal Revenue Serv., to Sharon Light, Internal Revenue Serv. (Jan. 24, 2013) [IRSC 7157].

[627] Transcribed interview of Diane Letourneau, in Wash., D.C. (Oct. 15, 2014).

Exhibit D

**Figure 24: E-mail from Lois Lerner to Sharon Light, Jan. 24, 2013**

**From:** Lerner Lois G
**Sent:** Thursday, January 24, 2013 11:46 AM
**To:** Light Sharon P
**Subject:** RE: EO Tax Journal 2013-15

**Oh--maybe I can get the DC office job!**

*Lois J. Lerner*
Director of Exempt Organizations

---

**From:** Light Sharon P
**Sent:** Thursday, January 24, 2013 11:35 AM
**To:** Lerner Lois G; Paz Holly O; Fish David L
**Subject:** RE: EO Tax Journal 2013-15

This is the most informative article I've read about it  – http://www.theatlantic.com/politics/archive/2013/01/how-organizing-for-action-plans-to-keep-obamas-foot-soldiers-enlisted/267384/.

Right now, the Obama campaign site includes info about this new org, featuring a blog from the new executive director who is leaving the White House to run it from Chicago.  They'll also have a DC office.

Since Priorities USA did not file a 1024, I woul d think they would follow the same self -declaring path here.  But maybe not.

Evidence available to the Committee indicates that Lerner sought to use her position to regulate political activity by non-profits.  Lerner told an audience in October 2010 about political pressure for the IRS to "fix the problem" of 501(c)(4) groups engaging in political activity.[628] She stated:

> What happened last year was the Supreme Court – the law kept getting chipped away, chipped away in the federal election arena.  The Supreme Court dealt a huge blow, overturning a 100-year old precedent that basically corporations couldn't give directly to political campaigns.  And everyone is up in arms because they don't like it.  The Federal Election Commission can't do anything about it.

> They want the IRS to fix the problem.  The IRS laws are not set up to fix the problem:  (c)(4)s can do straight political activity.  They can go out and pay for an ad that says, "Vote for Joe Blow."  That's something they can do as long as their primary activity is their (c)(4) activity, which is social welfare.

> So everybody is screaming at us right now:  "Fix it now before the election.  Can't you see how much these people are spending?"  I won't know until I look at their 990s next year whether they have done more

---

[628] John Sexton, *Lois Lerner Discusses Political Pressure on the IRS in 2010*, BREITBART.COM, Aug. 6, 2013.

than their primary activity as political or not. So I can't do anything right now.[629]

Around the same time, Lerner directed her subordinates to begin a "c4 project" – careful to avoid the perception of being "*per se* political" – to assess the level of political activity by 501(c)(4) groups.[630] Exempt Organizations staff eventually compiled a document itemizing the resources available to the IRS to determine the extent of a group's political activity.[631] It is unclear how Lerner intended to utilize this information, but other e-mails suggest that she hoped to publicize the IRS's denial of some tax-exempt applications filed by conservative groups.[632]

Other material shows that Lerner went to great lengths to expedite certain tax-exempt applications. In fact, apparent in one e-mail, Lerner even expedited a tax-exempt application from which she was recused. She wrote: "Mike gave me a raft of 7805(b) files re credit counseling. . . . I tried to provide comments – hopefully I've been clear and when I get them back they can go forward. I would like the one I'm recused from to move ASAP. The others hopefully can follow shortly thereafter."[633]

**Figure 25: E-mail from Lois Lerner to Holly Paz, Mar. 27, 2013**

| From: | Lerner Lois G |
|---|---|
| Sent: | Wednesday, March 27, 2013 5:03 PM |
| To: | Paz Holly O |
| Subject: | Two Things |

Mike gave me a raft of 7805(b) files re credit counseling. I had asked for them by a date certain and--the good news is they gave them to me on time. I sent most back for various reasons, but I would say the main point is they seemed to have the facts, but not always present them in the best way to make their case. So, I tried to provide comments--hopefully I've been clear and when I get them back they can go forward. I would like the one I'm recused from to move ASAP . The others hopefully can follow shortly thereafter.

Also--need to move c4 denials along--really need to get one out of here. (-:

*Lois G. Lerner*
Director of Exempt Organizations

Similarly, in the wake of the 2013 Boston Marathon bombing, the IRS received an application filed by One Fund Boston, a non-profit created by Massachusetts Governor Deval

---

[629] *See* "Lois Lerner Discusses Political Pressure on IRS in 2010," YOUTUBE (last visited Dec. 10, 2013) (transcription by Committee).

[630] E-mail from Lois Lerner, Internal Revenue Serv., to Cheryl Chasin, Laurice Ghougasian, & Judith Kindell, Internal Revenue Serv. (Sept. 15, 2010) [IRSR 191031-32].

[631] Internal Revenue Serv., Trends in Donations to, and the Political Activities of Certain Non-profit Corporations: Background on What Data May be Available [IRSR 185324-27].

[632] *See* E-mail from Lois Lerner, Internal Revenue Serv., to Nancy Marks et al., Internal Revenue Serv. (Apr. 1, 2013) [IRSR 188429].

[633] E-mail from Lois Lerner, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Mar. 27, 2013) [IRSR 659092].

Exhibit D

Patrick and Boston Mayor Thomas Menino.[634]  One Fund Boston submitted its application on
April 22, 2013.  Within days, Lerner personally reviewed material from the application on her
personal e-mail account – in violation of IRS rules[635] – in preparation for a meeting with Acting
IRS Commissioner Steve Miller.[636]  The personal attention paid by high-level IRS officials to
this particular application certainly shows the IRS's ability to prioritize certain applications.
Cindy Thomas, the manager of the Exempt Organizations Determinations Unit, similarly
testified that on occasion her superiors – including Lerner – directed her to prioritize or expedite
certain applications.[637]  The fact that Lerner could have prioritized the Tea Party applications, but
chose not to, speaks loudly to her priorities as the Exempt Organizations Director.

**Figure 26: E-mail exchange between Lois Lerner & Meghan Biss, May 4, 2013**

**From:** Lerner Lois G
**Sent:** Saturday, May 04, 2013 12:31 PM
**To:** Biss Meghan R
**Subject:** Re: Summary of Application

Thanks. Good move. I will look row and give you a call when I'm done. You're my hero!
Lois G. Lerner---------------------------
Sent from my BlackBerry Wireless Handheld

---

**From:** Biss Meghan R
**Sent:** Saturday, May 04, 2013 11:07 AM Eastern Standard Time
**To:** Lerner Lois G;           @msn.com <          @msn.com>
**Subject:** Summary of Application

Lois:

Attached is a summary of the entire application from One Fund Boston.  It includes the information from their initial
1023, our development letter, and their May 3 response.  In it, I also point out situations where the revenue rulings they
cite aren't exactly on point.  Additionally, where they reference other victim compensation funds, I included the
information we have on those funds from internet research.

As a note, the Aurora compensation fund may be an issue for the community foundation that made the payments.  The
CF is large enough (171 million on 2011 Form 990) that a 5 million payment to victims shouldn't jeopardize their
exemption.  But we won't know anything for sure until their 2012 Form 990 is filed.

Also, this article re funds distributing money to victims is interesting:
http://www.motherjones.com/politics/2013/04/where-does-money-donated-victims-mass-shootings-go

After you have had a chance to look over this document, we can have a discussion about it and any questions prior to
your meeting with Steve.

Thanks,

Meghan

---

[634] One Fund Boston, About the One Fund, https://secure.onefundboston.org/pages/about.
[635] Letter from Daniel Werfel, Internal Revenue Serv., to Darrell Issa, H. Comm. on Oversight & Gov't Reform
(Sept. 16, 2013).
[636] *See* E-mail from Meghan Biss, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (May 4, 2013)
[OGR 9364].
[637] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

Exhibit D

Other documents suggest that Lerner purposefully sought to evade congressional oversight of her Division's work.  In an April 2013 e-mail to an IRS information-technology employee, Lerner asked whether the IRS's internal instant-messaging system was archived.[638] She also curiously noted that she advised her employees to be "cautious" of the contents of their e-mail due to congressional interest in their work.  She wrote:

> I was cautioning folks about email and how we have had several occasions where Congress has asked for emails and there has been an electronic search for responsive emails – so we need to be cautious about what we say in emails.[639]

After the IRS IT employee informed her that the instant-messaging system was not automatically archived and searchable, Lerner responded in one word: "Perfect."[640]

---

[638] E-mail from Lois Lerner, Internal Revenue Serv., to Maria Hooke, Internal Revenue Serv. (Apr. 9, 2013) [IRSR 726247].

[639] *Id.*

[640] E-mail from Lois Lerner, Internal Revenue Serv., to Maria Hooke, Internal Revenue Serv. (Apr. 9, 2013) [IRSR 726247].

Exhibit D

Figure 27: E-mail from Lois Lerner to Maria Hooke, Apr. 9, 2013

| From: | Lerner Lois G |
|---|---|
| Sent: | Tuesday, April 09, 2013 2:51 PM |
| To: | Hooke Maria D |
| Cc: | Downing Nanette M |
| Subject: | RE: OCS |

Perfect

*Lois G. Lerner*
Director of Exempt Organizations

---

**From:** Hooke Maria D
**Sent:** Tuesday, April 09, 2013 2:45 PM
**To:** Lerner Lois G
**Cc:** Downing Nanette M
**Subject:** RE: OCS

Hello,

OCS messages are not set to automatically save as the standard; however the functionality exists within the software. That being said the parties involved in an OCS conversation can copy and save the contents of the conversation to an email or file.

To date OCS conversations are not specifically identified as part of the Electronic Data Request (EDR) for information, however, if one of the parties saved the conversation as an email or file they would become part of the electronic search.

My general recommendation is to treat the conversation as if it could/is being saved somewhere, as it is possible for either party of the conversation to retain the information and have it turn up as part of an electronic search.

Make sense?

---

**From:** Lerner Lois G
**Sent:** Tuesday, April 09, 2013 1:50 PM
**To:** Hooke Maria D
**Cc:** Downing Nanette M
**Subject:** OCS

**I had a question today about OCS. I was cautioning folks about email and how we have had several occasions where Congress has asked for emails and there has been an electronic search for responsive emails--so we need to be cautious about what we say in emails. Someone asked if OCS conversations were also searchable--I don't know, but told them I would get back to them. Do you know?**

*Lois G. Lerner*

Lerner's management style also contributed to the problems experienced by the Exempt Organizations Division. Handwritten, undated notes from Acting Commissioner Steve Miller's files reflect serious concerns in Lerner's management. The notes read: "**EO Judgment is an**

Exhibit D

**issue**.  She likes Holly [Paz] and Sharon Light and Nan [Marks] and that's it."[641]  Other notes from Miller's files show that "(c)(4) and Tea Party stuff was not well managed – not [Joseph Grant's] doing – not quite sure what is up with Lois."[642]

During his transcribed interview, Miller testified that he believed Lerner was "overall competent."[643]  But his chief of staff, Nikole Flax, was more colorful.  She told the Committee: "We didn't always – we didn't always get along.  You know, we had, as I said, Lois speaks freely, so we would have occasion when I would, you know, call her and she could scream for a minute . . . ."[644]  Flax also opined that Lerner was not "the ideal selection" to testify before Congress, calling her "unpredictable" and "emotional."[645]  Flax testified:

> Q   And you said before that Mr. Grant wasn't the best witness at the [July 2012 Ways and Means Subcommittee] hearing.  Was there any discussion about having Ms. Lerner as a witness for that hearing?
>
> A   No.
>
> Q   Why not?
>
> A   Lois is unpredictable.  She's emotional.  I have trouble talking negative about someone.  I think in terms of a hearing witness, she was not the ideal selection.[646]

Senior IRS official Nan Marks told the Committee that Lerner was a "fairly independent executive" who "tends to try and manage her own operation and solve her open problems and doesn't really tend to take them up the chain."[647]  When asked to describe Lerner's management style, Judy Kindell told Committee staff that Lerner "could be very hands on" and that she "sometimes tended to yell at people."[648]  Cindy Thomas gave perhaps the most critical testimony to the Committee.  When asked if Lerner was a "political" person, Thomas responded:

> I believe that she cares about power and that it's important to her maybe to be more involved with what's going on politically and to me we should be focusing on working the determination cases and closing the cases and it shouldn't matter what type of organization it is.  We should be looking at the merits of that case.  And it's my understanding that the Washington office has made comments like they would like for – Cincinnati is not as politically sensitive as they would like us to be, and frankly I think that

---

[641] Internal Revenue Serv., Handwritten notes (undated) [IRSR 505456].

[642] Internal Revenue Serv., Handwritten notes (undated) [IRSR 505701].

[643] Transcribed interview of Steven Miller, Internal Revenue Serv., in Wash., D.C. (Nov. 13, 2013).

[644] Transcribed interview of Nikole Flax, Internal Revenue Serv., in Wash., D.C. (Oct. 22, 2013).

[645] *Id.*

[646] *Id.*

[647] Transcribed interview of Nancy Marks, in Wash., D.C. (Oct. 8, 2013).

[648] Transcribed interview of Judith Kindell, Internal Revenue Serv., in Wash., D.C. (Oct. 29, 2013).

Exhibit D

maybe they need to be not so politically sensitive and focus on the cases that we have and working a case based on the merits of those cases.[649]

Thomas also explained her reaction to Lerner blaming "low-level" Cincinnati employees for the misconduct.  Thomas testified:

Q      And what was your reaction to hearing the news?

A      I was really, really mad.

Q      Why?

A      I feel as though Cincinnati employees and EO Determinations was basically thrown under a bus and that the Washington office wasn't taking any responsibility for knowing about these applications, having been involved in them and being the ones to basically delay processing of the cases.

***

Q      And you said that this was not the first time that you had heard Ms. Lerner use derogatory terms to refer to Cincinnati employees, is that correct?

A      Yes.

Q      Can you tell us about the other times that she referred to Cincinnati employees in a derogatory manner?

A      I know she referred to us as backwater before.  I don't remember when that was. . . .  She also makes comments like, well, you're not a lawyer.  And excuse me, I'm not a lawyer but that doesn't mean that I don't have something to bring to the table.  I know a lot more about IRS operations than she ever will.  And just because I'm not a lawyer doesn't mean I'm any less of a person or not as good a worker.[650]

In an e-mail to Lerner on the same day that Lerner blamed "low-level" employees for the misconduct, Thomas sharply asked her: "How am I supposed to keep the **low-level workers** motivated when the public believes they are nothing more than **low-level** and now will have no respect for how they are working cases?  The attitude/morale of employees is the lowest it has ever been."[651]

---

[649] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).
[650] *Id.*
[651] E-mail from Cindy Thomas, Internal Revenue Serv., to Lois Lerner, Internal Revenue Serv. (May 10, 2013) (emphases in original) [IRSR 366782].

Exhibit D

Lois Lerner deserves the most responsibility for the IRS's targeting of conservative-oriented applicants for tax-exempt status. In addition to her managerial role overseeing the applications, she personally ordered the applications to proceed through a "multi-tier review" and initiated a "c4 project." Lerner exhibited a personal bias against conservative applications – including Tea Party applications, which she called "very dangerous." She orchestrated a plan within Exempt Organizations to study and identify political activity by tax-exempt groups. Along with her brusque management style, Lerner wrongly blamed "low-level" Cincinnati employees for misconduct that emanated from Washington. But at the most fundamental level, the IRS targeted conservative tax-exempt applicants under Lerner's watch.

## Holly Paz, Director, Rulings and Agreements

Holly Paz was a manager in the IRS's Exempt Organization Division. Paz was Lerner's top deputy in the EO Division, which handles applications for tax-exempt status. As the line-level manager with specific responsibility for executing Lerner's instructions for handling applications for conservative groups, Paz had a high degree of personal involvement with the IRS targeting program. Paz allowed the use of inappropriate screening criteria and caused the backlog of conservative applicants to grow, leading to excessive delays in processing the applications. Paz was placed on paid administrative leave in June 2013.

In early 2010, when a line screener identified and elevated the first Tea Party application, Paz served as director of Exempt Organizations Technical Unit in Washington, D.C. In that role, she initiated Washington's involvement in the matter from the very beginning and later expanded the involvement by requesting two more Tea Party applications. It was Paz who directed the Cincinnati office to "hold" the remainder of applications "until we get a sense of what the issues may be."[652] Cindy Thomas, the manager of Exempt Organization Determinations Unit in Cincinnati explained the "hold" request during her transcribed interview with Committee staff. She testified:

> Q     Other than the fact that Washington wanted the first case and wanted two more cases, was there any other reason why the rest of them weren't being developed?
>
> A     We were holding them to wait for the Washington office to get back to us. . . . And typically the way our process works, these cases were just at the screening level. The screening group looks at cases when they come in the door and puts them into buckets, which would be they're either approving the cases, they're closing the cases as they're incomplete, or they're identified as more low risk cases, or they go into full development. So the screening process is just deciding which one of those processes should take

---

[652] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Mar. 17, 2010) [Muthert 1].

Exhibit D

place.  So there – the cases in our – at the screening level wouldn't be developed at that point in time.

Q      I see.  So which bucket were these 10 cases going into?

A      These cases were just being held until the Washington office got back to us.

Q      Okay.  So they weren't being put in any bucket?

A      That's correct.[653]

This inaction was not for lack of Paz's awareness.  Through the fall of 2010, Thomas sent Paz monthly requests asking about the status of Washington's guidance.[654]  Paz even told her boss, Lois Lerner, in February 2011 that "[n]o decisions are going out of Cincy until we go all the way through the process with the c3 and c4 cases here."[655]  Paz reaffirmed the order to Lerner in April 2011, writing to her that the Cincinnati office has been told "not to issue [determinations] until we work through the test cases we have here."[656]  As it were, the "test" cases would never be finished and the guidance would never come.

**Figure 28: E-mail from Holly Paz to Lois Lerner et al., Feb. 2, 2011**

**From:** Paz Holly O
**Sent:** Wednesday, February 02, 2011 11:02 AM
**To:** Lerner Lois G; Seto Michael C
**Cc:** Trilli Darla J; Douglas Akaisha; Letourneau Diane L; Kindell Judith E
**Subject:** RE: SCR Table for Jan. 2011

Tea Party - Cases in Determs are being supervised by Chip Hull at each step - he reviews info from TPs, correspondence to TPs, etc.  No decisions are going out of Cincy until we go all the way through the process with the c3 and c4 cases here.  I believe the c4 will be ready to go over to Judy soon.

Paz's request to hold the cases in Cincinnati also led to the use of inappropriate criteria to identify cases to hold.  John Shafer, the manager of the screening group in Cincinnati, told the Committee that once Paz expressed interest in working a test case in Washington, he asked his screeners to identify criteria for screening other Tea Party applications.  He testified:

[W]e need to hold those cases until we have further direction.  And so this was – this was communicated not only to these three senior people but to the group.  So, anyone who would be looking at cases and if they had these same particular issues presented to them, that we needed to not let them maybe go into the general inventory as we were looking for consistency.[657]

---

[653] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).
[654] *Id.*
[655] E-mail from Holly Paz, Internal Revenue Serv., to Lois Lerner & Michael Seto, Internal Revenue Serv. (Feb. 2, 2011) [IRSR 147511].
[656] E-mail from Holly Paz, Internal Revenue Serv., to Lois Lerner & Judith Kindell, Internal Revenue Serv. (Apr. 7, 2011) [IRSR 350220].
[657] Transcribed interview of John Shafer, Internal Revenue Serv., in Wash., D.C. (June 6, 2013).

Exhibit D

One of the screeners in Shafer's group, Gary Muthert, testified how he identified criteria for screening Tea Party applications.  He stated:

Q    Now, was there a point around this time period when Mr. Shafer asked you to do a search for similar applications?

A    Yes.

Q    To the best of your recollection, when was this request made?

A    Sometime in early March of 2010.

Q    And what did Mr. Shafer tell you to do exactly?

A    He told me he wanted me to find out how many Tea Parties were actually in TEDS [Tax Exempt Determinations System], and then how many was on another system called EDS.  We wanted to know how many cases were actually open that needed to be processed, and how many that has already been processed.  And I said, I'll get back to you.

                           ***

Q    Okay.  And, sir, when you were conducting this search, what criteria did you use to identify these cases?

A    At the time it was just Tea Party.

Q    Okay.  So you just searched for Tea Party; is that what you did?

A    At the initial search was Tea Party.

Q    Okay.  And this search term, "Tea Party," is that something you developed on your own, or did –

A    No.

Q    How did you develop that? How is that developed?

A    Because we had a Tea Party case come in, so we used the word "Tea Party."

                           ***

Q    What other terms did you use?

142

A      When I looked at the initial Tea Parties that were in house, the applications when they come in, I would see that they had Web sites. So I would look at the Web sites.  Then I would see other names, and I know there's – there wasn't 5 or 10 Tea Parties.  I noticed that there were hundreds of these things.  I went back and told John [Shafer].  I said, John, there's hundreds of these things, maybe thousands.  And I saw some other names.  So some of those names I used, some of those terms, to find the Tea Parties.  Tea Party went by other names.

*** 

Q      Can you give us examples of these other words or phrases that you used as criteria in these other searches?

A      Well, one was "patriots," and the "912 projects." If you looked at one Web site, you would see these.[658]

Paz's decision to work a couple of applications in Washington as "test" cases resulted in the need for the Cincinnati office to identify and hold similar cases for consistency.  The inappropriate criteria used by screeners to identify these applications were the direct result of Paz's decision.  Paz's request that Cincinnati hold the cases also resulted in substantial delays to hundreds of tax-exempt applicants.

### The IRS and the Obama Administration knowingly and wrongly blamed line-level IRS employees for the misconduct

The Committee has found that the IRS and the Obama Administration knowingly and wrongly blamed line-level IRS employees for the agency's misconduct.  They did so in a concerted effort to deflect responsibility from the Administration's political appointees.  As a result, they sacrificed the character of hard-working civil servants – who felt "thrown under the bus" – in order to protect their political patrons.

On May 10, 2013, Lois Lerner revealed, through a planted question,[659] that the IRS had targeted conservative tax-exempt applicants for additional scrutiny.[660]  In doing so, she blamed the inappropriate actions of the IRS on "line people" in Cincinnati.  She stated:

---

[658] Transcribed interview of Gary Muthert, Internal Revenue Serv., in Wash., D.C. (May 30, 2013).

[659] *Hearing on the IRS Targeting Conservative Groups: Hearing Before the H. Comm. on Ways & Means*, 113th Cong. (2013) (question and answer with Rep. Nunes); Bernie Becker, *Question that Revealed IRS Scandal was Planted, Chief Admits*, THE HILL, May 17, 2013; Abby Phillip, *IRS Planted Question About Tax Exempt Groups*, ABC NEWS, May 17, 2013.

[660] John D. McKinnon & Corey Boles, *IRS Apologizes for Scrutiny of Conservative Groups*, WALL ST. J., May 10, 2013; Jonathan Weisman, *IRS Apologizes to Tea Party Groups Over Audits of Applications for Tax Exemption*, N.Y.

Exhibit D

**So our line people in Cincinnati who handled the applications did what we call centralization of these cases.** They centralized work on these in one particular group. . . .   However, in these cases, the way they did the centralization was not so fine. Instead of referring to the cases as advocacy cases, they actually used case names on this list. They used names like Tea Party or Patriots and they selected cases simply because the applications had those names in the title. **That was wrong, that was absolutely incorrect, insensitive, and inappropriate — that's not how we go about selecting cases for further review. We don't select for review because they have a particular name.**[661]

Lerner did not offer this apology on her own accord.  The apology came after prolonged deliberations within the IRS, as well as discussions with the Treasury Department and the White House, about how to publicly acknowledge the targeting before the release of the independent inspector general's audit report.

