| 114TH CONGRESS *1st Session* | SENATE | REPORT 114–119 |
|---|---|---|

THE INTERNAL REVENUE SERVICE'S PROCESSING OF 501(c)(3) AND 501(c)(4) APPLICATIONS FOR TAX-EXEMPT STATUS SUBMITTED BY "POLITICAL ADVOCACY" ORGANIZATIONS FROM 2010–2013

————

COMMITTEE ON FINANCE
UNITED STATES SENATE

BIPARTISAN INVESTIGATIVE REPORT AS SUBMITTED BY CHAIRMAN HATCH AND RANKING MEMBER WYDEN

PART 1 OF 4



AUGUST 5, 2015.—Ordered to be printed

————

U.S. GOVERNMENT PUBLISHING OFFICE
95–784                   WASHINGTON : 2015

Exhibit E

UNITED STATES SENATE COMMITTEE OF FINANCE—MEMBERS

ORRIN G. HATCH (UT), *Chairman*
RON WYDEN (OR), *Ranking Member*

| REPUBLICAN MEMBERS | DEMOCRATIC MEMBERS |
|---|---|
| CHUCK GRASSLEY (IA) | CHARLES E. SCHUMER (NY) |
| MIKE CRAPO (ID) | DEBBIE STABENOW (MI) |
| PAT ROBERTS (KS) | MARIA CANTWELL (WA) |
| MICHAEL B. ENZI (WY) | BILL NELSON (FL) |
| JOHN CORNYN (TX) | ROBERT MENENDEZ (NJ) |
| JOHN THUNE (SD) | THOMAS R. CARPER (DE) |
| RICHARD BURR (NC) | BENJAMIN L. CARDIN (MD) |
| JOHNNY ISAKSON (GA) | SHERROD BROWN (OH) |
| ROB PORTMAN (OH) | MICHAEL F. BENNET (CO) |
| PATRICK J. TOOMEY (PA) | ROBERT P. CASEY, JR. (PA) |
| DAN COATS (IN) | MARK R. WARNER (VA) |
| DEAN HELLER (NV) | |
| TIM SCOTT (SC) | |

(II)

Exhibit E

# FOREWORD

——————

Since the inception of our Nation, the United States Committee on Finance (Committee) has conducted vigilant oversight of the Executive Branch agencies and departments under its jurisdiction. Given the significance of tax policy and its administration, the Committee has historically focused a large portion of its time and resources overseeing the activities of the Internal Revenue Service (IRS), the Executive Branch agency charged with tax matters. Two years and two months ago, the Committee became aware of allegations regarding the potential targeting by the IRS of certain tax-exempt organizations, based on the names and political views of those organizations. Serious allegations such as these strike at the very heart of the principal that the Nation's tax laws are to be administered fairly and without regard to politics of any kind. Accordingly, these allegations warranted swift Committee response in the form of an investigation—an activity the Committee is uniquely positioned to carry out as a result of its oversight authorities and responsibilities with respect to the IRS.

Despite the partisan political nature of these allegations, the Committee proceeded in true bipartisan spirit and initiated a joint investigation on May 21, 2013, under the direction of former Chairman Baucus and then-Ranking Member Hatch. When Senator Wyden assumed the Chairmanship of the Committee in February 2014, he agreed to continue the bipartisan work begun by Chairman Baucus. This bipartisan cooperation has continued unabated since I became Chairman in January 2015. Accordingly, despite several changes in the chairmanship, the Committee has continued its tradition of a bipartisan investigative effort.

While much has been reported about the alleged political targeting over the last two years, it is important to stress that this Committee has conducted the only bipartisan investigation into the matter. Consequently, this report will perhaps serve as the definitive account of events transpiring at the IRS and the management failures and other causes that were at the root of the IRS's actions. Hopefully, this report will provide a roadmap for how Congress and the public can act to make sure this type of conduct does not happen again.

We want to acknowledge the hard work and countless hours of time spent by Committee staff who conducted over 30 exhaustive interviews, reviewed more than 1.5 million pages of documentation, drafted numerous versions of this report, and performed countless other tasks necessary to bring this investigation to closure. The Committee staff whose diligence and devotion to duty made this investigation and report possible include the following: John Angell,

Exhibit E

IV

Kimberly Brandt, John Carlo, Justin Coon, Michael Evans, Daniel Goshorn, Christopher Law, Jim Lyons, Todd Metcalf, Harrison Moore, Mark Prater and Tiffany Smith.

ORRIN G. HATCH.
RON WYDEN.

Exhibit E

# C O N T E N T S

Page

Bipartisan Investigative Report as Submitted by Chairman Hatch And Rank-
 ing Member Wyden  ............................................................................................  1
Additional Views of Senator Hatch Prepared by Republican Staff  ....................  127
Additional Views of Senator Wyden Prepared by Democratic Staff  ....................  241
Timeline of Significant Events  ............................................................................  284
Appendices  ...........................................................................................................  375

(V)

Exhibit E

Exhibit E

| 114TH CONGRESS *1st Session* | SENATE | REPORT 114–119 |
|---|---|---|

THE INTERNAL REVENUE SERVICE'S PROCESSING OF 501(c)(3) AND 501(c)(4) APPLICATIONS FOR TAX-EXEMPT STATUS SUBMITTED BY "POLITICAL ADVOCACY" ORGANIZATIONS FROM 2010–2013

––––––––––

AUGUST 5, 2015.—Ordered to be printed

––––––––––

Mr. HATCH, from the Committee on Finance,
submitted the following

# R E P O R T

BIPARTISAN INVESTIGATIVE REPORT AS SUBMITTED BY CHAIRMAN HATCH AND RANKING MEMBER WYDEN

## CONTENTS

|  |  | Page |
|---|---|---|
| I. | EXECUTIVE SUMMARY AND RECOMMENDATIONS | 5 |
| II. | BACKGROUND ON BIPARTISAN INVESTIGATION BY THE SENATE FINANCE COMMITTEE | 11 |
|  | A. Scope of the Investigation and This Report | 11 |
|  | B. The Committee's Access to Taxpayer Information Protected by Section 6103 of the Internal Revenue Code, and Use of Taxpayer Information in This Report | 12 |
|  | C. Limitation on the Committee's Access to Relevant Information | 14 |
|  |    1. Summary of Information That Forms a Basis for this Report | 15 |
|  |    2. The IRS Loss of Data, Failure to Notify Congress in a Timely Manner, and Results of TIGTA Investigation | 15 |
|  |    3. Actions Taken by Committee Investigators to Mitigate the Information Gap | 28 |
|  | D. Legal Background of 501(c)(3) and 501(c)(4) Organizations | 29 |
|  | E. Structure of The IRS Exempt Organizations Division and General IRS Procedures for Reviewing Applications for Tax-Exempt Status | 30 |
| III. | FINDINGS OF THE SENATE FINANCE COMMITTEE AND SUMMARY OF SUPPORTING FACTS | 34 |
|  | A. IRS Management Lacked an Appreciation for the Sensitivity and Volatility of Political Advocacy Applications | 34 |

Exhibit E

B. IRS Management Allowed Employees to Use Inappropriate Screening Criteria That Focused on Applicants' Names and Policy Positions ................................................................................ 37

C. IRS Management Failed to Develop an Effective Plan for Processing Applications for Political Advocacy Groups ....................... 39

    1. IRS Management Placed Exclusive Reliance on Test Cases for Too Long .............................................................................. 39

    2. Lois Lerner's July 2011 Solution to Resolve the Political Advocacy Applications was Flawed and Ineffective ............. 40

    3. The 2011 Triage of Political Advocacy Applications Was Not Properly Supported by EO Management and Predictably Failed ............................................................................... 41

    4. Lack of EO Management Oversight of the Political Advocacy Applications Allowed Development of the Guidesheet to Simply Stop in November 2011 ............................................. 42

    5. EO Management Allowed the Advocacy Team to Process Political Advocacy Applications Without Proper Training and Support, and Failed to Adequately Manage Its Activities ..................................................................................... 43

    6. Although the "Bucketing" Exercise of 2012 Resolved Many Pending Political Advocacy Applications, the IRS Has Not Yet Issued Determinations for Some Applications ............... 44

D. The IRS Placement of Left-Leaning Applicants on the BOLO List Resulted in Heightened Scrutiny, Delay and Inappropriate and Burdensome Information Requests ...................................... 44

    1. The IRS Instructed Employees to Flag "Progressive," "Emerge," and ACORN Successor Applications at Training Workshops ................................................................................ 45

    2. The IRS Placed the Terms "Progressive," "ACORN," and "Occupy" on the BOLO List .................................................... 45

    3. IRS Scrutiny of Left-Wing Applicants Resulted in Years-Long Delays and Burdensome Information Requests .......... 45

E. The Culture in EO Contributed to a Lack of Efficiency in its Operations ....................................................................................... 45

    1. EO Management Lacked a Sense of Customer Service .......... 46

    2. Remote Management and Workplace Flexibilities Affected the Efficiency of EO Determinations ..................................... 48

    3. Antagonism Existed Between EO Senior Executive Level Management and EO Determinations Managers and EO Line Employees ....................................................................... 51

    4. The IRS Failed to Ensure That All EO Employees Received Technical Training ................................................................... 52

F. Lois Lerner Oversaw the Handling of Tea Party Applications and Provided Limited Information to Upper-Level Management ................................................................................................ 53

    1. Lois Lerner Was Informed About the Tea Party Applications in April 2010 and Received Updates About Them ............... 53

    2. Lois Lerner Failed to Inform IRS Upper Management About the Tea Party Applications .................................................... 55

    3. Lerner Did Not Consult With IRS Chief Counsel William Wilkins About the Tea Party Applications ............................. 57

G. Even During the Committee's Investigation, Some IRS Employees Continued to Screen Tea Party Applications Based on the Organization's Names ................................................................... 58

Exhibit E

3

      H. For a Three-Year Period, the IRS Did Not Perform Any Audits of Tax-Exempt Organizations That Were Alleged to Have Engaged in Improper Political Campaign Intervention ................... 59

IV. FOLLOWING THE CITIZENS UNITED CASE, THE IRS FACED EXTERNAL PRESSURE TO MONITOR AND CURTAIL POLITICAL SPENDING OF TAX-EXEMPT ORGANIZATIONS ............................... 60

      A. Employees Throughout the IRS Exempt Organizations Division Were Aware of the Citizens United Decision .............................. 60

      B. There was Extensive Press Coverage of Political Spending by Tax-Exempt Organizations Following Citizens United .............. 62

      C. Many Members of Congress Expressed Their Interest in Political Spending by Tax-Exempt Organizations ..................................... 63

      D. Practitioners and Interest Groups Requested IRS Action on Political Spending by Tax-Exempt Organizations ....................... 64

      E. In Response to External Scrutiny and Increased Political Spending by Tax-Exempt Organizations, the IRS Tracked Political Spending and Proposed Regulatory Changes ............................... 65

V. THE IRS IMPLEMENTED A SPECIAL PROCESS FOR HANDLING CERTAIN TYPES OF APPLICATIONS .................................................. 67

      A. The Touch and Go (TAG) Spreadsheet Was Developed to Assist EO Determination Agents ................................................. 67

      B. The TAG Spreadsheet Evolved Into the Joint TAG/Emerging Issues Spreadsheet ......................................................... 69

      C. EO Determinations Agents Were Trained in the Use of the New Spreadsheet at a June/July 2010 CPE Training ................. 70

      D. The New Spreadsheet Was Renamed the "BOLO" Spreadsheet .. 71

      E. EO Determinations Developed a Process to Update the BOLO Spreadsheet ................................................................... 72

VI. APPLICATIONS SUBMITTED BY TEA PARTY ORGANIZATIONS WERE SYSTEMATICALLY IDENTIFIED, CENTRALIZED AND SUBJECTED TO HEIGHTENED SCRUTINY BY THE IRS ................. 73

      A. After the IRS Received and Approved the First Few "Tea Party" Applications, it Prepared Sensitive Case Reports and Added an Entry to the BOLO Spreadsheet ............................................ 73

         1. Tea Party Applications Began to Draw Attention in EO Determinations ....................................................................... 73

         2. EO Technical Had Early Awareness of the Tea Party Applications ................................................................................. 74

         3. EO Technical Assumed Responsibility for Working Two Tea Party Applications as "Test Cases" ........................................ 74

         4. EO Technical Prepared the First SCR for the Tea Party Applications ............................................................................. 74

         5. Placing the Tea Party Applications on the SCRs Caused Delays in Their Processing .................................................... 75

         6. Identification of the Tea Party Applications as an Emerging Issue on the BOLO Spreadsheet Resulted in Centralization and Full Development of those Applications ........................ 76

      B. EO Determinations Periodically Updated the Emerging Issues Tab of the BOLO Spreadsheet ...................................................... 77

         1. Until July 2011, the Emerging Issues Tab of the BOLO Spreadsheet Specifically Referenced the Tea Party Movement ....................................................................................... 77

         2. In July 2011, Lois Lerner Directed that the References to "Tea Party" be Removed From the Emerging Issues Tab of the BOLO Spreadsheet ............................................... 78

Exhibit E

4

3. Cindy Thomas Removed References to the "Tea Party" From
   the Emerging Issues Tab of the BOLO Spreadsheet ............ 79
4. After July 11, 2011, Cindy Thomas and John Shafer Made
   No Changes to the Screening Criteria Used by Screeners
   to Identify Applications Received from Tea Party Groups ... 79
5. Steve Bowling and Cindy Thomas Changed the BOLO
   Spreadsheet in January 2012 .................................................. 82
6. Holly Paz and Lois Lerner Were Informed That EO Deter-
   minations Revised the July 2011 Emerging Issues Tab ...... 83
7. After Steve Miller Became Aware of the BOLO Criteria,
   Holly Paz Revised the Process for Making Changes to
   the BOLO Spreadsheet and a New BOLO Spreadsheet
   Was Issued .............................................................................. 84

VII. THE PROCESSES USED BY THE IRS TO WORK THE TEA PARTY
   APPLICATIONS WERE INEFFICIENT, CUMBERSOME, IN-
   VOLVED MULTIPLE LEVELS OF REVIEW, AND WERE PLAGUED
   BY DELAY ...................................................................................... 85
   A. The Initial Process Used to Review the Tea Party Applications
      in 2010 Was Laborious and Time Consuming ............................ 85
   B. Because of Miscommunications Between EO Determinations
      Management and Staff, No Tea Party Applications Were Proc-
      essed by EO Determinations for More than One Year (October
      2010 to November 2011) ................................................................ 87
   C. Preparation and Review of EO Technical's "Test Cases" from
      2010 to 2012 Added Substantial Delay to the Processing of
      the Tea Party Applications ........................................................... 89
   D. The Initiative to Develop a Guidesheet for EO Determinations
      Was a Failure That Further Contributed to Processing Delays
      in 2011 and 2012 ........................................................................... 92
   E. The Initial "Triage" of Tea Party and Other Political Advocacy
      Cases in 2011 Represented Yet Another Unsuccessful Attempt
      by EO Technical to Assist EO Determinations ........................... 95
   F. The Advocacy Team Failed to Approve or Deny any Applications
      Received From Tea Party or Other Political Advocacy Organi-
      zations From its Formation in December 2011 to June 2012 ..... 98
   G. The Multi-Step Review Procedure Established by EO Technical
      in 2012 for Political Advocacy Applications Reflected a Lack
      of Concern by IRS Management for the Need to Process the
      Applications Expeditiously ........................................................... 101
   H. The May 2012 "Bucketing" Initiative Resulted in EO Deter-
      minations Issuing the First Approvals of Tea Party and Other
      Political Advocacy Applications After Nearly Two and a Half
      Years ............................................................................................... 103

VIII. THE IRS SELECTED LEFT-LEANING APPLICANTS FOR REVIEW
    AND SUBJECTED THEM TO HEIGHTENED SCRUTINY AND
    DELAYS ......................................................................................... 106
    A. EO Determinations Flagged Left-leaning Applicants with the
       Names "Progressive," "ACORN," and "Occupy" .......................... 106
       1. PowerPoint Presentation Directs Employees to Flag "Pro-
          gressive" and "Emerge" Applicants ....................................... 106
       2. BOLO Spreadsheets Include the Phrase "Progressive" ........... 107
       3. IRS Determinations Manager Instructed Employees to Be
          Alert for "Emerge" Groups ..................................................... 107
       4. Employees Were Instructed to Give "Special Handling" to
          Groups Related to ACORN ...................................................... 107

Exhibit E

        5. Groups Using "Occupy" in Their Name Were Flagged Using
           the BOLO Watch List Tab ....................................................   109
    B. Liberal and Progressive Organizations Experienced Delayed
       Processing ......................................................................   110
    C. Organizations Deemed to be ACORN Successors Experienced
       Delays .............................................................................   111
    D. Inappropriate and Burdensome Information Requests ................   112
IX. ADDITIONAL FINDINGS NOT RELATED TO THE DETERMINA-
    TIONS PROCESS ...................................................................   113
    A. The IRS Struggled to Decide How to Review Allegations of
       Improper Political Campaign Intervention by Tax-Exempt Or-
       ganizations, Including Tea Party Groups ...................................   113
       1. General Processes for Audits of Tax-Exempt Organizations  ..   113
       2. The Changing Process for Handling Allegations of Improper
          Political Campaign Intervention ...........................................   115
       3. EO Determinations Employees Recommended that the ROO
          Review the Activities of Some Tea Party Organizations,
          and a Smaller Number of Progressive Organizations, for
          Improper Political Campaign Intervention ...........................   116
    B. The IRS Failed to Produce Responsive Documents to a FOIA
       Request in 2010 Seeking Information About its Handling of
       Tea Party Applications ....................................................   118
    C. TIGTA Reviewed Several Allegations of Improper Disclosures
       of Taxpayer Information by the White House and IRS ...............   121
       1. Koch Industries, Inc. .......................................................   121
       2. National Organization for Marriage ........................................   122
       3. Disclosure of Tax-Exempt Applications to ProPublica ...........   124
       4. Republican Governors Public Policy Committee .....................   125
X. CONCLUSION ...............................................................................   125

## I. EXECUTIVE SUMMARY AND RECOMMENDATIONS

This bipartisan investigation of the Senate Finance Committee examined the Internal Revenue Service's (IRS) handling of applications for tax-exempt status submitted by political advocacy organizations, following allegations that the IRS discriminated against some of these organizations based on their political views.

Our investigation found that from 2010 to 2013, IRS management was delinquent in its responsibility to provide effective control, guidance, and direction over the processing of applications for tax-exempt status filed by Tea Party and other political advocacy organizations. IRS managers either failed in their responsibility to keep informed about the very existence of the applications, or failed to recognize the sensitivity of these applications. In the case of the former, IRS managers forfeited the opportunity to shape the IRS's response to the influx of political advocacy applications by simply failing to read reports informing them of the existence of those applications. In the case of the latter, IRS managers did not take appropriate steps to ensure that the applications were processed expeditiously and accurately.

Our investigation focused particularly on the Exempt Organizations (EO) Division of the IRS, which is responsible for administering the tax code provisions related to tax-exempt organizations, including processing and deciding applications submitted by organizations seeking tax-exempt status. Lois Lerner served as the Director of the EO Division from January 2006 to May 2013.

Exhibit E

Lerner first became aware that the IRS received applications from Tea Party groups in April or May 2010. For the next two years, Lerner failed to adequately manage the EO employees who processed these applications. Moreover, Lerner failed to inform upper-level IRS management of the serious delays in processing applications for tax-exempt status from Tea Party and other politically sensitive groups. Consequently, it was a year before the IRS Office of Chief Counsel became involved, and nearly two years before Lerner's superiors in the IRS management chain were aware of the gross mismanagement of Tea Party and other sensitive advocacy applications.

While under the leadership of Lois Lerner, the EO Division undertook a number of initiatives aimed at finding a way to process the Tea Party and other political advocacy applications. Each of these initiatives was flawed in design and/or mismanaged. In one example, EO management sanctioned the use of the Be On the Lookout (BOLO) list, which improperly identified the Tea Party and other organizations by name and policy position. The IRS used the BOLO list to subject applications received from Tea Party groups to heightened scrutiny, even when that scrutiny was unwarranted because the applications gave no indication that the organizations would engage in political campaign intervention. Other initiatives to process political advocacy applications sanctioned by EO management were under-planned, under-staffed and under-executed. In each case, these poorly formed initiatives ended in predictable failure and each failure resulted in applicant organizations enduring inexcusably long delays in receiving decisions on their applications. Those delays often proved to be harmful or fatal to the organizations by undermining the very purposes for which they were formed.

The workplace "culture" prevalent in the EO Division was one in which little emphasis was placed on providing good customer service, a fact inconsistent with the IRS's promise to provide "top quality service." Indeed, the EO Division operated without sufficient regard for the consequences of its actions for the applicant organizations. Not only did those organizations have to withstand delays measured in years, but many also were forced to bear a withering barrage of burdensome and inappropriate "development letters" aimed at extracting information the IRS wrongly concluded was necessary to properly process the applications.

Factors further contributing to the dysfunctional "culture" of the EO Division included the office structure of the Determinations Unit that placed managers in offices located in geographic locales far from the employees they supervised, and employees and managers who frequently teleworked, in some cases up to four days a week. The confluence of remote management and a dispersed workforce undoubtedly impaired coordination and communication within the Determinations Unit. Moreover, acrimony typified the relationship between various organizations within the EO Division and served to further embitter the workplace "culture."

In the wake of the *Citizens United* decision in 2010, the IRS received an increasing number of allegations that tax-exempt organizations were engaged in political campaign intervention inconsistent with their exempt status. Recognizing the importance of having a process to evaluate these allegations, IRS management,

Exhibit E

including the Commissioner and Acting Commissioner, focused their efforts on devising a workable process that would allow the IRS to evaluate and investigate these allegations. Management's efforts proved fruitless, and as a consequence, the IRS performed no examinations of 501(c)(4) organizations related to political campaign intervention from 2010 until 2014.

The Committee's investigation included a review of more than 1,500,000 pages of documents and interviews of 32 current and former IRS and Treasury employees. Issuance of this report was delayed for more than a year when the IRS belatedly informed the Committee that it had not been able to recover a large number of potentially responsive documents that were lost when Lois Lerner's hard drive crashed in 2011.

At the Committee's request, the Treasury Inspector General for Tax Administration (TIGTA) investigated the circumstances behind the loss of data and other related issues, and was ultimately able to recover 1,330 emails that had not been produced to Congress. TIGTA's findings are described below in Section II(C). Overall, the IRS's less than complete response to these circumstances cast doubt about the thoroughness of their efforts to recover all relevant records related to the investigation, as well as their candor to this and other Congressional committees.

Although it was not possible to completely produce the records that were lost, the Committee exhausted all available measures to mitigate the amount of missing information by collecting additional information from the IRS, other executive agencies, and outside sources. This report accurately summarizes the facts known to the Committee, and we believe that our conclusions are supported by the record.

Committee staff have agreed on numerous bipartisan investigative findings. Some of these findings are highlighted below, along with corresponding recommendations to address the underlying problem. Greater discussion of these and other findings related to the determination process are contained in Section III, and ancillary findings are in Section IX.[1]

**Finding #1:** The IRS's handling of applications from advocacy organizations may affect public confidence in the IRS. To avoid any concerns that may exist that IRS decisions about particular taxpayers are influenced by politics, the following recommendations are made.

> **Related Recommendation #1:** Publish in the instructions to all relevant application forms objective criteria that may trigger additional review of applications for tax-exempt status and the procedures IRS specialists use to process applications involving political campaign activity. Prohibit the IRS from requesting individual donor identities at the application stage, although generalized donor questions should continue to be allowed, as well as requests for representations that, e.g., there will be no private inurement.

---

[1] In addition to the recommendations enumerated below, Committee staff also considered whether the IRS should improve its employee training program and whether it should modify the expedited review process. We have omitted these recommendations because they were included in TIGTA's recent report, Status of Actions Taken to Improve the Processing of Tax-Exempt Applications Involving Political Campaign Intervention, TIGTA Audit Report 2015–10–025 (Mar. 27, 2015) at 2. We encourage the IRS to follow the recommendations outlined in TIGTA's report.

**Related Recommendation #2:** Revise the Hatch Act to designate all IRS, Treasury and Chief Counsel employees who handle exempt organization matters as "further restricted." "Further restricted" employees are held to stricter rules than most government employees and are precluded from active participation in political management or partisan campaigns, even while off-duty. By designating those employees as "further restricted," the public can be assured that any impermissible political activity by an IRS employee that is detected will result in serious penalties, including removal from federal employment.

**Related Recommendation #3:** Create a position within the Taxpayer Advocate Service dedicated solely to assisting organizations applying for non-profit tax-exempt status.

**Finding #2:** The IRS systematically screened incoming applications for tax-exempt status from more than 500 organizations and implemented procedures that resulted in lengthy delays. Until early 2012, certain top-level management was unaware that these applications were being processed in this manner. (See Section III(A).)

**Related Recommendation #1:** The Exempt Organizations division should track the age and cycle time of all of its cases, including those referred to EO Technical, so that it can detect backlogs early in the process and conduct periodic reviews of over-aged cases to identify the cause of the delays. A list of over-aged cases should be sent to the Commissioner of the Internal Revenue Service quarterly.

**Related Recommendation #2:** The Exempt Organizations division should track requests for guidance or assistance from the EO Technical Unit so that management can assess the timeliness and quality of the guidance and assistance it provides to both Determinations Unit employees and the public.

**Related Recommendation #3:** The Exempt Organizations division should track requests for guidance or assistance from the Office of Chief Counsel so that management can assess the timeliness and quality of the guidance and assistance it provides to both the Determinations Unit employees and the public. Any requests for guidance or assistance from the Office of Chief Counsel that have not been responded to on a timely basis should be promptly reported to the Commissioner of the Internal Revenue Service.

**Finding #3:** The IRS took as long as five years to come to a decision on applications for tax-exempts status submitted by Tea Party and other applicants potentially involved in political advocacy. The IRS lacked an adequate sense of customer service and displayed very little concern for resolving these cases. (See Section III(E)(1).)

**Related Recommendation #1:** The Internal Revenue Manual contains standards for timely processing of cases. Enforce these existing standards and discipline employees who fail to follow them. Managers should also be held accountable if their subordinates fail to follow these standards.

**Related Recommendation #2:** For all types of tax-exempt applicants, IRS guidelines should direct employees to come to a decision on whether or not it will approve an application for

tax-exempt status within 270 days of when an application is filed.

**Finding #4:** Important issues were not elevated within the IRS. Some Sensitive Case Reports containing information about Tea Party applications were sent to top IRS managers in 2010, but the managers did not read them. (See Section III(A).)

>**Related Recommendation:** Revise the Sensitive Case Report process or develop a more effective way to elevate important issues within the organization other than the Sensitive Case Reports system. Require the senior recipient of each Sensitive Case Report within the Division (a member of the Senior Executive Service) to memorialize specific actions taken in relation to each issue raised in the report, and require such report to be forwarded to the IRS Commissioner for review.

**Finding #5:** A contributing factor to the IRS's management problems was the decentralization of its employees, including some who worked from home as often as 4 days per week, and managers who remotely supervised employees 2,000 miles away. (See Section III(E)(2).)

>**Related Recommendation:** Evaluate whether current organizational structures and workplace locations are inhibiting performance. Make appropriate adjustments to improve communication between employees and their managers.

**Finding #6:** Some managers within the EO Division were not trained in the substantive tax areas that they managed, including one who did not complete any technical training during the 10 years that she served in a managerial EO position. (See Section III(E)(4).)

>**Related Recommendation:** Set minimum training standards for all managers within the EO Division to ensure that they have adequate technical ability to perform their jobs.

**Finding #7:** The IRS did not perform any audits of groups alleged to have engaged in improper political activity from 2010 through April 2014. During that time, the IRS tried to implement new processes to select cases for examination, but a memo from Judy Kindell, Sharon Light and Tom Miller stated that this approach "arguably [gave] the impression that somehow the political leanings of [the organizations] mentioned were considered in making the ultimate decision." The IRS recently discontinued use of the Dual Track process and now uses generalized procedures when deciding whether to open an examination of an exempt organization's political activities. (See Section IX(A).)

>**Related Recommendation #1:** Review the recently-enacted procedures to determine if: (1) the process enables the IRS to impartially evaluate allegations of impermissible political activity; (2) any of the referrals have resulted in the IRS opening an examination related to political activity, and if so, whether such an examination was warranted; and (3) if necessary, the IRS should make further modifications to ensure that it carries out the enforcement function in a fair and impartial manner.

>**Related Recommendation #2:** The IRS should fully implement all recommendations of the Government Accountability Office in their July 2015 report titled "IRS Examination Selection: Internal Controls for Exempt Organization Selection Should be Strengthened," GAO–15–514.

Exhibit E

**Related Recommendation #3:** No later than July 1, 2017, we request that TIGTA conduct a review of the three points noted above in Recommendation #1 related to the revised EO Exam procedures.

**Finding #8:** On multiple occasions, the IRS improperly disclosed sensitive taxpayer information when responding to Freedom of Information Act (FOIA) requests. Employees who were responsible for these disclosures received minimal or no discipline. (See Section IX(C).)

**Related Recommendation:** Require all outgoing FOIA responses to be reviewed by a second employee to ensure that taxpayer information is not improperly disclosed.

**Finding #9:** In 2010, the IRS received a FOIA request from a freelance journalist seeking information about how the agency was processing requests for tax-exempt status submitted by Tea Party groups. After 7 months, the IRS erroneously informed the journalist that they did not possess any documents that were responsive to her request. (See Section IX(B).)

**Related Recommendation #1:** Ensure that IRS procedures specify which organizational units within the agency should be searched when the IRS receives an incoming FOIA request on a particular topic. For example, when the IRS receives a FOIA request for records related to tax-exempt applications, the agency should search the records of all components within the Exempt Organizations division.

**Related Recommendation #2:** To be consistent with the intent of FOIA, employees handling FOIA requests should construe the requests broadly and contact the requestor to clarify the scope of the request whenever necessary. However, the IRS should also take appropriate measures to safeguard taxpayer information and avoid improper disclosure.

**Finding #10:** The IRS has made Office Communicator Server (OCS) instant messaging software available to its employees. Under the collective bargaining agreement with the National Treasury Employees' Union, the IRS agreed that it would not automatically save messages sent to and from employees. As a result, messages can only be recovered if an employee elected to save them. TIGTA opined that this policy does not necessarily violate federal recordkeeping laws, but noted that "[w]hether OCS is being used according to NARA's guidance depends on how OCS end-users are utilizing the system." (See Section II(C)(2)).

**Related Recommendation:** The IRS should review how employees use OCS. If the program is not used for IRS business, the agency should evaluate whether it is appropriate and necessary. If OCS is used for official IRS purposes, the IRS should take measures to ensure such use complies with federal recordkeeping laws.

While the above findings and others detailed more fully on the succeeding pages have been jointly agreed to by the Majority and Minority, those Staffs were unable to reach agreement on three areas as set forth below:

• The extent, if any, to which political bias of IRS employees, including Lois Lerner, affected the IRS's processing of applications for tax-exempt status.

Exhibit E

- Whether the IRS used improper methods to screen and process applications for tax-exempt status submitted by progressive and left-leaning organizations.
- The involvement, if any, of Treasury Department and White House employees, including President Obama, in directing or approving the actions of the IRS.

The Majority and Minority have rendered their own conclusions on these and other topics which are set forth more fully in the sections of this report entitled Additional Views of Senator Hatch Prepared by Republican Staff and Additional Views of Senator Wyden Prepared by Democratic Staff.

## II. BACKGROUND ON BIPARTISAN INVESTIGATION BY THE SENATE FINANCE COMMITTEE

*This section describes the scope of the Senate Committee on Finance investigation; the Committee's access to taxpayer information and its use in this report; the Committee's access to information relevant to this investigation;the IRS's loss of records potentially relevent to this investigation; the legal background of tax-exempt organizations involved in the investigation; and, the way that the IRS processed applications for tax-exempt status.*

### A. Scope of the Investigation and This Report

The United States Senate Committee on Finance (the Committee) has exclusive legislative jurisdiction and primary oversight authority over the IRS.

On May 10, 2013, Lois Lerner, IRS Director of EO, disclosed at a panel for the Exempt Organizations Committee of the Tax Section of the American Bar Association that IRS employees had selected certain 501(c)(4) tax-exempt applications that contained the words "Tea Party" and "Patriots" for further review simply because the applications had those terms in the title.[2]

On May 14, 2013, TIGTA released a report finding that the IRS "used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention."[3]

At the time of the IRS and TIGTA disclosures that groups with the words "Tea Party," "9/12" or "Patriot" in the name were selected for additional scrutiny, there was speculation and concern expressed that the singling out of conservative organizations by name may have been a consequence of political bias or motivation on the part of IRS employees. There was further speculation concerning the role of political appointees at the IRS, Treasury Department or the White House in the selection of these conservative organizations for heightened scrutiny.

On May 20, 2013, the Committee sent a detailed letter to the IRS requesting that the IRS answer questions and turn over internal

---

[2] American Bar Association, Transcript of The Exempt Organization Tax Review (May 10, 2013) ABA Tax Section's Exempt Organizations Committee Meeting, Vol. 72, No. 2 pp. 126–127.
[3] TIGTA, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review (May 14, 2013) TIGTA Audit Report #2013–10–053.

Exhibit E

12

documents relating to the targeting controversy.[4] Simultaneously, the Committee began an in-depth bipartisan investigation to determine the facts surrounding the controversy. This investigation was prompted by the serious nature of allegations that political considerations may have driven the IRS's heightened scrutiny of conservative-leaning organizations applying for tax-exempt status.

The Committee held a hearing to publicly explore these issues on May 21, 2013, with Steven Miller, then Acting Commissioner, Internal Revenue Service; Douglas Shulman, Former Commissioner, Internal Revenue Service; and J. Russell George, Treasury Inspector General for Tax Administration, United States Department of the Treasury. The primary purpose of this report is to examine the IRS's handling of applications for tax-exempt status from 2010 through 2013, but it also covers other topics related to the IRS's oversight of tax-exempt organizations. Committee staff did not investigate the IRS's administration and enforcement of other parts of the Internal Revenue Code, including individual taxpayers and corporate for-profit entities; nor did it investigate the potential imposition of the gift tax for contributions made to tax-exempt organizations. Accordingly, these and other divergent topics are not covered by this report.

B. The Committee's Access to Taxpayer Information Protected by Section 6103 of the Internal Revenue Code, and Use of Taxpayer Information in This Report

When taxpayers submit information to the IRS, they expect it to be treated confidentially. Accordingly, section 6103 of the Internal Revenue Code prohibits the IRS from disclosing any "returns" or "return information," and these terms are defined broadly.[5] Violating section 6103 is a felony, punishable by imprisonment and fines and also subject to civil lawsuits for damages.[6] Section 6103, which was substantially tightened in 1976 in the wake of the controversy surrounding the Nixon Administration's attempt to review the tax returns of political enemies, is an essential safeguard.[7] It protects taxpayer privacy and prevents the IRS or anyone else from using taxpayer information for political or otherwise inappropriate purposes.

Section 6103 contains a set of narrow exceptions, which allow the IRS to disclose taxpayer information in certain limited circumstances and with appropriate safeguards. For example, there are exceptions for disclosure to federal or state law enforcement officials in certain circumstances and for disclosure to various federal agencies for the purpose of compiling government statistics.

---

[4] Letter from Chairman Baucus and Ranking Member Hatch to the Acting Commissioner Steven Miller (May 20, 2013).

[5] 26 U.S.C. 6103 (2013).

[6] Section 7213 states that criminal violations of section 6103 must be knowing, while under section 7431, civil violations must be knowing or negligent. Under section 7431(b), someone who discloses section 6103 information through a good-faith, non-negligent mistake is not liable.

[7] This practice did not begin with the Nixon Administration. At a 1976 hearing by a subcommittee of the Senate Finance Committee, a witness included in the record a report by the Center for National Security Studies, which said, "[t]he IRS has from time to time used its power to conduct audits of groups and individuals whose political views and activities were of concern to others. Special groups were established to conduct such audits under the Kennedy, Johnson, and Nixon Administrations. On at least one occasion an audit was conducted at the request of a congressional committee." Hearing. Subcommittee of the Senate Finance Committee on Administration of the Internal Revenue Code, Federal Tax Return Privacy (Jan. 23, 1976) p. 10.

Exhibit E

13

One of the exceptions, in section 6103(f), requires the IRS to provide taxpayer-specific information requested by the Congressional tax committees (Senate Committee on Finance, House Committee on Ways and Means, and the Joint Committee on Taxation),[8] and it authorizes the chairmen of the tax committees to designate staff members to "inspect returns and return information at such time and in such manner as may be determined by [the] chairman." This allows the committees to have access to taxpayer-specific information for the purposes of undertaking policy analyses or investigations.

As a general matter, staff who are designated by the chairman to review taxpayer-specific information are themselves subject to the confidentiality requirements of section 6103. In other words, they are required to keep the information confidential, subject to criminal and civil penalties. However, section 6103(f)(4)(A) goes on to provide that "[a]ny return or return information obtained by or on behalf of such committee . . . may be submitted by the committee to the Senate or the House of Representatives, or to both." Thus, taxpayer-specific information reviewed by the Finance Committee under section 6103(f) may be disclosed to the full Senate in open session, and, hence, to the public,[9] but only through the formal and careful process of a Committee vote to make a submission to the Senate.

In the course of this investigation, the Finance Committee has received extensive information under section 6103(f). For example, Committee staff examined, in detail, how specific applications for 501(c)(4) status were reviewed, to understand the decision-making process that the IRS applied. It also was important to consider whether particular applications were from "conservative" or "progressive" organizations, in order to determine whether the IRS was taking an even-handed approach.

In preparing this report of the investigation, the Finance Committee has decided, after careful consideration and after consultation with the Senate Legal Counsel's office, to include limited taxpayer information available to the Senate and the public, by making a formal submission to the Senate under section 6103(f)(4)(A). We have decided to do so for several reasons.

First, this approach is clearly permissible under section 6103. Although the principal purpose of section 6103 is to protect taxpayer-specific information, section 6103 also clearly contemplates the need for the public disclosure in compelling circumstances, and it establishes a formal and carefully considered process for a release: a submission by one of the tax committees to the House or Senate.

Second, the disclosure of limited taxpayer information facilitates a fully informative report. There has been a great deal of speculation about exactly what happened during the IRS review of

_____

[8] Section 6103(f) also allows other (i.e., non-tax) congressional committees to receive taxpayer-specific information, but only pursuant to a Senate or House resolution. Further, section 6103 contains a series of other exceptions, including allowing release of taxpayer-specific information to certain tax administrators, release of taxpayer-specific information of Presidential appointees, and release of taxpayer-specific information to criminal investigators pursuant to a court order.

[9] Contrast section 6103(f)(4)(A) with section 6103(f)(4)(B), which provides that information obtained by a committee *other* than the Finance, Ways and Means, or Joint Committee on Taxation may be submitted to the Senate or the House "only when sitting in closed executive session" (unless the taxpayer consents). In the case of a submission to the House or Senate by one of the tax committees, in contrast, there is no equivalent requirement that the submission occur in closed session.

Exhibit E

501(c)(4) organizations, and this has important implications for our governmental and political institutions. Under Supreme Court and IRS interpretations of section 6103, it would be difficult to provide a comprehensive review of the facts without making a formal submission to the Senate and thereby allowing disclosure notwithstanding section 6103.[10] In light of this, we have included some of the names of specific organizations, both conservative and progressive, who submitted section 501(c)(4) applications during this period, along with details about the handling of the applications which are essential to understanding the underlying facts.

Third, we have limited the disclosure to the minimum necessary to provide an informative report. We have omitted material, redacted material, and summarized wherever appropriate, and we have disclosed no personal names, financial information, or other details that are not necessary to understanding the essential facts. We have also, wherever possible, relied on information that already is in the public record.

Accordingly, the Committee has decided, on a bipartisan basis, to submit this report, including limited material covered by section 6103, to the full Senate in open session. We expect that, in the future, the Committee will only disclose section 6103 material in similarly compelling circumstances and with similar safeguards.

### C. LIMITATION ON THE COMMITTEE'S ACCESS TO RELEVANT INFORMATION

To fully investigate this matter, the Committee sought all information that could have some bearing on how the IRS processed applications for tax-exempt status from 2010 through 2013. The Committee considered a vast amount of information—receiving approximately 1,500,000 pages of documents and conducting interviews of 32 individuals—that enabled investigators to conduct a thorough review and reach the conclusions set forth in this report. Unfortunately, the IRS failed to retain information that may have been relevant to this investigation, which was lost when Lois Lerner's computer crashed and the IRS errantly disposed of backup data. This loss of information was compounded by the IRS's lack of candor in notifying this and other Congressional committees about the missing documents. The Committee attempted to fill in the information gap with records of other employees at the IRS and outside agencies; however, as described below, a large number of Lerner's records were never recovered. As a result, the full extent of the IRS's failings in this matter may never be known.

In spite of these limitations, the large volume of information we have reviewed gives us a high degree of confidence in the accuracy of the conclusions reached during our investigation, as described in this report.

---

[10] Section 6103 broadly prohibits public disclosure of "return information" in order to protect taxpayer privacy. Section 6103(2)(b) defines "return information" as information that can be identified with a particular taxpayer, but allows for disclosure of aggregate data for statistical analysis as long as that data doesn't directly or indirectly identify a taxpayer. Therefore, a report that does not contain return information protected under 6103 would necessarily be based on aggregated data, making a comprehensive review of the entity specific facts at issue difficult.

Exhibit E

### 1. Summary of Information That Forms a Basis for This Report

To complete this investigation, Committee staff interviewed 32 current and former IRS and Treasury Department employees. The interviewees included: (1) employees charged with reviewing and deciding tax-exempt applications; (2) managers who oversaw those employees, including former Acting Commissioner Steven Miller; (3) legal experts who were consulted on tax-exempt issues; (4) IRS executives and political appointees, including former Commissioner Douglas Shulman and Chief Counsel William Wilkins; and (5) two former senior Treasury officials, Deputy Secretary Neal Wolin and former Chief of Staff Mark Patterson, and current Treasury attorney Hannah Stott-Bumsted. Committee investigators also interviewed numerous individuals who submitted applications on behalf of nonprofit organizations or were otherwise involved in the application process for 501(c)(3) and 501(c)(4) entities. The Committee sought to interview Lois Lerner, but she declined the Committee's request.

In the course of this investigation, Committee staff reviewed approximately 1,500,000 pages of documents, the majority of which were produced by the IRS and TIGTA:

- In response to the Committee's May 20, 2013, document request letter and subsequent requests, the IRS provided the Committee with approximately 1,300,000 pages of documents.
- TIGTA provided the Committee with work papers and related documentation that were used in the compilation of the audit report they released on May 14, 2013. TIGTA also produced other materials requested by the Committee.

In response to requests of the Committee Chairman and/or Ranking Member, the Federal Election Commission (FEC), the Department of the Treasury, and the Department of Justice (DOJ) provided records to the Committee. The White House also provided a production of the limited number of documents that were sent to or from Lerner. Additionally, a number of nonprofit organizations provided information to the Committee about their interactions with the IRS.

The Committee has asked the IRS and TIGTA to notify the Committee if they locate additional documents that are relevant to this investigation. We will supplement the findings of this report if necessary.

### 2. The IRS Loss of Data, Failure to Notify Congress in a Timely Manner, and Results of TIGTA Investigation

At 2:00 PM on Friday, June 13, 2014, the IRS first informed the Committee that, due to a hard drive crash of Lerner's computer in 2011, the IRS had not produced all documents relevant to this investigation.[11] As described below, this disclosure came as a surprise to the Chairman and Ranking Member, who were prepared to start the formal process of issuing this report on Monday, June 16, 2014. Many of the 41 document requests in the Committee's May 20, 2013 letter to the IRS initiating this investigation involved records maintained by Lerner. Moreover, this Committee, as well as House committees, requested that the IRS produce all emails

---

[11] Letter from Leonard Oursler to Senator Wyden and Senator Hatch (June 13, 2014).

sent and received by Lerner from 2010 through May 2013. Thus, the IRS's unexpected announcement about Lerner's hard drive crash cast doubt on the completeness of the record upon which the Committee's draft report was based.

In its June 13 letter, the IRS stated that "Ms. Lerner's computer crashed in mid–2011" and despite "multiple processes to recover information . . . the data stored on her computer's hard drive was determined at the time to be 'unrecoverable' by the IT professionals."[12] As a result, the IRS concluded that "[a]ny of Ms. Lerner's email that was only stored on that computer's hard drive would have been lost when the hard drive crashed and could not be recovered."[13] The IRS further explained that IRS employees, including Lerner, had limited storage space on the network drive and therefore had to save messages on their personal computers. Thus, the IRS's revelation about Lerner's hard drive meant that an unknown quantity of emails sent and received by Lerner had not been retained by the IRS or produced to the Committee. These emails were particularly significant since they included messages transmitted during 2010 and the first half of 2011—the period when many of the most critical events in this matter occurred.

Based on the IRS's June 13 letter and subsequent meetings with Commissioner Koskinen, Senators Hatch and Wyden quickly determined that the full extent of data loss was not known. Accordingly, by letter dated June 23, 2014, then-Chairman Wyden and then-Ranking Member Hatch asked Inspector General George to investigate six issues, enumerated in the letter and reproduced below.[14] The Committee suspended release of this report until TIGTA completed its work.

In response to the Committee's request, TIGTA commenced a thorough investigation that included interviews of 118 witnesses and processing and reviewing more than 20 terabytes of data. On June 30, 2015, TIGTA issued its final report of investigation. TIGTA's principal findings are as follows, and its full report of investigation is attached as an exhibit to this report.[15]

   *Committee Request #1 to TIGTA:* Whether Lerner, and six other employees identified by the IRS as possibly suffering a loss of data,[16] did, in fact, lose data.

TIGTA concluded that four of the seven employees identified in the Committee's letter experienced hard drive crashes but did not lose any data. TIGTA found that the other three employees experienced computer problems that resulted in a data loss: Lerner, Julie Chen, and Nancy Heagney. The circumstances of each loss are discussed below in turn.

   *a. Lois Lerner*

TIGTA confirmed that Lerner's hard drive crash resulted in a loss of data. TIGTA determined that Lerner's hard drive likely

---

[12] *Id.*, Enclosure 3 p. 5.
[13] *Id.*
[14] Letter from Chairman Wyden and Ranking Member Hatch to J. Russell George (June 23, 2014).
[15] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30, 2014).
[16] The other six employees are Nikole Flax, former Chief of Staff to former Acting Commissioner Steven Miller; Michelle Eldridge, Supervisory Public Affairs Specialist; Kimberly Kitchens, Revenue Agent; Julie Chen, Revenue Agent; Tyler Chumney, Supervisory Revenue Agent; and Nancy Heagney, Revenue Agent.

17

crashed between 5 and 7 P.M. on Saturday, June 11, 2011, based
on the computer's failure to respond to a network query at 7 P.M.[17]
TIGTA attempted to determine if anyone entered Lerner's office on
the day of the crash; however, the building security vendor no
longer maintained logs for this period, so TIGTA was unable to
reach a conclusion on that issue.[18] Lerner "described coming into
office in the morning [of Monday, June 13, 2011] and seeing 'the
blue screen.'"[19] Later that morning, a work ticket "was entered in-
dicating Lerner's computer screen is black and won't allow [the]
employee to log in."[20]

At that point, an IRS IT Specialist was assigned to respond to
Lerner's work ticket. He told TIGTA that "he was unable to recover
any data from the hard drive, and following normal protocol, he re-
placed the hard drive in Lerner's computer with a new hard
drive."[21] The IT Specialist "did not observe any indications of tam-
pering or physical damage to Lerner's laptop."[22] After replacing
the hard drive, the IT Specialist noted that Lerner's computer also
"needed a new fan system and possibly a heatsink due to over-
heating."[23]

The IRS requested technical support from Hewlett-Packard. A
Hewlett-Packard employee then "worked on Lerner's laptop to re-
place the keyboard, trackpad, heat sink, and fan due to an over-
heating issue[.]"[24] When interviewed by TIGTA, the Hewlett-Pack-
ard employee did not specifically recall working on Lerner's com-
puter and "did not recall, or note in his records, any damage to the
laptop."[25] When asked for his opinion about the failure, he stated
many different things, including the environment, can cause dam-
age to a computer, and opined that "it was unusual for so many
components to fail at the same time."[26] He also stated that "there
are many causes for hard drive failures, although overheating caus-
ing a hard drive failure" is uncommon.[27] The Hewlett-Packard em-
ployee further told TIGTA that "[i]f there was severe impact to a
computer or hard drive, it could internally damage the mechanical
components of the hard drive making it unusable."[28]

An IRS Criminal Investigation Division technician later exam-
ined the hard drive in an attempt to recover data. He "noted con-
centric scoring of the hard drive platters, opining that the drive
had failed because the drive heads had impacted the platters while

---

[17] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30,
2014) p. 8. TIGTA noted that Lerner's computer received a software update on the afternoon
of June 11, 2011; however, TIGTA concluded that "[t]here is no indication software [update]
would have caused Lerner's hard drive to crash." Id. p. 9.

[18] *Id.* p. 9.

[19] *Id.* p. 10.

[20] *Id.* pp. 5–6.

[21] *Id.* p. 5.

[22] *Id.* p. 6.

[23] *Id.* pp. 5–6.

[24] *Id.* p. 6.

[25] TIGTA Memorandum of Interview or Activity, Personal Interview of Mauricio Terrazas
(Aug. 28, 2014) p. 2; TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-
008-I (June 30, 2014) p. 6.

[26] TIGTA Memorandum of Interview or Activity, Personal Interview of Mauricio Terrazas
(Aug. 28, 2014) p. 3; TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-
008-I (June 30, 2014) p. 6.

[27] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30,
2014) p. 6.

[28] *Id.*

Exhibit E

in operation[.]"[29] When TIGTA asked Hewlett-Packard employee "what scenario could have caused hard drive heads to impact the platter of the disk, [he] opined an impact to the laptop or hard drive was the most likely cause."[30]

During her interview with TIGTA, Lerner "denied hitting or damaging the hard drive intentionally" and "did not recall any incidents that could have damaged her laptop." Moreover, Lerner "was not aware of anyone who might want to destroy the data on her computer."[31]

Ultimately, TIGTA did not reach a conclusion about the cause of Lerner's hard drive crash.

Regardless of the cause, Lerner's hard drive crash erased data relevant to Lerner's job. Lerner told TIGTA that she regularly received a large volume of email that exceeded the amount of network storage. To keep her email functioning, Lerner and her assistants, Dawn Marx and Diane Letourneau, regularly moved messages to folders on her hard drive that were organized by subject.[32] Lerner said that her June 2011 computer crash "resulted in a significant amount of data being lost" and told TIGTA that it "cost her 'a lot of time' because so much of her current work was lost."[33]

Neither TIGTA nor the IRS could determine the exact number of records that were lost, and not subsequently recovered, when Lerner's hard drive crashed. Using an email transaction log maintained by the Treasury Department, TIGTA calculated that "as many as 23,000 to 24,000 email messages may not have been provided to Congress," although TIGTA noted that this estimate "could be high" because TIGTA was unable to compare these logs to documents that the IRS was able to recover from other custodians and produced to Congress.[34] The IRS's efforts to recover Lerner's emails through alternate means as described below likely yielded some, but not all, of these emails.

### b. Julie Chen

Chen is a revenue agent in the Cincinnati EO Determinations office. The hard drive on Chen's computer crashed on June 12, 2012. IRS IT was unable to recover data from her failed hard drive. Chen told TIGTA that she saved case documents to her hard drive but did not save emails—when her inbox was full, she would delete old emails instead of archiving them on her hard drive.[35] As a result, Chen's hard drive crash did not result in the loss of any emails potentially responsive to the Committee's investigation. The IRS technician who worked on Chen's crashed computer stated that she did not recall any damage to the computer and did not determine a cause of the crash; nor was there any indication of intentional data loss.[36]

---

[29]*Id.* p. 7.

[30]*Id.* p. 6.

[31]TIGTA Memorandum of Interview or Activity, Personal Interview of Lois Lerner (July 9, 2014).

[32]*Id.*

[33]TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30, 2014) p. 10.

[34]*Id.* pp.2–3.

[35]TIGTA Memorandum of Interview or Activity, Personal Interview of Julie Chen (Aug. 28, 2014).

[36]TIGTA Memorandum of Interview or Activity, Personal Interview of Pamela Merritt (Sep. 15, 2014).

Exhibit E

### c. Nancy Heagney

Like Chen, Heagney is a revenue agent in the Cincinnati EO Determinations office. The hard drive on Heagney's computer crashed on November 6, 2012. Heagney routinely saved letters to taxpayers and emails on her hard drive. After the crash, Heagney was able to recover some, but not all of the emails archived to her hard drive.[37] The IRS technician who worked on Heagney's crashed computer did not know if the computer was damaged and did not determine a cause for the hard drive failure.[38] The technician did not see any indication of intentional data loss.

> *Committee Request #2 to TIGTA:* Whether, in addition to those seven employees, any of the 112 other IRS employees identified as custodians of potentially relevant records suffered a data loss.

Based on a review of IT helpdesk tickets, TIGTA determined that 31 of the 119 employees (including the 7 employees identified above in request #1) experienced "apparent hard drive failures since 2009."[39] Based on interviews of these employees and a review of records, TIGTA determined that seven of them lost data: Judith Kindell, Tax Law Specialist; Justin Palmer, Revenue Agent; Ronald Shoemaker, Supervisory Tax Law Specialist; Sonya Adigun, Supervisory Tax Examining Technician; Kenneth Drexler, Attorney Advisor; Chen; and Heagney. The IRS asserted that the failure rate of these employees' equipment "is consistent with the industry standard new equipment failure rate of 5 to 6% over a three-year period."[40]

TIGTA correctly noted that for three of these employees (Adigun, Drexler and Palmer), the IRS did not produce responsive emails or documents to Congress.[41] Based on the Committee's review of IRS records, it appears that their involvement with this matter was minimal, at most.

Kindell's hard drive crashed on August 11, 2010, which resulted in a loss of "all of her archived email and work documents."[42] Kindell recovered some of the lost emails by asking coworkers to resend them to her; she was unable to recover other electronic documents.[43] The IT Specialist who worked on Kindell's computer told TIGTA that he could not remember the circumstances of Kindell's crash, the cause, or if there were any indications that it may have been intentional.[44]

On March 4, 2011, Shoemaker's hard drive crashed, resulting in the loss of "all of his archived emails and saved files for the years

---

[37] TIGTA Memorandum of Interview or Activity, Personal Interview of Nancy Heagney (Aug. 28, 2014).
[38] TIGTA Memorandum of Interview or Activity, Personal Interview of Marilyn Florence (Sep. 15, 2014).
[39] TIGTA Memorandum of Interview or Activity, Records Review of IRS Custodians and Hard Drive Failures (Sep. 4, 2014).
[40] Letter from Leonard Oursler to Chairman Camp (Sep. 5, 2014).
[41] TIGTA Memorandum of Interview or Activity, Records Review of IRS Custodians and Hard Drive Failures (Sep. 4, 2014).
[42] TIGTA Memorandum of Interview or Activity, Personal Interview of Judith Kindell (Aug. 6, 2014).
[43] *Id.*
[44] TIGTA Memorandum of Interview or Activity, Personal Interview of Frank Dematteis (Oct. 3, 2014).

Exhibit E

20

1994 through 2010," including Shoemaker's "managerial files[.]"[45] IRS IT was unable to recover the lost documents. When interviewed by TIGTA, the IT Specialist who worked on Shoemaker's computer stated that he was not sure if he had "ever determined what caused Shoemaker's hard drive to fail."[46]

> *Committee Request #3 to TIGTA*: What steps, if any, the IRS took to attempt to recover data for each employee who lost data.

The measures taken by the IRS to attempt to recover data immediately following the hard drive crashes of Chen, Heagney, Kindell, and Shoemaker are described above.

Efforts to recover data from Lerner's computer were more substantial than for the other employees identified above. After the IT Specialist who initially responded was unable to recover data, Lerner contacted former IRS Associate Chief Information Officer Carl Froehlich to say that "some documents in the files that [were lost] are irreplaceable" and asked him to take further efforts to recover the files.[47] Additional efforts to recover data by the IRS IT support and several Hewlett-Packard technicians were unsuccessful, so the hard drive was then sent to IRS Criminal Investigation Division's forensic lab. The IRS Criminal Investigation Division was unable to recover any data from the hard drive.[48]

The IRS Criminal Investigation Division returned the hard drive to the IRS's IT depot in Washington, D.C. The IRS CI technician believed that "data could still potentially be recovered using a third party donor hard drive or [by] hiring an outside vendor."[49] The IRS IT manager "confirmed data may have been recoverable by an outside vendor, but . . . decided the expense was not justified due to financial constraints[.]"[50] At this point, the IRS ceased attempts to recover data from Lerner's hard drive. Lerner told TIGTA that she "was 'surprised' that IRS IT could not do more to recover her email[.]"[51]

After the IRS Office of Chief Counsel became aware of Lerner's hard drive failure in February 2014, the IRS took additional measures to recover and produce Lerner documents to this Committee, other Congressional committees and the Department of Justice. The IRS summarized these steps in its June 13, 2013 letter to the Committee:

> • "Retraced the collection process for Ms. Lerner's computer to determine that all materials available in May 2013 were collected;"
> • "Located, processed, and included in [the IRS] production email from an earlier 2011 data collection of Ms. Lerner's email;"

---

[45] TIGTA Memorandum of Interview or Activity, Personal Interview of Ronald Shoemaker (Aug. 4, 2014).
[46] TIGTA Memorandum of Interview or Activity, Personal Interview of Aaron Signor (Sep. 5, 2014) (attachment omitted).
[47] Email chain between Lois Lerner, Carl Froehlich, Lillie Wilburn and others (July 19—Aug. 6, 2011) IRS0000651488–50.
[48] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30, 2014) p. 7.
[49] *Id.*
[50] *Id.* TIGTA noted that the IRS IT manager believed that "Lerner had categorized the data present on the hard drive as being personal in nature." This point is contradicted by Lerner's own testimony about the contents of her hard drive, as discussed above.
[51] TIGTA Memorandum of Interview or Activity, Personal Interview of Lois Lerner (July 9, 2104).

Exhibit E

- "Confirmed that back-up tapes from 2011 no longer exist because they have been recycled (which not uncommon [sic] for large organizations in both the private and public sectors);"
- "Searched email from other custodians for material on which Ms. Lerner appears as an author or recipient, then produced such email." [52]

The IRS calculated that these efforts yielded "approximately 24,000 Lerner-related emails between January 1, 2009 and April 2011," which were produced to this and other Committees.[53] On September 5, 2014, the IRS informed the Committee of similar efforts that it took to recover and produce emails sent and received by Chen, Heagney, Kindell, and Shoemaker.[54] After TIGTA opened its investigation of the lost documents in June 2014, the IRS largely ceased efforts to recover additional Lerner emails to avoid interfering with TIGTA's investigation, although it continued to produce documents to the Committee through January 2015.

*Committee Request #4 to TIGTA:* Whether any additional measures could reasonably be taken to attempt to recover lost data; and if so, TIGTA should perform its own analysis of whether any data can be salvaged and produced to the Committee.

An initial question was whether TIGTA could recover data from Lerner's crashed hard drive, as well as hard drives of other custodians who lost data (Chen, Heagney, Kindell, and Shoemaker). TIGTA did not recover data from any of the hard drives:

- After the IRS ended its 2011 efforts to recover data from Lerner's hard drive, the IRS grouped it with other failed hard drives and gave the failed hard drives to the IRS's vendor in charge of disposing of electronic media. TIGTA determined that Lerner's hard drive was "more than likely destroyed" at a shredding facility in Marianna, Florida on April 16, 2012.[55]
- "TIGTA was able to locate and take possession of Heagney's failed hard drive, but was unable to recover any information from the drive using standard forensic tools." [56] TIGTA will see if an outside vendor can recover any information.[57]
- Chen's failed hard drive was sent to an IRS facility in Covington, Kentucky in 2012.[58]
- It is unclear if TIGTA determined the ultimate disposition of Kindell and Shoemaker's failed hard drives. It does not appear that TIGTA located either of them.

Next, TIGTA turned to other sources to attempt to recover lost data:

---

[52] Letter from Leonard Oursler to Senator Wyden and Senator Hatch (June 13, 2014) Enclosure 3, p. 7.

[53] *Id.*

[54] Letter from Leonard Oursler to Chairman Camp (Sep. 5, 2014).

[55] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30, 2014) pp. 7–8. TIGTA noted that under IRS procedures and terms of the vendor's contract with the IRS, the serial numbers of electronic media were not tracked throughout the disposal process, so TIGTA could not confirm with certainty that Lerner's hard drive was, in fact, destroyed. Nonetheless, after interviewing the vendor employees who processed IRS media and visiting the Marianna shredding facility, TIGTA found no evidence that Lerner's hard drive had not been destroyed. We have no reason to doubt TIGTA's conclusion that Lerner's hard drive was "more than likely destroyed."

[56] *Id.* p. 12.

[57] *Id.*

[58] TIGTA Memorandum of Interview or Activity, Personal Interview of Pamela Merritt (Sep. 15, 2014).

- Backup (disaster recovery) tapes from the IRS's email server;
- Decommissioned exchange server hard drives and associated backup tapes;
- Lerner's Blackberrys and the Blackberry network server;
- Loaner laptops used by employees while waiting for resolution of IT problems; and
- Network transaction logs.

TIGTA's efforts, which constituted an enormous amount of work over the course of a year, are described in more detail on pages 12–20 of its report. In particular, TIGTA activated 744 disaster recovery backup tapes containing a backup of IRS email traffic from approximately November 2012. From the sources identified above, TIGTA produced approximately 6,400 documents to the Committee in April, May and June 2015. TIGTA subsequently determined that the IRS had not produced approximately 1,330 of these document to this Committee, other Congressional committees, DOJ, or TIGTA.[59]

Finally, TIGTA examined the IRS's instant messaging system (called the Office Communicator Server (OCS)) to see if they could recover records related to the Committee's investigation. These messages were of particular interest to the Committee, as Lerner had asked an IT employee in April 2013 if OCS conversations were searchable and could be produced to Congress:

> I had a question today about OCS. I was cautioning folks about email and how we have had several occasions where Congress has asked for emails and there has been an electronic search for responsive emails—so we need to be cautious for what we say in emails. Someone asked if OCS conversations were also searchable—I don't know, but told them I would get back to them. Do you know?[60]

TIGTA determined that under the terms of the IRS's collective bargaining agreement, the IRS agreed that it would not automatically save OCS messages. The only way that messages would be saved is if an individual employee copied the text into an email or other electronic document. TIGTA found that this retention policy was not necessarily a violation of National Archives and Records Administration (NARA) guidance, noting that "[w]hether OCS is being used according to NARA's guidance depends on how OCS end-users are utilizing the program."[61] TIGTA was not able to recover the substance of any OCS sessions between Lerner and other employees.[62]

> *Committee Request #5 to TIGTA:* For each employee who lost data, the date when the IRS first became aware that it had lost information potentially relevant to the Committee's investigation.

The Committee asked this question because it did not learn of any loss of potentially relevant data until June 2014. TIGTA's re-

---

[59] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30, 2014) p. 3.

[60] Email chain between Lois Lerner, Maria Hooke, and others (Apr. 9, 2013) IRS0000726247–48.

[61] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30, 2014) p. 22.

[62] *Id.* p. 21.

Exhibit E

23

port contains the following information about when the IRS first learned that it may have been missing data from Chen, Heagney, Kindell, and Shoemaker:

- In her interview with TIGTA, Chen noted that she disclosed the hard drive crash at the time when she received an IRS litigation hold in May or June 2013. It is unclear what, if anything, the IRS did in response.[63]

- In his interview with TIGTA, Shoemaker said that during at least one interview with a Congressional committee, DOJ, or TIGTA, he mentioned that his hard drive had crashed. (He did not disclose this issue during his interview with the Finance Committee.) It is unclear if the IRS was aware of this disclosure and what, if anything, the IRS did in response.[64]

- TIGTA's report did not include information about when the IRS first learned that Kindell and Heagney lost data potentially relevant to this investigation.

TIGTA's report and interviews establish the following timeline of the IRS's knowledge of Lerner's hard drive crash, and whether it resulted in data loss:

- February 2 or 3, 2014—While the IRS was preparing a production of Lerner emails, former Counselor to the IRS Commissioner Catherine Duval "noted a gap" in the number of Lerner emails sent before July 2011. Duval brought the gap to the attention of Thomas Kane, Deputy Associate Chief Counsel for Procedure & Administration.[65]

- February 3, 2014—Duval and Kane mentioned the gap in Lerner emails at an internal meeting with Christopher Sterner, Deputy Chief Counsel for Operations, and Stephen Manning, Deputy Chief Information Officer. The group decided to further investigate.[66]

- February 4, 2014—After investigation by attorneys under Kane's supervision, "it was determined that Lerner experienced a hard drive failure in June 2011."[67]

- February 5 or 6, 2014—Kane, Sterner, Duval and Manning met again to discuss the issue. Kane noted that IRS Chief Counsel William Wilkins "was included in the discussion at some point." According to Kane, the discussion "included whether to notify Congress or whether more information was needed. The discussion also included how much of Lerner's emails could be located elsewhere." In his interview with TIGTA, Kane noted that "one or two Congressional committees" were planning to release reports around that time, including the Senate Committee on Finance. Kane told TIGTA that it was decided to "not to report half or part of the story as Lerner emails were expected to be produced for some time in the future."[68]

---

[63] TIGTA Memorandum of Interview or Activity, Personal Interview of Julie Chen (Aug. 28, 2014).

[64] TIGTA Memorandum of Interview or Activity, Personal Interview of Ronald Shoemaker (Aug. 4, 2014).

[65] TIGTA Memorandum of Interview or Activity, Personal Interview of Thomas Kane (Oct. 22, 2014).

[66] *Id.*

[67] *Id.*

[68] *Id.*

Exhibit E

- March and April 2014—The IRS searched electronic records of other IRS employees for emails to and from Lerner. The IRS located a total of 24,000 emails.[69]
- April 2014—Koskinen told TIGTA that he was "first told about Lerner's hard drive failure in April 2014 by Duval, but was advised that a hard drive failure did not necessarily mean a loss of data." Koskinen explained to TIGTA that at this point, "Duval was leading an effort to validate that email were actually missing; and, not that the gap in email was attributable to something like an error in the backup system" or some other error. Koskinen noted that this error checking "was completed in April 2014."[70]
- Mid-April 2014—Duval informed Treasury attorney Hannah Stott-Bumsted that "there was an issue they (the IRS Office of Chief Counsel) were looking into regarding Lerner's emails."[71]
- April, May, and June 2014—Led by Duval, the IRS prepared a "white paper" that would be used to "notify Congress of the problem identified regarding the Lerner emails, how it was discovered and what steps were taken to fill in the apparent gap in her emails."[72] Koskinen told TIGTA that he "wanted to secure as many emails that the IRS could locate . . . in order to provide a more complete reporting to Congress. . . ."[73]

In summary, in early February 2014, the IRS first became aware that it may have lost Lerner documents potentially relevant to this investigation. By the end of April 2014 at the latest, the IRS had confirmed that relevant emails had been lost.

*Committee Request #6 to TIGTA:* Whether there is any evidence of a deliberate effort to withhold information from the Committee.

As described above, TIGTA could not come to a conclusion about the cause of Lerner's hard drive crash. TIGTA did not suggest that the hard drive failures of the other four employees was deliberate or intended to withhold information from Congress, DOJ, or TIGTA. Overall, TIGTA stated that "[n]o evidence was uncovered that any IRS employees had been directed to destroy or hide information from Congress, the DOJ, or TIGTA."[74] The National Archives and Records Administration told the Committee that they do not believe the IRS violated federal recordkeeping laws[75] and Paul Wester, Chief Records Officer at NARA told TIGTA that IRS "did nothing wrong as far as safeguarding records."[76]

---

[69] *Id.*

[70] TIGTA Memorandum of Interview or Activity, Personal Interview of John Koskinen (June 19, 2015).

[71] TIGTA Memorandum of Interview or Activity, Personal Interview of Catherine Duval (July 1, 2014).

[72] TIGTA Memorandum of Interview or Activity, Personal Interview of Thomas Kane (Oct. 22, 2014).

[73] TIGTA Memorandum of Interview or Activity, Personal Interview of John Koskinen (June 19, 2015).

[74] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54–1406–008–I (June 30, 2014) p. 18.

[75] Letter from David Ferriero to Senator Wyden and Senator Hatch (July 10, 2014) (some enclosures omitted).

[76] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54–1406–008–I (June 30, 2014) pp. 21–22.

Exhibit E

However, several of TIGTA's other findings cast doubt on the thoroughness of the IRS's efforts to recover all relevant records related to this investigation, as well as its candor to this and other Congressional committees.

First, less than two weeks into its investigation, TIGTA identified 744 backup server tapes that were likely to contain Lerner documents.[77] The IRS did not attempt to recover data from these tapes, errantly determining that they had already been recycled, or believed that they did not contain relevant data. Indeed, until May 22, 2013, the IRS practice was to reuse and recycle old backup tapes every six months as a cost-saving measure.[78] Thus, with this practice in place, prior to the beginning of Congressional investigations the IRS should have already recycled any backup tapes containing Lerner emails lost when her hard drive crashed in June 2011. This would prove to be incorrect, and TIGTA was able to recover approximately 1,007 emails that had not been previously provided by the IRS to the Committee, although most of those messages were sent after Lerner's June 2011 hard drive crash.[79]

A second troubling finding is that in 2014, the IRS may have unwittingly destroyed a separate batch of relevant backup tapes. TIGTA discovered that in March of 2014—after top IRS officials learned that Lerner's hard drive had crashed—IRS employees at a storage facility in West Virginia "magnetically erased 422 backup tapes that are believed to have contained Lerner's emails that were responsive to Congressional demands and subpoenas."[80]

The email server housing these backup tapes was located in New Carrollton, Maryland, and around May 2011, the IRS migrated to a new location in order to consolidate data centers.[81] The New Carrollton server was then decommissioned and disassembled, and in April 2012, the majority, but not all, of the equipment was destroyed.[82] Several hard drives and backup tapes from the decommissioned server continued to be stored in New Carrollton until December 2013, when the IRS had them removed in order to renovate the space.[83] These components, server hard drives and backup tapes, were shipped to a storage facility in West Virginia.[84] According to TIGTA, the employees "did not degauss the server hard drives that were shipped with the backup tapes because their interpretation of the CTO's May 22, 2013, e-mail directive was that it was meant to preserve hard drives only."[85] However, the IRS employees did degauss the server backup tapes. Ultimately, TIGTA identified an additional 422 backup tapes which were used to back up Lerner's email between January 1, 2008 and December 31, 2011, but were errantly erased on March 4, 2014.[86]

Although it took TIGTA extensive time and resources to locate, identify, and process these tapes and produce relevant records, this type of effort was justified given the extent of data lost and the in-

---

[77] *Id.* p. 13.
[78] *Id.* On May 22, 2013, the IRS CTO changed the backup tape policy to an indefinite retention in order to respond to ongoing investigations.
[79] *Id.* p. 15.
[80] *Id.* p. 3.
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.* pp. 3–4.

26

terest in this matter by Congress, the DOJ and the public. The IRS should have exhausted this possibility before it informed the Committee that "back-up tapes from 2011 no longer exist," which proved to be wholly incorrect.[87]

TIGTA noted that it "did not uncover evidence that the IRS and its employees purposely erased the tapes in order to conceal responsive e-mails from the Congress, the DOJ and TIGTA."[88] Instead, the decision to erase these tapes appeared to be the result of employees being unaware of, or misinterpreting, several IRS directives to preserve documents:

- The IRS issued litigation holds in May and June 2013 for records related to this matter.
- In May 2013, IRS Chief Technology Officer Terence Milholland "sent an e-mail to his senior managers responsible for destroying media and asked them to preserve media that might contain e-mail or data related to 'investigations' that were occurring."[89]
- On February 3, 2014, Duval sent a message to Deputy CIO Manning confirming a previous conversation with him about an "apparent lack of Lois Lerner email from before May 9, 2011." Per their earlier discussion, Duval asked Manning to take several steps, including to "ensure that the earliest possible network back-up tapes are available for review" and "[c]onfirm that no back-up tapes have been recycled since the hold on recycling was instituted last spring[.]"[90]

Milholland told TIGTA that he was "blown away" to learn that the 422 backup tapes had been destroyed and opined that it "was more significant than the loss of Lerner's hard drive."[91] We agree that these tapes should not have been destroyed and are disappointed that IRS senior management did not adequately secure them.

Finally, TIGTA's report shines light on the IRS's failure to notify Congress of the missing documents in a timely fashion. It is understandable that the IRS would take some amount of time to assess the information gap and possible solutions before contacting Congress. But the IRS's decision to wait more than four months is inexcusable, particularly in view of the following:

- Duval and other senior employees believed the information gap to be significant enough to raise with Chief Counsel Wilkins in early February 2014, and with Commissioner Koskinen no later than April 2014.
- Based on testimony from Kane, it appears that the IRS was unconcerned with the possibility that this Committee or any other Congressional committee may have issued a report before the IRS disclosed the problem.

---

[87] Letter from Leonard Oursler to Senator Wyden and Senator Hatch (June 13, 2014) Enclosure 3, p. 7.

[88] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54-1406-008-I (June 30, 2014) p. 3.

[89] TIGTA Memorandum of Interview or Activity, Personal Interview of Terence Milholland (June 11, 2015).

[90] Email from Catherine Duval to Stephen Manning, and others (Feb. 3, 2014).

[91] TIGTA Memorandum of Interview or Activity, Personal Interview of Terence Milholland (June 11, 2015).

Exhibit E

- Duval informed the Treasury Department about this issue in April 2014, which in turn informed the White House shortly thereafter.[92]
- During the period when the IRS knew about the data loss but did not tell the Committee, Committee staff were routinely in contact with the IRS—including Duval and other employees who had direct knowledge of the data loss—about issues related to production of documents. During these conversations, Committee staff informed Duval that the Committee would require Commissioner Koskinen to sign a statement attesting to the completeness of the IRS's productions. Committee staff first raised this issue to Duval on March 27, 2014, and raised it repeatedly in April, May and early June. Neither Duval nor any other IRS employee gave any indication that the IRS had lost documents, a fact that would materially affect the IRS's ability to provide the required statement.
- The IRS disclosed the data loss only when Committee staff informed Duval that release of the report was imminent, and placed a deadline on receipt of Commissioner Koskinen's signed statement of Friday, June 13, 2014—the date when the IRS finally informed the Committee of the data loss.
- Even after the IRS disclosed Lerner's hard drive crash, it failed to provide a full account of what it knew to the Committee. When IRS senior staff briefed Committee staff on June 16, they informed the Committee only of Lerner's hard drive crash. Just hours later, the IRS told staff of a House committee that the IRS may have lost records of several other IRS employees who were relevant to this investigation. As a result, the Chairman and Ranking Member did not get a complete account of what the IRS knew until later that week.

Instead of proactively informing the Committee about the information gap, the IRS took the opposite approach. In a March 19, 2014 letter to Senator Wyden, Commissioner Koskinen said:

> **We are transmitting today additional information that we believe completes our production to your committee** and the House Ways and Means committee of documents we have identified as related to the processing and review of applications for tax-exempt status as described in the May 2013 TIGTA report. . . .
> **In light of these productions, I hope that the investigations can be concluded in the very near future.**[93]

Even if Commissioner Koskinen was not personally aware of the information gap at the time of this letter, the statements contained in this letter—which were surely made with the knowledge of senior IRS employees aware of the efforts underway to recover missing Lerner emails—were deeply misleading. These statements stood uncorrected for nearly three months, even after the Commissioner learned that his staff was still attempting to recover Lerner documents. Indeed, if the Committee had released its report as hoped for in the letter from Commissioner Koskinen, it would have been based on an incomplete record.

---

[92] Letter from Neil Eggleston to Chairman Camp and Chairman Wyden (June 18, 2014).
[93] Letter from John Koskinen to Senator Wyden (Mar. 19, 2014) (emphasis added).

Exhibit E

By failing to locate and preserve records, making inaccurate assertions about the existence of backup data, and failing to disclose to Congress the fact that records were missing, the IRS impeded the Committee's investigation. These actions had the effect of denying the Committee access to records that may have been relevant and, ultimately, delayed the investigation's conclusion by more than one year. Without the IRS's candor, this Committee cannot fulfill its charge of overseeing the administration of the tax code.

### 3. Actions Taken by Committee Investigators To Mitigate the Information Gap

After the IRS notified the Committee of the loss of data, the Committee took several actions to mitigate the information gap:

- As described above, the Committee asked TIGTA to search for and recover documents, which resulted in the discovery and production of 1,330 records that had not been previously produced to the Committee.
- The IRS took remedial steps to recover and produce emails for Lerner, Chen, Heagney, Kindell, and Shoemaker, as described in the letter of September 5, 2014.[94] On July 1, 2015, Commissioner Koskinen signed a declaration attesting to the completeness of the IRS's productions, and promising that the IRS will promptly produce any additional relevant records if they are discovered.[95]
- After a review of Lerner's communications, Committee staff determined that Lerner had sent and/or received emails from employees of the Treasury Department, the DOJ, and the FEC during the relevant period. Senator Hatch requested that these agencies search for communications between their employees and Lerner. In response, each agency produced documents to the Committee.
- On June 18, 2014, the White House produced emails between its employees and Lerner.[96]
- Based on a review of Lerner's communications, Committee staff determined that Lerner frequently sent and received messages from a friend who used his corporate email address. Some of these messages were relevant to the Committee's investigation. Senator Hatch requested that the employer produce all messages between this employee and Lerner, and the company complied.

Even with the benefit of information from these sources, an information gap remains. The full number of records that were lost and not recovered will never be known. Nor is it possible to know if these records would alter any of the findings in this report.

Although it was not possible to completely reproduce the records lost by the IRS, the Committee exhausted every possibility for obtaining copies of relevant records. We are satisfied that these efforts have enabled the Committee to issue as comprehensive of a report as possible under the circumstances, and we believe that our conclusions are supported by the record.

---

[94] Letter from Leonard Oursler to Chairman Camp (Sep. 5, 2014).
[95] Declaration of John Andrew Koskinen (July 1, 2015).
[96] Letter from Neil Eggleston to Chairman Camp and Chairman Wyden (June 18, 2014).

## D. Legal Background of 501(c)(3) and 501(c)(4) Organizations

The Committee's investigation chiefly concerns organizations applying for tax-exempt status under sections 501(c)(3) and 501(c)(4) of the Internal Revenue Code.

An organization may qualify for exemption under section 501(c)(3) of the Internal Revenue Code if it is organized and operated for religious, charitable, educational and certain other specified purposes.[97] These organizations may not directly or indirectly "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office."[98] This prohibition is absolute.[99] Thus, if a 501(c)(3) organization engages in any amount of prohibited campaign intervention, the IRS may revoke its tax-exempt status and impose an excise tax.[100]

Section 501(c)(4) provides tax-exempt status for organizations operated "exclusively for the promotion of social welfare."[101] In 1959, the Treasury promulgated regulations that interpreted "operated exclusively" to mean "primarily engaged" in social welfare activities.[102] As a result, the IRS considers an organization to qualify for tax-exemption under section 501(c)(4) if its primary activity is "promoting in some way the common good and general welfare of the people of the community."[103] The regulations provide that political campaign intervention is not a social welfare activity,[104] but a group recognized as tax-exempt under section 501(c)(4) may engage in unlimited issue advocacy related to its exempt purpose and some political campaign intervention, as long as the group is primarily engaged in social welfare.[105]

---

[97] 26 U.S.C. § 501(c)(3) (2014).

[98] *Id.*

[99] IRS, The Restriction of Political Campaign Intervention by Section 501(c)(3) Tax-Exempt Organizations.

[100] *Id.*

[101] 26 U.S.C. § 501(c)(4) (2014).

[102] 26 C.F.R. § 1.501(c)(4)–1(a)(2)(i) (1990). The IRS did not create this definition out of whole cloth. The term "exclusively" appears in section 501(c)(3) as well as 501(c)(4), and in 1945 the U.S. Supreme Court ruled that a "substantial" nonexempt purpose will destroy exemption under section 501(c)(3). *Better Business Bureau* v. *United States*, 326 U.S. 279 (1945). But the Court did not interpret "exclusively" literally and forbid all non-exempt purposes. *See* Comment Letter on 501(c)(4) Exempt Organizations from the American Bar Association to Commissioner Koskinen dated May 7, 2014, at text accompanying footnotes 22–24. The 1959 regulations incorporated this interpretation, clarifying that "exclusively" means "primarily" for both section 501(c)(3) and section 501(c)(4) organizations. Congress also has demonstrated that the term "exclusively" cannot be interpreted literally. Organizations that operate exclusively to promote social welfare have had tax-exempt status since 1913. But in 1950, following revelations that some tax-exempt organizations also were operating businesses tax-free, Congress amended the law to add the unrelated business income tax (UBIT) regime. Under UBIT rules, nonprofits are allowed to engage in unrelated nonexempt activity as long as they pay taxes on the "unrelated business taxable income" generated as a result. *See* 26 U.S.C. §§ 511–513. According to one tax-exempt organizations expert, "exclusively" could not mean "exclusively" because "later law acknowledged these organizations could engage in other activities" if you tax them. *See* Alan Fram, Inside Washington: Conflicting Laws, IRS Confusion, Associated Press, June 5, 2013, *quoting* Tax Professor Ellen Aprill, an expert on tax-exempt organizations at Loyola Law School in Los Angeles, CA. Because of the statutory conflict in provisions allowing nonprofits to operate unrelated businesses, and the provision requiring section 501(c)(4) organizations to be operated exclusively for the promotion of social welfare, some suggest that the 1959 Treasury regulation interpreting "exclusively" to mean "primarily" was necessary to resolve this statutory conflict. *Id.* Thus, both the *Better Business Bureau* case and the UBIT regime support the argument that "exclusively" is not to be read literally.

[103] 26 C.F.R. § 1.501(c)(4)–1(a)(2)(i) (1990); IRS, Social Welfare Organizations.

[104] 26 C.F.R. § 1.501(c)(4)–1(a)(2)(i) (1990).

[105] IRS, Social Welfare Organizations.

Section 501(c)(3) organizations must apply to the IRS to be recognized for tax-exempt status.[106] Although the tax law allows section 501(c)(4) organizations to operate as tax-exempt without applying for IRS recognition of their status, most organizations apply for an IRS determination.[107] Another important distinction is that donors to 501(c)(3) organizations may generally take a tax deduction for the amount of their donation, while donations to 501(c)(4) organizations are not tax-deductible.[108]

Generally, the tax laws do not require 501(c)(3) public charities or 501(c)(4) organizations to publicly disclose the identity of their donors.[109] By contrast, the identity of donors to section 527 political organizations are made public, as well as periodic reports of contributions and expenditures filed by such organizations.[110]

E. STRUCTURE OF THE IRS EXEMPT ORGANIZATIONS DIVISION AND GENERAL IRS PROCEDURES FOR REVIEWING APPLICATIONS FOR TAX-EXEMPT STATUS

The IRS used the general processes described in this section during all times relevant to the Committee's investigation from 2009 through May 2013.[111]

The EO Division within the IRS reviewed all applications for tax-exempt status. As described below, revenue agents in the Cincinnati EO Determinations office resolved approximately 85% of incoming applications after reviewing the initial application with little or no additional follow-up. On some occasions, EO Technical or the Office of Chief Counsel, which are both located in Washington, D.C., reviewed applications. The IRS routinely elevated "sensitive" issues within the EO Division and to higher-level IRS management, sometimes up to the Office of the Commissioner.

At all times relevant to the Committee's investigation, the EO Division had the following basic structure and management:

---

[106] 26 U.S.C. § 508(a) (2006).
[107] Notes of Steven Miller (undated) IRS0000505538–42.
[108] 26 U.S.C. § 170 (2014).
[109] 26 U.S.C. § 6104(b), (d)(3)(A) (2014). 501(c) entities are required to submit to the IRS a list of persons who have donated $5,000 or more on an annual basis. This information generally is not made public, except that the information is made public for private foundations only.
[110] 26 U.S.C. § 527(k) (2014).
[111] Information in this section relies on Notes of Steven Miller (undated) IRS0000505538–42; IRM §§ 1.54.1 (Jan. 1, 2006) and 7.29.3 (July 14, 2008).

Exhibit E

**IRS Commissioner's Office**
Steven Miller (Acting)
November 2012 – May 2013
Douglas Shulman
March 2008 – November 2012

**Deputy Commissioner for Service
and Enforcement**
Steven Miller
2009 – November 2012

**Division Commissioner for Tax-
Exempt and Governmental Entities**
Joseph Grant
May 2013 – June 2013
December 2010 – May 2013 (Acting)
Sarah Hall Ingram
May 2009 – December 2010

**Exempt Organization**
Director: Lois Lerner
January 2006 – May 2013

**Examinations**
Director: Nanette Downing
2010 – 2014

**Rulings and Agreements**
Director: Holly Paz
May 2012 – May 2013
January 2011 – May 2012 (Acting)
Director: Robert Choi
2007 – December 2010

**Technical**
Manager: Michael Seto (Acting)
January 2011 - Present
Manager: Holly Paz
September 2010 – January 2011
September 2009 – September 2010
(Acting)

**Determinations**
Director: Cindy Thomas
October 2004 –2013

Exhibit E

All applications for tax-exempt status were initially routed to the IRS's EO Determinations office in Cincinnati, Ohio. The EO Determinations office was comprised of 13 "Groups" that processed applications for tax exemption. One group was responsible for performing an initial screening of applications. Employees in this group, referred to as "screeners," typically spent about 15–30 minutes reviewing an incoming application and completed 20–30 applications per day. Screeners had four options available for each application:

    1. Recommend approval of applications that raised no issues (approximately 35% of applications). The screening group manager would then conduct a final review of the draft approval letter to the applicant.

    2. Refer the case to other EO determinations agents for minor development (approximately 50% of applications). These applicants appeared to meet the requirements for tax-exempt status but lacked some required information, such as the articles of incorporation.

    3. Refer the case to other EO determinations agents for full development (approximately 13% of applications). Applications in this category left open questions as to the adequacy and scope of their exempt purposes, the inurement of a private benefit, or the presence of activities inconsistent with exempt status.

    4. Return a grossly incomplete application to the organization (approximately 2% of applications). If an application was missing pages or submitted on the wrong form, the screener could return the application and require re-submission.[112]

Applications in the second and third categories were sent from the screener to revenue agents in the EO Determinations office, who would then follow up with the applicant to develop the case. While many of these revenue agents worked in Cincinnati, some were located in other IRS offices around the country. The development process varied from case to case but typically included telephone calls and written correspondence (development letters) between the IRS and the applicant's point of contact. Revenue agents had a fair amount of discretion about which issues needed to be developed and how much information was necessary.

Most applications for tax-exempt status that were received by EO Determinations were processed to completion by EO Determinations employees without outside assistance. Certain applications, such as those that raised complex or novel questions or that contained sensitive or high-profile issues, were sent to EO Technical. Typically, applications that were received in EO Technical were assigned to a highly-graded Tax Law Specialist in one of the four EO Technical Groups. The Tax Law Specialist could either assume full control of the application or continue to work on the application in conjunction with an EO Determinations revenue agent. The Tax Law Specialist was responsible for developing the facts of the application, applying the law to those facts, reaching a conclusion, and preparing a proposed determination on the application for tax exemption. The Tax Law Specialist then submitted the proposed determination to a "reviewer" within the Tax Law Specialist's Group.

---

[112] SFC Interview of John Shafer (Sep. 17, 2013) pp. 7–9.

Exhibit E

33

The Group Manager could also decide to review the proposed determination at this time, or could allow the Tax Law Specialist and the reviewer to make the final determination. A final determination was made on a majority of applications at the Group level.

The Internal Revenue Manual (IRM) also specified certain issues that should be elevated within the IRS organization, including "sensitive" issues, issues that impact a large number of individuals, issues involving significant dollar amounts, issues that were or could become newsworthy, and issues requiring coordination with the Office of Chief Counsel or Treasury. The primary way of elevating these issues was through a Sensitive Case Report (SCR), which was usually prepared by the manager in charge of the issue. The SCR contained a summary of the facts, why the issue was important, and the proposed resolution.[113] SCRs about tax-exempt issues were periodically distributed to EO management, including Lerner and her advisors, and certain reports were also sent to top-level IRS management, including the Office of the IRS Commissioner. As discussed in greater detail below, the Committee determined that SCRs had little practical value as a tool for guiding difficult issues to resolution, as they were routinely ignored—and sometimes not even read—by top management.

Once EO Technical placed an application on an SCR, additional procedures were followed before a final determination could be made. A proposed determination made at the Group level could not be effectuated without first providing the Manager of EO Technical with an opportunity to review the proposal. After the Manager of EO Technical completed his/her review, then the proposed determination was sent to the Director of Rulings and Agreements for additional review. Accordingly, including an application or other matter on an SCR meant that at a minimum, the proposed determination would undergo two additional levels of review (EO Technical Manager, Director, Rulings and Agreements). These additional levels of review invariably required more time to complete, thereby delaying the ultimate disposition of the application.

In limited circumstances, pending applications were referred to the Office of Chief Counsel in Washington, D.C. The only cases that required mandatory review by the Office of Chief Counsel were proposed denials of tax-exempt status under section 501(c)(3).[114] All other applications could be sent to the Office of Chief Counsel for discretionary reasons specified in the IRM, including applications that presented novel issues of law or the possibility of litigation.[115]

---

[113] Section 7.29.3.2(C) of the IRM (July 14, 2008) provides that the Group Manager will determine whether an SCR should be prepared to alert "upper management" that a case: (i) is likely to attract media or Congressional attention; (ii) presents unique or novel issues; (iii) affects large numbers of taxpayers; (iv) potentially involves large dollar amounts; or (v) has another issue that warrants attention.

[114] IRM § 7.29.3.7(5) (July 14, 2008).

[115] IRM § 1.54.7.2 (Jan. 1, 2006).

Exhibit E

34

# III. FINDINGS OF THE SENATE FINANCE COMMITTEE AND SUMMARY OF SUPPORTING FACTS

*This section sets forth the bipartisan findings of the investigation and summarizes the supporting facts, some of which are described in greater detail later in this report.*

The bipartisan investigation conducted by Committee Staff identified a pattern of mismanagement commencing in 2010 by IRS management officials in their direction, or lack thereof, of the processing of applications for tax exemption submitted by Tea Party and other political advocacy organizations. This pattern of mismanagement consisted of both an underestimation of the political sensitivity of these applications and an overestimation of the effectiveness of a number of management initiatives aimed at processing these legally and factually complex applications. Most of these initiatives ended in failure. As a result, Tea Party and other political advocacy groups experienced long delays in the resolution of their applications, extending in many instances for two, three or even four years.

### A. IRS MANAGEMENT LACKED AN APPRECIATION FOR THE SENSITIVITY AND VOLATILITY OF POLITICAL ADVOCACY APPLICATIONS

One of the first Tea Party applications received by the IRS was flagged as a possible "high profile" case by Jack Koester, a screener in EO Determinations. (See Section VI(A).) Koester believed that the application was "high profile" because it had been submitted by an organization identifying itself as part of the Tea Party movement, a movement that was receiving substantial media coverage at the time. In addition to the potential for media interest in the application, Koester took note that the Tea Party organization indicated in its application that it was seeking to engage in political discourse, an issue that could affect its status as a tax-exempt entity.

Koester's immediate managers, up to and including Cindy Thomas, EO Determinations Program Manager, agreed with Koester's assessment that the application was "high profile." Thomas elevated the application to EO Technical in Washington D.C. Shortly thereafter, Steve Grodnitzky, Acting Manager for EO Technical, concluded that the application, as well as all other applications received from Tea Party groups, met the criteria for the preparation of a SCR. The purpose of an SCR is to apprise upper management of applications that warrant their attention because they present a significant issue or raise a notable concern.[116] In the case of the Tea Party applications, the issue was that the applications could attract significant media and Congressional attention. Carter Hull, a Tax Law Specialist in EO Technical, was assigned the Tea Party cases and prepared the first SCR on them in April 2010. Thereafter, either Hull or Hilary Goehausen, another Tax Law Specialist in EO Technical, prepared an SCR on these applications every month until 2013.

---

[116] IRM 7.29.3.2 (July 14, 2008).

Exhibit E

35

During the summer of 2010, Tax Exempt and Government Entities (TE/GE) Division Executive Assistant Richard Daly sent monthly emails to senior IRS management that contained SCRs about important pending issues within the TE/GE divisions. The SCRs transmitted by Daly were a subset of all SCRs that had been prepared by divisions within TE/GE, and included only the issues that were deemed most necessary for elevation to upper management.[117] Included in Daly's messages were the SCRs about the Tea Party applications prepared by Hull on May 24, 2010, June 22, 2010, and July 26, 2010.[118] These SCRs identified three Tea Party organizations by name; discussed the legal issue as "whether these organizations are involved in campaign intervention"; enumerated how many similar applications had been received; and explained how employees in Cincinnati and Washington were processing the applications.[119]

Although the Tea Party SCR was sent multiple times directly to IRS upper management in 2010, the SCR went unnoticed:

- Division Commissioner of TE/GE, Sarah Hall Ingram, received all three of Daly's messages containing the Tea Party SCR in 2010. Ingram had no memory of reviewing any of the Tea Party SCRs sent to her, asserting that "I did not read these [Tea Party SCRs]."[120] She explained that this was not out of the ordinary; Ingram routinely disregarded SCRs as she did "not personally [find] them particularly useful documents."[121] Instead of reading the SCRs herself, Ingram "relied on [the TE/GE] directors to bring me the ones they thought they were worried about."[122]

- Deputy Commissioner of TE/GE, Joseph Grant, also received all three of Daly's messages containing the Tea Party SCR in 2010. Grant viewed SCRs as "a heads up or an awareness of something that was going on," but, like Ingram, Grant did not routinely read them.[123] Although he received three Tea Party SCRs in 2010, Grant claimed that he was not aware of the Tea Party applications in 2010.[124]

- Assistant Deputy Commissioner for Services & Enforcement (S&E), Nikole Flax, received two of Daly's messages containing the Tea Party SCR. One of Flax's duties was to review incoming SCRs and inform the Deputy Commissioner for S&E, Steven Miller, of the most significant issues.[125] Flax had no recollection of reviewing either of the Tea Party SCRs sent to her in summer 2010 or discussing them with Miller.[126] Miller also had no memory of reviewing these SCRs in 2010 or dis-

---

[117] SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) pp. 44–45.
[118] Email from Richard Daly to Jennifer Vozne and others (June 6, 2010) IRS0000163997–4013 (email attachments containing taxpayer information omitted by Committee staff); Email from Richard Daly to Jennifer Vozne, Nikole Flax and others (July 1, 2010) IRS0000164020–43; Email from Richard Daly to Sarah Ingram and others (Aug. 5–6, 2010) IRS0000164044–72 (email attachments containing taxpayer information omitted by Committee staff).
[119] *Id.*
[120] SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 42.
[121] *Id.* p. 44.
[122] *Id.* p. 42.
[123] SFC Interview of Joseph Grant (Sep. 20, 2013) pp. 13–14.
[124] *Id.* p. 11.
[125] SFC Interview of Steven Miller (Dec. 12, 2013) pp. 37–39.
[126] SFC Interview of Nikole Flax (Nov. 1, 2013) p. 30.

Exhibit E

36

cussing them with Flax.[127] Flax noted that she never met with Miller to discuss SCRs.[128]

These IRS upper-level managers, by virtue of the positions they held, had the authority and the responsibility to ensure that the applications for exemption filed by Tea Party and other political advocacy groups did not languish in a bureaucratic morass. They were uniquely positioned to shape and direct the IRS's response to the influx of applications for exemption by Tea Party and other political advocacy groups first seen in 2010. Since they either did not bother to read the SCRs sent to them in 2010 or had no recollection of having read them, they forfeited the opportunity to exert their management influence to ensure that the applications were being properly processed. Each of these managers also told Committee Staff that they did not learn about the delays and other processing issues that Tea Party and other political advocacy groups had encountered until 2012, when media reports and Congressional inquiries regarding those processing issues began to appear. By that time, they were essentially managing a crisis.

Other managers like Lois Lerner, Rob Choi, Director of Rulings and Agreements, and Holly Paz, EO Technical Manager and later Director of Rulings and Agreements, all were aware of the Tea Party SCRs early in 2010.[129] Yet they simply failed to recognize the sensitivity of the applications and the potential for adverse media and Congressional reaction if those applications were not resolved in a reasonable period of time. Perhaps this failure to appreciate the sensitivity of the political advocacy applications was best summarized by Nikole Flax, who was asked by Committee Staff if the IRS was looking at the issue of political campaign intervention by 501(c)(4) organizations in 2010. Flax responded that "I wasn't aware that this was, like, a big issue at the time; that that was a bigger issue than all of the other sensitive issues that EO was dealing with." [130]

The volatility of these applications appears to have been better understood by staff-level employees than by their managers. For example, Elizabeth Hofacre, an EO Determinations agent, stated to Committee Staff that "because of the nature of these cases, the high profile characteristics, that it could really have, you know, imploded." [131] Hofacre likened working with the Tea Party cases during the period in 2010 when no determinations were being made on the applications to "[w]alking through a mine field." [132]

In the context of the Tea Party and other political advocacy applications, the identification of applications as "sensitive" or "high profile" and the preparation of SCRs proved to be no more than a paper exercise. The managers who had the responsibility and the authority to oversee the processing of the applications and who were the intended recipients of the information in the SCRs, either

---

[127] SFC Interview of Steven Miller (Dec. 12, 2013) p. 39.
[128] SFC Interview of Nikole Flax (Nov. 1, 2013) p. 34.
[129] Holly Paz experienced a rapid climb through the management ranks in EO. She was hired by the IRS in 2007 and thereafter promoted or assigned to the following management positions within EO: Manager of EO Guidance Group 2 in July 2008; Acting Manager of EO Technical in September 2009; Manager of EO Technical in September 2010; Acting Director of Rulings and Agreements in January 2011; and Director of Rulings and Agreements in May 2012.
[130] SFC Interview of Nikole Flax (Nov. 21, 2013) p. 33.
[131] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) p. 69.
[132] *Id.*

Exhibit E

37

elected to ignore the SCRs and thus missed the opportunity to en-
sure that the IRS properly managed this workload, or failed to rec-
ognize the sensitivity of the applications and take steps early in the
process to develop a plan to address their resolution.

Moreover, placing the Tea Party and other political advocacy ap-
plications on the SCR subjected those applications to further delays
by requiring that they undergo additional levels of review. (See
Section VI(A)(5).) The managers—who either did not recognize the
sensitivity of the applications or who did not make the effort to
keep informed of issues that could adversely impact taxpayers or
the IRS—effectively nullified the salutary effects of the SCR proc-
ess, while leaving in place those parts of the SCR process that
could delay resolution of the applications.

## B. IRS MANAGEMENT ALLOWED EMPLOYEES TO USE INAPPROPRIATE SCREENING CRITERIA THAT FOCUSED ON APPLICANTS' NAMES AND POLICY POSITIONS

Since the early 2000s, the IRS used various methods to alert EO
employees of important issues that could arise when reviewing in-
coming applications for tax-exempt status. (See Section V.) In 2010,
EO Determinations managers consolidated several lists of current
and past issues into a single document, called the BOLO list or
spreadsheet, an acronym for Be On the Lookout. From August 2010
until May 2013, the BOLO spreadsheet was distributed to all EO
Determinations employees, who used it as a reference tool when
screening and reviewing applications for tax-exempt status. The
BOLO spreadsheet was comprised of five "tabs": [133]

| Tab name | Tab characteristics / purpose |
|---|---|
| Emerging Issues | • Groups of applications for which there is no established case law or precedent.<br>• Issues arising from significant current events (excluding disaster relief organizations).<br>• Issues arising from changes to tax law or other significant world events. |
| Watch List | • Applications have not yet been received.<br>• Issues were the result of significant changes in tax law or world events and would require "special handling" by the IRS when received. |
| TAG (also referred to as Potential Abusive). | • Abusive tax avoidance transactions including abusive promoters and fake determination letters.<br>• Activities that were fraudulent in nature including: applications that materially misrepresented operations or finances, activities conducted contrary to tax law (e.g. Foreign Conduits).<br>• Applicants with potential terrorist connections. |
| TAG Historical (also referred to as Potential Abusive Historical). | • TAG issues that were no longer encountered, but that were of historical significance. |
| Coordinated Processing | • Multiple applications grouped together to ensure uniform processing.<br>• Existing precedent or guidance does not exist. |

The BOLO spreadsheet itself was not problematic; on the con-
trary, if used properly, it could have been an effective way for man-
agement to communicate important directives to employees.

A managerial failure occurred when the initial BOLO spread-
sheet was distributed in August 2010 containing a "Tea Party"
entry that TIGTA found to be "inappropriate," because the mere
use of the words "Tea Party" should not have been enough to trig-
ger review. At that time, EO Determinations managers up to, and

---

[133] Heightened Awareness Issues (undated) IRS0000557291–308.

38

including, Cindy Thomas were aware of the "Tea Party" entry.[134] The problematic "Tea Party" entry under the Emerging Issues tab of the spreadsheet read as follows: "[t]hese cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)." [135] The BOLO spreadsheet directed agents to send Tea Party applications to Group 7822 and specified that Elizabeth Hofacre was the coordinator. A similar "Tea Party" entry remained on every subsequent version of the BOLO spreadsheet until July 2011.

During that time, EO Determinations employees also screened incoming applications using words related to the Tea Party, such as "Patriots" and "9/12." As a result of these practices, every incoming application from a Tea Party or related conservative organization was sent to Group 7822 for further review—whether or not it reflected potential political campaign intervention—which ultimately resulted in heightened scrutiny and extended delays.

The versions of the BOLO spreadsheet that were circulated in 2010 and 2011 also contained entries describing "Progressive" applicants on the TAG Historical tab of the spreadsheet, as well as "ACORN Successors" on the Watch List tab of the spreadsheet. (See Section V(C).)

Paz and Lerner, who comprised upper-level EO management in Washington, D.C., claimed that they were unaware of the "Tea Party" BOLO spreadsheet entry until July 2011. As managers who were ultimately responsible for how the approximately 300 employees in EO Determinations reviewed incoming applications, this represents another significant management failing. Lerner, in particular, demonstrated a lack of understanding about how EO Determinations employees performed their day-to-day jobs, which hampered her ability to effectively manage EO.[136]

Following a meeting in July 2011, Lerner directed that the "Tea Party" BOLO criteria be changed to neutral language that identified activities of applicants, instead of policy positions or names of specific organizations. Although this successfully removed the inappropriate criteria that had been on the BOLO spreadsheet for almost a year, as discussed below, this ultimately resulted in a broader class of applicants across the political spectrum being flagged, delayed, and scrutinized.

The neutral criteria did not last for long. In January 2012, EO Determinations Group Manager Steve Bowling modified the BOLO spreadsheet to include policy terms intended to capture incoming applications from Tea Party organizations, and organizations affiliated with the Occupy Wall Street movement. Thomas approved these changes, as they did not identify any organizations by name.

---

[134] SFC Interview of Cindy Thomas (July 25, 2013) p. 67.

[135] Email chain between Holly Paz, Lois Lerner and Nikole Flax (May 21, 2012) IRS0000352978–84.

[136] IRS management above Lerner uniformly claimed that they were unaware of the BOLO or any criteria on the document until May 2012 at the earliest. It is less obvious whether these managers should have taken a more active role in supervising how EO handled incoming applications for tax-exempt status; arguably, upper-level managers in TE/GE should have also been involved in decisions affecting large numbers of taxpayers.

Exhibit E

39

However, TIGTA determined—and we agree—that the January 2012 BOLO spreadsheet entry was also inappropriate.[137]

Lerner and Paz again claimed that they were not aware of the problematic change on the BOLO spreadsheet until several months later. At that point, Lerner and Paz corrected the criteria and implemented new procedures that required all BOLO spreadsheet changes to be approved by Thomas. These events illustrate yet another failing of management: neglecting to oversee a process that they knew was wrought with problems, and only implementing controls after more damage had been done.

C. IRS MANAGEMENT FAILED TO DEVELOP AN EFFECTIVE PLAN FOR PROCESSING APPLICATIONS FOR POLITICAL ADVOCACY GROUPS

Despite a number of attempts over a three-year period, EO management was never able to develop a cohesive, effective approach for the processing of the Tea Party and other political advocacy applications. Instead, the period from 2010 to 2013 was marked by a series of under-planned, under-supported and under-executed initiatives that individually and collectively proved inadequate to bring the applications to resolution.

1. IRS Management Placed Exclusive Reliance on Test Cases for Too Long

The initial plan developed by Cindy Thomas in conjunction with Holly Paz in February 2010 was for EO Technical to develop two Tea Party "test cases." (See Section VI(A)(3).) EO Technical staff would then use its experience working these cases to provide guidance to EO Determinations agents so that those agents could process the balance of the then-pending Tea Party applications. That plan proved to be inadequate.

Carter Hull developed the two test cases, but took eight months to draft memos containing his findings. Those findings were then subjected to a variety of reviews from Elizabeth Kastenberg, a Tax Law Specialist in EO Technical, in January 2011, Judith Kindell, a Senior Technical Advisor to the EO Director, in April 2011, and eventually staff of the Office of the Chief Counsel in August 2011. By the time Kindell reviewed Hull's recommendations in April 2011, the initiative to work the two test cases was already more than one year old. Kindell expressed neither agreement nor disagreement with Hull's views, but simply recommended an additional round of review by the Office of the Chief Counsel. The Office of the Chief Counsel, in turn, recommended further factual development of the organizations' activities. Consequently, the IRS was not much closer to reaching resolution on the two test cases in August 2011 than it had been in April 2010.

It appears that only Cindy Thomas recognized that reliance on development of the two "test cases" alone was misplaced and that a more comprehensive plan was needed to move the applications that were forming a backlog in EO Determinations. Thomas told Paz in October 2010 that "we are just 'sitting' on these appli-

---

[137] In January 2012, Bowling also added a separate BOLO entry for "'Occupy' Organizations" on the Watch List tab of the BOLO. TIGTA's report did not discuss whether this entry was inappropriate.

cations" and that "we need to coordinate these cases as a group . . ." [138] Thomas asked Paz to meet with her "to discuss the approach that is being used and come up with a process so we can get these cases moving. . . ." [139] Instead, Paz assured her that the test cases would be resolved soon, since Kindell would review Hull's recommendations. [140]

Thomas's concerns, coupled with a lack of results from Hull's efforts to resolve the test cases, and the mounting backlog of undecided applications, should have prompted Paz, at some point in the continuum between April 2010 and August 2011, to look for another solution for developing the guidance required by EO Determinations to resolve the political advocacy applications. Instead of heeding the call sounded by Thomas in October 2010, Paz simply elected to press on with development of the test cases. As an added measure, Paz enlisted the assistance of yet another reviewer, Kindell, who was generally regarded as a slow worker. Indeed Paz herself told the Committee that Kindell "had a reputation of having difficulty with deadlines and taking a lengthy period of time on cases." [141] Paz's decision to continue with the test cases and involve Kindell caused months of additional delays and never yielded any useful guidance that could be passed on to EO Determinations.

### 2. Lois Lerner's July 2011 Solution To Resolve the Political Advocacy Applications Was Flawed and Ineffective

In a July 2011 meeting, Lerner was apprised of the extent of the backlog of Tea Party applications—which had grown to nearly 100—and of the criteria being used by the screeners to identify Tea Party applications. (See Section VI(B)(2).) At that time she was also aware that many of these applications dated back to late 2009 and early 2010, since Steve Grodnitzky had informed her as early as April 2010 of the existence of the Tea Party applications. Grodnitzky also informed Lerner in April 2010 that there were 15 Tea Party applications then pending resolution.

At the time of the July 2011 meeting, many of the Tea Party applications were nearly a year-and-a-half old. Furthermore, the two test cases were nowhere near completion after 15 months of effort by Hull, Kastenberg and Kindell. Amid this backdrop, Lerner concluded, and Paz concurred, that the IRS should continue with the plan to develop the test cases. Lerner also concurred with Kindell that the recommendations on the test cases should be reviewed by the Office of the Chief Counsel, an organization known for taking substantial periods of time to respond to requests for assistance. [142]

Additionally, Lerner agreed with her staff's recommendation that EO Technical prepare a guidesheet containing information and directions that would help EO Determinations agents process the potential political advocacy applications. Lerner also directed that the name "Tea Party" be removed from the BOLO list, a move that did nothing to help get the political advocacy applications resolved. In fact, the Lerner-directed name change in the BOLO from "Tea

---

[138] Email from Cindy Thomas to Holly Paz (Oct. 26, 2010) IRS0000435238–39.
[139] *Id.*
[140] *Id.*
[141] SFC Interview of Holly Paz (July 26, 2013) p. 166.
[142] SFC Interview of Steve Grodnitzky (Sep. 25, 2013) p. 145.

Party" to "Advocacy Orgs." only exacerbated the backlog by enlarging the universe of applications being systematically selected and placed on hold in the advocacy inventory from just Tea Party applications to organizations of every political (and in some cases nonpolitical) stripe.

Lerner's decisions belie a lack of concern over the mounting numbers of political advocacy applications and their increasing age. Her decision to proceed with a guidesheet was, at best, a band-aid solution for the escalating number of unresolved political advocacy applications.

Committee staff found little evidence of further active involvement by Lerner in the matter of the political advocacy applications until February 2012. This may have reflected Lerner's belief that her July 2011 management directives were sufficient to resolve the mounting backlog and alleviate the long delays endured by many groups. In February 2012, the media started reporting on Tea Party and other political advocacy groups that received burdensome development letters. Spurred by these media reports and by complaints from constituents, Congressional interest in the IRS's handling of Tea Party and political advocacy applications also began to collect momentum. (See section IV(C).)

Both Lerner and Paz were caught unaware by these media reports and Congressional inquiries. Paz told Committee staff that "[e]veryone I think sort of became aware of it at the same time because of the press coverage. We all saw the letters through the press coverage."[143] The fact that Lerner and Paz were made aware by media reports that EO Determination employees were sending inappropriate and sometimes intrusive development letters to Tea Party and other political advocacy groups demonstrates their lack of management oversight regarding the processing of these applications, a serious abdication of their responsibilities as the senior managers within EO.

### 3. The 2011 Triage of Political Advocacy Applications Was Not Properly Supported by EO Management and Predictably Failed

In September 2011, Cindy Thomas proposed to Holly Paz the idea of having EO Technical perform a "triage" on the political advocacy applications then pending in EO Determinations. (See Section VII(E).) This initiative appears to have resulted from Thomas's concern with EO Technical's inability to provide the guidance necessary to resolve the Tea Party and other political advocacy applications, guidance that she had first requested from Paz in February 2010. Thomas asked that Paz assign someone knowledgeable to triage the nearly 160 backlogged political advocacy applications then awaiting development and decision in EO Determinations. While the idea to perform a triage of the applications was a precursor to the 2012 "bucketing" exercise that actually resulted in the resolution of a number of applications, unlike that later effort, this one was seriously under-supported by EO management.

Paz determined that Hillary Goehausen would perform the triage with assistance from Justin Lowe, a Tax Law Specialist in EO Guidance, and would review the applications in an electronic repos-

---

[143] SFC Interview of Holly Paz (July 26, 2013) p. 144.

itory referred to as "TEDS" (Tax Exempt Determination System).
At the time of this determination, Hillary Goehausen was relatively
new to the IRS, having been hired as a Tax Law Specialist in EO
Technical in April of that year. Accordingly, Paz assigned a rel-
atively junior employee to undertake this important review. Unfor-
tunately, the entire application package with supporting documents
was not in TEDS so, for many of the applications, Goehausen re-
viewed an incomplete record. While Goehausen appears to have
done a credible job with the limited information that she had to
work with, her recommendations on the applications did not carry
the level of certainty that Thomas required to actually begin ren-
dering decisions. Paz described Goehausen's recommendation to
Committee Staff as follows: "[s]o I believe her advice was caveated
that before Determinations . . . issued a letter they should look
and see if there was anything that had come in subsequently that
. . . could perhaps change that answer." [144] Accordingly, Thomas
found the recommendations to be of little or no use.

   Had this triage been properly supported with additional staff to
assist Goehausen, and had she reviewed the entire record instead
of just a part, the recommendations for each application would
have been more useful to Thomas. The triage presented Paz with
a prime opportunity to bring some of these applications to resolu-
tion months, and in some cases years, before they were ultimately
decided. Instead, Paz allowed the opportunity to slip away by inad-
equately staffing the initiative and further limiting the review to
an incomplete set of records. Failure of this initiative contributed
to the growing backlog of political advocacy applications and the
mounting delays experienced by applicants.

4. Lack of EO Management Oversight of the Political Advocacy Ap-
   plications Allowed Development of the Guidesheet to Simply Stop
   in November 2011

   Goehausen and Lowe were tasked by Michael Seto, Manager of
EO Technical, with developing a "guidesheet" in July 2011. (See
Section VII(D).) The guidesheet was intended to contain informa-
tion and directions that would assist EO Determinations agents
process political advocacy applications. Goehausen and Lowe com-
pleted a draft of the guidesheet in September 2011 and circulated
it to certain staff and managers for comment. Having received com-
ments from only Hull, Goehausen sent the guidesheet out for com-
ment again in early November. Several days later, David Fish,
then Acting Director of Rulings and Agreements, decried the
guidesheet as unworkable in its current form and "too
lawyerly." [145] At that point in time, it appears that further work by
EO Technical to refine the guidesheet simply ceased.

   It does not appear that management made any attempt to re-
sume the process of completing the guidesheet again until Feb-
ruary 2012. At that time, Lerner was called to Capitol Hill to ex-
plain to Congressional staff concerns about inappropriate and
sometimes intrusive development letters received by constituents of
a Congressman. During her meeting with Congressional staff,

---

[144] *Id.* p. 135.
[145] *Id.* pp. 132–33.

Exhibit E

43

Lerner offered that EO had developed a guidesheet. Congressional staff requested a copy. Since development of the guidesheet had effectively ceased in November 2011, Lerner sought to expedite its completion so that she could comply with the request by Congressional staff. However, the guidesheet was never completed, as it was eventually superseded by a decision to instead train EO Determinations staff in May 2012 on processing political advocacy applications. Allowing development efforts on the guidesheet to simply stop in November 2011 represented yet another serious lapse in oversight by EO management.

Development of the guidesheet itself was an abject failure and again demonstrated the seeming indifference of EO management to finding a processing solution that would bring the political advocacy applications to resolution. As noted above, development of the guidesheet commenced in July 2011 and was terminated in May 2012. Over that period of time, and despite numerous attempts, staff of EO Technical with assistance from staff of the Office of Chief Counsel was unable to deliver a written guide on processing political advocacy applications that could be used by non-attorney EO Determination agents. EO management's inability to harness its resources to produce a solitary deliverable on a subject for which EO is a source of authority further demonstrated its lack of competence.

5. EO Management Allowed the Advocacy Team To Process Political Advocacy Applications Without Proper Training and Support, and Failed To Adequately Manage Its Activities

In December 2011, EO formed an "Advocacy Team" to develop and decide the political advocacy applications. This project resulted in yet another failed attempt to reduce the backlog of applications. (See Section VII(F).) Like the triage of 2011, the Advocacy Team appears to have been a Thomas-inspired initiative. Thomas appears to be the only manager within EO who expressed concern with the time that the applications were pending resolution and who translated that concern into palpable action.

While Thomas's idea to form the Advocacy Team was well-intentioned, unfortunately, she failed to properly manage its activities. Instead, she entrusted that responsibility to Steve Bowling, a first-line manager, and Stephen Seok, an EO Determinations employee, who both proved wholly inadequate for the task. Under the direction of Bowling and Seok, the Advocacy Team failed to bring a single case to resolution until the "bucketing" exercise of May 2012. However, the Advocacy Team will be most remembered for its attempts to extract extraneous information from applicants through incredibly burdensome and onerous development letters. A share of the blame for the failure of the Advocacy Team must also go to EO Technical, which was responsible for providing technical guidance to the Advocacy Team. It is unclear to what extent, if any, EO Technical actually provided guidance to the Advocacy Team. What is clear is that EO management exercised little or no coordination and oversight over the activities of the Advocacy Team, thereby allowing it to issue oppressive development letters until that practice was halted in February 2012 by Lois Lerner.

Exhibit E

44

6. Although the "Bucketing" Exercise of 2012 Resolved Many Pending Political Advocacy Applications, the IRS Has Not Yet Issued Determinations for Some Applications

One positive development that can be attributed to the Advocacy Team's inappropriate and sometimes intrusive development letters was that they created intense media and Congressional interest in the complaints voiced by Tea Party and other political advocacy groups who were receiving these letters. This attention, in turn, sounded the "wake-up" call for upper IRS management, like Steve Miller. Once Miller became aware of the problem regarding the development letters, he ordered Nancy Marks, a Senior Technical Advisor, to conduct an internal investigation aimed at finding out what was going on in EO Determinations. (See Section VII(H).)

Upon getting a report back from Marks, Miller approved her suggestion to perform a "bucketing" exercise where a team of EO Technical Tax Law Specialists and EO Determinations agents scrutinized each application and its supporting documents to identify the applications that could be readily approved, those that required minor development before approval, and those that required further development. As a consequence of the bucketing exercise, a significant number of the Tea Party and other political advocacy applications were finally decided.

While the bucketing exercise was the first successful attempt to process some of the political advocacy applications, it came too late for many groups that had waited years and eventually ceased operating because they lacked approved tax-exempt status from the IRS. Moreover, the "bucketing" exercise did not resolve all backlogged political advocacy applications, as the IRS informed Committee Staff that 14 percent of the 298 political advocacy cases identified by TIGTA remained unresolved in March 2014. As of April 2015, 10 of these applications were still pending resolution. A number of those applications date back to 2010. Indeed, the Albuquerque Tea Party, one of the original test cases assigned to Carter Hull in April 2010, was still awaiting a determination as of April 2015. Accordingly, while substantial progress has been made since 2010 to reduce the backlog of political advocacy applications, IRS management has not yet been able to bring all of these applications to closure.

D. THE IRS PLACEMENT OF LEFT-LEANING APPLICANTS ON THE BOLO LIST RESULTED IN HEIGHTENED SCRUTINY, DELAY AND INAPPROPRIATE AND BURDENSOME INFORMATION REQUESTS

While most of the potentially political applications that the IRS set aside for heightened scrutiny were Tea Party and conservative groups, the IRS also flagged some left-leaning tax-exempt applicants for processing. In order to centralize these cases for review and processing, names and descriptions of several left-leaning groups were placed on the BOLO spreadsheet. Moreover, IRS employees were instructed in a training workshop to set aside applications received from several left-leaning organizations and to subject them to secondary screening. Some left-leaning applicants experienced lengthy processing delays and inappropriate and burdensome requests for information. (See Section VIII.)

Exhibit E

45

### 1. The IRS Instructed Employees To Flag "Progressive," "Emerge," and ACORN Successor Applications at Training Workshops.

In the summer of 2010, the IRS EO Determinations office held training workshops where IRS employees were instructed to screen a wide range of potentially political applications. In addition to instructing screeners to flag applicants with names like "Tea Party," "Patriots," and "9/12 Project," the screeners were also instructed to look for the names "Progressive," and "Emerge," and to be on the lookout for successors to disbanded Association of Community Organizations for Reform Now (ACORN) organizations.

### 2. The IRS Placed the Terms "Progressive," "ACORN," and "Occupy" on the BOLO List

Numerous iterations of the BOLO spreadsheet included the terms "Progressive," "ACORN," and "Occupy," from August 2010 through July 2012. The term "Progressive" appeared on the BOLO spreadsheet tab titled TAG Historical or Potentially Abuse Historical, indicating that IRS employees no longer encountered applications with this term, but that the term still had historical significance. "ACORN Successors" appeared on the Watch List tab of the BOLO spreadsheet after an internal IRS research report concluded that ACORN may have engaged in activities inconsistent with its tax-exempt status. "Occupy" was placed on the BOLO spreadsheet under the Watch List tab after IRS Determinations employees noticed a news article that reported organizations affiliated with the Occupy movement were seeking tax-exempt status.

### 3. IRS Scrutiny of Left-Wing Applicants Resulted in Years-Long Delays and Burdensome Information Requests

The Committee found several examples of ACORN-affiliated and Emerge applicants that were delayed for over three years. The press also reported examples of delayed processing for left-leaning groups such as Alliance for a Better Utah and Progress Texas. Of the 27 organizations that the IRS inappropriately requested information concerning their donors, at least three of those groups were left-leaning.

### E. THE CULTURE IN EO CONTRIBUTED TO A LACK OF EFFICIENCY IN ITS OPERATIONS

EO Management tolerated and even fostered a culture that was not conducive to efficient and effective operations. Lacking a sense of customer service, EO Management operated without regard to the effect of its actions on applicant organizations. Remote management and telework in EO Determinations may have impeded communications and coordination between its employees. Further, a pervasive atmosphere of antipathy existed between the Cincinnati and Washington D.C. offices of EO, fueled largely by the words and actions of Lois Lerner. Lastly, the culture within EO permitted a manager with no technical training in the subject matter area over which she exerted supervisory authority to remain in her job for nearly a decade.

Exhibit E

46

## 1. EO Management Lacked a Sense of Customer Service

The IRS mission statement reads as follows:

> Provide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all.

While the mission statement pledges taxpayers much in regard to customer service, the IRS's recent record of processing political advocacy applications would suggest that many taxpayers received far less than promised.

Indeed, Committee Staff found little to suggest that EO management was concerned with the concept of customer service. Rather, EO management's focus was steadily centered on taking whatever actions it felt necessary to develop applications with the goal of obtaining sufficient information to support decisions (a goal that it has yet to achieve for some applications), even if that goal took years to achieve. While no one can fault EO management's desire to "get it right," the difficulty was that EO management struggled to find a method of doing so, even with multiple rounds of detailed development letters spanning over a number of years. Moreover, other than Cindy Thomas, EO management did not appear to be concerned with how its processing of applications might adversely affect the operations of the organizations awaiting the IRS's determination.

The IRS's treatment of the two test cases illustrates its customer service failings. The application for American Junto was closed in 2012 for failure to respond to a development letter. More accurately, the IRS sent American Junto three sets of development letters over a two-year period which caused its founders to give up on the notion of securing tax-exempt status and dissolve the organization. In an interview with a news agency, one of the founders of the group stated that "[w]e never got it off the ground . . . and the IRS is a large reason for that." [146] As of April 2015, the second test case, Albuquerque Tea Party, was still awaiting a decision from the IRS on its application which it first filed in December 2009.

EO Technical Group Manager Steven Grodnitzky told Committee Staff the following:

> Q. . . . [D]id you ever hear anybody at the IRS express any concern about the effect of this processing of these cases on these organizations? Did anybody say anything about it?
>
> A. Not—to my personal recollection.

> \*       \*       \*       \*       \*       \*       \*

> Q. . . . Were you at all concerned about the fact that these cases, these organizations were—were either dissolving or not responding to the requests for development? Did that give you any sense for maybe there was not good customer service here to these organizations?
>
> A. If an organization decided not to respond for whatever reason, that's their prerogative. And our policy and rules are

---

[146] USA Today, Short-lived Ohio Group was early test case for IRS (Sep. 23, 2013).

Exhibit E

if they don't respond to a particular letter, we close it out
FTE. . . .[147]

Recognizing the impact that an organization's "process" may have on its customers and then tailoring that process to minimize potential adverse effects would seem like a necessary and reasonable way to provide good customer service. It is abundantly clear from Grodnitzky's statements that EO management was not concerned at all with the adverse impact that organizations could experience if the IRS took years to process and decide their applications.

Cindy Thomas told Committee Staff that the work plan goal for closing applications for exemption under 501(c)(4) was 158 days, or approximately 5 months.[148] Holly Paz was asked if three or four years between receipt of an application and decision was normal. Paz stated to Committee Staff that "[i]t's not the norm." [149] However, Paz also told Committee Staff that she was aware of instances in which applicants waited four or five years for a decision on their applications for tax-exempt status.[150]

EO managers and employees routinely ignored the established IRM guidelines, which specify deadlines at various stages throughout the application process. For example, when an EO Determination employee decides that more information is needed about an application, the IRM allows five workdays to prepare and mail a development letter to the applicant.[151] Numerous Tea Party and political advocacy organizations heard nothing from the IRS for a year or more while their applications were pending, and then received a lengthy development letter seeking more information. This is but one example of EO employees failing to follow established deadlines and managers failing to enforce them.

When asked about the long delays experienced by Tea Party and other political advocacy groups seeking tax exemption, Nikole Flax stated her views as follows:

> "And I agree that was a problem. I mean, yes. And those are the problems that we were focused on, is all the organizations that ended up in the centralization, where they sat too long. I mean, I'm not defending any of that. That, in my mind, is the biggest offensive thing, is like, cases should not sit for 2 or 3 years or whatever they did. I mean, there is no excuse for that." [152]

While Flax's statements are an encouraging sign that someone at the IRS recognizes that EO owes taxpayers seeking exemption better customer service than they have recently received, the facts appear to suggest that her views are not universally shared within EO. Indeed, as of March 2014, nearly a year after TIGTA released its report on the IRS's use of inappropriate criteria to identify tax-exempt applications for review, more than 20 percent of the polit-

---

[147] SFC Interview of Steven Grodnitzky (Sep. 25, 2013) pp. 135–37. "FTE" stands for "Failure to Establish," which refers to applicants that stop responding to IRS communications and are deemed to have constructively withdrawn from the application process.
[148] SFC Interview of Cindy Thomas (July 25, 2013) pp. 186–87.
[149] SFC interview of Holly Paz (July 26, 2013) p. 11.
[150] Id.
[151] IRM §7.20.2.4.2 (Nov. 1, 2004).
[152] SFC Interview of Nikole Flax (Nov. 21, 2013) p. 135.

48

ical advocacy applications that were centralized between the years 2010 and 2013 were still awaiting a decision from the IRS. As indicated in the chart below, by April 2015, the IRS still had not rendered a decision on 10 of those political advocacy organizations.[153]

DISPOSITION OF CENTRALIZED POLITICAL ADVOCACY APPLICATIONS

| Date | Total Apps Centralized | Open/Pending | Resolved |
|------|------------------------|--------------|----------|
| Dec. 31, 2010 | 89 | 88 | 1 |
| Dec. 31, 2011 | 290 | 288 | 2 |
| Dec. 31, 2012 | 487 | 319 | 168 |
| Dec. 31, 2013 | 542 | 158 | 384 |
| Dec. 31, 2014 | 547 | 17 | 530 |
| Apr. 1, 2015 | 547 | 10 | 537 |

### 2. Remote Management and Workplace Flexibilities Affected the Efficiency of EO Determinations

From 2010 to 2013, EO Determinations in Cincinnati consisted of 13 Groups, each led by a Group Manager. Each Group consisted of approximately 12 EO Determinations agents. While many of EO Determinations' personnel were located in Cincinnati, there were a number of EO Determinations Groups situated in other locations across the United States, such as El Monte, California, Sacramento, California, Laguna Niguel, California, and Baltimore, Maryland. Agents in these Groups performed the same tasks as the agents located in Cincinnati, which included reviewing, developing and making recommendations on the disposition of applications for tax-exempt status.

While the EO Determinations offices were geographically dispersed, so was the management chain. For example, Sharon Camarillo, an EO Determinations Area Manager from 2002 to 2010, had responsibility in 2010 for eight Groups, five of which were located in Cincinnati, two of which were located in El Monte, California, and one of which was located in Sacramento, California. For a portion of the time Camarillo was an Area Manager, she was located in Los Angeles. In 2010, she was located in El Monte, California, together with two of the eight Groups that she supervised. Camarillo reported to Cindy Thomas, Program Manager of EO Determinations, who was located in Cincinnati. In 2010, Camarillo oversaw Group 7822 located in Cincinnati—the Emerging Issues Group managed by Steve Bowling, which was responsible for the processing of Tea Party and other political advocacy applications.

In addition to the dispersal of offices, staff and managers located throughout the country and time zone variances between offices, communications and coordination within EO Determinations may also have been affected by telework. For example, Gary Muthert, a screener in the Screening Group headed by John Shafer, told Committee Staff that he worked from home four days a week. Shafer, his manager, also worked from home two days a week. Steve Bowling, another Group Manager told Committee Staff that he worked from home 2 to 3 days a week. Shafer indicated that every one of the 13 screeners who worked in the screening Group

---

[153] Based on data provided to the SFC by the IRS (Apr. 8, 2015).

worked from home up to a maximum of four days per week, in accordance with the terms of a collective bargaining agreement. Regarding all other employees in EO Determinations, Shafer told Committee Staff the following:

> Q. And the other employees that were in the EO Determinations group in Cincinnati outside the screening group, the rest of them, were they also covered by that union agreement?
>
> A. Yes they were. Bargaining unit folks. Not, again, the managers.
>
> Q. So they could have worked at home up to 4 days a week?
> A. Yes.[154]

The following chart illustrates the difficulties that remote workplaces and telework placed on EO Determinations.

---

[154] SFC Interview of John Shafer (Sep. 17, 2013) p. 96.

Exhibit E

**Location of EO Determinations Employees Who Processed and Supervised Tea Party Applications in 2010**



51

This dispersal of staff and management undoubtedly complicated communication and coordination within EO Determinations. For example, the first Tea Party application identified as a "high profile" case by Jack Koester, a screener in EO Determinations, was sent by Koester to his manager, John Shafer, who was located in Cincinnati. Shafer then alerted Camarillo in California that the application had been received. Camarillo, in turn, apprised Thomas in Cincinnati of the development and sought guidance on how to handle the application. Camarillo not only contended with the geographic challenges of managing employees spread across the country and communicating with her superior who was in another locale, but also had to surmount the differences in time zones between her office and that of many of her employees and her supervisor. The circuitous path that information between staff and the various levels of management travelled surely hindered communications in EO Determinations.

Telework unquestionably serves a legitimate purpose. However, the pervasiveness of it in an office as fractionated as EO Determinations could only impede communications and coordination among the staff and managers.

3. Antagonism Existed Between EO Senior Executive Level Management and EO Determinations Managers and EO Line Employees

Another symptom of the problematic culture within the EO Division is the clear divide that existed between EO senior executive level management in Washington, D.C. and the mid-level managers and line employees in EO Determinations. Cindy Thomas explained her views of Lois Lerner as follows:

> . . . I don't think that she valued what employees were doing . . . she didn't really listen to what others had to say. She would cut you off and didn't allow people to express what was going on . . . it was like it didn't matter if other people had questions, so to speak. So I don't think she was a very good leader.[155]

Regarding Lerner's opinion of the line employees in EO Determinations, Thomas related the following to Committee Staff:

> Q. . . . Going back, you had said that Ms. Lerner had referred to the Cincinnati office, which does the kind of day-to-day work, as backwater?
> A. Right.
> Q. As low-level. Did employees in Cincinnati know that?
> A. Oh, yes.
> Q. Was there, a reaction—but I mean, did Lois realize that her words actually went back to employees, or did she perhaps just not?
> A. I know that when she referred to employees as backwater at one point in time, that . . . employees were talking about

---

[155] SFC Interview of Cindy Thomas (July 25, 2013) pp. 116–17.

52

it, you know, in Cincinnati . . . As far as "low-level," she did [say] that on May the 10th. . . .[156]

Thomas also felt that Lerner did not value EO Determinations because the employees were not attorneys. She expressed her views as follows:

> . . . Everybody has different levels of experience and different ideas and things, and we all have things to bring to the table. And just because a person is a lawyer doesn't make them any more important than anybody else . . . But I think that it was almost like a feeling like we're superior—I'm superior because I'm in the Washington Office, and you people in Determinations, you're all not lawyers and you're, like, backwater.[157]

Lois Lerner's polarizing words and actions had a demoralizing effect on both EO Determinations management and line employees. Those words and actions clearly exacerbated the atmosphere of antagonism that existed between the Cincinnati and Washington, D.C. EO offices.

#### 4. The IRS Failed To Ensure That All EO Employees Received Technical Training

EO employees administer a complex and nuanced area of the Internal Revenue Code, which includes statutes, regulations, revenue rulings, and other guidance issued by the Treasury Department. Although the IRS offered technical training to EO employees, it did not ensure that all employees received proper—or in some cases, any—technical training.

Sharon Camarillo was an area manager in EO Determinations for 8 years before she retired in December 2010. In that role, Camarillo oversaw several Groups of EO employees who evaluated applications for tax-exempt status that were submitted to the IRS, including the Technical Screening Unit, which was responsible for making the initial assessment of incoming applications. Yet Camarillo told Committee Staff that she "had no technical training in the area of Exempt Organizations, so I was not able to address technical issues."[158]

As a result of her lack of technical training, Camarillo was unable to provide feedback on substantive issues and instead deferred to other managers within EO. An example of Camarillo's deference occurred in February 2010, when the manager of the Technical Screening Unit, John Shafer, brought the first Tea Party application to her attention. Camarillo explained that she "simply reiterated what John had said and forwarded it on" to her manager, Thomas, "[b]ecause I was so untechnical, I did not have the EO background."[159]

In the culture of the IRS organization, it was not only acceptable for an employee who had no technical knowledge to be elevated to

---

[156] *Id.* p. 122.

[157] *Id.* pp. 117–18.

[158] SFC Interview of Sharon Camarillo (Sep. 26, 2013) p. 7. Camarillo explained that she was scheduled to attend a 6-week training session at one time during her tenure in EO, but she was removed from the session after one day by Thomas. *Id.* p. 25.

[159] Id. p. 16.

53

a managerial position, it was also acceptable for an employee to re-main in that position for nearly a decade without completing any meaningful technical training.

## F. LOIS LERNER OVERSAW THE HANDLING OF TEA PARTY APPLICA-TIONS AND PROVIDED LIMITED INFORMATION TO UPPER-LEVEL MANAGEMENT

As the Director of EO who was well-versed in the tax law of ex-empt organizations, Lerner was given a great amount of autonomy to manage the work of her division. The most senior official in EO, Lerner was responsible for keeping upper IRS management in-formed about significant issues within the organization that she oversaw. As she explained to one of her subordinates:

> [W]e ensure that all of our [senior] managers are aware of all highly visible hot button issues. Our job is to report up to our bosses on anything that might end up on the front page of the NY Times.[160]

Lerner first became aware that the IRS received applications from Tea Party groups in April or May 2010. Although Lerner be-came personally involved with the handling of these applications, upper-level IRS management remained largely unaware that the IRS had received applications from Tea Party groups. As a result, Lerner was left to oversee the processing of these applications with negligible oversight or accountability.

### 1. Lois Lerner Was Informed About the Tea Party Applications in April 2010 and Received Updates About Them

The Tea Party applications were first brought to Lerner's atten-tion soon after Jack Koester in Cincinnati flagged them. On April 28, 2010, the Acting Manager of EO Technical, Steven Grodnitzky, sent Lerner a chart summarizing the SCRs. The first entry on the chart was the Tea Party applications. Grodnitzky drew Lerner's at-tention to this entry in his cover email, where he stated:

> Of note, we added one new SCR concerning 2 Tea Party cases that are being worked in DC. Currently, there are 13 Tea Party cases out in EO Determinations and we are coordinating with them to provide direction as to how to consistently develop those cases based on our develop-ment of the ones in DC.[161]

On May 13, 2010, Grodnitzky updated Lerner on the status of the Tea Party applications and other SCRs prepared by EO Tech-nical.[162] Lerner responded by asking about the Tea Party applica-tions, and specifically, the basis of their exemption requests. Lerner instructed Grodnitzky that "[a]ll cases on your list should not go out without a heads up to me please." Grodnitzky then provided more information about the status of the cases (emphasis added):

---

[160] Email chain between Lois Lerner, Nanette Downing and others (May 10–11, 2011) IRS0000014917–20.
   [161] Email from Steven Grodnitzky to Lois Lerner, Robert Choi and others (Apr. 28, 2010) IRS0000141809–11.
   [162] Email chain between Steven Grodnitzky, Lois Lerner, Robert Choi and others (May 13–16, 2010) IRS0000167872–73.

54

> We have tea party cases here in EOT and in Cincy. In [EO Technical], there is a (c)(3) application and a (c)(4) application. In Cincy, there are 10 (c)(4)s and a couple of (c)(3)s. **The organizations are arguing education, but the big issue for us is whether they are engaged in political campaign activity.** We are in the development process at this point here in DC, and I have asked the [Tax Law Specialist] and front line manager to coordinate with Cincy as to how to develop their cases, but not resolve anything until we get clearance from you and Rob.
>
> The tea party cases, like the others on the list, are the subject of an SCR, and I customarily give Rob a heads up, b**ut of course can let you know as well before anything happens.**[163]

Lerner continued to receive updates about the status of the Tea Party applications throughout 2010, including revised SCRs that she received at the end of May 2010, in July 2010, in September 2010, and in November 2010.[164]

Lerner grew more concerned about the Tea Party applications in early 2011. On February 1, 2011, Michael Seto, the Acting Manager of EO Technical, sent an updated SCR table to Lerner. She responded, "Tea Party Matter very dangerous—This could be the vehicle to go to court on the issue of whether Citizen's United overturning the ban on corporate spending applies to tax exempt rules." Lerner indicated that Chief Counsel and Judy Kindell needed to be involved with these applications and that they should not be handled by Cincinnati.[165]

The following day, Paz advised Lerner that Carter Hull was supervising the applications handled by Cincinnati at every step and that no decision would be made until EO Technical completed the review of the 501(c)(3) and 501(c)(4) applications. Lerner noted that "even if we go with a 4 on the Tea Party cases, they may want to argue they should be 3s, so it would be great if we can get there without saying the only reason they don't get a 3 is political activity."[166]

A few months later, Lerner convened a meeting to further discuss the Tea Party and other advocacy applications. In preparation for the meeting, Justin Lowe developed a briefing paper for Lerner.[167] The paper indicated that EO Determinations Screening identified as an "emerging issue" a number of 501(c)(3) and (c)(4) applications by organizations "advocating on issues related to government spending, taxes and related matters." These applications were being sent to a specific group if they met any of the following criteria:

---

[163] *Id.*

[164] Email from Steven Grodnitzky to Lois Lerner, Robert Choi and others (May 27, 2010) IRS0000141812–14; Email chain between Theodore Lieber, Lois Lerner and others (July 27–30, 2010) IRS0000807076–115 (email attachments containing taxpayer information omitted by Committee staff); Email from Steven Grodnitzky to Lois Lerner, Robert Choi and others (Sep. 30, 2010) IRS0000156433–36; Email from Holly Paz to Lois Lerner, Robert Choi and others (Nov. 3, 2010) IRS0000156478–81.

[165] Email chain between Holly Paz, Lois Lerner and Michael Seto (Feb. 1–2, 2011) IRS0000159431–33.

[166] *Id.*

[167] SFC Interview of Holly Paz (July 26, 2013) p. 86. The meeting was originally scheduled for June 29, 2011, but was rescheduled for July 5, 2011.

- "Tea Party," "Patriots," or "9/12 Project" is referenced in the case file.
- Issues include Government spending, Government debt, or taxes.
- Education of the public via advocacy/lobbying to "make America a better place to live."
- Statements in the case file criticize how the country is being run.

The briefing paper also noted that:
- More than 100 cases that meet these criteria have been identified so far, but only two 501(c)(4) organizations have been approved.
- EO Technical is assisting EO Determinations by reviewing files and editing development letters; and
- EO Determinations requests guidance on how to process the cases to ensure uniformity.[168]

On July 5, 2011, Lerner discussed the Tea Party applications, including the BOLO entry and screening criteria, with Thomas, Paz, Kindell and others.[169] Lerner directed changes, as described herein in Section VI(B)(2), although her management was largely passive until the media and Congress became involved in 2012.

## 2. Lois Lerner Failed To Inform IRS Upper Management About the Tea Party Applications

Lerner's first line of management was the TE/GE Division Commissioner, a position that was held at relevant times first by Ingram and then by Grant.[170] While Ingram was Division Commissioner of TE/GE, she had little face-to-face contact with Lerner—their chief interactions were at quarterly meetings and reviews—although they did regularly exchange emails.[171] Ingram did not learn that the IRS had received Tea Party applications until late 2011 or early 2012, when she read newspaper articles about problems the groups were encountering with the IRS.[172] The first time that she learned of allegations that the IRS was treating certain applications inappropriately was during a staff meeting in 2012, when Grant or Flax presented information about congressional inquiries related to these organizations.[173]

Although Grant directly supervised Lerner from December 2010 through May 2013, they had "relatively minimal interaction" with each other.[174] Grant first became aware of the allegations that the IRS was treating Tea Party applications differently than other applicants in February or March of 2012, when the IRS began receiv-

---

[168] Email from Justin Lowe to Holly Paz and others (June, 27, 2011) IRS0000431165–66.
[169] SFC Interview of Holly Paz (July 26, 2013) pp. 86–89; SFC Interview of Cindy Thomas (July 25, 2013) pp. 53–55.
[170] Ingram served in that role from May 2009 to December 2010, when she became the Acting Director of the newly-created Services and Enforcement Affordable Care Act Office. Until the spring of 2013, Ingram also continued to serve as the Commissioner of TE/GE, providing high-level direction while Joseph Grant performed most of the duties as the Acting Director of TE/GE. Grant's position as Division Commissioner of TE/GE became permanent in May 2013, shortly before he retired from the IRS on June 3, 2013. SFC Interview of Sarah Hall Ingram (Dec 16, 2013) pp. 10, 19–20; SFC Interview of Joseph Grant (Sep. 20, 2013) pp. 5–6.
[171] SFC Interview of Sarah Hall Ingram (Dec 16, 2013) p. 18.
[172] *Id.* pp. 42–43.
[173] *Id.* pp. 64–68.
[174] SFC Interview of Joseph Grant (Sep. 20, 2013) p. 63.

ing letters from Congress.[175] He also asserted that Lerner did not tell him about the July 5, 2011 meeting about Tea Party applications until April of the following year.[176]

Lerner's second level of management was the Deputy Commissioner for Services & Enforcement, a position held by Steven Miller from late 2009 through November 2012, when he became Acting Commissioner of the IRS. As Deputy Commissioner for Services & Enforcement, Miller oversaw the IRS's four primary operating divisions, including the TE/GE Division, and reported directly to the IRS Commissioner.[177] Lerner worked closely with Steven Miller on issues related to exempt organizations, sometimes bypassing Ingram and Grant, as Miller had previous experience in that area and had served as the Director of EO in the early 2000s.[178]

Miller generally found that Lerner was "pretty good about elevating" important issues to him.[179] But he claims that he did not become aware of how the IRS was handling Tea Party applications until early 2012, when he saw accounts in the press of the IRS asking overly burdensome questions of these applicants, including requests for donor information.[180] Miller discussed these issues with Commissioner Shulman while Shulman was preparing to testify before Congress in March 2012. Around that time was also the first point when Shulman became aware of the pending Tea Party applications.[181]

Miller became increasingly concerned with how the applications were being handled and, as Ingram explained, during a meeting with senior staff "express[ed] great frustration, and I'm putting that mildly, that . . . he wasn't . . . getting a complete description of what was going on[.]"[182] Based on the information he received from Lerner, Miller "was not comfortable responding to the congressional [requests] that he had at that point."[183] To alleviate these concerns, in April 2012 Miller ordered Nancy Marks to visit Cincinnati and find out what was going on, then report to him directly. Lerner was notably absent from the group of employees sent to Cincinnati. Around that time, Miller informed Shulman of Marks' planned visit and also told Shulman that TIGTA was starting a review.[184]

On May 3, 2012, Marks briefed Miller on the key findings from her trip to Cincinnati, which included:

- The use of inappropriate and sometimes intrusive development questions resulted from a lack of guidance and training by EO Technical to EO Determinations;
- There were 250–300 political advocacy cases in the queue;
- EO Determinations agents used a "BOLO" list with "Tea Party" and "9/12" on it as screening criteria but that the problem with using such criteria had been "fixed" earlier;

[175] *Id*. p. 9.
[176] *Id*. pp. 14–15.
[177] SFC Interview of Steven Miller (Dec. 12, 2013) pp. 16–17.
[178] SFC Interview of Joseph Grant (Sep. 20, 2013) pp. 53–55; SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 12.
[179] SFC Interview of Steven Miller (Dec. 12, 2013) p. 242.
[180] *Id*. pp. 123–128.
[181] SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 32–35.
[182] SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 77.
[183] *Id*. p. 79.
[184] SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 35–37.

- Among the political advocacy cases in the queue were cases on both sides of the political spectrum;
- TIGTA was reviewing EO's treatment of the cases; and
- Marks found no evidence of political bias.[185]

Soon after being briefed by Marks, Miller conveyed to Shulman the salient points of Marks' findings, including the existence of the BOLO list and its criteria, one of which was "Tea Party." Shulman was concerned that "Tea Party" was on the BOLO, but he didn't follow up because Miller told him that the issue was resolved and TIGTA was investigating.[186] On May 30, 2012, Inspector General George briefed Miller and Shulman about TIGTA's audit, and specifically discussed his concern about screening criteria including the Tea Party, Patriots, 9/12 and other policy issues.[187]

After May 2012, Miller asked for periodic updates about the status of political advocacy applications and monitored their processing, keeping track of the number of applications that were still open. Miller "periodically" gave Shulman updates about the political advocacy applications, telling Shulman, "[W]e've got people on it, we're moving cases, we're putting determinations out; and [giving] the impression that, you know, the lag issue of approval was being worked on." [188]

Upon reflection, Miller believes that Lerner "under-managed" the political advocacy applications and should have made him aware of them sooner: "Certainly, before May [2012] I should've been aware that she found [problems with the handling of political advocacy applications]." [189]

### 3. Lerner Did Not Consult With IRS Chief Counsel William Wilkins About the Tea Party Applications

It does not appear that Lerner directly contacted IRS Chief Counsel William Wilkins to discuss the pending applications submitted by Tea Party and other political advocacy organizations. Like many senior officials within the IRS, Wilkins first learned that the IRS was reviewing applications from political advocacy groups in March of 2012.

The issue first rose to Wilkins when the Office of Chief Counsel was asked to review a guidesheet that was initially prepared by EO Technical.[190] Wilkins skimmed the guidesheet but never provided substantive comments or edits. He understood that EO Determinations employees would use the guidesheet to decide if applicants were engaging in political campaign intervention, but he did not know that the guidesheet was spurred by uncertainty over how to handle the Tea Party applications.[191] By that point, other attorneys in the Office of Chief Counsel had been assisting with political

---

[185] SFC Interview of Steven Miller (Dec. 12, 2013) pp. 133–141.
[186] SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 37–44.
[187] TIGTA Summary of Briefings to IRS and Treasury Leadership, Provided to SFC on May 19, 2014.
[188] SFC Interview of Douglas Shulman (Dec. 3, 2013) p. 80.
[189] SFC Interview of Steven Miller (Dec. 12, 2013) pp. 184, 240–41.
[190] SFC Interview of William Wilkins (Nov. 7, 2013) p. 24; Email from Michael Blumenfeld to William Wilkins and others (Mar. 13, 2012) IRS0000061498–505.
[191] SFC Interview of William Wilkins (Nov. 7, 2013) p. 24.

advocacy applications for nearly a year—but no one had informed Wilkins of their work.[192]

As the most senior attorney available to IRS management, Wilkins could have perhaps assisted with the legal questions posed by the political advocacy applicants if Lerner—or any other manager within the TE/GE chain—sought his help. Instead, Wilkins first learned that Tea Party organizations had applied for tax-exempt status, and that the IRS had screened organizations for full development based on their names, when he read the draft TIGTA report in April 2013.[193]

## G. Even During the Committee's Investigation, Some IRS Employees Continued To Screen Tea Party Applications Based on the Organization's Names

On June 20, 2013, the IRS suspended use of the BOLO list and instructed EO employees to follow generally-applicable procedures when reviewing applications for tax-exempt status.[194] Committee staff interviewed a number of EO Employees in the months following this directive. From these interviews, it is clear that the suspension of the BOLO left a procedural void and that at least some EO Determinations employees continued to screen cases by looking for "Tea Party" and other inappropriate terms in the organization name.

Cindy Thomas, who oversaw EO Determinations, explained that some types of applications were still sent to particular groups of employees for processing, even in the absence of a formal BOLO:

> I have asked the question about what are we supposed to do with like health care cases? We have a group that coordinates the cases when they come in and we have the advocacy cases. Are we, what are we supposed to do? And what I was told is that we can still have cases go to a designated group for consistency purposes, that maybe the BOLO was really more of a routing document to instruct specialists or screeners where to route cases more than anything. And we are still having cases to be routed to the group that worked health care cases, they still get cases routed to them, and the group that was coordinating advocacy cases they still are going to that group that was coordinating those cases.

One employee who screened incoming applications, Gary Muthert, opined that the absence of the BOLO "will lead to more inconsistent processing of applications."[195] Muthert also expressed confusion about how he should handle incoming applications from Tea Party organizations:

> Q. Let me ask you if currently, if you get two applications, one is for the Tea Party of Arkansas or whatever, the other is

[192] *Id.* pp. 38–39.

[193] *Id.* pp. 24, 35.

[194] Memorandum from Karen Schiller, Interim Guidance on the Suspension of BOLO List Usage (June 20, 2013). The memorandum instructed employees to immediately stop using the BOLO spreadsheet, including the Emerging Issues tab and the Watch List tab. However, employees were permitted to continue using other lists to identify and prevent waste, fraud and abuse.

[195] SFC Interview of Gary Muthert (July 30, 2013) (not transcribed).

Exhibit E

for Americans for Apple Pie, or something else, are the cases treated the same or is there still concern over how to consistently treat Tea Party cases?

A. In my opinion there's still concern because no one's resolved the issue. I mean, for me, it's like what am I supposed to do with this thing?[196]

Another screener, Jack Koester, stated that screeners "really don't have any direction or we haven't had any" since the BOLO was suspended.[197] On August 1, 2013, Koester explained that if he was assigned to review an incoming application with the words "Tea Party" in its name, he would ask another IRS employee to also review the application, even if there was no evidence of political activity:

Q. If you saw—I am asking this currently, if today if a Tea Party case, a group—a case from a Tea Party group came in to your desk, you reviewed the file and there was no evidence of political activity, would you potentially approve that case? Is that something you would do?

A. At this point I would send it to secondary screening, political advocacy.

Q. So you would treat a Tea Party group as a political advocacy case even if there was no evidence of political activity on the application. Is that right?

A. Based on my current manager's direction, uh huh.[198]

Based on this testimony, it appears that several months after TIGTA released their report, employees lacked appropriate instructions from management and possibly continued to pull out applications containing the words "Tea Party" for separate processing, despite the suspension of the BOLO and other assurances that the IRS had stopped these practices.[199]

H. For a Three-Year Period, The IRS Did Not Perform Any Audits of Tax-Exempt Organizations That Were Alleged to Have Engaged in Improper Political Campaign Intervention

After the Supreme Court's *Citizens United* decision in January 2010, the IRS became increasingly concerned with the amount of money spent to influence elections by tax-exempt organizations. (See Section IV.) . . . The IRS received an increasing number of allegations after *Citizens United* that tax-exempt organizations were engaging in an impermissible level of political campaign intervention. Under existing procedures, these allegations would be reviewed by EO Examinations employees who had discretion to open an audit. EO Examinations Director Nanette Downing, Lerner and

---

[196] *Id.*
[197] SFC Interview of Jack Koester (Aug. 1, 2013) p. 29.
[198] *Id.* pp. 39–40. As Koester and other EO Determinations employees explained, the secondary screening process entailed a second review by an employee who was familiar with a particular type of applications. This same process was first used to screen incoming applicants from Tea Party organizations in 2010. *Id.* p. 35; SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 27–28, 44–45.
[199] Since the Committee conducted the interviews referenced in this section, the IRS has issued additional guidance to employees implementing new procedures for reviewing tax-exempt applications. *See, e.g.,* Memorandum from Kenneth Corbin, Expansion of Optional Expedited Process for Certain Exemption Applications Under Section 501(c)(4) (Dec. 23, 2013); Memorandum from Stephen Martin, Streamlined Processing Guidelines for All Cases (Feb. 28, 2014). We have no knowledge of whether the IRS's recent guidance has affected the screening procedures applied to incoming applications for tax-exempt status.

Exhibit E

60

other managers believed that the IRS needed new procedures and better employee training to effectively process these allegations. By the end of 2010, Downing suspended all examinations of 501(c)(4) organizations that were alleged to have engaged in improper political campaign intervention. (See Section IX(A).)

High-level IRS managers, including Miller, Lerner and Downing, spent the next three years attempting to devise a new approach that would enable the IRS to effectively evaluate allegations related to political campaign intervention of tax-exempt organizations. Although these managers understood the importance of the issue and devoted significant time and resources to the project, they failed to put a new approach in place. As a result, from the end of 2010 until April 2014, the IRS did not perform any examinations of 501(c)(4) organizations related to impermissible political campaign intervention.

**Sections IV through VIII provide further detail about the facts that support the Committee's findings related to the Determinations process.**

## IV. FOLLOWING THE CITIZENS UNITED CASE, THE IRS FACED EXTERNAL PRESSURE TO MONITOR AND CURTAIL POLITICAL SPENDING OF TAX-EXEMPT ORGANIZATIONS

> *This section describes the environment within which the IRS EO Division operated from 2010–2013 in the wake of the Citizens United case.*

The IRS has long been concerned with political spending by tax-exempt organizations. As Sarah Hall Ingram, former Commissioner of TE/GE and an employee of the IRS for more than 30 years, explained:

> For decades, the issue of what activities are on which side of the line and what's permitted, and the factual issues around who's crossed the lines and who hasn't, that is a very old question.[200]

Ingram further observed that the focus on political spending tended to intensify at the close of election cycles.[201] Although the issue was not a novel one for the IRS, the level of external scrutiny on the agency increased dramatically after the Supreme Court issued its decision in *Citizens United* v. *Federal Election Commission*, 130 S. Ct. 876 (2010).

### A. EMPLOYEES THROUGHOUT THE IRS EXEMPT ORGANIZATIONS DIVISION WERE AWARE OF THE CITIZENS UNITED DECISION

On January 21, 2010, the Supreme Court issued its decision in *Citizens United*, striking down parts of the Bipartisan Campaign Reform Act of 2002 (McCain-Feingold Act). The chief holding was that "[p]olitical spending is a form of protected speech under the First Amendment, and the government may not keep corporations or unions from spending money to support or denounce individual

---

[200] SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 33.
[201] *Id.* p. 32.

Exhibit E

candidates in elections."[202] Although *Citizens United* directly addressed laws administered by the FEC, observers quickly predicted that the case might also have implications for the Internal Revenue Code and IRS regulations. On the day after the decision was announced, Lerner brought the case to the attention of upper-level TE/GE management and the Chief Counsel's office. Lerner believed that the case would probably not change IRS rules regarding tax exemption, but she recommended that the IRS prepare itself for inquiries regarding campaign spending by 501(c)(3) and 501(c)(4) organizations.[203] Ingram agreed that the agency should prepare Q&As as she thought that the case might result in a "test of the tax-exemption issue" in the courts.[204]

Lerner and others then prepared a few draft Q&As that could be posted to the IRS website to explain the effect of the holding on the IRS's enforcement of its regulations.[205] The Q&As restated established law regarding the activities of tax-exempt organizations and explained that Citizens United did not address the requirements that Congress imposed on organizations as a condition of being tax-exempt.[206] Ultimately, the IRS decided not to post any guidance about the case on its website though, as Ingram believed "it was sort of hard to explain why the IRS would be commenting on the FEC case in an affirmative way and also because all the other answers [in the Q&As] were already up on the Web in one format or another."[207] Lerner also observed that "[t]his is the danger zone no matter what we say."[208] The Q&As were provided to Commissioner Shulman and Steve Miller, so they could be prepared if the issue came up at a public event.[209]

Line employees in the EO Division were also aware of the *Citizens United* decision, independent of any notification by management. On the day after the decision was issued, an EO employee in Cincinnati forwarded Politico's analysis of the case to several of his colleagues, noting that it "[l]ooks like yesterday's Supreme Court ruling is going to result in more (c)(4)s engaging in political activities and the death of 527s."[210]

Two EO Determinations employees in Cincinnati assessed the potential impact of *Citizens United* on incoming applications for tax-exempt status. In August 2010, a screener in EO Determinations noted that an incoming application "appears to be using a recently decided Supreme Court case, '*Citizens United* v *Federal Election Commission*' which loosened some of the limits on for profit and nonprofit organizations with regard to political activities and expenditures."[211] The screener then recommended forwarding the case to upper management based on "the current political climate

[202] *Citizens United* v. *Federal Election Commission*, SCOTUSblog.
[203] Email chain between Sarah Ingram, Lois Lerner, Steve Miller and others (Jan. 22–24, 2010) IRS0000444375–77.
[204] *Id.*
[205] Email chain between Nikole Flax, Sarah Hall Ingram, Cathy Livingston and others (Jan. 24–25, 2010) IRS0000442110–12.
[206] *Id.*
[207] SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 40.
[208] Email chain between Nikole Flax, Sarah Hall Ingram, Cathy Livingston and others (Jan. 24–25, 2010) IRS0000575821–24.
[209] *Id.*
[210] Email from Michael Tierny to Faye Ng and others (Jan. 22, 2010) IRS0000639344–48.
[211] Email chain between Jack Koester, John Shafer and Gary Muthert (Aug. 3–4, 2010) IRS0000487033–35.

and possible sensitivity of the application".[212] The following month, an EO Determinations employee alerted a colleague about political contributions made by a potential applicant for tax-exempt status, which the employee believed were possible because of the *Citizens United* ruling.[213]

The impact of the *Citizens United* ruling on the IRS would remain a topic of discussion throughout the agency during the next several years, as noted below.

## B. THERE WAS EXTENSIVE PRESS COVERAGE OF POLITICAL SPENDING BY TAX-EXEMPT ORGANIZATIONS FOLLOWING CITIZENS UNITED

Political spending was a topic of continued interest in the press during the 2010 election year and beyond. The IRS had an active role in media coverage, and sometimes made senior employees available for interviews with reporters or offered comments on behalf of the agency. Some senior managers and employees in EO monitored the news and shared relevant articles about political spending by tax-exempt organizations with colleagues. These articles were often critical of the IRS and encouraged the agency to do more to rein in political spending.

At times, the IRS helped reporters understand the tax law and agency processes. The following examples occurred during the height of the 2010 election cycle:

• In August 2010, *The Washington Post* reporter Tim Farnam had contacted the IRS about campaign-related activity by 501(c)(4) and 527 organizations.[214] An employee in the media relations branch notified Ingram, Miller and Jonathan Davis, Commissioner Shulman's Chief of Staff, that employees in TE/GE provided existing data to Tim Farnam.[215] *The Washington Post* published Mr. Farnam's story a few days later, which discussed how Citizens United "has indirectly thrust the Internal Revenue Service into the more prominent role of overseeing [campaign] expenditures."[216] The published article was circulated among IRS managers, including Lerner and Ingram.[217]

• In September 2010, a reporter from the *New York Times* contacted the IRS about the operations of 501(c)(4) organizations after the *Citizens United* decision, and specifically, Crossroads GPS.[218] IRS press staff alerted Commissioner Shulman, Miller, Ingram, Lerner, and others about the expected story, noting, "One area raised as a concern are those groups that set up and function for a short period of time, and we are not aware of them until they file their return, well after their po-

[212] *Id.*
[213] Email from Michael Condon to Gary Muthert (Sep. 28, 2010) IRS0000487036.
[214] Email from Michelle Eldridge to Steve Miller, Sarah Ingram, Lois Lerner and others (Aug. 6, 2010) IRS0000452184.
[215] *Id.*
[216] Email chain between Lois Lerner, Joe Urban and others (Aug. 22, 2010) IRS0000210591–93.
[217] *Id.*
[218] Email chain between Steve Pyrek, Terry Lemons, Sarah Ingram and others (Sep. 21, 2010) IRS0000508974–76.

63

tential lobbying efforts and other activities are complete."[219] Ingram, Lerner and senior EO employee Judy Kindell spoke with the reporter on background, and Ingram provided a statement on the record that was drafted by Miller, Lerner, Ingram, and others.[220] The reporter subsequently published an article focusing on political spending by 501(c)(4) organizations in the 2010 election, focusing on Crossroads GPS.[221] Ingram stated that the article "came out pretty well" and she opined that "the 'secret donor' theme will continue."[222]

The press continued to run articles on political advocacy spending by tax-exempt organizations throughout 2011 and 2012. These articles were routinely distributed among EO managers, TE/GE management, and the Commissioner's office.[223]

Employees outside of IRS management also followed the media's coverage of this topic. Indeed, some staff-level employees in EO Determinations monitored the news and shared among themselves many of the same articles noticed by upper managers—particularly the *EO Tax Journal*, which often compiled relevant stories from other media sources.[224] A number of the EO Determinations employees who shared articles were responsible for reviewing and deciding incoming applications for tax-exempt status. Thus, employees at every level of the IRS were aware of the media's coverage of spending by tax-exempt organizations in the wake of the *Citizens United* ruling.

## C. MANY MEMBERS OF CONGRESS EXPRESSED THEIR INTEREST IN POLITICAL SPENDING BY TAX-EXEMPT ORGANIZATIONS

In recent years, Congress has become increasingly engaged in the issue of political spending by tax-exempt organizations. Members of both houses of Congress—and from both major political parties—frequently encouraged IRS action through speeches and direct requests to the IRS.

---

[219] Email chain between Michelle Eldridge, Steve Miller and others (Sep. 20, 2010) IRS0000211382.

[220] *Id.*; Email chain between Nikole Flax, Steve Miller, Ron Shultz and others (Sep. 20, 2010) IRS0000219086–91.

[221] Email chain between Steve Pyrek, Terry Lemons, Sarah Hall Ingram and others (Sep. 21, 2010) IRS0000508974–76.

[222] *Id.*

[223] IRS Urged to Investigate Charity for Possible Political Activity, *Tax Analysts* (Apr. 1, 2010) IRS0000230462–77; As Campaign Money Pours In So Do Complaints, *The Washington Post* (Oct. 13, 2010) IRS0000071305–06; 3 Groups Denied Break by I.R.S. Are Named, *New York Times* (July 21, 2011) IRS0000012346–47; The I.R.S. Does Its Job, *New York Times* (Mar. 8, 2012) IRS0000212452–53; How Dark-Money Groups Sneak by the Taxman, *Mother Jones* (June 13, 2012) IRS0000177467–75; How Nonprofits Spend Millions on Elections and Call it Public Welfare, *ProPublica* (Aug 20, 2012) IRS0000180278–304; The IRS's Feeble Grip on Big Political Cash, Politico (Oct. 15, 2012) IRS0000180729–30.

[224] Is 501(c)(4) Status Being Abused?, *EO Tax Journal* (Sep. 14, 2010) IRS0000512236–40; *New York Times* Primer on EO Tax Law, *EO Tax Journal* (Oct. 18, 2010) IRS0000385201–06; If You Can't Beat Them, Join Them, *EO Tax Journal* (Apr. 14, 2011) IRS0000645590; 3 Groups Denied Break by I.R.S. Are Named, *New York Times* (July 21, 2011) IRS0000531334–39; Groups Challenge Legality of IRS Regs as Failing to Properly Limit Campaign Activity by 501(c)(4) Organizations, *EO Tax Journal* (July 28, 2011) IRS0000385238–50; Seven Democratic Senators Ask Whether IRS Investigating Political (c)(4)s, *EO Tax Journal* (Feb. 17, 2012) IRS0000529987–93.

64

From the end of 2008 through early 2013, the IRS received 35 formal Congressional requests about tax-exempt organizations.[225] These requests covered a wide range of issues, including political spending by tax-exempt organizations; imposition of the gift tax on donors to tax-exempt organizations; questions about the status of a particular organization; and suggested changes to IRS regulations.[226] Incoming Congressional requests were forwarded to senior IRS management and the typical clearance process for requests related to tax-exempt issues involved getting feedback from high-level management in TE/GE, the Legislative Affairs office, and often the Commissioner's office. Beginning in July 2012, all Congressional responses involving 501(c)(4) organizations were vetted by Steve Miller's Chief of Staff, Nikole Flax, before being finalized.[227]

In addition to these 35 formal requests, members of Congress also spoke about political spending in floor speeches[228] and made informal requests to the IRS, sometimes through staff.[229] The continued interest by Congress ensured that the IRS—and particularly its top managers—stayed focused on these issues.

### D. PRACTITIONERS AND INTEREST GROUPS REQUESTED IRS ACTION ON POLITICAL SPENDING BY TAX-EXEMPT ORGANIZATIONS

As an agency charged with serving the public, IRS employees had frequent interaction with tax practitioners and other interested parties about political spending by tax-exempt organizations. Many supported specific reforms to the IRS regulations; but others focused on the actions of particular organizations applying for, or holding, tax-exempt status. A few examples that are generally representative of IRS interactions with the public are described below:

• In February 2011, Citizens for Responsibility and Ethics in Washington wrote to Commissioner Shulman asking the IRS to revoke the tax-exempt status of American Future Fund, Inc. The request was circulated among EO managers.[230]

• In March 2011 and September 2012, Lerner, Kindell and Treasury employee Ruth Madrigal corresponded directly with attorneys from the law firm of Adler & Colvin about proposed changes to the regulations for 501(c)(4) organizations. Lerner considered the possibility of meeting with the outside firm to discuss their proposals.[231]

• In September 2011, Democracy 21 and the Campaign Legal Center wrote to Lerner to request an IRS investigation of the tax-exempt status of four organizations, including Crossroads GPS, alleging that the groups conducted impermissible amounts of political campaign intervention. Lerner forwarded the request to EO Exam and instructed that it be treated as

---

[225] Email from Jorge Castro to Nikole Flax (Jan. 28, 2013) IRS0000292300–09. During that time, the IRS also received numerous informal requests from members of Congress and staff that are not captured in this exhibit.

[226] *Id.*

[227] Email from Lois Lerner to Holly Paz and others (July 24, 2012) IRS0000179669.

[228] *E.g.*, Email from Lois Lerner to Holly Paz and others (Apr. 17, 2012) IRS0000325929–30.

[229] *E.g.*, Email from Holly Paz to Lois Lerner (May 2, 2013) IRS0000409884.

[230] Email from Joseph Urban to Holly Paz and others (Feb. 2, 2011) IRS0000350193–97.

[231] Email chain between Lois Lerner, Ruth Madrigal, Holly Paz and others (Mar. 2, 2011) IRS0000634267–69; Email chain between Gregory Colvin, Lois Lerner and Judith Kindell (Aug. 24–27, 2012) IRS0000572618–19.

Exhibit E

65

a referral for examination. Lerner also informed the TE/GE Acting Commissioner, Joseph Grant, and Nikole Flax about the request and noted that it "also went to the Commissioner."[232]

• In February 2012, a tax practitioner contacted a local IRS office about an article titled "Is the IRS Attempting to Intimidate Local Tea Parties?" The request was flagged as practitioner "noise" and forwarded to management for their awareness, and was ultimately sent to Miller.[233]

• In December 2012, Democracy 21 and the Campaign Legal Center requested to meet with the IRS about its petition for rulemaking on candidate election activities by 501(c)(4) organizations. On January 4, 2013, the groups met with Lerner, Victoria Judson from the Office of Chief Counsel and Treasury employee Ruth Madrigal to discuss the proposal.[234]

These continual discussions with outside groups ensured that the IRS stayed focused on the issue of political spending by tax-exempt organizations.

E. In Response to External Scrutiny and Increased Political Spending by Tax-Exempt Organizations, the IRS Tracked Political Spending and Proposed Regulatory Changes

Lois Lerner described what she may have believed was pressure on the IRS to address political advocacy activities, especially within the TE/GE office, in a speech at Duke University's Sanford School of Public Policy in October 2010:

> The Supreme Court dealt it a huge blow [*in Citizens United*], overturning a 100-year old precedent that said basically corporations could give directly in political campaigns, and everyone is up in arms because they don't like it. The Federal Election Commission can't do anything about it. They want the IRS to fix the problem. The IRS laws are not set up to fix the problem. . . . So everybody is screaming at us right now, "Fix it now before the election, can't you see how much these people are spending?" I won't know until I look at their 990s next year whether they have done more than their primary activity as a political or not. So I can't do anything right now.[235]

After the 2010 election, the IRS became increasingly concerned with the amount and frequency of money spent to influence elections by tax-exempt organizations. Writing in 2012, Steve Miller observed that after the decision, there was a "rise of super PACS."[236] Miller noted that the decision contributed to an increase in 501(c)(4) organizations that can engage in "unlimited issue advocacy" but "limited political campaign activity."[237] Miller also noted

---

[232] Email from Lois Lerner to David Fish (Sep. 30, 2011) IRS0000511994–2018.
[233] Email chain between Steven Miller, Faris Fink and others (Feb. 29, 2012) IRS0000341677–80.
[234] Email chain between Lois Lerner, Ruth Madrigal and others (Dec. 14–19, 2012) IRS0000446771–75; SFC Interview of Victoria Judson (Sep. 11, 2013) pp. 40–43.
[235] SFC Transcription of Video Available on Youtube.com, Lois Lerner Discusses Political Pressure on IRS in 2010 (Oct. 19, 2010) <https://www.youtube.com/watch?v=EH1ZRyq-1iM>.
[236] Steve Miller notes (March 14, 2012) IRS0000506870–71.
[237] *Id.*

66

an increase in political spending by 501(c)(4) organizations at the Senate Finance Committee hearing on May 21, 2013:

> There is no doubt that since 2010 when *Citizens United* sort of released this wave of cash that some of that cash headed towards (c)(4) organizations. This is proven out by FEC data and IRS data. That does put pressure on us to take a look.[238]

Near the end of 2012, employees in the EO division began considering whether it was possible to quantify the effect that *Citizens United* had on political campaign intervention by tax-exempt organizations. In December 2012, TE/GE employee Cristopher Giosa sent Lerner his preliminary analysis on sources of data that might be available.[239] Giosa suggested that EO consider enlisting the Office of Compliance Analytics to help with this project.[240]

By April 2013, EO and the Office of Compliance Analytics had prepared a detailed presentation on political spending in 501(c)(4) organizations.[241] As background information for the report, the authors noted:

> Since *Citizens United* (2010) removed the limits on political spending by corporations and unions, concern has arisen in the public sphere and on Capitol Hill about the potential misuse of 501(c)(4)s for political campaign activity due to their tax exempt status and the anonymity they can provide to donors.[242]

The authors then provided a "problem statement," which stated that "[t]he public purpose of 501(c)(4)s may be diluted by political campaign activities as an unintended consequence of *Citizens United*."[243]

In May 2013, EO and the Office of Compliance Analytics revised the presentation in advance of a May 7 briefing for then-Acting Commissioner Miller.[244] The revised presentation, which was sent to Miller's office, made the following findings:

- The number of 501(c)(4)s reporting political campaign activities almost doubled from tax year 2008 through tax year 2010; and
- The amount of political campaign activities for large filers (defined as organizations with total revenue of more than $10 million) almost tripled from tax year 2008 through tax year 2010.[245]

The report identified two events that occurred contemporaneously with the drastic rise in the number of 501(c)(4) organiza-

---

[238] Senate Finance Committee Hearing, A Review of Criteria Used by the IRS to Identify 501(c)(4) Applications for Greater Scrutiny (May 21, 2013).
[239] Email from Christopher Giosa to Lois Lerner and others (Dec. 6, 2012) IRS0000185323–27.
[240] *Id.*
[241] Email from Justin Abold to Lois Lerner, Holly Paz and others (Apr. 12, 2013) IRS0000195666–90.
[242] *Id.*
[243] *Id.*
[244] Miller's calendar shows that he organized a meeting on May 7, 2013 to discuss "EO Data Matters" with Nikole Flax, Dean Silverman, Eric Schweikert and Joseph Grant (May 7, 2013) IRS0000456399.
[245] Email chain between Justin Lowe, Justin Abold and others (May 6, 2013) IRS0000494805–29.

67

tions that reported political campaign activities: the *Citizens United* decision and Congress's consideration of the Affordable Care Act.[246] Although the report did not conclude that those events caused a rise in political spending, by singling them out, it is clear that the IRS viewed them as significant, relevant factors.

The IRS took a step to address concerns about political campaign intervention by tax-exempt organizations on November 29, 2013, when it proposed regulations that would provide guidance to 501(c)(4) organizations on the types of political activities that would not be considered social welfare. After receiving more than 150,000 comments on the proposed regulations, on May 22, 2014, the IRS withdrew the regulations and stated that it planned to re-propose them after a thorough review of the submitted comments.[247]

As of the issuance of this report, the IRS has not proposed additional regulations or issued further guidance on this topic. However, the statements of Lerner and Miller, as well as the analytical work performed in 2013, make clear that the IRS has been working since 2010 to determine an appropriate response to external pressure following the *Citizens United* ruling.

## V. THE IRS IMPLEMENTED A SPECIAL PROCESS FOR HANDLING CERTAIN TYPES OF APPLICATIONS

*This section describes the special procedures that the IRS put in place to process applications that involved political advocacy, which were enabled by the creation of the BOLO spreadsheet.*

The general process that the IRS followed for processing applications for tax-exempt status is described above in Section II(E). Over time, the IRS developed special procedures for handling certain types of applications, particularly those that posed difficult issues.

### A. THE TOUCH AND GO (TAG) SPREADSHEET WAS DEVELOPED TO ASSIST EO DETERMINATION AGENTS

Each of the Groups within EO Determinations had specialty areas and processed applications that fell within those areas.[248] Cindy Thomas believed that having one Group work applications with similar issues promoted consistency in results, fostered greater efficiency, and improved customer satisfaction, as well as employee and manager satisfaction, since no agent was required to be an expert in all issues.[249]

The "Touch and Go" or "TAG" Group (Group 7830) worked on applications that involved:

    1. Abusive tax avoidance transactions:
        a. abusive promoters;
        b. fake determination letters;
    2. Activities that were fraudulent in nature:

---

[246] *Id.*
[247] IRS, Update on the Proposed New Regulation on 501(c)(4) Organizations (May 22, 2014).
[248] Email from Cindy Thomas to Holly Paz (Mar. 16, 2011) IRS0000008593–602.
[249] *Id.*

Exhibit E

a. applications that materially misrepresented operations or finances;

b. activities conducted contrary to tax law (e.g. Foreign Conduits); and

3. Applicants with potential terrorist connections.[250]

If an agent in the screening group determined that an application met the TAG criteria, he/she sent the application to Group 7830, the group assigned to work TAG applications.[251] In Group 7830, another agent performed a "secondary screening" of the application to ensure that the application, in fact, met the TAG criteria. If it did, the application was retained in Group 7830 and worked to completion.[252]

Over the course of time, the IRS identified many applications that met the TAG criteria. In an effort to catalog those applications so that screening agents could properly identify them, around 2002 or 2003, EO Determinations developed a TAG spreadsheet.[253] The TAG spreadsheet identified the various TAG applications, explained the tax law issue presented in each application and provided further processing guidance to the EO Determinations agents.[254] The TAG spreadsheet eventually was expanded to include a second tab that referenced TAG issues that were no longer encountered, but were of historical significance.[255] When new entries were made to the spreadsheet, a "TAG alert" email was sent to EO Determinations agents. Starting in April 2007, copies of TAG alert emails were also sent to Thomas, EO Quality Assurance Manager Donna Abner and Washington D.C. EO attorney Ted Lieber, who was, "responsible for disseminating the information to others in D.C. should he deem it necessary."[256]

The TAG spreadsheet was used not only by the screeners but also by all EO Determinations agents.[257] On occasion, an application presenting a TAG issue might slip through screening and not be identified as a TAG application.[258] Ultimately, the application would be assigned to an EO Determinations agent who, in developing the facts surrounding the applicant's activities, would determine that those facts involved a potential fraudulent transaction, or a tax avoidance scheme, or that the applicant might have terrorist connections.[259] In identifying the application as a TAG application, the agent would be guided by the descriptive information contained in the TAG spreadsheet. The agent would then send such an application to the TAG Group for work-up. Accordingly, it was considered important for all agents, not just the screeners, to have access to the TAG spreadsheet.[260]

---

[250] Heightened Awareness Issues (undated) IRS0000557291–308.
[251] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 31–32.
[252] *Id.*
[253] *Id.*; SFC Interview of Cindy Thomas (July 25, 2013) p. 66.
[254] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 31–32.
[255] *Id.* pp. 135–136.
[256] Email from Cindy Thomas to Jon Waddell (Apr. 18, 2007) IRS0000008413–14.
[257] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 30–33.
[258] *Id.*
[259] *Id.*
[260] *Id.*

Exhibit E

69

## B. THE TAG SPREADSHEET EVOLVED INTO THE JOINT TAG/ EMERGING ISSUES SPREADSHEET

Applications often presented new issues that were not related to TAG matters, and for which there was little established precedent. These issues also needed to be identified and described for EO Determinations agents so that the applications could be sent to a specific Group where they could be processed and determinations could be made in a consistent fashion.[261] Screeners identified most of these issues through the initial screening process.[262] Applications containing these issues were initially referred to as "consistency cases."[263] EO Determinations agents and managers were apprised of these "consistency cases" by email and provided direction on how to treat them.[264] However, at some point, agents had difficulty keeping track of all the emails they were receiving on the "consistency cases."[265] Accordingly, a decision was made to consolidate the "consistency case" information sent by email into the existing TAG spreadsheet so that EO Determinations agents could easily access all of the information that they required in one convenient document.[266]

Accordingly, Jon Waddell and Joseph Herr, Group Managers in EO Determinations (Groups 7830 and 7825 respectively), began creating a "Joint TAG/Emerging Issues Spreadsheet."[267] The spreadsheet contained a tab for TAG applications encountered over the past 2–3 years, as well as tabs for Emerging Issues and a Watch List.[268] Emerging Issues were defined as follows:

- Groups of applications for which there is no established case law or precedent
- Issues arising from significant current events (not disaster relief); and
- Issues arising from changes to tax law or other significant world events.[269]

The Watch List contained a list of issues that the IRS had not yet received, but that it might receive in the future. These issues were the result of significant changes in tax law or world events and would require "special handling" by the IRS when received.[270] Issues on the Watch List tab were generally identified by EO Technical staff and brought to the attention of the EO Determinations Program Manager.[271]

In April 2010, Thomas determined that the joint issues spreadsheet then under development should also contain a tab for "consistency cases," which she described as applications "where we

---

[261] Email from Cindy Thomas to Holly Paz (Mar. 16, 2011) IRS0000008593–602.
[262] *Id.*
[263] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 17–18.
[264] *Id.* pp. 94–95.
[265] *Id.*
[266] Email from Jon Waddell to Sharon Camarillo and Brenda Melahn (Apr. 6, 2010) IRS0000629335–48.
[267] *Id.*
[268] *Id.* Waddell noted that "the previous tabs for Archived and Removed TAG Issues have been taken out of the spreadsheet. Since the spreadsheet is now a joint one between TAG and Emerging Issues, we felt it would be too cumbersome to include additional tabs of 100's [of] former TAG issues."
[269] Heightened Awareness Issues IRS0000557291–308.
[270] *Id.*
[271] Email Chain between Holly Paz, Lois Lerner and Cindy Thomas (Feb. 18—Mar. 16, 2011) IRS0000008593–602.

Exhibit E

70

want to ensure consistent treatment . . . (these cases are not TAG or Emerging Issues). For example, a group ruling disbands and subordinates decide to apply for individual exemption—we need to make sure they are worked/treated the same."[272] She also decided that EO Determinations agents and managers would be informed about the new spreadsheet during the June/July 2010 Continuing Professional Education (CPE) training sessions that they would be attending, and asked that the draft spreadsheet be completed and presented to her for review by the end of April 2010.[273] Thomas suggested that the name of the spreadsheet be changed since it no longer was limited to just TAG issues, but she offered no suggestions for a new name.[274]

In accordance with Thomas's direction, Jon Waddell revised the "Joint Spreadsheet" to include tabs for TAG cases, Emerging Issues, Coordinated Cases, and a Watch List.[275] Subsequently, on May 6, 2010, Elizabeth Hofacre, Emerging Issues Coordinator for Group 7825, sent a copy of the "joint issues" spreadsheet to her manager, Joseph Herr. The draft spreadsheet referred to "Tea Parties" as a sample entry under the Emerging Issues tab and directed agents to "[c]oordinate with group 7825."[276]

## C. EO DETERMINATIONS AGENTS WERE TRAINED IN THE USE OF THE NEW SPREADSHEET AT A JUNE/JULY 2010 CPE TRAINING

In June and July of 2010, EO Determinations provided CPE training to its specialists.[277] During the course of the training, the specialists were advised that they would soon be provided with a "Combined Issues Workbook" that contained tabs for TAG, TAG Historical, Emerging Issues, Coordinated Processing Issues, and a Watch List.[278] The specialists were shown a PowerPoint presentation that advised them that a designated coordinator would maintain the workbook and disseminate alerts in one standard email.[279] During the course of the training, the specialists were instructed that "Tea Party Cases" were an Emerging Issue because they involved:
   1. High Profile Applicants
   2. Relevant Subject in Today's Media
   3. Inconsistent Requests for 501(c)(3) and 501(c)(4)
   4. Potential for Political/Legislative Activity
   5. Rulings Could be Impactful[280]
EO Determinations also told its specialists that "Successors to Acorn" was an example of a Watch List issue. The PowerPoint presentation instructed employees that Watch List Issues had the following characteristics:
   • Typically Applications Not Yet Received
   • Issues are the Result of Significant Changes in Tax Law

---

[272] Email chain between Cindy Thomas, Sharon Camarillo and Joseph Herr (Apr. 6–13, 2010) IRS0000629335–48.
[273] *Id.*
[274] *Id.*
[275] Email from Jon Waddell to Sharon Camarillo and Brenda Melahn (Apr. 27, 2010) IRS0000629455–57.
[276] Email from Elizabeth Hofacre to Joseph Herr (May 6, 2010) IRS0000542119–24.
[277] SFC Interview of Cindy Thomas (July 25, 2013) p. 43.
[278] Email chain between Cindy Thomas and Holly Paz (May 9–10, 2012) IRS0000004755–62.
[279] Heightened Awareness Issues (undated) IRS0000557291–308.
[280] *Id.*

- Issues are the Result of Significant World Events
- Special Handling is Required when Applications are Received.[281]

Following up on this training, on July 27, 2010, Elizabeth Hofacre prepared a "Combined Issue Spreadsheet" and distributed it to managers in EO Determinations.[282] The Emerging Issues tab of the spreadsheet informed the agents about Tea Party applications. The spreadsheet indicated that "[t]hese cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)." The entry in the spreadsheet further directed that "[a]ny cases should be sent to Group 7825. Liz Hofacre is coordinating. These cases are currently being coordinated with EOT." Hofacre was provided the language for this spreadsheet entry by Jon Waddell.[283]

The spreadsheet distributed by Hofacre also contained an entry for "Progressive" on the Tag Historical tab with the issue listed as "political activities." Further, the entry stated that the "[c]ommon thread is the word 'progressive.' Activities appear to lean toward a new political party. Activities are partisan and appear as anti-Republican. You see references to 'blue.'"[284]

In addition, the spreadsheet included a reference to "Acorn Successors" on the Watch List tab. The description stated that "[f]ollowing the breakup of ACORN, local chapters have been re-forming under new names and resubmitting applications."[285] Screeners were instructed to send these cases "to the TAG Group."[286]

### D. THE NEW SPREADSHEET WAS RENAMED THE "BOLO" SPREADSHEET

From the outset of the development of the Joint TAG/Emerging Issues spreadsheet in April 2010, there was some question about what to call the new consolidated spreadsheet. While in development, various iterations of the spreadsheet had been called "Joint Spreadsheet," "Combined Issues Workbook" and "Combined Issue Spreadsheet." Cindy Thomas stated that

> . . . no one really could think of a name for calling it so everyone would know what we are talking about, we decided to have—when we introduced this we said we will have a contest to see if anyone can name it and we will give—whoever came up with a name we would give them 59 minutes of administrative time. So Liz Hofacre was actually the one who came up with a name and we gave her 59 minutes of admin. And she came up with "Be on the Look Out," and that was in August 2010.[287]

Elizabeth Hofacre indicated that Joseph Herr had suggested the name "Be on the Look Out" or "BOLO" but gave credit for the sug-

[281] Id.
[282] Email from Elizabeth Hofacre to Steve Bowling, John Shafer and others (July 27, 2010) IRS0000008609–24.
[283] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) p. 109.
[284] Email from Liz Hofacre to IRS Staff (July 27, 2010) IRS0000008609–24.
[285] Id.
[286] Id.
[287] SFC Interview of Cindy Thomas (July 25, 2013) p. 43.

72

gestion to her, because he did not feel that it was appropriate to accept the award himself, since he had been a manager.[288]

On August 12, 2010, Hofacre distributed the first "BOLO" spreadsheet to EO Determinations agents in her capacity as Emerging Issues Coordinator. "Tea Party" applications were specifically identified under the Emerging Issues tab of the spreadsheet as follows: "[t]hese cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)." The BOLO directed agents to send Tea Party applications to Group 7822 and advised that Hofacre was the coordinator.[289] Jon Waddell provided Hofacre with the language for the Tea Party entry on the Emerging Issues tab.[290]

The BOLO spreadsheet distributed by Hofacre also contained an entry for "Progressive" on the Tag Historical tab with the issue listed as "political activities." Further, the entry stated that the "[c]ommon thread is the word 'progressive.' Activities appear to lean toward a new political party. Activities are partisan and appear as anti-Republican. You see references to 'blue.'"[291]

### E. EO DETERMINATIONS DEVELOPED A PROCESS TO UPDATE THE BOLO SPREADSHEET

Along with the introduction of the BOLO spreadsheet, EO determinations developed a process for making changes, from time to time, to the spreadsheet. Prior to May 17, 2012, for TAG issues, Coordinated Processing applications, and Watch List applications, a group manager would send an email requesting a revision to the manager of Group 7822.[292] If the Manager of Group 7822 agreed with the suggested revision, then the change was made and the Emerging Issues Coordinator sent out a BOLO alert to all EO Determinations agents and managers. If there was disagreement, then the manager of Group 7822 elevated the issue to Cindy Thomas for resolution. In addition, if the EO Technical Manager contacted Thomas to advise her to "watch for" certain types of applications, she would direct the Manager of Group 7822 to add the issue to the Watch List.

For changes to the Emerging Issues tab, prior to May 17, 2012, suggestions were sent to the Emerging Issues Coordinator in Group 7822, who researched the matter and reported his/her conclusions to the Manager of Group 7822. The Manager of Group 7822 then consulted with the Area Manager and/or the EO Determinations Program Manager for a final decision. The Emerging Issues Coordinator then emailed changes to EO Determinations agents and managers.[293]

Subsequent to May 17, 2012, this process changed. On that date, Holly Paz, Director of Rulings and Agreements, issued a memorandum requiring that all changes to the BOLO spreadsheet tabs (Abusive Transaction and Fraud Applications (TAG), Emerging Issues, Coordinated Processing applications and Watch List appli-

[288] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 127–128.
[289] Email chain between Holly Paz, Lois Lerner and Nikole Flax (May 21, 2012) IRS0000352978–84.
[290] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 129–131.
[291] Combined Spreadsheet TAG 8 12 10 (Aug. 10, 2010).
[292] Email chain between Cindy Thomas and Holly Paz (May 9–10, 2012) IRS0000004755–62.
[293] *Id.*

Exhibit E

73

cations) receive the approval of the Group Manager of the Emerging Issues Group, the EO Determinations Program Manager, and the Director of Rulings and Agreements.[294]

## VI. APPLICATIONS SUBMITTED BY TEA PARTY ORGANIZATIONS WERE SYSTEMATICALLY IDENTIFIED, CENTRALIZED AND SUBJECTED TO HEIGHTENED SCRUTINY BY THE IRS

> *This section explains how the IRS used the BOLO spreadsheet to systemically identify incoming applications submitted by Tea Party organizations, and how being placed on the BOLO spreadsheet affected the processing of those applications.*

A. AFTER THE IRS RECEIVED AND APPROVED THE FIRST FEW "TEA PARTY" APPLICATIONS, IT PREPARED SENSITIVE CASE REPORTS AND ADDED AN ENTRY TO THE BOLO SPREADSHEET

The first applications for tax exemption filed by Tea Party organizations were received by EO Determinations prior to March 2010.[295] EO Determinations processed the initial applications it received and in doing so, it approved two Tea Party organizations that had applied for exemption under 501(c)(4), and one Tea Party organization that had submitted an application for exemption under 501(c)(3).[296] It would be more than 18 months before the IRS approved another application from a Tea Party organization.[297]

### 1. Tea Party Applications Began To Draw Attention in EO Determinations

In early 2010, an application filed by the Albuquerque Tea Party was assigned to Jack Koester, a screener in Group 7838, EO Determinations.[298] Koester had heard about the Tea Party in news reports.[299] Upon receiving the application from the Albuquerque Tea Party, Koester concluded that it was "high profile" because of the possibility that it would attract media attention, so he informed his Group Manager, John Shafer. It was standard practice for screeners to bring "high profile" applications to the attention of their manager.[300] Subsequently, Koester sent Shafer an email in which he noted that "recent media attention to this type of organization indicates to me that this is a high profile case."[301] Koester also indicated that the organization stated in its Form 1024 that it may engage in "possible future political activities."[302]

Shafer, in turn, forwarded Koester's email to Sharon Camarillo, his Area Manager, who sent it to Cindy Thomas, asking that

---

[294] Email chain between Holly Paz, Lois Lerner and Nikole Flax (May 17, 2012) IRS0000437639–41.
[295] Email chain between Cindy Thomas, Steven Grodnitzky and others (Mar. 31–Apr. 12, 2010) IRS0000165413–14.
[296] *Id.*
[297] Based on data provided to the SFC by the IRS (Mar. 26, 2014).
[298] SFC Interview of Jack Koester (Aug. 1, 2013) p. 8.
[299] *Id.* p. 23.
[300] *Id.* pp.12–3.
[301] Email chain between Jack Koester, John Shafer, Sharon Camarillo, Cindy Thomas and others (Feb. 25–Mar. 17, 2010) IRS0000180869–73.
[302] *Id.*

Exhibit E

Thomas "let 'Washington' know about this potentially politically embarrassing case involving a 'Tea Party' organization."[303]

2. EO Technical Had Early Awareness of the Tea Party Applications

Upon receiving Camarillo's February 25, 2010 email, Thomas contacted Holly Paz, then the Acting Manager of EO Technical. Thomas told Paz that "[w]e have a Form 1024 for: Albuquerque Tea Party Inc. We're wondering if EO Technical wants the case because of recent media attention."[304] Paz, in reply, stated to Thomas, "I think sending it up here is a good idea given the potential for media interest."[305]

3. EO Technical Assumed Responsibility for Working Two Tea Party Applications as "Test Cases"

In early March 2010, Shafer asked Gary Muthert, a screener in his Group, to conduct a search of the case and inventory management systems used by TE/GE to determine if any other Tea Party organizations had filed applications for tax exemption.[306] Muthert found that there were seven applications pending from Tea Party organizations, and that three additional applications had already been approved for tax-exempt status.[307] When Thomas was made aware of the existence of these 10 applications, she apprised Paz, asking Paz whether she wanted "all of them or do you only want a few and then give us advice as to what to do with the remaining?"[308] Paz acknowledged receipt of the "one Tea Party case up here—that was sent up from [EO Determinations] just a few weeks ago . . . ." Paz then stated that she was unaware that there were more, and said "I think we should take a few more cases (I'd say 2) and would ask that you hold the rest until we get a sense of what the issues may be. Then we will work with [EO Determinations] in working the other cases."[309]

4. EO Technical Prepared the First SCR for the Tea Party Applications

On or around March 18, 2010, Steve Grodnitzky, Manager of EO Technical Group 1, became Acting Manager of EO Technical.[310] Several weeks later, Grodnitzky inquired of Donna Elliot-Moore, a Tax Law Specialist in EO Technical, about the specific activities of the two Tea Party organizations whose applications were then pending in EO Technical. One of those applications was for exemption under 501(c)(4) from the Albuquerque Tea Party, and the other was for exemption under 501(c)(3) from the Prescott Tea Party. Elliot-Moore advised Grodnitzky on April 1, 2010 that with regard to the activities of both organizations, "I looked briefly and it looks

[303] *Id.*
[304] *Id.*
[305] *Id.*
[306] SFC Interview of Gary Muthert (July 30, 2013) (not transcribed).
[307] *Id.*
[308] Email chain between Cindy Thomas, Holly Paz and others (Feb. 25–Mar. 17, 2010) IRS0000180869–73.
[309] *Id.*
[310] SFC Interview of Holly Paz (July 26, 2013) p. 16.

Exhibit E

more educational but with a republican slant obviously."[311] Grodnitzky responded "[t]hese are high profile cases as they deal with the Tea Party so there may be media attention. May need to do an SCR on them."[312] Elliot Moore noted in response that "[t]he Tea Party movement is covered in the Post almost daily. I expect to see more applications." Grodnitzky then contacted Cindy Thomas on April 2, 2010, and advised her that "I think there needs to be an SCR on the Tea Party cases, due to the high media attention. Actually, you can't turn on the television news without hearing about the movement."[313] Thomas concurred in Grodnitzky's assessment.

Grodnitzky assigned the two Tea Party applications to EO Technical Group 2, managed by Ronald Shoemaker.[314] Shoemaker, in turn, assigned the two applications to Carter (Chip) Hull, a Tax Law Specialist in Group 2. Hull, a veteran of the IRS since 1965, was considered to be a subject-matter expert on 501(c)(4) organizations.[315] Grodnitzky directed Shoemaker to prepare an SCR on the Tea Party applications.[316] The Tea Party cases met the criteria for preparation of an SCR because the applications were likely to attract media attention. Accordingly, Hull prepared the first SCR on the Tea Party applications which is dated April 19, 2010. In the SCR, Hull noted that the applications from the Albuquerque Tea Party and the Prescott Tea Party were "[l]ikely to attract media or Congressional attention." Hull further indicated that "[t]he various 'tea party' organizations are separately organized but appear to be part of a national politically conservative movement that may be involved in political activities. The 'tea party' organizations are being followed closely in national newspapers (such as the *Washington Post*) almost on a daily basis."[317]

### 5. Placing the Tea Party Applications on the SCRs Caused Delays in Their Processing

Grodnitzky's decision to place Tea Party applications on the SCR effectively meant that proposed determinations for those applications now required at least two additional levels of review before they could be released. Since the applications on the SCR were the "test cases," those needed to first be resolved before all other Tea Party applications pending in EO Determinations could also be brought to closure. Any delay in the disposition of the applications on the SCR would result in a corresponding delay in the disposition of all other Tea Party applications pending in EO Determinations. As explained in greater detail in Section VII(C), there were substantial delays in the processing of the "test cases" and those delays, in turn, contributed to delays in the processing of the Tea Party applications awaiting action in EO Determinations.

---

[311] Email chain between Donna Elliot-Moore, Steve Grodnitzky and others (Mar. 31–Apr. 2, 2010) IRS0000165413–14.
[312] *Id.*
[313] *Id.*
[314] Email chain between Steve Grodnitzky, Ronald Shoemaker and others (Mar. 31–Apr. 5, 2010) IRS0000166266–67.
[315] SFC Interview of Ronald Shoemaker (July 31, 2013) (not transcribed); SFC Interview of Carter Hull (July 23, 2013) (not transcribed).
[316] Email chain between Steve Grodnitzky, Ronald Shoemaker and others (Mar. 31–Apr. 5, 2010) IRS0000166266–67.
[317] TE/GE Division Sensitive Case Report (Apr. 19, 2010) IRS0000164074–75.

6. Identification of the Tea Party Applications as an Emerging Issue on the BOLO Spreadsheet Resulted in Centralization and Full Development of those Applications

As described more fully above, EO Determinations developed the new "Joint Tag Emerging Issues Spreadsheet" (subsequently refined and renamed "BOLO Spreadsheet") in early 2010, coincidentally with the identification of the first Tea Party applications and their placement on the SCR.[318] Joseph Herr and Elizabeth Hofacre added applications received from Tea Party organizations to a draft version of the spreadsheet as early as May 6, 2010, because these applications met the criteria for an "emerging issue" (absence of established precedent, issues arising from significant events, etc.).[319] Ultimately, the spreadsheet was renamed the "BOLO" spreadsheet and distributed to EO Determinations agents on August 12, 2010.[320]

Inclusion of the Tea Party reference in the Emerging Issues tab of the BOLO spreadsheet shaped the manner in which the Tea Party applications were processed by EO Determinations over the next few years. Specifically, applications identified as originating from Tea Party groups were then "centralized" by sending them to the Emerging Issues Group (7822). There they were subjected to full development for possible political advocacy.[321]

In order to identify what was, in fact, a "Tea Party" application, the screening agents and secondary screeners in EO Determinations developed screening criteria. If an application met the screening criteria, it was sent to Group 7822 for centralized handling as a Tea Party application. John Shafer summarized the criteria as follows:

> The following are issues that could indicate a case to be considered a potential "tea party" case and sent to Group 7822 for secondary screening.
> 1. "Tea Party," "Patriots" or "9/12 Project" is referenced in the case file.
> 2. Issues include government spending, government debt and taxes.
> 3. Educate the public through advocacy/legislative activities to make America a better place to live.
> 4. Statements in the case file that are critical of how the country is being run.[322]

Applications that merely contained the words "Tea Party," "9/12," "Patriots," and other like terms, but did not otherwise evidence political campaign intervention, were nevertheless centralized in Group 7822 as "Tea Party" applications and there received full development.[323] Similarly, applications that referenced activities such

---

[318] Email chain between Jon Waddell, Sharon Camarillo, Brenda Melahn and others (Apr. 6–13, 2010) IRS0000629335–48.

[319] Email chain between Elizabeth Hofacre, Joseph Herr and others (May 6–7, 2010) IRS0000542119–24.

[320] Email chain between Holly Paz, Lois Lerner and Nikole Flax (May 21, 2012) IRS0000352978–84.

[321] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) p. 47.

[322] Email chain between Holly Paz, John Shafer, Cindy Thomas and others (June 1–10, 2011) IRS0000066837–40.

[323] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) p. 118.

Exhibit E

as advocating for smaller government and balanced budgets, that criticized how the country was being run, or that suggested ways to make America a better place to live, but that did not contain words like "Tea Party" or "9/12" or "Patriots," were also considered to be "Tea Party" applications. Accordingly, they were centralized in Group 7822 where they were fully developed.[324]

During Elizabeth Hofacre's tenure as Emerging Issues Coordinator in Group 7822 (May 2010 to October 2010), screeners sometimes sent to Group 7822 applications received from organizations on the left of the political spectrum that involved possible political campaign intervention.[325] Hofacre returned these applications to the screeners or placed them in general inventory and they were subsequently assigned to any EO Determinations agent, since they did not meet the criteria for a Tea Party application.[326] Similarly, Hofacre returned to the screeners or to general inventory applications received from groups on the right of the political spectrum that did not meet the Tea Party criteria.[327] Applications so returned were assigned, processed and determinations were made on them.[328] In contrast, and as described more fully in succeeding sections, applications identified as "Tea Party" applications by EO Determinations and centralized in Group 7822 were subjected to long delays, multiple reviews, and unnecessarily burdensome development.

### B. EO DETERMINATIONS PERIODICALLY UPDATED THE EMERGING ISSUES TAB OF THE BOLO SPREADSHEET

The Emerging Issues tab of the BOLO spreadsheet underwent several major revisions between 2010 and 2012. Until May 2012, most of these changes had little practical effect in the way that EO Determinations employees screened and processed incoming applications from Tea Party organizations.

#### 1. Until July 2011, the Emerging Issues Tab of the BOLO Spreadsheet Specifically Referenced the Tea Party Movement

From its earliest iteration in May 2010 until the July 2011 revision, the BOLO specifically referenced the Tea Party movement.[329] For example, in October 2010, when Elizabeth Hofacre relinquished her position as the Emerging Issues Coordinator to Ronald Bell, the Emerging Issue tab read as follows:

**Issue Name:** Tea Party
**Issue Description:** These cases involve various local organizations in the Tea Party movement that are applying for exemption under 501(c)(3) or 501(c)(4).

---

[324] *Id.* pp. 50–52; Email chain between Holly Paz, John Shafer, Cindy Thomas and others (June 1–10, 2011) IRS0000066837–40.
[325] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 45–52.
[326] *Id.*
[327] *Id.*
[328] *Id.*
[329] Email chain between Holly Paz, Lois Lerner and Nikole Flax (May 21, 2012) IRS0000352978–84.

> **Disposition of Emerging Issue:** Any cases should be sent to Group 7822. Liz Hofacre is coordinating. These cases are currently being coordinated with EOT.[330]

In February 2011, the language was revised slightly as follows:

> **Issue Name:** Tea Party
>
> **Issue Description:** Organizations involved with the Tea Party movement applying for exemption under 501(c)(3) or 501(c)(4).
>
> **Disposition of Emerging Issue:** Forward case to Group 7822. Ron Bell (coordinator). Cases are being coordinated with EO Tech—Chip Hull.[331]

The references to the "Tea Party movement" in the Emerging Issues tab of the BOLO spreadsheet were meant to describe organizations that were part of the actual Tea Party movement.[332]

2. In July 2011, Lois Lerner Directed that the References to "Tea Party" be Removed From the Emerging Issues Tab of the BOLO Spreadsheet

On July 5, 2011, Lois Lerner convened a meeting with various members of her staff including Holly Paz, Cindy Thomas and others, to discuss the Tea Party applications and options for processing those applications.[333] In preparation for the meeting, Lerner's staff assembled a briefing paper that stated the criteria that the screeners in EO Determinations were using to identify applications as "Tea Party" applications.[334] The criteria were then discussed by the participants.[335] During the course of the meeting, Lerner directed that "Tea Party" organizations should no longer be referred to as such, but instead should be called "advocacy organizations."[336] Lerner was apparently concerned that referring to the organizations by their name would create the impression of bias.[337] On July 5, 2011, Cindy Thomas described to her staff Lerner's motivation for the name change as follows:

> Lois expressed concern with the "label" we assigned to these cases. Her concern was centered around the fact that these type things [sic] can get us in trouble down the road when outsiders request information and accuse us of "picking on" certain types of organizations even though we all know that isn't what is taking place.[338]

During the meeting, Lerner and those present worked out new language to replace the "Tea Party" reference in the Emerging

---

[330] *Id.*

[331] *Id.*

[332] SFC Interview of Joseph Herr (June 18, 2013) (not transcribed); SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).

[333] Email chain between Cindy Thomas, Ronald Bell and others (July 5, 2011) IRS0000620735–40.

[334] Email from Justin Lowe to Holly Paz (June 27, 2011) IRS0000431165–66.

[335] Email chain between Cindy Thomas, Steve Bowling, John Shafer and others (July 5, 2011) IRS0000620735–40.

[336] *Id.*

[337] SFC Interview of Holly Paz (July 26, 2013) p. 87.

[338] Email chain between Cindy Thomas, Steve Bowling, John Shafer and others (July 5, 2011) IRS0000620735–40.

Exhibit E

Issues tab of the BOLO spreadsheet with a more general reference to advocacy organizations.[339]

### 3. Cindy Thomas Removed References to the "Tea Party" From the Emerging Issues Tab of the BOLO Spreadsheet

Immediately after the meeting, Thomas made the agreed-to changes to the Emerging Issues tab.[340] The entry now read as follows:

> **Issue:** Advocacy Orgs
> **Issue Description:** Organizations involved with political, lobbying or advocacy for exemption under 501(c)(3) or 501(c)(4).
> **Disposition of Emerging Issue:** Forward case to Group 7822. Ron Bell is coordinating cases with EO Tech—Chip Hull.[341]

Thomas informed Steve Bowling and John Shafer that she had made the above-described change to the Emerging Issues tab.[342] She also advised Bowling and Shafer that "Lois did want everyone to know that we are handling the cases as we should, i.e., the Screening Group starts seeing a pattern of cases and is elevating the issue." [343]

On July 11, 2011, Ronald Bell sent the revised BOLO spreadsheet to EO Determinations employees in accordance with his responsibilities as the Emerging Issues Coordinator.[344] While Bell informed recipients of the BOLO Alert email to be on the lookout for applications for exemption under 501(c)(3) for "green" energy, his cover email failed to apprise recipients of the changes made to the Emerging Issues tab.[345]

### 4. After July 11, 2011, Cindy Thomas and John Shafer Made No Changes to the Screening Criteria Used by Screeners To Identify Applications Received From Tea Party Groups

After Bell transmitted the revised July 11, 2011, BOLO spreadsheet to EO Determinations staff, John Shafer, the Screening Group Manager, made no changes to the use of the criteria by the screeners to identify Tea Party applications.[346] The following colloquy occurred during Shafer's interview by the Committee:

> Q. Okay. Okay. So Exhibit 8, whatever you want to call it, the numbers 1 through 4 that are in your Exhibit 8 [applicant's name included "Tea Party," "Patriots," or "9/12," or statements existed in the application about government spending/debt, making America a better place to live, or that were critical of the way the country was being run], that's how the cases were being screened at that time in June of 2011?

---

[339] *Id.*
[340] *Id.*
[341] Email chain between Holly Paz, Lois Lerner and Nikole Flax (May 21, 2012) IRS0000352978–84.
[342] Email chain between Cindy Thomas, Steve Bowling, John Shafer and others (July 5, 2011) IRS0000620735–40.
[343] *Id.*
[344] Email from Ronald Bell to EO Determinations employees (July 11, 2011) IRS0000618365–70.
[345] *Id.*
[346] SFC Interview of John Shafer (Sep. 17, 2013) pp. 120–122.

A. Yes, it was.

Q. And then after this meeting with Lois Lerner in July of 2011, you did not direct your screeners to make any changes in how they were screening cases?

A. Not to my knowledge . . . .[347]

Shafer made no changes because he interpreted Thomas's email in which she advised that "Lois did want everyone to know that we are handling the cases as we should . . ." as confirmation that his screening Group was handling the Tea Party cases correctly.[348] Therefore, after July 11, 2011, the screeners received no direction to change the way that they had been processing Tea Party applications.

Similarly, Cindy Thomas understood the July 11, 2011 change directed by Lerner from "Tea Party" to "advocacy org." in the Emerging Issues tab to be no more than a name change.[349] She did not feel that the name change necessitated any revisions to the way EO Determinations was processing cases that involved political advocacy issues. Thomas told the Committee:

> Again, I believe that all along that we were including all cases with political activity. So why would I believe that something needed to be changed when I believed that we were treating all cases the same and putting them all in the bucket.[350]

The Committee found no evidence to suggest that Lois Lerner followed up with Thomas or any other manager to ensure that EO Determinations was properly screening applications in accordance with the revised "Advocacy orgs." entry of the July 2011 Emerging Issues tab of the BOLO spreadsheet.

### a. How Screeners Processed Applications Received From Tea Party and Affiliated Groups After the July 2011 BOLO Change

The screeners appear to have continued to apply the Tea Party screening criteria to identify cases as "Advocacy orgs." after the July 2011 change to the Emerging Issues tab of the BOLO spreadsheet.[351] During the Committee's interview of Gary Muthert, a screener in John Shafer's Group, Muthert was shown a copy of the July 27, 2011 Emerging Issues tab of the BOLO spreadsheet and was asked the following:

Q. But if I'm understanding what you said just a couple of minutes ago, you continued to look for organizations that were affiliated with the Tea Party, you flagged them as advocacy organizations, and you sent them to the BOLO group, is that right?

A. Yes.

Q. Okay. And that continued when this was, this document, Exhibit 6 [July 27, 2011 Emerging Issues tab], was out?

---

[347] *Id.* p. 121 and Interview Exhibit 8.
[348] SFC Interview of John Shafer (Sep. 17, 2013) p. 120.
[349] SFC Interview of Cindy Thomas (July 25, 2013) p. 91.
[350] *Id.*
[351] SFC interview of Gary Muthert (July 30, 2013) (not transcribed). Muthert stated that after the July 2011 change to the Emerging Issues tab of the BOLO spreadsheet, he continued to send applications that contained the words "Tea Party," to Group 7822 for full development.

81

A. Yes.[352]

It is probable that the screeners' continued use of the Tea Party criteria after the issuance of the July 11, 2011 Emerging Issues tab was a consequence of Thomas and Shafer's understanding that the screeners were "handling the cases as [they] should." Moreover, continued use of the Tea Party screening criteria was not necessarily inconsistent with the July 2011 revised description now found in the Emerging Issues tab, since cases that met the Tea Party criteria may also have met the description of "Advocacy orgs."[353]

Thomas herself believed that all Tea Party applications involved political activity and required full development. She stated to the Committee as follows:

Q. Did you think that all Tea Party cases involved political activity?

A. There was actually a case that had, from my understanding, there was a case that had Tea Party in the name and it was not a political case at all, that it was like Little Suzie's Tea Party, a little kid's group.

Q. But other than those that involved children's tea parties, all of the ones that are associated with the Tea Party movement, did you think they were all involving political activity?

A. Yes, those as well as all cases that involved any political activity.[354]

Accordingly, even after the July 2011 change to the Emerging Issues tab of the BOLO spreadsheet, EO Determinations management and EO Determinations screeners continued to treat applications received from Tea Party organizations much the same as they had before the July change.

### b. How Screeners Processed Applications Received From Organizations That Did Not Engage in Political Campaign Intervention After the July 2011 BOLO Change

In September 2011, Paz grew concerned about the growing number of political advocacy cases pending in EO Determinations. She told David Fish that there were now over 100 political advocacy cases on hold in EO Determinations. She went on to state that "[i]n meeting with Cindy in Cincy last week and looking at some of the cases, it is clear to me that we cast the net too wide and have held up cases that have nothing to do with lobbying or campaign intervention (e.g., org distributing educational material on the national debt)."[355] Thomas shared Paz's concern. In her view, the description of "Advocacy orgs." in the Emerging Issues tab was "way too broad," and resulted in sending to Group 7822 for full development applications that did not contain political advocacy issues, but rather presented lobbying issues.[356] Thomas stated that the July 2011 description of "Advocacy orgs." "caused confusion among the groups

---

[352] *Id.*

[353] This is consistent with TIGTA's finding that all applications received by EO from organizations with "Tea Party," "Patriots," or "9/12" in their names were forwarded to Group 7822 for full development. TIGTA, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review, TIGTA Audit Report 2013–10–053 (May 14, 2013) p. 6.

[354] SFC Interview of Cindy Thomas (July 25, 2013) p. 91.

[355] Email from Holly Paz to David Fish and Andy Megosh (Sep. 21, 2011) IRS0000010131.

[356] SFC Interview of Cindy Thomas (July 25, 2013) p. 80.

in Cincinnati and the employees because they then started believing it included many, many more types of cases than just political advocacy-type cases."[357]

5. Steve Bowling and Cindy Thomas Changed the BOLO Spreadsheet in January 2012

In January 2012, Steve Bowling discussed with several of the revenue agents in Group 7822, including Ronald Bell, the Emerging Issues Coordinator, ways to revise the Emerging Issue tab so as to narrow its focus to avoid selecting applications that did not include political advocacy issues.[358] At the same time, Cindy Thomas told Steve Bowling that an entry for Occupy organizations needed to be included on the Watch List or BOLO because of press reports that Occupy organizations may apply for tax-exempt status.[359] Initially, Bowling emailed Thomas two options for updating the BOLO criteria as follows:

> 1st scenario = 1 BOLO
>
> Current Political Issues: Political action type organizations involved in limiting/expanding government, educating on the constitution and bill of rights, $ocial economic reform / movement.
>
> Note: typical advocacy type issues that are currently listed on the Case Assignment Guide (CAG) do not meet these criteria unless they are also involved in activities described above.
>
> 2nd scenario = 2 BOLOs
>
> Tea Parties: Typically involved in the tea party movement, further the principles of the constitution and bill of rights, promote voter registration, may refer to governmental reform, and/or 912 projects.
>
> "Occupy" orgs: Involve organizations occupying public space protesting in various cities, call people to assemble (people's assemblies) claiming social injustices due to "big-money" influence, claim the democratic process is controlled by wall street/banks/multinational corporations, could be linked globally. Claim to represent the 99% of the public that are interested in separating money from politics and improving the infrastructure to fix everything from healthcare to the economy.[360]

Thomas vetoed the second suggestion based on her understanding of Lerner's concerns about how the reference to "Tea Party" would create the appearance of bias.[361] As a compromise, Thomas suggested that Bowling use the first scenario for the Emerging Issues tab while adding Occupy to the Watch List tab.[362]

[357] *Id.* p. 82.
[358] *Id.* p. 93; SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).
[359] SFC Interview of Cindy Thomas (July 25, 2013) pp. 93–94; Email chain between Mary Sheer and Peggy Combs (Jan. 9–20, 2012) IRS0000013412.
[360] Email chain between Cindy Thomas and Steven Bowling (Jan. 20–24, 2012) IRS0000621814–17.
[361] *Id.;* SFC Interview of Cindy Thomas (July 25, 2013) pp. 93–95.
[362] *Id.*

Exhibit E

Bowling accepted Thomas's suggestion and revised the Emerging Issue and Watch List tabs of the BOLO spreadsheet accordingly.[363]

The references to "political action type organizations involved in limiting" government and "educating on the constitution and bill of rights" were attempts to describe the agenda of the Tea Party without using the term "Tea Party."[364] The reference to "$ocial economic reform/movement" was "code" for the Occupy organizations.[365] Bell queried Bowling why it was necessary to include the "$ocial economic" reference in the Emerging Issues tab as well, but Bowling responded that organizations other than the Occupy groups were advocating a similar position.[366]

### 6. Holly Paz and Lois Lerner Were Informed That EO Determinations Revised the July 2011 Emerging Issues Tab

On February 22, 2012, Paz asked Thomas to provide some information regarding the number of political advocacy cases that were then pending, whether cases that met the BOLO description received full development, and "how do we currently have this described on the bolo?"[367] Thomas replied to Paz on that same day that there were 208 pending political advocacy cases, that "[a]ll cases meeting BOLO criteria are supposed to go to full development," and she attached a copy of the then-current BOLO spreadsheet.[368] The Emerging Issues tab of the attached spreadsheet reflected the changes that Bowling had made, and Thomas had approved, on January 25, 2012.

---

[363] SFC Interview of Cindy Thomas (July 25, 2013) pp. 93–95; Email chain between Holly Paz, Lois Lerner and Nikole Flax (May 21, 2012) IRS0000352978–84. When asked by Committee Staff who was responsible for the January 25, 2012 revisions to the BOLO spreadsheet, Bowling stated as follows:

> Q. Can you tell me who the change came from, the language here under "issue description" that's different?
>
> A. No, I don't know where the change came from.
>
> * * * * * * *
>
> Q. So you're not sure who instructed you to make this change but it was somebody above you in the command chain?
>
> A. Yes, that's the way it would be.
>
> * * * * * * *
>
> Q. Do you know if this change ... was directed by Ms. Esrig, Ms. Thomas or was it somebody in Washington who directed it?
>
> A. I don't know who directed it.

SFC Interview of Steve Bowling (June 13, 2013) (excerpt above transcribed by SFC staff). These statements by Bowling to Committee staff were not only inconsistent with the documentary evidence that the Committee received from the IRS subsequent to Bowling's interview on June 13, 2013, but also with Thomas's statements to Committee staff.

[364] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).

[365] Email chain between Ronald Bell and Steve Bowling (Jan. 25, 2012) IRS0000013187.

[366] *Id.* In response to a written questionnaire from the Committee, Bowling alleged that he did "not understand the difference between liberal organizations, Tea Party groups, or any other political groups." *See* IRS Employee Responses to Written Questions from Finance Committee Staff (Dec. 19, 2013). He also made similar assertions to the Committee staff during an interview on June 13, 2013. Bowling's statements to the Committee are at odds with his apparent understanding of the political viewpoints espoused by both Tea Party and Occupy organizations, as evidenced by the language he developed and proposed to Thomas for inclusion in the BOLO spreadsheet.

[367] Email chain between Holly Paz, Cindy Thomas, Roberta Zarin, Lois Lerner and others (Feb. 22, 2012) IRS0000013739–48.

[368] *Id.*

Exhibit E

84

Subsequently, on May 15, 2012, Thomas sent Paz and Lerner another copy of the BOLO spreadsheet, including the Emerging Issues tab that reflected the changes made on January 25, 2012.[369]

## 7. After Steve Miller Became Aware of the BOLO Criteria, Holly Paz Revised the Process for Making Changes to the BOLO Spreadsheet and a New BOLO Spreadsheet Was Issued

On May 3, 2012, Steve Miller was briefed by Nancy Marks on the existence of the BOLO entry for "Tea Party" and the criteria used to identify applications as Tea Party applications.[370] Miller told the Committee that when he first heard of the criteria, he thought that it "was stupid and inappropriate."[371] When Lerner found out that the July 2011 description of "Advocacy orgs." in the Emerging Issues tab had been subsequently changed, she "put her head on the table and said, 'I thought I had fixed it.'"[372] Miller then directed Holly Paz to look into the process by which changes were made to the BOLO spreadsheet and to make adjustments to the process.[373] It is possible that Miller was concerned about how the Emerging Issue tab had been changed without Lerner or Paz's knowledge or consent.

On May 10, 2012, Paz asked Thomas to explain the process by which the Emerging Issues tab was amended.[374] Thomas informed Paz that suggestions for additions were sent to the Emerging Issues Coordinator who then consulted with the Area Manager and/or the Program Manager to determine if the matter would be added to the Emerging Issue tab.[375]

On May 17, 2012, Paz issued a Memorandum to Thomas advising that any changes to the Emerging Issue tab would now require the approval of the Emerging Issues Group Manager, the EO Determinations Program Manager, and the Director of Rulings and Agreements.[376]

In June 2012, the BOLO Spreadsheet was revised.[377] The Emerging Issues tab stated as follows:

> **Issue:** Current Political Issues
>
> **Issue Description:** 501(c)(3), 501(c)(4), 501(c)(5) and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit). Note: advocacy action type issue (e.g., lobbying) that are currently listed on the Case Assignment Guide (CAG) do not meet this criteria.
>
> **Disposition of Emerging Issue:** Forward case to Group 7822.

---

[369] Email chain between Lois Lerner, Holly Paz and Cindy Thomas (May 15, 2012) IRS0000013776–82.
[370] SFC Interview of Steven Miller (Dec. 12, 2013) pp. 133–141.
[371] *Id.* p. 139.
[372] SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 107.
[373] Email chain between Holly Paz and Cindy Thomas (May 9–10, 2012) IRS0000004755–62.
[374] *Id.*
[375] *Id.*
[376] Email chain between Holly Paz, Lois Lerner and Nikole Flax (May 17, 2012) IRS0000437639–41.
[377] Email chain between Holly Paz, Nancy Marks and Sharon Light (May 14, 2013) IRS0000195830–31.

Exhibit E

Paz also directed Thomas to remove references to ACORN and Occupy from the Watch List tab of the spreadsheet, since "the issues we are concerned about in those cases should be captured" by the revised language in the Emerging Issues tab.[378]

This description remained in the Emerging Issues tab until April 2013 when the "Disposition of Emerging Issue" entry was changed to reflect that the cases should be sent to Group 7823.[379] Shortly thereafter, on June 20, 2013, the IRS suspended the use of the BOLO spreadsheet.[380]

## VII. THE PROCESSES USED BY THE IRS TO WORK THE TEA PARTY APPLICATIONS WERE INEFFICIENT, CUMBERSOME, INVOLVED MULTIPLE LEVELS OF REVIEW, AND WERE PLAGUED BY DELAY

*This section identifies various measures taken by the IRS that harmed Tea Party applicants.*

No solitary event can be said to have caused the lengthy delays experienced by the Tea Party and other political advocacy organizations in the processing of their applications from 2010 to 2013. Rather, a confluence of events, some inter-related and most involving poor management decisions or the absence of management oversight, effectively resulted in the IRS taking years to make decisions on these applications.

### A. The Initial Process Used To Review the Tea Party Applications in 2010 Was Laborious and Time Consuming

In early April 2010, Carter (Chip) Hull, Tax Law Specialist, EO Technical Group 2, began working on two of the first applications received from Tea Party groups (i.e., Albuquerque Tea Party and Prescott Tea Party).[381] Hull had been assigned to process these two "test cases" so that his experiences could then be shared with EO Determinations, the entity with primary responsibility for processing the Tea Party applications.[382] Hull commenced his work by reviewing the case files and preparing development letters aimed at eliciting information from the organizations about their planned activities.[383] This information was necessary for Hull to determine whether the planned activities of these organizations were consistent with the tax-exempt status they were seeking.[384]

All other applications received from Tea Party organizations remained in EO Determinations and in late April 2010, were assigned to Elizabeth Hofacre, the Emerging Issues Coordinator in EO Determinations, Group 7822.[385] In mid-May 2010, Steve Grodnitzky, Acting Manager of EO Technical, directed Hull to

---

[378] Email from Holly Paz to Cindy Thomas (June 1, 2012) IRS0000013799.
[379] BOLO Spreadsheet (Apr. 19, 2013) IRS0000002718–30.
[380] Memorandum from Karen Schiller, Interim Guidance on the Suspension of BOLO List Usage (June 20, 2013).
[381] SFC Interview of Carter Hull (July 23, 2013) (not transcribed).
[382] SFC Interview of Ronald Shoemaker (July 31, 2013) (not transcribed).
[383] SFC Interview of Carter Hull (July 23, 2013) (not transcribed).
[384] *Id.*
[385] Email chain between Cindy Thomas, Steve Grodnitzky, Ron Shoemaker and others (Apr. 23–26, 2010) IRS0000181051–52.

Exhibit E

share with Hofacre the development letters Hull had prepared for the Albuquerque and Prescott Tea Party applications.[386] Grodnitzky told Hull to explain to Hofacre how the questions had been tailored to the facts of each application, lest Hofacre simply copy the development letters. In carrying out this directive, Hull advised Hofacre to send each of her draft development letters to him, together with copies of the applications and supporting documents.[387] Under the process imposed by Hull, Hofacre could not release the development letters to the applicants without Hull's concurrence.[388] When Hofacre began to receive responses to some of the development letters, Hull instructed Hofacre to send those responses to him, as well.[389]

Hofacre described this process as highly unusual.[390] In Hofacre's experience, EO Determinations agents would sometimes contact EO Technical specialists, with prior management approval, to pose a question or two.[391] Typically, EO Determinations agents had broad discretion in processing applications and could make recommendations regarding the ultimate disposition of an application, or whether additional information was required of the applicant.[392] This was not the case for the Tea Party applications.[393] With regard to those applications, Hofacre was not permitted by Hull to exercise any discretion regarding the applications.[394] Hofacre felt that for several of the Tea Party applications, she had sufficient information in her possession to make a recommendation to either approve or deny the application, or to request additional information.[395] However, she was unable to do so, as Hull effectively controlled all the decisions regarding how the Tea Party applications were handled.[396]

In October 2010, Cindy Thomas grew concerned with the efficacy of this process under which Hull reviewed each determination letter and informed Holly Paz, then Manager of EO Technical, as follows:

> I have a concern with the approach being used to develop the tea party cases we have here in Cincinnati. Apparently, an additional information letter is prepared for each case and the letter is faxed to Chip Hull for him to review. After he reviews, we send out the letter. In some instances, the organizations have responded and we are just "sitting" on these cases. **Personally, I don't know why Chip needs to look at each and every additional information letter . . . we need to coordinate these cases as a group and not try to work them one by one.**[397]

---

[386] Email chain between Steve Grodnitzky and Carter Hull (May 17, 2010) IRS0000631583–84.
[387] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 52–70.
[388] *Id.*
[389] *Id.*
[390] *Id.*
[391] *Id.*
[392] *Id.*
[393] *Id.*
[394] *Id.*
[395] *Id.*
[396] *Id.*
[397] Email chain between Cindy Thomas, Holly Paz, Sharon Camarillo, Steve Bowling and others (Oct. 26, 2010–Jan. 28, 2011) IRS0000435238–39 (emphasis added).

Sometime in August 2010 and continuing unabated through to October 2010, Hull ceased communicating with Hofacre for reasons unknown to Hofacre.[398] She continued to draft development letters and to send them to Hull along with copies of the applications and supporting documents, but Hull never responded to her.[399] Without Hull's concurrence, Hofacre was unable to send any further development letters to applicant organizations.[400] When organizations called Hofacre to inquire about the status of their applications, Steve Bowling, her Group Manager instructed her to tell the callers that their applications were "under review."[401] Hofacre grew increasingly frustrated with this process.[402] She likened it to "working in lost luggage" and she "dreaded when the phone rang."[403] While she elevated the matter of Hull's non-responsiveness to Bowling, Bowling merely instructed Hofacre to continue to prepare development letters and to send them to the silent Hull.[404]

In October 2010, Hofacre left EO Determinations, in large part due to her frustration over a lack of "autonomy" in the processing of the Tea Party applications and because of her concern that these were "high-profile" applications that could have "imploded" at any time.[405] When Hofacre left EO Determinations, only a few development letters had been sent out on the 40 Tea Party applications then pending in EO Determinations.[406] A substantial number of the applications either remained unworked, or had been reviewed by Hofacre and draft development letters had been prepared, but not released.[407] This was due in large measure to the requirement that Hull review each application, development letter, and response, a process that was necessarily laborious and which was delayed, for unexplained reasons, in August 2010 when Hull ceased communicating with Hofacre.

## B. Because of Miscommunications Between EO Determinations Management and Staff, No Tea Party Applications Were Processed by EO Determinations for More Than One Year (October 2010 to November 2011)

With Hofacre's departure from EO Determinations in October 2010, Ronald Bell assumed responsibility as the Emerging Issues Coordinator in Group 7822.[408] Before her departure, Hofacre briefed Bell on his new duties, told him that Chip Hull was the EO Technical contact for the Tea Party applications, and forwarded to Bell some draft development letters that she had prepared.[409]

Upon the assumption of his new duties, Bell was also apprised by Steve Bowling, his Manager, that EO Technical was preparing guidance for EO Determinations to use to process the Tea Party

[398] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 58–70.
[399] *Id.*
[400] *Id.*
[401] *Id.*
[402] *Id.*
[403] *Id.*
[404] *Id.*
[405] *Id.*
[406] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).
[407] *Id.*
[408] *Id.*
[409] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 150–152.

Exhibit E

applications.[410] Bell interpreted this to mean that he should perform no work on the Tea Party applications until receiving that guidance from EO Technical.[411] Thus, in lieu of reviewing Tea Party applications and preparing draft development letters as Hofacre had done, Bell worked on auto-revocation cases.[412]

In November 2010, Hull's three-month period of inaccessibility appears to have come to an end when he contacted Bell and requested that Bell send him draft development letters for his review.[413] Bell informed Bowling of Hull's request and Bowling, in turn, informed Sharon Camarillo, the Area Manager.[414] Bowling told Camarillo that "Ron is getting phone calls on these cases and his typical answer is 'the case is under review.'"[415] Camarillo sent Bowling's email to Thomas who advised that she would follow up with Holly Paz for a status report.[416]

Thomas called Paz and discussed with her EO Technical's plan for dealing with the Tea Party applications.[417] Paz told Thomas that EO Technical was writing a briefing paper on the two applications under its review and would soon raise the issues in these applications with Judith Kindell, Senior Technical Advisor to Lois Lerner.[418] After her conversation with Paz, Thomas advised Bowling and Camarillo as follows:

> If Judy does not believe they have a basis for denial for the egregious situations, then they will most likely recommend all cases be approved. **In the meantime, the specialist(s) need to continue working the applications as they have and will need to advise applicants that the cases are still under review.**[419]

Bowling apparently failed to communicate to Bell the clear directive of Thomas that the Tea Party applications needed to be worked, and/or failed to take any action to ensure that Bell was, in fact, working the applications. As a result, Bell sent no development letters to Hull and continued to work auto-revocation cases.[420]

In March 2011, Thomas requested of Michael Seto that EO Technical develop an "action plan" for processing the Tea Party applications.[421] In reply, Seto provided Thomas with an update on the two

---

[410] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).

[411] *Id.* Bell told the Committee that Bowling did not directly instruct him not to work the Tea Party applications. Rather, Bell stated that Bowling knew that Bell was working on the auto-revocation cases, and therefore must have known that he was *not* working on the Tea Party applications. Bell also told the Committee that Bowling prepared Bell's performance appraisal for this time period, an act that would have necessarily required Bowling to know what work Bell had performed during the performance assessment period.

[412] *Id.* Section 6033(j) of the Internal Revenue Code (2010) requires the automatic revocation of exempt status for any organization that fails to file a required return for three consecutive years.

[413] Email chain between Steve Bowling, Sharon Camarillo and Cindy Thomas (Nov. 16–17, 2010) IRS0000163029–30.

[414] *Id.*

[415] *Id.*

[416] *Id.*

[417] Email chain between Cindy Thomas, Sharon Camarillo, Steve Bowling, Holly Paz and others (Oct. 26, 2010–Jan. 28, 2011) IRS0000435238–39.

[418] *Id.*

[419] *Id.*

[420] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).

[421] Email chain between Cindy Thomas, Michael Seto, Holly Paz and others (Mar. 29–Apr. 13, 2011) IRS0000576953–55 (Email attachments containing taxpayer information omitted by SFC staff).

Exhibit E

"test cases" being worked by Hull.[422] Thomas passed this information to Bowling, stating:

> **We still need to continue to work cases to the extent we can and then wait to issue the approval or denial letter.** EOT needs to meet with Judy Kindell, senior technical advisor to EO Director, and then Lois Lerner before they can finalize the guidance for us. I would not expect to receive anything until sometime in May 2011.[423]

For reasons that are unclear to the Committee staff, Bowling once again failed to follow through with Thomas's directive and ensure that Bell understood that he should be working on the Tea Party applications, or was, in fact, actually working on the applications.

Steve Bowling's failure to communicate Thomas's directives of November 2010 and March 2011 to Bell regarding the processing of the Tea Party applications, and his neglect to take any measures to ensure that Bell was actually working those applications, resulted in Bell focusing almost exclusive attention on auto-revocation cases from October 2010 to November 2011.[424] A factor further contributing to Bell's disregard of the Tea Party applications was that he received no guidance from EO Technical on what to do with those applications during his tenure as Emerging Issues Coordinator. When the screening group sent Bell an application from a Tea Party group during this period of time, he performed secondary screening on the application to ensure that it was, in fact, a Tea Party application.[425] If it was, he placed the application in a file cabinet and returned to his work on auto-revocation cases.[426] Aside from performing the secondary screening function, Bell did not review the Tea Party applications and did not prepare any development letters from October 2010, when he assumed responsibility as Emerging Issues Coordinator, until November 2011, when Stephen Seok replaced Bell as Emerging Issues Coordinator.[427] Instead, the applications simply sat in a file cabinet during this period of time.[428]

Accordingly, miscommunications at the first level of management in EO Determinations between Bowling and Bell, coupled with a failure of EO Technical to provide guidance on how to develop the Tea Party applications, caused those applications to remain unworked in Cincinnati for over a year.

### C. Preparation and Review of EO Technical's "Test Cases" from 2010 to 2012 Added Substantial Delay to the Processing of the Tea Party Applications

In February 2010, Holly Paz, the then-Acting Manager of EO Technical, advised Cindy Thomas that EO Technical would work two Tea Party applications to completion and then, based on the lessons learned in doing so, would provide EO Determinations with

---

[422] *Id.*
[423] *Id.*
[424] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).
[425] *Id.*
[426] *Id.*
[427] *Id.*
[428] *Id.*

Exhibit E

90

guidance on how to process the remaining Tea Party applica-
tions.[429] The IRS's inability to resolve the "test cases" over a sev-
eral year period directly impeded its ability to develop the guidance
required by EO Determinations to process the Tea Party and other
political advocacy applications then pending.

Hull's case notes for one of the two "test cases" assigned to him,
the Albuquerque Tea Party, show that he completed development
of the application on July 8, 2010 when he received the Albu-
querque Tea Party's articles of incorporation.[430] Hull's next entry
in the case history is dated January 10, 2011, some six months
later.[431] On that date, Hull noted that he had completed a memo-
randum for the file (memo).[432] In the two-page memo, Hull con-
cluded that the Albuquerque Tea Party should be granted tax-ex-
empt status.[433] It is unclear why it took Hull six months to prepare
the two page memorandum.

On the following day, January 11, 2011, Hull submitted the
memo to his reviewer, Elizabeth Kastenberg, a Tax Law Specialist
in EO Technical, Group 2.[434] Kastenberg reviewed the memo and
recommended that it be sent to Judith Kindell, Senior Technical
Advisor to Lois Lerner, for her consideration.[435] Kindell regarded
herself as the "go to" person for issues relating to political cam-
paign intervention by tax-exempt entities.[436]

In accordance with Kastenberg's recommendation, on March 24,
2011, Hull forwarded the memo to Kindell.[437] Around this time,
Hull completed a draft denial of the other "test case" assigned to
him, an application for 501(c)(3) status from a conservative organi-
zation called American Junto.[438]

Hull and Kastenberg met with Kindell on April 6, 2011, nearly
three months after Kastenberg initially recommended consulting
with Kindell, to discuss both the memo and the draft denial let-
ter.[439] During the meeting, Kindell raised a question whether
American Junto was organized primarily for private benefit rather
than for a tax-exempt purpose.[440] Consequently, Kindell rec-
ommended that the issue of private benefit be developed and that
the memo and draft denial letter be sent to the Office of the Chief
Counsel so as to secure its views.[441] Hull followed up on Kindell's
recommendation and sent a development letter to American Junto

[429] Email chain between Holly Paz, Cindy Thomas and others (Feb. 25–Mar. 17, 2010) IRS0000180869–73.
[430] Technical Case History for Albuquerque Tea Party, IRS0000001323–24.
[431] Id.
[432] Id.
[433] Email chain between Michael Seto, Cindy Thomas, Holly Paz and others (Mar. 29–Apr. 13, 2011) IRS0000622735–53.
[434] Technical Case History for Albuquerque Tea Party, IRS0000001323–24.
[435] SFC Interview of Carter Hull (July 23, 2013) (not transcribed).
[436] SFC Interview of Judith Kindell (July 18, 2013) p. 12.
[437] Technical Case History for Albuquerque Tea Party, IRS0000001323–24.
[438] Email chain between Michael Seto, Cindy Thomas, Holly Paz and others (Mar. 29–Apr. 13, 2011) IRS0000622735–53. Hull had been assigned an application for exemption under 501(c)(3) from the Prescott Tea Party but had closed the application in May 2010 for "failure to establish" when the Prescott Tea Party did not respond to a development letter. On June 30, 2010, Hull was assigned the application for exemption under 501(c)(3) submitted by American Junto as a replacement "test case."
[439] Technical Case History for Albuquerque Tea Party, IRS0000001323–24.
[440] Email chain between Judith Kindell, Lois Lerner, Holly Paz and others (Apr. 7, 2011) IRS0000634444.
[441] Id.

Exhibit E

on April 27, 2011.[442] Subsequently, he sent his draft approval memo for the Albuquerque Tea Party to the Chief Counsel's Office on May 25, 2011,[443] followed on July 19, 2011 by his draft denial letter for American Junto.[444]

Hull and Kastenberg next met with Don Spellman, Senior Counsel, and several other representatives from the Office of the Chief Counsel on August 10, 2011, to discuss the two "test cases."[445] Four months had now lapsed since Kindell first recommended that the Office of Chief Counsel review the memo and draft letter. During the course of the meeting, Spellman recommended that EO Technical further develop the activities of both organizations during election year 2010.[446] Spellman offered to review the development letters aimed at eliciting this information, but EO Technical never sought further involvement of the Chief Counsel's Office in either of the applications.[447]

In November 2011, Michael Seto transferred the "test cases" to Hillary Goehausen, a Tax Law Specialist in EO Technical, Group 1.[448] In that same month, Goehausen prepared and sent out a development letter (the third) for American Junto and a development letter (the second) for the Albuquerque Tea Party.[449] In December 2011, a representative of American Junto informed Goehausen that it would not respond to the third IRS development letter and that the organization had been dissolved.[450] Goehausen closed the American Junto application for "failure to establish," thus leaving only one remaining "test case," the Albuquerque Tea Party.[451] Goehausen received the Albuquerque Tea Party's response to the development letter in January 2012, and commenced drafting a letter denying that group tax exemption.[452] Goehausen's draft letter reversed the conclusion that Hull had previously reached in his January 2011 memo in which he concluded that the application should be approved.

In April of 2012, Nancy Marks visited Cincinnati at the direction of Steve Miller, then Deputy Commissioner for Services and Enforcement, because of Miller's concerns over how EO Determinations was processing political advocacy applications.[453] Among other things, Marks found that there were between 250–300 political advocacy applications awaiting determination, so she recommended to Miller that EO Technical staff provide direct assistance to EO Determinations by reviewing each political advocacy application through a "bucketing" exercise.[454] The object of this endeavor would be to separate applications that could be quickly decided from those that either required varying degrees of develop-

[442] Email chain between Hillary Goehausen, Michael Seto, Carter Hull and others (Feb. 28, 2012) IRS0000058356–61.
[443] Technical Case History for Albuquerque Tea Party, IRS0000001323–24.
[444] Sensitive Case Report (Oct. 19, 2011) IRS0000644656–57.
[445] SFC Interview of Carter Hull (July 23, 2013) (not transcribed).
[446] SFC Interview of Donald Spellman (July 10, 2013) pp. 23–36.
[447] *Id.*
[448] SFC Interview of Carter Hull (July 23, 2013) (not transcribed).
[449] Email chain between Hilary Goehausen, Michael Seto, Carter Hull and others (Feb. 28, 2012) IRS0000058356–61.
[450] *Id.*
[451] *Id.*
[452] *Id.*
[453] SFC Interview of Steve Miller (Dec. 12, 2013) pp. 128–145.
[454] *Id.*

Exhibit E

ment or that were likely denials, and to place them in respective "buckets" where they could be worked to completion.[455] Miller concurred in the recommendation and the "bucketing" exercise began in mid-May 2012 and extended into early June 2012.[456]

The decision to assist EO Determinations by "bucketing" the applications in this fashion effectively superseded the plan to develop guidance for EO Determinations by working the "test cases." In May of 2012, when the IRS decided to pursue the "bucketing" exercise and to no longer rely on the "test cases" for the development of guidance, two out of three of the "test cases" had been closed for "failure to establish" and the third was still in the development/drafting stage. The two year period during which the "test cases" had been worked resulted in the development of little or no guidance that could be used by EO Determinations to reach decisions on the growing backlog of Tea Party and other political advocacy applications. Moreover, much of the two year period that EO Technical, Judith Kindell and the Office of the Chief Counsel spent focusing on the "test cases" was marked with protracted delays, unexplained intervals of inactivity, and a lack of any sense of urgency.

Inability to resolve the "test cases" and to develop the guidance that EO Determinations had first asked for in February 2010 contributed substantially to the delays experienced by the Tea Party and other advocacy organizations in securing decisions on their applications for tax exemption.

D. THE INITIATIVE TO DEVELOP A GUIDESHEET FOR EO DETERMINATIONS WAS A FAILURE THAT FURTHER CONTRIBUTED TO PROCESSING DELAYS IN 2011 AND 2012

On July 5, 2011, Lois Lerner convened a meeting with Holly Paz, Nancy Marks, Cindy Thomas, and staff from EO Guidance and EO Technical, including Justin Lowe and Hillary Goehausen.[457] The purpose of the meeting was to discuss the Tea Party applications then pending in EO Determinations, which at that time, numbered in excess of 100, and to decide how to best process those applications.[458] After being brought up to date on the Tea Party screening criteria and the efforts of EO Technical to assist EO Determinations, Lerner made three decisions regarding the processing of these applications. First, Lerner directed that the groups no longer be referred to as Tea Party organizations, but rather be called "advocacy organizations."[459] Second, Lerner determined that EO Technical should proceed to secure review of the two test cases by the Office of the Chief Counsel.[460] Third, Lerner approved the suggestion contained in the briefing paper prepared by staff for the meeting that a "guidesheet" be prepared by EO Technical for use by EO Determinations.[461] As Paz explained to the Committee,

[455] Id.
[456] Email chain between Cindy Thomas, Bonnie Esrig, Peggy Combs and others (May 8–9, 2012) IRS0000596252; SFC Interview of Holly Paz (July 26, 2013) pp. 153–162.
[457] SFC Interview of Holly Paz (July 26, 2013) pp. 86–96.
[458] Id.; Email from Justin Lowe to Holly Paz (June 27, 2011) IRS0000431165–66.
[459] SFC Interview of Holly Paz (July 26, 2013) pp. 86–96.
[460] Id.
[461] Id. The suggestion contained in the briefing paper used for the meeting stated that "EOT composes a list of issues or political/lobbying indicators to look for when investigating potential

> [t]he idea is that the guide sheet would help the Determinations Unit in developing the cases and then also analyzing what they got in response to the development letter, in figuring out, for example, whether certain pieces of information indicated campaign intervention or did not indicate campaign intervention.[462]

Later in July 2011, Michael Seto directed Hillary Goehausen to draft the guidesheet and Justin Lowe, a Tax Law Specialist in EO Guidance, to review Goehausen's draft.[463] Goehausen had commenced her career at the IRS in April 2011.[464] She prepared a draft that was reviewed by Lowe and sent it out to Judith Kindell, Chip Hull, David Fish, Elizabeth Kastenberg and others for comment on September 21, 2011.[465] Only Hull provided comments to Goehausen, so Goehausen sent a slightly revised version to the same recipients on November 3, 2011, again requesting comments.[466] Regarding the four months that it required to move from Lerner's decision in early July 2011 to prepare a guidesheet to the circulation of a draft for comment in early November 2011, Paz told the Committee the following:

> Q. Did you feel that the 4 months to get to this stage was a suitable or an appropriate period of time to develop a document like this?
>
> A. I thought it could have been done faster.[467]

On November 6, 2011, David Fish, then-Acting Director of Rulings and Agreements,[468] opined with regard to the guidesheet that "the document won't work in its present form. I think we need to work with [EO Determinations] to make it a usable document."[469] Fish apparently felt that the guidesheet was "too lawyerly" to be of assistance to the agents in EO Determinations.[470] Paz stated to the Committee as follows:

> Q. Okay. So November 6th Mr. Fish, who is the Acting Director of Rulings and Agreements, concludes that the guidesheet . . . won't work in its present form. So now that means that all the effort that has been expended since what, July 5, or since whenever Ms. Goehausen began working on that, to November 6, which is a period of about four months, is pretty much gone. Right? That effort hasn't resulted in anything useful at this point.

---

political intervention and excessive lobbying, such as reviewing website content, getting copies of educational and fundraising materials, and close scrutiny of expenditures." Email from Justin Lowe to Holly Paz (June 27, 2011) IRS0000431165–66.

[462] SFC Interview of Holly Paz (July 26, 2013) p. 96.

[463] Email chain between Michael Seto, Hillary Goehausen and others (July 23–24, 2011) IRS0000644018.

[464] SFC Interview of Hilary Goehausen (July 11, 2013) (not transcribed).

[465] Email from Hilary Goehausen to Judith Kindell and others (Sep. 21, 2011) IRS0000636285–97.

[466] Email chain between Hillary Goehausen, Judith Kindell and others (Sep. 21–Nov. 3, 2011) IRS0000057352–65.

[467] SFC Interview of Holly Paz (July 26, 2013) p. 125.

[468] *Id.* p. 18. Paz was on maternity leave from October 24, 2011 to February 6, 2012. During that time, David Fish, Manager of EO Guidance, served as Acting Director of Rulings and Agreements.

[469] Email chain between David Fish, Michael Seto, Cindy Thomas and others (Oct. 24–Nov. 6, 2011) IRS0000520827–41; SFC Interview of Holly Paz (July 26, 2013) pp. 133–134.

[470] SFC Interview of Holly Paz (July 26, 2013) p. 133.

Exhibit E

94

A. That's correct.[471]

Subsequently, on February 24, 2012, Paz transmitted a copy of the November 2011 iteration of the guidesheet to Don Spellman, Senior Counsel in the Office of the Chief Counsel, for his review.[472] Because Paz sent Spellman a version of the guidesheet from November 2011, it appears that further work by EO Technical on the guidesheet was essentially suspended in November 2011, possibly because of the determination made by David Fish that the guidesheet would not be helpful to EO Determinations agents. Spellman reviewed the guidesheet shortly after receiving it from Paz and sent an email to Janine Cook letting her know that:

> [i]t's nowhere near ready for prime time. It's a good start, but needs corrections, additions, changes all over. The law in particular needs fixing. The development questions are good, but not complete.[473]

On that same day, Lerner emailed Spellman and his supervisor Janine Cook and asked that they let Lerner know their concerns with the guidesheet as soon as possible, as Lerner intended to provide the guidesheet to Congressional staff and to post it on the IRS website.[474]

Spellman provided comments to Lerner on the guidesheet during the week of March 5, 2012.[475] However, Lerner did not feel that the revisions made by Spellman would be helpful to EO Determinations agents working the applications and requested further changes in the format.[476] Spellman provided yet another version of the guidesheet to Lerner on April 25, 2012.[477] On April 27, 2012, Nikole Flax, the Assistant Deputy Commissioner for Services and Enforcement, sent the April 25, 2012 version of the guidesheet prepared by Counsel to Cathy Livingston, Health Care Counsel in the Office of Chief Counsel, and asked Livingston to provide a "gut reaction."[478] Livingston reviewed the guidesheet and concluded as follows:

> I am concerned about this document that Counsel has sent forward, both for its practical utility in Cincinnati and also for what it doesn't make clear and what it may be perceived as implying about existing guidance. The product reflects, to me, the best efforts of a team that has not had the requisite experience working with the cases and issues.[479]

Paz expressed the following to the Committee:

---

[471] *Id.* p. 134.
[472] Email chain between Holly Paz, Don Spellman and others (Nov. 21, 2011–Feb. 24, 2012) IRS0000056937–50.
[473] *Id.*
[474] Email chain between Lois Lerner, Don Spellman, Janine Cook and others (Feb. 24–March 1, 2012) IRS0000594977–80.
[475] Email chain between Don Spellman, Lois Lerner and others (Mar. 5, 2012) IRS0000057789–90.
[476] Email chain between Janine Cook, Lois Lerner, Victoria Judson and others (Mar. 19–21, 2012) IRS0000056992–7043.
[477] Email from Don Spellman to Lois Lerner and others (Apr. 25, 2012) IRS0000512392–446.
[478] Email chain between Nikole Flax, Cathy Livingston and others (Apr. 26–May 1, 2012) IRS0000063118–21.
[479] *Id.*

95

Q. Okay. But I guess my point is, though, that this effort that had been undertaken to prepare a guidesheet had commenced sometime after July 5th, and here we are now April of the following year and we are still talking about a draft document where people are commenting on. Is that correct?

A. Yes.

Q. And in all that intervening period of time the guidesheet hasn't been able to be used by anyone in EOD in kind of the way it was intended to be used. Is that correct?

A. That's correct.[480]

In May 2012, Steve Miller approved a recommendation to send a team of employees from EO in Washington D.C. to Cincinnati to provide a training workshop to the EO Determinations agents on how to process applications involving potential political advocacy issues.[481] The training took place on May 14–15, 2012.[482] Paz told the Committee that

. . . the workshop was an alternative to the guidesheet. We were never able to get Counsel to sign off on the guidesheet and give a final blessing to it. So we, at that point, had abandoned the guidesheet.[483]

Nearly 10 months after Lerner had first decided to develop a guidesheet, and after substantial investment of time and labor by staff from EO Technical, EO Guidance and the Office of the Chief Counsel, the IRS abandoned further efforts to complete the guidesheet. Together with the "test cases," the guidesheet was intended to serve as part of the guidance that EO Technical was responsible for providing to EO Determinations to assist it in processing the Tea Party and other political advocacy applications. As with the "test cases," EO Technical was never able to deliver to EO Determinations a useful product. EO Technical's inability to produce a set of written instructions in the form of a guidesheet for processing political advocacy applications after nearly 10 months of effort further delayed EO Determinations processing of Tea Party and other political advocacy applications. It cannot be disputed that the initiative to develop the guidesheet was an unmitigated failure. Miller best summed it up as follows:

Q. . . . Was [the guidesheet] the tool that EOD really needed to get the cases moving along?

A. Clearly it wasn't, because it didn't work.[484]

E. THE INITIAL "TRIAGE" OF TEA PARTY AND OTHER POLITICAL ADVOCACY CASES IN 2011 REPRESENTED YET ANOTHER UNSUCCESSFUL ATTEMPT BY EO TECHNICAL TO ASSIST EO DETERMINATIONS

In September 2011, Holly Paz and Sharon Light, Senior Technical Advisor to Lois Lerner, visited EO Determinations in Cincinnati.[485] During this visit, Paz and Light met with Cindy Thomas

---

[480] SFC Interview of Holly Paz (July 26, 2013) p. 153.
[481] SFC Interview of Steve Miller (Dec.12, 2013) pp. 121–122.
[482] Email chain between Cindy Thomas, Bonnie Esrig and others (May 8–9, 2012) IRS0000596252.
[483] SFC Interview of Holly Paz (July 26, 2013) p. 163.
[484] SFC Interview of Steve Miller (Dec. 12, 2013) p. 122.
[485] SFC Interview of Cindy Thomas (July 25, 2013) pp. 143–148.

Exhibit E

and during the course of a discussion on the advocacy applications, Thomas showed an advocacy application to Light.[486] In one sitting, Light reviewed the application and did internet research on the organization and concluded that the application should be approved.[487] Thomas then suggested to Paz and Light that perhaps other political advocacy applications could also be quickly approved, if EO Technical staff knowledgeable about political advocacy issues could review those applications.[488] Thomas suggested providing EO Technical with a list of all the political advocacy applications then pending in EO Determinations so that Tax Law Specialists in EO Technical could "triage" the applications.[489] The "triage" would consist of reviewing the applications in TEDS, the electronic data base that served as a repository for those records, and identifying applications that could be approved as well as those that could not.[490] Paz stated to the Committee as follows:

> Q. What was the overall goal of the triage?
>
> A. It was to find some cases that could be approved based on the information that we had so that we could close some of the cases, the taxpayers wouldn't have to wait any longer.[491]

Paz agreed with Thomas's suggestion to perform a "triage" on the pending applications and indicated that Hillary Goehausen and Justin Lowe would perform triage responsibilities.[492] Shortly thereafter, on September 15, 2011, Thomas sent to Paz a list of all advocacy applications then pending in EO Determinations together with their EINs and other information.[493] Goehausen and Lowe commenced reviewing PDF copies of the applications in TEDS and on October 24, 2011, a spreadsheet containing the results of their review of 162 Tea Party and other political advocacy applications was sent to Thomas.[494] Goehausen and Lowe made notations on the spreadsheet for each application, such as "general advocacy," "lobbying," "website has substantial inflammatory rhetoric," "political campaign activity," etc.[495] On October 25, 2011, Thomas wrote to Michael Seto regarding these notations and stated the following:

> [n]ot sure where this leaves us and I'm unclear as to what action is being suggested for some of these cases. Specifically, if the comment indicates "general advocacy," what does that mean—additional development or what?[496]

Goehausen attempted to explain the notations to Thomas on October 26, 2011.[497] Thomas wrote to Seto on October 30, 2011, again expressing confusion over the notations and stating her expectation that the "triage" would specifically identify applications that could be approved, or that required more development, or that should be

---

[486] *Id.*
[487] *Id.*
[488] *Id.*
[489] *Id.*
[490] Email chain between Cindy Thomas, Holly Paz and others (Sep. 15–Nov. 15, 2011) IRS0000057399–426; IRM §7.15.6 (June 12, 2013).
[491] SFC Interview of Holly Paz (July 26, 2013) p. 131.
[492] SFC Interview of Cindy Thomas (July 25, 2013) pp. 145–146.
[493] Email chain between Cindy Thomas, Holly Paz and others (Sep. 15–Nov. 15, 2011) IRS0000057399–426.
[494] *Id.*
[495] *Id.*
[496] *Id.*
[497] *Id.*

denied.[498] Seto followed up with Thomas on November 6, 2011, promising that Goehausen would revise the spreadsheet to comply with Thomas's expectation.[499] Thomas explained her concerns with Goehausen's notations as follows:

> . . . when I reviewed some of the comments, I didn't find it very helpful, because what I was looking to get is just tell us whether this case can be approved or not, similar to what Sharon Light did when she reviewed that one case. But there were comments on the spreadsheet and I didn't know whether that meant approve the case, don't approve the case, or what. So I sent it back to Mike and this process happened, I believe, three times that the spreadsheet was sent back and that the review took place like about three times.[500]

On November 22, 2011, Seto sent Thomas a revised spreadsheet and informed Thomas that of the 162 applications Goehausen reviewed, 12 might qualify for exemption, 15 were possible denials, and that the remainder (135) required further development.[501] Goehausen's recommendations were based only on a review of the organizations' applications, and not on any supporting documentation that the organizations may have submitted after filing their applications.[502] Since Goehausen's review was limited to examining applications, her recommendations were offered with the caveat that EO Determinations needed to perform further development before approving or denying any applications.[503]

In view of the tentative nature of Goehausen's recommendations, Thomas was unable to direct her staff to approve or deny any application.[504] She explained her actions to the Committee as follows:

> . . . I just wanted them to tell us this case is okay to approve or not approve . . . . I didn't give this [spreadsheet] to anybody that worked for me because I wanted it perfected in D.C. so that I could take this spreadsheet and give it out and say here, follow this direction. But I didn't do that because it was unclear to me. It was unclear to me what was being recommended by the Washington office.[505]

The effort expended in performing the "triage" of Tea Party and political advocacy applications from September 15, 2011 to November 22, 2011, failed to achieve its goal of providing EO Determinations with the information and direction necessary for it to approve or deny any of the pending applications.

Paz summarized the utility of the triage effort as a whole in the following terms:

> Q. . . . Was EOD able to take the results of that triage effort and actually implement them?
> A. From what I understand, they did not . . . .

[498] Id.
[499] Id.
[500] SFC Interview of Cindy Thomas (July 25, 2013) p. 146.
[501] Email chain between Michael Seto, Cindy Thomas and others (Nov. 22–Dec. 12, 2011) IRS0000439824–26.
[502] SFC Interview of Holly Paz (July 26, 2013) p. 135.
[503] Id.
[504] SFC Interview of Cindy Thomas (July 25, 2013) p. 147.
[505] Id.

Exhibit E

Q. Okay. So would it be fair to say that the entire triage effort, the triage effort, at least this first triage effort in 2011 then resulted in nothing useful?
A. That's correct.[506]

F. THE ADVOCACY TEAM FAILED TO APPROVE OR DENY ANY APPLICATIONS RECEIVED FROM TEA PARTY OR OTHER POLITICAL ADVOCACY ORGANIZATIONS FROM ITS FORMATION IN DECEMBER 2011 TO JUNE 2012

Throughout 2010 and 2011, Cindy Thomas had repeatedly asked EO Technical for the guidance to process the Tea Party applications that she had first been promised by Holly Paz in February 2010.[507] Thomas did not receive the promised guidance in 2010 or 2011. In late 2011, Michael Seto provided Thomas with a copy of the draft guidesheet, but Thomas was told that EO Determinations agents may not find it useful.[508] Thomas, now armed with the draft guidesheet and the tentative results produced by the "triage" of applications performed by Hillary Goehausen and Justin Lowe, decided to try to move the political advocacy applications.[509] Accordingly, on Steve Bowling's recommendation, Thomas replaced Ronald Bell as coordinator for the political advocacy applications with Stephen Seok, an EO Determinations agent in Group 7822.[510] Concurrent with that change, Thomas formed the "Advocacy Team" to process the Tea Party and political advocacy applications.[511] The team consisted of 12 GS–13 agents, one from each of the Groups within EO Determinations.[512] These agents were among the highest graded agents in each Group.

To assist in processing the applications, Seok was provided a copy of the guidesheet and the results of the "triage."[513] He provided the team members with a copy of the draft guidesheet[514] and shortly thereafter convened the first meeting of the Advocacy Team on December 16, 2011.[515] At this point, the Office of the Chief Counsel had not reviewed the guidesheet nor had it been approved for use by management. During the December 16, 2011 meeting, the members discussed the history of the advocacy applications, the purpose of the team, and how they would process the political advocacy applications through the use of "template" development let-

---

[506] SFC Interview of Holly Paz (July 26, 2013) p. 135.

[507] Email chain between Holly Paz, Cindy Thomas and others (Feb. 25–Mar. 17, 2010) IRS0000180869–73; Email chain between Cindy Thomas, Holly Paz and others (Oct. 26, 2010–Jan. 28, 2011) IRS0000435238–39; Email chain between Cindy Thomas, Holly Paz and others (Oct. 26, 2010–Mar. 2, 2011) IRS0000620724–26; Email chain between Cindy Thomas, Michael Seto and others (Mar. 29–Apr. 13, 2011) IRS0000576953–55; Email chain between Cindy Thomas, Holly Paz and others (Sep. 15–Nov. 15, 2011) IRS0000057399–426; Email chain between Cindy Thomas, Lois Lerner and others (Nov. 3, 2011) IRS0000162845–46 (Email attachment containing taxpayer information omitted by Committee staff); Email chain between Michael Seto, Cindy Thomas and others (Nov. 22–Dec. 12, 2011) IRS0000439824–26.

[508] SFC Interview of Cindy Thomas (July 25, 2013) p. 147.

[509] *Id*. pp. 147–48.

[510] *Id*.

[511] Email chain between Michael Seto, Cindy Thomas and others (Nov. 22–Dec. 12, 2011) IRS0000439824–26.

[512] *Id*.; Email chain between Cindy Thomas, Nancy Marks and others (Apr. 17–23, 2012) IRS0000013058–61.

[513] SFC Interview of Cindy Thomas (July 25, 2013) pp. 147–48.

[514] Email from Stephen Seok to Ronald Bell and others (Dec. 12, 2011) IRS0000059316–28.

[515] Email chain between Cindy Thomas, Nancy Marks and others (Apr. 17–23, 2012) IRS0000013058–61.

ters.[516] At the time of the meeting, Seok identified approximately 172 political advocacy applications awaiting decision.[517] While Seok served as Coordinator for the team, he reported to Steve Bowling and provided Bowling with periodic updates on the team's activities.[518]

Throughout the remainder of December 2011 and into the first half of January 2012, Seok assigned political advocacy applications to the team members and reviewed their draft development letters.[519] In his report to Bowling dated February 13, 2012, Seok indicated that development letters had been sent out for most of the applications that had been assigned and that except for a few applications, no responses had yet been received.[520] On February 15, 2012, Seok circulated to the Advocacy Team members as well as to Bowling copies of several draft documents, including a document that contained template development questions.[521] Among the template questions, which numbered in excess of 80, were questions seeking: the identity of donors and the amounts and dates of donations; the identity of volunteers; copies of every webpage including social networking sites and blog sites; detailed descriptions of all events sponsored by the organizations; and copies of all handouts distributed by the organizations.[522]

Seok used the draft guidesheet that had been provided to him to prepare the template questions.[523] In addition, Seok and other Advocacy Team members apparently used earlier iterations of the draft template questions to prepare some of the development letters sent to Tea Party organizations in January and early February 2012.

Beginning about the middle of February 2012, the IRS began to receive Congressional inquiries about the processing of applications for tax exemption filed by Tea Party organizations.[524] The inquiries were prompted by complaints from Tea Party groups seeking tax-exempt status that had recently received development letters from the IRS containing questions that appeared to be burdensome, inappropriate, and sometimes intrusive.[525] Many of the development letters requested information such as the names of all donors, donation amounts and dates of donations; the identities of all volunteers; and whether board members and officers would run for polit-

---

[516] *Id.*

[517] *Id.* Text discussing the 172 pending cases notes "37 c3 125 c4;" "[m]ostly advocacy with strong or some political activities, at least implied;" "[a]bout 155 cases reviewed by EO Tech: Favorable 13, Denial 13, All others: Development Needed;" "30 Something TEA party, Several 912, Repeal PPACT (Patient Protection and Affordable Care Act), Enact Universal Single-Payer Health Case [sic] System, etc."

[518] Email chain between Stephen Seok, Steve Bowling, Holly Paz and others (Jan. 8–Aug. 7, 2012) IRS0000434203–08.

[519] *Id.*

[520] *Id.*

[521] Email from Stephen Seok to Steve Bowling and the Advocacy Team (Feb. 15, 2012) IRS0000594910–29.

[522] *Id.*

[523] SFC Interview of Steve Miller (Dec. 12, 2013) p. 113. The close relationship between the draft guidesheet and the template questions clearly suggests that the former was used to prepare the latter.

[524] SFC Interview of Holly Paz (July 26, 2013) pp. 141–142; Letter from Senator Orrin G. Hatch to IRS Commissioner Shulman (Mar. 14, 2012) IRS0000488582–85.

[525] Email chain between David Fish, Keith Frank, Andy Megosh and others (Feb. 17–21, 2012) IRS0000610957–60.

Exhibit E

100

ical office.[526] The application for tax-exempt status (IRS Form 1023) does not require the provision of donor-identifying information. However, if an organization seeking tax-exempt status under section 501(c) provided information to the IRS regarding its donors during the application process pursuant to a follow-up request by an agent for donor-identifying information in connection with an application, then that information could be disclosed if the organization's application were subsequently approved. In contrast, 501(c) filers are required to disclose annually the names and addresses of anyone who contributed $5,000 or more as part of the Form 990 Schedule B, but Schedule B. is not required to be made public, except in the case of private foundations. Therefore, IRS agents requesting an organization's donor information during the application process subjected that donor information to a different standard of disclosure than otherwise applicable to 501(c) organizations.

In addition to Congressional inquiries, news articles began to appear in February 2012 reporting that Tea Party organizations that were awaiting determinations from the IRS on their requests for tax-exempt status had recently received burdensome development letters.[527] These development letters, which in some cases contained over 80 separate questions, also allowed only 14 days for reply. Moreover, many of the letters received by the applicant organizations contained duplicate requests.[528]

In response to both mounting Congressional inquiries and media stories about intrusive development questions that had been received by Tea Party organizations, Steve Miller, then Deputy Commissioner for Services and Enforcement, took several remedial actions.[529] Regarding donor information, Miller directed that the IRS inform recipients of the development letters that they need not provide the donor information.[530] For organizations that had already provided that information, Miller was apprised by the Office of the Chief Counsel that the donor information could be destroyed since it had not been used.[531] Accordingly, in most cases, the donor information was destroyed.[532] Organizations were also allowed more time to respond to the development letters and were permitted to submit sample web pages, in lieu of screen shots of every page.[533] Moreover, Cindy Thomas disciplined Seok as the majority of instances where donor information had been requested were applications that Seok had worked.[534] In addition, Seok was eventually replaced as Coordinator for political advocacy applications.[535] How-

---

[526] Email from Michele Eldridge to Steve Miller and others (Mar. 1, 2012) IRS0000341681–83.

[527] Email chain between Faris Fink, Steve Miller, Shane Ferguson and others (Feb. 29, 2012) IRS0000341677–80.

[528] Email chain between Lois Lerner, Holly Paz, Cindy Thomas and others (Feb. 24–Mar. 1, 2012) IRS0000594977–80.

[529] SFC Interview of Steve Miller (Dec. 12, 2013) pp. 123–129.

[530] *Id.*

[531] *Id.* Miller explained during his interview that if donor information had been retained by the IRS and the organization's application was subsequently approved, the donor information would then become public.

[532] *Id.* However, in at least one instance, donor information was not destroyed. See Email from Sharon Light to Lois Lerner (Apr. 19, 2013) IRS0000195724–25.

[533] SFC Interview of Steve Miller (Dec. 12, 2013) pp. 123–129.

[534] SFC Interview of Cindy Thomas (July 26, 2013) pp. 134–39.

[535] *Id.*

Exhibit E

ever, in January 2013, Thomas promoted Seok to the Group Manager position.[536]

The most significant consequence for the processing of political advocacy applications resulting from the issuance of the inappropriate, burdensome and sometimes intrusive development letters occurred on February 29, 2012. On that date, Lois Lerner instructed Paz to ensure that EO Determinations sent no further development letters until the letters were adjusted.[537] Paz so advised Thomas, and Thomas in turn directed Bowling to cease assigning any more political advocacy applications "until we have the template questions from DC."[538] On February 29, 2012, the Advocacy Team effectively ceased processing Tea Party and political advocacy applications, an activity that it would not resume again until mid-May 2012, when the IRS next attempted to process the Tea Party and other political advocacy applications through the "bucketing" initiative described below.

While the idea to form the Advocacy Team to finally work the Tea Party and other political advocacy applications appears to have been well-intentioned, the team was ill-equipped to carry out that task. The guidesheet relied on by the team was a draft only, and as explained in greater detail within this report, the IRS was never able to resolve its shortcomings. Additionally, the results of the "triage" performed in 2011 which the Advocacy Team also used as guidance were of dubious value, since the conclusions reached in that exercise were premised on a review of only partial records. Lastly, and perhaps most significantly, the Advocacy Team appears to have suffered from a lack of effective leadership. While Seok's errors may be explained somewhat by his apparent lack of managerial experience, Bowling was aware of the template questions, but failed to recognize the predictable consequences of their use. In sum, Bowling failed to properly manage the activities of the Advocacy Team, allowing burdensome, often irrelevant and sometimes intrusive questions to be asked of a group of organizations whose sensitivities were already heightened by years of delay in the resolution of their applications.[539]

G. THE MULTI-STEP REVIEW PROCEDURE ESTABLISHED BY EO TECHNICAL IN 2012 FOR POLITICAL ADVOCACY APPLICATIONS REFLECTED A LACK OF CONCERN BY IRS MANAGEMENT FOR THE NEED TO PROCESS THE APPLICATIONS EXPEDITIOUSLY

In March 2012, Cindy Thomas informed Michael Seto, EO Technical Manager, that EO Determinations was ready to send to EO Technical the first application for exemption under 501(c)(4) that it

---

[536] Id.

[537] Email chain between Lois Lerner, Holly Paz, Cindy Thomas and others (Feb. 29, 2012) IRS0000594977–80.

[538] Id.

[539] These egregious deficiencies in Bowling's management of the advocacy team do not appear to have adversely affected the IRS's assessment of his performance. In fact, the IRS performance review board gave him the highest recommendation for an award for the period which encompassed the events described above in late 2011 and early 2012. As a result, Bowling received a bonus that was among the highest for TEGE front-line managers, an amount that exceeded 2% of his annual salary. Email from Brent Brown to Lois Lerner and Dawn Marx (Nov. 29, 2012) (attachment containing sensitive personnel information omitted by Committee staff). Not only did the IRS give Bowling a stellar cash performance award in 2012, but upon Cindy Thomas's reassignment in August 2013, it also elevated him to the position of EO Determinations Manager along with Jon Waddell and Donna Abner. IRS Briefing for SFC Staff (July 7, 2015).

thought should be approved.[540] In apparent anticipation of reviewing the first application and recommendation, and presumably the others that would follow, Michael Seto announced a multi-step process for providing technical assistance to EO Determinations on advocacy applications.[541] The process involved the following steps:

1. Hilary Goehausen, EO Technical, analyzes the application and forms a recommendation;

2. Goehausen submits her analysis and recommendation to Justin Lowe, EO Guidance for his review;

3. When Goehausen and Lowe complete their review and recommendation, it is sent to Michael Seto for his review;

4. Seto then schedules a meeting with Cindy Thomas and Donna Abner, Director EO Quality Assurance, to update them on EO Technical's analysis and recommendation;

5. The analysis and recommendation are then sent to the Office of the Chief Counsel for its comment/concurrence;

6. When the Office of Chief Counsel completes its review, Seto schedules a meeting with Lois Lerner, Holly Paz and David Fish to discuss the recommendation;

7. The analysis/recommendation is released to EO Determinations.

It is unclear who the originator of this process was, and how many requests for technical assistance from EO Determinations were actually subjected to the multiple handoffs that characterize this "process."[542] What is clear, however, is that any request for technical assistance from EO Determinations that was processed in this fashion would take considerable time to move through all the steps. Steve Grodnitzky stated to the Committee as follows:

Q. . . . and looking at this process and the seven steps, do you think it would have an effect on your—the processing speed or the time it would take to move cases through your—your Group 1?

A. Well, the more individuals that look at a particular case, theoretically the longer it would take to resolve.

Q. Okay. In looking at this process, do you think that this would expedite or perhaps slow down the movement of cases through your group?

A. Having more people that are involved in the process would result in a case taking longer to resolve.

Q. So this process would slow things down, right?

A. Yes, it could.[543]

When asked about the length of time that it generally required for the Office of Chief Counsel to respond to a request for advice, Grodnitzky told the Committee the following:

It could be 3 months, 6 months, a year. It—depends. I— it varies on what their—well, let me step back. I don't want to speak for counsel, but I can only speak for my experience in working with counsel, and it would—it's vary-

---

[540] Email chain between Cindy Thomas, Michael Seto, Steve Bowling and others (Mar. 6, 2012) IRS0000617020–21.

[541] Email chain between Justin Lowe, Michael Seto, Steve Grodnitzky and others (Jan. 31–Mar. 5, 2012) IRS0000594982–84; Email from Michael Seto to Steve Grodnitzky and others (Mar. 9, 2012) IRS0000066875.

[542] SFC Interview of Steve Grodnitzky (Sep. 25, 2013) pp. 137–146.

[543] *Id*.

ing lengths of time, but in my experience, counsel has taken—can take a great deal of time.[544]

This process was instituted at a time when some of the applications received from the Tea Party groups were already two and a half years old. It was also instituted after better than two years of fruitless effort by EO Technical in working "test cases," developing guidesheets, and triaging applications. Implementation of the multi-step review process at this juncture clearly evidences that management within EO, whether at the EO Technical level or higher, was seemingly unconcerned about the already long delays endured by many Tea Party and other applicants seeking to engage in some level of political advocacy. Rather than looking for ways to expedite the processing of these long delayed applications, EO devised a process that virtually guaranteed that any application subject to the seven steps would languish without resolution for many more months.

H. THE MAY 2012 "BUCKETING" INITIATIVE RESULTED IN EO DETERMINATIONS ISSUING THE FIRST APPROVALS OF TEA PARTY AND OTHER POLITICAL ADVOCACY APPLICATIONS AFTER NEARLY TWO AND A HALF YEARS

In March 2012, Steve Miller, then Deputy Commissioner for Services and Enforcement, grew increasingly concerned about the processing of Tea Party and other political advocacy applications.[545] His concern was prompted by stories in the media and Congressional inquiries regarding the apparent issuance of intrusive and burdensome development letters by EO Determinations to Tea Party groups.[546] Miller sent Nancy Marks, Special Assistant to the TE/GE Commissioner, to Cincinnati to determine how EO Determinations was processing the Tea Party and other political advocacy applications.[547] In late April, Marks and several others arrived in Cincinnati and interviewed employees involved in the processing of political advocacy applications.[548] Marks also examined applications for exemption filed by political advocacy organizations.[549] She reported back to Miller on May 3, 2012 and among other revelations, indicated that the use of unnecessary and sometimes intrusive development questions resulted from a failure by EO Technical to provide EO Determinations with adequate training and guidance.[550] Marks also told Miller that there were approximately 250–300 applications pending decision that involved possible political advocacy.[551] Marks recommended, and Miller agreed, that EO Technical and EO Determinations personnel would review all of the political advocacy applications through a

---

[544] *Id*.
[545] SFC Interview of Steve Miller (Dec. 12, 2013) pp. 129–145.
[546] *Id*.
[547] *Id*.
[548] Email chain between Holly Paz, Cindy Thomas, Donna Abner and others (Apr. 20–23, 2012) IRS0000003152–55.
[549] *Id*.
[550] SFC Interview of Steve Miller (Dec. 12, 2013) pp. 129–145.
[551] *Id*.

"bucketing" exercise that would allow applications to be quickly approved if they met the requirements for exemption.[552]

In May 2012, Cindy Thomas advised members of her staff that certain EO Determinations personnel, as well as "a few additional folks from D.C.," would place the advocacy applications in one of the following four buckets:

    1. Favorable (no further substantive development needed).
    2. Favorable (limited development with approximately two or three questions to ask the applicant).
    3. Significant development.
    4. Probable denial.[553]

Thomas further informed her staff that, "[m]ost likely, we'll try to get those cases in Bucket 1 closed quickly and then move to Bucket 2." [554]

The bucketing was preceded by several days of classroom training for the EO Determinations specialists. Holly Paz described the approach used to train the specialists as follows:

> We did it in a workshop format where we used the real cases that we had and used those as a way to discuss issues that come up. We also talked a lot about, here's an issue you see on the application; how would you ask a development question about it? What would the question look like? And then worked through what would be a good question that would get at what you needed to know but not be too burdensome to the applicant.[555]

The bucketing of applications commenced on May 16, 2012[556] and extended for three weeks.[557] Two employees, one from EO Determinations and the other from EO Technical, reviewed each application.[558] Each employee reviewed the application independently and made a recommendation as to the bucket to which the application should be assigned.[559] If the two employees agreed on the bucket, the application was assigned to that bucket.[560] If there was disagreement, the employees would meet and attempt to reconcile their differences.[561] If they could not, then the disagreement was elevated to Sharon Light, Senior Technical Advisor to the EO Director, who would make the determination as to the appropriate bucket.[562]

On June 7, 2012, Paz reported to Cindy Thomas and Lois Lerner the results of the now completed bucketing exercise as follows:

    83 c/3s bucketed:
    16 approval
    16 limited development
    23 general development

---

[552] Id.
[553] Email chain between Cindy Thomas, Bonnie Esrig and others (May 8–9, 2012) IRS0000596252.
[554] Id.
[555] SFC Interview of Holly Paz (July 26, 2013) p. 162.
[556] Email chain between Cindy Thomas, Bonnie Esrig and others (May 8–9, 2012) IRS0000596252.
[557] SFC Interview of Holly Paz (July 26, 2013) pp. 160–161.
[558] Id.
[559] Id.
[560] Id.
[561] Id.
[562] Id.

> 28 likely denial
> 199 c/4s bucketed:
> 65 approval
> 48 limited development
> 56 general development
> 30 likely denial [563]

While the bucketed applications were from groups on both the political right as well as the left, the majority of the applications were from right-leaning organizations. On July 18, 2012, Judith Kindell noted this fact to Lois Lerner as follows:

> Of the 84 (c)(3) cases, slightly over half appear to be conservative leaning groups based solely on the name. The remainder do not obviously lean to either side of the political spectrum.
> Of the 199 (c)(4) cases, approximately ¾ appear to be conservative leaning while fewer than 10 appear to be liberal/progressive leaning groups based solely on name. The remainder do not obviously lean to either side of the political spectrum. [564]

Political advocacy applications received after June 8, 2012, were bucketed in EO Determinations. [565] Commencing in June 2012, 41 applicants for exemption, including Tea Party and other political advocacy groups, received approval letters from the IRS. [566] These approvals represented the first approvals of political advocacy applications since early 2010 when the IRS had granted tax exemption to one 501(c)(3) and two 501(c)(4) Tea Party organizations. In addition, 31 development letters were prepared and sent out in June 2012 by EO Determinations on other bucketed applications. [567] These were the first development letters issued by EO Determinations since February 29, 2012, when Lois Lerner suspended the further issuance of development letters. For applications that were likely denials and that had been placed in bucket 4, EO Technical prepared the majority of development letters and worked the applications. [568] From June 2012 to December 2012, the IRS approved a total of 133 political advocacy applications. [569]

While not entirely free from problems, the "bucketing" exercise represented the first IRS initiative in two and a half years that actually succeeded in bringing political advocacy applications to closure. Yet, as of March 2014, more than four years since the first political advocacy applications were filed, 22% of those applications were still unresolved. While the IRS succeeded in closing most of the applications in the ensuing year, 10 organizations were still waiting a determination as of April 2015. [570]

---

[563] Email chain between Holly Paz, Lois Lerner, Donna Abner and others (June 8, 2012) IRS0000578664–66.
[564] Email from Judith Kindell to Lois Lerner (July 18, 2012) IRS0000585328.
[565] Email chain between Holly Paz, Lois Lerner, Donna Abner and others (June 8, 2012) IRS0000578664–66.
[566] Email chain between Cindy Thomas, Holly Paz, and Donna Abner (June 27–28, 2012) IRS0000005239.
[567] *Id*.
[568] SFC Interview of Cindy Thomas (July 26, 2013) p. 108.
[569] Calculation based on data provided to the SFC by the IRS (Mar. 26, 2014).
[570] Based on data provided to the SFC by the IRS (Apr. 8, 2015).

## VIII. THE IRS SELECTED LEFT-LEANING APPLICANTS FOR REVIEW AND SUBJECTED THEM TO HEIGHTENED SCRUTINY AND DELAYS

> *This section discusses how the IRS handled applications for tax-exempt status submitted by various types of progressive and left-leaning organizations.*

IRS Exempt Organizations employees also selected left-leaning and progressive organizations applying for tax-exempt status for special processing:

- Names associated with left-leaning applicants were placed on the Watch List and Tag Historical tabs of the BOLO list.
- IRS screeners were instructed during training sessions in 2010 to select left-leaning applications that were potentially political organizations.

In some cases, after selecting left-leaning applicants, EO Determinations transferred the cases to EO Technical or placed them on hold while awaiting technical assistance from the Washington D.C. office, a process that delayed their resolution for years.

### A. EO DETERMINATIONS FLAGGED LEFT-LEANING APPLICANTS WITH THE NAMES "PROGRESSIVE," "ACORN," AND "OCCUPY"

#### 1. PowerPoint Presentation Directs Employees to Flag "Progressive" and "Emerge" Applicants

A PowerPoint presentation and notes from a July 28, 2010 screening workshop meeting in Cincinnati show that IRS employees were instructed to flag applications with the words "progressive" and applications associated with Emerge (an organization that sought to train female Democratic political candidates) and to send them to Group 7822 for secondary screening.[571] The notes from the meeting state that Gary Muthert indicated that the "following names and/or titles were of interest and should be flagged for review:"

- 9/12 Project
- Emerge
- Progressive
- We The People
- Rally Patriots, and
- Pink-Slip Program [572]

This PowerPoint presentation from this screening workshop also had a slide that read, "Politics" with a picture of an elephant and a donkey. One slide stated "Look for names like" preceding additional slides with the words "Tea Party . . . Patriots . . . 9/12 Project . . . Emerge . . . Progressive . . . We the People" under the heading "Current Activities." [573]

---

[571] Screening Workshop Notes (July 28, 2010) IRS0000012315–17; Screening Workshop Presentation IRSR0000169695–720.

[572] Screening Workshop Notes (July 28, 2010) IRS0000012315–17.

[573] Screening Presentation (July 28, 2010) IRS0000169695–720.

Exhibit E

### 2. BOLO Spreadsheets Include the Phrase "Progressive"

Numerous iterations of the BOLO spreadsheet included the term "Progressive" on the TAG Historical tab. For example, a BOLO list dated August 12, 2010, instructed screeners to send applications containing the word "Progressive" to the TAG Group. The BOLO list entry for "progressive" further instructed screeners that the:

> Common thread is the word "progressive." Activities appear to lean towards a new political party. Activities are partisan and appear as anti-Republican. You see references to "blue" as being "progressive."[574]

According to IRS agent Ron Bell, who was responsible for the BOLO list, screening terms were placed on the Tag Historical tab after IRS employees were not seeing applications as frequently.[575]

### 3. IRS Determinations Manager Instructed Employees to Be Alert for "Emerge" Groups

In October 2008, the IRS placed two applications from Emerge groups, an organization with state chapters that trained Democratic women to run for political office, on SCRs subjecting the applicants to multiple layers of review. The Emerge applications that screeners were instructed to flag at the screening workshop were not specifically listed on the BOLO, but an IRS Determinations manager alerted screeners via email on September 24, 2008, to look for applicants with "Emerge" in their name along with other "politically sensitive" cases.[576]

The EO Technical review of the applications was delayed because of pending litigation between the IRS and the Democratic Party Leadership Council.[577] Two additional Emerge cases were put on the SCR, one in June 22, 2009, and another on January 18, 2010.[578] As explained in greater detail in Section (B) below, the decision to review the Emerge cases pending the outcome of litigation contributed to delays in processing these cases.

### 4. Employees Were Instructed to Give "Special Handling" to Groups Related to ACORN

Another PowerPoint presentation presented at training events in June and July of 2010 titled "Heightened Awareness Issues," listed "Successor to Acorn" as a Watch List Issue specifying that "[s]pecial handling is [r]equired when [a]pplications are [r]eceived."[579] ACORN (Association of Community Organizations for Reform Now) was a national "community organization group" with local chapters that "fought for liberal causes like raising the minimum wage, registering the poor to vote, stopping predatory

---

[574] BOLO Spreadsheet (Aug. 12, 2010).

[575] SFC Interview of Ron Bell (July 30, 2013) (not transcribed).

[576] Email from Joseph Herr to Elizabeth Hofacre and others (Sep. 24, 2008) IRS0000011492–4.

[577] TE/GE Division Sensitive Case Report (Oct. 21, 2008) IRS0000012307–08.

[578] TE/GE Division Sensitive Case Report (June 22, 2009) IRS0000633497–98; TE/GE Division Sensitive Case Report (Jan. 18, 2010) IRS0000147518–19.

[579] Heightened Awareness Issues (undated) IRS0000557291–308; Email from Chadwick Kowalczyk to Donna Abner and others (May 18, 2010) IRS0000195587.

lending and expanding affordable housing."[580] In addition, ACORN assisted lower income families with tax return preparation.[581] The national organization declared bankruptcy in the wake of accusations of fraud, embezzlement, and mismanagement, but several local organizations decided to regroup under new names.[582]

On March 22, 2010, Cindy Thomas notified EO Technical that descendants of ACORN were reorganizing, citing three specific organizations that were likely to submit applications.[583] In April 2010, Sharon Camarillo emailed Cindy Thomas and Robert Choi telling them that EO Determinations received two ACORN-successor cases.[584]

Also in April 2010, an IRS interoffice research team completed its research into allegations of illegal activity by ACORN, its affiliates and employees. The research team was formed to investigate allegations that ACORN was engaged in actions inconsistent with tax-exempt status, including systematic commingling of funds between taxable and tax-exempt entities and individuals associated with ACORN. The Research team found evidence of: the cover-up of an embezzlement committed by a board member; possible conflicts created by employees working for multiple affiliates and staffers and members serving on the Board of Directors; improper money transfers among the affiliates; lack of proper documentation of financial transactions; and possible improper use of donations as well as pension and health care benefit funds. The research team concluded that these findings, together with ACORN's apparent loose governance and a lack of respect for the corporate structure, warranted a closer examination by the IRS into the financial practices of ACORN and its affiliates to determine if its tax-exempt status was appropriate.[585] This report was shared with IRS management, including Sarah Hall Ingram, Joseph Grant and Lois Lerner, in June and July 2010.[586]

The August 12, 2010 BOLO listed "ACORN Successors" as an "Issue Name" on the "BOLO List" tab. The description states that "Following the breakup of ACORN, local chapters have been re-forming under new names and resubmitting applications." Screeners were instructed to send these cases "to the TAG Group."[587] An entry for "Acorn Successors" appeared on copies of the BOLO lists, first on the BOLO List tab and then on the Watch List tab, examined by Committee staff from 2010 until Holly Paz removed it in June 2012.[588]

An October 7, 2010 email from Jon Wadell alerted Steven Bowling and Sharon Camarillo to two ACORN-related cases. Waddell recommended "an alert be sent informing agents/screeners that to

[580] Acorn on Brink of Bankruptcy, Officials Say, New York Times (May 19, 2014).
[581] Id.
[582] Id.
[583] Email chain between Cindy Thomas, Steven Grodnitzsky and others (Mar. 22, 2010) IRS0000458579448–51.
[584] Email from Sharon Camarillo to Cindy Thomas and Robert Choi (Apr. 28, 2010) IRS0000458467.
[585] IRS, ACORN Research Activities Summary Report (Apr. 28, 2010) IRS0000713482–87.
[586] IRS, Memorandum on Investigative Research Findings (June 21, 2010) IRS0000713488; Email from Nancy Todd to Sarah Hall Ingram, Joseph Grant, Lois Lerner, and others (July 8, 2010) IRS0000713482.
[587] Combined Spreadsheet TAG 8 12 10 (Aug. 12, 2010).
[588] Id.; Email chain between Holly Paz, Cindy Thomas and others (June 1, 2012) IRS0000013434–35.

be on the lookout for the following name an application factors associated with Acorn related cases."[589] In addition, he suggested adding the following "factors to the Watch Issue Description section for this category":

    1. The name(s) Neighborhoods for Social Justice or Communities Organizing for Change

    2. Activities that mention Voter Mobilization of the Low-Income/Disenfranchised

    3. Advocating for Legislation to Provide for Economic, Healthcare, and Housing Justice for the poor.

    4. Educating Public Policy Makers (i.e. Politicians) on the above subjects.[590]

Sharon Camarillo forwarded the alert to John Shafer instructing that his screeners "be on the lookout for these cases."[591] John Shafer forwarded Camarillo's email to IRS screeners in his group.[592]

The Watch List tab of the February 2, 2011 BOLO instructed IRS screeners to look for the words "ACORN" or "Communities for Change in the name and/or throughout the application." It read:

> Local chapters of the former ACORN organization have reformed under new names and are requesting exemption under section 501(c)(3). Succession indicators include ACORN and Communities for Change in the name and/or throughout the application.[593]

ACORN cases were also being screened in 2012. Ron Bell wrote an email to Carter Hull on May 13, 2012 stating:

> I've got a case that I believe is an acorn successor org. I googled the name of the org and that is where several websites (such as the capital research center) indicate that it is an acorn successor. The BOLO list states to contact you . . . Please advise how you want to process this case.[594] [sic]

### 5. Groups Using "Occupy" in Their Name Were Flagged Using the BOLO Watch List Tab

In January 2012, the IRS Determinations office began screening organizations with the term Occupy in their name on the Watch List tab on the BOLO. After a news article was distributed within the IRS that suggested some organizations affiliated with the Occupy movement were seeking tax-exempt status, Cindy Thomas told Steven Bowling, the manager of the IRS Determinations group that handled political advocacy cases, that the Occupy cases should

---

[589] Email chain between Jon Waddell, Steven Bowling, Sharon Camarillo and others (Oct. 7–8, 2010) IRS0000410433–34.

[590] *Id.*

[591] Email chain between Jon Waddell, Sharon Camarillo, John Shafer and others (Oct. 7–8, 2010) IRS0000389342.

[592] *Id.*

[593] BOLO Spreadsheet (Feb. 2, 2011) IRS0000389362.

[594] Email from Ronald Bell to Carter Hull (May 13, 2012) IRSR0000054963.

be referred to his Group so they could be worked "with the advocacy cases."[595]

Steven Bowling told Cindy Thomas that the BOLO list would need to be modified in order to properly flag the Occupy cases, but expressed frustration that the IRS did not want to use the words "Tea Party" or "Occupy" in screening.[596] Thomas replied:

> We can't refer to "tea party" cases because it would appear as though we're singling them out and not looking at other Republican groups or Democratic groups.
>
> How about a compromise—What do you think about changing the description for advocacy organizations on the Emerging Issues tab to that which you've included under scenario #1; then, you could include the Occupy description from your scenario #2 on the Watch For tab specifying that these cases should be referred to your group? We could still have the same grade 13 agents working the advocacy and Occupy cases.[597]

After receiving this instruction from Thomas, Bowling added "$ocial economic reform/movement" to the BOLO entry for "current political issues." In addition, Bowling added "Occupy orgs" to the BOLO Watch List tab. Ronald Bell wrote an email to Bowling questioning the need for a separate entry for "Occupy orgs" on the Watch List since he thought "$ocial economic reform . . . was our code word' for the occupy organizations." Bowling replied, "I think we can leave it in. Some of the orgs are pushing that other than occupy groups."[598]

Emails written in May 2012 show that at least two Occupy cases were flagged by IRS screeners after the term was added to the BOLO list.[599] The next month, Holly Paz had Cindy Thomas revised the BOLO list to "remove the references to Acorn and Occupy from the "Watch List" and replaced the "Emerging Issue" description of ideological positions of conservative and liberal groups with neutral language.[600]

## B. LIBERAL AND PROGRESSIVE ORGANIZATIONS EXPERIENCED DELAYED PROCESSING

Some tax-exempt applicants affiliated with Emerge, ACORN successor groups, and other left-leaning applications waited years for a determination from the IRS after their applications were flagged by screeners and held up or forwarded to the EO Technical office in Washington, D.C.

In the case of three of the Emerge groups, it took three years from the time they applied until the applications were denied. Previously, the IRS erroneously approved five applications affiliated

---

[595] Email chain between Cindy Thomas, Steven Bowling and Peggy Combs (Jan. 20, 2012) IRS0000013418–19; Email chain between Cindy Thomas, Steve Bowling, Peggy Combs and Mary Sheer (Jan. 20, 2012) IRSR0000013414–15.

[596] Email chain between Cindy Thomas, Steven Bowling and Peggy Combs (Jan. 20, 2012) IRS0000013418–19.

[597] Email from Cindy Thomas to Steven Bowling (Jan. 24, 2012) IRSR0000621814–17.

[598] Email between Steven Bowling and Ronald Bell (Jan. 25, 2012) IRS0000013187.

[599] Email chain between Tyler Chumney, Peggy Combs and others (May 24–27, 2012) IRSR0000013234–48.

[600] Email chain between Holly Paz, Cindy Thomas and others (June 1, 2012) IRS0000013434–35.

111

with Emerge for 501(c)(4) status from 2004 through 2008, including the main umbrella organization Emerge America.[601] These five Emerge approvals were subsequently determined to have been in error because Emerge groups were found to benefit the Democratic Party. Their 501(c)(4) status was revoked.[602]

On September 2008, emails show that IRS employee Donna Abner recommended issuing an "alert" for other incoming Emerge cases because of the "partisan nature of the cases" as well as a reminder that "sensitive political issue' cases are subject to mandatory review" per IRS guidelines and subject to full development.[603]

EO Technical staff asked EO Determinations to transfer the Emerge Maine and Emerge Nevada applications on October 10, 2008, to be held "until the litigation on this issue has concluded and then we will work them."[604] EO Technical instructed EO Determinations to hold any additional Emerge cases "pending the outcome of a similar issue in the DLC litigation."[605] A January 2011 Sensitive Case Report indicates that Emerge Massachusetts applied for tax-exempt status on August 15, 2008, and was transferred to EO Technical on April 16, 2009. Emerge Oregon applied on February 9, 2010, and its application was transferred to EO Technical on April 14, 2010. The IRS did not inform the four Emerge groups, whose cases were selected for review and then developed at EO Technical until 2011, that their applications had been denied, creating delays of approximately three years for some of the organizations.[606]

### C. Organizations Deemed To Be Acorn Successors Experienced Delays

Organizations the IRS determined to be related to the disbanded ACORN organizations also experienced significant delays. EO Determinations began receiving ACORN-successor organization applications in April 2010.[607] On June 8, 2010, the Acting Manager of EO Technical, Steven Grodnitzky, instructed Cindy Thomas not to develop or resolve ACORN-related cases until they received further instruction.[608]

On July 15, 2010, Cindy Thomas alerted Robert Choi that EO Determinations received another "potential successor to Acorn" applying for 501(c)(3) status related to a 501(c)(4) ACORN-successor application received in April 2010.[609] Thomas reported that "[w]e

---

[601] Email chain between Donna Abner, Cindy Thomas and others (Sep. 8, 2008) IRS0000012292–93.

[602] Email from Nalee Park to Justin Lowe (Nov. 16, 2011) IRS0000636384 (Email attachments containing taxpayer information omitted by Committee staff).

[603] Email chain between Donna Abner, Cindy Thomas and others (Sep. 8, 2008) IRSR0000012292–93.

[604] Email chain between Justin Lowe to Jon Waddell (Oct. 10, 2008) IRS0000012299–300.

[605] Email chain between Deborah Kant, Cindy Wescott and others (Oct. 16, 2008) IRS0000012304.

[606] TE/GE Division Sensitive Case Report (Jan. 18, 2011) IRSR0000147518. Although this document is dated "January 18, 2010," it references events in January 2011. Therefore, we believe that it was mistakenly dated 2010 instead of 2011.

[607] Email from Sharon Camarillo to Cindy Thomas and Robert Choi (Apr. 28, 2010) IRS0000458467.

[608] Email chain between Steven Grodnitzky, Cindy Thomas, Donna Abner and others (June 8, 2010) IRS0000054956.

[609] Email chain between Cindy Thomas, Robert Choi and others (July 15–16, 2010) IRS0000054949–50.

112

placed the other case in suspense pending guidance from the Washington Office and are doing so with this case."[610]

Cindy Thomas emailed Holly Paz on October 24, 2010, with a request for technical assistance on ACORN-successor cases from EO Technical. Over a month later, on November 26, 2010, Holly Paz told Cindy Thomas to work with Carter Hull in EO Technical on the Acorn-successor cases, the same employee in charge of developing the Tea Party cases in 2010 and early 2011.[611]

An EO Determinations employee contacted Carter Hull on March 4, 2011, telling him that "we have four exemption applications for organizations that have previously operated as ACORN. Could we arrange to discuss these cases with you by phone sometime next week?"[612] It is unclear what guidance Carter Hull provided EO Determinations on the ACORN-successor applications but he informed another EO Determinations employee in July 2011, that "his manager informed him that he should not be doing research for our cases."[613] Hull asked EO Determinations to remove his name "from the BOLO list as a contact person."[614]

In April 2013, EO Technical was still developing two ACORN-successor applications, including one of the applications that spurred EO Determinations managers to alert screeners to flag ACORN-successor cases in October 2010.[615] The other case mentioned in the email was transferred from EO Determinations to EO Technical in April 2012.[616] ACORN-successor cases were still on hold as of May 2013, according to Cindy Thomas.[617]

Other left leaning and progressive groups told media outlets their applications were delayed as well. One left-leaning group, Alliance for a Better Utah, told NPR Morning Edition in a story that aired on June 13, 2013, that it had been waiting almost 600 days for a determination on its application for 501(c)(3) status to do "voter-education work."[618] The same group told Politico a month later that the delay was "causing problems because it can't apply for foundation and grant money while that application to become a charitable organization is in limbo."[619] Progress Texas reported that it took "18 months to get its 501(c)(4) approval."[620]

## D. Inappropriate and Burdensome Information Requests

As described in Section VII(F) of this report, in January 2012 the IRS Determinations Unit made unnecessary and burdensome requests to some tax-exempt applicants that in some cases included requests for donor information. IRS officials decided the request of the donor information was inappropriate and ordered the donor in-

---

[610] *Id.*

[611] Email chain between Holly Paz, Cindy Thomas and others (Oct. 14, 2010—Jan. 19, 2011) IRS0000054942–44.

[612] Email from John McGee to Carter Hull (Mar. 4, 2011) IRS0000631878.

[613] Email chain between Melissa Conley, William Agner and others (July 11, 2011) IRS0000054945–46.

[614] *Id.*

[615] Email chain between Holly Paz, Cindy Thomas and others (Apr. 3, 2013) IRS0000054976–78.

[616] *Id.*

[617] See response submitted by Cindy Thomas, IRS Employee Responses to Written Questions from Finance Committee Staff (Dec. 19, 2013).

[618] *NPR*, Liberal Groups say They Received IRS Scrutiny Too (June 19, 2013).

[619] *Politico*, IRS Scrutinized Some Liberal Groups (July 22, 2013).

[620] *Id.*

Exhibit E

formation destroyed.[621] Some left-leaning/progressive groups received inappropriate development questions regarding donor information while experiencing lengthy delays in the application process. At least three of the twenty-seven groups that received donor information requests were left-leaning applicants for tax-exempt status.[622]

## IX. ADDITIONAL FINDINGS NOT RELATED TO THE DETERMINATIONS PROCESS

*This section includes findings that are not directly related to the processing of applications for tax-exempt status, but are nonetheless relevant to the IRS's treatment of tax-exempt organizations. We describe how the IRS failed to perform any audits of political advocacy performed by tax-exempt organizations for more than three years. We also describe how the IRS failed to produce documents that were responsive to a 2010 FOIA request seeking information about how the IRS was processing Tea Party applications. Finally, we discuss TIGTA's investigation of several improper disclosures of information related to conservative organizations.*

A. THE IRS STRUGGLED TO DECIDE HOW TO REVIEW ALLEGATIONS OF IMPROPER POLITICAL CAMPAIGN INTERVENTION BY TAX-EXEMPT ORGANIZATIONS, INCLUDING TEA PARTY GROUPS

The first area of supplemental findings concerns the IRS's process for examining allegations of impermissible political campaign intervention by tax-exempt organizations. The Committee's investigation revealed numerous serious problems that rendered the IRS incapable of resolving allegations regarding the Tea Party and other political advocacy organizations.

### 1. General Processes for Audits of Tax-Exempt Organizations

The Examinations unit, within the Exempt Organizations Division, monitors whether organizations that have been approved for tax-exempt status are operating in accordance with federal tax law.[623] At all times relevant to the Committee's investigation, Nanette Downing was the Director of EO Examinations and reported directly to Lois Lerner.[624] Unlike most other IRS divisions, which are administered at the IRS headquarters in Washington, D.C., EO Examinations has its head office in Dallas, Texas. IRS officials explained that EO Examinations was placed outside of Washington to ensure that other divisions of the IRS in Washington did not improperly influence the tax enforcement decisions for exempt organizations.[625]

EO Examinations serves as the repository for allegations that tax-exempt organizations are engaged in improper conduct (or "referrals"). All referrals—including those that originate in other divisions within the IRS, as well as those made by individuals or enti-

[621] SFC Interview of Holly Paz (July 26, 2013) pp. 146–147.
[622] Email chain between Judith Kindell, Holly Paz and Sharon Light (Apr. 25, 2012) IRS0000013868 (email attachment containing taxpayer information omitted by Committee staff).
[623] IRS, Charity and Nonprofit Audits: Exempt Organizations Examinations.
[624] SFC Interview of Nanette Downing (Dec. 6, 2013) pp. 6, 9, 15.
[625] *Id.* p. 53; SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 71.

114

ties outside of the IRS—are all given the same consideration.[626] EO Examinations employees evaluate the referral based on its content and decide if the IRS will investigate further.[627] Apart from the referral process, EO Examinations employees also use other criteria to determine if the IRS needs to open a review.

EO Examinations performs two kinds of reviews of tax-exempt organizations:

> • **Examinations** (also known as **audits**) are reviews of a taxpayer's books and records to determine tax liability, and may involve the questioning of third parties. For exempt organizations, an examination also determines an organization's qualification for tax-exempt status. If the IRS determines that an organization is not complying with the tax law, the IRS may impose a tax liability and, in some instances, may also revoke the organization's tax-exempt status.[628]
> • **Compliance checks** are less comprehensive reviews used to determine if an organization is following the required recordkeeping and reporting requirements, and whether its activities are consistent with its stated tax-exempt purpose. Compliance checks are usually conducted using information already in the possession of the IRS, although the IRS will sometimes request additional information from the taxpayer. If the IRS concludes that the organization might owe a tax liability, it may refer the organization for a full examination.[629]

The Review of Operations (ROO) is a division within EO Examinations that performs compliance checks on tax-exempt organizations, usually 3–5 years after an organization has been approved for tax-exempt status. Unlike other types of compliance checks, IRS employees are not permitted to contact the taxpayer during ROO compliance checks.[630] In addition, because the ROO does not conduct an examination, it is not authorized to review an organization's books and records or ask questions regarding tax liabilities or the organization's activities.[631]

When the ROO receives a referral, ROO employees review the referral, along with information in the possession of the IRS, to determine if the allegations can be supported. The ROO then recommends one of the following options:

> • Start an examination;
> • Start a compliance check; or
> • Take no further action.[632]

Thus, a referral has the effect of bringing the referred group to the attention the ROO and subjecting the group's information to review by ROO employees—thereby increasing the probability (but not guaranteeing) that the IRS will commence an examination or compliance check of the subject organization.[633]

---

[626] SFC Interview of Nanette Downing (Dec. 6, 2013) pp. 35–37.

[627] *Id.* pp. 26–29.

[628] IRS Memorandum produced to SFC (Sep. 4, 2013) IRS0000378444–46; IRS, Charity and Nonprofit Audits: Closing/Conclusion.

[629] IRS Memorandum produced to SFC (Sep. 4, 2013) IRS0000378444–46; IRS Publication 4386, *Compliance Checks,* Rev. 4–2006.

[630] IRS Memorandum produced to SFC (Sep. 4, 2013) IRS0000378444–46.

[631] *Id.*

[632] Email from Diane Letourneau to Sarah Ingram, Nikole Flax, Lois Lerner and others (Oct. 13, 2011) IRS0000468121–28.

[633] Downing repeatedly disputed this conclusion during her interview conducted by Committee staff:

Exhibit E

115

## 2. The Changing Process for Handling Allegations of Improper Political Campaign Intervention

In recent years, the IRS altered its process for reviewing the political activities of tax-exempt organizations. These changes were spurred by an increasing number of referrals to EO Examinations starting in 2010, after the *Citizens United* decision, particularly referrals related to political campaign intervention by 501(c)(4) organizations.[634] By the end of 2010, Downing had suspended all examinations of 501(c)(4) organizations that were alleged to have engaged in improper political activities.[635]

In 2011, under the direction of Miller, Lerner and Downing, the IRS developed a new approach for referrals of political campaign intervention called the "Dual Track" process. This process allowed the ROO to perform its own analysis of organizations, using information from the annual Form 990 that tax-exempt organizations are required to file. The ROO would consider its analysis of the data, as well as any referral, when deciding if it should recommend a review of an organization's political campaign intervention.[636]

The ROO's recommendation would then be reviewed by a panel of career Federal employees, known as the Political Action Review Committee (PARC).[637] The PARC could either concur with the ROO's recommendation or modify it. If the PARC selected an organization for examination or a compliance check, the PARC would also determine if the referral was high- or regular-level priority.[638]

The Dual Track process was modified in 2012, after an internal review found that the ROO's written explanations of its decisions "arguably [gave] the impression that somehow the political leanings of [the organizations] mentioned were considered in making the ultimate decision" of whether or not to recommend an examination or compliance check.[639] The internal review also noted other problems with the Dual Track process, including choices made for reasons unrelated to the tax issues presented (such as the effect that an examination might have on an organization's fundraising ability).[640]

Although examinations related to political campaign intervention were suspended, the IRS continued to receive allegations that Tea Party organizations and other advocacy groups had engaged in im-

---

Q. But you had indicated earlier that if a group is referred to the ROO, one potential outcome is that there will be an exam. Is that right?
A. Correct.
Q. Okay. So that referral to the ROO would increase the chances that it will have an exam.
A. No.
Q. That follows, right?
A. No. No, I don't agree with that statement. I mean, pulling up project data analytics I mean, it doesn't give you a higher chance than anything else.
SFC Interview of Nanette Downing (Dec. 6, 2013) pp. 65. The Committee did not find Downing's testimony on this point to be credible.
[634] SFC Interview of Nanette Downing (Dec. 6, 2013) pp. 30–31.
[635] *Id.* pp. 63–64. The IRS continued to examine other types of allegations against tax-exempt organizations.
[636] Email from Diane Letourneau to Sarah Ingram, Nikole Flax, Lois Lerner and others (Oct. 13, 2011) IRS0000468121–28.
[637] IRS Memorandum produced to SFC (Sep. 4, 2013) IRS0000378444–46.
[638] Email from Diane Letourneau to Sarah Ingram, Nikole Flax, Lois Lerner and others (Oct. 13, 2011) IRS0000468121–28.
[639] Email from Lois Lerner to Nikole Flax, Nanette Downing and others (July 9, 2012) IRS0000179069–71.
[640] *Id.*

proper political campaign intervention. The IRS treated those allegations as referrals and sent them to EO Examinations.[641] In all, the IRS received 53 referrals related to 24 applicants for tax-exempt status that the IRS identified as "political advocacy" organizations.[642] These referrals were eventually reviewed using the Dual Track criteria and some were selected for examination;[643] however, as of June 2015, the IRS had not conducted any examinations in response to these referrals and was not actively considering the referrals.[644]

Ultimately, the Dual Track process was suspended in June 2013 at the direction of TE/GE managers installed by then-Principal Deputy Commissioner Daniel Werfel,[645] and permanently discontinued in 2015.[646] As a result, from the end of 2010 until April 2014, the IRS did not perform any examinations of 501(c)(4) organizations related to impermissible political campaign intervention.[647] Since the Dual Track process was discontinued in 2015, the IRS has sent referrals of impermissible political campaign intervention to the PARC, where they are reviewed in the same manner as other referrals related to tax-exempt organizations.[648] The IRS also continues to evaluate data submitted on Form 990 tax returns to assess if organizations have engaged in improper political activity.[649]

3. EO Determinations Employees Recommended that the ROO Review the Activities of Some Tea Party Organizations, and a Smaller Number of Progressive Organizations, for Improper Political Campaign Intervention

In 2011, as the number of political advocacy applications in EO Determinations' inventory increased, the IRS considered whether all Tea Party cases should simply be approved and then referred to the ROO for follow-up compliance checks. As Paz explained in July 2011:

> EOD Screening has identified an increase in the number of (c)(3) and (c)(4) applications where organizations are advocating on issues related to government spending, taxes, and similar matters. . . . Over 100 cases have been identified so far, a mix of (c)(3)s and (c)(4)s. . . .
>
> Lois would like to discuss our planned approach for dealing with these cases. We suspect that we will have to approve the majority of the c4 applications. Given the volume of applications and the fact that this is not a new issue (just an increase in frequency of the issue), we plan to

---

[641] Email chain between Lois Lerner, Nicole Flax, David Fish and others (Sep. 28–Oct. 3, 2011) IRS0000263043–67.

[642] IRS Memorandum produced to SFC (Sep. 4, 2013) IRS0000378444–46.

[643] *Id.*

[644] IRS Briefing for SFC Staff (June 22, 2015).

[645] *Id.*

[646] IRS Briefing for SFC Staff (June 22, 2015).

[647] SFC Interview of Nanette Downing (Dec. 6, 2013) pp. 63–64; IRS Briefing for SFC Staff (Aug. 26, 2014). In April 2014, the IRS re-opened 26 examinations that had been selected under the Dual Track process related to allegations of impermissible political campaign intervention. These 26 examinations were all concluded by June 2015. None resulted in revocation of tax-exempt status, although some of the organizations received a written advisory. IRS Briefing for SFC Staff (June 22, 2015).

[648] *Id.*

[649] *Id.*

117

> [have] EO Determinations work the cases. . . . We will
> also refer these organizations to the Review of
> [O]perations for follow-up in a later year.[650]

This idea was discussed during the July 5, 2011 meeting that Lerner convened with Thomas and other EO employees. Lerner elected not to follow this approach, because she did not think that EO Examinations had enough employees to handle the increased workload.[651]

Although Lerner did not uniformly implement this approach, EO Determinations employees started to recommend that the ROO review the activities of certain political advocacy groups in the future. This happened with greater frequency during the "bucketing" process in 2012, when a large number of applications were recommended for approval subject to later review by the ROO.[652] EO managers, including Thomas and Paz, were aware of at least some of these recommendations.[653]

From the end of 2011 through May 2013, EO Determinations employees recommended that the ROO review 60 political advocacy organizations.[654] After the TIGTA report came out, Downing learned that these 60 "Tea Party case referrals" had been "sitting in a pile for quite a while" in the ROO.[655] Analysis performed by the Committee staff indicated that of these groups, 41 (68%) were conservative or Tea Party groups, 7 (12%) were progressive or liberal, and 12 (20%) had no obvious political affiliation. After consulting with managers installed by then-Principal Deputy Commissioner Werfel, Downing returned these referrals to EO Determinations for further processing.

Despite substantial time and effort expended by the IRS, the agency failed to perform any meaningful oversight of political advocacy performed by tax-exempt organizations for a three-year period. Although management has made recent changes to the examination process, concerns persist that the IRS could open examinations for an inappropriate reason. In July 2015, the Government Accountability Office (GAO) issued a report on the criteria and processes used by the IRS to select exempt organizations for examination.[656] GAO concluded that "EO has some controls in place that are consistent with internal control standards, and has implemented those controls successfully," but found "several areas where EO's controls were not well designed or implemented." Most significantly, GAO stated that:

> The control deficiencies GAO found increase the risk
> that EO could select organizations for examination in an

---

[650] Email chain between Holly Paz and Janine Cook (July 18–19, 2011) IRS0000429489.

[651] SFC Interview of Holly Paz (July 26, 2013) p. 139; Email chain between Cindy Thomas, Ronald Bell, Steve Bowling and others (July 5, 2011) IRS0000620735–40.

[652] Email chain between Sharon Light, Cindy Thomas and others (Aug. 27–28, 2012) IRS0000573175–76; Email from Janine Estes to Hilary Goehausen (July 11, 2012) IRS0000582651 (Email attachment containing taxpayer information omitted by Committee staff).

[653] Email chain between Sharon Light, Cindy Thomas and others (Aug. 27–28, 2012) IRS0000573175–76.

[654] IRS Chart produced to SFC (Sep. 4, 2013) IRS0000378447–48.

[655] SFC Interview of Nanette Downing (Dec. 6, 2011) pp. 47–48.

[656] GAO, IRS Examination Selection: Internal Controls for Exempt Organization Selection Should be Strengthened (July 2015) GAO–15–514.

Exhibit E

118

unfair manner—for example, based on an organization's religious, educational, political, or other views.[657]

Although the GAO did not consider whether these deficiencies actually led to improper selection of organizations for examination, these findings confirm that the IRS must continue to implement changes to ensure that examinations are opened only when warranted, based on a fair and impartial decision.

## B. THE IRS FAILED TO PRODUCE RESPONSIVE DOCUMENTS TO A FOIA REQUEST IN 2010 SEEKING INFORMATION ABOUT ITS HANDLING OF TEA PARTY APPLICATIONS

The second area of supplemental findings concerns the IRS's handling of a 2010 Freedom of Information Act (FOIA) request.

In June 2010, a freelance reporter made a FOIA request to the IRS for records that explained how the IRS was processing applications for tax-exempt status submitted by Tea Party organizations.[658] As described below, by the time of the request, the IRS had generated numerous documents that satisfied the search criteria and explained how the agency was handling Tea Party applications. But the IRS performed a deficient search that revealed only a few of these numerous responsive documents in existence at the date of the request. Then, the IRS elected not to produce any of the documents it identified, incorrectly claiming that the agency had "no responsive documents." As a result, the reporter did not obtain any of the documents showing how Tea Party cases were handled in 2010.

On June 3, 2010, the IRS received a FOIA request from freelance reporter Lynn Walsh that sought:

> Documents relating to any training, memos, letters, policies, etc. that detail how the "Tax Exempt/Government Entities Division" reviews applications for non-profits, 501(c)(3)s, and other not-for-profit organizations specifically mentioning "Tea Party," "the Tea Party," "tea party," "tea parties." [659]

The IRS determined that Walsh's letter was a valid request under FOIA and assigned it to Sharon Baker, a Senior Disclosure Specialist in the Washington, D.C. Disclosure Office. Baker prepared an SCR for the FOIA request, noting that it was "likely to attract media or Congressional attention" and forwarded a search notice to Michael Guiliano in EO Guidance and Michael Seto in EO Technical.[660] A copy of the incoming request was also sent to the Office of Chief Counsel and to Media Relations.[661]

On July 6, 2010, EO Guidance manager David Fish sent two responsive documents to the disclosure division: the April 19, 2010 and May 24, 2010 SCRs prepared by Hull that explained how the Tea Party cases were being handled.[662] After that, there were sev-

---

[657] *Id.*

[658] 5 U.S.C. § 552 (2009).

[659] FOIA Request Letter from Lynn Walsh (June 3, 2010) IRSC003801.

[660] Email chain between Sharon Baker, Valerie Barta and others (June 14, 2010) IRSC003861–63.

[661] *Id.*

[662] Memorandum from David Fish to Manager, Disclosure with Attachments (July 6, 2010) IRSC003845–49.

Exhibit E

eral additional document searches that were done within the EO Division and the Office of Chief Counsel through early November 2010.[663]

Inexplicably, Baker and her managers in the Disclosure Office determined that these two documents were not responsive to Walsh's FOIA request. Baker excluded the SCRs because she deemed them to be outside of Walsh's request as they were not "guidance," despite Giuliano's assertion that these documents were indeed responsive. Baker notes in the Case Report that "I have been back and forth with Matthew and I am tried [sic]."[664] Tiffany Eder and others in the Office of Chief Counsel also questioned Baker's interpretation of the request and suggested that she follow up with Walsh to clarify the scope of the request.[665] It appears that the follow up never occurred.

In response to one of the searches, a third document was sent to Baker: a "Coordinating Tea Party Cases Update Memorandum" prepared by Hull on October 18, 2010.[666] This document explained how Hull was working with Hofacre in EO Determinations to review and develop incoming Tea Party applications. Baker excluded the October 2010 memorandum on grounds that the document was not responsive to the FOIA request "since it occurred after the FOIA request was received in our office."

Ultimately, the IRS did not produce any documents to Walsh. On January 6, 2011, Disclosure Manager Marie Twarog, formally responded to Walsh's June 3, 2010 FOIA request, advising the journalist that "I found no documents specifically responsive to your request."[667]

The IRS's handling of this FOIA request reveals several troubling issues.

First, the search for responsive documents was deficient.

The IRS failed to search for relevant records in EO Determinations' Cincinnati office, even though they learned from the SCRs and Hull's memorandum that the Tea Party applications were being processed by EO Determinations employees in Cincinnati. The IRS also failed to locate numerous responsive emails generated by Rulings & Agreement employees in Washington regarding the handling of Tea Party cases, including emails to and from Lerner and Paz.

Second, the IRS's narrow reading of Walsh's FOIA request caused the agency to exclude responsive documents.

Although some IRS employees disagreed with Baker's interpretation of the request, no one in Baker's management chain overruled Baker or required her to follow up with Walsh to clarify the scope of the request. By excluding these records, the IRS violated its policies as stated in the IRM:

> Disclosure personnel must be careful not to read a request so narrowly that the requester is denied information that the agency knows exists. Some requesters may have little or no knowledge of the types of records maintained

[663] Case Notes Report (Jan. 6, 2011) IRSC003756–61.
[664] *Id.*
[665] *Id.*
[666] Fax transmission from James Mackay to Sharon Baker (Oct. 26, 2010) IRSC003782–84.
[667] Letter to Lynn Walsh (Jan. 6, 2011) IRSC003765.

by the Service while others have greater knowledge of IRS files.[668]

Walsh's request far exceeded this standard and, in fact, was precise enough that some IRS employees, including Guiliano and others, were able to locate responsive records. The IRS erred by ruling that these records were outside of the request.

Finally, the IRS also took a narrow view of the time limits of Walsh's request.

The IRS regulations implementing FOIA state that the agency's response "shall include only those records within the official's possession and control as of the date of the receipt of the request by the appropriate disclosure officer."[669] But the IRM allows staff to include such documents at their discretion, particularly when there are delays in processing:

> In rare circumstances, a lengthy delay (e.g., 90 days) may be unavoidable before search efforts are initiated. If this occurs, the case history must be documented to explain the delay and the search period must be extended to the date of search. **Also, when appropriate in terms of good customer service and/or in the spirit of openness in government, Disclosure personnel may make a determination to include records created after the receipt date of the request.** This determination is to be made on a case-by-case basis.[670]

In this case, the IRS asked Walsh for five extensions to respond to her letter and provided its ultimate response more than 7 months after the initial request—far outside of the 20 business-day period prescribed by law.[671] IRS also conducted multiple searches of its records after finding that the initial searches were deficient, circumstances that meet the criteria of "lengthy delay" set forth in the IRM. Despite these lengthy delays and multiple searches, Baker and other officials chose not to extend the search period and instead construed the IRS policies narrowly to exclude responsive records.

Although there is no reason to believe that the IRS's handling of this FOIA request was motivated by political bias, its treatment was not consistent with the purpose of FOIA, which states "that the public has a right to know what goes on in government without having to demonstrate a need or reason".[672] The IRS's deficient response to Walsh deprived her of the information that she was entitled to under the law, including SCRs; information about the purpose and use of the BOLO; and emails between Paz, Lerner and other managers containing instructions about how these cases should be handled. If the IRS had chosen to extend the responsive period until November 2010—when EO and Chief Counsel employees performed their final searches—they could have also produced information about training on screening procedures for Tea Party applications given to EO Determinations screeners; Hull's October

---

[668] IRM § 11.3.13.6.2(2) (Oct. 1, 2007).
[669] 26 C.F.R. § 601.702(c)(8)(ii) (2002).
[670] IRM § 11.3.13.6.3(13) (Oct. 1, 2007) (emphasis added).
[671] 5 U.S.C. § 552(a)(6)(A) (2009).
[672] IRM § 11.3.13.1(3) (Oct. 1, 2007).

2010 update on the status of Tea Party cases; and the first cir-
culated BOLO spreadsheet. If this information had been made pub-
lic in 2010 pursuant to a lawful FOIA request, the IRS's treatment
of applications received from Tea Party organizations may have
been exposed to the public in 2010, far sooner than it was. Shining
the light of transparency on how the IRS was processing Tea Party
applications in 2010 may have forced the IRS to have resolved
those applications sooner than it eventually did. Instead, the IRS
elected to release nothing and consequently, these applications
were left to fester for years.

C. TIGTA REVIEWED SEVERAL ALLEGATIONS OF IMPROPER DISCLO-
   SURES OF TAXPAYER INFORMATION BY THE WHITE HOUSE AND IRS

The final area of supplemental findings concerns allegations that
the IRS and White House improperly disclosed taxpayer informa-
tion.

The Committee requested that TIGTA provide information about
its investigations into four high-profile incidents of alleged disclo-
sure of confidential taxpayer information by the White House and
the IRS. Three of the alleged disclosures involved information
about conservative organizations that applied for, or received, tax-
exempt status. While the results of the investigations are consid-
ered tax return information and are thus confidential under section
6103 of the Internal Revenue Code, Committee staff believes it is
in the public interest to lawfully disclose the results and status of
these TIGTA investigations because the high-profile nature of the
alleged disclosures raised serious concerns about public officials'
handling of confidential taxpayer information.

### 1. Koch Industries, Inc.

On August 27, 2010, White House advisor Austan Goolsbee, dur-
ing a briefing to reporters about a newly released report from the
President's Economic Recovery Board on corporate tax reform,
made the statement that Koch Industries may be avoiding cor-
porate income taxes by structuring itself as an S-corporation. Mark
Holden, senior vice president and general counsel of Koch Indus-
tries provided *The Weekly Standard* with a transcript of these re-
marks:

> So in this country we have partnerships, we have S
> corps, **we have LLCs, we have a series of entities that
> do not pay corporate income tax. Some of which are
> really giant firms, you know Koch Industries is a
> multibillion dollar businesses.** So that creates a nar-
> rower base because we've literally got something like 50
> percent of the business income in the U.S. is going to busi-
> nesses that don't pay any corporate income tax. They point
> out [in the report] you could review the boundary between
> corporate and non-corporate taxation as a way to broaden
> the base.[673]

Holden told *The Weekly Standard* in the same article:

---

[673] *The Weekly Standard,* Koch Industries Lawyer to White House: How Did You Get Our Tax
Information? (Sep. 20, 2010).

122

> I'm not accusing any one of any illegal conduct. But it's my understanding that under federal law, tax information, is confidential and it's not to be disclosed or obtained by individuals except under limited circumstances. . . . I don't know what [the senior administration official] was referring to. I'm not sure what he's saying. I'm not sure what information he has. But if he got this information—confidential tax information—under the internal revenue code . . . if he obtained it in a way that was inappropriate, that would be unlawful. But I don't know that that's the case.[674]

On September 23, 2010, seven Republican members of the Senate Finance Committee wrote a letter to TIGTA Inspector General Russell George asking that he "investigate a very serious allegation that Administration employees may have improperly accessed and disclosed confidential taxpayer information."[675]

On September 25, 2010, Holden issued a statement supporting an investigation while also stating that the "senior Obama administration official's August 27th statement is wrong—Koch Industries does pay corporate income taxes and complies with all its tax obligations."[676]

Inspector General George informed the Senate Finance Committee Republicans on September 28, 2010 that he would initiate a review of the matter.[677] The TIGTA investigation concluded in August 2011, but TIGTA refused to release the results of its inquiry to Koch Industries or Senator Grassley, citing the same confidentiality provisions that were allegedly violated.[678]

In response to inquiries from Senate Finance Committee staff in connection with this investigation, Inspector General George stated in a letter to Chairman Wyden that there was no improper disclosure on the part of Austan Gooslbee. He wrote: "[t]he allegation was disproved. We developed no evidence that IRS information pertaining to Koch Industries was either accessed for or disclosed to the President's Economic Recovery Advisory Board."[679]

### 2. National Organization for Marriage

On March 30, 2012, *The Huffington Post* and *Human Rights Watch* published the National Organization for Marriage's (NOM) confidential Form 990 Schedule B that contains donor information.[680] *The Huffington Post* reported that the "pro-gay rights Human Rights Campaign was sent a private IRS filing from NOM via a whistleblower."[681]

---

[674] *Id.*

[675] Letter from Senate Finance Committee Ranking Member Charles Grassley, et. al. to Inspector General J. Russell George (Sep. 23, 2010).

[676] Koch Industries Statement (Sep. 25, 2010).

[677] *Bloomberg News,* White House Advisor Goolsbee's Comment on Koch Taxes Reviewed by Treasury (Oct. 7, 2010).

[678] *The National Review,* The Missing Koch Report (Aug. 20, 2013).

[679] Letter from Inspector General J. Russell George to Chairman Ron Wyden (May 22, 2014).

[680] *Human Rights Campaign Blog,* One of NOM's Top Secret Donors Revealed: Mitt Romney (Mar. 30, 2012); *The Huffington Post,* Mitt Romney's PAC Funded Anti-Gay Marriage Group Under the Radar (Mar. 30, 2012).

[681] *The Huffington Post,* Mitt Romney's PAC Funded Anti-Gay Marriage Group Under the Radar (Mar. 30, 2012).

After the confidential donor information was published, Ranking Member Hatch wrote a letter on May 8, 2012 to IRS Commissioner Shulman asking that the IRS investigate to determine the source of the leak.[682]

NOM filed a lawsuit against the IRS on October 3, 2013, alleging that the IRS willfully disclosed the Schedule B Form.

In response to inquiries from Committee staff in connection with this investigation, TIGTA stated in a letter to Chairman Wyden that there was an improper disclosure of confidential taxpayer information. TIGTA determined that an IRS employee working in the Return and Income Verification Services (RAIVS) unit "printed unredacted copies of the National Organization for Marriage's IRS Form 990 . . . and the associated Schedule B Form . . . and sent them outside the IRS."[683]

The RAIVS unit is responsible for processing Form 4506–A (Request for Public Inspection or Copy of Exempt or Political Organization IRS Form) requests for public versions of tax-exempt organizations' Form 990s. However, the Schedule B of the Form 990 is confidential and should not be provided in response to a Form 4506–A public record request.[684]

TIGTA found that the "disclosure was probably a work error by the IRS employee" and that its investigation "did not identify any link between [the IRS employee] and the organizations or individuals involved in posting or publishing the unredacted forms." In addition, TIGTA did not find any evidence that the disclosure was motivated by political animus. TIGTA was "also unable to determine whether the IRS received a valid Form 4506–A . . . for the information at issue because" TIGTA "became aware of the allegation after the IRS's 45-day retention period for the Form 4506–A had passed."[685]

On August 10, 2012, TIGTA first referred the matter to the Department of Justice Public Integrity Section but it declined prosecution on September 19, 2012. TIGTA then referred the matter to the IRS "for administrative action on October 17, 2012. On January 30, 2013, the IRS issued a 'Closed Without Action' letter with a cautionary statement" to the employee involved in the disclosure.[686]

Previous to TIGTA's investigation, "IRS RAIVS unit employees had access to both redacted and unredacted copies of the IRS Form 990 and associated Schedule B Forms on the IRS's Statistics of Income Exempt Organizations Return Image Network (SEIN)." As a result of the incident, "[t]he IRS has now restricted RAIVS unit employees' access to only redacted Forms 990 maintained on the SEIN. In addition, the IRS's retention period for IRS Forms 4506–A was extended from 45 days to three years from the last day of the calendar year in which they are received."[687]

---

[682] Letter from Senator Orrin Hatch to IRS Commissioner Shulman (May 8, 2012).

[683] Letter from Inspector General J. Russell George to Chairman Ron Wyden (May 22, 2014).

[684] Instructions for Form 4506–A (Rev. Aug. 2014).

[685] Letter from Inspector General J. Russell George to Chairman Ron Wyden (May 22, 2014).

[686] *Id.*

[687] *Id.*

Exhibit E

124

### 3. Disclosure of Tax-Exempt Applications to *ProPublica*

In November 2012, *ProPublica* submitted a Freedom of Information Act (FOIA) request to the IRS requesting tax-exempt applications from 67 non-profit organizations.[688] In response, the IRS sent *ProPublica* records relating to 31 of the groups. However, nine of these groups' tax-exempt applications were still pending with the IRS, and were therefore still confidential.[689] On December 14, 2012, *ProPublica* published the confidential application of Crossroads GPS on its website. *ProPublica* reported:

> The IRS sent Crossroads' application to *ProPublica* in response to a public-records request. The document sent to *ProPublica* didn't include an official IRS recognition letter, which is typically attached to applications of nonprofits that have been recognized. The IRS is only required to give out applications of groups recognized as tax-exempt.[690]

An IRS spokeswoman told *ProPublica*, "It has come to our attention that you are in receipt of application materials of organizations that have not been recognized by the IRS as tax-exempt." Further she told the news organization that "publishing unauthorized returns or return information was a felony punishable by a fine of up to $5,000 and imprisonment of up to five years, or both."[691]

*ProPublica* disagreed with the IRS interpretation of the statute penalizing publication of the application, citing the First Amendment. Nonetheless, prior to publishing the document, *ProPublica* "redacted parts of the application to omit Crossroads' financial information."[692] On the same day *ProPublica* published the confidential tax-exempt application, the IRS requested that TIGTA investigate the matter.[693]

On January 2, 2013, *ProPublica* published details about five other pending tax-exempt applications in an article citing confidential application materials it had received from the IRS.[694]

On May 16, 2013, the Republican members of the Senate Finance Committee asked TIGTA to investigate "the IRS's improper, and likely illegal, disclosure of nine organizations' applications for tax-exempt status" to *ProPublica*.[695]

In response to inquiries from Committee staff in connection with this investigation, TIGTA stated in a letter to Chairman Wyden that there was an improper disclosure of confidential taxpayer information. TIGTA determined that an IRS employee improperly disclosed the tax-exempt applications of nine organizations that were awaiting a determination from the IRS. The organizations af-

---

[688] *ProPublica*, IRS Office That Targeted Tea Party Also Disclosed Confidential Docs From Conservative Groups (May 13, 2013).
[689] *Id.*
[690] *ProPublica*, Karl Rove's Dark Money Group Promised IRS It Would Spend "Limited" Money on Elections (Dec. 14, 2012).
[691] *Id.*
[692] *Id.*
[693] Email chain between Beth Tucker, Timothy Camus, Nikole Flax and others (Dec. 14, 2012–Jan. 4, 2013) IRS0000562277–78.
[694] *ProPublica*, Controversial Dark Money Group Among Five that Told IRS They Would Stay Out of Politics, Then Didn't (Jan. 2, 2013).
[695] Letter from Senate Finance Committee Republicans to Inspector General J. Russell George (May 16, 2013).

Exhibit E

fected were Crossroads GPS, Rightchange.com, Freedompath, Citizen Awareness Project, Americans for Responsible Leadership, A Better America Now, America is Not Stupid, YG Network, and Secure America Now. The improper disclosure was made in response to a November 15, 2012 FOIA request from *ProPublica*, an online media organization.[696]

TIGTA did not find any evidence that the improper disclosure was motivated by political animus, and referred the matter to the IRS "for administrative action on January 30, 2013."[697] TIGTA reported that "[o]n March 7, 2013, the IRS issued a 'Letter of Admonishment' to the employee responsible for the disclosure."[698] Cindy Thomas explained that the letter from *ProPublica* had requested over 67 applications "and the clerical employee in the correspondence unit was trying to go through these very quickly." Thomas told the Committee that the IRS employee responsible was a "good employee, and it was the first time that she had made a mistake."[699]

As a result of this improper disclosure, the IRS now requires that the release of tax-exempt entity documents under FOIA be approved at the IRS headquarters level.[700]

### 4. Republican Governors Public Policy Committee

On April 4, 2013, the Center for Public Integrity reported that it "obtained a copy of the [Republican Governors Association Public Policy Committee's] Form 990 from a website that displays tax returns online. The return included one page of the 'Schedule B' list of donors which the IRS does not require to be made public."[701]

The RGA spokesman told the Center for Public Integrity that "donor information is confidential, and its partial disclosure by the IRS was erroneous and unauthorized. In fact it is a felony to disclose the information."[702]

TIGTA investigated the circumstances behind the disclosure. They found that the Schedule B information was sent to the website by an employee in the Ogden, Utah IRS office. TIGTA concluded that the disclosure was a workplace error and found no indication this this information was intentionally disclosed. The IRS employee was subsequently disciplined by the IRS.[703]

## X. CONCLUSION

This bipartisan report of the Committee concludes that between 2010 and 2013, the IRS failed to fulfill its obligation to administer the tax law with "integrity and fairness to all."[704] The IRS functioned in a politicized atmosphere following the 2010 *Citizens United* Supreme Court decision, which put pressure on the IRS to monitor political spending. Employees in the TE/GE Division, in-

---

[696] Letter from Inspector General J. Russell George to Chairman Ron Wyden (May 22, 2014).
[697] *Id.*
[698] *Id.*
[699] SFC Interview of Cindy Thomas (July 25, 2013) p. 120.
[700] Letter from Inspector General J. Russell George to Chairman Ron Wyden (May 22, 2014).
[701] Center for Public Integrity, IRS "Outs" Handful of Donors to Republican Group (Apr. 4, 2013).
[702] *Id.*
[703] TIGTA Briefing for SFC Staff (July 10, 2015).
[704] IRS, The Agency, Its Mission and Statutory Authority.

126

cluding Lois Lerner, were aware that the IRS had received an increasing number of applications from organizations that planned to engage in some level of political advocacy. Yet senior IRS executives, including Lerner, failed to properly manage political advocacy cases with the sensitivity and promptness that the applicants deserved. Other employees in the IRS failed to handle the cases with a proper level of urgency, which was symptomatic of the overall culture within the IRS where customer service was not prioritized.

As a result of these failings, a number of Tea Party and other political advocacy groups waited as long as five years to receive a decision from the IRS. These delays negatively affected applicants in many ways, including:

• Inability to gain tax-exempt status within their state until the IRS issued a determination letter; [705]

• Significant time and financial cost to respond to lengthy and burdensome IRS questions;

• Ineligibility for grants and other financial support that require IRS documentation of tax-exempt status;

• Decreased donations; and

• Financial uncertainty about whether the organization will owe a tax liability if the IRS determines that it does not meet the criteria for tax-exemption. [706]

After experiencing these problems, numerous organizations withdrew their applications for tax-exempt status and some organizations ceased to exist altogether.

The consequences of the IRS's actions in singling out organizations based on their name and subjecting them to heightened scrutiny, substantial delays, and to burdensome and sometimes intrusive questions are far reaching and troubling. Undoubtedly, these events will erode public confidence and sow doubt about the impartiality of the IRS. The lack of candor by IRS management about the circumstances surrounding Lois Lerner's missing emails may only serve to reinforce those doubts.

The IRS exercises an important and powerful role in the lives of every citizen in the country, and it is charged with the responsibility to exercise that power in a fair and impartial way. Sadly, this investigation has uncovered serious shortcomings in how the IRS exercised that authority when it processed applications for tax-exemption from organizations that were engaged in political advocacy—shortcomings that raise public doubt about whether the IRS is a neutral administrator of the tax laws. Immediate and meaningful changes, including increased accountability to Congress and strengthened internal controls, are necessary if diminished public confidence in the IRS is to be restored.

---

[705] Some states require applicants to submit an IRS Determination letter before the state will confer tax-exempt status. *See, e.g.,* Georgia Department of Revenue, Tax-Exempt Organizations Frequently Asked Questions.

[706] For a discussion of these and other adverse effects of the IRS' delayed rulings, *see Politico*, From IRS: "Death by Delay" (Feb. 26, 2015).

Exhibit E

ADDITIONAL VIEWS OF SENATOR HATCH

PREPARED BY REPUBLICAN STAFF

CONTENTS

Page

I. Executive Summary ........................................................................................ 129
II. Lois Lerner's Personal Political Views Influenced the IRS's Processing
    of Applications for Tax-Exempt Status from Tea Party and Conserv-
    ative Organizations ................................................................................... 136
        A. Lerner's Personal Political Views: Lerner Supported the Demo-
            cratic Party, President Obama, and Other Democratic Politi-
            cians ............................................................................................ 138
        B. Lerner's Political Views Relevant to Her IRS Position: Lerner
            Held Extreme Views on Limiting Campaign Finance Expendi-
            tures and Political Speech ......................................................... 140
        C. Lerner's Bias Harmed Conservative Organizations ...................... 143
            1. Lerner and Senior IRS Management Devised Ways to Sys-
               temically Constrain Tax-Exempt Organizations That En-
               gaged in Political Speech ................................................... 143
            2. Lerner Exerted a "Surprising" Level of Autonomy Over the
               Tea Party Applications ...................................................... 145
            3. Lerner Created Roadblocks for Tea Party Applications That
               Applied for Tax-Exempt Status .......................................... 147
            4. The IRS Sometimes Responded to Political Inquiries by
               Quickly Deciding Certain Applications, But Not When the
               Inquiries Were About Tea Party Organizations ................... 149
            5. Lois Lerner's Management of the EO Examinations Unit
               Reveals Her Political Bias Against Conservative Organiza-
               tions ................................................................................. 153
        D. Conclusions Regarding Lerner's Role and Culpability .................. 162
III. Senior IRS Officials Continuously Misled Congress About the IRS's
    Handling of Applications Submitted by Tea Party Organizations ......... 163
        A. Doug Shulman Misled Congress Regarding the Targeting of
            Tea Party Groups ....................................................................... 163
        B. Steve Miller Withheld Information about Political Targeting
            From the Congress ..................................................................... 165
            1. Miller's Response to Senator Hatch's March 14, 2012 Letter
               Was Misleading ................................................................. 165
            2. Miller Became Aware of Important Information Regarding
               Targeting Within a Week of Issuing his Response to Sen-
               ator Hatch's March 14, 2012 Letter, but Failed to Bring
               That Information to the Attention of Congress ................... 166
            3. Miller's Response to the June 18, 2012 Letter From Senator
               Hatch Regarding the IRS's Attempt to Collect Donor Infor-
               mation From Applicants Continued Miller's Pattern of Ob-
               fuscation ........................................................................... 168

Exhibit E

4. Miller's Explanation for Failing to Inform Congress Was a Sham ......................................................................... 169

C. Lois Lerner Actively Covered Up the Existence of IRS Targeting in her Communications With Congress ........................................ 170

1. Lerner Misled Staff of the U.S. House of Representatives Committee on Oversight and Government Reform .............. 170

2. Lerner's Testimony Before the House Ways and Means Subcommittee on Oversight was False and Misleading ............ 172

IV. The Obama Administration Signaled the IRS and Other Agencies to Target Conservative Tax-Exempt Organizations ...................................... 175

A. White House Coordination With the IRS ......................................... 177

B. The DOJ Enlisted the IRS's Help in Potential Prosecution of Organizations Engaged in Political Speech .................................. 179

1. In 2010, the DOJ Enlisted the IRS to Help Examine Political Spending by Tax Exempt Organizations ......................... 180

2. The FBI Was Investigating Tax-Exempt Organizations in 2010 ......................................................................... 182

3. The DOJ Again Reached out to the IRS for Assistance in 2013 ................................................................... 183

C. The FEC and the IRS Worked Together to Target Conservative Organizations .............................................................................. 184

1. The FEC Used Information Provided by the IRS to Target Four Conservative Organizations ......................................... 185

2. The FEC Enlisted the IRS in Other Efforts to Restrict Political Speech ...................................................... 187

D. Treasury Department Coordination With the IRS ......................... 188

V. Disparate Treatment of Conservative and Progressive Applicants for Tax-Exempt Status ..................................................................................... 190

A. Applications From the Tea Party and Related Conservative Groups Were Singled Out for Special Treatment ......................... 190

1. The "Test Cases" Selected for Development by EO Technical Were Applications From Tea Party Organizations ............... 190

2. The Initial Process Used to Develop the Tea Party Applications Was Highly Unusual ...................................... 191

3. Until July 2011, the Emerging Issues Tab of the BOLO Spreadsheet Specifically Targeted the Tea Party ................. 193

4. Until the Tea Party Entry Was Removed From the Emerging Issues Tab, Applications From Both Liberal and Conservative Groups That Did Not Meet the Tea Party Criteria Were Sent to General Inventory, Assigned, and Decided ......................................................................... 195

5. The IRS Continued to Target the Tea Party After the Emerging Issue Tab Was Revised in July 2011 to Remove the Entry for the Tea Party .................................................... 196

B. The IRS Did Not Target Progressive Organizations ...................... 198

1. *Democratic Allegation:* "Progressive" groups were targeted because they appeared on the BOLO spreadsheet ............... 198

2. *Democratic Allegation:* Groups affiliated with Association of Community Organizations for Reform Now (ACORN) were targeted because they appeared on the BOLO spreadsheet and were subsequently inappropriately scrutinized ... 200

Exhibit E

    3. *Democratic Allegation:* The IRS targeted groups affiliated with "Occupy Wall Street," through a standalone BOLO entry and also by expanding the BOLO entry for political advocacy groups to capture Occupy groups that might submit applications .................................................................. 203

    4. *Democratic Allegation:* In 2008, an EO Determinations manager instructed employees to be on the lookout for applicants with the word "Emerge" in their names. It took 3 years for the IRS to come to a conclusion on some of the Emerge cases .............................................................. 205

    5. *Democratic Allegation:* TIGTA's audit, which culminated in its report dated May 14, 2013, established that IRS employees did not allow their own political beliefs to influence the manner in which they processed Tea Party applications .................................................................................. 207

VI. Tea Party Organizations Were Harmed by IRS Targeting ........................ 209

    A. The Tea Party and Related Conservative Groups Whose Applications Were Centralized and Delayed Were Generally Small Organizations .................................................................................. 209

    B. Tea Party Organizations Suffered Far Greater Harm Than Progressive Applicants ........................................................................ 210

    C. Tea Party Groups Suffered Substantial Harm as a Result of IRS Delays ................................................................................... 213

    1. The Albuquerque Tea Party ..................................................... 213

    2. American Junto ......................................................................... 215

    3. Pass the Balanced Budget Amendment (PBBA) ...................... 217

    4. King Street Patriots and True the Vote ................................... 219

VII. Political Influence Within the IRS .............................................................. 222

    A. The IRS's Lack of Independent Agency Status Fostered the Expression of Political Bias and Has Irrevocably Tainted the Agency's Credibility ...................................................................... 222

    B. Union Influence Within the IRS Has Created an Atmosphere of Political Bias ............................................................................... 224

    C. Recent Violations of the Hatch Act Show Pervasive Political Bias Throughout the IRS .............................................................. 226

VIII. The IRS has Yet to Fully Correct its Problems ....................................... 227

    A. Although the IRS Has Addressed Some Problems Identified by TIGTA, There Is Much Work Left to Do ................................. 228

    1. Initial IRS Response and Suspension of BOLO ...................... 228

    2. The Expedited Process .............................................................. 229

    3. Further Updates on TIGTA Recommendations and Other Changes ..................................................................................... 231

    B. Attempts by the IRS and Others to Suppress Political Speech and Discourage an Informed Citizenry Must Be Rejected .......... 231

    1. Background on 501(c)(4) Exemption ........................................ 232

    2. IRS's Proposed Regulatory Changes ........................................ 233

    3. Legislative Proposals ................................................................. 234

    4. View of the Majority Committee Members on Legislative and Regulatory Proposals ...................................................... 236

IX. Conclusion and Recommendations .............................................................. 237

# I. EXECUTIVE SUMMARY

The mission statement of the Internal Revenue Service (IRS) charges its employees to "[p]rovide America's taxpayers top quality

130

service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all."[1] The IRS believes that "[t]his mission statement describes our role and the public's expectation about how we should perform that role."[2] Indeed, the public has a right to expect that the IRS will administer the tax code with integrity and fairness in every context. Yet for many conservative organizations that applied for tax-exempt status during the last five years, the IRS fell woefully short of this standard.

The Majority staff of the Senate Committee on Finance has conducted a thorough review of the evidence presented during the course of this investigation. Our findings are set forth in these Additional Views of Senator Hatch Prepared by Republican Staff (Additional Republican Views), which include the following five primary conclusions.

**First, we found that the IRS systemically selected Tea Party and other conservative organizations for heightened scrutiny, in a manner wholly different from how the IRS processed applications submitted by left-leaning and non-partisan organizations.**

Our investigation affirmed the conclusion of the Treasury Inspector General for Tax Administration (TIGTA) in its May 2013 report that "[t]he IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention."[3] The inappropriate criteria were initially developed and applied by revenue agents in the Cincinnati Exempt Organizations Determinations office. While these actions were arguably outside the scope of normal IRS operating procedure, the hallmarks of disparate treatment—and the resulting harm to conservative organizations—occurred after the applications were raised to IRS managers in the Washington, D.C. headquarters in March 2010. From that point forward, Lois Lerner and other senior managers directed the course of the applications and made decisions that directly resulted in increased scrutiny, long delays, and requests for inappropriate information.

A key finding is that at the time when the IRS developed and employed the inappropriate criteria to process Tea Party applications, it did not consider how each of the affected groups operated. The initial Sensitive Case Report for Tea Party applications, prepared in April 2010, indicates that "[t]he various 'tea party' organizations **are separately organized**, but appear to be part of a national political movement that **may be involved** in political activities."[4] Soon thereafter, the IRS considered developing a "template" questionnaire to send to Tea Party applicants—an approach that had been used successfully in the past when the IRS received numerous applications from groups that shared common characteris-

---

[1] IRS, The Agency, Its Mission and Statutory Authority.
[2] *Id.*
[3] TIGTA, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review, Audit Report 2013–10–053 (May 14, 2013), Highlights. We commend TIGTA for their thorough audit and report on this issue.
[4] Email from Richard Daly to Sarah Ingram, Joseph Grant and others (June 6, 2010) IRS0000163997–164013 (email attachments containing taxpayer information omitted by Committee staff).

Exhibit E

131

tics. Holly Paz explained why the IRS rejected this approach for the Tea Party applications:

> Generally, you know, in situations where you are talking about using a template or—our goal is to group things for consistency. You wouldn't want similarly situated organizations that are engaged in similar activities to get different answers. Some to get approved and some to get denied. **But here, from what Carter Hull was saying, the organizations were very different. Some were represented by attorneys and appeared very sophisticated. Some were very small grassroots organizations. Some had talked about educational activities. Others talked more about candidate activity. So there was a lot of variety.** [5]

Although the IRS knew that the Tea Party applications were too dissimilar to be grouped under a common template, it continued to segregate them for screening and processing based on the presence of certain key words or phrases in the applicants' names or applications like "Tea Party," "9/12" and "Patriots," as well as indicators of political views that included being concerned with government debt, government spending or taxes, educating the public via advocacy or lobbying "to make America a better place to live," or being critical of how the country was being run.[6] At the time when the IRS segregated the Tea Party applications, they had little or no firsthand knowledge of the organizations' actual or planned activities. Thus, the unifying factor for how Tea Party applicants were handled was not specific activities, but rather an underlying political philosophy.

This factor sets apart the IRS's treatment of conservative organizations from left-leaning and nonpartisan organizations. With one exception that affected just two organizations, all left-leaning organizations that the Minority alleges were improperly treated participated in activities that legitimately called their tax-exempt status into question.[7] The IRS did not "target" these groups based on their names or ideologies, but instead evaluated their actual activities that were known to the IRS—activities that, in many cases, properly resulted in denial or revocation of tax-exempt status. Although some left-leaning organizations that applied for tax-exempt status also experienced delays, we found no evidence that the IRS scrutinized left-leaning organizations in the same manner, to the same extent, or for the same politically-motivated reasons as it targeted Tea Party and other conservative organizations. Instead, those delays were merely a symptom of a culture within the IRS that does not value customer service.

The IRS's inequitable treatment caused great harm to conservative organizations, the vast majority of which were small, local

---

[5] SFC Interview of Holly Paz (July 26, 2013) p. 71 (emphasis added).
[6] Email chain between John Shafer, Cindy Thomas, Steve Bowling, and others (June 1–10, 2011) IRS0000066837–40.
[7] The two liberal organizations that were improperly handled were affiliated with the Occupy movement. As discussed below in Section V(B)(3), the IRS briefly delayed these applications based on a poor decision by EO managers in Cincinnati. The Minority does not allege that these groups were subject to a concerted effort by IRS senior management to delay processing, nor do they allege that these groups were actually harmed by the IRS's actions.

Exhibit E

132

groups. These groups had limited funding and were ill-equipped to respond to the IRS's tactics of delaying their applications and then buffeting them with an almost innumerable number of requests for information. As a result, many of the Tea Party groups seeking tax-exemption gave up on the process; and some of these groups ceased to exist entirely, based at least in part on their failure to secure tax-exempt status.

**Second, our investigation revealed an environment within the IRS where the political bias of individual employees like Lois Lerner can, and sometimes does, influence decisions.**

Structurally, the IRS is a bureau within the Treasury Department, which precludes the IRS from being truly independent of the governing administration. We found that within the IRS, the union exerts extreme influence on employees in nearly every facet of their employment. The union itself favors the Democratic Party and contributes money almost exclusively to its candidates, which makes it difficult for the agency to remain apolitical. These influences are borne out in the number of IRS employees who have violated Federal laws designed to prevent government employees from exerting personal political bias while on the job.

Within this atmosphere, IRS upper management gave the Director of Exempt Organizations Lois Lerner free rein to manage applications for tax-exempt status. We found evidence that Lerner's personal political views directly resulted in disparate treatment for applicants affiliated with Tea Party and other conservative causes. Lerner orchestrated a process that subjected these applicants to multiple levels of review by numerous components within the IRS, thereby ensuring that they would suffer long delays and be required to answer burdensome and unnecessary questions. Lerner showed little concern for conservative applicants, even when members of Congress inquired on their behalf, allowing them to languish in the IRS bureaucracy for as long as two years with little or no action. The IRS began to resolve these applications only after some of the problems became public in 2012. By that time, the damage had been done.

**Third, the IRS has shown a pattern of continually misleading Congress about its handling of applications submitted by Tea Party organizations.**

Top IRS management including Doug Shulman, Steve Miller, and Lois Lerner made numerous misrepresentations to Congress in 2012 and 2013 regarding the IRS's mistreatment of Tea Party organizations. These three individuals made oral and/or written assertions to Congress justifying and defending the IRS's processing of applications for tax exemption from Tea Party groups during this time period. In reality, that IRS processing included subjecting the organizations to extraordinary delays and causing them to divulge unprecedented amounts of highly irrelevant and, in many cases, confidential information. Contrary to their oral and/or written statements to Congress, Shulman, Miller and Lerner knew, or had reason to know, that the IRS's processing of those applications was improper and that the IRS's demands for information from those groups was unwarranted. Moreover, Shulman, Miller and Lerner concealed information from Congress regarding the processing of those applications which included the fact that the IRS had singled

Exhibit E

133

out Tea Party groups for additional scrutiny based on their political views.

The pattern of deception engaged in by Shulman, Miller, and Lerner from 2012 to 2013 was designed to throw Congress off the scent of IRS wrongdoing so as to allow the IRS to put into place remedial half-measures aimed at addressing the targeting, the long delays, and the collection of highly detailed but irrelevant information from Tea Party applicants. By actively misleading Congress about the IRS's mistreatment of Tea Party groups, Shulman, Miller and Lerner effectively obstructed Congress in the exercise of its authority to oversee the activities of the IRS.

**Fourth, soon after the Obama Administration began a concerted effort to constrain spending on political speech, the IRS and other executive agencies began scrutinizing conservative organizations that had, or sought, tax-exempt status.**

The White House's focus on this issue intensified after the Supreme Court issued its *Citizens United* decision in January 2010, starting with President Obama's castigation of the Court in his State of the Union address and continuing throughout 2010 until the mid-term elections.

We found clear evidence that the IRS and other agencies heeded the President's call. Just a few weeks after the President's State of the Union address, the IRS made the pivotal decision to set aside all incoming Tea Party applications for special processing— a decision that would subject those organizations to long delays, burdensome questions, and would ultimately prove fatal to some of them. Around that same time, the Department of Justice was considering whether it could bring criminal charges against 501(c)(4) organizations that engaged in political activity. The Federal Election Commission had also opened investigations into conservative organizations that aired political ads. The IRS met with both agencies, providing input on the Department of Justice's proposals and information to the Federal Election Commission on organizations that were under investigation. These actions leave little doubt that when Congress did not pass legislation to reduce spending on political speech, the administration sought alternative ways to accomplish the same goal.

Regrettably, the Majority staff was not able to determine the full extent of Treasury Department and White House involvement in this matter. The Treasury Department did not fully cooperate with the Committee's requests to make witnesses and documents available to the Committee. As a result, the Committee interviewed only three current and former employees of the Treasury Department and did not have access to the full scope of relevant documents. Similarly, the Committee did not have sufficient access to White House records or employees. Together, these gaps in knowledge prevent us from determining when the Obama Administration and the Treasury Department first became aware that the IRS was targeting Tea Party groups. They also prevent us from concluding that the Obama Administration and the Treasury Department did not direct, approve of, or allow any aspect of the targeting of Tea Party groups.

Exhibit E

134

Regardless of whether an explicit directive was given, the President's use of his bully pulpit had the effect of increasing scrutiny on conservative organizations, rendering a direct order to individual employees unnecessary.

**Finally, the IRS harmed the Committee's investigation by failing to properly preserve a significant portion of Lois Lerner's email, resulting in its loss, and then concealing that loss from the Committee for months.**

As discussed more completely in Section II(C) of the Bipartisan Investigative Report, in early February 2014, the IRS determined that it could not locate many of Lois Lerner's emails dating from 2010 and 2011, a period crucial to the Committee's investigation. Upon conducting an inquiry into the matter, the IRS discovered that many of these emails had been stored on Lerner's laptop computer and that the computer suffered a hard drive failure in June 2011. While IRS officials were able to determine why many of Lerner's were missing, they incorrectly assumed that server backup tapes containing copies of those emails had been overwritten, and thus failed to attempt to recover records from those backup tapes. Based on that faulty assumption, the IRS ultimately concluded in April 2014 that Lerner's missing emails were permanently lost and so advised the Treasury Department, which in turn, notified the White House. However, the IRS failed to simultaneously inform the various Congressional committees conducting investigations into the IRS's treatment of Tea Party organizations, choosing instead to conceal this fact from Congress.

In March 2014, this Committee asked the IRS to provide it with a written statement attesting that all documents requested by the Committee and relevant to its investigation had been produced to the Committee. Rather than provide the attestation, the IRS submitted to the Committee on June 13, 2014 a rambling, nearly incomprehensible letter that, with attachments, was 27 pages in length. Buried nearly halfway through the letter was an admission that the IRS had lost an undetermined number of Lerner's emails from 2010 and 2011, and that backup tapes that once contained those emails no longer existed. The circumstances surrounding the IRS's dilatory admission regarding the lost emails is troubling, as it strongly suggests that had it not been for the Committee's request for an attestation, the IRS may never have revealed to it the existence of the missing emails.

Moreover, in a March 19, 2014 letter to the Committee, the IRS asserted that it had completed its production of documents as requested by the Committee and urged it to release its final report on the investigation. As explained above, in February 2014, IRS officials knew that a substantial number of Lerner's emails had been lost as a result of the hard drive failure, and might not be recoverable from any other source. Accordingly, it is difficult to reconcile the IRS officials' awareness of the missing emails in February 2014 with their subsequent assertion to the Committee in March 2014 that the document production was complete and that the Committee should release its report. Indeed, in light of this knowledge, it would appear that the assertion was false and intended to hasten the Committee to complete its investigation, thus foreclosing the

Exhibit E

possibility that it would ever find out about the missing Lerner emails.

Furthermore, IRS staff had numerous interactions with Committee staff after the March 19, 2014 letter and before the IRS's reluctant admission on June 13, 2014 that it had lost many of Lerner's emails. At no time during any of those interactions did IRS staff attempt to correct the inaccurate impression created in the March 19, 2014 letter that the IRS had completed its production of requested documents.

In addition to concealing the loss of Lerner's emails, IRS officials also failed to take adequate steps to preserve backup tapes that contained copies of those emails. Upon concluding in February 2014 that many of Lerner's emails from 2010 and 2011 were missing, IRS officials failed to conduct a proper search for backup tapes that might contain copies of those emails. In what appears to be an exercise in pure expediency, those officials simply concluded that no such tapes existed because they should have been overwritten by then in accordance with the IRS's practice to recycle backup tapes every six months. In truth, in February 2014, the IRS had in its possession nearly 1,200 backup tapes that could have contained Lerner's emails from the period in question. Because the IRS failed to look for, identify and preserve the backup tapes, 422 of those backup tapes were erased by the IRS in March 2014, resulting in the loss of Lerner emails relevant to the Committee's investigation.

The actions taken by IRS officials, as well as those they failed to take after discovering the missing Lerner emails, harmed the Committee's investigation. IRS officials concealed from the Committee for as long as possible the fact that Lerner's emails were lost. Moreover, those officials misled the Committee into believing that the IRS had completed its document production, when in fact, they knew that many of Lerner's emails from a period of time of great interest to the Committee were missing. Further, those officials failed to discharge their responsibility to take adequate steps to preserve thousands of Lerner's emails, resulting in the irrevocable loss of as many as 24,000 of those emails. These actions not only deprived the Committee of information important to its investigation and caused substantial delay in its completion, but also further eroded the Committee's confidence that the IRS has been forthcoming in all of its other representations to Congress regarding this investigation.

The Committee undertook a number of measures aimed at mitigating the consequences of the harm caused by the IRS's failure to preserve copies of the backup tapes containing Lerner's email. For example, in an effort to bridge the gap in the missing emails, the Committee secured from alternate sources, including the Treasury Department, the Department of Justice, the Federal Election Commission, TIGTA, a private organization, and the White House, copies of emails between their employees and Lerner. In addition, TIGTA undertook extraordinary efforts to recover missing Lerner emails. Within two weeks of commencing its investigation into the lost emails, TIGTA located 744 backup tapes that the IRS erroneously determined contained no information relevant to the Committee's investigation. After recovery efforts, those 744 tapes yield-

ed over 1,000 Lerner emails not previously provided to the Committee by the IRS—some of which proved relevant to this investigation. Additional recovery efforts by TIGTA from other sources resulted in over 300 more Lerner emails. In total, TIGTA was able to provide the Committee with 1,330 Lerner emails that the IRS had been unable to produce and that the Committee had not seen before. Although it was not possible to reproduce a full record of Lerner's communications during 2010 and 2011, we believe that these efforts have provided the most comprehensive record that is possible.

**In addition to the findings set forth herein, the Majority staff fully supports the joint findings contained in the Bipartisan Investigative Report.** Those findings reveal several other serious problems at the IRS, including:

• Management lacked an appreciation for the sensitivity and volatility of the political advocacy applications and allowed employees to use inappropriate screening criteria. (See Sections III(A) and III(B) of the Bipartisan Investigative Report.)

• The IRS lacked any sense of customer service for organizations that applied for tax-exempt status. (See Section III(E)(1) of the Bipartisan Investigative Report.)

• The IRS improperly disclosed taxpayer information of numerous conservative organizations. (See Section IX(C) of the Bipartisan Investigative Report.)

• In 2010, a freelance reporter made a FOIA request for documents related to the IRS's handling of Tea Party applications. The IRS identified responsive documents, but elected not to produce them, thereby precluding early public scrutiny of its treatment of Tea Party applicants. (See Section IX(B) of the Bipartisan Investigative Report.)

In all, Committee staff reviewed more than 1,500,000 pages of documents and conducted 32 interviews in the course of this investigation. We believe that the findings described in the Bipartisan Investigative Report and in these Additional Republican Views are supported by the record.

As a result of the practices described in both the Bipartisan Investigative Report and in these Additional Republican Views, the public's confidence in the IRS has been justifiably shaken. There is much work that needs to be done to restore the public's trust in the IRS's ability to administer the tax system in a fair and impartial way.

## II. LOIS LERNER'S PERSONAL POLITICAL VIEWS INFLUENCED THE IRS'S PROCESSING OF APPLICATIONS FOR TAX–EXEMPT STATUS FROM TEA PARTY AND CONSERVATIVE ORGANIZATIONS

*Lois Lerner supported the Democratic Party and President Obama, and she held extreme views on campaign finance reform. Lerner's bias influenced the IRS's handling of Tea Party appications and these organizations were harmed by her actions.*

A central aim of the Committee's investigation was to determine if any IRS actions toward conservative taxpayers were influenced

137

by political bias. Assuredly, employees working in the executive branch are entitled to hold personal political views—and indeed, many citizens who serve in federal agencies can and do play a valuable part in the democratic process using personal time and resources, and subject to limits the law imposes on such activity by government employees. However, the personal political views of a federal employee working in an apolitical position should never influence their official actions. If this were to happen, the public could question whether the government has acted in a fair and impartial manner. The danger of political bias is particularly acute at the IRS, which has been entrusted to "enforce the law with integrity and fairness to all." [8]

As the senior executive in charge of Exempt Organizations (EO), Lois Lerner was the person with ultimate responsibility for overseeing all of the employees involved who processed applications for tax-exempt status. By virtue of her position, Lerner had the potential to exert tremendous power over many taxpayers who sought to exercise their right to political speech.

Amidst allegations that Lerner's political views influenced IRS actions, our inquiry focused on three questions. First, what are Lois Lerner's political views? Second, did she hold any political views relevant to her specific responsibilities at the IRS? And finally, is there any evidence that her political views influenced official actions of the IRS? We address these questions in turn below.

In resolving these questions, the Committee sought to interview Lerner as part of its investigation. Indeed, because of her position in the IRS, Lerner would be uniquely able to explain how conservative applicants were treated by the IRS. Lerner declined the Committee's request for an interview, citing her Fifth Amendment right to remain silent. In the absence of her testimony, the Committee has been able to reach conclusions about her role after careful review of over 1,500,000 pages of documents and dozens of interviews with IRS and Treasury employees, many of whom worked directly with Lerner.

In response to our first question, the Senate Finance Committee's investigation revealed that Lerner was a Democrat who consistently supported Democratic politicians, particularly President Obama, during her tenure at the IRS. Her communications also suggest that she felt animus toward the views of the Republican Party.

In response to our second question, we found that Lerner favored campaign finance reform efforts and had deep disdain for the Supreme Court's loosening of these restrictions in the *Citizens United* decision, which she deemed "by far the worst thing that has ever happened to this country" and feared would lead to "the end of America.' " [9]

In response to our third question, we conclude that Lerner's partisan bias directly harmed conservative organizations applying for tax-exempt status from early 2010 until May 2013. Under Lerner's leadership, Tea Party organizations were systemically targeted and set aside for special processing. The impact of Lerner's bias was ex-

---

[8] IRS, The Agency, Its Mission and Statutory Authority.
[9] Email chain between Lois Lerner and Mark Tornwall (June 1, 2012) IRS0000800024.

138

acerbated by her superiors' failure to oversee her, and directly caused conservative organizations to suffer long delays and endure numerous rounds of burdensome questions. Her biases are particularly evident when comparing her inaction on Tea Party applications to her quick responses to inquiries from Democratic politicians. We also found evidence that Lerner's bias led to audits of some conservative organizations, which imposed even greater burdens and further stifled their political speech.

A. LERNER'S PERSONAL POLITICAL VIEWS: LERNER SUPPORTED THE DEMOCRATIC PARTY, PRESIDENT OBAMA, AND OTHER DEMOCRATIC POLITICIANS

A primary focus of our investigation was whether Lerner's personal political views favored one political party or the other. Lerner has acknowledged that she is a registered Democrat but she publicly stated that she is "not a political person." [10]

Our review of Lerner's communications casts doubt on her claim of being "apolitical." To the contrary, her conversations with family and friends show that Lerner followed politics closely and supported the Democratic Party and Democratic politicians, particularly President Obama. These conversations—all on Lerner's government email account—also show that Lerner's friends and family uniformly shared her views and sometimes made disparaging comments about Republicans and the Tea Party to Lerner:

- In an October 2004 email conversation with a former colleague from the Federal Election Commission (FEC), Lerner said, "[A]fter the election, we'll get together—hopefully to celebrate, but it sure looks iffy!" [11] The next month, Republican George W. Bush defeated Democrat John Kerry in the presidential election.

- In October 2012, a friend wrote to Lerner about the upcoming election: "The Romney/Ryan ticket is really scary. How did a creep like Romney ever get elected to be governor of Massachusetts, anyway?" [12]

- In November 2012, a friend invited Lerner to an election-night party that she decided to host "now that Nate Silver has raised Obama's chance of winning to 85.1%." The party invitation included a picture of the Democratic Party logo.[13] Lerner responded, "Would have loved to, but am in London." Lerner passed the invitation along to her husband and told the host, "[I]f he's smart he'll join you." Lerner noted that she was "[k]eeping my fingers crossed. And, I did vote!" [14]

- On Election Day in 2012, Lerner's husband told her that it was "hard to find the socialist-labor candidates on the ballot, so I wrote them in." Lerner described the election as "[o]nce in a lifetime stuff" and said that "[people in London] get that it's close but they don't seem to think Obama could really lose. They all want to know who the heck this Romney guy is." [15]

---

[10] *Politico,* Exclusive: Lois Lerner Breaks Silence (Sep. 22, 2014).
[11] Email chain between Lois Lerner and FEC Employee (Oct. 12, 2004) FECSUBP5001079.
[12] Email chain between Lois Lerner and Mark Tornwall (Oct. 11–17, 2012) IRS0000793954.
[13] Email from friend to Lois Lerner and others (Nov. 4, 2012) IRS0000794177–78.
[14] Email chain between Lois Lerner and friend (Nov. 4, 2012) IRS0000794185.
[15] Email chain between Lois Lerner and Michael Miles (Nov. 6, 2012) IRS0000794247–48.

- On November 7, 2012, a family member wrote an email to Lerner with the subject "Hurray, Hurray—OBAMA for 4 more years."[16]
- On November 7, 2012, Lerner's husband described her as being "in that post-election state of bliss" after the election results were announced.[17]
- In a November 2012 email with a family member, Lerner was informed that Democrats retained control of the U.S. Senate. Lerner responded: "WooHoo! I[t] was important to keep the Senate. If it had switched, it would be the same as a Rep president." In the same conversation, Lerner celebrated Maryland's legalization of same-sex marriage. Lerner's family member commented, "I think there were 3 seats that switched from tea party republicans to democrats so that's exciting!"[18]
- In November 2012, Lerner had the following email exchange with her husband, Michael Miles:

Miles: Well, you should hear the whacko wing of the GOP. The US is through; too many foreigners sucking the teat; time to hunker down, buy ammo and food, and prepare for the end. The right wing radio shows are scary to listen to.
Lerner: Great. Maybe we are through if there are that many assholes.
Miles: And I'm talking about the hosts of the shows. The callers are rabid.
Lerner: So we don't need to worry about alien terrorists. It's our own crazies that will take us down.[19]

- In January 2013, Lerner remarked that she might look for a position at the Washington, D.C. office of Organizing for Action, the successor organization of President Obama's 2012 re-election campaign—a possibility that her subordinates appear to have taken seriously.[20]
- After the Tea Party scandal broke in May 2013, a friend wrote to Lerner to offer support. The friend said, "My brother was here when I read the paper, and frankly, he was hoping you would 'nail' the tea party, but I realize that you are just doing your job, ha ha."[21]
- In a March 2014 conversation, a friend informed Lerner that "[t]his Republican crap has become really bad in Texas." The friend then offered negative comments about several Texas Republicans, including former Governor Rick Perry, Ted Nugent, and Greg Abbott, whom the friend believed was "still likely to be the next Governor of Texas simply because he claims to be in favor of gun rights and against same-sex marriage." The friend concluded, "As you can see, the Lone Star State is just pathetic as far as political attitudes are concerned." This prompted Lerner to state the following:

[16] Email chain between Lois Lerner and family member (Nov. 7, 2012) IRS0000794253.
[17] Email chain between Lois Lerner and Michael Miles (Nov. 7, 2012) IRS0000794265.
[18] Email chain between Lois Lerner and family member (Nov. 6–7, 2012) IRS0000317155–56.
[19] Email chain between Lois Lerner and Michael Miles (Nov. 8–9, 2012) IRS0000890492.
[20] Email chain between Lois Lerner, Sharon Light, Holly Paz, and others (Jan. 24, 2013) IRSC007157.
[21] Email chain between Lois Lerner and friend (May 12, 2013) IRS0000662634,

Exhibit E

140

> Look my view is that Lincoln was our worst president not our best. He should'[v]e let the south go. We really do seem to have 2 totally different mindsets.[22]

This was not the first time that Lerner expressed this sentiment about the United States. In a December 2012 email to a different friend, Lerner said:

> We're in Ohio for the holiday and waiting to go over the fiscal cliff! I truly believe this country is out of its head with ridiculousness! We really need to split in two—we are so polarized that we can't do anything constructive.[23]

The Majority staff's review of approximately 1,500,000 pages produced by the IRS and other entities did not reveal find any instances when Lerner expressed positive sentiments about the Republican Party, a specific Republican candidate, or the Tea Party. Similarly, we found no instances when any friend of family member of Lerner's expressed such sentiments in a message to Lerner. Indeed, it is highly probable that the individuals who sent Lerner these politically charged messages, which were supportive of Democratic politicians and often critical of their Republican counterparts, did so because they were aware of her political beliefs and knew that she shared in their convictions.

As a whole, these communications establish that Lerner staunchly supported President Obama and the Democratic Party and, contrary to her assertions, followed politics closely. They also suggest that Lerner held disdain for those who supported conservative values and Republican ideals.

## B. Lerner's Political Views Relevant to Her IRS Position: Lerner Held Extreme Views on Limiting Campaign Finance Expenditures and Political Speech

Next, we consider whether Lerner held any political views that were relevant to her position at the IRS. As described below, we conclude that Lerner supported campaign finance reform efforts and was generally in favor of restraining political speech by tax-exempt organizations. These views were directly relevant to her oversight of the EO Division at the IRS.

Before joining the IRS in 2001, Lerner spent most of her career in election law. Lerner joined the FEC in 1981 and served in several senior positions during her 20-year tenure, including head of the Enforcement Division and Acting General Counsel.[24] A colleague from the FEC who has known Lerner since 1985, attorney Craig Engle, described Lerner's views of campaign finance law as follows:

> Engle describes Lerner as pro-regulation and as somebody seeking to limit the influence of money in politics. The natural companion to those views, he says, is her belief that "Republicans take the other side" and that conservative groups should be subjected to more rigorous investigations. According to Engle, Lerner harbors a "sus-

[22] Email chain between Lois Lerner and Mark Tornwall (Mar. 6, 2014) 00064–66.
[23] Email chain between Lois Lerner and Lisa Klein (Dec. 23–24, 2014).
[24] Resume of Lois Lerner (undated) IRS0000798764–65.

Exhibit E

picion" that conservative groups are intentionally flouting the law.[25]

   While Lerner was head of the FEC's Enforcement Division, she was reported to have improperly threatened a Republican candidate for the U.S. Senate, allegedly saying, "Promise me you will never run for office again, and we'll drop [the pending charges against you]."[26]

Lerner's expertise in election law certainly shaped her view of the role of tax-exempt organizations in the political process when she joined the IRS in 2001 as the Director of Rulings and Agreements. While she was at the IRS, Lerner continued to support spending restrictions on political speech. In a February 2002 message to a former colleague at the FEC, Lerner stated that it was "pretty exciting that the campaign finance [reform bill] may actually go through."[27] Lerner was referring to the Bipartisan Campaign Reform Act of 2002 (McCain-Feingold Act), which became law on March 27, 2002. More recently, Lerner supported the DISCLOSE Act, a proposed law that would require donor disclosure by tax-exempt organizations that engage in political campaign activities, although she apparently realized it was not likely to pass. When informed that Democrat Chris Van Hollen introduced the DISCLOSE Act in the House, Lerner said, "Wouldn't that be great? And I won't hold my breath."[28]

Given Lerner's support for the McCain-Feingold Act, it should come as no surprise that she was disappointed when the Supreme Court struck down parts of the Act in *Citizens United* v. *Federal Election Commission*, 130 S. Ct. 876 (2010). The depth of Lerner's emotion, however, is surprising. Lerner bluntly told a friend:

   *Citizens United* is by far the worst thing that has ever happened to this country.[29]

After her friend agreed that it was a "total disgrace that the Supreme Court has endorsed this concept," Lerner expanded on her view of the case to explain why the decision had repercussions far beyond campaign finance rules:

   We are witnessing the end of "America." There has always been the struggle between the capitalistic ideals and the humanistic ideals. Religion has usually tempered the selfishness of capitalism, but the rabid, hellfire piece of religion has hijacked the game and in the end, we will all lose out. [I]t's all tied together—money can buy the Congress and the Presidency, so in turn, money packs the SCt. And the court usually backs the money—the "old boys" still win.[30]

These extreme views would be troubling if held by any government official; but they are particularly troubling when held by a

---

[25] *National Review*, Lois Lerner at the FEC (May 23, 2013).
[26] *The Washington Post*, Lois Lerner: The Scowling Face of the State (June 12, 2013).
[27] Email chain between Lois Lerner and FEC Employee (Feb. 22, 2002) FECSUBP5001236.
[28] Email chain between Lois Lerner, Joseph Urban and others (Feb. 13, 2012) IRS0000694708–10.
[29] Email chain between Lois Lerner and Mark Tornwall (June 1, 2012) IRS0000800024.
[30] *Id.*

142

senior IRS official charged with oversight of tax-exempt organizations, including those that engage in political speech.

While employed at the IRS, Lerner maintained close ties to numerous outside advocacy groups that shared her goal of limiting spending by tax-exempt organizations on political speech. These groups took advantage of their direct access to Lerner and other senior IRS officials, frequently asking the IRS to tighten its control over political spending by tax-exempt organizations as described in Section IV(D) of the Bipartisan Investigative Report. Lerner even met with some of them in person to discuss their proposals.

One group that had particularly close ties to Lerner is the Americans for Campaign Reform (ACR). ACR describes itself as "a community of citizens who believe passionately that public funding [of elections] is the single most critical long-term public policy issue our nation faces."[31] Lerner's ties to ACR were strong enough that when ACR was searching for a new CEO in 2012, they sought Lerner's opinion on Larry Noble, who had been the General Counsel at the FEC during Lerner's tenure, and thanked Lerner "for [her] contribution to this search."[32] Lerner recommended that ACR hire Noble and told him that she was "[g]lad I could be a part of their decision."[33] Lerner and Noble made plans to have lunch, and Lerner asked Noble, "So, when should I expect your first letter yelling at me about the c4s?"[34] Noble replied, "That's Fred's job," apparently referring to Fred Wertheimer, President of Democracy 21—another group that was regularly in touch with Lerner.

Lerner also maintained close ties with Kevin Kennedy, the Director and General Counsel of the Wisconsin Government Accountability Board, which administers and enforces Wisconsin campaign finance and election laws.[35] Kennedy shared many of Lerner's views on campaign finance and the need for increased regulation of political speech.[36] In 2008, Kennedy organized a panel discussion for the Council on Government Ethics Laws on "regulating political speech."[37] Lerner spoke at this panel along with Larry Noble (who was then practicing at a private law firm), FEC Commissioner Ellen Weintraub, and Campaign Legal Center attorney Paul Ryan.[38] Kennedy and Lerner regularly discussed election law, and in 2011 Kennedy bemoaned Wisconsin's loosening campaign finance regulations, saying, "[T]he legislature has killed our cor-

---

[31] Americans for Campaign Reform, About Us.
[32] Email chain between Lois Lerner and Larry Noble (Aug. 17, 2012) IRS0000683618–20.
[33] Email chain between Lois Lerner and Larry Noble (Aug. 10, 2012) IRS0000801074–77.
[34] Email chain between Lois Lerner and Larry Noble (Aug. 10, 2012) IRS0000801105–08.
[35] The Wisconsin Government Accountability Board is reported to have provided assistance to prosecutors in a secret John Doe investigation of conservative organizations' political activities during the 2011 and 2012 Wisconsin recall elections. On July 16, 2015 the Wisconsin Supreme Court ended the John Doe investigation, ruling that Scott Walker's campaign did not violate campaign finance laws. *See Milwaukee Journal Sentinel*, Q&A: Untangling Wisconsin's recent John Doe Investigations (Sep. 10, 2014); *Wall Street Journal*, Wisconsin Targets the Media (Dec. 21, 2014); *Wall Street Journal*, Wisconsin's Friend at the IRS (July 9, 2015); *Milwaukee Journal Sentinel*, Wisconsin Supreme Court ends John Doe probe into Scott Walker's campaign (July 16, 2015).
[36] Email chain between Lois Lerner and Kevin Kennedy (July 22, 2011) IRS0000796497–98; Email chain between Lois Lerner and Kevin Kennedy (Nov. 1, 2012) IRS0000726736; Isthmus, Wisconsin elections director Kevin Kennedy is at the center of state's political storm (Nov. 1, 2012). Kennedy characterized this piece as a positive piece from the progressive media about himself.
[37] Email from Kevin Kennedy to Lois Lerner and others (Dec. 10, 2008) FECSUBP5001025–44; Email from Kevin Kennedy to Ellen Weintraub, Lois Lerner and Paul Ryan (Dec. 3, 2008) FECSUBP5001131.
[38] *Id.*

Exhibit E

porate disclosure rules."[39] Kennedy described Lerner as his "favorite IRS person" and, "a professional friend [he has known] for more than 20 years.[40]

Lerner's views on campaign finance laws and her close ties to organizations and government officials that sought to limit political speech must be taken into consideration when evaluating how Lerner administered the tax law as Director of EO.

### C. LERNER'S BIAS HARMED CONSERVATIVE ORGANIZATIONS

Finally, we consider whether Lerner's personal political views influenced her work at the IRS. We found evidence of five ways that Lerner's bias affected IRS actions, all of which resulted in harm to conservative organizations that came into contact with the IRS during Lerner's tenure.[41]

1. Lerner and Senior IRS Management Devised Ways To Systemically Constrain Tax-Exempt Organizations That Engaged in Political Speech

As described in Section IV of the Bipartisan Investigative Report, various external forces—including several of the left-leaning groups noted above—pressured the IRS to monitor and curtail political spending of 501(c)(4) organizations in the wake of the Supreme Court's *Citizens United* decision. Perhaps no one was more aware of this pressure than Lerner, particularly given her personal disdain for the ruling. As described below, Lerner encouraged senior IRS management to use the agency's tools to dampen the effect of the Supreme Court's decision.

On the day after the *Citizens United* decision was announced, Lerner brought the decision to the attention of upper-level management in the Tax Exempt and Government Entities (TE/GE) Division and the Chief Counsel's office.[42] Lerner recognized the sensi-

---

[39] Email chain between Lois Lerner and Kevin Kennedy (July 22, 2011) IRS0000796497–98; Email chain between Lois Lerner and Kevin Kennedy (Feb. 6–7, 2013) IRS0000667365; Email chain between Lois Lerner and Kevin Kennedy (Jan. 28, 2013) IRS0001163477; Email from Lois Lerner to Kevin Kennedy (Feb. 20, 2013) IRS0000052989–90.

[40] Email chain between Lois Lerner and Kevin Kennedy (Mar. 7, 2013) IRS0000811079; *Wall Street Journal*, Wisconsin's Friend at the IRS (July 9, 2015).

[41] In addition to our findings, Lerner's political bias is further reinforced by findings of the House Ways and Means Committee in their April 9, 2014 referral of Lerner to Attorney General Eric Holder at the Department of Justice for willful misconduct by an IRS official and potential violation of criminal statutes. In that letter, the House Ways and Means Committee pointed to three potential violations of law:

• Lerner used her position to improperly influence agency action against only conservative organizations, denying those groups due process and equal protection rights under the law. She showed extreme bias and prejudice toward conservative groups. The letter lays out evidence on how Lerner targeted conservative organization Crossroads GPS, as well as other right-leaning groups, while turning a blind eye to liberal groups that were similarly organized, such as Priorities USA.

• Lerner impeded official investigations by providing misleading statements in response to questions from TIGTA.

• Lerner used her personal email for official business, including confidential return information. Further investigation could show that Lerner committed an unauthorized disclosure in violation of section 6103 of the Internal Revenue Code.

[42] Lerner's angst over the Supreme Court overturning the corporate ban on political contributions commenced long before the actual decision was rendered by the Court on January 21, 2010. Indeed, on November 17, 2009, Lerner wrote to Sarah Hall Ingram in anticipation of such an eventuality, stating that the Court's overturning the ban "will open up numerous pandora's boxes" for the IRS. She requested that Ingram "get a discussion going with [Steve] Miller so we at least know the perameters [sic] of the box we're in . . . ." Lerner also indicated that "[t]he

Continued

144

tivity of the case, stating, "[t]his is the danger zone no matter what we say." [43] In October 2010, Lerner described the pressure on the IRS when she spoke at Duke University's Sanford School of Public Policy:

> The Supreme Court dealt a huge blow [in *Citizens United*], overturning a 100-year old precedent that said basically corporations could give directly in political campaigns, and everyone is up in arms because they don't like it. The Federal Election Commission can't do anything about it. They want the IRS to fix the problem. The IRS laws are not set up to fix the problem. . . . So everyone is screaming at us right now, "Fix it now before the election, can't you see how much these people are spending?" I won't know until I look at their 990s next year whether they have done more than their primary activity as a political or not. So I can't do anything right now. [44]

Near the end of 2012, Lerner and other employees in the EO division began considering whether it was possible to quantify the effect that *Citizens United* had on political campaign intervention by tax-exempt organizations. In December 2012, TE/GE Division employee Cristopher Giosa sent Lerner his preliminary analysis on sources of data that might be available. [45] Giosa suggested that EO consider enlisting the IRS's Office of Compliance Analytics to help with this project. [46]

By April 2013, EO and the Office of Compliance Analytics had prepared a detailed presentation on political spending by 501(c)(4) organizations. [47] As background information for the report, the authors noted:

> Since Citizens United (2010) removed the limits on political spending by corporations and unions, concern has arisen in the public sphere and on Capitol Hill about the potential misuse of 501(c)(4)s for political campaign activity due to their tax exempt status and the anonymity they can provide to donors. [48]

The authors then provided a "problem statement," which stated that "[t]he public purpose of 501(c)(4)s may be diluted by political campaign activities as an unintended consequence of Citizens United." [49]

In May 2013, EO and the Office of Compliance Analytics revised the presentation in advance of a May 7 briefing for then-Acting

---

Commissioner also needs to be aware that this is going to get noisey [sic] real fast." Email between Lois Lerner and Sarah Hall Ingram (Nov. 17–23, 2009) IRS0000853501–02.

[43] Email chain between Lois Lerner, Nicole Flax, Sarah Hall Ingram, and others (Jan. 24–25, 2010) IRS0000442122–24.

[44] SFC Transcription of Video Available on Youtube.com, Lois Lerner Discusses Political Pressure on IRS in 2010 (Oct. 19, 2010) <https://www.youtube.com/watch?v=EH1ZRyq-1iM>.

[45] Email from Christopher Giosa to Lois Lerner, Joseph Grant and others (Dec. 6, 2012) IRS0000185323–27.

[46] *Id.*

[47] Email from Justin Abold to Lois Lerner, Holly Paz and others (Apr. 12, 2013) IRS0000195666–90.

[48] *Id.*

[49] *Id.*

Exhibit E

145

Commissioner Miller.[50] The revised presentation, which was sent to Miller's office, made the following findings:

- The number of 501(c)(4)s reporting political campaign activities almost doubled from tax year 2008 through tax year 2010; and
- The amount of political campaign activities for large filers (defined as organizations with total revenue of more than $10 million) almost tripled from tax year 2008 through tax year 2010.[51]

The report identified two events that occurred contemporaneously with the drastic rise in the number of 501(c)(4) organizations that reported political campaign activities: the *Citizens United* decision and Congress's consideration of the Affordable Care Act.[52] Although the report did not conclude that these events caused a rise in political spending, by singling them out, it is clear that the IRS viewed them as significant, relevant factors.

It is unclear if IRS management considered OCA's report when it proposed regulations that would provide guidance on political activities to 501(c)(4) organizations on November 29, 2013. Regardless, the regulations would have had the effect of restraining political speech by 501(c)(4) organizations, but not by other types of tax-exempt organizations. The IRS received more than 150,000 comments on the proposed regulations from people and organizations across all parts of the political spectrum, which were overwhelmingly opposed to the regulations. In the face of this opposition, on May 22, 2014, the IRS stated it planned to re-propose the regulations after a thorough review of the submitted comments.[53]

Although the IRS was unsuccessful in implementing these regulations, the IRS's aim was clearly aligned with Lerner's belief that the IRS should take measures within its power as the executive branch to restrain spending on political speech, thereby circumventing the effect of the judicial branch's *Citizens United* decision.

### 2. Lerner Exerted a "Surprising" Level of Autonomy Over the Tea Party Applications

The unusual manner in which incoming Tea Party applications were handled suggests that Lerner did not want other IRS officials to influence the review process. In spite of Lerner's concern about political spending, she did not inform her managers that the IRS had received a large number of applications from Tea Party organizations, some of which engaged in political discourse, or that EO was struggling to process these applications. Lerner's failure to elevate these issues is discussed in greater detail in Section III(F)(2) of the Bipartisan Investigative Report.

Lerner recognized that one of her key duties as EO Director was to keep upper-level management informed. As she explained to one of her subordinates:

---

[50] Miller's calendar shows that he organized a meeting to discuss "EO Data Matters" with Nikole Flax, Dean Silverman, Eric Schweikert, and Joseph Grant (May 7, 2013) IRS0000456399.
[51] Email chain between Justin Lowe, Justin Abold and others (May 6, 2013) IRS0000494805–29.
[52] *Id.*
[53] IRS, Update on the Proposed New Regulation on 501(c)(4) Organizations (May 22, 2014).

Exhibit E

146

> [W]e ensure that all of our [senior] managers are aware
> of all highly visible hot button issues. Our job is to report
> up to our bosses on anything that might end up on the
> front page of the NY Times.[54]

Yet, there was little accountability for executives like Lerner
within the TE/GE Division management chain. From late 2010
through May 2013, Lerner reported to Joseph Grant, who was Act-
ing Division Commissioner of TE/GE. Grant told Committee staff
that he had "relatively minimal interaction" with Lerner.[55] Grant
believed that Lerner "was enjoying being in charge of EO . . . that
was something that she ran with," but Lerner's managerial style
required Grant to "make more effort" to stay aware of what was
happening in EO.[56] Lerner's previous immediate supervisor, Sarah
Hall Ingram, described a similar relationship with Lerner and
noted that their main face-to-face interaction was at quarterly
meetings.[57] Thus, the onus was on Lerner to keep her immediate
managers informed of information that Lerner deemed important.

Lerner appeared to have had more frequent contact with Steve
Miller than Grant or Ingram, despite the fact that Miller was two
or three levels above Lerner. Like Lerner, Miller's background at
the IRS was in the EO Division, where he served as Director while
Lerner served below as Director of Rulings and Agreements in the
early 2000s. Miller continued to be in Lerner's management chain
when he was promoted to Division Commissioner for TE/GE, then
to Deputy Commissioner for Services & Enforcement, and ulti-
mately, to Acting Commissioner of the IRS. Throughout their time
together at the IRS, Lerner used Miller as a sounding board on
tax-exempt issues and Miller appears to have given Lerner broad
authority and autonomy within EO. In his interview with Com-
mittee staff, Miller stated, "Lois and I have a good relationship."[58]

On the whole, Miller felt that Lerner "was pretty good about ele-
vating things" that required his attention.[59] This made Lerner's de-
cision not to tell him about the Tea Party applications particularly
vexing for Miller, who stated, "you know, she was pretty good
about [elevating issues], so this was a bit of a surprise."[60] In fact,
the first time that Miller had any indication that something was
amiss was in early 2012, when the IRS started receiving questions
from the media and Congress about burdensome requests made of
Tea Party and other political advocacy applicants. By that point,
Lerner had been overseeing the processing of applications from Tea
Party organizations for almost two years.

Miller was not the only senior executive who Lerner kept in the
dark. As described more fully in Section III(F)(2) of the Bipartisan
Investigative Report, Lerner also failed to inform Division Commis-
sioner for TE/GE Sarah Hall Ingram, Acting Division Commis-
sioner for TE/GE Joseph Grant, Assistant Deputy Commissioner
for Services & Enforcement Nikole Flax, and IRS Commissioner

---

[54] Email chain between Lois Lerner, Nanette Downing and others (May 10–11, 2011)
IRS0000014917–20.
[55] SFC Interview of Joseph Grant (Sep. 20, 2013) p. 63.
[56] *Id.* p. 64.
[57] SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 18.
[58] SFC Interview of Steve Miller (Dec. 12, 2012) p. 242.
[59] *Id.*
[60] *Id.*

Exhibit E

147

Douglas Shulman about the Tea Party applications. Several of those managers also seemed surprised that Lerner failed to brief them before the problems became public. Grant, her direct supervisor from the end of 2010 through 2013, was particularly frustrated:

> In retrospect, of course I wish that [I had become aware of Tea Party backlogs before April or May of 2012]. I would have liked to have known about that and have been informed about the challenges and backlogs that [EO] faced.[61]

Lerner's decision not to brief upper-level management about the Tea Party applications was a break from the norm. Her omission suggests that there were reasons she did not want them to be aware of her handling of these applications and did not want others to become involved—such as those discussed in the sections immediately below.

### 3. Lerner Created Roadblocks for Tea Party Applications That Applied for Tax-Exempt Status

In the absence of input from upper IRS management, Lerner exerted control over the Tea Party applications starting at the time when she first became aware that Tea Party organizations had applied for tax-exempt status in 2010. On May 13, 2010, EO Technical Acting Manager Steven Grodnitzky alerted Lerner to a number of open Sensitive Case Reports, including a new one that had been prepared for the Tea Party applications. Lerner responded by asking about the Tea Party applications, and specifically, the basis of their exemption requests. Lerner instructed Grodnitzky that "[a]ll cases on your list should not go out without a heads up to me please."[62] Through the remainder of 2010, Lerner received at least four updates about the status of Tea Party applications, which noted the growing number of applications and the IRS's failure to resolve any of them.[63]

Lerner grew more concerned about the Tea Party applications in early 2011. On February 1, 2011, Michael Seto, the Acting Manager of EO Technical, sent an updated summary of SCRs to Lerner. She responded, "Tea Party Matter very dangerous—This could be the vehicle to go to court on the issue of whether *Citizen's United* overturning the ban on corporate spending applies to tax exempt rules."[64] Based on these concerns, Lerner decided that the Office of Chief Counsel and Judy Kindell needed to be involved with these applications and that they should not be handled by Cincinnati but

---

[61] SFC Interview of Joseph Grant (Sep. 20, 2013) p. 50.

[62] Email chain between Lois Lerner, Rob Choi, Steve Grodnitzky, and others (May 13–16, 2010) IRS0000167872–73.

[63] Email from Steven Grodnitzky to Lois Lerner and Robert Choi (May 27, 2010) IRS0000141812–14; Email from Theodore Lieber to Lois Lerner and others (July 30, 2010) IRS0000807076–807115 (email attachments containing taxpayer information omitted by Committee staff); Email from Steven Grodnitzky to Lois Lerner and Robert Choi (Sep. 30, 2010) IRS0000156433–36; Email from Holly Paz to Lois Lerner and Robert Choi (Nov. 3, 2010) IRS0000156478–81.

[64] Email chain between Holly Paz, Lois Lerner, and Michael Seto (Feb. 1–2, 2011) IRS0000159431–33.

Exhibit E

instead by employees in Washington, D.C.[65] Lerner must have anticipated that these directives would inevitably delay the processing of Tea Party applications:

- Kindell had "a general reputation of being slow in all work." Further, "[s]he had a reputation of having difficulty with deadlines and taking a lengthy period of time on cases."[66] In an email to her manager Ingram, Lerner described Kindell as follows: "[s]he's not real useable (sic) in terms of making things happen."[67]

- Similarly, the Office of Chief Counsel could take "3 months, 6 months, a year" to provide feedback to EO and generally "can take a great deal of time" to respond to EO requests for help.[68]

- Finally, as noted by Paz and others, the EO office in Washington, D.C. had far fewer employees than Cincinnati who could evaluate and develop applications for tax-exempt status. Reviewing all of the Tea Party applications, which by that point exceeded 100, in Washington, D.C. would certainly result in delays.

Lerner convened a meeting in July 2011 with Paz, Thomas, and others specifically to discuss the growing backlog of Tea Party applications. Thomas summarized the outcome of the meeting in a message to her employees in Cincinnati:

Lois expressed concern with the "label" we assigned to these cases [on the BOLO]. Her concern was centered around the fact that these type things can get us in trouble down the road when outsiders request information and accuse us of "picking on" certain types of organizations. . . . Lois did want everyone to know that we are handling the cases as we should, i.e., the Screening Group starts seeing a pattern of cases and is elevating the issue.[69]

In other words, Lerner was concerned about the perception that the IRS might be "picking on" Tea Party and conservative organizations, but she was not concerned about how the applications were actually being handled. Rather than expediting the applications—some of which had now been pending for nearly a year and a half—Lerner added more layers of review and raised hurdles for applicants to clear during the July 2011 meeting:

- EO Technical would develop and draft a guide sheet for EO Determinations to use when reviewing 501(c)(3) and 501(c)(4) "advocacy organization" applications to assist in spotting issues associated with these types of cases.

- EO Determinations would send 15–20 developed cases to EO Technical for review.

- The IRS would require 501(c)(3) and 501(c)(4) "advocacy organizations" to make certain representations regarding compliance with the guide sheet and certain issues (i.e. they won't

---

[65] *Id.*
[66] SFC Interview of Holly Paz (July 26, 2013) pp. 128, 166.
[67] Email chain between Lois Lerner and Sarah Hall Ingram (April 29, 2010) IRS0000858652–53.
[68] SFC Interview of Steven Grodnitzky (Sep. 25, 2013) p. 145.
[69] Email chain between Cindy Thomas, Steven Bowling, John Shafer, and others (July 5, 2011) IRS0000620735–40.

149

politically intervene) in order to pin them down in the future if they engage in prohibited activities.
• EO Determinations would also look to see if these organizations have registered with the Federal Election Commission and if so, they would ask additional questions.[70]

These and other measures implemented under Lerner's watch ensured that the Tea Party and other conservative organizations were subjected to multiple levels of review, as explained more fully in Section VI of the Bipartisan Investigative Report. Lerner continued to receive updates, including a November 2011 message from Thomas advising that the backlog of political advocacy applications had grown to more than 161 and that some of them had been in process since 2009.[71] In spite of these warning signs, Lerner did nothing to expedite these applications until the problems started becoming public in early 2012.

Due to the circuitous process implemented by Lerner, only one conservative political advocacy organization was granted tax-exempt status between February 2009 and May 2012. Lerner's bias against these applicants unquestionably led to these delays, and is particularly evident when compared to the IRS's treatment of other applications, discussed immediately below.

4. The IRS Sometimes Responded to Political Inquiries by Quickly Deciding Certain Applications, But Not When the Inquiries Were About Tea Party Organizations

Although applications from the Tea Party and conservative organizations languished at the IRS, this was not the case for all groups that applied. In cases where the IRS wanted to act quickly, it did—particularly for other high-profile applications that attracted political attention.

One example is an application for 501(c)(3) tax-exempt status filed by Applicant X.[72] On February 21, 2012, a Democratic U.S. Senator's office sent a letter to Commissioner Shulman requesting that the IRS perform an expedited review of the application.[73] The letter noted that "[Applicant X] fits the profile of a 'new markets' district, with its low income and high unemployment profile . . . [and] will acquire, finance, construct, rehabilitate and lease . . . a . . . building for use as a municipal office facility with street level retail."[74] Applicant X had applied for tax-exempt status in October 2011 and had twice requested expedited review, and twice the IRS denied the request.

---

[70] Memorandum from Hilary Goehausen to Michael Seto, Notes from Meeting on c3/c4 "advocacy organization" applications with Lois on July 5 (July 6, 2011) IRS0000487709.
[71] Email chain between Cindy Thomas, Lois Lerner and others (Nov. 3, 2011) IRS0000162845–46 (email attachment containing taxpayer information omitted by Committee staff).
[72] The Majority staff has assigned a pseudonym to this taxpayer to protect its identity. Documents referring to this taxpayer have also been redacted by the Majority staff to remove identifying information about the taxpayer and the U.S. Senator who was involved with this application.
[73] Email chain between Senator's staff, Floyd Williams, Doug Shulman and others (Feb. 21—Mar. 2, 2012) IRS0000411951–52 (email attachments containing taxpayer information omitted by Committee staff).
[74] Id.

150

Commissioner Shulman was scheduled to talk with the Senator on March 5, 2012.[75] Shulman was advised to tell the Senator that he doesn't get involved in individual cases but that he will convey to EO why the Senator thought the case should be expedited.[76] The next day, Flax asked Lerner for an update on the status of Applicant X. Lerner responded:

> The latest is that they will get approved today. Cindy [Thomas] took another look and they are comfortable with this one. I've asked Holly [Paz] to tell Cindy [Thomas] to let us know once it has actually been approved and closed. There is no "but" here. [I]t will be approved today.[77]

Thomas further noted that the case had been approved based on information already in the IRS's possession. The case had been "sitting in [EO's] full development unassigned inventory" until the IRS received the Senator's inquiry.[78] Applicant X's application was approved on March 6, 2012.

A second example occurred in late April 2013 when Lerner instructed Thomas to keep an eye out for an incoming application from Applicant Y and to send it to Washington, D.C. so that it could be expedited for review by Lerner's senior advisors.[79]

Thomas noted that under normal IRS procedures, Applicant Y did not fall into a category that would receive expedited processing; nonetheless, at Lerner's direction, Thomas forwarded the case to Washington, D.C. for expedited processing when it arrived in late April.[80] Within a few days, the IRS had reviewed the application, sent a development letter with questions, and reviewed the organization's responses. The IRS reviewers noted a problem that "would prevent us from being able to recognize them as a charitable (c)(3) organization." [81] In the meantime, Acting Commissioner Miller and Treasury Department Chief of Staff Mark Patterson had spoken with the staff of the Democratic mayor of the city where Applicant Y was based, and the IRS received a separate inquiry from a Democratic U.S. Senator.[82]

Thereafter, Lerner, Nancy Marks, and other senior EO staff spoke with the organization about how they could remedy the problems that would preclude the IRS from granting tax-exempt status.[83] For example, On May 3, 2013, Lerner notified Nikole Flax

---

[75] Shulman told Committee staff that he had no recollection of whether the conversation actually occurred. SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 116–117.

[76] Email chain between Floyd Williams, Doug Shulman and others (Feb. 21—Mar. 2, 2012) IRS0000411951–52 (email attachments containing taxpayer information omitted by Committee staff).

[77] Email chain between Lois Lerner, Nikole Flax and others (Mar. 6, 2013) IRS0000429946–47.

[78] *Id.*

[79] Email chain between Lois Lerner, Holly Paz and others (Apr. 10–19, 2013) IRS0000012957–60. The Majority staff has assigned a pseudonym to this taxpayer to protect its identity. Documents referring to this taxpayer have also been redacted by the Majority staff to remove identifying information about the taxpayer and the U.S. Senator who was involved with this application.

[80] *Id.;* SFC Interview of Cindy Thomas (July 25, 2013) p. 39. Thomas and other IRS employees noted that the IRS had also expedited past applications received from applicants under similar circumstances.

[81] Email from Lois Lerner to Nancy Marks (May 6, 2013) IRS0000013050–51.

[82] Email chain between Mark Patterson and Steven Miller (May 4, 2013) IRSC032185; Email chain between Andy Megosh, Lois Lerner and others (Apr. 23, 2013—May 7, 2013) IRS0000207919–20; and SFC Interview of Mark Patterson (Apr. 7, 2014) pp. 59–61.

[83] SFC Interview of Steven Miller (Dec. 12, 2013) p. 229.

Exhibit E

that she had personally informed a representative of the applicant that "our goal was to assist them in understanding what troubles us about the application" and "to suggest ways they might modify it. . . ."[84] Miller also personally met with the organization's leader.[85] On May 14, 2013, the IRS granted Applicant Y tax-exempt 501(c)(3) status.[86]

In a third case, a Democratic U.S. Senator's office inquired about the status of an applicant for tax-exempt status. Lerner stated, "Our guys took a real close look at this and we now think it is an approval and will be able to get the letter out tomorrow."[87]

Finally, in January 2013, the IRS received an inquiry from a Democratic member of Congress about the status of an application for tax-exempt status. Thomas told Paz that "I don't know why [the application] hasn't been assigned yet" for review since it had been received by the IRS six months prior.[88] Thereafter, the case was reviewed within the next few days and Paz informed Lerner that it would be approved on merit. Lerner expressed her frustration to Paz:

> I'm guessing you know this only makes me a little bit happy. I have to talk to the Congressman about why it takes so long for case[s] to be assigned and worked. . . . As I told you—almost every time I ask them to go back and look at a case that has been sitting—it miraculously gets closed on merit—after it has been sitting for months and months awaiting full development.[89]

Yet Lerner's observation—that the IRS usually resolved applications within days of receiving a Congressional inquiry—didn't always prove true. Republican members of Congress who inquired about Tea Party groups were met with a very different response from Lerner and her subordinates.

In November 2011, Thomas told Lerner that she had spoken with representatives from political advocacy organizations who were "threatening to contact their Congressional offices."[90] To "buy time" so one of the groups "didn't contact his Congressional office," Thomas informed Lerner that she ordered one of her subordinate managers to send a superfluous request for information to the group.[91] Lerner did not object to this plan.

In March 2012, Republican Representative Daniel Lungren wrote a letter to the Treasury Department about an application for tax-exempt status submitted by the Mother Lode Tea Party, which Representative Lungren noted had already "waited 12 months[.]"[92]

---

[84] Email from Lois Lerner to Nikole Flax and Joseph Grant (May 3, 2013) IRS0000662208.
[85] SFC Interview of Steven Miller (Dec. 12, 2013) p. 229.
[86] Letter from IRS to Applicant Y (May 14, 2013).
[87] Email chain between Lois Lerner, Andy Megosh and others (Dec. 20–21, 2012) IRS0000185655–56.
[88] Email chain between Lois Lerner, Holly Paz, Cindy Thomas, and others (Jan. 30–Feb. 8, 2013) IRS0000194742–45.
[89] *Id.*
[90] Email chain between Cindy Thomas, Lois Lerner and others (Nov. 3, 2011) IRS0000162845–46 (email attachment containing taxpayer information omitted by Committee staff).
[91] *Id.*
[92] Email chain between Linda McCarty, Jennifer Vozne and others (Feb. 13–14, 2013) IRS0000542433–38.

The request was routed to Lerner, who reviewed a draft response to Mr. Lungren in April 2012. In August 2012, Lerner told Paz:

> At this point, we aren't sending a response [to Mr. Lungren] because we know he will ask for an end date—which is why I was asking [for the] status. I think we need to get the development letter out and that may be what we say to him—application has raised questions about whether the org meets requirements and have sent them a letter trying to flesh out.[93]

Ten months after Representative Lungren's inquiry, the IRS had still not submitted a response. At that point, the employee coordinating the IRS process said, "I have had absolutely no luck in getting a response . . . [t]he last thing I heard was this was with Nikole Flax in Commissioner's office [sic]." [94]

In March 2011, the IRS received two Congressional inquiries about the status of Tea Party applicants, one of which was submitted by Republican Representative Wally Herger about Patriots Educating Concerned Americans Now (PECAN).[95] These Tea Party inquiries were not even elevated to Lerner's level; the IRS apparently did not respond to Representative Herger and instead, Thomas and Seto subjected the applications to additional levels of review.[96]

More than a year later, Representative Herger's request about PECAN was still outstanding when it eventually worked its way to Lerner in July 2012. By that point, the Taxpayer Advocate Service made the universal decision that the IRS would respond to all outstanding inquiries regarding political advocacy organizations by telling the taxpayer "that they had to wait for the decisions to be made." [97] Lerner was enthusiastic about this development, telling Paz:

> Well, that's a wonderful piece of news! [98]

Lerner's comment encapsulates her view on the Tea Party applications: it was fine for them to languish in the bottomless abyss of IRS administrative review, and any questions from the outside were a mere annoyance. Indeed, even after Lerner's handling of Tea Party applications became public in May 2013, she failed to show any remorse for the harm she had caused, or even to grasp the significance of her role. In June 2014, she told a friend:

> How I got involved in this is simply because I was the person who announced that the IRS had used organization names (both conservative and liberal) to select applications for additional review. The conservative Republicans were sure they had a Watergate on their hands and went into

---

[93] Email chain between Lois Lerner, Holly Paz and others (Aug. 10–17, 2012) IRS0000210056–58.
[94] Email chain between Linda McCarty, Jennifer Vozne and others (Feb. 13–14, 2013) IRS0000542433–38.
[95] Email chain between Cindy Thomas, Steven Bowling and others (Mar. 29–Apr. 13, 2011) IRS0000576953–55 (Email attachments containing taxpayer information omitted by Committee staff).
[96] Id.
[97] Email chain between Lois Lerner, Holly Paz and others (July 27—Aug. 13, 2012) IRS0000221356–0959.
[98] Id.

overdrive to prove it. $50 Million later and hundreds of
documents and interviews and they still don't have any
evidence of their theory. . . .[99]

She also told that same friend:

The Tea Party has decided this is a wonderful fund-
raising event for them so they keep trying to keep it alive.
. . . [N]othing corroborating their version of the story has
come out. . . .[100]

Lerner's comments do not accurately reflect the reality facing
hundreds of conservative organizations that applied for tax-exempt
status. Indeed, as of April 15, 2015, the IRS still had not rendered
a determination on the application filed by PECAN, despite direct
intervention by Representative Herger years before.[101] The dif-
ficulty that groups like PECAN faced is particularly stark when
compared to the IRS's treatment of certain groups that received at-
tention from Democratic politicians, and should not be trivialized.

5. Lois Lerner's Management of the EO Examinations Unit Reveals
Her Political Bias Against Conservative Organizations

The influence of Lerner's personal political views on her official
duties is particularly evident in her management of the IRS divi-
sion that reviewed allegations of improper political campaign inter-
vention by tax-exempt organizations. Indeed, Lerner showed great
zeal for using examinations as a weapon to intimidate tax-exempt
organizations:

Just as they got Al Capone on tax evasion instead of
drugs, prostitution and murder, we need to do the same!
[. . .]
By the way, even if we couldn't "get" any of them be-
cause of hazards with valuation or comp, that wouldn't
stop me from putting something out that says we looked
at these and it appears . . . .[102]

As a result of Lerner's heavy-handed management of the EO Ex-
aminations unit, numerous conservative organizations were subject
to unwarranted IRS scrutiny. The effect of Lerner's bias was com-
pounded by her distrust in the employees who were supposed to
make audit decisions and the failure of those employees to report
her interference to TIGTA.

  *a. Lois Lerner Closely Managed the Committee That Was
      Created to Evaluate Referrals of Alleged Improper Polit-
      ical Campaign Intervention*

The Examinations unit, within the EO Division, monitors wheth-
er organizations that have been approved for tax-exempt status are
operating in accordance with federal tax law.[103] At all times rel-
evant to the Committee's investigation, Nanette Downing was the

[99] Email chain between Lois Lerner and Mark Tornwall (June 26, 2014) 00011–14.
[100] Email chain between Lois Lerner and Mark Tornwall (July 3–Sep. 4, 2013) 00025–30.
[101] Based on information provided by IRS to Senate Finance Committee (April 15, 2015).
[102] Email chain between Lois Lerner, Nanette Downing, and Jason Kall (Nov. 14–15, 2012).
[103] IRS, Charity and Nonprofit Audits: Exempt Organizations Examinations.

Director of EO Examinations and reported directly to Lois Lerner.[104]

Unlike most IRS divisions, which are administered at the IRS headquarters in Washington, D.C., EO Examinations has its head office in Dallas, Texas. IRS officials explained that EO Examinations was placed outside of Washington to ensure that the tax enforcement decisions for exempt organizations were not improperly influenced by other divisions of the IRS in Washington.[105]

Those measures did not stop Lerner from closely managing EO Examinations or, in some cases, directing EO Examinations to commence examinations of particular entities. Lerner repeatedly expressed her concern about Downing's management and questioned the competence of EO Examinations staff.[106] Lerner's distrust of EO Examinations employees and management resulted in her keeping tight reins on the operation,[107] thereby circumventing measures designed to handle allegations of improper political campaign intervention.

As described more fully in Section IX(A) of the Bipartisan Investigative Report, one attempt to insulate the IRS from political influence was to create the Political Action Review Committee (PARC). The PARC was a panel of career Federal employees who reviewed allegations of improper political campaign intervention and made the final decision on whether to open an examination of the subject organization.

The decisions of the PARC were supposed to be final. Downing explained that attempting to override the PARC would have serious consequences:

Q. And can any one person override a PARC decision?

A. No. No.

Q. So once the PARC makes a decision one way or the other, no one can come in and say

A. No. And I would expect—I don't think you were in here when I talked about this. **I would expect if anybody tried to do that, they would turn that in to TIGTA [for investigation]. We are not allowed to do that.**[108]

Even with these supposed safeguards, Lerner kept close tabs on the PARC. Shortly after it was created in 2012, Lerner cast doubt on the PARC's first set of decisions in a message to Downing:

Do you have any sense why of the 88 referrals reviewed by the PARC they only recommended 33 for Exam? Considering the allegations, that surprises me. Were any others selected for compliance checks or anything?[109]

---

[104] SFC Interview of Nanette Downing (Dec. 6, 2013) pp. 6, 9, 15.
[105] *Id.* p. 53; SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) p. 71.
[106] *See, e.g.,* Email chain between Lois Lerner, Nanette Downing, and others (Dec. 12–18, 2012) IRS0000185603–13. In that exchange, Lerner stated that EO Examinations personnel "have very little ability to apply any judgment" and asked Downing, "Who, in Exam, is responsible for oversight of the projects? More and more I'm feeling like it's me, and that doesn't work."
[107] The assertion that Lerner maintained tight control of EO operations is further borne out by Lerner's own admission that she is the "queen of control." Email from Lois Lerner to Sarah Hall Ingram (Oct. 25, 2010) IRS0000770062.
[108] SFC Interview of Nanette Downing (Dec. 6, 2013) p. 36 (emphasis added).
[109] Email chain between Lois Lerner and Nanette Downing (Oct. 31–Nov. 1, 2012) IRS0000184801.

Exhibit E

Downing assured Lerner that a "post review" of the PARC's decisions "will be done." [110] Lerner indicated that she wanted to further review the PARC's work:

> I looked at the names of the orgs selected [for examination] and only one is one that had been in the news. I would like to see the list of the ones not selected [for examination].[111]

Concluding the conversation, Lerner noted that she does not "plan to talk about this with Steve [Miller]," because Miller "needs to be outside case selection" since he had been elevated to Acting IRS Commissioner.[112] Lerner apparently saw no problem with her own involvement in the process. Neither did Downing, as she did not refer Lerner to TIGTA following this email exchange. Downing's permissive management enabled Lerner to inject her personal political bias into the review process of allegations related to political campaign intervention.

### b. Lois Lerner Intervened in Audit Decisions Involving Political Organizations

Apart from the PARC, Lerner was active in the process of referring taxpayers for audits. As Downing explained:

> Q. Would Ms. Lerner ever contact you about specific taxpayers?
>
> A. Yes. Often, she would have requests for—I mean, we get that kind of stuff all the time: congressional requests, media requests. And she would need to know the status of something and whether or not we got it. But then, also, if she got referrals, she would send referrals to us.[113]

Indeed, documents reviewed by the Majority Staff of the Committee show that Lerner often relayed referrals to EO Examinations—particularly when the allegations related to conservative organizations—and in one case, she may have acted to prevent an audit of a Democratic organization.

### i. Conservative Organizations Profiled by ProPublica

A prime example of Lerner's influence within the IRS to open audits occurred in January 2013. *ProPublica* published an article about "dark money" groups that named five conservative organizations: Americans for Responsible Leadership; Freedom Path; Rightchange.com; America is Not Stupid; and A Better America.[114] Lerner sent this article to Paz, David Fish and Light and requested to meet to discuss the "status of these applications." [115] While we do not know what Lerner told Paz, Fish and Light at that meeting, analysis performed by the House Ways and Means Committee found:

> [F]our of the five groups were subject to extra-scrutiny; two of the groups were placed in the IRS' surveillance pro-

---

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] SFC Interview of Nanette Downing (Dec. 6, 2013) pp. 17–18.

[114] *ProPublica*, Controversial Dark Money Group Among Five That Told IRS They Would Stay Out of Politics, Then Didn't (Jan. 2, 2013).

[115] Email chain between Lois Lerner, Nikole Flax and others (Jan. 2, 2013) IRS0000122510.

gram, called a "Review of Operations," and two were se-
lected to be put before the [PARC], which determines
whether a group will be audited. Ultimately three of the
groups were selected for audit.[116]

Lerner's interest in these conservative organizations and their
resulting treatment by the IRS suggests that her left-leaning polit-
ical views may have influenced official IRS actions.

### ii. Teen Pregnancy Organization Affiliated With Bristol Palin

Another example of Lerner's interest in conservative organiza-
tions occurred in 2011, when Lerner considered opening an audit
of a group with ties to Bristol Palin. There were reports that Palin
received $332,500 in compensation from the Candie's Foundation,
a nonprofit organization that seeks to prevent teen pregnancy.
Upon receiving an article containing this information, Lerner took
the initiative to ask her senior advisors if the IRS should open an
audit of the organization:

> Thoughts on the Bristol Palin issue? I'm curious that a
> [private foundation] can pay any amount to someone who
> is not a [disqualified person]? It is a [private foundation]
> right? Even if it were a [public charity]—would that be pri-
> vate benefit—what are the consequences? I'm asking be-
> cause I don't know whether to send to Exam as a refer-
> ral.[117]

Lerner's willingness to act on this particular news article—
among many that reached her inbox each day—shows that she was
paying close attention to conservative politicians and organizations.
In its review of nearly 1,500,000 pages of documents provided by
the IRS, Majority staff did not find any instances where Lerner re-
ferred a progressive organization for audit based on a news article.

### iii. Crossroads GPS

One conservative group that particularly interested Lerner was
Crossroads GPS, which was founded by Karl Rove and applied for
501(c)(4) tax-exempt status in 2010. Lerner's handling of this appli-
cation, in particular, shows her bias against conservative organiza-
tions that sought tax-exempt status—and her close connections to
outside liberal advocacy groups. Of particular note, the Majority
staff's review of IRS documents did not reveal any interactions be-
tween Lerner and representatives from outside conservative groups
similar to her interactions with liberal groups described below.

In October 2010, Lerner received complaints about Crossroads
GPS's alleged political activities from the Ways and Means Over-
sight Subcommittee Minority staff, as well as two outside liberal
advocacy groups, Democracy 21 and the Campaign Legal Center.[118]
After learning that Crossroads GPS had filed an application for

---

[116] House Ways and Means Committee, Letter from Chairman Camp to Attorney General Eric
Holder (Apr. 9, 2014) p.7 (internal citations omitted).
[117] Email chain between Lois Lerner, David Fish, Judith Kindell, and others (April 8, 2011)
IRS0000847941–46.
[118] Email chain between Lois Lerner, David Fish, Sarah Hall Ingram, Joseph Grant, and oth-
ers (Oct. 6, 2010) IRS0000453771–72; Email chain between Lois Lerner, Nan Downing and oth-
ers (Oct. 5–Nov. 4, 2010) IRS0000459877–95.

157

tax-exempt status, Lerner suggested that the application should be reviewed in Washington, D.C. instead of Cincinnati, where the application would normally be reviewed.[119] A month later, on her own initiative, Lerner followed up to ensure that the October letter from Democracy 21 and the Campaign Legal Center had been sent to EO Examinations as a referral, so that they could decide whether to open an audit based on the allegations in the letter.[120]

The following May, Downing updated Lerner about two referrals that EO Examinations had received about Crossroads GPS.[121] Paz noted that the Crossroads GPS application for tax-exempt status had "just arrived [in Washington, D.C.] from Cincy."[122] Lerner then set up a meeting with her senior EO managers, Holly Paz, Michael Seto, Judy Kindell, and David Fish, to discuss "several moving pieces" involving Crossroads GPS, which included "[r]eferrals in Dallas [and] applications in Cincy."[123] Lerner also told Downing that she wanted to talk with her about Crossroads GPS.[124] A few days after that meeting, the application for Crossroads GPS was delivered to Paz.[125]

Democracy 21 and the Campaign Legal Center subsequently submitted two additional complaints about Crossroads GPS to the IRS in July and September 2011.[126] Lerner directed David Fish to send the second letter to EO Examinations as a referral.[127]

In May 2012, Democracy 21 and the Campaign Legal Center wrote again to the IRS, this time requesting that it deny Crossroads GPS's request for tax-exempt status.[128] After receiving this letter, Lerner requested a status update on Crossroads GPS's application. Sharon Light told Lerner that the case has been reviewed by two reviewers and that one has recommended general development while the other has recommended limited development. Lerner responded by telling Light that "full development may be the best course. . . ."[129] Lerner further stated to Light that "I will leave it in your capable hands. Having said that—as they say they have been filing 990s, you should be looking at those as well."[130] This message illustrates Lerner's management style: on the surface, she left matters in her employees' "capable hands," but she nudged them in whatever direction she desired—even senior employees like Light.

---

[119] Email chain between Lois Lerner, David Fish, Sarah Hall Ingram, Joseph Grant, and others (Oct. 6, 2010) IRS0000453771–72.

[120] Email chain between Lois Lerner, Joseph Urban and others (Oct. 5–Nov. 4, 2010) IRS0000459877–95.

[121] Email chain between Lois Lerner, Nan Downing, Holly Paz and others (May 26–27, 2011) IRS0000196483–84.

[122] Id.

[123] Email chain between Lois Lerner, Nan Downing and others (May 26–27, 2011) IRS0000196485.

[124] Id.

[125] Email chain between Cindy Thomas, Holly Paz and others (June 1–0910, 2011) IRS0000066837–40.

[126] Petition for Rulemaking on Campaign Activities by Section 501(c)(4) Organizations (July 27, 2011) IRS0000436241–0960; Email chain between Lois Lerner, Nikole Flax and others (Sep. 28, 2011) IRS0000511970–93.

[127] Email chain between Lois Lerner, David Fish and others (Sep. 28–30, 2011) IRS0000511994–2018.

[128] Email chain between Lois Lerner, Sharon Light and others (May 25, 2012) IRS0000199184–86.

[129] Id.

[130] Id.

Exhibit E

158

A few weeks later, on June 20, 2012, Lerner forwarded an article critical about Crossroads GPS to Downing and asked for an update about "referrals on this and what happened[.]"[131] In response, Downing explained that out of the 16 referrals, 10 were closed after the Political Activities Compliance Initiative committee decided not to pursue them, three others were closed by EO Classification, and the remaining three would be sent to the Review of Operations as part of the dual track program.[132]

On January 4, 2013 at 11:00 AM, Lerner met with Democracy 21 and the Campaign Legal Center to discuss the groups' proposed regulatory changes that would curtail political activities of 501(c)(4) organizations.[133] Victoria Judson, Associate Chief Counsel for TE/GE, and Ruth Madrigal, from the Treasury Department's Office of Tax Policy, were also at the meeting.[134] Shortly after the meeting, Lerner asked her technical advisor Thomas Miller if EO Examinations had opened an audit of Crossroads GPS.[135] Miller informed Lerner that EO Examinations had twice considered allegations against Crossroads GPS, and had decided both times not to start an audit.[136] After learning this information, Lerner questioned EO Examinations' handling of the allegations in an email to Downing:

> To get ready for the [January 4, 2013] meeting [with Democracy 21 and the Campaign Legal Center], I asked for every document they had sent in over the last several years because I knew they had sent in several referrals. **I reviewed the information last night and thought the allegations in the documents were really damning, so wondered why we hadn't done something with the org.** The first complaint came in 2010 and there were additional ones in 2011 and 2012.
>
> \*     \*     \*     \*     \*     \*     \*
>
> I don't know where we go with this—as I've told you before—I don't think your guys get it and the way they look at these cases is going to bite us some day. The organization at issue is Crossroads GPS, which is on the top of the list of c4 spenders in the last two elections. It is in the news regularly as an organization that is not really a c4, rather it is only doing political activity—taking in money from large contributors who wish to remain anonymous and funneling it into tight electoral races. **Yet—twice we rejected the referrals for somewhat dubious reasons and never followed up once the 990s were filed.**[137]

Lerner further told Downing that while the organization had recently been referred to EO Examinations again, "this is an org that was a prime candidate for exam when the referrals and 990s first

---

[131] Email chain between Lois Lerner, Nan Downing, and others (June 4–20, 2012).

[132] *Id*. See Section IX(A) of the Bipartisan Investigative Report for additional discussion of the Review of Operations, as well as other EO Examinations procedures.

[133] Email chain between Lois Lerner, Ruth Madrigal, Victoria Judson, and others (Dec. 14–19, 2012) IRS0000446771–75.

[134] Email chain between Lois Lerner, Victoria Judson, Ruth Madrigal, and others (Dec. 14, 2012) IRS0000446755–56.

[135] Email chain between Thomas Miller, Lois Lerner and Nanette Downing (Jan. 4–7, 2013) IRS0000122549–51.

[136] *Id*.

[137] *Id*. (emphasis added).

159

came in." [138] Lerner also stated, "I'm not confident [EO Examinations employees] will be able to handle the exam without constant hand holding—the issues here are going to be whether the expenditures they call general advocacy are political intervention." [139] Lerner closed by instructing Downing:

> Please keep me apprised of the org's status in the [Review of Operations] and the outcome of the referral committee. You should know that we are working on a denial of the application, which may solve the problem because we probably will say it isn't exempt. **Please make sure all moves regarding the org are coordinated up here before we do anything**. [140]

At 3:30 that afternoon, Lerner called a meeting with Paz and others to discuss the Crossroads GPS application for tax-exempt status. Paz noted that she "suspect[ed] this will be the first of many discussions" about Crossroads. [141] EO Determinations agent Joseph Herr, who has been working on the Crossroads GPS application for exemption since January 30, 2012, was also invited to the 3:30 meeting. Herr noted in the case log for the Crossroads GPS application that he participated on a conference call with EO Technical on January 4, 2013, "[o]n how best to proceed with case." [142] On January 7, 2013, Herr noted, "Based on conference begin reviewing case information, tax law and draft/template advocacy denial letter, all to think about how to compose the denial letter." [143] These entries reflect the first time in the log that Herr noted the possibility of denying Crossroads GPS's application since he was assigned the case in January 2012, which suggests that he received the direction to deny the case from Lerner during the conference call that afternoon. [144]

On January 7, 2013, Downing provided a summary to Lerner of the referrals made about Crossroads GPS and the decisions of the PARC not to open audits. [145] Lerner told Downing that the reasons given by the PARC are "most disturbing." Lerner further told Downing:

> As I said, we are working on the denial for the 1024, **so I need to think about whether to open an exam. I think yes, but let me cogitate a bit on it**. [146]

If anything is "disturbing" about the IRS's handling of Crossroads GPS, it is Lerner's excessive involvement in all stages of the application and examination process. Lerner's actions went beyond mere concern that the IRS would reach the correct decisions on the

---

[138] *Id.*

[139] *Id.*

[140] *Id.* (emphasis added).

[141] Email from Holly Paz to Nancy Marks (Jan. 4, 2013) IRS0000475846.

[142] EP/EO Case Chronology Record for Crossroads Grassroots Policy Strategies (undated) IRS0000071224–26.

[143] *Id.*

[144] In fact, the IRS prepared a draft denial in April 2013. *See* Email chain between Sharon Light, Holly Paz, Joseph Herr and others (April 8–May 30, 2013) IRS0000529074–75 (attachment containing taxpayer information omitted by Committee staff). As of April 2015—54 months after Crossroads GPS submitted its application for tax-exempt status—the IRS had still not rendered a final decision.

[145] Email chain between Thomas Miller, Lois Lerner and Nanette Downing (Jan. 4–7, 2013) IRS0000122549–51.

[146] *Id.* (emphasis added).

Exhibit E

160

application and referrals. Through her heavy-handed management, she ensured that the application received particular attention in Washington, D.C. and that the allegations of improper activity were considered time and time again—culminating in her discussion with Downing about whether they should open an examination in January 2013 after her subordinates had repeatedly declined to do so.

### iv. Stupak for Congress, Inc.

In at least one instance, Lerner and other senior IRS officials may have acted to stop a planned audit of a Democratic organization.

An organization affiliated with Democratic Congressman Bart Stupak was selected for examination in April 2010 by the National Research Program (NRP). TE/GE Division staff identified the organization as an "extremely sensitive" case, characterizing Stupak as an "anti-abortion Democrat" who was a "lightning rod for the Republicans and anti-abortion crowd" and whose "office was picketed by the Tea Party folks."[147] The proposed audit was elevated to Nan Downing, who then asked Lerner if the IRS should continue with the planned audit. Lerner, in turn, asked Ingram if the audit should continue. Ingram suggested that Lerner should see if the NRP would "toss them out" of the planned audit because the organization would cease to exist after Stupak left office in January 2011. Lerner indicated that she would follow up with the NRP as Ingram suggested.[148]

It is unclear if Lerner and Ingram were able to stop the audit. But regardless, their actions show a willingness to manipulate the audit process when political issues were at stake.

### c. Nan Downing Allowed Lois Lerner to Make Audit Decisions and Did Not Refer Her to TIGTA

As noted throughout the discussion above, Downing allowed—and in some cases enabled—Lerner and other senior IRS officials to become directly involved in selecting organizations for examination. Although many of these discussions appear to be prohibited by IRS policy, their extended discussion about referrals for Crossroads GPS, described immediately above, is most troubling. Although Lerner did not overtly direct Downing to open an audit, Lerner's emails reveal her belief that the IRS should audit Crossroads GPS. Lerner's repeated involvement with this conservative taxpayer showed her persistence in making sure an audit was, in fact, opened—and further evidence her bias against organizations on the right side of the political spectrum.

Downing told Committee staff that interfering with the career Federal employees in EO Examinations charged with deciding whether to open audits had serious repercussions:

> You know, as a revenue agent and, you know, even as an IRS employee, you know, my folks are taught from the very beginning about, you know, several things. One is,

---

[147] Email chain between Lois Lerner, Sarah Hall Ingram, Nan Downing, and others (Apr. 19–0920, 2010) IRS0000713405–09.
[148] *Id.*

you know, no one will tell us who to do an audit on. If they did, you'd turn that in to TIGTA [for investigation].[149]

Downing stated that this rule would also apply to Lerner in the event that she tried to direct an audit.[150] Yet Downing did not refer Lerner to TIGTA.[151] Downing told Committee staff that a referral was not necessary because she did not consider Lerner's emails of January 4, 2013 and January 7, 2013 to be directing an audit:

> Q. Is this Lois Lerner telling you or suggesting that Exams open up an audit?
> A. No. That's not the way I took it. The way I took it is she worried—we were not lawyers, as I said. We were accountants. And whether or not we were correctly—if we knew what we were doing.

> \*     \*     \*     \*     \*     \*     \*

> Q. Well, her statement that "twice we rejected the referrals for somewhat dubious reasons," doesn't that suggest the negative
> A. That
> Q. that the correct decision was not projected?
> A. That is not the way I took it. And maybe it was because of my relationship of her. I did not take it that she was telling me what to do.[152]

Downing told Committee staff that she construed Lerner's message as a general comment about the referral process, and that it did not relate to Crossroads GPS specifically:

> Q. How did you take the statement, "Please make sure all moves regarding the organization are coordinated up here before we do anything"?

> \*     \*     \*     \*     \*     \*     \*

> A. Okay. So this was—okay. So this one—and I think she mentions somewhere in here that there's an application pending. And in our dual track process—so, to me, it wasn't Crossroads GPS, it was any of them, that the team, as we built the dual track process, they are to be cognizant if Rulings and Agreement[s] has an application. So we're going to go on and start an exam, but we just want to make sure, what if, right before we get ready to start exams, they issue a denial? And I don't even know what their process is, but what if they deny it? So it's coordinating, making sure that piece is in my process.
> Q. I mean, because there's nothing in this email chain relating to general process, and it's all
> A. No.
> Q. with respect to one taxpaying group.
> A. But I took it
> Q. So that just doesn't follow from the

---

[149] SFC Interview of Nanette Downing (Dec. 6, 2013) p. 18.
[150] *Id*. p. 19.
[151] *Id*. p. 76.
[152] *Id*.

A. Yeah. But that's how I took it because it's—it's because of an application pending.

\*    \*    \*    \*    \*    \*    \*

Q. So if you took that statement to be a general statement about the process, why was your response totally with respect to one group?

A. Well, she was originally asking about

Q. Well, in the statement she's asking about one group.

A. She was asking about that referral, so I responded to that. You know, you had to know Lois. You had to know the emails you got. I responded with the facts, and the rest of it I just made sure that we had this built in to the process.

\*    \*    \*    \*    \*    \*    \*

Q. So when she says, "Please make sure all moves regarding the org are coordinated up here before we do anything"

A. What I did was what my staffing says: Do we have a process in place that we know which ones have applications pending? They said yes.

Q. But did you feel that you had to apprise her of all moves regarding the org

A. No.

Q. with her?

A. No. What I took from that was, in that process, if any of them, GPS, Crossroads GPS, anything else, had an application pending, we built in to the process that if it was decided for the exam, they had a contact to reach out with [Rulings and Agreements] to see what the status was.

\*    \*    \*    \*    \*    \*    \*

Q. And then her statement, "I need to think about whether to open an exam. I think yes, but let me cogitate on it a bit," that did not, to you, sound like it was her decision whether or not to open up an exam on

A. No. No. I didn't take it that way. I took it about, what is the process, and when we have any organization that has a potential application, and where is that application and whether, you know—and, again, how close is the decision on that application.[153]

In spite of Downing's imaginative interpretation, Lerner was clearly referring to Crossroads GPS in her messages of January 4, 2013 and January 7, 2013. These exchanges should have been referred to TIGTA as they amounted to an overt attempt by Lerner to open an audit on a specific taxpayer. But even taking Downing's testimony at face value, which we do not, her complacent attitude allowed Lerner to exert improper influence on the examination process.

D. CONCLUSIONS REGARDING LERNER'S ROLE AND CULPABILITY

There can be little doubt that Lois Lerner's personal political views directed the course of IRS interactions with a large number of tax-exempt organizations. The IRS's treatment of these organiza-

───────────
[153] *Id*. pp. 76–85 (portions omitted).

163

tions was almost universally consistent with Lerner's personal po-
litical views—this is, supporting Democratic candidates and oppos-
ing conservative tax-exempt organizations that engaged in political
speech. Conservative organizations that sought to participate in the
nation's political discourse, such as the Tea Party, drew the strong-
est ire from Lerner. Her influence led not only to indefinite delays
in the processing of these groups' applications for tax-exempt sta-
tus, but also to audits. During that same time, the IRS generally
responded quickly and favorably to nonprofit organizations that
were affiliated with progressive causes or politicians.

We conclude that Lerner was responsible for harm caused to con-
servative taxpayers during her tenure at the IRS. But we must
hold IRS and Treasury management equally responsible for their
failure to exert any meaningful oversight of Lerner's EO Division.
A biased employee, such as Lerner, should not have been allowed
to remain in senior positions for more than 10 years, and should
never have been given free reign over such a vast and influential
part of the IRS. To avoid exposing taxpayers to the risk of biased
treatment in the future, the IRS and Treasury must keep a closer
watch of their employees and ferret out politically-biased behavior.

## III. SENIOR IRS OFFICIALS CONTINUOUSLY MISLED CONGRESS ABOUT THE IRS'S HANDLING OF APPLICATIONS SUBMITTED BY TEA PARTY ORGANIZATIONS

*Senior IRS officials including Doug Shulman, Steve Miller, and Lois Lerner consis-
tently misled Congress about the IRS's targeting of Tea Party and other political
advocacy groups that were seeking tax exempt status. These misrepresentations
covered up IRS wrongdoing, allowed the IRS to escape accountability for its abusive
treatment of Tea Party organizations until the release of the TIGTA report in May
2013, and materially impeded Congress in the performance of its Constitutional
oversight responsibilities.*

### A. DOUG SHULMAN MISLED CONGRESS REGARDING THE TARGETING OF TEA PARTY GROUPS

On March 22, 2012, then-Commissioner Doug Shulman testified
before the House Ways and Means Subcommittee on Oversight.[154]
Prior to appearing before that Subcommittee, Shulman had become
aware from press stories, as well as from letters he received from
Members of Congress, of allegations that Tea Party groups that
had filed applications for tax-exempt status were receiving intru-
sive development letters from the IRS that sought unusual infor-
mation such as the names of their donors.[155] Shulman was also
aware from these sources that there existed a backlog of applica-
tions for tax-exempt status and that many of these Tea Party
groups had been waiting a substantial period of time for a decision
from the IRS.[156] Coverage of these issues in the media had been
so pervasive that Shulman anticipated that he might be asked
questions during the hearing regarding processing delays and in-

---

[154] Hearing before the Subcommittee on Oversight of the House Committee on Ways and
Means, "Internal Revenue Service Operations and the 2012 Tax Filing Season" (Mar. 22, 2012).
[155] SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 58–65.
[156] *Id.* pp. 39–40.

164

trusive development letters.[157] During the course of the hearing, the following colloquy occurred between Representative Boustany and Commissioner Shulman.

**Mr. Boustany:** . . . It has come to my attention, I've gotten a number of letters, we've seen some recent press allegations that the IRS is targeting certain Tea Party groups . . . Can you elaborate on what's going on with that? Can you give us assurances that the IRS is not targeting particular groups based on political leanings?

**Mr. Shulman:** Thanks for bringing this up. I think there's been a lot of press about this and a lot of moving information, so I appreciate the opportunity to clarify. **First, let me start by saying, yes, I can give you assurances.**

\*  \*  \*  \*  \*  \*  \*

**There is absolutely no targeting. This is the kind of back-and-forth that happens when people apply for 501(c)(4) status.**[158]

Shulman's response failed to acknowledge several facts of which he was aware at the time of his testimony. For example, he knew that the IRS had issued intrusive development letters to these groups, in many cases seeking the names of donors, yet he chose to depict these interactions as "the kind of back-and-forth that happens" when the IRS processes an application for tax-exemption.[159] Moreover, he was aware of the fact that these groups were experiencing substantial processing delays.[160] The intrusive questions and delays were facts that clearly suggested that these groups were being treated differently by the IRS, possibly as a result of their political views. In light of Shulman's knowledge at the time of his testimony, it is difficult to reconcile his emphatic assurance that the IRS was not improperly processing applications from conservative organizations. Indeed, characterizing these circumstances as part of the "back and forth that happens when people apply for 501(c)(4) status" was nothing short of misleading and had the effect of throwing Congress and the public off the scent of IRS wrongdoing.

In early May 2012, just five or six weeks after Shulman's appearance before the House Ways and Means Subcommittee on Oversight, Shulman was informed by Steve Miller of the existence of the BOLO list and that it contained an entry for the Tea Party.[161] Later that month, Inspector General George apprised Shulman that TIGTA was pursuing an investigation into the use by the IRS of inappropriate criteria in the processing of applications for tax exempt status.[162] Thus, by late May 2012, Shulman was not only aware that the IRS had been improperly focusing on Tea Party groups as a result of their political views, but also knew that the

---

[157] *Id.* pp. 70–71.
[158] Hearing before the Subcommittee on Oversight of the House Committee on Ways and Means, "Internal Revenue Service Operations and the 2012 Tax Filing Season" (Mar. 22, 2012) pp. 93–94 (emphasis added).
[159] SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 31–37.
[160] *Id.* pp. 34–35.
[161] *Id.* pp. 40–52.
[162] *Id.* pp. 76–77.

Exhibit E

Inspector General was launching an investigation into the matter. In spite of this knowledge, Shulman elected to remain silent and make no effort whatsoever to correct his recent inaccurate testimony before the Subcommittee regarding the absence of targeting. His failures allowed the IRS to actively conceal its mistreatment of Tea Party and other political advocacy groups for more than a year until the issuance of the TIGTA report in May 2013, and thwarted the Subcommittee in the performance of its oversight responsibilities.

### B. STEVE MILLER WITHHELD INFORMATION ABOUT POLITICAL TARGETING FROM THE CONGRESS

During 2012, Steve Miller, while Deputy Commissioner for Services and Enforcement, was afforded a number of opportunities to apprise Congress about the use of inappropriate criteria to target Tea Party and other political advocacy organizations, but instead, elected at each instance not to do so.

### 1. Miller's Response To Senator Hatch's March 14, 2012 Letter Was Misleading

By letter dated March 14, 2012, Senator Orrin Hatch together with 11 other Republican Members of the U.S. Senate penned a letter to Commissioner Shulman regarding their concern over intrusive IRS inquiries to Tea Party and other conservative organizations that were seeking tax exemption under section 501(c)(4).[163] The letter stated that the Senators were concerned in ensuring that "tax compliance efforts are pursued in a fair, even handed and transparent manner—without regard to politics of any kind." [164] The letter sought information about how and why the IRS sought particular types of information from applicants and stated that the questions were born of "concerns about selective enforcement and the duty to treat similarly situated taxpayers" in the same fashion.[165]

Miller responded by letter dated April 26, 2012.[166] At the time of Miller's response, he was aware of a number of disturbing facts regarding how the IRS was processing applications for tax-exempt status received from Tea Party and other political advocacy groups. For example, he knew in February 2012 that many of the applications for tax exemption from Tea Party and other political advocacy groups that were awaiting decision in the Determinations Unit were very old.[167] He was also aware of the press stories focusing on the IRS's use of highly intrusive questions, including questions about the identity of applicant organizations' donors.[168] Miller himself told Senate Finance Committee investigators that he believed the questions constituted "overreaching" by the IRS.[169] Further, he

---

[163] Letter from Senator Orrin Hatch to Commissioner Douglas Shulman (Mar. 14, 2012) IRS0000509339–42.
[164] *Id.*
[165] *Id.*
[166] Letter from Steven T. Miller to Senator Orrin Hatch (Apr. 26, 2012) TIGTA Bates No. 006998–7007.
[167] SFC Interview of Steven Miller (Dec. 12, 2013) pp. 102–103.
[168] *Id.* pp. 159–160.
[169] *Id.* p. 159.

knew in late March of 2012 that TIGTA was going to conduct an audit into how the IRS processed applications for tax exemption under sections 501(c)(4), (5) and (6).[170] In addition, at the time of his response to Senator Hatch, Miller had grown alarmed about the press stories and Congressional inquiries reporting lengthy processing delays experienced by Tea Party groups and of the use of intrusive development questions.[171] Miller testified that in March 2012, his concerns over these reports caused him to send Nan Marks, a trusted senior advisor, to visit the Determinations Unit in Cincinnati to investigate how the cases were being processed and to report back to him.[172]

In spite of these facts, Miller's response to Senator Hatch of April 26, 2012 actually *defended and justified* the IRS's demands from applicant organizations for information such as: the names of the organizations' donors; copies of social media posts, speeches, and panel presentations; the names and qualifications of speakers and participants at events; and written materials distributed by these organizations at public gatherings. In his April 26, 2012 response, Miller explained these highly unusual and intrusive requests—which he subsequently characterized during his interview with Senate Finance Committee staff as "overreaching"—in the following manner:

> The revenue agent uses sound reasoning based on tax law training and his or her experience to review the application and identify the additional information needed to make a proper determination of the organization's exempt status. The revenue agent prepares individualized questions and requests for documents based on the facts and circumstances set forth in the particular application." [173]

At best, Miller's written response to the Senators was disingenuous, and at worst, it was plainly false and likely calculated to forestall further Congressional inquiry into the matter of how the IRS was processing applications for tax exemption from Tea Party and other political advocacy groups.

2. Miller Became Aware of Important Information Regarding Targeting Within a Week of Issuing His Response to Senator Hatch's March 14, 2012 Letter, but Failed To Bring That Information to the Attention of Congress

During the first week of May 2012—a scant week after issuing his response to Senator Hatch's letter—Miller was briefed by Nan Marks on her findings regarding how applications were being processed.[174] He then learned first-hand that the reports of a backlog and the long delays that applicant organizations were experiencing, in some cases for better than two years, were accurate.[175] He also learned from Marks that the issuance of intrusive development

---

[170] *Id.* pp. 146–147. Email from Richard Daly to Steve Miller and others (Mar. 29, 2012) IRS0000411131–32.

[171] SFC Interview of Steven Miller (Dec. 12, 2013) pp. 123–130.

[172] *Id.* p. 129.

[173] Letter from Steven T. Miller to Senator Orrin Hatch (Apr. 26, 2012) TIGTA Bates No. 006998–7007.

[174] SFC Interview of Steven Miller (Dec. 12, 2013) p. 131.

[175] *Id.* pp. 133–135.

167

questions by Determinations Unit staff resulted from a failure to properly train that staff and to provide it with adequate technical support.[176] Most importantly, Marks apprised Miller of the existence of the BOLO list; that "Tea Party" was on the list; and that applications for tax exemption had been selected for full development based on the presence of terms in the applications, such as "Tea Party," "Patriots," and "9/12." [177]

Miller told Committee staff during his interview that he was "outraged" when he first learned of the existence of the BOLO list and felt that it was "stupid" and "inappropriate." [178] Miller's outrage over the existence of the BOLO list stemmed in part from his concern that such a list that focused on the names of organizations, rather than on their activities, suggested that the IRS was applying the tax laws in a partisan way, with regard to the political views of the organizations whose applications it was considering.[179]

Unfortunately, Miller's outrage over the use of terms like "Tea Party" to flag applications for full development did not motivate him to the point of contacting Senator Hatch, to whom he had most recently written, and to inform him of Marks's findings. This is particularly troublesome given the fact that the stated intent of Senator Hatch's letter was his concern whether the IRS was administering the tax laws in a fair and even way, "without regard to politics of any kind"—the very same concern that Miller formed when he purportedly became "outraged" over the fact that the IRS had been flagging applications for full development based on the political views of applicant organizations. Not more than a week after writing to Senator Hatch to provide answers to questions raised by their now shared concern whether the IRS was administering the tax laws fairly and without regard to the political views of tax payers, Miller was in possession of information directly germane and responsive to that concern. Rather than inform Senator Hatch of Marks's findings, Miller, once again, elected to remain silent on the matter.

Of further note, and again reflective of Miller's lack of candor with the Congress, is the fact that Marks told Miller that the intrusive development questions resulted from a failure to adequately train the EO Determinations Unit staff, as well as a failure to provide that staff with sufficient technical support.[180] Accordingly, by the week of May 3, 2012, Miller was fully aware that the intrusive development letters that had been issued by EO Determinations personnel most certainly were not the product of "sound reasoning" nor were they "based on tax law training and . . . experience," as he had asserted in his response to Senator Hatch dated April 26, 2012. Miller was content to leave his inaccurate and misleading response stand without revision, yet another disingenuous act aimed at obfuscating the true state of affairs with the IRS's processing of the Tea Party and other political advocacy applications.

---

[176] *Id.* p. 134.
[177] *Id.* pp. 135–139.
[178] *Id.* pp. 139–141.
[179] *Id.*
[180] *Id.* p. 134.

Exhibit E

3. Miller's Response to the June 18, 2012 Letter From Senator Hatch Regarding the IRS's Attempt to Collect Donor Information From Applicants Continued Miller's Pattern of Obfuscation

On June 18, 2012, Senator Hatch, together with ten other Republican Senators, corresponded again with Commissioner Shulman over the IRS's treatment of Tea Party organizations.[181] This time, the focus of the Senators' attention was on the collection by the IRS of the names of the donors who made, or were expected to make, a donation to Tea Party and similar political advocacy organizations seeking tax-exempt status. As explained in the June 18, 2012 letter, by operation of law, the identity of donors of tax-exempt organizations is not information subject to disclosure by the IRS. However, information provided to the IRS by an organization in furtherance of its application can be disclosed to the public once the IRS grants tax-exempt status. Thus, by asking organizations for the names of their donors as part of the application process, the IRS was, in effect, subjecting that information to disclosure and thereby nullifying the statutory safeguards designed to protect the privacy of donor information. In light of this anomaly, Senator Hatch wrote to Commissioner Shulman, posing specific questions about the IRS's requests for donor information.

Miller responded to Senator Hatch's letter three months later on September 11, 2012.[182] This response provided Miller with an excellent opportunity to inform Congress about the BOLO list and the targeting of Tea Party and similar political advocacy organizations, facts of which Miller was now well aware. However, rather than do so, Miller chose to avoid the topic of targeting entirely, providing a very technical and carefully drawn response to the immediate questions raised, that once again justified the IRS's collection of information regarding the identity of donors. By doing so, Miller elected to stay the course of obfuscation, relying once again on the IRS nostrum that:

> Revenue agents use sound reasoning based on tax law training and their experience to review applications and identify the additional information needed to make a proper determination of an organization's exempt status. . . . As noted above . . . donor information may be needed for the IRS to make a proper determination of an organization's exempt status.[183]

Miller's letter was misleading on an even more basic level. The September 11, 2012 letter failed to note IRS management's own concerns about the attempt to collect donor information, a concern that prompted Miller to direct on March 8, 2012, *some six months earlier*, that applicant organizations that called the IRS to discuss requests for the identity of their donors were to be informed that they did not need to provide that information.[184] Miller also failed to inform Senator Hatch that at the request of Lois Lerner, the Office of the IRS Chief Counsel had provided an opinion on May 21, 2012, that the donor information submitted by organizations in re-

---

[181] Letter from Senator Orrin Hatch to Commissioner Douglas Shulman (June 18, 2012).
[182] Letter from Steven Miller to Senator Orrin Hatch (Sep. 11, 2012).
[183] *Id.*
[184] Email from Nikole Flax to Lois Lerner (Mar. 8, 2012) IRS0000465957.

169

sponse to requests received from the IRS could be destroyed.[185] Similarly, Miller's response of September 26, 2012 omitted the fact that on June 27, 2012, Holly Paz directed IRS staff to expunge donor information from files and to send affected applicants a letter advising them that the donor information would be destroyed.[186]

Miller's statements to Congress defending the requests for donor information when he was fully aware that they were inappropriate, constituted "overreaching" and in fact, had been halted by the IRS, were false and misleading.

### 4. Miller's Explanation for Failing To Inform Congress Was a Sham

At Miller's interview with Senate Finance Committee Staff, he was asked why, after learning from Nan Marks about the BOLO list and that applications from Tea Party groups had been flagged for full development based on the basis of their political views, he did not convey that information to Senator Hatch. Miller's response was that he did not have all the facts yet, and that TIGTA was conducting a review.

> Q. . . . Why didn't you pick the phone up? Why didn't you write an email to Senator Hatch? Why didn't you ask your staff to contact the Senate Finance Committee staff and have them come over and brief them on what Ms. Marks had found? All those things were things that could have been done and should have been done, don't you think?
>
> A. No. I didn't have all the facts. TIGTA was working on the facts . . . .[187]

Miller took the position that he had no duty to inform Senator Hatch after learning about the BOLO list and how it had been used because TIGTA was now investigating the matter in order to establish "all the facts." In Miller's view, the involvement of TIGTA obviated any responsibility on his part to bring the facts of which he was aware to the attention of Congress.

The flaw in Miller's rationale for failing to inform Congress is evident when viewed in the light of Miller's subsequent actions in April and May of 2013. Miller had been briefed by Inspector General George on March 27, 2013 about TIGTA findings regarding the IRS's use of inappropriate criteria in the processing of applications for tax exempt status.[188] Shortly thereafter, either in March or April, Miller was also given a discussion draft of the TIGTA report to review.[189] Even though the TIGTA review was not yet completed nor the report finalized, Miller plotted with Lois Lerner to disclose the draft findings of that report to the public at an American Bar Association (ABA) meeting on May 10, 2013, before issuance of the final report, in an effort to get out in front of the unfavorable conclusions reached by TIGTA.[190] Accordingly, while Miller asserted to the Senate Finance Committee investigators that the ongoing TIGTA investigation relieved him of any responsibility to inform

---

[185] Email chain between Margo Stevens, Lois Lerner and Kristen Witter (May 21, 2012) IRS0000177231.
[186] Email from Holly Paz to Sharon Light and Matthew Giuliano (June 25, 2012) IRS0000432414.
[187] SFC Interview of Steve Miller (Dec. 12, 2013) p. 168.
[188] *Id.* pp. 210–213.
[189] *Id.*
[190] *Id.* p. 218; SFC Interview of Nikole Flax (Nov. 21, 2013) pp. 190–194.

Exhibit E

170

Congress that applications from Tea Party and other political advocacy groups had been flagged for full development based on the political views of the groups in question, apparently, he felt no such constraint when it came to leaking the contents of TIGTA's investigation to the public in furtherance of his own interests.

In sum, Miller's communications with Congress about IRS targeting evidenced a pattern of half-truths, misinformation, and downright deception. Unfortunately, this conduct served Miller well throughout 2012 and early 2013, as it kept Congress and the public from confirming as true what was then widely suspected as IRS wrongdoing in the treatment of Tea Party organizations.

### C. LOIS LERNER ACTIVELY COVERED UP THE EXISTENCE OF IRS TARGETING IN HER COMMUNICATIONS WITH CONGRESS

Much the same as her superiors Shulman and Miller, Lerner also misled Congress about the targeting of Tea Party and other political advocacy groups.

#### 1. Lerner Misled Staff of the U.S. House of Representatives Committee on Oversight and Government Reform

In 2012, Lerner provided several briefings to staff of the U.S. House of Representatives Committee on Oversight and Government Reform (OGR) regarding the treatment of applications received from Tea Party and other political advocacy groups.[191] During the course of one such briefing on February 24, 2012, she was asked by House Committee staff if the IRS had changed the criteria for evaluating applications for tax-exempt status.[192] Lerner apparently informed House Committee staff that it had not.[193] This answer was false, as Lerner knew that the criteria had changed in 2010 with the issuance of the BOLO list that identified the Tea Party as an emerging issue.[194] She was aware that screeners had used the names of conservative organizations like "Tea Party," "Patriots," or "9/12" as the criteria to select applications for full development.[195] She also knew that for other organizations whose names did not include these terms, screeners had used the conservative policies advocated by these organizations (e.g., balancing the budget, limiting government, reducing taxes, etc.) as the criteria for selecting their applications.[196] Moreover, Lerner herself had ostensibly changed the criteria in July 2011 when she directed Cindy Thomas to remove the "Tea Party" entry from the BOLO list and replace it with the more generic reference "advocacy orgs."[197]

Subsequently, on April 4, 2012, Lerner provided another briefing to House Committee staff regarding highly intrusive development questions that the IRS had sent to Tea Party and other political advocacy organizations, seeking unusual information that included,

---

[191] U.S. House of Representatives Committee on Oversight and Government Reform, The Internal Revenue Service's Targeting of Conservative Tax-Exempt Applicants: Report of Findings for the 113th Congress (Dec. 23, 2014).

[192] Id. p. 55.

[193] Id.

[194] Email from Justin Lowe to Holly Paz and others (June 27, 2011) IRS0000431165–66.

[195] Id.

[196] Id.

[197] Email chain between Cindy Thomas, Ronald Bell, Steve Bowling, John Shafer and others (July 5, 2011) IRS0000620735–40.

Exhibit E

among other things, the names of the donors of the applicant orga-
nizations.[198] Lerner falsely characterized these requests for infor-
mation as not being out of the ordinary.[199] As explained more fully
below, Lerner herself had reservations about the information re-
quests months earlier, information requests that TIGTA subse-
quently determined were irrelevant, burdensome and caused delays
in the processing of applications.[200]

Indeed, on May 4, 2012, Lerner provided a 45 page written re-
sponse to a letter dated March 27, 2012 from then Chairman Issa
requesting additional information regarding the intrusive develop-
ment questions, such as the names of donors, a list of issues impor-
tant to the organization, and details about events held by the orga-
nization.[201] Lerner explained the circumstances under which the
IRS would request each piece of information identified in the
March 27, 2012 letter and repeated the IRS "go-to-line" that:

> The revenue agent working a case uses sound reasoning
> based on tax law training and his or her experience to re-
> view the application and identify the additional informa-
> tion needed to make a proper determination of the organi-
> zation's tax exempt status. Follow-up information re-
> quested would be based on the facts and circumstances set
> forth in the particular application.[202]

Unfortunately, Lerner failed to convey in her response to Chair-
man Issa some very important additional information on the mat-
ter of the development questions. For example, Lerner failed to
state that on February 29, 2012, she had grown concerned about
the highly burdensome development questions (possibly as a result
of the bad press and Congressional inquiries the IRS was receiving
as a consequence of their use) and apprised Holly Paz to direct EO
determinations to stop using the questions, as follows:

> Have we given Cincy new guidance on how they might
> reduce the burden in the information requests and make
> it clearer that recipients can ask for extensions? I don't
> want anymore [sic] letters going out on advocacy cases
> until the letters have been adjusted. **Also, I have been
> telling folks that not all the letters are the same be-
> cause it depends on the facts. What I've seen so far
> though is identical letters—can you clarify for me
> please. Thanks**[203]

Moreover, on April 24, Holly Paz asked Judith Kindell to review
development letters and to "create a list of what you consider to be
the 5–10 most troubling questions . . . ."[204] Kindell complied and

[198] U.S. House of Representatives Committee on Oversight and Government Reform, The In-
ternal Revenue Service's Targeting of Conservative Tax-Exempt Applicants: Report of Findings
for the 113th Congress (Dec. 23, 2014) p. 55.
[199] *Id.*
[200] TIGTA, Inappropriate Criteria Were Used to *Identify Tax-Exempt Applications for Review*,
Audit Report 2013–10–053 (May 14, 2013).
[201] Letter from Lois Lerner to Chairman Darrell Issa (May 4, 2012) TIGTA Bates No. 007008–
007052.
[202] *Id.*
[203] Email chain between Lois Lerner, Holly Paz, David Fish, and Cindy Thomas (Feb. 24–29,
2012) IRS0000209976–77 (emphasis added).
[204] Email from Holly Paz to Judith Kindell (Apr. 24, 2012) IRS0000512491.

172

prepared a list that she sent to Paz on April 25, 2012.[205] Among the seven types of development questions that Kindell identified as "troubling" were questions asking organizations to identify their donors, describe the issues important to them, and provide details regarding events held by them.[206] These were the very *same questions* that Lerner depicted in her May 4, 2012 letter as authorized under law and appropriate and necessary for the IRS to ask in order to properly evaluate applications.[207]

Accordingly, Lerner's May 4, 2012 response to then-Chairman Issa created the false impression that the questions were entirely proper and regular, when in fact, Lerner had recognized months earlier that they were burdensome and possibly not tailored to the facts of each application, and had therefore directed that EO Determinations agents stop using them. Moreover, among the questions that Lerner justified as appropriate were questions that her own Senior Technical Advisor, Judith Kindell, had flagged as "troubling" just a week earlier. Indeed, EO not only viewed these questions as "troublesome," but also concluded that they were "unnecessary."[208] Contrary to Lerner's misleading statements, the questions then, were not based on "sound reasoning," "tax law training and . . . experience" nor were they "based on the facts and circumstances set forth in the particular application."

### 2. Lerner's Testimony Before the House Ways and Means Subcommittee on Oversight Was False and Misleading

Sometime in April 2013, Steve Miller and Lerner agreed that she would make a public statement regarding the results of the TIGTA review in advance of the release of the TIGTA report.[209] Lerner ultimately chose the May 10, 2013 ABA Tax Section's Exempt Organizations Committee Meeting as the venue for her public announcement.[210] In order to make the plan work, Lerner needed to be certain that she would be asked a question that would afford her the opportunity to preview TIGTA's conclusions.[211] Accordingly, she contacted Celia Roady, an acquaintance and Washington D.C. tax attorney who would be attending the ABA meeting.[212] Lerner arranged to have Roady ask her a "planted" question during the question and answer portion of the ABA meeting.[213] The relevant portions of Lerner's statements at the meeting are as follows:

**Ms. Roady:** Lois, a few months ago there was some concern about IRS review of 501(c)(4) organizations, 501(c)(4) applications by Tea Party organizations. And I'm just wondering if you can provide any update on any of that.

---

[205] Email from Judith Kindell to Holly Paz and Sharon Light (Apr. 25, 2012) IRS0000013868.
[206] *Id.*
[207] Letter from Lois Lerner to Chairman Darrell Issa (May 4, 2012) TIGTA Bates No. 007008–007052.
[208] TIGTA, Inappropriate Criteria Were Used to *Identify Tax-Exempt Applications for Review*, Audit Report 2013–10–053 (May 14, 2013).
[209] SFC Interview of Steven Miller (Dec. 12, 2013) pp. 218–221.
[210] Email from Lois Lerner to Steven Miller (May 8, 2013) IRS0000209214.
[211] Email from Lois Lerner to Nikole Flax (May 9, 2013) IRS0000209300.
[212] *U.S. News and World Report,* Exclusive: Woman Who Asked IRS's Lois Lerner Scandal-Breaking Question Details Plant (May 17, 2013).
[213] *Id.*

173

**Ms. Lerner:** . . . So our line folks in Cincinnati that handle the applications did what we call centralization of these cases. They centralized work on these in one particular group. . . .

However, in this case the way they did the centralization was not so fine. Instead of referring to the cases as advocacy cases, they actually used case names on this list. They used names like Tea Party, or Patriots. They selected cases simply because the application had those names in the title.

That was wrong, that was absolutely incorrect, it was insensitive, and it was inappropriate. That's not how we go about selecting cases for further review. We select them for further review because they need further review, not because they have a particular name.

The other thing that happened was they also, in some cases, cases sat around for a while. They also sent some letters out that were far too broad; they were asking questions of these organizations that weren't really necessary in the type of application.

In some cases you probably read that they asked for contributor names. That's not appropriate, it's not usual. . . .[214]

Lerner's admission that "line folks" at the IRS had targeted Tea Party groups seeking tax-exempt status for "further review," subjected them to delays as well as to unnecessary and burdensome development questions, and her tepid apology for those actions, came as a shocking revelation. For over a year, Lerner, Shulman and Miller had steadfastly denied any wrongdoing by the IRS in the treatment of Tea Party groups. Indeed, just two days before her admission and apology, Lerner appeared before the Subcommittee on Oversight of the House Committee on Ways and Means.[215] Lerner was asked by Representative Joseph Crowley about the status of the IRS's own investigation into 501(c)(4) groups. The exchange between Representative Crowley and Lerner was as follows:

**Mr. Crowley:** And finally, in the summer of 2012 it was reported that the IRS was going to undertake a similar investigation into the one taken here on colleges and universities on political entities that fund political campaign ads that were taking donations anonymously and are tax exempt. These are the folks that put on hundreds of millions of dollars in campaign ads in 2012 elections, all with no accountability and with taxpayer subsidy.

This hearing highlights certain compliance problems in the tax-exempt sphere, and I hope the IRS aggressively looks into these political and business leagues to see if they are abusing the tax-exempt status. I don't want to speak for the chairman or for the ranking member, but I know my constituents in Queens do not want their tax dollars being used to subsidize political campaigns. I suspect neither do any of the members on this panel.

---

[214] American Bar Association, Transcript of The Exempt Organization Tax Review (May 10, 2013) ABA Tax Section's Exempt Organizations Committee Meeting, Vol. 72, No. 2 pp. 126–127.
[215] Hearing Before the Subcommittee on Oversight of the House Committee on Ways and Means, "Hearing on the Internal Revenue Service's Colleges and Universities Compliance Project" (May 8, 2013).

Exhibit E

174

So, Ms. Lerner, if you could comment briefly on the status of the IRS investigation into these political not-for-profits, I would appreciate that as well.

**Ms. Lerner:** Well, there was a questionnaire that began this discussion and there is also a questionnaire out there, you can look at it on our Web site right now, that is seeking information from section 501(c)(4), (5), and (6) organizations, and a big piece of that questionnaire relates to their political activities. So that is our beginning.

**Mr. Crowley:** I appreciate that. Thank you.[216]

Lerner's referral to an obscure IRS questionnaire in response to Representative Crowley's point-blank question regarding the status of the IRS investigation into "political not-for-profits" was pure deception. On May 8, 2013, the date of her appearance before the Subcommittee on Oversight, Lerner was aware of a number of incriminating facts. She knew at least as early as July 2011 that organizations seeking tax-exempt status that had the names "Tea Party," "Patriots" and "9/12" had been singled out on the BOLO List and subjected to additional scrutiny.[217] Also, nearly a year before her exchange with Representative Crowley, Lerner became aware that TIGTA would conduct a review of how the IRS processed applications for tax exempt status under section 501(c)(4) that involved political advocacy issues.[218] Lerner knew that the outcome of that review would be condemnatory. She told Sarah Hall Ingram, Holly Paz and others on June 22, 2012 that:

It is what it is. Although the original story isn't as pretty as we'd like, once we learned this were (sic) off track, we have done what we can to change the process, better educate staff and move the cases. So, we will get dinged, but we took steps before the "dinging" to make things better and have written procedures. So, it is what it is.[219]

By March 21, 2013, Lerner had read TIGTA's Pre-Discussion Draft Report and thus was aware of the full extent of the "dinging" that she was about to receive from TIGTA.[220] She knew from reading that draft that TIGTA's findings would not be limited just to finding fault with the IRS's use of names like "Tea Party," "9/12" and "Patriots" to identify applications for further review, but would also ascribe blame to her organization for causing long delays in the processing of applications and for using unnecessary and burdensome development questions, including questions seeking the identity of donors and the amounts of their contributions. Yet when asked by Representative Crowley about the status of the investigation, Lerner could offer only a dissembling reference to an IRS questionnaire.

Lerner's failure to truthfully respond to Representative Crowley's question during the House Subcommittee on Oversight hearing was

---

[216] *Id.*

[217] Email chain between Cindy Thomas to Ronald Bell, Steve Bowling, John Shafer and others (July 5, 2011) IRS0000620735.

[218] Email chain from Lois Lerner to Richard Daly, Sarah Hall Ingram, Holly Paz and others (June 22–25, 2012). IRS00000000475251–52.

[219] *Id.*

[220] Email chain between Lois Lerner, Troy Patterson, Holly Paz and others (Mar. 21, 2013). IRS0000053201.

175

yet one more act of deception and obfuscation in a series of such acts intended to either cover up the IRS's targeting of Tea Party groups, or mitigate the consequences of that targeting.

In sum, Shulman, Miller, and Lerner engaged in an active pattern of deception in their oral and written communications with Congress regarding the IRS's treatment of Tea Party and other conservative groups seeking tax-exempt status. That pattern of deception is evident not only in what these individuals told Congress about the treatment of Tea Party groups, but also in what they failed to tell Congress. It is also apparent in the way that Miller and Lerner conspired to disclose the existence of the targeting through the use of a planted question at an ABA meeting, so as to diminish the repercussions resulting from TIGTA's soon-to-be released findings. The duplicity in their communications with Congress allowed the IRS to keep the legislative branch at arm's length in 2012 and 2013 while they took whatever steps they felt were necessary to address the targeting. Lerner's email quoted immediately above clearly shows the plan—when the targeting was discovered and ultimately disclosed by TIGTA, the IRS would claim that it had long ago corrected the problem and had taken the steps necessary to "make things better."[221] By actively concealing IRS wrongdoing in an effort to avoid Congressional scrutiny and interference, Shulman, Miller, and Lerner also undermined Congress's exercise of its Constitutional authority to oversee the activities of the IRS.

## IV. THE OBAMA ADMINISTRATION SIGNALED THE IRS AND OTHER AGENCIES TO TARGET CONSERVATIVE TAX-EXEMPT ORGANIZATIONS

> *Political pressure from the White House following the Supreme Court's Citizens United decision unduly influenced the IRS and other government agencies, most notably the Department of Justice and the Federal Election Commission, to scrutinize political spending by 501(c) organizations. These agencies coordinated with each other on initiatives targeting conservative tax-exempt organizations.*

The Democratic Party has consistently called for increased controls on political spending. In fact, this issue has been included in their national platforms since 2000:

> 2000: "We must restore American's faith in their own democracy by providing real and comprehensive campaign finance reform, creating fairer and more open elections, and breaking the link between special interests and political influence. The Republicans will have none of this. Instead of limiting the influence of the powerful on our politics, they want to raise contribution limits so even more special interest money can flow into campaigns."[222]

> 2004: "To guarantee the integrity of our elections and to increase voter confidence, we will seek action to ensure that voting systems are accessible, independently auditable, accurate, and secure. We will support the full funding of programs to re-

---

[221] Email chain from Lois Lerner to Richard Daly, Sarah Hall Ingram, Holly Paz and others (June 22–25, 2012). IRS00000000475251–52.

[222] Democratic Party Platform of 2000 (Aug. 14, 2000).

176

alize this goal. Finally, it is the priority of the Democratic Party to fulfill the promise of election reform." [223]

2008: "We support campaign finance reform to reduce the influence of moneyed special interests, including public financing of campaigns combined with free television and radio time. We will have the wisdom to put the public interest above special interests." [224]

2012: "Our political system is under assault by those who believe that special interests should be able to buy whatever they want in our society, including our government. Our opponents have applauded the Supreme Court's decision in *Citizens United* and welcomed the new flow of special interest money with open arms. In stark contrast, we believe we must take immediate action to curb the influence of lobbyists and special interests on our political institutions." [225]

Political pressure to curtail political speech reached a crescendo following the Supreme Court's January 21, 2010 *Citizens United* decision, which struck down parts of the Bipartisan Campaign Reform Act of 2002 (McCain-Feingold Act).[226] That same day, President Obama sharply condemned the decision, stating:

With its ruling today, the Supreme Court has given a green light to a new stampede of special interest money in our politics. It is a major victory for big oil, Wall Street banks, health insurance companies and the other powerful interests that marshal their power every day in Washington to drown out the voices of everyday Americans.[227]

A few days later, President Obama used his State of the Union Address as an opportunity to shame the Court and call for reform:

With all due deference to separation of powers, last week the Supreme Court reversed a century of law that I believe will open the floodgates for special interests—including foreign corporations—to spend without limit in our elections. I don't think American elections should be bankrolled by America's most powerful interests, or worse, by foreign entities. They should be decided by the American people. And I'd urge Democrats and Republicans to pass a bill that helps to correct some of these problems.[228]

During the next several months leading up to the 2010 mid-term election, President Obama repeatedly denounced the *Citizens United* decision and called on Congress to tighten the reins on political spending by nonprofits. The calls were echoed by others in the Obama Administration and by Democrats in Congress, who introduced the DISCLOSE Act, which would have required certain nonprofits that engage in political activity to report information about their donors.[229] When the Senate failed to pass the legislation, President Obama castigated Republican lawmakers and stat-

---

[223] Democratic Party Platform of 2004 (July 26, 2004).

[224] Democratic Party Platform of 2008 (Aug. 25, 2008).

[225] Democratic National Platform of 2012 (Sep. 3, 2012).

[226] 558 U.S. 310 (2010).

[227] The White House, Statement from the President on Today's Supreme Court Decision (Jan. 21, 2010).

[228] The White House, Remarks by the President in the State of the Union Address (Jan. 27, 2010).

[229] S. 3295, 111th Cong. (2010); H.R. 5175, 111th Cong. (2010).

Exhibit E

ed that the bill's failure was "a victory for special interests and U.S. corporations—including foreign-controlled ones—who are now allowed to spend unlimited money to fill our airwaves, mailboxes, and phone lines right up until Election Day."[230]

President Obama's statements did not go unnoticed by the IRS and other government agencies. As discussed more fully in Section IV(A) of the Bipartisan Investigative Report, employees throughout the IRS closely monitored media coverage of the issue. The Division Commissioner for TE/GE, Sarah Hall Ingram, even referenced the President's words directly in a September 2010 email to other senior managers, stating that the "secret donor theme will continue—see Obama salvo and today's Diana Reehm [sic]."[231]

As the President repeatedly called for tighter regulation of spending on political speech, the IRS began to systematically target Tea Party organizations that applied for tax-exempt status. Indeed, just a few weeks after the President's State of the Union address in 2010, the IRS made the pivotal decision to set aside all incoming Tea Party applications for special processing. In the following weeks, IRS executives who closely monitored news about the White House would set a course for these applicants that subjected them to long delays, burdensome questions, and ultimately proved fatal to some of them.

A major focus of the Committee's investigation was to determine to what extent the IRS coordinated with the Department of Justice (DOJ), the FEC, and the Treasury Department in responding to the political pressure from the White House. Our investigation revealed concerted actions by these arms of the Obama Administration which had the effect of targeting conservative tax-exempt organizations.

## A. WHITE HOUSE COORDINATION WITH THE IRS

Due to the documentary limitations discussed more fully in Section II(C) of the Bipartisan Investigative Report, as well as Lois Lerner's refusal to cooperate with this investigation, the Committee was not provided with a full record of communications between the White House and IRS.[232] But we need look no further than the

---

[230] The White House, Statement by the President on the DISCLOSE Act Vote in the Senate (Sep. 23, 2010).

[231] Email chain between Sarah Hall Ingram, Lois Lerner, Joseph Grant, and others (Sep. 21, 2010) IRS0000508974–76. The Diane Rehm Show that aired on September 21, 2010 included a segment called "Campaign Spending," which featured Democratic Congressman Chris Van Hollen and Sheila Krumholz, Executive Director of the Center for Responsive Politics, among other guests. Diane Rehm's website describes the segment as "Diana and guests explore campaign finance and the influence of secret donors." The Diane Rehm Show, Campaign Spending (Sep. 21, 2010).

[232] In June 2014, the IRS informed Congress that Lois Lerner's computer experienced a hard drive crash in May 2011, potentially resulting in emails being lost between January 2009 and May 2011, as described more fully in Section II(C) of the Bipartisan Investigative Report. In an effort to obtain lost Lerner emails, then-Chairman Wyden of the Senate Finance Committee and then-Chairman Camp of the House Ways and Means Committee sent letters to President Obama, requesting all communications between Lerner and White House employees between January 2009 and May 2011. Accordingly, the White House conducted a search for Lerner emails but did not find any direct emails between Lerner and White House employees. However, the White House did identify three emails that both Lerner and White House employees had received from a third party. On June 18, 2014, the White House responded to the Chairmen's letters and provided the Committees with three emails, totaling 66 pages of documents. After review, the Committee determined that these emails were not relevant to the Committee's investigation: one email was spam and the other two were from an individual requesting tax
Continued

President's repeated public criticism of the *Citizens United* decision to determine the White House's influence on other executive agencies. Indeed, White House's continuous messaging rendered communication to individual employees unnecessary.

The Committee found evidence that several key employees within the IRS maintained regular contact with the White House. Most notably, Commissioner Shulman admitted that he had "pretty regular interactions" and "went to a whole number of meetings" with White House staff during his tenure at the IRS.[233] Indeed, the White House visitor log shows 174 visits from "Douglas Shulman" or "Doug Shulman" between February 2009 and December 2012.[234]

Analysis by the House Ways & Means Committee staff shows that at least 17 entries on this log also appear on Shulman's calendar.[235]

When interviewed by Committee staff, Shulman indicated that his meetings with White House staff concerned implementation of the Affordable Care Act; issues related to the IRS budget; tax provisions in the American Recovery and Reinvestment Act; economic roundtables and other high-level domestic policy matters involving the IRS; and events open to the general public, such as the Easter Egg Roll.[236] However, Shulman could not recall anything about a number of his other meetings with White House employees.[237]

Shulman described four in-person meetings with President Obama:

   • a press conference with the President and Treasury Secretary Geithner about offshore tax proposals on May 4, 2009;[238]

   • a meeting where Shulman presented the daily economic briefing to the President about general matters of the tax gap on October 21, 2009;[239]

   • a meeting with the President and other heads of agencies about how to improve the government on June 6, 2011;[240] and

   • a photo-op with the President on December 14, 2012 after Shulman's term as IRS Commissioner expired.[241]

Shulman denied that the targeting of Tea Party organizations was ever discussed at any meeting with White House staff or the President.[242] Several other IRS employees met with White House staff between 2010 and 2013. Like Shulman, those employees de-

---

assistance. *See* Letter from Chairman Dave Camp to President Barack Obama (June 16, 2014) and Letter from W. Neil Eggleston to Chairmen Camp and Wyden (June 18, 2014).

[233] SFC Interview of Douglas Shulman (Dec. 3, 2013) p. 19.

[234] SFC Interview of Douglas Shulman (Dec. 3, 2013) Interview Exhibit 8, also available at *White House Visitor Access Records*, http://www.whitehouse.gov/briefing-room/disclosures/visitor-records. This log includes visits to all buildings in the White House complex: the White House proper, the Eisenhower Executive Office Building and the New Executive Office Building.

[235] *Id.*; SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 87–116; and selected entries from Douglas Shulman calendar, IRS0000385548–49, IRS0000385566, IRS0000385577, IRS0000385584, IRS0000385604 and IRS0000385603.

[236] SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 19–22, 87–116; Hearing before the House Oversight and Government Reform Committee, "The IRS: Targeting Americans for their Political Beliefs" (May 22, 2013) p. 51 (extraneous pages omitted).

[237] SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 90–91, 93–95, 97, 101, 104, 106–107.

[238] *Id.* p. 93.

[239] *Id.* p. 96.

[240] *Id.* pp. 111–12.

[241] *Id.* p. 116.

[242] Hearing before the House Oversight and Government Reform Committee, "The IRS: Targeting Americans for their Political Beliefs" (May 22, 2013).

179

nied that they discussed the Tea Party applications with anyone in the White House or received any directions about how the applications should be handled.

We determined that the White House was briefed by Treasury officials before TIGTA released its report publicly. Former Treasury Chief of Staff Mark Patterson told Committee staff that he spoke with Mark Childress, who at that time was a Deputy Chief of Staff at the White House, twice in April or May 2013 about the IRS's plan to apologize in advance of the forthcoming TIGTA report.[243] Childress concurred with Patterson's view that if the IRS apologized, it should do so only once.[244] Patterson does not know if Childress spoke with anyone else at the White House about this issue.[245] Former Treasury Deputy Secretary Neal Wolin and Patterson indicated that, to their knowledge, the only meetings with the President and other White House staff about the Tea Party targeting occurred shortly after the TIGTA report was released.[246] The Committee did not interview any White House employees during the course of the investigation.

The Treasury Department and the White House also had advance notice about the IRS's loss of information potentially relevant to this investigation caused by Lois Lerner's hard drive crash. As described more fully in Section II(C) of the Bipartisan Investigative Report, the IRS first discovered a gap in Lerner's emails in early February 2014. The IRS did not inform Congress of this problem— which was material to this and several other Congressional investigations—until June 13, 2014. However, the Treasury Department learned of the problem in April 2014, when a senior IRS advisor notified an attorney in the Treasury's Office of General Counsel.[247] Treasury, in turn, informed the White House shortly thereafter.[248]

Overall, it is apparent that it was unnecessary for the President to direct any individual government employee to target the Tea Party and conservative organizations. Instead, the White House's frequent public statements condemning political spending ensured that government agencies were acutely aware of the President's wishes and they responded accordingly.

## B. THE DOJ ENLISTED THE IRS'S HELP IN POTENTIAL PROSECUTION OF ORGANIZATIONS ENGAGED IN POLITICAL SPEECH

President Obama's repeated criticism of the Supreme Court's *Citizens United* decision and his frequent calls to curtail political spending quickly infiltrated the halls of the DOJ. One option that DOJ officials considered was the feasibility of prosecuting 501(c) organizations for engaging in political speech.

The Public Integrity Section (PIN) of the DOJ's Criminal Division combats corruption of public officials and prosecutes election crimes.[249] Documents produced to the Committee show that Lois

---

[243] SFC Interview of Mark Patterson (Apr. 7, 2014) pp. 33–36.
[244] *Id*.
[245] *Id*.
[246] *Id*. pp. 36–42; SFC Interview of Neal Wolin (May 1, 2014) pp. 22–25.
[247] TIGTA Memorandum of Interview or Activity, Personal Interview of Catherine Duval (July 1, 2014).
[248] Letter from Neil Eggleston to Chairman Camp and Chairman Wyden (June 18, 2014).
[249] DOJ, Public Integrity Section.

Exhibit E

Lerner was the PIN's key contact at the IRS, and in this capacity she provided DOJ with critical data and access to IRS officials as she coordinated the IRS's response to DOJ's requests for assistance. Lois Lerner and PIN employees were communicating with each other and discussing campaign finance options as early as March 2009.[250] EO and DOJ staff were also discussing the Tea Party as early as July 2010 when staff discussed a campaign ad for Tea Party Congressional Candidate Rick Barber.[251] Emails produced to the committee document a clear, deliberate, and multi-year effort on the part of DOJ to scrutinize conservative tax-exempt organizations.

### 1. In 2010, the DOJ Enlisted the IRS to Help Examine Political Spending by Tax Exempt Organizations

On September 21, 2010, Jack Smith, PIN Chief, wrote to his subordinates Raymond Husler, PIN Principle Deputy Chief, Justin Shur, PIN Deputy Chief, and Richard Pilger, Director of the Election Crimes Branch, about a *New York Times* story on 501(c)(4)s intentionally using donations for political spending in order to skirt campaign finance law:

> This seems egregious to me—could we ever charge a 371 conspiracy to violate laws of the USA for misuse of such non profits [sic] to get around existing campaign finance laws + limits? I know 501s are legal but if they are knowingly using them beyond what they are allowed to use them for (and we could prove that factually)? [252]

Smith then recommended that PIN meet with TE/GE Division Commissioner Sarah Hall Ingram to discuss the feasibility of his idea. The following day, Pilger expressed skepticism about Smith's plan and advised him to take an alternate path forward:

> It would be good to gear up some enforcement, but very challenging as criminal work in the near term unless there is coordination with campaigns. Absent coordination, the Department's way in is probably most directly through Tax Division.[253]

Nancy Simmons, PIN Senior Counsel, agreed with Pilger's assessment, stating, "This area has been the subject of much debate and press articles over the past, but I don't see a viable way to make a prosecutable federal case here."[254] Despite the concerns raised by his staff, Smith decided to press forward with his plan and set up a meeting on September 22 with Pilger, Simmons and others to discuss these issues.[255] The following week, PIN employ-

---

[250] Email chain between Craig Donsanto, Lois Lerner and others (Mar. 6, 2009) SFC IRS 000211

[251] Email chain between Justin Lowe, Nicole Siegel and others (June 30–July 1, 2010) SFC IRS 000751.

[252] Email chain between Jack Smith, Richard Pilger and others (Sep. 21–22, 2010) SFC IRS 000004. Although not noted by name, it appears that the DOJ employees were referring to a September 21, 2010 *New York Times* article titled "Donor Names Remain Secret as Rules Shift."

[253] *Id.*

[254] *Id.*

[255] Email calendar invite from Jack Smith (Sep. 22, 2010) SFC IRS 000006. Email calendar invite from Richard Pilger to Nancy Simmons (Sep. 22, 2010) SFC IRS 000007.

Exhibit E

181

ees Smith, Shur, Simmons, Pilger, and Husler met again to discuss a "Possible 501/Campaign Finance Investigation."[256]

On September 29, Pilger reached out to Sarah Hall Ingram's office to set up a meeting with the IRS to discuss 501(c)(4) issues. Ingram told her staff, "we have to do this" but since she was traveling, Ingram asked Lois Lerner to organize the meeting.[257] The IRS planned to:

> [W]alk [PIN] through the basic civil law rules within our jurisdiction and find out what if anything else they are looking for. If they need more than the primer then we would need to assign carefully to preserve the civil-criminal wall. These are not tax people so [Lerner] may also take Joe Urban to do clear perimeters about tax info should they want to do any 6103 fishing (as opposed to public record 6104 info).[258]

On Monday, October 4, Lerner and Pilger spoke in preparation for Friday's meeting.[259] During the call, Lerner and Pilger discussed having the IRS provide the DOJ and the Federal Bureau of Investigation (FBI) with 501(c)(4) filing data and inviting the FBI to attend the Friday meeting.

On Friday, October 8, the IRS, DOJ and FBI held their first meeting to discuss political spending by 501(c)(4) organizations.[260] Siri Buller, an employee in EO Technical, prepared a summary about what was discussed during this meeting that included the following points:

- "[PIN] attorneys expressed concern that certain section 501(c) organizations are actually political committees posing' as if they are not subject to FEC law, and therefore may be subject to criminal liability. The attorneys mentioned several possible theories to bring criminal charges under FEC law," including a partnership between DOJ, FEC and IRS.

- Lerner explained the tax law surrounding 501(c)(4)s and challenges to criminally prosecuting these organizations including confusing terminology and a lack of clear definitions and rulings.[261]

In a follow-up meeting a few weeks later, Pilger asked for a contact from the IRS so that PIN could further discuss "criminal tax enforcement against tax exempt organizations" with the IRS.[262] Nancy Marks provided Pilger with the requested contact but noted the very unusual nature of DOJ's inquiry and warned that the IRS had not "seen activity that rises to the level of criminal investiga-

[256] Email from Jack Smith to Richard Pilger and others (Sep. 30, 2010) SFC IRS 000016.

[257] Email chain between Richard Pilger, Cynthia Brown and Sarah Hall Ingram (Sep. 29, 2010) IRSC038433; Email chain between Sarah Hall Ingram, Richard Pilger, Lois Lerner, and others (Sep. 29, 2010) IRSC038466.

[258] Email chain between Sarah Hall Ingram, Richard Pilger, Lois Lerner and others (Sep. 29, 2010) IRSC038466.

[259] Email chain between Richard Pilger, Lois Lerner and Cynthia Brown (Sep. 29—Oct. 2, 2010) SFC IRS 000017–18.

[260] Email calendar invite from Richard Pilger to Sarah Hall Ingram, Jack Smith and others (Oct. 8, 2010) SFC IRS 000038. Email chain between Lois Lerner, Richard Pilger, Brian Fitzpatrick, and others (Oct. 6–7, 2010) SFC IRS 000034–35

[261] Email from Siri Buller to Lois Lerner, Judith Kindell and others (Oct. 11, 2010) IRSC038444–46. The IRS also provided the DOJ with a series of documents regarding political activity of 501(c)(4)s. Email from Siri Buller to Joseph Urban (Oct. 7, 2010) IRSC038472–73

[262] Email chain between Joseph Urban, Nancy Marks and others (Oct. 19, 2010) IRSC038471.

Exhibit E

182

tion."[263] Apparently, the DOJ's overly zealous attempts to criminally prosecute tax-exempt groups were enough to make even the IRS uncomfortable.

2. The FBI Was Investigating Tax-Exempt Organizations in 2010

The FBI is tasked with investigating tax fraud and performing counterterrorism operations as part of its law enforcement responsibilities, and the FBI routinely coordinates work on these issues with the IRS. Cooperation between agencies is common during law enforcement actions and allows law enforcement personnel to take advantage of the expertise provided by other government agencies. This cooperation between the FBI and IRS was a common occurrence both before and during the time the IRS was inappropriately targeting conservative tax-exempt organizations, and the Committee possesses emails documenting numerous instances of cooperation that appears to be appropriate.

Nonetheless, one set of interactions between the agencies raises questions of impropriety. On October 5, Lerner informed her staff about DOJ's request for 501(c)(4) filing data:

> They [DOJ] would like to begin looking at 990s from last year for c4 orgs. They are interested in the reporting for political and lobbying activity. How quickly could I get disks to them on this? Also would 990 EZ filers have information on lobbying and political activity on the EZ?[264]

Lerner's staff immediately began working on this request, compiling a list of 501(c)(4)s that had engaged in political activity between 2007–2010.[265] Over the next couple of days Lerner and her staff worked with the DOJ to nail down details about the request as they shepherded DOJ's request through the IRS bureaucracy.[266]

On October 22, the IRS sent the requested documents, totaling 21 DVDs of information, to FBI Supervisory Special Agent Brian Fitzpatrick in Washington D.C.[267] These DVDs contained the 990s filed between 2007 and 2010 by 501(c)(4)s that had indicated they had engaged in some level of political activity.[268] On November 4, Lerner followed up with her staff to verify that the 990s had been sent to the FBI.[269]

---

[263] *Id.*

[264] The 990 and 990 EZ forms are the annual tax return forms filed by 501(c)(4) organizations. Email chain between Lois Lerner, Cheryl Chasin, Sherry Whitaker, and others (Oct. 5, 2010) IRS0000902548–50.

[265] Cheryl Chasin evaluated if a 501(c)(4) was engaged in political activity based on the Form 990. Email chain between Lois Lerner, Cheryl Chasin, Sherry Whitaker and others (Oct. 5, 2010) IRS0000902548–50; Email chain between Lois Lerner, Judith Kindell, Sherry Whitaker and other (Oct. 5—Nov. 7, 2010) IRS0000807007–08.

[266] The IRS provided DOJ only with publically available data and did not produce the protected Schedule B of the 990 form. Email chain between Judith Kindell and Cheryl Chasin (Oct. 5, 2010) IRS0000902536–37; Email chain between Lois Lerner, Cheryl Chasin, Sherry Whitaker, and others (Oct. 5, 2010) IRS0000902548–50; Email chain between Lois Lerner and Richard Pilger (Oct. 5–7, 2010) IRSC038475–76; Email chain between Sherry Whitaker and David Hamilton (Oct. 5, 2010) IRSC038477–78; Email chain between Sherry Whitaker and David Hamilton (Oct. 5, 2010) IRSC038479–80; Email chain between Lois Lerner, Richard Pilger, Sherry Whitaker, and others (Oct. 5–7, 2010) SFC IRS 000034–35; Email chain between Lois Lerner, Richard Pilger, and Sherry Whitaker (Oct. 5–7, 2010) SFC IRS 000036–37.

[267] Email chain between Sherry Whitaker and David Hamilton (Oct. 7–22, 2010) IRSC038436.

[268] Email chain between Lois Lerner, Judith Kindell, Sherry Whitaker and others (Oct. 5—Nov. 7, 2010) IRS0000807007–08; Email chain between Judith Kindell and Cheryl Chasin (Oct. 5, 2010) IRS0000902536–37.

[269] Email chain between Lois Lerner, Judith Kindell, Sherry Whitaker, and others (Oct. 5—Nov. 7, 2010) IRS0000807007–08.

Exhibit E

183

The FBI's interest in this information, and the IRS's willingness to provide it, raises the question of whether the FBI was used by the administration to target political advocacy organizations.

### 3. The DOJ Again Reached Out to the IRS for Assistance in 2013

The IRS and DOJ continued to discuss political spending by 501(c) organizations sporadically throughout 2011 and 2012.[270] Serious consideration of prosecuting 501(c) organizations reemerged just days before news of the Tea Party targeting scandal broke.

In early 2013, DOJ gave Democratic staff of the Senate Judiciary Committee's Subcommittee on Crime and Terrorism a briefing on:

> The Department of Justice's approach to and investigation or prosecution of . . . material false statements to the IRS regarding political activity in order to obtain and maintain 501(c)(4) status . . . [and] knowing and willful violations of disclosure rules.[271]

On April 9, 2013, the Senate Judiciary Committee's Subcommittee on Crime and Terrorism held a hearing entitled "Current Issues in Campaign Finance Law Enforcement." Subcommittee Chairman Sheldon Whitehouse questioned IRS and DOJ witnesses as to why they had failed to prosecute 501(c)(4) organizations that appeared to make false statements regarding their political campaign activities:

> I would urge that the Department and the Service get together and rethink whether in these two specific areas, which I think bear little resemblance to traditional tax violations and are in fact very plain-vanilla criminal cases . . . or whether the Department could not proceed to . . . put together a criminal case showing a fairly straightforward false statement or a fairly [straightforward] shell corporation disclosure violation.[272]

In an apparent response to political pressure from Democrats, Richard Pilger again reached out to Lerner for assistance in May 2013—just two days before Lois Lerner revealed that the IRS had been targeting conservative groups. Lerner informed her colleagues of DOJ's meeting request:

> [Pilger] wanted to know who at IRS the DOJ folks could talk to about Sen. Whitehouse [sic] idea at the hearing that DOJ could piece together false statement cases about applicants who "lied" on their 1024s—saying they weren't planning on doing political activity, and then turning

---

[270] In late 2011 and early 2012, the IRS, DOJ, and FEC worked on a report to The Council of Europe's Group of States against Corruption (GRECO), explaining U.S. campaign finance law to foreign tax officials. See Email from Jane Ley to Lois Lerner, Judith Kindell and others (Nov. 18, 2011) FECSUBP5000052–93; Email chain between John Brandolino, Nancy Simmons, Lois Lerner, Nancy Simmons, and others (Jan. 26–27, 2012) IRS0000313073–74; Email chain between Jane Ley, Lois Lerner and others (Nov. 19–21, 2011) IRS0000714413–15; Email chain between Jane Ley, Nancy Simmons, Lois Lerner and others (Nov. 19–21, 2011) IRS0000714408–09; Email chain between Lois Lerner and Richard Pilger (Jan. 26, 2011) SFC IRS 0000194–95.

[271] Email chains between DOJ staff and Democratic Staff of the Senate Judiciary Committee (Nov. 2012—Mar. 2013).

[272] Hearing before the Subcommittee on Crime and Terrorism of the Senate Judiciary Committee, "Current Issues in Campaign Finance Law" (April 9, 2013) pp. 13–14 (extraneous pages omitted).

Exhibit E

> around and making large visible political expenditures.
> DOJ is feeling like it needs to respond, but want to talk
> to the right folks at IRS to see whether there are impedi-
> ments from our side and what, if any damage this might
> do to IRS programs.[273]

In response to Lerner's email, Nikole Flax expressed support for
DOJ's idea and asked about the potential of inviting the FEC to
also attend the meeting. After some deliberation, Lerner decided to
let DOJ invite the FEC, and she also recommended inviting IRS
Criminal Investigations Division and their counsel to the meet-
ing.[274] On May 10, 2013, Lerner revealed that the IRS had been
targeting Tea Party organizations. Even in the midst of the fierce
backlash that resulted from this revelation, she continued to assist
DOJ in their efforts to target tax-exempt groups. On the evening
of May 10, Lerner told Pilger that Nancy Marks would work on ar-
ranging this meeting between the IRS and the DOJ.[275] Majority
staff does not know if this meeting ever occurred, as the IRS pro-
duced no further records regarding this meeting.

Throughout its dealings with DOJ, the IRS provided timely re-
sponse to requests for information and assistance. Lerner was
quick to respond to DOJ staff. On multiple occasions Lerner made
herself available for calls, sometimes within a few minutes after re-
ceiving DOJ's request for assistance. Instead of delegating to her
subordinates, Lerner personally handled these requests and she
guided them through the IRS bureaucracy. These examples illus-
trate a multi-year coordinated effort between the IRS and the DOJ
to constrain political spending by tax-exempt organizations, pursu-
ant to the President's public statements and views.

### C. THE FEC AND THE IRS WORKED TOGETHER TO TARGET CONSERVATIVE ORGANIZATIONS

In response to mounting pressure to constrain political spending
in recent years, the FEC increased its scrutiny of political speech.
Indeed, some of this pressure predated President Obama's adminis-
tration as part of a broader Democratic push to limit the amount
of money in politics, as noted above. But following the calls for re-
form after *Citizens United,* the FEC's scrutiny of conservative tax-
exempt organizations reached new levels.

We found that the FEC worked with the IRS to investigate con-
servative organizations—but not any progressive organizations—
with Lois Lerner's eager assistance. Lerner had previously worked
at the FEC and was well known for her aggressive investigation of
conservative groups, particularly those that she believed were at-
tempting to expand the influence of money in politics.[276] Docu-
ments produced to the Committee show that the FEC also worked
with the IRS on broader political spending issues, concurrent with

---

[273] Email chain between Lois Lerner, Nikole Flax and others (May 8–9, 2013)
IRS0000209398–400.
[274] *Id.*
[275] Email chain between Richard Pilger and Lois Lerner (May 8, 2013) SFC IRS 000201;
Email chain between Richard Pilger, Lois Lerner and others (May 8–10, 2013) SFC IRS 000204.
[276] *National Review,* Lois Lerner at the FEC (May 23, 2013).

Exhibit E

the IRS's systematic targeting of Tea Party applications for tax-exempt status.

## 1. The FEC Used Information Provided by the IRS To Target Four Conservative Organizations

On November 18, 2013, then-Ranking Member Hatch sent a letter to the Chair of the FEC requesting that the FEC provide all documents reflecting communications between FEC employees William Powers and Wade Sovonick and any employee of the Treasury Department (including the IRS), from January 2006 to the present. Lisa Stevenson, Deputy General Counsel—Law, FEC, responded to Senator Hatch's letter via email on November 26, 2013.[277] Ms. Stevenson noted that she had attached a complete set of responsive documents the FEC was producing in response to Senator Hatch's letter. The Committee also made a similar request to the IRS for communications its employees had with the FEC. On September 11, 2013, the IRS informed Senator Hatch that it had produced all relevant documents.[278] Review by the Majority staff confirmed that many of the same documents were produced by both agencies and that there were no substantive differences or omissions.

As a whole, the documents show that Lerner was the FEC's key contact at the IRS. In this capacity she and the IRS helped the FEC with enforcement actions against four conservative tax-exempt organizations.[279]

The first communication regarding these conservative groups occurred in July 2008, when FEC Enforcement Division attorney Wade Sovonick contacted Lerner to discuss a 501(c)(4) organization that he believed "recently filed [for tax-exempt status] with the IRS."[280] Shortly thereafter, Sovonick and another Enforcement attorney, William Powers, spoke with Lerner and revealed that their inquiry related to the tax-exempt status of the American Future Fund.[281] At the time of this conversation, the FEC was considering a complaint filed against the American Future Fund by the Minnesota Democratic Farmer Labor Party alleging violations of the Federal Election Campaign Act related to television advertisements.[282] According to materials cited in the complaint, the American Future Fund describes itself as a "mechanism to promote conservative, free market ideas, and to communicate them to the public."[283] It appears that Lerner provided only limited information to the FEC attorneys during the July 2008 conversation. She explained that section 6103 of the Internal Revenue Code prevented her from sharing further information about an application for tax-exempt status while the application is still pending before the IRS.[284]

On September 30, 2008, Powers and other FEC attorneys recommended that the FEC Commissioners find that the American

[277] Email from Lisa Stevenson to SFC Staff (Nov. 26, 2013).
[278] Letter from Leonard Oursler to Senator Orrin Hatch (Sep. 11, 2013).
[279] Email chain between Lois Lerner, William Powers, Wayne Sovonick and others (Feb. 3, 2009) FECOGC000005–06.
[280] Email chain between Wayne Sovonick and Lois Lerner (July 9, 2008) FECOGC000001–02.
[281] FEC, Report of Telecon (July 10, 2008) FECOGC000003–04.
[282] FEC, First General Counsel's Report (Sep. 30, 2008).
[283] *Id.*
[284] FEC, Report of Telecon (July 10, 2008) FECOGC000003–04.

186

Future Fund violated three provisions of the Federal Election Campaign Act.[285] The recommendation memorandum did not directly reference the conversation with Lerner, but instead stated, "The IRS has not yet issued a determination letter regarding [American Future Fund's] application for exempt status. Based on the information from the response and the IRS website . . . it is likely that the [American Future Fund's] application is still under review."[286]

Just two weeks after President Obama was sworn in, Powers contacted Lerner for an update on the American Future Fund and for information about three additional conservative organizations: the American Issues Project, Citizens for the Republic, and Avenger, Inc.[287] As Powers noted in his message, American Issues Project was the successor of the other two subjects of his inquiry—Citizens for the Republic and Avenger.

At the time of Powers's request, the FEC was considering two complaints filed against American Issues Project: one by Obama for America, and another by Democracy 21—a liberal group that Lerner also directly corresponded with regarding complaints against conservative groups lodged with the IRS, as discussed above in Section II(C)(5).[288] American Issues Project described its mission as "[t]o advocate for and promote the core conservative principles of our founding fathers and Ronald Reagan."[289] FEC records show that at the time of Powers's inquiry, the FEC was trying to determine the amount of political spending by the American Issues Project. The FEC had scant information—it was only aware of the organization's spending on one advertisement—and could not determine the overall percentage of political spending because the organization had not "filed anything [with] the IRS yet."[290] FEC records also show that the FEC was apparently seeking the IRS's opinion about whether political spending constituted the organization's primary activity. Indeed, this appears to be the purpose of Powers's message to Lerner—"to see if an IRS determination has been made re exemption."[291]

Before Lerner responded to Powers's February 2009 message, the Commissioners closed the complaint against American Future Funds on a split vote.[292] On March 3, 2009, Lerner provided the requested information about all four organizations and Powers thanked her, noting that the information "looks as if it will be very useful."[293] Lerner apologized for the response taking so long.[294] On March 31, 2009, Michael Seto provided an additional 150 pages of records about American Issues Project and American Future Fund

---

[285] FEC, First General Counsel's Report (Sep. 30, 2008) p. 15.
[286] Id.
[287] Email chain between William Powers, Lois Lerner and others (Feb. 3, 2009) FECOGC000005–06.
[288] FEC, Complaint by Obama for America, MUR No. 6081 (Sep. 8, 2008); FEC, Complaint by Democracy 21, MUR No. 6094 (Oct. 10, 2008) (exhibits omitted).
[289] FEC, Statement of Reasons of Vice Chairman Donald F. McGahn and Commissioners Caroline C. Hunter and Matthew S. Peterson (July 25, 2013) p. 10.
[290] FEC, Case Activation Meeting Notes (Jan. 21, 2009) FECOGC000195–98.
[291] Id.
[292] FEC, Amended Certification, MUR. 5988 (Feb. 25, 2009).
[293] Email chain between Lois Lerner, William Powers and others (Feb. 3—Mar. 6, 2009) FECOGC000008–09.
[294] Id.

Exhibit E

to Powers, including the applications for tax-exempt status for both groups and the 2007 Form 990 for the former group.[295]

In January 2010, following the *Citizens United* ruling, President Obama began condemning the decision in his public statements including his State of the Union address. In, February 2010, just weeks after these events, Powers requested more information about American Issues Project—including the tax return for 2008, which would show financial information—while the FEC was still considering the two complaints lodged against the organization.[296] The next day, Lerner informed Powers that "we have checked our records and there are no additional filings at this time."[297] Neither the IRS nor the FEC produced any records of subsequent communications between the agencies about any of these organizations. In July 2013, the FEC Commissioners dismissed the complaints against American Issues Project, finding that the organization was not a political committee subject to FEC regulation.[298]

The IRS's attentive treatment of the FEC requests for information stands in stark contrast to the experience of conservative organizations that applied for section 501(c)(3) and 501(c)(4) status. Lerner was quick to respond to FEC attorneys; rather than having staff employees assist the FEC, Lerner shepherded their requests through the IRS herself, with the assistance of two senior managers: Michael Seto (Manager of EO Technical) and Robert Choi (Director of Rulings and Agreements). Powers noted that Seto in particular was "extremely helpful . . . in providing me the requested documents both promptly and professionally."[299]

### 2. The FEC Enlisted the IRS in Other Efforts To Restrict Political Speech

As early as 2006, the IRS was working with the FEC on examining political spending by 501(c)(4)s.[300] On November 3, 2006, FEC Assistant General Counsel Mark Shonkwiler asked Lois Lerner for assistance:

> Which division/office of the IRS would be in the best position to receive a report from the Commission . . . regarding apparent violations of the law in connection with an organization which claims tax exempt status under Section 501(c)(4) status, yet appears to be focused primarily, if not exclusively, on electoral politics—and actually is registered as a state political committee?[301]

Lerner told Shonkwiler that would that she would forward the report to the IRS Classification Office, which handles referrals.[302]

---

[295] FEC, Fax transmission cover sheet from Michael Seto to William Powers (Mar. 31, 2009) FECOGC000069 (subsequent pages omitted by Committee staff).

[296] Email chain between Lois Lerner, William Powers and others (Feb. 2, 2010) FECOGC000013.

[297] Email chain between Lois Lerner, William Powers and others (Feb. 3, 2010) FECOGC000014–15.

[298] FEC, Statement of Reasons of Vice Chairman Donald F. McGahn and Commissioners Caroline C. Hunter and Matthew S. Peterson (July 25, 2013) p. 25.

[299] Email chain between Lois Lerner, William Powers and others (Apr. 3, 2009) FECOGC000012.

[300] Email between Lois Lerner and Mark Shonkwiler (Nov. 3, 2006) FECSUBP5000751.

[301] *Id.*

[302] *Id.*

188

In 2010, the FEC took the unusual step of requesting formal written comments from the IRS on proposed regulations for 501(c)(3)s.[303] IRS employees noted the unprecedented nature of this request, with Catherine Livingston saying "Mike [Blumenfeld] tells me he is not aware of a prior instance in which we have sent a formal written comment to the FEC on proposed regulations."[304] Nevertheless, the IRS Chief Counsel's Office worked with Lerner to draft comments on the FEC proposal, per the FEC's request.[305]

Overall, the Majority staff finds that the IRS and the FEC worked together to constrain political speech over a period of several years in direct response to the political pressure by Democrats, both in and out of the Obama administration. These efforts resulted in greater scrutiny on spending of political speech by organizations on the right side of the political spectrum.

### D. TREASURY DEPARTMENT COORDINATION WITH THE IRS

Based on evidence uncovered by the Majority staff, it appears that top Treasury officials had some knowledge of the IRS's handling of Tea Party applications before TIGTA publicly released its report. Aspects of Treasury's overall role in the targeting remains unclear due to a lack of cooperation with the Committee investigation.

IRS Commissioner Shulman had regular contact with the Deputy Secretary of the Treasury and other high-level Treasury officials, but he denied that he spoke with them about the targeting of Tea Party groups.[306] Several other IRS employees met with Treasury officials between 2010 and 2013, including Acting Commissioner Miller, Chief of Staff Nikole Flax, and attorneys in the IRS Office of Chief Counsel, including Chief Counsel William Wilkins. Like Shulman, those employees denied that they discussed the Tea Party applications with anyone in the Treasury, or received any directions from Treasury about how these applications should be handled.

The Committee interviewed two former Treasury executives: former Deputy Secretary Neal Wolin and former Chief of Staff Mark Patterson. Wolin told Committee investigators that in 2012, Inspector General George told him that TIGTA had started an audit; however, Wolin claimed he only learned that Tea Party groups were targeted after Lerner apologized for that targeting in May 2013.[307] Patterson stated that he first learned that TIGTA was doing an audit in early 2013, but he did not learn about TIGTA's conclusions until a few weeks before its report came out.[308] TIGTA's records differ from Patterson's recollection: TIGTA informed the Committee that Inspector General George first briefed Patterson on September 14, 2012, and that, to the best of his recollection, George "conveyed the general sense that the IRS

---

[303] Email chain between Eugene Lynch, Michael Blumenfeld and others (Feb. 17–18, 2010) IRS0000713335.
[304] Email chain between Catherine Livingston, Nikole Flax and others (Feb. 26, 2010) IRS0000853254.
[305] Email between Lois Lerner, Michael Blumenfeld and others (July 23, 2010) IRS0000834396.
[306] SFC Interview of Douglas Shulman (Dec. 3, 2013) pp. 16–19, 77.
[307] SFC Interview of Neal Wolin (May 1, 2014) pp. 25–26, 30.
[308] SFC Interview of Mark Patterson (Apr. 7, 2014) pp. 25–29.

had selected applications from certain political groups for additional scrutiny, including using descriptors such as 'tea party' to identify such applications." [309] Neither Wolin nor Patterson recalled discussing the Tea Party targeting with Secretary Lew until after Lerner's apology.[310] TIGTA informed the Committee that it briefed Secretary Lew about the audit on March 15, 2013.[311]

Below the Deputy Secretary's level, Treasury employees in the Office of Tax Policy discussed the political activities of tax-exempt organizations with Lerner and other IRS employees a number of times between 2010 and 2013. The primary Treasury employee who was involved in these discussions was Ruth Madrigal, an attorney in the Office of Tax Policy.[312] When forwarding an article about an appellate court's decision about political activity on 501(c)(4) organizations, Madrigal said that "I've got my radar up" about the issue and noted that "we mentioned potentially addressing them (off-plan) in 2013." [313] In spite of Madrigal's clear connection to the subject of the Committee's investigation, the Treasury Department refused repeated requests of the Committee to make her available for an interview. Thus, we could not definitively determine if Madrigal had any role in, or knowledge about, the IRS's decisions that disproportionately affected conservative organizations.

As discussed above, the Treasury Department and the White House also had advance notice about the IRS's loss of information potentially relevant to this investigation caused by Lois Lerner's hard drive crash. Indeed, in April 2014, IRS officials notified the Treasury Department that Lois Lerner emails were lost, and in turn, the Treasury Department notified the White House. In contrast, IRS only notified the Committee of the lost emails in June 2014.

In view of the limitations noted above, we are not able to determine the full scope of the Treasury Department's involvement in this matter. However, we conclude that Treasury had at least some knowledge of the IRS's targeting of conservative organizations before the matter was made public.

Overall, we conclude that the White House's drive to curtail political speech resulted in a coordinated effort across several executive agencies to increase scrutiny of conservative tax-exempt organizations. Furthermore, the IRS played a central role in the various attempts to target conservative groups engaged in political speech.

---

[309] TIGTA Summary of Briefings to IRS and Treasury Leadership, Provided to SFC on May 19, 2014.

[310] SFC Interview of Neal Wolin (May 1, 2014) pp. 31–32; SFC Interview of Mark Patterson (Apr. 7, 2014) pp. 28–30.

[311] TIGTA Summary of Briefings to IRS and Treasury Leadership, Provided to SFC on May 19, 2014.

[312] See, e.g., email chain between Ruth Madrigal, Judith Kindell and others (Oct. 6, 2010) IRS0000446776–77 (regarding political activities of 501(c)(4), (5) and (6) organizations); email chain between Ruth Madrigal, Lois Lerner, Victoria Judson, and others (June 14, 2012) IRS0000015400–01 (discussing the possibility of addressing 501(c)(4) regulations "off plan"); email chain between Lois Lerner, Ruth Madrigal, Victoria Judson and others (Dec. 14, 2012) IRS0000189994–95 (regarding an upcoming meeting between Democracy 21, Campaign Legal Center and the IRS to discuss petition for rulemaking on political activities of 501(c)(4) organizations).

[313] Email chain between Ruth Madrigal, Lois Lerner, Victoria Judson and others (June 14, 2012) IRS0000015400–01.

Exhibit E

## V. DISPARATE TREATMENT OF CONSERVATIVE AND PROGRESSIVE APPLICANTS FOR TAX–EXEMPT STATUS

*Applications received from Tea Party organizations were not only singled out, but were processed differently than other applications, including applications submitted by left-learning organizations. Left-leaning organizations were not subjected to the heightened scrutiny that Tea Party organizations encountered.*

### A. Applications From the Tea Party and Related Conservative Groups Were Singled Out for Special Treatment

While the Minority has attempted to create the impression that applications submitted by left-leaning groups were also singled out by the IRS, the facts recounted below demonstrate that applications received from Tea Party groups were not only singled out, but were processed differently than other applications.

#### 1. The "Test Cases" Selected for Development by EO Technical Were Applications From Tea Party Organizations

On February 25, 2010, one of the first applications for tax exemption received by the IRS from a Tea Party drew the attention of Jack Koester, a screener in EO Determinations.[314] Koester noted that the application from the Albuquerque Tea Party had the potential to be a "high-profile" case since the Tea Party was the object of "recent media attention."[315] Koester also noted that the Albuquerque Tea Party indicated in its application that it may support political candidates.[316] Thereafter, the decision was made by Holly Paz to send several Tea Party applications to EO Technical so that EO Technical could work the cases.[317] The intention was for EO Technical to develop guidance to assist EO Determinations in processing these applications.[318] Ultimately, the applications for Albuquerque Tea Party and Prescott Tea Party were sent to EO Technical and assigned to Carter Hull to be worked.[319] When the Prescott Tea Party failed to respond to a development letter, Hull closed the application for "failure to establish" and requested another Tea Party application.[320] He was subsequently assigned an application submitted by a conservative organization applying for 501(c)(3) status called American Junto.[321] Steve Grodnitzky, Acting EO Technical Manager at the time Hull was assigned the cases, described the test cases as follows:

> Q. . . . [T]he cases that were under review in Cincinnati and the cases that were under review in EO Technical by Mr. Hull, those were—as far as you understood, what were they? Were they cases across the whole political spectrum, or were they essentially Tea Party cases?

314 Email chain between Holly Paz, Cindy Thomas, Jack Koester, and others (Feb. 25–Mar. 17, 2010) IRS0000180869–73.
315 *Id.*
316 *Id.*
317 *Id.*
318 SFC Interview of Carter Hull (July 23, 2013) (not transcribed).
319 *Id.*
320 *Id.*
321 *Id.*

Exhibit E

A. Well, with—I guess with respect to the organizations that—I don't want to sound—in my mind, they were Tea Party organizations. They came in, and in their name, Albuquerque Tea Party——

Q. Uh—huh A.—Prescott Tea Party, those had "Tea Party" in their name.

Q. Uh-huh.

A. So I assumed that they were Tea Party organizations.

Q. And one of them—I think, if you'll—you probably recall this. At some point in 2010, Mr. Hull—and I think you actually had indicated that Prescott was a (c)(3) and it failed to establish, right?

A. That is correct.

Q. And Mr. Hull requested another case, and he got another case from Cincinnati, a (c)(3) to work; is that correct?

A. That is correct.

Q. And actually, if you look at the sensitive case report summary charts, but—but they will indicate that that replacement case, I think was American Junto?

A. American Junto or Hunto?

Q. Junto or Hunto, I don't know how they pronounce it either. Was your appreciation then that American Junto was either a Tea Party org or related or affiliated with the Tea Party, or perhaps espoused the same kind of political views as a Tea Party?

A. My understanding of a case that was coming up, American Hunto or Junto, that was to replace the Prescott Tea Party, was that it was connected in some way to the Tea Party. Perhaps it was—they had the same beliefs that—that the Prescott Tea Party or the Albuquerque Tea Party organizations had.[322]

As is evident from this exchange, the IRS's intention to scrutinize the Tea Party applications extended down to its selection of "test cases."

### 2. The Initial Process Used To Develop the Tea Party Applications Was Highly Unusual

In addition to working on the "test cases," Hull was assigned to assist Elizabeth Hofacre develop the Tea Party applications then pending in EO Determinations.[323] Hull provided Hofacre with several sample development letters to use on the Tea Party applications, but then also required Hofacre to send to him each draft development letter together with a hard copy of the application for his examination.[324] Hofacre could not release the development letters without first securing Hull's approval.[325] Moreover, once applicants responded to the development letters, Hull instructed Hofacre to send the responses to him for his review.[326] Under this scheme, Hofacre was unable to act independently and exercise the

[322] SFC Interview of Steve Grodnitzky (Sep. 25, 2013) pp. 70–71.
[323] SFC Interview of Carter C. Hull (July 23, 2013) (not transcribed).
[324] Email chain between Carter C. Hull, Steve Grodnitzky, Ronald Shoemaker, and others (May 17, 2010) IRS0000631583–84.
[325] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 57–64.
[326] *Id.*

normal range of discretion that an EO Determinations agent would have in determining how an application should be processed, or whether sufficient information existed upon which to base a recommendation to approve or deny the exemption request.[327] Hofacre described her experience to Committee staff as follows:

> Q. Okay. So this process that you've—that you've outlined where you would get the case and you would review the case and you would draft the letter and then you would send it to Mr. Hull, and Mr. Hull would send it back to you, and then you would release it, then you would get the response and you'd send the response to Mr. Hull . . .
>
> A. Yes. Exactly.
>
> Q. Is this—is this process a usual process, in your experience as an EOD agent in the—and the, I think it was almost 11 years that you'd been an EOD agent at the time that this process was put into place? Is that a usual—something that was usual in your experience?
>
> A. I had never seen that in my experience before or since then.[328]

Hofacre also told Committee staff that she had sufficient information in her possession in 2010 to recommend to her manager a decision on some of the Tea Party applications, but was prevented from doing so under the highly unusual review process imposed by Hull.

> Q. But for the process where you had to submit the—the development letter to Mr. Hull or perhaps—get Mr. Hull's approval on what the next step was, but for that process, could you have decided some of these cases and whether they had been a denial or a grant of the exemption request?
>
> A. Yes.
>
> Q. Okay. And that would have been in that window of time that you were in [Group] 7822, which would have been May to October of 2010?
>
> A. Right. There was enough information there to make a determination, whether or not positive or adverse.
>
> Q. But you were prevented from making that?
>
> A. I had no decision making authority.
>
> Q. Okay. And typically you would have that authority as an [EO Determinations] agent, right?
>
> A. Right. Like I said in my interview in May, this particular project and the procedure in this was so peculiar and so odd that I was—had no decision making authority. There was no—no freedom to do anything.[329]

The unfortunate consequence of imposing this highly rigid and unorthodox process on EO Determinations was that many Tea Party applications that could have been decided in 2010 were not. Rather, those Tea Party applications unnecessarily languished for several more years, while the IRS mismanaged its way through a series of failed initiatives designed to bring the applications to decision.

---

[327] *Id.*
[328] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) p. 65.
[329] *Id.* pp. 63–64.

Exhibit E

### 3. Until July 2011, the Emerging Issues Tab of the BOLO Spreadsheet Specifically Targeted the Tea Party

The first iteration of the Emerging Issues tab of the Combined Issues spreadsheet dated July 27, 2010, contained an entry for Tea Party applications.[330] The entry read as follows: "These cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)."[331] While the July 27, 2010 spreadsheet was distributed only to managers, subsequently, on August 12, 2010, Elizabeth Hofacre sent the first BOLO spreadsheet to all EO Determinations employees.[332] The Emerging Issues tab of the August 12, 2010 BOLO spreadsheet contained an entry for "Tea Party" identical to the entry found on the July 27, 2010 Combined Issue Spreadsheet. The entry specifically targeting the Tea Party remained in the Emerging Issues tab of the BOLO spreadsheet until the July 2011 revision. At that time, the entry was deleted and replaced with one for "Advocacy Orgs." which were described as "[o]rganizations involved with political, lobbying or advocacy for exemption under 501(c)(3) or 501(c)(4)."

Elizabeth Hofacre, Emerging Issues Coordinator from May 2010 to October 2010, was shown a list that Carter Hull had prepared on October 18, 2010, reflecting the status of the 40 "Tea Party" applications then pending in EO Determinations. Hofacre told Committee staff the following:

> Q. . . . in looking at this list, I think you indicated this before, and I don't want to belabor the point, but these essentially are Tea Party cases, 9/12 cases or conservative cases. Is that correct?
>
> A. Yes, that would be correct.
>
> Q. All right. And there's no Emerge or Acorn or liberal or progressive groups in this list that you're aware of, right?
>
> A. No, there are not.
>
> Q. Okay. And that's because the criteria that was being used focused only on Tea Party, patriots, 9/12, conservative organizations; right?
>
> A. Yes, that's correct.[333]

Ronald Bell assumed responsibility as Emerging Issues Coordinator from Hofacre in October 2010, and remained in that position for more than a year.[334] Bell was shown a copy of the BOLO spreadsheet dated November 16, 2010. The Emerging Issues tab of the spreadsheet has an entry for "Tea Party" that states that "[t]hese cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)."[335] Bell explained to Committee staff that he used this BOLO entry to perform secondary screening on the applications sent to him by screeners, in order to ensure that the applications

---

[330] Email from Elizabeth Hofacre to Steve Bowling, John Shafer, and others (July 27, 2010) IRS0000008609–24.
[331] *Id.*
[332] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) p. 130.
[333] *Id.* pp. 91–92.
[334] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).
[335] BOLO iteration chart (Apr. 30, 2012) IRS0000352979–84.

Exhibit E

he received were, in fact, applications from Tea Party organizations. He stated to Committee staff as follows:

> Q. Okay. And then you were describing your process earlier when cases, new cases were referred to you as Tea Party coordinator. You would look at the criteria on the BOLO to see if it was actually really a case that should stay, is that correct?
> A. Correct.
> Q. So based on this criteria here [November 16, 2010 BOLO], which cases would you have kept in your group for processing?
> A. Which cases would I have kept and added to the advocacy inventory?
> Q. Yes.
> A. Ones that talked about the Tea Party.
> Q. Okay. So at the time [November 2010] this was on the BOLO, you weren't necessarily pulling any case that had political advocacy issues, it was just the ones that were related to the Tea Party?
> A. That's correct.[336]

The criteria developed by the screeners to identify "Tea Party" cases clearly illustrates that the IRS was focused, at least until July 2011, exclusively on applications received from Tea Party or related groups, and not just on applications containing general advocacy issues. An application was considered to be received from a "Tea Party" if it contained the words "Tea Party," "9/12 Project," or "Patriots."[337] If those words were not present it was still considered a Tea Party application if the application indicated that the group was concerned with government debt, government spending or taxes, or that it would educate the public via advocacy or lobbying "to make America a better place to live," or that it was critical of how the country was being run.[338] When asked about these criteria and their connection to the Tea Party entry on the Emerging Issue tab, Holly Paz told Committee staff the following:

> Q. Just to look at this, kind of, the connection between the criteria as you understand it and it was given to you by Mr. Shafer and this reference in the BOLO, it makes perfect sense, doesn't it, that the screeners were using the kind of criteria they were using if they were looking for cases involved with the Tea Party movement?
> A. Yeah, I mean, the language on this be-on-the-lookout list uses the name "Tea Party." So the other names appear to be an extrapolation of that.[339]

Accordingly, until at least July 2011, the IRS screening criteria exclusively targeted Tea Party and related organizations.

---

[336] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).
[337] Email chain between John Shafer, Cindy Thomas, Steve Bowling, and others (June 1–10, 2011) IRS0000066837–40.
[338] *Id.*
[339] SFC Interview of Holly Paz (July 26, 2013) p. 84.

Exhibit E

4. Until the Tea Party Entry Was Removed From the Emerging
Issues Tab, Applications From Both Liberal and Conservative
Groups That Did Not Meet the Tea Party Criteria Were Sent to
General Inventory, Assigned, and Decided

Elizabeth Hofacre explained to Committee staff that during her
tenure as Emerging Issues Coordinator, applications that contained
political advocacy issues but that did not meet the criteria for a
Tea Party case were handled differently than applications received
from Tea Parties. She recounted the following to Committee staff:

Q. Okay. And when you began to receive the applications
from the groups, the liberal groups or the progressive groups,
did you also perform a secondary screening function or task on
those applications?

A. I didn't start receiving those applications until July
[2010]. The only screening that I performed was very limited,
to make sure they either met or did not meet the Tea Party
criteria.

Q. Okay. And what was the Tea Party criteria?

A. Well, a lot of times Tea Party was in their name, 9/12 Or-
ganizations, or Patriots. Some of the activities would be kind
of Tea Party-type rallies. A lot of the applicants would edu-
cate—I'm sorry, educate the public on the Constitution, the Bill
of Rights, those types of activities.

Q. Okay. So if a case had that—those indicators in it then,
is that a case you kept, you retained and began to develop?

A. That is correct.

Q. So just to draw a contrast now, so in July or in the subse-
quent months, if you received an application from an organiza-
tion that was liberal or progressive that the screeners had sent
to you, you know, what did you do with that case?

A. Well, if it came from an agent and if it didn't meet the
Tea Party criteria, I would send it back to that particular
agent. If it came from a screener and they thought it met the
Tea Party criteria, and if I determined that it did not, it went
to general inventory.

\*    \*    \*    \*    \*    \*    \*

Q. . . . if they went back in general inventory . . . they
were in the normal pipeline to be worked and for decisions to
be made on them. Is that correct?

A. Yes it is.

Q. Okay. So they didn't get hung up or held up in this col-
lection of Tea Party cases?

A. Correct.[340]

Therefore, until at least through Hofacre's tenure as Emerging
Issues Coordinator, October 2010, and most likely until the July
2011 BOLO change in which the reference to Tea Party was de-
leted, applications that raised political advocacy issues but that did
not met the "Tea Party" criteria were sent to general inventory, as-
signed and worked. In contrast, applications that did meet the "Tea
Party" criteria were systematically collected by the IRS and sub-
jected to a variety of delays and failed processing attempts.

---

[340] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 45–46, 48.

### 5. The IRS Continued To Target the Tea Party After the Emerging Issue Tab Was Revised in July 2011 to Remove the Entry for the Tea Party

In July 2011, at Lois Lerner's direction, Cindy Thomas revised the Emerging Issues tab to remove the reference to the Tea Party and in its place, to add an entry for "Advocacy Orgs." that were described as "organizations involved with political, lobbying or advocacy . . ."[341] Even after this change, Ronald Bell, the Emerging Issues Coordinator, continued to add Tea Party applications to his inventory of political advocacy applications if they merely contained the words "Tea Party" and otherwise exhibited no suggestion that the organization would engage in political advocacy. Bell explained this in the following exchange with Committee staff:

> Q. Okay. Do you recall seeing any groups that were affiliated with the Tea Party that didn't have political activity?
>
> A. You mean did they check the box "yes" or "no?'
>
> Q. No. In your evaluation of the application.
>
> A. We, in fact—in one exhibit, from the Exhibit 1 [Screening Workshop Notes—July 28, 2010],[342] it says to err to the conservative. So, if the Tea Parties—there was a question whether they were exempt or not. So, if I didn't maybe see that, "vote for this candidate" or whatever, it still went in the inventory.
>
> Q. When you say "err to the conservative," you mean for the screeners to err to the side of giving a case full development?
>
> A. Yes.
>
> Q. Okay. So is it accurate to say that after the BOLO change of July 2011, you still continued to pull all of the Tea Party cases that you saw into the full development Tea Party group?
>
> A. Yes.[343]

As Bell confirmed, the July 2011 change to the Emerging Issue tab was no more than a triumph of form over substance. While it outwardly created the appearance that applicants were being evaluated on the content of their applications, in reality it did nothing to change the practice of systemically selecting Tea Party applications and subjecting them to heightened scrutiny and substantial processing delays based on the mere presence of the words "Tea Party" in their applications. This is further borne out by the fact that TIGTA, in its May 14, 2013 review of the IRS practices related to the processing of political advocacy applications, found that 100 percent of all applications that contained the words "Tea Party," "9/12 Project," and "Patriots" were selected for full development by the IRS, and consequently experienced significant processing delays.[344]

On January 25, 2012, Cindy Thomas and Steve Bowling removed the "Advocacy Orgs." Entry from the Emerging Issues tab of the BOLO spreadsheet.[345] In their place, Thomas and Bowling inserted

---

[341] Email chain between Cindy Thomas, Ronald Bell, and others (July 5, 2011) IRS0000620735.

[342] Email from Nancy Heagney to Ronald Bell and others (July 29, 2010) IRS0000006700–04.

[343] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).

[344] TIGTA, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review (May 14, 2013) p. 8.

[345] SFC Interview of Cindy Thomas (July 25, 2013) p. 95.

Exhibit E

a new entry captioned "Current Political Issues" that Bowling described as follows: "political action type organizations involved in limiting/expanding Government, educating on the Constitution and Bill of Rights, Social economic reform/movement."[346] Ronald Bell explained that part of the motivation for this change was to identify the Tea Party without actually using the name "Tea Party." Bell stated the following:

> Q. Were you guys just trying to get at Tea Party with the first, you know—because the Tea Party guys say they want to limit Government and that gets at the Tea Party while it also looks balanced because you also say "expanding Government?"
>
> A. Yeah.
>
> * * * * * * *
>
> Q. And the same thing on "educating on the Constitution and Bill of Rights," that you mentioned the Tea Party and 9/12, Patriots who that caught in that filter, right?
>
> A. Yeah . . .[347]

Accordingly, even after the Emerging Issues tab was revised to remove direct reference to the Tea Party, the changes made to the Emerging Issues tab in January 2012 were designed to continue to target the Tea Party without mentioning it by name.

The Tea Party applications continued to receive unwarranted scrutiny from the IRS even after the Emerging Issues tab was revised again in June 2012. The revision redefined "Current Political Issues" as "501(c)(3), 501(c)(4), 501(c)(5) and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention . . . ." In August 2013, Jack Koester, a screener in EO Determinations, told Committee staff he applied the revised BOLO criteria as follows:

> Q. If you saw—I am asking this currently, if today if a Tea Party case, a group—a case from a Tea Party group came in to your desk, you reviewed the file and there was no evidence of political activity, would you potentially approve that case? Is that something that you would do?
>
> A. At this point I would send it to secondary screening, political advocacy.
>
> Q. So you would treat a Tea Party group as a political advocacy case even if there was no evidence of political activity in the application. Is that right?
>
> A. Based on my current manager's direction, uh huh.[348]

In sum, applications for tax-exempt status submitted by Tea Party and conservative organizations were treated very differently by the IRS than applications submitted by other groups, including those on the left. Beginning in early 2010, the IRS focused singular attention on Tea Party applications and selected several exemplars from among those applications to serve as "test cases." The IRS's exclusive focus on the Tea Party extended unbroken until the July 2011 change from "Tea Party" to "Advocacy Org." in the Emerging Issues tab of the BOLO list. Thus, until July 2011, the IRS grappled with the issue of the permissible extent of political advocacy

[346] BOLO iteration chart (Apr. 30, 2012) IRS0000352979–84.
[347] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).
[348] SFC Interview of Jack Koester (Aug. 1, 2013) pp. 39–40.

Exhibit E

for a section 501(c)(4) organization only within the context of the Tea Party's political agenda. During that span of time, Tea Party applications were methodically and systematically culled from the application pool by IRS workers, subjected to a bizarre and dilatory development process, and eventually left to languish unattended for lengthy periods of time while the IRS bumbled its way through a variety of failed processing initiatives.

In contrast, throughout the period culminating with the July 2011 change to the Emerging Issues tab, applications received from other organizations, including those on the left that involved political advocacy issues, were assigned, worked and resolved by IRS staff, and consequently suffered no untoward delays in their resolution. Even after the July 2011 change in the Emerging Issues tab as well as the subsequent changes in January and June of 2012, applications received from every Tea Party organization as well as every organization with a name that included "9/12 Project" or "Patriots" automatically drew IRS attention and with it, the rigors of full development and its associated delays. This was true whether or not the organizations calling themselves "Tea Party," "9/12 Project" or "Patriots" indicated in their applications an intention to engage in political discourse. In this way, applications submitted by Tea Party organizations and other conservative groups were processed by the IRS in a fashion unlike any other applications.

## B. THE IRS DID NOT TARGET PROGRESSIVE ORGANIZATIONS

Throughout the Committee's investigation, there have been claims by the Minority and by others that the IRS targeted progressive groups in the same manner as the Tea Party. This is simply not accurate.

Our investigation revealed that there was no plan to systemically capture and delay left-leaning applications at the IRS, as there was for Tea Party and conservative applications. While it is true that some liberal groups got caught in the process, most of the groups that were harmed by the IRS were Tea Party and conservative groups, and those were the groups that endured the longest delays because they were the first to be set aside.

In the Additional Democratic Staff Views, there are various claims in support of the flawed assertion that the IRS "targeted" left-leaning groups, too. Each is discussed below in turn.[349]

1. ***Democratic Allegation:*** "Progressive" Groups Were Targeted Because They Appeared on the BOLO Spreadsheet

    ***Response:*** The term "Progressive" was on a part of the BOLO spreadsheet that was not actively used by IRS employees who screened incoming applications, and did not result in any disparate treatment.

The Minority correctly observes that certain terms identifying left-leaning organizations appeared on the BOLO spreadsheet from August 2010 through April 2013, including the term "Progressive."

---

[349] Many of the same arguments raised by the Minority have already been disproven. *See* U.S. House of Representatives Committee on Oversight and Government Reform, Debunking the Myth that the IRS Targeted Progressives: How the IRS and Congressional Democrats Misled America about Disparate Treatment (Apr. 7, 2014).

Indeed, during the three years that the BOLO spreadsheet was used, there were dozens of terms that appeared on the BOLO spreadsheet in some capacity—including other terms, besides the "Tea Party" entry, that involved conservative organizations or conservative values. Merely appearing on the BOLO spreadsheet does not indicate that the IRS improperly targeted a particular organization; what matters is how IRS employees applied the BOLO criteria to process applications.

From August 2010 until May 2013, the BOLO spreadsheet was distributed to all EO Determinations employees, who used it as a reference tool when screening and reviewing applications for tax-exempt status. The BOLO spreadsheet was comprised of five "tabs": [350]

| Tab Name | Tab Characteristics/Purpose |
|---|---|
| Emerging Issues | • Groups of applications for which there is no established case law or precedent<br>• Issues arising from significant current events (excluding disaster relief organizations)<br>• Issues arising from changes to tax law or other significant world events |
| Watch List | • Applications have not yet been received<br>• Issues were the result of significant changes in tax law or world events and would require "special handling" by the IRS when received. |
| TAG (also referred to as Potential Abusive). | • Abusive tax avoidance transactions including abusive promoters and fake determination letters<br>• Activities that were fraudulent in nature including: applications that materially misrepresented operations or finances, activities conducted contrary to tax law (e.g. Foreign Conduits)<br>• Applicants with potential terrorist connections |
| TAG Historical (also referred to as Potential Abusive Historical). | • TAG issues that were no longer encountered, but that were of historical significance |
| Coordinated Processing | • Multiple applications grouped together to ensure uniform processing<br>• Existing precedent or guidance does not exist |

While some terms discussed below that describe left-leaning organizations did appear on the BOLO spreadsheet, it is clear that these BOLO entries did not result in the same treatment as the "Tea Party" BOLO entry, which appeared on the Emerging Issues tab of the BOLO spreadsheet.

From 2010 through 2013, there was an entry for "Progressive" organizations on the TAG Historical tab of the BOLO spreadsheet. As Cindy Thomas explained, the entries on this part of the spreadsheet were there because "there were no current cases that they had seen, but they—we didn't want to lose track of it, and that's why it stayed on the Historical tab." [351]

It is unclear when, if ever, the "Progressive" entry was ever relevant. Indeed, no employee interviewed by Committee staff knew when, or why, the term was added to the TAG Historical tab. The manager of employees who screened all incoming cases, John Shafer, did not recall receiving any "progressive" applications during the last 10 years:

Q. Now, do you recall seeing any—during the time, and I'm talking about the whole time that you were the screening manager, all the way back to 10 years, I guess, to 2003, do you recall any cases that came in that met this criteria of progressive?

---

[350] Heightened Awareness Issues (July 28, 2010) IRS0000557291–308.
[351] SFC Interview of Cindy Thomas (July 25, 2013) p. 154.

Exhibit E

A. Not to my knowledge. You said this was TAG History?

Q. It was—the tab in the Excel document is called TAG Historical.

A. Okay.

Q. So do you recall any progressive cases that were sent to Washington for processing?

A. I do not.[352]

Shafer's testimony is consistent with other IRS employees who do not remember reviewing any "Progressive" applications in EO Determinations after 2006[353] or in EO Technical, in Washington, D.C., after 2007.[354]

Hofacre further explained that the TAG Historical tab of the BOLO spreadsheet was not relied on by EO Determinations employees:

Q. Okay. Would the EO [Determinations] agents need to know this information [in the TAG Historical Tab] in order to do their job?

A. Based on my opinion, no.[355]

Other employees also confirmed that they did not refer to the TAG Historical tab when reviewing incoming applications; instead, they focused on the Emerging Issues tab.[356] Thus, the entry for "Progressive" applications did not affect how the IRS screened incoming applications for tax-exempt status during the period covered by the Committee's investigation.

2. ***Democratic Allegation:*** Groups affiliated with association of Community Organizations for Reform Now (acorn) were targeted because they appeared on the bolo spreadsheet and were subsequently inappropriately scrutinized

***Response:*** The IRS had legitimate cause to look for incoming cases from ACORN-related organizations following the dissolution of ACORN amidst widespread concern about criminal activity, and the BOLO spreadsheet was not used inappropriately to screen these groups.

From August 2010 until the beginning of January 2012, the BOLO spreadsheet contained an entry for "ACORN Successors." This entry appeared on the Watch List tab of the BOLO, which was used to mark issues that had not yet come before the IRS, but would require special handling if and when they arose.[357] The ACORN entry would only be placed on this part of the BOLO spreadsheet if the IRS was not actively receiving applications that met this criteria.

In fact, the IRS had good reason to look for incoming applications from ACORN-related groups. As the Minority acknowledges, ACORN purportedly disbanded in 2010 after accusations of fraud, embezzlement and mismanagement—all issues that would directly affect an organization's ability to maintain or attain tax-exempt status. In July 2009, the Ranking Member of the House OGR Com-

[352] SFC Interview of John Shafer (Sep. 17, 2013) pp. 129–130.
[353] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) p. 140.
[354] SFC Interview of Judith Kindell (July 18, 2013) pp. 107–108.
[355] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) p. 136.
[356] SFC Interview of Ronald Bell (July 30, 2013) (not transcribed).
[357] Heightened Awareness Issues (July 28, 2010) IRS0000557291–308.

201

mittee issued a report entitled "Is ACORN Intentionally Structured as a Criminal Enterprise?"[358] This report, which was provided to the IRS,[359] raised many allegations regarding the operation of ACORN and its affiliates. Included among those allegations were the following: ACORN failed to report an embezzlement of nearly $1 million, covered up the crime for more than 8 years, and used charitable contributions to recover the losses due to the embezzlement; it comingled accounts of its federally funded affiliates with its politically active affiliates and then used those funds to engage in partisan political activities; it conducted voter registration drives that routinely produced fraudulent registrations; and ACORN illegally plundered employee benefits and relieved corporate debts through prohibited loans.[360]

In February 2010, Minority staff of the House OGR Committee issued a second report on ACORN entitled "Follow the Money: ACORN, SEIU and their Political Allies."[361] Included in this report were a number of new findings that shed light on ACORN's operations including the following: there was no distinction between ACORN and its affiliates making it impossible to consider them as separate organizations; ACORN and its affiliates used coercion and threats of litigation to extract concessions, loans and funds from sources; and ACORN controlled the Service Employees International Union (SEIU), received money from it and used its employees to advance ACORN's organizing and partisan political goals. Lois Lerner, Robert Choi, Holly Paz and others received a copy of this report on February 19, 2010.[362]

These accusations, together with those from other Congressional sources, were serious enough to prompt the IRS to establish its own research team in November 2009 to look into ACORN's activities.[363] The IRS research team completed its review in April 2010, finding evidence that: ACORN had covered up an embezzlement committed by a board member; ACORN employees worked for multiple affiliates and staff and members served on the Board of Directors, thereby creating potential conflicts of interest; affiliates improperly transferred money among themselves; ACORN and its affiliates failed to properly document financial transactions; and ACORN may have improperly used donations as well as employee pension and health care benefit funds. The research team concluded that these findings, together with ACORN's apparent loose governance and a lack of respect for the corporate structure, warranted that the IRS take a closer look into the financial practices of ACORN and its affiliates.[364]

Around that same time, OGR Minority staff issued a third report on ACORN entitled "ACORN Political Machine Tries to Reinvent

---

[358] U.S. House of Representatives Committee on Oversight and Government Reform, "Is ACORN Intentionally Structured As a Criminal Enterprise?" (July 23, 2009).

[359] Email from Nancy Todd to Sarah Hall Ingram, Joseph Grant, Lois Lerner, and others (July 8, 2010) IRS0000713482.

[360] U.S. House of Representatives Committee on Oversight and Government Reform, "Is ACORN Intentionally Structured As a Criminal Enterprise?" (July 23, 2009).

[361] U.S. House of Representatives Committee on Oversight and Government Reform, "Follow the Money: ACORN, SEIU and Their Political Allies" (Feb. 18, 2010) IRS0000791014–81.

[362] Email from Joseph Urban to Lois Lerner, Robert Choi, Holly Paz, Nanette Downing and others (Feb. 19, 2010) IRS0000791013.

[363] IRS, Memorandum on Investigative Research Findings (June 21, 2010) IRS0000713488.

[364] IRS, ACORN Research Activities Summary Report (April 28, 2010) IRS0000713483–87.

Exhibit E

Itself."[365] The report outlined how stories in the press that ACORN was disbanding were greatly exaggerated. In fact, many of the ACORN affiliates were simply changing their names so as to remove any reference to ACORN, or re-incorporating as new entities under new names, but maintaining the same boards, staff and Employer Identification Numbers as former ACORN affiliates. The report indicated that this "rebranding" activity was being orchestrated by the parent ACORN organization and its national senior leadership.[366] This report was provided to the IRS on June 3, 2010.[367]

Even before OGR Minority staff provided a copy of its report to the IRS in June 2010, several news stories and other reports began to surface about ACORN's attempts to rebrand itself.[368] These news stories most likely contributed to the IRS's awareness that some local ACORN groups were attempting to reorganize and regain tax-exempt status under other names that did not reference ACORN. These groups often had close ties to former or current ACORN organizations. Steven Grodnitzky found that in the case of one applicant, the Ballot Initiative Group of Missouri, "ACORN is a member of the organization, contributes money, appoints a member of the board, and the principal was a high ranking official with ACORN in the Midwest."[369]

Indeed, the BOLO spreadsheet entry for "ACORN Successors" indicates that the IRS was concerned with precisely those types of issues:

> Local chapters of the former ACORN organization have reformed under new names and are requesting exemption under section 501(c)(3). Succession indicators include ACORN and Communities for Change in the name and/or throughout the application.[370]

Thus, the issue with ACORN applications wasn't necessarily the existence or amount of political activity, but rather whether these applicants were affiliated with a former non-profit organization that was found to have engaged in criminal wrongdoing.

IRS employees interviewed by Committee staff recalled seeing a few incoming applications from ACORN-related groups. As Hofacre explained, those applications were processed using normal IRS procedures and were not subject to the specialized process or scrutiny that the Tea Party cases received:

> Q. And were the ACORN type cases treated the same as the Tea Party cases? In other words, did they go to a group and then
>
> A. Based on my recollection, no.

[365] U.S. House of Representatives, Committee on Oversight and Government Reform, Staff Report, "ACORN Political Machine Tries to Reinvent Itself" (June 3, 2010) IRS0000742758–65.
[366] Id.
[367] Letter from Ranking Member Darrell Issa to IRS Commissioner Douglas Shulman (June 3, 2010) IRS0000742756–57.
[368] Fox News, ACORN Branches Rebrand After Video Scandal (Mar. 15, 2010); The American Spectator, ACORN Housing Boom (Mar. 2, 2010).
[369] Email chain between Steven Grodnitzky, Brenda Melahn and others (June 8, 2010) IRS0000054956.
[370] BOLO Spreadsheet (Feb. 2, 2011). Other versions of the BOLO spreadsheet had slightly different entries for ACORN Successors, but conveyed the same information.

Q. Did they go into general inventory or they go to the TAG—I guess they went to the TAG Group, right?

A. Based on my recollection, no, they were just in general inventory. I mean, some may have made it to that, but based on my job as a reviewer right now, a lot of times they are just sent to whoever gets them.

Q. Okay. And regarding the development of those cases, if you know this, and I don't know if you are competent to say if you know, in those particular ACORN cases, were development letters created?

A. Yes, they were.

Q. Do you know if they were sent to EO Technical for a review out of the same coordinated effort that was engaged in with the Tea Party cases?

A. Based on—I only reviewed a couple of them. And there was no processing like that.[371]

Although some ACORN-related organizations did receive heightened scrutiny from the IRS, they were not targeted for their political beliefs and their treatment was in no way comparable to Tea Party and conservative organizations.

3. **Democratic Allegation:** The IRS targeted groups affiliated with "Occupy Wall Street," through a standalone BOLO entry and also by expanding the BOLO entry for political advocacy groups to capture occupy groups that might submit applications

**Response:** Although these changes to the BOLO were misguided, they alerted the IRS to only two applications submitted by organizations affiliated with the "Occupy" movement. Those applications were promptly sent to the "bucketing" process for evaluation and there are no indications that the affected groups suffered harm.

The January 25, 2012 BOLO spreadsheet included two entries related to the Occupy Wall Street movement. The first reference to Occupy organizations appeared in the entry for "current political issues" on the Emerging Issues tab of the BOLO spreadsheet:

**Issue:** Current Political Issues

**Issue Description:** Political action type organizations involved in limiting/expanding government, educating on the constitution and bill of rights, $ocial economic reform/movement. **Note:** typical advocacy type issues that are currently listed on the Case Assignment Guide (CAG) do not meet these criteria unless they are also involved in activities described above.

**Disposition of Emerging Issue:** Forward to Group 7822. Stephen Seok is the coordinator.[372]

As explained more fully in Section VI(B)(5) of the Bipartisan Investigative Report, this change occurred after Paz, Thomas, and other managers expressed concern that the previous BOLO entry was overly broad. In response to this concern, Steve Bowling originally suggested modifying the BOLO to once again reference "Tea Party" organizations; but his manager Thomas informed him that

---

[371] SFC Interview of Elizabeth Hofacre (Sep. 24, 2013) pp. 146–147.
[372] BOLO Iteration Chart (Apr. 30, 2012) IRS0000352979–84 (emphasis in original).

204

Lerner had discontinued this practice. To capture the same organizations without using the words "Tea Party," Bowling drafted new criteria that described views of the Tea Party organizations: limiting the government, and educating on the constitution and bill of rights.[373]

A secondary aim of Bowling was also to capture any applications that might be submitted by groups affiliated with Occupy Wall Street. To achieve this goal, he inserted the phrase "$ocial economic reform/movement," which was "code" for the Occupy organizations.[374] Bowling believed that this phrase would also apply to other groups besides Occupy that may present themselves in the future and would advocate for similar positions.[375]

Bowling also created a separate BOLO entry, titled "'Occupy' Organizations," that applied more narrowly to organizations affiliated with the Occupy Wall Street movement. Like the "ACORN Successors" entry, the "'Occupy' Organizations" entry appeared on the Watch List tab of the BOLO spreadsheet, which indicates that the IRS had not yet received any applications meeting this criteria. The "'Occupy' Organizations" entry appeared only on the January 2012 version of the BOLO spreadsheet.

It is without doubt that Bowling's revisions to the BOLO spreadsheet were misguided. Indeed, as noted in Section VII(B) of the Bipartisan Investigative Report, Bowling had already committed several substantial errors that resulted in applications from Tea Party and conservative organizations being neglected for more than a year. As noted in Section VII(F) of the Bipartisan Investigative Report, Bowling also mismanaged the Advocacy Team in early 2012, thereby allowing it to issue burdensome and improper development letters that predictably resulted in an uproar in the media and in Congress.

Unlike some previous changes to the BOLO spreadsheet, the changes made by Bowling in January 2012 were not approved by Paz, Lerner, or any upper-level EO managers. When Paz and Lerner became aware of the changes in May 2012, they quickly ordered that the BOLO criteria be changed and removed all references to "Occupy," including the "code" reference, and instead use neutral language that would apply to all political advocacy organizations.[376]

The Minority correctly states that in May 2012, the IRS received two applications from organizations that the IRS deemed to be part of the Occupy movement (although neither group had the word "Occupy" in its name).[377] EO Determinations employees decided that these applications met the criteria for the "'Occupy' Organizations" Watch List BOLO entry, and sent them directly to the bucketing process, where they were evaluated along with applications from other political advocacy groups.[378] The Minority does not allege that the two "Occupy" groups were harmed by the IRS.

[373] *Id.*

[374] Email chain between Ronald Bell and Steve Bowling (Jan. 25, 2012) IRS0000013187.

[375] *Id.*

[376] Email chain between Holly Paz, Cindy Thomas and others (June 1, 2012) IRS0000013434–35.

[377] Email chain between Tyler Chumney, Stephen Seok and others (May 24–27, 2012) IRS0000013234–48.

[378] *Id.* Emails from Tyler Chumney and Peggy Combs indicate that the applications will be sent to the "bickerers." Subsequent email conversation between Chumney and Combs (not in-

Exhibit E

205

Meanwhile, Majority staff analysis reveals that during that six-month period when the references to "Occupy" appeared on the BOLO, IRS employees used the same BOLO criteria to "centralize" 46 applications from Tea Party or conservative groups. A number of those 46 applications were still pending resolution as of September 2014, more than two years later.

4. ***Democratic Allegation:*** In 2008, An EO Determinations manager instructed employees to be on the lookout for applicants with the word "emerge" in their names. it took 3 years for the IRS to come to a conclusion on some of the emerge cases

   ***Response:*** The IRS approved a number of Emerge applications before realizing that these organizations, which were state chapters of the same organization, were recruiting and training Democratic Party candidates. The IRS subsequently determined that these activities conferred a private benefit on the Democratic Party and, thus, were not permissible activities for a 501(c)(4) organization. When the IRS learned about these activities, it decided to revoke tax-exempt status from the organizations that had been approved and deny tax-exempt status for pending applications. The IRS's ultimate disposition was delayed by several factors, including ongoing litigation.

In support of this claim, the Minority cites an email conversation dated September 8, 2008, which discusses several applications submitted by Emerge affiliates.[379] In the initial email, an employee noted that a total of eight Emerge organizations, each representing a different state, had filed applications and that the IRS could therefore expect more applications from affiliates in other states. The employee then noted that "[t]he purpose of the organizations appear [sic] to be similar—train 'Democratic' party candidates in areas such as campaigning, fundraising, public speaking, press relations, and leadership skills." Continuing, the employee noted that "[b]ecause of the partisan nature of the cases" further guidance is pending. In the meantime, the employee recommended that all incoming applications from Emerge affiliates be handled in accordance with section 7.20.5 of the Internal Revenue Manual (IRM).

The referenced IRM section specifies certain types of cases that should be sent to the Quality Assurance division for further review, including:

   Applications that present sensitive political issues, including the following types of activities:
   • Voter registration
   • Inaugural and convention host committees
   • Post-election transition teams (to assist the elected official prior to officially assuming the elected position)
   • Voter guides
   • Voter polling
   • Voter education

---

cluded with this report) indicates that the word "bucketers" had been automatically changed by the email program to "bickerers."

[379] Email chain between Donna Abner, Sharon Camarillo, Joseph Herr and others (Sep. 8–24, 2008) IRS0000011492–94.

Exhibit E

- Other activities that may appear to support or oppose candidates for public office.[380]

Based on information about previous Emerge organizations cited in the September 8, 2008 email, the IRS's decision to invoke this provision in the IRM seems reasonable. It was made based on actual knowledge of the organization's activities, which had been self-reported to the IRS and suggested the possibility of private benefit. This lies in stark contrast to the IRS's decision to set aside Tea Party applications in early 2010, which was based on very little information about the actual or planned activities of the organizations.

Finally, the Minority notes that some of the Emerge applicants waited three years to get a final determination (although others were approved very quickly by the initial screeners). As explained by several IRS employees, the issue presented by Emerge organizations was not the presence or amount of political campaign intervention, but rather the inurement of private benefit—which is a distinct legal issue.[381] As the Minority notes, the IRS was also waiting for the courts to resolve a "similar issue" that was being litigated.[382] This required the IRS to coordinate the review of Emerge applications with the Chief Counsel Office, as Judith Kindell explained:

> I believe [EO] coordinated [the Emerge applications] with Counsel and that we ultimately denied the cases, that there had been some that had been approved so we had centralized the ones that we were aware of and worked them together. We developed them. They were fairly similar so that once we had developed them we were able to apply it across the board because they basically had, they were basically doing the same thing.
> . . . We were aware of some that had been approved prior to us noticing the issue, and there was at least one that even after we had noticed the issue and told Cincinnati that we needed to bring them all in and work them together there was at least one that was approved on screening at the same time that we were developing the denials.[383]

The Emerge applications were all eventually denied when the IRS concluded that the organizations "were providing private benefit to the Democratic party."[384] The disposition of these applications supports the IRS's measured approach in developing the applications and waiting until the legal issues had been resolved before taking the consequential action of denying tax-exempt status. Clearly, the type of activities performed by the Emerge organizations was very different from those of most Tea Party groups, which were concerned chiefly with issue advocacy—an activity that is permissible under tax law for 501(c)(4) organizations.

---

[380] IRM § 7.20.5 (Aug. 14, 2007).
[381] SFC Interview of Judith Kindell (July 18, 2013) pp. 111–113.
[382] Email chain between Deborah Kant, Cindy Westcott and others (Oct. 10–16, 2008) IRS0000012304.
[383] SFC Interview of Judith Kindell (July 18, 2013) pp. 111–112.
[384] Id.

5. ***Democratic Allegation:*** TIGTA's Audit, Which Culminated in Its Report Dated May 14, 2013, Established That IRS Employees Did Not Allow Their Own Political Beliefs To Influence The Manner in Which They Processed Tea Party Applications

> ***Response:*** Minority staff has sought to advance the proposition that TIGTA made a finding, based on its audit work, that the actions of IRS employees were not politically motivated. Contrary to the assertions of the Minority staff, TIGTA made no "findings" regarding the absence of political motivation, but rather merely concluded, based on statements collected from IRS employees including Lois Lerner, that there was no evidence that political motivation influenced official action. With regard to the issue of the existence of political influences within the IRS, TIGTA arrived at its conclusion without the benefit of a record as substantial as the record developed by Majority staff investigators. In contrast to the self-serving statements relied upon by TIGTA, Majority staff investigators uncovered a compelling trail of evidence that demonstrates that Lois Lerner's political views affected not only the performance of her duties, but also shaped the way the IRS treated conservative tax-exempt organizations.

Shortly after the release of TIGTA's May 14, 2013 audit report, the Senate Finance Committee convened a hearing to further probe into the IRS's use of inappropriate criteria to process applications for tax-exempt status. During the course of that hearing, the following exchange occurred between Senator Crapo and Inspector General George.[385]

> Mr. Crapo: You know, there's been a lot of discussion about who knew what and when they knew it. And, one of the big questions I have—this is probably for you, Mr. George—is it seems that there is an argument being made that there was no political motivation in these actions.
>
> Is that a conclusion that you have reached?
>
> Mr. George: In the review that we conducted thus far, Senator, that is the conclusion that we have reached.
>
> Mr. Crapo: And how do you reach that kind of conclusion?
>
> Mr. George: In this instance, it was as a result of the interviews that were conducted of the people who were most directly involved in the overall matter.
>
> And so you take it one step by another and we directly inquired as to whether or not there was direction from people in Washington beyond those who were directly related to the determinations unit. And their indications to us—now I have to note that this was not done under oath, this was again an audit and not an investigation—but they did indicate to us they did not receive direction from people beyond the IRS.
>
> Mr. Crapo: When you say people beyond the IRS, that could be anyone up the chain of the IRS?

---

[385] While Minority staff quoted a portion of this exchange in the Additional Democratic Views, it omitted the most significant part of Inspector General George's testimony, the portion emphasized in bolded text here.

208

> Mr. George: In theory it could be, but we have no evidence thus far that it was beyond the people in the determinations unit.
>
> Mr. Crapo: **So, in other words, you have simply the statement of those engaging in the conduct saying they were not politically motivated?**
>
> Mr. George: **That is correct, sir.**
>
> Mr. Crapo: **And based on that, and statements not under oath, you reached the conclusion that there was no political motivation? Now, have you reached the conclusion that there was none or that you haven't found it?**
>
> Mr. George: **It's the latter, that we have not found any, sir.**[386]

At a later point in the hearing, Inspector General George had a further opportunity to clarify that TIGTA made no findings regarding the absence of political motivation. The following colloquy between Senator Portman and Inspector General George reinforces this very significant point.

> Mr. Portman: So, on page seven of your report, you stated that Mr. Miller and subordinate employees, quote "stated that the inappropriate criteria was not influenced by any individual or organization outside of the IRS." That's on page seven of your report. And that's been used by the administration to say that there was no—no influence.
>
> **Let me be clear. Is that a finding of your report? Or is that simply a restatement of what IRS employees told you?**
>
> Mr. George: **It is a restatement of the information that we received from IRS employees, Senator.**[387]

Accordingly, TIGTA made no *findings* regarding the absence of political influence in the processing of applications for tax-exempt status. Rather, it simply concluded that no evidence of such influence existed in the self-serving statements that it collected from the very employees responsible for the processing of those applications.

Regarding the existence of Lois Lerner's political bias, and how that bias affected the performance of official duties, it is important to point out that TIGTA's audit work, which took nearly a year to complete, involved a review of a fairly confined number of emails (5,500) from within the IRS. It is without doubt that TIGTA should be commended on the quality and completeness of its audit into the IRS's processing of applications for tax-exempt status. However, in contrast, and building on the excellent work TIGTA had already performed, Majority staff spent more than two years conducting its own investigation into the matter, including examining the issue of possible political motivation by IRS employees. During the course of that investigation, Majority staff reviewed a substantially larger universe of documents (1,500,000 pages) from numerous sources including some outside of the IRS, documents that TIGTA auditors never saw. Unlike TIGTA, Majority staff interviewed former IRS

---

[386] Hearing before the Senate Finance Committee, "A Review of Criteria Used by the IRS to Identify 501(c)(4) Applications for Greater Scrutiny" (May 21, 2013) (emphasis added).
[387] *Id.* (emphasis added).

officials who had occupied high-level IRS management positions including a former IRS Commissioner, as well as officials from the Treasury Department. Based upon disturbing information uncovered during the course of its more exhaustive investigation, Majority staff devoted particular emphasis to establishing the actions and the motivations of Lois Lerner, significantly eclipsing any similar effort by TIGTA. As a consequence, the Majority staff was able to uncover substantial evidence that Lerner's political biases influenced the manner in which the EO Division interacted with tax-exempt organizations, evidence that TIGTA did not find.

## VI. TEA PARTY ORGANIZATIONS WERE HARMED BY IRS TARGETING

> *The Tea Party groups that were scrutinized by theIRS were generally small and were harmed significantly more than progressive organizations. The committee highlights four examples of groups that were harmed by the IRS targeting.*

A. THE TEA PARTY AND RELATED CONSERVATIVE GROUPS WHOSE APPLICATIONS WERE CENTRALIZED AND DELAYED WERE GENERALLY SMALL ORGANIZATIONS

Starting in 2009, Tea Party groups began to organize in virtually all parts of the country.[388] The Tea Party movement is a grassroots movement of both local and national groups.[389] There is no central organization that controls the various Tea Parties.[390] While each Tea Party organization exercises autonomy in deciding the subjects that it will advance, most Tea Party organizations share certain core beliefs, such as the elimination of excessive taxes, ending the national debt, reducing the size of government, and terminating deficit spending.[391]

As part of its investigation, Majority Committee staff spoke to a number of individuals who organized various Tea Parties that applied for tax exemption and whose applications were delayed by the IRS. All of these individuals shared the same abiding sense of purpose: that the United States needs to be placed on a course to ensure a fiscally responsible government that taxes with restraint and spends within its means.

The political left has sought to depict all Tea Party groups as well-funded organizations patronized by wealthy, anonymous donors.[392] In actuality, a vast majority of Tea Parties and related conservative organizations that sought tax-exempt status from the IRS during the period 2010 to 2013 were small operations. Majority staff reviewed a random sample of 40 applications submitted for exemption under 501(c)(4) by organizations with "Tea Party," "9/12," or "Patriots" in their names. Our review of these 40 sample organizations revealed very limited funding:[393]

---

[388] Tea Party Platform, Tea Party Movement.
[389] *Id.*
[390] *Id.*
[391] *Id.*
[392] Sourcewatch.org, Tea Party.
[393] Based on information contained in applications and other documents provided by IRS.

210

SFC MAJORITY STAFF SAMPLE OF 40 RANDOMLY SELECTED TEA PARTY ORGANIZATIONS THAT
FILED FOR TAX-EXEMPT STATUS BETWEEN 2010 AND 2013

| | |
|---|---|
| Average annual revenue ................................................................................................... | $21,329 |
| Median annual revenue ................................................................................................... | $9,755 |

Indeed, one organization's annual revenue was a mere $1,500. This data confirms that Tea Party and related conservative groups that applied to the IRS between 2010 and 2013 for tax-exempt status were predominantly low budget operations, created by people with a deep sense of conviction that government growth, spending, and taxation need to be checked in order to make, and keep, America strong.

## B. TEA PARTY ORGANIZATIONS SUFFERED FAR GREATER HARM THAN PROGRESSIVE APPLICANTS

The Minority has asserted that left-leaning political advocacy groups that applied for exemption under 501(c)(4) experienced delays at the hands of the IRS just as the Tea Party and other conservative groups did. While some left-leaning groups may have encountered delays in receiving decisions on their applications for exemption, it is clear that the majority of applications that were delayed by the IRS were submitted by Tea Parties and other right-leaning groups. Based on information provided to the Committee by the IRS, 547 applications for exemption involving potential political activity were identified by the IRS during the time period 2010 through 2014.[394] The IRS "centralized" the 547 applications by sending them, at various points in time, to the Emerging Issues Group in EO Determinations for development and decision. Of those 547 applications, analysis by the Majority Staff shows that 359 were received from Tea Party or other conservative groups. This represents 65.63% of all applications presenting potential political advocacy issues. The remaining applications were almost equally divided between liberal organizations (19.20%) and non-aligned organizations that do not appear to be either right or left-leaning (15.17%).

---

[394] Data provided to the Committee by the IRS reflect that 25 of the 547 applications involving possible political advocacy were centralized between May 21, 2013 and April 28, 2014. Even though the Committee's investigation has principally focused on the IRS's treatment of applications centralized from January 1, 2010 to May 20, 2013, the charts and analysis in this section include the 25 applications centralized after May 20, 2013. Since these applications involved possible political advocacy issues, their treatment by the IRS was relevant to the Committee's investigation.

Exhibit E



Moreover, Tea Party and other conservative groups whose applications were centralized waited longer, on average, for a decision on their applications for tax-exempt status. These groups, in total, waited 621 years for the IRS to make a decision on their applications for tax exempt status. In contrast, left leaning groups waited a combined total of 152 years and non-aligned groups waited 119 years. In addition, Tea Party and other conservative groups waited nearly 100 days longer than left-leaning and non-aligned groups to receive decisions on their applications for tax-exempt status.



Tea Party and conservative organizations were "centralized" beginning in February 2010, when Jack Koester first noticed an application from the Albuquerque Tea Party. In October 2010, some two months after issuance of the first BOLO spreadsheet containing an entry for "local organizations in the Tea Party move-

Exhibit E

closed for FTE, over 5 conservative groups suffered the same fate in their quest for tax-exempt status.



All of the above data confirm that Tea Party and conservative organizations waited longer and were more severely harmed than left-leaning groups.

### C. TEA PARTY GROUPS SUFFERED SUBSTANTIAL HARM AS A RESULT OF IRS DELAYS

Majority Committee staff interviewed principals from a number of Tea Party and related conservative organizations whose applications for exemption were, and in some cases continue to be, delayed. These individuals all recounted similar stories of long delays, intrusive inquiries bordering on the Orwellian, and of adverse impact on the operations of their organizations. Recounted below are several representative stories told to Majority staff by these conservative groups.

### 1. The Albuquerque Tea Party

The Albuquerque Tea Party first filed its application for exemption under 501(c)(4) in December 2009. EO Determinations received the application on January 4, 2010.[398] In its application, the Albuquerque Tea Party indicated that it intended to: sponsor educational forums informing attendees about current political issues (40 percent of the organizations' activities); provide advocacy training to empower people to become more active in the political process (30–40 percent of its activities); hold candidate forums allowing non-partisan access to candidates for public office (20 percent of its activities); and organize event rallies that are non-partisan gatherings open to the general public for the purpose of educating and

---

[398] Email chain between Hilary Goehausen, Michael Seto and others (Feb. 28, 2012) IRS0000058356–61.

motivating (10 percent of its activities).[399] Question 15 of the application asks if the organization has spent, or intends to spend, funds attempting to influence the selection, nomination, election, or appointment of any person to public office or to office in a political organization. In response, the Albuquerque Tea Party stated that while no monies had yet been spent on these activities, that approximately 20 percent of its budget would be set aside for such purposes.[400]

On February 25, 2010, Jack Koester, a screener in EO Determinations, flagged this application as a possible "high-profile" case because of media attention surrounding the Tea Party.[401] Koester's managers agreed with his assessment and eventually, the application was sent to EO Technical and assigned to Carter (Chip) Hull to work as one of the two Tea Party "test cases."[402] Hull sent the organization a development letter in April 2010. Included among the questions in Hull's development letter was a query asking the Albuquerque Tea Party to describe its connection to "Marianne Chiffelle's Breakfasts," a breakfast gathering of the Bernalillo County Republican Party organized by Marianne Chiffelle, a then-83 year old great-grandmother.[403] Rick Harbaugh, the President of the Albuquerque Tea Party, told Majority staff that he found Hull's question about "Marianne Chiffelle's Breakfasts" to be peculiar, as Chiffelle simply hosted a breakfast club and offered a prayer before each breakfast. After the IRS granted a brief extension of time to respond, the Albuquerque Tea Party sent the IRS a reply in June 2010.

Thereafter, the Albuquerque Tea Party heard nothing from the IRS for nearly a year and a half, when in November 2011, it received a second development letter from Tax Law Specialist Hillary Goehausen. Goehausen's development letter asked for substantially more information than Hull's had, such as copies of every newsletter and publication of the Albuquerque Tea Party. Harbaugh stated that he considered Goehausen's development letter of November 2011 to be intrusive and burdensome. The Albuquerque Tea Party sent its response to the IRS in January 2012. Having heard nothing from the IRS for more than a year, in March 2013, the Albuquerque Tea Party retained counsel who made inquiry as to the status of its application. Goehausen replied by stating that she had prepared a recommended determination but that she could not disclose it to the Albuquerque Tea Party and that it was pending with her reviewer. Since April 2013, the Albuquerque Tea Party has not heard anything more from the IRS regarding the status of its application.[404]

Harbaugh spoke to Majority staff in February 2014. He stated that it was difficult for him to understand why his organization was still awaiting a decision on its application after 50 months, while the Barack H. Obama Foundation, a charitable organization

[399] Email chain between Holly Paz, Cindy Thomas, Jack Koester, and others (Feb. 25–Mar. 17, 2010) IRS0000180869–73.
[400] *Id.*
[401] *Id.*
[402] SFC Interview of Carter Hull (July 23, 2013) (not transcribed).
[403] *Washington Examiner,* IRS Went After 89-year-old Tea Party Granny (May 20, 2013).
[404] The Albuquerque Tea Party is currently involved in litigation against the IRS. Generally, litigation does not preclude the IRS from coming to a final determination on a litigant's pending application for tax-exempt status.

Exhibit E

operated by President Obama's brother, received its approval to operate as a 501(c)(3) from Lois Lerner within a month after it filed its application.[405] Harbaugh indicated that the Albuquerque Tea Party had never endorsed a political candidate, but rather has expended most of its effort in advocating for small government. Harbaugh also expressed concern about whether he had become a personal target for the IRS and other government agencies as a result of his Tea Party activities, as he was audited by the IRS in 2010 and 2011 and was approached by the U.S. Census Bureau on two occasions during that time and asked to answer "supplemental questions."

Harbaugh indicated that his ordeal in attempting to secure tax-exempt status from the IRS has negatively affected the operation of the Albuquerque Tea Party. He stated that the absence of a determination letter from the IRS approving tax-exempt status affects the willingness of donors to make contributions. He expressed his belief that donors are less inclined to make donations to an entity whose tax-exempt status has not yet been confirmed by the IRS. He also indicated that the lack of a determination letter negatively impacts his ability to secure affiliations from other groups, as people are afraid that they may also be "oppressed" by the IRS if they lend their name to the Albuquerque Tea Party. Lastly, Harbaugh told Majority staff that the absence of a determination letter has caused him to operate very cautiously from a fiscal perspective, as he must keep a portion of the group's revenue on hand in the event of an adverse determination by the IRS, as such a determination would result in a retroactive tax liability. This factor has prevented the Albuquerque Tea Party from engaging in the full range of activities that it would otherwise have undertaken. As of April 2015, the Albuquerque Tea Party was still waiting for a determination from the IRS, more than five years after they applied for tax-exempt status.

### 2. American Junto

In 2008, American Junto was formed by Chris Littleton, a self-described conservative, and several of his friends who had become increasingly concerned with the direction the country was taking, and with the sense that a growing number of Americans were losing faith in the political process. They wanted to do something to help others restore that lost faith. This motivated Littleton and his friends to create American Junto, an organization named after meetings that Benjamin Franklin hosted in his home to discuss issues of the day. American Junto was never intended to be an advocacy organization or to engage in political campaign intervention, and in fact, did not engage in these activities. Littleton's plan was to make American Junto a non-profit, community-centered, education organization that would provide scholarships and host educational events aimed at encouraging people to involve themselves in the political process.

---

[405] *The Daily Caller*, IRS Official Lerner Speedily Approved Exemption for Obama Brother's "Charity" (June 4, 2013); Barack H. Obama Foundation, <http://www.barackhobamafoundation.org/>.

216

In 2009, Littleton decided that American Junto would best be able to accomplish its goal of encouraging citizen participation in the political process by becoming a charitable organization under 501(c)(3). As a 501(c)(3) organization, donations made to American Junto would be tax-deductible. Littleton, without legal assistance, prepared an application for tax-exempt status under 501(c)(3), and submitted it to the IRS in or about February 2010. Thereafter, Littleton incorporated American Junto, opened a bank account for it and began operating American Junto like a 501(c)(3) organization. American Junto sponsored a conference that dealt with liberty issues, hosted a conference on climate change, and raised hundreds of dollars for scholarships.

American Junto received a development letter from Carter Hull in July 2010. The letter inquired about American Junto's connection to the Tea Party, as well as to Ohio Liberty Council, a 501(c)(4) organization that Littleton had recently formed to take positions on political issues. Littleton felt that the questions asked by Hull were invasive and that the time and effort required to respond to the letter would be substantial. Nevertheless, he answered the development letter since he understood that American Junto's ability to raise funds through sustained donations was directly linked to its receiving approval from the IRS to operate as a 501(c)(3) organization. Sometime after responding to the development letter, one of the co-founders of American Junto called Hull to inquire as to the status of the application. The call to Hull was motivated by the need to get IRS approval so that the organization could raise in earnest the money it required to fund its planned activities. Hull responded by stating that the application was "under review."

While American Junto's application was "under review" by Hull and his IRS colleagues in Washington D.C., Littleton began to involve himself more with the activities of Ohio Liberty Council. Then, nearly 10 months after responding to Hull's first development letter, in April of 2011, he received a second development letter from Hull. The application for exemption was now 14 months old and Littleton began to lose heart that it would ever be approved. Littleton weighed the possibility of simply shutting down American Junto and moving on with Ohio Liberty Council. After consulting with his co-founders, Littleton decided to submit a response to Hull's development letter and did so in May 2011.

In November 2011, American Junto received yet a third development letter requesting more information, this one from Hillary Goehausen. This letter sounded the curtain call for American Junto. After waiting nearly 22 months and enduring several rounds of detailed and intrusive development letters, Littleton felt that no matter how he answered the development letter, American Junto would never be approved as a 501(c)(3) by the IRS. In December 2011, Goehausen called Littleton to inquire if American Junto was going to provide the information requested in the November development letter. Littleton informed Goehausen that American Junto would not respond and that the organization would be dissolved.

Exhibit E

Goehausen subsequently sent Littleton a letter advising him that the application was closed.[406]

Littleton explained to Majority staff how the IRS's handling of the American Junto application had a profoundly negative effect on American Junto's ability to operate as a 501(c)(3) entity. First, the absence of an approval letter from the IRS prevented American Junto from fund raising effectively, since donations would not be tax-deductible until the IRS granted tax-exempt status. Littleton recounted how one donor offered American Junto several thousand dollars to fund an event, but withdrew the offer after learning that American Junto had not yet been approved as a tax-exempt organization. Second, Littleton indicated that the length of time that the application was pending and the string of burdensome development letters contributed to his decision to quit the process. In essence, the IRS's glacial pace in developing the application and the time consuming nature of its interactions with Littleton simply wore down his resolve to complete the application process. Third, Littleton feared that his activities with American Junto had elevated his profile with the IRS and other government agencies, a fear he believes was realized in 2010 when he was audited by the IRS. While there is no direct proof that the audit resulted from his activities with American Junto, Littleton was quick to point out that an acquaintance of his who is active with the Cincinnati Tea Party was also audited by the IRS at about the same time. Littleton's suspicions about the IRS's motivations in auditing him and his acquaintance stem from a deep-rooted lack of confidence in the impartiality of the IRS, a conviction shared by many of the groups with whom Majority staff spoke.

### 3. Pass the Balanced Budget Amendment (PBBA)

This organization was started by Charles Warren and several of his friends who share a common belief that the government must eliminate unnecessary spending and balance the federal budget. In November 2010, PBBA filed with the IRS an application for tax-exempt status under section 501(c)(4). In its application for exemption, PBBA indicated that its activities included education, research, lobbying and media efforts aimed at securing the passage of a balanced budget amendment to the Constitution. PBBA stated to the IRS that it would use town hall meetings, social media, speeches, rallies, and printed media to promote its message. In support of the requirement for exemption that it be primarily engaged in promoting the common good of the citizenry, PBBA asserted in its application that its activities would benefit the public by resulting in a more robust economy, limiting federal spending, and reducing inflation. Notably, in response to question 15 of the application which asks if the organization will attempt to influence the selection, nomination, election, or appointment of any person to public office or office within a political organization, PBBA answered "no." Indeed from a review of PBBA's application and the supporting documents submitted to the IRS, it is clear that PBBA's purpose and activities were dedicated exclusively to stimulating the

---

[406] This is one example of an application that the IRS closed for "failure to establish."

218

electorate into supporting the passage of a balanced budget amendment.

PBBA's application was screened in EO Determinations in January 2011. The screener noted that there was no indication of direct political activities in the application and supporting documents. However, the screener characterized PBBA as an "advocacy group" and sent its application to the advocacy inventory. While PBBA was not a Tea Party and was neither partisan in its message nor its educational activities, it did promote a common theme advanced by Tea Parties—the elimination of the national debt and of deficit spending. Indeed, one of the screening criteria relied upon by EO Determinations to identify "Tea Party" cases was the presence of statements in the application related to "Government spending, Government debt . . . ."[407] If the screener applied the "Tea Party" screening criteria when reviewing the application, it is highly probable that his decision to send PBBA's application to the advocacy inventory was based on the conclusion that PBBA met the criteria for a Tea party application. In any event, the decision to send the case to the advocacy inventory proved a fateful one for PBBA, as explained below.

The application was initially assigned to an EO Determinations agent in California. She sent the first development letter to PBBA on March 31, 2011, and a second development letter on May 12, 2011. After PBBA had responded to the development letters and resolved an issue about its status as a "for-profit" corporation under state law, the EO Determinations agent was prepared to approve the application in September 2011. However, she then realized that PBBA was classified as an "advocacy group" and was therefore required to send the application to the Emerging Issues Group in Cincinnati.

The application was assigned to an EO Determinations agent in Cincinnati in February 2012. The agent sent PBBA an extremely detailed development letter containing, with subparts, 48 questions. A number of the questions asked for information that PBBA had already provided to the IRS in its responses to the prior two development letters. However, many of the questions asked for highly specific information:

- a hardcopy printout of PBBA's entire website;
- a hardcopy printout of its social media outlets;
- copies of all handouts and workshop materials for all public events conducted **or planned to be conducted** by PBBA, including:
    ⊕ the content of all speeches delivered or **planned to be delivered** at those events; and
    ⊕ the identities of the speakers and their credentials;
- copies of all communications distributed by PBBA regarding the outcome of specific legislation;
- copies of all radio, television or internet advertisements relating to lobbying activities; and
- copies of all written communications with members of legislative bodies.[408]

---

[407] Email chain between Holly Paz, John Shafer, Cindy Thomas and others (June 1–10, 2011) IRS0000066837–40.

[408] Letter from Joseph Herr to PBBA (Feb. 7, 2012) IRS0000048218–22 (emphasis added).

Exhibit E

219

Shortly after receipt of the third development letter, PBBA secured the services of an attorney who then submitted a response to the IRS. On May 25, 2012, PBBA received a determination letter from the IRS approving its application for tax exemption under 501(c)(4).

Even so, PBBA was adversely impacted by the IRS's mishandling of its application. First, the application and supporting documents clearly demonstrated that PBBA, while undoubtedly espousing a conservative message, was not a Tea Party or an advocacy group. The decision to characterize PBBA as an advocacy group delayed the IRS's decision to approve PBBA's application for exemption. Had the application been assigned to general inventory and developed in January 2011, it is likely that it would have been approved shortly thereafter. Aside from speculation, it is clear from the case history that the EO Determinations agent in California was prepared to approve the application in September 2011. However, because PBBA had been characterized as an advocacy group, its application was sent to Cincinnati where its approval was further delayed by 8 months. In addition, PBBA was required to respond to three rounds of development questions, and in particular, extremely onerous and burdensome questions that were hardly justified in light of the information already provided to the IRS. That information bore stark witness to the fact that PBBA was not a partisan political organization engaged in campaign intervention. Finally, after receiving a third development letter in 14 months, PBBA deemed it prudent to secure legal counsel at substantial cost to it, as a hedge against the vagaries of the application process.

### 4. King Street Patriots and True the Vote

Catherine Engelbrecht founded King Street Patriots (KSP) and True the Vote (TTV) in 2009–2010 after witnessing voter fraud and related abuses while serving as a volunteer poll watcher in a Texas election. Her experiences as a poll watcher convinced her that more needed to be done to ensure the "sanctity of the vote." Accordingly, she formed KSP as a non-partisan, non-profit organization dedicated to addressing some of the problems at the polls that she had personally experienced. KSP's activities included enlisting volunteers to work at the polls, training those workers, leading voter registration drives, and hosting events to encourage voter turnout. In May 2010, Engelbrecht filed with the IRS, on behalf of KSP, an application for tax exemption under 501(c)(4).

In September 2010, Engelbrecht submitted to the IRS an application for exemption under 501(c)(3) for TTV. Engelbrecht described TTV's activities as centering on the recruitment and training of volunteers to work inside polling places. Among other things, TTV was formed to aggressively pursue voter fraud allegations to ensure prosecutions where appropriate, to provide a support system to assist poll watchers carry out their duties, and to engage in efforts aimed at validating existing voter registration lists.

The IRS issued its first development letter to KSP in February 2012, some 21 months after KSP's application was filed. The development letter contained 95 questions and requests for documents, including subparts. In a now all too familiar pattern, the develop-

Exhibit E

ment letter sought from KSP an enormous amount of highly de-
tailed information of dubious probative value:

- copies of every page of KSP's webpage;
- minutes of every board meeting;
- copies of every fundraising solicitation;
- a list of all issues important to KSP and KSP's position on each issue;
- the criteria KSP used when determining whether to en-dorse a candidate for political office;
- copies of all training materials;
- copies of all materials distributed at educational events;
- copies of all materials distributed at candidate forums; and
- copies of all materials distributed during voter registration drives.

KSP responded to the IRS's development letter in May 2012 with a submission totaling nearly 300 pages. The IRS's next develop-ment letter was sent to KSP eight months later in October 2012. KSP responded in November 2012 with the requested information. Almost a year later, in December 2013, after waiting nearly 3 and a half years, KSP received a determination letter from the IRS ap-proving its application for exemption under 501(c)(4).

Development and resolution of TTV's application for tax-exempt status under 501(c)(3) followed much the same course as that of KSP's. TTV received its first development letter in February 2011, five months after filing its application. The letter asked a reason-able number of questions specifically aimed at eliciting informa-tion about TTV's activities, information clearly necessary for the IRS to be able to determine if TTV's activities were consistent with tax-exempt purposes. The next development letter that TTV received, a year later in February 2012, was not so reasonable. The number of requests for information and the demands for documents actu-ally exceeded that of the February 2012 letter sent to KSP, topping the prodigious sum of 120.[409] Moreover, many of these oppressive and burdensome requests were identical to those contained in the KSP development letter. It is indeed difficult to understand how the answers and information provided to many of these requests would possibly assist the IRS reach a conclusion on whether TTV should be granted tax-exempt status. The following examples give a flavor of the irrelevance of most of these requests:

- the percentage of people trained as election administration workers versus the percentage trained as election observers;
- the names and credentials of the election law experts used by TTV to review TTV's materials and to staff its voter integ-rity center;
- the number of individuals trained to perform voter reg-istration integrity activities as well as the number who are currently in training;
- the number of jurisdictions in which TTV conducted voter registration integrity activity;
- the name of the owner of the intellectual property rights to the software used by TTV to review lists of registered voters; and

[409] Letter from Janine Estes to True the Vote (Feb. 8, 2012) IRS0000084012–21.

221

- the name of any person or organization that provided educational services to TTV, together with a full description of the services and the political affiliation of the person or organization.

Notwithstanding the enormity of the effort required to respond to these largely superfluous and invasive requests, TTV did, in fact, respond in March 2012. Thereafter, TTV heard nothing from the IRS as another year passed. Then in March 2013, TTV was required to respond to yet another request for information from the IRS. Ultimately, after waiting three years, and responding to at least four different requests for additional information, TTV received its determination letter from the IRS granting it status as a 501(c)(3) tax-exempt organization.

Engelbrecht explained to Majority Staff that the delays experienced by both KSP and TTV adversely impacted the operations of these organizations. She recounted that the long delays and multiple rounds of development letters caused these entities to incur substantial legal fees, as assistance of counsel was required at nearly every juncture of the application process. She also indicated that KSP and TTV suffered the "stigma" of not having approved tax-exempt status while attempting to operate as tax-exempt entities, since the lack of IRS approval created the perception to some that the organizations lacked legitimacy. She also expressed frustration over TTV's inability to apply for foundation grants while it waited the three years required by the IRS to approve the application. Engelbrecht told Majority staff of one instance in which TTV had been awarded a grant with the condition that the funds could not be expended unless TTV was approved as a 501(c)(3) organization by the end of the year. When IRS approval was not forthcoming within that time, TTV was required to return the funds. Engelbrecht also noted that since KSP and TTV were both approved tax-exempt status, donations have increased, which lead her to the reasonable conclusion that the lengthy delays that both organizations endured from 2010 to 2013 negatively affected their ability to raise funds in those years.

Perhaps the most disconcerting aspect of Engelbrecht's saga is the heightened interest that several agencies of the U.S. Government took in her personally from 2010 through 2013, as well as in the operations of KSP, TTV and in Engelbrecht Manufacturing, the business that she and her husband operate. In January 2011, the IRS audited the tax returns of her business for tax years 2008 and 2009 and then in June of 2011, audited her personal returns for those same tax years. Throughout 2011, she was contacted by the FBI six times (four phone calls and two personal visits) regarding the general activities of KSP and about a particular individual who attended a KSP function. In 2012, a new round of government inquiry into her business affairs commenced with two audits of Engelbrecht Manufacturing by the Bureau of Alcohol, Tobacco, Firearms, and Explosives as well as an audit by the Occupational Safety and Health Administration. Engelbrecht indicated that between the years 1994, when she and her husband started their small business, and 2010, when she first filed the applications for tax exemption, the extent of her contact with the government had been limited to the filing of annual tax returns. However, this

Exhibit E

222

changed dramatically after she submitted applications to the IRS in 2010 seeking tax-exempt status for KSP and TTV. It is unclear whether this increased scrutiny into the business of Catherine Engelbrecht and her husband was simply serendipitous, or was the product of an orchestrated campaign by the government to harass her. It may also have resulted from the decentralized actions of like-minded bureaucrats in various agencies who were executing an unstated directive to intimidate the political opponents of the administration, or perhaps was a combination of some or all of the above. Whatever the cause, Engelbrecht believes with unshakable conviction that she has been personally targeted by the government and that the actions directed against her, as recounted above, reflect the "weaponizing of government."[410]

## VII. POLITICAL INFLUENCE WITHIN THE IRS

*Recent events have demonstrated that the organizational structure of the IRS is fundamentally flawed, resulting in an environment rife with political bias.*

A. THE IRS'S LACK OF INDEPENDENT AGENCY STATUS FOSTERED THE EXPRESSION OF POLITICAL BIAS AND HAS IRREVOCABLY TAINTED THE AGENCY'S CREDIBILITY

One of the critical lessons learned from the Committee's investigation is the need for the IRS to be an independent agency. To fully appreciate the politicized environment of the IRS, it is necessary to understand the IRS's role as a bureau of the Treasury Department—an entity that is closely controlled by the President to implement his economic and financial initiatives.

Many errantly believe that the IRS already is an independent entity. Indeed, Jay Carney, the former White House press secretary, mistakenly called the IRS "an independent enforcement agency with only two political appointees," during a press briefing on May 10, 2013.[411] President Obama also claimed that the IRS was an "independent agency," during a May 13, 2013 press conference. Specifically, he stated, "If, in fact, IRS personnel engaged in the kind of practices that had been reported on and were intentionally targeting conservative groups, then that's outrageous and there's no place for it. And they have to be held fully accountable, because the IRS as an independent agency requires absolute integrity, and people have to have confidence that they're applying it in a nonpartisan way—applying the laws in a non-partisan way."[412]

Despite these claims from the Administration and the misperception of many in the public that the IRS is indeed an independent agency, the reality is that it is most definitely not. The IRS is a bureau within the Treasury Department, which is an executive branch agency within the Federal Government.[413] According to the IRS website, the agency was "organized to carry out the **re-**

---

[410] *Townhall*, True the Vote President Catherine Engelbrecht Slams IRS Abuse, Weaponizing of Government (Feb. 7, 2014).
[411] White House, Press Briefing by Press Secretary Jay Carney (May 10, 2013).
[412] White House, Remarks by President Obama and Prime Minister Cameron of the United Kingdom in Joint Press Conference (May 13, 2013).
[413] U.S. Department of Treasury, About Bureaus.

Exhibit E

**sponsibilities of the Secretary of the Treasury** under section 7801 of the Internal Revenue Code."[414]

The IRS Commissioner is a political appointee nominated by the President and confirmed by the Senate. However, the IRS Commissioner does not report to the President, as the head of an independent agency would; instead, the IRS Commissioner reports to the Secretary of the Treasury via the Deputy Secretary of the Treasury.[415] This reporting line ensures that the IRS remains within Treasury's purview.

The law further states that the IRS Commissioner can be removed from the position "at the will of the President."[416] That action cannot be taken against the heads of some other "independent" agencies without a reason. For example, the Chairman of the National Labor Relations Board can "be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause."[417] Likewise, Members of the Federal Reserve Board, another independent agency, can only be removed "for cause."[418] These officials presumably have less concern that their judgment could result in removal if the Administration does not find it agreeable—unlike the IRS Commissioner, who can essentially be fired at will.

Indeed, President Obama may have indirectly exercised his authority to remove the IRS Commissioner on May 15, 2013, when he stated that he had directed Treasury Secretary Jack Lew to review TIGTA's findings. Soon after the President's directive, Lew requested and accepted the resignation of then-Acting IRS Commissioner, Steve Miller.[419] At that time, it had been reported that Miller was aware of the agency's targeting of conservative political groups and chose not to disclose it to members of Congress.[420]

One way that federal law attempts to remove partisanship from the IRS is through the use of five-year terms for its Commissioner that overlap the four-year presidential election cycles. The only other political appointee in the agency besides the Commissioner is the IRS Chief Counsel, who "provides legal guidance and interpretive advice to the IRS, Treasury and to taxpayers."[421]

Another safeguard is that the law prohibits the President, Vice President and members of their executive office staff from requesting, "directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer."[422]

The Treasury Department is supposed to keep an arms-length relationship with the IRS on matters of tax administration, enforcement and "process," which essentially means that it doesn't ask the IRS for information about taxpayers. However, on matters of tax policy and regulations, the Treasury Department works closely

---

[414] IRS, The Agency, its Mission and Statutory Authority (emphasis added).
[415] U.S. Department of Treasury, About Treasury Order 101–05.
[416] 26 U.S.C. § 7803 (2008).
[417] 29 U.S.C. § 153 (1982).
[418] 12 U.S.C. § 242 (2010).
[419] White House, Statement by the President (May 15, 2013).
[420] *Washington Post*, IRS Officials in Washington Were Involved in Targeting of Conservative Groups (May 13, 2013).
[421] IRM § 1.1.5.1(5) (Oct. 28, 2008).
[422] 26 U.S.C. § 7217 (1998).

Exhibit E

with the IRS. This dichotomy is a difficult one to balance and is
made even more challenging because the IRS Chief Counsel is ac-
tually organizationally housed in the Treasury Department and is
not a part of the IRS. Instead, the Office of Chief Counsel and the
Chief Counsel reports through Treasury Department's chain of
command, thereby adding an even greater appearance of
politicization.

This close working relationship between IRS and the Treasury
Department creates the appearance, if not the actuality, of an in-
herent conflict of interest that allows exactly the type of political
bias that occurred when conservative groups applied for tax-exempt
status between 2010 and 2013. If the IRS is to fulfill its mission
to act in a fair and impartial manner while carrying out its very
unique function, then it needs to be treated uniquely.

Making the IRS an independent agency, like the Social Security
Administration, would minimize the political influence of the
Treasury Department, while at the same time allowing the Com-
missioner to be an independent voice for tax administration. In
order for the American public to ever have its faith in the IRS re-
stored, it is essential that the IRS be taken out of the political
realm and put squarely where it needs to be—as an independent
enforcement agency that is free from all real and perceived political
influence and bias.

### B. Union Influence Within the IRS Has Created an Atmosphere of Political Bias

It is virtually impossible for the IRS to maintain the reality,
much less the appearance, of neutrality and fairness to all tax-
payers, when a substantial number of IRS employees are members
of the highly partisan and left-leaning National Treasury Employ-
ees Union (NTEU). The NTEU is one of the largest and most pow-
erful federal employee unions in the federal government. Currently
the union represents about 150,000 employees in 31 government
agencies, including the IRS.[423] At the IRS alone there are approxi-
mately 48,972 dues-paying union employees, representing 65.5% of
the bargaining unit employees at the IRS.[424]

Politically, the NTEU is extremely active and twice endorsed Mr.
Obama for President, first in 2008 and again in 2012. NTEU's cur-
rent president, Colleen Kelley, was a 14-year IRS revenue agent
and is now both union president and an Obama administration ap-
pointee to the Federal Salary Council, whose function is to rec-
ommend raises for IRS and other federal employees.[425] During the
2010 election cycle, when the IRS targeting of Tea Party groups
began, the NTEU raised $613,633 through its political action com-
mittee (PAC), donating approximately 98% of that amount to
Democrats. In 2012, $729,708—or 94% of NTEU PAC contribu-
tions—went to anti-Tea Party Democrats.[426]

Of further note is that as of 2011, at least 201 IRS employees
worked full time on union issues. For that year, 625,704 hours of

[423] NTEU, Who We Are.
[424] IRS Briefing for Majority staff (May 30, 2014).
[425] *Breitbart*, Obama Met with IRS Union Boss Day Before Tea Party Targeting Began (May 20, 2013).
[426] *The American Spectator*, Obama and the IRS: The Smoking Gun? (May 20, 2013).

Exhibit E

225

official employee time within Treasury Department (including the IRS) was spent on union duties. These union activities cost taxpayers an estimated $27 million.

Although IRS employees are career civil servants, many of them are political partisans. For example, in the past three election cycles, the Center for Responsive Politics's database shows about $474,000 in political donations by individuals listing "IRS" or "Internal Revenue Service" as their employer.[427] This money heavily favors Democrats: $247,000 to $145,000.[428] IRS employees also gave $67,000 to the NTEU political action committee, which in turn gave more than 96 percent of its contributions to Democrats. When NTEU political action committee contributions are added to the donations by individual IRS employees, those contributions favor Democrats 2 to 1.[429]

The IRS office in Cincinnati involved in the targeting of Tea Party applications is even more partisan than the IRS as a whole, judging by FEC filings. More than 75 percent of the campaign contributions from that office in the past three elections went to Democrats. In 2012, every donation traceable to employees at that office went to either President Obama or a particular Democratic Senator.[430]

These figures indicate that IRS employees are primarily paying for efforts to elect anti-Republican candidates, both through their union membership and by their direct contributions. Moreover, IRS employees are beholden to the NTEU, as it has negotiated favorable labor agreements with the IRS on their behalf that affect virtually every aspect of work life, such as "alternative work schedules, flexi-place, transit subsidies, performance awards and much more." [431] These labor agreements also make it more difficult for IRS management to discipline and terminate employees who are failing to perform their jobs.

In addition to the NTEU's leanings towards the Democratic Party is the fact that the Tea Party's anti-IRS views are well documented.[432] These factors together create an atmosphere that may foster an outright bias against Tea Party groups by IRS employees in the performance of their duties; or, at least one that may color their perspective to a degree that could cause them to administer the tax laws unfairly to the detriment of the Tea Party.

Under current law, most federal employees are permitted representation by a union. The major exception to this rule is Federal employees who work in national security or other agencies where the nature of their work requires them to be completely apolitical. The Federal Labor-Management Relations Statute provides that employees at the following agencies are not entitled to union representation: Government Accountability Office, Federal Bureau of Investigation, Central Intelligence Agency, National Security Agency, Tennessee Valley Authority, Federal Labor Relations Authority,

---

[427] Center for Responsive Politics, data available at http://www.opensecrets.org.
[428] *Id.*
[429] *National Review*, A Partisan Union at the IRS (May 20, 2013).
[430] *Washington Examiner*, Tim Carney: The IRS is Deeply Political and Very Democratic (May 15, 2013).
[431] NTEU, The Voice of Federal Employees.
[432] *Wall Street Journal*, Tea Party Protesters Rally Against IRS, Government (June 19, 2013).

226

Federal Service Impasses Panel, and U.S. Secret Service and U.S. Secret Service Uniformed Division.[433]

The IRS is currently not one of the exempted entities, but the issues and facts brought forth by this investigation make a compelling case of why they should be exempted. The charge of the IRS is to administer the tax law in a fair and impartial manner. It is difficult, if not impossible, for that to occur when the union presence is so pervasive. The only way to completely eliminate the appearance of any bias is to add the IRS to the list of agencies where union membership is prohibited.

### C. RECENT VIOLATIONS OF THE HATCH ACT SHOW PERVASIVE POLITICAL BIAS THROUGHOUT THE IRS

The Hatch Act was enacted in 1939 following widespread allegations that Federal employees were exerting improper political influence in the course of their official duties. The Act has been amended several times since its enactment and prevents Federal employees from engaging in partisan political activity while on duty. The Office of Special Counsel (OSC) is authorized to issue advisory opinions about alleged violations of the Hatch Act throughout the Federal Government.[434]

Federal employees are routinely warned about the consequences of participating in prohibited political activity. Still, in every election cycle, there are violations of the Hatch Act. Some of these incidents occur when a reasonable person may have made a mistake in judgment. Often, though, the incidents are blatant violations, such as those described below in recent investigations into the activities of IRS employees.

In total, OSC received 38 allegations of Hatch Act violations committed by Treasury Department employees from fiscal year 2010 through fiscal year 2013.[435] Of those 38 allegations, 95% were lodged against IRS employees (the remaining 5% comprised employees from all other bureaus within the Treasury Department). In fiscal year 2013 alone—which included the months surrounding the 2012 election—there were 22 allegations of Hatch Act violations filed against IRS employees.

OSC issued a press release on April 9, 2014, announcing its investigation of several cases against IRS employees and offices suspected of illegal political activity in support of President Obama and fellow Democrats in 2012.[436] In the press release, OSC stated that it has evidence that an IRS employee used his authority and influence as a customer service representative for a political purpose.[437] When fielding taxpayer's questions from an IRS customer service help line, the employee urged taxpayers to reelect President Obama in 2012 by repeatedly reciting a chant based on the spelling

---

[433] 5 U.S.C. §7103(a)(3) (2004). In at least one case, subsequent legislation has allowed union representation at an agency exempted by the Federal Labor-Management Relations Statute. See 31 U.S.C. §732(e)(2) (2008), authorizing a labor-management relations program for the Government Accountability Office.

[434] U.S. Office of Special Counsel, Request an Advisory Opinion.

[435] OSC Summary of Alleged Violations of Hatch Act, Produced to SFC Majority Staff (May 23, 2014).

[436] U.S. Office of Special Counsel, OSC Enforces Hatch Act in a Series of IRS Cases (Apr. 9, 2014).

[437] Id.

Exhibit E

227

of his last name. In June 2014, OSC announced that the employee had agreed to serve a 100-day unpaid suspension and "acknowledged that he had used his authority and influence as an IRS customer service representative for a political purpose and did so while at work." [438]

In another recent IRS case, OSC found that an employee in Kentucky promoted her partisan political views to a taxpayer she was assisting during the 2012 Presidential election season.[439] The employee in question had previously been warned about violating the Hatch Act. A recorded conversation between the employee and a taxpayer revealed the employee saying that she was "for" the Democrats because "Republicans already [sic] trying to cap my pension and . . . they're going to take women back 40 years." The employee explained that her mother always said, " 'If you vote for a Republican, the rich are going to get richer and the poor are going to get poorer.' And I went, 'You're right.' I found that out." The employee then told the taxpayer, "I'm not supposed to voice my opinion, so you didn't hear me saying that."

Following OSC's investigation, the employee entered into a settlement agreement in April 2014, agreeing to serve a 14-day suspension. In the agreement, the employee admitted to violating the Hatch Act's restrictions against engaging in political activity while on duty and using her official authority or influence to affect the result of an election.

Finally, OSC recently completed an investigation of allegations that an IRS manager in California violated the Hatch Act while on official travel to Las Vegas in November 2012. The manager allegedly canceled a meeting in Las Vegas to meet her husband at the site of a rally for President Obama's 2012 reelection campaign. OSC concluded that the manager's likely attendance of the Obama rally violated the Hatch Act's restrictions on engaging in political activity during official time. OSC referred its findings to the IRS, which is considering misconduct charges against the manager.[440]

In view of the IRS's targeting of conservative groups, the actions of these employees have re-focused attention on whether the IRS may have been used to benefit one political viewpoint or candidate over another. Incidents such as these are unfortunate, as they denigrate the public image of an agency that has been given tremendous influence over the lives of Americans and is supposed to be impartial in wielding this influence.

## VIII. THE IRS HAS YET TO FULLY CORRECT ITS PROBLEMS

> *The IRS has failed to correct many of the fundamental problems that led to the inappropriate targeting of Tea Party groups.*

---

[438] U.S. Office of Special Counsel, OSC Obtains Disciplinary Action in Two Hatch Act Cases (July 10, 2014).

[439] U.S. Office of Special Counsel, OSC Enforces Hatch Act in a Series of IRS Cases (Apr. 9, 2014).

[440] OSC Briefing for SFC Staff (July 9, 2015).

Exhibit E

228

Soon after being installed as Principal Deputy Commissioner, Danny Werfel recognized the importance of addressing the problems identified in TIGTA's report:

> I assure you, we're doing everything we can to re-look at this process to make sure that it moves more quickly and swiftly. It's too slow right now, I absolutely agree. But the reforms that we put in place, and I'm happy to send more time with you and your staff detailing exactly how we're looking at the reengineering these processes to make these improvements. We're going to do everything in our power to make sure that they take effect and take effect quickly.[441]

Commissioner Koskinen affirmed his commitment to fixing these problems—and to working with the Committee—during his confirmation hearing before the Committee:

> Taxpayer services need to be improved, particularly in the areas of tax-exempt organization filings and operations. There are several investigations ongoing into the delays encountered by many of those seeking to establish themselves as 501(c)(4) social welfare organizations. And I look forward to working with this committee as it concludes its investigation of that matter.[442]

Although there have been some changes at the IRS since May 2013, neither Mr. Werfel nor Mr. Koskinen has enacted the type of structural changes that are necessary to correct the serious problems identified by TIGTA and by this Committee. Moreover, the IRS unsuccessfully attempted to modify the regulations to constrain free speech of 501(c)(4) organizations, which would have institutionalized the type of targeting that TIGTA found to be problematic.

### A. ALTHOUGH THE IRS HAS ADDRESSED SOME PROBLEMS IDENTIFIED BY TIGTA, THERE IS MUCH WORK LEFT TO DO

#### 1. Initial IRS Response and Suspension of BOLO

There was a flurry of activity after the IRS targeting of conservative organizations became public in May 2013. The first glimpse inside the agency came on June 24, 2013, when the Principal Deputy Commissioner Werfel released a 30-day update. Among the key steps noted in that report were the results of the IRS's internal investigation, which found "significant management and judgment failures;" replacement of four levels in the management chain that had responsibility for the activities identified in the TIGTA report; and the suspension of use of the BOLO spreadsheet.[443] At the time

---

[441] Testimony of Danny Werfel, House Ways and Means Subcommittee on Oversight Holds Hearing on Oversight of the IRS Exempt Organizations Division After the Treasury Inspector General for Tax Administration's Audit (Sep. 18, 2013).

[442] Testimony of John Koskinen, Senate Finance Committee Confirmation Hearing on the Nomination of John Koskinen to be IRS Commissioner (December 10, 2013).

[443] IRS, Charting a Path Forward at the IRS: Initial Assessment and Plan of Action (June 24, 2013). Appendix C is a memorandum from Karen Schiller titled Interim Guidance on the Suspension of BOLO List Usage (June 20, 2013). The memorandum instructed employees to immediately stop using the BOLO spreadsheet, including the Emerging Issues tab and the Watch

Exhibit E

of the 30-day update report, Lerner had been placed on paid administrative leave by the IRS. She eventually retired in September 2013 after an internal investigation found that she was guilty of "neglect of duties" and recommended her removal.[444] Notably, before TIGTA's report was released, Lerner had been contemplating retiring on October 1, 2013—exactly one week after her actual retirement date.[445]

These initial actions did not immediately cease all of the practices that TIGTA found to be problematic. As discussed in Section III(G) of the Bipartisan Investigative Report, it appears that several months after TIGTA released its report, employees lacked appropriate instructions from management and possibly continued to pull out applications containing the words "Tea Party" for separate processing. Since the Committee conducted the interviews referenced in that section of the report, the IRS has issued additional guidance to employees implementing new procedures for reviewing tax-exempt applications.[446] We have no knowledge of whether the IRS's recent guidance has affected the screening procedures applied to incoming applications for tax-exempt status or whether the IRS continues to subject Tea Party applicants to improper levels of scrutiny named on their names or political affiliation.

### 2. The Expedited Process

In June 2013, the IRS also announced a "new voluntary process" for political advocacy organizations with applications for 501(c)(4) tax-exempt status that had been pending for more than 120 days.[447] The IRS would grant tax-exempt status to applicants that certified that the organization "satisfies, and **will continue to satisfy**, set percentages with respect to the level of its social welfare activities and political campaign intervention activities[.]" Specifically, applicants were required to certify that during each past year that the organization has existed, during the current year, and during all future years in which the organization will rely on the IRS's determination of tax-exempt status:

> The organization has spent, or will spend, 60% or more of **both** the organization's total expenditures **and** its total time (measured by employee and volunteer hours) on activities that promote the social welfare; and

> The organization has spent, or will spend, less than 40% of **both** the organization's total expenditures **and** its total time (measured by employee and volunteer hours) on direct or indirect participation or intervention in any political campaign on behalf of (or in opposition to) any candidate for public office.[448]

---

List tab. However, employees were permitted to continue using other lists to identify and prevent waste, fraud and abuse.

[444] Washington Times, Lois Lerner, IRS Official in Tea Party Scandal, Forced Out for "Neglect of Duties" (Sep. 23, 2013).

[445] Email from Richard Klein to Lois Lerner (January 28, 2013) IRS0000202615 (email attachment omitted by Majority staff).

[446] IRS, Memorandum from Kenneth Corbin, Expansion of Optional Expedited Process for Certain Exemption Applications Under Section 501(c)(4) (Dec. 23, 2013); IRS, Memorandum from Stephen Martin, Streamlined Processing Guidelines for All Cases (Feb. 28, 2014).

[447] IRS, Charting a Path Forward at the IRS: Initial Assessment and Plan of Action, Appendix E (June 24, 2013).

[448] Id. (emphasis in original).

230

As of April 2015, the IRS reported that 145 political advocacy organizations in the "backlog" were offered expedited treatment; of those, 43 elected to participate in the expedited process and were granted tax-exempt status.[449] The low participation rate—less than a third of eligible organizations—indicates that the expedited process was a deeply flawed proposition. First and foremost, the standards were based on an arbitrary measure of organizational activity that is not found in any statute or regulation. Rather than asking applicants to certify that they will comply with the existing law, the IRS created new standards.

A second and related problem is that the invented standards are, in fact, more stringent than the existing law. The expedited option was not available to an organization that had, in the past, performed a legally-acceptable amount of political campaign intervention that exceeded 40%. Likewise, by attesting to these requirements, an organization would be forfeiting its ability to ever engage in the amount of political campaign intervention allowable under the current law, thereby restraining its speech.

Finally, the expedited process required applicants to certify that their submission was accurate under penalty of perjury. The IRS frequently requires all types of taxpayers to sign submissions under penalty of perjury. But in this area of tax law—where the IRS had difficulty applying its own statues and regulations, and then invented new standards just for this process—risking perjury seems like a risky proposition, particularly when the organization must perform a precise calculation of all past, current, and future activities.

Indeed, many organizations that were eligible for the expedited process elected to proceed with the IRS's standard process rather than submit to these onerous demands. The Majority staff spoke with attorneys who together represent a large number of Tea Party organizations, and they uniformly advised their clients not to participate in the expedited process. Some of those attorneys believed that the IRS then drew adverse inferences about their clients' level of political activities, a charge that the IRS has denied.

Despite these concerns, the IRS later broadened the expedited option to "include all applicants for 501(c)(4) status (as opposed to only those with applications pending for more than 120 days as of May 28, 2013) whose applications indicate the organization could potentially be engaged in political campaign intervention or in providing private benefit to a political party[.]"[450]

Overall, as of March 26, 2014, 117 applicants that were "centralized" by the IRS were still waiting for a final determination—more than one-fifth of the total number that were delayed. Tellingly, all of those organizations preferred to stick with the IRS's normal determination process, which by that point had resulted in delays of more than three years for some applicants. As of April 2015, 10 of those applicants were still waiting for a final determination of their tax-exemption.[451]

---

[449] IRS Briefing for SFC Staff (April 15, 2015).
[450] IRS, Memorandum from Kenneth Corbin, Expansion of Optional Expedited Process for Certain Exemption Applicants Under 501(c)(4) (Dec. 23, 2013).
[451] IRS Briefing for SFC Staff (April 15, 2015).

Exhibit E

### 3. FURTHER UPDATES ON TIGTA RECOMMENDATIONS AND OTHER CHANGES

Since May 2013, the IRS has continued to update the Committee about its progress in implementing TIGTA's recommendations and other changes to its review of applications for tax-exempt status. As of January 31, 2014, the IRS reported that it had implemented all of TIGTA's recommendations.[452] TIGTA concurred, writing in a March 2015 report that "[t]he IRS has taken significant actions to address the nine recommendations made in our prior audit report."[453] In that report, TIGTA made two additional recommendations: one related to employee training, and a second suggestion that if the expedited process becomes permanent, it should be available to "additional organizations with similar political campaign interventions."[454]

We note that in addition to its implementation of the recommendations outlined in TIGTA's March 2015 report, the IRS has also made a number of other changes to the EO division, which are reflected in the IRM and internal IRS operational procedures.

### B. ATTEMPTS BY THE IRS AND OTHERS TO SUPPRESS POLITICAL SPEECH AND DISCOURAGE AN INFORMED CITIZENRY MUST BE REJECTED

Following the release of the TIGTA report, some argued that although the IRS's actions were misguided, the larger underlying problem lies in law and regulations that are vague, outdated, and difficult to apply. Indeed, this theory is advanced in the Additional Democratic Views. We disagree. As described throughout this document, the fault in this matter lies squarely with IRS executives in Washington, D.C. who purposefully misapplied and manipulated well-established rules, thereby interfering with the work of EO field offices.

In response to these concerns, the IRS proposed regulatory changes in November 2013 that would have constrained political speech by 501(c)(4) organizations. Although the IRS later withdrew the regulations, the proposal should be recognized for what it was: an attempt to suppress dialogue that leads to informed debate. Based on these and other concerns, the proposed regulations were roundly rejected by citizens, regardless of their personal political affiliation.

Legislative proposals that would require near-universal disclosure of donors, such as those advanced by the Minority Staff, should also be rejected. These proposals show a troubling indifference to harassment of individuals that follows from the publication of donor identities—a concern that was raised by the American Civil Liberties Union (ACLU) in response to the IRS's proposed regulations on political speech. As the ACLU and others of all political affiliation have noted, there is a dark side to disclosure.

---

[452] IRS, Exempt Organizations Recommended Actions Ending May 23, 2014.
[453] TIGTA, Status of Actions Taken to Improve the Processing of Tax-Exempt Applications Involving Political Campaign Intervention, TIGTA Audit Report 2015–10–025 (Mar. 27, 2015) p. 2.
[454] *Id*. pp. 11, 16.

232

### 1. Background on 501(c)(4) Exemption

Section 501(c)(4) provides a tax exemption for civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, and no part of the net earnings of which inures to the benefit of any private shareholder or individual. Treasury regulations provide that an organization is operated exclusively for the promotion of social welfare if it is engaged primarily in promoting in some way the common good and general welfare of the people of a community or bringing about civic betterments and social improvements.[455] Contributions to 501(c)(4) organizations are not tax deductible.[456]

Treasury regulations provide that the promotion of social welfare does not include "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office" ("political campaign intervention").[457] However, social welfare organizations are permitted to engage in political campaign intervention so long as the organization is primarily engaged in activities that promote social welfare.[458]

Under current Treasury regulations, the determination of whether an activity constitutes political campaign intervention depends on all the facts and circumstances of the particular case.[459] The rules concerning political campaign intervention apply only to activities involving candidates for elective public office; the rules do not apply to activities involving officials who are selected or appointed, such as executive branch officials and judges. Similarly, section 501(c)(4) organizations may engage in activities that educate the public on important issues. Thus, section 501(c)(4) organizations are allowed to hold candidate forums and distribute voter guides outlining candidates' positions on issues important, in the view of the organization, to the public. Section 501(c)(4) organizations also are allowed to conduct nonpartisan get-out-the-vote drives and voter registration drives.[460]

Similar rules apply for determining whether other types of section 501(c) organizations have engaged in political campaign intervention, including charities (section 501(c)(3)), labor and horticultural organizations (section 501(c)(5)), and business leagues (section 501(c)(6)). However, while section 501(c)(4), (5) and (6) organizations may engage in some political campaign intervention without jeopardizing exempt status, section 501(c)(3) organizations alone are prohibited by statute from engaging in any political campaign intervention.[461]

---

[455] 26 C.F.R. §§ 1.501(c)(4)–1(a)(1) and (2)(i) (1990). An organization is not operated primarily for the promotion of social welfare if its primary activity is operating a social club for the benefit, pleasure, or recreation of its members, or is carrying on a business with the general public in a manner similar to organizations that are operated for profit. 26 C.F.R. § 1.501(c)(4)–1(a)(2)(ii) (1990).

[456] 26 U.S.C. § 170 (2014). By contrast, contributions to 501(c)(3) organizations are deductible.

[457] 26 C.F.R. § 1.501(c)(4)–1(a)(2)(ii) (1990).

[458] Rev. Rul. 81–95, 1981–1 C.B. 332.

[459] Rev. Rul. 2007–41, 2007–25 I.R.B. 1421 (June 18, 2007) (analyzing 21 different factual scenarios involving section 501(c)(3) charitable organizations for political campaign intervention); Rev. Rul. 81–95, 1981–1 C.B. 332 (referencing section 501(c)(3) standards in determining whether activities of a section 501(c)(4) organization constitute political campaign intervention).

[460] The proposed section 501(c)(4) regulations, discussed *infra*, categorize all of these activities as political activity not consistent with the promotion of social welfare.

[461] 26 U.S.C. § 501(c)(3) (2014).

Exhibit E

The lobbying and advocacy activities of a section 501(c)(4) organization generally are not limited, provided the activities are in furtherance of the organization's exempt purpose.

### 2. IRS's Proposed Regulatory Changes

On November 29, 2013, the Internal Revenue Service and the Treasury Department published proposed regulations regarding the political campaign activities of section 501(c)(4) organizations.[462] The proposed regulations, which were eventually withdrawn by the IRS in May 2014 in the face of fierce public opposition, sought to replace the present-law facts-and-circumstances test used in determining whether a section 501(c)(4) organization has engaged in political campaign intervention with an enumerated list of activities that constitute political campaign activities.[463]

The proposed regulations were intended to replace the political campaign intervention referenced in the existing section 501(c)(4) regulations (i.e., "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office") with a new defined term, "candidate-related political activity."[464] Candidate-related political activity is defined in the proposed regulations as: (1) communications that express a view on, whether for or against, the selection, nomination, election, or appointment of one or more clearly identified candidates (often referred to as express advocacy communications); (2) certain public communications (as defined) within 30 days of a primary election or 60 days of a general election that refer to one or more clearly identified candidates, or in the case of a general election one or more political parties; (3) communications the expenditures for which are reported to the FEC; (4) contributions (including gifts, grants, subscriptions, loans, advances, or deposits) of money or anything of value to or the solicitation of contributions on behalf of a candidate, a section 527 political organization, or a section 501(c) organization that engages in candidate-related political activity; (5) conduct of a voter registration drive or "get-out-the-vote" drive; (6) distribution of any material prepared by or on behalf of a candidate or by a section 527 political organization; (7) preparation or distribution of a voter guide that refers to one or more clearly identified candidates, or in the case of a general election to one or more political parties; and (8) hosting or conducting a forum for candidates within 30 days of a primary election or 60 days of a general election.[465]

For purposes of candidate-related political activity, the proposed regulations define the term "candidate" to mean "an individual who publicly offers himself, or is proposed by another, for selection, nomination, election, or appointment to any federal, state, or local public office or office in a political organization, or to be a Presidential or Vice-Presidential elector, whether or not such individual

[462] Notice of Proposed Rulemaking, *Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related Political Activities* REG–134417–13, 78 Fed. Reg. 71535 (Nov. 29, 2013); incorporating Prop. Treas. Reg. §§ 1.501(c)(4)–1(a)(2)(ii), (a)(2)(iii), and (c).

[463] Notice of Proposed Rulemaking, *Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related Political Activities*, REG–134417–13, 78 Fed. Reg. 71535 (Nov. 29, 2013) p. 71536.

[464] Prop. Treas. Reg. §§ 1.501(c)(4)–1(a)(2)(ii) and (iii).

[465] Prop. Treas. Reg. § 1.501(c)(4)–1(a)(2)(iii)(A).

Exhibit E

is ultimately selected, nominated, elected, or appointed," including officeholders who are the subject of a recall election;[466] this includes certain judicial and executive branch appointments.

The proposed regulations would have applied only to section 501(c)(4) organizations.[467] Other section 501(c) organizations (including section 501(c)(3) charitable organizations, section 501(c)(5) labor and horticultural organizations, and section 501(c)(6) business leagues) would continue to use present-law rules concerning political campaign intervention. The regulations were proposed to be effective on the date they were published in the Federal Register as final regulations.[468]

Conservative social welfare organizations—the types of organizations targeted by the IRS—weighed in strongly against the regulations. But it was not just conservative groups that submitted comments critical of the proposed regulations. Left-leaning and progressive groups also were highly critical. The ACLU, for example, submitted a comment letter arguing that the proposed regulations would "produce the same structural issues at the IRS that led to the use of inappropriate criteria in the selection of various charitable and social welfare groups for undue scrutiny." The ACLU argued that social welfare groups should be free to participate in the political process because that kind of participation "is at the heart of our representative democracy. To the extent it influences voting, it does so by promoting an informed citizenry."[469] In all, the IRS received more than 150,000 comments on the proposed regulation before the comment period closed on February 27, 2014—by far the most comments ever submitted in response to a proposed IRS regulation.[470] On May 22, 2014, the IRS gave public notice that it view of the comments it received, it would make changes to the proposed regulation, issue a revised proposed regulation, and then hold a public hearing on that revised regulation.[471] The IRS has not indicated when the revised proposed regulation will be published.

### 3. Legislative Proposals

The legislative response to the proposed regulations that has garnered the most support from Republicans in the Senate is the Stop Targeting of Political Beliefs by the IRS Act of 2015 (S. 283), introduced on January 28, 2015, by Senator Jeff Flake (R–AZ). The bill would prohibit the Secretary of the Treasury from finalizing the proposed regulation, or from issuing other forms of guidance (e.g.,

---

[466] Prop. Treas. Reg. § 1.501(c)(4)–1(a)(2)(iii)(B)(1).

[467] Notice of Proposed Rulemaking, *Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related Political Activities* REG–134417–13, 78 Fed. Reg. 71535 (Nov. 29, 2013) p. 71537.

[468] Prop. Treas. Reg. § 1.501(c)(4)–1(c). In the notice of proposed rulemaking, the IRS requested comments from the public on a number of issues, including: (1) whether the existing regulation that provides that an organization is operated exclusively for social welfare if it is engaged primarily in promoting in some way the common good and general welfare of the people of a community should be modified; and (2) whether the rules included in the proposed regulations should be extended to other section 501(c) organizations or to section 527 political organizations. Notice of Proposed Rulemaking, *Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related Political Activities* REG–134417–13, 78 Fed. Reg. 71535 (Nov. 29, 2013) p. 71537.

[469] Public comment letter from ACLU to IRS Commissioner John A. Koskinen (Feb. 4, 2014).

[470] Prepared Remarks of Commissioner of Internal Revenue Service John Koskinen Before the National Press Club, (Apr. 2, 2014).

[471] IRS, IRS Update on the Proposed New Regulation on 501(c)(4) Organizations (May 22, 2014).

revenue rulings, etc.) to restrict 501(c)(4) political activity. The bill also provides that the standards and definitions in effect on January 1, 2010, which are used to determine whether an organization is operated exclusively for the promotion of social welfare for purposes of section 501(c)(4), shall apply for determining the tax-exempt status of organizations under section 501(c)(4). The provisions in the bill would sunset after February 28, 2017.

The legislative solution suggested by former Chairman Wyden was the enactment of a bill he introduced on April 23, 2013, co-sponsored by Senator Lisa Murkowski (R–AK), the Follow the Money Act of 2013 (S. 791). The bill required comprehensive disclosure of independent federal election-related activity—both the money coming in and the money going out. Independent federal election-related activity involved an expenditure made by any person for the purpose of influencing the selection, nomination or election of any individual to any federal office which was made by a person or entity independent of the candidate and which was not coordinated with the candidate. The full universe of independent political spenders was covered by this regime. This included independent spending by individuals, unincorporated organizations, partnerships, Limited Liability Companies, corporations, trade associations, labor unions, SuperPACs, Indian tribes, 501(c) organizations of all types and 527 groups.

Not later than January 1, 2015, the bill required the FEC to make available a real-time contribution disclosure system to its regulated community. Once this system was implemented, the regulated community would be required to report contributions, including covered contributions to certain politically active 501(c)(4) organizations, not more than 10 days after receipt and, in some cases, just 48 hours after receipt. The FEC would immediately disclose this information to the general public upon receipt.

The bill did not address the question of how much 501(c)(4) organizations can spend on political activity, but in many cases it would have required disclosure of 501(c)(4) donor information currently protected as confidential by the Internal Revenue Code. Thus, donor anonymity would be a thing of the past for many 501(c) organizations.

What supporters of donor disclosure fail to fully appreciate are the important Constitutional values that would be impaired by their proposals. Just as we should not allow the government to pull back the curtain of privacy that surrounds the voting booth, we also should not allow government to use donor identification information to suppress free speech or impair the right to anonymous political association, including when those rights are expressed in the form of financial support for the causes of one's choice. This country has a long history of reprisals and harassment that follow government disclosure of the identity of donors to controversial groups. As the ACLU observed in its letter commenting on the proposed 501(c)(4) regulations: "It is well and long established that forced donor disclosure for any controversial group—even partisan groups—is unconstitutional." [472]

---

[472] Public comment letter from ACLU to IRS Commissioner John A. Koskinen (Feb. 4, 2014).

The ACLU was not making a frivolous argument. It was refer-
ring to U.S. Supreme Court cases such as *McIntyre v. Ohio Elec-
tions Commission,* 514 U.S. 334 (1995), which recognized a Con-
stitutional right to distribute anonymous campaign literature;
*Brown v. Socialist Workers '74 Campaign Committee,* 459 U.S. 87
(1982), which required exemption from donor disclosure for con-
troversial groups subject to reprisal or harassment, and *National
Association for the Advancement of Colored People v. Alabama,* 357
U.S. 449 (1958), which prohibited the State of Alabama from re-
quiring donor disclosure as a condition for in-state operation. As
the ACLU pointed out, the *NAACP* Court expressly recognized that
imposing taxes upon an activity as well as directly prohibiting an
activity pose equally severe First Amendment concerns.

The pattern is well known. First, a governmental entity compels
or permits the disclosure of donor identities. Next, private actors,
armed with information regarding donor identities, embark on a
campaign of reprisals and harassment. This is precisely the sce-
nario that concerned the Supreme Court in the *NAACP* case: citi-
zens that associate with particular groups, having had their identi-
ties disclosed, will be subjected to "economic reprisal, loss of em-
ployment, threat of physical coercion, and other manifestations of
public hostility."[473] Nor should we forget that many of the tax-
payer privacy protections in the Internal Revenue Code were added
in response to the common practice of both Democrat and Repub-
lican Administrations in the 1970s and earlier of using the Internal
Revenue Service and the government's taxing power to harass and
intimidate political opponents.[474]

Contrary to the suggestion in the Additional Democratic Views,
the Committee's Republican Members do not assert a Constitu-
tional right to a charitable tax deduction or insist on a tax break
when exercising one's free speech rights. As previously noted, con-
tributions to 501(c)(4) organizations are not tax deductible. But
the identity of the 501(c)(4) donors is protected. As set forth above, ano-
nymity in one's political associations is an American value worth
preserving and, as even progressive groups like the ACLU have ob-
served, has Constitutional implications.

#### 4. View of the Majority Committee Members on Legislative and Regulatory Proposals

In the view of the Committee's Republican Members, it would
have been a grave mistake for the Treasury Department to finalize
the proposed 501(c)(4) regulations and thereby institutionalize the
very type of IRS targeting of grassroots organizations that came to
light in 2013. On April 2, 2014, Commissioner Koskinen said, "It's
going to take us a while to sort through all [of the] comments [re-

---

[473] 357 U.S. 449 (1958) at 462. For a recent example of the economic reprisals that can accom-
pany the disclosure of a political donor's identity, see the following post on The Mozilla Blog,
dated April 5, 2014 (emphasis added): "On April 3, 2014 Brendan Eich voluntarily stepped down
as CEO of Mozilla. It has been well documented that Brendan's past political donations led to
boycotts, protests, and intense public scrutiny. Upon his resignation, Brendan stated: 'Our mis-
sion is bigger than any one of us, and under the present circumstances, I cannot be an effective
leader.' **The intense pressure from the press and social media made it difficult for
Brendan to do his job as CEO and effectively run Mozilla."**
[474] For a recent example of the harassment political donors can experience from agencies of
the U.S. Government, including the Internal Revenue Service, when their identities are dis-
closed, see *Wall Street Journal,* Obama's Enemies List—Part II, (July 19, 2012).

Case 1:13-cv-00734-RBW   Document 119-7   Filed 01/19/17   Page 243 of 379

ceived by the IRS], hold a public hearing, possibly re-propose a draft regulation and get more public comments."[475] Subsequently, the IRS announced that it will publish a revised proposed regulation in the future.[476] We encourage the IRS to carefully review all existing and future comments and heed the warnings of people from all sides of the political spectrum. The IRS should refrain from issuing another fatally flawed proposed regulation.

Similarly, it would be a mistake for Congress to enact legislation that requires or allows the government to compel the disclosure of the identities of donors to 501(c)(4) organizations, or otherwise impose new limits on their operations or tax status. The Minority relies heavily on the notion that there was confusion at the IRS regarding the definition of "political activity" and imprecision in the term "primarily" to advance the argument that legislative changes to section 501(c)(4) are necessary. But the facts don't bear out the need for, much less the wisdom of, new legislation. First, testimony received by the Committee's investigators reveals that the EO tax law specialists in Cincinnati knew full well that "primarily" means 51%.[477] Second, the distinction between social welfare activity and political activity has a 55 year administrative track record of interpretation by the IRS. For example, nonpartisan activities like voter education, voter registration and get-out-the-vote drives have long been acceptable activities for 501(c)(4) organizations. It is the 2014 proposed regulation that has sown confusion in this area, not the well-worn 1959 regulation.

## IX. CONCLUSION AND RECOMMENDATIONS

The Committee's investigation uncovered serious organizational problems throughout the IRS, which are detailed both in the Bipartisan Investigative Report and in these Additional Republican Views. The IRS has received recommendations from TIGTA and from others, such as the National Taxpayer Advocate, and has been receptive to implementing at least some of them. Those measures are a step in the right direction, but they are not sufficient to correct the underlying problems uncovered by our investigation. We believe that any attempt to address those problems, if it is to be successful, must immunize the IRS from the whims of the party that controls the Executive Branch, whether that party is the Democratic or the Republican Party. Achieving this goal will not only require legislative changes, but also constant vigilance by both Congress and the public to ensure that the IRS stays true to its mission and administers the tax laws fairly and without regard to politics of any kind.

A chief finding of the Majority staff is that the organizational structure of the IRS enabled the political bias of individual employees like Lois Lerner to flourish. Indeed, at least partly because of this bias, the IRS uniformly targeted applications from Tea Party and other conservative groups for extra scrutiny, which resulted in their experiencing lengthy delays and in many cases, multiple rounds of burdensome development questions. Unlike other organi-

---

[475] Prepared Remarks of Commissioner of Internal Revenue Service John Koskinen Before the National Press Club, (Apr. 2, 2014).
[476] IRS, Update on the Proposed New Regulations on 501(c)(4) Organizations (May 22, 2014).
[477] SFC Interview of Elizabeth Hofacre (Sep. 23, 2013) pp. 22–24.

Exhibit E

zations seeking tax-exempt status including those on the left side of the political spectrum, applications received from Tea Party and other conservative groups were identified, collected and then subjected to full development based on the political philosophy of the groups, rather than on their planned activities. Accordingly, these Tea party and other conservative groups were, in fact, "targeted" by the IRS based on their political views. We found no evidence that the IRS scrutinized left-leaning organizations in the same manner, or for the same politically motivated reasons, as it targeted Tea Party and other conservative organizations.

Lois Lerner's personal political biases directly affected how the IRS processed applications received from Tea Party and other conservative organizations. Lerner managed a process that caused applications received from these organizations to undergo multiple levels of review by different components within the IRS, virtually guaranteeing that these applications would languish through the political campaign cycles of 2010 and 2012. Lerner showed complete disinterest in the plight of these organizations as they sought tax-exempt status, even in the face of growing Congressional interest in claims that they were being treated unfairly by the IRS because of their political views.

In 2012 Congressional interest finally prompted management above Lerner to intercede and take remedial measures to reduce the backlog of applications that she had allowed to grow. By that time, irreparable damage had been done to many of these Tea Party organizations. Most were small, grass-roots entities, unable to withstand the withering barrage of intrusive IRS development questions punctuated by year-long stretches of silence from the IRS. As a consequence, many of these Tea Party organizations simply withdrew from the application process. Without IRS approval of their tax-exempt status, those that stayed the course found it difficult to raise funds to carry out their stated purposes, which generally included engagement in the political process. Many were forced to secure legal help in fending off the IRS at considerable expense to their fledging budgets, and with a corresponding adverse impact on their ability to exercise political speech.

Majority staff also found that top IRS officials, including Doug Shulman, Steve Miller and Lois Lerner, continuously misled Congress throughout 2012 and 2013 regarding the IRS's mistreatment of Tea Party and other conservative groups. They also actively concealed from Congress the existence of the IRS's political targeting of the Tea Party and other conservative groups with names that included "9/12 Project" or "Patriots," thereby allowing the IRS to escape scrutiny for that conduct until Lois Lerner made her fateful admission regarding political targeting at an ABA Conference meeting, just days before TIGTA released its report in which it concluded that the IRS had used "inappropriate criteria" when processing applications for tax exemption. The lack of candor by these three individuals in their communications with Congress not only concealed IRS wrongdoing, but it also undermined the exercise of congressional oversight into the IRS's treatment of Tea Party and other conservative groups.

Unfortunately, the lack of candor by senior IRS officials in their dealings with Congress did not end with the release of the TIGTA

Exhibit E

report in May 2013. The IRS was derelict in its duty to preserve backup tapes containing Lois Lerner's email and made subsequent false statements to Congress in June 2014 denying the existence of those backup tapes. Furthermore, IRS officials misrepresented to Committee staff in March 2014 that the documents that had been provided to the Committee by that date completed its production of documents. In truth, some senior IRS officials knew at that time that many of Lerner's emails from 2010 and 2011, a period critical to the ongoing Congressional investigations, were missing. In April 2014, the IRS concluded that the missing Lerner emails were not recoverable, and so notified the Treasury Department of their loss. Unfortunately, the IRS failed to also notify the Congressional committees conducting investigations of the IRS of their loss, choosing instead to conceal that fact, ostensibly in the hope that the loss might never be discovered by Congress. Only when this Committee demanded a written statement from the IRS Commissioner attesting to the completeness of the IRS's document productions did the IRS reluctantly reveal the loss of Lerner's emails. This pattern of shoddy conduct by IRS officials in their dealings with Congress is deeply disappointing and confirms that a "culture of concealment" remains at the agency.

In addition, Majority staff concluded that the Obama Administration's efforts to limit spending on political speech directly or indirectly influenced the treatment of conservative organizations by Executive Branch agencies. The IRS served as the lynchpin for Administration activities against conservative organizations. Not only did it engage in political targeting of Tea Party and other conservative groups, but it also actively assisted both the DOJ and the FEC in the pursuit of various initiatives aimed at chilling the political speech rights of conservative organizations. Indeed, the IRS provided advice to the DOJ on various proposals to criminally punish organizations that engaged in political activity in excess of that stated in their applications for tax-exempt status, and offered FEC information regarding specific conservative organizations under investigation by the FEC for airing political advertisements.

Even if the IRS is able to root out all of the specific causes of problems noted in this report, only the most significant of which are mentioned above, it will still operate in a politicized environment by virtue of its position as a bureau within the Treasury Department, where the omnipresent IRS union wields considerable influence.

To enable the IRS to meet its mission of administering the tax code "with integrity and fairness for all," the following changes are needed:

    1. The IRS must be removed from the authority of the Treasury Department and established as an independent stand-alone agency.

    2. The Federal Service Labor-Management Relations Statute must be amended to designate the IRS as an agency that is exempt from labor organization and collective bargaining requirements.

    3. Congress should amend section 7428 of the Internal Revenue Code to enable applicants for tax-exempt status under 501(c)(4), (5), and (6) to seek a declaratory judgment if the IRS

has not rendered a decision on whether or not it will approve an application within 270 days. Doing so would afford these organizations the same remedy currently available only to 501(c)(3) organizations, thereby advancing parity among non-profits.

4. A key finding of this report is that many small organizations with limited resources were overwhelmed by unduly burdensome IRS demands. We recommend that the IRS establish a streamlined application process for small organizations applying for tax exemption under 501(c)(3) and 501(c)(4) that enables them to avoid unnecessary administrative burdens, provided that appropriate conditions are satisfied.[478]

5. Any further attempt by the IRS to promulgate regulations revising the standard for determining whether section 501(c)(4) organizations have engaged in political campaign intervention must not chill the free exercise of political speech by those organizations, nor disproportionately affect organizations on either side of the political spectrum.

While Majority staff is confident in the soundness of the findings expressed herein, there is no doubt that its investigation into the IRS's treatment of political advocacy organizations seeking tax-exempt status was hampered, if not harmed, by the IRS's failure to preserve electronic records belonging to Lois Lerner, the central figure in this sordid story of how Tea Party and other conservative groups were targeted by the IRS because of their political views. Extraordinary efforts were made by TIGTA to locate and restore some of Lerner's lost email, and indeed, those efforts yielded positive results, with the recovery of over 1,300 emails not previously produced by the IRS. Moreover, Majority staff secured from sources, including the Treasury Department and the White House, copies of emails between their employees and Lerner in an effort to bridge the gap in the missing emails. Together with the nearly 1,500,000 pages of documents produced by the IRS, these documents reveal a disturbing pattern of mismanagement and politically motivated misconduct by IRS employees at all levels within the agency.

---

[478] We note that the IRS's expedited process for applicants is currently limited to organizations that engage in political advocacy. As discussed in these Additional Republican Views, we do not believe that this process is an effective way to handle these applications, nor do we endorse extending that process to all applicants for tax-exempt status.

ADDITIONAL VIEWS OF SENATOR WYDEN PREPARED BY DEMOCRATIC STAFF

CONTENTS

Page

I. Executive Summary ................................................................. 242
II. No Evidence of Political Motivation by IRS Employees ............................ 244
III. No Evidence of Pressure from Obama Administration Political Appointees to Increase Scrutiny of Politically Active Nonprofits ............... 246
IV. Delays in Processing of Nonprofit Applications ........................................ 247
V. Lack of Clarity in Standards for Political Activity by 501(C)(4) Nonprofits ................................................................................................ 248
VI. There Was an Increase in Applications from Right-Leaning Nonprofits 248
VII. The "BOLO" List ...................................................................................... 250
VIII. Liberal and Progressive Groups Were Scrutinized by the IRS ................. 252
    A. IRS Determinations Screened Left-Leaning Groups for Review ... 252
        1. ACORN ...................................................................................... 253
        2. Watch For "Occupy" Groups ................................................... 254
        3. Liberal and Progressive Organizations Experienced Three-Year Delays ............................................................................. 255
    B. Inappropriate and Burdensome Information Requests to Left-Leaning Groups ............................................................................ 258
IX. What Could Have Been .............................................................................. 260
X. What Was ................................................................................................... 261
XI. Response to Additional Republican Views ................................................ 265
    A. No Evidence of Political Bias in 501(c)(4) Determinations ........... 265
        1. No Evidence of Lois Lerner Political Bias ............................... 265
        2. No Double Standard for Members of Congress ....................... 267
        3. No Evidence to Validate Charge of Union Bias ...................... 268
        4. No Evidence Individual Employee Views Influenced Decisions for Political Purposes ................................................... 268
        5. No Evidence White House or Treasury Officials Influenced Tea Party Applications ........................................................... 268
    B. IRS Failure to Preserve Lerner's Emails ...................................... 269
    C. Misleading Congress .................................................................... 270
    D. IRS Independence .......................................................................... 270
    E. No Inappropriate FEC Interaction ................................................ 270
    F. Attempts to "Suppress" Political Speech ....................................... 271
    G. Ways And Means Referral Letter ................................................. 271
XII. IRS Response to the TIGTA Report ........................................................ 272
    A. IRS 30 Day Report ....................................................................... 272
    B. Additional IRS Response .............................................................. 273
XIII. Need for Reform of the Tax Code Treatment of Political Activity by Nonprofits ............................................................................................ 273
    A. Evolution of 501(c)(4) Nonprofits into Political Entities Creates a Need for More Transparency ................................................... 274
    B. Statutory Changes are Needed ..................................................... 278
        1. The Follow the Money Act ....................................................... 278

(241)

2. Return to the Pre-1959 Standard  ............................................  279
3. Reform of 501(c)(5) and 501(c)(6) Organizations  ...................  279
XIV. Conclusion  .......................................................................................  279
XV. Timeline of Key Events  ...................................................................  282

## I. EXECUTIVE SUMMARY

The Committee has conducted significant investigations into the activities of nonprofits in recent years. The Finance Committee Democratic staff investigated Jack Abramoff's use of nonprofits such as Americans for Tax Reform and Citizens Against Government Waste to lobby Congress, summarized in a 2006 Finance Committee staff report.[1] Senator Grassley, when he was chairman or ranking member of the Committee, closely scrutinized the nonprofit sector, investigating religious organizations and nonprofit hospitals, among others. Together, Chairman Grassley and Senator Baucus investigated the Nature Conservancy, a 501(c)(3), in 2005.[2]

On May 10, 2013, the Director of IRS Exempt Organizations Lois Lerner disclosed that IRS employees selected tax exempt applications for further review with "names like Tea Party and Patriots and they selected cases simply because the applications had those names in the title." Lerner described this process of selecting cases for review because of a "particular name" as "wrong, insensitive, and inappropriate."[3]

In addition, Lerner described how the IRS improperly handled the tax-exempt applications that were set aside for further review, subjecting them to delays and overly broad and unnecessary requests for information.[4]

According to Lerner, IRS employees' inappropriate scrutiny of applications was not "because of any political bias." Rather, the employees were trying to streamline and centralize cases but "they didn't have the appropriate level of sensitivity about how this might appear to others and it was just wrong."[5]

On May 14, 2013, the Treasury Inspector General for Tax Administration (TIGTA) released a report finding that the IRS "used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based on their names or policy positions instead of indications of potential political campaign intervention."[6]

At the time of the disclosures from the IRS and TIGTA, there was speculation and concern expressed that singling out conservative organizations by name may have been a consequence of political bias or motivation on the part of IRS employees, possibly at the direction of political appointees at the IRS, Treasury Department or the White House.

The Committee began an in-depth bipartisan investigation to determine the facts surrounding the controversy due to the serious

---

[1] Senate Finance Committee, Minority Staff Report: Investigation of Jack Abramoff's Use of Tax-Exempt Organizations (Oct. 2007).

[2] Washington Post, Senators Question Conservancy's Practices (June 8, 2005).

[3] American Bar Association, Transcript of The Exempt Organization Tax Review (May 10, 2013) ABA Tax Section's Exempt Organizations Committee Meeting, Vol. 72, No. 2 pp. 126–127.

[4] Id.

[5] Id.

[6] TIGTA, "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review," Audit Report #2013–10–053, (May 14, 2013).

nature of allegations that political considerations may have driven the IRS's heightened scrutiny of conservative leaning organizations applying for tax-exempt status.

On May 20, 2013, the Committee requested that IRS answer questions and turn over internal documents relating to the targeting controversy.[7]

**Key Democratic Staff Findings:**

- Actions by IRS personnel were not politically motivated.
- Political appointees did not influence the enhanced scrutiny of 501(c)(3) and 501(c)(4) applications presenting political advocacy issues.
- Under federal tax law the IRS's scrutiny of tax-exempt applications showing political activity was completely justified.
- The *process* of examining applications was plagued by inefficiency, bad judgment, bad management, and unwarranted delay.

Staff investigators received over 1.5 million pages of documents and conducted 32 interviews with IRS employees.

The bipartisan narrative describes key events in the years 2010, 2011, and 2012 during which Tea Party and conservative-leaning applications were set aside for special analysis. A smaller number of politically left-leaning applications were also subject to special scrutiny during that time.

There are currently 1.5 million nonprofits in the U.S and 70,000 nonprofit applications per year are received by the IRS. Nonprofit organizations spent hundreds of millions of dollars to influence the 2010 and 2012 election cycles. A 501(c)(3) organization must be organized for religious, charitable, or educational purposes, and these organizations cannot participate or intervene in any political campaign activity.[8] A 501(c)(4) organization must be organized for the primary activity of promoting "general welfare of the people of the community" and may engage in political campaign activity only if the organization is determined not to be "primarily engaged" in campaign activity.[9]

Because federal law does not allow unlimited political activity by 501(c)(4) nonprofits, it was necessary for the IRS to scrutinize the applications of organizations seeking favored tax status, including those associated with the Tea Party. There is only a right to 501(c)(4) status under federal tax law if standards for that status are met by the applicant.

Some argue that there is a Constitutional First Amendment right to free speech through anonymous donations to 501(c)(3) and 501(c)(4) organizations. Contrary to this view, IRS Chief Counsel William Wilkins explained that case law indicates "the prohibition on political activity by 501(c)(3)s is not a prohibition on free speech because there are other avenues for the speech to proceed that don't generate charitable deductions for the donor and that there

---

[7] Letter from Chairman Baucus and Ranking Member Hatch to the Acting Commissioner Steven Miller (May 20, 2013).

[8] 26 U.S.C. § 501(c)(3) (2014).

[9] 26 C.F.R. § 1.501(c)(4)–1(a)(2)(i) (1990).

is not a First Amendment right to a charitable deduction."[10] This same standard applies to 501(c)(4) nonprofits.

Section 501(c)(3) organizations must apply to the IRS to be recognized for tax-exempt status.[11] The tax law allows section 501(c)(4) organizations to operate as tax-exempt without applying for IRS recognition of their status, although most organizations apply for an IRS determination.[12] Once nonprofit status is granted, the IRS can investigate the political activity of nonprofits in a thorough, but evenhanded way. Nonprofit status can be terminated if it is determined that political activity is the primary activity of the nonprofit (see Section II(D) of the Bipartisan Investigative Report for discussion of the law governing 501(c)).

What is not defensible is the appearance the IRS gave of "targeting" the Tea Party, even though no evidence exists that it was based on political beliefs or orders from political appointees. And the best way to avoid that appearance would have been to process the Tea Party applications as quickly as possible using the fairest possible standards.

New IRS management has moved aggressively to address the broken system of processing 501(c)(4) applications with political advocacy issues by (1) removing key employees in the IRS who failed to properly manage the processing of these applications, (2) establishing new procedures to help process nonprofit applications quickly, and (3) processing nearly all the delayed applications.[13]

These actions will help ensure that mistakes made by the IRS in 2010, 2011 and 2012 are not repeated.

## II. NO EVIDENCE OF POLITICAL MOTIVATION BY IRS EMPLOYEES

This investigation, based on staff interviews with 32 IRS employees and a review of 1.5 million IRS documents, found no evidence of political motivation driving the heightened scrutiny of Tea Party and conservative groups and the subsequent delays in processing their tax-exempt applications. Furthermore, TIGTA, whose report highlighting the inappropriate criteria used to identify tax-exempt applications for review was the impetus of this investigation, made no finding that political motivation was behind the inappropriate activity.[14]

During interviews with Committee staff, IRS employees did not cite political motivation as a factor for heightened scrutiny of Tea Party applications. Attached are questions and answers from each of the interviewees denying that politics was involved.[15]

While TIGTA should be lauded for exposing the flawed review process used by the IRS in screening tax exempt applications for political activity, the narrow scope of its report and its omission of key information contributed to a misimpression that the controversy was politically motivated.

---

[10] SFC Interview of IRS Chief Counsel William Wilkins (Nov. 7, 2013) p. 28.
[11] 26 U.S.C. § 508(a) (2006).
[12] Notes of Steven Miller (undated) IRS0000505538–42.
[13] Based on data provided to the SFC by the IRS (April 8, 2015).
[14] TIGTA, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review (May 14, 2013) TIGTA Audit Report #2013–10–053.
[15] IRS Employee Responses to Written Questions from Finance Committee Staff (Dec. 19, 2013).

Exhibit E

245

TIGTA documents released months after the report was published show that its investigative staff, based on a review of 5,500 emails, concluded three weeks prior to the release of the audit report that there was no political motivation on the part of IRS employees. An email from Timothy Camus, the Deputy Inspector General for Investigations at TIGTA, concludes:

> Review of these emails revealed that there was a lot of discussion between the employees on how to process the Tea Party and other political organization applications. There was a Be On the Lookout (BOLO) list specifically naming these groups; however, the e-mails indicated the organizations needed to be pulled because the IRS employees were not sure how to process them, not because they wanted to stall or hinder the application. *There was no indication that pulling these selected applications was politically motivated.* The e-mail traffic indicated there were unclear processing directions and the group wanted to make sure they had guidance on processing the applications so they pulled them. This is a very important nuance.[16]

Despite this finding of no political motivation by IRS employees in selecting Tea Party groups for additional scrutiny, in a glaring omission, TIGTA failed to mention this investigative finding by the Deputy IG in its audit report.

TIGTA Chief Counsel Michael McCarthy also concluded that TIGTA had no evidence that IRS employees had political motivations. After McCarthy reviewed a draft of the TIGTA 501(c)(4) audit report in late February 2013, he suggested that the TIGTA auditors had overreached in writing that IRS officials "targeted" the Tea Party. He wrote:

> As an initial concern, "targeted" has a connotation of improper motivation that does not seem to be supported by the information presented in the audit report. I think "selected" or even "singled out" would be more accurate.[17]

The same counsel commented on the criteria used in the BOLO list (discussed in the following section "The BOLO List").

It was not until a Congressional hearing held three days after the TIGTA report was released, in the midst of a media frenzy that Inspector General Russell George confirmed, in response to questioning from House Ways and Means Committee Ranking Member Sander Levin, that his office did not find any evidence of political motivation on the part of IRS employees.[18]

> Levin: Did you find any evidence of political motivation in the selection of the tax exemption applications?
> George: We did not, sir.[19]

Additionally, the public did not learn about TIGTA's review of IRS staff emails and its conclusion about the nonpolitical nature of this controversy until House Oversight Committee Democrats and

---

[16] Email from TIGTA Deputy Inspector General for Investigations Timothy Camus to TIGTA staff (May 3, 2013) (emphasis added).
[17] Email from TIGTA Chief Counsel Michael McCarthy (Feb. 28, 2013) TIGTA008007.
[18] House Ways and Means Committee Hearing, Hearing on Internal Revenue Service Targeting of Conservative Groups (May 17, 2013).
[19] *Id.*

House Ways and Means Democrats released the internal TIGTA email describing the review in July 2013.[20] TIGTA failed to include critical information about the nonpolitical nature of the IRS mismanagement of the Tea Party applications that would have provided crucial context to a sensitive issue.

## III. NO EVIDENCE OF PRESSURE FROM OBAMA ADMINISTRATION POLITICAL APPOINTEES TO INCREASE SCRUTINY OF POLITICALLY ACTIVE NONPROFITS

There is no evidence of Presidential appointees at the IRS, the Treasury Department or the White House pressing IRS personnel to target nonprofits engaging in political activity.

All of the IRS personnel interviewed were asked directly whether political appointees in the Obama administration had influenced the processing of the applications with political activity issues, and not one of them identified any pressure from the political ranks.[21]

In a Senate Finance Committee hearing on the TIGTA report in May of 2013, Senator Crapo questioned TIGTA IG Russell George on this issue.

> Senator Crapo: You know there has been a lot of discussion about who knew what and when they knew it. One of the big questions I have, Mr. George, is it seems that there is an argument being made that there was no political motivation in these actions. Is that a conclusion that you have reached?
>
> Mr. George: In the review that we conducted thus far, Senator that is the conclusion we have reached.
>
> Senator Crapo: And how do you reach that kind of a conclusion?
>
> Mr. George: In this instance it was as a result of the interviews that were conducted of the people who were most directly involved in the overall matter, so you take it one step by another and we directly inquired as to whether or not there was direction from people in Washington beyond those who are directly related to the Determinations Unit they did indicate to us that they did not receive direction from people beyond the IRS.
>
> Senator Crapo: When you say "people beyond the IRS," that could be anyone up the chain of the IRS?
>
> Mr. George: It in theory could be, but we have no evidence thus far that it was beyond, again, the people in the Determinations Unit.[22]

The TIGTA office reiterated this point in an answer to questions posed by the Finance Committee:

> Did any official from the office of the president or the White House have any form of communication with any IRS official employed in the Tax Exempt and Government Entities Division between January 20, 2009 and the present?

---

[20] Committee on Oversight and Government Reform, "Cummings Asks Issa to Recall IG for Testimony at Upcoming IRS Hearing," Democratic Press Release (July 12, 2013)

[21] IRS Employee Responses to Written Questions from Finance Committee Staff (Dec. 19, 2013).

[22] Senate Finance Committee Hearing, "A Review of Criteria Used by the IRS to Identify 501(c)(4) Applications for Greater Scrutiny" (May 21, 2013) p. 19.

247

U.S. Senate Committee on Finance

> List the days any communications occurred and the form it took (i.e. phone, email, in person, etc)

TIGTA responded:

> We have no knowledge of any communications between the White House and any employee in the Tax Exempt and Government Entities Division.[23]

And the question was asked again with a focus on the Treasury Department:

> Did any employee of the Treasury Department (excluding the IRS) who was appointed by the President have any form of contact with any employee of the Tax Exempt and Government Entities Division between January 1, 2010 and May 1, 2013?
>
> List the days any communications occurred and the form it took (i.e. phone, email, in person, etc.)

TIGTA responded:

> We have no knowledge of any communication between Presidential appointees at the Department of Treasury and any employees in the Tax Exempt and Government Entities Division.[24]

## IV. DELAYS IN PROCESSING OF NONPROFIT APPLICATIONS

The key failure in this matter was the delay in processing the Tea Party and other conservative leaning applications for 501(c)(4) status. The IRS took over *two years* to process what were essentially a handful of applications. In February of 2010 the first Tea Party applications were received by the Cincinnati office. In March 2012 TIGTA began their audit. Making a decision on one application a day during this period would have avoided most of the delay in processing the applications.

Senior leadership at the Exempt Organizations office should have stepped in much earlier in the process and demanded expedited consideration of these politically sensitive applications. They failed to take charge. The applications piled up, complaints from Congress and the applicants intensified, and a crisis developed. Eventually TIGTA stepped in to investigate.

The decision in 2010 to allow the applications to pile up while a confusing and inefficient process for analyzing them was developed over the next two year period is inexplicable and inexcusable.

The IRS prides itself on being nonpolitical. However, in this case a more politically astute leadership team would have never let this problem develop.

---

[23] Senate Finance Committee Hearing Questions for the Record, "A Review of Criteria Used by the IRS to Identify 501(c)(4) Applications for Greater Scrutiny" (May 21, 2013) p. 107.
[24] *Id.* p. 108.

## V. LACK OF CLARITY IN STANDARDS FOR POLITICAL ACTIVITY BY 501(C)(4) NONPROFITS

While it is not an excuse for the delays in processing, it is a fact that the rules for political activity by 501(c)(4)s are extremely hard to understand.

501(c)(4) are intended to be organized exclusively for the promotion of social welfare, however, social welfare organizations are permitted to engage in political campaign activity so long as it is not the organization's *primary activity*.[25]

The primary activity standard (discussed in the following section entitled "Need for Reform of the Tax Code Related to Political Activity of Nonprofits") is confusing and imprecise. While it is logical to assign a percentage to determine whether political campaign activity is an organization's primary activity,—51%, 60%, 75%—the law and regulations *do not* set such a number.[26] Without a percentage standard to apply, it is extremely difficult to make judgments about an application from a 501(c)(4) nonprofit which shows an intent to engage in political activity.

Second, "political activity" is not well defined. The law provides virtually no guidance at all on what "political activity" means. This lack of clarity in the law, both on the primary activity standard and on what constitutes political activity, partially explains why IRS personnel froze at the sight of hundreds of applications exhibiting evidence of political activity.

This lack of clarity should have been well known to senior members of the Exempt Organizations team—the law and the regulatory structure had been on the books since 1959.

Focused and aggressive assistance to the Cincinnati office by senior management in Washington D.C. could have overcome the confusion surrounding the rules for 501(c)(4) nonprofits. Inept management plus an uncertain legal and regulatory situation led to two years of confusion and delay.

## VI. THERE WAS AN INCREASE IN APPLICATIONS FROM RIGHT-LEANING NONPROFITS

The IRS was scrutinizing progressive non-profits with political activity in addition to Tea Party-related applications, as described

---

[25] Joint Committee on Taxation, "Report to the House Committee on Ways and Means on Present Law and Suggestions for Reform Submitted to the Tax Reform Working Groups" (May 6, 2013) p. 35.

[26] The Additional Republican Views are dismissive of the difficulty in determining this standard, stating that stuff knew full well that "primarily" means 51%. While some IRS staff members admitted to using a percentage test, such a test is not supported by regulations or caselaw. The IRS points to a number of sources in this regard, see, e.g. Treas. Reg. 1.501 (c)(4)–1 (a)(2) (No percentage test established), Rev. Rul. 68–45, 1968–1 C.B. 259 (Principal source of income does not determine an organization's primary activity under 501 (c)(4); all facts and circumstances are considered). Haswell v. United States, 500 F.2d 1133, 1142, 1147 (CI. CI. 1974) ("A percentage test . . . is not appropriate. Such a test obscures the complexity of balancing the organization's activities in relation to its objectives and circumstances in the context of the totality of the organization.") Contracting Plumbers v. United States, 488 F.2d 684, 686 (2d Cir. 1973) (multiple factors relevant in applying this standard, including formative history, stated purposes, and actual operations). Seasongood v. Commissioner, 227 F.2d 907, 909, 912 (6th Cir. 1955) (expenditures, employees, and organization's time and effort considered). See also, Exclusively Standard Under 501(c)(4), prepared by IRS at 14, ("The IRS has not published a precise method of measuring exempt activities or purposes in any of its published guidance, thought three revenue rulings have state that all of the organization's activities must be considered and that there is no pure expenditure test.").

249

below in the section entitled "Liberal/Progressive Groups Were Scrutinized by the IRS."

However evidence suggests that applications from conservative-leaning groups substantially outnumber applications from left-leaning groups. In fact, EO staff told the Committee they were "inundated" with Tea Party application issues in 2010.[27] This trend continued at least through 2011, when Holly Paz observed "EOD Screening has identified an increase in the number of (c)(3) and (c)(4) applications where organizations are advocating on issues related to government spending, taxes, and similar matters."[28] The greater *number* of Tea Party applications resulted in a greater number of Tea Party applications being scrutinized. This outcome was used to establish an unproven narrative of bias against nonprofits on the conservative side of the political spectrum.

One explanation is the increase in the amount of political activity engaged in by the Tea Party and related organizations. The health care reform struggle resulted in many groups mobilizing to influence the political system in 2009 and 2010.

But this does not explain the intense interest by hundreds of groups in becoming 501(c)(4) organizations.

There is some evidence that conservative groups were competing for anonymous donations to fund their activities, donations from a number of very wealthy conservative donors. In 2010, Scott Reed, a Republican lobbyist and the Chamber of Commerce's political strategist, told the Center for Public Integrity in an interview that "501cs are the keys to the political kingdom . . . because they allow anonymity."[29]

A *Wall Street Journal* article published on August 28, 2013 provides some clues about why the Cincinnati office found itself in 2010 looking at dozens of right leaning organizations seeking nonprofit status under the Internal Revenue Code. The political activity of the Tea Party movement, which was born in the summer of 2009 as citizens participated in town hall meetings protesting efforts by Congress to reform the health care system, helped the Republican Party take control of the House of Representatives in the 2010 elections.[30]

The *Journal* article focuses on the Tea Party Patriots group, explaining that it applied for nonprofit status in late 2010. The *Journal* article stated that the Tea Party Patriots had a 400,000 person donor base, a $24 million a year budget and its director made $250,000 a year.[31]

The article explained: "One problem dogged the group: The Patriots didn't have tax exempt status, a disincentive to some potential donors. The group applied for such status in late 2010 but says it had heard nothing from the IRS during all of 2011."[32]

Nonprofits do not need to publically disclose who has donated funds, nor do they need to disclose how much an individual or corporation has contributed.

[27] SFC Interview of Liz Hofacre (Sept 24, 2013) pp 61–64.
[28] Email chain between Holly Paz and Janine Cook (July 18–19, 2011) IRS0000429489.
[29] Center for Public Integrity, Campaign Cash: The Independent Fundraising Gold Rush since "Citizens United" Ruling (October 4, 2010).
[30] *Wall Street Journal,* "Anger at IRS Powers Tea-Party Comeback" (Oct. 10, 2013).
[31] *Id.*
[32] *Id.*

Exhibit E

250

The *Wall Street Journal* article confirms a widely held belief that political contributions are disguised by cycling them through nonprofits. Again, no dollar amount from any individual is revealed to the public.

This same incentive for obtaining nonprofit tax status is identified in the article in a quote from Jenny Beth Martin, executive director of the Tea Party Patriots: "I kept telling everyone—including the big donors who wouldn't give to us without our nonprofit status—that the IRS appeared to be targeting tea-party groups."

The influx of 501(c)(4) applications to the IRS may have been the result of a desire to attract "big donors" who would not give to right leaning groups "without . . . nonprofit status." [33]

Finally, many point to the *Citizens United* decision as the reason political spending soared during the years in question.

Acting Commissioner Steven Miller told the Finance Committee that the number of 501(c)(4) applications doubled since "*Citizens United* released this wave of cash" and "some of that cash headed towards c(4) organizations. That's proven out by FEC data and IRS data." [34]

## VII. THE "BOLO" LIST

Evidence suggests that the number of conservative-leaning tax-exempt organizations active in this time period outnumbered liberal organizations. [35] The number of 501(c)(4)s reporting political campaign activities almost doubled from tax year 2008 through 2010, and the amount of campaign activity for large filers almost tripled. [36] According to the Center for Responsive Politics, more than 80% of the political funds spent in the 2012 elections by nonprofits were sponsored by conservative 501(c)(4)s. [37] This amount of spending, along with the desire to attract large donors, partially explains why most of the nonprofit applications with political advocacy issues were from conservative-leaning organizations during 2010, 2011 and 2012. The IRS was not targeting these groups, rather it was facing the reality that more politically active conservative groups than left-leaning groups were sending in applications to the IRS Exempt Organizations office in Cincinnati.

A great deal of attention has been focused on the "Be On The Lookout" (BOLO) list which designated the Tea Party as a term for IRS employees to watch for when reviewing applications for nonprofit status.

There is no question that the use of the BOLO and the terms used therein presents a very unattractive picture of an IRS focus on Tea Party groups seeking nonprofit status. Even Lois Lerner believed it was wrong to place the term "Tea Party" on the BOLO

---

[33] *Id.*

[34] Senate Finance Committee Hearing, "A Review of Criteria Used by the IRS to Identify 501(c)(4) Applications for Greater Scrutiny" (May 21, 2013) p. 23.

[35] The IRS receives 70,000 applications for nonprofit status each year. The Committee did not have the resources necessary to determine the total number of conservative and liberal organizations applying during this time period.

[36] Email chain between Justin Lowe, Justin Abold, and others (May 6, 2013) IRS0000494805–29.

[37] USA Today, Dark Money of Non-profit Political Groups Targeted (June 11, 2013).

Exhibit E

251

list.[38] Placing names of right-leaning groups on the BOLO list was inappropriate.

While not endorsed by the Democratic staff, another point of view on how the IRS operated should be noted. The charge is that Cincinnati "targeted" the Tea Party because of its political affiliation. But once the IRS had selected the two Tea Party applications for review in the Washington D.C. office it can be argued that it was logical to develop a method of collecting *all* the Tea Party applications that continued to surface in Cincinnati. The BOLO list can be seen as an efficient procedure to use to make sure personnel in Cincinnati identified the right applications to set aside while Washington D.C. determined the best way to deal with these applications. Applications by left-leaning groups were also collected in this manner.

The IRS receives 70,000 applications a year for nonprofit status. With so many applications to process the placement of terms on a BOLO list was one way to gather all of the relevant applications in one place while the experts in Washington D.C. delivered to Cincinnati a plan for approving or disapproving the applications.

Supporting this perspective, TIGTA's Chief Counsel expressed concern about TIGTA describing the BOLO list terms—Tea Party, 9/12 and Patriots—as "inappropriate" because it did help IRS screeners centralize political cases. He wrote in an email:

> Also, it is not clear why exactly we find the criteria used were "inappropriate."
>
> It is because specific names associated with political activity shouldn't be used as criteria? That would seem to make it difficult for the IRS to identify potential political applications for referral to the specialized unit. If this is the rationale, the information in footnote 11, that the use of organization names occurs in non-political cases as well, seems like it needs more attention, since it suggests both that the IRS was not politically motivated in this case, and that our recommendations might need to be broader.
>
> Or are we saying it was inappropriate because the use of names was one-sided, i.e. name criteria included only certain types of groups seen as conservative, and names of other political groups with different policies should have also been included? If that is the rationale, do we have evidence that similarly situated groups from the left side of the political spectrum should have been included by name in the criteria, but were not? The later sections of the report seem to suggest this, but it is not clear.[39]

The TIGTA Chief Counsel makes two critical points:

> (1) Using names in the BOLO list simply helped the IRS "identify potential political applications for referral to a specialized unit." The names were not placed on the BOLO list because of political bias.
>
> (2) Use of names in the BOLO list identifying left-leaning groups (as reviewed in following section) is evidence that the

---

[38] Email chain between Cindy Thomas, Steve Bowling, John Shafer and others (July 5, 2011) IRS0000620735.
[39] Email from TIGTA Chief Counsel Michael McCarthy (Feb 28, 2013) TIGTA008002.

IRS was evenhanded in its administrative processing of 501(c)(4) applications.

## VIII. LIBERAL AND PROGRESSIVE GROUPS WERE SCRUTINIZED BY THE IRS

The IRS's treatment of liberal, Democratic, and progressive organizations applying for tax-exempt status was similar to its treatment of Tea Party applicants. Although TIGTA intentionally limited the scope of its report to "narrowly focus on Tea Party organizations" at the request of the Chairman of the House Committee on Oversight and Government Reform,[40] many of TIGTA's findings with respect to the IRS's treatment of Tea Party groups also apply to the IRS's treatment of left-leaning organizations before and concurrent with the IRS's screening of Tea Party groups.

### A. IRS DETERMINATIONS SCREENED LEFT-LEANING GROUPS FOR REVIEW

TIGTA characterized the IRS Determinations Unit's use of "specific names (Patriots and 9/12) or policy positions" to identify cases to be reviewed for political activity as inappropriate.[41] However, TIGTA's audit did not focus on similar methods used by the IRS to identify and select left-leaning applicants for review.[42]

A PowerPoint presentation and notes from a July 28, 2010 screening workshop meeting show that IRS employees were instructed to look for applications with the terms progressive and Emerge (an organization that sought to train female Democratic political candidates) in addition to Tea Party groups.[43] The notes from the meeting state that Gary Muthert indicated that the "following names and/or titles were of interest and should be flagged for review:

⊕ "9/12 Project,
⊕ "Emerge,
⊕ "Progressive
⊕ "We The People,
⊕ "Rally Patriots, and
⊕ "Pink-Slip Program." [44]

Similarly, the PowerPoint presentation from this screening workshop has a slide that reads, "Politics" with a picture of an elephant and a donkey. The slide states "Look for names like" preceding additional slides with the words "Tea Party . . . Patriots . . . 9/12 Project . . . Emerge . . . Progressive . . . We the People" under the heading "Current Activities." [45]

---

[40] The Hill, IG: Audit of IRS Actions Limited to Tea Party Groups at GOP Request (June 26, 2013).
[41] TIGTA, "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review," Audit Report #2013–10–053 (May 14, 2013).
[42] It should also be noted that the term "Patriot" does not even necessarily indicate the organization is conservative leaning. According to Center for Responsive Politics, a group called Patriot Majority was the most active left-leaning group in 2012 election cycle, and the 14th most politically active of all 501(c)(4)s.
[43] Screening Workshop Notes (July 28, 2010) IRS0000012315; Screening Workshop PowerPoint (July 28, 2010) IRSR0000169695.
[44] Screening Workshop Notes (July 28, 2010) IRS0000012315.
[45] Screening Workshop PowerPoint (July 28, 2010) IRSR0000169695.

Numerous iterations of the BOLO spreadsheet included the term "progressive" on the "TAG Historical" tab. For example, a BOLO list dated August 12, 2010 instructed screeners to flag applications for the word "progressive." The BOLO list entry for "progressive" further instructed screeners that the:

> "Common thread is the word 'progressive.' Activities appear to lean towards a new political party. Activities are partisan and appear as anti-Republican. You see references to 'blue' as being 'progressive.'"[46]

According to IRS agent Ron Bell, who was responsible for the BOLO list, screening terms were placed on the "Tag Historical" tab after IRS employees were not seeing the cases as frequently.[47] While the organizations with the name "progressive" in their name were not applying for tax-exempt status as frequently as conservative or Tea Party organizations, the IRS was still instructing its employees to screen and set aside cases because of potential political activity based on the word "Progressive."

The Emerge applications that screeners were instructed to flag at the screening workshop were not specifically listed on the BOLO, but an IRS Determinations manager alerted screeners via email on September 24, 2008 to look for applicants with "Emerge" in their name along with other "politically sensitive" cases.[48]

### 1. ACORN

Another PowerPoint presentation presented at training events in June and July of 2010 titled "Heightened Awareness Issues," listed "Successor to Acorn" as a "Watch For Issue" specifying that "[s]pecial handling is [r]equired when [a]pplications are [r]eceived."[49] ACORN (Association of Community Organizations for Reform Now) was a national "community organization group" with local chapters that "fought for liberal causes like raising the minimum wage, registering the poor to vote, stopping predatory lending and expanding affordable housing."[50] In addition, ACORN assisted lower income families with tax return preparation.[51] The national organization declared bankruptcy in the wake of accusations of fraud, embezzlement, and mismanagement but several local organizations decided to regroup under new names.[52]

An entry for "ACORN successors" appears on copies of the BOLO list examined by the Committee from 2010 until it was removed by EO Director of Rulings and Agreements Holly Paz in June 2012.[53]

On March 22, 2010, EO Determinations Director Cindy Thomas notified EO Technical that descendants of ACORN were reorganizing citing three specific cases.[54] In April 2010, Sharon Camarillo

[46] Email from Liz Hofacre to IRS Staff (July 27, 2010) IRS0000008609–24.
[47] SFC Interview of Ron Bell (July 30, 2013).
[48] Email from Joseph Herr to IRS EO screeners (Sep. 24, 2008) IRS0000011492.
[49] Heightened Awareness Issues PowerPoint, IRS0000557291; Email between EO Employees (May 18, 2010) IRSR0000195587.
[50] *New York Times,* "ACORN on Brink of Bankruptcy, Officials Say" (May 19, 2014).
[51] *Id.*
[52] *Id.*
[53] Email chain between Holly Paz, Cindy Thomas and others (June 1, 2012) IRS0000013434–35.
[54] Email from Cindy Thomas to Steven Grodnitzky (Mar. 22, 2010) IRS0000458448.

emailed Cindy Thomas and Robert Choi telling them that EO Determinations received two ACORN-successor cases.[55]

The August 2010 BOLO lists "ACORN Successors" as an "Issue Name." The description states that "Following the breakup of ACORN, local chapters have been reforming under new names and resubmitting applications." Screeners are instructed to send these cases "to the TAG Group."[56]

An October 7, 2010 email from Jon Waddell alerted Steven Bowling and Sharon Camarillo to two ACORN-related cases. Waddell recommended sending an alert to screeners "to be on the lookout for the following name [and] application factors associated with ACORN related cases."[57] In addition he suggested adding the following "factors to the Watch Issue Description section for this category:

"1. The name(s) Neighborhoods for Social Justice or Communities Organizing for Change.
"2. Activities that mention Voter Mobilization of the Low-Income/Disenfranchised.
"3. Advocating for Legislation to Provide for Economic, Heathcare, and Housing Justice for the poor.
"4. Educating Public Policy Makers (i.e. Politicians) on the above subjects."[58]

Sharon Camarillo forwarded the alert to John Shafer instructing that his screeners "be on the lookout for these cases."[59] John Shafer forwarded Camarillo's email to IRS screeners in his group.[60]

The February 2, 2011 BOLO instructs IRS screeners to look for the words "ACORN" or "Communities for Change in the name and/or throughout the application." It reads:

Local chapters of the former ACORN organization have reformed under new names and are requesting exemption under section 501(c)(3). Succession indicators include ACORN and Communities for Change in the name and/or throughout the application.[61]

ACORN cases continued to be screened in 2012. Ron Bell wrote an email to Carter Hull on May 13, 2012 stating: "I've got a case that I believe is an acorn successor org. I googled the name of the org and that is where several websites (such as the capital research center) indicate that it is an acorn successor. The BOLO list states to contact you . . . Please advise how you want to process this case."[62] [sic]

### 2. Watch For "Occupy" Groups

In January 2012, the IRS Determinations office began screening organizations with the term "Occupy" in its name on the "Watch

[55] Email from Sharon Camarillo to Cindy Thomas and Robert Choi (Apr. 28, 2010) IRS0000458467.
[56] Copy of Combined Spreadsheet TAG 8 12 10. (Aug. 12, 2010).
[57] Email from Jon Waddell to Steven Bowling and Sharon Camarillo (Oct. 7–8, 2010) IRS0000410433.
[58] Id.
[59] Email chain between EO Employees (Oct. 7–8, 2010) IRS0000389342.
[60] Id.
[61] BOLO Spreadsheet (Feb. 2, 2011) IRS0000389362.
[62] Email from Ronald Bell to Carter Hull (May 13, 2012) IRSR0000054963.

For" list on the BOLO. After a news article was distributed within the IRS that suggested some organizations affiliated with the Occupy movement were seeking tax exempt status, Cindy Thomas told Steven Bowling, the manager of the IRS Determinations group that handles political advocacy cases, that the Occupy cases should be referred to his group so they can be worked "with the advocacy cases." [63]

EO Determinations Group Manager Steven Bowling told Cindy Thomas that the BOLO list would need to be modified in order to properly flag the Occupy cases but expressed frustration that the IRS does not want to use the words "Tea Party" or "Occupy" in screening.[64] Thomas replied:

> [w]e can't refer to "tea party" cases because it would appear as though we're singling them out and not looking at other Republican groups or Democratic groups . . . How about a compromise—What do you think about changing the description for advocacy organizations on the Emerging Issues tab to that which you've included under scenario #1; then, you could include the Occupy description from your scenario #2 on the Watch For tab specifying that these cases should be referred to your group? We could still have the same grade 13 agents working the advocacy and Occupy cases.[65]

After receiving this instruction from Thomas, Bowling adds "$ocial economic reform / movement" to the BOLO entry for advocacy cases. In addition, Bowling added "Occupy orgs" to the BOLO watch list. Ronald Bell wrote an email to Bowling questioning the need for a separate entry for "Occupy orgs" on the watch list since he thought "$ocial economic reform . . . was our 'code word' for the occupy organizations." Bowling replied, "I think we can leave it in. Some of the orgs are pushing that other than occupy groups." [66]

Emails written in May 2012 show that at least two Occupy cases were flagged by IRS screeners after the term was added to the BOLO list.[67] By the next month, Holly Paz had Cindy Thomas revise the BOLO list to "remove the references to ACORN and Occupy from the 'Watch List'" and replaced the "Emerging Issue" description of ideological positions of conservative and liberal groups with neutral language.[68]

### 3. Liberal and Progressive Organizations Experienced Three-Year Delays

TIGTA's finding that "[o]rganizations that applied for tax-exempt status and had their applications forwarded to the team of specialists experienced substantial delays" [69] applies to left-leaning applicant organizations in addition to Tea Party and conservative

---

[63] Email chain between EO Employees, (Jan. 20, 2012) IRSR0000013418–19.
[64] Id.
[65] Email chain between EO Employees, (Jan. 20, 2012) IRSR0000013414; Email from Steven Bowling to Ronald Bell, (Jan. 25, 2012) IRSR0000013181.
[66] Emails between Steven Bowling and Ronald Bell (Jan. 25, 2012) IRS0000013187.
[67] Email chain between EO Employees (May 24–27, 2012) IRS0000013234.
[68] Email from Holly Paz to Cindy Thomas (June 1, 2012) IRS0000013434.
[69] TIGTA, "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review," Audit Report #2013–10–053 (May 14, 2013).

groups. The Committee investigation and press reports show that applicants affiliated with Emerge, ACORN successor groups, and others also waited years for a determination from the IRS after their applications were flagged as potentially political by screeners and forwarded to the EO Technical office in Washington, D.C.

*Emerge*

In the case of three of the Emerge groups, it took three years from the time they applied until the applications were denied. Previously the IRS erroneously approved five applications affiliated with Emerge for 501(c)(4) status from 2004 through 2008, including the main umbrella organization Emerge America.[70] These approvals were subsequently determined to have been in error because Emerge groups were found to benefit the Democratic Party.[71]

On September 2008, emails show that IRS employee Donna Abner recommended issuing an "alert" for other incoming Emerge cases because of the "partisan nature of the cases" as well as a reminder that "'sensitive political issue' cases are subject to mandatory review" per IRS guidelines and subject to full development.[72] EO Technical staff asked EO Determinations to transfer the Emerge Maine and Emerge Nevada applications on October 10, 2008 to be held "until the litigation on this issue and concluded and then we will work them."[73] EO Technical instructed EO Determinations to hold any additional Emerge cases "pending the outcome of a similar issue in the DLC litigation."[74] However, a January 18, 2010 Sensitive Case Report indicates that Emerge Massachusetts applied for tax-exempt status on August 15, 2008 and was transferred to EO Technical on April 16, 2009. Additionally, Emerge Oregon applied on February 9, 2010 and its application was transferred to EO Technical on April 14, 2010.[75] The IRS did not inform the four Emerge groups, whose cases were selected for review and then developed at EO Technical until 2011, that their applications had been denied, creating delays of approximately three years for some of the organizations.[76]

*ACORN*

Organizations the IRS determined to be related to the disbanded ACORN organization also experienced delays of nearly three years. EO Determinations began receiving ACORN-successor organizations in April 2010.[77]

ACORN-successor organizations were the subject of congressional interest at this time as well. On June 3, 2010, Ranking Member Darrell Issa on the House Oversight Committee submitted a letter with an attached report to Commissioner Doug Shulman urging him not to "stop your investigation into ACORN and its use of fed-

---

[70] Email from Donna Abner to Cindy Wescott, Sharon Camarillo, and Brenda Melahn (Sep. 8, 2008) IRS0000012292.
[71] Email from Park Nalee to Vasu Nair (October 21, 2011) IRS0000636331.
[72] Email from Donna Abner to Cindy Wescott, Sharon Camarillo, and Brenda Melahn (Sep. 8, 2008) IRSR0000012292.
[73] Email from Justin Lowe to Jon Waddell (Oct. 10, 2008) IRS0000012299.
[74] Email from Deborah Kant to Cindy Westcott (Oct. 16, 2008) IRS0000012304.
[75] TE/GE Division Sensitive Case Report (Apr. 2010) IRS0000147518.
[76] Email from Holly Paz to Cindy Thomas (July 21, 2011) IRS0000429500.
[77] Email from Sharon Camarillo to Cindy Thomas and Robert Choi (Apr. 28, 2010) IRS0000458467.

eral funds. I ask that you maintain oversight over ACORN's re-branded affiliates."[78] In response, on June 8, 2010 the Acting Manager of EO Technical Steven Grodnitzky instructed Cindy Thomas not to develop or resolve ACORN-related cases until they receive further instruction.[79]

On July 15, 2010, Cindy Thomas alerted Robert Choi that EO Determinations received another "potential successor to ACORN" applying for 501(c)(3) status that is related to a 501(c)(4) ACORN-successor application received in April 2010.[80] Thomas reported that "[w]e placed the other case in suspense pending guidance from the Washington Office and are doing so with this case."[81]

Emails show that additional ACORN-successor organizations were flagged in October 2010.[82]

Cindy Thomas emailed Holly Paz on October 24, 2010 with a request for technical assistance on ACORN-successor cases from EO Technical. Over a month later, on November 26, 2010, Holly Paz told Cindy Thomas to work with Carter Hull in EO Technical on the ACORN-successor cases, the same employee in charge of developing the Tea Party cases.[83]

An EO Determinations employee contacted Carter Hull on March 4, 2011, telling him that "we have four exemption applications for organizations that have previously operated as ACORN. Could we arrange to discuss these cases with you by phone sometime next week?"[84] It is unclear what guidance Carter Hull provided EO Determinations on the ACORN-successor applications but he told another EO Determinations employee in July 2011 that "his manager informed him that he should not be doing research for our cases."[85] Hull asked EO Determinations to remove his name "from the BOLO list as a contact person."[86]

In April 2013, EO Technical was still developing two ACORN-successor applications including one of the applications that spurred EO Determinations managers to alert screeners to flag ACORN-successor cases in October 2010.[87] The other case mentioned in the email was transferred from EO Determinations to EO Technical in April 2012.[88] ACORN-successor cases were still on hold as of May 2013, according to Cindy Thomas.[89]

*Other Left-Leaning Groups Also Experienced Delays*

Other liberal and progressive groups told media outlets their applications were delayed as well. One left-leaning group, Alliance for a Better Utah, told NPR Morning Edition in a story that aired on

---

[78] Letter from House Oversight and Government Reform Committee Ranking Member Darrell Issa to IRS Commissioner Doug Shulman (June 3, 2010) IRS0000459733.

[79] Email from Steven Grodnitzky to Cindy Thomas and Donna Abner (June 8, 2010) IRS0000054956.

[80] Email from Cindy Thomas to Robert Choi (July 15, 2010) IRS0000054948.

[81] *Id.*

[82] Email from Jon Waddell to Steven Bowling and Sharon Camarillo (Oct. 7–8, 2010) IRS0000410433.

[83] Holly Paz email to Cindy Thomas (Nov. 26, 2010) IRS0000054942.

[84] Email from John McGee to Carter Hull (Mar. 4, 2011) IRS0000631878.

[85] Email from Melissa Conley to Willian Agner (July 11, 2011) IRS0000054945.

[86] *Id.*

[87] Email from Cindy Thomas to Steven Bowling and Jon Waddell (Apr. 3, 2013) IRS0000054976.

[88] *Id.*

[89] IRS Employee Responses to Written Questions from Finance Committee Staff (Dec. 19, 2013) pp. 27–28.

258

June 13, 2013 that it had been waiting almost 600 days for a determination on its application for 501(c)(3) status to do "voter-education work."[90] The same group told *Politico* a month later that the delay was "causing problems because it can't apply for foundation and grant money while that application to become a charitable organization is in limbo."[91] Progress Texas reported that it took "18 months to get its 501(c)(4) approval."[92]

### B. Inappropriate and Burdensome Information Requests to Left-Leaning Groups

As summarized by the TIGTA report and described in the bipartisan narrative of this report, in January 2012, the IRS Determinations Unit made unnecessary and burdensome requests to a number of tax-exempt applicants that in some cases included requests for donor information.[93] Many groups that received these questions saw the inquiry about donors as an unwarranted intrusion.[94] Ultimately, IRS officials decided the request of the donor information was inappropriate and ordered the donor information destroyed.[95] Left-leaning/progressive groups also received inappropriate development questions regarding donor information while experiencing lengthy delays in the application process, similar to Tea Party groups.

Although TIGTA points out in its report that thirteen of the 27 organizations that received requests for donor information had "Tea Party, Patriots, or 9/12 in their names,"[96] it is clear from reviewing documents that the IRS was not acting on a partisan basis. Liberal and progressive groups were subject to burdensome requests for information from the IRS, similar to the requests made of conservative groups. At least three of the groups that received donor information requests were left-leaning applicants for tax-exempt status.[97] This treatment was unfair and inappropriate whether directed at conservative or left-leaning groups.

This indicates that the donor list requests were not a concerted political effort within the IRS to harass or discriminate against conservative groups. While more conservative groups were subject to burdensome development letters, there were simply more conservative groups applying for tax-exempt status during this period.

In addition to asking liberal organizations about their donors, IRS Exempt Organizations Specialist Grant Herring asked burdensome questions to at least one voter registration organization.[98] The letter asked the organization to respond to approximately 82 different questions/requests for information within twenty days. Two of the requests asked the applicant to provide "recruitment

---

[90] *NPR*, "Liberal Groups Say They Received IRS Scrutiny Too" (June 19, 2013).
[91] *Politico*, "IRS Scrutinized Some Liberal Groups" (July 22, 2013).
[92] *Id.*
[93] TIGTA, "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review," Audit Report #2013–10–053 (May 14, 2013).
[94] 501(c) entities are required to submit to the IRS a list of persons who have donated $5,000 or more on an annual basis. This information generally is not made public.
[95] SFC Interview of Holly Paz, July 26, 2013 pp. 130–132.
[96] TIGTA, "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review," Audit Report #2013–10–053, (May 14, 2013) footnote 43.
[97] Email with attachment from Judith Kindell to Holly Paz and Sharon Light (Apr. 25, 2012) IRS0000013868.
[98] IRS Letter to a Voter Registration Organization (Nov. 29, 2010) IRS0000631009.

259

materials, training materials and manuals *you will* create and employ" (emphasis added) for the purposes of voter registration activities and assistance to other charitable organizations.[99] These questions indicate the IRS was asking the organization to provide documents that may not have existed at the time it was applying for tax-exempt status.

Herring provided the questionnaire as an example to another IRS employee who was reviewing a voter registration organization's application for tax-exempt status. In his email to the IRS employee he wrote:

> What worries me about the big ones is that they concentrate on turning out voters that historically support one of the two parties, and this is their unacknowledged purpose, rather than increasing civic participation or voter education.
>
> These questions are from one of my letters. I don't know how complicated your organization is. If it is big and ambitious all these questions may come in handy. I think we need at least to put them on record that in their voter contacts their conduct will be as pure as the driven snow, because I do not think we will ever apply the American Campaign Academy rationale to these organizations, as we should.
>
> If it is getting a lot of [private foundation] money and seem to lean to the left, make sure it isn't an ACORN successor.[100]

After EO Determinations employees began receiving ACORN-successor applications in April 2010, Herring flagged a "get-out-the-vote" organization that had already been approved as tax-exempt but "many internet sources allege is an ACORN affiliate or front" and had asked the IRS for an advance 4945(f) ruling. A 4945(f) ruling is an IRS determination that the organization's voter registration activities satisfy legal requirements to receive private foundation grants for that purpose. On May 18, 2010, Herring wrote:

> I question whether the applicant qualifies for exemption. 501c3s can engage in non-partisan voter registration, of course, but what is the basis of their exemption if that is their exclusive or primary activity, as in this case (no voter ed)? Also, I don't think this org's activities are nonpartisan in effect: they don't say "Republican" or "Democrat", but they target their extremely-well-funded-by-left-leaning-PFs voter registration activities to areas where traditional Democrat constituencies are concentrated. I don't think it would be difficult for EOT to revoke the approval letter.[101]

Grant Herring reported his activities related to developing this case in July 2010:

> A letter was sent on 7/15, with response due 8/4. I asked very detailed questions about how they are conducting

[99] *Id.*
[100] Email from Grant Herring to Susan Maloney (Nov. 29, 2011) IRS0000631168.
[101] Email from Donald Herring to Joseph Herr (May 18, 2010) IRS0000629458.

Exhibit E

their voter registration activities, to make sure that they are being conducted in a non-partisan manner. I do not think there is any doubt that the targeted demographics will vote overwhelmingly for Democratic candidates, and that it is the unstated purpose of the organization to turn out the vote for "progressive" candidates; but I don't think the request can be denied on that basis, although I am going to make sure of that before I issue a favorable letter. However, I thought that a politically biased applicant like this one should be made to demonstrate that it treats all political candidates and parties even-handedly in its contacts with unregistered voters. I am talking to Mike Repass in Technical about this case and a different voter registration organization.[102] [sic]

The case was sent to EO Technical as a result of Herring "raising concerns" because "it involved voter registration and a possible link to ACORN," according to an EO Determinations manager summarizing the case a year later. As of May 2011, there was a decision to grant a favorable 4945(f) ruling with a referral to the Review of Operations Division but the case was awaiting another layer of review by EO Quality Assurance.[103]

## IX. WHAT COULD HAVE BEEN

Another useful perspective on the inefficiency and mismanagement at the IRS is a focus on the month when the Tea Party applications first arrived in Cincinnati and a two week period when the IRS first acted decisively on the Tea Party and right-leaning applications.

As discussed in the bipartisan narrative of this report, the first Tea Party application arrived in February of 2010. Cindy Thomas contacted Washington D.C. and asked for guidance from EO technical. Holly Paz, in Washington D.C., agrees that the applications should be reviewed by experts in Washington D.C.

*Results Come 26 Months Later*

In May/June of 2012, the IRS finally finds a process and personnel who make decisions relatively efficiently about the about 200 applications that have been piling up starting in February of 2010.[104] This was referred to as a "triage" effort by IRS personnel. A team of five Washington D.C. based staff, led by Sharon Light, was sent to Cincinnati. There they meet up with a team from the Determinations unit. The two teams conducted a workshop to establish a common understanding of the rules for political activity and 501(c)(4) nonprofits.

Teams of two—one from Washington D.C. and the other from Cincinnati—were given applications to review. They were allowed to reach one of these conclusions:

• If they both agree an application should be approved it is approved—no further appeals to multiple IRS personnel in Washington D.C. follow. The decision of the team is final.

[102] Email from Peggy Combs to Brenda Melahn (July 27, 2010) IRS0000622672.
[103] Email from Gerardo Fierro to Donna Abner (May 15, 2011) IRS0000640477.
[104] Email from Holly Paz to Winonna Holton (June 7, 2012) IRS0000344052.

- The team can also agree to deny the application. Again, no final review is necessary.
- Finally the two teams can agree to gather more information about the applications.

Using this process the Sharon Light led team approved 65 applications and denied 30, about 100 applications were set aside for more information gathering.[105]

If this process had been used in the summer of 2010, a few months after the first Tea Party applications were received, much of the delay in processing the applications could have been avoided.

Another possible way to address large volumes of political advocacy cases was devised by Acting Commissioner Danny Werfel in the aftermath of the TIGTA report. This process allows applicants to declare that over 60% of their activities are non-political. If this declaration is made, a favorable determination on the application is issued by the IRS within 2 weeks.[106] (see discussion of the IRS 30 day response in these views).

## X. WHAT WAS

Between February of 2010 and the "triage" effort in June of 2012, the Finance Committee investigation found a continuing series of missteps, bad management, inefficiency, confusion and incompetence.

A quick summary of what transpired for two years in the Washington D.C. office is contained in an email from Steve Grodnitzky. EOT here is the Exempt Organization Technical office which had the lead in analyzing political advocacy issues related to 501(c)4s:

> EOT is working on the Tea Party applications in coordination with Cincy. We are developing a few applications here in DC and providing copies of our development letters with the agent to use as examples in the development of their cases. Chip Hull is working these cases in EOT and working with the agent in Cincy, so any communication should include him as well. Because the Tea Party applications are the subject of an SCR, we cannot resolve any of the cases without coordinating with [Robert Choi, the Director of Rulings and Agreements].[107]

In short, Tea Party cases piled up in Cincinnati for two years while Washington D.C. unsuccessfully tried to develop a way to process them, i.e. approve or deny them. For some time the focus was on two of the applications, but even that focus was lost toward the end of the two year period and the EO team became completely disorganized in its effort to make decisions on the applications.

On April 28, 2010 Grodnitzky emailed Lerner and Choi a summary chart of sensitive case reports (SCRs) being handled by EO Technical that included Tea Party applications.[108] He wrote:

---

[105] *Id.*

[106] IRS, Charting a Path Forward at the IRS: Initial Assessment and Plan of Action, Appendix E (June 24, 2013).

[107] Email from Steven Grodnitzky to Cindy Thomas and Sharon Camarillo (July 6, 2010) IRS0000165422–24.

[108] Email from Steven Grodnitzky to Lois Lerner and Robert Choi (Apr. 28, 2010) IRS0000141809.

> Of note, we added one new SCR concerning 2 Tea Party cases that are being worked here in DC. Currently, there are 13 Tea Party cases out in EO Determinations and we are coordinating with them to provide direction as to how to develop those cases based on our development of the ones in DC.[109]

The SCR dated April 19, 2010 describing the two Tea Party cases shows that the cases were flagged because they were determined to be "Likely to attract media or Congressional attention." [110]

On May 13, 2010, in response to an inquiry from Lerner about the basis for EO Technical's examination of Tea Party cases, Grodnitzky replied that:

> The [Tea Party] organizations are arguing education, but the big issue for us is whether they are engaged in political campaign activity.[111]

By November 3, 2010, the number of applications on hold in EO Determinations increased to 40 as Cincinnati continued to wait for development of the two Tea Party test cases in EO Technical.[112]

Robert Choi told Committee investigators that he inferred the Tea Party cases were likely on their way to being resolved because a November 2010 summary of the sensitive case reports indicated that EO Technical (Carter Hull) was drafting a favorable determinations letter for one of the Tea Party test cases.[113]

This was not the case—the confusion and bureaucratic buck passing continued until the triage effort, 19 months later, in June of 2012, well after the TIGTA investigation had begun, sounding alarm bells at the IRS.

The bulk of the responsibility for managing the processing of these applications falls on Lerner as manager of the nonprofit tax division of the IRS. She refused to testify in open session before the House Government Affairs Committee, pleading the Fifth Amendment.[114] She has refused to talk to Finance Committee and Ways and Means investigators. Consequently, her side of the story will not be completely told in this report.

Perhaps the best summary of her perspective comes from a TIGTA interview with her conducted on May 22, 2012. Lerner describes the initial process used to collect the applications containing political advocacy issues:

> It has been customary for the applications group in Cincinnati to document emerging issues through emails. However, we received complaints at a CPE that employees were receiving too much information via e-mail and there was no consolidated place where employees could go for this information. As a result, Cincinnati began consolidating information into what is called a BOLO (Be On the Lookout). In the spring of 2010, the applications group

[109] *Id.*
[110] TEGE Sensitive Case Report Tea Party (Apr. 19, 2010) IRS0000164074.
[111] Email chain between Steven Grodnitzky and Lois Lerner and Robert Choi (May 13, 2010) IRS0000167872.
[112] Email from Holly Paz to Lois Lerner and Robert Choi (Nov. 3, 2010) IRS0000156478.
[113] SFC Interview of Robert Choi (Sep. 19, 2013) p. 67.
[114] New York Times, IRS Suspends Official at Center of Story (May 23, 2013).

263

began seeing a surge in applications that were very up front about political work the organizations would be conducting. It is not unusual for us to send cases to a specific group when we see an uptick of applications with the same issues. We like to have a specific group or set of people work the applications so that we are consistent in our determinations.[115]

She continued in the interview to summarize her decision to order a change in the Tea Party designation in the BOLO list:

When I heard the criterion being used, I immediately asked that the criterion be changed. While I don't believe our folks in Cincinnati meant any malice, I was disappointed with the language used to describe the emerging issue. I would agree that the language should be more about the issues in the applications and not about particular groups that are applying for tax exemption. I believe that Cincinnati was just using shorthand to describe the cases and was not thinking about the impact of describing the cases in a particular manner. Our work is much more out in the public and, while I believe the Cincinnati employees were just trying to find an easy way to describe the applications, our employees need to be cognizant of the fact that we need to make it clear that we do not select cases for additional determinations or examination work based on political affiliation. It should not enter into the conversation.[116]

Holly Paz, a key EO figure and by all accounts a conscientious worker, shifted jobs frequently and was often designated as "acting" while filling a position. She was not able, understandably, to take charge and move the Exempt Organization team towards a quick resolution of the Tea Party applications piling up in Cincinnati. Paz, between March of 2010 and May of 2012, went through four different position changes. This constant changing of jobs, and the multiple times she was placed in an acting position, whether as a manager or director, probably contributed to her inability to take charge and resolve the challenge of dealing with the dozens of 501(c)(4) applicants who were intending to become involved in political campaigns.[117]

She did not feel able, apparently, to confront Lerner about the endless process of review and delay that was inevitably leading to the TIGTA investigation, and the eventual explosion of the issue in Congress and in the U.S. media.[118]

Months and months went by with the IRS personnel developing "guidesheets," constructing a "bucket" system for analyzing the cases, drafting development letters, and training personnel on the 501(c)(4) political advocacy issues. "Triage" was attempted in the fall of 2011 (reviewing all the applications and attempting to make a quick decision on denial or approval), meetings occurred, various offices refused to take charge and resolve the pending applications.

---

[115] Memorandum of Discussion between Lois Lerner and Troy Patterson (May 22, 2012).
[116] *Id*.
[117] SFC Interview of Holly Paz (July 26, 2013) pp. 14–17.
[118] SFC Interview of Holly Paz (July 26, 2013) pp. 50–51.

Exhibit E

264

No evidence was uncovered that political motivations fed this bureaucratic nightmare, but that does not make it acceptable. Once the TIGTA investigation began it was too late to undo the damage.

Two email chains providing an example of the endless, confused and disorganized process is included in the appendix of this report. In one, two months are squandered in an email exchange that is almost incomprehensible. This occurs, incredibly, 18 months after the first Tea Party emails were received in Cincinnati, and 10 months after the Tea Party had been partially credited with taking back the House of Representatives for the Republican Party, an event that produced a massive amount of media exposure and national attention.[119] In another email the reader can see a narrative of buck passing and confusion that squandered three months, from June 8, 2012 to September 12, 2012. Incredibly this email covers a period after the TIGTA investigation had begun.[120]

Three opportunities to expedite the processing of the conservative leaning applications were missed from the summer of 2010 to the summer of 2011.

Carter Hull was given the job of analyzing two Tea Party applications (a 501(c)(3) and a 501(c)(4)) in April of 2010. As one of the EO Technical employees with the most experience with nonprofit political activity he was in a position to develop a definitive test for the applications waiting to be resolved.

He took until January of 2011 to recommend that one of these applications be approved. Had he been managed better and finished his analysis in September or October of 2010 the standards he set could have been used to test the dozens of applications sitting in Cincinnati.

Another opportunity was wasted when Hull recommended approving the (c)(4) application in January. A better management team would have seized this moment and used his analysis to immediately resolve the Tea Party applications pending in Cincinnati.

A "triage" team similar to the one formed in June of 2012 could have made short work of the applications using the standards set by Hull in recommending approval of the two applications selected by the Washington D.C. office for special analysis.

Instead of using the Hull decision on the 501(c)(4) application to kick off a final review of the pending applications his decision was reviewed by Senior Technical Advisory Judy Kindell. Kindell recommended the application be reviewed by Chief Counsel's office because the issue of private benefit, namely whether the Tea Party groups were operating for the benefit of the Republican Party, was not explored by Carter Hull in his examination.[121] This may have been a good idea if a two week deadline for that effort had been enforced. But the meeting with Don Spellman of the Office of Chief Counsel did not occur until August—seven months after Hull had belatedly made a final decision on the two applications.

No clear 501(c)(4) political activity guidance was ever given by the Counsel's office so this step in the process was a complete waste of time.

---

[119] Email chain between EO Employees (Sep 15, 2011–Nov. 15, 2011) IRS0000057399–426.
[120] Email chain between EO Employees (June 8, 2012–Sep. 12, 2012) IRSR0000441141.
[121] SFC Interview of Judith Kindell (July 18, 2013) pp. 53–55.

Exhibit E

A final missed opportunity was the failure to follow up on the July 2011 meeting between Lerner and her senior team with a plan to approve or disapprove the applications.

Lerner does get credit for ordering a change to problematic BOLO terms that specifically mentioned the Tea Party and conservative groups.[122] But at the same meeting (June 29, 2011) at which she ordered the offending language removed she did nothing to get her team to expedite the processing of Tea Party applications.[123] One hundred applications had piled up in Cincinnati at this point.[124]

This turned out to the last chance for the IRS to resolve the pending applications before the TIGTA investigation was initiated. From the June 29 meeting on, the IRS tax-exempt office continued drifting on the political advocacy cases. With no decisive action by Lerner or Paz, the IRS bureaucracy stumbled forward without establishing a competent and efficient plan for processing the applications.

Without a resolution of the applications in the fall of 2011 the frustration of the applicants increased. In early 2012 press reports and congressional inquiries triggered the TIGTA investigation.

## XI. RESPONSE TO ADDITIONAL REPUBLICAN VIEWS

A. No Evidence of Political Bias in 501(c)(4) Determinations

### 1. No Evidence of Lois Lerner Political Bias

Federal employees are allowed to have political affiliations. The question is whether they let those affiliations affect their professional duties. There is no evidence that Lois Lerner allowed her political beliefs affect how she carried out her duties as manager of the Exempt Organizations, merely anecdotal evidence that she was a Democrat.

Even though the decision came too late, Lois Lerner was responsible for removing from the BOLO list the terms Tea Party, 9/12 and Patriots out of a concern that these terms gave the appearance of "targeting" the groups.[125]

In addition, a September 15, 2010 email chain shows that Lerner's office was concerned about the potential abuse of 501(c)(4) status by organizations from across the political spectrum.[126] After Lerner expressed concern about "a perception out there that" 501(c)(4) organizations were set up specifically for political activity, her colleague Cheryl Chasin emailed her and wrote the abuse was "definitely happening."[127] In this email she listed "a few organizations . . . that sure sound . . . like they are engaging in political activity:

---

[122] Emails from Cindy Thomas to Steven Bowling and John Shafer (July 5, 2011) IRS0000619080–81.
[123] Id.
[124] TIGTA, "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review" (May 14, 2013) See Appendix VII, "Over 100 applications were identified by this time. It was decided to develop a guide sheet for processing these cases."
[125] Email chain between Cindy Thomas, Steve Bowling, John Shafer and others (July 5, 2011) IRS0000620735.
[126] Email chain between Lois Lerner, Cheryl Chasin, Judith Kindell, Nannette Downing and others (September 15–16, 2010) IRS0000633894.
[127] Id.

266

     Faulkner County Tea Party
     Paradise Republican Womens Club
     Culver PAC
     Taxpayersadvocate Org State PAC
     Escondido Republican Women Federated
     Folsom Republican Women Federated
     Alice B Toklas Lesbian & Gay Democratic Club
     Obama Democratic Club Of Silicon Valley
     National Breast Cancer Coalition Political Action Com-
     mittee." [128]

Lerner's response was, "OK guys. We need to have a plan. We need to be cautious so it isn't a per se political project. More a (c)4 project that will look at levels of lobbying and pol. activity along with exempt activity." [129] The email shows that employees in the Exempt Organizations division were concerned about abuse of the tax code no matter what political views represented.

Lerner's weakness in managing her office's processing of tax-exempt applicants affected both left and right-leaning organizations. Both types of groups faced delays in the processing of their applications for nonprofit status. There is no evidence Lerner treated left and right-leaning groups differently.

There are no facts demonstrating that Lerner told her employees to focus in an unfair way on right-leaning applications. As the report states, left-leaning groups were also placed on the BOLO list, were asked extensive questions about their activities as part of the nonprofit approval or disapproval process and waited years for their applications to be processed.

Lerner's concern with the *Citizens United* decision was appropriate given her role at the IRS. If the Supreme Court decision led to more political advocacy activity by nonprofits then the case was central to the Exempt Organizations team that Lerner led. Making reference to it in conversations or in speeches is not surprising; to ignore the decision would have been odd.

It is similarly appropriate for Lerner to take notice of Congressional efforts to reform campaign finance through the DISCLOSE Act. The bill, which would require independent groups to disclose the names of contributors who gave more than $10,000 for use in political campaigns, had wide support in 2012. The Senate version, S. 3369, had 40 co-sponsors, while the House version, H.R. 4010 had 165 co-sponsors.

Furthermore, campaign finance reform and the *Citizens United* decision are issues that are important to many Americans. Eighty five percent of Americans believe we should either "rebuild" or make "fundamental changes" to our campaign finance system.[130] In addition, 75% of Americans believe that groups who participate in political campaigns should be required to publicly disclose their donors, and 8 in 10 Americans oppose *Citizens United*.[131]

As for congressional inquiries, media interest and outside groups contacting the EO office, this is the norm for any federal agency

---

[128] *Id.*
[129] *Id.*
[130] *New York Times,* "American's Views on Money in Politics" (June 2, 2015).
[131] *Id.*; *Washington Post,* "Poll: Large Majority Opposes Supreme Court's Decision on Campaign Financing" (Feb. 17, 2010).

Exhibit E

267

or department. These interactions occur on a daily basis in every federal government office. There is no evidence that Lerner reacted to these contacts by ordering a delay in the processing of 501(c)(4) applications.

### 2. No Double Standard for Members of Congress

The Additional Republican Views cite three cases in which they say that Democratic Senators intervened to request that the review of applications for tax-exempt status be expedited, and where that apparently was done. The inference is that there was a double standard, contrasting the quick resolution of these cases to the long delays, described in this report, in the cases of applications for 501(c) status by Tea Party and other advocacy groups.

On their face, the facts of the three cases relied on do not support the inference of a double standard. It appears that the three applications were for 501(c)(3) status, organizations that are not allowed to engage in any political activity, not for the 501(c)(4) status which is the focus of this report. Further, there is nothing to indicate that the three applications were particularly difficult or controversial. The one exception appears to be a request for the expeditious consideration of an application for tax-exempt status by the One Boston Foundation, in order to facilitate fundraising and assistance to the victims of the Boston Marathon attacks in April, 2013; in that case, it appears that the IRS did in fact cut through some red tape so that the organization could get up and running quickly.[132] The three cases that the Additional Republican Views rely on were *not* cases where Democratic officeholders sought to ex-

---

[132] Boston Bar Journal, Disaster Relief: The One Fund Boston Model (April 1, 2014). (An article in the Boston Bar Journal described the efforts to get 501(c)(3) status for the "One Fund":

In the wake of the Boston Marathon bombings on April 15, 2013, Boston Mayor Menino and Massachusetts Governor Patrick proposed creating a charity to benefit the survivors and families of those killed in the attack. On April 16, Mayor Menino reached out to local businesses Hill Holliday and John Hancock to assist with the creation of the One Fund Boston. Later that day, before the fund was even incorporated and before Ken Feinberg was brought on as administrator, the One Fund received its first $1 million commitment from John Hancock. As the One Fund's attorneys, we at Goodwin Procter had to seek quick incorporation of the fund and apply on an expedited basis for 501(c)(3) tax-exempt status with the IRS. However, applications for 501(c)(3) status often take up to eighteen months to process, and in addition, obtaining the necessary approval was challenging, due to IRS limitations on the types of distributions that charitable organizations can make to individuals in the context of disaster relief.

Generally, to qualify for tax-exempt status, an organization must show that it will assist a large enough or sufficiently indefinite charitable class so that it is providing a public rather than a private benefit. In addition, in IRS Publication 3833, the IRS takes the position that an organization cannot distribute funds to individuals merely because they are victims of a disaster, but generally must determine that a recipient lacks adequate financial resources of his or her own. The IRS therefore had questions about the One Fund's plans to make distributions without financial needs testing.

The One Fund team worked closely with the IRS to overcome these issues and to show that the One Fund instead met the criteria for a 501(c)(3) tax-exempt charitable organization as an organization that lessens the burdens of government, focusing on the organization's relationship with the City of Boston and the City's role in approving distributions. "Lessening the burdens of government" is an alternative method of qualifying as a 501(c)(3) organization. As far as we know, this method has not been used before in the disaster relief context. This approach to the formation of a relief organization allowed the One Fund Boston to accomplish its immediate and ongoing goals for distributions.

On May 14, just one month after the bombings, the IRS granted the One Fund Boston 501(c)(3) tax-exempt status. The One Fund's attorneys were able to use procedures for expedited approval and effective dialogue with the IRS to obtain this unusually quick and favorable result.

The One Fund has been a huge success and an important contribution to Boston's recovery. All of the $60 million in funds donated to the One Fund Boston through June 26, 2013 were distributed to those who were most affected by the bombings, in accordance with a protocol developed by Mr. Feinberg. In addition, the One Fund Boston will continue to provide support for those affected and has announced that it will make a second distribution.

pedite the approval of progressive groups' applications for 501(c)(4) status. Further, we have not looked carefully to consider how similar requests from Republican Senators and Representatives (i.e., requests for expeditious treatment of noncontroversial 501(c)(3) applications) were handled.

As the bipartisan narrative makes clear, the IRS took far too long to review 501(c)(4) applications from Tea Party and other advocacy groups, and subjected many of the groups to inappropriate review; the IRS was insufficiently responsive to requests, from those groups as well as members of Congress, for information and for better consideration. But the fact that the IRS was able to handle a few very different cases reasonably well does not show a double standard. In this regard, the Additional Republican Views are comparing apples and oranges.

### 3. No Evidence To Validate Charge of Union Bias

Union membership in and of itself does not mean political bias. The Additional Republican Views establish no factual evidence that any IRS employee, whether they belonged to a union or not, was politically biased in their actions related to the 501(c)(4) applications with political advocacy issues. Moreover, Lerner, as a senior manager, was not eligible for union membership.

### 4. No Evidence Individual Employee Views Influenced Decisions for Political Purposes

Again, there is no evidence of political bias on the part of IRS personnel involved in the processing of the 501(c)(4) applications with political advocacy issues. The Committee has received signed statements from each of the IRS employees in interviewed asserting that politics was not involved in the decision making process.[133] TIGTA also found no evidence of political bias on the part of IRS personnel involved in processing of 501(c)(4) applications.

Of the 85,000 employees at the IRS, the Additional Republican Views highlight three who engaged in political activity during company time in violation of the Hatch Act. None work in the IRS offices processing the 501(c)(4) applications.

### 5. No Evidence White House or Treasury Officials Influenced Tea Party Applications

There is no evidence of Treasury or White House officials participating in the processing of 501(c)(4) applications or influencing how they were processed. There is no evidence that any Treasury or White House employee directed or influenced the actions of the IRS with regard to Tea Party or other political advocacy applications. The Additional Republican Views provide only unfounded speculation about the involvement of Treasury and White House officials in the processing of advocacy applications.

Two high ranking Treasury officials were interviewed by the Committee, Mark Patterson, former chief of staff to the Secretary, and Neal Wolin, former Deputy Secretary. One other employee was

---

[133] IRS Employee Responses to Written Questions from Finance Committee Staff (Dec. 19, 2013).

requested by the Republican staff to appear for an interview, Ruth Madrigal. Madrigal served as a policy expert on 501(c)(4) law at main Treasury.

Her interview transcript with the Oversight and Government Reform/Ways and Means Republican staff was made available, and after reviewing the transcript of the interview the Democratic staff was satisfied that Madrigal had not even a remote connection to the key decisions made by the EO office regarding the applications with political advocacy issues. She did not participate in any way in the management of those applications by the IRS Exempt Organizations office. Nor did she consult with upper level management of the IRS on how to respond to the delay in processing of those applications once the mismanagement was uncovered.

## B. IRS FAILURE TO PRESERVE LERNER'S EMAILS

On June 23, 2014, then-Chairman Wyden and then-Ranking Member Hatch asked Inspector General George to investigate the circumstances surrounding a June 2011 hard drive crash suffered by Lois Lerner, and to determine whether any additional documents belonging to Lerner could be recovered.[134] The hard drive crash predated any investigations of Lerner by nearly two years. TIGTA's resulting investigation found no evidence that any IRS employee intentionally destroyed records to hide information from Congress. TIGTA invested a significant amount of time and resources to activate available disaster recovery backup tapes used by the IRS. This effort resulted in the production of 1,007 emails that had not been previously produced as part of the 1,500,000 documents produced to the Committee.[135] Very few of these documents were germane to the Committee's investigation.

TIGTA's investigation also uncovered a second batch of backup tapes dating back to May 2011 that were erased by IRS employees in May 2014. TIGTA "did not uncover evidence that the IRS and its employees purposely erased the tapes and order to conceal responsive e-mails from the Congress, the DOJ and TIGTA." [136] The IRS reasonably, but erroneously, assumed that these backup tapes, which sat in storage in an IRS warehouse for years, had been destroyed long ago. Disaster recovery backup tapes do not store information in an easily accessible format and are rarely utilized in litigation.[137] However, given the extraordinary interest in this matter, the IRS should have exercised greater care and diligence in determining whether meaningful information could be recovered from disaster recovery tapes.

The Additional Republican Views take great issue with the amount of time that elapsed between when the IRS learned of Lois Lerner's hard drive crash, February 2014, and when it disclosed that information to Congress, June 2014. There is bipartisan agreement that the IRS showed a lack of candor in this matter. However, the Additional Republican Views characterize statements

---

[134] Letter from Chairman Wyden and Ranking Member Hatch to J. Russell George (June 23, 2014).

[135] TIGTA, Exempt Organizations Data Loss, Report of Investigation 54–1406–008–I (June 30, 2014) p. 15.

[136] *Id.* p. 13.

[137] See, e.g., Fed. R. Civ. P. 26(b)(2)(B); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003).

made by the IRS to the Committee on March 19, 2014 as "false" and "intended to hasten the Committee to complete its investigation." While the Democratic staff respects the Republican staff and their view about the veracity of these statements, we do not reach the same conclusions. On March 27, 2014, Committee staff asked the IRS for a statement attesting to the completeness of the IRS production. When the statement arrived on June 13, 2014, Lerner's hard drive crash was clearly disclosed.[138]

## C. MISLEADING CONGRESS

The Additional Republican Views charge that senior IRS officials continuously mislead Congress, citing hearings before various Congressional committees and subcommittees, a meeting with Finance Committee staff, and responses to letters from Senator Hatch and other Republican Senators. The veracity of these IRS officials' testimony and statements has not been a subject of our bipartisan staff investigation. While we have particular respect for Chairman Hatch's views about the veracity and completeness of responses to him, it would, in our view, take considerably more bipartisan work to reach conclusions about such serious charges.

## D. IRS INDEPENDENCE

The IRS is organized under the Treasury Department because the tax function is a critical element of government and clear lines of authority and management need to be established. This report demonstrates how important accountability and the power to act quickly are when mismanagement has occurred. Treasury Secretary Jack Lew was able to fire the head of the IRS almost immediately after revelations about the alleged Tea Party targeting were unveiled. A truly independent agency, with lengthy burdensome process for removing executives, could have continued with its existing management for some period of time.

While there are clear lines of authority, this is balanced by the nonpolitical nature of the IRS, demonstrated by the fact that unlike other agencies, only two executives are political appointees—nominated by the President and confirmed by Congress. Except for the Commissioner and the Chief Counsel, every other employee at the IRS is nonpartisan, ensuring that the IRS acts in a nonpolitical fashion. Furthermore, it is important to note that Commissioner Shulman, the Commissioner during the relevant time of this investigation, was a George W. Bush appointee.

Most agencies and departments have dozens of political appointees, resulting in a much greater political focus by the managers of the department.

## E. NO INAPPROPRIATE FEC INTERACTION

501(c)(4) nonprofits report their campaign spending to the Federal Election Commission. It is clear from the investigation that the IRS tries to determine levels of political spending in their processing of 501(c)(4) applications with political advocacy. The FEC

---

[138] Letter from Leonard Oursler to Senator Wyden and Senator Hatch (June 13, 2014) Enclosure 3, p. 7.

deals with political spending even more directly. Essentially there is overlapping jurisdiction over campaign activities/spending between the FEC and the IRS. Agencies in the federal government, all existing under the umbrella of the executive branch, are encouraged to share information when that information will assist them in carrying out their responsibilities to the taxpayer. The information shared in this case between the FEC and the IRS constitutes proper cooperation between two agencies in the executive branch.

### F. Attempts To "Suppress" Political Speech

Efforts to change the law governing nonprofit political advocacy are addressed in the following section entitled "Evolution of 501(c)(4) Nonprofits into Political Entities Creates a Need for More Transparency." The IRS withdrew proposed regulations governing political activity by 501(c)(4) nonprofits on May 22, 2014.

### G. Ways and Means Referral Letter

On April 9, 2014, the Ways and Means Committee voted to send a letter to the Attorney General asking DOJ to investigate Lois Lerner to determine whether she violated "multiple federal criminal statutes." [139] The primary charge in the letter is that Lerner focused intensively on the 501(c)(4) application from Crossroads GPS and turned a blind eye to liberal groups. The letter attempts to make the case that Lerner relied on her own political party affiliation to investigate the group's activities, eventually seeking to cancel their 501(c)(4) status. [140]

The issues raised in the Ways and Means referral letter have not been the focus of the investigation conducted by the Democratic and Republican Finance Committee staff summarized in this report. There has not been enough development of the facts in the current investigation to reach any informed conclusion about the legality of Lerner's actions regarding Crossroads. In addition, it is properly the role of the Justice Department to determine the legality of Lois Lerner's actions highlighted by the Ways and Means Committee.

However, the public should also be aware of significant facts about Crossroads GPS that the House Ways and Means Chairman omitted from his letter to the Justice Department. These facts may explain why the Lois Lerner, the IRS official primarily responsible for ensuring that political campaign organizations are not masquerading as social welfare organizations, would focus on Crossroads GPS.

The IRS permits 501(c)(4) organizations to "engage in political campaigns on behalf or in opposition to candidates for public office provided that such intervention does not constitute the organization's primary activity."

A Federal Election Commission First General Counsel's Report filed in November of 2012 concluded that Crossroads GPS spent 53% of its budget on federal campaign activity in 2010. Chairman Baucus's letter to the IRS in 2010 was partially based on public re-

---

[139] Letter from the Ways and Means Committee to Attorney General Eric Holder (April 9, 2014).
[140] Id.

ports of the vast amounts of money being spent on political activity by Crossroads and left-leaning groups.[141] OpenSecrets.org concluded that in the 2010 and 2012 election cycles Crossroads spent almost $90 million on independent expenditures (ads that advocate the election or defeat of specific candidates). Consequentially it is not surprising that Lois Lerner examined the activities of Crossroads as Director of the Exempt Organizations team. Her job was to make sure that 501(c)(4) nonprofits obey the law and are not engaged primarily in political activities. Without a full investigation it is unfair to criticize her for doing her job on this matter.

Whether Lerner was evenhanded in doing her job is certainly a legitimate question for any full investigation. As pointed out in these views, left-leaning nonprofits were subject to delay, applications for nonprofit status were denied and withdrawn. Applications from left-leaning organizations were subject to full development. The BOLO list contained terms identifying left-leaning nonprofits.

A new investigation would have to examine the total number of left-leaning nonprofits conducting political activity and how Lerner dealt with each of them. Large left-leaning nonprofits involved in political activity such as Priorities USA and Organizing for America would be part of this inquiry. Only after a complete investigation examining Lerner's actions regarding both right and left-leaning applicants could a final determination of bias be established.

## XII. IRS RESPONSE TO THE TIGTA REPORT

### A. IRS 30 DAY REPORT

On June 24, 2013 a report was released by the IRS describing their response to the TIGTA investigation.
• A team appointed by Danny Werfel, Acting Commissioner of the IRS, found no evidence of intentional wrongdoing by IRS personnel, or "involvement in these matters by anyone outside the IRS."
• Personnel were replaced in the four levels of the managerial chain that had responsibility for the activities identified in the TIGTA report.
• The following personnel were removed from or left their management positions: the IRS: Acting IRS Commissioner Steve Miller, Commissioner for Tax Exempt and Government Entities Joseph Grant, Lois Lerner (Lerner was put on paid leave on May 23, 2013 and retired from federal service in September of 2013), and Holly Paz.
• BOLO (Be on the Lookout) lists were suspended. These are the lists that contained the term Tea Party and that identified left-leaning organizations.

The 30 day plan also established a method of expediting the processing of applications for nonprofit status. The new procedures are available to applicants that are:
• Involved in political campaign activities or issue advocacy, and
• Have had applications pending for more than 120 days as of May 28, 2013.

---

[141] Letter from Chairman Baucus the Commissioner Doug Shulman (Sept. 28, 2010).

273

The IRS mailed letters to applicants caught up in the enhanced scrutiny process. They received Letter 5228, "Application Notification of Expedited 501c4 Option."

The organization is allowed to self-certify by signing and returning the letter if it agrees to abide by special rules for obtaining tax exempt status.

Groups are granted 501(c)(4) status within two weeks if they certify that 60% or more of their time and expenses are devoted to activities promoting "social welfare." They must also certify their political campaign intervention involves less than 40% of their spending and time.

## B. ADDITIONAL IRS RESPONSE

In testimony before the House Oversight and Government Reform Committee on March 26, 2014 IRS Commissioner John Koskinen summarized additional changes made following the TIGTA report:

- Establishing a new process for documenting the reasons why applications are chosen for further review;
- Developing new training and workshops on a number of critical issues, including the difference between issue advocacy and political campaign intervention, and the proper way to identify applications that require review of political campaign intervention activities;
- Establishing guidelines for IRS EO specialists on how to process requests for tax-exempt status involving potentially significant political campaign intervention; and
- Creating a formal, documented process for EO determinations personnel to request assistance from technical experts.

## XIII. NEED FOR REFORM OF THE TAX CODE TREATMENT OF POLITICAL ACTIVITY BY NONPROFITS

The Joint Tax Committee summarizes the law addressing political advocacy by 501(c)(3) organizations as follows:

[U]nder present law 501(c)(3) charitable organizations may not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office. The prohibition on such political campaign activity is absolute and, in general, includes activities such as making contributions to a candidate's political campaign, endorsements of a candidate, lending employees to work in a political campaign, or providing facilities for use by a candidate. Many other activities may constitute political campaign activity, depending on the facts and circumstances. The sanction for a violation of the prohibition is loss of the organization's tax-exempt status.

For organizations that engage in prohibited political campaign activity, the Code provides three penalties that may be applied either as alternatives to revocation of tax exemption or in addition to loss of tax-exempt status: an excise tax on political expenditures, termination assess-

Exhibit E

274

ment of all taxes due, and an injunction against further political expenditures.[142]

Section 501(c)(3) organizations are required to apply for exempt status.[143] Contributions to these organizations are tax deductible.

The Joint Tax Committee description of the law relating to 501(c)(4) organizations is as follows:

> The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office; however, social welfare organizations are permitted to engage in political campaign activity so long as it is not the organization's primary activity.

[. . .]

> Social welfare organizations need not, but may, seek formal IRS recognition of exempt status, whereas charitable organizations are required to file an application for recognition of exemption.[144]

Along with section 501(c)(4) organizations (social welfare), (c)(5) organizations (labor unions) and (c)(6) organizations (trade associations) may participate in some political activity as long as that activity is not the organization's primary activity. [145]

If it is determined the primary purpose of the 501(c)(4) organization is political activity—that 70 or 80 or 90 percent of the money goes to political activity—then that organization could lose its tax exempt status.[146]

Contributions to 501(c)(4) organizations are not deductible.[147]

Section 527 organizations are political organizations and may engage in unlimited political activities. At formation, these groups must give notice to the IRS within 24 hours. These organizations are required to make public donors making contributions of more than $200 per person, per calendar year.[148]

### A. EVOLUTION OF 501(C)(4) NONPROFITS INTO POLITICAL ENTITIES CREATES A NEED FOR MORE TRANSPARENCY

Much has changed since the Tariff Act of 1894, which contained the earliest statutory reference to tax exemptions for nonprofits. A critical change was made in 1959 when the IRS issued an administrative rule opening the door to 501(c)(4) political activity by interpreting "exclusively" to mean that groups had to be "primarily" engaged in social welfare and helping the community. Whether or not this was a valid interpretation of the statute,[149] it put the IRS in the position of determining what level and type of activities constitute "primarily political" activities. The events described in this report illustrate the difficulty of such an exercise. This is especially

---

[142] Joint Committee on Taxation, "Report to the House Committee on Ways and Means on Present Law and Suggestions for Reform Submitted to the Tax Reform Working Groups" (May 6, 2013) p. 35.

[143] Id. p. 20.

[144] Id. p. 39.

[145] Id.

[146] Id.

[147] Id.

[148] IRS, Section 527 Political Organizations—Tax Filing Requirements.

[149] See footnote 102 in the Bipartisan Investigative Report.

Exhibit E

275

true given the vagueness of the existing regulations, which have not been significantly modified since 1959. A lot has changed since then, including the apparent surge of political activity by 501(c)(4) groups in recent years. The story told in this report is not just about mismanagement. It also is about vague regulations that are inherently difficult to apply and have become outdated.

For this reason, Democratic staff are surprised by the implication, in the Additional Republican Views, that the 1959 regulations never should be revised in any way. This goes too far. The current regulations are part of the problem. Granted, the revisions that the Treasury Secretary proposed in 2013 generated a huge public response, and there were places where the proposed revisions clearly went overboard, such as with respect to voter registration and get-out-the-vote activity. But that is not a sufficient argument for maintaining the 1959 regulations into perpetuity. Organizations seeking tax-exempt status, as well as the IRS itself, would benefit from greater clarity in this area, and we believe that the IRS and the Treasury Department should continue to seek improvements to the current regulations, with appropriate public input.

Better guidance on how to measure what is the "primary activity" of social welfare organizations was also recommended by the May 2013 TIGTA audit report.

We also are surprised by the Republican views' broad opposition to transparency with respect to disclosing the identity of contributors to groups engaging in extensive political activities. One of the underlying questions in this case is why there was such an apparent surge in applications for tax-exempt status under section 501(c)(4), thereby necessitating the IRS review of whether an applicant's primary activities would be political. As it now stands, groups can obtain tax-exempt status and engage in as much political campaign activity as they want: their activities can be not only *primarily* political but *exclusively* political. They simply have to obtain their tax-exempt status pursuant to section 527 rather than section 501(c)(4); section 527 requires, in turn, greater disclosure, including of the identity of those who contribute $200 or more. To some extent, the increase in applications may have been designed to avoid disclosure requirements.

According to the Center for Responsive Politics, in 2012 nonprofit 501(c)(4) organizations spent over $200 million on political activity.[150] By electing to use 501(c)(4)s instead of 527s, none of the organizations behind this $200 million effort were required to reveal their donors.

Some have pointed to the *Citizens United* case as the reason political spending by nonprofits has increased exponentially. In *Citizens United* v. *FEC* (2010) the Supreme Court invalidated restrictions on independent political campaign expenditures by corporations, associations and labor unions.

Acting IRS Commissioner Steven Miller said at the Senate Finance Committee hearing on the TIGTA report in May of 2013 that:

> There is no doubt that since 2010 when *Citizens United* sort of released this wave of cash that some of that cash

---

[150] Center for Responsive Politics, 2012 Outside Spending by Group.

headed towards c 4 organizations. This is proven out by FEC data and IRS data. That does put pressure on us to take a look.[151]

During a time where campaign spending is soaring and the Supreme Court is loosening controls on political spending it is critical that as much transparency as possible is required by federal regulation and law.

Finance Committee Chairman Max Baucus wrote a letter to IRS Commissioner Shulman in September of 2010 encouraging the IRS to investigate the flood of political spending by social welfare organizations. He asked this question: "Is the tax code being used to eliminate transparency in the funding of our elections—elections that are the constitutional bedrock of our democracy?"[152]

The Additional Republican Views sharply criticize proposals to increase disclosure requirements for political campaign contributions, arguing that such proposals would violate free speech, citing the Supreme Court's decision in *NAACP* v. *Alabama*. This shows a lack of confidence in the positive role that transparency plays in our political process, and it also dramatically overstates the constitutional point. The *NAACP* v. *Alabama* decision stands for the proposition that organizations cannot be required to disclose membership lists without a sufficient justification from the government that outweighs the implicated First Amendment and privacy rights.[153] In contrast, the Supreme Court has repeatedly upheld reasonable political campaign disclosure requirements. Most notably, in *Buckley* v. *Valeo*, the Supreme Court considered *NAACP* v. *Alabama* when deciding the constitutionality of campaign finance disclosure rules enacted in the Federal Election Campaign Act of 1971.[154] The disclosure provisions required candidates and political committees to file quarterly reports containing detailed information about donors who contributed over \$100.[155] While the Court decided that, as a result of *NAACP* v. *Alabama*, campaign finance disclosure rules should be subject to strict scrutiny, it ultimately decided that the government's interest can prevail in matters where the '"free functioning of our national institutions' is involved."[156] The Court found that the disclosure requirements were a "reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view."[157] The Supreme Court cited three justifications for upholding campaign finance disclosure: (1) campaign finance disclosure laws provide voters with information about candidates, (2) the rules "deter actual corruption and avoid the appearance of corruption," and (3) recordkeeping is required to detect violations of disclosure limitations.[158] Similarly, in *McConnell* v. *FEC*, the Supreme Court upheld the expanded campaign finance

---

[151] Senate Finance Committee Hearing, "A Review of Criteria Used by the IRS to Identify 501(c)(4) Applications for Greater Scrutiny" (May 21, 2013) p. 23.

[152] Letter from Chairman Baucus to Commissioner Doug Shulman (Sept. 28, 2010). (Sep. 28, 2010).

[153] NAACP v. Alabama, 357 U.S. 449 (1958).

[154] Buckley v. Valeo, 424 U.S. 1 (1976).

[155] *Id.* at 61.

[156] *Id.* at 66 (quoting Communist Party v. Subversive Activities Control Bd., 367 U.S. 1, 97 (1961)).

[157] *Id.* at 62.

[158] *Id.* pp. 66–68.

277

disclosure provisions of McCain Feingold, including a provision requiring the disclosure of contributors to political campaigns.[159] Most recently, in *McCutcheon* v. *FEC*, Justice Roberts cited campaign finance disclosure laws as part of the Court's justification for striking down aggregate limits on campaign contributions to candidates.[160] He argued that "disclosure of contributions minimizes the potential for abuse of the campaign finance system."[161] In addition, disclosure laws are more effective against corruption now as opposed to when *Buckley* was decided.[162]

Justice Scalia summed the point up well in a 2010 case (*Doe* v. *Reed*):

> Requiring people to stand up in public for their political acts fosters civic courage, without which democracy is doomed. For my part, I do not look forward to a society which, thanks to the Supreme Court, campaigns anonymously and even exercises the direct democracy of initiative and referendum hidden from public scrutiny and protected from the accountability of criticism. This does not resemble the Home of the Brave.

Chief Justice John Roberts observed in the *McCutcheon* v. *Federal Election Commission* case:

> With modern technology, disclosure now offers a particularly effective means of arming the voting public with information.

Our political system will benefit from *more* transparency, not less.

An argument for why transparency matters was set forth in a New York Times article on March of 2014. A report from a special investigative committee in the Utah state legislature described a 501(c)(4) organization set up solely to fund a candidate for Attorney General who told payday loan companies he would advocate for their policy interests.[163] After winning election in 2012 the Attorney General resigned amid allegations of corruption a year later.[164] The article states that the campaign "exploited a web of vaguely named nonprofit organizations in several states to mask hundreds of thousands of dollars in campaign contributions from payday lenders."[165] According to the New York Times, the Attorney General knew that the public would view his defense of payday lenders as unsavory:

> It was important to 'not make this a payday race,' he (the candidate) wrote. The solution: Hide the payday money behind a string of PACs and nonprofits, making it

---

[159] McConnell v. FEC, 540 U.S. 93. The Court left the door open to a challenge to disclosure laws in the case where a "group can show a 'reasonable probability' that disclosing its contributors' names would subject them to threats, harassment or reprisals from either Government officials or private parties." Citizens United v. FEC, 558 U.S. 310, 367 (2010) (citing 540 U.S. 93, 198).

[160] McCutcheon v. FEC, No. 12–536, slip op. (U.S April 2, 2014).

[161] *Id.* p. 35.

[162] *Id.* p. 36.

[163] New York Times, "A Campaign Inquiry in Utah is the Watchdogs' Worst Case" (Mar. 18, 2014).

[164] *Id.*

[165] *Id.*

278

difficult to trace donations from payday lenders to Mr. Swallow's campaign.[166]

The section in the bipartisan views on flaws in the IRS's response to a FOIA request also demonstrates the need for transparency in the operations of government.

The goal of greater transparency is the basis for many proposals to reform the law governing political advocacy by nonprofits.

## B. STATUTORY CHANGES ARE NEEDED

Democratic staff believes further changes in the 501(c)(4) law are necessary and recommend the following be considered by the Senate Finance Committee.

(1) Require (c)(4)s, (5)s, and (6)s to file notice of formation within 24 hours (same as 527s)

(2) Create a bright-line test on political activity (lobbying and campaigning)—for example, a limitation of 10% of expenditures during the calendar year

(3) Penalty: Apply Section 4955 penalty to (c)(4)s—excise tax on excess political expenditures.

(4) Require the disclosure of donors who contribute over $200 to 501(c)(4)s who engage in political activity (same as 527 organizations), or $1,000, which is the threshold in the Wyden-Murkowski bill.

(5) Require FEC filings to be attached to 990s.

(6) Require electronic filing of 990s (included in the Senate Finance Committee's Tax Administration Discussion Draft).[167]

### POSSIBLE ALTERNATIVE PROPOSALS

• Require disclosure similar to 527 organizations (or by cross reference) for tax exempt organizations that do any "electioneering communications" as defined under FEC rules;

• Require tax exempt organizations that wish to fund electioneering communications to fund these operations through a segregated 527 account, thus, contributions would be subject to disclosure; or

• Require these organizations be reclassified as 527 organizations

### 1. The Follow the Money Act

The Follow the Money Act introduced by Chairman Wyden and Senator Murkowski requires that all individuals and entities engaged in independent political spending, including 501(c)(4)s, disclose the names of donors that contribute over $1,000 per year. The legislation also requires real-time disclosure of significant independent political expenditures by 501(c)(4)s similar to the way political candidates report spending to the FEC. This legislation would lessen the processing burden on the IRS Exempt Organizations office because its disclosure regime will eliminate the incen-

---

[166] *Id.*

[167] Senate Finance Committee, Summary of Staff Discussion Draft: Tax Administration (Nov. 20, 2013).

tive for organizations to apply for tax-exempt 501(c)(4) status as a means to funnel large anonymous donations into federal elections.

### 2. Return to the Pre-1959 Standard

A final option which would not require changes in law envisions the IRS reversing its decision in 1959 to interpret "exclusively" as meaning "primarily." The regulatory decision that has led to hundreds of millions of dollars of political spending by "social welfare" organizations could be cancelled by another regulatory decision setting the same standards that applied before 1959.

### 3. Reform of 501(c)(5) and 501(c)(6) Organizations

The Democratic staff recommends that additional work be done to determine what reforms to 501(c)(5) and 501(c)(6) organizations are needed. Because the TIGTA report did not involve those non-profit categories, the Democratic staff does not include a discussion of them in these views.

## XIV. CONCLUSION

Hundreds of thousands of federal government employees work hard every day to perform their duties, from the CIA personnel that tracked Osama Bin Laden to Abbattobad, Pakistan to the NIH researcher who makes it possible to take steps toward stopping cancer, from border patrol agents preventing human trafficking to weather forecasters tracking hurricanes. Sadly, in this case IRS personnel fell short. They took exactly the wrong approach to evaluating many 501(c)(4) applications, in particular the flood of politically right-leaning organizations. There is no evidence IRS personnel had any political bias, nor did they receive outside interference or pressure from political appointees in the IRS, at Treasury or in the White House, but their actions created the appearance of political bias and discrimination.

This was a consequence of bad management and bad judgment.

The director of the Exempt Organizations office, Lois Lerner, deserves the largest share of the blame. It was her job to manage and lead the EO division. In this case she failed to organize her staff to quickly review and either approve or deny the 501(c)(4) applications.

In a generous summary of her performance, former Acting IRS Commissioner Steven Miller said that Lerner "undermanaged" the influx of Tea Party applications.[168] Mr. Miller also took a personnel action against Ms. Lerner, showing his frustration with the failure to resolve the right-leaning applications.[169] Because Lerner refused to testify or be interviewed on this matter, we were not able to establish her side of the story.

This investigation, as well as the TIGTA investigation, did not find any of the IRS actions to be politically motivated. Interviews of IRS personnel showed them to be uninterested in politics or politically naive. The following email from a TIGTA investigator concludes that there was "no indication of" political motivation.

---

[168] SFC Interview of Steven Miller (Dec. 12, 2014) pp. 164–165.
[169] *Id.*

280

Review of these emails revealed that there was a lot of discussion between the employees on how to process the Tea Party and other political organization applications. There was a Be On the Lookout (BOLO) list specifically naming these groups; however, the e-mails indicated the organizations needed to be pulled because the IRS employees were not sure how to process them, not because they wanted to stall or hinder the application. There was no indication that pulling these selected applications was politically motivated. The e-mail traffic indicated there were unclear processing directions and the group wanted to make sure they had guidance on processing the applications so they pulled them. This is a very important nuance.[170]

Again, Russell George confirmed in a question from House Ways and Means Committee Ranking Member Sander Levin that no political motivation was found:

Levin: Did you find any evidence of political motivation in the selection of the tax exemption applications?

George: We did not, sir.[171]

IRS employees involved in processing and overseeing the processing of Tea Party applications were each asked if their actions were politically motivated. None of them answered affirmatively.

No evidence was found linking political appointees at the IRS, Treasury or the White House to this delay and mismanagement. No IRS employees identified pressure from political appointees as the cause of the delayed scrutiny of right leaning applications.[172]

This was a case of gross mismanagement, rather than an attempt to exert political influence. While the numbers of left leaning 501(c)(4) applications were not as great as the right-leaning 501(c)(4) applications, the IRS did use the BOLO list to select left-leaning cases. IRS personnel subjected them to a lengthy review, approving some applications and denying others.

The IRS employees set aside Tea Party applications, waiting on a review in Washington D.C., and placed the term on a BOLO list when the applications should have been treated like any other 501(c)(4) seeking nonprofit status and processed accordingly.

To compound the error, various IRS personnel in the Washington D.C. office allowed month after month to go by as they analyzed a handful of the applications. One application was approved on January 11, 2011 by one of the most experienced 501(c)(4) political activity experts, Carter Hull, but his superiors decided even more review was warranted.

At the same time this was taking place efforts were underway to develop a guidesheet to help Cincinnati process the applications. Months were wasted on this project. In the end no guidesheet was ever agreed to.

A key meeting in July of 2011 between Lois Lerner and her team discussed the idea of processing the applications expeditiously, but

---

[170] Email from TIGTA Deputy Inspector General for Investigations Timothy Camus to TIGTA staff (May 3, 2013).

[171] House Ways and Means Committee Hearing on IRS Tax-Exempt Investigation (May 17, 2013).

[172] IRS Employee Responses to Written Questions from Finance Committee Staff (Dec. 19, 2013).

Exhibit E

there was no follow through—the EO team stumbled along in the remaining months of 2011 until the TIGTA investigation began in early 2012.

While these disorganized efforts to process the applications continued, the Tea Party was attracting massive amounts of media coverage—multiple in-depth articles appeared in the *New York Times*, *the Washington Post*, the *Wall Street Journal* and other publications across the country.

Many political commentators credited the Tea Party with shifting control of the House of Representatives to the Republican Party.

Yet no alarm bells went off at the IRS after the mid-term elections in November of 2010. More than a year and a half went by after this historic election without any efficient or aggressive action on the 501(c)(4) right-leaning applications.

IRS personnel were completely oblivious to the harsh consequences waiting for them because they ignored a new wave of activism in the American political system.

No plan to process the applications quickly was organized until June of 2012—after the TIGTA investigation was begun. By that time it was too late to avoid damage to the reputation of the IRS.

Commentators have complained that any attempt to review an application for 501(c)(4) status, investigate how that nonprofit operates, or for the IRS to propose clarifying the political advocacy rules, is somehow a violation of the Constitution's First Amendment protection of free speech. This demonstrates a misunderstanding of the tax laws of the United States and the Constitution. Any American or group of Americans have freedom of speech in political matters. What they don't have is a Constitutional right to a tax break for engaging in political activity. IRS personnel have the responsibility to scrutinize applications for 501(c)(4) status in an evenhanded, thorough way. And after approving an application the IRS can investigate that nonprofit's activities to determine if the 501(c)(4) law is being followed. Under the law the tax status of nonprofits is determined by the IRS. If the participants in the nonprofit feel their freedom of speech is being limited they are free to engage in political activity outside the tax advantaged status of a 501(c)(4) nonprofit.

Management at the IRS has moved aggressively to address the broken system of processing 501(c)(4) applications with policy advocacy issues.

Four key employees in the IRS who failed to manage properly have been removed from their jobs.

A new process for quickly approving 501(c)(4) applications with political advocacy issues has been put in place.

Finally, the Democratic staff believes the law governing political activity by nonprofits must be strengthened further to prevent abuses.

The Finance Committee staff will continue to monitor the IRS to ensure these mistakes are not repeated.

Exhibit E

282

## XV. TIMELINE OF KEY EVENTS

**2010**

February 25: Tea Party case arrives in Cincinnati Determinations Unit. Because of recent media attention, the case is determined to be "high profile" and sent, along with two other Tea Party applications, to Washington D.C. for analysis.

March/April: Tea Party applications are held in Cincinnati while the D.C. office examines the 3 test cases.

April: Tax Law Specialist Carter Hull is assigned two of the three Tea Party test cases to review. Hull prepares development letters to send to the organizations.

July: EO Determinations holds a screening workshop in Cincinnati. A presentation instructs staff to "look for names like Tea Party, Patriots, 9/12 Project, Emerge, Progressive, We the People."

August: Be On the Lookout or "BOLO" spreadsheet distributed with Tea Party designation added to "Emerging Issues" Tab. Spreadsheet also identifies "Progressive" and "ACORN Successor" on other tabs.

October 18: Hull sends a memo to his manager summarizing the relevant issues of the Tea Party cases he is developing and apprising him of his progress.

October 26: Determinations Director Cindy Thomas expresses concern to her superior about the manner and pace with which Tea Party cases are being worked.

November: Burdensome development questions sent to left-leaning voter registration applicant.

December: Cindy Thomas inquires about status of Tea Party test cases in Washington D.C.

**2011**

January: Carter Hull recommends approval of Tea Party test case applications. Recommendation sent to senior staff for review.

March: Cindy Thomas is still concerned with pace of Tea Party applications. Recommends developing a specific plan of action to resolve cases.

April: Hull's recommendation is reviewed by a senior staff member, who decides more development of the test cases is needed. The case is sent to personnel in the Chief Counsel's office for review.

July 5: Lois Lerner meets with staff on BOLO list issue (at this point 100 Tea Party cases were in Cincinnati waiting for decisions).

July 5: BOLO terminology changed to remove Tea Party, per instructions from Lerner.

August: Meeting with Don Spellman of Chief Counsel's office to discuss the two Tea Party test applications that had been sent for review.

September: First attempt at application "triage."

November: Guidesheet for evaluating Tea Party applications sent to Cincinnati; IRS personnel did not find it helpful.

**2012**

January: BOLO terminology changed again, modified to capture conservative and left-leaning groups.

Exhibit E

January: Extensive development letters are sent to Tea Party and a few left-leaning applicants.

February: Beginning of press attention regarding failure of IRS to approve or deny 501(c)(4) applications with political activity issues. Lerner attempts to disseminate new guidance to staff on how to reduce burdensome development requests.

March: TIGTA audit begins.

May: Commissioner Doug Shulman and Deputy Commissioner Steven Miller briefed on audit.

May: Workshop conducted on bucketing exercise to expedite Tea Party applications.

May 17: BOLO is changed again to eliminate current advocacy organization language that is capturing conservative and liberal groups.

June: Bucketing exercise begins in Cincinnati.

June 4: Acting General Counsel of Treasury Christopher Meade briefed by Russell George.

End of 2012: Commissioner Shulman leaves IRS, Steve Miller becomes Acting Commissioner.

**2013**

May: TIGTA report issued.

284

## Chronological Listing of Significant Occurrences – 2002 to 2013

The chronologically arrayed events listed below were derived from documents secured by the Senate Finance Committee from the IRS and other sources, including from interviews conducted by Senate Finance Committee Staff with current and former IRS and Treasury employees.

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| February 22, 2002 | Jonathan Levin, attorney at the Federal Election Commission, emails Lois Lerner advising her that he is studying the Shays-Meehan campaign finance reform law. Lerner responds in part by stating "[i]t's pretty exciting that the campaign finance stuff may actually go through." | Lois Lerner, Jonathan Levin | FECSUBP5001236 |
| October 12, 2004 | Jonathan Levin, attorney are the Federal Election Commission, emails Lois Lerner and states "once this election is over, we need to get together. I do miss you." Lerner responds "... after the election, we'll get together – hopefully to celebrate, but it sure looks iffy!" | Lois Lerner, Jonathan Levin | FECSUBP5001079 |
| November 3, 2006 | Mark Shonkwiler, Assistant General Counsel, Federal Election Commission, emails Lois Lerner asking her "which division/office of the IRS would be in the best position to receive a report from the Commission . . . regarding apparent violations of the law in connection with an organization which claims tax exempt status under Section 501(c)(4) status, yet appears to be focused primarily, if not exclusively, on electoral politics – and actually is registered as a state political committee?" Lerner responds that she will accept the report and that she will forward it to the IRS Classification Office, which handles referrals. | Lois Lerner, Mark Shonkwiler | FECSUBP5000751 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| December 19, 2007 | A memorandum is sent from the Director of Exempt Organizations Rulings and Agreement Director Robert Choi stating that "[e]xemption applications that present the types of sensitive political issues described below should be assigned for full case development and should not be approved through the EO Determination merit screening process or the EO Technical inventory reduction project." The memo states that these types of activities may be indicators of sensitive political issues: <br><br>• "Voter registration <br>• "Inaugural host committees <br>• "Post election transition teams (to assist the elected official prior to officially assuming the elected position) <br>• "Voter guides <br>• "Voter polling <br>• "Voter education <br>• "Other activities that may appear to support or oppose candidates for public office." | Robert Choi | IRS0000012298 |
| September 8, 2008 | Donna Abner alerts managers that a review of two pending Emerge applications led to the discovery that Emerge applications were previously approved. Abner notes that because of the "partisan nature of the cases – guidance from EO Technical is pending." She recommends "an alert be issued regarding this type of case as well as a reminder that 'sensitive political issue' cases are subject to mandatory review." <br><br>Brenda Melahn sends forwards Abner's email to some EO managers, including Steven Bowling and John Shafer, reminding them that "any 'political sensitive' case should be sent to [EO Determinations Quality Assurance]. Memo from [Robert Choi] dated 12/19/07 indicate they should be worked as full development cases (not screened out) AND they are mandatory review." [sic] | Donna Abner, Brenda, Melahn, John Shafer, Steven Bowling | IRS0000012294-5 |
| September 24, 2008 | Further alerts are sent to EO employees reminding them that "politically sensitive cases" are subject to mandatory review and full development. | Joseph Herr, Sharon Camarillo, Cindy Wescott | IRS0000011492-94, IRS0000044815-16 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|----------------------|-----------|
| October 10, 2008 | EO Technical Tax Law Specialist Justin Lowe asks Jon Waddell to transfer Emerge Maine and Emerge Nevada to EO Technical. He says that EO Technical "will hold on to them here until the litigation on this issue has concluded and then work them."<br><br>Waddell tells Sharon Camarillo that "we might want to coordinate future receipt of Emerge Cases directly through Group 7821 and we can then send them from one spot to D.C." | Justin Lowe, Jon Waddell | IRS0000012299-12300 |
| October 16, 2008 | Deborah Kant tells Cindy Westcott that additional Emerge cases should be held "pending the outcome of a similar issue in the DLC litigation. At that point, we can decide on the best course of action." | Deborah Kant, Cindy Westcott | IRS0000012304 |
| October 21, 2008 | A Sensitive Case Report is submitted regarding the Emerge cases. The Sensitive Case Report states that "[t]wo organizations from 2 different states applied for exemption under section 501(c)(4) for the purpose of training women to run for political office. The services are only provided to women affiliated with the Democratic Party and focus on a variety of subjects such as public speaking and press relations, as well as how to conduct fund raising activities. The applications appear to represent potential partisan political activity.<br><br>Coordination has taken place between EO Determinations, the Quality Office, and EO Technical." | Jon Waddell, Sharon Camarillo | IRS0000012307-08 |
| October 21, 2008 | Two Emerge cases are transferred from EO Determinations in Cincinnati to EO Technical in Washington, DC. | Justin Lowe | IRS0000124196 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| February 3, 2009 – March 4, 2009 | William A. Powers, Enforcement Attorney, Federal Election Commission, contacts Lois Lerner, Director, Office of Exempt Organizations, by email regarding American Future Fund, a 501(c)(4) organization, and American Issues Project. Powers is seeking information regarding the status of the applications for tax exemption filed by these organizations. Powers advises that American Issues Project appeared to be the successor to two other groups, Citizens for the Republic, and Avenger, Inc. Powers states that he spoke to Lerner "last July" and that Lerner told him then that American Future Fund had not received an exemption letter from the IRS. Lerner asks Judy Kindle and David Fish how the IRS can help the FEC get the information. Kindle locates information in Lexis on Citizens for the Republic (501(c)(4) approved by IRS) and sends it to Powers. David Fish indicates that Mike Seto requested the file in case FEC wanted it. | Lois Lerner, Judith Kindle, David Fish, Robert Choi, Mike Seto | IRS000009372-75 |
| March 31, 2009 | Mike Seto faxes to William A. Powers the following: Form 1024 and Form 990 (2007) for American Issues Project, Inc. (formerly Citizens for the Republic, Inc.), and; Form 1024 for American Future Fund. | Mike Seto, William A. Powers | FECOGC000069 |
| April 3, 2009 | William A. Powers thanks Lois Lerner for providing answers to his inquiries about 501(c)(4) organizations. Powers notes that Mike Seto provided the requested information. | Lois Lerner, William A. Powers, Mike Seto | IRS0000123131 |
| May 4, 2009 | Siri Buller files a Sensitive Case Report on Emerge organizations noting that the "applications appear to represent partisan political activity." The Emerge cases were transferred to EO Technical in October 2008. | Siri Buller | IRS0000627566-67 |
| June 22, 2009 | Siri Buller files a Sensitive Case Report for three Emerge organizations | Siri Buller | IRS0000633497-98 |
| November 19, 2009 | A memo from EO Technical manager Steve Grodnitzky states that "[w]e have 3 applications for 501(c)(4) exemption from 'Emerge' organizations in our group. Several of the Emerge organizations have already been recognized as exempt entities. There may be other applications in the pipeline in Cincinnati." | Steve Grodnitzky | IRS0000124181 |
| January 18, 2010 | Siri Buller submits a Sensitive Case Report for four Emerge groups. | Siri Buller | IRS0000147518-19 |

Exhibit E

288

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| January 22, 2010 | Michael Tierny, a Quality Assurance Reviewer in Exempt Organizations (EO), Rulings and Agreements (R&A), Quality Assurance (QA), Cincinnati, notes to several of his colleagues in the wake of the Supreme Court's decision in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (decided Jan. 21, 2010) that it "[l]ooks like yesterday's Supreme Court ruling is going to result in more (c)(4)s engaging in political activities and the death of 527s." Tierny's email contained an attachment with a January 21, 2010 article published by Politico. The article cites "[l]eading Republican election lawyer Ben Ginsberg and four colleagues at Patton Boggs" who circulated a memo titled "Citizen's United v. FEC – Opportunities for Participation Grow." Ginsberg described 501(c)(4)s and 501(c)(6)s in the following manner: "Likely to emerge as the biggest players in the 2010 and 2012 elections, ideological groups and trade associations also have been granted the ability to engage much more robustly in the political process. Meager disclosure requirements of their donors will make them a favorite repository of funds for independent expenditures." | Michael Tierny, Donna Abner | IRS0000639344-48 |
| January 22, 2010 | Lois Lerner communicates by email with Steve Miller, Sarah Hall Ingram, and Nancy Marks regarding the Supreme Court's decision in *Citizens United*. Lerner summarizes the holding and expresses the view that the case probably does not change the IRS rules regarding tax exemption. Lerner suggests that the IRS prepare itself for inquiries regarding campaign spending by 501(c)(3) and (c)(4) organizations. Nancy Marks suggests doing a few "plain English Q&A's" that explain that the decision does not apply to the laws governing political activities by exempt organizations. Sarah Hall Ingram agrees and asks Lerner, Marks and Cathy Livingston to prepare a FAQ that can go on the IRS website. She also expresses the concern that the case will result in a "test of the tax exemption issue" in the courts. | Lois Lerner, Steve Miller, Nancy Marks, Sarah Hall Ingram, Cathy Livingston | IRS0000444375-77 |
| January 24-25, 2010 | Cathy Livingston prepares several draft FAQs on *Citizens United* and sends them to Lerner, Marks, Ingram, and Flax. Flax revises the FAQ's and sends them to Steve Miller. The FAQs re-state established law regarding the activities of 501(c)(3), (c)(4), (c)(5) and (c)(6) organizations and provide that the *Citizens United* case did not address the requirements of being tax exempt. | Cathy Livingston, Lois Lerner, Sarah Hall Ingram, Steve Miller, Nikole Flax | IRS0000442110-12 |

Exhibit E

289

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| January 25, 2010 | Lois Lerner expresses concern over the FAQ that states that the *Citizens United* case did not address the requirements that Congress imposed on organizations as a condition of being tax exempt. Lerner states that "[t]his is the danger zone no matter what we say." Cathy Livingston agrees and recommends that this FAQ not be used as the IRS has not had time to analyze the case and consider "language in the opinion that raises questions." The FAQs are provided to Doug Shulman, Steve Miller and Frank Keith who revise them, in case Shulman is asked about the case. | Cathy Livingston, Lois Lerner, Nikole Flax, Doug Shulman, Steve Miller, Frank Keith. | IRS0000442122-24 |
| February 2, 2010 | William A. Powers, Enforcement Attorney, Federal Election Commission, writes to Lois Lerner and states that last year, Lerner and her staff provided him with copies of publicly available information filed by American Issues Project, Inc. He notes that Lerner and staff provided him with the group's Forms 8718, 1024, 8868 and 990 for 2007. He asks Lerner if she would provide him with the group's Form 990 for 2008 and any additional publicly available forms that it may have filed after 2007. Lerner indicates that she will have someone check and get back to him. | William A. Powers, Lois Lerner | IRS0000123133 |
| February 25, 2010 | Jack Koester, a Determinations Unit screener in Cincinnati, is assigned an application for exemption under 501(c)(4) from a "Tea Party." Koester informs his manager, John Shafer, about the application and suggests that "recent media attention to this type of organization indicates to me that this is a 'high profile' case." Koester notes that the applicant organization has indicated in its 1024 that it may support political candidates. Shafer sends Koester's email to Sharon Camarillo, Area Manager, and tells her that he will "hold this case" pending a determination whether it is a "high profile case." Camarillo forwards the case to Cindy Thomas, requesting that Thomas "let 'Washington' know about this potentially politically embarrassing case involving a 'Tea Party' organization." | Jack Koester, John Shafer, Sharon Camarillo | IRS0001808069-73 |
| February 25, 2010 | Cindy Thomas alerts Holly Paz that EO Determinations has received an application for exemption under 501(c)(4) from a Tea Party organization and asks if EO Technical wants the case "because of recent media attention." Paz responds "I think sending it up here is a good idea given the potential for media interest." Thomas asks Shafer to "thank Jack for identifying the issue and elevating it." | Holly Paz, Cindy Thomas, John Shafer | IRS0001808069-73 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| March 01, 2010 | Sharon Camarillo asks Cindy Thomas to alert EO Technical to a "potential new twist on the former ACORN organization." Camarillo notes that "ACORN may have gone out of business, but has re-organized into several different organizations with the same purpose." She agrees with a recommendation from John Shafer that they "not open a new TAG issue until we actually receive one these organizations and can make an assessment for their potential for fraud or other abuse." | Sharon Camarillo, Cindy Thomas, John Shafer | IRS000045848-51 |
| Early March 2010 | John Shafer, Screening Group Manager, asks Gary Muthert, a screener in his Group, to search the databases to find out if other Tea Party groups have filed applications for exemption. Muthert finds 7 Tea Party cases and sends them to Shafer. Muthert continues to search the databases until May 2010. | Gary Muthert, John Shafer | SFC Interview of Gary Muthert, (July 30, 2013) not transcribed |
| March 16-17, 2010 | John Shafer advises Cindy Thomas that there are now 10 Tea Party applications pending in EO Determinations. In addition, three have been approved (one 501(c)(3) and two 501(c)(4) organizations). Thomas asks Holly Paz if all the cases should be transferred to EO Technical. Paz determines to take two cases in total and for Thomas to "hold the rest until we get a sense of what the issues may be." | Cindy Thomas, John Shafer, Holly Paz | IRS0000180869-73 |
| March 17, 2010 | Ronald Shoemaker sends an email to his staff advising "[b]e on the lookout for a tea party case. If you have received or do receive a case in the future involving an organization having to do with tea party let me know." | Ronald Shoemaker | IRS000063157? |
| March 17, 2010 | John Shafer sends two Tea Party cases to EO Technical – one an application for exemption under 501(c)(3) and the other an application for exemption under 501(c)(4). Shafer tells Cindy Thomas that he will hold the remaining Tea Party cases in his group under status 75 (not for general assignment). | John Shafer, Cindy Thomas | IRS0000181003-07 |
| March 22-24, 2010 | Cindy Thomas forwards Sharon Camarillo's March 1, 2010 email about potential ACORN cases to Steven Grodnitzky. Grodnitzky alerts Robert Choi that "it appears that ACORN is morphing into new organizations. According to Cincy, there was one organization that came in for exemption, but they believe it was closed [for failure to establish]. Will keep you updated as to new developments in this area. May cause some press attention." | Cindy Thomas, Sharon Camarillo, Steven Grodnitzky, Robert Choi | IRS000045848-51 |

Exhibit E

291

| Date | Occurrence | Key Personnel Involved | Authority |
|------|------------|------------------------|-----------|
| March 26-28, 2010 | Robert Choi asks for a "summary from Cincy regarding this issue of ACORN morphing into new entities." A technical advisor from Rulings and Agreements tells Choi that "[a]lthough an organization is required to disclose on its application if it is taking over the activities of another…we may have difficulty trying to put an alert for these applications because I don't know if we have identifies all the ACORN entities they would replace." [sic] Jon Waddell writes that "[t]o my knowledge, we have yet to see any of these applications…" | Robert Choi | IRS0000458448-51 |
| March 31, 2010 to April 2, 2010 | Steve Grodnitzky, Acting Manager, EO Technical, is made aware that two Tea Party applications are being worked in EO Technical. Grodnitzky determines that a Sensitive Case Report (SCR) needs to be completed since "[t]hese are high profile cases as they deal with the Tea Party so there may be media attention. May need to do an SCR on them." Cindy Thomas agrees and informs Grodnitzky that there are a total of 11 Tea Party cases and that three have been approved (two have been granted exemption under 501(c)(4) and the third under 501(c)(3)). | Steve Grodnitzky, Cindy Thomas | IRS0000165413-14 |
| April 1, 2010 | Lois Lerner reminds Rob Choi and Nanette Downing that it is their responsibility to review Sensitive Case Reports (SCR) and provide feedback to staff before the SCRs go forward. She states that SCRs "go all the way to the Commissioner's Office." | Lois Lerner, Robert Choi, Nanette Downing | IRS0000162656 |
| April 5, 2010 | Steve Grodnitzky asks Cindy Thomas for information on each Tea Party case pending in Cincinnati so that the information can be included in the SCR. Thomas asks Gary Muthert, a Screener in the Screening Group, to prepare a list of the cases showing the code section that the organizations are applying under. Muthert prepares a list showing 18 cases, three of which have already been approved. | Steve Grodnitzky, Cindy Thomas, Gary Muthert | IRS0000165415-19 |

Exhibit E

292

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| April 5, 2010 | Steve Grodnitzky assigns the two Tea Party cases to Ronald Shoemaker's Group within EO Technical. The plan is for EO Technical to work the cases and then develop some guidance for EO Determinations to use on its pending cases. Shoemaker assigns the two Tea Party cases to Carter C. Hull, a Tax Law Specialist in Shoemaker's Group, based on Hull's expertise on evaluating applications from organizations seeking exemption under 501(c)(4). | Carter C. Hull, Ronald Shoemaker | IRS000433722 IRS000166266-67 SFC Interview of Ronald Shoemaker (July 31, 2013) not transcribed SFC Interview of Steve Grodnitzky (Sep. 25, 2012) p. 23 |
| April 6, 2010 | Jon Waddell, Group Manager, EO Determinations, provides Sharon Camarillo and Brenda Melahn with a copy of the latest draft of the "Joint TAG/Emerging Issues Spreadsheet." The spreadsheet is based on the current TAG spreadsheet that informs agents about cases that may raise fraud issues, tax avoidance schemes or that may involve possible terrorist groups. The "Joint" spreadsheet is now expanded to include "Emerging Issues," which are issues for which there is no clear precedent, as well as "Watch for List" cases, which are cases not yet received, but that will require special handling when received. The draft "Joint" spreadsheet contains a tab for each group of cases. Waddell indicates that he and Joseph Herr have been meeting to discuss methods for updating the spreadsheet and will continue to work together to develop a proposal for consideration. | Jon Waddell, Sharon Camarillo, Brenda Melahn | IRS000629335-48 |
| April 6, 2010 | Carter Hull asks Siri Buller for materials relating to Emerge cases because it may help him with his work on the Tea Party cases. Buller replies to Hull, "I'm not sure how similar they are to the Tea Party applications, but I have attached the proposed denial letter for one of the organizations." | Carter Hull, Siri Buller | IRS000012132 |
| April 10, 2010 | Cindy Thomas advises Sharon Camarillo and Brenda Melahn to include in the Joint Issues spreadsheet a tab for "Consistency" cases, or cases that require consistent treatment but that are not cases involving TAG or Emerging issues. She directs that the spreadsheet be completed by the end of April 2010 and states that it can be introduced to the EO Determinations agents along with the Emerging Issues procedures at the Continuing Professional Education (CPE) training session in June/July 2010. | Cindy Thomas, Sharon Camarillo, Brenda Melahn | IRS000629335-48 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| April 12, 2010 | Sharon Camarillo informs Cindy Thomas that several names for the Joint Issues spreadsheet have been considered, but rejected.  She asks Thomas if she has "any ideas as to what to call this spreadsheet." | Sharon Camarillo, Cindy Thomas | IRS0000629335-38 |
| April 14, 2010 | The EO Determinations screening group (Group 7838) holds a group meeting. Gary Muthert gives a presentation on Tea Party cases.  He informs the screeners that three cases have been approved, including a 501(c)(3) organization.  Muthert advises that EO Determinations is awaiting guidance from EO Technical on the Tea Party cases and that John Shafer is holding Tea Party cases in his office. | Gary Muthert, John Shafer | IRS0000168256-57 |
| April 16, 2010 | Siri Buller submits an SCR about four Emerge chapters.  The estimate closure date is June 30, 2010. | Siri Buller | IRS0000638426-27 |
| April 19, 2010 | Carter C. Hull prepares the first Sensitive Case Report on the two Tea Party cases assigned to him.  The Prescott Tea Party is an applicant for exemption under 501(c)(3) and the Albuquerque Tea Party is an applicant for exemption under 501(c)(4).  Estimated closure date is September 30, 2010.  The applicable sensitive case criterion is that the cases are "[l]ikely to attract media or Congressional attention."  Hull notes that "'[t]he various 'tea party' organizations are separately organized, but appear to be part of a national politically conservative movement that may be involved in political activities. The 'tea party' organizations are being followed closely in national newspapers . . . ."  Hull also informs that Cincinnati is holding three applications for exemption under 501(c)(3) and ten for exemption under 501(c)(4), and that Cincinnati has approved exemption for two 501(c)(4) groups and a 501(c)(3) group that may be Tea Parties. | Carter C. Hull, Ronald Shoemaker | IRS0000164074-75 |
| April 23, 2010 | Steve Grodnitzky informs Cindy Thomas that EO Technical is working on two Tea Party cases.  A development letter has been sent out on the 501(c)(3) organization and a development letter will shortly be prepared for the 501(c)(4) organization.  Grodnitzky suggests that EO Technical coordinate with EO Determinations in the processing of the cases. | Steve Grodnitzky, Cindy Thomas | IRS0000181051-52 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| April 25, 2010 | Cindy Thomas and Brenda Melahn assign to Joseph Herr, manager of EO Determinations Group 7825, an emerging issue called "Tea Party." Herr assigns to Liz Hofacre, the Emerging Issues Coordinator, approximately 20 Tea Party cases and tells Hofacre to contact Ron Shoemaker to coordinate her work on those cases with EO Technical's work on its two Tea Party cases. Emerging Issues cases are those cases where there is little or no precedent, or unclear precedent. | Cindy Thomas, Liz Hofacre | IRS0000181051-52 SFC Interview of Joseph Herr (June 18, 2013) not transcribed SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 15, 39 |
| April 27, 2010 | Jon Waddell sends a revised version of the draft Joint Issues spreadsheet to Sharon Camarillo and Brenda Melahn for their information. The draft spreadsheet now contains tabs for TAG cases, Emerging Issues, Coordinated Cases, and Watch For cases. | Jon Waddell, Sharon Camarillo, Brenda Melahn | IRS0000629453-54 |
| April 28, 2010 | Grant Herring, EO Determinations agent, explains that Liz Hofacre designed the Joint Spreadsheet. Herring notes that "Watch For" cases are cases that EO Determinations thinks that they will see, but have not yet seen. Herring writes that the issues in the cases are driven by recent events like changes in the law. | Grant Herring, Jon Waddell, Brenda Melahn, Sharon Camarillo | IRS0000629453-54 |
| April 28, 2010 | Steve Grodnitzky, Acting Manager of EO Technical, prepares a chart summarizing the SCRs for EO Technical for the period ending April 28, 2010 and sends the chart to Lois Lerner and Robert Choi. In his email, Grodnitzky advises Lerner and Choi that EO Technical is working on two Tea Party cases and assisting EO Determinations in developing thirteen other Tea Party cases assigned to EO Determinations. | Steve Grodnitzky, Lois Lerner, Robert Choi | IRS0000141809-11 |
| April 28, 2010 | Sharon Camarillo emails Cindy Thomas and Robert Choi that EO Determinations has received two applications from successors to ACORN. One of the groups, previously closed for "failure to establish," has been reopened and no action has been taken on the other. | Sharon Camarillo, Cindy Thomas, Robert Choi | IRS000000458467 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| April 28, 2010 | An IRS inter-office research team completes its research into allegations of illegal activity by ACORN, its affiliates and employees. The research team was formed to investigate allegations that ACORN was engaged in actions inconsistent with tax-exempt status, including systematic commingling of funds between taxable and tax-exempt entities and individuals associated with ACORN. The Research team found evidence of: the cover-up of an embezzlement committed by a board member; possible conflicts created by employees working for multiple affiliates and staffers and members serving on the Board of Directors; improper money transfers among the affiliates; lack of proper documentation of financial transactions; and possible improper use of donations as well as pension and health care benefit funds. The research team concluded that these findings together with ACORN's apparent loose governance and a lack of respect for the corporate structure warranted a closer examination by the IRS into the financial practices of ACORN and its affiliates to determine if its tax-exempt status was appropriate. | Nancy Todd, Joseph Urban | IRS0000713483-87 |
| May 1, 2010 | The Groups within EO Determinations are realigned. Several employees are moved to different groups and some responsibilities are shifted among the Groups. Liz Hofacre moves to Group 7822 from Group 7825. With Hofacre's reassignment, responsibility for Emerging Issues now resides in Group 7822 (Steve Bowling, Manager). Hofacre remains Emerging Issues Coordinator in Group 7822. Joseph Herr, manager of Group 7825, is reassigned to new duties unrelated to supervision. | Liz Hofacre, Steve Bowling, Joseph Herr | SFC Interview of Steve Bowling (June 13, 2013) not transcribed<br>SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 14-16<br>SFC Interview of Joseph Herr, (June 18, 2013) not transcribed |
| May 1, 2010- October 2010 | Liz Hofacre's primary responsibility while in Group 7822 is to work Tea Party cases by reviewing applications and preparing development letters. Screeners send Hofacre applications for exemption, most of which contain the name "Tea Party" or that are from conservative organizations that engage in the same type of political activities as Tea Parties. | Liz Hofacre | SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 18-19 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| May 1, 2010 to October 2010 | Liz Hofacre performs a secondary screening on the cases sent to her by the Screening agents and uses the criteria "Tea Party," "9/12," "Patriots," or statements in the application advocating for smaller government, or promoting the Bill of Rights to ensure that the cases are correctly identified as Tea Party cases. These are the same criteria that the screeners are using. Screeners are not first attempting to determine if there is possible political activity in an application. Any cases that contain the above words are automatically sent to Hofacre, along with cases that don't contain the words but that include statements about smaller government, etc.<br><br>Over the months, Hofacre also receives cases from organizations that are left-leaning and right-leaning but do not fit the criteria for a Tea Party case. She returns the left-leaning cases to the EO Determinations agent that sent them to her. In the event the application from a left-leaning group comes from a screener, it is sent to general inventory. If an application from a conservative group is sent to her by another EO Determinations agent, and the application does not meet the Tea Party criteria, it is also sent back to the agent or to general inventory. Steve Bowling instructs Hofacre to treat the cases that don't meet the Tea Party criteria this way. Hofacre usually discusses the cases that don't meet the Tea Party criteria with Bowling before sending them back to an agent or to general inventory. Cases sent back to an agent or to general inventory are worked and determinations made on them. They are not caught in the Tea Party "net" and delayed. | Liz Hofacre | SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 45-52 |
| May 1, 2010 to October 2010 | Upon preparing draft development letters, Hofacre emails them to Hull for his review per Hull's direction and faxes him a copy of the file containing the 1023 or 1024 and supporting documents. Hull reviews her questions and on occasion, suggests additional questions. He never writes any development letters for her and his revisions are not substantial. Steve Grodnitzky also revises her questions in one instance. Steve Bowling is aware of the process used by Hofacre and Hull. Hofacre generally communicates with Hull by phone. | Liz Hofacre, Carter C. Hull | SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 55-58 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|----------------------|-----------|
| May 6, 2010 | Liz Hofacre sends Joseph Herr a draft Joint Issues spreadsheet that refers to "Tea Parties" as an "emerging issue" and directs agents to "[c]oordinate with group 7825." | Liz Hofacre, Joseph Herr | IRS000352978-84 IRS000542119-24 |
| May 13, 2010 | Steve Grodnitzky sends Lois Lerner and Robert Choi information about cases handled by EO Technical in April 2010, which includes a reference to the Tea Party cases. Lerner responds asking about the Tea Party cases, and specifically, asks if they are seeking exemption under 501(c)(3), and if they are, the basis of their exemption requests. Lerner states that "[a]ll cases on your list should not go out without a heads up to me please." Grodnitzky replies by telling Lerner and Choi that EO Technical is working on two Tea Party cases – one an application for exemption under 501(c)(3) and the other under 501(c)(4). He tells Lerner that there are ten more cases pending in EO Determinations and that most are applications for 501(c)(4) status. He advises that the organizations claim that education is their primary purpose, but that the "big issue" is whether they are involved in campaign intervention. He tells Lerner and Choi that the cases in EO Technical are in development and that no case will be resolved until Lerner and Choi provide clearance. | Steve Grodnitzky, Lois Lerner, Robert Choi | IRS000167872-73 |
| May 17, 2010 | Carter C. Hull sends two development letters to Liz Hofacre to use as samples when preparing her letters. Steve Grodnitzky tells Carter C. Hull to speak to EO Determinations about the development letters and how the questions that Hull asked in the letters applied to the facts of his cases. Grodnitzky is concerned that without an explanation, EO Determinations may just use Hull's letters without tailoring them to the specific facts of their cases. Hull advises Grodnitzky that he has spoken to Hofacre, that she has about 20 Tea Party cases, and that she will be sending her draft development letters to Hull for his review before sending them to the applicant organizations. | Steve Grodnitzky, Carter C. Hull | IRS000631583-84 |
| May 18, 2010 | IRS employee Grant Herring alerts Joseph Herr to an application "which many internet sources allege is an 'ACORN affiliate or front.'" He writes, "I don't think this org's activities are nonpartisan in effect: they don't say 'Republican' or 'Democrat,' but they target their extremely-well-funded-by-left-leaning-PFs voter registration activities to areas where traditional Democratic constituencies are concentrated. I don't think it would be difficult for EOT to revoke the approval letter." | Joseph Herr, Grant Herring | IRS000629458 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| May 24, 2010 | Carter C. Hull prepares an SCR for the Tea Party cases for May 2010. The SCR indicates that the Prescott Tea Party, the applicant for exemption under 501(c)(3), failed to submit requested information and that its application was closed for failure to establish (FTE). Hull requests that EO Determinations send him another 501(c)(3) application from a Tea Party. Albuquerque Tea Party, the applicant for exemption under 501(c)(4), requests an extension of time to respond to its development letter. Estimated closure date is September 30, 2010.<br><br>Siri Buller prepares an SCR for the four Emerge cases. She notes the denial letter for Emerge Maine is being reviewed by TEGE Counsel. The estimated closure date is July 30, 2010. | Carter C. Hull, Ronald Shoemaker | IRS0000163997-164013<br>(Email attachments containing taxpayer information omitted by Committee staff)<br><br>IRS0000163242-43 |
| May 27, 2010 | Steve Grodnitzky sends Lois Lerner and Rob Choi an SCR summary chart for May 2010. Included in the summary chart is a description of the Tea Party cases being worked by Hull. | Steve Grodnitzky, Lois Lerner, Robert Choi | IRS0000141812-14 |
| May 27, 2010 | Carter C. Hull begins reviewing proposed development letters prepared by Liz Hofacre for the Tea Party cases. Hull communicates his comments on the proposed letters to Hofacre by telephone. Hofacre cannot send out development letters until Hull approves them. According to Hofacre, the requirement that EO Technical first approve a development letter before EO Determinations can issue it is an unusual practice and not the way EO Technical had assisted EO Determinations in the past. | Liz Hofacre, Carter C. Hull | IRS0000433722<br>SFC Interview of Liz Hofacre (Sep. 24, 2013) pp. 58-65 |
| May 28, 2010 | Lois Lerner advises Nanette Downing and Robert Choi that she doesn't always have time to read SCRs and going forward, she would like to set up an hour to go over SCRs when they are ready, as she has many questions that cannot be answered in the short format of the reports. | Lois Lerner, Robert Choi, Nannette Downing | IRS0000162663 |
| June 3, 2010 | A freelance journalist submits a request under the FOIA to Eva Littlejohn, IRS Disclosure Office, seeking "documents relating to any training, memos, letters, policies, etc. that detail how [TE/GE] reviews applications for non-profits, 501(c)(3)s, and other not-for-profit organizations specifically mentioning 'Tea Party,' 'the Tea Party,' 'tea party,' 'tea parties.'" | Eva Littlejohn | IRS0000163600-06 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| June 3, 2010 | House Oversight Committee Ranking Member Darrell Issa writes a letter with an attached congressional report to Commissioner Doug Shulman informing Shulman that on "April 21, 2010, the United States Court of Appeals for the Second Circuit granted an emergency stay to the government, suspending the lower court decision declaring Congress's ban of federal funds to ACORN unconstitutional. The congressional ban on funds to ACORN thus remains in effect. I ask that you do not stop your investigation into ACORN and its use of federal funds. I ask that you maintain oversight over ACORN's rebranded affiliates." | Doug Shulman | IRS0000459733-42 |
| June 6, 2010 | Richard Daly sends a number of SCRs to Sarah Hall Ingram and Joseph Grant, among other recipients. Included in the SCRs is the May 24, 2010 SCR on the Tea Party cases prepared by Carter C. Hull. Estimated closing date is September 30, 2010. Ingram does not read the SCRs. She subsequently tells the SFC that "I relied on my directors to bring me the ones they thought they were worried about." | Richard Daly, Sarah Hall Ingram, Robert Choi | IRS000163997-164013 (Email attachments containing taxpayer information omitted by Committee staff) SFC Interview of Sarah Hall Ingram (Dec. 16, 2013) pp. 41-51 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| June 7, 2010 to July 19, 2010 | EO Determinations conducts Continuing Professional Education (CPE) sessions for its employees. During these sessions, Determinations employees are given a PowerPoint instruction on "Heightened Awareness Issues." Those issues are now contained in a new "Combined Excel Workbook" (the Joint Issues spreadsheet of April and May) that contains tabs for: "TAG" (Touch and Go) cases; "TAG Historical" cases; "Emerging Issues;" "Coordinated Processing" cases; and "Watch For" cases. Agents are given an explanation of each tab of the spreadsheet. They are told that "TAG" cases are those that involve abusive tax avoidance transactions, fraud, or applicants potentially involved in terrorism. "TAG Historical" cases are TAG cases that are no longer generally encountered, but that may be encountered so agents should be aware of them. "Emerging Issues" are cases where there is no established precedent, or cases arising from significant current events or changes to tax law. An example of an emerging issue presented to the participants is the Tea Party cases. The PowerPoint indicates that: these are "High Profile Applicants;" the Tea Party is a "Relevant Subject in Today's Media;" there is a "Potential for Political/Legislative Activity;" and, "Rulings Could be Impactful." "Coordinated Cases" are defined in the PowerPoint as "Cases with Issues Organized for Uniform Handling" and that "Existing Precedent or Guidance Does Exist." For "Emerging Issue" cases like the Tea Party cases, agents are directed to "complete the required referral form and submit to your manager." "Watch For" issues are described as involving "applications not yet received" in which the issues are the result of significant changes in the law or in world events. When received, applications will require "special handling." An example of a "Watch For" issue presented to the participants is "Successors to Acorn." For "Watch For" issue cases, agents are also directed to refer the cases to their managers. The PowerPoint indicates that a designated coordinator will maintain the Excel workbook and issue alerts by email. The PowerPoint instructs agents to follow certain procedures when encountering cases on the Combined Excel Workbook." | EO Determinations staff | IRS0000557291-308 IRS0000195587 |

301

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| June 8, 2010 | Steven Grodnitzky tells Cindy Thomas that he wants to "make sure we are all on the same page as to ACORN-related cases. We should not be developing or resolving them at this point. I had spoken to Rob about a successor to one of the ACORN orgs in NY and he mentioned that some activity is going on in the TEGE Commissioner's office with respect to ACORN and to hold off." Grodnitzky recommended that an Acorn-related voter registration organization be "put on hold til we hear further from [Robert Choi]." He also stated that "ACORN is a member of the organization, contributes money, appoints a member of the board, and the principal was a high ranking official with ACORN in the Midwest." | Steven Grodnitzky, Cindy Thomas, Donna Abner | IRS000054956 |
| June 11 – 14, 2010 | Sharon Baker, Disclosure Specialist, apprises Matthew Giuliano, Tax Law Specialist, EO, and Mike Seto of the FOIA request received from a freelance journalist on June 3, 2010 seeking documents related to how TE/GE reviews Tea Party applications.  On June 14, 2010, Giuliano sends the request to numerous recipients and asks that they provide responsive documents by COB. | Sharon Baker, Matthew Giuliano, Mike Seto | IRS000163600-06 |
| June 21, 2010 | An internal memorandum was sent to various IRS offices regarding "Investigative Research Findings" about ACORN and ACORN affiliates.  The memo states that "[b]ased on the information reviewed, there appears to be sufficient evidence to warrant further investigations of the activities of ACORN and associated individuals and organizations." | Nancy Todd, Joseph Urban | IRS000474708 |
| June 22, 2010 | Carter C. Hull prepares an SCR for the Tea Party cases for June 2010.  The SCR advises that the 501(c)(4) Tea Party applicant submitted information in response to a development letter and that Hull was evaluating the information.  Estimated closure date is September 30, 2010.  Siri Buller prepares an SCR for the four Emerge cases.  TEGE Counsel is reviewing the proposed denial of Emerge Maine. | Carter C. Hull, Ron Shoemaker | IRS000164020-43 (Email attachments containing taxpayer information omitted by Committee staff) IRS000163284-85 |
| June 30, 2010 | Carter C. Hull is assigned the application for exemption under 501(c)(3) from American Junto, a Tea Party-type organization, as a replacement for the application that he closed for failure to establish (Prescott Tea Party). | Carter C. Hull | IRS000433722 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| July 1, 2010 | Richard Daly sends TE/GE's SCRs for June 2010 to Nikole Flax, Sarah Hall Ingram and Joseph Grant. Included in the SCRs was the June 22, 2010 SCR prepared by Hull and Shoemaker on the Tea Party cases assigned to Hull and the June 22, 2010 SCR prepared by Siri Buller on the Emerge cases. | Richard Daly, Nikole Flax, Sarah Hall Ingram, Joseph Grant, Siri Buller | IRS000164020-43 |
| July 6, 2010 | Steve Grodnitzky informs Cindy Thomas that EO Technical is working the Tea Party applications in coordination with Cincinnati. Grodnitzky states: "[w]e are developing a few applications here in DC and providing copies of our development letters with the agent to use as examples in the development of their cases." | Steve Grodnitzky, Cindy Thomas | IRS000165422-24 |
| July 7, 2010 | Carter C. Hull sends a development letter to American Junto, the 501(c)(3) Tea Party organization that he was assigned as a replacement when the application from Prescott Tea Party was closed.  The letter contains 16 numbered questions. | Carter C. Hull | IRS000111197-11200 |
| July 8, 2010 | Sarah Hall Ingram and Joseph Grant are provided a copy of the internal IRS investigation report into the activities of ACORN.  The report concludes that there is sufficient evidence of improper activities by ACORN, its affiliates and associated individuals to warrant further investigation of ACORN by the IRS. | Nancy Todd, Sarah Hall Ingram, Joseph Grant | IRS000713482 |
| July 15-16, 2010 | Cindy Thomas tells Robert Choi that "[i]t appears as though we have another case that may be a potential successor to Acorn…We placed the other case in suspense pending guidance from the Washington Office and are doing so with this case." Choi asks Thomas to "[c]heck-in with me next week re this case. We may be moving forward on developing these applications." | Cindy Thomas, Robert Choi | IRS000054949-50 |
| July 23, 2010 | Siri Buller prepares an SCR for four Emerge cases.  The estimated closure date is December 31, 2010. | Siri Buller | IRS000163327-28 |
| July 26, 2010 | Carter C. Hull prepares an SCR for the Tea Party cases assigned to him.  The SCR indicates that Hull is preparing a second development letter for Albuquerque Tea Party, the 501(c)(4) organization, and that he has sent a development letter to the replacement 501(c)(3) organization, American Junto.  Estimated closing date is August 31, 2010. | Carter C. Hull, Ronald Shoemaker | IRS000807114-15 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|----------------------|-----------|
| July 27, 2010 | A "Combined Issue Spreadsheet" is prepared for use by EO Determinations agents. The "Emerging Issues" Tab of the spreadsheet informs the agents about "Tea Party" cases. The spreadsheet indicates that "[t]hese cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)." The entry in the spreadsheet further directs that "[a]ny cases should be sent to Group 7825. Liz Hofacre is coordinating. These cases are currently being coordinated with EOT." The "Watch For" tab of the spreadsheet also contains the entry "'ACORN successors.'" It states that "[f]ollowing the breakup of ACORN, local chapters have been reforming under new names and resubmitting applications." The entry directs that "[i]f you see these cases, they should be sent to the TAG group." The TAG Historical tab contains an entry that concerns the term "Progressive" and indicates that the issue is "political activities." It states that the "[c]ommon thread is the word 'progressive.' Activities appear to lean toward a new political party. Activities are partisan and appear anti-Republican." | Liz Hofacre | IRS000352978-84 IRS000621837-52 |
| July 27, 2010 | Grant Herring reported that he sent a detailed development letter to a voter registration organization that he believed was a politically biased and may be an ACORN-successor organization. | Grant Herring | IRS0000622672 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| July 28, 2010 | EO Determinations holds a Screening Workshop in Cincinnati. Participants include the screeners, EO Quality Assurance staff, Area 1 and 2 Managers, and Cindy Thomas, the Determinations Program Manager.<br><br>A PowerPoint presentation is given at the workshop. The slide that discussed "Politics" contained a picture of an elephant and a donkey. The slide presentation instructs IRS employees to "look for names like…Tea Party…Patriots…9/12 Project…Emerge…Progressive…We the People." The next slide advises that "[t]hese organizations may file a Form 1023 or 1024" and "[m]ost will file as IRC 501(c)(4)." A subsequent slide states: "Concerns: May be more than 50% political, possible PAC (Political Action Committee)."<br><br>Notes from the presentation state that Gary Muthert addresses the group and indicates that the focus of review for Tea Party applications is on political activity, and that if a screener is in doubt about that activity, he/she should forward the case to Group 7822. Names and/or titles like "9/12 Project," "We The People," "Rally Patriots," "Emerge," "Pink-Slip Program," and "Progressive" should be flagged for review. Liz Hofacre, described in the notes as the "Tea Party coordinator" advises the attendees that "Progressive" applications are not considered "Tea Parties." | Gary Muthert, Liz Hofacre | IRS0000067300-04<br>IRS0000169695-720 |
| July 30, 2010 | Theodore Lieber sends SCRs prepared by Rulings and Agreements staff to Lois Lerner and others. Included among the SCRs is the July 26, 2010 SCR prepared by Carter C. Hull describing the work performed by Hull on the Tea Party cases (Prescott Tea Party, Albuquerque Tea Party, and American Junto) assigned to him. | Theodore Lieber, Lois Lerner | IRS000807076-807115<br>(Email attachments containing taxpayer information omitted by Committee staff) |
| August 2010 | A contest to rename the "Combined Issues Spreadsheet" (also called the "Joint Issues spreadsheet" and the "Combined Excel Workbook") is held in EO Determinations. The prize for the winning suggestion is one hour of administrative leave. Joseph Herr suggests using the name "BOLO" (Be On the Look Out) spreadsheet. The suggestion wins. Herr gives Liz Hofacre credit for suggesting the "BOLO" moniker. | Liz Hofacre, Joseph Herr | SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 126-128 |
| August 2010 | In August 2010, Liz Hofacre stops hearing from Carter C. Hull. She sends him development letters to review, but doesn't hear back from him. Hull essentially stops communicating with Hofacre through August, September and October. | Liz Hofacre, Carter C. Hull | SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 57-59 |

305

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|----------------------|-----------|
| August 2010 to October 2010 | Liz Hofacre tells Steve Bowling that she is "inundated" with Tea Party cases and responses. Bowling tells her that EO Determinations is awaiting advice from EO Technical. When a case is assigned to Hofacre, she has 5 days to review it and 5 days to prepare the development letter. Even though Hull is not responding to her, she continues to prepare development letters and send them to him through August, September and October 2010. She does not release any of the letters, but just drafts them and sends them to Hull. Hofacre feels that she can decide some of the Tea Party cases based on the responses received from the applicants, but cannot do so without Hull's approval. Hull fails to respond to Hofacre's emails. | Liz Hofacre, Carter C. Hull | SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 61-64 |
| August 3, 2010 | Jack Koester, a screener in EO Determinations, informs his supervisor, John Shafer, that he has identified an application for exemption under 501(c)(4) from an organization. Koester notes that the organization is planning to conduct some legislative/political activities, which it stated is not its primary focus. The applicant told the IRS that "[t]o the extent permitted by Code § 501(c)(4), applicable regulations, and the Supreme Court's recent decision in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010), the Corporation will provide support and advocacy for or against: specific candidates during election seasons where candidates have taken stances on issues of particular importance to the [redacted] business community. At no time will such activities constitute the primary purpose of the Corporation. The Corporation's primary activity is and will always be the promotion of social welfare through voter education and issue advocacy."

He notes that the applicant appears to meet the requirements for exemption and that he would "normally consider closing the case on merit," but that given the "current political climate," "it might be prudent to elevate the case to 'upper management.'" Shafer forwards Koester's email to Sharon Camarillo, his Area Director, who then forwards the email to Justin Lowe, the subject matter expert on legislative activities. Camarillo asks that the application be held until Lowe responds. | Jack Koester, John Shafer, Sharon Camarillo, Justin Lowe | IRS0000487033-35 |
| August 3, 2010 | Lois Lerner asks her assistant to print out a number of SCRs so that she can review them. Included among them is an SCR for the Tea Party cases. | Lois Lerner | IRS0000163358-97 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| August 5-6, 2010 | Richard Daly forwards TE/GE's SCRs for August to Nikole Flax, Sarah Hall Ingram, and Joseph Grant. Included among the SCRs is the SCR that Hull prepared on July 26, 2010 regarding the Tea Party cases assigned to him | Richard Daly, Nikole Flax, Sarah Hall Ingram, Joseph Grant | IRS0000164044-72<br>(Email attachments containing taxpayer information omitted by Committee staff) |
| August 8, 2010 | Jon Waddell and/or Steve Bowling instruct Liz Hofacre to prepare a "BOLO" spreadsheet and tell Hofacre what to include in it. She sends the BOLO spreadsheet to EO Determinations managers. | Liz Hofacre, Jon Waddell, Steve Bowling | SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 129-133 |
| August 12, 2010 | Liz Hofacre distributes the BOLO spreadsheet to Determinations Unit agents. Tea Party cases are specifically identified under the Emerging Issues tab of the spreadsheet as follows: "[t]hese cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)." The BOLO directs agents to send Tea Party cases to Group 7822 and that Liz Hofacre is coordinator.<br>ACORN Successors are specifically identified under the "Watch For" tab of the BOLO spreadsheet as follows: "Following the breakup of ACORN, local chapters have been reforming under new names and resubmitting applications." The BOLO directs agent to send ACORN Successor cases to the TAG Group.<br>The word "Progressive" is specifically identified on the TAG Historical tab of the spreadsheet as a "Political activities" issue. The entry states that the "[c]ommon thread is the word 'progressive.' Activities appear to lean toward a new political party. Activities are partisan and appear as anti-Republican. You see references to 'blue' as being 'progressive.'" | Liz Hofacre | SFC Interview of Liz Hofacre, (Sep. 24, 2013) p. 132<br>IRS0000352978-84<br>Combined Spreadsheet TAG 8 12 10 |
| August 13, 2010 | Matthew Giuliano provides Senior Disclosure Specialist Sharon Baker with copies of two Sensitive Case Reports on the Tea Party cases as documents responsive to the June 3, 2010 FOIA request from a journalist who requested "documents relating to any training, memos, letters, policies, etc. that detail how [TE/GE] reviews applications for non-profits, 501(c)(3)s, and other not-for-profit organizations specifically mentioning 'Tea Party,' 'the Tea Party,' 'tea party,' 'tea parties.'" Baker concludes that the SCRs are not responsive to the request, despite Giuliano's assertion the contrary. Baker notes in the Case Report that "I have been back and forth with Matthew and I am tried [sic]." | Matthew Giuliano, Sharon Baker | IRSC003755-61 |

307

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| August 18, 2010 | Carter C. Hull prepares an SCR for August for the Tea Party cases assigned to him. The SCR indicates that Hull is assisting Cincinnati in crafting development letters. | Carter C. Hull, Ronald Shoemaker | IRS000165378-79 |
| September 15, 2010 | In response to an article in the *EO Tax Journal* about organizations that may be abusing their 501(c)(4) status by engaging primarily in political advocacy, Lois Lerner tells Judith Kindell, "I'm really thinking we do need a c4 project next year." Kindell responded, "My big concern is the statement 'some (c)(4)s are being set up to engage in political activity' – if they are being set up to engage in political campaign activity they are not (c)(4)s."  Lerner replied, "I'm not saying this is correct – but the perception out there that that is what is happening." [sic]  Cheryl Chasin added, "It's definitely happening.  Here are a few organizations...that sure sound like they are engaging in political activity:  Faulkner County Tea Party  Paradise Republican Womens Club  Culver PAC  Taxpayersadvocate Org State PAC  Escondido Republican Women Federated  Folsom Republican Women Federated  Alice B Toklas Lesbian & Gay Democratic Club  Obama Democratic Club Of Silicon Valley  National Breast Cancer Coalition Political Action Committee."  In a subsequent email, Lerner tells Kindell and others "[w]e need to have a plan.  We need to be cautious so it isn't a per se political project.  More a c4 project that will look at levels of lobbying and pol. activity along with exempt activity." | Lois Lerner, Judith Kindell, Cheryl Chasin | IRS000182865-68 |
| September 20, 2010 | Doug Shulman, Steve Miller and Nikole Flax are advised that the *New York Times* will likely run a story the following day on the large upswing in money donated to 501(c)(4) organizations whose primary activities are political in nature.  The article notes that the identity of donors to 501(c)(4) organizations is not disclosed and that the IRS lacks resources to monitor these activities and enforce the rules.  Sarah Hall Ingram, Lois Lerner and Judy Kindell provided background information to the reporter on a "not-for-attribution" basis. | Doug Shulman, Steve Miller, Nikole Flax, Lois Lerner | IRS000211382 |

Exhibit E

308

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| September 20, 2010 | Steve Miller, Nikole Flax and others develop a statement to be used in response to the release of the *New York Times* article on 501(c)(4) organizations. | Steve Miller, Nikole Flax | IRS0000219086-91 |
| September 20, 2010 | Steve Pyrek sends Nikole Flax a two-page document summarizing the rules on advocacy by exempt organizations. He asks that she share it with Steve Miller and advises that it was provided to IRS Media Relations for use in responding to the *New York Times* article on 510(c)(4) organizations. | Steve Miller, Nikole Flax | IRS0000267177-79 |
| September 21, 2010 | Sarah Hall Ingram sends an email to Lois Lerner, Joseph Grant and others indicating that the *New York Times* article "came out pretty well." She expresses her opinion that the "secret donor" theme expressed in the article will continue and says "see Obama salvo." She also indicates that the article "started the idea that we don't have the law to do something."<br><br>The article attached to the email focuses attention on Crossroads GPS, a 501(c)(4) organization and asserts that the organization has spent millions on commercials attacking Democrats. The article notes that there is a growing popularity for organizations to seek 501(c)(4) status since they can engage in political activity, accept unlimited contributions from corporations, and keep the identity of their donors secret. The article attributes this growth in the popularity of 501(c)(4) organizations to the Supreme Court's ruling in *Citizens United*. The article also notes that the majority of these 501(c)(4) organizations support Republican candidates. The article also depicts the IRS as not having the resources necessary to prevent this activity through enforcement of the laws. | Sarah Hall Ingram, Lois Lerner, Joseph Grant, Judy Kindell | IRS0000508974-76 |
| September 21, 2010 | Sharon Baker follows up on the June 3, 2010 FOIA request with Tiffany Eder, Office of Chief Counsel, Procedures and Administration (P&A). Eder informs Baker that she and Charles B. Christopher (Branch Chief, P&A, Office of Chief Counsel) are confused why Baker has concluded that the SCRs submitted by Matthew Giuliano are not responsive to the FOIA request. Baker notes in the Case Record that "[t]he request asks for guidance on how the applications would be reviewed, the Sensitive Case Reports are merely notification that an application referencing "tea party" was filed." | Sharon Baker, Tiffany Eder | IRSC003755-61 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| September 22, 2010 | Carter C. Hull prepares an SCR for September for the Tea Party cases assigned to him. The SCR continues to indicate that a second development letter is being developed for the 501(c)(4) Tea Party applicant, that the response received from the 501(c)(3) Tea Party applicant is being evaluated, and that Hull is continuing his efforts to assist Cincinnati in the development of the other Tea Party cases assigned to EO Determinations. Estimated closure date is December 31, 2010.<br>Siri Buller prepares an SCR for the four Emerge cases noting that the "TEGE Counsel is reviewing approved similar applications for comparison." | Carter C. Hull, Ronald Shoemaker | IRS0000156464<br>IRS000156447-48 |
| September 28, 2010 | Senator Baucus writes to IRS Commissioner Shulman raising concerns that political campaign activity by organizations claiming tax exemption may be inconsistent with their tax exempt status under 501(c)(4), (c)(5) and (c)(6). | Douglas Shulman | IRS0001543032 |
| September 28, 2010 | Michael Condon, a member of EO Determinations Group 7821, informs Gary Muthert, an EO Determinations screener (Group 7838), that American Crossroads is a pro-Republican group that has accounted for more than half of Super PAC spending. Condon advises Muthert that the American Financial Group has donated more than $400,000 to American Crossroads, a contribution made possible by the fact that the Supreme Court in *Citizens United* lifted restrictions on corporate spending on elections. | Michael Condon, Gary Muthert | IRS0000487036 |
| September 30, 2010 | Steve Grodnitzky sends Lois Lerner and Robert Choi an SCR summary chart for September 2010. The summary chart, that contains 22 entries discussing a range of issues, advises Lerner and Choi that both the 501(c)(3) and (c)(4) Tea Party cases are being reviewed by EO Technical and that there are now 25 applications for exemption from Tea Party groups pending in EO Determinations. The chart also advises that TEGE Counsel is reviewing the proposed denials for the Emerge cases. | Steve Grodnitzky, Lois Lerner, Robert Choi, Siri Buller | IRS000156433-36 |
| October 2010 | Liz Hofacre leaves Group 7822 and assumes a position in EO Quality Assurance. Hofacre leaves in part due to her frustration and irritation over the process employed to review Tea Party cases and the resulting delays. She states to the SFC that: "Mr. Hull or EOT was stonewalling me." | Liz Hofacre | SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 9, 69-70, 74-75 |

310

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| October 2010 | Liz Hofacre's responsibility as Emerging Issues Coordinator is reassigned to Ronald Bell. Hofacre briefs Bell before her departure from the Group. She gives Bell the name of the Washington D.C. EO Technical contact (Carter C. Hull) and forwards to Bell a few development letters that she was working on with Hull. Bell then becomes the primary contact for all political activity cases and is assigned all of these cases. Bell has between 50-100 cases when he takes over from Hofacre. Some of the cases are in development when they are transferred to Bell. Some have a development letter in the file and others have not been worked by Hofacre. | Ronald Bell, Steve Bowling | SFC Interview of Ronald Bell, (July 30, 2013) not transcribed |
| October 2010 | Ronald Bell's Manager, Steve Bowling, tells Bell that EO Determinations is awaiting guidance on the Tea Party cases from EO Technical. Bell infers from this statement that he should perform no work on the cases until receiving further guidance from EO Technical. Accordingly, Bell works on auto-revocation cases exclusively and ignores the Tea Party cases. When new cases are sent to him that meet the BOLO spreadsheet criteria for Tea Party cases, he places them in a filing cabinet and returns to work on auto revocation cases. Bowling is aware that Bell is not working the Tea Party cases. | Ronald Bell, Steve Bowling | SFC Interview of Ronald Bell, (July 30, 2013) not transcribed |
| October 2010 | The BOLO criteria that says "organizations affiliated with the Tea Party" is understood by the screeners to mean actual Tea Party groups or groups with a viewpoint similar to the Tea Party. The reference does not include or encompass other types of organizations that are engaged in political activity. | Ronald Bell, Liz Hofacre, | SFC Interview of Ronald Bell, (July 30, 2013) not transcribed SFC Interview of Liz Hofacre, (Sep. 24, 2013) p. 19 |
| October 2010 to July 2011 | From October 2010 when Ronald Bell takes over Tea Party cases to July 2011, he works no Tea Party cases. There is no development and none of the cases are assigned to any EOD agents. | Ronald Bell, Steve Bowling | SFC Interview of Ronald Bell, (July 30, 2013) not transcribed |

Exhibit E

311

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| October 2010 to November 2011 | As Emerging Issues Coordinator, Ronald Bell is charged with making updates to the BOLO list and informing EO Determinations agents and management of the changes. Bell's manager, Steve Bowling, sends Bell all changes to the BOLO list. Bowling receives some of those changes from his Area Manager (Bonnie Esrig or Sharon Camarillo). Bell summarizes the issues, sends the summary to EO Determinations agents and management by email along with an updated BOLO spreadsheet. | Ronald Bell, Steve Bowling | SFC Interview of Ronald Bell, (July 30, 2013) not transcribed SFC Interview of Steve Bowling, (June 13, 2013) not transcribed |
| October 5, 2010 | Democracy 21 and Campaign Legal Center send a letter to Commissioner Shulman and Lois Lerner requesting that the IRS investigate the activities of Crossroads GPS, to determine if it is operating in violation of 501(c)(4) tax status. | Douglas Shulman, Lois Lerner | IRS000459877-93 |
| October 6, 2010 | Judith Kindell sends Ruth Madrigal, Attorney-Advisor, Office of Tax Policy, Treasury Department, IRS instructional materials on political activity by 501(c)(4), (c)(5) and (c)(6) organizations. | Judy Kindell, Ruth Madrigal | IRS000446776-77 |
| October 6, 2010 | Ways and Means Oversight Subcommittee minority staff inquire of the IRS whether Crossroads GPS is a 501(c)(4) organization and whether American Crossroads is a 527 organization. Lois Lerner is made aware of the inquiry and takes the opportunity to express her view to Sarah Hall Ingram, Joseph Grant and others that the law is flawed because an organization can operate as a 501(c)(4) organization without prior approval of the IRS. By so operating, the IRS has no information on the organization until it files a 990. Therefore, an allegation that the organization is operating inconsistent with 501(c)(4) status would be referred to EO Exams, but the matter would be closed because there is no record of the organization. By the time a 990 is filed, there is no allegation to pursue because the exam has been closed. David Fish advises Lerner that Crossroads GPS has filed a 1024. She replies by suggesting that the case should be worked in Washington D.C. | Dave Fish, Lois Lerner | IRS000453771-72 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| October 7, 2010 | John Shafer, Screening Group Manager, sends an email to his group forwarding a copy of a letter sent by Democracy 21 to IRS Commissioner Shulman that appeared in the press. In the letter, Democracy 21 makes the assertion that Crossroads GPS, a conservative organization operating as a 501(c)(4), is primarily engaged in political advocacy and should not be approved by the IRS as a 501(c)(4) organization. Gary Muthert receives Shafer's email and advises Steve Bowling, Group 7822 Manager, that he sent Crossroads GPS' application to Bowling's group as a "Tea Party" case and that he "might want to get the case." Bowling determines that the application is in status 51 (unassigned inventory). Bowling instructs an employee to change the status of the case to status 75 (not for general assignment) and to place the original application on his desk. | Gary Muthert, Steve Bowling | IRS0000487037-47 |
| October 7, 2010 | Siri Buller, Tax Law Specialist, EO Technical, Group 1 sends Ruth Madrigal, Attorney Advisor, Office of Tax Policy, Treasury Department, reference materials setting forth the IRS' policy on political activity for 501(c)(4), (c)(5) and (c)(6) organizations. | Ruth Madrigal, Siri Buller | IRS0000446776-77 |
| October 7-8, 2010 | Jon Waddell emails Steven Bowling and Sharon Camarillo suggesting that they alert IRS screeners to "Name and Application factors associated with Acorn related cases." Camarillo asks John Shafer to "[p]lease ask your screeners to be on the lookout for these cases." Shafer forwards the email to IRS screeners. | Jon Waddell, Steven Bowling, Sharon Camarillo, John Shafer | IRS000410433-34 |
| October 14, 2010 | Lois Lerner, and other IRS officials are emailed a copy of a letter from Senator Dick Durbin to IRS Commissioner Douglas Shulman urging the IRS to investigate the activities of Crossroads GPS. Durbin alleges that Crossroads' spending on political campaign advertising demonstrates that its primary purpose is not the promotion of social welfare. | Lois Lerner | IRS0000262668-69 |
| October 14, 2010 | Sharon Camarillo tells Cindy Thomas that help from EO Technical is needed to work the ACORN successor cases. | Sharon Camarillo, Cindy Thomas | IRS0000054942-44 |

313

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| October 18, 2010 | Carter C. Hull prepares for his manager, Ronald Shoemaker, a memo describing his work to date on Tea Party cases. Hull indicates that the majority of the cases are under the jurisdiction of Cincinnati but that a 501(c)(3) and a 501(c)(4) application are being worked at HQ in Washington. He indicates that Cincinnati provides HQ with copies of the Tea Party files along with proposed development letters. Hull reviews the letters and provides comments to the agent in Cincinnati, Liz Hofacre. Hofacre then sends the development letters to the organizations. | Carter C. Hull | IRS0000165172-76. |
| October 19, 2010 | Ronald Shoemaker sends to Holly Paz the memorandum prepared by Carter C. Hull dated October 18, 2010, describing Hull's efforts to date in assisting Cincinnati develop its Tea Party applications. Attached to the memo is a list of 40 "Tea Party" cases that are pending in EO Determinations. Only 6 do not have the words, Tea Party, Patriots, Conservative, or 912 in their name. However, all of the cases on the list are Tea Party or conservative cases. According to Hofacre, this is because all of the cases have been selected for full development based on meeting the Tea Party screening criteria. | Ronald Shoemaker, Carter C. Hull | IRS0000165172-76 SFC Interview of Liz Hofacre, (Sep. 24, 2013) pp. 91-92 |
| October 19, 2010 | Lois Lerner addresses Duke University students on the effects of the Supreme Court's decision in *Citizens United*. Lerner says generally with regard to the decision that "[t]he Supreme Court dealt a huge blow, overturning a 100-year precedent that basically corporations couldn't give directly to political campaigns, and everyone is up in arms because they don't like it. The Federal Election Committee can't do anything about it. They want the IRS to fix the problem. The IRS laws are not set up to fix the problem." She goes on to state that "everyone is screaming at us right now 'fix it now before the election . . . see how much these people are spending.' I won't know until I look at their 990s next year whether they have done more than their primary activity as political or not. So I can't do anything right now." | Lois Lerner | https://www.youtube.com/watc h?v=EH1ZRyq-1iM |
| October 24, 2010 | Cindy Thomas asks Holly Paz for an EO Technical employee to assist with the ACORN successor cases. | Cindy Thomas, Holly Paz | IRS0000054942-44 |

Exhibit E

314

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|----------------------|-----------|
| October 26, 2010 | Cindy Thomas expresses her concern to Holly Paz about the manner in which the Tea Party cases are being worked. She questions why Carter C. Hull needs to review every development letter and notes that this results in EO Determinations "just 'sitting' on these cases." She asks Paz for a template development letter to use and states that there are now 45 of these cases pending. | Cindy Thomas, Holly Paz | IRS0000435238-39 |
| October 26, 2010 | Matthew Giuliano sends Sharon Baker a copy of the Memo dated October 18, 2010, prepared by Carter C. Hull that describes how Tea Party applications are being reviewed by the IRS. Baker concludes that the document is not responsive to the FOIA request "since it occurred after the FOIA request was received in our office." | Matthew Giuliano, Sharon Baker | IRSC003755-61 |
| October 27, 2010 | Carter C. Hull prepares an SCR for October for Albuquerque Tea Party and American Junto, the Tea Party cases assigned to him. No new information is included, except that the estimated closing date is now March 2011. | Carter C. Hull, Ronald Shoemaker | IRS0000164329-30 |
| November 3, 2010 | Holly Paz sends Lois Lerner and Robert Choi an SCR summary chart for November 2010. The chart indicates that there are now 40 applications from Tea Party groups pending in Cincinnati. The chart also has an entry for four Emerge cases that were received on January 11, 2008. | Holly Paz, Lois Lerner, Robert Choi | IRS0000156478-81 |
| November 4, 2010 | Lois Lerner asks Nanette Downing and Judith Kindell if the Democracy 21 letter of October 5, 2010, alleging that Crossroads GPS was acting inconsistently with tax exempt status, has been sent to "Dallas" (EO Exams). Mike Seto advises that Democracy 21's allegation was sent to "Dallas" on November 2, 2010. | Lois Lerner, Nanette Downing, Judith Kindell | IRS0000459877-95 |
| November 16, 2010 | The BOLO listing is updated to reflect that Ronald Bell is now coordinator for Tea Party cases. The description of Tea Party cases continues to read as follows: "[t]hese cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)." | Ron Bell | IRS0000352978-84 |

Exhibit E

315

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| November 16-17, 2010 | Carter C. Hull requests cases files and development letters from Ron Bell. Bell's advises Steve Bowling, Group 7822 Manager, of Hull's request. Bowling then asks Sharon Camarillo, Area Manager, how to proceed with the Tea Party cases. He informs Camarillo that Bell is telling applicants who call to inquire about their application that "the case is under review." Camarillo asks Cindy Thomas and she states that she will check with Holly Paz. | Ron Bell, Steve Bowling, Cindy Thomas | IRS0000163029-30 |
| November 17, 2010 | Paz discusses with Thomas the issues surrounding the backlog of Tea Party cases Thomas raised on October 26, 2010 and tells her that a template letter isn't feasible because the cases present different issues. Paz tells Thomas that EO Technical is planning on discussing these issues with Judith Kindell, Senior Technical advisor to the EO Director, Lois Lerner. | Holly Paz, Cindy Thomas, Judith Kindell | IRS000435238 |
| November 2010 | Carter C. Hull speaks to Ronald Bell once or twice, but never receives any development letters from Bell. | Carter C. Hull, Ronald Bell | SFC Interview of Carter C. Hull (July 23, 2013) not transcribed |
| November 18, 2010 | Carter C. Hull prepares an SCR for the two Tea Party cases under his review. The SCR indicates that Hull will draft a proposed favorable ruling for Albuquerque Tea Party, the 501(c)(4) Tea Party applicant. by December 13, 2010, and will request limited additional information from American Junto, the 501(c)(3) Tea Party applicant. Hull indicates that he is continuing to coordinate with Cincinnati on the development letters. The estimated closure date is January 31, 2011. | Carter C. Hull, Ronald Shoemaker | IRS0000164331-33 |
| November 29, 2010 | EO Determinations sends a development letter to a voter registration organizations applying for 501(c)(3) status. | Grant Herring | IRS0000631009-13 |
| November 26, 2010 | Holly Paz responds to Cindy Thomas's request for EO Technical assistance with the ACORN successor cases telling her to work with Chip Hull on those cases. | Holly Paz, Cindy Thomas | IRS0000054942-44 |
| December 13, 2010 | Holly Paz informs Cindy Thomas that FO Technical is finishing a proposal to approve the 501(c)(4) case being worked in EO Technical and that upon completion, EO Technical will discuss it with Judith Kindell. Paz states that EO Technical is evaluating the response received from the 501(c)(3) organization and that it expects to discuss that case with Kindell in January 2011. | Holly Paz, Cindy Thomas | IRS0000435238-39 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| December 13, 2010 | Carter C. Hull prepares an SCR for the two Tea Party cases under his review. The SCR indicates that Hull will prepare a proposed favorable ruling for Albuquerque Tea Party, the 501(c)(4) organization, by January 15, 2011, and a proposed denial for American Junto, the 501(c)(3) organization, by January 31, 2011. Hull indicates that he is continuing to coordinate with Cincinnati on the development letters. | Carter C. Hull, Ronald Shoemaker | IRS0000165343-44 |
| December 17, 2010 | Siri Buller prepares an SCR on four Emerge groups seeking 501(c)(4) status. The Emerge organizations recruit women who belong to the Democratic Party and train them in campaign-related skills. The SCR indicates that the applications will be denied based on substantial private benefit to the Democratic party. | Siri Buller | IRS000015931314 |
| January 6, 2011 | Sharon Baker's manager, Marie A Twarog, responds to the June 3, 2010 FOIA request, advising the journalist that "I found no documents specifically responsive to your request." | Sharon Baker, Marie Twarog | IRSC003765 |
| January 10, 2011 | Carter C. Hull completes a draft memo concluding that tax exemption should be granted to Albuquerque Tea Party, the 501(c)(4) organization that has been under his review since April 2010. | Carter C. Hull | IRS0000013885-86 |
| January 10, 2011 | Steven Grodnitzky informs Michael Seto that "the proposed denial for Emerge Maine will be issued to the taxpayer. This is the case in which the organization is training Democratic women for politics. We are relying on a private benefit denial, similar to the American Campaign Academy case, although this is a (c)(4)." | Steven Grodnitzky, Michael Seto | IRS0000012237 |
| January 11, 2011 | Carter C. Hull refers the draft memo recommending granting exemption to Albuquerque Tea Party, the 501(c)(4) organization, to his reviewer, Liz Kastenberg. Kastenberg reviews the memo and recommends sending it to Judith Kindell for review. | Carter C. Hull, Liz Kastenberg | IRS0000001323-24 SFC Interview of Carter C. Hull, (July 23, 2013) not transcribed |
| January 24, 2011 | Carter C. Hull prepares an SCR for the two Tea Party cases under his review. The SCR indicates that Hull has prepared a proposed favorable memo on Albuquerque Tea Party, the 501(c)(4) organization, and forwarded it for review. Hull indicates that he is continuing to coordinate with Cincinnati on the development letters. | Carter C. Hull, Ronald Shoemaker | IRS0000166302-03 |

317

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| February 1 – 2, 2011 | Mike Seto, Acting Manager EO Technical, sends an SCR table to Lois Lerner. She responds "Tea Party Matter very dangerous – This could be the vehicle to go to court on the issue of whether *Citizen's United* overturning the ban on corporate spending applies to tax exempt rules." Lerner indicates that Counsel and Judy Kindell need to be involved with these cases and that they should not be handled by Cincinnati. Holly Paz responds by advising Lerner that Carter Hull is supervising the cases handled by Cincinnati at every step and that no decision will be made on those cases until the review of the 501(c)(3) and 501(c)(4) cases are completed by EO Technical. Lerner notes that "even if we go with a 4 on the Tea Party cases, they may want to argue they should be 3s, so it would be great if we can get there without saying the only reason they don't get a 3 is political activity." | Lois Lerner, Holly Paz | IRS0000159431-33 |
| February 2, 2011 | The BOLO spreadsheet is updated. The reference to Tea Party cases now reads "[o]rganizations involved with the Tea Party movement applying for exemption under 501(c)(3) or 501(c)(4)." The spreadsheet also indicates that the cases are being coordinated with Chip Hull in EO Technical. | Ron Bell | IRS0000352978-84 |
| February 3, 2011 | Mike Seto, Acting EO Technical Manager, informs Cindy Thomas that Carter C. Hull's memo recommending exemption for the 501(c)(4) is done and will be sent to Judith Kindell shortly. Seto states that the "timeline with the c3 application is near the end of Feb." | Mike Seto, Cindy Thomas | IRS0000620724-26 |
| February 14, 2011 | Siri Buller prepares a Sensitive Case Report on four Emerge cases. | Siri Buller | IRS0001164849-50 |
| February 18, 2011 | Holly Paz requests information about the TAG Group from Cindy Thomas, at Lois Lerner's request. | Holly Paz, Cindy Thomas | IRS0000008593-602 |
| February 24, 2011 | Carter C. Hull prepares an SCR for the two Tea Party cases under his review. The SCR indicates that Hull will draft a denial for American Junto, the 501(c)(3) organization, by February 28, 2011. Hull states that he is continuing to coordinate with Cincinnati on the development letters. | Carter C. Hull, Ron Shoemaker | IRS0001164335-36 |
| March 4, 2011 | A revenue agent from EO Determinations asks Carter Hull to discuss "four exemptions applications for organizations that previously operated as ACORN" that are being held in Cincinnati EO Determinations. | Carter C. Hull, John McGee | IRS0000631878 |

Exhibit E

318

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| March 11, 2011 | Lois Lerner asks Holly Paz and Cindy Thomas to "schedule a status on TAG and have a seriously discussion of the pros and cons...I want to better understand its utility and explore whether we should maintain it as is, or get rid of it altogether." [sic] | Lois Lerner, Holly, Paz, Cindy Thomas | IRS000008593-602 |
| March 16, 2011 | Thomas responds to Paz regarding Lerner's TAG concerns by explaining that the BOLO list includes TAG cases as well as cases that represent "emerging issues," like the Tea Party cases. She explains that the purpose of "assigning 'emerging issue' cases to one designated group is so that: 1) we are consistent in our approach in working these cases, and 2) we can minimize time charges to cases. When we have an emerging issue category, the applications have many similarities." Thomas writes that the Tea Party cases are the only current "emerging issue" entry on the BOLO list.<br><br>Thomas attaches the latest version of the BOLO spreadsheet. The BOLO list provided to Paz contains an entry for the Tea Party under Emerging Issues as follows: "Organizations involved with the Tea Party movement applying for exemption under 501(c)(3) or 501(c)(4)." Under the "Disposition of Emerging Issue" heading, the BOLO states: "Forward case to Group 7822. Ron Bell (coordinator). Cases are being coordinated with EO Tech – Chip Hull." | Holly Paz, Cindy Thomas | IRS000008593-602 |
| March 17, 2011 | Siri Buller submits an SCR for four Emerge cases. She notes that three proposed denials have been submitted. | Siri Buller | IRS0000159499 |
| March 21, 2011 | Carter C. Hull prepares an SCR for the two Tea Party cases under his review. The SCR now indicates that a proposed denial for American Junto was forwarded for review on March 2, 2011. | Carter C. Hull, Ron Shoemaker | IRS00001164450-51 |
| March 29, 2011 | Carter C. Hull sends his draft memo recommending granting exemption to the 501(c)(4) organization to Judith Kindell for her review. | Carter C. Hull, Judith Kindell | IRS0000001323-24 |
| March 30, 2011 | Cindy Thomas is informed that the IRS has received Congressional inquiries regarding the status of two Tea Party applications. Thomas expresses to Mike Seto her concern regarding these inquiries and suggests that a plan be developed for completing the cases, otherwise the inquiries will eventually turn into Tax Payer Assistance Orders (TAO). | Cindy Thomas, Mike Seto | IRS0000576953-55 (Email attachments containing taxpayer information omitted by SFC staff) |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| March 31, 2011 | Cindy Thomas advises Steve Bowling that since EO Technical is still working on the two Tea Party cases, "[w]e still need to continue to work cases to the extent we can and then wait to issue the approval or denial letter. EOT needs to meet with Judy Kindell . . . and then with Lois Lerner before they can finalize the guidance for us." Bowling apparently fails to convey this message to Ronald Bell. | Cindy Thomas, Steve Bowling | IRS000576953-55 SFC Interview of Ronald Bell, (July 30, 2013) not transcribed |
| April 6, 2011 | Carter C. Hull and Liz Kastenberg meet with Judith Kindell to discuss Hull's draft recommendation regarding the 501(c)(4) organization. Kindell advises Hull and Kastenberg to send the recommendation to the Office of Chief Counsel for its review. According to Hull, it was not normal procedure for Kindell to get involved with specific cases. Hull says it is rare that he consults with others about his recommendations. Those recommendations are always reviewed, but the extra step of consulting with Kindell or another who was not a reviewer is not typical. According to Hull, Kindell neither agrees nor disagrees with the recommendation. She does not explain to him why the case needed to be reviewed by the Chief Counsel's office. Hull thinks that this decision is odd since under IRS procedures, only denials of 501(c)(3) applications are required to be reviewed by IRS Chief Counsel, and not approvals of applications for 501(c)(4) status. | Carter C. Hull, Liz Kastenberg, Judith Kindell | IRS0000001323-24 SFC Interview of Carter C. Hull, (July 23, 2013) not transcribed |

320

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| April 7, 2011 | Judith Kindell informs Lois Lerner and Holly Paz that she just spoke to Carter C. Hull and Liz Kastenberg about two Tea Party applications that they are working on. Kindell states: "I recommended that they develop the private benefit argument further and that they coordinate with Counsel. They also mentioned that there are a number of other (c)(3) and (c)(4) applications of orgs related to the Tea Party that are currently in Cincinnati." Kindell recommends that all the Tea Party cases in Cincinnati be worked in DC because of their sensitivity, the need to coordinate with Counsel, and the fact that there are TAS inquiries on some of the cases. Paz states in response: "With so many EOT and Guidance folks tied up with ACA (cases and Guidance) and the possibility looming that we may have to work reinstatement cases up here to prevent a backlog in Determs, I have serious reservations about our ability to work all of the Tea Party cases out of this office." Lois Lerner replies to Paz and Kindell as follows: "yes but these could blow up like crazy if the Determs folks let one out incorrectly – think MN Firefighters. Can Cindy have all of them assigned to one or two folks who don't make a move without Counsel/Judy involvement?" | Lois Lerner, Holly Paz, Judith Kindell | IRS000063444 |
| April 7, 2011 | Holly Paz informs Lois Lerner that the Tea Party applications "are currently being assigned to one group. They consult with Chip on all development. They have been told not to issue determs until we work through the test cases we have here." | Holly Paz, Lois Lerner | IRS000350220-21 |
| April 25, 2011 | Carter C. Hull prepares an SCR for the two Tea Party cases under his review. The SCR now indicates that he is drafting additional development letters for both the 501(c)(3) and (c)(4) organizations. Estimated closure date is July 31, 2011.<br><br>Siri Buller prepares an SCR for four Emerge Cases. Final adverse determinations were made in regard to three of the organizations. A proposed denial was issued for the final organization. | Carter C. Hull, Ron Shoemaker | IRS000166555-57<br>IRS000163645-46 |
| May 10, 2011 | Lois Lerner asks Nan Downing to find out the circumstances surrounding the referral from TE/GE Exams to E&G on gift tax. Lerner expresses her view that the IE/GE Exams employee who made the referral failed to notify his managers before making the referral to E&G. Lerner says: ". . . we ensure that all our sr managers are aware of all highly visible hot button issues. Our job is to report up to our bosses on anything that might end up on the front page of the NY Times." | Lois Lerner, Nan Downing | IRS00000149170-20 |

321

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| May 17, 2011 | Carter C. Hull prepares an SCR for the two Tea Party cases under his review. The SCR notes that the proposed favorable ruling on the application by Albuquerque Tea Party, the 501(c)(4) organization, was sent to Chief Counsel for review on May 4, 2011 and that an additional development letter was sent to American Junto, the 501(c)(3) organization, on April 27, 2011. Estimated closure date is July 31, 2011. | Carter C. Hull, Ron Shoemaker | IRS0000164425-27 |
| May 25, 2011 | Carter C. Hull sends his draft recommendation on Albuquerque Tea Party, the 501(c)(4) case, to a contact person in the Office of the Chief Counsel. | Carter C. Hull | IRS0000001323-24 |
| May 26, 2011 | Nanette Downing advises Lois Lerner that EO Exams has received two referrals on Crossroads GPS. Lerner tells Downing that in addition to the referrals, the organization has applied for 501(c)(4) status. She indicates that she has scheduled a meeting with Holly Paz, Mike Seto, David Fish, and Judith Kindell to discuss what is happening with this organization. Holly Paz informs Lerner that the application for this organization has just arrived from Cincinnati. Lerner states "Cindy tells me there is a whole passel of "tea party related" cases being worked in Cincy that Chip is overseeing/coordinating?'" She also states "I'm told Chip Hull is heading this up—scaring me - can I get a briefing?" | Lois Lerner, Holly Paz, Nanette Downing | IRS0000196482 IRS0000196483-84 IRS0000196488-89 |
| June 1, 2011 | Elizabeth Kastenberg, Tax Law Specialist, EO Technical, emails Carter C. Hull two cases that are denials of 501(c)(4) status based on political activity. | Carter C. Hull, Elizabeth Kastenberg | IRS0000012166-76 |
| June 1, 2011 | Holly Paz requests that Cindy Thomas provide her with the following: (1) A copy of the Grassroots Policy Strategies application. Paz states that "Lois wants Judy to take a look at it so she can summarize the issues for Lois." (2) The criteria used to label a case a "Tea Party case." She tells Thomas that "[w]e want to think about whether those criteria are resulting in over-inclusion." She also tells Thomas that "Lois wants a briefing on these cases. . . We're aiming for the week of 6/27." | Holly Paz, Cindy Thomas | IRS0000066837-40 |
| June 1, 2011 | Brenda Melahn informs Holly Paz that she will send her the Crossroads Grassroots Policy Strategies application by UPS on June 2, 2011. | Brenda Melahn, Holly Paz | IRS0000066839 |

Exhibit E

322

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| June 2, 2011 | Cindy Thomas asks John Shafer, Manager of the Screening Group, for the "criteria screeners use to label a case as a "tea party case."" Thomas asks Shafer "how do we know an applicant is involved with the tea party movement?" | Cindy Thomas, John Shafer | IRS000066839 |
| June 2, 2011 | John Shafer asks Gary Muthert and several other screeners (Dale Schaber, Roger Vance) what criteria they use to identify an applicant organization as a Tea Party group. Based on the information he receives from the screeners, Shafer informs Cindy Thomas that "[t]he following are issues that could indicate a case to be considered a potential "tea party" case and sent to Group 7822 for secondary screening.<br><br>1. "Tea party," "Patriots" or "9/12 Project" is referenced in the case file.<br>2. Issues include government spending, government debt and taxes.<br>3. Educate the public through advocacy/legislative activities to make America a better place to live.<br>4. Statements in the case file that are critical of how the country is being run."<br><br>Thomas forwards Shafer's email to Paz. | Cindy Thomas, Holly Paz, John Shafer | IRS000066838<br>SFC Interview of John Shafer, (Sep. 17, 2013) pp. 111-114<br>SFC Interview of Cindy Thomas, (July 25, 2013) pp. 40-41 |
| June 3 - 6, 2011 | Cesar Sabando, an EO Exams employee, tells Peggy Combs that he is on the Classification Referral Committee and is investigating a complaint about an organization named Crossroads Grassroots Policy Strategies. He asks Combs if there is a 1024 pending on the organization. Thomas tells Combs to tell Sabando that there is an application pending. She writes in an email to Ronald Bell that "Lois Lerner asked me about this case on May 26 after Steve Miller asked her about it. I told Lois that it was assigned to you and that you were coordinating these cases with EOT (Chip Hull) who is working with her senior technical advisor (Judy Kindell)."<br><br>Cindy Thomas writes in an email to Steven Bowling, "After receiving and reviewing the [Crossroads] application, Holly sent an email and asked questions about criteria being used to identify cases as 'tea party cases.' The D.C. office thinks the criteria being used may be resulting in over-inclusion. They think Crossroads is associated with the Republican Party, not necessarily the Tea Party." | Cindy Thomas, Ronald Bell, Steven Bowling | IRS000510245-46 |

Exhibit E

323

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| June 21, 2011 | Mike Seto tells Carter C. Hull and Hilary Goehausen that there will be a briefing for Lois Lerner and Holly Paz to inform them of EO Technical's review of two applications from Tea Party organizations and the assistance that EO Technical has provided to EO Determinations. He asks for Hull's memos in which Hull recommended denial of one group and approval of the other. Seto also provides his vision for a memo to Lerner on the two Tea Party applications that explains the cases. Seto subsequently tells Holly Paz that if the memo can't be prepared in time, that he will ask for a postponement of the meeting with Lerner. | Mike Seto, Lois Lerner Holly Paz, Carter C. Hull | IRS0000168069 |

324

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| June 27, 2011 | In preparation for the meeting requested by Lois Lerner to discuss the processing of Tea Party applications, Justin Lowe develops a briefing paper and sends it Holly Paz, Mike Seto, Carter Hull, Hilary Goehausen, and others. The paper indicates that EOD Screening identified as an "emerging issue" a number of 501(c)(3) and (c)(4) applications by organizations "advocating on issues related to government spending, taxes and related matters." These applications are sent to a specific group if they meet any of the following criteria: <br><br> • "Tea Party," "Patriots," or "9/12 Project" is referenced in the case file. <br><br> • Issues include Government spending, Government debt, or taxes. <br><br> • Education of the public via advocacy/lobbying to "make America a better place to live." <br><br> • Statements in the case file criticize how the country is being run. <br><br> The briefing paper also notes that: <br><br> • Over 100 cases that meet these criteria have been identified so far, but only two 501(c)(4) organizations have been approved. <br><br> • EOT is assisting EOD by reviewing files and editing development letters; and <br><br> • EOD requests guidance on how to process the cases to ensure uniformity. <br><br> Among the suggestions for "next steps," the briefing paper proposes that EOT prepare a check sheet or Guidesheet that would consist of "a list of issues or political/lobbying indicators to look for when investigating potential political intervention and excessive lobbying . . . ." | Holly Paz, Hilary Goehausen, Justin Lowe, Carter C. Hull | IRS00004311165-66 <br> SFC Interview of Justin Lowe, (June 20, 2013) not transcribed |

Exhibit E

325

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| July 5, 2011 | Lois Lerner conducts a meeting with Holly Paz, Nancy Marks, Cindy Thomas, Carter Hull, Hilary Goehausen and others on the processing of Tea Party cases. Lerner directs that the applicants no longer be called "Tea Party" groups but rather "advocacy organizations" and that Thomas change the "Tea Party" reference in the BOLO to "Advocacy Orgs." Lerner also approves the development of a Guidesheet by EO Technical to be used as a tool to assist EO Determinations in the processing of applications that present political advocacy issues. She further sanctions the continued development of the "test cases" assigned to Carter C. Hull as an added means of assisting EO Determinations process the applications. A suggestion is made during the meeting that the cases could be approved and then examined subsequently by the Review of Operations (ROO) to see if the groups' actual activities are consistent with exempt status. Lerner rejects the notion on the basis that the ROO has insufficient resources to examine all the approved Tea Parties. | Lois Lerner, Holly Paz, Nancy Marks, Cindy Thomas, Carter C. Hull, Hilary Goehausen, Justin Lowe | IRS0000620735-40 SFC Interview of Holly Paz, (July 26, 2013) pp. 86-93 SFC Interview of Carter C. Hull, (July 23, 2013) not transcribed SFC Interview of Hilary Goehausen, (July 11, 2013) not transcribed |
| July 5, 2011 | Thomas changes the Emerging Issues tab of the BOLO spreadsheet by deleting the reference to "Tea Party" in accordance with Lerner's directive. In its place she inserts a new issue called "Advocacy Orgs." and describes the issue as "[o]rganizations involved with political, lobbying, or advocacy for exemption under- 501(c)(3) or 501(c)(4)." In an email to Ronald Bell and Steve Bowling, she indicates that she might also change the EO Technical contact person, pending further word from Washington D.C. Thomas then sends an email to her managers and informs them of the removal of the reference to "tea party cases" from the BOLO. Thomas explains Lerner's rationale for the change as follows: "Lois expressed concern with the 'label' we assigned to these cases. Her concern was centered around the fact that these type things can get us in trouble down the road when outsiders request information and accuse us of "picking on" certain types of organizations . . ." Thomas continues as follows: "Lois did want everyone to know that we are handling the cases as we should, i.e., the Screening Group starts seeing a pattern of cases and is elevating the issue." During the call, Lerner apprises Thomas that Washington D.C. will prepare a document to assist Cincinnati work the political advocacy cases. | Cindy Thomas, Steve Bowling, Ronald Bell, John Shafer | IRS0000620735-40 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| July 2011 | After Cindy Thomas changes the description of political advocacy cases in July 2011, screeners review applications to see if there is an indication of possible political activity. According to Bell, absent any such indication, the mere presence of the name "Tea Party" in the application is enough to warrant assigning the case to Group 7822 for full development. | Ronald Bell | SFC Interview of Ronald Bell, (July 30, 2013) not transcribed |
| July 6, 2011 | Hilary Goehausen prepares a summary for Mike Seto of the "next steps" decided at the July 5, 2011 meeting with Lois Lerner on Tea Party cases. Included among the next steps are the following:<br><br>• EO Technical will develop and draft a checksheet for Cincinnati to use when working c3/c4 "advocacy organization" applications to assist in spotting issues associated with these types of cases.<br>• Cincinnati will send 15-20 developed cases to EO Technical in order for EO Technical to review.<br>• Require c3/c4 "advocacy organizations" to make certain representations regarding compliance with the checksheet and certain issues (i.e. they won't politically intervene) in order to pin them down in the future if they engage in prohibited activities.<br>• Cincinnati will also look to see if these organizations have registered with the FEC and if so, they should ask additional questions. | Hilary Goehausen, Mike Seto | IRS000487709 |
| July 11, 2011 | Ronald Bell sends an email attaching the revised BOLO list to EO Determinations staff and management. The reference to "Tea Party" is deleted and replaced with "Advocacy Orgs." The BOLO now describes these cases as "[o]rganizations involved with political, lobbying, or advocacy for exemption under 501(c)(3) or 501(c)(4)." While Bell's covering email advises to "be on the lookout" for organizations seeking exemption under 501(c)(3) that provide "green" energy, the email fails to alert recipients to the change in the Tea Party/Advocacy Orgs. criteria. | Ronald Bell | IRS000352978-84<br>IRS000618365-70<br>SFC Interview of Ronald Bell, (July 30, 2013) not transcribed |
| July 11, 2011 | Ronald Bell tells Steve Bowling that the ACORN entry on the BOLO list needs to be updated because Chip Hull was no longer the correct contact person at EO Technical for these cases. | Ronald Bell, Steve Bowling, Chip Hull | IRS000054945-46 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| After July 11, 2011 | Gary Muthert, a screener in EO Determinations, continues to send cases that include the terms "Tea Party," "9/12," or "Patriots" to general inventory for full development even after the BOLO criteria is changed. His Manager, John Shafer, says he made no changes or adjustments to the way Tea Party cases are being screened by his staff. Shafer views Cindy Thomas' email of July 5, 2011 wherein she states that "Lois did want everyone to know that we are handling the cases as we should . . ." as affirmation that the screening process is fine. | Gary Muthert, John Shafer | SFC Interview of Gary Muthert, (July 30, 2013) not transcribed SFC Interview of John Shafer, (Sep. 17, 2013) pp. 120-123 |
| July 19, 2011 | Lois Lerner's computer hard drive fails.  She requests that IRS IT personnel make an effort to recover the data on the hard drive, some of which Lerner characterizes as "irreplaceable." | Lois Lerner, Carl T. Froehlich | IRS000651448-50 |
| July 19, 2011 | Holly Paz provides background information to Janine Cook about a meeting that Lois Lerner has scheduled for the following week to discuss an apparent increase in the number of applications for exemption under 501(c)(3) and (c)(4) filed by organizations "advocating on issues related to government spending, taxes and similar matters.  Often there is possible political intervention or excessive lobbying."  Paz goes on to state that "[w]e suspect that we will have to approve the majority of the c4 applications. . . we plan to have EO Technical compose some informal guidance re: development of these cases (e.g., review websites, check to see whether org is registered with FEC, get representations re: the amount of political activity, etc.). . . We will also refer these organizations to the Review of operations for follow-up in a later year." | Holly Paz, Janine Cook | IRS000429489 |
| July 20, 2011 | A New York Times reporter asks why some Emerge groups were approved for tax-exempt status while others were not. Lois Lerner asks Holly Paz, Judith Kindell, and Nannette Downing for assistance in "determining why some [of the Emerge cases] were approved and what, if anything has occurred with them since approval." | Lois Lerner, Holly Paz, Judith Kindell, Nanette Downing | IRS000623704 IRS000196669 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|------------|------------------------|-----------|
| July 20, 2011 | Lillie Wilburn, Field Director, IRS IT Customer Service Support, advises Lois Lerner that "I checked with the technician and he still has your drive. He wanted to exhaust all avenues to recover the data before sending it to the "hard drive cemetery." Unfortunately, after receiving assistance from several highly skilled technicians including HP experts, he still cannot recover the data." Wilburn tells Lerner that she will explore the possibility of securing technical assistance in recovering the data from one additional source, and update Lerner on those developments when appropriate. | Lillie Wilburn, Lois Lerner | IRS0000651448-50 |
| July 22, 2011 | Carter C. Hull prepares an SCR on the two Tea Party cases assigned to him. The SCR notes that the proposed favorable determination for Albuquerque Tea Party was forwarded to Chief Counsel on June 16, 2011, and that the proposed denial for American Junto was revised to reflect additional information received from the applicant and sent to a reviewer on July 19, 2011. Estimated closure date is July 31, 2011. | Carter C. Hull, Ron Shoemaker | IRS0000163722-23 |
| July 23 - 24, 2011 | Mike Seto informs staff that Justin Lowe is the new contact person for EO Determinations on political advocacy cases. He states that "Justin will work with Hilary Goehausen and Chip Hull, who are initiators on political advocacy cases pending in EOT." Seto informs Goehausen to draft a Guidesheet for EO Determinations agents to use when working political advocacy cases, and directs Lowe to review the Guidesheet. <br><br> Mike Seto directs that the Tea Party cases be reassigned to Hilary Goehausen and that the name on the SCR be changed from "Tea Party" to "political advocacy organization." | Mike Seto, Hilary Goehausen, Carter C. Hull | IRS0000644018 <br> IRS0000159753-63 |
| Week of July 25, 2011 | Lois Lerner convenes a meeting with representatives of Chief Counsel to discuss the political advocacy cases. They discuss the possibility of developing a model template of development questions for EOD agents to use in processing political advocacy cases. | Nancy Marks, Holly Paz, Janine Cook, Don Spellman | IRS0000635899-90 |
| July 27, 2011 | The BOLO is revised to note that Ron Bell is coordinating the cases with Justin Lowe. | Ron Bell | IRS0000352978-84 |

Exhibit E

329 of 379

329

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| July 27, 2011 | Democracy 21 and Campaign Legal Center file with the IRS a "Petition for Rulemaking on Campaign Activities by Section 501(c)(4) Organizations." The "Petition" calls on the IRS to revise existing regulations to preclude political campaign advocacy by organizations with 501(c)(4) tax-exempt status. The "Petition" describes Crossroads GPS as an organization engaged primarily in political campaign intervention, but that operates as a 501(c)(4) tax exempt entity, contrary to the requirements of the law. | | IRS000517176-96 http://www.democracy21.org/u ploads/D21 and CLC Petition _to_IRS_7_27_2011.pdf |
| July 27, 2011 | Lois Lerner forwards a copy of the "Petition" submitted by Democracy 21 to Ruth Madrigal, Office of Tax Policy, Department of the Treasury, stating to Madrigal "[t]hought you might be interested." | Lois Lerner, Ruth Madrigal | IRS0000196795-96 |
| July 31, 2011 | Mike Seto prepares an SCR summary chart indicating that EO Technical is developing both a 501(c)(3) Tea Party application and a 501(c)(4) Tea Party Application. A proposed favorable determination for the 501(c)(4) organization is also under review. The SCR indicates that the two cases were discussed with Judith Kindell on April 6, 2011 and that based on that discussion, additional development letters were sent out. The proposed favorable ruling was forwarded to Chief Counsel for comment on May 4, 2011. A meeting was held with the Director EO on June 29, 2011, to discuss the two cases. | Mike Seto | IRS0000159753-63 |
| August 1, 2011 | Lillie Wilburn advises Lois Lerner that she has sent Lerner's damaged hard drive to the IRS' Criminal Investigations forensic lab to attempt data recovery. | Lillie Wilburn, Lois Lerner | IRS0000651448-50 |
| Early August 2011 | Don Spellman and other representatives of the Office of the Chief Counsel meet with Carter C. Hull, Hillary Goehausen, Mike Seto and others to discuss the two 501(c) cases that Chief Counsel reviewed and are sending back to EO Technical with the recommendation that EO Technical "factually develop the election year of 2010." Also discussed is the "checksheet" that EO Technical is preparing, and IRS guidance and case law on the standard for exemption under 501(c)(4). | Don Spellman, Carter C. Hull, Hillary Goehausen, Mike Seto, David Marshall, Amy Franklin | IRS0000635899-90 |
| August 4, 2011 | Justin Lowe asks Holly Paz if the Office of Chief Counsel will review the "checksheet" prior to its issuance to EO Determinations. Paz answers "Yes." | Holly Paz, Justin Lowe | IRS000435479 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| August 4, 2011 | After performing several unsuccessful procedures to try to recover data on Lois Lerner's failed computer hard drive, John Minesk, Investigative Analyst, IRS – Criminal Investigations, advises Lillie Wilburn, IRS IT Field Director, that "[a]nother option is an outside data recovery service." Wilburn responds as follows:  ". . . there's no need to continue." | John Minesk, Lillie Wilburn | IRSC038572-77 |
| August 5, 2011 | Lillie Wilburn informs Lois Lerner that data recovery attempts on Lerner's hard drive failed because sectors of the hard drive were bad. | Lillie Wilburn, Lois Lerner | IRS0000651448-50 |
| August 10, 2011 | Don Spellman and other representatives of the Office of the Chief Counsel meet with Carter C. Hull, Hilary Goehausen, Mike Seto and others to discuss the two 501(c) cases that Chief Counsel reviewed and are sending back to EO Technical with the recommendation that EO Technical "factually develop the election year of 2010." Also discussed is the "checksheet" that EO Technical is preparing, and IRS guidance and case law on the standard for exemption under 501(c)(4). | Don Spellman, Carter C. Hull, Hilary Goehausen, Mike Seto, David Marshall, Amy Franklin | IRS0000635899-90 IRS0000520827-41 |
| August 17, 2011 | Carter C. Hull prepares an SCR for the two Tea Party cases under his review. The SCR indicates that the draft proposed approval for Albuquerque Tea Party was returned for additional information and that he is preparing another development letter. The draft denial for American Junto is still pending with the reviewer. Estimated closure date is now December 31, 2011. | Carter C. Hull, Ron Shoemaker | IRS0000164564- 66 |
| September 15, 2011 | Cindy Thomas and Holly Paz agree that Hilary Goehausen and Justin Lowe will triage all of the political advocacy cases pending in EO Determinations and place them in the following general "buckets:" those that can be approved; those that require development; and those that should be denied. Thomas sends a list of those cases to Paz. | Cindy Thomas, Holly Paz | IRS0000429529 (Email attachment containing taxpayer information omitted by Committee staff) |
| September 16, 2011 | Mike Seto sends the August 31, 2011 SCR Report Table to Lois Lerner, Holly Paz and others.  The reference to "Tea Party" is changed to "Political Advocacy Organizations."  However, the stated issue is "whether a Tea Party organization meets the requirements under section 501(c)(3) and is not involved in political intervention." | Mike Seto, Holly Paz, Lois Lerner | IRS0000618548-57 |
| September 21, 2011 | Hilary Goehausen and Justin Lowe complete a draft "Advocacy Org. Guidesheet" and send it Judith Kindell, Carter C. Hull and others for comment. | Hilary Goehausen | IRS0000636285-97 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| September 21, 2011 | Holly Paz advises David Fish that there are over 100 "advocacy" cases pending in EO Determinations. Paz indicates her belief that "we cast the net too wide . . . and have held up cases that have nothing to do with lobbying or campaign intervention . . . We are tasking Hilary with the task of looking at these cases on TEDs and triaging them – identifying those that clearly are advocacy cases and those that are clearly not." | Holly Paz, David Fish | IRS0000010131 |
| September 27, 2011 | Carter C. Hull prepares an SCR for the two Tea Party cases assigned to him. The applicants are no longer referred to as "tea parties" but rather as "advocacy organizations." There are no further developments in either case. | Carter C. Hull, Ron Shoemaker | IRS000163744-46 |
| September 28, 2011 | Democracy 21 and Campaign Legal Center send Lois Lerner a letter requesting that the IRS investigate Crossroads GPS, Priorities USA, American Action Network, and Americans Elect to determine if they are ineligible for tax-exempt status under section 501(c)(4). | Lois Lerner | IRS000511970-93 http://democracy21.org/uploads /Letter_to_the_IRS_from_Dem ocracy_21_and_Campaign_Leg al_Center_9_28_2011.pdf |
| September 30, 2011 | Lois Lerner directs David Fish to send to Dallas (EO Exams) the Democracy 21 letter of September 28, 2011 calling for an investigation into Crossroads GPS, Priorities USA, American Action Network, and Americans Elect. | Lois Lerner | IRS000511994-2018 |
| September 30, 2011 | Lois Lerner asks Holly Paz and David Fish for "a status of where we are on revoking the determ letters of the other Emerge cases." | Lois Lerner | IRS0000640620 |
| October 4 - 6, 2011 | Cindy Thomas asks Mike Seto about the status of the Guidesheet. Seto responds that "[w]e have a draft on areas to watch out for, but it is being vetted and not completed yet." | Cindy Thomas, Mike Seto | IRS0000057399-426 |
| October 5, 2011 | Lois Lerner advises Nikole Flax that she is ready to meet with Steve Miller on political activity. | Lois Lerner | IRS0000463501 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| October 19, 2011 | Steve Miller meets with Lois Lerner, Nikole Flax, Nanette Downing, Nancy Marks and others to discuss a proposal to adopt the "Dual Track" review process for EO Examinations. Under Dual Track, the Review Of Operation (ROO) can initiate its own reviews of organizations for engaging in political activity inconsistent with their exempt purposes, based on an analysis of data collected from the organizations on the Form 990. These reviews would be in addition to reviews initiated as the result of referral from sources outside of EO Exams alleging that organizations are engaged in excessive political activity. The proposal is referred to as "Dual Track" because reviews can be initiated under one of two possible means: 1) as the result of data analytics, or 2) outside referrals. Under the Dual Track proposal, all referrals, whether resulting from data analytics or from outside sources, are sent to the ROO and tested to determine if the organization's return would have been otherwise selected for examination, and to review the Form 990 and other public information. Based on this test, the ROO can recommend that the organization be selected for examination, selected for a compliance check, or non-selected. The ROO's referral is then sent to the Political Action Review Committee, or PARC. The PARC reviews to ROO's recommendation and can either concur with it or modify it. If the organization is selected for examination or compliance check, the PARC also prioritizes the referral. High priority referrals are assigned to a group of agents and worked. All other referrals are dealt with under general exam procedures.<br><br>Miller approves the Dual Track proposal but decides that he wants to "bounce it off Doug [Shulman.]" | Lois Lerner, Steve Miller, Nikole Flax, Nancy Marks, Nanette Downing | IRS0000468121-28<br><br>SFC Interview of Steve Miller, (Dec. 12, 2013) pp. 76-78 |
| October 19, 2011 | Carter C. Hull prepares an SCR for the two advocacy cases assigned to him, Albuquerque Tea Party and American Junto. There are no changes from the prior month's entry. | Carter C. Hull, Ron Shoemaker | IRS000167129-30 |
| October 21, 2011 | The IRS revokes tax-exempt status for previous approved Emerge organizations. | David Fish | IRS000063631-32 |
| October 24, 2011 | Hilary Goehausen prepares comments on each of the political advocacy cases pending in EO Determinations. The comments are intended to assist EO Determinations agents process the cases. Thomas Lieber forwards those comments to Cindy Thomas. | Cindy Thomas | IRS0000057399-426 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| October 25, 2011 | Cindy Thomas reviews Hilary Goehausen's comments on the political advocacy cases and states to Mike Seto "[n]ot sure where this leaves us and I'm unclear as to what action is being suggested for some of these cases. . . . Also, where do we stand on the [Guidesheet]. . . . We're starting to get a lot of heat from the public on these cases sitting idle and now have Congressionals on some of these. What is the plan of action and estimated completion date?" | Cindy Thomas, Mike Seto | IRS000057399-426 |
| October 26, 2011 | Hilary Goehausen explains to Cindy Thomas her notations with regard to the cases that she reviewed. | Hilary Goehausen, Cindy Thomas | IRS000057399-426 |
| October 30, 2011 | Cindy Thomas expresses to Mike Seto her continued concern over Hilary Goehausen's comments on the cases reviewed by Goehausen. Thomas states that "[i]t was my understanding that from Holly that the cases were going to be put in buckets, i.e., those that can be approved as is, those that require additional development, and those that appear to be denials." Regarding the Guidesheet, Thomas tells Seto that "I'm not sure what the hold is on the document/guidance EOT is supposed to be providing for us . . ." Thomas expresses concern that continued delay in processing the political advocacy cases may result in Congressional inquiries. | Cindy Thomas, Mike Seto | IRS000057399-426 |
| November 2011 | Mike Seto reassigns Carter C. Hull's political advocacy cases to Hilary Goehausen. | Carter C. Hull, Mike Seto, Hilary Goehausen | SFC Interview of Carter C. Hull, (July 23, 2013) not transcribed |
| November 3, 2011 | Hilary Goehausen incorporates comments received from Carter C. Hull on the draft "Advocacy Org. Guidesheet." She sends a revised draft to Judith Kindell and others requesting comments and suggestions. | Hilary Goehausen | IRS000057352-65 |
| November 3, 2011 | Lois Lerner emails Mike Seto, Cindy Thomas, and others expressing her concern about the amount of work in Rulings and Agreements and how that work is being handled. She states her view that "we should be making prioritization decisions based on EO as a whole, not in our own stovepipes." She asks for reports on workloads, backlogs, and cases pending in the Chief Counsel's Office. | Lois Lerner, Cindy Thomas, Mike Seto | IRS0000162701-08 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| November 3, 2011 | In response to Lerner's email of the same date, Cindy Thomas advises Lois Lerner that there is a backlog of advocacy cases in EO Determinations. She indicates that there are more than 161 cases sitting idle in EO Determinations and that some of the cases date back to 2009. She states that EO Determinations has been waiting for a guidance/reference document from EO Technical. She expresses her concern that there will soon be Congressional inquiries and Taxpayer Assistance Orders to deal with in addition to processing the cases. She also tells Lerner that she instructed one of her Determinations agents to send another development letter out in a case just to buy time and prevent a taxpayer from contacting his Congressional office. | Lois Lerner, Cindy Thomas | IRS0000162845-46 (Email attachment containing taxpayer information omitted by Committee staff) |
| November 6, 2011 | David Fish, Acting Director for Rulings and Agreements, concludes that the guidesheet "won't work in its present form. I think we need to work with Determs to make it a usable document." | David Fish, Mike Seto, Cindy Thomas | IRS0000520827-41 SFC Interview of Holly Paz, (July 26, 2013) pp. 132-133 |
| November 15, 2011 | Cindy Thomas sends Hilary Goehausen's comments on the political advocacy cases to Judith Kindell, per the request of Lois Lerner. | Cindy Thomas, Lois Lerner, Judith Kindell | IRS0000057399-426 |
| November 15, 2011 | Hilary Goehausen prepares an SCR for Albuquerque Tea Party and American Junto, the two political advocacy cases that were reassigned from Carter C. Hull to her. Goehausen notes that a third development letter is being prepared for both organizations. She notes that EOT has reviewed approximately 160 political advocacy cases pending in EO Determinations. | Hilary Goehausen, Steve Grodnitzky | IRS0000163753-54 |
| November 15, 2011 | Steve Miller, Nikole Flax and others meet with Commissioner Douglas Shulman to apprise him of the proposed "Dual Track" process. Shulman approves the proposal. | Steve Miller, Douglas Shulman | SFC Interview of Steve Miller, (Dec. 12, 2013) p. 86 IRS0000468518-20 |
| November 22, 2011 | Mike Seto brings Cindy Thomas up-to-date on Hilary Goehausen's review of advocacy cases pending in EO Determinations. He advises Thomas that 162 cases have been screened; 12 may qualify for exemption, 15 may be denials; and the balance require further development. | Mike Seto, Cindy Thomas | IRS0000439824-26 |
| November 23, 2011 | Cindy Thomas provides Steve Bowling with a copy of the Guidesheet and tells Bowling "for those cases that EOT believes can be approved, I'd recommend you go ahead and have those cases worked now that the Guidesheet is available." | Cindy Thomas, Steve Bowling | IRS0000066140-66 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| November 28, 2011 | Mike Seto instructs Steve Grodnitzky to track all political advocacy cases in EO Technical. He tells Grodnitzky that Ron Shoemaker will screen the cases and that they will be assigned to Grodnitzky's Group. | Mike Seto, Steve Grodnitzky, Ronald Shoemaker | IRS0000012230 |
| Week of November 28, 2011 | Cindy Thomas replaces Ron Bell as Coordinator of political advocacy cases and installs Stephen Seok in his place. She meets with Seok and Steve Bowling to discuss the idea of forming a team of Determinations Unit Specialists to work the political advocacy cases (Advocacy Team). The Advocacy Team will be comprised of one GS-13 member of each of the EO Determinations Groups. | Cindy Thomas, Steve Bowling, Stephen Seok | IRS0000043982-4-26 |
| November 29, 2011 | Steve Grodnitzky asks Mike Seto if the advocacy cases are to receive "expedited" treatment. Seto responds by telling Grodnitzky that "[t]he advocacy cases are not expedited unless the taxpayer requested expedited treatment and the request was approved. The exceptions are the two cases that are on the SCRs." | Steve Grodnitzky, Mike Seto | IRS0000012231 |
| November 29, 2011 | An EO Determinations employee shares his questionnaire template with another employee working voter registration cases. | Grant Herring | IRS0000631168 |
| December 7, 2011 | Cindy Thomas announces the formation of the Advocacy Team, whose members will work on the political advocacy cases. Team members are: Stephen Seok (Coordinator); Ronald Bell; Janine Estes; Joseph Herr; Grant Herring; Mitch Steele; Carly Young; Jodi Garuccio; Annetta Morris; Gregory Woo; and Elizabeth Marquez. | Cindy Thomas | IRS0000436489-90 |
| December 9, 2011 | Liz Hofacre is named to the Advocacy Team. Mike Seto names Hilary Goehausen and Justin Lowe as EO Technical contacts for the Team. | Liz Hofacre | IRS0000043982-4-26 |
| December 12, 2011 | Stephen Seok sends a copy of the draft Guidesheet to the Advocacy Team. | Stephen Seok | IRS0000059316-28 |
| December 16, 2011 | Stephen Seok convenes the first meeting of the Advocacy Team. The Team discusses: the history of the advocacy cases; the purpose of the team; how the team will review the cases; and other matters. There are 172 political advocacy cases pending as of this date. | Stephen Seok | IRS0000013058-61 |

Exhibit E

336

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| December 29, 2011 | Hilary Goehausen prepares an SCR for the political advocacy cases that are assigned to her. She notes that the application from American Junto will be closed for failure to respond to a development letter. The estimated closure date for these cases is now December 31, 2012. | Hilary Goehausen | IRS0000163764-66 (Email attachment containing taxpayer information omitted by Committee staff) |
| January 9, 2012 | Cindy Thomas is sent an article from Tax Notes about Occupy groups applying for tax-exempt status with a note, "Elevating for consideration to add to BOLO." | Peggy Combs, Cindy Thomas | IRS0000013414-15 |
| January 18, 2012 | Stephen Seok informs Steve Bowling that 35 of the "170+" political advocacy cases have been assigned to the Advocacy Team and that he is reviewing development letters that will soon be ready to be released. Seok indicates that the Team will be creating template development questions in the near future. | Stephen Seok, Steve Bowling | IRS0000434203-08 |
| Various dates in January 2012 | The Advocacy Team begins to release development letters on the political advocacy cases. Team members use the questions in the Guidesheet when creating development questions to send to applicants for exemption. Many of the development letters contain intrusive and burdensome requests for information. | Advocacy Team | IRS0000483837-59 IRS0000626189-91 IRS0000455273-74 SFC Interview of Joseph Herr, (June 18, 2013) not transcribed |
| January 19, 2012 | Hilary Goehausen prepares an SCR for the political advocacy cases that have been assigned to her. Only the Albuquerque Tea Party application remains open and Goehausen notes that she is reviewing the latest response from the organization. Estimated closure date is May 2012. | Hilary Goehausen | IRS0000163774-75 |
| January 20, 2012 | Cindy Thomas tells Steven Bowling that the Occupy groups should be referred to his group so they can be worked "with the advocacy cases." Bowling agrees they should be worked with the advocacy cases and says the BOLO needs to be modified to "capture these as well as to try and weed out the ones that we do not want in this inventory…I know we don't want to use the words 'tea party' or 'occupy' but I'm not sure how we could weed out a simple advocacy type organization." Cindy Thomas suggests they speak to some other managers to see "if they have any ideas" on wording the revised entries on the BOLO. | Steven Bowling, Cindy Thomas, Cindy Thomas | IRS0000013418-19 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| January 24, 2012 | Bowling presents two options to Cindy Thomas to modify the BOLO list. The first scenario "is very general but we think it's better than what we currently have." The second scenario "is what is preferred; we think it is clear and to the point but if we can't site 'tea party' or 'occupy' then we don't need to consider it." [sic] <br><br> Thomas replies, "[w]e can't refer to 'tea party' cases because it would appear as though we're singling them out and not looking at other Republican groups or Democratic groups...How about a compromise – What do you think about changing the description for advocacy organizations on the Emerging Issues tab to that which you've included under scenario #1; then, you could include the Occupy description from your scenario #2 on the Watch For tab specifying that these cases should be referred to your group? We could still have the same grade 13 agents working the advocacy and Occupy cases." | Cindy Thomas, Steven Bowling | IRS000062814-17 |
| January 25, 2012 | Steve Bowling changes the BOLO spreadsheet entry for "Advocacy Orgs'" and replaces it with "Current Political Issues." Bowling revises the criteria as follows: "political action type organizations involved in limiting/expanding Government, educating on the Constitution and Bill of Rights, Social economic reform/movement." Bowling changes the coordinator contact from Ronald Bell to Stephen Seok. | Steve Bowling | IRS000352978-84 <br><br> SFC Interview of Ronald Bell (July 30, 2013) not transcribed |
| January 25, 2012 | Steve Bowling informs Ronald Bell that he has made changes to the emerging issues tab of the BOLO to "remove advocacy groups'" and "to update the issue in an effort to capture what we are looking for." Bowling explains to Bell that the July 2011 BOLO criteria was too broad and was catching cases that did not involve political advocacy issues. He instructs Bell to send out the revised BOLO. Bell asks about Bowling's use of the phrase "Social economic reform'" in the revised criteria. He states that this was "code" for the Occupy groups and since Bowling added the Occupy groups to the BOLO, there was no need to use this phrase. Bowling advises to leave the phrase in the BOLO, as other groups might also advocate for social economic reform. | Steve Bowling, Ron Bell | IRS000013187 <br><br> SFC Interview of Ronald Bell (July 30, 2013) not transcribed |

Exhibit E

338

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| February 10, 2012 | Cindy Thomas emails Holly Paz the Tax Notes article previous emailed on January 20th. Thomas writes, "The information below is what we have for the 'Occupy' groups.  We added this to our 'Watch List' tab on our BOLO spreadsheet.  Also, our revised write up for the advocacy cases is included on the "Emerging Issues" tab."  Attached to Thomas' email is a copy of the BOLO spreadsheet.  The Emerging Issues tab of the spreadsheet contains an entry for an issue labeled "Current Political Issues."  The issue is described as "[p]olitical action type organizations involved in limiting/expanding government, educating on the constitution and bill of rights, Social economic reform / movement." | Holly Paz, Cindy Thomas. | IRS000013754-60 |
| February 15, 2012 | Stephen Seok distributes draft template development questions to the Advocacy Team together with the Guidesheet. He plans to convene a meeting in the near future to finalize the draft template development questions and development guidance. | Stephen Seok | IRS000594910-29 |
| February 21, 2012 | Hilary Goehausen prepares an SCR for the political advocacy cases assigned to her.  She notes that with regard to the only open case, the Albuquerque Tea Party, she is now preparing a proposed denial. | Hilary Goehausen | IRS000163778-80 (Email attachment containing taxpayer information omitted by Committee staff) |
| February 22, 2012 | Stephen Seok, Joseph Herr, Ronald Bell and others meet with Steve Bowling to discuss the draft template development questions. | Steve Bowling, Stephen Seok, Joseph Herr, Ronald Bell | IRS000594936 |

Exhibit E

339

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| February 22, 2012 | In preparation for a meeting with Steve Miller, Lois Lerner asks Holly Paz for the number of all advocacy cases in the pipeline, whether they are screened or sent to full development, and whether there is history on similarly situated organizations. Paz asks Cindy Thomas for the number of advocacy cases and to confirm that all applications meeting the BOLO criteria receive full development. She also asks Thomas "[h]ow do we have this described in the bolo?" Thomas responds by providing Paz with information showing that there are over 200 advocacy cases pending, and tells Paz that all cases that meet the BOLO criteria get full development. She also provides Paz with the Emerging Issues tab from the BOLO spreadsheet that contains the entry for political advocacy cases. That entry reflects the changes made by Steve Bowling on January 25, 2012 and now reads:<br><br>"Current Political Issues – Political action type organizations involved in limiting/expanding government, educating on the constitution and bill of rights, Social economic reform/movement. **Note: typical advocacy type issues that are currently listed on the Case Assignment Guide (CAG) do not meet these criteria unless they are also involved in activities described above.**" | Lois Lerner, Holly Paz, Cindy Thomas | IRS000001739-48 |
| February 24, 2012 | Holly Paz sends Don Spellman the Guidesheet for his review. The draft Guidesheet is dated November 2011. Spellman forwards the Guidesheet to his supervisor, Janine Cook, and informs her that the Guidesheet requires "corrections, additions, changes all over." He indicates that he will assemble a working group with EO to review the Guidesheet. Cook does not know why TE/GE waited so long to review the Guidesheet.<br><br>Spellman determines that in its current form, the Guidesheet departs from published IRS guidance, necessitating review and approval by Treasury's Office of Tax Policy. | Holly Paz, Don Spellman, Janine Cook | IRS000056937-50<br>SFC Interview of Janine Cook, (Sep. 9, 2013) p. 72<br>SFC Interview of Donald Spellman, (July 10, 2013) pp. 88-90 |

Exhibit E

340

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| February 24, 2012 | Lois Lerner meets with Republican Congressional staff to discuss the IRS' processing of several applications for exemption from Tea Party groups (Ohio Liberty Council and Shelby County Liberty Group). She tells Holly Paz, Janine Cook and Don Spellman that Congressional Staff has asked for a copy of the Guidesheet. She asks Spellman and Cook to review the Guidesheet and let her know their concerns so that the Guidesheet can be finalized. Lerner also asks Paz to prepare for her a timeline showing the increase in the number of applications from political advocacy groups, and when cases were sent to R&A for guidance. | Lois Lerner, Holly Paz | IRS0000220094-98 IRS0000220078-83 |
| February/March 2012 | Victoria Judson reviews the Guidesheet. She suggests that the Guidesheet be revised to instruct agents to ask applicants for representative samples of documents, instead of copies of every document generated by the applicant. | Victoria Judson | SFC Interview of Victoria Judson, (Sep. 11, 2013) pp. 60-61 |
| February 27, 2012 | Joseph Herr, a member of the Advocacy Team, asks Stephen Seok when the Team will be permitted to again send out development letters. Seok forwards Herr's inquiry to Steve Bowling who forwards it to Cindy Thomas. Thomas asks why development letters are not being sent out. Bowling denies telling Seok to stop sending out development letters and explains that Seok misunderstood Bowling's directive to not develop template questions. | Steve Bowling, Cindy Thomas | IRS0000594958-63 |
| February 28, 2012 to March 1, 2012 | Stephen Seok sends Steve Bowling a list of template development questions that the Advocacy Team generated for use in processing political advocacy cases. Bowling forwards the template questions to Cindy Thomas and she sends them to Holly Paz, Justin Lowe and Andy Megosh. Thomas tells Paz that she will check to make sure that "our folks were instructed not to ask questions if information is in the case file." | Cindy Thomas, Steve Bowling | IRS0000605973-80 |
| February 28, 2012 | Lois Lerner adds a sentence to a statement prepared by Michele Eldridge in response to an AP inquiry. The sentence states that 501(c)(4) organizations can operate without material barrier in the absence of approval of their tax exempt status by the IRS. In explaining her suggested edit, Lerner states that "it doesn't harm you that we take a long time." | Lois Lerner, Steve Miller, Nikole Flax | IRS0000341674-76 |

Exhibit E

341

| Date | Occurrence | Key Personnel Involved | Authority |
|------|------------|------------------------|-----------|
| February 29, 2012 | Steve Miller asks Nikole Flax to find out how many cases are pending in EO Exams that involve allegations of political activity. She indicates over 100 501(c)(3), (4), (5) and (6) cases have allegations of political activity and that there are 51 501(c)(4) cases in Exams (not limited to allegations of political activity). | Steve Miller, Nikole Flax | IRS0000219479-82 |
| February–April 2012 | Numerous news articles begin to appear in the press reporting on complaints from various Tea Party organizations about the IRS' use of 'intrusive, burdensome and repetitive questions, as well as the IRS' failure to issue determinations on applications for exemption. Congressional interest in the IRS' treatment of Tea Party groups increases. | | IRS0000341677-80 IRS0000325929-30 IRS0000212412-414 |
| February 29, 2012 | Lois Lerner asks Holly Paz and Cindy Thomas if Cincinnati has been given "new guidance on how they might reduce the burden in the information requests and make it clearer that recipients can ask for extensions." Lerner states "I don't want any more letters going out on advocacy cases until the letters have been adjusted." She also expresses concern that the letters that EO Determinations staff is sending to applicants are identical. In response, Thomas asks Steve Bowling to find out what the agents are doing. Bowling reports back that the agents are modifying the template questions to fit the circumstances and understand that they shouldn't ask for information that has already been provided. | Lois Lerner, Holly Paz, Cindy Thomas, Steve Bowling | IRS0000594977-80 |
| March 2, 2012 | Janine Cook forwards to Victoria Judson an article from the *Huffington Post* entitled "IRS Battles Tea Party Groups Over Tax Exempt Status." The article states that "[t]he fight features 'instances in which the IRS has asked for voluminous details about the groups' postings on social networking sites . . . , information on donors and key members' relatives, and copies of all literature they have distributed to their members . . . ." Cook tells Judson that other than reviewing the Guidesheet, she hasn't heard anything from the client about its review of applications from advocacy organizations. | Janine Cook, Victoria Judson | IRS0000014473-76 |
| March 2012 | Douglas Shulman is scheduled to testify before the House Ways and Means Subcommittee on Oversight on March 22, 2012. In preparation for the hearing, Shulman discusses with Steve Miller the allegation that intrusive questions are being asked to Tea Party organizations. | Douglas Shulman, Steve Miller | SFC Interview of Douglas Shulman, (Dec. 3, 2013) pp. 59-66 |

Exhibit E

342

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| March 2, 2012 | A member of Congress reaches out to Commissioner Doug Shulman regarding "Applicant X," an organization seeking exemption under 501(c)(3). The organization had submitted an application in October 2011 and had twice requested expedited review, and twice the IRS denied the request. Shulman is advised to tell the member that he doesn't get involved in individual cases and that he convey to EO why the member thinks the application should be expedited. | Doug Shulman | IRS0004411951-52 (Email attachment containing taxpayer information omitted by Committee staff) |
| March 5, 2012 | Don Spellman asks to meet with EO to go over his comments and suggestions for the Guidesheet. Lois Lerner expresses the view that there won't be enough time to finalize the Guidesheet since it is already with Steve Miller and she will be visiting the Senate Finance Committee on March 8, 2012 to discuss the Guidesheet. | Lois Lerner | IRS0000057789-90 |
| March 5, 2012 | In response to an email from Stephen Seok asking whether EO Technical will review the first proposed approval of a political advocacy organization's application for tax exemption, Mike Seto directs that:<br><br>• "EOD will send the application up;<br>  Hilary will look at it first then Justin;<br>  Once EOT/EOG review is completed and recommendations made, we send the application to Counsel for review based on the information in the file and front office concurrently;<br>• We will then do a briefing with the executives on the case."<br><br>Thomas tells Seto that EO Determinations will be sending to EO Technical a 501 (c)(3) denial soon and asks EO Technical review it. | Mike Seto | IRS0000594982-84 |
| March 5, 2012 | In reaction to stories in the press regarding complaints from Tea Party groups about the nature of the development letters that they are receiving from the IRS, Holly Paz instructs Cindy Thomas to suspend sending out development letters. She also asks Thomas to send her some copies of "development letters we have sent to these orgs that have different questions from the ones that have been reported in the press . . . Lois wants to support her story that we are not asking everyone the same questions – that the letters are tailored." | Holly Paz, Cindy Thomas | IRS0000477182-83 |

Exhibit E

343

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| March 6, 2012 | Nikole Flax asks to meet with Lois Lerner and Holly Paz to discuss the member of Congress' request for expedited treatment of "Applicant X's" application for exemption under 501(c)(3). Lerner responds that the application will be approved that day. Flax asks Lerner if the approval is based on new information received from the organization. Cindy Thomas advises Lerner that the case was approved based on the information already in the file. | Lois Lerner, Nikole Flax, Cindy Thomas, Holly Paz | IRS0000429946-47 |
| March 6, 2012 | Cindy Thomas sends a draft approval of a 501(c)(4) political advocacy case to Mike Seto for review. | Cindy Thomas, Mike Seto | IRS0000617020-21 |
| March 7, 2012 | Janine Cook sends the Guidesheet to William Wilkins and to Erik Corwin. She explains to them that EO prepared the Guidesheet to assist EO Determinations in processing applications for exemption that involve political advocacy and lobbying. She further indicates that Congress has made inquiries of Lois Lerner as to how the advocacy cases are being handled because of concerns over delays and allegations of intrusive development questions. Cook tells Wilkins and Corwin that Congress has asked to see the Guidesheet. Cook explains that her staff has worked quickly in turning around comments on the Guidesheet. | Janine Cook, William Wilkins, Erik Corwin | IRS0000056969-83 |
| March 7, 2012 | Lois Lerner directs that EO Determinations advise organizations that have received a development letter that they will be given 90 days to respond to the development letter, and that if they do not respond within those 90 days, that their case will be put in suspense for an additional 90 days. Thereafter, the case will be closed and the organization will be required to re-apply. Cindy Thomas tells Paz that "obviously, we'll do what we are told" but questions Paz why Lerner is directing this change. Paz states that "when we have had a case for a long time without taking action and are asking for a lot of stuff, we have to give more time." Paz notes to Thomas: "I also do what I am told." | Cindy Thomas, Holly Paz, Lois Lerner | IRS0000593393-96 |
| March 8, 2012 | TIGTA staff meets with Oversight and Government Reform staff to hear their concerns regarding the IRS' treatment of Tea Party groups seeking tax-exempt status. | Matt Sutphen, Nancy Nakamura, Troy Patterson | Emails from Matt Sutphen to Nancy Nakamura, Troy Patterson and others, Mar. 1-8, 2012 |

Exhibit E

344

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| March 8, 2012 | Steve Miller directs that if an organization that has been asked to provide donor information calls about the request, agents are to permit the organization to not send in the donor information. | Steve Miller | IRS0000414835-36 |
| March 9, 2012 | Mike Seto announces a 7-step process by which EO Technical will provide technical assistance to EO Determinations on political advocacy cases. The seven steps are as follows: <br> 1) Request assigned to Hilary Goehausen; <br> 2) Goehausen's recommendation is then reviewed by Justin Lowe (EO Guidance); <br> 3) When Lowe completes his review, Seto schedules a meeting with Cindy Thomas and Donna Abner; <br> 4) EO Technical meets with Thomas and Abner to discuss; <br> 5) The recommendation is then sent to the Chief Counsel's office for review; <br> 6) Once Counsel comments, a meeting is scheduled with Lois Lerner and Holly Paz to discuss the recommendation; and <br> 7) The recommendation is issued. | Mike Seto | IRS0000066875 |
| March 13, 2012 | William Wilkins receives the Chief Counsel TE/GE biweekly report. It contains an entry explaining how EO requested expedited review of the Guidesheet (within one week) and how Chief Counsel staff worked quickly to provide EO with comments and suggested revisions. | William Wilkins | IRS0000061498-61505 |
| March 14, 2012 | Steve Miller analyzes the holding of the *Citizens United* decision in handwritten notes. Miller notes that after the decision, there was a "rise of super PACS." He also notes that the decision contributed to an increase in 501(c)(4)s that can engage in "unlimited issue advocacy" but "limited political campaign activity." He further notes that if approved, a 501(c)(4)'s "donor list is not public." | Steve Miller | IRS0000506870-71 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| March 15, 2012 | In coordination with Steve Miller's office, EO develops guidance for treating advocacy cases. For cases in which an additional development letter was sent but no response was received, the organizations will be given a 60-day extension. Cases already placed in suspense for failure to respond to a development letter will be taken out of suspense and the applicant will be provided an additional 60 days to respond. Stephen Seok informs the Advocacy Team of the guidance. | Holly Paz, Cindy Thomas | IRS000455356-58 IRS000599500-02 |
| March 21, 2012 | Hilary Goehausen prepares an SCR for the political advocacy cases assigned to her. Regarding the Albuquerque Tea Party, she notes that it has retained counsel and that counsel has requested an extension of time until May 15, 2012 to respond to the second development letter. Estimated closure date is now July 31, 2012. | Hilary Goehausen | IRS000163796-97 |
| March 21, 2012 | Janine Cook sends a revised version of the Guidesheet to Lois Lerner. She indicates that Lerner was not satisfied with the initial round of edits by Chief Counsel staff and asked that the Guidesheet be revised so as to be more usable to EO Determinations staff. Cook suggests a meeting and expresses her concern that the Guidesheet must not state new guidance, but rather just restate existing rules, so as to avoid the necessity of securing Treasury Department review. | Janine Cook, Lois Lerner, Victoria Judson | IRS000056992-57043 |
| March 22, 2012 | In response to a question from Rep. Boustany about the IRS targeting Tea Party organizations for additional scrutiny, Douglas Shulman tells the House Ways and Means Subcommittee on Oversight that "[t]here is absolutely no targeting." | Douglas Shulman | Transcript of W&M Hearing on IRS Targeting Mar 22. 2012 |
| March 23, 2012 | Stephen Seok provides Cindy Thomas with template questions distributed to the Advocacy Team of EO Determinations Specialists. Included in the questions is a demand for donor information. Seok denies using these questions as a "template." Rather, he asserts that the questions were distributed to the Team "just for reference." | Stephen Seok, Cindy Thomas | IRS000414842-55 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| March 2012 | Steve Miller discusses with Nancy Marks, Senior Technical Advisor to the TE/GE Commissioner, his concerns with the processing of Tea Party applications in Cincinnati. These concerns are a product of both media stories and Congressional inquiries. Miller asks Marks to visit the Cincinnati operation, find out what is going on, and make recommendations to address any issues. | Steve Miller, Nancy Marks | SFC Interview of Steve Miller, (Dec. 12, 2013) pp. 128-129 |
| March 26, 2012 | David Marshall, Attorney in the Chief Counsel's Office, submits an inventory of his assignments to his supervisor. Marshall includes his work on the Guidesheet and states that it is a matter of the "highest priority" and that the issue of political campaign intervention by 501(c)(4) organizations is the subject of much Congressional attention. | David Marshall | IRS0000058862-71 |
| March 26, 2012 | The *EO Tax Journal* publishes a letter from Landmark Legal Foundation to TIGTA calling for an investigation of the IRS' handling of Tea Party applications. Joseph Urban sends the letter to Nancy Marks and Joseph Grant. Marks responds by stating "we might want to call TIGTA to say we'd welcome this." Grant also states that "it would be a good idea to have TIGTA review this." | Nancy Marks, Joseph Grant | IRS0000218372-75 |
| March 29, 2012 | TIGTA sends Lois Lerner and others an email containing an audit planning notification. The notification advises that TIGTA will audit IRS' handling of applications for 501(c)(4), (c)(5) and (c)(6) organizations. | Lois Lerner, Steve Miller, | IRS0000509688 (email attachment omitted) |
| Late March 2012 | Steve Miller informs Douglas Shulman that he is sending Nancy Marks to Cincinnati to find out how EO Determinations has been processing political advocacy cases. Miller tells Shulman that TIGTA will also be doing a report on the matter. | Douglas Shulman, Steve Miller | SFC Interview of Douglas Shulman, (Dec. 3, 2013) pp. 35-36 |
| April 3, 2012 | Victoria Judson sends William Wilkins and Erik Corwin an agenda for the TE/GE bi-weekly meeting. Included in the agenda is the Guidesheet. | Victoria Judson, William Wilkins | IRS0000232208-09 |
| April 16, 2012 | Steve Miller is informed that TIGTA is in Ogden, Utah investigating the disclosure of the 2008 Schedule B of the National Organization for Marriage (NOM). The Schedule B contains a list of donors who have given $5,000 or more to the entity. | Steve Miller | IRS0000279572-73 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| April 17, 2012 | Nikole Flax sends Lois Lerner an article from *The Hill* in which GOP lawmakers state that the IRS harassed Tea Parties and call for an investigation. Lerner responds by stating "I get more and more concerned that these cases can't properly be worked in Cincy." | Lois Lerner, Nikole Flax | IRS00032592993-30 |
| April 17, 2012 | Hilary Goehausen prepares an SCR for the political advocacy cases assigned to her. Goehausen notes that Cincinnati sent EO Technical the case file for a 501(c)(4) organization (First Coast Tea Party) that Cincinnati determined should be approved. EO Technical and EO Guidance reviewed the file and determined that the application should be denied. EO Technical is preparing the denial that will need to be reviewed by TE/GE Counsel. Goehausen further notes that there are nine additional political advocacy cases pending in EO Technical. | Hilary Goehausen | IRS0000163812-14<br>(Email attachment containing taxpayer information omitted by Committee staff) |
| April 23 - 25, 2012 | Nancy Marks, together with Holly Paz, Sharon Light (Senior Technical Advisor to the Director, EO), Rob Malone, and Joe Urban (Senior Technical Advisors to the TE/GE Commissioner) visit EO Determinations in Cincinnati to interview employees on the handling of political advocacy cases and to review applications for exemption by political advocacy organizations. | Holly Paz, Sharon Light, Rob Malone, Nancy Marks, Joe Urban | IRS0000031525-55 |
| April 25, 2012 | At Holly Paz's request, Judith Kindell reviews development letters sent to applicant organizations by EO Determinations. Kindell reports back to Paz a list of troubling questions that EO Determinations asked of applicant organizations. The questions ask, among other things for: the names of donors; a list of all issues important to the organization and its positions relative to the issues; the substance of conversations between the members of the organization and audiences at events; whether officers or directors will run for office; the political affiliations of officers, directors and speakers; and the activities of other organizations. | Holly Paz, Judith Kindell | IRS0000013868<br>(Email attachment containing taxpayer information omitted by Committee staff) |
| April 25, 2012 | Don Spellman provides Lois Lerner with comments on the draft Guidesheet. | Don Spellman, Lois Lerner | IRS0000512392-419 |

ち

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| May 3, 2012 | Nancy Marks reports to Steve Miller on the results of her 3-day trip to EO Determinations in Cincinnati from April 23-25, 2012, during which time she interviewed employees and reviewed cases. Marks tells Miller that: the use of intrusive development questions resulted from a lack of guidance and training by EO Technical to EO Determinations; there are 250-300 political advocacy cases in the queue; the EO Determinations agents used a "BOLO" list with "Tea Party" and "9/12" on it as screening criteria but that the problem with using such criteria had been "fixed" earlier; among the political advocacy cases in the queue are cases on both sides of the political spectrum; TIGTA is reviewing EO's treatment of the cases; and she found no evidence of political bias.<br><br>Marks makes the following recommendations to Miller: train the EO Determinations agents; pair EO Determinations agents with EO Technical staff to provide direct assistance; and review all of the political advocacy cases through a "bucketing" exercise that allows the cases that didn't require much or any further development to be quickly decided.<br><br>Based on Cathy Livingston's concerns about the Guidesheet, Steve Miller decides to proceed with Nan Marks' suggestion to train EO Determinations agents instead of using the Guidesheet.  Further development of the Guidesheet ceases and it is shelved. | Nancy Marks, Steve Miller | SFC Interview of Steve Miller, (Dec. 12, 2013) pp. 133-144<br>SFC Interview of Nikole Flax, (Nov. 21, 2013) pp. 85-86 |
| May 3, 2012 | Steve Miller briefs Douglas Shulman, Commissioner of the IRS, on Nancy Marks' findings.  He conveys to Shulman the salient points, including the existence of the BOLO list and its criteria.  He also tells Shulman that the BOLO list issue has been resolved. | Steve Miller, Douglas Shulman | SFC Interview of Steve Miller, (Dec. 12, 2013) p. 142<br>SFC Interview of Douglas Shulman, (Dec. 3, 2013) pp. 37-40 |
| May 2012 | Steve Miller believes that Stephen Seok and John Shafer are responsible for the change made to the BOLO by Steve Bowling on January 25, 2012. Accordingly, Miller has Shafer and Seok counseled by Cindy Thomas for changing the BOLO criteria.  Miller is subsequently told that neither Seok nor Shafer were behind the change, but he never finds out who actually did direct the change (Thomas and Bowling).  He also has Seok reassigned so that he no longer is the Advocacy Team coordinator since Seok was responsible for the intrusive development letters and because he had not performed well as the Advocacy Team coordinator. | Steve Miller, John Shafer, Stephen Seok, Steve Bowling | SFC Interview of Steve Miller, (Dec. 12, 2013) pp. 143-145 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| May 8, 2012 | Holly Paz informs Cindy Thomas that a team from Washington D.C. will arrive in Cincinnati on May 14, 2012. The team members (Matthew Giuliano; Hilary Goehausen; Judy Kindell; Sharon Light; Justin Lowe; Andy Megosh) will provide training to the Advocacy Team. Training will begin on May 14 and end on May 15. Paz informs Thomas that starting on May 16, 2012, the training team and several Determinations Unit Specialists will start to place the political advocacy cases in "buckets" as follows:<br><br>Bucket 1 – favorable (no further substantive development required).<br><br>Bucket 2- favorable (limited development required).<br><br>Bucket 3 – significant development.<br><br>Bucket 4 –likely denial<br><br>Two reviewers will review each case. Both reviewers must agree to place a case in a particular "bucket." If they disagree, another reviewer will look at the case and attempt to reconcile the disagreement. | Holly Paz, Cindy Thomas | IRS0000596252 |
| May10, 2012 | Cindy Thomas explains to Holly Paz how the BOLO list is updated. Thomas states that Group 7822 is responsible for updating the BOLO and sending BOLO alerts to Determinations specialists and managers when changes are made. For the Watch List, Potential Abusive and Coordinated Processing tabs, managers send their suggested revisions to the Group 7822 manager for consideration. For Emerging Issues, the suggested revisions are sent to the Emerging Issues Coordinator in Group 7822. The Group 7822 manager then consults with the area manager or with the Program Manager. Thomas states that the BOLO spreadsheet was introduced in June/July 2010. The name "BOLO" was adopted in August 2010. | Cindy Thomas, Holly Paz | IRS000004755-62 |
| May 13, 2012 | Ronald Bell emails Carter C. Hull advising him that he has an application from a group that he believes may be an ACORN successor group. Bell tells Hull that "[t]he BOLO list states to contact you" and asks Hull to "[p]lease advise how you want to process this case." | Ronald Bell, Carter C. Hull | IRS000054963 |
| May 14-15, 2012 | The Advocacy Team receives training on political advocacy cases from the Washington D.C. team. Sharon Light is named Coordinator of the Advocacy Team. | Sharon Light | IRS000599626-28 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| May 15, 2012 | Lois Lerner asks how the BOLO list is used. Cindy Thomas explains that the BOLO is used by all EO Determinations specialists and managers. Screeners use it to determine if a case needs to go to a particular Group. Others use it when they receive information from the applicant that would suggest that the case needs to go to another Group. Lerner is provided a copy of the BOLO that contains the entry for political advocacy cases. That entry reads: "Current Political Issues – Political action type organizations involved in limiting/expanding government, educating on the constitution and bill of rights, Social economic reform/movement." | Cindy Thomas, Lois Lerner, Holly Paz | IRS0000013776-82 |
| May 16, 2012 | Members of the training team from Washington D.C. and members of the Advocacy Team begin "bucketing" the political advocacy cases pending in EO Determinations. | Holly Paz | IRS0000599626-28 |
| May 16, 2012 | Holly Paz asks Lois Lerner and others for feedback on language for the BOLO that would "replace the current advocacy org language on the BOLO as well as the separate references to ACORN successors and Occupy groups. The language proposed by Paz reads as follows: "501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention or close connection to a political party or candidate(s). Note: typical advocacy type issues (e.g, lobbying) that are currently listed on the Case Assignment Guide (CAG) do not meet these criteria." | Holly Paz | IRS0000013697 |
| May 17, 2012 | Holly Paz issues a Memorandum regarding the BOLO spreadsheet. In the Memorandum, she states that Abusive Transactions and Fraud Issues, Emerging Issues, Coordinated Processing cases and a Watch List will be tracked on the BOLO and occupy separate tabs. The Emerging Issues Coordinator will maintain the spreadsheet, receive updates and enter them on the BOLO. Any updates or changes must be approved by the Group Manager of the Emerging Issues Coordinator, the Determinations Program Manager and the Director, Rulings and Agreements. | Holly Paz | IRS0000437639-41 |
| May 17, 2012 | IRS employees identify a case as an "occupy BOLO case." | Roger Vance, Karl Beckerich, Gary Muthert | IRS0000014349 |

352

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| May 21, 2012 | Margo Stevens of the IRS Chief Counsel's Office informs Lois Lerner that since the IRS did not rely on or use the donor information submitted by some applicants in response to a request for same by the IRS, that the donor lists were not records within the meaning of the Federal Records Act and could be destroyed by the IRS or returned to the applicant. | Lois Lerner, Margo Stevens | IRS0000182318-19 |
| May 24, 2012 | A telephone call script is developed to inform some organizations that had not responded to the additional information requests that it was not necessary to send the requested information and that their applications had been approved. Also, an additional paragraph is developed for the favorable determination letters sent to these organizations. | Cindy Thomas | IRS0000005204-08 |
| May 24, 2012 | IRS Determinations staff identifies an Occupy group application based on its entry on the "Watch For" tab of the BOLO list. Tyler Chumney tells Peggy Combs that Steven Bowling told him there is one other Occupy case. Chumney explains to Combs that Occupy cases are not "considered to be Current Political Issues" because they do not advocate for expanding/limiting the government, so they have a separate entry on the BOLO under the "Watch For" tab. | Tyler Chumney, Peggy Combs | IRS0000013231 – 33 |
| May 25, 2012 | Joe Urban forwards to Lois Lerner and others an article in *Tax Analysts* on Democracy 21 and Campaign Legal Center's request for exemption. Lerner requests a status from Cindy Thomas on Crossroads GPS' application and Thomas refers Lerner to Sharon Light, since Light is overseeing the Advocacy Team and tracking the cases. Light tells Lerner that the case has been reviewed by two reviewers and that one has recommended general development while the other has recommended limited development. Lerner responds by telling Light "full development may be the best course . . ." Lerner further states to Light that "[ full development will leave it in your capable hands. Having said that -- as they say they have been filing 990s, you should be looking at those as well." | Lois Lerner, Sharon Light | IRS0000199184-86 |
| May 30, 2012 | TIGTA briefs Steve Miller on the scope of the review that it will conduct on the way EO processes political advocacy cases. TIGTA tells Miller that criteria targeting "Tea Party," "9/12" and "Patriots" were used in reviewing applications for tax exempt status. | Steve Miller | SFC Interview of Steve Miller, (Dec. 12, 2013) p. 151 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| June 1, 2012 | Holly Paz sends Lois Lerner a draft letter to be sent to applicant organizations that were asked for, and provided donor information. The letter advises that the donor information will be destroyed. | Holly Paz, Lois Lerner | IRS000182990-91 |
| June 1, 2012 | Holly Paz sends Cindy Thomas new "wording that should be used for the Emerging Issue description for advocacy cases." Paz tells Thomas that "[w]e'll remove the references to Acorn and Occupy from the 'Watch List' – the issues we are concerned about in those cases should be captured by the language below." The new language is: "501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit). Note: advocacy type issues (e.g., lobbying) that are currently listed on the Case Assignment Guide (CAG) do not meet these criteria." | Holly Paz, Cindy Thomas | IRS000013434-35 |
| June 1, 2012 | Mark Tornwall, an acquaintance of Lois Lerner, sends Lerner an email in which he states that Australia is politically "a lot more progressive than here in 'Tea Party' Land." He then asks Lerner: "[s]o speaking of regressive politics – does 'Citizens United' scare you as much as it scares me?" Lerner responds as follows: "Citizens United is by far the worst thing that has ever happened to this country. More on that later." Tornwall agrees with Lerner's depiction of the *Citizens United* decision and notes that his "take on this is that the right wing and five of the Supreme Court Justices have concluded that the wealthy among us are entitled to decide what happens here." Lerner then summarizes to Tornwall her views on the *Citizens United* decision in the following manner: *"We are witnessing the end of 'America.' There has always been the struggle between the capitalistic ideals and the humanistic ideals. Religion has usually tempered the selfishness of capitalism, but the rabid, hellfire piece of religion has hijacked the game and in the end, we will all lose out. it's (sic) all tied together   money can buy the Congress and the Presidency; so in turn, money packs the SCt. and the court backs the money – the "old boys" still win."* | Lois Lerner, Mark Tornwall | IRS000080024-26 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| June 6, 2012 | Steve Grodnitzky prepares a list of advocacy cases pending in EO Technical. There are 12 cases on the list. None are completed and a number have been pending in EO Technical for months with little or no activity. | Steve Grodnitzky | IRS0000011212-14 |
| June 7, 2012 | The bucketing exercise is concluded.  Holly Paz reports the results as follows:<br>83 501(c)(3) organizations bucketed:<br>    16 approvals<br>    16 limited development<br>    23 general development<br>    28 likely denials<br>199 501(c)(4) organizations bucketed<br>    65 approvals<br>    48 limited development<br>    56 general development<br>    30 likely denials<br><br>Paz informs that applicants who submitted donor information will be advised by letter that the request was an error and that the donor information will be destroyed.  Going forward, Mitch Steele and Joseph Herr will bucket all new cases and send their bucketing worksheets to Sharon Light who will reconcile any differences of opinion between Steele and Herr.  Ron Bell will track advocacy cases going forward.  Bucketed cases are assigned to EO Determinations agents to work. | Holly Paz | IRS0000578664-66 |
| June 14, 2012 | Ruth Madrigal, Attorney Advisor, Office of Tax Policy, Treasury Department, transmits to Lois Lerner, Victoria Judson, Janine Cook, and Nancy Marks a news story about the 4th Circuit upholding the "major purpose" test for political committees.  She indicates that she has her "radar up" on 501(c)(4)s and that "we mentioned potentially addressing them (off-plan) in 2013." | Ruth Madrigal, Victoria Judson, Janine Cook, Nancy Marks | IRS0000015400-01 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| June 15, 2012 | The BOLO is revised. Under the Emerging Issues Tab, the issue name is now "Current Political Issues." The Issue Description reads as follows:<br><br>"501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit). Note: advocacy action type issues (e.g., lobbying) that are currently listed on the Case Assignment Guide (CAG) do not meet this criteria." Under the Disposition column, the BOLO instructs to "[f]orward case to Group 7822." | | IRS000195830<br>BOLO furnished by TIGTA |
| June 18, 2012 | Lois Lerner asks Nancy Marks to react to an idea. Lerner is concerned about 501(c)(4) organizations for which the IRS has received referrals, but which have not applied for exemption and have not yet filed a 990 return. Lerner suggests that for organizations that have received an EIN over a year and a half ago, that the IRS perform an audit (compliance check) on the organization. During the audit, Lerner suggests that the IRS ask the organization why it hasn't filed a return. Marks thinks the idea has merit, but suggests that the Chief Counsel P&A react to it. | Lois Lerner, Nancy Marks | IRS00047783-84 |
| June 19, 2012 | Nikole Flax asks Lois Lerner to give her an update on all of the letters that the IRS has sent out on 501(c)(4) political activities. Andy Megosh prepares a list showing that 17 letters have been released (14 Congressional); 8 Congressional letters remain open; and 13 non-Congressional letters remain open. | Nikole Flax, Lois Lerner, Andy Megosh | IRS000178125-31 |
| June 20, 2012 | Mike Seto sends an email to EO Technical Managers informing them that before their staffs issue any favorable or denial rulings on any cases with advocacy issues, the reviewers must first notify their managers and Seto and get approval. Seto indicates that he may also require a short briefing on the facts of the particular case. | Mike Seto | IRS000182786 |
| June 22, 2012 | TIGTA informs Joseph Grant and Lois Lerner by way of Engagement Letter that it is initiating a review of the manner in which the IRS has reviewed applications for tax-exempt status involving political advocacy issues. Steve Miller is made aware of the letter. | Joseph Grant, Lois Lerner, Steve Miller | IRS000284200-04<br>IRS000219503-06 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| June 25, 2012 | Lois Lerner is apprised by Richard Daly that TIGTA will conduct a review of the manner in which IRS deals with applications from 501(c)(4) organizations. Daly provides Lerner with a copy of the engagement letter. Lerner states in response: "[i]t is what it is. Although the original story isn't as pretty as we'd like, once we learned this were [sic] off track, we have done what we can to change the process, better educate our staff and move the cases. So, we will get dinged, but we took steps before the "dinging" to make things better and we have written procedures. So, it is what it is." | Lois Lerner, Sarah Hall Ingram, Joseph Urban, Nancy Marks | IRS000047525 1-52 |
| June 27, 2012 | Holly Paz issues directions to staff involved in the bucketing exercise. She informs staff to expunge donor information from files and to send affected applicants letters to that effect. If there is an outstanding development letter and a new one is being sent, she directs that staff advise the applicant to disregard the prior letter. She also tells staff that "there is no need to engage in extensive development" of political activity. If such activity is present, then the key question is "does the applicant have sufficient social welfare activity to meet the primary test." | Holly Paz, Cindy Thomas | IRS000005234-38 |
| June 28, 2012 | Cindy Thomas reports to Holly Paz that 41 cases have been approved and that 31 development letters have been sent to bucket 2 applicants. | Cindy Thomas, Holly Paz | IRS0000005239 |
| June 2012 | With the bucketing exercise completed, development letters once again are sent to applicant organizations. | Joseph Herr | SFC Interview of Joseph Herr, (June 18, 2013) not transcribed |
| July 9, 2012 | Lois Lerner forwards to Nikole Flax and Nanette Downing a memo from Judith Kindell and others reflecting the results of a review of the write-ups produced by the ROO Referral Committee when considering allegations of improper political activity. Lerner indicates her concern that the ROO may not appreciate the sensitivity required by these cases nor know when to use resource people from Rulings and Agreements. Lerner states that "Steve is very sensitive to DC involvement with Exam decisions." The memo generally finds that the write-ups don't objectively describe the allegation and that the recommendations don't always rely on tax policy. | Lois Lerner, Judith Kindell | IRS000017906 9-71 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| July 17, 2012 | A *ProPublica* reporter asks to interview Lois Lerner on matters related to 501(c)(4) organizations. Michele Eldridge, IRS Media Relations Chief, advises Steve Miller, Nikole Flax, and Lois Lerner that the reporter has gathered both IRS records and FEC documents on more than 70 groups including many high-profile social welfare groups. Lerner's response is: "I think she has an interesting angle and it might be a good thing to explain why an organization might be reporting "political" activity to FEC, but not to IRS." | Steve Miller, Nikole Flax, Lois Lerner | IRS0000180842-44 |
| July 18, 2012 | Judith Kindell reports to Lois Lerner on the "bucketed" cases. She tells Lerner that "[o]f the 84 (c)(3) cases, slightly over half appear to be conservative leaning groups based solely on the name. The remainder do not obviously lean to either side of the political spectrum. Of the 199 (c)(4) cases, approximately ¾ appear to be conservative leaning while fewer than 10 appear to be liberal/progressive leaning groups based solely on name. The remainder do not obviously lean to either side of the political spectrum." | Lois Lerner, Judith Kindell | IRS0000585328 |
| July 24, 2012 | Lois Lerner advises Holly Paz, David Fish and others that "NO responses related to c4 stuff go out without an affirmative message, in writing from Nikole." | Lois Lerner, Holly Paz, David Fish | IRS0000179669 |
| August 7, 2012 | Joseph Urban sends Steve Miller copies of various monthly SCRs prepared by Carter C. Hull in 2010 and 2011, along with Hull's October 18, 2010 memorandum on his activities in processing Tea Party cases. | Steve Miller | IRS0000165070-80 |
| August 9, 2012 | David Monroe emails to Victoria Judson, Janine Cook and others an excel chart that contains information about exempt organizations regulatory issues being considered by the Treasury Department Office of Tax Policy and the IRS. The spreadsheet contains fourteen items published in the Priority Guidance Plan and six items on the "Local List (i.e., work off plan). The "off-plan" list includes considering "[w]hether 'operated exclusively' has the same meaning under section 501(c)(3) and (c)(4)" along with five other exempt organization issues. | David Monroe | IRS0000458989-92 |

Exhibit E

358

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| September 12, 2012 | Donna Abner asks Mike Seto and Holly Paz if Cincinnati "can go ahead and complete our review of the proposed denial letters and issue them to the [taxpayers.]" Paz responds that "[a]ny denials will need to be briefed to Lois before being issued, and she will need to give folks up the chain a heads up. This is because these will be the first denials on cases in the advocacy bucket and will be looked at VERY carefully by the public so we have to tread carefully." | Holly Paz, Mike Seto, Donna Abner | IRS000441138-40 |
| September 26, 2012 | TIGTA provides a TE/GE quarterly briefing to Joseph Grant on its activities. TIGTA describes a review that it is conducting as addressing "Consistency in Identifying and Reviewing Applications for Tax-Exempt Status Involving Potential Political Advocacy Issues." Among other things, TIGTA is looking to determine if TE/GE management sanctioned "the use of criteria targeting applications for tax exemption that mention: the "Tea Party," "Patriots," or the "9/12 Project." | Joseph Grant | IRS000468928-30 SFC Interview of Steve Miller, (Dec. 12, 2013) pp. 208-210 |
| October 2012 | Steve Miller is disappointed with Lois Lerner's overall performance for FY 2012. Miller believes that she has "under-managed." He does not approve Lerner for a retention bonus. | Steve Miller | SFC Interview of Steve Miller, (Dec. 12, 2012) p. 184 |
| October 19, 2012 | Steve Miller suggests to Nikole Flax that they meet with Cathy Barre to discuss an article in *Politico* about an organization (Americans for Prosperity). The article states that the organization has spent "$72 million on ads bashing Democrats so far this year." The article describes the organizations as a "Koch brothers-backed nonprofit" that did not disclose to the IRS when it was seeking exempt status in 2004 its intention to spend funds on political campaign intervention. The article is critical of the IRS for failing to audit Americans for Prosperity. | Steve Miller, Nikole Flax | IRS000345931-37 |
| October 30, 2012 | Cindy Thomas emails Holly Paz regarding the bucketing exercise, and specifically, the bucket 4 cases (likely denials). She indicates that the specialists don't know what to do with the responses received from the organizations, whether someone in Washington is supposed to be looking at the responses, and that at the pace the cases are being worked, the specialists believe that "they'll be working the bucket 4 cases until they retire." | Cindy Thomas, Holly Paz | IRS000005378 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| October 31, 2012 | Lois Lerner asks Nanette Downing "why of the 88 referrals reviewed by the PARC they only recommended 33 for exam?" Lerner also asks "[d]o we plan to do a post review of the PARC decisions?" Downing can't answer Lerner's first question, but tells Lerner that "a post review will be done." Lerner states that "I looked at the names of the orgs selected and only one is one that had been in the news. I would like to see the list of the ones not selected. Don't plan to talk about this with Steve. He needs to be outside case selection. He's Commissioner now." | Lois Lerner, Nanette Downing | IRS0000184801 |
| November 2, 2012 | Lois Lerner answers questions posed to her by TIGTA regarding her knowledge of the use of the BOLO criteria. Lerner says that (1) executive management did not review or approve the use of the BOLO criteria at the time of its adoption in early 2010; (2) Paz learned of the criteria that was being used to flag Tea Party cases when she asked Cindy Thomas about the criteria in June 2011; (3) "the BOLO description and the … list of criteria used by EO Determinations to determine which cases fell under the BOLO description were their shorthand way of referring to the group of advocacy cases rather than targeting any particular group;" (4) Lerner first became aware that the BOLO referenced the Tea Party and that EO Determinations was using the criteria when she was briefed on the cases on June 29, 2011. | Lois Lerner, Holly Paz | IRS00000505950-53 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| November 9, 2012 | While in England, Lerner writes an email to her husband, Michael Miles, in which she states as follows:<br><br>"Overheard some ladies talking about American (sic) today. According to them, we've bankrupted ourselves and at (sic) through. We'll never be able to pay off our debt and are going down the tubes. They don't seem to see that they can't afford to keep up their welfare state either. Strange."<br><br>Her husband replies:<br><br>"Well, you should hear the whacko wing of the GOP. The US is through; too many foreigners sucking at the teat; time to hunker down, buy ammo and food, and prepare for the end. The right wing radio shows are scary to listen to."<br><br>Lerner responds to this email as follows:<br><br>"Great. Maybe we are through if there are that many assholes."<br><br>Her husband states in reply:<br><br>"And I'm talking about the hosts of the shows. The callers are rabid."<br><br>Lerner concludes this exchange with the following observation:<br><br>"So we don't need to worry about alien teRrorists (sic). It's our own crazies that will take us down." | Lois Lerner, Michael Miles | IRS0000890492-95 |
| December 6, 2012 | Christopher Giosa sends Lois Lerner a paper entitled *Trends in Donations to, and the Political Activities of Certain Nonprofit Corporations*. The hypothesis of the paper is that the holding in *Citizens United* "has led to increased donations to, and political activities of nonprofit corporations under 501(c)(4), (c)(5) and (c)(6)." The paper identifies various sources of data that could be examined and questions that would need to be answered in order to test the hypothesis. | Lois Lerner | IRS0000185323-27 |
| December 14, 2012 | Democracy 21 and Campaign Legal Center contact Lois Lerner about setting up a meeting to discuss the 'Petition for Rulemaking" that these organizations had submitted to the IRS on July 27, 2011. Lerner agrees to meet and invites representatives of the IRS Chief Counsel and the Treasury Department. The meeting is scheduled for January 4, 2013. | Lois Lerner | IRS0000122502-05 |

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| December 14, 2012 | Hillary Goehausen prepares an SCR on the five political advocacy cases now assigned to her. Two cases have been closed for FTE. Two are open pending review by Judith Kindell and/or Sharon Light including Albuquerque Tea Party, which is a proposed denial. Goehausen notes that "EOT is working approximately 9 other advocacy application cases in the office." | Hillary Goehausen | IRS0000011237-40 |
| December 14, 2012 | In response to a FOIA request filed by a *ProPublica* reporter, the IRS improperly discloses tax return information (Form 1024 and accompanying documents) from a conservative group Crossroads GPS that is seeking exempt status. Lois Lerner notes that "[e]veryone understands that mistakes happen, but because this is a disclosure, we will be referring to TIGTA." Lerner makes Nikole Flax aware of the disclosure. | Lois Lerner | IRS0000189992-93 |
| December 18, 2012 | Lois Lerner brings to Nanette Downing's attention some issues with a letter sent to organizations that have not responded to a Group Ruling Questionnaire. Lerner is critical of Downing's staff and says "[b]ut they don't think like that—they just do whatever they've always done." Lerner points out that the letter is appropriate for a compliance check, but not for reminding organizations to return a questionnaire. She goes on to tell Downing of her staff that "these folks have very little ability to apply any judgment." She also tells Downing that "I'm not really sure where Exam management is on the projects. They aren't reporting to you about the progress—who are they reporting to? . . . More and more I'm feeling like it's me, and that doesn't work." She tells Downing to "plan on coming up here after the New Year. We need to figure out how to get a handle on this so we don't get ourselves in trouble." | Lois Lerner, Nanette Downing | IRS0000185603-613 |
| January 2, 2013 | *ProPublica* requests comments from the IRS on an article that it will publish about the efforts of Democracy 21 and Campaign Legal Center to have the IRS investigate Crossroads GPS. The article is entitled "Watchdog Groups Again Call on IRS to Deny Tax-Exempt Status to Karl Rove's Crossroads GPS." Lois Lerner advises Nikole Flax and others that she has referred the letter from Democracy 21 and Campaign Legal Center to EO Exams. She also states that "Ruth Madrigal, Vickie Judson and I are meeting with Democracy 21 and some others on Friday regarding their request for guidance on c4. This has been set up for some time. . . . We will be very cautious." | Lois Lerner, Nikole Flax | IRS0000122515-18 |

362

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| January 4, 2013 | Lois Lerner, Victoria Judson and Ruth Madrigal meet at 11:00 AM with representatives of Democracy 21 and Campaign Legal Center to discuss changes in the 501(c)(4) policy relative to political advocacy. These groups had sent in several referrals in the prior two years specifically alleging that Crossroads GPS and other organizations were engaged in campaign intervention to a degree inconsistent with exempt status under 501(c)(4). After the meeting, Lerner tells Nanette Downing that the ROO referral committee had twice non-selected Crossroads GPS for audit. Lerner says "I don't know where we go with this – as I've told you before—I don't think your guys get it and the way they look at these cases is going to bite us some day." Lerner tells Downing that while the organization has currently been referred to the ROO, that "this is an org that was a prime candidate for exam when the referrals and 990s first came in." Lerner also states that "I'm not confident they will be able to handle the exam without constant hand holding – the issues here are going to be whether the expenditures they call general advocacy are political intervention." Lerner closes by instructing Downing to keep her "apprised of the org's status in the ROO and the outcome of the referral committee. You should know that we are working on a denial of the application, which may solve the problem because we probably will say it isn't exempt. Please make sure all moves regarding the org are coordinated up here before we do anything." | Lois Lerner, Victoria Judson, Ruth Madrigal, Nanette Downing | IRS000122519-20 IRS000446771-75 |
| January 4, 2013 | Lois Lerner tells Nancy Marks that "I have said from day one that Exam is not capable of dealing with the political stuff . . . ." Lerner tells Marks "[w]e always feel safer because Exam decisions are made by 'career IRS agents.' I think they make poor decisions . . . they don't have a clue and just non-select the referral." | Lois Lerner, Nancy Marks | IRS000122525-26 |
| January 4, 2013 | Lois Lerner schedules a meeting for 3:30 PM on January 4, 2013. Holly Paz notes to Nancy Marks that the call is to discuss the Crossroads GPS application. Paz tells Marks that "I suspect this will be the first of many discussions . . . ." EO Determinations agent Joseph Herr, who has been working on the Crossroads GPS application for exemption since January 30, 2012, is invited to the meeting. Herr notes in the case log for the Crossroads GPS case that the participants in a conference call with EO Technical on January 4, 2013, discussed "[o]n how best to proceed with case." | Lois Lerner, Holly Paz, Nancy Marks, Joseph Herr | IRS000071224-26 IRS000475846 |

363

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| January 7, 2013 | Joseph Herr writes in the case log for Crossroads GPS as follows: "Based on conference begin reviewing case information, tax law, and draft/template advocacy denial letter, all to think about how best to compose the denial letter." | Joseph Herr | IRS0000071224-26 |
| January 7, 2013 | Lois Lerner tells Nanette Downing that the reasons given by the Political Activity Review Committee (PARC) on two prior instances when the PARC did not select Crossroads GPS for exam are "most disturbing." Lerner tells Downing, "[a]s I said, we are working on the denial for the 1024, so I need to think about whether to open an exam. I think yes, but let me cogitate a bit on it." | Lois Lerner, Nanette Downing | IRS0000122549-51 |
| January 24, 2013 | An article appears in the *EO Tax Journal* about how an Obama-endorsed entity called Organizing for Action will operate as a 501(c)(4). Lois Lerner asks, "Has this org actually come in? If so, do we have it in DC? We need to be careful to make sure we are comfortable." Holly Paz replies, "I am not aware that we have received this but will check." Sharon Light tells Lois Lerner that the organization intends to operate from both Chicago and Washington DC. In response, Lois Lerner states "[o]h—maybe I can get the DC office job!" | Lois Lerner, Sharon Light | IRS0000217252-67 |
| January 28, 2013 | Jorge Castro prepares for Nikole Flax a summary chart showing 35 Congressional inquiries regarding tax exempt issues received by the IRS from October 2008 through June 2012. Castro notes that the chart does not contain letters from outside groups like CREW and Democracy 21. | Nikole Flax | IRS0000292300-09 |
| January 28, 2013 | Richard Klein, IRS Benefits Specialist, prepares at Lois Lerner's request, a retirement estimate based on a projected retirement date of October 1, 2013. | Lois Lerner | IRS0000202615 (attachment omitted by Committee staff) IRS0000202620-21 |
| January 30, 2013 to February 8, 2013 | Lois Lerner is advised that a Congressman has inquired about the application status for a tax exempt organization. Holly Paz informs Lerner that the IRS correctly denied the organization's request for expedited processing of its application. Cindy Thomas has the case assigned and informs Lerner that the application will be approved on merit. Lerner states that "almost every time I ask them to go back and look at a case that has been sitting—it miraculously gets closed on merit  after it has been sitting for months and months awaiting full development." | Lois Lerner, Holly Paz, Cindy Thomas | IRS0000194742-45 |

Exhibit E

364

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| January 31, 2013 | Lois Lerner emails Christopher Wagner, Chief of Appeals, telling him that she informed his staff that in the near future, his office will "get a lot of business from our TPs regarding denials on 501(c)(4) applications. I explained the issue is whether they are primarily involved in social welfare activities and whether their political intervention activities, along with other non-social welfare activities mean they don't meet the c4 requirements. I explained the issue was very sensitive and visible and there is a lot of interest—Congress, press, political groups, you name it. . . . this is a new issue driven by a recent Supreme Court case expanding spending in elections to corporations, and a desire by some to make the expenditures without having their names show up on Federal Election Reports. . . I told them that this is a place where we have worked very hard to be consistent and have all our cases worked by one group, and suggested they may want to do something similar. . . If I were you, this is definitely something I'd want to be aware of and have a high level person overseeing and reporting regularly to me. . . . Hope this doesn't should [sic] like I'm trying to run your shop." | Lois Lerner, Christopher Wagner | IRS0000122863-64 |
| March 8, 2013 | Holly Paz informs Lois Lerner that the first denial of a 501(c)(4) organization is ready to be transmitted to Chief Counsel for review. Paz is concerned about the length of time it takes Counsel to complete a review and suggests to Lerner that they ask Chief Counsel to only review the letter and not the accompanying file. | Lois Lerner, Holly Paz | IRS000020795-807 |
| March 13, 2013 | Sharon Light, in response to a question from Donna Abner, clarifies that political advocacy cases that are bucketed involve political campaign intervention and not lobbying. Abner sends this clarification out to her employees in QA. | Sharon Light, Donna Abner | IRS0000012122-26 |
| March 13, 2013 | Connie Peek, an IRS Program Analyst, informs Lois Lerner, Joseph Grant and David Fish (among others) that the IRS has disclosed the list of donors (Schedule B) for the Republican Governors Public Policy Committee. Lerner responds "[w]hile this happens sometimes–this is not the best org, it could have happened with – sigh." Lerner advises Nikole Flax that she will notify TIGTA. | Lois Lerner, Nikole Flax | IRS0000320844-46 |
| March 14, 2013 | Janine Cook advises Lois Lerner that Chief Counsel concurs in the first 501(c)(4) denial, but has comments on the letter. Cook indicates that the comments will be complete by the following Monday or Tuesday. | Lois Lerner, Janine Cook | IRS0000202865 |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|-----------|------------------------|-----------|
| March 14-15, 2013 | An IRS employee asks for an update on guidance from EO Technical regarding an ACORN-related application that the Determinations group determined did not meet the requirements for tax-exempt status. The employee notes that EO Technical told EO Determinations in August 2012 that the case would be "back in a couple weeks." | April Garrett, Peggy Combs | IRS000544897-98 |
| March 15, 2013 | Inspector General J. Russell George briefs Treasury Secretary Jacob Lew about TIGTA's audit. | Russell George, Jacob Lew | Summary of TIGTA briefings produced by TIGTA to the Committee on May 19, 2014 |
| March 18, 2013 | Troy Patterson provides Lois Lerner with an advance copy of the TIGTA report "regarding applications" so that Lerner "can have a little extra time to consider the issues in the report . . ." | Troy Patterson, Lois Lerner | IRS000053201 |
| March 21, 2013 | Lois Lerner advises Troy Patterson that "Holly and I have gone over the report and will try and incorporate our concerns into one document and get it to you by Monday. . ." | Lois Lerner, Holly Paz, Troy Patterson | IRS000053201 |
| March 26, 2013 | Jon Waddell elevates an ACORN-related issue to Cindy Thomas. He explains the background on these cases: <br><br> "1. Acorn-related cases were previously reflected on the BOLO and subsequently folded into the political advocacy category over a year ago. <br><br> "2. Currently, we have two proposed denials under review in D.C. involving Acorn-related cases... <br><br> "3. These cases contain some of the same characteristics as other identified political advocacy cases as the applications contain instances of partisan political activity and excessive legislative and mobilization activities precluding approval under c(3)." | Jon Waddell, Cindy Thomas | IRS000054976-78 |
| March 28, 2013 | TIGTA provides IRS Legislative Affairs with a "discussion draft report-Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review..." | Joel Rustein | IRS000509688 (email attachment omitted) |
| March 29, 2013 | David Fish provides Nancy Marks, Richard Daly, Lois Lerner and others with a list of proposals for guidance projects. Among them is "[a]mend 501(c)(4) regulations to incorporate substantial part limitation (this is far and away the most important)." | Lois Lerner, David Fish, Nancy Marks | IRS000188368-81 |

Exhibit E

8

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| April 19, 2013 | Lois Lerner advises Holly Paz to tell Cindy Thomas to watch for an application for exemption recently filed by "Applicant Y" and that when it comes in to EO Determinations, to send the application it to Washington, so that it can be worked under the supervision of Meghan Biss and Judy Kindell. Paz asks Lerner if she should add the group by name to the BOLO list or to describe it more generally in the BOLO list like "[o]rganizations providing relief to victims of recent acts of mass violence." | Lois Lerner, Holly Paz | IRS0000129957-60 |
| April 19, 2013 | Sharon Light advises Lois Lerner, Holly Paz and others that Chief Counsel has concluded its review of the first denial for a 501(c)(4) organization. Light has incorporated Chief Counsel's comments. | Lois Lerner, Sharon Light, Holly Paz | IRS0000195712-21 |
| April 25, 2013 | Lois Lerner tells Mike Seto to "get the ["Applicant Y"] application thru screening right away and up to R and A. . . . Would like it today, if possible." | Lois Lerner, Mike Seto | IRS0000189156 |
| May 2013 | Steve Miller decides to get in front of the impending release of the TIGTA report on the use of inappropriate criteria.  He decides to have Lois Lerner make an apology at the ABA conference on May 10, 2013, in response to a planted question from someone in the audience.  Miller discusses the idea with Mark Patterson, Chief of Staff to the Treasury Secretary, and with Mark Mazur, Assistant Secretary for Tax Policy, Treasury.  Patterson tells Miller that he wants to think about it.  Mazur doesn't get back to Miller.  Miller decides to proceed with the idea. | Steve Miller, Mark Patterson, Mark Mazur | SFC Interview of Steve Miller, (Dec. 12, 2013) p. 220 SFC Interview of Mark Patterson, (Apr. 7, 2013) p. 36 |
| May 1, 2013 | The IRS sends "Applicant Y" a development letter. | | IRS0000013040-49 |
| May 3, 2013 | "Applicant Y" responds to the development letter. | | IRS0000013040-49 |
| May 3, 2013 | Lerner informs Nikole Flax and Joseph Grant that she just concluded a conversation with an applicant (presumably "Applicant Y").  Lerner tells Flax and Grant that "I told her our goal was to assist them in understanding what troubles us about the application, suggest ways they might modify it and discuss other situations reported in the media so we could all be on the same page regarding what occurred.  I'm not feeling particularly confident about this one.  They seem to think that because Congress passed a special bill after 9/11, IRS has authority to incorporate the same rules here.  She sounded like she wasn't taking no for an answer." | Lois Lerner, Nikole Flax, Joseph Grant | IRS0000662208 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|------------|------------------------|-----------|
| May 4, 2013 | Steve Miller informs Mark Patterson that he will speak to the Mayor's Chief of Staff about "Applicant Y" after a phone call with Chief Counsel and EO. Patterson suggests emailing the Mayor's Chief of Staff to let him know that the IRS is working the matter over the weekend. | Steve Miller, Mark Patterson | IRSC032185 |
| May 4, 2013 | The Form 1023 application for "Applicant Y" is sent to Meghan Biss. She summarizes it for Lois Lerner and points out issues with it. Lerner sends the summary of the application for exemption under 501(c)(3) to Steve Miller. | Lois Lerner, Steve Miller | IRS0000322699-700 |
| May 6, 2013 | Lois Lerner sends Nancy Marks a one-page summary of "Applicant Y's" application and plan of operation, together with an analysis of the problems in the organization's plan of operations that would preclude the IRS from granting the organization 501(c)(3) status. | Lois Lerner, Nancy Marks | IRS0000013050-51 |
| May 6, 2013 | Justin Abold sends Steve Miller a copy of a report entitled **Updated Baseline Analysis of 501(c)(4) Form 990 Filers with** *Political Campaign Activities* in preparation for a meeting scheduled for the following day to discuss the conclusions reached in the report. The Report examines whether "501(c)(4) organizations have become increasingly involved in *Political Campaign Activities* (PCA) since 2010." The Report reaches three main conclusions: 1) The number of 501(c)(4) filers reporting PCA almost doubled from TY2008-TY2010; 2) the amount of PCA for large filers almost tripled from TY2008-TY2010; and that there is a limited number of 510(c)(4) filers that engaged in PCA and filed a Form 990 for only one year.  The report notes two events that occurred in 2010: the *Citizens United* Supreme Court decision in January, and the ACA Reconciliation Act (from October 2009 to June 2010). | Steve Miller, Justin Abold | IRS0000494805-29 |
| May 6, 2013 | Holly Paz advises Lois Lerner that the first proposed denial of a 501(c)(4) organization will be released the following day. | Holly Paz, Lois Lerner | IRS000007348 |
| May 6, 2013 | Nikole Flax informs Steve Miller that "[first proposed c4 denial going tomorrow — not the well known org." | Nikole Flax, Steve Miller | IRSC032193 |
| May 7, 2013 | A Senator inquires about the application from "Applicant Y." Lois Lerner tells Holly Paz to tell the Senator's office that the application is assigned and is being worked on and that the IRS has had several conversations with the organization. | Lois Lerner, Holly Paz | IRS000020791 9-20 |

| Date | Occurrence | Key Personnel Involved | Authority |
|------|------------|------------------------|-----------|
| May 7, 2013 | Steve Miller meets with Nikole Flax, Dean Silverman and Eric Schweikert to discuss the report entitled **Updated Baseline Analysis of 501(c)(4) Form 990 Filers with _Political Campaign Activities_**. | Steve Miller, Nikole Flax, Dean Silverman, Eric Schweikert | IRS000456399 |
| May 8, 2013 | Lois Lerner advises Nikole Flax that Richard Pilger at the Department of Justice wants to meet with IRS officials to discuss the possibility of criminally prosecuting 501(c)(4) organizations under the False Claims Act if they "lied" on their Form 1024s by stating they would not engage in political activity, but did, in fact engage in that activity. | Lois Lerner, Nikole Flax | IRS000209199 |
| May 8, 2013 | Steve Miller announces that Joseph Grant has been selected as the TE/GE Commissioner. | Steve Miller | IRS000208974-75 |
| May 8, 2013 | Lois Lerner tells Steve Miller "I do need to talk to someone as early as possible about ABA and whether we're still on?  Will need to reach out if so." Miller responds "[t]hink we do it." (Lerner is referring to asking someone who will be in attendance at the ABA Conference to ask her a "planted" question about the IRS' treatment of the Tea Party.) | Steve Miller, Lois Lerner | IRS000209214 |
| May 9, 2013 | Lois Lerner asks Nikole Flax "[d]o we have a plan for Friday re c4?  Do I need to reach out re asking me a question or directly hit it head on?  Need to know soon please."  Flax responds "[w]e have a call for 11:30." | Lois Lerner, Nikole Flax | IRS000209300 |
| May 9, 2013 | Lois Lerner calls Celia Roady Esq., an attorney at Morgan Lewis, and requests that Roady pose to her a question about the IRS' handling of Tea Party applications after Lerner's prepared remarks at the Tax Section Meeting of the ABA Conference scheduled for the following day.  Roady agrees and Lerner provides her the question to ask. | Lois Lerner | US News, Woman Who Asked IRS's Lois Lerner Scandal-Breaking Question Details Plant |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| May 9, 2013 | Steve Miller meets with ABA representatives.  He intends to discuss with the ABA representatives: 1) the IRS's handling of Tea Party applications; 2) the IRS intention to move forward with a discussion on imposing the gift tax on donations to 501(c)(4) organizations and how the ABA might help; 3) the (c)(4) regulation and how "a wave of cash [was] unleashed by *Citizens United*" and "that cash chose a favorable port due to disclosure and under-enforced gift tax rules."  Miller intends to ask for the ABA's views on: 1) whether the IRS should craft new rules in the (c)(4) area; 2) whether the IRS should also change the rules for (c)(5) and (c)(6) organizations; and 3) the distinction between 501(c)(3) and (c)(4) organizations after the rule changes.  Miller intends to explore various options including whether the ABA would sponsor a study on some of these issues.  It is unclear whether Miller addresses all these issues with the ABA representatives. | Steve Miller | IRS00050547-50 |
| May 9, 2013 | William Wilkins, Janine Cook, Victoria Judson, Steve Miller, Lois Lerner, and Nikole Flax meet with ABA Committee and Sub-Committee Chairs the day before an ABA Conference to discuss campaign activity by exempt organizations. | William Wilkins, Janine Cook, Victoria Judson, Steve Miller, Lois Lerner, Nikole Flax | IRS000014699-718 |
| May 10, 2013 | Lois Lerner attends the Tax Section Meeting of the ABA Conference in Washington D.C.  In response to a question asked by Celia Roady, Esq. at the Conference for an update on concerns about the IRS' review of applications for tax exemption by Tea Party groups, Lois Lerner states:  "line people" in Cincinnati selected applications for "further review" based on the existence of names in their applications like "Tea Party" or "Patriots;" the cases "sat around for too long;" "[t]hey also sent some letters out that were far too broad . . . they asked for contributor names . . . they didn't do it correctly and they didn't do it with a higher level of review."  Lerner ends her remarks as follows:  "So, I guess my bottom line here is that we at the IRS should apologize for that, it was not intentional, and as soon as we found out about what was going on, we took steps to make it better and I don't expect that to reoccur." | Lois Lerner | http://meetings.abanet.org/webupload/commupload/TX319000/sitesofinterest_files/may_2013_aba.pdf |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|------|------------|------------------------|-----------|
| May 10, 2013 | Shortly after making her statements during the morning session of the ABA Conference, Celia Roady emails Lerner a copy of a national news alert entitled "IRS apologizes for inappropriately targeting conservative political groups." According to the news alert, Lerner attributed the IRS practice of targeting conservative groups to "low-level workers in Cincinnati . . ." | Lois Lerner, Celia Roady | IRS0000662454-55 |
| May 10, 2013 | By early afternoon, Terry Lemons, IRS Communications Chief, suggests to Steve Miller, Nikole Flax, Joseph Grant, and Lois Lerner that Lerner send a voice message to staff explaining her comments earlier in the day at the ABA Conference. Lemons also informs Miller, Flax, Grant, and Lerner that the "NTEU press person just called; they are hearing from employees as well . . . ." | Lois Lerner, Steve Miller, Nikole Flax, Joseph Grant, Terry Lemons | IRS0000662535 |
| May 10, 2013 | Lerner sends an email to Steve Miller, Nikole Flax, Joseph Grant and Terry Lemons advising that she spoke to Cindy Thomas who informed her that "employees are especially upset with RAs being referred to as "lower level" employees." | Lois Lerner, Steve Miller, Nikole Flax, Joseph Grant, Terry Lemons | IRS0000662538 |
| May 10, 2013 | Lois Lerner sends the voice mail message to Cindy Thomas and Donna Abner, instructing them to send the message to their staffs. Lerner laments to Thomas and Abner as follows: "I know the press that came out today is upsetting, and I'm guessing there will be more to come. . . ." | Lois Lerner, Cindy Thomas, Donna Abner | IRS0000662553 |
| May 2013 | Steve Miller writes a handwritten chronology of events in this matter. He marks in capital letters that in June 2011, "LOIS DID NOT ELEVATE ANYTHING." | Steve Miller | IRS0000468988 |
| May 14, 2013 | IRS grants "Applicant Y" 501(c)(3) status. | Holly Paz | "Applicant Y" 501(c)(3) Approval Letter (May 14, 2013) |
| May 14, 2013 | TIGTA releases its report entitled "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review." The report concludes that "[t]he IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based on their names or policy positions instead of indications of potential political campaign intervention. Ineffective management: 1) allowed inappropriate criteria to be developed and stay in place for more than 18 months, 2) resulted in substantial delays in processing certain applications, and 3) allowed unnecessary information requests to be issued." | TIGTA | TIGTA, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| May 14, 2013 | Chairman Darrel Issa, House Oversight and Government Reform Committee, sends Lois Lerner a letter requesting that Lerner provide a briefing on the IRS handling of Tea Party applications.  When informed of the request, Lerner responds as follows:  "So what do they expect of me?" | Lois Lerner | IRS0000190728-29 IRS0000189591-600 |
| May 15, 2013 | Chairman Issa's staff informs the IRS that there will be a hearing the following week and requests Lois Lerner to respond to the invitation to appear and testify at the hearing by noon the following day.  When informed of the invitation to testify, Lerner says:  "I am not ready to respond.  I need to talk to some people first." | Lois Lerner | IRS0000189624-26 |
| May 15, 2013 | Nancy Marks sends Lerner a list of the BOLO entries for the Tea Party and political advocacy cases, and indicates that she will send Lerner a full copy of the TIGTA report. | Lois Lerner | IRS0000190733-34 |
| May 16, 2013 | Joseph Grant announces that he intends to retire from the IRS effective June 3, 2013. | Joseph Grant | IB Times, IRS Scandal Claims Second Agency Casualty_ Joseph Grant To Retire Over Controversy |
| May 16, 2013 | At the request of Secretary Jacob Lew, Steve Miller resigns as Acting Commissioner of the IRS and retires from Federal Service.  His resignation/retirement is effective in 2 weeks. | Steve Miller | SFC Interview of Steve Miller (Dec. 12, 2013) pp. 12-13 SFC Interview of Mark Patterson, (Apr. 7, 2013) pp. 41-43 |
| May 23, 2013 | Lois Lerner is placed on an administrative leave by the IRS. | Lois Lerner | The Washington Post, Lois Lerner put on Administrative Leave by IRS |

Exhibit E

| Date | Occurrence | Key Personnel Involved | Authority |
|---|---|---|---|
| May 2013 | After release of the TIGTA report, Nanette Downing realizes that there is a "pile" of Tea Party cases that EO Determinations had referred to EO Exams. The cases had "just been sitting" and were marked for 3- to 5-year follow-ups. Downing turns the issue into TIGTA and after meeting with Ken Corbin and Karen Schiller (former head of R&A), they decide to send the cases back to EO Determinations. The Tea Party cases were referred by more than one employee in EO Determinations and were sent "in intervals" and not all at once.  In addition, the PARC received the first batch of political referrals in February 2013 and recommended 20-30 exams.  When the TIGTA report is released, IRS halts the exams. | Nanette Downing | SFC Interview of Nanette Downing, (Dec. 6, 2013) pp. 39-40, 47-49, 92-95 |
| May 30, 2013 | Joseph Herr sends Sharon Light a draft denial on the application for exemption by Crossroads GPS. | Joseph Herr, Sharon Light | IRS0000529074-91 |
| June 24, 2013 | The IRS suspends the use of the BOLO spreadsheet in the application process for tax-exempt status. | | IRS, Report Outlines Changes for IRS To Ensure Accountability, Chart a Path Forward; Immediate Actions, Next Steps Outlined |
| August 1, 2013 | Jack Koester, a screener in EO Determinations states that if he currently reviews an application from a Tea Party that contains no indicia of political activity, he would send the application to secondary screening for political advocacy.  "Q.  So you would treat a Tea Party group as a political advocacy case even if there was no evidence of political activity in the application.  Is that right?  A.  Based on my current manager's direction, uh huh." | Jack Koester | SFC Interview of Jack Koester, (Aug. 1, 2013) pp. 39-40 |
| September 2013 | Lois Lerner retires from the IRS after an internal investigation finds that she was guilty of "neglect of duties" and recommends her removal. | Lois Lerner | The Washington Times, Lois Lerner, IRS Official in Tea Party Scandal, Forced Out |

Exhibit E