UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUE THE VOTE, INC.,** *Plaintiff*, <br><br> v. <br><br> **INTERNAL REVENUE SERVICE,** *et al.***,** <br><br> *Defendants*. | Civ. No. 13-cv-00734-RBW <br><br> **Oral Argument Scheduled for March 2, 2017** |

# DECLARATION OF CLETA MITCHELL IN SUPPORT OF MOTION FOR DISCOVERY UNDER FEDERAL RULE OF CIVIL PROCEDURE 56(D).

I, Cleta Mitchell, declare as follow:

1. I am a partner in the Washington D.C. office of Foley & Lardner LLP. I am lead counsel for Plaintiff True the Vote in connection with the above-captioned matter.

2. This Declaration is submitted pursuant to Federal Rule of Civil Procedure 56(d), which provides,

> (d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

3. Although True the Vote believes the Government's Motion for Summary Judgment (Doc. 112) should be denied outright for the reasons set forth in True the Vote's Memorandum of Law In Opposition to the Government's Motion for Summary Judgment ("TTV Opposition Memorandum"), True the Vote submits this Declaration to demonstrate that True the Vote cannot present *all* facts essential to support its opposition to the Government's Motion for

1

Summary Judgment because it has never been allowed to discover the facts underlying the issues of this case.

4.True the Vote also cannot identify the specific types of evidence True the Vote intends to present to the Court, because such evidence is in the exclusive control and/or custody of the Government. *See Am. Broad. Cos. v. United States Info. Agency*, 599 F. Supp. 765, 770 (D.D.C. 1984) (defendant's exclusive control of discoverable information weighs in favor of granting a request for discovery under Rule 56(d)).

5.This litigation will enter its fourth year in May 2017, and it has now been almost *seven* years since True the Vote submitted its initial application to the IRS for recognition as a tax-exempt entity. Yet to date, True the Vote has been denied the opportunity to conduct *any* discovery to support its well-pleaded allegations, which are "quite sufficient to warrant a merits disposition based on adjudication of substantive evidence, not simply a dismissal at the pleadings stage." *True the Vote v. IRS*, 831 F.3d 551, 563 (D.C. Cir. 2016).

6.The following discoverable information is <u>essential</u> to True the Vote's opposition to the Government's Motion, but is unavailable to True the Vote without discovery:

 a)<u>Evidence regarding the processing of True the Vote's application for tax-exempt status.</u> As explained further in True the Vote's Opposition Memorandum, the Government makes little to no mention of the IRS's treatment of True the Vote, specifically. Only with this information can the Court resolve whether such conduct is likely to recur or has permanently ceased. Accordingly, True the Vote is entitled to discovery of the following documents and electronically stored information, including deposition testimony, related to the Government's

processing of True the Vote's application, including documents and all supporting and related information, to wit:

    i. the initial selection and segregation of True the Vote's application for further review and development under the IRS Targeting Scheme;

    ii. the subjecting of True the Vote's application to the "multi-tier review process" developed by the IRS;

    iii. communications between and among IRS employees assigned to True the Vote's application, in Cincinnati, Washington D.C. and elsewhere;

    iv. communications between and among IRS employees and any individual or entity outside the IRS regarding True the Vote's application;

    v. the names and titles of all individuals who took any part in the discussions about and/or the processing of True the Vote's application;

    vi. the creation and propounding of all "development" letters sent to True the Vote following the submission of its application for exempt status in 2010;

    vii. the creation of the intrusive, burdensome and unnecessary requests for information propounded to True the Vote and other exempt organizations in 2012; and

    viii. any other decisions, discussions, and communications regarding the handling or treatment of True the Vote's application for exempt status from 2010 through the present date.

b) <u>Evidence concerning the retention and disclosure True the Vote's application material.</u> True the Vote alleged that the IRS "made multiple, unnecessary, burdensome, and voluminous requests for information and documentation wholly

unnecessary to the determination of True the Vote's tax-exempt status." (Doc. 14 ¶ 128.) The IRS remains in possession of this information and is required by law to publicly disclose it upon request. 26 U.S.C. § 6104(a)(1)(A). The IRS's possession of this material is a direct consequence of the IRS Targeting Scheme and an "effect" that continues to persist. Yet the Government does not address this effect in its Motion.

