IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
TRUE THE VOTE, INC.                                 )
                                                    )
            Plaintiff,                              )
                                                    )
            v.                                      )          Civil Action No. 1:13-cv-00734-RBW
                                                    )
UNITED STATES OF AMERICA, *et al.*,                 )
                                                    )
            Defendants.                             )
_____)


**UNITED STATES' REPLY IN SUPPORT OF SUMMARY JUDGMENT
AS TO REMAINING CLAIMS**

# Table of Contents

Table of Authorities ....................................................................................................... ii

DISCUSSION ..................................................................................................................3

I.  The United States' motion for summary judgment presents threshold issues
    of the Court's subject matter jurisdiction, which are appropriately decided now  .............3

    A.  Contrary to Plaintiff's misleading use of a selected portion of a quotation
        to try to show otherwise, the United States does not agree that Plaintiff
        is entitled to discovery before the issue of the Court's subject matter
        jurisdiction is decided ..........................................................................................3

    B.  The D.C. Circuit's prior ruling does not preclude a determination that Plaintiff's
        claims are moot on the grounds that its application has been granted....................4

II. Plaintiffs' claims for declaratory and injunctive relief present no live or ongoing case
    or controversy for the Court to decide ...............................................................................7

    A.  There is no actual controversy given that True the Vote's application for
        tax-exempt status has been granted.........................................................................7

    B.  Plaintiff does not identify any ongoing harms for which it may receive present
        relief ........................................................................................................................8

        1.  *The alleged retention of information that was not necessary to evaluating
            Plaintiff's application is both beyond the scope of the complaint and
            factually unfounded* ................................................................................8

        2.  *Plaintiff's claim that it might be the subject of "surveillance" after its
            application was granted is speculative and beyond the scope of the
            complaint* .............................................................................................10

        3.  *The possibility that Plaintiff might be selected for audit in the future is a
            speculative harm that goes beyond the scope of the complaint* ................12

        4.  *Plaintiff's allegation of past harm does not entitle it to declaratory
            and/or injunctive relief now* ...................................................................15

        5.  *The alleged "dissemination" of Plaintiff's application information
            is both speculative and beyond the scope of the complaint* .....................15

15048830.1

6.    *Even if Plaintiff's application were still pending, which it is not, it would not face imminent harm from prior practices that have permanently ceased* ..................................................................................17

CONCLUSION ........................................................................................................................20

## Table of Authorities

**Cases**

*Already, LLC v. Nike, Inc.*,
133 S. Ct. 721 (2013) .........................................................................................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .........................................................................................................10

*Dearth v. Holder*,
641 F.3d 499 (D.C. Cir. 2011) ............................................................................................8

*DeSilva v. Donovan*,
81 F. Supp. 3d 20 (D.D.C. 2015) ........................................................................................8

*Linchpins of Liberty v. United States*,
71 F. Supp. 3d 236 (D.D.C. 2014) .....................................................................................1

*Qassim v. Bush*,
466 F.3d 1073 (D.C. Cir. 2006) .........................................................................................7

*True the Vote, Inc. v. IRS*,
831 F.3d 551 (D.C. Cir. 2016) ...................................................................1, 2, 5, 6, 7, 13, 16

*True the Vote, Inc. v. IRS*,
71 F. Supp. 3d 219 (D.D.C. 2014) .........................................................................2, 8, 11, 13

**Statutes**

26 U.S.C. § 6103 ...............................................................................................................16

Protecting Americans from Tax Hikes Act of 2015 ("PATH Act"), 129 Stat. 2242 ...................18

15048830.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
TRUE THE VOTE, INC.                                 )
                                                    )
         Plaintiff,                                 )
                                                    )
         v.                                         )        Civil Action No. 1:13-cv-00734-RBW
                                                    )
UNITED STATES OF AMERICA, *et al.*,                 )
                                                    )
         Defendants.                                )
_____)

**UNITED STATES' REPLY IN SUPPORT OF SUMMARY JUDGMENT
AS TO REMAINING CLAIMS**

Plaintiff True the Vote attempts to save its claims from a finding of mootness by alleging

speculative harms that go beyond the allegations of its complaint.  The Internal Revenue Service

granted True the Vote's application more than three years ago. It has also now acted on all

pending applications in *Linchpins of Liberty, Inc., et al. v. Internal Revenue Service*, No. 13-777

(D.D.C.), which presented similar claims and was combined for argument and decision before

the D.C. Circuit on True the Vote's and the *Linchpins* plaintiffs' appeals of this Court's prior

dismissals.  In reversing and remanding the dismissal of True the Vote's and the *Linchpins*

plaintiffs' claims for declaratory and injunctive relief, the D.C. Circuit was concerned that the

United States had not carried its burden to show mootness under the voluntary cessation

doctrine.  The D.C. Circuit found that voluntary cessation had not occurred because some of the

*Linchpins* plaintiffs' applications had yet to be processed.  *True the Vote, Inc. v. IRS*, 831 F.3d

