IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRUE THE VOTE, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:13-cv-00734-RBW |
| ) | |
| UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**UNITED STATES' RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL
MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT**

The United States contends that none of the additional facts asserted by Plaintiff, whether they are disputed or not, preclude the entry of a judgment of dismissal in favor of the United States for the reasons stated in the United States' Motion for Summary Judgment as to Remaining Claims and in the Reply filed in support of that Motion. The United States further responds to the statement of additional facts as follows:

8. In its Application, True the Vote stated under penalty of perjury that it did not "support or oppose candidates in political campaigns in any way[.]" (Exhibit B to the First Amended Complaint (Doc. 14-2) at 9.) As a Section 501(c)(3) organization, True the Vote engages in no partisan campaign intervention, endorses no political candidates and makes no political expenditures. (Doc. 14 ¶ 131.) Accordingly, the Government's reliance on the 2015 TIGTA Report regarding dealing with exempt organizations and applicants and political campaign intervention is actually demonstrative of the IRS's ongoing failure to treat True the Vote as it does any other applicant for 501(c)(3) status, and represents an ongoing discriminatory

approach to True the Vote, somehow presuming that it engages in political campaign intervention when it has never done so.

**RESPONSE:** Denied. In its Amended Complaint, True the Vote cites the 2013 TIGTA Report no less than 34 times, including in nearly all of the paragraphs describing the "targeting scheme" that forms the basis of True the Vote's claims against the IRS. (*See* Dkt. 14, ¶¶ 80-108.) As Plaintiff states, the 2013 TIGTA Report concludes that the IRS used "inappropriate criteria" to select for review applications for tax exemption submitted under § 501(c)(3) and (c)(4) of the Internal Revenue Code. However the 2013 TIGTA Report also recommended that the IRS take certain actions to address the issues that gave rise to the problems in the tax exempt application process described in the 2013 TIGTA Report. The 2015 TIGTA Report, entitled *Status of Action Taken to Improve the Processing of Tax-Exempt Applications Involving Political Campaign Intervention*, provides independent verification of the steps the IRS has taken to ensure that the problems that led to the findings in the 2013 TIGTA Report are addressed and will not recur.

Because True the Vote's claims of harm stem directly from the conclusions of the 2013 TIGTA Report, the fact that the 2015 TIGTA report concludes that the IRS has taken "significant action" to address the prior problems cuts right to the heart of True the Vote's claims. By presenting the findings of the 2015 TIGTA Report the government does not, as True the Vote claims, wrongfully presume that it engages in political campaign intervention. Rather, True the Vote, heavily citing the 2013 TIGTA Report, complains that it suffered harm due to the application of inappropriate criteria as in the manner described by TIGTA. Accordingly, the findings of TIGTA's follow-up report, including that the IRS had taken significant action to eliminate the use of inappropriate criteria, are relevant to the very claims that True to Vote describes in its Amended Complaint.

9.      The Government systematically targeted True the Vote for unwarranted delay and heightened review and scrutiny. As a result, True the Vote was deliberately subjected to numerous unnecessary, burdensome, and unlawful requests for information about its operations, activities, leadership, volunteers, associations, and affiliations. (*See* Doc. 14 ¶¶ 5, 125-126, 128-130.)

**RESPONSE:** Not material and denied. Additionally, Plaintiff has cited no evidence in support of this assertion. Rule 56(c) of the Federal Rules of Civil Procedure provides that citation to "mere pleadings," as Plaintiff has done here by citing its Amended Complaint, is insufficient. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Now that Plaintiff's application has been acted on, Plaintiff is no longer impacted by any alleged "unwarranted delay and heightened review and scrutiny." Furthermore, of the seven questions identified in the 2013 TIGTA Report as unnecessary (*see* Doc. 14-6 at 27), the IRS asked True the Vote only one to which it provided information: the IRS asked for the resumes of past and present officers, directors and key employees. (Doc. 14-4 at 4.) Although the seven questions identified in the 2013 TIGTA Report do not specifically reference resumes, they do include "[r]equests [for] information regarding employment, other than for the organization, including hours worked" (Doc. 14-6 at 27), and resumes likely will include information regarding employment outside the organization.  But instead of providing resumes, True the Vote provided a brief chart that gave only very general information about its directors.  (See Ex. 2 at 2.)  It is difficult to imagine how such general information could be considered harmful to Plaintiff.  The IRS also asked True the Vote whether its officers, board members, etc., has or plans to run for public office.  (Doc. 14-4 at 4.)  But True the Vote's response to that question – that none of its directors had or planned to run for public office – cannot be understood as

3

providing information that requires shielding from potential disclosure. (See Ex. 2 at 2.) Finally, now that Plaintiff's application has been acted on, Plaintiff is no longer impacted by any allegedly improper requests for additional information it received.

