UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRUE THE VOTE, | ) |
| Plaintiff, | ) ) ) |
| -vs- | ) Civil Action No. 1:13-cv-00734-RBW ) |
| UNITED STATES OF AMERICA, *et al.*, | ) ) |
| Defendants. | ) ) ) |

**C**ONSENT **O**RDER

Plaintiff True the Vote, an applicant seeking tax-exempt status pursuant to 26 U.S.C. § 501(c)(3) (hereinafter, "Plaintiff" or "Plaintiff organization"), filed its original Complaint in this matter on May 21, 2013, seeking: monetary damages from the named individual defendants pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for alleged violations of its rights under the First Amendment to the United States Constitution; equitable relief, both declaratory and injunctive, against the United States and the Internal Revenue Service ("Government Defendants"), for alleged violations of its rights under the First Amendment to the United States Constitution; a determination of its tax-exempt status under 26 U.S.C. § 7428; and monetary damages against the United States, pursuant to 26 U.S.C. § 7431, for alleged violations of 26 U.S.C. § 6103. Plaintiff filed a First Verified Amended Complaint on July 22, 2013 seeking the same relief, and adding the Administrative Procedure Act (5 U.S.C. § 702, *et seq.*) as a grounds for its original claim for declaratory and injunctive relief.

1

The district court dismissed the claims in Plaintiff's First Verified Amended Complaint ("Complaint") by order of October 23, 2014, and entered final judgment. Following a timely appeal by Plaintiff, the United States Court of Appeals for the District of Columbia Circuit, by order of August 5, 2016, affirmed in part and reversed in part, reinstating Plaintiff's claims for equitable relief (except the claim for a determination of its tax-exempt status) against the Government Defendants.

The parties submit the following proposed Consent Order in resolution of the remaining claims:

### STIPULATION OF AGREED FACTS

The parties hereby stipulate to the following agreed facts:

1.  This Court has jurisdiction to enter this consent order.

2.  The Complaint alleges that Plaintiff is an organization that applied for 501(c)(3) tax-exempt status with the IRS on July 15, 2010 and is entitled to the rights protected by the First Amendment to the United States Constitution, including the rights to freely associate and engage in speech as a tax-exempt organization.

3.  The Complaint further alleges that the Internal Revenue Service ("IRS"), its officers, agents, and employees violated Plaintiff's constitutional rights by, at a minimum, screening its tax-exempt application, significantly delaying the processing of the application, and making harassing, probing, and unconstitutional requests for information based on the name, associations, and/or political viewpoints of the Plaintiff organization and that the violations are ongoing.

4.  The United States Senate Committee on Finance ("Senate Finance Committee") has acknowledged that allegations such as those of Plaintiff "strike at the very heart of the

principal [sic] that the Nation's tax laws are to be administered fairly and without regard to politics of any kind."

5. On May 10, 2013, then-Director of the IRS's Exempt Organizations ("EO") Division, Lois Lerner, publicly admitted that the IRS used a method of centralization for certain organizations based on their names, such as "Tea Party" or "Patriots." As Lerner stated, "That was wrong, that was absolutely incorrect, it was insensitive, and it was inappropriate." Lerner also apologized for the delay in processing many of those applications. Finally, Lerner acknowledged that the IRS requested information from those applicants that was too broad, unnecessary, and inappropriate, including requests for the names of contributors to those organizations, which, even if relevant in some circumstances, were not here.

6. The Treasury Inspector General for Tax Administration ("TIGTA") has conducted audits of the IRS's treatment of these applicants.

7. From 2010 to 2013, EO senior management was delinquent in its responsibility to provide effective control, guidance, and direction over the processing of applications for tax-exempt status filed by Tea Party and other political advocacy organizations. EO senior managers either failed in their responsibility to keep informed about the very existence of the applications, or failed to recognize the sensitivity of these applications. In the case of the former, EO senior managers forfeited the opportunity to shape the IRS's response to the influx of political advocacy applications by simply failing to read reports informing them of the existence of those applications. In the case of the latter, EO senior managers did not take appropriate steps to ensure that the applications were processed expeditiously and accurately.

