**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **True the Vote, Inc.;** | |
| *Plaintiff,* | **Civil Case No.** 1:13-cv-000734-RBW |
| *v.* | |
| **Internal Revenue Service, et al.;** | **Memorandum of Points and Authorities in Support of Plaintiff's Motion for Attorneys' Fees, Costs, and Expenses Under the Equal Access to Justice Act** |
| *Defendants.* | |

# Memorandum of Points and Authorities in Support of Plaintiff's Application and Motion for Attorneys' Fees, Costs, and Expenses Under the Equal Access to Justice Act

## Introduction

True the Vote, Inc. ("TTV") respectfully seeks an order awarding it reasonable attorneys' fees of $1,933,888.06 under the Equal Access to Justice Act ("EAJA"). This amount can be awarded as an "bad faith" enhancement under 28 U.S.C. § 2412(b), based upon the IRS's actions or as a "special factor" enhancement under § 2412(d)(2)(A), based upon the IRS's unusually litigious position.[1] In the alternative, TTV respectfully seeks an order awarding it reasonable attorneys' fees of $750,922.79, pursuant to the EAJA statutory rate, adjusted for inflation, under

---

[1] TTV has included attorneys' fees through February 13, 2018, including fees incurred in making this application, in these totals. TTV will also seek attorneys' fees incurred after February 13, 2018 related to this application and will file a supplemental request for such fees once briefing is concluded.

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**

§ 2412(d)(2)(A). TTV requested "costs and reasonable attorneys' fees" under the EAJA from the outset of this litigation. (*See First Am.Verified Compl.*, Doc. 14, *Prayer for Relief* at ¶ 9). In addition, the letter from Defendants' ("IRS") counsel, attached to the proposed consent order specifically acknowledged that the proposal was a full and final resolution of all claims, "except any request for attorney's fees and costs that Plaintiff might make under any applicable law . . . ." (*Consent Order Cover Letter*, attached as Ex. 9).

TTV satisfies all requirements for an award of attorneys' fees under the EAJA. The EAJA applies to this case because it is a civil action brought against officials of the United States acting in their official capacities. TTV meets the net worth eligibility requirements of the EAJA. This application is timely. TTV is the "prevailing party" in this litigation. The IRS's position is not substantially justified in either its actions underlying this litigation or its actions during the litigation. Special circumstances do not exist that make an award of attorneys' fees unjust. The fees sought are fair, reasonable, and align with the fee structure used by this Court in previous cases. Because TTV satisfies the requirements of the EAJA, it is entitled to the requested attorneys' fees. The IRS acted in bad faith in both its actions underlying this litigation and its actions during the litigation itself, so TTV is entitled to an enhanced attorney fee rate over the EAJA statutory cap under § 2412(b). The IRS's unusually litigious position also justifies an enhanced attorney fee rate over the EAJA statutory cap under § 2412 (d)(2)(A).

## Background

On June 7, 2010, TTV organized as a not for profit corporation under laws in the State of

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                              2

Texas. (*First Am.Verified Compl.*, Doc. 14, at ¶ 31). Almost immediately, TTV applied for tax exemption under Section 501(c)(3) with the IRS, and the IRS received TTV's application no later than September 23, 2010. (*Defendant's Answer*, Doc. 117, at ¶ 4). However, TTV did not receive its determination letter granting tax-exempt status until September 20, 2013. (*Determination Letter*, attached as Ex. 10). The reasons it took the IRS nearly three years to grant TTV's tax-exempt status prompted the instant litigation.

In 2010, instead of simply processing TTV's application in the same manner as all other applications received, the IRS began to select certain organizations for heightened scrutiny. *See* (*Consent Order*, Doc. 150, at ¶ 8(a))*.* Applicants whose names contained "Tea Party," "Patriots," "9/12," or other "political sounding names" were referred to a separate group ("Group 7822") for processing. *Id.* at ¶¶ 8(a),(b),(f). Likewise, heightened scrutiny was given to applicants that expressed concern about issues like government spending, government debt, or taxes. *Id.* at ¶ 8(h). If an applicant expressed interest in education of the public by advocacy/lobbying to "make America a better place to live," it was identified for heightened scrutiny. *Id.* The IRS issued a "be on the lookout" ("BOLO") spreadsheet for such "Tea Party" applications. *Id.* at ¶ 8(c),(e),(f).

The use of this screening criteria resulted in requests for information from TTV that were unnecessary for a proper tax-exempt status determination. *Id.* at ¶ 40. Some of these requests included: requests for the identities of donors; identification of issues important to the organization and the organization's positions on those issues; the types of conversations and discussions members and participants had during organizational activities; whether officers or directors planned to run for public office; and political affiliations of officers and directors.

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                                    3

(*Defendant's Answer*, Doc. 117, at ¶ 129(a-j)). This unnecessary screening resulted in substantial delays in processing TTV's application. (*Consent Order*, Doc. 150, at ¶ 40).

TTV sought various legal and equitable remedies in this litigation, including: declaratory judgments under the Internal Revenue Code, actual damages, punitive damages, declaratory judgments under the First Amendment to the United States Constitution, permanent enjoinment of the IRS from further implementation or application of similar policies, *Bivens* damages due to a violation of TTV's Constitutional rights under the First Amendment, and reasonable attorney fees and costs. (*First Am.Verified Compl.*, Prayer for Relief, at ¶ ¶ 1-10). The actual and punitive damages were denied by this Court and affirmed by the United States Court of Appeals for the District of Columbia. *See True the Vote, Inc. v. IRS*, 831 F.3d 551 (D.C. Cir. 2016). The declaratory judgments were denied by this Court, but the court of appeals reversed that decision and remanded the litigation back to this Court. *Id.* After further discovery and negotiations, the parties agreed to a Consent Order, which was entered by this Court on January 21, 2018. *Consent Order*, Doc. 150. In a letter attached to the Consent Order, the IRS specifically acknowledged TTV preserved its right to apply for an award of attorneys' fees. (*Consent Order Cover Letter*, attached as Ex. 9).

