*Consent Order, Z STREET*
**EXHIBIT 11**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Z STREET,<br><br>Plaintiff,<br><br>v.<br><br>DAVID KAUTTER,<br>IN HIS OFFICIAL CAPACITY AS<br>ACTING COMMISSIONER OF INTERNAL<br>REVENUE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil No. 1:12-cv-401-KBJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CONSENT ORDER

In December 2009, Z STREET submitted an application for recognition of tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. In August 2010, Z STREET filed this suit, alleging that the Internal Revenue Service ("IRS") had a so-called "Israel Special Policy" ("ISP") under which it applied heightened scrutiny to applications connected in any way with Israel. Specifically, Z STREET alleged that, on July 19, 2010, its counsel was informed by an IRS employee reviewing Z STREET's application that "approval of Z Street's application for tax-exempt status [was] delayed, and [might] be denied, because of a special IRS policy in place regarding organizations in any way connected with Israel, and further that the applications of many such Israel-related organizations have been assigned to 'a special unit in the D.C. office to determine whether the organization's activities contradict the Administration's public policies.'" Z STREET sought a declaratory judgment that the ISP was unconstitutional. Z STREET also sought injunctive relief: (1) barring the IRS from applying the ISP to its application; (2) requiring that its application be processed expeditiously and fairly;

and (3) requiring the IRS to publicly disclose the origin, development, approval, substance, and application of the ISP.

The parties submit this proposed Consent Order in resolution of this action:

## STIPULATION OF AGREED FACTS

The parties hereby stipulate to the following agreed facts:

1. This Court has jurisdiction to enter this consent order.

2. On or about December 29, 2009, Z STREET applied to the IRS for recognition of tax-exempt status under section 501(c)(3) of the Internal Revenue Code.

3. In email correspondence produced in discovery, a Treasury Department employee stationed in Israel asked the IRS in spring 2009, at the request of a State Department employee, whether organizations' tax-exempt status could be revoked for funding Israeli settlements in the West Bank. The Treasury Department employee asked whether such activity could be deemed illegal or in violation of established public policy based on executive branch policy as stated in a 2005 Congressional Research Service report that no U.S. assistance to Israel can be used in the occupied territories because the United States does not want to foster the appearance of endorsing Israel's annexation of the territories without negotiations. The Treasury Department employee further asked whether this would be enough to revoke the tax-exempt status of organizations that provide funds to "Israeli occupied territories."

4. As reflected in email correspondence produced in discovery, a number of IRS employees evaluated the questions raised by the Treasury Department employee in an effort to respond to the inquiry. An IRS employee ultimately referred the Treasury Department employee to the IRS hotline for reporting violations of the Internal Revenue laws.

2

5. On May 15, 2010, Z STREET received from the IRS requests for additional information. Z STREET supplied this information on June 17, 2010, including copies of Z STREET's postings on its website.

6. According to a July 5, 2010, New York Times article entitled, "Tax-Exempt Funds Aid Settlements in West Bank," and discussing U.S tax-exempt funds being used to support settlements in the West Bank, a senior State Department official anonymously told the New York Times: "It's a problem...It's unhelpful to the efforts that we're trying to make." According to the article, the IRS declined to discuss donations for West Bank settlements.

7. As reflected in email correspondence produced in discovery, other internal discussions similar to those identified in paragraphs three and four occurred in 2009, 2010, and 2012, during which IRS employees considered whether organizations' tax-exempt status could be denied or revoked for funding Israeli settlements in the West Bank. The IRS contends that no policy or procedure was ever developed by anyone at the IRS addressing these questions. The IRS contends that none of these discussions resulted in the denial or revocation of an organization's tax-exempt status on the basis of supporting or funding Israeli settlements in the West Bank.

