# United States District Court
## For the District of Columbia

| | |
|---|---|
| **True the Vote, Inc.**;<br><br>    *Plaintiff*,<br><br>    *v.*<br><br>**Internal Revenue Service, et al.**;<br><br>    *Defendant*s. | **Civil Case No.** <u>1:13-cv-000734-RBW</u><br><br>**Memorandum of Points and Authorities in Support of Plaintiff's Notice of Compliance with Court Order** |

# Memorandum of Points and Authorities in Support of Plaintiff's Notice of Compliance with Court Order

## Introduction

Plaintiff, True the Vote, Inc. ("**TTV**"), seeks a recovery of attorneys' fees, costs, and expenses totaling $1,982,109.56 under The Equal Access to Justice Act ("**EAJA**").[1] 28 U.S.C. § 2412(b)(d).

In its *Memorandum Opinion*, this Court held that TTV is the prevailing party in this

---

[1] This total of $1,982,109.56, valued at the LSI Matrix rates, reflects: **(1)** $1,933,888.06 in attorneys' and paraprofessional's fees sought in *Plaintiff's Application and Motion for Attorneys' Fees, Costs, and Expenses Under the Equal Access to Justice Act* (ECF No. 151) ("**Application**"); **(2)** ($54,730.20) as an adjustment to attorney and paraprofeesional fees, costs, and expenses, detailed in *Plaintiff's Reply to United States' Opposition to Application and Motion for Attorneys' Fees, Costs, and Expenses Under the Equal Access to Justice Act* (ECF No. 156) ("**Reply**"); **(3)** $103,049.20 in attorneys' and paraprofessional fees sought in *Plaintiff's Supplemental Application and Motion for Attorneys' Fees, Costs, and Expenses Under the Equal Access to Justice Act* (ECF No. 157) ("**Supplemental Application**"); and **(4)** ($97.50) as an adjustment to The Bopp Law Firm's ("**BLF**") billing records in this *Plaintiff's Notice of Compliance with Court Order* ("**Notice**") which removed a charge for paraprofessional Matthew Michaloski. TTV will also seek attorneys' fees incurred in submitting this *Plaintiff's Notice of Compliance with Court Order* and will file a second supplemental request for such fees once briefing is concluded.

litigation. (ECF No. 162 at 11.) ("**Memo. Op.**"). The Court ruled that TTV prevailed because the Consent Order's declaratory judgment that "discrimination on the basis of political viewpoint in administering the United States tax code violates fundamental First Amendment rights" afforded TTV some of the relief it sought in the litigation, and that this declaratory judgment was judicial relief that effected a "material alteration of the legal relationship between [TTV] and the government." *See id.* at 9-12. (internal citations omitted). Further, this Court held that Defendants' actions underlying this litigation—namely the discriminatory conduct the IRS engaged in against TTV—was not substantially justified. *See id.* at 13-14. Finally, the Court held that the Defendants could not show that special circumstances exist that would make a fee award unjust. *See id.* at 16. Therefore, this Court held that TTV is entitled to attorneys' fees under the EAJA. *Id.*

The Court held not only that TTV is entitled to an award of attorneys' fees, but it also found that TTV is entitled to a "bad faith enhancement" over the EAJA statutory hourly rate cap on those fees. *Id.* at 21-22. The Defendants' admissions that it "screen[ed] [TTV's] application based on its name or policy positions, subject[ed] the application to heightened scrutiny and inordinate delays, and demand[ed] [that TTV provide unnecessary] information," the Circuit's observation that "the IRS cannot defend its discriminatory conduct on the merits," and the Defendants' failure to offer any justification that their conduct was "narrowly tailored to serve compelling state interests" all combined to provide this Court with "clear and convincing" evidence that the IRS acted in bad faith. *See id.* at 21.

The Court held in abeyance the actual award of fees pending further submission by TTV supporting the reasonableness of its requested attorney and non-attorney billing rates. *Id.* at 25.

# Argument

## I. TTV's Requested Attorneys' Fees, Valued at the LSI Matrix Rates, Are Reasonable For this Litigation.

TTV calculated the enhanced "bad faith" fees using the LSI Matrix.[2] The D.C. District and Circuit Courts have not settled, as a matter of law, which matrix applies to petitions for attorney's fees. TTV maintains that the complexity of the instant litigation, the evidence TTV provides in support of the LSI Matrix, as well as the declarations TTV provides from attorneys within and from outside this litigation support the conclusion that the LSI Matrix accurately reflects the prevailing market rate for substantially similar litigation.

