Submitted: 2/1/2021 4:04 PM
Sue Murphy, District Clerk
Austin County, Texas
By: Sue Murphy, Deputy

NO. ___2021V-0015___

| | | |
|---|---|---|
| **FREDRIC N. ESHELMAN,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **AUSTIN COUNTY, TEXAS** |
| | § | |
| **TRUE THE VOTE, INC., CATHERINE** | § | |
| **ENGELBRECHT, AND WILLIAM** | § | |
| **ENGELBRECHT.** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | **155th  JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR APPOINTMENT OF RECEIVER

Fredric N. Eshelman files this Original Petition and Application for Appointment of Receiver against Defendants True the Vote, Inc., Catherine Engelbrecht, and William Engelbrecht and in support thereof respectfully shows the court as follows:

### INTRODUCTION

This case is about fraud perpetrated by the Defendants on Fred Eshelman, a concerned citizen who wanted to make sure the outcome of the 2020 presidential election was not in doubt. It was a fraud that happened very quickly, given the short timeframe between the election and the dates when the election results would be certified. But it is also a fraud that is ongoing because the Defendants continue to spend down Plaintiff Eshelman's contributions on things they never represented they would and on things he never intended.

Plaintiff Eshelman, a scientist by training, and a donor to important political causes, watched on election night as reports of voting irregularities started surfacing and large swings in vote totals changed the apparent results. Having supported candidates before the election, he

1

wanted to be certain the results were fair and accurate. He did this by finding and offering significant financial support to Defendant True the Vote, a nonprofit that claims to engage in election integrity efforts.

Just two days after Election Day 2020, Defendant True the Vote's President, Defendant Catherine Engelbrecht, made promises and representations to Plaintiff that True the Vote would investigate, litigate, and expose suspected illegal balloting and fraud in the 2020 presidential election. ***Based on those representations*** by Defendant Catherine Engelbrecht (on behalf of Defendant True the Vote), Plaintiff conditionally contributed ***$2 million*** to Defendant True the Vote so True the Vote could quickly and effectively work on exactly what it promised Plaintiff it would do. In fact, Defendant Catherine Engelbrecht drafted a one-page summary of the efforts True the Vote was going to undertake with Mr. Eshelman's money and sent it to him shortly after that first phone call. With certification deadlines looming, time was of the essence and True the Vote promised that it would use Mr. Eshelman's money to get to the bottom of any election fraud in time to pursue appropriate legal action.

As it turns out, Defendants True the Vote and Catherine Engelbrecht knew at the time they made those representations that True the Vote did not intend to use Plaintiff's generous conditional contribution for such promised purposes. Defendant True the Vote did very little, if anything, of what it promised to do, and used much of the money to fund other activities *not* related to voter integrity in the 2020 presidential election and, on information and belief, to enrich the other Defendants.

Two weeks after his conditional contribution (which Plaintiff supplemented by an *additional* $500,000 contribution to cover supposed "litigation expenses" that Defendant Catherine Engelbrecht represented was needed), after realizing the Defendant True the Vote was

not fulfilling its promises (or even trying to), Plaintiff asked for True the Vote to stop its activities, account for its spending, and send the rest of his money back. True the Vote did not provide an accounting of what it had done, did not return his money, and, on information and belief, continues to this day to spend it.

Given that the election is now over, there is absolutely nothing more Defendant True the Vote can or should be doing with Plaintiff's conditional contribution. As such, Plaintiff is entitled to a return of his money from Defendant True the Vote and from the other Defendants to whom Defendant True the Vote transferred the money. All Plaintiff wanted to do was help, and yet Defendants saw him as a mark, swindled Plaintiff's money, and hurt him instead.

## I.      DISCOVERY CONTROL PLAN

1.      Pursuant to TEX. R. CIV. P. 190.1 and 190.4, Plaintiff intends that discovery be conducted under Discovery Level 3.

## II.      CLAIM FOR RELIEF

2.      Pursuant to TEX. R. CIV. P. 47(c), Plaintiff seeks monetary relief over $1 million.

## III.      PARTIES AND SERVICE

3.      Plaintiff Fredric N. Eshelman ("Plaintiff" or "Mr. Eshelman") is a citizen of the United States who is a resident of, and domiciled in, North Carolina.

4.      Upon information and belief, Defendant True the Vote, Inc. ("TTV" or "True the Vote"), is a 501(c)(3) not-for-profit corporation organized under the laws of Texas with its principal place of business in Ms. Engelbrecht's house, located in Austin County, Texas. At time of the events made the basis of this lawsuit, it was operating in and from Austin County, Texas. It may be served through its registered agent, Defendant Catherine Engelbrecht, at 13909 Track Rd

E, Cat Spring, TX 78933, 7232 Wynnwood Lane, Houston, Texas 77008-6041, or wherever the registered agent may be found.

5.    Defendant Catherine Engelbrecht ("Ms. Engelbrecht" or "Engelbrecht") is an individual and citizen of the State of Texas who resides in Austin County, Texas.  She may be served at 13909 Track Rd E, Cat Spring, TX 78933, 7232 Wynnwood Lane, Houston, Texas 77008-6041, or wherever she may be found.

6.    Defendant William Engelbrecht is an individual and citizen of the State of Texas who resides in Austin, County Texas.  He may be served at 13909 Track Rd E, Cat Spring, TX 78933, or wherever he may be found.

### IV.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter of this dispute because Plaintiff seeks monetary damages in excess of the minimum jurisdictional limits of this Court.

8.    This court has personal jurisdiction over the parties to this case because all parties either reside in, are organized under the laws of, or do business in Texas within the meaning of TEX. CIV. PRAC. & REM. CODE §17.042.  Moreover, each Defendant either has continuous and systematic contacts with the State of Texas, or alternatively has purposely availed themselves of the privilege of conducting activities within the State of Texas, out of which activities this lawsuit arises, and the exercise of personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.  Defendant True the Vote is a citizen and resident of Austin County, Texas.  Defendant True the Vote is organized under Texas law and maintains its principal office in Austin County, Texas.  Defendant Catherine Engelbrecht is a citizen and resident of Austin County, Texas and conducted many of the daily affairs of Defendant True the Vote during

the events in this Petition out of Austin County, Texas.  Defendant William Engelbrecht is a citizen and resident of Texas, and lives in Cat Spring in Austin County, Texas.

9.      Venue of this action is proper in Austin County, Texas under TEX. CIV. PRAC. & REM. CODE §§ 15.002 and 15.005 because all or a substantial part of the events or omissions giving rise to the claim occurred in Austin County, because Austin County is where Defendant William Engelbrecht and Catherine Engelbrecht reside, because Defendant True the Vote maintains its principal office in Austin County, and because all the claims in this suit arise out of the same transaction, occurrence, or series of transactions or occurrences.

## V.      FACTUAL ALLEGATIONS

**A.      The Initial Phone Call and the Representations Made**

10.      Immediately after the November 3rd general election, Plaintiff decided it was important to understand whether the allegations of voting irregularities swirling around were accurate, either to find legal remedies to bring about the right result, or to be able to tell the American people that the election results were fair and accurate. Plaintiff asked his representatives to figure out how best to accomplish that goal. With time being of the essence, given the short electoral clock, they found one organization that might work: Defendant True the Vote.

11.      Defendants hold True the Vote out on True the Vote's website as "the country's largest voters' rights organization" and note that it is "well known for [its] ability to lead national unified plans to protect election integrity." In describing the organization's mission, Defendants describe its operations as "a network hub, working together with other organizations to implement targeted election integrity initiatives to expose and deter election fraud."  Defendant Catherine Engelbrecht is True the Vote's President.

12.     On November 5th, Plaintiff's representatives spoke by phone with Defendant Catherine Engelbrecht about Defendant True the Vote's activities around the 2020 general election. That discussion included an explanation of True the Vote's election integrity whistleblower hotline and all of the efforts that True the Vote was allegedly engaged in to ferret out election fraud.  Given the scope of True the Vote's supposed capabilities, Mr. Eshelman's representatives conferenced him into the conversation.

13.     With Mr. Eshelman on the line, Defendant Catherine Engelbrecht further described True the Vote's capabilities and what it was working on, with an emphasis on the election integrity hotline and the effort to identify whistleblowers who could provide information about voting irregularities and vote harvesting.

14.     Defendant Catherine Engelbrecht further represented to Plaintiff during those conversations that Defendant True the Vote believed those efforts were necessary in light of significant evidence that there were numerous instances of illegal ballots being cast and counted in the 2020 general election.