It was widely reported in May 2013 that the Administration blamed the misconduct on two "rogue agents" in Cincinnati.[662]   Even Jay Carney, President Obama's Press Secretary, described the issue as "the apparent conduct by our IRS officials in Cincinnati,"[663] and that "there were line employees at the IRS who improperly targeted conservative groups."[664]  As recently as early December 2013, in an interview on MSNBC, President Obama blamed the IRS misconduct on employees in "an office in Cincinnati."[665]  The Committee's investigation shows that this blame was misdirected.  The IRS and the Administration knowingly and wrongly placed the blame on line-level IRS employees.

## Washington was involved from the beginning

From the very beginning, Washington IRS officials were involved in the agency's treatment of the Tea Party applications.  On the same day that a screener identified the initial application, Cindy Thomas, the head of the IRS Cincinnati office, informed Holly Paz, then the manager of EO Technical in Washington, about the case and potential media attention and asked

---

TIMES, May 10, 2013; Abram Brown, *IRS, to Tea Party: Sorry We Targeted You & Your Tax Status*, FORBES, May 10, 2013.

[661] Rick Hasen, *Transcript of Lois Lerner's Remarks at Tax Meeting Sparking IRS Controversy*, ELECTION LAW BLOG (May 11, 2013, 7:37AM), http://electionlawblog.org/?p=50160 (emphasis added).

[662] Chelsea J. Carter, Drew Griffin, & David Fitzpatrick, *'Angry' Obama Announces IRS Leader's Ouster after Conservatives Targeted*, CNN, May 16, 2013.

[663] Andrew Stiles, *Five IRS Scandal Myths*, NAT'L REVIEW, June 10, 2013.

[664] Rich Lowry, *The Cincinnati Lie*, POLITICO, June 12, 2013.

[665] *Hardball with Chris Matthews* (MSNBC television broadcast Dec. 5, 2013) (interview with President Barack Obama).

if Washington wanted the case.[666]  Paz responded on February 26, 2010: "I think sending [the case] up here is a good idea given the potential for media interest."[667]

As more applications arrived, Washington exerted more control.  On March 17, 2010, Paz asked Cincinnati to transfer two additional Tea Party cases to Washington and that Cincinnati "hold the rest until [Washington] get[s] a sense of what the issues may be.  Then we will work with [Cincinnati] in working the other cases."[668]  These cases were assigned to Carter Hull, a veteran Washington official with 48 years of experience in the IRS and an expert on 501(c)(3)s and 501(c)(4)s.  Hull worked these applications as "test" cases to "find out how [the IRS] should approach these organizations, and how we should handle them."[669]  Although he offered proposed determinations, his recommendations were never carried out.  Instead, the cases were forwarded up the Washington chain of command because "they were too controversial."[670]

Likewise, Elizabeth Hofacre, the Cincinnati-based IRS employee who first processed the Tea Party applications pending there, testified that she had to contact Hull in Washington for guidance on each application.[671]  Regarding the involvement of Washington and the process applied to Tea Party applications, Hofacre testified: "I never have done that before or since then."[672]  Thomas testified that the Cincinnati office could not issue determinations without Washington's approval.[673]

At a Committee hearing on July 18, 2013, Hofacre testified alongside Hull about Washington's involvement in the cases. At the hearing, both veterans of the IRS testified that the level of Washington's involvement was unusual.  Hofacre explained her involvement in an exchange with Congressman Jimmy Duncan:

Rep. DUNCAN.  We have heard Mr. Hull in his 48 years of experience say that these cases were handled in a very unusual manner.   And Ms. Hofacre, I understand that you said that in your 14 years experience these cases were handled differently. Was that the word?

Ms. HOFACRE.  Yes, sir, that is correct.

[666] E-mail from Cindy Thomas, Internal Revenue Serv., to Holly Paz, Internal Revenue Serv. (Feb. 25, 2010) [Muthert 2-3].
[667] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Feb. 26, 2010) [Muthert 2].
[668] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (Mar. 17, 2010) [Muthert 1].
[669] Transcribed Interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. (June 14, 2013).
[670] Id.
[671] Transcribed Interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. (May 31, 2013).
[672] Id.
[673] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

Exhibit D

| Rep. DUNCAN. | And you had 40 to 60 of these cases that were given to you in April, and then, in October, you requested a transfer, is that correct? |
|---|---|
| Ms. HOFACRE. | Well, sir, the number that you had just stated was how many I had when – assigned to me when I left in October of 2010. Initially I had maybe about 20. |
| Rep. DUNCAN. | I see.  And prior to this, how common was it that you would be told by the – by someone in Washington to hold up applications? |
| Ms. HOFACRE. | It wasn't very common at all.[674] |

## Washington was heavy handed in its approach to the cases

The level of involvement of the Washington IRS was significant.  Hofacre testified that "she had no autonomy" from Washington and "felt micromanaged to death" by Washington.[675] Cincinnati manager Cindy Thomas felt that her agents in Cincinnati could take no action on the growing backlog of applications until Washington provided guidance.  She testified:

Q     And so at this point, every new application that came in from a Tea Party group was being held in the screening group?  Is that right?

A     I don't know. I believe that the cases were being held.

*** 

Q     But you said that the 10 were being held?

A     The 10 were being held, and it was – it's my understanding that additional cases were being held.

*** 

Q     Okay.   And they were being held pending the guidance in Washington?

A     That's correct.

---

[674] *"The IRS's Systematic Delay and Scrutiny of Tea Party Applications": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013) (statement of Elizabeth Hofacre).
[675] Transcribed Interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. (May 31, 2013).

Exhibit D

Q      So even if an application submitted on its face could have moved
       through the process, it wasn't able to, because you guys were
       waiting on guidance from Washington?

A      That's correct.[676]

Similarly, Stephen Seok, a Cincinnati IRS official who served as "team leader" of a special group created to process Tea Party cases in December 2011, testified about Washington's influence on the burdensome requests sent to applicants. In a transcribed interview with Committee staff, Seok testified that the information-request letters sent to applicants – including those requesting donor information – were based on guidance documents drafted by tax law specialists in Washington. He testified:

Q      Mr. Seok, you stated earlier that as a part of the advocacy team,
       you drafted questions that were sent to applicants, is that correct?

A      Drafted the questions, yes, for myself, at the time.

Q      And you also stated earlier that you drafted your questions based
       on the guide sheet from Washington, is that correct?

A      Correct.

Q      Did you believe the questions you drafted fairly captured the intent
       of the guide sheet provided by Washington?

A      Yes.

                                    ***

Q      So is it fair to say that you believe the question about donor
       information was consistent with the guide sheet provided by
       Washington?

A      Consistent -- could you define further consistent?

Q      Had the consistent intent?

A      Consistent intent, yes.[677]

## The IRS and the Obama Administration coordinated on Lerner's apology

---

[676] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).
[677] Transcribed interview of Stephen Daejin Seok, Internal Revenue Serv., in Wash., D.C. (June 19, 2013).

Exhibit D

The IRS did not act alone in leaking the findings of TIGTA's audit report that the tax agency had targeted conservative tax-exempt applicants.  The Committee's investigation shows that the IRS coordinated with senior leadership in the Treasury Department, which also notified the White House.  This coordinated response to the TIGTA report was orchestrated to alert the senior Administration leadership of the public dissemination of information damaging to the Administration.  As one handwritten document alludes, the coordination between the IRS and the Treasury Department was meant as a "c4 warning" about unflattering information to come.[678]

There is conflicting evidence about when the Treasury Department became aware of the IRS targeting.[679]  According to testimony from Treasury Department officials, however, the Treasury Department became aware in early 2013 that TIGTA's audit would include "troubling findings" about the IRS's treatment of conservative 501(c)(4) applicants.[680]  Treasury Department General Counsel Christopher Meade testified that J. Russell George told him about the audit's findings in "the first quarter of 2013."[681]  Then-Chief of Staff Mark Patterson told Committee staff in his transcribed interview that he learned of the audit from George in early 2013 as well.[682]  Deputy Chief of Staff Adewale "Wally" Adeyemo testified that he became aware of the TIGTA audit from IRS Chief of Staff Nikole Flax in late March 2013.[683]

On April 22, 2013, Flax sent the draft, nonpublic TIGTA audit report to Adeyemo.[684]  Adeyemo sent the report to then-Deputy General Counsel Christian Weideman and to the Department's public affairs staff.[685]  He also hand-delivered a copy of the TIGTA report to Patterson.[686]  Separately, the same day, Flax e-mailed Adeyemo a copy of the draft statement that the IRS would use in apologizing for the targeting.[687]  During his transcribed interview, Adeyemo explained that his communications with Flax concerned the timing of the release of TIGTA's report.  He testified:

> Q      Do you recall anything else about what you and Ms. Flax discussed in that time period between late March 2013 to the time you informed Mr. Patterson [some time before April 22nd]?
>
> A      Much of my conversations with Nikole and much of the information I provided to Mark [Patterson] had to do with the timing for public release of information like a TIGTA report.  We

---

[678] Internal Revenue Serv., Handwritten notes with Patterson and Mazur (undated) [IRSR 506024].

[679] *See supra* section titled "There is conflicting evidence on whether the Treasury Department was aware of the IRS targeting in 2012."

[680] Transcribed interview of Christopher Meade, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 26, 2014); *see also* Transcribed interview of Christian Weideman, U.S. Dep't of the Treasury, in Wash., D.C. (Mar. 27, 2014);, Transcribed interview of Mark Patterson, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 4, 2014).

[681] Transcribed interview of Christopher Meade, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 26, 2014).

[682] Transcribed interview of Mark Patterson, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 4, 2014).

[683] Transcribed interview of Adewale Adeyemo, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 11, 2014).

[684] E-mail from Nikole Flax, Internal Revenue Serv., to Adewale Adeyemo, U.S. Dep't of the Treasury (Apr. 22, 2013) [OGR 11-7-13 2800].

[685] Transcribed interview of Adewale Adeyemo, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 11, 2014).

[686] *Id.*

[687] E-mail from Nikole Flax, Internal Revenue Serv., to Adewale Adeyemo, U.S. Dep't of the Treasury (Apr. 22, 2013) [OGR 11/7/13 612].

Exhibit D

checked in from time to time to see what progress was in terms of the work that the IRS was doing with TIGTA on the audit report and when they thought the audit report might be completed.

Q    And why is the timing important to the Department?

A    I can't speak to why it's important for the entire Department. For me, part of my job is helping to coordinate information and provide information to the chief of staff.

Q    And how does the timing of the release of a TIGTA report fit in with other matters the Department is handling?

A    I don't want to speculate as to any TIGTA report and how it fits in to other matters that we're handling. Part of my job is to simply know where things stand, in terms of the process. My job is to keep the trains running on time. And I was simply finding out from Nikole when she thought that report and other things that were ongoing would actually be completed.[688]

**Figure 29: E-mail from Nikole Flax to Adewale Adeyemo, Apr. 22, 2013**

| From: | Flax Nikole C |
|---|---|
| To: | Adeyemo, Adewale (Wally) |
| Subject: | Draft remarks |
| Date: | Monday, April 22, 2013 3:19:55 PM |
| Attachments: | draft c4 comments 4-22-13.doc |

Per the prior discussion - let me know if you want more details. This is a very rough draft. Event is Thursday. Thanks

In turn, the Treasury Department coordinated with the White House. On or around April 16, 2013, Treasury Deputy General Counsel Weideman notified Jonathan Su, an attorney in the White House Counsel's office about TIGTA's review and "that the IG had identified some problems or concerns with the application process as it related to conservative organizations."[689] Weideman testified that his reason for informing Su was to "give him a sense of what we anticipated to be the timing of the public release of information."[690] Over the course of the next several days, Weideman and Su continued to communicate about the TIGTA audit as the Treasury Department received more information from the IRS.

The IRS originally anticipated leaking information about the TIGTA audit report during an April 25 tax-law panel at Georgetown University on which Lerner spoke. According to Acting Commissioner Steve Miller, the Treasury Department's concerns stopped the IRS from breaking the news on April 25. Miller testified:

---

[688] Transcribed interview of Adewale Adeyemo, U.S. Dep't of the Treasury, in Wash., D.C. (Feb. 11, 2014).
[689] Transcribed interview of Christian Weideman, U.S. Dep't of the Treasury, in Wash., D.C. (Mar. 27, 2014).
[690] *Id.*

Q       Now, in public statements, the Treasury Department has said that they expressed some concern about Ms. Lerner making an announcement about the TIGTA report before the report had been released publicly but that ultimately they deferred to the IRS's desire to issue an apology for the conduct.  Is that consistent with your recollection of how that happened?

A       Generally, but let me walk through a little bit here.  There were two instances in which we were considering having Lois say something.  One was in a speech at Georgetown University.  And we, I think through public affairs to public affairs, and I might have sent it over to [Mark] Patterson as well, shared a piece of the speech.  **I believe that Treasury came back and said they were not comfortable with that**.  I subsequently talked to Mark Patterson about the ABA question and answer, and I think I walked him through what we would say.  And he was going to get back to me, he never did, and we went forward.  And that's sort of how all that happened.

Q       So when you in April of 2013 discussed Ms. Lerner's potential remarks at the Georgetown conference, what concerns did Mr. Patterson raise with you?

A       I think they said they were just uncomfortable with it.  And I don't really remember particulars.  And I'm not sure whether I heard it directly from him or whether I heard it from public affairs through our public affairs person.

***

Q       Do you recall having an understanding that Treasury's concern was about the substance of the intended remarks from Ms. Lerner or whether it was the timing of the remarks, or something else entirely?

A       I think it was the level of depth that we were going into, possibly. I don't think it was – **I know Patterson didn't have a view that we shouldn't do this, we shouldn't, you know, start the ball rolling here and release**.  So I don't believe it was that.  But particularly what it was – my recollection is it was maybe length, but I don't remember that that well, so.[691]

        Patterson testified that he expressed "skepticism" to Miller about the IRS's "two-part plan to make a public apology," which consisted of Miller answering questions during an April 25th Ways and Means Subcommittee hearing and Lerner giving a public apology during the

---

[691] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013) (emphases added).

Exhibit D

Georgetown conference.[692]  Following their conversation, Patterson spoke with White House Deputy Chief of Staff Mark Childress, after which he called Miller back.  Patterson testified:

> I spoke with Mr. Childress, and I described my conversation with him – to him – I described to him the conversation I had with Mr. Miller, and my recollection is that we both felt that doing two things in the same week was unnecessary.  And so, following that, I called Mr. Miller back, and my recollection of that conversation was that Mr. Miller volunteered that they were not going to do the speech but that he still intended to answer questions about this in testimony, which he indicated to me was certain – he indicated he was certain he was going to be asked about this in a hearing that week.[693]

Patterson testified that he informed Childress about the IRS plan to disclose the targeting "so that the White House wouldn't be surprised by the news."[694]

According to Miller, Patterson's input factored into his decision not to allow Lerner to acknowledge the targeting on April 25, 2013.  In contrasting his decision to abandon the April 25th announcement with his decision to have Lerner acknowledge the targeting on May 10th, Miller testified:

> I think the way I would characterize it is I was looking for [Patterson's] counsel because he had been my contact over there and had given me good advice throughout.  And if [the Treasury Department] had a problem with it, then probably I would have taken that into account in making a decision to go forward, as I did with [Lerner's] Georgetown speech.[695]

Although the Lerner speech was called off, Miller prepared to acknowledge the targeting during an April 25 hearing before the Ways and Means Subcommittee Oversight.[696]

On April 24, as Miller coordinated with Patterson and Patterson coordinated with Childress, Treasury Deputy General Counsel Christian Weideman had several phone calls with White House Special Counsel Jonathan Su about the IRS plan to acknowledge the targeting.[697]  Weideman and General Counsel Christopher Meade also had a phone call that afternoon with Deputy White House Counsel Ed Siskel, Su, and White House Deputy Press Secretary Eric Schultz.[698]  Weideman described the conversation as "about what the IRS was contemplating and general concerns with that course of action."[699]

---

[692] Transcribed interview of Mark Patterson, in Wash., D.C. (Feb. 4, 2014).
[693] Id.
[694] Id.
[695] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).
[696] Id.
[697] Transcribed interview of Christian Weideman, U.S. Dep't of the Treasury, in Wash., D.C. (Mar. 27, 2014).
[698] Id.
[699] Id.

Exhibit D

**Figure 30: E-mail exchange between Christian Weideman & Jonathan Su, Apr. 24, 2013**

| | |
|---|---|
| **From:** | Weideman, Christian |
| **To:** | "Su, Jonathan" |
| **Subject:** | RE: |
| **Date:** | Wednesday, April 24, 2013 7:49:00 PM |

I'm back at my desk. ▉▉▉▉ .  Give me a ring whenever you have a moment?  Thanks.

-----Original Message-----
From: Su, Jonathan [mailto:▉▉▉▉@who.eop.gov]
Sent: Wednesday, April 24, 2013 7:39 PM
To: Weideman, Christian
Subject:

I have updates whenever you have a chance to talk.

**Figure 31: E-mail from Jonathan Su to Christian Weideman, Apr. 25, 2013**

| | |
|---|---|
| **From:** | Su, Jonathan |
| **To:** | Weideman, Christian |
| **Subject:** | can we do an update call tomorrow afternoon? |
| **Date:** | Thursday, April 25, 2013 6:10:43 PM |

Jonathan C. Su
Special Counsel to the President
The White House
(202) ▉▉▉▉ (office)
(202) ▉▉▉▉ (cell)

On April 26 – after Miller's testimony passed without him acknowledging the targeting – Weideman spoke with Su again about the TIGTA audit.[700]  According to Weideman, he and Su "had a discussion about the draft TIGTA audit report and a very high level general overview of what TIGTA had found and what its factual findings were."[701]  Weideman testified that following April 26, up until Lerner's apology on May 10, he and Su may have had additional conversations about the timing of TIGTA's release of the audit report.[702]

In early May 2013, Miller notified Patterson about the IRS's plan for Lerner to apologize for the targeting during the May 10th American Bar Association event.[703]  Miller testified that Patterson told him: "I'm not against trying to get in front of this, but let me think about this one."[704]  When Patterson did not object, the IRS went forward with the plan.[705]  Patterson

---

[700] *Id.*
[701] *Id.*
[702] *Id.*
[703] Transcribed interview of Steven Miller, in Wash., D.C. (Nov. 13, 2013).
[704] *Id.*
[705] *Id.*

Exhibit D

testified that he did not object to the IRS's plan because "Mr. Miller felt strongly that it was what the right thing to do was for the agency, and he thought an apology was needed, and I didn't feel like I had a basis to second-guess that judgment."[706]

The Committee's investigation shows that the IRS coordinated closely with the Treasury Department and, in turn, the White House about the IRS's plan to apologize for its targeting of Tea Party tax-exempt applicants. The IRS even shared its draft remarks, talking points, and the nonpublic TIGTA audit report with the Administration. The IRS took these actions weeks before the public first became aware of the audit's findings and before the IRS ever informed Congress about the targeting. Whether through willful neglect or benign indifference, the Administration's failure to stop Lerner's staged apology amounted to a tacit endorsement of the IRS's strategy for spin control.

## Cincinnati IRS employees felt that Washington threw them "under the bus"

Despite early and heavy-handed involvement in the processing of the Tea Party applications, the IRS and the Obama Administration attempted to blame front-line employees for the misconduct. When Lerner blamed line-level employees for the targeting, the Cincinnati office justifiably bristled. Cindy Thomas, head of the Cincinnati office, wrote Lerner an e-mail that very afternoon, titled "Low Level Workers thrown under the Bus."[707] Thomas excoriated Lerner, noting that through Lerner's remarks, "Cincinnati wasn't publicly 'thrown under the bus' [but] instead was hit by a convoy of Mack trucks."[708] Cincinnati line employee Joseph Herr likewise observed in a separate e-mail: "Now, we know what the underside of a bus looks like."[709]

[ BOTTOM OF PAGE INTENTIONALLY BLANK ]

---

[706] Transcribed interview of Mark Patterson, in Wash., D.C. (Feb. 4, 2014).
[707] E-mail from Cindy Thomas, Internal Revenue Serv., to Lois Lerner, et al., Internal Revenue Serv. (May 10, 2013) [IRSR 366782].
[708] *Id.* (emphasis added).
[709] E-mail from Joseph Herr, Internal Revenue Serv., to Elizabeth Hofacre, Internal Revenue Serv. (May 10, 2013) [IRSR 550732].

Exhibit D

**Figure 32: E-mail from Cindy Thomas to Lois Lerner, May 10, 2013**

| | |
|---|---|
| **From:** | Thomas Cindy M |
| **Sent:** | Friday, May 10, 2013 12:59 PM |
| **To:** | Lerner Lois G |
| **Cc:** | Paz Holly O |
| **Subject:** | Low-Level Workers thrown under the Bus |

As you can imagine, employees and managers in EO Determinations are furious. I've been receiving comments about the use of your words from all parts of TEGE and from IRS employees outside of TEGE (as far away as Seattle, WA).

I wasn't at the conference and obviously don't know what was stated and what wasn't. I realize that sometimes words are taken out of context. However, based on what is in print in the articles, it appears as though all the blame is being placed on Cincinnati. Joseph Grant and others who came to Cincinnati last year specially told the **low-level workers** in Cincinnati that no one would be "thrown under the bus." Based on the articles, Cincinnati wasn't publicly "thrown under the bus" instead was hit by a convoy of mack trucks.

Was it also communicated at that conference in Washington that the **low-level workers** in Cincinnati asked the Washington Office for assistance and the Washington Office took no action to provide guidance to the **low-level workers?**

One of the **low-level workers** in Cincinnati received a voice mail message this morning from the POA for one of his advocacy cases asking if the status would be changing per "Lois Lerner's comments." What would you like for us to tell the POA?

How am I supposed to keep the **low-level workers** motivated when the public believes they are nothing more than **low-level** and now will have no respect for how they are working cases? The attitude/morale of employees is the lowest it has ever been. We have employees leaving for the day and making comments to managers that "this low-level worker is leaving for the day." Other employees are making sarcastic comments about not being thrown under the bus. And still other employees are upset about how their family and friends are going to react to these comments and how it portrays the quality of their work.

The past year and a half has been miserable enough because of all of the auto revocation issues and the lack of insight from Executives to see a need for strategic planning that included having anyone from EO Determinations involved in the upfront planning of this work. Now, our leader is publicly referring to employees who are the ones producing all of this work with fewer resources than ever as **low-level workers!**

If reference to **low-level workers** wasn't made and/or blame wasn't placed on Cincinnati, please let me know ASAP and indicate what exactly was stated so that I can communicate that message to employees.

Exhibit D

During her transcribed interview, Thomas explained that Lerner's statements at the event were "derogatory" to lower-level employees working determinations cases.[710]  She testified:

Q      And what was your reaction to hearing the news?

A      I was really, really mad.

Q      Why?