True the Vote is entitled to return of all information demanded in connection with the IRS Targeting Scheme. The scope of that information cannot be accurately ascertained because such information is in the possession and control of the IRS. Accordingly, True the Vote is entitled to discovery of the following documents and electronically stored information, including deposition testimony, concerning:

  i. the creation and development of all "development" letters propounded on True the Vote and other organizations targeted by the IRS. (S*ee e.g.*, Docs. 14-4 – 14-5);

 ii. communications, both within and outside the IRS, concerning all "development" letters propounded on True the Vote (*id.*); and,

iii. requests for and disclosure of True the Vote's application material, including the identity all individuals who have made such requests.

c) <u>Evidence concerning the dissemination and sharing of True the Vote's application material both within and outside the IRS.</u> Evidence available to True the Vote indicates that True the Vote's application material was shared with government officials both within and outside the IRS for reasons not related to tax

administration. For example, in January 2013, the Committee on Oversight and Government Reform discovered that

> Democratic staff of the House Oversight Committee asked the IRS for material relating to the tax-exempt application of True the Vote, a Tea Party-related organization. Holly Paz, director of Exempt Organizations Rulings and Agreements, authorized the IRS to release information to the Democratic staff, but it is unclear what information the IRS eventually provided.

Staff Report, House of Representatives Committee on Oversight and Government Reform, "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress" at 159, 113th Cong. (Dec. 23, 2014) (Exhibit D to TTV Opposition Memorandum, hereafter "Oversight Findings"). The Government does not address the dissemination of True the Vote's application material nor confirm that any information shared with Democratic staff was returned, destroyed and not disseminated further.

The conduct of the IRS and other federal agencies strongly suggests that True the Vote's application material was shared with other government officials both within and outside the IRS. In 2010, Catherine Engelbrecht founded True the Vote along with another non-profit group, King Street Patriots, and sought a tax-exemption from the IRS for both organizations. (Declaration of Catherine Engelbrecht ¶¶ 1-4.) Shortly thereafter, Ms. Engelbrecht, her non-profit organizations, and her family business were subjected to repeated visits, audits, and investigations by three different federal agencies, as well as the IRS, which, for the first time ever, audited Ms. Engelbrecht, her husband and her family business. (*Id*. ¶¶ 6-13.) Ms. Engelbrecht and True the Vote attempted to utilize the Freedom of Information Act to ascertain the circumstances surrounding the

government's actions. Yet the recipient agencies of those requests withheld documents that would allow for such an understanding. (*Id*. ¶¶ 21-35.) Accordingly, True the Vote is entitled to discovery of the following documents and electronically stored information, including deposition testimony, concerning:

i. the request for and release of True the Vote's application material and/or tax return information to Democratic staff of the House Oversight Committee;

ii. the names and titles of all Democratic staff members to whom True the Vote application material and/or tax return information was disseminated;

iii. the dissemination of True the Vote's application material and/or tax return information to any other private individuals or government actors, including, but not limited to the IRS, Federal Bureau of Investigation, Occupational Safety and Health Administration, and the Bureau of Alcohol, Tobacco, and Firearms.

iv. the visits, audits, and investigations of Catherine Engelbrecht, her husband, and her business interests by government agencies, as more thoroughly described in the Declaration of Catherine Engelbrecht filed contemporaneously with this declaration.

d) <u>Evidence concerning the use of viewpoint-based criteria in any aspect of tax administration.</u> As described by this Court, the Government must present facts demonstrating why True the Vote "will not experience any negative consequences resulting from the alleged discriminatory targeting scheme employed by the defendants throughout its tenure as a tax-exempt entity." (Doc. 109.) The Court of