551, 561 (D.C. Cir. 2016).  The D.C. Circuit "advise[d]" that the IRS could not simply show

"that the case is *nearly moot, or is moot as to a 'vast majority' of the parties*"; to prevail, the IRS

has to "establish cessation, not near cessation."  *Id*. (emphasis added).  Now that the IRS has

acted on the previously pending applications of the *Linchpins* plaintiffs, as described in the motion for summary judgment and reply in support of that motion in *Linchpins*, the IRS has answered the D.C. Circuit's concern that mootness "as to a 'vast majority' of the parties" did not mean the consolidated cases were fully moot as to all the parties.  The IRS has eliminated the harms that True the Vote and the *Linchpins* plaintiffs had alleged regarding the application process.

True the Vote tries to manufacture continuing jurisdiction in this Court by speculating that it will be discriminatorily subjected to audits, among other conjectures that are beyond the scope of its complaint.  But as this Court already has observed and the D.C. Circuit agreed, Plaintiff's claims raise questions about the fairness of the *application* process alone.  The D.C. Circuit has described both True the Vote and the *Linchpins* plaintiffs as alleging "that their *applications for tax exempt status* were selected out" based on improper criteria.  *True the Vote,* 831 F.3d at 556 (emphasis added); *see also id.* ("Because their *applications* were subjected to extended delay and were not receiving the same processing as those of other organizations, and as they learned from other sources that the IRS might be employing improper and unconstitutional criteria, several applicants brought the present actions.") (emphasis added).

As this Court previously observed, True the Vote's complaint "is entirely focused on an alleged 'targeting scheme' during the plaintiff's tax-exempt *application process*." *True the Vote, Inc. v. IRS*, 71 F. Supp. 3d 219, 228 (D.D.C. 2014) (emphasis added), *aff'd in part, rev'd in part and remanded sub nom. True the Vote, Inc. v. IRS*, 831 F.3d 551 (D.C. Cir. 2016).  The D.C. Circuit agreed that this Court "correctly identified the nature of this controversy and the nature of the government conduct subject to equitable relief."  *True the Vote*, 831 F.3d at 564.  Plaintiff

may not salvage its complaint by speculating that it might be harmed by events – if they ever were to occur – that are not the subject of the complaint.

The result is the same whether viewed as a standing or a mootness issue.  To establish mootness, the United States is required to show that the effects *of the alleged violation* have been completely and irrevocably eradicated.  It is not required to show that every speculative harm *beyond the injuries alleged in the complaint* is eradicated.  To require otherwise would eviscerate the rules of pleading, as well as the fundamental principle that underlies the intertwined concepts of standing and mootness – that Courts lack jurisdiction to grant relief on anything other than an actual controversy that presents more than a speculative chance of harming a plaintiff.  No actual controversy remains as to Plaintiff's claims for declaratory and injunctive relief in Counts II and V, and no declaration or injunction from this Court could give it any additional relief that it is entitled to receive.

## DISCUSSION

I.  **The United States' motion for summary judgment presents threshold issues of the Court's subject matter jurisdiction, which are appropriately decided now.**

A.  <u>Contrary to Plaintiff's misleading use of a selected portion of a quotation to try to show otherwise, the United States does not agree that Plaintiff is entitled to discovery before the issue of the Court's subject matter jurisdiction is decided.</u>

Previewing the weakness of its position on the merits, Plaintiff opens its brief with an outrageously selective quotation extracted from its context to mislead the Court to believe that "[t]he Government admits that True the Vote is entitled to discovery in this matter."  (*See* Doc. 119 at 7.)  True the Vote cites the following statement from the United States' counsel at the status conference on November 17, 2016: "So they are entitled to discovery, we do not dispute that . . . ."  (Doc. 119 at 7 (quoting Tr. of Nov. 17, 2016, Status Conf., at 13:24-25 (ellipsis provided by Plaintiff).)  But the remainder of counsel's statement, which True the Vote

3

chose to hide from the Court, provides a key qualification.  Read in full, the United States'

counsel stated:

> So they are entitled to discovery, we do not dispute that, but it has to be specific
> discovery to something that's relevant.
>
> If plaintiffs believe that further discovery is warranted they must
> specifically articulate what discovery is necessary and demonstrate how those
> responses will enable them to defeat our summary judgment motion.

(Ex. 1, Tr. of Nov. 17, 2016, Status Conf., at 13:24-25 through 14:1-6.)  Read in full, the

statement of the counsel for the United States merely acknowledges that Plaintiff is entitled to

discovery only if it can show the need for specific, relevant discovery under Rule 56(d).  It in no

way supports True the Vote's claim that the United States agrees that True the Vote is, without

qualification, entitled to discovery.  Plaintiff's use of a snippet of the quotation to argue a point

flatly contradicted by the full quotation is a sign of its desperation and a questionable ploy.