10. The IRS remains in possession of this information and is required by law to publicly disclose it upon request. 26 U.S.C. § 6104(a)(1)(A). The Government has not identified how it has used or how it intends to use the unnecessary and irrelevant information it requested and received from True the Vote. (*See, e.g*. Docs. 112 and 112-3.)

**RESPONSE:** The first sentence is not material and admitted. The second sentence is not material and the United States denies the speculation that the IRS has made "use" of this information outside that provided by 26 U.S.C. § 6104. This Court previously concluded that any injury caused by retention and potential public disclosure of information that True the Vote submitted in support of its application was both "speculative" and "different than the [harm] identified in the complaint." *True the Vote*, 71 F. Supp. 3d 219, 228 (D.D.C. 2014) (emphasis added), *aff'd in part, rev'd in part and remanded sub nom. True the Vote, Inc. v. IRS*, 831 F.3d 551 (D.C. Cir. 2016). Also, see response to paragraph 9.

11. The IRS claimed to have granted True the Vote's application in September 2013 but it did not add True the Vote to its published list of approved charitable organizations until over *eight months later*, and did so only when undersigned counsel alerted the Government to the omission. True the Vote learned that it was not listed as a recognized charity when a prospective donor attempted to confirm True the Vote's status on the IRS's website. Letters between Cleta Mitchell and Grover Hartt (May 9, 2014, May 16, 2014), *available at* http://publicinterestlegal.org/cases/true-the-vote-v-irs/.

**RESPONSE:** Admitted but not material. As counsel for the United States advised Ms. Mitchell in the above-cited letters, while the government worked to quickly address True the Vote's concern by having it manually added to the online list, Plaintiff could "include its exempt status in any materials it desires to disseminate publicly and provide a copy of the Service's letter granting its application for exempt status to any potential donors."

12.     Despite granting True the Vote's application for a tax exemption, the Government admits that it currently "lacks knowledge or information sufficient to form a belief" about whether True the Vote operates for charitable and educations purposes. (*Compare* Gov. Answer ¶ 3 (Doc. 117) with Doc. 14 ¶ 3.) The Government's understanding of True the Vote's activities is fundamental to its ability to oversee True the Vote in a fair and impartial manner. Yet the Government provides no assurance that True the Vote even continues to qualify for the tax-exemption it rightfully received after 3 years of unwarranted delay. And clearly the Government presumes that True the Vote is an organization that engages in political campaign intervention, which it does not do, because doing so would result in immediate revocation of True the Vote's exempt status.

**RESPONSE:** Not material and denied. As an initial matter, Plaintiff has cited no evidence in support of this assertion. Rule 56(c) of the Federal Rules of Civil Procedure provides that citation to "mere pleadings," as Plaintiff has done here by citing its Amended Complaint, is insufficient. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Furthermore, Plaintiff's citation to ¶ 3 of the United States' Answer mischaracterizes the text of that document. Paragraph 3 of Plaintiff's Amended Complaint covers an unspecified time frame and alleges numerous facts regarding True the Vote's activities. In its Answer, the United States admitted that True the Vote was granted tax exempt status on September 26, 2013.

However, it lacked knowledge as to the remaining allegations, because the United States has no basis to know whether True the Vote's description of its activities in the more than three years that have elapsed since its receipt of tax exempt status is accurate. Such an answer does nothing to support Plaintiff's assertion that the Service "presumes" it engages in prohibited activities.

13. The 2015 TIGTA Report addresses only the application process and does not address the interactions True the Vote might have with IRS for tax administration purposes in which True the Vote would continue to experience discriminatory treatment for the same unlawful reasons its application was targeted in 2013 and from which it presently seeks relief. (*See* Doc. 14, Prayer for Relief.)