8. The 2013 TIGTA Report entitled *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* (Dkt. 1-6) substantiates certain facts that give rise to

3

Plaintiff's claims in this case. The IRS admits to the following pertinent events detailed in the 2013 TIGTA Report:

    a. In 2010, the IRS began receiving applications for tax exempt status under §§ 501(c)(3) and (c)(4) of the Internal Revenue Code from entities with the terms "Tea Party," "Patriots," and "9/12" in their names.

    b. In March 2010, an EO Determinations Unit Specialist was asked to search for applications with "Tea Party," "Patriots," or "9/12" in the organization's name as well as other "political-sounding" names.

    c. In April 2010, the first "Sensitive Case Report" was prepared with regard to the "Tea Party" cases. Sensitive Case Reports are shared with the Director, Rulings and Agreements, and a chart summarizing all Sensitive Case Reports is provided to the Director of the EO Division.

    d. In July 2010, the EO Determinations Unit management requested that its specialists "be on the lookout" for "Tea Party" applications.

    e. In August 2010, the first "be on the lookout" ("BOLO") spreadsheet was issued. The BOLO listing was developed by the EO Determinations Unit to replace the prior practice of sending separate e-mails to all EO Determinations Unit employees to watch for potentially abusive cases, cases requiring processing by the team of specialists, and emerging issues.

    f. The BOLO spreadsheet alerted EO Determinations Unit staff to route applicants containing certain characteristics to specific EO Groups for processing. Relevant to this case, in August 2010, the "Emerging Issues" tab of the BOLO spreadsheet contained an entry entitled "Tea Party," instructing EO

      Determinations Unit screeners to direct applications that met the specified criteria to Group 7822 for coordinated processing. The criteria used changed over time. (For a chart detailing the evolution of the criteria, see "Timeline of Written Criteria for Identifying Potential Political Cases," 2013 TIGTA Report, Appendix VI, Dkt. 1-6, Page 36.)

g. The IRS utilized the criteria for more than 18 months.

h. As of June 2011, the criteria used to identify potential political cases were:

    i. Case files that reference "Tea Party," "Patriots," or "9/12 Project";

    ii. Issues that include government spending, government debt, or taxes;

    iii. Education of the public by advocacy/lobbying to "make America a better place to live;" or

    iv. Statements in the case file that criticize how the country is being run.

i. In May 2012, the relevant BOLO listing entry read "Advocacy Cases," and the criteria to identify those cases focused on political activity, rather than issues advocated. These criteria were "501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organization with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit)."

j. Approximately 1/3 of the entities forwarded to Group 7822 for processing had names that contained the terms "Tea Party," "Patriots," or "9/12." Furthermore,

all entities whose names contained the terms "Tea Party," "Patriots," or "9/12" were forwarded to Group 7822, while a smaller proportion of entities whose names did not contain those terms were forwarded.

9. The use of these inappropriate criteria resulted in substantial delays in processing these applications (in some cases, for a period of time spanning two election cycles), and unnecessary requests for information from these applicants (including requests for the identities of donors, identification of issues important to the organization and the organization's position(s) on those issues, the type of conversations and discussions members and participants had during organizational activities, whether officers or directors planned to run for public office, political affiliations of officers and directors, and information about other organizations). The use of a BOLO spreadsheet was permanently suspended in June 2013.

10. The EO Division is responsible for administering the tax code provisions related to tax-exempt organizations, including processing and deciding applications submitted by organizations seeking tax-exempt status.