## Argument

The EAJA provides that "[u]nless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys." *Id*. at § 2412(b). Further, the EAJA states that, "[e]xcept as otherwise specifically provided by statute, a court *shall* award to the prevailing party

**Memo. Of Points and
Auth. In Support of Pl.'s
Motion for Att. Fees
Under EAJA**                4

other than the United States fees and other expenses, . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." *Id*. at § 2412(d)(1)(A) (emphasis added).

### I. The EAJA Applies to This Action.

Under the EAJA, a court may award reasonable fees and expenses of attorneys to the prevailing party in any civil action brought against the United States or any agency or official of the United States acting in her official capacity. *Id*. at § 2412(b). The EAJA applies to this action because the instant case is a civil action brought against the Internal Revenue Service, an agency of the United States, and various officials of the IRS, acting in their official capacities. (*See, e.g., First Am.Verified Compl.*, Doc. 14, *Prayer for Relief* at ¶¶ 13(a-e), 32 - 48).

### II. TTV Is an Eligible Party and Meets the Net Worth Requirements of the EAJA.

Under the EAJA, a Section 501(c)(3) organization qualifies as a "party" eligible for an award of attorneys' fees, regardless of the organization's net worth. *Id*. at § 2412(d)(2)(B). On September 26, 2013, the IRS granted TTV's tax-exempt status and specified the effective date of such status was June 7, 2010. (*Determination Letter*, attached as Ex. 10). Therefore, TTV is an eligible party and meets the net worth requirements under the EAJA.

### III. TTV's EAJA Application Is Timely.

A party seeking an award of fees under the EAJA must file an application within 30 days of final judgment. *Id*. at § 2412(d)(1)(B). "Final judgment" is a "judgment that is final and not appealable, and includes an order of settlement." *Id*. at § 2412(d)(2)(G). Here, this Court entered a Consent Order on January 21, 2018, in which the IRS stipulated to certain facts, and in which

**Memo. Of Points and
Auth. In Support of Pl.'s
Motion for Att. Fees
Under EAJA**                                            5

this Court made certain declaratory judgments. (*Consent Order*, Doc. 150) The IRS's stipulation to facts resulted in a judicial holding of those facts. This Consent Order is final and not appealable. *See Delorme Publ'g Co. v. ITC*, 805 F.3d 1328, 1336 (Fed. Cir. 2015). This application is timely because it has been filed within 30 days of when the Consent Order was entered on January 21, 2018.[2]

### IV. TTV Is the Prevailing Party in This Litigation.

Under § 2412, in order to obtain "prevailing party" status, "a party must obtain a 'substantial part of' the relief it sought and the lawsuit must have caused 'a change in someone's primary conduct in the real world.'" *Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 966 (D.C. Cir. 2004) (quoting *Waterman Steamship Corp. v. Maritime Subsidy Board*, 901 F.2d 1119, 1122 (D.C. Cir. 1990)). While an injunction or a "mere legal declaration" that does no more than preserve the status quo does not confer "prevailing party" status, a decision or outcome that alters the legal relationship between the parties does confer such status within the meaning of the EAJA. *Lake Pilots Ass'n v. United States Coast Guard*, 310 F. Supp. 2d 333, 339 (D.D.C. 2004).

The plaintiff need not prevail on every issue, or even on the central issue, to be considered the prevailing party in the litigation. *Waterman Steamship Corp.*, 901 F.2d at 1121. However, the plaintiff must demonstrate a causal relationship between litigation brought and the result obtained. *Lundin v. Mecham*, 980 F.2d 1450, 1458 (D.C. Cir. 1992).

Therefore, if a decision or outcome in litigation either grants a substantial part of the relief

---

[2] February 20, 2018, is the 30th day after the entry of the Consent Order, according to Fed. R. Civ. P. 6(a)(1).

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                                        6

sought or causes a change in the conduct or relationship between the parties, the plaintiff is the "prevailing party" under the EAJA.

**A.   The Court of Appeals Ruling Changed the Legal Relationship Between TTV and the IRS.**

The District of Columbia Court of Appeals ruled that the IRS had not fully, unequivocally, and permanently ceased the "inappropriate" actions, such as subjecting "Tea Party" groups to heightened scrutiny; this heightened scrutiny prompted TTV to initiate this litigation. *See True the Vote, Inc. v. IRS*, 831 F.3d 551, 563-64 (D.C. Cir. 2016). The IRS only fully and permanently changed its primary and potential conduct toward TTV and other similar litigants when forced to do so by this litigation and the resulting decision of the court of appeals. *Id.* This ruling is relevant, authoritative, and amounts to a binding legal holding with legal effect on the parties' rights.

Therefore, the court of appeals ruling changed the legal relationship between TTV and the IRS.

**B.   The Consent Order Changed the Legal Relationship Between TTV and the IRS.**

The appellate court's holding led directly to further discovery, motions, and negotiations between TTV and the IRS. (*See Discovery Order*, Doc. 138). These negotiations ended in the Consent Order approved and adopted by this Court. (*Consent Order*, Doc. 150).

In the Consent Order, the IRS stipulates to and this Court finds a chain of facts demonstrating conclusively that the litigation resulted in a change in the conduct or legal relationship between the parties—i.e., that TTV is the prevailing party. The IRS stipulates and this Court finds that

**Memo. Of Points and Auth. In Support of Pl.'s Motion for Att. Fees Under EAJA**                    7

TTV alleged the IRS violated its constitutional rights when it screened TTV's tax-exempt application, significantly delayed processing its application; made harassing, probing, and unconstitutional requests for information based on the name, associations, and/or political viewpoints of TTV; and continued violating TTV's rights. (*Consent Order*, Doc. 150, at ¶ 3).[3]

The substantiation and stipulations continue in the Consent Order. This Court, through the Consent Order, adopts as fact the findings of the 2013 Treasury Inspector General for Tax Administration ("TIGTA") Report, to which the IRS stipulates. *Id.* at ¶ 8. These findings include that in March 2010, an EO Determinations Unit Specialist was asked to search for applications with "Tea Party," "Patriots," or "9/12" in the organization's name as well as other "political sounding" names. *Id.* at ¶ 8(b). A "Sensitive Case Report" was prepared with regard to the "Tea Party" cases and was shared and reported with EO upper management. *Id.* at ¶ 8(c). The EO Determinations Unit management requested that its specialists "be on the lookout" ("BOLO") for "Tea Party" applications. *Id.* at ¶ 8(d).