8. Z Street attached a partial copy of a 2010 letter to its Amended Complaint, signed by an Internal Revenue agent, containing questions addressed to an organization that, among other things, operated an "online Judaica store that sells merchandise associated with the Jewish religion and culture," relating to the organization's application for tax-exempt status. The letter contained the following questions: "Does your organization support the existence of the land of Israel? Describe your organization's religious belief system

3

toward the land of Israel." In September 2010, that agent was instructed not to ask applicants questions relating to their views or beliefs regarding Israel in the future. That agent was not involved in any way in Z STREET's application for tax-exempt status. Documents produced by Z Street in discovery reflect that similar questions appear in letters addressed to other applicants, prepared by the same agent, before the agent was asked to stop: "Describe your organization's beliefs regarding the State of Israel" (Jul. 20, 2010), "Describe your organization's beliefs regarding the land of Israel" (Aug. 26, 2010).

9. On July 19, 2010, Z STREET's counsel spoke by telephone with an IRS employee who was then reviewing Z STREET's application. In its Complaint in this case, Z STREET alleges that during that conversation, the IRS employee "informed Z STREET's counsel that the IRS is carefully scrutinizing organizations that are in any way connected with Israel." Z STREET alleges in its Complaint that the IRS employee further informed "counsel for Z STREET: 'these cases are being sent to a special unit in the D.C. office to determine whether the organization's activities contradict the Administration's public policies.'"

10. On August 25, 2010, Z STREET filed a Complaint in this action.

11. On December 17, 2010, Z STREET filed an Amended Complaint.

12. The Complaint and the Amended Complaint allege that the IRS had a so-called "Israel Special Policy" under which it applied heightened scrutiny to applications connected in any way with Israel, and disparate treatment on the basis of the viewpoint expressed by the applicant. Z STREET alleged that the ISP resulted in extensive delay and potential

4

denial of tax-exempt applications including Z STREET's, and constituted viewpoint discrimination in violation of the First Amendment.

13. The Complaint sought, and the Amended Complaint seeks, a declaratory judgment that the alleged ISP was unconstitutional and constituted viewpoint discrimination in violation of the First Amendment. Both pleadings also seek injunctive relief: (1) barring the IRS from applying the alleged ISP to its application; (2) requiring that its application be processed expeditiously and fairly; and (3) requiring the IRS to publicly disclose the origin, development, approval, substance, and application of the alleged ISP.

14. In its Answer, filed on June 26, 2014, the defendant denied the allegations described in paragraphs 9, 12 and 13.

15. While processing Z STREET's application, certain procedures, as set forth in the Internal Revenue Manual 7.20.6 "EO Touch-and-Go Determination Case Procedures," applicable to applications for tax-exempt status at that time, were not followed.

    a. Specifically, the Terrorism Checksheet (revision date 06/2007) referenced with respect to Z STREET's application was outdated and contained a non-exclusive list of exemplar countries including Israel that, while not designated as state sponsors of terrorism, raised potential concerns regarding discretion and control of funds to prevent diversion to terrorists. The revised Terrorism Checksheet (revision date 04/2009) that should have been referenced to process Z STREET's application did not contain a list of any such countries, including Israel.

    b. Under the outdated Terrorism Checksheet used in processing Z STREET's application, applicants "organized, operated in, or [having] affiliations to" Israel

5

were to be coordinated with the TAG Group, and possibly referred to the EO Technical Unit in Washington, D.C. for additional processing.

   c. The Internal Revenue Manual at the time required that certain steps be followed when applications were referred to the TAG group. See I.R.M. 7.20.6.4.1 (rev. 4/28/09). Z STREET's application was referred to the TAG group, but the referral did not follow all of the steps enumerated in IRM 7.20.6.4.7. A written referral was not prepared when Z STREET's application was referred to the TAG group. Consequently, a written referral was not provided to either the TAG group manager or to the area manager.

16. The government was aware by October 12, 2010, that the Checksheet that had been used in connection with transferring Z STREET's application to the TAG group was outdated. The IRS did not resume processing of Z STREET's application when it became aware of this error, or disclose this error to Z STREET when it became aware of it. The IRS contends that the error was immaterial to the IRS's processing of Z STREET's application. The IRS disclosed that error to Z STREET through discovery in 2016.