## A. TTV Is Entitled To Use a Matrix as Proof of Prevailing Market Rates in this Litigation.

Rate matrices have been accepted as presumptive proof of prevailing market rates for complex litigation in the D.C. District and Circuit courts. *Gatore v. United States Dep't of Homeland Sec.*, 286 F. Supp. 3d 25, 36 (D.D.C. 2017) (finding "a plaintiff may show that the 'proceedings qualify as complex federal litigation, to which [matrix] rates *presumptively* apply'") (quoting *Flood v. District of Columbia*, 172 F. Supp. 3d 197, 210 (D.D.C. 2016) (emphasis added)).

---

[2] Several rate matrices exist and have been used by the D.C. District and Circuit Courts, and the various names used have created some confusion, as all have been referred to at various times as different types of "Laffey" Matrices. *See, e.g.*, *Salazar v. District of Columbia*, 809 F.3d 58, 65 (D.C. Cir. 2015); *Cobell v. Norton*, 407 F. Supp. 2d 140, 152 (D.D.C. 2005). To minimize confusion, TTV refers to the pre-2011 version of the USAO Laffey Matrix, as the "USAO I Matrix." TTV refers to the post-2011 version of the USAO Laffey Matrix as the "USAO II Matrix." TTV refers to the LSI Laffey Matrix as the "LSI Matrix."

1.      **Complex Litigation Justifies the Use of Matrices or Attorney Declarations as Proof of the Prevailing Market Rates.**

Within the context of "complex federal litigation," the courts in this district have allowed prevailing parties to submit as presumptive proof of prevailing market rates: (1) the LSI Matrix, *or* (2) the USAO II Matrix, *or* (3) "their own survey of prevailing market rates in the community." *Covington v. District of Columbia*, 57 F.3d 1101,1109 (D.C. Cir. 1995). However, this Court affirmed the use of matrices as "a starting point" in calculating the prevailing market rate, but noted that a defendant "may rebut a plaintiff's showing with countervailing evidence." *Gatore*, 286 F. Supp. 3d at 34, 36.

Once a plaintiff has made a threshold showing that the litigation qualifies as "complex federal litigation," the "issue then becomes which version of the Laffey Matrix applies, and a plaintiff must show that its desired version properly reflects the prevailing rates for complex federal litigation." *Id.* (internal citations omitted). A plaintiff in complex federal litigation may also offer proof that the rates "customarily charged by District practitioners in similar cases are comparable to those provided in its preferred matrix. *Id.*

2.      **The Instant Case Is Complex Litigation.**

The D.C. district and circuit courts have not established bright-line standards for "complex federal litigation," but have generally held that cases which only involve representing clients at straight-forward administrative hearings or that do not require discovery and motions common in litigation generally are not considered "complex." *See generally Salazar* 809 F.3d at 64 (contrasting class action Medicaid suit with IDEA actions in which a "submarket" with lower hourly rates had developed). The Supreme Court does not limit "complex federal litigation" to large class action cases or cases involving areas of law such as antitrust, and has expressly noted

that civil rights litigation may appropriately be treated as "complex." *Blum v. Stenson*, 465 U.S. 886, 893-94 (1984).

This case involved important constitutional questions of First Amendment rights. It was not limited to administrative hearings or agencies, but instead required close to six years of litigation at the United States District Court and Circuit Court of Appeals for the District of Columbia. Multiple motions, including motions on discovery and motions for summary judgment, were filed. (*See, e.g., True the Vote's Opposition to the Government's Motion to Dismiss Counts I, II, IV, and V*, ECF No. 65; *True the Vote's Opposition to the Government's Motion for Summary Judgment*, ECF No. 119). Oral Hearings were conducted by this Court. (*See, e.g.,* Oral Arguments on *Plaintiff's Motion for Discovery*, ECF No. 120.) The extensive legal work on a matter of fundamental Constitutional principles amply qualifies this case as "complex federal litigation," a conclusion that Defendants have never attempted to controvert. *See Gatore*, 286 F. Supp. 3d at 36 (holding that defendant's lack of argument regarding the question of complexity or the existence of a "[FOIA] submarket" supported a conclusion that the litigation was complex).

This case qualifies as "complex federal litigation," and this Court should accept Matrices as proof of presumptively reasonable prevailing market rates.

**B.     TTV Has Provided Proof That the LSI Matrix Should Be Used Instead of the USAO II Matrix.**

**1.     This Court Has Previously Evaluated the Underlying Support for Both the LSI Matrix and the USAO II Matrix.**

In *Gatore*, this Court considered declarations and supporting documentation from economists which explained the underlying methodologies and reliability of both the LSI Matrix

and the USAO II Matrix.[3] *See id.* at 38-40. There, the Court found the economist supporting the

USAO II Matrix to be generally more convincing. The *Gatore* parties also submitted market data

"to demonstrate that the rates in their preferred matrix better estimate the prevailing market rate

for complex federal litigation in the District." *Id.* at 40. After reviewing this data, this Court

found the USAO II Matrix a more reliable indicator of prevailing market rates in the D.C. area.