15.      During that call, Defendant Catherine Engelbrecht explained to Plaintiff that she had developed a multi-pronged plan to investigate, litigate, and expose suspected illegal balloting and fraud in the 2020 general election. As part of that plan, Defendants intended to: (1) solicit whistleblower testimonies from those impacted by or involved in election fraud; (2) build public momentum through broad publicity of those whistleblowers' stories; (3) galvanize Republican legislative support for voter fraud challenges in key states; (4) aggregate and analyze data to identify patterns of election subversion; and (5) file lawsuits in federal court with capacity to be heard by the Supreme Court of the United States.

16.     With respect to its plan to file lawsuits in key states, Defendant Catherine Engelbrecht represented to Plaintiff that James Bopp, Jr. (a private-practice attorney who also served as True the Vote's General Counsel) would file lawsuits in the seven closest battleground states with an eye toward serving subpoenas on state election officials to produce relevant election data. Defendant Catherine Engelbrecht further misrepresented to Plaintiff that Mr. Bopp had served as lead counsel in *Bush v. Gore*.

17.     Defendant Catherine Engelbrecht represented to Plaintiff that Defendant True the Vote, based upon data to be subpoenaed in those seven proposed lawsuits, then intended to undertake sophisticated data modeling and statistical analysis to identify potentially illegal or fraudulent balloting.

18.     In reliance on Defendant Catherine Engelbrecht's representations regarding Defendants' comprehensive plans to investigate, litigate, and publicize illegal balloting and other election fraud, Plaintiff agreed to contribute an initial amount of $2 million to True the Vote ***on the condition*** that the funds would be used to fund Defendant True the Vote's projects related to the 2020 general election that Defendant Engelbrecht represented on the call. Specifically, Plaintiff expressed his intent that $1 million would be used for the whistleblower program, in particular to fund rewards for those coming forward, since True the Vote represented that it had a hotline and investigation program in place at the time and that the remaining $1 million would be used for some combination of communications outreach and litigation. Plaintiff advised he would contribute more as the project progressed (conditioned on Defendants' living up to their representations about how the money would be spent).

19.     Importantly, Plaintiff's contribution was directed and limited to Defendants' general election efforts project.  Plaintiff's contribution was not to True the Vote unconditionally

or generally, nor was it made in support of other efforts, such as recounts or the Georgia Senate runoff elections.

20.     Subject to those conditions, and in reliance on Defendant Catherine Engelbrecht's representations, Plaintiff wired $2 million to True the Vote's Wells Fargo bank account on November 5, 2020 using wiring instructions provided by Defendant Catherine Engelbrecht that same day.

21.     Shortly after their initial conversation, Mr. Eshelman asked Defendant Catherine Engelbrecht for a summary of the plan that he had discussed with her so that he could line up other donors for those specific efforts. Before the day was over, Defendant Catherine Engelbrecht had prepared a one-page summary of the effort they had discussed. Working with Mr. Eshelman's representatives, she named it "Validate the Vote 2020" and sent the document to Mr. Eshelman's representatives.[1] This document clearly and succinctly summarized what Defendant True the Vote planned to undertake with respect to the 2020 general elections. Defendant Catherine Engelbrecht's cover email described this document as "an overview of **the plan**." (Emphasis supplied). Her closing line of the email said: "Thank you for this opportunity.  We will not let you down."

22.     At no time during these conversations on November 5 did Plaintiff or his representatives discuss that Plaintiff's contribution was intended to provide general operating funds for True the Vote, or that the funding was intended to support activities not directly related to the 2020 general election. The $2 million was clearly intended to be used exclusively for those efforts, and Mr. Eshelman expected that they would be expended on those efforts before the election results were certified on or about December 14.

---

[1] A one-page summary of the Validate the Vote 2020 plan that Defendant Engelbrecht provided to Plaintiff is attached hereto as **Exhibit 1**.

23.     The very next day, Friday, November 6, Defendant Catherine Engelbrecht sent Mr. Eshelman's representative a plan for litigation in seven states, with a budget of $250,000 per state for the initial data gathering through discovery.

**B.     The Next 10 Days**

24.     Mr. Eshelman's representatives continued to interact regularly with Defendant Catherine Engelbrecht and her small team. On November 11, one of Plaintiff's representatives traveled to Texas to meet with Defendant Catherine Engelbrecht, Gregg Phillips (a former board member and current contractor of True the Vote), Mr. Bopp, and some potential donors. At that meeting, they discussed an extensive communications campaign.

25.     Specifically, Defendant True the Vote and Defendant Catherine Engelbrecht agreed that a significant investment in so-called "paid media" would be necessary to publicize the results and findings of the Validate the Vote initiative. To that end, one of Mr. Eshelman's representatives undertook, at his own expense, to build out a communications team that would be able to execute the strategy Defendants True the Vote and Catherine Engelbrecht wanted to pursue. Using that team, the expectation was that Defendant True the Vote would spend approximately $900,000 on paid digital media to publicize the findings of its purported investigative efforts.

26.     They also worked to book Mr. Bopp on national news shows, and to connect True the Vote with senior advisors to members of the Senate Judiciary Committee. All of these efforts were well-known to Defendants.

27.     By November 13 – with time slipping away – Mr. Bopp, Defendant True the Vote's attorney, had only managed to file cookie-cutter lawsuits making vague allegations of fraud unsupported by any evidence in four states (despite Defendant Catherine Engelbrecht's representations that Defendant True the Vote would pursue litigation in seven battleground states).

Even though those four cases were in their infancy, and even though just a week had passed since Plaintiff gave his initial $2 million conditional contribution, Defendant Catherine Engelbrecht represented to Plaintiff's representative that the legal expenses might exceed the initial budget, which the Validate the Vote plan pegged at more than $2.5 million during the trial-court phase. In order to maintain what he thought was momentum, and again in reliance on Defendant Catherine Engelbrecht's representations and conversations with Plaintiff regarding their "mutual" work to accomplish the Validate the Vote 2020 goals, Plaintiff agreed on November 13th to contribute an additional $500,000 to Defendant True the Vote, subject to the same condition that those funds would be used to fund Defendants' Validate the Vote 2020 efforts.

28.     Subject to those conditions, and in reliance on Defendant Catherine Engelbrecht's representations, Plaintiff wired $500,000 to True the Vote on November 13, 2020 to True the Vote's Wells Fargo bank account using wire instructions provided by Defendant Catherine Engelbrecht.

29.     Time was of the essence to the efforts outlined in Defendants' Validate the Vote 2020 plan because of various state and federal deadlines for certification of state election results and electoral college votes.

30.     After agreeing to conditionally contribute funds to True the Vote to support its Validate the Vote 2020 efforts, Plaintiff regularly and repeatedly sought substantive updates from Defendant Catherine Engelbrecht, Mr. Phillips, Mr. Bopp, and other individuals associated with True the Vote. Specifically, Plaintiff sought specific and actionable updates—both directly and through his agents—regarding progress on Defendants' purported investigation, litigation, and communication efforts in key states.

31.     Plaintiff's requests were consistently met with vague responses, platitudes, and empty promises of follow-up that never occurred.

32.     Specifically, in response to requests for specific data relating to potential whistleblowers and how their allegations fit into an overall narrative, Defendant Catherine Engelbrecht would simply respond with vague comments like: "We are vetting" or "They are solid."

33.     Defendant Catherine Engelbrecht also routinely ignored repeated requests for memoranda and written reports to summarize Defendants' efforts to identify and obtain information from whistleblower witnesses.

34.     In response to questions about Defendants' litigation strategy in the seven key battleground states targeted by the Validate the Vote 2020 initiative, Plaintiff was only ever provided with the four cookie-cutter complaints filed in Wisconsin, Michigan, Georgia, and Pennsylvania, none of which cited any substantial evidence. He was not provided any specific update on the status or strategy behind those cases. Nor was he provided any explanation as to the status of litigation in the remaining three states.

35.     As it turned out, Defendants never filed suit in three of the seven states they had represented to Plaintiff would be the subject of the Validate the Vote 2020 effort.  Defendants failed to consult with or inform Plaintiff of the decision not to pursue litigation in the remaining three states, even though that decision amounted to a material deviation from Defendants True the Vote and Defendant Catherine Engelbrecht's representations regarding the project Plaintiff conditionally gave funds to support, which representations he relied upon when making those conditional contributions.