A      I feel as though Cincinnati employees and EO Determinations was basically thrown under a bus and that the Washington office wasn't taking any responsibility for knowing about these applications, having been involved in them and being the ones to basically delay processing of the cases.[711]

Other employees interviewed by the Committee expressed similar sentiment.  When asked about allegations that Cincinnati was to blame for the misconduct, Gary Muthert, an IRS agent in Cincinnati, testified: "Well, it's hard to answer the question because in my mind I still hear people saying we were low-level employees, so we were lower than dirt, according to people in D.C.  So, take it for what it is.  They were basically throwing us underneath the bus."[712] Another Cincinnati employee, Steven Bowling, called the idea of two rogue agents "ridiculous,"[713] while Ron Bell called it "not true."[714]  Their colleague, Joseph Herr, concurred: "I disagree because the term 'rogue' in my mind means doing something that you are not authorized to do.  I am not aware of anyone in Cincinnati that operated outside of their job authorities."[715]  Stephen Seok similarly testified: "Rogue employees means doing their own acting.  I don't think anybody in our team, including myself, did their own thing out of the command of chain."[716]

In both her interview with Committee staff and at the July 18, 2013, hearing,  Hofacre described the way she felt after learning that officials in Washington were blaming Cincinnati as "like a nuclear strike."[717] Hofacre also testified that she agreed with Thomas's characterization that Cincinnati was "thrown under a bus" and felt that this was done for political reasons.  She explained her feelings during an exchange with Subcommittee Chairman Jim Jordan:

Rep. JORDAN.      So you would agree with Cindy Thomas, one of your bosses in Cincinnati who said, people in Cincinnati felt like they were being thrown under the bus.

[710] Transcribed Interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).
[711] *Id.* (emphasis added).
[712] Transcribed interview of Gary Muthert, Internal Revenue Serv., in Wash., D.C. (May 30, 2013).
[713] Transcribed interview of Steven Bowling, Internal Revenue Serv., in Wash., D.C. (June 12, 2013).
[714] Transcribed interview of Ronald Bell, Internal Revenue Serv., in Wash., D.C. (June 13, 2013).
[715] Transcribed interview of Joseph Herr, Internal Revenue Serv., in Wash., D.C. (June 4, 2013).
[716] Transcribed interview of Stephen Daejin Seok, Internal Revenue Serv., in Wash., D.C. (June 19, 2013).
[717] Transcribed interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. (May 31, 2013).

Exhibit D

| | |
|---|---|
| Ms. HOFACRE. | I'm not sure the context that was stated in, but literally, that statement I would agree with that. |
| Rep. JORDAN. | Let me ask you one other question here and then I will close, Mr. Chairman. You were asked in your interview by our staff, Ms. Hofacre, this specific question: "Do you think the public has been purposely misled by assertions that Cincinnati was to blame'' And your response was? |
| Ms. HOFACRE. | Yes, I believe so. |
| Rep. JORDAN. | Yeah, I think your response was, according to what we have, "exactly." So statements made by folks in Washington, two rogue agents, this narrative that was trumpeted out there and bandied about, statements made by – statements made by the White House press secretary, "apparent conduct by IRS officials in Cincinnati.   IRS line personnel had improperly targeted conservative groups." They were purposely – according to your statement, you think folks in Washington were purposely, that's the key point, you said you think it was a purposeful misleading of the facts and what really took place. |
| Ms. HOFACRE. | Sir, in my opinion, when Lois Lerner made that statement, that would be correct.[718] |

Although Thomas acknowledged that the Cincinnati office was not perfect in handling tax-exempt applications, she explained that IRS officials in Washington were primarily responsible for the delay.[719]  She stated:  "[Y]es, there were mistakes made by folks in Cincinnati as well [as] D.C. but the D.C. office is the one who delayed the processing of the cases."[720] Thomas also noted the impact of Lerner's comments on employee morale.  She stated in part: "[I]t's frustrating like how am I supposed to keep them motivated when our so-called leader is referring to people in that direction."[721]

The deliberate attempts to blame line-level IRS employees for the agency's targeting of conservative tax-exempt applicants are troubling.  These were desperate efforts by the Administration's political leadership to avoid blame and attempt to extricate Washington from the controversy.  From Lois Lerner's initial acknowledgement up to President Obama's nationally televised interview in December 2013, the IRS targeting has never been the doing of

---

[718] *"The IRS's Systematic Delay and Scrutiny of Tea Party Applications": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013) (question and answer with Rep. Jordan).
[719] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).
[720] *Id.*
[721] *Id.*

Exhibit D

line-level employees in the Cincinnati office.  Any suggestion otherwise is a deliberate effort to shift blame away from political figures in Washington.

## The Obama Administration's IRS is not an independent tax administrator

The Committee's investigation has shown that since 2010, the IRS is not a truly independent tax administrator.  Rather, during the Obama Administration, the IRS has become an entity responsive to and responsible for implementing significant policy initiatives.  In addition to targeting conservative tax-exempt applicants, the IRS has counseled senior White House officials on the implications of ObamaCare.  It has coordinated closely with the Administration and Congressional Democrats on policy measures.  Documents and testimony show that the IRS has becoming increasingly politicized, contrary to its historical position as a fair and neutral administrator of federal tax law.

## ObamaCare has politicized the IRS

ObamaCare has fundamentally changed the role of the IRS.  The law has charged the IRS with administering at least 47 new provisions, including 18 new taxes, essential to the law's implementation.[722]  It has required the IRS to work closely with other departments and agencies within the Administration.  ObamaCare has taken the IRS away from its traditional role of collecting taxes and inserted the agency into broader policy debates.

In 2012, former Commissioner Mark Everson voiced concerns that "direct participation of the [Internal Revenue] Service in a major non-tax Administration initiative has the potential to erode the historic independence of the Service. . . .  [W]hen you bring the Service in closer to the White House and to other agencies you just run the risk of eroding that independence."[723] Documents and information obtained during the Committee's investigation have confirmed Everson's worries.

E-mails produced by the IRS show that the White House used the supposed independent tax administrator for partisan policy guidance.  In July 2012, as several religious-affiliated non-profits sued the Administration over ObamaCare's violations of religious freedom, the White House sought IRS counsel about the law's exemption for certain non-profits.[724]  Jeanne Lambrew, the Deputy Assistant to the President for Health Policy, engaged in a lengthy e-mail exchange with Sarah Hall Ingram, the director of the IRS ObamaCare office and IRS Commissioner for Tax Exempt and Government Entities.  In discussing the scope of the exemption, Lambrew inquired of Ingram how the Administration could change the regulations to dismiss a legal challenge while maximizing the law's contraception mandate: "[D]o we feel at

---

[722] *See* Letter from Douglas W. Elmendorf, Cong. Budget Office, to John Boehner, Speaker of the House of Representatives (July 24, 2012).
[723] *"IRS: Enforcing ObamaCare's New Rules and Taxes": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 112th Cong. (2012) (statement of Mark W. Everson) (emphasis added).
[724] E-mail from Ellen Montz, Exec. Office of the Pres., to Catherine Livingston & Sarah Hall Ingram, Internal Revenue Serv. (July 18, 2012) [IRSR 189780].

Exhibit D

this point we can say that we believe that replacing the four-prong test with the fourth prong will not expand the number of workers in health plans that are exempt from contraception coverage? What more needs to be done to make such a determination?"[725]   Ingram responded in part with feedback on Lambrew's proposal:

> Not sure what you are looking for on your question since I don't think it is possible to say that zero additional people would fall into the reg rule.  If you are looking for a quantification of the delta between using prongs 1-4 and using only prong 4, my sense anecdotally is that the delta is more than zero but I don't think we would have any way of quantifying it for you.[726]

The Office of Tax Policy within the Department of Treasury is the proper entity to advise the Administration on partisan tax policy questions.  The IRS exists to administer the tax code. The fact that Ingram, a veteran IRS employee, engaged in a partisan policy discussion about a highly controversial Administration regulation under litigation shows the degree to which partisan agendas have politicized the IRS.

A document produced to the Committee appears to show White House pressure on the IRS to portray ObamaCare's benefits in a favorable light.  In May 2012, Ron Pollack from left-wing group Families USA e-mailed White House official Liz Fowler about a report noting that 3.2 million businesses would qualify for ObamaCare small business tax credits.[727]  Fowler forwarded the e-mail to Lambrew and others, noting "3.2 million seems high."[728]  Lambrew passed the message on to the IRS, writing: "Agree – and already got a note from WH press folks asking if we can embrace these numbers."[729]  IRS Chief of Staff Jonathan Davis eventually responded with an alternative figure of 332,000 small businesses.[730]

Close coordination between the White House and a non-independent federal agency is not unusual.  In this case, however, the agency in question is the IRS, which has traditionally been sequestered from political activities, including messaging related to a major White House policy initiative.  The Committee's investigation showed that the IRS participated in several aspects of the ObamaCare rollout, which heightened the appearance that the IRS has been inappropriately politicized.

---

[725] E-mail from Jeanne Lambrew, Exe. Office of the Pres., to Sarah Hall Ingram, Internal Revenue Serv., & Ellen Montz, Exec. Office of the Pres. (July 19, 2012) [IRSR 189779].

[726] E-mail from Sarah Hall Ingram, Internal Revenue Serv., to Jeanne Lambrew & Ellen Montz, Exec. Office of the Pres. (July 19, 2012) [IRSR 189779].

[727] E-mail from Ron Pollack, Families USA, to Liz Fowler, Exec. Office of the Pres. (May 8, 2012)  [IRSR 247603].

[728] E-mail from Liz Fowler, Exec. Office of the Pres., to Mark Iwry, Dep't of the Treasury, et al. (May 8, 2012) [IRSR 247603].

[729] E-mail from Jeanne Lambrew, Exec. Office of the Pres., to Liz Fowler, Exec. Office of the Pres. (May 8, 2012) [IRSR 247602-03].

[730] E-mail from Jonathan Davis, Internal Revenue Serv., to Jeanne Lambrew, Exec. Office of the Pres. (May  8, 2012) [IRSR 247602].

Exhibit D

## The IRS acts as a political arm of the Obama Administration, rather than an independent tax administrator

As the IRS has become increasingly politicized, the agency has begun to operate more like a political extension of the Obama Administration rather than an independent administrator of federal tax law.  Documents and information available to the Committee show that the IRS works in conjunction with the Administration and its allies to promote partisan objectives.

Evidence suggests that the Administration viewed the IRS as a political and policy extension of the Administration.  For example, in January 2011, the Democratic staff of the House Ways and Means Committee notified the White House and the Department of Health and Human Services (HHS) about an upcoming hearing on ObamaCare.[731]  The Democratic staff director wrote to several White House and HHS officials: "My lovely and considerate counterpart just informed us that we are having a full Committee hearing next Wed[nesday] on [health] reform's effect on jobs and the economy. . . .  Also, wanted to see whether we wanted to have an Admin witness.  Have no idea if we do or if you can do it, but if someone could be confident and strong, then it may throw them off because we'd be able to frame it without other witnesses at the table . . . ."[732]  Nancy-Ann DeParle, then-Director of the White House Office of Health Reform, forwarded the e-mail to IRS Chief of Staff Jonathan Davis, asking for the information for the Administration's use at the hearing.  She wrote: "I am trying to pull together some background materials for the Ways & Means hearing next week that Dems believe will focus on the following . . . .  Does . . . IRS have anything already prepared, particularly on the 1099, small business tax credit, tax on investment income topics?"[733]

Likewise, congressional Democrats also viewed the IRS as a political and policy resource.  In September 2012, the Obama Administration released a report detailing its forecast for the consequences for the sequestration of federal funds mandated by the Budget Control Act of 2011.[734]  In wake of the report, the Democratic staff of the House Appropriations Committee asked the agency for "any dire impact" information about sequestration's effect on the IRS.[735]  Similarly, in January 2013, the Democratic staff of the House Oversight Committee asked the IRS for material relating to the tax-exempt application of True the Vote, a Tea Party-related organization.[736]  Holly Paz, director of Exempt Organizations Rulings and Agreements, authorized the IRS to release information to the Democratic staff, but it is unclear what information the IRS eventually provided.[737]

---

[731] E-mail from Cybele Bjorklund, H. Comm. on Ways & Means, to Jeanne Lambrew, Dep't of Health & Human Servs., et al. (Jan. 19, 2011) [IRSR 252032].

[732] Id.

[733] E-mail from Nancy-Ann DeParle, Exec. Office of the Pres., to Jonathan Davis, Internal Revenue Serv., et al. (Jan. 21, 2011) [IRSR 252030-31].

[734] See Exec. Office of the Pres., OMB Report Pursuant to the Sequestration Transparency Act of 2012 (P.L. 112-115).

[735] E-mail from Pamela LaRue, Internal Revenue Serv., to Jonathan Davis & Beth Tucker, Internal Revenue Serv. (Sept. 19, 2012) [IRSR 247604].

[736] E-mail from Catherine Barre, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (Jan. 25, 2013) [IRSR 180907].

[737] E-mail from Holly Paz, Internal Revenue Serv., to Catherine Barre, Internal Revenue Serv. (Jan. 31, 2013) [IRSR 557181].

Exhibit D

**Figure 33: E-mail from Pamela LaRue to Jonathan Davis & Beth Tucker, Sept. 19, 2012**

**From:** LaRue Pamela J
**Sent:** Wednesday, September 19, 2012 3:27 PM
**To:** Davis Jonathan M (Wash DC); Tucker Beth
**Cc:** Amato Amy; Gillis Ursula S; Flax Nikole C; Barre Catherine M
**Subject:** FW: sequestration coverage
**Importance:** High

Jonathan/Beth – Amy has received an inquiry from Laura (House Minority approps) – asking for "any dire impact" of sequestration on IRS. While we have prepared our impact statement (provided to Treasury but to the best of my knowledge not shared with OMB), last Friday, I reached out to Jeptha when we were trying to find out if there was any public portion on IRS provided in addition to the references in the report. As Terry noted – nothing public was released, but Jeptha subsequently shared with me a short impact summary he prepared for OMB internal use only which is below. He provided it, asking me to validate the "8,000 people or more" statement:

The IRS even collaborated with Congressional Democrats about partisan tax policy matters. In June 2012, a Democratic staff member from the House Ways and Means Committee e-mailed the IRS with five specific questions related to 501(c)(4) exemptions, including questions about Tea Party-affiliated applications.[738] After IRS employees called the staff member, they reported back that "she is very pleased with our quick response."[739] Other e-mails show a similar close relationship between the IRS and Senator Chuck Schumer's (D-NY) staff.[740] A staff member for Senator Schumer gave the IRS a "head's up" [*sic*] of a favorable *New York Times* article on 501(c)(4) groups and a forthcoming letter from the Senate "asking for immediate administrative changes."[741]

**Figure 34: E-mail from Floyd Williams to Doug Shulman et al., Mar. 8, 2012**

**From:** Williams Floyd L
**Sent:** Thursday, March 08, 2012 05:41 PM
**To:** Shulman Doug; Davis Jonathan M (Wash DC); Keith Frank; Lemons Terry L; Eldridge Michelle L; Miller Steven T; Flax Nikole C; Barre Catherine M; Lerner Lois G; Paz Holly O; Urban Joseph J
**Cc:** Norton William G Jr
**Subject:** FW: campaign finance letter / proposal

FYI--I received this from Senator Schumer's office.

---

Heads up NY times will do a follow up piece on IRS campaign finance on 501(c)(4) and senate is sending you another letter asking for immediate administrative changes. I will send letter late tomorrow.

---

[738] E-mail from Karen McAfee, H. Comm. on Ways & Means, to James Glenn & William Norton, Internal Revenue Serv. (June 19, 2012) [IRSR 228145].

[739] E-mail from James Glenn, Internal Revenue Serv., to Nikole Flax, Internal Revenue Serv. (June 19, 2012) [IRSR 228143].

[740] *See, e.g.*, E-mail from Anna Taylor, U.S. Senate, to Catherine Barre, Internal Revenue Serv. (Nov. 13, 2012) [IRSR 542555].

[741] E-mail from Floyd Williams, Internal Revenue Serv., to Doug Shulman et al., Internal Revenue Serv. (Mar. 8, 2012) [IRSR 15399].

160

Other documents suggest that the IRS may even have aided Democrat legislators in partisan policy initiatives.  For example, as Senator Carl Levin (D-MI) engaged in a lengthy correspondence with the IRS about section 501(c)(4) organizations in 2012, IRS personnel assisted his staff by providing information for some of the letters.  In one e-mail, with the subject "[w]orking on the next letter," Senator Levin's staff sought answers from the IRS about its treatment of six applications, including Crossroads GPS, American Action Network, and the Club for Growth.[742]

The IRS's close collaboration with Congressional Democrats and their staff is a concerning aspect of the IRS's politicization.  As these Democratic Members of Congress wrote letters to the IRS urging reforms to the section 501(c)(4) and limits on political speech by these 501(c)(4) groups, the IRS actively and willingly aided these efforts.  The IRS provided these Members with material and information for use in formal letters to the Commissioner. Congressional staff shared information with the IRS about their draft requests.  In this way, IRS played a significant – and largely unseen – role in drafting requests for the agency to crack down on political speech by 501(c)(4) groups.

The IRS's politicization has filtered down to how it processes tax-exempt applications. EO Determinations Manager Cindy Thomas testified during her transcribed interview that Washington officials have, on occasion, directed her to give a particular application expedited treatment.[743]  The Washington office has also asked EO Determinations to single out tax-exempt applications relating to issues in the news, such as gun control.[744]  The politicization of the IRS hurts the agency's credibility and its core function as an independent tax administrator.

## There are indications of political bias in the IRS

The Committee has uncovered evidence that the officials within the Obama Administration's IRS viewed conservative tax-exempt applications differently from normal applications.  This evidence supports the Committee's finding that the IRS is no longer a fair and neutral arbiter of federal tax administration.

For example, Stephen Seok, a revenue agent in the Cincinnati office, testified that the activities of the Tea Party applicants differed from those of other 501(c)(4) applications.  He stated:

Normal (c)(4) cases we must develop the concept of social welfare, such as the community newspapers, or the poor, that types.  These [Tea Party] organizations mostly concentrate on their activities on the limiting government, limiting government role, or reducing government size, or

---

[742] E-mail from Kaye Meier, U.S. Senate, to Catherine Barre, Internal Revenue Serv. (Sept. 26, 2012) [IRSR 182403-04].
[743] Transcribed interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).
[744] *See, e.g.*, E-mail from Holly Paz, Internal Revenue Serv., to Jon Waddell, Internal Revenue Serv. (May 3, 2013) [IRSR 417534].

Exhibit D

paying less tax.  I think it[']s different from the other social welfare organizations which are (c)(4).[745]

His statement suggests a degree of bias against social-welfare applicants organized for traditionally conservative goals of limiting government and lowering taxes.

David Fish, a manager in the Exempt Organizations Guidance Unit, testified that he believed there could be "controversy" from the tax-exempt applications filed by Tea Party groups.[746]  He testified:

Q       Do you recall what was it that made you think that there might be some controversy that could potentially result from the IRS working those applications?

A       Only that it's – they're Tea Party. The expectation is that they're going to be – they expected to be given tax-exempt status, even though they're doing things that they might not be allowed to do.

Q       I note that the email mentions, "According to Cincy, three cases have been approved, 2 (c)(4)'s and one(c)(3)."  Do you recall why you thought there might be controversy if any Tea Party applications were denied on a tax-exempt status?

A       Don't recall other than denials – we don't have a whole lot of denials. And Tea Party, probably a loud group.[747]

Likewise, a discussion between IRS executive Holly Paz and Deputy Division Counsel Janine Cook evinces the IRS's inherent skepticism and reluctance to approve tax-exempt applications filed by Tea Party organizations.  Paz wrote to Cook:  "Lois [Lerner] would like to discuss our planned approach for dealing with these cases.  **We suspect we will have to approve** the majority of the c4 applications."[748]  When Cook forwarded Paz's e-mail to colleague Don Spellmann, he noticed the tone of Paz's comment.  He wrote to Cook: "Thank you Janine.  This line in particular stood out: 'We suspect we will have to approve the majority of c4 applications.'  That's an interesting posture."[749]  Cook replied in part by confirming IRS's doubts about conservative tax-exempt applicants, writing: "[G]uess they are thinking they'll have suspicions about reality but the paper/reps will pass muster."[750]

---

[745] Transcribed interview of Stephen Seok, Internal Revenue Serv., in Wash., D.C. (June 19, 2013).

[746] Transcribed interview of David Fish, Internal Revenue Serv., in Wash., D.C. (Oct. 2, 2014).

[747] *Id.*

[748] E-mail from Holly Paz, Internal Revenue Serv., to Janine Cook, Internal Revenue Serv. (July 19, 2011) (emphasis added) [IRSR 14372-73].

[749] E-mail from Don Spellmann, Internal Revenue Serv., to Janine Cook, Internal Revenue Serv. (July 19, 2011) (emphasis in original) [IRSR 428420].

[750] E-mail from Janine Cook, Internal Revenue Serv., to Don Spellmann, Internal Revenue Serv. (July 19, 2011) [IRSR 428420].

Exhibit D

**Figure 35: E-mail exchange between Don Spellmann & Janine Cook, July 19, 2011**

**From:** Cook Janine
**Sent:** Tuesday, July 19, 2011 3:51 PM
**To:** Spellmann Don R
**Subject:** RE: Advocacy orgs

yes.  guess they are thinking they'll have suspicions about reality but the paper/reps will pass muster.

---

**From:** Spellmann Don R
**Sent:** Tuesday, July 19, 2011 3:35 PM
**To:** Cook Janine
**Subject:** RE: Advocacy orgs

Thank you Janine.  This line in particular stood out:  "We suspect we will have to approve the majority of the c4 applications."  That's an interesting posture.

Other documents show that the IRS – and Lois Lerner, in particular – had a keen interest in Crossroads GPS, a prominent conservative-leaning non-profit group.  In October 2010, Senator Dick Durbin (D-IL) wrote to IRS Commissioner Doug Shulman imploring the IRS to investigate Crossroads.[751]  Days earlier, Democratic staff on the House Ways and Means Committee called the IRS asking for information about the exempt status of Crossroads GPS.[752]  After an IRS employee verified that Crossroads had not been recognized as tax-exempt, Lerner forwarded the e-mail to her bosses, Sarah Hall Ingram and Joseph Grant, complaining about the law.  "Another glitch in the law," she wrote.  She continued:

> If they started up this year and did not come into us for exemption, we have nothing on them until they file a 990 [exempt organization return form].  So allegations going into Dallas [for audit] would be closed out in EO and sent to [the Small Business Division] since we have no record of them being taxable.  If they are taxable, SB would do nothing because they can do this activity – so they'd close it out. . . .  Solution – Congress pass a law that says all organizations that want tax exemption must apply!!!!![753]

Later, in June 2011, Lerner requested that the Cincinnati office send Crossroads GPS's application to Washington for review.  According to an e-mail from Lerner subordinate Holly Paz, "Lois wants Judy [Kindell] to take a look at it so she can summarize the issues for Lois."[754]  By spring 2012, according to testimony, Lerner had resolved to deny Crossroad GPS's application.[755]

---

[751] Press Release, Durbin Urges IRS to Investigate Spending by Crossroads GPS (Oct. 12, 2010).
[752] E-mail from Floyd Williams, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (Oct. 6, 2010) [IRSR 453772].
[753] E-mail from Lois Lerner, Internal Revenue Serv., to Sarah Hall Ingram & Joseph Grant, Internal Revenue Serv. (Oct. 6, 2010) [IRSR 453771].
[754] E-mail from Holly Paz, Internal Revenue Serv., to Cindy Thomas, Internal Revenue Serv. (June 1, 2011) [IRSR 69915].
[755] See Letter from Dave Camp, H. Comm. on Way & Means, to Eric H. Holder, Jr., U.S. Dep't of Justice (Apr. 9, 2014).