Appeals recognized this principle in its decision, stating that the Government must demonstrate two things: "(1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *True the Vote, Inc. v. IRS*, 831 F.3d at 561 (internal quotations omitted). Accordingly, evidence concerning the presence and/or use of discriminatory criteria employed by the IRS to monitor and oversee True the Vote as a tax exempt organization are essential to support True the Vote's opposition to the Government's motion. However, such evidence is unavailable to True the Vote because it is in the possession and control of the IRS. Accordingly, True the Vote is entitled to discovery of the following documents and electronically stored information, including deposition testimony, concerning:

i. the failure of the IRS to include True the Vote as a recognized public charity from and after the granting of True the Vote's exempt status in response to this litigation.

ii. all discussions, communications, decisions regarding the segregation of True the Vote from other recognized exempt organizations even after receiving its letter of recognition as a tax-exempt entity; and

iii. all communications and decisions regarding True the Vote following the granting of its exempt status.

iv. the use of BOLO listings and any other method employed by the IRS to target organizations based on their names, viewpoints, policy positions, politics, officers, directors, volunteers, and/or associations;

      v.    the suspension and alleged cessation of BOLO listings used inside and outside the tax-exempt application process;

     vi.    the safeguards established by the IRS to govern the ongoing interactions between True the Vote and the IRS for the duration of True the Vote's existence and to ensure there is no viewpoint discrimination in the tax administration obligations of the IRS with respect to True the Vote; and,

    vii.    the findings and conclusions of the report issued by the Government Accountability Office, which found that (1) "control deficiencies . . . increase the risk that EO could select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views." Government Accountability Office, Report to Congressional Requesters, "IRS Examination Selection: Internal Controls for Exempt Organization Selection Should Be Strengthened" (July 2015) (Exhibit B to TTV Opposition Memorandum).

e) <u>Evidence concerning the political interests and biases of IRS employees and officials.</u> The Government adopts TIGTA's finding that the cause of the IRS Targeting Scheme was nothing more than "ineffective management." (*See* Doc. 112-1 at Highlights.) True the Vote alleges that the IRS Targeting Scheme was the result of viewpoint-based discrimination and political bias harbored by officials within the Obama Administration. (*See* Doc. 14 ¶ 150-152.)There are, therefore, questions of fact regarding the underlying issues, factors, and causes that resulted in the IRS Targeting Scheme, to which True the Vote must be privy

8

in order to ascertain to what extent the issues, factors and causes have been permanently eradicated.

There is more than sufficient evidence to presently support True the Vote's view that it was politics, not ineffective management, that caused the IRS to target groups like True the Vote. In June 2014, the U.S. House of Representatives Committee on Oversight and Government Reform released a report entitled "How Politics Led the IRS to Target Conservative Tax-Exempt Applicants for their Political Beliefs," which, as the name suggests, concludes that groups like True the Vote were targeted because of their political beliefs, actual or perceived. Staff Report, House of Representatives Committee on Oversight and Government Reform, "How Politics Led the IRS to Target Conservative Tax-Exempt Applicants for their Political Beliefs," 113th Cong. (June 16, 2014) (Exhibit C to TTV Opposition Memorandum).

Later in 2014, the House Oversight Committee released a second report entitled "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress." Staff Report, House of Representatives Committee on Oversight and Government Reform, "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress," 113th Cong. (Dec. 23, 2014). The Report concluded that there developed a "culture of bias against conservative organizations among certain IRS employees," *id.* at 209-210, which ultimately manifested itself as the IRS Targeting Scheme. The Report contains an entire

section on the discriminatory treatment of True the Vote by the IRS and a high-ranking member of the Democratic Party.