Plaintiff asserts that it is unable to adequately respond to the United States' motion for

summary judgment absent discovery.  While Plaintiff's comprehensive opposition to the motion

seems to belie that contention, we address the asserted need for discovery in our opposition to

Plaintiff's Rule 56(d) motion.  As shown there, we do not believe Plaintiff has established a need

for or entitlement to discovery here.

    B.    <u>The D.C. Circuit's prior ruling does not preclude a determination that Plaintiff's
claims are moot on the grounds that its application has been granted.</u>

The United States' motion for summary judgment presents threshold issues of the Court's

subject matter jurisdiction, and it is appropriate to present and resolve them now.  That motion

does not "contravene" the D.C. Circuit's instructions, as Plaintiff contends.  (*See* Doc. 119 at 7.)[1]

While Plaintiff points to the D.C. Circuit's statement that "[t]he allegations of the complaint are quite sufficient to warrant a merits disposition based on adjudication of substantive evidence, not simply a dismissal at the pleadings stage," (Doc. 119 at 7, 10 (quoting *True the Vote*, 831 F.3d at 563)), that statement was made when some of the *Linchpins* plaintiffs' applications were still pending, which precluded a finding of mootness in the consolidated cases at that time.  But now all applications have been acted on.  Nothing about the D.C. Circuit's statement, especially in the context of the overall opinion, implies that any plaintiff is necessarily entitled to discovery, as well as an adjudication on the merits, if its claims were moot.

Because the IRS has acted on True the Vote's application for tax-exempt status, it is no longer experiencing any harms related to the application process, and its claims are thus moot. Plaintiff wrongly contends that the D.C. Circuit's prior ruling precludes that result, noting that Plaintiff's application had been granted before that ruling was made.  (*See* Doc. 119 at 8.)  As Plaintiff further notes, the D.C. Circuit acknowledged the "differences in factual detail" between the *True the Vote* and *Linchpins* cases, but found that "those differences are immaterial to our ultimate decision on all issues, and therefore, all our statements of law [in the opinion] are applicable to both."  *True the Vote*, 831 F.3d at 554.  Yet other statements in the D.C. Circuit's opinion show that it did not understand its consolidated ruling to preclude a finding of mootness based on the fact that a plaintiff's application has been acted upon, *once all plaintiffs' applications have been acted upon*.  The D.C. Circuit's concern was not *which* plaintiffs

---

[1] Citations to page numbers in record documents are to the page number in the upper right-hand corner assigned by the ECF system.

(between the *True the Vote* and *Linchpins* cases) still had applications pending, but that *any* of those collective plaintiffs still had applications pending at the time of their appeal.  The D.C. Circuit stated "that a heavy burden of establishing mootness is not carried by proving that the case is *nearly moot, or is moot as to a 'vast majority' of the parties*.  Their heavy burden requires that they establish cessation, not *near* cessation." *Id*. at 561 (emphases added).  Now that the IRS has acted on the previously pending applications of the *Linchpins* plaintiffs, the IRS has dealt with the D.C. Circuit's concern that mootness "as to a 'vast majority' of the parties" did not mean the consolidated cases were fully moot as to all the parties.

The D.C. Circuit provided another clue that its decision does not preclude a finding of mootness now that all plaintiffs have received at least initial action on their applications. Speaking of the regulatory challenges that are present in the *Linchpins* cases, the D.C. Circuit stated that those challenges "are not moot *for the same reasons as above* – i.e., they continue to affect those plaintiff-organizations *with pending applications* and are amply supported by allegations in the complaint." *Id.* at 563 (emphases added).  Although True the Vote does not raise any regulatory challenges in its complaint, the D.C. Circuit's statement shows that it contemplated that its findings on mootness depended on the existence of pending applications in either case.

But the overall situation that the D.C. Circuit addressed when it chose to hear and decide *True the Vote* and *Linchpins* together now has changed.  The point remains that, because True the Vote's application has been granted, it is not experiencing harms that are properly raised in its complaint, and no declaration or injunction from this Court could give it any additional relief that it is entitled to receive.  As discussed next, True the Vote has pointed to no ongoing or

6

sufficiently imminent harm that would allow the Court to give it further relief through a

declaration and/or an injunction.

**II.     Plaintiff's claims for declaratory and injunctive relief present no live or ongoing
         case or controversy for the Court to decide.**

      A.     <u>There is no actual controversy given that True the Vote's application for tax-
                exempt status has been granted.</u>

  "An actual controversy must be extant at all stages of review, not merely at the time the

complaint is filed." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013).  As the D.C. Circuit

observed, a case is only moot "if events have so transpired that the decision will neither presently

affect the parties' rights nor have a more-than-speculative chance of affecting them in the

future." *True the Vote*, 831 F.3d at 558.  Now that all applications are acted on, no actual

controversy remains.  The granting of True the Vote's application more than three years ago

certainly ended any prior delay in processing its application.  But acting on the application means

more than just that the delay has long since ceased.  Once Plaintiff's application was granted, it

no longer was impacted by inappropriate selection criteria or any improper requests for

additional information it may have received – even if the IRS still were engaging in those

activities, which it is not.  *See Qassim v. Bush*, 466 F.3d 1073, 1076 (D.C. Cir. 2006) (finding

that Guantanamo Bay detainees' claims challenging their detention under allegedly unlawful

detention policy became moot upon their release).  True the Vote's arguments notwithstanding,

no declaration or injunction would presently affect its rights, nor have anything other than a

speculative chance of affecting its rights in the future.  Since its application was granted, Plaintiff

faces no current or certainly impending harm from the deficiencies in the *application process* on

which the complaint is based.