**RESPONSE:** Admitted as to what 2015 TIGTA Report addresses but not material. True the Vote's generalized fears are speculative and do not give it standing to pursue any potential future claims. Furthermore, Plaintiffs have cited no evidence in support of the assertion that it may face "discriminatory treatment" in future interactions with the IRS. Rule 56(c) of the Federal Rules of Civil Procedure provides that citation to "mere pleadings," as Plaintiff has done here by citing its Amended Complaint, is insufficient. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Finally, that the 2015 TIGTA Report focuses on the application process makes it directly relevant to True the Vote's claims, because those claims are "entirely focused on an alleged 'targeting scheme' during the plaintiff's tax exempt *application process*." *True the Vote*, 71 F. Supp. 3d at 228.

14. According to TIGTA, 21 percent of IRS employees required to take political campaign intervention training did not complete one or more of the training sessions and/or did not attend the training sessions for the required amount of time. (Doc. 112-1 at 13-14.)

**RESPONSE:** Not material and denied as incomplete. The 2015 TIGTA Report should be read for its contents, and the United States does not dispute the findings of the 2015 TIGTA Report.

With regard to training, the 2015 TIGTA Report found that "173 (79 percent) of 219 personnel required to take the political campaign intervention training have completed all of the training sessions." Of the remaining personnel, most of the "40 employees missed only 11 to 15 minutes of a training session." (Dkt. 112-1, at 13-14.) As TIGTA noted, IRS officials extended the "grace period" that an employee may miss from training from 10 to 15 minutes due, in part, to "issues involved with a large number of employees attempting to log in to training sessions at the same time." (Doc. 112-1 at 15.)

In addition, IRS management agreed to the supplemental recommendation in the 2015 TIGTA Report to improve the timing of the training by completing it earlier in the election cycle so that employees can effectively apply it, to review the methodology used to determine training attendance and require employees who miss more than the allotted time to retake the missed segments, and to evaluate all phases of the political campaign intervention training to gather credible data to improve training. (Doc. 112-1 at 16.) As of 2016, the IRS already met the goal of changing the timing of the training by beginning the delivery of training on March 1. (Dkt. 112-3, at 19, n.9.)

15.   TIGTA expressed concern that "[i]f employees miss key portions of training sessions, they may not have the knowledge needed to effectively and efficiently carry out their responsibilities." (Doc. 112-1 at 14.) See also response to paragraph 14.

**RESPONSE:** Not material. The 2015 TIGTA Report should be read for its contents, and the United States does not dispute the findings of the 2015 TIGTA Report.

7

16.     TIGTA discovered that as many as 6.15 percent of employees "do not know what information to consider when determining if there was potential political campaign intervention" problems with a particular organization." (Doc. 112-1 at 25.) However, TIGTA was only 90 percent sure the number of such employees was not higher. (*Id.*)

**RESPONSE:**  Not material and denied.

Plaintiff has ignored the actual survey results found on page 8 of the 2015 TIGTA Report, instead mischaracterizing a statement of statistical margin of error to present a misleading picture to the Court. In fact, based on interviews with 85 out of 176 EO Determinations Unit employees, a statistically valid sample size, TIGTA found that 83 of the 85 interviewees "only considered the activities and/or facts and circumstances of each case or used interim guidance when determining if there was potential political campaign intervention." (Doc. 112-1 at 8.) The two remaining employees reported not knowing what criteria to use. Two out of 85 employees translates to 2.4 percent, not 6.15 percent. Accordingly, the 6.15 percent figure, does not represent the actual percentage of employees unaware of what criteria to use. Rather, this percentage, which is discussed under the 2015 TIGTA Report heading "Detailed Objective, Scope, and Methodology," represents the statistical margin of error introduced when extrapolating the information from the 85 interviewees to the population of 176 employees. The relevant portion of the Report states:

> [TIGTA] Selected and interviewed a statistically valid sample of 85 Determinations Unit and Quality Assurance first-line managers and employees responsible for processing applications for tax-exempt status from the population of 176 employees to determine if BOLO listings or similar listings were still in use and if they knew the criteria that should be considered when processing cases. A statistical sample was used to allow the results to be projected to the overall population. We relied on TIGTA's contract statistician to verify our sampling methods. We calculated our sample size using a 90 percent confidence interval, 5 percent precision, and 10 percent estimated error rate as adjusted by the contract statistician. Therefore, we are 90 percent confident that "at most" 2.67 percent of

8

> employees were still using BOLO listings or other similar listings to identify cases or issues for further review. In addition, we are 90 percent confident that "at most" 6.15 percent of employees do not know what information to consider when determining if there was potential political campaign intervention. The precision is based on a one-sided 90 percent confidence interval.