11. The then-Director of the EO Division, Lois Lerner, first became aware that the IRS received applications from Tea Party groups as early as April or May 2010. For the next two years, Lerner failed to adequately manage the EO Division employees who processed these applications. Moreover, Lerner failed to inform upper level IRS management of the serious delays in processing applications for tax-exempt status from Tea Party and other politically sensitive groups. Consequently, it was a year before the IRS Office of Chief Counsel became involved, and nearly two years before superiors in the IRS management chain were aware of the mismanagement of Tea Party and other sensitive advocacy applications.

12. The EO Division undertook a number of initiatives aimed at finding a way to process the Tea Party and other political advocacy applications. Most of these initiatives were ineffective.

13. The Senate Finance Committee reported that "[I]n one example, EO Division management approved of the use of the BOLO list, which improperly identified the Tea Party and other organizations by name and policy position. The IRS used the BOLO list to subject applications received from Tea Party groups to heightened scrutiny, even when that scrutiny was unwarranted because the applications gave no indication that the organizations would engage in political campaign intervention."

14. The Senate Finance Committee reported that "[o]ther initiatives to process political advocacy applications sanctioned by EO management were under-planned, under-staffed, and under-executed. In each case, these initiatives ended in failure, and each failure resulted in applicant organizations enduring excessively long delays in receiving decisions on their applications."

15. The EO Division operated without sufficient regard for the consequences of its actions for the applicant organizations.

16. Not only did those organizations have to withstand delay measured in years, but many also were forced to bear burdensome and inappropriate ''development letters'' aimed at extracting information that TIGTA determined was not necessary to properly process the applications.

17. Congress has held numerous hearings concerning the IRS's treatment of these applicants.

18.     The Senate Finance Committee reported that, for over a full year, "every incoming application from a Tea Party or related conservative organization was sent to [the Emerging Issues Group] for further review – whether or not it reflected potential political campaign intervention – which ultimately resulted in heightened scrutiny and extended delays."

19.     The Senate Finance Committee reported that "[u]ntil July 2011, the Emerging Issues Tab of the BOLO spreadsheet specifically referenced the Tea Party movement."

20.     The Senate Finance Committee reported that "[W]hile the bucketed applications were from groups on both the political right as well as the left, the majority of the applications were from right-leaning organizations." To support this conclusion, the report cited IRS correspondence, which stated:

> Of the 84 (c)(3) cases, slightly over half appear to be conservative leaning groups based solely on the name. The remainder do not obviously lean to either side of the political spectrum.
>
> Of the 199 (c)(4) cases, approximately 3⁄4 appear to be conservative leaning while fewer than 10 appear to be liberal/progressive leaning groups based solely on name. The remainder do not obviously lean to either side of the political spectrum.

21.     The Senate Finance Committee reported that the centralized treatment of the Tea Party applicants began in 2010.

22.     Plaintiff did not receive a final determination granting it tax-exempt status under section 501(c)(3) until September 20, 2013, over three years after filing its application.

23.     The Senate Finance Committee reported that the IRS's treatment of Tea Party applicants caused some such applicants to stop pursing tax-exempt status.

24.     Tea Party applicants reported to Congress that the IRS's treatment of them, including the lengthy delays in issuing determinations, has affected the willingness of donors to make contributions, the willingness of others to associate themselves with the organizations, and

8

the ability of the organizations to engage in the full range of activities they would otherwise have undertaken.

25. The Senate Finance Committee reported that "these events will erode public confidence and sow doubt about the impartiality of the IRS."

26. TIGTA made nine recommendations to the IRS for how to correct these problems, including requiring the director of Rulings and Agreements to approve original entries and changes to criteria included on the BOLO listing, implement proper training before election cycles, better document its reasons for selecting applications for review, and to recommend guidance on how to measure the "primary activity" of I.R.C. § 501(c)(4) social welfare organizations for inclusion in the Department of the Treasury Priority Guidance Plan.

27. TIGTA completed a follow-up audit concerning the IRS's implementation of TIGTA's 2013 recommendations and published its findings in a March 2015 report.