The BOLO directive caused screeners to direct qualifying applications to Group 7822 for coordinated processing. *Id.* at ¶ 8(e)(f). The IRS identified potential political cases on the basis of the organization's name; the organization's concern with issues like government spending, government debt, or taxes; public education by advocacy/lobbying to "make America a better

---

[3] The IRS stipulates and this Court finds that then-director of the IRS's Exempt Organization ("EO"), Lois Lerner, publicly admitted that the IRS used a method for triggering centralized and invasive scrutiny for certain organizations based on their names, such as "Tea Party" or "Patriots." Ms. Lerner stated, "That was wrong, that was absolutely incorrect, it was insensitive, and it was inappropriate." *Id.* at ¶ 5.

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA** 8

place to live"; and statements in case files which criticized how the country is being run. *Id.* at

¶ 8(h)(I-iv). The IRS continued utilizing these criteria for more than 18 months. *Id.* at ¶ 8(g).

Further, the IRS stipulates and this Court finds that the use of such inappropriate criteria resulted

in "substantial delays" in processing these applications, and that Ms. Lerner failed to adequately

manage or to inform upper-level IRS management for *two years*. *Id*. at ¶¶  9,11 (emphasis

added).

As a result of the litigation, the IRS now states that it "remains fully committed to avoiding

any selection and/or further review of tax-exempt applicants or entities that is based solely on the

name or policy positions of such entity" (referencing many of the changes recommended by the

TIGTA report and the Senate Finance Committee's Report). *Id.* at ¶ 41. In short, the IRS made a

blanket admission of the very specific, inappropriate screening methods it used against TTV, and

the IRS made a wholesale admission that its treatment of TTV was wrong.[4]

Not only does the IRS acknowledge its wrongful treatment of TTV, but this Court also issues

declaratory judgments in the Consent Order. "The traditional function of a declaratory judgment

---

[4] As perhaps the most important indication that this litigation changed the IRS's conduct toward TTV in the real world, the IRS finally admitted its actions were wrong and apologized to TTV:

> . . . [I]ts treatment of TTV during the tax-exempt determination process, including screening its application based on its name or policy positions, subjecting the application to heightened scrutiny and inordinate delays, and demanding of TTV some information that TIGTA determined was unnecessary to the agency's determination of its tax-exempt status, was wrong. For such treatment, the IRS expresses its sincere apology.
> *Consent Order, Doc.* 150, at ¶ 40.

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                    9

is to affect the parties' future conduct by resolving present disputes over legal rights and obligations." *All. for Democracy v. FEC*, 335 F. Supp. 2d 39, 47 (D.D.C. 2004). When read in context with the IRS admissions, these declaratory judgments caused a change in the legal relationship between TTV and the IRS. This Court declares it "wrong to apply the United States tax laws . . . to any tax-exempt applicant or entity based solely on such entity's name, any lawful positions it espouses on any issues, or its association or perceived associations with a particular political movement, position, or viewpoint." *Id.* at ¶ 48. This Court further declares that any action taken by the IRS "must be applied evenhandedly and not based solely on a tax-exempt applicant or entity's name, political viewpoint, or associations or perceived associations with a particular political movement, position, or viewpoint." *Id.* at ¶ 49. For this Court to say an action is "wrong" is to say it violates law, and the Consent Order directly declares so when it states that "discrimination on the basis of political viewpoint in administering the United States tax code violates First Amendment rights. . . . [and] is unlawful." *Id.* at ¶ 50.

The IRS admits it mistreated TTV, "including screening its application based upon its name or policy positions." *Id.* at ¶ 40. This Court agrees, deeming it unlawful to apply tax law based solely on an "entity's name, or any lawful positions it espouses." *Id.* at ¶ 48. Since the IRS did not qualify its apology by indicating it screened TTV's application for heightened scrutiny or issued a BOLO on any factors other than its "name or policy positions," the IRS admission in paragraph 40 of the Consent Order falls squarely within the boundaries of the actions this Court declared wrong and unlawful.

Before this litigation commenced, the IRS admittedly screened TTV's tax-exempt application

for heightened scrutiny based upon inappropriate criteria. Prior to this litigation, TTV was not

assured that such inappropriate IRS actions had fully, unequivocally, and permanently ceased. As

a direct result of this litigation, the inappropriate IRS actions toward TTV have fully,

unequivocally, and permanently ceased. The appellate court's ruling caused a permanent

cessation of improper and unlawful IRS heightened scrutiny and caused a change in the legal

relationship between TTV and the IRS. The IRS admissions and this Court's declarations in the

Consent Order also caused a fundamental change in the legal relationship between TTV and the

IRS. Those types of legal changes between the parties in the real world that the *Role Models, Inc.*

Court envisioned. Therefore, TTV is the prevailing party in this litigation.

### V. The IRS's Position in This Litigation Is Not Substantially Justified.

In addition, for a prevailing party to obtain attorneys' fees under the EAJA, the position of

the United States must not be substantially justified. *Id*. at § 2412(d)(1)(B). However, the

prevailing party does not bear the burden of proving that the position of the United States was not

substantially justified. Once a plaintiff demonstrates that it is the prevailing party, the burden

shifts to the United States to affirmatively show that its position was substantially justified.

*Carey v. Federal Election Comm'n*, 864 F. Supp. 2d 57, 62-63 (D.D.C. 2012) (holding FEC

could not substantially justify ignoring controlling law).