17. The government has maintained in its defense in this case that Z STREET's application was transferred to the TAG group because of the possibility that Z STREET might have been providing resources to Israel and, if so, the IRS needed to determine whether Z STREET had sufficient procedures in place to maintain discretion and control over such resources. On December 9, 2010, the IRS submitted to the court in this case the sworn statement of an IRS employee stating that Z STREET's "application indicated that Z STREET could be providing resources to organizations within Israel or facilitating the provision of resources to organizations within the state of Israel," and that "Israel is one

6

of many Middle Eastern countries that have a 'higher risk of terrorism.' (I.R.M. 7.20.6.7.5.2(1)."

18. At no time since Z STREET filed its application for recognition of tax-exempt status has the government ever requested any information from Z STREET regarding its expenditure of any funds or regarding the existence or content of any internal procedures governing Z STREET's disposition of any funds.

19. Also on December 9, 2010, the IRS submitted to the court in this case the sworn statement of the IRS employee referred to in paragraph nine herein, which employee had been reviewing Z STREET's application in July, 2010. In this sworn statement, the IRS employee stated that, in July, 2010, the employee was advised that Z STREET's application might "…be transferred to E.O. Technical or the Touch and Go (TAG) group."

20. The IRS Exempt Organizations Technical Unit was, in 2010, located in Washington, D.C.

21. The Treasury Inspector General for Tax Administration ("TIGTA") conducted audits of the IRS's treatment of applications for tax-exempt status during the time period in which Z STREET's application was pending. The 2013 TIGTA Report states that TIGTA performed the 2013 audit "…based on concerns expressed by members of Congress and reported in the media regarding the IRS's treatment of organizations applying for tax-exempt status."

22. In a 2013 TIGTA report entitled *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review*, TIGTA found that early in calendar year 2010, the IRS began using inappropriate criteria to identify organizations applying for tax-exempt status to review for indications of significant political campaign intervention. Specifically,

TIGTA found that the IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of other indications of an impermissible level of potential political campaign intervention. TIGTA further found that ineffective management: (1) allowed inappropriate criteria to be developed and stay in place for more than 18 months; (2) resulted in substantial delays in processing certain applications; and (3) allowed unnecessary information requests to be issued. Z STREET was not addressed in the 2013 TIGTA report.

23. In a 2017 TIGTA report entitled *Review of Selected Criteria Used to Identify Tax-Exempt Applications for Review*, TIGTA provided a historical account of the IRS's development and use of 17 criteria other than the criteria that were the subject of the 2013 TIGTA report. One of the criteria discussed in the report was Occupied Territory Advocacy.

24. According to the 2017 TIGTA report, in August of 2010, the IRS began using a list called "Be on the Lookout" ("BOLO") to identify similar applicants for tax-exempt status for consistent treatment.

25. According to the 2017 TIGTA report, on August 10, 2010, a BOLO list with the entry "Occupied Territory Advocacy" was circulated for the first time to IRS employees. The entry cites to an email or memorandum dated August 6, 2010. Each BOLO list that was subsequently circulated and contained this category makes reference to this email or memorandum. According to the 2017 TIGTA report, the EO function could not locate the August 6, 2010 memorandum. The IRS acknowledges that, if the August 6, 2010, memorandum or email is located before the Court's entry of this Consent Order, the IRS must produce it to Plaintiff, as it is responsive to outstanding discovery requests.

8

26. As set forth in the 2017 TIGTA report, the "Occupied Territory Advocacy" BOLO list criterion, as it appeared on BOLO lists issued between August and December, 2010, described applications that may fall into this category as follows: "Applications deal with disputed territories in the Middle East... Applications may be inflammatory, advocate a one sided point of view and promotional materials may signify propaganda."

27. The first BOLO list on which this criterion appeared was issued August 10, 2010, and this criterion continued to appear on BOLO lists issued through December 13, 2010. No BOLO list, issued after December 13, 2010, has been located on which this criterion appeared. On June 20, 2013, the IRS issued a memorandum suspending the use of the BOLO lists.