*Id.* That is, based on the evidence before it in *Gatore*, the Court there expressed a preference for

the methodologies used in and market data produced by the USAO II Matrix. The question is still

open, however, and LSI Matrix rates can be supported by case law "applying the LSI [Matrix] to

an award of attorneys' fees pursuant to the EAJA" (Memo. Op. at 23), and aside from and in

addition to this, this Court has advised that a plaintiff can support LSI-level rates via proof that

attorneys in the geographic area *had billed* and *had been paid* LSI rates *for similar litigation*.

*Gatore*, 286 F. Supp. 3d  at 45. (emphasis added).

## 2. TTV Has Provided the Required Proof to Support this Court's Use of the LSI Matrix in this Case.

The *Gatore* plaintiff provided proof that attorneys in the D.C. area had billed and been

paid LSI rates, but it failed to offer proof that those attorneys had billed those rates for similar

(FOIA) litigation. *Id.* at 45, 46 (finding "two of the declarants do not claim to have received, or

even charged, rates in line with the LSI Laffey Matrix for their services in FOIA cases"). Here,

---

[3] For the Court's convenience, TTV has attached the following items this Court used in *Gatore* (originally submitted as evidence in *DL v. District of Columbia*, 267 F. Supp. 3d 55 (D.D.C. 2017)): (1) an affidavit from Dr. Kavanaugh, the economist who created the LSI Matrix, in support of the LSI Matrix ("**Kavanaugh Aff.**"); (2) an affidavit from Michael P. Downey, an expert on market rates for complex federal litigation ("**Downey Aff.**"); (3) an affidavit from Bruce MacEwen, an expert on market rates ("**MacEwen Aff.**"); (4) a table analyzing the average D.C. firm billing rates as they compare to the USAO II and LSI Matrices ("**Comparison Table**"); and (5) a table showing the percentage difference between D.C. market rates and the rate matrices ("**Percentage Comparison Table**"), attached as Exhibits 1 - 5.

we offer the exact proof the plaintiff in *Gatore* lacked.

> **a.      TTV Has Provided Declarations from Attorneys Who Practice in the D.C. Area Which Support the Rates Found in the LSI Matrix.**

Robert J. Cynkar is an attorney who has been practicing in the Washington D.C. area since 1977. Declaration of Robert J. Cynkar, ¶ 1, attached as Exhibit 6. ("**Cynkar Decl.**"). Mr. Cynkar has litigated cases involving First Amendment rights. *Id.* at ¶ 2. Mr. Cynkar specifically declares that he has charged, and has been paid, rates "comparable to those requested by Plaintiff's attorneys for this case for work on the same sort of case or substantially similar types of cases." *Id.* at ¶ 5. In addition, Mr. Cynkar attested to the hourly rates for attorneys, based upon the attorney's level of experience, that are "reasonable for the geographic area encompassing the District Court for the District of Columbia for work comparable to that performed by Plaintiff's counsel in this matter." *Id.* at ¶ 7. Those rates are in line with those requested by TTV's attorneys in this matter. Mr. Cynkar's declaration shows that he *has billed*, and *has been paid* rates similar to those in the LSI Matrix, *for similar litigation*.

Jason Torchinsky is an attorney who has been practicing in the Washington, D.C. area since 2001, handling a number of cases involving First Amendment freedoms, election law, and redistricting issues. Declaration of Jason Torchinsky, ¶¶ 1,2, attached as Exhibit 7. ("**Torchinsky Decl.**") Mr. Torchinsky declares that he *charges* and *receives* $930 per hour for *work comparable to TTV's counsel's work in this case*. *Id.* at ¶ 8. Mr. Torchinsky has been practicing for 18 years. For that experience level, the LSI Matrix rate is $742 per hour. *See* Laffey Matrix, attached as Exhibit 8. Mr. Torchinsky's declaration shows that his hourly rate exceeds that of the LSI Matrix, and yet, he has remained competitive in the D.C. market. In addition, Mr. Torchinsky's declaration also supports that the rates requested by TTV are reasonable for the D.C. geographic

area. *Id.*

Cleta Mitchell was an attorney in this case from 2013-2017 and has been practicing in the Washington D.C. area since 1975. Declaration of Cleta Mitchell, ¶¶ 1,3, attached as Exhibit 9. ("**Mitchell Notice Decl.**") Ms. Mitchell attests to the rates that her firm, Foley & Lardner ("Foley") has charged, and been paid, for work comparable to that performed by TTV's counsel here. *Id.* ¶ 6. Ms. Mitchell further attests to the rates that Foley has charged, and was paid, for similar litigation for all of the attorneys and non-attorneys ("**paraprofessionals**") for which fees are sought in this case. In all cases, Foley attorneys and paraprofessionals charge and receive rates very similar to the rates in the LSI Matrix, with some slight variance both above and below the LSI Matrix. *See id.* ¶¶ 7-33.