36.    Defendants' consistent delay and inability to make progress on the goals that Defendant Catherine Engelbrecht described to Plaintiff just after the election suggested that many of those goals might not be met, since many important deadlines relating to state election results were rapidly approaching.

### C.    True the Vote Fails to Make Good on Its Commitments

37.    After repeatedly being stonewalled by Defendants True the Vote and Catherine Engelbrecht when they sought information about information brought forward by whistleblowers and the status of pending litigation, Plaintiffs' representatives communicated extensively with Plaintiff about their frustration with Defendants True the Vote and Catherine Engelbrecht's lack of progress on the goals of the Validate the Vote project.

38.    Given Defendants' lack of progress and the rapidly approaching certification deadlines, Plaintiff decided to call a meeting with Defendant Catherine Engelbrecht, Gregg Phillips, Jim Bopp, and other individuals associated with Defendants' Validate the Vote effort.

39.    Specifically, Plaintiff sought detailed information and reports on voter data that Defendants had collected, identities of any alleged whistleblowers (along with the information they would testify to and their vetting status), the entities and resources dedicated to performing statistical analysis on available voter data, the expected timeline to obtain such statistical analysis, the status and strategy update for the litigation in each of the seven battleground states, Defendants' promises to provide media content for circulation, and Defendants' efforts to raise the remaining money to fund the project.

40.    That meeting took place by teleconference on November 16 and was attended by Plaintiff and Defendant Catherine Engelbrecht, Gregg Phillips, and Jim Bopp, among others.

41.     Also on November 16, but before their meeting with Mr. Eshelman, Defendants True the Vote and Catherine Engelbrecht voluntarily dismissed all four of the pending pieces of litigation True the Vote's attorney had filed less than a week earlier. Even though that decision amounted to a material deviation from the scope of the Validate the Vote 2020 program Defendants represented to Plaintiff, on which representation Plaintiff conditioned his contribution and on which he relied when making it, Defendants failed to consult with or inform Plaintiff of that decision until after the deed had been done. And despite failing to inform Plaintiff of that material deviation from the Validate the Vote plan, Plaintiff understands (upon information and belief) that the decision to abandon those cases was made in concert with counsel for the Trump campaign.

42.     The November 16 meeting unfolded in a manner similar to the many others that had taken place regarding the Validate the Vote 2020 efforts since November 5—which is to say that Defendants failed to engage with or respond to Plaintiff's requests for specific, actionable updates on the issues set forth above and proposed plans to accomplish all of the efforts he had originally agreed to fund.

43.     The November 16 meeting took a turn, however, when Defendant Catherine Engelbrecht and Mr. Bopp informed Plaintiff that Defendant True the Vote had voluntarily dismissed the four threadbare lawsuits that they had previously filed in Georgia, Michigan, Pennsylvania, and Wisconsin. Given that Mr. Eshelman had conditionally contributed $2.5 million for the purpose of pursuing allegations of fraud in connection with the 2020 presidential election (in large part through the judicial process), he was deeply troubled and upset that Defendants True the Vote and Catherine Engelbrecht had apparently decided to abandon the project he had agreed to fund without even consulting with or informing him of that decision.

44.     Following that revelation, it had become clear to Plaintiff that Defendants had abandoned the Validate the Vote 2020 efforts that Plaintiff had agreed to help fund and that Defendants had represented to him True the Vote would undertake.

### D.     Eshelman Demands a Refund

45.     Since Defendants True the Vote and Catherine Engelbrecht had failed to comply with the conditions on Plaintiff's contribution and on the representations they made prior to convincing Plaintiff to make his contributions, Plaintiff sent an e-mail to True the Vote and Engelbrecht early on November 17, 2020, to request a refund of the balance of his $2.5 million contribution. In relevant part, that e-mail read:

> Please wire the balance of my contributions to my account as shown below. Also send a full accounting of all monies spent out of the $2.5M, which should be de minimis since nothing was accomplished over the 10 or so days. Thank you for a prompt response.[2]

46.     Consistent with their conduct over the preceding twelve days, Defendants failed to respond to Plaintiff's request.

47.     In light of the upcoming vote certification deadlines and his desire to use the funds he had conditionally contributed to True the Vote to support other, legitimate efforts to expose and litigate election fraud, Plaintiff sent Defendant Catherine Engelbrecht another e-mail requesting repayment early on November 19. In relevant part, that e-mail read:

> Please acknowledge receipt of my previous email with wiring instructions to return the bulk of the money I put in. This is needed immediately for other activities toward the common goal.[3]

48.     Again, Defendants failed to respond to Plaintiff's request.

---

[2] A true and accurate copy of Plaintiff's November 17, 2020 e-mail (with redactions to protect Plaintiff's financial information) is attached hereto as **Exhibit 2**.
[3] A true and accurate copy of Plaintiff's November 19, 2020 e-mail is attached hereto as **Exhibit 3**.

49.     Given Defendants' repeated refusal to respond to Plaintiff's request for repayment, counsel for Plaintiff sent a letter to Defendant True the Vote on November 21 regarding the "directed donations that [Plaintiff] made to True the Vote, Inc. in the two weeks following the election, totaling $2.5 million." Specifically, that letter requested that True the Vote confirm before 7:00 p.m. EST on November 22 that it intended to return Plaintiff's $2.5 million in conditional contributions and that it would undertake to initiate a wire transfer to do so by 10:00 a.m. on November 23.[4]

50.     Defendant Catherine Engelbrecht responded by e-mail after 5:30 p.m. the next day but did not confirm that Plaintiff intended to return Plaintiff's money.

51.     Instead, Defendants continued to engage in dilatory tactics, Catherine Engelbrecht claiming without any specificity that they did not "expect to have complete information on what *we* have spent on the project this month until next month[,]" and that "*we* have made commitments to many people, including whistleblowers, that *we* must fulfill.   And *we* have committed to activities that *we* must complete" (emphasis added).[5]

52.     Nonetheless, Defendants' response did acknowledge that Plaintiff's contributions had been conditioned on their use in support of Defendants' Validate the Vote 2020 efforts. Specifically, Defendant Catherine Engelbrecht assured Plaintiff's counsel that True the Vote had "spent the money on the project *we* discussed with Mr. Eshelman" (emphasis added).   That statement, as it turns out, was false, as set forth further below.

53.     Shortly thereafter on November 22, Plaintiff's counsel responded by e-mail, noting in relevant part:

---

[4] A true and accurate copy of the November 21 letter from Plaintiff's counsel is attached hereto as **Exhibit 4**.
[5] A true and accurate copy of Ms. Engelbrecht's November 22 e-mail message is attached hereto as **Exhibit 5**.

> Mr. Eshelman expects a wire of at least $2 million first thing in the morning [of November 23]. Based on the limited reports that he has received, we cannot believe that True the Vote has committed more than $500,000.[6]

54.     As they had already done three times before, Defendants again refused to respond and failed to initiate a wire transfer of Plaintiff's funds by 10:00 a.m. EST.

55.     In light of Defendants' failure to wire the requested funds, Plaintiff (through counsel) sent one final demand letter to Defendant True the Vote, through Defendant Catherine Engelbrecht, on November 23.[7] In that letter, Plaintiff notified Defendants Catherine Engelbrecht and True the Vote that if they failed to initiate a wire transfer of the requested $2 million before 5 p.m., Plaintiff would be forced to seek judicial intervention to obtain the requested funds.

56.     Thirty minutes after that deadline, Jim Bopp responded to Plaintiff's counsel's letter on his law firm's letterhead (as opposed to True the Vote's). In that letter, True the Vote offered to return $1 million of Plaintiff's $2.5 million in conditional contributions in exchange for a waiver of claims and an agreement not to file suit against Defendant True the Vote.[8] Because of Defendants' refusal to provide any information or accounting regarding what the other $1.5 million had been spent on, Plaintiff refused to release any claims for those amounts.

57.     As of the date Plaintiff filed this Original Petition, True the Vote had still not initiated any wire transfer to Plaintiff in any amount or even agreed to stop spending whatever remained of Plaintiff's conditional contributions, even though the opportunity to contest the results of the November 2020 election in court were long past.

---

[6] A true and accurate copy of Plaintiff's counsel's November 22 e-mail message is attached hereto as **Exhibit 6**.
[7] A true and accurate copy of Plaintiff's counsel's November 23 demand letter (omitting the originally attached exhibits which are merely duplicative of materials already attached to Plaintiff's complaint) is attached hereto as **Exhibit 7**.
[8] A true and accurate copy of Mr. Bopp's November 23 letter is attached hereto as **Exhibit 8**.