Exhibit D

**Figure 36: E-mail from Holly Paz to Cindy Thomas, June 1, 2011**

**From:** Paz Holly O
**Sent:** Wednesday, June 01, 2011 2:21 PM
**To:** Thomas Cindy M
**Cc:** Melahn Brenda
**Subject:** group of cases

re: Tea Party cases

Two things re: these cases:

1.   Can you please send me a copy of the Crossroads Grassroots Policy Strategies (EIN 27-2753378) application?  Lois wants Judy to take a look at it so she can summarize the issues for Lois.

2.   What criteria are being used to label a case a "Tea Party case"?  We want to think about whether those criteria are resulting in over-inclusion.

Lois wants a briefing on these cases.  We'll take the lead but would like you to participate.  We're aiming for the week of 6/27.

Thanks!

Holly

Documents released by the House Ways and Means Committee pursuant to its authority to examine confidential taxpayer information show that the IRS took action relating to Crossroads GPS.  In January 2013, Lerner wrote to Nanette Downing, the head of the Exempt Organization audit unit, about Crossroads GPS, reciting the concerns of Democratic lawmakers that the group was "funneling" money to political campaigns.  Lerner wrote:

> I reviewed the information last night and thought the allegations in the documents were really damning, so wondered why we hadn't done something with the org.  **The first complaint came in 2010 and there were additional ones in 2011 and 2012**. . . .  I don't know where we go with this – as I've told you before – I don't think your guys get it and the way they look at these cases is going to bite us some day.  **The organization at issue is Crossroads GPS, which is on the top of the list of c4 spenders in the last two elections.  It is in the news regularly as an organization that is not really a c4, rather it is only doing political activity – taking in money from large contributors who wish to remain anonymous and funneling it into tight electoral races**. . . .  I know the org is now in the ROO [Review of Operations] – based on allegations sent in this year, but this is an org that was a prime candidate for exam when the referrals and 990s first came in.

<p align="center">***</p>

Exhibit D

You should know that we are working on a denial of the application, which may solve the problem because we probably will say it isn't exempt.[756]

The IRS ought to be an independent and neutral administrator of federal tax law. The evidence available to the Committee shows otherwise. In recent times, with the agency's outsized role in ObamaCare and the Obama Administration's use of the IRS for political policy-making, the agency has departed from its traditional role. As a result, there are indications of political bias within the IRS that compromise confidence in the agency's fair administration of the tax code.

### The Administration's investigation of the targeting

The Administration's investigation into the IRS targeting has been characterized by a lack of accountability. During a congressional hearing in June 2013 – only a month after Attorney General Holder announced the Administration's investigation – then-FBI Director Robert Mueller was unable to answer basic questions about the status of the investigation.[757] Twice in late 2013, Chairman Issa and Chairman Jordan wrote to FBI Director James Comey seeking information about the Administration's investigation.[758] The FBI refused to provide the requested information and, after apparent intervention by the Department of Justice, rescinded an offer to brief Chairman Jordan on the investigation.[759] Even as recently as July 2014, after the IRS informed Congress that it had destroyed two years of Lerner's e-mails, the FBI continued its refusal to provide any information about its investigation.[760]

Through IRS witnesses, the Committee learned that Barbara Bosserman, an attorney in the Civil Rights Division of the Department of Justice, played a leading role in the Administration's investigation.[761] Federal Election Commission records showed that Bosserman has contributed almost $7,000 to President Obama's political campaigns and the Democratic National Committee in recent years.[762] A subsequent news report stated that Bosserman participated in a bill-signing event at the White House in October 2009 – apparently an "extraordinary" occurrence for a career Department attorney.[763] The Committee later learned that the other two Justice Department entities involved in the investigation – the Public Integrity Section and the FBI – met with Lois Lerner in October 2010 to discuss the potential prosecution

[756] E-mails from Lois Lerner, Internal Revenue Serv., to Nanette Downing, Internal Revenue Serv. (Jan. 4, 2013) [IRS 122549-50].
[757] "Oversight Hearing of the Federal Bureau of Investigation": Hearing Before the H. Comm. on the Judiciary, 113th Cong. (2013) (question and answer with Rep. Jordan).
[758] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to James Comey, Fed. Bureau of Investigation (Sept. 6, 2013); Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to James Comey, Fed. Bureau of Investigation (Dec. 2, 2013).
[759] See Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Eric H. Holder, Jr., U.S. Dep't of Justice (Jan. 8, 2014).
[760] See Letter from Stephen D. Kelly, Fed. Bureau of Investigation, to Jim Jordan, H. Comm. on Oversight & Gov't Reform (July 11, 2014).
[761] Id.
[762] Id.
[763] Obama backer leading IRS probe visited White House in '09, records show, FOX NEWS, Jan. 13, 2014.

165

Exhibit D

of politically active non-profits.[764]  The IRS even sent a 1.1 million-page database of non-profit information – including confidential taxpayer information – to the FBI.[765]

Shortly after news of Bosserman's involvement in the investigation became public, anonymous "law-enforcement officials" leaked to the *Wall Street Journal* that the Administration did not plan to file criminal charges relating to the IRS targeting.[766]  This leak stood in stark contrast to the FBI's outright refusal – with the Department's approval – to brief Congress on the investigation just weeks earlier.  The leak undercut the credibility of Attorney General Holder's pledge of a thorough investigation and undermined public confidence in the investigation.  In light of the politicized track record of the Civil Rights Division,[767] there are serious concerns about the Administration's interest in holding wrongdoers accountable.

Troubled by the dubious circumstances undergirding the Department's investigation, the Committee wrote to Attorney General Holder on January 8, 2014, requesting information about the Administration's investigation.[768]  The Principal Deputy Assistant Attorney General for Legislative Affairs, Peter Kadzik, replied on the Attorney General's behalf, providing no useful information and instead equating the Committee's request for information to the IRS's targeting of tax-exempt applicants.[769]  Because of the Department's intransigence, Chairman Jordan requested that Bosserman testify about the Department's investigation and the apparent conflict of interest caused by her participation.[770]  Deputy Attorney General James Cole responded on Bosserman's behalf, refusing to provide her or any Department official to testify about the Administration's investigation.[771]  To date, the Committee has received virtually no information about the Administration's investigation – despite serious questions about its integrity and the appearance of serious conflicts of interest.

Since learning about Bosserman's conflict of interest, the Committee has come to learn that several other entities within the Justice Department have similar conflicts.  The other two Justice Department components involved in the criminal investigation – the Public Integrity Section and the Federal Bureau of Investigation – have serious conflicts of interest stemming from their interaction with the IRS in October 2010.[772]  In particular, the Public Integrity Section discussed with Lois Lerner potential criminal aspects of non-profit political speech in 2010 in the

---

[764] *See* Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to John Koskinen, Internal Revenue Serv. (June 9, 2014).

[765] *Id.*

[766] Devlin Barrett, *Criminal charges not expected in IRS probe*, WALL ST. J., Jan. 13, 2014.

[767] H. Comm. on Oversight & Gov't Reform, H. Comm. on the Judiciary, and S. Comm. on the Judiciary, Joint Republican Staff Report, *Department of Justice's Quid Pro Quo with St. Paul: How Assistant Attorney General Thomas Perez Manipulated Justice and Ignored the Rule of Law,* 113th Cong. (Apr. 15, 2013).

[768] *Id.*

[769] *See* Letter from Peter J. Kadzik, U.S. Dep't of Justice, to Darrell E. Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform (Jan. 24, 2014).

[770] Letter from Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Barbara Kay Bosserman, U.S. Dep't of Justice (Jan. 28, 2014).

[771] *See* Letter from James Cole, U.S. Dep't of Justice, to Jim Jordan, H. Comm. on Oversight & Gov't Reform (Jan. 30, 2014).

[772] Transcribed interview of Jack Smith, U.S. Dep't of Justice, in Wash., D.C. (May 29, 2014); Transcribed interview of Richard Pilger, U.S. Dep't of Justice, in Wash., D.C. (May 6, 2014).

Exhibit D

wake of the President's attacks upon the Supreme Court's *Citizens United* decision.[773]  The FBI even went so far as to acquire 1.1 million pages of non-profit tax-return information, including confidential taxpayer information protected by federal law, from the IRS.[774]

Other Justice Department entities – the Tax Division and the Office of Legislative Affairs – had similar apparent conflicts of interest.  The Tax Division, which is representing the IRS in civil lawsuits relating to the targeting, appointed Andrew Strelka, a former IRS attorney who worked for Lois Lerner, to represent the IRS.[775]  While working for Lerner at the IRS, Strelka received an e-mail in March 2010 directing him to "[b]e on the lookout for a tea party case."[776]  Even after he left the IRS, Strelka maintained a close relationship with Lerner, writing to her: "I still feel an EO connection" and "I cherished my time in the EO family and I owe a big thanks to you for hiring me . . . ."[777]  Strelka's connection with the IRS is so strong that he was made aware of Lerner's hard drive crash in June 2011 almost immediately after it occurred.[778]  In addition, Strelka's connection with IRS was important enough that TIGTA and the Justice Department interviewed him in spring 2014 about the IRS targeting.[779]

Strelka testified that although he worked on at least two cases at the Justice Department that concerned Exempt Organizations, Strelka never disclosed to the court or his opposing counsel his connection with the IRS or that fact that he was a witness in the criminal investigation into the IRS's targeting.[780]  With respect to one case involving Judicial Watch's Freedom of Information Act request for documents from the IRS, Strelka testified:

> Q     Okay.  Sir, when you entered your appearance in the Judicial Watch litigation relating to the 501(c)(4) applications, did you disclose to the court your previous experience with the IRS?
>
> A     No.
>
> Q     Did you disclose to the court your experience working for Lois Lerner?
>
> A     No.

---

[773] E-mail from Jack Smith, U.S. Dep't of Justice, to Raymond Hulser, U.S. Dep't of Justice (Sept. 21, 2010) [OGR IRS 1]; Meeting among Jack Smith, Justin Shur, Nancy Simmons, Richard Pilger, & Raymond Hulser, U.S. Dep't of Justice, "Possible 501/Campaign Finance Investigation (Sept. 30, 2010) [OGR IRS 16].

[774] Letter from Peter Kadzik, U.S. Dep't of Justice, to Darrell E. Issa, H. Comm. on Oversight & Gov't Reform (June 4, 2014); Letter from Peter Kadzik, U.S. Dep't of Justice, to Darrell E. Issa, H. Comm. on Oversight & Gov't Reform (May 29, 2014).

[775] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Eric H. Holder, Jr., U.S. Dep't of Justice (Aug. 25, 2014).

[776] E-mail from Ronald Shoemaker, Internal Revenue Serv., to Ellen Berick et al., Internal Revenue Serv. (Mar. 17, 2010) [IRSR 631577].

[777] E-mail from Andrew Strelka, U.S. Dep't of Justice, to Lois Lerner, Internal Revenue Serv. (Aug. 23, 2012) [IRSR 717505].

[778] E-mail from Pilar Jarrin, Internal Revenue Serv., to Andrew Strelka, U.S. Dep't of Justice (June 13, 2011) [HOGR IRS 353].

[779] Transcribed interview of Andrew Strelka, in Wash., D.C. (Oct. 3, 2014).

[780] *Id.*

Exhibit D

Q       Did you disclose to the court your experience working 501(c)(4) applications?

A       No.

Q       Did you disclose to opposing counsel that you worked at the IRS?

A       No.

<div align="center">***</div>

Q       Did you disclose to opposing counsel your experience working in Lois Lerner's organization?

A       No.

Q       Did you disclose to opposing counsel your experience working on 501(c)(4) applications?

A       No.

Q       And, sir, at the time you entered your appearance in the Judicial Watch FOIA matter relating to 501(c)(4) applications, did you disclose to the court that you were aware in 2011 that Ms. Lerner's hard drive had crashed?

A       No.

<div align="center">***</div>

Q       And, sir, in your work on the Judiciary Watch matter that we discussed earlier, did you ever disclose to the court that you were interviewed by the Department of Justice in connection with the criminal investigation into the IRS' treatment of tax-exempt applicants?

A       No, and I will add that, on both of those matters, my designated ethics official never stated I had any affirmative duty to do so.[781]

Although Strelka testified that the Justice Department's ethics officials cleared him to work on cases involving tax-exempt applications, his involvement on cases – especially litigation concerning documents for which Strelka may have been a custodian while at the IRS – creates the appearance of a conflict.  Similarly, the Office of Legislative Affairs had an apparent conflict, hiring an attorney who also previously worked for Lois Lerner at the IRS and, prior to

---

[781] *Id.*

<div align="center">168</div>

<div align="right">Exhibit D</div>

the IRS, for ActBlue, described as an Internet-based political action committee for Democratic candidates.[782]  With the Justice Department's mission to "do justice, not just [to] win cases,"[783] these circumstances create the inappropriate appearance of a predisposition within the Justice Department in favor of the IRS.

**Figure 37: E-mail from Ronald Shoemaker to Andrew Strelka et al., Mar. 17, 2010**

| From: | Shoemaker Ronald J |
|---|---|
| Sent: | Wednesday, March 17, 2010 9:34 AM |
| To: | Berick Ellen S; Gitterman Janet E; Henzke Leonard J; Hull Carter C; Manasterli Jacqueline B; Kastenberg Elizabeth C; Mackay James R; Orcino Leonardo M; Patton John M; Paul Susan L; Phaup Lee T; Strelka Andrew C; Wrathall Meghan R; Zelasko James |
| Subject: | lookout |

Be on the lookout for a tea party case. If you have received or do receive a case in the future involving an exemption for an organization having to do with tea party let me know.

Thanks.

---

[782] Leslie Wayne, *A fund-raising rainmaker arises online*, N.Y TIMES, Nov. 29, 2007; "Nicole Siegel, Attorney Advisor – DOJ Legislative Affairs," www.linkedin.com/pub/nicole-siegel/10/185/692 (last visited Aug. 18, 2014).
[783] Press Release, U.S. Dep't of Justice, Department Asks Alaska Corruption Cases Be Remanded to District Court, Former State Representatives Be Released (June 4, 2009) (statement of Attorney General Eric H. Holder, Jr.).

**Figure 38: E-mail exchange between Lois Lerner & Andrew Strelka, Aug. 23, 2013**

| From: | Lerner Lois G |
|---|---|
| Sent: | Thursday, August 23, 2012 4:30 PM |
| To: | Strelka, Andrew C. (TAX) |
| Subject: | RE: Greetings |

That is terrific—Congratulations!  I'm glad we could be a part of your success.  Enjoy the trip—San Diego is lovely.

We are hanging in here at North Capital.  The office space is nice, but not many eateries around, although folks keep saying there will be "soon."   I do have to agree that the issues we're dealing with these days may be more interesting than what's on your plate—we've had a lot of Congressional attention this year.  I will pass on your good news to all.  Stop by and see us if you're in the area.

*Lois G. Lerner*
Director of Exempt Organizations

---

**From:** Strelka, Andrew C. (TAX)
**Sent:** Thursday, August 23, 2012 5:16 PM
**To:** Lerner Lois G
**Subject:** Greetings

Lois,

When I left EO you said my time here would fly by.  The last two years have felt like two months.  I hope everyone has settled in on North Capitol.

Apart from my almost daily emails to Pilar, I still feel an EO connection as my time in your office has led to me being assigned to several § 7428 cases.  I can conclusively state that the nuances of EO law trumps the mechanics of federal tax liens any day.

I wanted to let you know that I was just recently informed that I've been awarded the Federal Bar Association's 2012 Younger Federal Lawyer Award, and my nominators noted some of my accomplishments in EO (I pasted what my nominators wrote below my signature and highlighted the EO parts).  I will receive the award at a ceremony in late September at the FBA's annual convention in San Diego.  I cherished my time in the EO family and I owe a big thanks to you for hiring me, Chip for teaching me, and Ron for putting up with me!

All the best,

Andrew C. Strelka

Another troubling element about the Department's investigation is that Lois Lerner felt comfortable speaking privately with Department investigators without any legal protections while simultaneously refusing to testify publicly before Congress.  The *Wall Street Journal* reported on March 6, 2014, that Department attorneys interviewed Lerner about the IRS targeting "within the last six months."[784]  According to the article, Lerner gave a "lengthy

---

[784] John D. McKinnon, *Former IRS official Lerner gave interview to DOJ*, WALL ST. J., Mar. 6, 2014.

Exhibit D

interview" to unspecified Department investigators without a grant of immunity from the government.[785]  Lerner, however, refused to speak publicly to the Committee, invoking her Constitutional privilege against self-incrimination. Chairman Issa and Chairman Jordan sent a letter to the Attorney General on March 20, 2014, seeking limited information about the circumstances of Lerner's interview with the Department.[786]  The Department again refused to accommodate the Committee's oversight interests, withholding any information about the interview.[787]

Perhaps most telling about the nature of the Administration's criminal investigation is that the Justice Department was not aware that the IRS had destroyed Lois Lerner's e-mails until *after* it read about it in news accounts.  According to veteran law-enforcement officials, if the Administration was conducting a serious investigation, the Justice Department would have known months earlier that Lerner's e-mails were missing.  Former Justice Department official Hans von Spakovsky testified to the Committee:

> The first thing you would do if you have the FBI as your investigator [in a] situation like this is go and seize all of the documents and information the way the FBI does when they're investigating a private organization.  A year and a half later, they clearly had not done that and didn't even know that all of the evidence they were supposedly supposed to be looking at, all those emails, didn't exist.[788]

Deputy Attorney General James Cole testified that the Justice Department learned about the destroyed Lerner e-mails "from the press accounts that were in the paper following the IRS's notification to the Congress."[789]  If the Justice Department truly was conducting a comprehensive criminal investigation of the IRS's targeting of conservative groups, it should have seized all evidentiary material in May 2013 and would not be in the position to learn from press accounts in June 2014 that the IRS had destroyed relevant evidence.

With these substantial concerns about the integrity and seriousness of the Administration's investigation, Members of Congress have sought to ensure the IRS targeting is properly investigated.  On May 7, 2014, the House passed H. Res. 565, calling upon Attorney General Eric Holder to appoint a special counsel to thoroughly and independently investigate the IRS's targeting.[790]  This resolution passed on an overwhelmingly bipartisan basis, with 26 Democrats joining Republicans in urging the Administration to restore credibility to the investigation.  In addition, the Committee asked Department of Justice Inspector General to

---

[785] *Id.*

[786] *See* Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Eric H. Holder, Jr., U.S. Dep't of Justice (Mar. 20, 2014).

[787] Letter from Peter Kadzik, U.S. Dep't of Justice, to Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform (Mar. 28, 2014).

[788] *"IRS Abuses: Ensuring that Targeting Never Happens Again": Hearing Before the H. Comm. on Oversight & Gov't Reform,* 113th Cong. (2014) (statement of Hans von Spakovsky).

[789] *"Examining the Justice Department's Response to the IRS Targeting Scandal.": Hearing Before the Subcomm. on Economic Growth, Job Creation & Reg. Affairs of the H. Comm. on Oversight & Gov't Reform,* 113th Cong. (2014) (testimony of James Cole, Deputy Attorney General, Dep't. of Justice).

[790] H.R. Res. 565, 113th Cong. (2014).

Exhibit D

examine how the Department conducted its investigation into the IRS misconduct.[791]  As this review proceeds, the Committee will continue to urge the Administration to hold accountable those government officials who targeted conservative tax-exempt applicants.

## The Department of Justice's role in the targeting

Compounding the Committee's already-serious concerns with the Administration's investigation of the IRS targeting, documents also suggest that the Department of Justice was willing to pursue criminal prosecutions based on information that the IRS obtained from tax-exempt groups.  These documents show that the Public Integrity Section considered prosecuting tax-exempt organizations for actions relating to political speech.  The Department coordinated with the IRS – and with Lois Lerner, in particular – to discuss these potential prosecutions.

Documents first made public by the government watchdog Judicial Watch on April 16, 2014 indicated the Department coordinated with IRS to unduly scrutinize Tea Party groups and potentially subject them to criminal prosecution.[792]  On May 8, 2013, Richard Pilger, the Director of the Election Crimes Branch of the Department's Public Integrity Section, e-mailed Lois Lerner, writing: "[W]hen you have a moment, would you call me?  I have been asked to run something by you."[793]  After Mr. Pilger and Ms. Lerner spoke, Ms. Lerner summarized the conversation in an e-mail to Nikole Flax, then-chief of staff to Acting Commissioner Steve Miller.  She wrote:

> I got a call today from Richard Pilger Director Election Crimes Branch at DOJ.  I know him from contacts from my days there.  He wanted to know who at IRS the DOJ folks could talk to about Sen. Whitehouse idea at the hearing that DOJ could piece together false statement cases about applicants who "lied" on their 1024s – saying they weren't planning on doing political activity, and then turning around and making large visible political expenditures.  DOJ is feeling like it needs to respond, but want to talk to the right folks at IRS to see whether there are impediments from our side and what, if any damage this might do to IRS programs.[794]

Ms. Lerner asked veteran IRS official Nan Marks to coordinate the meeting.[795]

---

[791] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Michael E. Horowitz, U.S. Dep't of Justice (Jan. 15, 2014).
[792] *See* Gregory Korte, *On eve of Tea Party scandal, IRS discussed criminal probes*, USA TODAY, Apr. 16, 2014.
[793] E-mail from Richard Pilger, U.S. Dep't of Justice, to Lois Lerner, Internal Revenue Serv. (May 8, 2013) [IRSR 209188].
[794] E-mail from Lois Lerner, Internal Revenue Serv., to Nikole Flax, Internal Revenue Serv. (May 8, 2013) [IRSR 209282].
[795] *Id.*

Exhibit D

**Figure 39: E-mail from Lois Lerner to Nikole Flax, May 8, 2013**

**From:** Lerner Lois G
**Sent:** Wednesday, May 08, 2013 5:30 PM
**To:** Flax Nikole C
**Cc:** Grant Joseph H; Marks Nancy J
**Subject:** DOJ Call
**Importance:** High

I got a call today from Richard Pilger Director Elections Crimes Branch at DOJ. I know him from contacts from my days there. He wanted to know who at IRS the DOJ folks could talk to about Sen. Whitehouse idea at the hearing that DOJ could piece together false statement cases about applicants who "lied" on their 1024s--saying they weren't planning on doing political activity, and then turning around and making large visible political expenditures. DOJ is feeling like it needs to respond, but want to talk to the right folks at IRS to see whether there are impediments from our side and what, if any damage this might do to IRS programs.

I told him that sounded like we might need several folks from IRS. I am out of town all next week, so wanted to reach out and see who you think would be right for such a meeting and also hand this off to Nan as contact person if things need to happen while I am gone--

Thanks

*Lois G. Lerner*
Director of Exempt Organizations

During the Committee's transcribed interview of Pilger, he acknowledged having another interaction with Lerner in October 2010.[796] Subsequent documents produced by the Justice Department and IRS showed that Department became interested in potential criminal aspects of non-profit political speech after the chief of the Public Integrity Section read a front-page *New York Times* article – an article the IRS assisted in preparing. As a result of the Justice Department's engagement, the IRS sent 1.1 million pages of non-profit tax-return information, including confidential taxpayer information protected by federal law, to the Federal Bureau of Investigation.