The Government concedes that the personal behavior of the individuals involved in the IRS Targeting Scheme is relevant to this Court's disposition: "Within days of the issuance of the TIGTA Report, *senior leadership and managers that permitted the activity were replaced* and new leadership immediately began implementing changes. In light of evidence strongly indicating that political bias played a major role in the targeting of True the Vote and other groups, True the Vote is entitled to discover the following information, including all documents and electronically stored information, and deposition testimony concerning:

  i. a list of all individuals identified by the IRS to have "permitted the activity" about which True the Vote complains;
  ii. the current employment status of those individuals, including their present titles, job descriptions and responsibilities;
  iii. the replacement of those individuals, including the reasons for their replacement; and
  iv. a list of all individuals hired by the IRS to replace those individuals in the identified positions

f) <u>Evidence concerning the training of IRS employees and evidence concerning the effectiveness of the training.</u> The Government asserts that it is undisputed that the IRS has implemented TIGTA's recommendations in such a way that it is "absolutely clear the allegedly wrongful behavior could not reasonably be

expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000), and that all effects of the Targeting Scheme have been permanently eradicated. However, the TIGTA report on which the Government relies for this assertion reveals that over 20% of EO employees had not completed the training necessary to implement TIGTA's recommendations, leaving those employees without the "knowledge needed to effectively and efficiently carry out their responsibilities." (Doc. 112-1 at 13-14.) The consequences of missed training were evident. TIGTA discovered that as many as 6.15 percent of employees "do not know what information to consider when determining if there was potential political campaign intervention" problems with a particular organization." (*Id*. at 25.)

Moreover, even for those employees who had completed the necessary training, "the IRS did not complete the process designed to evaluate the effectiveness of the training." (Doc. 112-1 at 15.) Thus, even assuming, *arguendo*, that a cause of the IRS Targeting Scheme was "ineffective management,"[1] (Doc. 14-6 at 2), the 2015 Report reveals that such ineffectiveness has not been eradicated, but continues to persist.

Facts concerning training and managerial oversight designed to remedy the alleged harm are directly relevant to the ongoing effects of the IRS Targeting Scheme. Accordingly, True the Vote is entitled to discover the all documents and electronically stored information, and deposition testimony, concerning:

---

[1] True the Vote denies that "ineffective management" was the "sole cause" of the IRS Targeting Scheme.

11

      i. the programs, materials, and content of the training identified in the 2015 TIGTA Report;

     ii. the identity of the presenters and trainers involved in the training identified in the 2015 TIGTA Report;

    iii. evaluation results of the training identified in the 2015 TIGTA Report and background of the evaluators;

    iv. any training designed to remedy the conduct of which True the Vote complains conducted outside the tax-exempt application process and the application of such training to other tax administration obligations and procedures impacting True the Vote during the life of its existence and interactions with the IRS;

g) <u>Evidence concerning ongoing oversight of True the Vote and any other effects of the alleged violations.</u> The Government was ordered by the D.C. Circuit and this Court to address all "effects" of the IRS Targeting Scheme throughout True the Vote's tenure as a tax-exempt entity. Yet the Government provides only five paragraphs of "evidence" with respect to its ongoing oversight of True the Vote. Former EO Director Tamera L. Ripperda—who left the position only days after submitting her affidavit filed by the Government and who further was not even in that position during the period during which True the Vote was subjected to the IRS Targeting Scheme with respect to its application for exempt status—states as an "undisputed factual matter" that "True the Vote is not more or less likely to be audited based on any additional scrutiny using inappropriate criteria that may have taken place during its application process because actions taken during the

application process are not considered by the automated case selection models." (Doc. 112-3 ¶ 28.)

As her statement plainly indicates, Ms. Ripperda's position is limited to those audit referrals made by the IRS's "automated case selection models," and not to other audit referral sources. Ms. Ripperda acknowledges that audit referrals for an organization such as True the Vote also "can come from individuals or groups outside the IRS or from other divisions within the IRS." (Doc. 112-3 ¶ 26.) Yet Ms. Ripperda gives no assurances about—and in fact does not even discuss—these other avenues through which True the Vote could face unfair treatment in the audit selection process.

The evidence currently available to True the Vote regarding the audit selection process indicates that "control deficiencies" within the IRS that "increase the risk that EO could select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views." Government Accountability Office, Report to Congressional Requesters, IRS Examination Selection: Internal Controls for Exempt Organization Selection Should Be Strengthened, Highlights, July 2015 (Exhibit B to TTV Opposition Memorandum).