B.      Plaintiff does not identify any ongoing harms for which it may receive present relief.

A plaintiff seeking declaratory or injunctive relief cannot establish a present controversy by pointing to a past injury.  *DeSilva v. Donovan*, 81 F. Supp. 3d 20, 24 (D.D.C. 2015) (citing *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)).   To try to circumvent that fundamental problem, Plaintiff points to various items that it asserts show an ongoing harm, but none of them actually do.

1.      *The alleged retention of information that was not necessary to evaluating Plaintiff's application is both beyond the scope of the complaint and factually unfounded.*

Although True the Vote now alleges that it faces ongoing harm from the information that it submitted in response to the "unnecessary" requests for additional information because such information is subject to public disclosure upon request (Doc. 119 at 15, 23),  that alleged harm is not included in True the Vote's complaint.[2] Nor does the injunctive relief it seeks ask the Court to order the IRS to destroy, purge, return or otherwise remove any information from Plaintiff's application file.  In fact, this Court previously concluded that any injury caused by retention and potential public disclosure of information that True the Vote submitted in support of its application was both "speculative" and "different than the [harm] identified in the complaint."  *True the Vote*, 71 F. Supp. 3d at 228.  Plaintiff tries to avoid that conclusion by pointing to language in the D.C. Circuit opinion regarding alleged "unconstitutional requests for

---

[2] Plaintiff's statement that "once established, standing cannot be lost" (Doc. 119 at 13) ignores the fact that the bulk of the harms that Plaintiff now puts forward were not included in its complaint.  The United States should not be held to the standard of proving mootness for alleged harms that are beyond the scope of the complaint.

additional information," (Doc. 119 at 30) but the D.C. Circuit opinion includes no discussion of whether the retention of information submitted in response to any such request constitutes an ongoing harm, nor whether True the Vote, or any of the *Linchpins* plaintiffs, properly plead any such harm.

In any event, the scant information that True the Vote submitted in response to the questions identified in the 2013 TIGTA Report as "unnecessary" does not give rise to an actionable harm.  Of those seven questions identified in the 2013 TIGTA Report (*see* Doc. 14-6 at 27), the IRS asked True the Vote only one to which it provided information: the IRS asked for the resumes of past and present officers, directors and key employees.  (Doc. 14-4 at 4.)[3] Although the seven questions identified in the 2013 TIGTA Report do not specifically reference resumes, they do include "[r]equests [for] information regarding employment, other than for the organization, including hours worked" (Doc. 14-6 at 27), and resumes likely will include information regarding employment outside the organization.  But instead of providing resumes, True the Vote provided a brief chart that gave only very general information about its directors. (*See* Ex. 2 at 2.)  It is difficult to imagine how such general information could be considered harmful to Plaintiff.  The IRS also asked True the Vote whether its officers, board members, etc., has or plans to run for public office.  (Doc. 14-4 at 4.)  But True the Vote's response to that question – that none of its directors had or planned to run for public office – cannot be understood as providing information that requires shielding from potential disclosure.  (S*ee* Ex. 2 at 2.)   Even if True the Vote had asked for an injunction in its complaint to order the IRS to

_____

[3] True the Vote attached the additional information request letters that it received from the IRS as Exhibits C, D and E to its amended complaint.  (*See* Docs. 14-3, 14-4, 14-5.)

destroy, expunge or otherwise remove information from its file, it is difficult to understand how such innocuous material would justify an injunction.

> 2. *Plaintiff's claim that it might be the subject of "surveillance" after its application was granted is speculative and beyond the scope of the complaint.*

Similarly, while True the Vote now speculates that it could be subject to monitoring or other "surveillance" after its application was granted, it did not mention alleged "surveillance" in its complaint.  Indeed, True the Vote has not alleged in its complaint any wrongdoing on the part of the IRS beyond the initial application review stage.  Even now in its opposition to the United States' motion for summary judgment, True the Vote does not allege that it **has been** the subject of any alleged "surveillance."  Plaintiff is not entitled to relief from a potential harm that it does not even allege has impacted it.  Notwithstanding that Plaintiff filed a 214-paragraph complaint, Plaintiff asks the Court *to assume* there *might be* additional elements of improper conduct that Plaintiff has not plead, and Plaintiff further claims that it is entitled to discovery to see if it *might* find other claims. It is well settled that only properly plead *facts* will support a complaint.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiff ignores that principle when it asks the Court to allow it to proceed to discovery to see if it might be able to find other bases for its claims.  That would amount to a fishing expedition, which the federal rules do not permit.