(Dkt. 112-1 at 25.)

17. TIGTA found that "the IRS did not complete the process designed to evaluate the effectiveness of the training" its employees were allegedly completing. (Doc. 112-1 at 15.) Specifically, "the IRS did not compile or evaluate case study results completed by students to determine if they learned skills and acquired knowledge as a result of the training." (*Id.* at 16.) Consequently, TIGTA concluded: "Considering the importance of effectively training employees on proper handling of tax-exempt applications, *improvements in the timing and execution of future training are needed.*" (*Id.*)

**RESPONSE:** Not material. The 2015 TIGTA Report should be read for its contents, and the United States does not dispute the findings of the 2015 TIGTA Report.

TIGTA further reported that IRS management agreed to the supplemental recommendation in the 2015 TIGTA Report to improve the timing of the training by completing it earlier in the election cycle so that employees can effectively apply it, to review the methodology used to determine training attendance and require employees who miss more than the allotted time to retake the missed segments, and to evaluate all phases of the political campaign intervention training to gather credible data to improve training. (Doc. 112-1 at 16.) As of 2016, the IRS already met the goal of changing the timing of the training by beginning the delivery of training on March 1. (Dkt. 112-3, at 19, n.9.)

18. TIGTA discovered that as many as 2.67 percent of employees were still using BOLO listings or other similar listing to identify cases or issues for further review, (Doc. 112 at 25).

9

**RESPONSE:** Not material and denied. As detailed in the response to paragraph 16, Plaintiff ignored the actual survey results and mischaracterized the statistical margin of error discussion found in TIGTA's methodology discussion.

TIGTA's interview of 85 EO Determinations Unit employees found: that *zero* employees were still using the BOLO or similar listings, nor did they know of anyone else using such listings. (Doc. 112-1 at 8.) Because TIGTA interviewed a sample of the total population (85 out of 176 employees), TIGTA cannot conclude that there is zero chance of any EO Determinations Unit employee still using the BOLO list. However, *none* of the 85 employees interviewed were still using the BOLO or similar listings, and extrapolating that finding out to the population of 176 employees yields a statistical error rate of 2.67 percent with a 90 percent confidence interval. Accordingly, it is flatly inaccurate to claim, as Plaintiff did, that "TIGTA discovered" *any* employees still using the BOLO or similar listings, as not one of the 85 employees interviewed still uses the BOLO list or similar listings, nor were they aware of anyone else still doing so. This finding confirms that, as Commissioner Koskinen testified to Congress and Ms. Ripperda stated in her declaration, the IRS permanently ended any use of the BOLO list. (Doc. 112-3 at 12.)

19.   The House Ways and Means Committee's IRS Oversight Subcommittee revealed the existence of a scheme within the IRS in which organizations who were targeting for special scrutiny during the application process were immediately subjected to a program of ongoing heightened review and potential audit *after* their applications were approved. *See, e.g.*, Press Release, House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit (*Remarks as Prepared*) (Sept. 18, 2013) (http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=350126 (accessed

Jan. 15, 2017)). According to the statement from Congressman Boustany, Chairman of the IRS Oversight Subcommittee of the Ways and Means Committee:

> Additionally, we discovered that, through a process approved by [Lois] Lerner (former Director of the IRS Exempt Organizations Unit), EO Examinations itself flags groups for surveillance based on complaints received from inside and outside the agency. Ninety-four percent of all organizations flagged for surveillance by the Examinations unit were right leaning. Most startling, of the organizations referred for audit from this process, 100 percent were right leaning.

*Id.* In response, the IRS merely suspended the surveillance program pending further review. *Id.*

**RESPONSE:** Not material and denied. Plaintiff cites the opening statement prepared by Congressman Boustany for the House Ways and Means Committee's Hearing on the IRS's Exempt Organizations Division Post-TIGTA Audit on September 18, 2013 in support of its claim of "surveillance". (Doc. 119 at 32.) In that statement, Congressman Boustany refers to the former "Review of Operations" as the "surveillance program . . . conducted by the EO Examinations unit." *See* https://waysandmeans.house.gov/boustany-opening-statement-hearing-on-the-internal-revenue-services-exempt-organizations-division-post-tigta-audit/. However, the ROO function that concerns Plaintiff no longer exists. As confirmed by Tamera L. Ripperda, the then Director of the IRS Exempt Organizations Unit, in her declaration:

> On September 10, 2013, the IRS issued TEGE-07-0913-14 providing that the ROO will no longer accept referrals from EO Determinations. As a result, two ROO groups were disbanded. As of October 4, 2015, the former ROO employees' only responsibility is the review of hospital organizations' compliance with the Affordable Care Act and this group is now known as the Hospital, or ACA, Review Group.