28. TIGTA reported that "[t]he IRS has taken significant actions to address the nine recommendations made in our prior audit report."

29. TIGTA reviewed documentation indicating that "decisions on referrals containing emerging issues are being made based upon activities and not names or policy positions."

30. TIGTA concluded that there was "increased assurance that emerging issues are being considered impartially."

31. TIGTA further found that "[t]he IRS has substantially changed its procedures for processing applications for tax-exempt status" and expressed its belief "that the current procedures address [TIGTA's] original concern that only applications with indications of significant political campaign intervention should be worked as potential political cases and the basis for selection should be clearly documented in the file."

32. TIGTA found that "[t]he IRS developed and provided extensive political campaign intervention training for relevant Rulings and Agreements office employees, including all Determinations Unit employees."

33. TIGTA found that the IRS had eliminated the use of BOLO or similar listings.

34. At the time of the 2015 report, TIGTA found that guidance addressing how to measure the "primary activity" of a social welfare organization was included for consideration in the Department of the Treasury 2013–2014 Priority Guidance Plan.  As the Department of the Treasury was in the process of drafting guidance, Congress prohibited the IRS from publishing any regulation "relating to the standard which is used to determine whether an organization is operated exclusively for the promotion of social welfare for purposes of section 501(c)(4) of the Internal Revenue Code of 1986 (including the proposed regulations published at 78 Fed. Reg. 71535 (Nov. 29, 2013))." Department of the Treasury Appropriations Act, 2016, § 127 (Title I of Div. E of the Consolidated Appropriations Act of 2016).

35. TIGTA concluded that, "[u]ntil this guidance is finalized, the IRS does not have a clearly defined test for determining whether an organization's request for exemption as a social welfare organization should be approved. As a result, for those applicants not choosing the optional expedited process, the IRS continues to use a subjective facts and circumstances process."

36. The IRS accepted all the recommendations in the Senate Finance Committee's report concerning the determinations process that were within its control – that is, those that did not involve tax policy matters or legislative action. They included 15 of the report's 18 bipartisan recommendations.

37. The IRS is charged with the responsibility to exercise its power in a fair and impartial way as a neutral administrator of the tax laws.

38. The IRS acknowledges that the First Amendment generally prohibits the government from discriminating against citizens on the basis of the viewpoint(s) of their protected speech and/or their protected associational interests.

39. The IRS acknowledges that criteria for selecting tax-exempt applications and/or tax-exempt entities for IRS review should focus on the activities of the organizations and whether they fulfill the requirements of the law.

40. The IRS admits that its treatment of Plaintiff during the tax-exempt determinations process, including screening its application based on its name or policy positions, subjecting the application to heightened scrutiny and inordinate delays, and demanding of Plaintiff some information that TIGTA determined was unnecessary to the agency's determination of its tax-exempt status, was wrong. For such treatment, the IRS expresses its sincere apology.

41. The IRS agrees with and has implemented recommendations made by TIGTA, and is continuing to follow those recommendations. In a new TIGTA report dated September 28, 2017, in which TIGTA found that the IRS also had used names such as "Progressive" and "Emerge" to identify potential political advocacy cases, TIGTA concluded that no corrective recommendations were necessary because the IRS already had implemented the recommendations from TIGTA's 2013 report. The IRS remains fully committed to avoiding any selection and/or further review of tax-exempt applicants or entities that is based solely on the name or policy positions of such entity.

42. The IRS agrees that it is unlawful to share, disseminate, or otherwise use for any purpose, directly or indirectly, except as required or permitted by law, any information obtained during the determinations process from Plaintiff in response to requests seeking the following:

    a. whether the officer, director, *etc.*, has run or will run for public office; and

    b. information regarding employment, other than for the organization, including hours worked.