The government must show that "its position, including *both* the underlying agency action

*and* the arguments defending that action in court, was substantially justified within the meaning

of the [EAJA]." *Cobell v. Norton*, 407 F. Supp. 2d 140, 152 (D.D.C. 2005) (emphasis added).

Government conduct is "substantially justified" where it is "justified in substance or in the main -

**Memo. Of Points and
Auth. In Support of Pl.'s
Motion for Att. Fees
Under EAJA** 11

that is, justified to a degree that could satisfy a reasonable person. That is no different from [having] a reasonable basis both in law and fact." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Therefore, the government must show it could satisfy a reasonable person that its position is substantially justified. The government must show substantial justification for the underlying actions of the government that lead to litigation and for its position during litigation. The IRS cannot carry this heavy burden.

The same instances of the IRS's admitted wrongdoing described in the "prevailing party" section of this memorandum are also pertinent to the determination that the IRS is not substantially justified. These arguments are incorporated by reference into this section, but are summarized for the Court's convenience.

**A.   The IRS's Actions Underlying This Litigation Are Not Substantially Justified.**

Using the *Pierce* standard, the IRS must show its actions underlying this litigation would "satisfy a reasonable person." *Pierce*, 487 U.S. at 565. The IRS cannot satisfy this heavy burden. An organization that submits an application for tax-exempt status to the IRS should reasonably expect that its application will be reviewed fairly, without regard to political viewpoint, to determine if it meets the requirements under existing tax law. Conversely, it would be unreasonable for that organization to anticipate its name or political philosophy will be used against it, contrary to tax law and the most fundamental understanding of our system of governance. Instead of upholding this fundamental understanding of governance, the court of appeals recognized that the IRS "utterly failed" in its mission to "apply tax law with integrity and fairness to all." *True the Vote, Inc.*, 831 F.3d at 559 (referencing TIGTA at 6-7). The court of

appeals decision noted that "it [was] plain" to it, to the Inspector General, and to the district court, that the IRS "[could] not defend its discriminatory conduct on the merits." *True the Vote, Inc.*, 831 F.3d at 561.

Yet, in order to show it was "substantially justified" in its underlying actions, the IRS would have to satisfy a reasonable person that its actions, described as indefensible discriminatory conduct, were justified. The IRS would have to convince a reasonable person that its actions, characterized by the Court of Appeals as an utter failure, were justified. To equate "indefensible," "discriminatory," and "utter failure" with a substantial justification for such actions is contrary to law and reason.

Further examination of specific IRS actions demonstrates just how untenable the IRS's substantial justification argument would be in this case. The IRS admits and this Court finds that in 2010, it started separating out organizations for heightened scrutiny based upon the organizations' names and assumed political ideology. (*Consent Order*, Doc. 150, at ¶ 8(h)(I-iv)). The IRS admits and this Court finds it created BOLO lists on the same basis. *Id.* at ¶ 8(f). The IRS admits and this Court finds it subjected TTV to heightened scrutiny, which was "unnecessary" in order to make its determination under the law. *Id.* at ¶ 40. The IRS admits and this Court finds it separated out groups based upon its "policy positions," such as the truly radical notion that citizens have a right to be concerned about government spending, government debt, or taxes. *Id.* at ¶ 8(h)(ii). The IRS admits and this Court finds that an organization with the goal of educating the public on how to "make America a better place to live" deserved special scrutiny under its practices at the time. *Id.* at ¶ 8(h)(iii).

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                13

This unlawful screening continued throughout 2010. The IRS admits and this Court finds that this heightened scrutiny led to "substantial delays" in processing (in some cases, for a period of time spanning two election cycles). *Id.* at ¶ 9. Yet the IRS continued this practice throughout 2011 and 2012. Before this litigation began, Ms. Lerner publicly admitted "[that separating applicants based upon their names] was wrong, that was absolutely incorrect, it was insensitive, and it was inappropriate." *Id.* at ¶ 5.  The IRS continued utilizing these criteria for more than 18 months after Lerner admitted it was wrong. *Id.* at ¶ 8(g). In fact, because of the IRS's unreasonable practices, TTV did not receive its tax-exempt status until September 26, 2013, more than three years after its initial application was submitted. (*Determination Letter,* attached as Ex. 10).

A reasonable person would not think any of the IRS's admitted wrongdoing underlying this litigation is substantially justified. After all, a reasonable person, as demonstrated by the court of appeals decision, would think the IRS should apply tax law fairly, without regard to an organization's name or political ideology. However, the IRS admits to doing just the opposite when it "screen[ed]" [TTV's] application based on its name and policy positions. (*Consent Order*, Doc. 150, at ¶ 40). A reasonable person would not expect an applicant seeking tax-exempt status would be subjected to "heightened scrutiny" based upon this screening process. Yet the IRS admits TTV experienced such heightened scrutiny. *Id.* at ¶ 40. A reasonable person would not expect it to take nearly three years and two election cycles to screen an organization's application. *Id.* at ¶ 9. Nonetheless, that is exactly how long it took the IRS to finally grant TTV's tax-exempt status. In the meantime, TTV lost the opportunity in two separate elections to

effectively speak to the issues it is passionate about.

Controlling authorities in this jurisdiction recognize the IRS's actions were discriminatory, indefensible, and utter failures under a fair system of government. The IRS cannot now argue that the very same actions prompting the use of such strong language and rulings by controlling authorities in this jurisdiction satisfies its burden of substantial justification to a reasonable person. Because the IRS cannot meet this heavy burden, its actions are not substantially justified.

## B.  The IRS's Actions During the Litigation Are Not Substantially Justified.

Using the *Pierce* standard, the IRS must also show its actions during this litigation would "satisfy a reasonable person." *Pierce*, 487 U.S. at 565. The IRS also cannot satisfy this heavy burden. The IRS had at least eighteen months before this litigation began to fully, unequivocally, and permanently stop this unlawful practices. It had at least eighteen months to treat all organizations fairly under the law, regardless of political perspective. It had at least eighteen months to admit this wrongdoing, apologize for its actions, and expedite the applications for the groups affected by its misjudgment and abuse. The IRS did not choose this path.