28. After this case was filed, the IRS suspended processing of Z STREET's application. Z STREET was informed of this suspension in a filing in this case on January 14, 2011. The IRS took this step in an exercise of discretion pursuant to an IRS revenue procedure which provided that a "ruling on exempt status will not ordinarily be issued if an issue involving the organization's exempt status under § 501 or § 521 is pending in litigation." Rev. Proc. 2010-9, § 4.04.

29. The 2017 TIGTA report confirmed that three political cases were processed using the Occupied Territory Advocacy criterion. The report did not state whether these applications referenced or contained the terminology "Disputed Territories." The report found that each of these three cases was opened in June 2010 or earlier, before the criterion appeared on the BOLO list. The 2017 report indicates that the criterion was removed from the BOLO list while these three cases remained open.

9

30. As reflected in documents exchanged in discovery in this case, in September 2012, IRS employees expressed concern as to whether a favorable resolution of the remaining open case processed under the Occupied Territory Advocacy criterion "...would impact the litigation in the Z Street case."

31. The 2017 TIGTA report further provided that one additional political case was processed during the time period the Occupied Territory Advocacy criterion was in use. The report found that this case was opened in December 2009, before the criterion appeared on the BOLO list. The report could not confirm whether that case was or was not identified or processed based upon the Occupied Territory Advocacy criterion discussed in the report. The report indicates that the criterion was removed from the BOLO list while the case remained open. The report does not state whether the processing of the application was suspended when this criterion was removed from the BOLO list. This case was opened December 28, 2009, and was approved 2,488 days later. Z STREET's application was filed December 28, 2009, and was approved 2,488 days later.

32. Z STREET used the term "Disputed Territories" to refer to areas in the Middle East. Z STREET contends that organizations opposed to Israel's presence in lands east of the 1949 Armistice Line, commonly referred to as the Green Line, never refer to such areas as "Disputed Territories," and instead refer to such areas as "Occupied Territories" or "Palestinian Territories" or "the West Bank and Gaza." Z STREET further contends that, at least during the period between January 20, 2009, and January 20, 2017, neither the United States Department of the Treasury, the Internal Revenue Service, nor the United States Department of State referred to such areas as "disputed territories."

33. According to the 2017 TIGTA report, the TAG group manager in Cincinnati, Ohio, recommended that consideration be given to transferring the applications from the three organizations described in the entry "Occupied Territory Advocacy" to the EO Technical Unit in Washington, D.C., on October 20, 2010, which was almost two months after Z STREET filed this case and a little over two months after the entry was added to the BOLO list. Referring to a contemporaneous email, the 2017 TIGTA report noted that "the cases had been transferred to […] in the Determinations Unit and the TAG group manager suggested transferring the cases to the Technical Unit because the cases (1) involved anti-Israeli sentiment claiming, among many items, violation of international law as well as ethnic cleansing by Israel; (2) mentioned activities and funding going to Israel and related areas such as the Gaza Strip as well as West Bank areas, which could involve settlement issues; (3) mentioned support [in two of the three applications] for various hospitals in the Gaza Strip, […]; (4) involved elevated rhetoric that would likely draw media attention if the applicants ultimately disagree with the IRS's decision; and (5) involved high-impact or sensitive issues that could generate publicity."

34. Of the applications identified on page 62 of the 2017 TIGTA report, one was approved in 875 days, and two were denied for failure to establish.

35. The 2017 TIGTA report determined that Z STREET received a request for information from the IRS during the processing of its application that TIGTA determined, in its 2013 report, to be unnecessary.

36. The EO Technical Unit within the IRS responsible for assisting with the development of many of the applications referenced in the 2013 and 2017 TIGTA reports was located in Washington, DC at the time these cases were processed.

11

37. The 2017 TIGTA report confirmed that the EO Technical Unit was not involved in the processing of Z STREET's application.

38. TIGTA did not make any recommendations in its 2017 report because the procedures in place when the 17 criteria were potentially used by the IRS are no longer in effect.