James Bopp, Jr., TTV's counsel since 2017, also attests to the rates BLF would regularly charge, and receive, for BLF's attorneys' work in similar litigation. Declaration of James Bopp, Jr., ¶¶ 4-7, attached as Exhibit 10. ("**Bopp Notice Decl.**") In all cases, BLF attorneys and paraprofessionals charge and receive rates very similar to the rates in the LSI Matrix, with some variance both above and below the LSI Matrix. *See id.*

*Makray v. Perez* was a gender discrimination case brought against the Department of Labor. 159 F. Supp. 3d 25, 27 (D.D.C. 2016). It was considered "complex federal litigation" that took nearly four years to resolve and included intense discovery and motion practice. The time and amount of work involved to protect a fundamental right from government intrusion in *Makray* is analogous to the case at bar. Steven K. Davidson, a partner in the law firm of Steptoe & Johnson, submitted a declaration in support of the plaintiff's attorney fee petition, attached as Exhibit 11. ("**Davidson Decl.**") After reviewing the case and the LSI Matrix, Mr. Davidson

offered his expert opinion that the LSI Matrix more accurately reflects the prevailing market rate in the D.C. area, compared to the USAO II Matrix. *See* Davidson Decl. at ¶¶ 11-22. Similarly, John P. Relman, a Managing Partner of Relman, Dane & Colfax PLLC, submitted a declaration in support of Makray's attorney fee petition, attached as Exhibit 12. ("**Relman Decl.**") Mr. Relman stated that in his opinion, the LSI Matrix more accurately reflects the prevailing market rate in the D.C. area than does the USAO II Matrix. Relman Decl. at ¶¶ 13-21. Finally, Robert C. Sheldon, another attorney in the *Makray* case, submitted his own declaration, attached as Exhibit 13. ("**Sheldon Decl.**") Mr. Sheldon also stated that, in his opinion, the LSI Matrix more accurately reflects the prevailing market rate in the D.C. area than does the USAO II Matrix. Sheldon Decl. at ¶¶ 7-9.

The declarations and evidence this Court analyzed in *Gatore*, attached hereto as Exhibits 1-5, then and now support the conclusion that the LSI Matrix is comparable to actual rates attorneys charge in the D.C. area. Expert D.C. practitioners Steven K. Davidson and John P. Relman testify that the LSI Matrix more accurately reflects the prevailing market rate in the D.C. area than does the USAO II Matrix. Exhibits 11, 12. Longtime D.C. practitioners Robert J. Cynkar, Jason Torchinsky, and TTV counsel Cleta Mitchell and James Bopp, Jr. attest that each has billed and been paid rates *for similar litigation* that are comparable to similar to or even substantially exceed those of the LSI Matrix.

### b. TTV Has Provided Declarations Detailing the Paraprofessionals' Education and Experience.

As required by the Court's Order, the firms who used paraprofessionals in this case have submitted declarations detailing the non-attorneys' education and experience. *See* Mitchell

Notice Decl. at ¶¶ 16-32; Declaration of John C. Eastman at ¶¶ 9-11 ("**Eastman Decl.**"), attached

as Exhibit 14; Declaration of Noel H. Johnson at ¶¶ 7-9, ("**Johnson Decl.**"). attached as Exhibit

15. BLF had only one charge for a paraprofessional, and has removed that charge from the total

requested, *supra*, n. 1.

###### c.    TTV Has Provided Detailed Billing Records, Subtotaled by Attorney and Paraprofessional.

Pursuant to the Court's Order, TTV has subtotaled the amount requested for each attorney

and each paraprofessional involved in the case. *See,* BLF Application Billing Records, attached

as Exhibit 16; BLF Supplemental Billing Records, attached as Exhibit 17; Center for

Constitutional Jurisprudence ("**CCJ**") Billing Records, attached as Exhibit 18; the Public Interest

Law Firm ("**PILF**") Billing Records, attached as Exhibit 19, and Foley's Billing Records,

attached as Exhibit 20. In addition, TTV has created a one page summary of all the fees, costs,

and expenses requested, subtotaled by attorney and paraprofessional. Consolidated Billing

Records, attached as Exhibit 21. BLF's costs and expenses are integrated and subtotaled in its

billing records. PILF and Foley's combined costs and expenses are submitted separately, attached

as Exhibit 22.[4]