58.     In light of Defendants' refusal to engage with Plaintiff's reasonable requests, Plaintiff suspects that Defendants are currently disposing (or have already disposed) of Plaintiff's funds in support of unrelated projects or bad-faith expenditures supposedly in support of the Validate the Vote 2020 project.  On information and belief, Defendant Catherine Engelbrecht has been personally enriched with the funds that Plaintiff gave to Defendant True the Vote.  On information and belief, Defendant William Engelbrecht has also been personally enriched with the Eshelman Funds as he was involved in and worked for his mother's company, Defendant True the Vote. Neither Defendant Catherine Engelbrecht nor Defendant William Engelbrecht acquired the money in good faith or for valuable consideration, as they knew of the conditions tied to Plaintiff's contributions to True the Vote but did not use the funds in furtherance of the Validate the Vote 2020 mission, and because they did not properly work for and earn the monies paid to them by True the Vote as their work (if any) was not for the Validate the Vote 2020 initiative towards which Plaintiff conditionally gave his contributions totaling $2.5 million.

59.     Also because of Defendants' refusal to engage with Plaintiff's reasonable requests, Plaintiff further suspects, on information and belief, that Defendant Catherine Engelbrecht's representations to him regarding the scope of the Validate the Vote 2020 effort were false when made, or made with the present intention not to perform as promised.

60.     Based on Plaintiff's investigation, Defendant Catherine Engelbrecht and Gregg Phillips are lovers.  Public records reveal that Phillips formed OPSEC in September 2020.  OPSEC is a for-profit company.  Plaintiff suspects that Defendant Catherine Engelbrecht and Phillips saw an opportunity in the run-up to the 2020 election to take financial advantage of growing conservative suspicion and outrage over the potential for election fraud, and established OPSEC to be the for-profit entity to which True the Vote would pay monies contributed by donors like

Plaintiff in the wake of the election, ostensibly for information-gathering and investigative efforts to uncover election fraud.  In reality, OPSEC was a vehicle for Phillips and Engelbrecht to line their pockets with money from donors like Plaintiff.

61.     Such a transaction between Defendant True the Vote and OPSEC would violate the terms of Section 22.230 of the Texas Business Code applicable to nonprofit corporations because it is a transaction between a nonprofit organization and an interested person (either because of Phillips's dual roles with OPSEC and True the Vote, or because of Defendant Catherine Englebrecht's relationship with Phillips, or both).

62.     On information and belief, Defendant True the Vote has also used funds from Plaintiff to pay ordinary operating expenses and retainers that were not part of the Validate the Vote 2020 project to which Plaintiff directed his contribution.

63.     In short, the Defendants worked together on the scheme to swindle funds from Plaintiff on the pretext of using all the funds from Plaintiff for the Validate the Vote 2020 project, while knowing the funds would be used for other unrelated projects or to pay past expenses incurred prior to the Validate the Vote 2020 initiative.

64.     Plaintiff has suffered and will continue to suffer irreparable harm, loss, and damage because of Defendants' continued and unrestrained possession of the funds, if Defendants' actions are not quickly remedied or halted by the Court.  Defendants have indicated an intention to continue spending Plaintiff's contributed money, stating vaguely that Defendant True the Vote has a variety of "commitments" that must be fulfilled and "activities" that must be completed.  Despite repeated requests that Defendant True the Vote agree in writing to cease using Plaintiff's conditionally contributed funds, Defendants have refused to provide such a commitment,

indicating their intent to continue using the funds for efforts unrelated to and inconsistent with the representations about the Validate the Vote 2020 effort.

## VI.   CAUSES OF ACTION

### COUNT I
### Breach of Contract as to True the Vote

65.    Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

66.    The parties, for valuable consideration, entered into an enforceable oral contract on November 5, 2020, whereby Plaintiff would make a contribution of $2 million to Defendant True the Vote in exchange for True the Vote's commitment to undertake the specific efforts referred to by Defendant Engelbrecht and in True the Vote's marketing materials as the Validate the Vote 2020.

67.    The parties subsequently amended or restated the terms of the original oral agreement on November 13, 2020 when Plaintiff agreed to make an additional $500,000 contribution to True the Vote on the condition that those funds would also be used solely to fund Defendant's Validate the Vote 2020 project.

68.    The parties mutually understood that if True the Vote deviated from the Validate the Vote 2020 plan as described to Plaintiff by Ms. Engelbrecht and in True the Vote's marketing materials, that Plaintiff would have the right to revoke his conditional contribution.

69.    As set forth above, True the Vote has abandoned its efforts (or never really intended) to implement and execute the programs and efforts associated with its Validate the Vote 2020 initiative.

70.    Consistent with Texas law, Plaintiff has repeatedly notified True the Vote of his intent to revoke his conditional contribution due to True the Vote's failure to comply with its

obligations under the parties' contribution agreement. *See Oadra v. Stegall*, 871 S.W.2d 882, 891-92 (Tex. App—Houston [14th Dist.] 1994, no writ); *Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App.—Corpus Christi 1973, no writ).

71.     Faced with Plaintiff's requests and its own failure to abide by the terms of the parties' agreement, True the Vote's refusal to surrender possession of $2.5 million of Plaintiff's funds amounts to a material breach of the parties' agreement.

72.     True the Vote's breach has caused Plaintiff to suffer damages in excess of $2.5 million.

73.     Plaintiff has retained counsel to represent him in this matter and has agreed to pay reasonable and necessary attorney's fees, costs, and expenses.  Plaintiff is entitled to recover his reasonable and necessary attorney's fees, costs, and expenses pursuant to § 38.001 of the Texas Civil Practice and Remedies Code.

## COUNT II
## Conversion as to All Defendants

74.     Plaintiff incorporates by reference all allegations in all paragraphs of the Original Petition as though fully set forth herein.

75.     Where a donor manifests his intent to revoke a conditional gift for failure to satisfy a condition of the gift, title to the originally gifted property remains vested in the donor. *See Oadra v. Stegall*, 871 S.W.2d 882, 891-92 (Tex. App. 1994); *Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App. 1973).  Further, because Defendant True the Vote and Defendant Catherine Engelbrecht had no present intention of performing on their representations to Plaintiff, *i.e.*, Plaintiff was induced to make the conditional contribution under false pretenses, Plaintiff had the immediate right to re-take possession of his funds as soon as he wired the money to True the Vote.

76.     Plaintiff has repeatedly notified Defendants of his intent to revoke his conditional contribution of $2.5 million due to Defendants' failure to comply with their obligations under the parties' contribution agreement—that is, their failure to implement and execute the Validate the Vote 2020 program.

77.     Despite Plaintiff's repeated notice of his revocation of his conditional contributions, Defendants have persisted in wrongfully withholding $2.5 million in Plaintiff's money.

78.     None of the Defendants have returned any of Plaintiff's money.

79.     On information and belief, Defendant Catherine Engelbrecht has herself been personally enriched by Plaintiff's funds.  Though Plaintiff made multiple requests to her to return his entire contribution, she has not returned any of the money, including the amount she is believed to have personally pocketed.

80.     Additionally, demand to William Engelbrecht would be futile, as he most likely knows of Plaintiff's multiple demands to his mother and her company, and has refused to return the portion of Plaintiff's money that he acquired.

81.     Defendants' unauthorized and wrongful exercise of control over Plaintiff's $2.5 million to the exclusion of Plaintiff's superior claim to those funds amounts to conversion.

82.     Additionally, Defendant True the Vote, even if it had not acquired possession of Plaintiff's property under false pretenses, wrongfully exercised dominion and control over the property by using it in a way that departed from the conditions under which it was received.

83.     Defendants' commission of the tort of conversion has caused Plaintiff to suffer damages in excess of $2.5 million.

## COUNT III
### Declaratory Judgment

84.     Plaintiff incorporates by reference all allegations in all paragraphs of the Original Petition as though fully set forth herein.

85.     As set forth above, Plaintiff has effectively revoked his conditional contributions totaling $2.5 million to True the Vote on the basis of True the Vote's failure to abide by the condition on those contributions—namely, that Defendant True the Vote would implement and execute the plans incorporated into its Validate the Vote 2020 initiative.

86.     Having issued a valid revocation of a conditional contribution, Plaintiff remains the rightful owner of the $2.5 million that was initially transferred as a conditional contribution to True the Vote.