On September 21, 2010, Jack Smith, chief of the Justice Department's Public Integrity Section, e-mailed his senior leadership, writing:

> Check out [the] article on front page of ny times [*sic*] regarding misuse of non-profits for indirectly funding campaigns. This seems egregious to me – could we ever charge a [18 U.S.C. §] 371 conspiracy to violate laws of the USA for misuse of such non profits to get around existing campaign finance laws + limits? I know 501s are legal but if they are knowingly using them beyond what they are allowed to use them for (and we could prove that factually)? IRS Commissioner sarah ingram [*sic*] oversees these groups. Let's discuss tomorrow but maybe we should try to set up a meeting this week.[797]

---

[796] Transcribed interview of Richard Pilger, U.S. Dep't of Justice, in Wash., D.C. (May 6, 2014).

[797] E-mail from Jack Smith, U.S. Dep't of Justice, to Raymond Hulser, U.S. Dep't of Justice (Sept. 21, 2010) [OGR IRS 1].

Exhibit D

Documents show that the IRS assisted in drafting this article, with Ingram and Lerner even speaking to the reporter on background.[798] After the article was published, Ingram commented that "it came out pretty well. The 'secret donor' theme will continue . . . . At least [the article's author] started the idea that we don't have the law to do something . . . ."[799] Indeed, the idea that the IRS had limited enforcement abilities contributed to the Justice Department's engagement on the issue.[800]

**Figure 40: E-mail from Jack Smith to Raymond Hulser et al., Sept. 21, 2010**

| | |
|---|---|
| **From:** | Smith, Jack |
| **Sent:** | Tuesday, September 21, 2010 9:52 PM |
| **To:** | Hulser, Raymond; Shur, Justin; Pilger, Richard |
| **Subject:** | 501 non profits |

Check out article on front page of ny times regarding misuse of nonprofits for indirectly funding campaigns. This seems egregious to me - could we ever charge a 371 conspiracy to violate laws of the USA for misuse of such non profits to get around existing campaign finance laws + limits? I know 501s are legal but if they are knowingly using them beyond what they are allowed to use them for (and we could prove that factually)?

IRS Comssioner sarah ingram oversees these groups.  Let's discuss tomorrow but maybe we should try to set up a meeting this week.

        In the ensuing weeks, the Public Integrity Section began to discuss possible actions on non-profits engaged in political speech. Smith convened meetings on a "possible 501/campaign finance investigation."[801] At Smith's direction, Pilger arranged a meeting with Lerner and the IRS to discuss the "evolving legal landscape" of campaign-finance law after the *Citizens United* decision.[802] Pilger intended to engage with Lerner about being "more vigilant to the opportunities from more crime in the . . . 501(c)(4) area."[803] He also sought to better understand the "practicalities" of criminally enforcing non-profit political speech, such as whether the IRS could review donor lists of 501(c)(4) organizations for potential violations of campaign-finance law.[804] Similarly, the IRS sought to "walk [the Justice Department] through the basic civil rules within [the IRS's] jurisdiction and find out what if anything else they are looking for. . . . These are not tax people so [Lerner] may also take [IRS employee] Joe Urban to do clear perimeters about tax info should they want to do any 6103 fishing (as opposed to public record 6104 info)."[805]

---

[798] *See* E-mail from Michelle Eldridge, Internal Revenue Serv., to Doug Shulman et al., Internal Revenue Serv. (Sept. 20, 2010) [IRSR 250053].

[799] E-mail from Sarah Hall Ingram, Internal Revenue Serv., to Terry Lemons et al., Internal Revenue Serv. (Sept. 21, 2010) [IRSR 508974]; *See also supra* note 260 and accompanying text.

[800] Transcribed interview of Jack Smith, U.S. Dep't of Justice, in Wash., D.C. at 39 (May 29, 2014) ("I don't remember it word for word, but I remember there being a concern in the article that there was[n't] appropriate enforcement here, and I wanted to discuss the issue.").

[801] Meeting among Jack Smith, Justin Shur, Nancy Simmons, Richard Pilger, & Raymond Hulser, U.S. Dep't of Justice, "Possible 501/Campaign Finance Investigation (Sept. 30, 2010) [OGR IRS 16].

[802] Transcribed interview of Richard Pilger, U.S. Dep't of Justice, in Wash., D.C. at 8 (May 6, 2014).

[803] *Id.* at 101.

[804] *Id.* at 159-60.

[805] *Id.*

Exhibit D

Figure 41: E-mail from Sarah Hall Ingram to Steve Miller et al., Sept. 29, 2010

| From: | Ingram Sarah H |
|---|---|
| Sent: | Wednesday, September 29, 2010 5:29 PM |
| To: | Miller Steven T; Song Victor S O; Raven Rick A |
| Cc: | Lerner Lois G |
| Subject: | DOJ Meeting |
| | |
| Importance: | High |

This is to heads-up you about the 10/8 meeting we have been invited to at the Criminal Division of Justice. Lois will take the lead for us as I will be out of town. Lois knows at least some of these folks from her years working in this office (a while back and before she worked at Fed Election Commission).

The plan is to walk them through the basic civil law rules within our jurisdiction and find out what if anything else they are looking for. If they need more than the primer then we would need to assign carefully to preserve the civil – criminal wall.

These are not tax people so she may also take Joe Urban to do clear perimeters about tax info should they want to do any 6103 fishing (as opposed to public record 6104 info).

Would IRS-CI like to send anyone with us? Anyone want to be pre-briefed? We would report back on the meeting and any follow-up issues.

PS. Steve: Lois and I are on your calendar this Friday on the Baucus letter.

The meeting occurred on October 8, 2010.[806] An IRS memorandum summarizing the meeting confirmed that the discussion resulted from recent media attention on "the political activity of exempt organizations."[807] The memorandum also demonstrated that the President's political rhetoric contributed to the Justice Department's investigation of non-profit political speech. Echoing the President's rhetoric, the memorandum explained: "The [Public Integrity] section's attorneys expressed **concern that certain section 501(c) organizations are actually political committees 'posing' as if they are not subject to FEC law**, and therefore may be subject to criminal liability."[808] The Justice Department also proposed "whether a three-way partnership among DOJ, the FEC, and the IRS is possible to prevent prohibited activity by these organizations," and they discussed "several possible theories to bring criminal charges under FEC law."[809] According to Pilger, however, Lerner expressed skepticism about the practicality of using criminal law to address political speech by 501(c)(4) organizations.[810]

Nonetheless, the IRS-Justice Department coordination continued. On October 19, 2010, Lerner spoke to an audience at Duke University about political pressure on the IRS to respond to *Citizens United*. Lerner was asked about the flow of money from corporations to 501(c)(4) groups. Lerner stated: "Everyone is up in arms because they don't like it. Federal Election

---

[806] Internal Revenue Serv., Untitled Meeting Memorandum (undated) [IRSC 38438].

[807] *Id.*

[808] *Id.* (emphasis added).

[809] *Id.*

[810] Transcribed interview of Richard Pilger, U.S. Dep't of Justice, in Wash., D.C. at 94-95 (May 6, 2014).

Commission can't do anything about it; they want the IRS to fix the problem."[811] Also on October 19, 2010 – the same day Lerner spoke at Duke University about the pressure on the IRS to "fix the problem" of *Citizens United* – Pilger asked the IRS for a "good IRS contact re criminal tax enforcement against tax exempt organizations."[812] The IRS selected an employee in its Criminal Investigation unit to serve as a liaison with the Justice Department on criminal enforcement relating to non-profit political speech.[813]

Figure 42: E-mail exchange between Joseph Urban & Nancy Marks, Oct. 19, 2010

| From: | Marks Nancy J |
| Sent: | Tuesday, October 19, 2010 12:19 PM |
| To: | Urban Joseph J; Johnson Janet J - CT |
| Cc: | Kindell Judith E |
| Subject: | RE: Contact Point/501(c)(4) |
| Categories: | NUUU |

Thanks and yes Janet is the right contact. I'd let him know that we've given her a heads up but also let him know that because this has not been an area in which we've seen activity that rises to the level of criminal investigation it is pretty unfamiliar ground for anyone in the criminal tax enforcement area thereby laying the foundation that we'll be with Janet in any exploration of the issues in order to provide the EO context.

**From:** Urban Joseph J
**Sent:** Tuesday, October 19, 2010 1:14 PM
**To:** Marks Nancy J; Johnson Janet J - CT
**Cc:** Kindell Judith E
**Subject:** Contact Point/501(c)(4)

We received an e-mail today from Richard Pilger, who was an attorney in the meeting we had with the DOJ folks on election issues. He gives his title as Director, Election Crimes Branch & Senior Trial Attorney Public Integrity Section Criminal Division. He asked whether we "had a chance to identify a good IRS contact re criminal tax enforcement against tax exempt organizations?" I wanted you to know the request was here and to confirm that it was still OK to offer Janet as the contact.

Other documents show that Lerner worked with Pilger to arrange for the transmittal of 1.1 million pages of non-profit tax-return information to the FBI.[814] On October 5, 2010 – in advance of the October 8th meeting – an IRS employee e-mailed Lerner and her senior technical advisor Judith Kindell about sending non-profit tax return forms, known as Form 990s, to the Justice Department. She wrote: "Diane told me you wanted a couple 990s to show to DOJ. Is there something specific you want to show them, in terms of size, activities, etc? **Or should I**

[811] John Sexton, *Lois Lerner discusses political pressure on the IRS in 2010*, BREITBART, Aug. 6, 2013.
[812] E-mail from Joseph Urban, Internal Revenue Serv., to Nancy Marks & Janet Johnson, Internal Revenue Serv. (Oct. 19, 2010) [IRSC 38452].
[813] E-mail from Nancy Marks, Internal Revenue Serv., to Joseph Urban & Janet Johnson, Internal Revenue Serv. (Oct. 19, 2010) [IRSC 38452].
[814] E-mail from Richard Pilger, U.S. Dep't of Justice, to Lois Lerner, Internal Revenue Serv. (Oct. 6, 2010) [HOGR IRS 22]; E-mail from Lois Lerner, Internal Revenue Serv., to Richard Pilger, U.S. Dep't of Justice (Oct. 5, 2010) [HOGR IRS 19].

Exhibit D

**guess based on current events**?"[815]  Kindell responded: "If we can provide a set, that would be best.  Otherwise, if we can get a sample of orgs that reported political campaign expenditures."[816]

Figure 43: E-mail exchange between Cheryl Chasin & Judith Kindell, Oct. 5, 2010

| From: | Kindell Judith E |
|---|---|
| Sent: | Tuesday, October 05, 2010 7:31 AM |
| To: | Chasin Cheryl D; Lerner Lois G |
| Subject: | Re: 501(c)(4) 990s |

What are the procedures for getting DVDs of the Forms 990? If we can just provide a set, that would be best. Otherwise, if we can get a sample of orgs that reported political campaign expenditures.

---

**From**: Chasin Cheryl D
**To**: Lerner Lois G; Kindell Judith E
**Sent**: Tue Oct 05 08:25:31 2010
**Subject**: 501(c)(4) 990s

Diane told me you wanted a couple of 990s to show to DOJ.  Is there something specific you want to show them, in terms of size, activities, etc?  Or should I guess based on current events?

Lerner later wrote separately to her colleagues about the urgent "DOJ request" for tax return information about non-profits engaged in political speech.  She wrote: "I am meeting with DOJ on Friday.  They would like to begin looking at 990s from last year from c4 orgs.  **They are interested in the reporting for political and lobbying activity**.  How quickly could I get disks to them on this?"[817]

Figure 44: E-mail from Lois Lerner to Sherry Whitaker et al., Oct. 5, 2010

**From:** Lerner Lois G
**Sent:** Tuesday, October 05, 2010 1:38 PM
**To:** Whitaker Sherry L; Chasin Cheryl D; Ghougasian Laurice A
**Cc:** Kindell Judith E
**Subject:** DOJ Request
**Importance:** High

I am meeting with DOJ on Friday.  They would like to begin looking at 990s from last year for c4 orgs.  They are interested in the reporting for political and lobbying activity.  How quickly could I get disks to them on this?  Also, would 990 EZ filers have information on lobbying and political activity on the EZ?  Do we have disks for those--I guess I should know by now, shouldn't I?!   Cheryl/Laurice, if I can't get anything soon, could we pull a "sample of the?  Thanks

*Lois G. Lerner*
Director, Exempt Organizations

---

[815] E-mail from Cheryl Chasin, Internal Revenue Serv., to Lois Lerner & Judith Kindell, Internal Revenue Serv. (Oct. 5, 2010) (emphasis added) [IRSC 38408].

[816] E-mail from Judith Kindell, Internal Revenue Serv., to Cheryl Chasin & Lois Lerner, Internal Revenue Serv. (Oct. 5, 2010) [IRSC38408].

[817] E-mail from Lois Lerner, Internal Revenue Serv., to Sherry Whitaker et al., Internal Revenue Serv. (Oct. 5, 2010) (emphasis added) [IRSC 38415].

Exhibit D

Later that day, Lerner wrote to Pilger that the IRS was working "on getting you the disks we spoke about" and asked whether the Department had a formatting preference.[818]  Pilger forwarded the e-mail to an unidentified FBI agent, writing: "This is incoming data re 501c4 issues.  Does FBI have a format preference?"[819]  Pilger later responded to Ms. Lerner, writing: "Thanks Lois – FBI says Raw format is best because they can put it into their systems like excel."[820]  The disks were apparently transmitted on October 22, 2010 – days before the midterm election.[821]

**Figure 45: E-mail exchange between Lois Lerner & Richard Pilger, Oct. 6, 2010**

| | |
|---|---|
| From: | Pilger, Richard |
| Sent: | Wednesday, October 06, 2010 2:05 PM |
| To: | Lerner Lois G |
| Cc: | Whitaker Sherry L; Simmons, Nancy; ███████████ (FBI) |
| Subject: | RE: DATA FORMAT ISSUE -- TIME SENSITIVE |

Thanks Lois – FBI says Raw format is best because they can put it into their systems like excel.

---

From: Lerner Lois G [███████████████]
Sent: Tuesday, October 05, 2010 5:52 PM
To: Pilger, Richard
Cc: Lerner Lois G; Whitaker Sherry L
Subject: DATA FORMAT ISSUE -- TIME SENSITIVE

In checking with my folks on getting you the disks we spoke about, I was asked the following:

Before we can get started do you know if they would like the images in Alchemy or Raw format? The difference is, Alchemy you need to search on one of the 5 index fields where Raw format, you load into your on software and you can do what ever you want to with it.

If you're like me, you don't know the answer.  But, if you can check and get back to me Wednesday, we can get started and have these in about 2 weeks.  If we don't have the information by tomorrow, it will take longer as there are other priorities in line.  Please cc Sherry Whitaker on your response as she is likely to see your response before I do.  Thanks

---

[818] E-mail from Lois Lerner, Internal Revenue Serv., to Richard Pilger, U.S. Dep't of Justice (Oct. 5, 2010) [HOGR IRS 19].

[819] E-mail from Richard Pilger, U.S. Dep't of Justice, to unnamed FBI agent, Fed. Bureau of Investigation (Oct. 5, 2010) [HOGR IRS 20].

[820] E-mail from Richard Pilger, U.S. Dep't of Justice, to Lois Lerner, Internal Revenue Serv. (Oct. 6, 2010) [HOGR IRS 22].

[821] E-mail from David Hamilton, Internal Revenue Serv., to Sherry Whitaker, Internal Revenue Serv. (Oct. 22, 2010) [IRSC 38436].

Exhibit D

**Figure 46: E-mail from Richard Pilger to Unnamed FBI Agent, Oct. 5, 2010**

| From: | Pilger, Richard |
|---|---|
| Sent: | Tuesday, October 05, 2010 8:01 PM |
| To: | ██████████ (FBI) |
| Subject: | Fw: DATA FORMAT ISSUE -- TIME SENSITIVE |

This is incoming data re 501c4 issues. Does FBI have a format preference?
Richard C. Pilger
Director, Election Crimes Branch &
Senior Trial Attorney
Public Integrity Section
Criminal Division
United States Department of Justice
Washington, D.C. 20530
202█████
202█████   (f)

     The Justice Department stated in a letter to the Committee that the material transmitted from the IRS to the FBI in October 2010 amounted to 21 disks of 1.1 million pages of non-profit tax return information.[822]  Although the Department first asserted that this material was publicly available and never used for any investigatory purpose,[823] the Department later notified the Committee that the 21 disks did, in fact, contain confidential taxpayer information protected by federal law.[824]  This revelation suggests that the FBI compiled a massive database of the lawful political speech of thousands of American citizens, just weeks before the 2010 midterm elections, working with Lois Lerner and the IRS to receive confidential taxpayer information.  Indeed, Public Integrity Section Chief Jack Smith testified to the Committee that his team continued an investigatory "dialogue" with the FBI about non-profits engaged in political speech.[825]

     These documents suggest that the Department actively considered prosecuting non-profit groups for their political activities.  The Department went so far as to meet with the IRS about the investigation and to gather a 1.1 million-page database of information as potential evidentiary material.  Even more astounding, the Department considered prosecuting non-profit groups for actions that are legal for 501(c)(4) groups under federal tax law – that is, for engaging in political speech.[826]  The documents make clear that like the IRS, the Justice Department responded to the political rhetoric orchestrated by the President in opposition to *Citizens United* and political speech by tax-exempt groups.  Clearly, as evident from this material, the Department felt the need to do *something* in response to this rhetoric.

     Since May 10, 2013, the Obama Administration has spoken forcefully about the IRS's "inexcusable" and intolerable behavior, and about holding wrongdoers accountable for the IRS targeting.  But despite this strong rhetoric, the Administration's actions have shown a lack of accountability with respect to the IRS targeting.  The Administration's investigation has been

[822] Letter from Peter Kadzik, U.S. Dep't of Justice, to Darrell E. Issa, H. Comm. on Oversight & Gov't Reform (May 29, 2014).
[823] *Id.*
[824] Letter from Peter Kadzik, U.S. Dep't of Justice, to Darrell E. Issa, H. Comm. on Oversight & Gov't Reform (June 4, 2014).
[825] Transcribed interview of Jack Smith, U.S. Dep't of Justice, in Wash., D.C. at 99-105 (May 29, 2014).
[826] *See* I.R.C. § 501(c)(4); Treas. Reg. § 1.501(c)(4)-1(a)(2).

Exhibit D

compromised by apparent conflicts of interest and the revelation that the Department of Justice collaborated with the IRS in contemplating the prosecution of non-profits.

## *Administrative oversight of the IRS failed to prevent the targeting or disclose the misconduct in a timely manner*

Given the tremendous power of tax administration, Congress created administrative oversight entities within the Executive Branch to ensure the IRS carries out its mission efficiently and responsibly.  These entities – specifically, the IRS Oversight Board and the Treasury Inspector General for Tax Administration – exist to ensure that IRS misconduct does not occur and, if it does, to identify and address it immediately.  In the case of the IRS's targeting of conservative tax-exempt applicants, these administrative oversight entities failed in their missions.

Congress created the IRS Oversight Board in the IRS Restructuring and Reform Act of 1998.[827]   The Board, which consists of the Secretary of the Treasury, the Commissioner of the IRS and seven "private-life" members, is charged "with providing the IRS with long-term guidance and direction."[828]   In creating the Board, Congress gave it the specific responsibility to "ensure the proper treatment of taxpayers by the employees of the Internal Revenue Service."[829]   The IRS Restructuring and Reform Act of 1998 also established a separate Treasury Inspector General for Tax Administration.[830]   Under the Act, TIGTA has authority to audit or investigate "all matters relating to the Internal Revenue Service."[831]

The Committee's investigation of the IRS's targeting of conservative tax-exempt applicants exposes the deficiencies of the IRS Oversight Board.  Paul Cherecwich, the Chairman of the IRS Oversight Board, wrote to the Committee that some of the Board members had asked Commissioner Shulman about news reports about Tea Party applicants seeking 501(c)4 status during an executive session meeting in 2012.[832]   According to Mr. Cherecwich, Commissioner Shulman assured the members "that the IRS had safeguards in place and that there was no targeting going on, and this was a typical claim that arose each election cycle."[833]   Although the Board's interest in the allegations is admirable, it lacked any independent means of verifying Shulman's assurances and apparently probed no further.  The Board failed to further inquire about the IRS's treatment of conservative tax-exempt applicants and, in this respect, it failed its duty to ensure the proper treatment of taxpayers by IRS employees.

The investigation also highlights the shortcomings in TIGTA's audit of the IRS's treatment of tax-exempt applicants.  First, and most important, TIGTA failed to disclose its

---

[827] IRS Restructuring and Reform Act of 1998, Pub. L. 105-206, I.R.C. § 7802.
[828] IRS Oversight Board, *About Us*, http://www.treasury.gov/IRSOB/about/Pages/default.aspx.
[829] *Id.*
[830] IRS Restructuring and Reform Act of 1998, Pub. L. 105-206, 5 U.S.C. app.
[831] *Id.*
[832] Letter from Paul Cherecwich, IRS Oversight Board, to Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform (June 18, 2013).
[833] *Id.*

Exhibit D

findings to the Committee until *after* Lois Lerner had leaked the IRS targeting on May 10, 2013. For several months, the Committee repeatedly sought information from TIGTA about its work.[834]  Each time, TIGTA responded that it was not able to provide any update.[835]  While TIGTA was withholding information from the Committee, it had already briefed senior IRS and Treasury Department officials about the audit's early findings.  In particular, on May 30, 2012, Inspector General J. Russell George briefed IRS Commissioner Shulman on TIGTA's finding that the IRS had used the term "Tea Party" to screen tax-exempt applicants.[836]

Under section 5(d) of the Inspector General Act, an inspector general must report particularly flagrant problem to Congress via the agency head within seven days through what has become known as a "seven-day letter."[837]  As recently as August 2012, Chairman Issa wrote to Mr. George reminding him of his responsibility under section 5(d).[838]  When Mr. George briefed Commissioner Shulman that the IRS had used the term "Tea Party" to screen applicants – an IRS misdeed – Mr. George should have simultaneously notified the Committee pursuant to section 5(d).  Because Mr. George did not, the Committee and the American people were kept in the dark about the IRS targeting until Lerner's public apology on May 10, 2013.

Second, the manner in which TIGTA conducted its audit needlessly compromised the independence and integrity of the process.  TIGTA allowed IRS executive Holly Paz—Lerner's top deputy in the EO Division—to sit in on nearly every TIGTA interview with IRS line-level employees.[839]  Paz therefore had access to the information TIGTA gathered during these interviews and shared this material with her superiors.[840]  In addition, TIGTA shared multiple drafts of its audit report with Paz, Lerner, and other senior IRS executives in late 2012 and early 2013.  By trading drafts, the IRS effectively delayed the publication of the TIGTA audit report until a time it thought it was best prepared to respond.  As a result, the IRS continued to hide its targeting for several months until May 2013.

Two of the administrative entities created to oversee the IRS, the IRS Oversight Board and the Treasury Inspector General for Tax Administration, failed to prevent and then to timely disclose the IRS's targeting of conservative tax-exempt applicants.  With more robust and more independent bodies, Congress could have learned of the misconduct earlier and taken appropriate steps to hold the IRS accountable.