The Government's limited assertions regarding oversight and monitoring of True the Vote and the ongoing effects of the IRS Targeting Scheme are questions of fact. True the Vote cannot sufficiently oppose the Government's facts without the opportunity to conduct discovery with respect to evidence that is in the exclusive possession and control of the IRS. Accordingly, True the Vote is

entitled to discover the all documents and electronically stored information, and deposition testimony, concerning:

    i. communications within and outside the IRS regarding referral of True the Vote for examination, audit, or investigation;

    ii. IRS audit selection and referral procedures and programs and any other post-determination compliance programs, including training designed to eliminate the use of viewpoint-based discrimination with such programs; and

    iii. reports and training of the IRS's Political Activity Referral Committee (Doc. 112-3 p. 24).

    iv. IRS Review of Operations ("ROO") which, according to Government witness Tamera L. Ripperda, are "non-contact compliance reviews of tax exempt organizations." (Doc. 112-3, ¶ 18.)

h) <u>Deposition of Government witness Tamera L. Ripperda</u>. The Government's sole witness Tamera L Ripperda states that she is the current director of the IRS's Exempt Organization Division. (Doc. 112-3 ¶ 2.) However, Ms. Ripperda departed that position just *three* days after the Government filed her testimony. *See* Bloomberg BNA, Daily Tax Report, "IRS Exempt Organizations Director Switching Roles Next Month" (Oct. 26, 2016), https://www.morganlewis.com/~/media/files/news/2016/bloombergbna_irs-exempt-organizations-director-switching-roles-next-month_26oct16.ashx?la=en (last accessed Jan. 19, 2017). Ms. Ripperda's departure means she is no longer in a position to oversee the alleged implementation of TIGTA's recommendations. Moreover, Ms. Ripperda

was not in the position of EO Director—or even in a position within the EO unit—until years after the conduct alleged in the Amended Complaint occurred. (Doc. 112-3 ¶ 2 ("I have held this position since January 2014.")). This raises serious questions regarding whether Ms. Ripperda has the requisite personal knowledge necessary to testify as to the IRS's conduct, the effects of that conduct, and the alleged eradication of those effects. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") Nevertheless, True the Vote is entitled to depose Tamera L. Ripperda regarding the following non-exhaustive topics:

  i. Ms. Ripperda's personal knowledge of the facts about which she testifies;
 ii. ROO compliance reviews of True the Vote (Doc. 112-3 ¶ 18);
iii. implementation of actions recommended in the 2013 TIGTA Report, including the training designed and developed to implement those recommendations (Doc. 112-3 ¶ 21);
 iv. implementation of actions recommended in the 2013 Senate Finance Committee Report, including the training designed and developed to implement those recommendations (Doc. 112-3 ¶¶ 23-25);
  v. potential for future audits of True the Vote (Doc. 112-3 ¶¶ 26-30); and
 vi. the status and nature of actions taken to implement recommendations made by other entities, including the Government Accountability

      Office, the Senate Finance Committee, and the House Oversight Committee.

7. The foregoing evidence is discoverable pursuant to Federal Rule of Civil Procedure 26(b)(1) because it is "relevant" to True the Vote's claims that the IRS engaged in viewpoint discrimination in violation of True the Vote's First Amendment rights and engaged in violations of the Administrative Procedure Act.

8. The foregoing evidence is essential to demonstrate the existence of disputes concerning facts material to the disposition of this case, specifically, whether the Government has carried its "heavy" burden of establishing mootness as a result of its voluntary cessation.

9. True the Vote is presently unable to present the foregoing evidence because any such evidence is solely and exclusively in the possession and/or control of the Government.

10. Accordingly, this Court should grant True the Vote relief under Federal Rule of Civil Procedure 56(d). The Government's motion for summary judgment should be denied, or alternatively deferred, to allow time to take discovery regarding the foregoing evidence.

11. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on January 19, 2017,

                                                /s/
                                        Cleta Mitchell
                                        *Counsel for Plaintiff*