True the Vote also ignores that fundamental principle – that only properly plead facts will support a complaint – when it tries to expand the reach of its complaint by saying that the "discriminatory conduct of which True the Vote complains is viewpoint discrimination in violation of the First Amendment."  (Doc. 119 at 14.)  But the basis of that broad allegation is the application process.  True the Vote's theory would allow it to bring *any* First Amendment challenge, even when no factual allegations as to particular violations are made in the complaint.  *Iqbal* does not allow that result.

10

This Court was correct when it previously did not allow True the Vote to expand the scope of its complaint through arguments made in its briefs:

> the Court will not allow the plaintiff to amend the already-amended complaint through an opposition brief and recast its claims concerning the IRS's alleged targeting scheme that stalled the approval of its tax-exempt application, *e.g.,* [Compl.] ¶ 73 (identifying IRS targeting scheme as limited to a "written and unwritten policy for identifying and *subjecting certain applicants for tax-exempt status* to additional and heightened review and scrutiny" (emphasis added)), as a broader challenge to a potentially unlawful ongoing scheme or policy at the IRS in carrying out its responsibilities other than reviewing tax-exempt applications. Indeed, "it is a well-established principle of law in this Circuit that [the plaintiff] may not amend [its] complaint by making new allegations in [the] opposition brief." *Budik v. Ashley,* 36 F. Supp. 3d 132, 144, No. 12–cv–1949(RBW), 2014 WL 1423293, at *8 (D.D.C. Apr. 14, 2014) (Walton, J.) (citing *Larson v. Northrop Corp.,* 21 F.3d 1164, 1173–74 (D.C. Cir.1994)).

*True the Vote*, 71 F. Supp. 3d at 229 n.10.  The D.C. Circuit opinion – which hinged on the fact that some applications remained pending and that the evidence then before this Court did not establish that the IRS had *permanently* changed its prior procedures – in no way undermines this Court's conclusion that it would not allow True the Vote to expand its claims beyond what True the Vote actually plead in its complaint.

In any event, the particular function that gave rise to Plaintiff's allegations about the possibility of "surveillance" no longer exists.  The source that Plaintiff cites for its proposition about "surveillance" is the opening statement prepared by Congressman Boustany for the House Ways and Means Committee's Hearing on the IRS's Exempt Organizations Division Post-TIGTA Audit on September 18, 2013.  (Doc. 119 at 32.)  In that statement, Congressman Boustany refers to the former "Review of Operations" as the "surveillance program . . . conducted by the EO Examinations unit."  *See* https://waysandmeans.house.gov/boustany-opening-statement-hearing-on-the-internal-revenue-services-exempt-organizations-division-post-tigta-audit/.  Tamera L. Ripperda, the then Director of the IRS Exempt Organizations Unit, has described the function of the Review of Operations unit as it previously existed:

During the relevant time period, EO Examinations also contained two groups known as Review of Operations (ROO). The ROO conducted non-contact compliance reviews of tax exempt organizations. It was authorized to determine whether an organization's activities were consistent with its stated tax-exempt purpose and whether the organization was adhering to reporting requirements. However, the ROO was not authorized to contact an entity, examine an organization's books and records or to ask questions regarding tax liabilities. On September 10, 2013, the IRS issued TEGE-07-0913-14 providing that the ROO will no longer accept referrals from EO Determinations. As a result, two ROO groups were disbanded. As of October 4, 2015, the former ROO employees' only responsibility is the review of hospital organizations' compliance with the Affordable Care Act and this group is now known as the Hospital, or ACA, Review Group.

(Doc. 112-3 ¶ 18.)  As this shows, there is simply no possibility that the ROO is monitoring True

the Vote or any of the *Linchpins* plaintiffs.

> 3. *The possibility that Plaintiff might be selected for audit in the future is a speculative harm that goes beyond the scope of the complaint.*

Plaintiff has made no allegations in its complaint that the IRS uses discriminatory or

otherwise inappropriate criteria to select the information returns filed by tax-exempt

organizations for audit.  Furthermore, the potential of selection for audit is not a consequence of

the past conduct that is the subject of the complaint – it is a potential consequence faced by any

applicant that has received tax-exempt status.  To the extent that Plaintiff seeks assurance that it

never will be subject to audit, the IRS cannot responsibly give that assurance.  To do so would be

an abdication of the IRS's duties of tax administration.

But the IRS has given the best assurance that it can – that, if Plaintiff is selected for an

audit at some point in the future, it will not be for any improper purpose.  Ms. Ripperda has

described the non-discriminatory criteria that the IRS uses for audit selection.  (*See* Doc. 112-3

¶¶ 26-27.)  She also assures that Plaintiff is neither more nor less likely to be audited as a result

of any additional scrutiny using inappropriate criteria that may have taken place during the

application process.  (Doc. 112-3 ¶ 28.)  Even if Plaintiff had alleged potential future harm from

discriminatory audits in its complaint, it still would lack standing to pursue that claim because it would assert, at best, a highly speculative future harm – not only that Plaintiff will be selected for audit, but that it will be selected for an improper purpose.