(Doc. 112-3 ¶ 18.)

20.     In July 2015—*after* the release of the 2015 TIGTA Report—the Government Accountability Office (GAO) released a report entitled "IRS Examination Selection: Internal Controls for Exempt Organization Selection Should be Strengthened," which examined the

possibility that existing tax-exempt organizations would be subjected to viewpoint-based discrimination in examination selection (i.e., audit). (Exhibit B to TTV Opposition Memorandum at Highlights.) GAO found that (1) "control deficiencies . . . increase the risk that EO could select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views"; (2) because procedures for applying selection criteria are not included in the Internal Revenue Manual as required by IRS policy, there is an increased "risk of unfair selection of organizations' returns for examination"; and, (3) management does not consistently monitor the selection of organizations for examination. *Id.*

**RESPONSE:** Admit and not material. The GAO Report is irrelevant to this action.

The subject of that report is the selection of tax-exempt organizations for examination (*i.e.*, audit), not the application process at issue in this case. Furthermore, the GAO Report was not based on allegations of actual wrongdoing in the selection of tax-exempt organizations for audit, and it contains no findings that any wrongdoing has actually happened in that arena.

As this Court already has observed and the D.C. Circuit agreed, Plaintiffs' claims raise questions about the fairness of the application process alone. The D.C. Circuit has described Plaintiffs as alleging "that their *applications for tax exempt status* were selected out" based on improper criteria. *True the Vote, Inc. v. IRS*, 831 F.3d 551, 556 (D.C. Cir. 2016) (emphasis added); *see also id*. ("Because their applications were subjected to extended delay and were not receiving the same processing as those of other organizations, and as they learned from other sources that the IRS might be employing improper and unconstitutional criteria, several applicants brought the present actions.") (emphasis added). Plaintiff's complaint pointed to no examinations, much less any examinations that it contends were improperly motivated.

12

21. In August 2015, the United States Senate Committee on Finance issued a report entitled "The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted by 'Political Advocacy' Organizations From 2010-2013," Part 1 of 4 (August 5, 2015) (Exhibit E to TTV Opposition Memorandum.) The Committee found that between 2010 and 2014, the IRS attempted to implement a new process for selecting cases for examination. *Id.* at 9. An internal memo revealed that this new approach "[gave] the impression that somehow the political leanings of [the organizations] mentioned were considered in making the ultimate decision." *Id.* Although the IRS eventually discontinued the use of its new approach, the Committee recommended that "further modifications" to the IRS's examination selection process were necessary in order to "ensure that [the IRS] carries out the enforcement function in a fair and impartial manner." *Id.* These recommendations included full implementation of the recommendations made by GAO in its report. *Id.*

**RESPONSE:** Admitted and not material. Plaintiff points to the GAO Report's conclusions regarding the IRS's *examination selection process*, but Plaintiff's complaint points to no examinations, much less any examinations that it contends were improperly motivated. See response to paragraph 20.

22. The IRS has instituted no formal and permanent prohibition on viewpoint-based treatment of tax-exempt groups like True the Vote. (*See* Docs. 112, 112-1, 112-2, 112-3.)

**RESPONSE:** Denied. Congress recently amended the Internal Revenue Code to specify that IRS employees may be fired for "performing, delaying, or failing to perform (or threatening to perform, delay, or fail to perform) any official action (including any audit) with respect to a taxpayer for purpose of extracting personal gain or benefit or for a political purpose." Protecting Americans from Tax Hikes Act of 2015, § 407, 129 Stat. 2242 (excerpt attached as Ex. 2). In

addition, Ms. Ripperda's detailed declaration and the conclusions from the 2015 TIGTA Report demonstrate the steps taken by the IRS to ensure that *appropriate* criteria are used to review applicants for tax exempt status.