43. The IRS agrees that it is unlawful for the IRS, its officers, agents, employees, and all others in active concert or participation with any of them, to take any action not permitted by law that causes harm against Plaintiff, which includes an action for which there is no documented basis other than its having participated in this litigation or public statements it has made concerning the allegations in this litigation.

44. The IRS agrees that it is unlawful for the IRS, its officers, agents, employees, and all others in active concert or participation with any of them, to take any action not permitted by law that causes harm against any individual officer, director, and/or any individual that was a member of Plaintiff during the course of this litigation, which includes an action for which there is no documented basis other than its having participated in this litigation or public statements it has made concerning the allegations in this litigation.

45. The IRS agrees that it shall inform all Exempt Organizations Division employees, the Deputy Commissioner for Services and Enforcement, and the Commissioners and any Deputy Commissioners of the Wage and Investment, Large Business and International, Small Business/Self Employed, and Tax Exempt and Government Entities Divisions, of the terms of this Order, including the below declarations of the Court.

46. The IRS is fully committed to a tax administration system that promotes public confidence in the fairness and integrity of the tax system.

47. Plaintiff agrees that, in light of the parties' agreed stipulations of fact and the Court's entry of this Order, all remaining claims in this action should be dismissed.

### DECLARATORY JUDGMENT

48. The Court hereby declares that it is wrong to apply the United States tax laws, including any and all tax rules, regulations, policies, procedures, and standards of review, to any tax-exempt applicant or entity based solely on such entity's name, any lawful positions it espouses on any issues, or its associations or perceived associations with a particular political movement, position, or viewpoint.

49. The Court hereby declares that any action or inaction taken by the IRS must be applied evenhandedly and not based solely on a tax-exempt applicant or entity's name, political viewpoint, or associations or perceived associations with a particular political movement, position, or viewpoint.

50. The Court hereby declares that discrimination on the basis of political viewpoint in administering the United States tax code violates fundamental First Amendment rights. Disparate treatment of taxpayers based solely on the taxpayers' names, any lawful positions the taxpayers espouse on any issues, or the taxpayers' associations or perceived associations with a particular political movement, position, or viewpoint is unlawful.

In light of the parties' agreed stipulations, and the foregoing Declaratory Judgment, IT IS HEREBY ORDERED that Plaintiff's remaining claims are dismissed with prejudice.

**SO ORDERED** this _____ day of January, 2018.

                                                                                     _____
                                                                                     REGGIE B. WALTON
                                                                                     United States District Judge

Approved as to form and content:

| | |
|---|---|
| s/ James Bopp, Jr. | RICHARD E. ZUCKERMAN |
| JAMES BOPP. JR. | Principal Deputy Assistant Attorney General |
| COURTNEY TURNER MILBANK | Tax Division |
| The Bopp Law Firm, P.C. | |
| The National Building | s/ Joseph A. Sergi |
| 1 South 6th Street | JOSEPH A. SERGI (DC 480837) |
| Terre Haute, IN  47807 | Senior Litigation Counsel |
| jboppjr@aol.com | U.S. Department of Justice, Tax Division |
| cmilbank@bopplaw.com | 555 4th Street NW, JCB 7207 |
| | Washington, DC 20001 |
| ATTORNEYS FOR PLAINTIFF | (202) 305-0868; (202) 307-2504 (FAX) |
| | Joseph.A.Sergi@usdoj.gov |
| | |
| | LAURA M. CONNER (VA 40388) |
| | STEVEN M. DEAN (DC 1020497) |
| | JOSEPH R. GANAHL (MD) |
| | W. CARL HANKLA (DC 411665) |
| | JEREMY N. HENDON (OR 982490) |
| | Trial Attorneys |
| | U.S. Department of Justice, Tax Division |
| | 555 4th Street, NW |
| | Washington, DC 20001 |
| | (202) 514-2000 |
| | |
| | Of Counsel: |
| | JESSIE K. LIU |
| | United States Attorney |
| | |
| | ATTORNEYS FOR THE |
| | UNITED STATES |