This action was originally filed on May, 21, 2013. (*Verified Compl. for Declaratory Judgment, Declaratory and Injunctive Relief and Damages*, Doc. 1). It is now 2018, almost eight years after the IRS initially began subjecting certain organizations to heightened scrutiny, based upon criteria that was "wrong," according to the IRS's own admissions. (*Consent Order*, Doc. 150, st ¶ 40). The court of appeals found that there "was little factual dispute" between the parties as to the IRS's conduct. *True the Vote, Inc.*, 831 F.3d at 555. Instead of ending this litigation quickly based upon this lack of factual dispute, the IRS continued to argue in court that

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                                            15

the case should be dismissed for mootness because it had "voluntarily ceased" using the offensive and inappropriate targeting criteria. *Id.* at 561.

However, it had not fully, unequivocally, and permanently ceased such actions. All "suspect" applications still had not been properly processed, and worse, the IRS had not unequivocally and permanently abandoned its use of BOLO lists. *Id.* at 561, 563. Instead, it merely "suspended [the practice] until further notice." *Id.* at 563. It took eight years of litigation and a court of appeals ruling to convince the IRS that properly processing "most" applications is not the same as properly processing "all" applications, and that "suspension until further notice" does not equate to "unequivocally and permanently abandon."

The IRS offered a "rather puzzling explanation" for why the continued failure to properly process some of the applications should not prevent a finding of cessation by the court of appeals. The IRS pointed to its "long-standing" procedure of suspending the applicable processing if a party litigates against it. The court of appeals completely rejected this argument, comparing it to Joseph Heller's classic, *Catch-22*. *Id.* at 562. In Heller's book, the government told World War II airmen they were entitled to exemptions from flying if they were mentally unfit, but "you can't get it as long as you are asking for it." *Id.* (quoting *Catch-22*). The court of appeals drew a direct parallel between Heller's airmen and the applicants impacted by the IRS's conduct. The court of appeals found the IRS essentially said to each applicant who litigated, "we have been violating your rights and not properly processing your applications. You are entitled to have your applications. But if you ask for that processing by way of a lawsuit, then you can't have it." *Id.*

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                                16

TTV was not the only organization impacted by the IRS's puzzling logic or apparent litigation strategy. The IRS "suspended" the processing of Z STREET's application because it filed an action under similar circumstances. (*Consent Order*, Z STREET, Doc. 117-1, attached as Ex. 11 at ¶ 43) (alleging IRS subjected Z STREET to heightened scrutiny on basis of "Israel Special Policy"). The IRS apologized to Z STREET that its decision resulted in a delay of *six years and ten months*. *Id*. This type of unjustified litigation strategy affected the NorCal Tea Party Patriots as well. After allegedly being subjected to scrutiny on the basis of its name and political ideology, the Sixth Circuit found the "lawsuit ha[d] progressed as slowly as the underlying applications themselves: at every turn the IRS ha[d] resisted the plaintiffs' requests for information regarding the IRS's treatment of the plaintiff class, eventually to the open frustration of the district court." *United States v. NorCal Tea Party Patriots* (*In re* United States), 817 F.3d 953, 955 (6th Cir. 2016).

A reasonable person who discovered the IRS actually issued BOLO alerts for organizations based upon names and assumed political ideology would expect the IRS to quickly and unequivocally stop such actions. A reasonable person would not expect the IRS to argue it had stopped such actions, when it had merely "suspended" them "until further notice." A reasonable person would not expect that its application would be suspended because it chose to litigate against such actions, when litigation was virtually the only option available to the litigant. A reasonable person would not expect it to take five years of litigation to make the IRS fully, unequivocally, and permanently stop such actions.

The IRS cannot meet its heavy burden to show its actions during the litigation itself would

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                                    17

satisfy a reasonable person. Because the IRS cannot meet this burden, its actions are not substantially justified.

Therefore, the IRS's actions underlying this litigation and its actions during this litigation are not substantially justified.

**C.  Special Circumstances Do Not Exist That Make an Award of Attorneys' Fees Unjust.**

Even if the position of the United States was not substantially justified, a fee award is inappropriate if "special circumstances make an award unjust." 28 U.S.C. at § 2412(d)(1)(A). This Court has held this "safety valve" was designed to "insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts" and to permit courts to rely on "equitable considerations" in denying a fee award. *Wilkett v. Interstate Commerce Commerce*, 844 F.2d 867, 873 (D.C. Cir. 1988) (quoting H.R. REP. No. 1418, 96th Cong., 2d Sess. 11, reprinted in 1980 U.S. CODE CONG. & ADMIN. NEWS 4984, 4990).

The IRS's actions underlying this litigation were more than "vigorous enforcement efforts." Vigorous enforcement efforts by the IRS might justifiably include investigating the activities of an applicant, to make sure it complies with tax law". If proper, vigorous enforcement efforts were all the efforts used by the IRS in this case, such efforts might give rise to a special circumstance that would make an award unjust.

The IRS admits multiple instances of wrongdoing. It admits to screening the application based upon names or policy positions. (*Consent Order*, Doc. 150, at ¶ 40). It admits this improper screening subjected TTV to heightened, unnecessary scrutiny and inordinate delays. *Id.*

**Memo. Of Points and
Auth. In Support of Pl.'s
Motion for Att. Fees
Under EAJA**                                18

The Inspector General and court of appeals made it clear that the IRS utterly failed in its mission to apply the tax laws of this nation fairly and equitably. *True the Vote, Inc.*, 831 F.3d at 559. Both this Court and the court of appeals held that the IRS's discriminatory actions could not be defended. *Id.* at 561.