39. Z STREET did not initiate this litigation to obtain tax-exempt status, as both the District Court for the District of Columbia and the Court of Appeals for the D.C. Circuit have found in this case. Under section 7428 of the Internal Revenue Code, all organizations seeking tax-exempt status have the right to bring a court action seeking a declaratory judgment regarding their tax-exempt status upon the expiration of 270 days after submitting their application. The United States District Court for the Eastern District of Pennsylvania held that that this suit "is best construed as a controversy arising under 26 U.S.C. §7428, which provides for declaratory judgments in suits related to the classification of organizations under Section 501(c)(3)." The court also stated: "[t]he Court shares Plaintiff's view that this case is about constitutionally valid process, and finds that 26 U.S.C. § 7428 is the statute which establishes Plaintiff's right to challenge the IRS's 503(c) [sic.] classification process," thereby requiring that it be transferred from that court to the United States District Court for the District of Columbia. Once the case reached this Court, the defendant again moved to dismiss on the grounds that this suit should have been filed as a declaratory judgment action under 26 U.S.C. § 7428 if the IRS had not, within 270 days of Z STREET's application being submitted, made a final determination on it. However, the defendant's position was rejected, first by this Court and then by the D.C. Circuit. *Z Street v. Koskinen*, 44 F.Supp.3d 48 (D.D.C. 20014), *aff'd*, 791 F.3d 24 (D.C. Cir. 2015).

12

40. In *True the Vote v. Internal Revenue Service*, 831 F.3d 551 (D.C. Cir. 2016), the Plaintiffs alleged, among other things, that the IRS engaged in viewpoint discrimination in the processing of applications for exemption under Section 501(c)(4) of the Internal Revenue Code. In that decision, the Court of Appeals referred to the IRS policy of suspending processing of applications if the applicant initiates litigation against the IRS challenging the manner in which the applications are being processed as a "Catch 22" under which the applicant can only obtain tax-exempt status if the applicant does not file a lawsuit challenging the manner in which its application is being processed. Following that decision, which was issued on August 5, 2016, the IRS began processing the applications of litigants whose applications remained pending, including Z STREET's application, which had been pending but suspended.

41. On August 16, 2016, the government notified Z STREET that the government would resume processing of Z STREET's application. After the IRS resumed processing of Z STREET's application, the IRS did not seek any additional information from Z STREET, beyond what the IRS possessed as of the filing of this lawsuit. The IRS granted Z STREET's application for tax-exempt status under section 501(c)(3) of the Internal Revenue Code on October 19, 2016.

42. By the time the IRS began processing the applications of litigants whose applications remained pending in August 2016, the IRS's procedures for processing applications for recognition of tax-exempt status had been substantially revised, as set forth in I.R.M. 7.20.2 (last rev. Oct. 22, 2015). This included the procedures for issuing development letters.

43. The government's decision to suspend the processing of Z STREET's application as a result of the filing of this action by Z STREET resulted in the application not being approved for six years and ten months, until October 19, 2016, substantially longer than would otherwise have been the case. For this delay, the government expresses its sincere apology.

44. IRS Exempt Organizations Division is responsible for administering the tax code provisions related to tax-exempt organizations, including processing applications submitted by organizations seeking tax-exempt status and determining whether they are entitled to such status.

45. The IRS is charged with the responsibility to exercise its power in a fair and impartial way as a neutral administrator of the tax laws.

46. The IRS acknowledges that criteria for selecting tax-exempt applications and/or tax-exempt entities for IRS review should focus on the activities of the organizations and whether they fulfill the requirements of the law, and not on the applicants' political viewpoints.

47. Z STREET agrees that, in light of the parties' agreed stipulations of fact and the Court's entry of this Order, and the parties' separately memorialized agreement, all remaining claims in this action should be dismissed.

In light of the parties' agreed stipulations, IT IS HEREBY ORDERED that Plaintiffs' remaining claims are dismissed with prejudice.