---

[4] In TTV's Reply (ECF No. 156), additional reductions were made to Foley's and PILF's billing records for inadvertent charges for unsuccessful claims, media relations charges, fundraising, or other non-legal work ("**Reply Reductions**"). *See* Reply, ECF No. 156 at 22-24. These Reply reductions are now incorporated in the Adjusted Hours as *line-item reductions* in Foley's Billing Records, subtotaled by person, Exhibit 20 hereto. The Reply Reductions for electronic research, *see id.* at 24, are now incorporated as line items on PILF and Foley's combined costs and expenses, attached as Exhibit 22 hereto. *Individual line-item reductions* do not appear in PILF's billing records subtotaled by person, Exhibit 19 hereto, but remain identified by page number reference in the Reply (ECF No. 156) at 22-24 and appear in aggregate on page two of the Consolidated Billing Records, attached as Ex. 21.

**d.    Because the EAJA Has a Statutory Cap on Fees, this District Has Neither Affirmed Nor Rejected the LSI Matrix in EAJA Cases Applying a Bad Faith Enhancement.**

The EAJA provides a cap on hourly rates, which can only be exceeded in "special circumstances." One such special circumstance justifying "enhanced" fees is the bad faith exhibited by the IRS in the discriminatory actions underlying this litigation. The bad faith fee enhancement is uncommon to EAJA cases and courts in this District have neither affirmed nor rejected the LSI matrix as authoritative for hourly rates in EAJA in which a bad faith enhancement has been found warranted. There have been 430 EAJA cases filed in this District since January 1, 2009. Of those 430 cases, only this case found that a bad faith enhancement is warranted.[5] In 2005, this Court did consider what rates were appropriate in an EAJA case in which a bad faith enhancement was found warranted.

As previously detailed in TTV's briefing to this Court, *Cobell* was an EAJA case that awarded enhanced rates on the basis of "bad faith." 407 F. Supp. 2d at 168. But the *Cobell* court did not compare the USAO I Matrix[6] to the LSI Matrix for an EAJA bad-faith enhanced fee award, as the plaintiffs apparently only requested the USAO I Matrix rates. *See id.* at 170.

Courts have applied expressly identified LSI Matrix rates or rates closely approximating them in non-EAJA cases of similar complexity and with similar claims. *Hoye v. City of Oakland* was a constitutional challenge to the City of Oakland's "bubble ordinance" that created a buffer

---

[5] Source: https://www.courtlistener.com/recap/ , a search engine that compiles and searches all cases filed through PACER. Searches for filings at the D.C. district and circuit courts run on June 12, 2019: (1) ("Equal Access to Justice Act" OR "EAJA"); (2) ("Equal Access to Justice Act" OR "EAJA") and "bad faith"; (3) ("Equal Access to Justice Act" OR "EAJA") AND "LSI"

[6] The USAO II Matrix was not established until 2011.

around people seeking access to reproductive health care clinics. No. C 07-06411 CRB, 2012 U.S. Dist. LEXIS 142038, at *2 (N.D. Cal. Oct. 1, 2012). The prevailing attorneys used the LSI Matrix to support their petition for fees, and the court allowed LSI rates, based partly upon the complexity of the case. *See id.* at *22. *NorCal Tea Party Patriots v. IRS*, a class action case with nearly identical facts to the case at bar, was settled in 2018. *See* No. 1:13cv341, 2018 U.S. Dist. LEXIS 139769 (S.D. Ohio Aug. 17, 2018). While the court did not analyze the rate structure, it granted an award of $1.75 million in attorneys' fees. *Id.* (holding the amount "falls within the range of reasonable fees as a percentage of the settlement" and finding the class counsel had incurred more than $3.5 million in fees over the course of four years).

TTV has provided declarations from attorneys both from outside and within this litigation attesting to the fact that they *have charged* and *have been paid* rates comparable to the LSI Matrix rates *for litigation substantially similar to the case at bar*.[7] TTV has researched and provided the available EAJA case law. While no EAJA case has applied the LSI Matrix, no EAJA has considered and rejected LSI Matrix rates. In fact, no other case in the last ten years has awarded fees based upon a "bad faith enhancement." Thus, as a matter of case law, the question of hourly rates for a bad-faith enhanced EAJA case is an open question. And this Court has specifically pointed to the kind of proof TTV offers here—evidence of the rates that attorneys have billed and been paid—as proof that can be used to justify regardless of the Court's underlying methodological preference for the USAO II Matrix. Those rates are essentially identical to the LSI Matrix rates.

---

[7]In addition, TTV has provided the evidence the Court requested regarding the paraprofessionals' education and experience, as well as billing records subtotaled by attorney and paraprofessional.