87.     Accordingly, Plaintiff is entitled to a declaratory judgment that he is the rightful owner of the $2.5 million at issue in this litigation and an order requiring True the Vote to immediately transfer possession to Plaintiff. *See* Tex. Civ. Prac. & Remedies Code §§ 37.004, 37.011.

88.     Plaintiff has retained counsel to represent him in this matter and has agreed to pay reasonable and necessary attorney's fees, costs, and expenses.  Plaintiff is entitled to recover his reasonable and necessary attorney's fees, costs, and expenses pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code.

## COUNT IV
### Fraudulent Misrepresentation as to Defendants True the Vote and Catherine Engelbrecht

89.     Plaintiff incorporates by reference all allegations in all paragraphs of the Original Petition as though fully set forth herein.

22

90.     Defendants made material misrepresentations that were false, and Defendants knew the representations were false when made or made recklessly without any knowledge of the truth, with the intention that Plaintiff act upon the misrepresentations.  Plaintiff justifiably relied upon the misrepresentations and suffered damages.

91.     Specifically, on November 5, 2020, on November 13, 2020, and on November 16, 2020, Defendants Catherine Engelbrecht and True the Vote made material misrepresentations to Plaintiff or his representatives—all by phone—that, using Plaintiff's money Plaintiff would contribute, True the Vote would investigate, litigate, and publicize illegal balloting and other election fraud via litigation and targeted paid advertising as part of its Validate the Vote 2020 efforts.  But Defendants Engelbrecht and True the Vote knew at the time that those representations were false, as they knew they intended to use Plaintiff's conditional contributions for other purposes, such as paying the money to activists and, upon information and belief, paying off debts it owed to other activists, whistleblowers, and attorneys in connection with other matters besides the Validate the Vote 2020 project, and not for the manner in which they told Plaintiff they would use the money.  Defendants Engelbrecht and True the Vote made these representations with the intention that Plaintiff act and contribute the monies to True the Vote.  Plaintiff justifiably relied on Defendants' misrepresentations by making conditional contributions of $2.5 million to True the Vote, and has suffered at least $2.5 million in damages as a result.

## COUNT V
### Negligent Misrepresentation as to Defendants True the Vote and Catherine Engelbrecht

92.     Plaintiff incorporates by reference all allegations in all paragraphs of the Original Petition as though fully set forth herein.

93.     In the alternative, Defendants Catherine Engelbrecht and True the Vote made representations in the course of their business and/or in a transaction in which they had a pecuniary interest that was false for the purpose of guiding Plaintiff.  Defendants failed to exercise reasonable care in gathering and disseminating the information, and Plaintiff suffered a financial loss due to his justifiable reliance on Defendants' representations.

94.     Specifically, on November 5, 2020, on November 13, 2020, and on November 16, 2020, Defendants Catherine Engelbrecht and True the Vote made material representations to Plaintiff or his representatives—all by phone—in the course of their business and/or in a transaction in which they had a pecuniary interest that were false, that Defendants would investigate, litigate, and publicize illegal balloting and other election fraud via litigation as part of its Validate the Vote 2020 efforts and that Plaintiff's conditional contribution would be used for same, for the purpose of guiding Plaintiff to make the conditional contributions to True the Vote. Defendants failed to exercise reasonable care in gathering and disseminating that information to Plaintiff, and Plaintiff suffered a financial loss of at least $2.5 million due to his justifiable reliance on Defendants' representations.

### COUNT VI
**Money Had and Received as to All Defendants**

95.     Defendants hold money that, in equity and good conscience, belongs to Plaintiff. Plaintiff conditionally gave $2.5 million to Defendant True the Vote, in which Defendant Catherine Engelbrecht is an officer/director and in which Defendant William Engelbrecht is an employee or contractor and Defendants did not perform on their end of their obligations to use the money as conditioned by Plaintiff and as represented by Defendants.  Defendants Catherine Engelbrecht and William Engelbrecht, have, on information and belief, received all or part of the

money Plaintiff conditionally contributed to True the Vote (or, alternatively, received all or part of the money Plaintiff contributed to True the Vote based on the representations True the Vote and Catherine Engelbrecht made when they had no present intention of performing them), and are currently holding said funds, all of which in equity and good conscience belongs to Plaintiff.

## VII.   APPLICATION FOR APPOINTMENT OF RECEIVER

96.    Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

97.    Because Plaintiff conditionally gave $2.5 million to Defendant True the Vote, Plaintiff has a probable interest in the money held by Defendant True the Vote and by the other Defendants who Defendant True the Vote transferred the money to.

98.    The money is in danger of being lost or removed by Defendants' misappropriation of the funds through, among other improper actions, Defendants' using the monies to pay off other debts or obligations or to pay expenses not related to voter fraud integrity for the 2020 presidential election or paying the money to themselves.

99.    As such, Plaintiff requests that the Court appoint a Receiver to take possession of, and to collect, manage, control and pay over the proceeds of the assets and bank accounts belonging to Defendants.

100.    Plaintiff further requests that an accounting be done of Defendants True the Vote's books and records to identify where Defendants spent, placed, or paid any part of Plaintiff's $2.5 million conditional contribution.

## VIII.   ALTERNATIVE ALLEGATIONS

101.    Pursuant to Rules 47 and 48, Texas Rules of Civil Procedure and the rules of pleadings, allegations in this petition are made in the alternative.

## IX.      CONDITIONS PRECEDENT

102.      All conditions precedent have been satisfied.

## X.      PLAINTIFF HEREBY DEMANDS TRIAL BY JURY

103.      Pursuant to Tex. R. Civ. P. 216(a), Plaintiff respectfully demands a trial by jury,

and has paid the requisite jury fee concurrently with filing its Original Petition.

## XI.      RELIEF REQUESTED

WHEREFORE, Plaintiff Fredric N. Eshelman prays that this Honorable Court would grant
the following relief:

1.      An order declaring Mr. Eshelman to be the rightful owner of the $2.5 million
conditionally contributed to Defendant True the Vote and requiring Defendant True
the Vote to immediately surrender possession of those funds to Mr. Eshelman;

2.      An award of contractual and economic damages of $2.5 million, at a minimum;

3.      An order appointing a Receiver over the assets and business of Defendant True the
Vote because Plaintiff has a probable interest in the money held by Defendant, and
the money is in danger of being lost, removed, or materially injured, by Defendant's
using the monies to pay off other debts or obligations or paying the money to
themselves;

4.      An order for pre-judgment writ of attachment against Defendants' non-exempt
property, including but not limited to, Defendants' bank accounts;

5.      An order for an accounting of Defendant True the Vote's records with respect to
Plaintiff's conditional contributions;

6.      An award of Mr. Eshelman's attorney's fees and costs;

7.      An award of pre- and post-judgment interest;

8.      An award of exemplary damages under Texas Civil Procedure & Remedies Code
§ 41.003(a) as Plaintiff's damages stemmed from Defendants' gross negligence,
malice, or actual fraud; and

9.      All other relief that the Court deems just and proper.

Dated: February 1, 2021

Respectfully submitted,


*/s/ Douglas A. Daniels*
Douglas A. Daniels
State Bar No. 00793579
Sabrina R. Tour
State Bar No. 24093271
DANIELS & TREDENNICK PLLC
6363 Woodway Dr., Suite 700
Houston, TX 77057-1759
(713) 917-0024 Telephone
(713) 917-0026 Facsimile
Email: doug.daniels@dtlawyers.com
Email: sabrina@dtlawyers.com


Ronald M. Jacobs (*pro hac vice* to be submitted)
Christopher J. Climo (*pro hac vice* to be submitted)
rjacobs@venable.com
cjclimo@venable.com
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 344-8215
(202) 344-8300 (facsimile)

*Counsel for Plaintiff Fredric Eshelman*

# Exhibit 1

# Validate the Vote 2020



### Goal

To ensure the 2020 election returns reflect one vote cast by one eligible voter and thereby protect the right to vote and the integrity of the election.

### Problem

There is significant evidence that there are numerous instances of illegal ballots being cast and counted in the 2020 general election.  Most of these illegal votes are being counted in Democrat counties and are suppressing legitimate results.

This is a result of Democrat officials refusal to obey state election laws and counting illegal votes.  It is also the result of deliberate election fraud. This situation has been aided by the Democrat's deliberate effort to radically expand mail-in balloting, creating myriad opportunities for voter fraud that does not exist with in-person voting.