### *Lois Lerner's refusal to testify hindered the Committee's investigation*

As the Director of Exempt Organizations during the time of the IRS targeting, Lois Lerner is uniquely positioned and possesses special knowledge about the IRS's misconduct.

---

[834] *"The IRS Targeting Americans for their Political Beliefs": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013).
[835] *Id.*
[836] Transcribed interview of Doug Shulman, in Wash., D.C. (Dec. 4, 2013).
[837] 5 U.S.C. app. §5(d).
[838] Letter from Darrell Issa, H. Comm. on Oversight & Gov't Reform, to J. Russell George, Treasury Inspector Gen. for Tax Admin. (Aug. 3, 2012).
[839] *See* Transcribed interview of Holly Paz, Internal Revenue Serv., in Wash., D.C. (May 21, 2013).
[840] *Id.*

Exhibit D

Because of her role, the Committee sought her cooperation with its investigation, primarily through her testimony.  Lerner refused to cooperate with the Committee's investigation.  Her refusal hindered the Committee's investigation into uncovering the full extent of the IRS's targeting of conservative tax-exempt applicants.  The House of Representatives voted on May 7, 2014, to find Lois Lerner in contempt of Congress for her refusal to comply with a Committee subpoena.[841]

## Lerner's failed assertion of her Fifth Amendment privilege

In advance of a May 22, 2013 hearing on TIGTA's report, the Committee formally invited Ms. Lerner to testify.  Lerner's testimony was necessary to understand the rationale for and extent of the IRS's practice of targeting certain tax-exempt groups for heightened scrutiny.  By then, it was well-known that Lerner had extensive knowledge of the scheme to target conservative groups.  In addition to the fact that she was director of Exempt Organizations, the Committee believed that Lerner had made numerous misrepresentations of fact to the Committee related to the IRS's targeting.  The Committee hoped to set the record straight by hearing Lerner's testimony and asking her questions during the hearing.

Prior to the hearing, Lerner's attorney informed Committee staff that she would assert her Fifth Amendment privilege[842] – a refusal to appear before the Committee voluntarily to answer questions.  As a result, Chairman Issa issued a subpoena on May 17, 2013, to compel her testimony at the Committee hearing on May 22, 2013.  On May 20, 2013, William Taylor III, representing Lerner, sent the Committee a letter advising that Lerner intended to invoke her Fifth Amendment privilege against self incrimination.[843]  For this reason, Taylor requested that Lerner be excused from appearing.[844]  On May 21, 2013, the Chairman responded to Taylor's letter, informing him that her attendance at the hearing was necessary due to "the possibility that [Ms. Lerner] will waive or choose not to assert the privilege as to at least certain questions of interest to the Committee."[845]  The subpoena that compelled her appearance remained in place.[846]

On May 22, 2013, Lerner appeared with the other invited witnesses.  Rather than properly asserting her Fifth Amendment privilege, Lerner, in the opinion of the Committee, the House General Counsel, and many legal scholars, waived her privilege by making a voluntary statement of innocence.  Instead of remaining silent and declining to answer questions, with the exception of stating her name, Lerner read a lengthy statement professing her innocence:

Good morning, Mr. Chairman and members of the Committee.  My name is Lois Lerner, and I'm the Director of Exempt Organizations at the Internal Revenue Service.

[841] H.R. Res. 574, 113th Cong. (2014).
[842] Letter from Mr. William W. Taylor, Partner, Zuckerman Spaeder LLP, to Hon. Darrell E. Issa, Chairman, H. Comm. on Oversight & Gov't Reform (May 20, 2013).
[843] Id.
[844] Id.
[845] Letter from Hon. Darrell Issa, Chairman, Comm. on Oversight & Gov't Reform to Mr. William W. Taylor, III, Zuckerman Spaeder (May 21, 2013).
[846] Id.

Exhibit D

I have been a government employee for over 34 years. I initially practiced law at the Department of Justice and later at the Federal Election Commission. In 2001, I became — I moved to the IRS to work in the Exempt Organizations office, and in 2006, I was promoted to be the Director of that office.

\* \* \*

On May 14th, the Treasury inspector general released a report finding that the Exempt Organizations field office in Cincinnati, Ohio, used inappropriate criteria to identify for further review applications for organizations that planned to engage in political activity which may mean that they did not qualify for tax exemption. On that same day, the Department of Justice launched an investigation into the matters described in the inspector general's report. In addition, members of this committee have accused me of providing false information when I responded to questions about the IRS processing of applications for tax exemption.

**I have not done anything wrong. I have not broken any laws. I have not violated any IRS rules or regulations, and I have not provided false information to this or any other congressional committee.**

And while I would very much like to answer the Committee's questions today, I've been advised by my counsel to assert my constitutional right not to testify or answer questions related to the subject matter of this hearing. After very careful consideration, I have decided to follow my counsel's advice and not testify or answer any of the questions today.

Because I'm asserting my right not to testify, I know that some people will assume that I've done something wrong. I have not. One of the basic functions of the Fifth Amendment is to protect innocent individuals, and that is the protection I'm invoking today. Thank you.[847]

Prior to Lerner's statement, Ranking Member Cummings sought to introduce into the record a document containing Lerner's responses to questions posed by TIGTA. After her statement and at the request of the Chairman, Lerner reviewed and authenticated the document offered into the record by the Ranking Member.[848] In response to questions from Chairman Issa, she stated:

Chm. ISSA:        Ms. Lerner, earlier the Ranking Member made me aware of a response we have that is purported to

---

[847] *Hearing on the IRS: Targeting Americans for Their Political Beliefs: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. 22 (2013) (H. Rept. 113-33) (statement of Lois Lerner, Director, Exempt Orgs., IRS) [hereinafter May 22, 2013 IRS Hearing] (emphasis added).
[848] *Id.* at 23 (statement of Lois Lerner, Director, Exempt Orgs., IRS).

Exhibit D

| | |
|---|---|
| | come from you in regards to questions that the IG asked during his investigation.  Can we have you authenticate simply the questions and answers previously given to the inspector general? |
| Ms. LERNER: | I don't know what that is.  I would have to look at it. |
| Chm. ISSA: | Okay.  Would you please make it available to the witness? |
| Ms. LERNER: | This appears to be my response. |
| Chm. ISSA: | So it's your testimony that as far as your recollection, that is your response? |
| Ms. LERNER: | That's correct.[849] |

Next, the Chairman asked Lerner to reconsider her position on testifying and stated that he believed she had waived her Fifth Amendment privilege by giving an opening statement and authenticating a document.[850]  Lerner responded: "I will not answer any questions or testify about the subject matter of this Committee's meeting."[851]

After Lerner refused to answer any questions, Representative Gowdy sought recognition. He stated:

> Mr. Issa, Mr. Cummings just said we should run this like a courtroom, and I agree with him.  She just testified.  She just waived her Fifth Amendment right to privilege.  You don't get to tell your side of the story and then not be subjected to cross examination.  That's not the way it works.  She waived her right of Fifth Amendment privilege by issuing an opening statement.  She ought to stay in here and answer our questions.[852]

Shortly after Representative Gowdy's comments, Chairman Issa excused Lerner, reserving the option to recall her at a later date.  Chairman Issa stated that Lerner was excused "subject to recall after we seek specific counsel on the questions of whether or not the constitutional right of the Fifth Amendment has been properly waived."[853]  Rather than adjourning the hearing on May 22, 2013, the Chairman recessed it, in order to reconvene at a later date after a thorough analysis of Lerner's actions.

---

[849] *Id.*
[850] *Id.*
[851] *Id.*
[852] *Id.*
[853] *Id.* at 24.

Exhibit D

On June 28, 2013, the Chairman convened a business meeting to allow the Committee to vote on whether Lerner waived her Fifth Amendment privilege.  The Chairman made clear that he recessed the May 22, 2013 hearing so as not to "make a quick or uninformed decision."[854]  He took more than five weeks to review the circumstances, facts, and legal arguments related to Lerner's voluntary statements.[855]  The Chairman reviewed advice from the Office of General Counsel of the U.S. House of Representatives, arguments presented by Lerner's counsel, and the relevant legal precedent.[856]

Chairman Issa explained his conclusion, after much deliberation, that Lerner waived her constitutional privilege when she made a voluntary opening statement that involved several specific denials of various allegations.[857]  He stated:

> **Having now considered the facts and arguments, I believe Lois Lerner waived her Fifth Amendment privileges.  She did so when she chose to make a voluntary opening statement.**  Ms. Lerner's opening statement referenced the Treasury IG report, and the Department of Justice investigation, and the assertions she previously had provided – sorry – and the assertions that she had previously provided false information to the committee.  **She made four specific denials.**  Those denials are at the core of the committee's investigation in this matter.  She stated that she had not done anything wrong, not broken any laws, not violated any IRS rules or regulations, and not provided false information to this or any other congressional committee regarding areas about which committee members would have liked to ask her questions.  Indeed, committee members are still interested in hearing from her.  Her statement covers almost the entire range of questions we wanted to ask when the hearing began on May 22.[858]

After vigorous debate and considering the argument of Lerner's attorney, the Committee approved a resolution finding that Lois Lerner waived her Fifth Amendment privilege against self-incrimination when she made a voluntary opening statement at the Committee's May 22, 2013, hearing entitled "The IRS: Targeting Americans for Their Political Beliefs."[859]  The Committee approved the resolution by a vote of 22 ayes to 17 nays.[860]

---

[854] H. Comm., on Oversight & Gov't Reform Business Mtg., June 28, 2013, at 4.
[855] *Id.*
[856] *Id.* at 5.
[857] *Id.*
[858] *Id.* (emphasis added)
[859] *Id.*
[860] *Id*. at 65-66.

Exhibit D

## Lerner continued to defy the Committee's subpoena

Following the Committee's determination that Lerner waived her Fifth Amendment privilege, Chairman Issa recalled her to testify on March 5, 2014.[861]  By letter to Lerner's attorney, Chairman Issa informed her that the May 22, 2013, hearing would reconvene and that her subpoena remained in effect.[862]  The letter stated, in relevant part:

> Ms. Lerner's testimony remains critical to the Committee's investigation . . . .  Because Ms. Lerner's testimony will advance the Committee's investigation, the Committee is recalling her to a continuation of the May 22, 2013, hearing, on March 5, 2014, at 9:30 a.m. in room 2154 of the Rayburn House Office Building in Washington, D.C.

> The subpoena you accepted on Ms. Lerner's behalf remains in effect. In light of this fact, and because the Committee explicitly rejected her Fifth Amendment privilege claim, I expect her to provide answers when the hearing reconvenes on March 5.[863]

The next day, Lerner's attorney responded to Chairman Issa.  He wrote:

> I write in response to your letter of yesterday.  I was surprised to receive it.  I met with the majority staff of the Committee on January 24, 2014, at their request.  At the meeting, I advised them that Ms. Lerner would continue to assert her Constitutional rights not to testify if she were recalled. . . .  We understand that the Committee voted that she had waived her rights. . . .  We therefore request that the Committee not require Ms. Lerner to attend a hearing solely for the purpose of once again invoking her rights.[864]

Chairman Issa required Lerner to appear in person on March 5, 2014, due to the possibility that she would choose to answer some or all of the Committee's questions.  When the hearing reconvened, the Chairman notified Lerner that the Committee might recommend that the House of Representatives hold her in contempt if she continued to refuse to answer questions, based on the Committee's determination that she had waived her Fifth Amendment privilege.  Chairman Issa told Lerner:

> At a business meeting on June 28, 2013, the Committee approved a resolution rejecting Ms. Lerner's claim of Fifth Amendment privilege based on her waiver at the May 22, 2013, hearing.

---

[861] Letter from Darrell E. Issa, H. Comm. on Oversight & Gov't Reform, to William W. Taylor III, Zuckerman Spaeder LLP (Feb. 25, 2014).

[862] *Id.*

[863] *Id.*

[864] Letter from William W. Taylor III, Zuckerman Spaeder LLP, to Darrell E. Issa, H. Comm. on Oversight & Gov't Reform (Feb. 26, 2014).

Exhibit D

After that vote, having made the determination that Ms. Lerner waived her Fifth Amendment rights, the Committee recalled her to appear today to answer questions pursuant to rules.  The Committee voted and found that Ms. Lerner waived her Fifth Amendment rights by making a statement on May 22, 2013, and additionally, by affirming documents after making a statement of Fifth Amendment rights.

If Ms. Lerner continues to refuse to answer questions from our Members while she's under subpoena, the Committee may proceed to consider whether she should be held in contempt.[865]

Despite this notice that the Committee had resolved that she waived her Fifth Amendment privilege and that her refusal to answer questions could result in contempt proceedings, Lerner continued to refuse to answer questions.[866]  She stated:

> Q.    On October 10 – on October – in October 2010, you told a Duke University group, and I quote, "The Supreme Court dealt a huge blow overturning a 100 year old precedent that basically corporations couldn't give directly to political campaigns.  And everyone is up in arms because they don't like it.  The Federal Election Commission can't do anything about it.  They want the IRS to fix the problem."  Ms. Lerner, what exactly "wanted to fix the problem caused by Citizens United," what exactly does that mean?
>
> A.    My counsel has advised me that I have not –
>
> Q.    Would you please turn the mic on?
>
> A.    Sorry.  I don't know how.  My counsel has advised me that I have not waived my constitutional rights under the Fifth Amendment, and on his advice, I will decline to answer any question on the subject matter of this hearing.
>
> Q.    So, you are not going to tell us who wanted to fix the problem caused by Citizens United?
>
> A.    On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer that question.
>
> Q.    Ms. Lerner, in February 2011, you emailed your colleagues in the IRS the following: "Tea Party matter, very dangerous.  This could be the vehicle to go to court on the issue of whether Citizens

---

[865] *"The IRS: Targeting Americans for their Political Beliefs": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014).
[866] *Id.*

Exhibit D

United overturning the ban on corporate spending applies to tax exempt rules.  Counsel and Judy Kindell need to be on this one, please.  Cincy should probably NOT," all in caps, "have these cases."  What did you mean by "Cincy should not have these cases"?

A.     On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer the question.

Q.     Ms. Lerner, why would you say Tea Party cases were very dangerous?

A.     On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer that question.

Q.     Ms. Lerner, in September 2010, you emailed your subordinates about initiating a, parenthesis, (c)(4) project and wrote, "We need to be cautious so that it isn't a per se political project."  Why were you worried about this being perceived as a political project?

A.     On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer that question.

Q.     Ms. Lerner, Mike Seto, manager of EO Technical in Washington, testified that you ordered Tea Party cases to undergo a multi tier review.  He testified, and I quote, "She sent me email saying that when these cases need to go through" – I say again – "she sent me email saying that when these cases need to go through multi tier review and they will eventually have to go to Ms. Kindell and the Chief Counsel's Office."  Why did you order Tea Party cases to undergo a multi tier review?

A.     On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer that question.

Q.     Ms. Lerner, in June 2011, you requested that Holly Paz obtain a copy of the tax exempt application filed by Crossroads GPS so that your senior technical advisor, Judy Kindell, could review it and summarize the issues for you.  Ms. Lerner, why did you want to personally order that they pull Crossroads GPS, Karl Rove's organization's application?

A.     On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer that question.

Exhibit D

Q.     Ms. Lerner, in June 2012, you were part of an email exchange that appeared to be about writing new regulations on political speech for 501(c)(4) groups, and in parenthesis, your quote, "off plan" in 2013.  Ms. Lerner, what does "off plan" mean?

A.     On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer that question.

Q.     Ms. Lerner, in February of 2014, President Obama stated that there was not a smidgeon of corruption in the IRS targeting.  Ms. Lerner, do you believe that there is not a smidgeon of corruption in the IRS targeting of conservatives?

A.     On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer that question.

Q.     Ms. Lerner, on Saturday, our committee's general counsel sent an email to your attorney saying, "I understand that Ms. Lerner is willing to testify and she is requesting a 1 week delay.  In talking" – "in talking to the chairman" – excuse me – "in talking to the chairman, wanted to make sure that was right."  Your lawyer, in response to that question, gave a one word email response, "yes." Are you still seeking a 1 week delay in order to testify?

A.     On the advice of my counsel, I respectfully exercise my Fifth Amendment right and decline to answer that question.[867]

With her continued refusal to testify evident, Chairman Issa adjourned the hearing and excused Lerner.  On April 10, 2014, the Committee met and considered a resolution recommending that the House hold Lerner in contempt of Congress for her refusal to testify.[868] The Committee approved the resolution by a vote of 21 ayes to 12 nays.[869]

## Lerner's testimony is critical to the Committee's investigation

Before Lerner's attempted assertion of her Fifth Amendment privilege, the Committee believed her testimony would advance the investigation of the targeting of conservative-oriented tax-exempt applicants.  As the director of Exempt Organizations, Lerner managed the two IRS units most involved in the targeting – the EO Determinations Unit in Cincinnati, Ohio, and the EO Technical Unit in Washington, D.C.  In this role, Lerner also interfaced with other senior IRS leaders and senior officials in the IRS Chief Counsel's office.  Her position, therefore, affords her unique knowledge about the IRS's targeting at all levels and across many units of the agency.

---

[867] *Id.*
[868] H. Comm. on Oversight & Gov't Reform, Bus. Mtg. (Apr. 10, 2014).
[869] *Id.*

Exhibit D

Lerner's testimony is also crucial because she has not provided any information to the IRS or Congress since the release of the TIGTA audit report. Acting Commissioner Daniel Werfel did not interview Lerner as part of his ongoing internal review. In finding that there was no intentional wrongdoing associated with the IRS targeting, Werfel never spoke to Lois Lerner and the IRS lacks the power to require Lerner to provide answers. Moreover, Lerner has not provided any testimony to Congress about her actions with respect to the targeting. Without testimony from Lois Lerner, however, the Committee may never fully understand the IRS's actions.

While Lois Lerner has refused to obey a subpoena testify before Congress about her role in the IRS's targeting of conservative groups, she gave interviews to Justice Department investigators and the media. On March 6, 2014, the *Wall Street Journal* reported that Lerner spoke to DOJ investigators about the IRS targeting "within the last six months."[870] According to the report, Lerner gave a "lengthy interview" to the investigators without a grant of immunity from the government.[871]

The Supreme Court has held that a witness who makes a voluntary statement denying any wrongdoing cannot subsequently refuse to answer questions about the underlying facts.[872] Documents produced to the Committee after the May 22, 2013, hearing demonstrate that Lois Lerner played a central and instrumental role in the IRS's mistreatment of conservative tax-exempt applicants. This material makes clear that Lerner's testimony is essential to understanding the truth regarding the targeting of certain groups. Lerner's refusal to provide testimony about the IRS's mistreatment of conservative tax-exempt applicants hinders the Committee's investigation and prevents the Committee from fully examining the IRS's targeting.

On May 7, 2014, by a bipartisan vote of 231 ayes to 187 nays, the House passed H. Res. 574, finding Lerner in contempt of Congress for her refusal to answer questions under subpoena about the IRS's targeting.[873] Her refusal to comply with the subpoena could result in a fine of $1,000 or imprisonment of up to one year.[874] By law, the contempt certification is sent to the United States Attorney for the District of Columbia.[875] According to the statute, the U.S. Attorney has a "duty" to "bring the matter before the grand jury for its action."[876] The U.S. Attorney's office has stated the matter is "under review."[877] Whether the Justice Department carries out its prosecutorial responsibility remains to be seen.

Despite her refusal to testify to the Committee and significant evidence of misconduct, Lerner was allowed to retire from government service with her pension intact. For several months after her planted apology in May 2013, the IRS placed Lerner on paid administrative leave. When the Accountability Review Board prepared to recommend that Lerner be removed

---

[870] John D. McKinnon, *Former IRS official Lerner gave interview to DOJ*, WALL ST. J., Mar. 6, 2014.
[871] *Id.*
[872] *See* Brown v. United States, 356 U.S. 148 (1958).
[873] H.R. Res. 574, 113th Cong. (2014).
[874] 2 U.S.C. § 192.
[875] *Id.* § 194.
[876] *Id.*
[877] *Where's Jim Comey*, WALL ST. J., July 8, 2014.

Exhibit D

as Director of Exempt Organization, the IRS allowed Lerner to retire with her full pension.[878] Reportedly, Lerner's retirement could cost the taxpayers between $60,000 to more than $100,000 annually.[879]  Apart from her five-month paid vacation, Lerner was never held accountable for the IRS targeting.

### The IRS obstructed and delayed the Committee's investigation

In the immediate aftermath of the TIGTA audit report, the Obama Administration pledged full cooperation with all congressional investigations into its misconduct.  President Obama called the misconduct "inexcusable" and proclaimed that his Administration would work "hand in hand" with Congress as it carried out its oversight duties.[880]  On May 16, 2013, President Obama appointed Administration official Daniel Werfel to be the Acting IRS Commissioner, with the goal of "restor[ing] public trust and administer[ing] the tax code with fairness and integrity."[881]  Despite these promises of cooperation, the IRS continually obstructed and delayed the Committee's oversight efforts.

During Werfel's first congressional hearing on June 6, 2013, Appropriations Subcommittee Chairman Ander Crenshaw asked for his full cooperation with ongoing congressional investigations into the IRS's inappropriate conduct.  Werfel replied: "Absolutely. You have my commitment for full cooperation."[882]  Werfel similarly testified before the Oversight Committee on June 6, 2013: "I am confident that together with Congress and other external stakeholders we will address the current challenges and move forward with the indispensible work of this agency."[883]

On August 1, 2013, President Obama nominated John Koskinen to be the permanent IRS Commissioner.[884]  Koskinen, with a "history as a Washington fixer," was brought on specifically to turn around the troubled IRS.[885]  In fact, when Koskinen was earlier offered a job with the Obama Administration, he turned it down and "told them to call if they had something disastrous that no one else wanted to manage."[886]  Like Acting Commissioner Werfel, Koskinen pledged to

---

[878] John D. McKinnon, *Lois Lerner, at Center of IRS Investigation, Retires*, WALL ST. J., Sept. 23, 2013; Lauren French, *Lois Lerner Still Hill's Favorite Piñata*, POLITICO, Sept. 23, 2013.
[879] *See* Pete Sepp, *Learning the Cost Lois Lerner's Pension*, Sept. 30, 2013, http://www.ntu.org/governmentbytes/9-30-13-lerner-taxpayer-pension-cost html.
[880] The White House, Statement by the President (May 15, 2013).
[881] The White House, President Obama Appoints Daniel Werfel as Acting Commissioner of Internal Revenue (May 16, 2013).
[882] *"IRS Oversight Hearing": Hearing Before the Subcomm. on Financial Servs. & General Gov't of the H. Comm. on Appropriations*, 113th Cong. (2013).
[883] *"Collected and Wasted: The IRS Spending Culture and Conference Abuses": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013).
[884] Justin Sink, *Obama to nominate corporate turnaround specialist for IRS chief*, THE HILL, Aug. 1, 2013.
[885] Alan Rappeport, *I.R.S. Commissioner John Koskinen, on hot seat has history of bureaucratic rescue jobs*, N.Y. TIMES, July 1, 2014.
[886] Albert R. Hunt, *For I.R.S. Chief, a challenge too big to pass up*, N.Y. TIMES, Mar. 9, 2014.