As noted above, this Court previously and correctly declined Plaintiff's invitation to allow it to expand the scope of its complaint through arguments made in its briefs.  As this Court then observed, True the Vote's complaint "is entirely focused on an alleged 'targeting scheme' during the plaintiff's tax-exempt *application process*." *True the Vote*, 71 F. Supp. 3d at 228 (emphasis added).  The D.C. Circuit agreed that this Court "correctly identified the nature of this controversy and the nature of the government conduct subject to equitable relief."  *True the Vote*, 831 F.3d at 564.  The D.C. Circuit's opinion did not cast doubt on either of the two reasons—that the allegations were not in the complaint and that there is no jurisdiction—this Court previously gave for rejecting Plaintiff's allegations of future harm.  In particular, the D.C. Circuit described both True the Vote and the *Linchpins* plaintiffs as alleging "that their *applications for tax exempt status* were selected out" based on improper criteria.  *True the Vote*, 831 F.3d at 556 (emphasis added).  The D.C. Circuit, like this Court, understood Plaintiff's complaint to be limited to alleged harm that occurred during the application process.  The D.C. Circuit, in remanding for further proceedings to determine whether allegations related to the application process were moot, did not give Plaintiff license either to venture outside the complaint or to raise a speculative claim of future harm.[4]

---

[4] Despite its protestations otherwise, even True the Vote speaks of its complaint as addressing the application process.  Citing its amended complaint, True the Vote says in its opposition to the United States' motion for summary judgment that "True the Vote alleged that the IRS developed and implemented a policy under which certain *applications* for tax-exempt status were subjected (continued...)

For those reasons, Plaintiff's reliance on the July 2015 report from the Government Accountability Office entitled "IRS Examination Selection:  Internal Controls for Exempt Organizations Should Be Strengthened" ("GAO Examination Report") is misplaced.  The subject of that report is selection of tax-exempt organizations for examination (i.e., audit).  As Plaintiff notes, the GAO Examination Report refers to the "risk" that deficiencies in the Exempt Organization unit's internal controls could lead to selecting tax-exempt organizations for audit based on improper criteria (Doc. 119 at 33), but the Report was not based on allegations of actual wrongdoing in the selection of tax-exempt organizations for audit, and it contains no findings that any wrongdoing has actually happened in that arena.  If anything, looking into other Exempt Organization functions where there has not been as much as a suggestion of actual wrongdoing shows the government's commitment that the improper actions that took place for a limited time in the application process are not repeated there or anywhere else.  But in any event, Plaintiff has complained only about the application process; it has pointed to no examinations, much less any examinations that it contends were improperly motivated.[5]  The most Plaintiff can say is that it fears there might be problems with examinations, if it is ever the subject of an examination in the future.  That highly speculative allegation of future harm, which is not included in Plaintiff's complaint, is insufficient to confer standing.

---

(… continued)

to discriminatory and unconstitutional treatment."  (Doc. 119 at 10 (emphasis added) (citing Doc. 14 ¶¶ 73-76).)

[5] Plaintiff's position as to the GAO Examination Report would give courts jurisdiction to oversee operations of other co-equal branches of government anytime a report recommending improvements is issued, even absent a concrete harm plead by a plaintiff.  Such a result would stretch Article III's "case or controversy" requirement far beyond its limits.

4.      *Plaintiff's allegation of past harm does not entitle it to declaratory and/or injunctive relief now.*

True the Vote futilely tries to conjure up continuing harm based on the allegation that it took the IRS eight months to include True the Vote on a public list of groups that have obtained tax-exempt status under Internal Revenue Code section  501(c)(3).  (Doc. 119 at 31.)  Plaintiff's claim to harm is speculative at best.  As counsel for the United States advised Plaintiff's counsel in the letter cited by Plaintiff, while the government worked to quickly address True the Vote's concern by having it manually added to the online list, Plaintiff could "include its exempt status in any materials it desires to disseminate publicly and provide a copy of the Service's letter granting its application for exempt status to any potential donors."  (Ex. 3, Letters between Cleta Mitchell and Grover Hartt, at 1.)