23. In June 2014, the U.S. House of Representatives Committee on Oversight and Government Reform released a report entitled "How Politics Led the IRS to Target Conservative Tax-Exempt Applicants for their Political Beliefs," which, as the name suggests, concludes that groups like True the Vote were targeted because of their political beliefs, actual or perceived. (*See* Exhibit C to TTV Opposition Memorandum.)

**RESPONSE:** Not material and the Report should be read for its contents.

24. In 2014, the House Oversight Committee released a second report entitled "The Internal Revenue Service's Targeting of Conservative Tax- Exempt Applicants: Report of Findings for the 113th Congress." (Exhibit D to TTV Opposition Memorandum.) The report concluded that there developed a "culture of bias against conservative organizations among certain IRS employees," Exhibit D at 209-210, which ultimately manifested itself as the IRS Targeting Scheme. The Report contains an entire section on the discriminatory treatment of True the Vote by the IRS and a high-ranking member of the Democratic Party. Exhibit D at 203-207.

**RESPONSE:** Not material and the Report should be read for its contents.

25. Defendant IRS Chief Counsel William Wilkins was involved "in creating, overseeing, revising, and implementing the IRS Targeting Scheme." (Doc. 14 ¶ 109.) Mr. Wilkin's office even "review[ed] the applications of the Targeted Organizations." (*Id.* ¶ 110.)

**RESPONSE:** The first sentence is denied and not material. The second sentence is not material and denied, expect that Office of Chief Counsel personnel reviewed applications during the optional expedited process. Furthermore, Plaintiff has cited no evidence in support of this

assertion. Rule 56(c) of the Federal Rules of Civil Procedure provides that citation to "mere pleadings," as Plaintiff has done here by citing its Amended Complaint, is insufficient. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

26. The House Oversight Committee discovered that in January 2013

> Democratic staff of the House Oversight Committee asked the IRS for material relating to the tax-exempt application of True the Vote, a Tea Party-related organization. Holly Paz, director of Exempt Organizations Rulings and Agreements, authorized the IRS to release information to the Democratic staff, but it is unclear what information the IRS eventually provided.

Exhibit D at 159.

**RESPONSE:** Not material. Plaintiff's complaint contains no allegation of unlawful disclosure of tax return information. Nor is this allegation related to the application process or claims of ongoing harm.

27. In 2010, Catherine Engelbrecht founded True the Vote along with another non-profit group, King Street Patriots, and sought a tax-exemption from the IRS for both organizations. (*See* Declaration of Catherine Engelbrecht ¶¶ 1-4 (attached as an exhibit to True the Vote's Motion for Discovery Under Federal Rule of Civil Procedure 56(d).) Shortly thereafter, Ms. Engelbrecht, her non-profit organizations, and her family business were subjected to repeated visits, audits, and investigations by three different federal agencies, as well as the IRS, which, for the first time ever, audited Ms. Engelbrecht, her husband (also a True the Vote office and board member) and her family business. (*Id.* ¶¶ 6-13.) Ms. Engelbrecht and True the Vote attempted to utilize the Freedom of Information Act to ascertain the circumstances surrounding the government's sudden and probing interest in her life. Yet the recipient agencies of those requests withheld documents that would allow for such an understanding. (*Id.* ¶¶ 21-35.)

**RESPONSE:** Not material. Plaintiff has cited no evidence in support of its speculative assertion that the IRS improperly released information to other federal agencies, causing those

agencies to "probe" Ms. Engelbrecht's life. Such speculation, absence evidence, is not allowed by the Federal Rules. Rather, Rule 56(c) of the Federal Rules of Civil Procedure provides that citation to "mere pleadings," as Plaintiff has done here by citing its Amended Complaint, is insufficient. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A closer look at Plaintiff's unfounded and speculative allegations reveals them to be divorced from reality. For example, Plaintiff alleges that the fact that the Occupational Health and Safety Administration (OSHA) investigated Ms. Engelbrecht's family business, "strongly suggest[s]" that [True the Vote's] application for tax-exempt status "was shared with other both within and outside the IRS." (Doc. 119 at 38; *see also* Doc. 120-2 at 3-4.) Ms. Engelbrecht's "family business" is Engelbrecht Manufacturing, which specialized in "precision machining." *See* Engelbrecht Manufacturing, available at http://www.engelbrechtmfg.com/ (last visited Feb. 7, 2017.) Plaintiff provides no evidence to support its assertion that the IRS shared True the Vote's application for tax exempt status with other federal agencies, such as OSHA. Given Plaintiff's failure to cite any evidence in support of its allegation and given the fact that OSHA's mission is to ensure safe workplaces, the fact that OSHA investigated or audited a manufacturing company would hardly seem to suggest unlawful conduct on the part of the IRS.