The *Wilkett* Court made clear equity may be considered. In this case, equity demands an award of attorney fees. TTV is not a wealthy organization. TTV has had to litigate for almost five years against the IRS, which is backed by the almost limitless resources of the federal government. Not only do these admissions and rulings eliminate "special circumstances" that would make an award unjust, refusing such an award would itself be manifestly unjust.

### VI. Enhanced Rates Over the EAJA Statutory Cap Are Fair and Reasonable.

**A.   TTV Is Entitled to an Enhanced Attorney Fee Rate Over the EAJA Statutory Cap.**

An enhancement of the EAJA's statutory fee ceiling is available in either of two circumstances: (1) this Court determines the IRS acted in bad faith and should be "liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award" under § 2412(b); or (2) this Court finds the IRS was unnecessarily litigious and should be subject to a "special factor" under § 2412(d)(2)(A). TTV is entitled to an enhanced attorney fee rate under § 2412(b) because of the bad faith exhibited by the IRS in both the actions underlying this litigation and in the litigation itself. The IRS's actions, discussed in the "prevailing party" and "substantial justification" sections of this memorandum, amount to bad faith and an abrogation of the public trust. Furthermore, the IRS's unnecessarily litigious position also justifies an enhanced rate under

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                    19

§ 2412(d)(2)(A) .

**1.   TTV Is Entitled to an Enhanced Attorneys' Fee Rate because of the IRS's Bad Faith Actions.**

This court has awarded bad faith enhancements in excess of the statutory cap under § 2412(b). *See Cobell*, 407 F. Supp. 2d 140. This "narrow exception" to the American Rule is triggered where the losing party has acted "vexatiously, wantonly, or for oppressive reasons." *Id*. at 167. The "bad faith" enhancement is appropriate where "(1) the Government's misconduct occurred in connection with the litigation, *or* (2) was an aspect of the conduct giving rise to the litigation." *Id*. at 168 (quoting *American Hosp. Ass'n v. Sullivan*, 290 U.S. App. D.C. 397, 938 F.2d 216, 219 (D.C. Cir. 1991)) (emphasis added). It is a "punitive" award that must be construed "stringently," and "imposed only in exceptional cases and for dominating reasons of justice." *Id*. at 167 (citations omitted).

In *Cobell*, trustee-delegates, acting as representatives of the United States, abrogated their trust responsibilities toward Indian beneficiaries. The *Cobell* Court found that the defendants' pretrial conduct consistently contravened controlling authority and required plaintiffs "to undertake otherwise unnecessary litigation to vindicate plain legal rights." *Id.* at 168. The court noted the appellate court had characterized the *Cobell* defendants' actions as "unreasonable" and "egregious." *Id.* Therefore, actions by defendants that are vexatious, oppressive, or an abrogation of clear duty are subject to a "bad faith" enhancement under § 2412(b). Further, defendants who force plaintiffs to initiate "unnecessary litigation" in order "vindicate plain legal rights" act in bad faith and are subject to fee enhancement under § 2412(b).

The bad faith, dishonesty, and misjudgment exhibited by the IRS both in the events underlying the litigation and in the litigation itself justify increased rates. The IRS admits its "treatment of [TTV] during the tax-exempt determination process, including screening its application based on its name or policy positions, subjecting the application to heightened scrutiny and inordinate delays, and demanding of [TTV] some information that TIGTA determined was unnecessary to the agency's determination of its tax-exempt status, was wrong." It strains credulity to think the IRS's admitted wrongdoing was not for an oppressive purpose. Approximately 1/3 of the entities forwarded to Group 7822, the group in charge of "coordinated processing," had names that contained the terms "Tea Party," "Patriots," or "9/12." (*Consent Order*, Doc. 150, at ¶ 8(j)). Furthermore, *all* entities whose names contained these terms were forwarded for coordinated processing, while a smaller proportion of entities whose names did not contain those terms were forwarded. *Id*. (emphasis added). If not for an oppressive purpose, the IRS would not have placed all the applicants with names meeting its screening criteria into a suspected category.

While the *Cobell* Court dealt with a financial trust which endowed the trustee-delegates with certain fiduciary and legal duties, this Court has before it a case dealing with a different kind of trust – the public trust. The public should be able to trust its government and its agencies to apply the law fairly and equally, without regard to political ideology. This Court has stated it "is constantly aware that the public interest requires judicial support of executive and administrative officials in the faithful execution of their public trust." *Black v. Sheraton Corp. of Am.*, 371 F. Supp. 97, 101 (D.D.C. 1974) (holding "admitted misconduct and perversion of power by

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                21

governmental officials, rather than a legitimate determination of policy. . . strike at the

foundation of democratic government"). The IRS abrogated this public trust in its treatment of

TTV. Because the IRS abrogated the public trust in its treatment of TTV, it is entitled to a "bad

faith" enhanced attorney fee rate over the EAJA statutory cap under § 2412(b).

## 2.   TTV Is Entitled to an Enhanced Attorneys' Fee Rate because of the IRS's Unnecessarily Litigious Actions .

Enhanced rates may be awarded under § 242(d)(2)(A), if the court finds a "special factor"

justifying such an enhancement. The government's "unusually litigious position"would constitute

such a special factor if it could be shown that its aggressive strategy was adopted in order to deter

attorneys subject to a statutory cap to operate at a loss. *Jean v. Nelson*, 863 F.2d 759, 776 n. 13

(11th Cir. 1988). Therefore, this Court should award an enhancement under the "special factor"

analysis of § 2412(d)(2)(A) because the IRS's litigation strategy was unnecessarily aggressive.

This litigation has taken over five years. As the court of appeals noted, there "was little

factual dispute" between the parties as to the IRS's conduct. *True the Vote, Inc.*, 831 F.3d at 555.