3. **The Importance of this Case and the Purpose and Policy of a"Bad Faith Enhancement" Justify the Use of the LSI Matrix over the USAO II Matrix.**

The court in *Citizens for Responsibility & Ethics in Wash. ["CREW"] v. United States DOJ* found the LSI Matrix rates justified in part because the case was an appropriately complex FOIA case[8] that "involve[d] a matter of national public interest." 80 F. Supp. 3d 1, 5 (D.D.C. 2015). LSI Matrix rates are justified in complex litigation of national public interest. This case is of national public importance—people and organizations in this country, whether on the right or the left, have a fundamental right to be treated fairly by their government, without regard to what political beliefs they hold. It would be hard to characterize this litigation as anything but a matter of "national public interest."

The *Cobell* Court stated that the EAJA bad faith enhancement is a "punitive" award . . . that "must be "imposed only in exceptional cases and for dominating reasons of justice." 407 F. Supp. 2d at 167 (quoting *Bergman v. United States*, 844 F.2d 353, 357 (6th Cir. 1988); *Baldr Motor Co. v. Abko Properties, Inc.*, 780 F.2d 751, 756 (9th Cir.)). In *Cobell*, the government mishandled trust fund accounts maintained on behalf of more than 350,000 Native Americans. *Cobell*, 407 F. Supp. 2d at 146. The government challenged the Native American's fee petition

---

[8] The *CREW* court then reduced the requested *rates* by 15%, explaining, "[f]irms frequently discount their standard rates and, even after discounting, lower the effective rate further by writing off a portion of their billed hours to reflect attorney inefficiency and other considerations. . . . Finally, firms do not always collect 100 percent of the fees they ultimately bill." The *CREW* court's justification for a 15% reduction to rates conflates reducing the *reasonable number of hours* under the "billing judgment" requirement with establishing *prevailing hourly rates. See Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). Taking hours off your bill is not discounting the *rate* for the hours that remain. TTV's counsel has already made significant reductions in the exercise of billing judgment, detailed fully in prior briefings and incorporated by reference here. The rates applied to TTV's counsel's remaining hours should not be discounted to reflect billing judgment for hours no longer claimed by TTV.

13

on "every conceivable front," alleging: (1) a failure to comply with class action notice requirements; (2) a failure to demonstrate EAJA eligibility; (3) that the Native Americans were not prevailing parties; (4) that the government's actions, at all relevant times, was "substantially justified"; (5) criticism of counsel's billing records; and (6) that the Native American's counsel was not entitled to a fee enhancement. *Id.* The court rejected all of those arguments, noting that the circuit court had excoriated the government's conduct, both at the agency level and during litigation, labeling it "fundamentally unreasonable" and "egregious." *Id.* at 152 (internal citations omitted). The district court emphasized that the government's pretrial conduct "consistently contravened controlling authority and required plaintiff's to undertake otherwise unnecessary litigation to vindicate plain legal rights." *Id.* at 168 (internal citations omitted).

Here, the IRS mishandled not a trust fund, but a basic public trust, which the circuit court recognized as the IRS "utterly fail[ing]" in its duty to "apply tax law with integrity and fairness to all." *True the Vote, Inc. v. IRS*, 831 F. 3d 551, 559 (D.C. Cir. 2016). It should not have required six years of litigation to force the IRS to admit that treating applicants differently on the basis of political ideology was wrong. *See Consent Order*, ECF No. 150 at ¶48. It should not have taken years of litigation, at both the district and circuit levels, to force the IRS to enter into an enforceable agreement that *permanently* forestalled the IRS from ever again violating fundamental constitutional freedoms for applicants. *See id.* at ¶ 50.

And yet nearly five years after filing suit, after admitting it targeted organizations because of their name and assumed political ideology, *Consent Order* at ¶ 40, the IRS still challenged TTV's fee petition on almost every conceivable front, just as the government did when it was soundly rebuked for breaching its statutory and common-law duties in *Cobell*. As in *Cobell*, the

14

government claimed TTV was not the prevailing party, ostensibly because the government

surmised that it had actually "won" in the end, deeming the consent decree to be a private

agreement in which it had barely admitted an indistinct "wrongdoing." Mem. Op., ECF No. 162

at 8-11. Knowing that its treatment of the Plaintiff and similar organizations was a blatant

violation of TTV's First Amendment freedoms, the IRS "virtually ignor[ed] the[ir] [ ] conduct

underlying the litigation," and instead tried to justify its actions by focusing on "what [they] did

to change the complained-of conduct." *Id.* at 12. As in *Cobell*, the government denied that

anything it had done justified a bad faith fee enhancement, *see Defs.' Opp. to Pl.'s Mot. Atty

Fees*, (ECF No. 152) at 16-17, and criticized TTV's billing records, *id.* at 16-19.