Furthermore, this flood of illegal votes violates the U.S. Constitution's right to vote by diluting the votes of legitimate voters.

## Plan

• Solicit whistleblower testimonies from those impacted by or involved in election fraud  - True the Vote
• Build public momentum through broad  publicity  - True the Vote
• Galvanize Republican legislative support in key states - True the Vote
• Aggregate and analyze data to identify patterns of election subversion - OPSEC Group
• File lawsuits in Federal Court with capacity to be heard by SCOTUS - True the Vote

**Tactical Organizing:** National,  State,  with micro-targeting in key counties

**Key States:** Arizona, Nevada,  Georgia,  North Carolina, Pennsylvania, Michigan, Wisconsin

### Legal Strategy

Jim Bopp,  True the Vote General Counsel, lead attorney in Bush v. Gore and Citizens United, will file federal suits in the seven closest battleground states to investigate voter fraud, expose it, and to nullify the results of the state's election, so that the Presidential Electors can be selected in a special election or by the state legislature.

**Step 1:** A federal civil rights lawsuit will be filed in each targeted state. This will provide the vehicle to serve subpoenas on state election officials to produce critical election data.

**Step 2:** Along with publicly available data, the produced election data will be analyzed to identify both illegal voters and illegal votes.

**Step 3**: If sufficient election fraud is proven, making the results of the election doubtful, the lawsuit will seek to have the state's election results overturned, leading to a special election, to selection of Presidential Elector by the state legislature, or to the selection the President by the U.S. House of Representatives.

**TEAM**

**True the Vote**
**Catherine Engelbrecht**
*President*

**Legal**
**Jim Bopp**
*True the Vote General Counsel*

**Public Affairs**
**David Polyansky**
*Principal*
**Catherine Frazier**
*Principal*

**Data and Research**
**OPSEC Group**
**Gregg Phillips**
*President*

**Funding Estimate**
Whistleblower Campaign
$2,000,000

Data and Research
$1,750,00

Litigation
District Courts $2,500,00
Appeals $375,000
US Supreme Court
$700,000

**Total Effort**
**$7,325,000**

**Funding Vehicles**
**True the Vote**
**Non-Profit 501c3**

**OPSEC Group**
**Limited Liability Corp.**

# Exhibit 2

## Fred Eshelman

| | |
|---|---|
| **From:** | Fred Eshelman |
| **Sent:** | Tuesday, November 17, 2020 8:16 AM |
| **To:** | Catherine Engelbrecht |
| **Subject:** | FW: Eshelman account |

Please wire the balance of my contributions to my account as shown below.  Also send a full accounting of all monies spent out of the $2.5M, which should be de minimis since nothing was accomplished over the 10 or so days.
Thank you for a prompt response.
Fred Eshelman

**From:** Nan Howard <nan@eshelmanventures.com>
**Sent:** Tuesday, November 17, 2020 8:10 AM
**To:** Fred Eshelman <fred@eshelmanventures.com>
**Cc:** Karen L. Paar (karen.paar@bofa.com) <karen.paar@bofa.com>
**Subject:** RE: Eshelman account


Fred:

Per your request, please find wiring information for your account at Bank of America listed below.

| | |
|---|---|
| Bank: | Bank of America |
| Name on account: | Fredric N Eshelman |
| Routing Number: | |
| Account Number: | |
| Routing number to receive wires: | |
| Contact at BOA: | Karen Paar 980.683.9034 |

Nan

**Nan Howard**
Work: 910.558.6885  ||  Mobile: 910-620-5552 nan@eshelmanventures.com
**Eshelman Ventures, LLC**  ||  319 North 3rd Street, Suite 301, Wilmington, NC  28401

# Exhibit 3

**Fred Eshelman**

**From:**        Fred Eshelman
**Sent:**        Thursday, November 19, 2020 5:37 AM
**To:**          Catherine Engelbrecht
**Subject:**     Funding

Please acknowledge receipt of my previous email with wiring instructions to return the bulk of the money I put in.  This is needed immediately for other activities toward the common goal.
Fred

# Exhibit 4



November 21, 2020

Ronald M. Jacobs

**T** 202.344.8215
**F** 202.344.8300
RMJacobs@Venable.com

*Via email to: catherine@truethevote.org*

Ms. Catherine H. Engelbrecht
True the Vote, Inc.
13909 Track Road East
Cat Spring, TX 78933

> Re:    *Return of Funds*

Dear Ms. Engelbrecht:

We represent Fred Eshelman with respect to the directed donations that he made to True the Vote, Inc. in the two weeks following the election, totaling $2.5 million. In short, and as Mr. Eshelman has previously requested, we ask that these funds be returned immediately. To that end, I will need an email this weekend (no later than 7:00 p.m. EST on Sunday, November 22, 2020) agreeing to the prompt return, *and* a wire transfer initiated Monday morning (10:00 a.m. EST) to return those funds, or we will have to take additional steps to collect those funds.

We understand that True the Vote may have engaged in some limited activities in furtherance of the specific projects for which Mr. Eshelman agreed to make a donation. With appropriate documentation and accounting, Mr. Eshelman is willing to allow True the Vote to retain some of the funds he donated. Given the lack of information provided to date about these activities, we anticipate this will be a relatively low number, but are willing to discuss. Please contact me immediately if True the Vote believes it is entitled to retain any of these funds so that we can maintain our timeline.

As should be clear from the prior correspondence you have had with Mr. Eshelman, no further funds should be expended from the money he donated. In addition, True the Vote must retain all necessary records to justify any funds that were expended previously.

If I do not receive confirmation that you intend to return the funds to Mr. Eshelman, and if we do not receive proof of a wire transfer on Monday morning, we will be forced to take legal action to obtain redress. Given the reasonable foreseeability of litigation, True the Vote must

# VENABLE LLP

Ms. Catherine H. Engelbrecht
November 21, 2020
Page 2

immediately take steps to preserve all hard-copy and electronically stored information that may contain evidence relevant to Mr. Eshelman's claims. True the Vote must also immediately cease all data destruction (scheduled or otherwise) and undertake efforts to prevent the destruction or disposition of hard-copy materials or electronically stored information that may contain relevant evidence.

We are hopeful that this matter can be resolved quickly and amicably. Please know, however, that Mr. Eshelman expects his money back immediately as he has other efforts he wishes to fund that have very short timelines. We look forward to your prompt response.

Sincerely,

Ronald M. Jacobs

cc:     Mr. Fredric N. Eshelman

# Exhibit 5

**From:**                 Catherine Engelbrecht <catherine@truethevote.org>
**Sent:**                  Sunday, November 22, 2020 5:38 PM
**To:**                     Jacobs, Ronald M.
**Subject:**               Re: Fred Eshelman Return of Funds

**Caution: External Email**

Dear Mr. Jacobs,

Since Mr. Eshelman asked for his money back, we have started to put together the costs and expenses of the project that he helped fund.

Unfortunately, we only have a few invoices and other receipts at this point, with many more forthcoming.  Most vendors bill monthly, so we don't expect to have complete information on what we have spent on the project this month until next month.

In addition, we have made commitments to many people, including whistleblowers, that we must fulfill.  And we have committed to activities that we must complete.

Finally, we have a invoice for one million dollars from Old Town Digital Agency, LLC, which Mr. Eshelman asked us to pay from his gift, which is not resolved.  We have contacted them to get information about this but have not heard back.  This invoice must be resolved before we are able to provide you a report of what we have spent so far on the project.

We have provided regular reports to Mr. Eshelman directly and through extensive communication with the people he said he is working with. I assure you that we have spent the money on the project we discussed with Mr. Eshelman.

I am happy to discuss this further with you, once we get all the information together, and I hope we can resolve this.