Exhibit D

cooperate fully with congressional investigations into the IRS's targeting of conservative groups.[887]  Koskinen was sworn in as IRS Commissioner on December 23, 2013.[888]

The President's pledge to work "hand in hand" with Congress has fallen woefully short. Contrary to his public promises of unfettered cooperation, the IRS has done the opposite under both Acting Commissioner Werfel and Commissioner Koskinen.  The IRS attempted to obstruct, delay, and hinder the Committee's work in many different ways.  The agency produced documents on an artificially slow timeline.  It withheld relevant material from the Committee in advance of transcribed interviews.  Chief Counsel William Wilkins testified "I don't recall" over eighty times in full or partial response to questions during a transcribed interview.[889]  The IRS delayed the Committee's access to key witnesses.  Even in the face of three subpoenas issued by the Committee for documents, the IRS failed to fully cooperate.  The IRS's lack of cooperation has frustrated the Committee's ability to conduct constitutional oversight and bring the truth to the American people.

## The IRS failed to comply with three Committee subpoenas

On August 2, 2013, Chairman Issa issued a subpoena to Treasury Secretary Jack Lew, as the custodian of IRS documents, requiring him to produce eight categories of documents.[890]  The Chairman issued this subpoena because at that time – after almost three months of inquiries – the IRS had only produced less than a tenth of a percent of responsive documents.[891]  The subpoena required the production of the following documents:

- All e-mails sent or received by Lois Lerner, IRS Director of Exempt Organizations;
- All e-mails sent or received by Holly Paz, IRS Director of Exempt Organizations, Rulings and Agreements;
- All e-mails sent or received by William Wilkins, IRS Chief Counsel;
- All e-mails sent or received by Jonathan Davis, IRS Chief of Staff;
- All communications between or among the IRS Chief Counsel's office, the Treasury Department, and the White House about tax-exempt organizations;
- All communications from the IRS to the White House;
- All communications from the White House to the IRS; and
- All documents about the evaluation or examination of tax-exempt groups.

Several months after the issuance of the subpoena, the IRS still had not satisfied any of the categories of documents covered by the subpoena.  For this reason, on February 14, 2014, after the Senate confirmed new IRS Commissioner Koskinen, Chairman Issa reissued the subpoena to Commissioner Koskinen, making him personally responsible for the production of

---

[887] *Nomination of John Koskinen: Hearing Before the S. Comm. on Finance*, 113th Con. (2013) (question and answer with Ranking Member Orrin Hatch).
[888] Bernie Becker, *Koskinen sworn in as IRS Commissioner*, THE HILL, Dec. 23, 2013.
[889] Transcribed interview of William Wilkins, Internal Revenue Serv., in Wash., D.C. (Nov. 6, 2013).
[890] H. Comm. on Oversight & Gov't Reform, Subpoena to Jacob J. Lew (Aug. 2, 2013).
[891] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Daniel Werfel, Internal Revenue Serv. (July 30, 2013).

Exhibit D

the documents.[892]  During Commissioner Koskinen's first appearance before the Committee, on March 26, 2014, he mocked the Committee's subpoena, saying that it was "far too broad" and that "in a court of law, a judge would not enforce it."[893]  Under pressure from several Members, however, Commissioner Koskinen grudgingly promised to honor the subpoena, but warned the Committee that it would take the IRS "years, not months."[894]

Despite the Commissioner's promises to produce the relevant documents to the Committee, in early June 2014, the IRS told Congress that several years of e-mails were lost when Lois Lerner's hard drive crashed in 2011.[895]  On June 17, 2014, Chairman Issa issued a subpoena to the Commissioner Koskinen for hardware and documents relating to Lois Lerner's computer, and the missing e-mails that it contained.[896]  In particular, the Chairman subpoenaed Lerner's hard drive, her blackberry, and all external drives, back-up tapes, and other items.  The Chairman also subpoenaed documents relating to the IRS's discovery of the destroyed e-mails and the IRS's decision on when to inform Congress.  The IRS had not fully complied with this subpoena when, in November 2014, TIGTA informed Congress that it had restored approximately 30,000 missing Lerner e-mails.

Testimony received by the Committee confirms that the IRS blatantly disregarded the Committee's duly authorized and issued congressional subpoenas.  Thomas Kane, the IRS attorney charged with primary responsibility for producing documents to the Committee, testified in a transcribed interview that the Committee's August 2013 subpoena for all of Lois Lerner's e-mail had no "impact" on the IRS's document production process.[897]  According to Kane, Jennifer O'Connor, Counselor to Acting Commissioner Werfel, instructed him to disregard the Committee's subpoena for Lerner's e-mails and make no changes to the IRS's already-existing document review and production process.[898]  He testified:

> A    We were in the process of responding to the four congressional requests, and a decision was made with respect to the determinations process. And the decision – I was told that the decision was made that we should respond to all four congressional requests, the commonality, before we turn – before we could turn our attention to things that went beyond the common request.
>
> Q    Who told you that?
>
> A    I got that instruction from Jen O'Connor.
>
> Q    Do you recall when she gave you that instruction?

---

[892] H. Comm. on Oversight & Gov't Reform, Subpoena to John Koskinen (Feb. 14, 2014).
[893] *"Examining the IRS Response to the Targeting Scandal": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014) (question and answer with Rep. Jason Chaffetz).
[894] *Id.*
[895] Letter from Leonard Oursler, Internal Revenue Serv., to Ron Wyden & Orrin Hatch, S. Comm. on Finance (June 13, 2014).
[896] H. Comm. on Oversight & Gov't Reform, Subpoena to John Koskinen (June 17, 2014).
[897] Transcribed interview of Thomas Kane, Internal Revenue Serv., in Wash., D.C. (July 17, 2014).
[898] *Id.*

Exhibit D

A       It would have been sometime after this subpoena was issued.

\*\*\*

Q       When you say "this subpoena," you're referring to Exhibit 4?

A       The August 2, 2013, subpoena.

\*\*\*

Q       So is it fair to say this subpoena had no impact on the process that
you were following or the documents that you were reviewing?

A       It didn't impact our production process, that's correct.[899]

The IRS's decision to ignore a congressional subpoena directly hindered the Committee's investigation.

In addition, the IRS was unable to produce any internal instant-messaging communications covered by the Committee's subpoenas because the IRS does not preserve instant messages,[900] despite the fact that many of them are likely to be federal records subject to record-keeping requirements.  In fact, the IRS did not even acknowledge the existence of this instant-messaging material until confronted with it by Committee Members during a July 9, 2014, hearing.

The IRS's continued failure to comply timely and fully with the Committee's subpoenas needlessly frustrated and delayed the Committee's investigation.  Especially with respect to Lois Lerner, who refused to testify, the Committee needs all relevant documents to fully assess the nature and extent of the IRS targeting.

## The IRS destroyed documents relevant to the Committee's investigation

Late on a Friday afternoon in June 2014, the IRS notified Congress that it no longer possessed over two year's worth of e-mails sent or received by Lois Lerner.[901]  Hoping to minimize this disclosure, the IRS buried the news deep in a letter sent to the Senate Finance Committee.  Specifically, the IRS acknowledged that it did not possess e-mails sent or received by Lerner from January 2009 to April 2011.  Although it recovered some e-mails from other custodians, an untold number of Lerner e-mails from the beginning of the targeting were, according to the IRS, lost forever.

---

[899] *Id.*

[900] Letter from John A. Koskinen, Internal Revenue Serv., to Darrell Issa, H. Comm. on Oversight & Gov't Reform (July 11, 2014).

[901] Letter from Leonard Oursler, Internal Revenue Serv., to Ron Wyden & Orrin Hatch, S. Comm. on Finance (June 13, 2014).

Exhibit D

The IRS's response to the destroyed e-mails exacerbated the problem.  The notification of the missing e-mails came less than three months after Commissioner Koskinen testified under oath that the IRS would produce all of Lois Lerner's e-mails subpoenaed by the Committee.[902]  When the Committee recalled Commissioner Koskinen to explain himself, he acknowledged that he knew as early as February 2014 that there were problems with recovering Lerner's e-mails.[903]  The White House claimed to have been made aware of the missing Lerner e-mails in April 2014.  In a June 2013 letter to Senate Finance Chairman Ron Wyden and House Ways and Means Chairman Dave Camp, White House Counsel W. Neil Eggleston wrote:  "In April of this year, Treasury's Office of General Counsel informed the White House Counsel's Office that it appeared Ms. Lerner's custodial email account contained very few emails prior to April 2011 and that the IRS was investigating the issue and, if necessary, would explore alternative means to locate additional emails."[904]

The Commissioner's first-order loyalties to his political bosses in the Administration prevented the Congress and the American people from knowing about the destroyed evidence in a timely manner, four months after Koskinen himself knew of the problem and two months after the White House knew.

The Committee's further efforts to gain information about the destroyed Lois Lerner e-mails were met with an outright refusal by the IRS to cooperate.  On June 19, 2014, the Committee requested that the IRS make certain employees available for transcribed interviews to shed light on the missing e-mails.[905]  The IRS refused to make these employees available voluntarily, forcing Chairman Issa to issue deposition subpoenas in July 2014.  The IRS used TIGTA's investigation into the missing e-mails as an excuse to not cooperate with the Committee's oversight.

Later, on September 5, 2014, the IRS notified Congress that it had lost additional e-mails from five other custodians.[906]  The IRS destroyed e-mails sent and received by Judy Kindell, Lerner's senior technical advisor and expert on non-profit political speech; Justin Lowe, a tax law specialist who briefed Lerner on the Tea Party cases in June 2011; Ronald Shoemaker, a Washington manager who oversaw work on the applications; and Julie Chen and Nancy Heagney, two Cincinnati-based Determinations Specialists.[907]  The destruction of these e-mails from several key figures in the targeting of conservative groups compounds the difficulties of fact-finding.

---

[902] *"Examining the IRS Response to the Targeting Scandal": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014) (question and answer with Rep. Jason Chaffetz).

[903] *"IRS Obstruction: Lois Lerner's Missing Emails": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014).

[904] Letter from W. Neil Eggleston to Sen. Ron Wyden, Chairman, S. Finance Comm., and Rep. Dave Camp, Chairman, H. Comm. on Ways and Means (Jun. 18, 2013).

[905] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to John Koskinen, Internal Revenue Serv. (June 19, 2014).

[906] Letter from Leonard Oursler, Internal Revenue Serv., to Dave Camp, H. Comm. on Ways & Means (Sept. 5, 2014) (carbon copy to Darrell Issa, H. Comm. on Oversight & Gov't Reform).

[907] *Id.*

The IRS's destruction of responsive e-mails sent or received by Lois Lerner is troubling. By destroying this material, the IRS prevented a full examination of the genesis of the IRS's targeting of conservative tax-exempt groups. The IRS's response to the destroyed e-mails is also concerning. The agency first sought to bury the news in a Friday afternoon letter and when it failed at that, it decided to stonewall and obstruct congressional inquiries. The Committee continues to pursue all avenues to recover the destroyed e-mails and fully examine how the IRS managed to lose documents responsive to a congressional investigation.

## The IRS slow-rolled document productions and excessively redacted documents

The IRS obstructed the Committee's investigation by producing documents on an artificially slow schedule. In fact, two months after the Committee's first request for documents, the IRS had produced a mere 0.019 percent of all responsive documents.[908] Because of this unnecessarily slow pace of document production, Chairman Issa first issued a subpoena on August 2, 2013, for all responsive material.

Even as the IRS has produced documents, however, the pace and the scope of the productions have frustrated the Committee's oversight work. Although the IRS initially committed to producing documents on a regular biweekly schedule, the agency abruptly stopped making regular productions in mid-October 2013 and refused to provide an explanation for the change.[909] These regular productions only resumed in spring 2014. On several occasions, the IRS failed to produce requested material after previously promising the Committee that it would do so.[910] On another occasion, the IRS omitted thousands of pages of documents from the stated scope of production.[911]

Furthermore, a troubling number of documents produced by the IRS contain excessive redactions that go well beyond those necessary to protect confidential taxpayer information. These documents include tens of thousands of entire pages of redactions, which made the material completely unintelligible and useless for the Committee's oversight purposes. The IRS also produced duplicative material with differing redactions, suggesting that the IRS inappropriately redacted information for reasons unrelated to taxpayer confidentiality. On multiple occasions, the IRS even retrospectively reevaluated its redactions after the fact in wake of controversy about the nature of the redacted material. The IRS's inconsistent manner for redacting information from responsive documents needlessly frustrated the Committee's examination and use of this material.

---

[908] *See* Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Daniel Werfel, Internal Revenue Serv. (July 30, 2013).
[909] *See* E-mail from Committee staff to Leonard Oursler, Internal Revenue Serv. (Dec. 5, 2013).
[910] *See* E-mail from Committee staff to Jorge Castro & Leonard Oursler, Internal Revenue Serv. (Oct. 17, 2013).
[911] *See* E-mail from Committee staff to Leonard Oursler & Jorge Castro, Internal Revenue Serv. (Nov. 1, 2013).

Exhibit D

**Figure 47: Excessive IRS redaction**



197

Exhibit D

**The IRS withheld documents relevant to witness interviews and prolonged the Committee's investigative efforts**

The IRS has similarly hindered the Committee's ability to properly examine witnesses by withholding documents relevant to the examination.  In the first instance, the IRS affirmatively prevented Exempt Organizations Determinations Manager Cindy Thomas from providing the Committee with documents in her possession for use during the Committee's interview.[912]  Although Thomas's attorney provided the IRS with ample notice to review the material for confidential taxpayer information, the IRS did not produce a single document that Thomas attempted to make available to the Committee before her transcribed interview.

Weeks prior to Thomas's transcribed interview, her attorney indicated to Committee staff that Thomas possessed document relevant to the Committee's investigation.  Committee staff recommended that Thomas's attorney ask the IRS to review the documents for any potential confidential taxpayer information before Thomas produced the material to the Committee.  Thomas's attorney made the material available to the IRS, which refused to approve the release of the documents prior to the Committee's interview of Thomas.  During the transcribed interview, Thomas's attorney explained the IRS's obstruction.  He stated:

> I do think it prudent to state for the record that Ms. Thomas through counsel has endeavored to provide to the Committee in advance of today all relevant documentation as was requested. . . .  [T]he guidance from Oversight was to provide those e-mails, correspondence, that sort of thing directly to [the IRS] to address [I.R.C. §] 6103 concerns.  They would redact as necessary and get those documents to the Committee. . . .  We requested the IRS as late as yesterday to get a last minute kind of [§] 6103 scrubbing of certain limited, select e-mail correspondence that we thought would be helpful to the committee here today.  That request, too, was denied.

> So generally the point that we did want to make for the record was we really have endeavored to get the documentation to the Committee.  It is with the IRS, and it's regrettable that to the extent it has not – it has not found its way to you before today, that that's not – that was not our intention.[913]

The IRS's willful delay in reviewing and producing this material to the Committee directly affected the scope and substance of the Committee's interview of Ms. Thomas.

Likewise, the IRS affirmatively prevented Nikole Flax from producing to the Committee material from Flax's non-official e-mail account relating to official IRS business.[914]  Flax's attorney provided the material to the IRS so that it could review any confidential taxpayer

---

[912] *See* Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Daniel Werfel, Internal Revenue Serv. (July 30, 2013).

[913] Transcribed Interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. (June 28, 2013).

[914] *See* E-mail from Committee staff to Jorge Castro & Leonard Oursler, Internal Revenue Serv. (Oct. 23, 2013).

Exhibit D

information.  Although attorneys in the IRS Chief Counsel's office told Flax's attorney that the documents contained no such information, the IRS refused to authorize Flax to produce the documents.  The IRS did not allow her to produce the documents until *after* her transcribed interview with the Committee.

The IRS's posture with respect to the congressional investigation of the targeting program caused unnecessary delays, which deprived Americans of answers and made the process more expensive for taxpayers.  Rather than produce documents and records to Congress in a manner consistent with Congress's constitutionally-mandated oversight function, the IRS took months to apply inappropriate redactions and to otherwise devise ways to obstruct the Committee's work.  The IRS allocated resources to this effort that could have been used elsewhere to serve taxpayers.

The manner in which the IRS engaged the Committee in responding to constitutional congressional oversight has been highly disappointing.  The IRS's actions strongly suggest that the agency is more concerned about rehabilitating its public image than cooperating fully with congressional oversight into misdeeds.  The IRS has attempted to delay, frustrate, and impede the Committee's fact-finding.  Only by means of compulsory process and persistence has the Committee been able to uncover new details of the IRS's wrongdoing.

## *The White House and Congressional Democrats obstructed the Committee's investigation*

When the Committee began its investigation into the IRS's targeting of applicants for tax-exempt status, there appeared to be a truly bipartisan desire to pursue the truth.  President Obama called the targeting "inexcusable" and pledged to work "hand in hand" with Congress to investigate the misconduct.[915]  During the Committee's first hearing, Ranking Member Elijah Cummings proclaimed his guiding principles of "truth and trust," explaining his hope for a "bipartisan and thorough investigation."[916]  Since that time, however, the actions of the Administration and Committee's Democratic Members and staff have fallen well short of the public rhetoric.  Falling in line with the Administration, the Democratic Minority has consistently attempted to disrupt and derail the Committee's efforts to uncover all the facts and restore public trust in the IRS.

### The White House refused to assist the Committee's fact-finding efforts

Contrary to the President's public pledge to work "hand in hand" with Congress, the White House flatly refused to assist the Committee's investigation.  This refusal occurred even after the Committee obtained evidence of seemingly improper policy-oriented communications between White House health officials and the IRS's ObamaCare team.  The White House's

---

[915] The White House, Statement by the President (May 15, 2013).
[916] *"The IRS: Targeting American for Their Political Beliefs": Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2013).

Exhibit D

obstruction not only violated the President's promise of cooperation, but it affected the Committee's fact-finding obligations.

On October 22, 2013, Chairman Issa and Chairman Jordan wrote to then-White House Counsel Kathryn Ruemmler requesting the White House's assistance in better understanding the IRS's relationship with the White House.[917]  On November 6, 2013, Ruemmler responded, refusing to assist the Committee's investigation with little explanation and no justification.[918]  Ruemmler made no attempt to work with the Committee, instead "encourag[ing]" the Chairmen to seek answers from the IRS.[919]

As the Committee began to examine the circumstances surrounding Lois Lerner's destroyed e-mails, it sought testimony from former IRS Counselor to the Commissioner, Jennifer O'Connor.  She had left the IRS in November 2013 to lead the Department of Health and Human Service's response to congressional oversight about the failure of HealthCare.gov.[920]  She was later promoted to the White House Counsel's office in May 2014.[921]  With O'Connor's leading role in coordinating the IRS's response to congressional oversight in 2013, the Committee invited her to testify at a hearing about Lerner's destroyed e-mails.[922]  White House Counsel W. Neil Eggleston responded on her behalf, refusing to allow O'Connor to testify.[923]  Due to the White House's refusal to cooperate with the Committee's fact-finding, the Committee was forced to issue a subpoena to compel O'Connor's testimony.[924]

The Committee later learned that the White House employed former IRS and Justice Department attorney Andrew Strelka for approximately six months in late 2013 and early 2014.[925]  While working at the White House, Associate Counsel Lamar Baker notified Strelka that the Justice Department and TIGTA sought to interview him.[926]  It is unclear how Baker learned that the Justice Department sought to speak with Strelka, but Baker provided Strelka with the contact information for the Department attorneys.[927]

The White House's unfortunate refusal to cooperate with the Committee's investigation contravened the President's promise of "hand in hand" cooperation.  It also prevented the Committee from obtaining and evaluating relevant documents regarding the politicization of the IRS.

---

[917] Letter from Darrell Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform, to Kathryn Ruemmler, Exec. Office of the Pres. (Oct. 22, 2013).
[918] Letter from Kathryn H. Ruemmler, Exec. Office of the Pres., to Darrell E. Issa & Jim Jordan, H. Comm. on Oversight & Gov't Reform (Nov. 6, 2013).
[919] Id.
[920] Tristyn Bloom, *White House adds crisis control expert to Counsel's office*, DAILY CALLER, May 30, 2014.
[921] Id.
[922] Letter from Darrell Issa, H. Comm. on Oversight & Gov't Reform, to Jennifer O'Connor, Exec. Office of the Pres. (June 19, 2014).
[923] Letter from W. Neil Eggleston, Exec. Office of the Pres., to Darrell Issa, H. Comm. on Oversight & Gov't Reform (June 23, 2014).
[924] H. Comm. on Oversight & Gov't Reform, Subpoena to Jennifer O'Connor (June 23, 2014).
[925] Transcribed interview of Andrew Strelka, in Wash., D.C. (Oct. 3, 2014).
[926] Id.
[927] Id.

Exhibit D

## The Ranking Member sought to disrupt the investigation

The manner in which the Ranking Member and his staff participated in this investigation has not reflected a desire to pursue the full truth about the IRS's misconduct.  Instead, they worked to shield the Administration from real accountability.  Only weeks after the investigation began, Ranking Member Cummings appeared on national television and proclaimed "the case is solved," after the Committee had received a modicum of documents and had interviewed only five IRS employees.[928]  The Ranking Member continued to attempt to draw attention away from the issue throughout the ongoing investigation by releasing misleading information and making public comments suggesting the investigation should end.

The Ranking Member's interactions with Lerner extend as far back as 1998, when Lerner testified before the Committee as an FEC Associate General Counsel.[929]  During that hearing, Ranking Member Cummings defended Lerner's actions at the FEC and questioned the propriety in the Committee holding public officials to account.  He said:

> I was listening to all of this, and as a new Member of Congress it does concern me that public servants who are doing the best they can, as Thurgood Marshall says, with what they have, are brought before our committee, this committee, and beaten up on.  As a lawyer, as one who has made discretionary types of decisions, I understand that everybody won't agree with me or agree with you or agree with the chairman, or anybody here.  People have disputes all the time.  I guess, but then to be beaten up over it is a whole other question and concern.[930]

In this instance, the Minority's efforts to collude with the IRS began even before the IRS's targeting was uncovered.  In March 2012, after Chairman Issa and Chairman Jordan wrote to Lois Lerner about allegations of IRS targeting, a "senior" staffer for Ranking Member Cummings informed the IRS that it could expect hearings on the letter.[931]  In recounting the conversation, the IRS employee contacted by the Minority wrote: "I got some intelligence from a senior Democratic staff member on House Oversight and Government Reform – and given the incoming letter from Chairman Issa – a hearing in May or June on 501 c 4's [sic] may be in the works."[932]

---

[928] *State of the Union* (CNN television broadcast June 9, 2013) (interview of Ranking Member Elijah Cummings).
[929] *See "Federal Election Commission Enforcement Actions: Foreign Campaign Contributions and Other FECA Violations": Hearing before the H. Comm. on Gov't Reform & Oversight*, 105th Cong. (1998).
[930] *Id.* (question and answer with Rep. Elijah E. Cummings).
[931] *See* E-mail from William Norton, Internal Revenue Serv., to Catherine Barre & Floyd Williams, Internal Revenue Serv. (Mar. 28, 2012) [IRSR 594531].
[932] *Id.*

Exhibit D

**Figure 48: E-mail from William Norton to Catherine Barre & Floyd Williams, Mar. 28, 2012**

| From: | Norton William G Jr |
|---|---|
| Sent: | Wednesday, March 28, 2012 9:14 AM |
| To: | Barre Catherine M; Williams Floyd L |
| Subject: | tax gap/ senate finance testimony |

We have provided Joan Pryde with enough information to begin drafting the Tax Gap testimony. We should have something from Joan by Friday. As I mentioned last evening, I would expect a hearing with this subcommittee of House Oversight and Government Reform may spark a hearing in House Small Business.