Regardless, even True the Vote's argument acknowledges that it now is included on that list.  As Plaintiff already has obtained what it wanted – inclusion on the list – there is nothing for an injunction to remedy.[6]

5.      *The alleged "dissemination" of Plaintiff's application information is both speculative and beyond the scope of the complaint.*

The alleged "dissemination" of True the Vote's application for tax-exempt status also does not save its claims for declaratory and injunctive relief.  True the Votes alleges that the IRS "disseminated" its application, including in response to a request for information from the House Oversight Committee.  (Doc. 119 at 37.)  If Plaintiff believed that the IRS had disclosed its

---

[6] The same applies to Plaintiff's stated harm from the alleged "chilling effects" on its activities and donors.  Assuming for purposes of the United States' pending motion that Plaintiff experienced such harms during the period that it faced uncertainty about whether its application for tax-exempt status would be granted, there is no reason to believe that it currently faces such harms, given that it now holds tax-exempt status and all the benefits associated with that status.

return information in violation of Internal Revenue Code section 6103, it could have raised that as a claim in its complaint, yet it did not.  Plaintiff certainly knew of the availability of that remedy, as it included a claim, based on other grounds, that the IRS had wrongfully inspected its return information, in violation of section 6103.[7]  (Doc. 14 ¶¶ 168-87.)  Any allegation that the IRS disclosed True the Vote's application in violation of section 6103 is not only beyond the scope of the complaint, but it is speculative as well.

Without authority or any attempt to establish a causal connection, Plaintiff asserts that alleged audits of its president's business and investigations conducted by other government agencies, including the Bureau of Alcohol, Tobacco, Firearms & Explosives and the Occupational Safety and Health Administration "strongly suggest" that its application for tax-exempt status "was shared with others both within and outside the IRS."  (Doc. 119 at 38; *see also* Doc. 120-2 at 3-4.)  True the Vote provides no explanation for its leap in logic.  Its suggestion that the existence of other government investigations shows that the IRS improperly disclosed its return information is highly attenuated, at best.  Nor does True the Vote account for the more likely explanation that the relevant regulatory agencies were doing their job by reviewing businesses within their purview.  (*See* U.S. Resp. to Pl.'s Stmt. of Add'l Material Facts ¶ 27.)  Such a conjectural connection could not support a claim for declaratory and/or injunctive relief, even if True the Vote had plead it in its complaint, which it did not.

---

[7] The D.C. Circuit upheld this Court's dismissal of the claim True the Vote made for the alleged violation of section 6103.  *True the Vote*, 831 F.3d at 557-58.

     6.     *Even if Plaintiff's application were still pending, which it is not, it would not face imminent harm from prior practices that have permanently ceased.*

Because True the Vote's application for tax-exempt status was approved more than three years ago, it no longer faces harm from the conduct surrounding the processing of applications, which is the subject of True the Vote's complaint.  But even if True the Vote's application were still pending, which it is not, any fear of repeated inappropriate treatment in the future also is contrary to the IRS's changed procedures noted with approval by TIGTA and described in more detail in the declaration submitted by Tamera L. Ripperda, the then Director of the IRS Exempt Organizations Unit.[8]  TIGTA's findings and the unequivocal statements from Ms. Ripperda show that the IRS has changed its policies and practices to correct the prior conduct that is the subject of the complaint.[9]  From permanently eliminating the use of inappropriate criteria to select applications for review and refocusing on a group's activities to evaluate its application for tax-exempt status, to formulating template questions to seek additional information from applicants

---

[8] Plaintiff criticizes the selection of Ms. Ripperda to give the declaration on the actions the IRS has taken to eliminate the complained-of conduct and to ensure that it does not happen again. First Plaintiff complains that Ms. Ripperda was not the Director of the IRS Exempt Organizations Unit at the time the complained-of activities took place.  (Doc. 119 at 12.)  Then Plaintiff complains that Ms. Ripperda, after giving her declaration, moved to another post in the IRS.  (Doc. 119 at 12.)  Plaintiff misses the critical point that Ms. Ripperda was Director of the IRS Exempt Organizations Unit during the time that the remedial measures were implemented, and she was the appropriate person to describe those steps.  Plaintiff's argument ignores the reality that individuals do not remain in official posts forever, as well as the point that the institutional practices of the IRS have changed and that Ms. Ripperda was an appropriate person to describe those changes.

[9] Plaintiff's criticism that the TIGTA Report of 2015 does not address any alleged harm beyond the application process (Doc. 119 at 23) is inapposite.  As previously discussed, True the Vote's complaint only encompasses the application process.  And the TIGTA Report of 2015 addresses each of the complained-of elements.

when needed, to requiring management approval to seek additional information that is not included in the template questions, to eliminating the backlog of previously pending applications and ensuring expeditious processing of future applications, Ms. Ripperda and TIGTA have confirmed that the conduct that is the subject of Plaintiff's complaint is no longer occurring and will not recur.[10]

Plaintiff is wrong when it says the "IRS has instituted no formal and permanent prohibition on viewpoint-based treatment of tax-exempt groups like" itself. (Doc. 119 at 35.) Ms. Ripperda's detailed declaration and the conclusions from the TIGTA Report of 2015 belie that statement. In addition to those assurances, Congress also recently amended the Internal Revenue Code to specify that IRS employees may be fired for "performing, delaying, or failing to perform (or threatening to perform, delay, or fail to perform) any official action (including any audit) with respect to a taxpayer for purpose of extracting personal gain or benefit or for a political purpose." Protecting Americans from Tax Hikes Act of 2015, § 407, 129 Stat. 2242 (excerpt attached as Ex. 4).