28. The GAO Report found that "the IRS does not have protections in place to ensure that taxpayers are treated fairly when being selected for audits." House Ways and Means Committee, Brady and Roskam Letter to Commissioner Koskinen, Sep. 20, 2016 (Exhibit A to TTV Opposition Memorandum) (citing Government Accountability Office (GAO), "IRS Needs to Define Field Program Objectives and Assess Risks in Case Selection," September 13, 2016, available at http://www.gao.gov/assets/680/679711.pdf.

**RESPONSE:** Not material. The GAO Report is irrelevant to this action. See response to paragraph 20.

29. The Government's sole witness, Tamera L. Ripperda, states that she is the current director of the IRS's Exempt Organization Division. (Doc. 112-3 ¶ 2.) However, Ms. Ripperda departed that position just three days after the Government submitted her testimony. See Bloomberg BNA, Daily Tax Report, "IRS Exempt Organizations Director Switching Roles Next Month" (Oct. 26, 2016), https://www.morganlewis.com/~/media/files/news/2016/bloombergbna_irs-exempt-organizations-director-switching-roles-next-month_26oct16.ashx?la=en (last accessed Jan. 19, 2017). Ms. Ripperda's departure means she is no longer in a position to oversee the alleged implementation of TIGTA's recommendations. Moreover, Ms. Ripperda was not in the position of EO Director—or even in a position within the EO unit—until years after the conduct alleged in the Amended Complaint occurred. (Doc. 112-3 ¶ 2 ("I have held this position since January 2014.")). This raises serious questions regarding whether Ms. Ripperda has the requisite personal knowledge necessary to testify as to the IRS's conduct, the effects of that conduct, and the alleged eradication of those effects. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

**RESPONSE:** Denied that Ms. Ripperda lacks knowledge to testify as to the facts contained in her declaration or that Ms. Ripperda is not the proper person to testify as to those facts.

Plaintiff criticizes the selection of Ms. Ripperda to give the declaration on the actions the IRS has taken to eliminate the complained-of conduct and to ensure that it does not happen again. First Plaintiff complains that Ms. Ripperda was not the Director of the IRS Exempt

17

Organizations Unit at the time the complained-of activities took place.  (Doc. 119 at 12.)  Then Plaintiff complains that Ms. Ripperda , after giving her declaration, moved to another post in the IRS.  (Doc. 119 at 12.)  These criticisms miss the point. Ms. Ripperda was Director of the IRS Exempt Organizations Unit during the time that the remedial measures were implemented, and she was the appropriate person to describe those steps.

DATED: February 9, 2017

           Respectfully submitted,

           DAVID A. HUBBERT
           Acting Assistant Attorney General
           Tax Division

           s/ Joseph A. Sergi
           JOSEPH A. SERGI (DC 480837)
           Senior Litigation Counsel
           U.S. Department of Justice, Tax Division
           555 4th Street, N.W., JCB 7207
           Washington, D.C. 20001
           (202) 305-0868; (202) 307-2504 (FAX)
           Joseph.A.Sergi@usdoj.gov

           LAURA C. BECKERMAN (CA 278490)
           LAURA M. CONNER (VA 40388)
           JOSEPH R. GANAHL (MD)
           JEREMY N. HENDON (OR 982490)
           GERALD A. ROLE (DC 415274)
           Trial Attorneys
           U.S. Department of Justice, Tax Division
           555 4th Street, N.W.
           Washington, D.C. 20001
           (202) 514-2000

Of Counsel:
CHANNING D. PHILLIPS
United States Attorney

           ATTORNEYS FOR THE UNITED STATES

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRUE THE VOTE, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:13-cv-00734-RBW |
| ) | |
| UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2017, the United States' Response to Plaintiff's Statement of Additional Material Facts Precluding Summary Judgment in the above-captioned matter was filed with the United States District Court for the District of Columbia via the Court's CM/ECF system.

s/ *Joseph A. Sergi*
JOSEPH A. SERGI