However, the IRS continued to litigate this case based upon its claim it had "voluntarily ceased"

using the offensive and inappropriate targeting criteria, even though complete cessation had not

occurred. *Id.* at 561. It is now five years after the litigation was initiated and almost eight years

after the IRS began using the inappropriate criteria that prompted this case. Continuing to litigate

a case when very little factual dispute exists and in the face of the TIGTA report is unnecessarily

litigious. The unnecessarily protracted litigation position, the statutory rate cap, and the disparity

in resources virtually guaranteed that TTV would be forced to rely on it attorneys to ultimately

operate at a loss. TTV is entitled to an enhanced attorneys' fee rate because of the IRS's

unnecessarily litigious actions.

**B.   TTV Is Entitled to Receive the LSI Laffey Rates for This Award.**

In 2005, the *Cobell* Court awarded enhanced rates over the statutory cap on the basis of "bad

faith." 407 F. Supp. 2d at 169. Once a fee enhancement is granted, a fee applicant must establish

at least three elements: (1) the attorneys' billing practices; (2) the attorneys' skill, experience, and

reputation; and (3) the prevailing market rates in the relevant community. *Id.* at 170.

**1.   TTV's Attorneys' Billing Practices Are Fair and Reasonable.**

Over the course of this litigation, four traditional and public-interest law firms have worked

for TTV: (1) The Public Interest Legal Foundation ("PILF"), (2) The Claremont Institute Center

For Constitutional Jurisprudence ("CCJ"), (3) Foley & Lardner, LLP ("Foley"), and (4) The

Bopp Law Firm, PC ("BLF"). All firms submitted billing records detailing the gross amount of

hours worked on TTV's behalf; the attorneys, clerks, or paralegals performing the work[5]; and

detailed descriptions of the work done. Each firm has submitted a declaration attesting to the

accuracy of the gross billing hours and descriptions submitted (*Billing Records*, attached as Ex.

1-5).

---

[5] The U.S. Supreme Court held that paralegal fees are recoverable at the prevailing market rate as part of an award of "attorneys' fees" under the EAJA. *See Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 128 S. Ct. 2007 (2008).

**Memo. Of Points and
Auth. In Support of Pl.'s
Motion for Att. Fees
Under EAJA**                    23

The facts underlying all of TTV's claims were virtually the same, as all claims arose from the IRS's improper heightened scrutiny on the basis of names and ideology. However, TTV was ultimately unsuccessful in some of its claims. This Court did not award statutory damages based upon improper disclosure of IRS records, (*First Am.Verified Compl.*, Doc. 14, at Count IV), did not award *Bivens* damages from the individual defendants, *Id.* at Count III, and did not award damages for violations of the Administrative Procedures Act. *Id.* at Count V. The attorneys' hours have been adjusted to reflect a deduction for the unsuccessful claims according to the following process:

- The percentage of documents (briefs, motions, etc.) that pertained to the unsuccessful claims was calculated. For example, approximately 20% of the initial complaint was devoted to the unsuccessful claims. (*See Table of Percentage Deductions for Unsuccessful Claims*, attached as Ex. 8).
- If the billing sheet was unspecified as to what issue or claim the attorney was working on, the hours were adjusted according to the relevant percentage devoted to the unsuccessful claims.
- If the billing description pertained to only one of the unsuccessful claims, that line item was "no charged."
- If the billing description pertained to only the successful claim(s), that line item remained fully chargeable, with no reduction of hours.
- Reimbursable expenses include filing fees, process service fees, copying/printing, and computer-aided legal research. All other expenses are non-reimbursable. Travel time is awarded at half the hours.
- CCJ and BLF included expenses in the billing detail. (*See Billing Records*, attached as Ex. 3,5). PILF's and Foley's expenses are not in the billing detail, but attached separately. (*See PILF/Foley Expenses*, attached as Ex. 4).

Because the attorneys have diligently and accurately recorded their time and have adjusted for the unsuccessful claims, the attorneys' billing practices are fair and reasonable.

## 2. TTV's Attorneys' Skill, Experience, and Reputation Are Well-Established.

The attorneys who worked in this litigation have hundreds of years of combined experience,

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                    24

much of which has specifically been spent specializing in not-for-profit tax, constitutional and election law. The attached biographies and declarations for the attorneys show the skill and experience TTV received in this litigation. *Declarations of* [CCJ, PILF, Foley, and BLF] *in Support of Plaintiff's Application and Motion for Attorneys' Fees, Costs, and Expenses Under the Equal Access to Justice Act* (February 20, 2018). The prevailing market rate for legal skill and experience of this caliber is accurately accounted for within the LSI Laffey Matrix.

### 3. The LSI Laffey Rates Are the Prevailing Market Rates in the Relevant Community.

The *Cobell* Court validated the use of the Laffey Matrix when enhanced fees apply to an EAJA award. *Cobell*, 407 F. Supp. 2d 140, 170. The Laffey Matrix is a schedule of hourly rates based on years of experience originally developed by the D.C. Circuit. *Id.* The *Cobell* Court applied United States Attorney's Office's ("USAO") version of the Laffey Matrix. *Id.*

Ten years after the *Cobell* Court applied the USAO Laffey Matrix, this circuit upheld the use of a more recently updated matrix, the LSI Laffey Matrix. *See Salazar v. District of Columbia*, 809 F.3d 58, 65 (D.C. Cir. 2015) (holding relevant market is that of complex federal litigation). Although *Salazar* was a claim for attorneys' fees based on 42 U.S.C. § 1983, the reasoning behind using the LSI Laffey Matrix was not based specifically on the statutory framework, but instead on the reasonableness and accuracy of the matrix selected. The district court had determined that the LSI Laffey Matrix had "the distinct advantage of capturing the more relevant data because it is based on the legal services component of the Consumer Price Index (CPI) rather than the general CPI on which the [USAO] matrix is based." *Id.* at 62. In affirming the

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                                    25

district court's decision, the court of appeals noted that the LSI Matrix was probably a conservative estimate of the actual cost of legal services in the Washington, D.C. area. *Id.* at 65. In adopting the LSI Laffey Matrix, the court of appeals affirmed that "fees should be neither lower, nor calculated differently, when the losing defendant is the government." *Id.*

Civil Rights litigation has been recognized as complex federal litigation, as the *Salazar* Court indicated as a factor for the use of the LSI Laffey Matrix. The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, authorizes district courts to award a reasonable attorney's fee to prevailing civil rights litigants.[7] In enacting the statute, Congress directed that attorney's fees be calculated according to standards currently in use under other fee-shifting statutes, such as anti-trust litigation, and "not be reduced because the rights involved may be nonpecuniary in nature." *Blum v. Stenson*, 465 U.S. 886, 893 (1984).