This Court has rejected the IRS's arguments against prevailing party status, the arguments

imagining any substantial justification, and the arguments against a bad faith enhancement. All

that is left for this Court to decide is which fee rate and amount will send the government an

appropriately "punitive" message. The LSI rates are amply justified as a matter of law. But in

addition, when the government fails its fundamental duty to protect citizens' most sacred rights

— indeed openly flouting "a clear . . . judicially imposed duty," Mem. Op. at 20, there is a

"dominating reason[ ] of justice" to hold the government accountable to the highest degree

allowed under law. Awarding compensation at the highest justifiable rates will do just that.

**C.    Even if the LSI Matrix Is Not Considered Dispositive on its Own, TTV Has Justified
        the Rates Requested as Accurately Representative of Prevailing Market Rates.**

Even if the LSI Matrix is not found to be dispositive proof on its own for this litigation,

the Plaintiff has provided declarations and other proof that equate to a survey of the prevailing

market rates. *Supra* at I.B.2. This survey shows that the LSI Matrix rates requested by TTV

reflect the prevailing market rate in the Washington, D.C. area. But even without using a matrix, the D.C. District and Circuit courts have held that a plaintiff can prove prevailing market rates by providing "their own survey of prevailing market rates in the community." *Covington*, 57 F.3d at 1109. As noted *supra*, TTV has provided a wealth of information amounting to just such a survey of prevailing market rates. The attached attorney declarations from attorneys involved in this case and other D.C. area attorneys who litigate substantially similar cases prove the prevailing market rates. *See, e.g.*, Cynkar Decl., Torchinsky Decl., Mitchell Notice Decl.

TTV is entitled to use a matrix as proof of prevailing market rates in this litigation because this litigation qualifies as "complex federal litigation." TTV has provided proof showing that attorneys in the D.C. area *have charged* and *have been paid* rates comparable to the rates in the LSI Matrix for *litigation substantially similar to the case at bar*. This in itself should suffice to show that the LSI Matrix should be used instead of the USAO II Matrix. But even if the LSI Matrix is not considered dispositive, TTV has justified the rates requested as accurately representative of prevailing market rates.

## II. The Use of Matrices as Dispositive Proof of Prevailing Market Rates Should Be Adopted for all Attorney's Fee Petitions.

If a case qualifies as "complex litigation," the courts in this district and circuit have stated the following methods can be *presumptive* proof of prevailing market rates: (1) the LSI Matrix, *or* (2) the USAO II Matrix, *or* (3) "their own survey of prevailing market rates in the community." *Covington v. District of Columbia*, 57 F.3d 1101,1109 (D.C. Cir. 1995). However, in almost every recent fee award litigation, courts in this Circuit have not weighted the matrices with any kind of actual presumption, but only as a starting point for a fresh analysis *See, e.g.,*

*Eley v. District of Columbia*, 793 F.3d 97, 104 (D.C. Cir. 2015)*; Gatore*, 286 F. Supp. 3d at 34, 36. It is true that "presumptive" only means presumed to be true in the absence of further information. But, the competing "battle of analyses" that almost always arises between the LSI and USAO II Matrices requires attorneys to provide information to the courts that is difficult to obtain from objective sources, and worse, not as reliable as either Matrix. For this reason, TTV maintains that matrices should be dispositive, not just presumptive, proof of the prevailing market rates.

**A.     Both the USAO II Matrix and the LSI Matrix Use Better Methodologies of Compiling Attorney Fee Data than any Firm Can Provide for a Single Case.**

Both matrices have compiled data from surveys of attorneys' rates in the D.C. area. The USAO II Matrix combines rates from complex and non-complex litigation, and uses data from a 2011 ALM survey as a starting point for its rates. *Gatore*, 286 F. Supp. 3d at 34. The LSI Matrix begins with based rates derived from a 1989 declaration submitted by an attorney for use in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 273 (D.C. Cir. 1988) (en banc). *Id.* The USAO II Matrix is adjusted for inflation using a Producer Price Index that "tracks pricing changes in output of Offices of Lawyers." *Id.* The LSI Matrix adjusts for inflation using the Legal Services Index of the Bureau of Labor Statistics. *Id.*

Regardless of the conclusion drawn about which matrix has better methodology, the surveys and adjustments to the rates are based on much broader information and data than any information an attorney can provide regarding one single case.

**B.     The Court Should Not Require Proof of the Rates Attorneys Actually Charge for any Particular Case.**

A for-profit firm can only provide anecdotal, not broader survey information regarding

rates for any particular case. Law firms typically have varying rate structures for different types of clients. Bopp Decl., at ¶ 8. These varying rates are based upon different considerations such as the nature and length of the relationship with a particular client, as well as the peculiarities of a specific case. *Id.* ¶ 9. Forcing law firms to publicize their rate structures in one case makes these rate structures a matter of public record and creates unnecessary business challenges as clients with very different legal needs use the publicized rates as uninformed leverage in rate negotiations. *Id.* ¶ 10.