Sincerely,
Catherine Engelbrecht

On Sat, Nov 21, 2020 at 1:47 PM Jacobs, Ronald M. <RMJacobs@venable.com> wrote:

> Dear Ms. Engelbrecht:
>
>
> We represent Mr. Eshelman with respect to his directed donation to True the Vote, Inc. Please see that attached letter. I look forward to your prompt reply.
>
>
> Sincerely,
>
> Ron Jacobs

**Ronald M. Jacobs** | **Chair, Political Law Practice** | **Venable LLP**
**t** 202.344.8215 | **f** 202.344.8300 | **m** 202.329.4296
600 Massachusetts Avenue, NW, Washington, DC 20001

RMJacobs@Venable.com | www.Venable.com | www.PoliticalLawBriefing.com

*********************************************************************
This electronic mail transmission may contain confidential or privileged information. If
you believe you have received this message in error, please notify the sender by reply
transmission and delete the message without copying or disclosing it.
*********************************************************************

--

Catherine Engelbrecht
Founder, True the Vote

# Exhibit 6

**From:**            Jacobs, Ronald M.
**Sent:**            Sunday, November 22, 2020 7:44 PM
**To:**              Catherine Engelbrecht
**Subject:**         RE: Fred Eshelman Return of Funds

Dear Ms. Engelbrecht:

Thank you for your email. Mr. Eshelman expects a wire of at least $2 million first thing in the morning. Based on the limited reports that he has received, we cannot believe that True the Vote has committed more than $500,000. If we see the $2 million set to wire, we can hold off on filing the lawsuit in federal district court that we are preparing, which will seek a full refund, plus attorney's fees and damages. Thanks.

Sincerely,
Ron Jacobs

**Ronald M. Jacobs** | Chair, Political Law Practice | **Venable LLP**
t 202.344.8215 | f 202.344.8300 | m 202.329.4296
600 Massachusetts Avenue, NW, Washington, DC 20001

RMJacobs@Venable.com | www.Venable.com | www.PoliticalLawBriefing.com

**From:** Catherine Engelbrecht <catherine@truethevote.org>
**Sent:** Sunday, November 22, 2020 5:38 PM
**To:** Jacobs, Ronald M. <RMJacobs@Venable.com>
**Subject:** Re: Fred Eshelman Return of Funds

**Caution: External Email**

Dear Mr. Jacobs,

Since Mr. Eshelman asked for his money back, we have started to put together the costs and expenses of the project that he helped fund.

Unfortunately, we only have a few invoices and other receipts at this point, with many more forthcoming.  Most vendors bill monthly, so we don't expect to have complete information on what we have spent on the project this month until next month.

In addition, we have made commitments to many people, including whistleblowers, that we must fulfill.  And we have committed to activities that we must complete.

Finally, we have a invoice for one million dollars from Old Town Digital Agency, LLC, which Mr. Eshelman asked us to pay from his gift, which is not resolved.  We have contacted them to get information about this but have not heard back.  This invoice must be resolved before we are able to provide you a report of what we have spent so far on the project.

We have provided regular reports to Mr. Eshelman directly and through extensive communication with the people he said he is working with. I assure you that we have spent the money on the project we discussed with Mr. Eshelman.

I am happy to discuss this further with you, once we get all the information together, and I hope we can resolve this.

Sincerely,
Catherine Engelbrecht

On Sat, Nov 21, 2020 at 1:47 PM Jacobs, Ronald M. <RMJacobs@venable.com> wrote:

Dear Ms. Engelbrecht:

We represent Mr. Eshelman with respect to his directed donation to True the Vote, Inc. Please see that attached letter. I look forward to your prompt reply.

Sincerely,

Ron Jacobs

**Ronald M. Jacobs** | **Chair, Political Law Practice** | **Venable LLP**
**t** 202.344.8215 | **f** 202.344.8300 | **m** 202.329.4296
600 Massachusetts Avenue, NW, Washington, DC 20001

RMJacobs@Venable.com | www.Venable.com | www.PoliticalLawBriefing.com

*********************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
*********************************************************************

--

Catherine Engelbrecht
Founder, True the Vote

# Exhibit 7



600 MASSACHUSETTS AVE., NW    WASHINGTON, DC 20001
**T** 202.344.4000  **F** 202.344.8300   www.Venable.com

November 23, 2020

Ronald M. Jacobs

**T 202.344.8215**
**F 202.344.8300**
RMJacobs@Venable.com

*Via email to: catherine@truethevote.org*

Ms. Catherine H. Engelbrecht
True the Vote, Inc.
13909 Track Road East
Cat Spring, TX 78933

Re:    *Notice of Claim and Pre-Suit Demand*

Dear Ms. Engelbrecht:

I write subsequent to my e-mail correspondence dated November 22, 2020. Despite our reasonable request that True the Vote return at least $2 million of Mr. Eshelman's conditional gifts totaling $2.5 million by wire transfer this morning, no such wire transfer has materialized. In light of True the Vote's repeated failure to comply with Mr. Eshelman's requests for repayment, this will serve as notice of our intent to file suit against True the Vote in federal court tomorrow, Tuesday, November 24, if True the Vote fails to remit $2 million to Mr. Eshelman by wire transfer before 5 p.m. EST today.

First, a summary of the underlying facts. Immediately after the November 3rd general election, Mr. Eshelman decided to support efforts to investigate allegations of illegal and fraudulent conduct in connection with the 2020 general election. Following conversations with you about True the Vote's plan to pursue such investigations and to bring related litigation, Mr. Eshelman agreed on November 5th to donate $2 million to True the Vote on the condition that the funds would be used exclusively to fund its "Validate the Vote 2020" initiative.[1] Mr. Eshelman caused those funds to be wired to True the Vote that same day. Eight days later, on November 13th, Mr. Eshelman agreed to give True the Vote an additional $500,000 – again on the condition that those funds would be used to fund the Validate the Vote 2020 efforts.

---

[1] A one-page summary of that initiative circulated by True the Vote to Mr. Eshelman is attached hereto as <u>Exhibit A</u>.



Ms. Catherine H. Engelbrecht
November 23, 2020
Page 2

Between November 5th and November 16th, Mr. Eshelman and his team repeatedly sought substantive updates on the status of the Validate the Vote 2020 efforts, including investigation, litigation, and communication strategy in key states. Those requests, however, were met with platitudes and empty promises of follow-up. After eleven days with little progress and a rapidly approaching deadline for certification of election results, Mr. Eshelman called a meeting on November 16th with you and other individuals affiliated with True the Vote in order to develop a comprehensive strategy to accomplish the goals of the Validate the Vote 2020 effort. Unfortunately, that call proceeded just as so many before and ended without any meaningful action items or next steps. All the while, time marched on.

Following the November 16th meeting, it became clear that True the Vote had wasted too much time and would be unable to execute the ambitious plans that Mr. Eshelman had agreed to fund. Accordingly, Mr. Eshelman sent you an e-mail early on November 17th to request that True the Vote refund the balance of his $2.5 million donation and provide an accounting of all funds spent out of that $2.5 million. Mr. Eshelman's e-mail made clear his expectation that any such expenditures "should be de minimis since nothing was accomplished over the 10 or so days" as well as his expectation that True the Vote would provide a "prompt response."[2]

Consistent with True the Vote's dilatory conduct that initially led Mr. Eshelman to seek the return of his directed donation, 48 hours passed without any action or response to Mr. Eshelman's request. Given other organizations' immediate need for funds to pursue similar activities, Mr. Eshelman followed up with you early on November 19. Specifically, he requested that you "[p]lease acknowledge receipt of my previous email with wiring instructions" and that you "return the bulk of the money" he had conditionally donated to True the Vote.[3]

Again, 48 hours passed without a response from you or anyone affiliated with True the Vote. Given True the Vote's refusal to respond to Mr. Eshelman's correspondence, I wrote you to specifically request that True the Vote confirm by 7 p.m. EST on November 22 that it would agree to promptly return Mr. Eshelman's $2.5 million by wire transfer initiated by 10 a.m. EST on Monday, November 23. My November 21 letter further underscored that time was of

---

[2] A copy of Mr. Eshelman's November 17 e-mail is attached hereto as <u>Exhibit B</u>.
[3] A copy of Mr. Eshelman's November 19 e-mail is attached hereto as <u>Exhibit C</u>.



Ms. Catherine H. Engelbrecht
November 23, 2020
Page 3

the essence, noting that "Mr. Eshelman expects his money back immediately as he has other efforts he wishes to fund that have very short timelines."[4]

Less than an hour and a half before 7 p.m. on November 22, you responded to my letter via e-mail without indicating whether True the Vote would agree to return the balance of Mr. Eshelman's $2.5 million in donations.[5] Instead, your e-mail again sought to kick the can down the road. While it notes that True the Vote has "started to put together the costs and expenses of the project" and has "spent the money on the project [you] discussed with Mr. Eshelman," you also note without any specificity that True the Vote does not "expect to have complete information on what [it has] spent on the project this month until next month," that True the Vote has "made commitments to many people, including whistleblowers, that [it] must fulfill," and that True the Vote has "committed to activities that we must complete."[6]

Shortly after receiving your November 22 e-mail, I responded by e-mail noting Mr. Eshelman's expectation that True the Vote would wire at least $2 million to him first thing today, November 23.[7] I also noted that we were highly skeptical that more than $500,000 of Mr. Eshelman's $2.5 million in directed contributions had been committed based on the limited reports Mr. Eshelman has received to-date. Again, True the Vote failed to comply with that request.