As to Senate Finance, as we discussed, I think Tony is putting together that testimony. In earlier discussions with Larry, Ann Cammack stated that included will be the issue of identity theft. I think we should highlight a section on identity theft in that testimony.

Additionally, I got some intelligence from a senior Democrat staff member on House Oversight and Government Reform -- and given the incoming letter from Chairman Issa -- a hearing in May or June on 501 c 4's may be in the works.

In addition to working with the IRS, the Committee's Minority attempted to undermine the integrity of the investigation. In June 2013, just as the investigation began, the Ranking Member recklessly released a full transcript of the Committee's interview of Cincinnati employee John Shafer, in direct contravention of Chairman Issa's admonition. This release not only ignored Committee comity, but jeopardized the integrity of the Committee's investigation. The Ranking Member's action added no substantive contribution to the Committee's investigation, and instead served to provide future witnesses with a roadmap of the Committee's questions and an opportunity to coordinate their testimony. Indeed, one witness told the Committee that an IRS official had actually directed him to review the Shafer transcript in advance of his interview with Committee staff.[933] David Marshall testified:

> Q   Sir, did you review any of the transcripts of the committee interviews that are available in the public realm?
>
> A   I read -- there was a transcript that I believe Representative Cummings made available from one of the people who was in Cincinnati, and I did read that transcript at the suggestion of Dave Breen.[934]

In the wake of the Ranking Member's release of the Shafer interview transcript, an attorney representing another IRS witness feared that the Ranking Member would do the same to his client. Objecting to the questions posed by the Ranking Member's staff, the attorney said:

> Democratic Counsel: Based on your experience as the team leader for the Advocacy team, did you see any evidence that the White House directed the consolidation of a coordinated review of Tea Party cases?

---

[933] Transcribed interview of David Marshall, Internal Revenue Serv., in Wash., D.C. (July 26, 2013).
[934] *Id.*

Exhibit D

Witness Attorney: Of course he didn't see any evidence.  He was so far from the White House, you know, literally, it would have took a plane to get there and you know that.  And you're asking a question that you know he know nothing about, and you are going to try to do the same thing with him that you did with Mr. Shafer and end up with a quote in the paper saying that [the witness] knows of, you know, no White House involvement in the process.  And the fact is, [the witness] has no idea one way or the other.  And you know that when you're asking the question.

<div align="center">***</div>

Witness Attorney: [T]he ranking member released John Shafer's quote, knowing that John Shafer wouldn't have a clue one way or the other as to what happened at the White House.  I mean, you, you know, abused a working person in Cincinnati for political benefit, and you get on your high horse with me and telling me the way I'm acting.  I'm responding to precisely what you're doing.[935]

While Mr. Cummings's public statements called for a fair and proper investigation, his actions suggest he sought just the opposite.

## The case of True the Vote

After volunteering at a polling place in Texas during the 2009 elections, Catherine Engelbrecht observed "fundamental procedural problems" and "undeniable acts of election fraud" that she felt had to be addressed.[936] She subsequently founded True the Vote, "an organization that grew into a national movement to ensure that every American voter has an opportunity to participate in elections that are free and fair."[937] True the Vote provides "training, technology, and support" to citizens to ensure election integrity.[938] Engelbrecht also founded King Street Patriots, a "group of Americans united by [a] commitment to Freedom, Constitutional Governance, and Civic Duty."[939]

---

[935] Transcribed interview of Stephen Daejin Seok, Internal Revenue Serv., in Wash., D.C. (June 19, 2013).
[936] *See* testimony of Catherine Engelbrecht, H. Comm. on Oversight & Gov't Reform, "The IRS Targeting Investigation: What is the Administration Doing," Feb. 6, 2014. *See also* "True the Vote," https://www.truethevote.org/aboutus.
[937] *See* testimony of Catherine Engelbrecht, H. Comm. on Oversight & Gov't Reform, "The IRS Targeting Investigation: What is the Administration Doing," Feb. 6, 2014.
[938] "True the Vote," https://www.truethevote.org/aboutus.
[939] "King Street Patriots," https://www.facebook.com/KingStreetPatriots/info?tab=page_info.

Exhibit D

In July 2010, Engelbrecht filed with the IRS seeking tax-exempt status for King Street Patriots and True the Vote.[940]   That winter, the FBI questioned Engelbrecht about a person who had attended a King Street Patriots event once.[941]   Engelbrecht had no further information about the person in question.[942]   Then, on January 11, 2011, the IRS visited the Engelbrechts' place of business and conducted an on-site audit of both their business and their personal tax returns.[943]

In March 2011, Engelbrecht received follow-up questions from the IRS regarding True the Vote's application for tax-exempt status.[944]   In June 2011, the IRS notified Engelbrecht that it had selected her family for audits of their personal income in the 2008 and 2009 tax years.  In October, the IRS asked for even more information.[945]   In 2012, her family business was separately investigated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Occupational Safety and Health Administration.[946]

In February 2012, True the Vote received a third request for information from the IRS, which also sent its first questionnaire to King Street Patriots.[947]   Engelbrecht says the IRS had "hundreds of questions—hundreds and hundreds of questions."[948]   Among other things, the IRS requested every Facebook post and Tweet Engelbrecht had ever written.[949]

Later in 2012, True the Vote became the focus of scrutiny from congressional Democrats.  In September, Sen. Barbara Boxer wrote to Thomas Perez, then the assistant attorney general of DOJ's civil rights division.  Sen. Boxer wrote:  "As you know, an organization called 'True the Vote,' which is an offshoot of the Tea Party, is leading a voter suppression campaign in many states. . . .  [T]his type of intimidation must stop.  I don't believe this is 'True the Vote.'  I believe it's 'Stop the Vote.'"[950]

The next front in the inappropriate scrutiny of True the Vote came from Ranking Member Cummings.  On October 4, 2012, the Ranking Member wrote to Engelbrecht requesting extensive information about True the Vote's work.[951]   Similar to the IRS's burdensome information requests of Tea Party groups, the Ranking Member's letter broadly requested all voter registration challenges, copies of computer programs and databases used by True the Vote, all organizations with access to those programs and databases, and all contracts and agreements between True the Vote and affiliates.[952]

---

[940] *Id.*

[941] *Id.*

[942] *Id.*

[943] *Id.*

[944] *Id.*

[945] *Id.*

[946] Letter from Catherine Engelbrecht, True the Vote, to Darrell Issa, H. Comm. on Oversight & Gov't Reform (Jan. 9, 2012) (emphasis in original).

[947] Jillian Kay Melchior, *True Scandal*, NATIONAL REVIEW ONLINE, May 20, 2013.

[948] *Id.*

[949] *Id.*

[950] *Id.*

[951] Letter from Elijah Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Oct. 4, 2012).

[952] *Id.*

Exhibit D

Engelbrecht responded to the Ranking Member the following day, requesting a meeting to explain in detail True the Vote's practices and mission.[953]  Ranking Member Cummings replied almost two weeks later, on October 18, 2012, expanding his request for documents and telling Engelbrecht: "I accept your offer to come to Washington to answer these allegations, but *only after you provide the documents I requested*."[954]  In this letter, the Ranking Member accused True the Vote of acting in an illegal manner, writing that the organization's "efforts are intentional, politically-motivated, and wide spread across multiple states," and threatening that their actions "could amount to a criminal conspiracy to deny legitimate voters their Constitutional rights."[955]

The Ranking Member's emphasis on True the Vote's political beliefs were strikingly similar to broader efforts to target the group.  Cummings even asked the group to explain its coordination with "Republican party officials, Tea Party groups . . . or other political organizations or 501(c)(4) entities, including funding received by these organizations."[956]  The IRS posed similar questions to True the Vote and its affiliate, King Street Patriots.[957]  Later, the IRS even admitted that questions about Tea Party groups' funding sources were inappropriate.[958]  In contrast to the IRS's limited admission of wrongdoing, the Ranking Member steadfastly defended his questions of True the Vote and his coordination with the IRS.[959]

Around the same time that Ranking Member Cummings wrote to Engelbrecht, the Obama-Biden reelection campaign issued an open memorandum authored by Robert Bauer, the former White House Counsel to President Obama and the General Counsel of the Obama-Biden reelection campaign and the Democratic National Committee.  The letter attacked True the Vote.[960]  The Obama campaign's attacks on True the Vote cited material nearly identical to the information in Ranking Member Cummings's letters to Engelbrecht, which created the appearance that the attacks were coordinated.  For example:

- Bauer alleged that True the Vote is "closely associated" with the Republican Party in its voter integrity efforts.[961]  Cummings similarly accused True the Vote of "being coordinated closely" with the Republican Party in its poll monitoring work.[962]

---

[953] Letter from Catherine Engelbrecht, True the Vote, to Elijah Cummings, H. Comm. on Oversight & Gov't Reform (Oct. 5, 2012).

[954] Letter from Elijah Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Oct. 18, 2012) (emphasis added).

[955] *Id.*

[956] Letter from Elijah E. Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Dec. 20, 2012).

[957] *See* Letter from the Internal Revenue Serv. to True the Vote (Feb. 8, 2012); Letter from the Internal Revenue Serv. to King Street Patriots (Feb. 8, 2012).

[958] E-mail from Judith Kindell, Internal Revenue Serv., to Holly Paz & Sharon Light, Internal Revenue Serv. (Apr. 25, 2012) [IRSR 13868]; TREASURY INSPECTOR GEN. FOR TAX ADMIN., INAPPROPRIATE CRITERIA WERE USED TO IDENTIFY TAX-EXEMPT APPLICATIONS FOR REVIEW (May 14, 2013).

[959] April 17th letter, *supra* note **Error! Bookmark not defined.**; April 9th letter, *supra* note **Error! Bookmark not defined.**.

[960] Memorandum from Robert F. Bauer, Obama for America & the Democratic Nat'l Comm., to Interested Parties, "Update on Voter Misinformation Activities and Efforts to Protect the Vote" (undated), *available at* http://secure.assets.bostatic.com/pdfs/BauerMemo/BauerMemo.pdf [hereinafter "Bauer memo"].

[961] *Id.* at 4.

Exhibit D

- Bauer cited the Wisconsin Government Accountability Board's review of True the Vote's involvement in the 2012 gubernatorial recall election as evidence that "swing states are not waiting and taking their chances that True the Vote acts to disrupt the electoral process."[963]  In a letter to Engelbrecht, Cummings likewise cited the Wisconsin Governmental Accountability Board's review, detailing its conclusions in support of his assertions of "problems" in True the Vote's voter integrity efforts.[964]

- Bauer cited a letter from Democratic state senators in Ohio to the Secretary of State identifying concerns with True the Vote's work in Ohio.[965]  Cummings also cited concerns with True the Vote's voter integrity efforts in Ohio, even quoting the Ohio Secretary of State.[966]

In addition to Ranking Member Cummings's and the Obama-Biden reelection campaign's public accusations against True the Vote, Cummings also privately solicited records related to True the Vote from the IRS.  A January 25, 2013 e-mail from Catherine Barre, the Acting IRS Legislative Affairs director, to Lois Lerner, Holly Paz and others stated:

> The House oversight committee (not the subcommittee of ways and means) has requested any publicly available information on an entity that they believe has filed for c3 status. . . .  The entity is KSP True the Vote.[967]

Holly Paz forwarded the e-mail to a subordinate, asking to "have someone look and see what public available docs (app, 990s) we have on this one."[968]  Paz's e-mail included material redacted as confidential taxpayer information pursuant to I.R.C. § 6103.  If this material was provided to the Ranking Member, or to the Obama-Biden reelection team or any of the other federal entities that were harassing True the Vote, then the IRS may have unlawfully disclosed information about True the Vote's tax information.  On April 9, 2014, Chairman Issa and five subcommittee Chairmen wrote Ranking Member Cummings and requested that he "explain the full extent of you and your staff's communications with the IRS and why you chose to keep communications with the IRS from Majority Members and staff even after it became a subject of controversy."[969]  Cummings responded the same day,[970] and again on April 17, 2014.[971]  In his

---

[962] Letter from Elijah E. Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Oct. 18, 2012); Letter from Elijah E. Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Oct. 4, 2012).
[963] Bauer memo, *supra* note **Error! Bookmark not defined.**, at 5.
[964] Letter from Elijah E. Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Oct. 4, 2012).
[965] Bauer memo, *supra* note **Error! Bookmark not defined.**, at 5.
[966] Letter from Elijah E. Cummings, H. Comm. on Oversight & Gov't Reform, to Catherine Engelbrecht, True the Vote (Oct. 4, 2012).
[967] E-mail from Catherine Barre, Internal Revenue Serv., to Lois Lerner et al., Internal Revenue Serv. (Jan. 25, 2013) [IRSR 180906].
[968] E-mail from Holly Paz, Internal Revenue Serv., to Andy Megosh, Internal Revenue Serv. (Jan. 25, 2013) [IRSR 180906].
[969] Letter from Darrell Issa, Jim Jordan, James Lankford, John Mica, Jason Chaffetz, & Blake Farenthold, H. Comm. on Oversight & Gov't Reform, to Elijah E. Cummings, H. Comm. on Oversight & Gov't Reform (Apr. 9, 2014).

Exhibit D

responses, Cummings neither disclosed the extent of his communications with the IRS nor explained why he kept those communications secret.

Additionally, federal tax law prohibits the President and other Executive Branch officials from asking the IRS to investigate any particular taxpayer.[972]  This prohibition applies to the President, the Vice President, any member of the Executive of Office of the President, and all cabinet-level officials.[973]  Any applicable person who asks the IRS to investigate a particular taxpayer could be subject to a $5,000 fine or five years imprisonment.[974]

## Tax administration working for the taxpayers:  Suggested reforms

The Committee's investigation into the IRS's targeting of conservative-oriented tax-exempt applicants makes clear that tax administration in the United States is in need of reform. The Committee recommended 15 reforms to address politicization of the IRS in a July 12, 2014 staff report, titled "Making Sure Targeting Never Happens: Getting Politics Out of the IRS and Other Solutions."  Among the proposals:

- Replacing the IRS Commissioner with a multi-member, bipartisan commission;

- Removing the IRS as a regulator of political speech for social-welfare groups;

- Allowing taxpayers, and not the IRS, to control access to their confidential taxpayer information;

- Creating a private right of action for victims of willful and injurious leaks by IRS officials of confidential taxpayer information;

- Establishing transparent and objective criteria for scrutiny of applicants;

- Establishing clear and transparent rules for information-collecting purposes;

- Prohibiting political and policy communications between the IRS and Executive Office of the President; and,

- Removing the IRS from implementation of the Affordable Care Act.

---

[970] Letter from Elijah E. Cummings, H. Comm. on Oversight & Gov't Reform, to Darrell Issa, H. Comm. on Oversight & Gov't Reform (Apr. 9, 2014).
[971] Letter from Elijah E. Cummings, H. Comm. on Oversight & Gov't Reform, to Darrell Issa, H. Comm. on Oversight & Gov't Reform (Apr. 17, 2014).
[972] *See* I.R.C. § 7217; *see also id.* § 6103.
[973] *Id.* § 7217; *see also* 5 U.S.C. § 5312.
[974] I.R.C. § 7217 (d).

Exhibit D

The U.S. House of Representatives has also passed a series of bills to address the problems identified by the Committee's investigation.  On September 17, 2014, the House approved five bills by voice vote that respond to the Internal Revenue Service's targeting of conservative organizations and other abuses of taxpayers at the IRS.  The five bills enhanced protections for taxpayers' rights and created additional tools to hold IRS officials accountable in cases where they target taxpayers for their political beliefs.  The bills passed on September 17, 2014 are:

- The SES Accountability Act (H.R. 5169), sponsored by Rep. Tim Walberg (R-MI) – Gives agencies greater authority to take action against Senior Executive Service (SES) members who are underperforming or who engage in misconduct.

- The Federal Records Accountability Act (H.R. 5170), sponsored by Rep. Mark Meadows (R-NC) – Helps ensure that employees who intentionally destroy federal records will be fired (along with any criminal penalties to which they are subject) by creating a clear and expeditious process for removal.

- An Act to amend the Internal Revenue Code of 1986 to permit the release of information regarding the status of certain investigations (H.R. 5420), sponsored by Rep. Charles Boustany Jr., M.D. (R-LA).

- An Act to prohibit officers and employees of the Internal Revenue Service from using personal email accounts to conduct official business (H.R. 5418), sponsored by Rep. Charles Boustany Jr., M.D. (R-LA).

- An Act to amend the Internal Revenue Code of 1986 to provide for a right to an administrative appeal relating to adverse determinations of tax-exempt status of certain organizations (H.R. 5419), sponsored by Rep. Charles Boustany Jr., M.D. (R-LA).

## Conclusion

Nearly five years after the IRS first began targeting conservative organizations for additional scrutiny due to their political beliefs, the agency has still not escaped the shadow of its misdeeds and abuse of power.  Most American taxpayers find themselves at the mercy of the IRS – they must turn over sensitive information and even successful efforts to fight off erroneous agency actions can create life-altering turmoil.  Trust in the IRS is essential – Americans want and expect an IRS that treats them fairly and does not discriminate based on factors like race, religion, political beliefs, or legal participation in our democracy.

The facts surrounding wrongdoing by the IRS and the agency's wholly inadequate response have broken the trust that Americans placed in the IRS as a neutral and unbiased enforcer of the tax code.  Conservative organizations were not just singled out because of their

Exhibit D

political beliefs—they were targeted by IRS officials and employees who expressed a general loathing toward them even while begrudgingly admitting that those organizations were in compliance with the only thing the IRS should care about: the federal tax code.

Documents and interviews show IRS officials failed to limit their professional judgments to enforcing the tax code and instead inserted their own beliefs and judgments into federal matters to influence outcomes and decisions.  One IRS agent wrote about an organization applying for 501(c)(4) status that donated to other organizations that engaged in political activity, "I'm not sure we can deny them because, technically, I don't know that I can deny them simply for donating to another 501(c)(4)."[975]  Another agent responded, "This sounds like a bad org . . . This org gives me an icky feeling."[976]

During an interview with Committee staff, one IRS employee explained his view that, "These [Tea Party] organizations mostly concentrate their activities on the limiting government, limiting government role, or reducing government size, or paying less tax.  I think it['s] different from the other social welfare organizations which are (c)(4)."[977]

A top deputy to Exempt Organizations Director Lois Lerner wrote to colleagues, "We suspect we will have to approve the majority of the [advocacy org] c4 applications."[978]  Recognizing the infusion of a personal moral judgment in a legal matter, a recipient forwarded a quote from that e-mail to another colleague: "'We suspect we will have to approve the majority of the c4 applications.' That's an interesting posture."[979]

The IRS and its employees, whose conduct is largely shielded from public scrutiny to protect taxpayers, were not only affected by politics, but by a more basic human failure: a discriminatory outlook on the world.  The IRS's inability to keep politics out of objective decisions about interpretation of the tax code damaged its primary function: an apolitical tax collector that Americans can trust to treat them fairly.

Not only did IRS employees allow politics to seep into their work from February 2010 to May 2012, but even after agency officials learned of misconduct, the response from senior agency officials was to manage the fallout rather than quickly expose and correct the misconduct.  Senior officials contemplated informing Congress of wrongdoing before the 2012 election, but decided against it.  Accounts about whether Obama Administration officials outside the IRS were told of targeting before the 2012 election are conflicting.

It is difficult, if not fundamentally impossible, to determine the root cause of the culture of bias against conservative organizations among certain IRS employees.  On one level, there is

---

[975] E-mail from Jodi Garuccio, Internal Revenue Serv., to Hilary Goehausen, Internal Revenue Serv. (Apr. 22, 2013) [IRSR 547115].

[976] E-mail from Hilary Goehausen, Internal Revenue Serv., to Jodi Garuccio, Internal Revenue Serv. (Apr. 22, 2013) [IRSR 547116].

[977] Transcribed interview of Stephen Seok, Internal revenue Serv., in Wash., D.C. (June 19, 2013).

[978] E-mail from Holly Paz, Internal Revenue Serv., to Janine Cook, Internal revenue Serv. (July 19, 2011) [IRSR 14372-73].

[979] E-mail from Don Spellmann, Internal Revenue Serv., to Janine Cook, Internal revenue Serv. (July 19, 2011) [IRSR 428420].

Exhibit D

nothing wrong with career federal employees holding strong political beliefs so long as these beliefs play no role in their work at an apolitical federal agency. But when political beliefs affect work, and these political beliefs align with those being openly and loudly espoused by the President of the United States and his political allies, there is at minimum a correlation. Shortly before the targeting began, and as it accelerated, the President of the United States publicly and repeatedly attacked conservative non-profits engaged in the political process as "shadowy"[980] and a "threat to our democracy."[981]  The President's allies even openly advocated for an IRS crackdown on such organizations that some in the IRS took to heart rather than tune-out as political noise.  A 2003 academic study of how U.S. Attorneys in the 1980s responded to presidential rhetoric during the War on Drugs found evidence that, "Rhetoric provides a direct mechanism for the managerial influence of the president."[982]  Consistent with this study, several current and former IRS employees testified to the Committee during the investigation that the IRS was acutely aware of the public rhetoric against conservative-leaning non-profit groups. Lois Lerner, before the targeting scandal broke publicly, also acknowledged the weight of calls on the IRS to "fix the problem."[983]

When the truth finally began to emerge, some of these leaders knowingly and wrongfully blamed line-level employees in a Cincinnati office for misconduct in an apparent attempt to absolve themselves.  The effect of this false spin is a public left ever more skeptical that the IRS is on the level.  Repeated promises to cooperate with various investigations have been broken; the President swung wildly from firing the IRS Commissioner because of the scandal to subsequently denying even a "smidgeon of corruption;"[984] agency officials repeatedly changed their stories regarding the availability of key documents; a top IRS official refused to testify to the Committee and cited her Fifth Amendment right against self-incrimination; and the President's own Attorney General resisted bipartisan calls for an independent criminal investigation that would increase public confidence in the rule of law.  In light of all this, it is no surprise that Americans have lost faith in the IRS's ability to fairly administer the tax code.

Nearly four years after the Committee began probing complaints about disparate treatment towards applicants for tax-exempt status, the Committee's investigation is not closed. The IRS continues to produce responsive documents and other federal agencies have yet to fully comply with the Committee's requests for information.  The Committee presents these facts and understandings as the 113th Congress concludes to inform the public about what we know and what remains clouded in secrecy.  Certainly recent revelations that e-mails from officials like former Exempt Organizations Director Lois Lerner that the IRS once said were lost forever can now be recovered, and other changes, including the departure of the Attorney General who refused to empanel an independent investigative team, offers renewed hope that more answers may come in the next Congress.

---

[980] President Barack Obama, Remarks For Weekly Address (Aug. 21, 2010).

[981] President Barack Obama, Remarks At Campaign Event, Philadelphia, PA (Oct. 10, 2010).

[982] Andrew B. Whitford & Jeff Yates, *Policy Signals and Executive Governance: Presidential Rhetoric in the "War on Drugs,"* 65 J. OF POL. 1004 (Nov. 2003).

[983] *See* "Lois Lerner Discusses Political Pressure on IRS in 2010," YOUTUBE (Dec. 10, 2013), http://www.youtube.com/watch?v=EH1ZRyq-1iM (transcription by Committee).

[984] *"Not even a smidgeon of corruption": Obama downplays IRS, other scandals*, FOX NEWS, Feb. 3, 2014.

Exhibit D