The independent oversight group, TIGTA, confirms in its 2015 Report that the IRS has taken corrective actions that address all nine of its recommendations from the 2013 TIGTA Report. True the Vote challenges only the training that the IRS implemented in response to

---

[10] Plaintiff's argument that the IRS has not identified whether Plaintiff was the subject of the complained-of treatment (Doc. 119 at 26) is inapposite. Determining which particular complained-of activities Plaintiff was subjected to in the past does not change the relationship between Plaintiff and the IRS given that the IRS approved Plaintiff's application more than three years ago. That is true for the additional reason that the prior conduct that is the subject of the complaint has ceased. The IRS is not subjecting *anyone* to that former treatment anymore. Determining the particular conduct Plaintiff was subjected to in the past does not change the relationship between it and the IRS now that the prior conduct has ceased, so Plaintiff is not presently entitled to declaratory or injunctive relief.

TIGTA's recommendations.  But TIGTA concluded that the "required training appropriately addressed" the listed topics, including "the use of activities, instead of names and policy positions, to identify applications for further review," and "the type of additional information that should be requested and the appropriate wording of questions in additional information request letters."  (Doc. 112-1 at 12-13.)  Plaintiff alleges various "deficiencies" as to the training (Doc. 119 at 27-29), but it ignores that IRS management agreed to the supplemental recommendation in the 2015 TIGTA Report to improve the timing of the training by completing it earlier in the election cycle so that employees can effectively apply it, to review the methodology used to determine training attendance and require employees who miss more than the allotted time to retake the missed segments, and to evaluate all phases of the political campaign intervention training to gather credible data to improve training.  (Doc. 112-1 at 16.)  As of 2016, the IRS already met the goal of changing the timing of the training by beginning the delivery of training on March 1.  (Doc. 112-3 at 19 n.9.)

Plaintiff's argument about alleged deficiencies also ignores that the training regarding appropriate additional information to be requested is backed up by additional measures.  The IRS has developed template questions, to which Plaintiff has voiced no objection, and management approval must be obtained to ask other questions.  (*See* Doc. 112-3 ¶ 21.c, d.)

Plaintiff also objects that the IRS has increased the "grace period" that an employee may miss training from 10 to 15 minutes.  (Doc. 119 at 27.)  That is a modest change, and TIGTA notes the practical reason for it:

> IRS officials stated that this extended grace period was in part due to issues involved with a large number of employees attempting to log in to training sessions at the same time.  IRS officials also stated that they would direct those employees missing more than 15 minutes of any session to retake the sessions.

(Doc. 112-1 at 15.)

Regardless, any fear that True the Vote will be harmed by alleged deficiencies in training is entirely speculative.  True the Vote's application has been approved.  Alleged deficiencies in training as to the review of applications cannot affect True the Vote.

The details of the IRS's changed procedures discussed by Ms. Ripperda, along with TIGTA's favorable findings that the IRS has implemented all nine of its recommendations, show that the IRS has permanently eradicated the conduct that gave rise to the complaint.  Those protections will ensure appropriate treatment of all current and future applications for tax-exempt status.

## CONCLUSION

The fact that the IRS granted True the Vote's application more than three years ago leaves no live or ongoing issues to be resolved as to its claims, which centered on the application process.  And, as a separate and independent ground upon which to base a finding of mootness, the IRS has permanently changed its procedures that gave rise to True the Vote's claims.  True the Vote also does not have standing to pursue relief for any of the speculative harms that it has not even included in its complaint.  For those reasons, True the Vote is not entitled to the declaratory and injunctive relief that it seeks.

DATED: February 9, 2017

Respectfully submitted,

DAVID A. HUBBERT
Acting Assistant Attorney General
Tax Division

s/ Joseph A. Sergi
JOSEPH A. SERGI (DC 480837)
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
555 4th Street, N.W., JCB 7207
Washington, D.C. 20001
(202) 305-0868; (202) 307-2504 (FAX)
Joseph.A.Sergi@usdoj.gov

LAURA C. BECKERMAN (CA 278490)
LAURA M. CONNER (VA 40388)
JOSEPH R. GANAHL (MD)
JEREMY N. HENDON (OR 982490)
GERALD A. ROLE (DC 415274)
Trial Attorneys
U.S. Department of Justice, Tax Division
555 4th Street, N.W.
Washington, D.C. 20001
(202) 514-2000

Of Counsel:
CHANNING D. PHILLIPS
United States Attorney

ATTORNEYS FOR THE UNITED STATES

21

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| TRUE THE VOTE, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:13-cv-00734-RBW |
| ) | |
| UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2017, the United States' Reply in Support of Motion for Summary Judgment as to Remaining Claims in the above-captioned matter was filed with the United States District Court for the District of Columbia via the Court's CM/ECF system.

s/ *Joseph A. Sergi*
JOSEPH A. SERGI