This litigation has always been based in the federal courts in Washington, D.C. and involved many complex questions involving tax law, constitutional law, and administrative law. While this litigation did not invoke civil rights legislation, many of the same complex questions of statutory interpretation, fairness, and equality apply to IRS's actions toward TTV. Such complex litigation required attorneys experienced in such law. Even though TTV received nonpecuniary awards, such as declaratory judgments, the *Blum* Court made clear the lack of monetary damages did not render the litigation simple versus complex.

---

[7]Section 1988 provides in relevant part:

"In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                        26

LSI Laffey rates are applicable to a bad faith enhancement in this litigation. (LSI Laffey Rates per attorney, attached as Ex. 6). If a bad faith enhancement or "special factor" enhancement is awarded, TTV's award is $1,933,888.06. The chart below summarizes the LSI Laffey rates, adjusted as explained above.

**LSI Bad Faith Enhancement Calculations**

| Description | CCJ | Foley | PILF | BLF | Totals |
|---|---|---|---|---|---|
| Gross LSI Bad Faith Enhancement Award (PILF includes PILF/Foley Gross Expenses; CCJ and BLF Gross Expenses included) | $ 155,705.80 | $ 902,762.40 | $ 993,916.73 | $ 312,530.16 | $ 2,364,915.09 |
| Less Billing Adjustments for Unsuccessful Claims, Travel Time, Non-reimbursable Expenses (PILF includes adjustments for PILF/Foley Expenses; CCJ and BLF expense adjustments included) | $ (57,518.50) | $ (168,287.20) | $ (198,662.77) | $ (6,558.56) | $ (431,027.03) |
| **Net LSI Bad Faith Enhancement Award** | **$ 98,187.30** | **$ 734,475.20** | **$ 795,253.96** | **$305,971.60** | **$ 1,933,888.06** |

## D. TTV Accurately Applied the Statutory Rate if a Bad Faith Enhancement Is Not Awarded.

If this Court agrees that TTV is the prevailing party and the IRS's actions are not substantially justified, but does not agree that TTV should be awarded a "bad faith" or "special factor" enhanced rate under § 2412(b) or § 2412 (d)(2)(A), then the statutory rate, adjusted for inflation, should apply. The current statutory rate structure for EAJA is attached to this memorandum. (*EAJA Rates*, attached as Ex. 7). The EAJA rate structure is applied for the entire calendar year and are the same for each attorney, regardless of experience.

The same adjustments for billing related to unsuccessful claims would apply to a statutory

rate EAJA award. In that case, TTV's statutory award would be $750,922.79. The chart below

summarizes the EAJA rates, adjusted as explained above.

**EAJA Statutory Rate Calculations**

| Description | CCJ | Foley | PILF | BLF | Totals |
|---|---|---|---|---|---|
| Gross EAJA Statutory Rate Award (PILF includes PILF/Foley Gross Expenses; CCJ and BLF Gross Expenses included) | $41,854.30 | $260,235.34 | $518,512.22 | $116,250.24 | $936,852.10 |
| Less Billing Adjustments for Unsuccessful Claims, Travel Time, Non-reimbursable Expenses (PILF includes adjustments for PILF/Foley Expenses; CCJ and BLF expense adjustments included) | $(16,594.12) | $(56,128.92) | $(111,525.20) | $ (1,681.07) | $(185,929.31) |
| **Net EAJA Statutory Rate Award** | **$25,260.18** | **$204,106.42** | **$406,987.02** | **$114,569.17** | **$750,922.79** |

## Conclusion

The IRS utterly failed in its mission to treat applicants fairly under tax law. With these

indefensible actions, the IRS broke an important public trust – the trust that the rule of law will

apply to any individual or organization regardless of political ideology.

TTV is the prevailing party in this litigation and the IRS's actions are not substantially

justified. Therefore, TTV is entitled to an award of attorneys' fees under the EAJA. Because of

the IRS's bad faith in both its actions underlying this litigation and in the litigation itself, as well

as the IRS's aggressive litigation strategy, TTV is entitled to a "bad faith" or "special factor"

enhancement of the award. The total award with a "bad faith" or "special factor" enhancement is

$1,933,888.06, and TTV respectfully requests this Court grant that award. The total award

**Memo. Of Points and
Auth. In Support of Pl.'s
Motion for Att. Fees
Under EAJA** 28

without a bad faith or special factor enhancement is $750,922.79, and TTV alternatively requests this Court grant that award if it does not grant the bad faith or special factor enhancement.

February 20, 2018                              Respectfully submitted,

                                               /s/ James Bopp, Jr.
                                               James Bopp, Jr. (D.C. Bar No. CO0041)
                                               Courtney Turner Milbank*
                                               THE BOPP LAW FIRM, P.C.
                                               The National Building
                                               1 South 6th Street
                                               Terre Haute, Indiana 47807
                                               (812) 232-2434
                                               (812) 235-3685 (fax)
                                               *Attorneys for TTV*
                                               *Admitted *pro hac vice*

**Memo. Of Points and**
**Auth. In Support of Pl.'s**
**Motion for Att. Fees**
**Under EAJA**                    29

## Certificate of Service

I hereby certify that on February 20, 2018 , I caused the *Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Application and Motion for Attorneys' Fees, Costs, and Expenses Under the Equal Access to Justice Act* and exhibits thereto in the above-captioned matter to be filed with the United States District Court for the District of Columbia via the Court's CM/ECF system.

/s/ James Bopp, Jr.
James Bopp, Jr.