In addition, law firms who are not involved in a particular case are extremely reluctant to provide rate information, not only because of the business considerations discussed *supra*, but because they view the information as proprietary and confidential. *See id.* ¶¶ 12-13. In an effort to offer additional proof to the Court of prevailing market rates, TTV's counsel requested supporting declarations from attorneys at 17 for-profit law firms and 20 non-profit organizations or public-interest law firms. *Id.* ¶¶ 11-12. All of these requests were directed toward colleagues Mr. Bopp knew personally, several of whom Mr. Bopp either represented or served as co-counsel with on past litigation. *Id.* Only two attorneys from for-profit firms not involved in this litigation were willing to provide such declarations. *See* Cynkar Decl.; Torchinsky Decl. Cleta Mitchell also provided such information on D.C. rates in her declaration. *See* Mitchell Notice Decl. Only two attorneys from non-profit organizations or public-interest law firms were willing to provide such declarations. *See* Declaration of Catherine Short ("**Short Decl.**"), attached as Exhibit 23; Declaration of Martin Sander Kaufman ("**Kaufman Decl.**"), attached as Exhibit 24.

The law firms' business considerations and concerns over confidential and proprietary information necessarily mean that a court is analyzing a "rate battle" in a fee dispute, requiring

declarations will lead the court to rely on less information than the information providing the basis for either the LSI Matrix or the USAO II Matrix.

## C.   Non-profit Organizations and Public Interest Law Firms Cannot Provide Rates Billed Because they Offer Pro Bono Services to Clients.

The D.C. district and circuit courts recognize that a non-profit organization or public interest law firm will not have relevant billing practices but are nonetheless entitled to "prevailing market rates." *Covington*, 57 F.3d at 1107. Non-profit organizations rely on recovering fees based upon prevailing market rates to support the organization's ongoing efforts. *See* Short Decl. at ¶ 5; Kaufman Decl. at ¶ 5.

Unless a matrix is adopted as dispositive proof of prevailing market rates, a non-profit organization will usually be required to provide proof of rates from for-profit firms to support its preferred matrix. Hence, the non-profit organization will be met with the same, if not greater, resistance regarding providing rate declarations from for-profit firms because of the business, confidentiality, and proprietary concerns already discussed.

The use of matrices as dispositive proof of prevailing market rates will alleviate the need for non-profit organizations and public interest law firms to provide difficult-to-obtain and necessarily narrower declarations regarding prevailing market rates.

Matrices are more methodologically sound than the limited declarations in a particular case. Law firms have legitimate business, confidentiality, and proprietary concerns regarding providing their rates for any particular case. Non-profit organizations and public interest law firms cannot provide rate information of their own that is relevant and will therefore be confronted with the same limitations for-profit firms encounter in providing accurate, reliable

information regarding prevailing market rates. Therefore, the use of matrices as dispositive proof of prevailing market rates should be adopted in all attorney's fee petitions.

## Conclusion

This litigation qualifies as "complex federal litigation" and this Court should accept Matrices as proof of the presumptively reasonable prevailing market rates. TTV has provided declarations from attorneys both from outside and within this litigation attesting to the fact that they *have charged* and *have been paid* rates comparable to the LSI Matrix rates *for litigation substantially similar to the case at bar*. TTV has researched and provided the available EAJA case law on LSI and USAO rates in analogous cases. While no EAJA case has applied the LSI Matrix, no EAJA has considered and rejected LSI Matrix rates. This Court and others have pointed to the kind of proof TTV offers here as proof that can be used to justify the LSI Matrix, regardless of underlying methodological differences between the LSI and the USAO II Matrices.

Matrices are more methodologically sound than the limited declarations in a particular case. Law firms have legitimate business, confidentiality, and proprietary concerns regarding providing their rates for any particular case. Non-profits organizations and public interest law firms cannot provide rate information of their own that is relevant and are confronted with the same limitations for-profit firms encounter in providing accurate, reliable information regarding prevailing market rates. Therefore, the use of matrices as dispositive proof of prevailing market rates should be adopted in all attorney's fee petitions.

TTV respectfully requests this Court award attorneys' fees, costs, and expenses totaling $1,982,109.56 for this litigation.

## Certificate of Service

I hereby certify that on June 13, 2019 , I caused the *Memorandum of Points and Authorities in Support of Plaintiff's Notice of Compliance with Court Order* and exhibits thereto in the above-captioned matter to be filed with the United States District Court for the District of Columbia via the Court's CM/ECF system.

/s/ James Bopp, Jr.
James Bopp, Jr.