Given True the Vote's repeated refusal to comply with Mr. Eshelman's time-sensitive requests for return of the balance of his $2.5 million in gifted funds and the urgent need for those funds to support other election-related projects, True the Vote has left us no choice but to pursue legal redress to obtain those funds. As noted above, we intend to file complaint in federal court against True the Vote on Tuesday, November 24. We expect that complaint will allege claims for breach of contract, conversion, and violation of the Texas Deceptive Trade Practices Act. We intend to seek a full refund of the $2.5 million in conditional gifts that Mr. Eshelman gave to True the Vote as well as damages and attorney's fees. We also intend to

---

[4] A copy of my November 21 correspondence is attached hereto as <u>Exhibit D</u>.

[5] A copy of your November 22 e-mail is attached hereto as <u>Exhibit E</u>.

[6] To the extent your November 22 e-mail references an invoice for $1 million from Old Town Digital Agency, LLC, we understand that invoice has been cancelled since the time for communications is over and True the Vote never requested Old Town Digital to perform any of the contemplated services.

[7] A copy of my November 22 e-mail is attached hereto as <u>Exhibit F</u>.



Ms. Catherine H. Engelbrecht
November 23, 2020
Page 4

seek equitable relief to preserve the status quo and to prevent any further disbursement of Mr. Eshelman's funds.

As you are no doubt aware, Texas law provides that donors have the right to revoke a gift whenever the gift remains "conditional on a future act." *Oadra v. Stegall*, 871 S.W.2d 882, 891-92 (Tex. App. 1994). That right has been recognized even where possession of the allegedly gifted property has been transferred to the purported donee. *Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App. 1973). Here, there appears to be no dispute that Mr. Eshelman's gifts were made contingent on their use to fund the Validate the Vote 2020 effort or that those efforts remain largely unfulfilled.[8] Since the conditions on Mr. Eshelman's gifts have not been satisfied, he retains the right to revoke his conditional gift. Again, there can be no reasonable dispute that Mr. Eshelman has requested his funds be returned four times now.[9] Accordingly, there can be no doubt that the gift is not valid. To the extent True the Vote disagrees, it will be burdened to prove a valid gift by *clear and convincing evidence*. *Oadra*, 871 S.W.2d at 891.

In similar circumstances, other courts have held that a non-profit entity's failure to abide by a condition on a directed donation amounts to a breach of the underlying gift agreement remediable by a return of the gifted funds. *Adler v. SAVE*, 74 A.3d 41, 43 (N.J. App. Div. 2013); *Tennessee Div. of United Daughters of the Confederacy v. Vanderbilt Univ.*, 174 S.W.3d 98, 119 (Tenn. Ct. App. 2005). Those courts have so held even where "the conditions that existed at the time of the gift may have materially changed, making the fulfillment of the donor's condition either impossible or highly impractical." *Adler*, 74 A.3d at 43. Since True the Vote has failed to comply with the conditions on Mr. Eshelman's $2.5 million gift – that is, that the funds would be used in support of the Validate the Vote 2020 activities as originally outlined in Exhibit A – there can be no doubt that True the Vote is obliged to return those funds.

Because True the Vote has no legal or equitable right to retain Mr. Eshelman's $2.5 million in conditional gifts, they must be returned immediately. Failure to do so will give rise to claims for conversion, breach of the gift agreement between Mr. Eshelman and True the Vote, and violation of the Texas Deceptive Trade Practices Act. If Mr. Eshelman were to prevail on those claims – which we expect he would – he would be entitled not only to repayment of the $2.5 million in conditional gifts, but also to damages under  as well as attorneys' fees under Texas Business & Commerce Code § 17.50(d) (breach of Deceptive Trade Practices Act), Texas

---

[8] *See* Ex. E ("I assure you that we have spent the money on the project we discussed with Mr. Eshelman.")
[9] *See* Exs. B, C, D, F.



Ms. Catherine H. Engelbrecht
November 23, 2020
Page 5

Civil Practice & Remedies Code § 38.001 (breach of contract), and Texas Civil Practice &
Remedies Code § 37.009 (declaratory judgments).

We remain hopeful that this matter can be resolved quickly and amicably. That cannot occur,
however, if True the Vote refuses to return Mr. Eshelman's funds. Given Mr. Eshelman's
desire to use those funds in connection with other election-related efforts with very short
timelines, time is of the essence. Accordingly, we will have no choice but to seek judicial
intervention if we cannot reach a resolution before 5 p.m. EST today. I look forward to your
prompt response.

Sincerely,

Ronald M. Jacobs

cc:    Mr. Fredric N. Eshelman

# Exhibit 8

JAMES BOPP, JR.
jboppjr@aol.com

———————————

MELENA S. SIEBERT
msiebert@bopplaw.com

# THE BOPP LAW FIRM, PC
## ATTORNEYS AT LAW

THE NATIONAL BUILDING
1 South Sixth Street
TERRE HAUTE, INDIANA 47807-3510
Telephone 812/232-2434   Facsimile 812/235-3685
www.bopplaw.com

———————————

November 23, 2020
Via email to: RMJacobs@venable.com

Mr. Ronald M. Jacobs                    Re:    True the Vote, Inc.
Venable LLP
500 Massachusetts Ave., NW
Washington, DC 20001

Dear Mr. Jacobs:

We represent Ms. Engelbrecht with respect to the $2.5 million donation True the Vote, Inc. received from Mr. Eshelman. Please direct all communications regarding this matter to us.

Our client has advised us that she has been trying to resolve this issue with your client, but has been unable to do so to this point. After receiving your client's initial request for a refund of his entire $2.5 million donation, our client responded via email to you that True the Vote was still gathering details of the costs and expenses of the project, including commitments made to whistleblowers and others involved in True the Vote's project. In an email on November 22, 2020, you responded via email that your client expected at least $2 million of the $2.5 million donation to be returned by the morning of November 23, 2020.

True the Vote, Inc. also received an invoice from Old Town Digital Agency, LLC. Ms. Engelbrecht inquired as to what agreement or services this invoice was based upon, as she was unaware of any specific services that had been provided to date from Old Town Digital Agency, LLC. On November 23, 2020, Ms. Engelbrecht received an email from Dikran Yacoubian that this invoice was canceled.

After reviewing the expenses and obligations incurred regarding this project, including commitments made to whistleblowers, our client is prepared to offer your client a return of $1 million of his donation to True the Vote, Inc. This return will be contingent upon your client, and others he is associated with, to enter into a written agreement to waive any claims regarding the donation by Mr. Eshelman to True the Vote, and regarding the Old Town Digital Agency, LLC's $1 million invoice and any agreement with True the Vote.  Furthermore, this return is contingent on Mr. Eshelman's and Old Town Digital Agency LLC's agreement not to file suit against True

Mr. Ronald M. Jacobs
November 23, 2020
Page 2

the Vote, Inc. while the written agreement is being finalized. True the Vote, Inc. will wire the $1 million refund to Mr. Eshelman within 24 hours of the execution the written agreement.

Given the reasonable foreseeability of litigation if no settlement can be reached, Mr. Eshelman and Old Town Digital Agency, LLC must immediately take steps to preserve all hard-copy and electronically stored information that may contain evidence relevant to the donation by Mr. Eshelman to True the Vote, and regarding the Old Town Digital Agency, LLC's $1 million invoice and any agreement with True the Vote. Likewise, Mr. Eshelman and Old Town Digital Agency, LLC must also immediately cease all data destruction (scheduled or otherwise) and undertake efforts to prevent the destruction or disposition of hard-copy materials or electronically stored information that may contain relevant evidence.

We hope that this matter can be resolved quickly and amicably. Please respond to True the Vote, Inc.'s offer of the refund of $1 million of Mr. Eshelman's donation in lieu of litigation by noon on Tuesday, November 24, 2002. We look forward to your prompt response.

CC: Ms. Catherine Engelbrecht

Sincerely,

THE BOPP LAW FIRM, PC

James Bopp, Jr.
Melena S. Siebert